**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA,<br>By and through its Attorney General, JEFF LANDRY; <br><br>PLAINTIFF,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;<br><br>MICHAEL S. REAGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency;<br><br>LILIAN S. DORKA, in her official capacity as Director of EPA's External Civil Rights Compliance Office;<br><br>The UNITED STATES DEPARTMENT OF JUSTICE;<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States of America;<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; and<br><br>The UNITED STATES OF AMERICA;<br><br>DEFENDANTS. | CIVIL ACTION NO. _____ |

**COMPLAINT**

The State of Louisiana (the "State") brings this civil action against the above-listed Defendants for declaratory and injunctive relief, vacatur, and other appropriate relief and alleges as follows:

1

## INTRODUCTION

1.      This suit challenges the Executive's fundamental transgressions of the Constitution, the Clean Air Act, and the Civil Rights Act of 1964. EPA has remarkably managed to (1) unconstitutionally delegate the sovereign authority it actually possesses to private special interest groups while (2) simultaneously arrogating to itself powers never given to it by Congress. The governmental powers that Congress gave the agency have thus been illegal given away to non-governmental groups, while those that Congress never saw fit to give the agency have been unlawfully usurped. The State seeks to remedy these violations through this suit.

2.      Along the way, EPA officials have lost sight of the agency's actual environmental mission, and instead decided to moonlight as a social justice warriors fixated on race. To that end, EPA officials declare compliance with environmental law and actual environmental standards is not enough: to avoid loss of federal funds, States must also satisfy EPA's increasingly warped vision of "environmental justice" and "equity."

3.      EPA is doing so by putatively enforcing Title VI of the Civil Rights Act of 1964 ("Civil Rights Act"). But Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). All of EPA's relevant actions, however, have nothing to do with intentional racial discrimination (which is not even alleged). Instead, EPA is relying on a "disparate impact" theory to expand its authority far past enforcement of actual environmental standards into imposing its amorphous vision of "justice" upon the American public.

4.      To be sure, the State does not quarrel in the slightest with Title VI's requirement that it refrain from engaging in intentional racial discrimination. Discrimination on the basis of race is fundamentally antithetical to the Fourteenth Amendment: "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (cleaned up).

5.    The State, however, objects to Defendants' attempts to impose disparate-impact-based requirements on the State—which effectively *compel* the State to *discriminate* on the basis of race. *See, e.g., Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (Disparate-impact requirements "not only permit[] but affirmatively *require*[] [race-based discrimination] when a disparate-impact violation *would* otherwise result.").

6.    Activities that would be perfectly lawful under environmental law are thus now threatened because EPA believes those activities occur proximate to the "wrong" racial groups. EPA does not bother to deny that it would be unconcerned if the *exact same emissions* occurred in areas with differing racial demographics. But EPA has nonetheless arrogated to itself the authority to decide whether otherwise-lawful emissions are affecting the "right" racial groups. Put succinctly, EPA frequently does not care about the content of air and water emissions, but only the color of the skin of those proximate to them. That dystopian nightmare violates the Civil Rights Act.

7.    Nor would the intended beneficiaries of EPA's actions have much to celebrate: EPA intends to render large swaths of them unemployed not because of any threatened violation of *environmental* law, but instead because EPA believes that "environmental justice" is best served by inflicting a disparate economic injury on them in the form of substantial unemployment—all to prevent putative disparate environmental impacts that would otherwise be completely lawful if they affected communities with different racial compositions. EPA's paternalistic view that Louisiana citizens are best served by the agency disproportionately rendering them unemployed is as dubious as it is illegal.

8.    EPA is further not content to impose only those requirements actually found in its regulations. Instead, EPA officials have been perfectly clear that they intend to impose mandates found *nowhere* in their actual regulations, and instead invented wholecloth by mid-level employees on an *ad hoc* basis. Such an approach would be obviously *ultra vires* in any context, as agencies may only

impose legal requirements by undergoing the processes mandated by the Administrative Procedure Act ("APA").

9.      That approach is even more profoundly unlawful here. Title VI of the Civil Rights Act. Section 602 of that act specifically provides that "[n]o such rule, regulation, or order [implementing Title VI] shall become effective *unless and until approved by the President*." 42 U.S.C. § 2000d-1 (emphasis added). But the wholecloth inventions of mid-level EPA bureaucrats have not even arguably been approved by the President, and thus are unequivocally without legal force.

10.      Despite the patent illegality of these unratified, extra-regulatory requirements, EPA has been perfectly clear that it intends to impose them on the State. Because the plain language of Section 602 and the APA is apparently insufficient to stop EPA's unlawful attempts to impose invented mandates, the State seeks a judgment from this Court that will do so.

11.      EPA first sought to use Clean Air Act permits for two facilities in St. John Parish: (1) the Denka Performance Elastomer LLC - Pontchartrain Plant ("Denka Facility") and the FG LA LLC facility (the "Formosa Facility") as the vehicle for its illegality. Those facilities provide hundreds of jobs in an economically struggling community.

12.      The Louisiana Department of Environmental Quality ("LDEQ") granted permits under the Clean Air Act ("CAA") to both facilities on January 6, 2020, pursuant to its permitting authority under CAA Title V, which establishes a cooperative federalism framework.

13.      EPA has not taken issue with substance of those permit grants under the CAA. Indeed, EPA has admitted that LDEQ "follow[ed] the environmental law" in granting the permits. Instead, EPA has employed its authority under Title VI of the Civil Rights Act to challenge undefined parts of the process used to issue those permits.

14.     EPA made clear that it seeks to impose its illegality statewide, including on permits in this district. Indeed, EPA recently demanded that LDEQ provide a vast quantity of information about its activities statewide.

15.     In doing so, EPA has dramatically overstepped its bounds, violating both the Constitution and the statutory provisions at issue. Defendants' legal violations here broadly fall within three categories.

16.     **First Set of Violations: Private Non-Delegation Doctrine.** *First*, EPA has violated the private non-delegation doctrine by delegating sovereign governmental powers to private special interest groups.

17.     Title VI mandates that no enforcement action may be "taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the [applicable Title VI] requirement and *has determined that compliance cannot be secured by voluntary means.*" 42 U.S.C. § 2000d-1 (emphasis added). EPA's Title VI regulations similarly mandate that the agency "shall attempt to resolve complaints *informally whenever possible.*" 40 C.F.R. § 7.120 (emphasis added).

18.     Title VI and EPA's regulations thus mandate that EPA attempt to secure compliance through (a) "voluntary means" and (b) "informally" whenever such measures might be effective. *See* 42 U.S.C. § 2000d-1; 40 C.F.R. § 7.120.

19.     EPA, however, has partially given away its power to achieve compliance through voluntary compliance and informal means—and thus abdicated its duty to do so. Specifically, EPA has given private organizations the power to veto continuation of informal resolution discussion that last more than 180 days—even where EPA itself believes that it is still possible (or even *likely*) to achieve voluntary compliance through informal procedures, and despite EPA publicly acknowledging that 180 days is often not enough time to resolve complex environmental matters.

20.     EPA acquiesced to a judgment and amended judgment with the Sierra Club, Californians for Renewable Energy, and other organizations (hereinafter, "Private Special Interest Groups"), *see Californians for Renewable Energy v. EPA*, No. 4:15-cv-3292 (N.D. Cal. June 13, 2018) (Doc. 116); *id.* (Doc. 145) (N.D. Cal. Oct. 2, 2020) requiring EPA to "issue preliminary findings and any recommendations for voluntary compliance, or otherwise resolve the complaint, within 180 days of the date of acceptance."

21.     EPA's agreement to such 180-day timelines was a promise that the agency could, at best, rarely keep. EPA *itself* has previously admitted that 180-day deadlines were "unrealistic," "inflexible," and "impracticable given the inherent scientific complexity associated with determining which and how populations are impacted by environmental pollutants; the number of discrimination allegations and theories that may be asserted in any one complaint under Title VI or the other non-discrimination statutes; and the volume of the complaints received." EPA, *Nondiscrimination in Programs or Activities Receiving Federal Assistance from the Environmental Protection Agency*, 80 Fed. Reg. 77284, 77,287 (Dec. 14, 2015).

22.     Thus, by EPA's own admission, it frequently cannot reach a rational, non-arbitrary determination within 180 days as to whether: (1) compliance can "be secured by voluntary means," as Title VI requires, 42 U.S.C. § 2000d-1, and whether issues can be resolved "informally," as its own regulations require, 40 C.F.R. § 7.120.

23.     But through the regulation and the acquiesced judgment, EPA has delegated away its authority to continue informal proceedings beyond 180 days *unless* the Private Special Interest Groups consent. In doing so, EPA has given *non*-governmental actors control over how *federal executive power* is exercised. Specifically, EPA has delegated away its authority to continue seeking compliance through voluntary/informal means beyond 180 days if the Private Special Interest Groups decide to veto such action.

24.     A simple example demonstrates the inversion here. Under EPA's view of its governing legal authority, if President Biden expressly commanded EPA to continue informal negotiations beyond 180 days, but the Private Special Interest Groups exercised their veto, EPA would be legally compelled to obey the Private Special Interest Groups over a contrary presidential order. Absent invalidation of these unconstitutional delegations, EPA is subordinate to private groups even at the expense of the President's authority.

25.     The dispute about the Denka and Formosa Facilities bears this out. EPA has been perfectly clear in negotiations with the State that *it* was willing—and desired to—to continue informal proceedings beyond 180 days and thus believed that voluntary/informal resolution was still reasonably achievable. But EPA was equally clear that it was submitting the matter to the Private Special Interest Groups for their approval and, if their veto was exercised, EPA would abide by their decision as to whether EPA should extend informal negotiations.

26.     On March 2, 2023, EPA specifically told State officials that that continued informal negotiations were dependent on securing the approval of the Private Special Interest Groups and that the informal proceedings would end without that approval.

27.     On March 8, 2023, EPA notified State officials that it had secured the approval of the Private Special Interest Groups and thus could exercise its own judgment that continued informal negotiations were warranted. EPA further made clear that securing the Private Special Interest Groups' agreement/non-veto came at a price: EPA shared with the groups drafts of proposed agreements it had sent to the State to resolve the Title VI complaints. EPA made clear the quid-pro-quo by telling State officials that the agency "did not think it was a very high price … in order to get a 120-day extension for the purpose of continuing what we think is a very productive discussion [and] negotiation."

28.     These through exchanges, EPA officials removed any possible ambiguity as to the situation here: private groups have been given control over how federal governmental power is to be exercised. Absent the consent of the Private Special Interest Groups, EPA would have been compelled to terminate informal negotiations even if the agency itself believed that it was wiser governmental policy to continue them (as its officials made clear was the case).

29.     This delegation of veto power to the Private Special Interest Groups squarely violates the private non-delegation doctrine. For nearly a century the Supreme Court has made clear that conferring governmental powers on private organizations is "is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

30.     The Fifth Circuit has reiterated these principles recently: "While the [Supreme] Court has allowed limited delegations of authority to government agencies, it has set its face against giving public power to private bodies." *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (citation omitted) (invalidating statute under the private non-delegation doctrine). Indeed, "[n]ot content merely to reject the idea, the Court has also called it insulting names." *Id.*; *see also id.* ("[C]onferring power on private persons is 'legislative delegation in its most obnoxious form' (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).

31.     To be sure, private organizations can serve a role in the administrative process as long as they are *subordinate* to the agency: "Congress may formalize the role of private parties in proposing regulations so long as that role is merely as an aid to a government agency that retains the discretion to approve, disapprove, or modify them. If the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional." *Id.* at 881 (cleaned up) (citation omitted)).

32.     Here EPA has turned these principles on their head: The Private Special Interest Groups do "not function subordinately" to EPA, but rather EPA has rendered itself *subordinate* to them: *EPA* may not exercise governmental power in a manner it deems prudent *unless* it secures the approval of those private groups.

33.     By rendering itself subordinate to private organizations as to how its governmental enforcement authority should be exercised, EPA has acted in a manner "'utterly inconsistent'" with the Constitution. *Id.* at 880 (quoting *Schechter Poultry*, 295 U.S. at 537). And to the extent that subordination flows from an "arbitrary" and "unrealistic" self-imposed regulatory deadline, that deadline itself is arbitrary, capricious, and contrary to law.

34.     **Second Set of Violations: Imposing Disparate-Impact-Based Requirements In Contravention of Title VI.** *Second*, EPA's attempt to impose disparate-impact-based requirements under Title VI on the State (and innumerable other entities) violates Title VI itself and exceeds the Executive's authority under that statute and the Constitution. Title VI bans *only* intentional discrimination. The attempt by EPA, the U.S. Department of Justice ("DOJ"), and other agencies to impose *disparate-impact*-based liability under Title VI squarely violates that provision and the Constitution, and further exceeds the authority that the Executive possesses under Title VI.

35.     The Supreme "Court has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003).

36.     "Disparate treatment [*i.e.*, intentional discrimination] is the most easily understood type of discrimination. The [decision-maker] simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic. Liability in a disparate-treatment case depends on whether the protected trait ... actually motivated the [decision-maker] decision." *Id.*

37.     "By contrast, disparate-impact claims 'involve [challenged] practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business [or policy] necessity. Under a disparate-impact theory of discrimination, a facially neutral … practice may be deemed illegally discriminatory without evidence of the [decision-maker's] subjective intent to discriminate that is required in a 'disparate-treatment' case." *Id.* at 52-53 (cleaned up) (citations omitted).

38.     These approaches are fundamentally distinct, and "courts must be careful to distinguish between these theories." *Id.* at 53; *see also Ricci*, 557 U.S. at 595-96 (noting intentional-discrimination and disparate-impact theories are often at "war" with each other).

39.     "It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurral). But far from having any apparent aversion to such sordidness, EPA has an unmistakable appetite for it. And Defendants are employing their putative authority to impose disparate-impact-based requirements under Title VI to serve those distasteful ends.

40.     EPA's policies squarely mandate "divvying us up by race." *Id.* EPA divides racial groups into favored and disfavored groups. As to the latter, "mere" compliance with *all* existing environmental standards is sufficient to grant permits or approvals. In other words, for those without preferential status, compliance with all *environmental* standards is sufficient to satisfy *environmental* law. But for those higher up in EPA's intersectional pyramid, EPA will impose additional mandates based purely on the racial composition of the relevant groups, rather any race-neutral standard of environmental protection.

41.     Nor does EPA make any pretext of even-handedness: only disparate impacts affecting certain racial groups concern the agency. Those groups further down the agency's intersectional pyramid can at best expect apathy from the agency.

42.     None of this is subtle or disputed: EPA loudly asserts that it has authority to impose heightened requirements based purely on the racial composition of the individuals at issue, and will fervently engage in the "sordid business [of] divvying us up by race," unless courts prevent them from doing so. *Id.* Because Title VI provides EPA no authority to engage in the sort of intentional racial discrimination, this Court should do so.

43.     Section 601 of the Civil Rights Act provides the operative prohibition for Title VI of the Civil Rights Act: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

44.     The Supreme Court long ago held that Title VI prohibits *only* intentional discrimination. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978). Indeed, it has long been "beyond dispute … that § 601 prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). *Accord Alexander v. Choate*, 469 U.S. 287, 293 (1985) ("Title VI itself directly reached only instances of intentional discrimination.").

45.     Standing alone Section 601 thus unequivocally does not provide *any* basis for imposing *disparate-impact-based* mandates. Its prohibition is purely for intentional discrimination.

46.     Defendants have instead looked to Section 602 to foist disparate-impact requirements on the States and other federal grant recipients. That section provides the agencies giving "financial assistance … by way of grant, loan, or contract … [are] authorized and directed to effectuate [Section 601] … by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d.

47.     The question thus becomes whether agencies can "effectuate" Section 601—a provision prohibiting *only* intentional discrimination—by creating an *entirely distinct* theory of liability in the form of disparate-impact requirements.

48.     The Supreme Court has never resolved this issue, and has explicitly recognized it as an open one. The Court in *Sandoval* thus "assume[d] for the purposes of deciding this case that the DOJ and DOT regulations proscribing activities that have a disparate impact on the basis of race are valid." *Sandoval*, 532 U.S. at 282. That assumption has never been tested again in the Supreme Court.

49.     *Sandoval* held that there was no private cause of action to enforce any disparate-impact regulations issued under Section 602, however. *Id.* at 293. As a likely result of the unavailability of private enforcement, this issue has not reached the Supreme Court again.

50.     Under straightforward interpretive principles and precedent, however, Defendants lack authority under Section 602 to impose disparate-impact based mandates.

51.     Defendants' authority under Section 602 is limited solely to "effectuat[ing]" Section 601. And it is incontestable that Section 601 itself only bars intentional discrimination. Defendants cannot "effectuate" Section 601 by transmuting it into something that it unequivocally is not. That is an act of mythological alchemy, not agency "effectuation" of a statute.

52.     The Supreme Court has "consistently recognized [the] distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact." *Raytheon*, 540 U.S. at 52.

53.     The Executive cannot effectuate an intentional-discrimination standard by obliterating one of its crucial features and expanding it to encompass something that the Supreme Court has long recognized *it is not*.

54.     The Executive's lack of authority to "effectuate" Section 601 by imposing disparate-impact-based requirements is underscored by the fact that intentional-discrimination and disparate-impact standards are not merely (and fundamentally) distinct from each other, but also in substantial—often even irreconcilable—tension with one other. "[D]isparate-impact provisions place a racial thumb on the scales, often requiring [decision-makers] to evaluate the racial outcomes of their

policies, and *to make decisions based on (because of) those racial outcomes*. That type of racial decisionmaking is, as the Court explains, *discriminatory*." *Ricci*, 557 U.S. at 595-96 (2009) (Scalia, J., concurring) (emphasis added). Intentional-discrimination and disparate-impact standards are thus often at "war" with each other. *Id.*

55.     Given that "war" between the standards, an agency cannot "effectuate" Title VI's prohibition on intentional discrimination by imposing disparate-impact-based mandates. That is akin to "effectuating" the United States' policy of supporting Ukraine in the Russia-Ukraine War by giving arms to Russia.

56.     The Fifth Circuit's decision in *Kamps v. Baylor University*, 592 F. App'x 282 (5th Cir. 2014) all-but compels a conclusion that Defendants' disparate-impact-based standards violate Title VI.

57.     *Kamps* rejected Department of Energy ("DOE") regulations purporting to create disparate impact liability for individuals with disabilities. *Kamps v. Baylor Univ.*, 592 F. App'x 282, 285 (5th Cir. 2014). The Fifth Circuit reasoned that "[w]hen Congress wants to allow disparate impact claims, *it uses particular language*," and cited to such particular language in Title VII and the Age Discrimination in Employment Act ("ADEA"). *Id.* (emphasis added). But the "ADA lack[ed] any such language," and hence DOE regulations could not create disparate-impact-based requirements. *Id.* Crucially here, Title VI also has no such "particular language."

58.     *Kamps* further explicitly recognized as much: "the ADA's prohibition *is almost identical to Title VI* of the Civil Rights Act, which prohibits only intentional discrimination." *Id.* (emphasis added).

59.     Under the reasoning of *Kamps*, regulations imposing disparate-impact liability under Title VI are invalid.

60.     The invalidity of Defendants' disparate-impact Title VI regulations is further sup-
ported by the major questions doctrine. That doctrine recognizes that "[e]xtraordinary grants of reg-
ulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'"
*West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Here, Congress carefully restricted Title VI's
prohibition purely to intentional discrimination. *Sandoval*, 532 U.S. at 280.

61.     Defendants' contention that the power to "effectuate" that intentional-
discrimination prohibition by imposing disparate-impact-based liability is precisely the sort of
"hid[ing] elephants in mouseholes" reasoning that the doctrine forbids. *Whitman v. Am. Trucking As-
sociations*, 531 U.S. 457, 468 (2001).

62.     Indeed, the question of whether Section 602 authorizes Defendants to impose dis-
parate-impact-based requirements satisfies *all three* of the independent triggers for the major ques-
tions doctrine: (1) it involves a "matter of great political significance," (2) "it seeks to regulate a sig-
nificant portion of the American economy," and (3) it "intrud[es] into an area that is the particular
domain of state law," *i.e.*, commanding states to regulate in a manner that avoids disparate impacts.
*West Virginia*, 142 S. Ct. at 2620-21 (Gorsuch, J., concurring) (cleaned up) (collecting cases).

63.     But even if Section 602 could bear Defendants' construction under ordinary princi-
ples of statutory interpretation (and the major questions doctrine notwithstanding), Defendants' at-
tempt to bind the States to disparate-impact-based requirements is unlawful because it exceeds the
federal government's power under the Constitution. In particular, it violates the Spending Clause,
which demands *inter alia* that if the federal government wishes to impose conditions on the States
through spending programs—such as through Title VI—then those conditions must be "unambig-
uous" in the statute itself. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987); *accord Arlington Cent. Sch.
Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (States can only be bound to conditions under
the Spending Clause where Congress has provided "clear notice regarding the liability at issue.").

64.     Section 601 unambiguously forbids only intentional discrimination. *Sandoval*, 532 U.S. at 280. It thus provides no "unambiguous" notice to States that accepting federal funds would bind them to disparate-impact-based requirements. Indeed, by its own terms it unambiguously does *not* impose any such requirements.

65.     And even if, contrary to the reasoning above, Section 602's bare "effectuate" text could otherwise be read to supply authority to impose disparate-impact-based requirements, it certainly does not do so *unambiguously*. As a result, the States cannot be bound by the Executive's attempt to exploit Congress's Spending Clause power to impose disparate-impact-based requirements on the States.

66.     Nor can agencies supply the requisite unambiguous clarity for conditions. The Fifth Circuit has explicitly they lack constitutional authority to do so. *See Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361-62 (5th Cir. 2021) ("The needed clarity cannot be so provided [by regulation]—it must come directly from the statute."); *see also Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (adopting opinion of Luttig, J., dissenting at panel-stage).

67.     Even aside from its illegality, imposing disparate-impact mandates under Title VI is frequently disastrous policy—even for the racial group that the agency is attempting to assist. *See also Rollerson*, 6 F.4th at 650 (Ho, J., concurring) ("Citizens are understandably skeptical when government officials claim that they're just here to help—but then declare that up is down, left is right, race consciousness is good, and race neutrality is bad.") (Title VI case).

68.     For example, when the Department of Education imposed disparate-impact-based requirements on school discipline, the results were calamitous for all involved. Schools predictably reacted by drastically reducing suspensions and vastly increasing the threshold for imposing them. For example, the Oklahoma City School District reduced its number of suspensions by 42.5% and

teachers were told suspensions would not be handed down unless there was literal bloodshed.[1] Disparate-impact-based policies similarly produced disaster in Lafayette Parish, Louisiana.[2] The end result was to exacerbate disruptions in the classroom, which had the perverse effect of disproportionately making it harder for minority students to learn—the group that the Education Department paternalistically was purporting to *assist*.[3] But the federal government's action *itself* perversely inflicted a disparate burden on minority students' educations.

69.     That would be the case here too: in the name of benefiting African Americans in the Baton-Rouge-New-Orleans region through reduced air emissions, EPA would in fact be creating substantial economic disruption and unemployment that would disproportionately fall upon the very African Americans that EPA is purporting to help. And such "assistance" would be in spite of the fact that EPA does not contest either that (1) the State has not engaged in any intentional racial discrimination and (2) the State has otherwise complied with all actual *environmental* (*i.e.*, non-"equity"-based) standards.

70.     Those economic benefits are why local officials elected by the residents support the facilities and celebrated when the Denka facility opened a new corporate office:

---

[1] *See, e.g.*, Heriot, Gail & Somin, Alison *The Department of Education's Obama-Era Initiative on Racial Disparities in School Discipline: Wrong For Students and Teachers, Wrong on the Law* (hereinafter, *"School Disciple"*), 22 Tex. Rev. L. & Pol. 471, 496-97 (Spring 2018) (Teachers "were told that referrals would not require suspension unless there was blood.'" (quoting The Oklahoman Editorial Board, *Survey Shows Disconnect Between OKC School District and Its Teachers,* OKLAHOMAN (Nov. 4, 2015), *http://newsok.com/article/5457999[https://perma.cc/75JR-DQEC]*.)

[2] *Id.* at 499-50.

[3] *Id.* at 495-507.



71.     EPA's purported solicitude for helping minorities thus does not extend to actually listening to what they or their elected leaders have to say. Instead, EPA paternalistically "knows" what is best for them and intends to impose it upon them whether they like it or not.

72.     ***Third Set of Violations: EPA's Policy Of Imposing Extra-Regulatory, Unratified Requirements.*** EPA's actions suffer a final legal infirmity: the agency's attempt to invent new Title VI mandates on the fly is patently illegal.

73.     Section 602 provides agencies with authority to "issu[e] rules, regulations, or orders of general applicability [to effectuate Section 601] which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." U.S.C. § 2000d-1. "No such rule, regulation, or order shall become effective *unless and until approved by the President*," however. *Id.* (emphasis added).

74.     EPA notably has a set of Title VI regulations, which are codified at 40 C.F.R. Part 7, and have received the requisite ratification by the President (through DOJ, which was delegated the relevant authority by the President). *See* Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (1980).

75.     But EPA is not content simply to enforce the requirements actually found in its Presidentially-approved regulations. Instead, the agency has made plain its intent to impose new requirements on the State, which are purely inventions and not found *anywhere* in EPA's regulations—or even EPA's own Title VI programs.

76.     EPA has, for example, has demanded pre-decisional impacts analysis equivalent to the National Environmental Policy Act ("NEPA") without the slightest authority to require such analysis. In particular, EPA has demanded "cumulative impacts assessment"—a concept not even hinted at in EPA's Title VI regulations.

77.     EPA has similarly demanded that LDEQ create an entirely new system of conducting "community meetings" to address a "perceived lack of community involvement," and to process complaints in a particular manner, making clear that EPA intends to micro-manage LDEQ and other state agencies. EPA is not content merely to ensure that state agencies do not impose unlawful disparate impacts, but also intends to dictate *how* they avoid such impacts.

78.     EPA's attempt to invent new mandates on the fly is unequivocally unlawful. As an initial matter, EPA cannot engage in rulemaking—such as creating new putative Title VI requirements—except through compliance with the APA rulemaking requirements. *See generally* 5 U.S.C. § 501 *et seq.* The APA creates important procedural safeguards, such as notice-and-comment rulemaking and publication in the Federal Register. The former allows the public to participate in the process of creating the relevant requirements while the latter is essential so that regulated parties have notice as to what is actually required of them.

79.     EPA's attempted rulemaking-by-whim approach here is fundamentally incompatible with the APA. If EPA wishes to add requirements to its Title VI regulations, it must do so through APA rulemaking, rather than *ad hoc* inventions.

80.    EPA's violations are even more clearly unlawful here as they violate not only the APA generally, but Section 602's explicit requirement that no "rule, regulation, or order" implementing Title VI can "become effective *unless and until approved by the President.*" 42 U.S.C. § 2000d-1 (emphasis added).

81.    EPA has never indicated that any of its newly minted mandates have been ratified by the President and the State is not aware of any evidence that they have been. As such, EPA's *ad hoc* inventions appear to violate the explicit Presidential approval requirement of Section 602.

82.    EPA's leveraging Title VI to impose requirements beyond those of Title VI itself for unspecified violations also impinges the statutory limitation that a remedy is unavailable "until the department or agency concerned as advised the appropriate person or persons of the failure to comply with the requirement and has determined that *compliance* cannot be secured by voluntary means." *Id.* (emphasis added).

83.    The legal violations present here are clear-cut and squarely within this Court's jurisdiction to review now. This Court should vacate and/or enjoin Defendants' unlawful actions and regulations.

84.    EPA has further made clear that it wanted Louisiana agencies to apply EPA's "civil rights framework" in "to all of your permitting actions" going forward, not just specific sites or permits. Put plainly, EPA intends to apply its unlawful policies throughout all judicial districts in the State.

## **PARTIES**

85.    Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

86.     Louisiana brings this suit through its Attorney General, Jeff Landry. He is authorized by Louisiana law to sue on the State's behalf. La. Const. Art. IV, § 8. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

87.     Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing the challenged actions and regulations.

88.     Defendant, EPA is the federal agency charged with the administration of federal environmental laws, such as the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*

89.     EPA also provides federal monetary assistance and funds to state agencies, such as the LDEQ and the Louisiana Department of Health ("LDH"). Through offices within EPA, including the External Civil Rights Compliance Office and/or the Office of Civil Rights ("OCR"), EPA enforces certain regulations promulgated pursuant to Title VI of the Civil Rights Act of 1964 that purport to prohibit discrimination against members of the public by recipients of EPA funds.

90.     Defendant Michael S. Regan the Administrator of EPA. He is sued in his official capacity.

91.     Defendant Lilian S. Dorka ("Dorka") is the Director of EPA's External Civil Rights Compliance Office (formerly EPA's Office of Civil Rights) and executed the Letter of Concern to LDH and LDEQ. Upon information and belief, Dorka is required to "approve any informal resolution before it becomes final" and "is authorized to issue final agency decisions on Title VI cases." *See* EPA Order 4701. Dorka is sued in her official capacity.

92.     Defendant Department of Justice ("DOJ") is an executive department of the United States Federal Government.

93.     Defendant Merrick Garland is the Attorney General of the United States of America. He is sued in his official capacity.

94.     Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

95.     Defendant the United States of America is sued under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346 and includes the departments and agencies thereof.

## JURISDICTION AND VENUE

96.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. § 701-06.

97.     An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, 28 U.S.C. § 1361, and its inherent equitable powers.

98.     The State has several causes of action to assert the claims at issue here: those (1) "arising] under the Constitution" itself, *Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021) (en banc) *cert. granted* 142 S.Ct. 2707 (2022); (2) an equitable cause of action arising from the "power of federal courts of equity to enjoin unlawful executive action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *accord Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)) (collecting cases); (3) a "non-statutory cause of action" to challenge "[w]hen an executive acts ultra vires," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); and (4) a cause of action under Section 10 of the APA (5 U.S.C. § 704).

99.     To the extent that it exists, sovereign immunity has been waived for all of the State's claims under 5 U.S.C. § 702.

100.    Section 702 "waive[s] immunity for non-statutory causes of action against federal agencies arising under 28 U.S.C. § 1331." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014). "Section 702 … waives immunity for two distinct types of claims." *Id.* 489. The first is for final agency actions under the APA's cause of action (§ 704). *Id.* The second is

"where a person is 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Id.* (quoting 5 U.S.C. § 702). "This type of waiver applies when judicial review is sought pursuant to a *statutory or non-statutory cause of action* that arises completely apart from the general provisions of the APA." *Id.* (emphasis added).

101.    "There is no requirement of 'finality' for this [second] type of waiver to apply. The requirement of 'finality' comes from § 704 and has been read into § 702 in cases where review is sought pursuant only to the general provisions of the APA. Instead, for this type of waiver there only needs to be 'agency action' as set forth by 5 U.S.C. § 551(13)." *Id.* (citations omitted).

102.    As a result, the State need not establish final agency action for any of the first three types of cause of action asserted here (*i.e.*, claims arising under the Constitution, under the equitable powers of federal courts to enjoin unlawful agency action, and under the non-statutory cause of action to challenge *ultra vires* agency actions).

103.    As to the State's APA claims, Defendants have taken final agency action that is reviewable by this Court.

104.    No other statute precludes judicial review here. Nor has Congress intended to preclude judicial review of the claims asserted here.

105.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

106.    The challenged EPA actions and policies would apply to Clean Air Act permit applications and renewals that are currently pending for sources in this division, as well as future permitting actions under other environmental statutes in this division.

107.    According to LDEQ's "Check Permit Status" tool, multiple permit applications and permit renewals are pending for sources in Calcasieu parish.

108.    For example, LDEQ's "Check Permit Status" tool shows, as of 5/19/2023, Reynolds Metals Company is seeking an Air Permit Variance that has been pending since 9/30/2015. Activity No. PER20150004. Reynolds is also seeking a Title IV Permit Initial (Activity PER20110001) and a Title V Regular Permit Renewal (PER20110002).

## LEGAL BACKGROUND

### TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

109.    Title VI of the Civil Rights Act provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

110.    "Only racial discrimination of the same character as that forbidden by the Equal Protection Clause is prohibited by [Section] 601." *Rollerson v. Brazos River Harbor Nav. Dist.*, 6 F. 4th 633, 639 (5th Cir. 2021) (citing *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003)). "Thus, it 'prohibits only intentional discrimination.'" *Id.* (quoting *Sandoval*, 532 U.S. at 280). That requires the challenged action was done "at least in part 'because of,' not merely 'in spite of' … adverse effects." *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

111.    Title VI, Section 602, authorizes implementing regulations. It provides:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the

provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however*, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. 2000d-1.

112.    Rules and regulations issued under Section 602 require Presidential ratification: "No such rule, regulation, or order [implementing Title VI] shall become effective unless and until approved by the President." 42 U.S.C. § 2000d-1.

113.    The President delegated his authority to approve Title VI regulations to the Attorney General of the United States, and further directed the Attorney General of the United States to "coordinate the implementation and enforcement by Executive agencies" of Title VI. Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (1980). The Attorney General of the United States, in turn, directed that "the Assistant Attorney General in charge of the Civil Rights Division shall be responsible for coordinating the implementation and enforcement by Executive agencies of the nondiscrimination provisions" of Title VI. 28 C.F.R. § 0.51(a).

114.    DOJ has adopted regulations to implement Title VI under Section 602. *See* 28 C.F.R. §§ 41.101-12. Since their adoption in 1966, DOJ's regulations have purported to impose disparate-impact-based requirements. *See, e.g.,* 28 C.F.R. § 42.104(b)(2).

115.    EPA has adopted regulations to implement Title VI. *See* 40 C.F.R. §§ 7.10-180. Since at least 1984, EPA's regulations have contained language which EPA construes as proscribing disparate-impact. *See* 40 C.F.R. § 7.35(b), (c).

116.    In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court called into serious doubt whether regulations promulgated under Section 602 of Title VI may validly proscribe activities that merely have a disparate impact:

> [H]ow strange it is [for the dissent] to say that disparate-impact regulations are "inspired by, at the service of, and inseparably intertwined with" § 601, *post,* at 1531, when § 601 permits the very behavior that the regulations forbid. *See Guardians,* 463 U.S., at 613, 103 S.Ct. 3221 (O'Connor, J., concurring in judgment) ("If, as five Members of the Court concluded in *Bakke,* the purpose of Title VI is to proscribe *only* purposeful discrimination ..., regulations that would proscribe conduct by the recipient having only a discriminatory *effect* ... do not simply 'further' the purpose of Title VI; they go well *beyond* that purpose").

532 U.S. at 286 n.6.

117.    In 2003, when DOJ, EPA, and numerous other agencies issued a joint rule implementing the Civil Rights Restoration Act, the agencies stated they were "mindful of the Supreme Court's statements in *Sandoval* that call the validity of the Title VI disparate impact regulations into question." 68 Fed. Reg. 51,334, 51,338 (Aug. 26, 2003). The agencies nevertheless proceeded in issuing a final rule because *Sandoval* "did not … address the focus of [that 2003] rulemaking." *Id.*

118.    DOJ developed a final rule in 2020 to address "[t]he current regulations' extension of prohibited conduct to unintentional disparate impact" which "expands the prohibition to a vastly broader scope of conduct than the intentionally discriminatory conduct that the statute itself prohibits." DOJ noted "[t]he Supreme Court's *Sandoval* decision has led to a divergence between Title VI enforcement by private plaintiffs and federal departments and agencies." The final rule's "regulatory

changes address the concerns regarding the statutory authority supporting the scope of [DOJ's] regulations that the Supreme Court questioned in *Sandoval*, harmonize the implementing regulations' scope with the conduct that Congress actually intended Title VI to prohibit, promote consistent enforcement among private plaintiffs and federal departments and agencies, as well as provide much needed clarity to the courts and federal funding recipients and beneficiaries."

119.    To that end, the final rule deleted regulatory language purporting to regulate disparate impact. Although the Office of Management and Budget completed its review of the final rule on January 8, 2021, Defendants inexplicably failed to publish it in the Federal Register.

**EPA'S TITLE VI COMPLAINT RESOLUTION PROCESS**

120.    EPA's Title VI regulations establish a complaint process. Any person "who believes that he or she or a specific class of persons has been discriminated against" may file a complaint. 40 C.F.R. § 7.120(a).

121.    The complaint "must be filed within 180 calendar days of the alleged discriminatory acts," unless EPA waives the "time limit for good cause." 40 C.F.R. § 7.120(b)(2). EPA must "promptly" investigate all such complaints. 40 C.F.R. § 7.120.

122.    Once a complaint is filed, EPA will "immediately initiate [its] complaint processing procedures" and conduct a "preliminary investigation" to determine if it will accept, reject, or refer the complaint to the appropriate agency. 40 C.F.R. § 7.120(d). If EPA accepts the complaint, EPA will notify the recipient of the allegations and allow the recipient to submit a response to the complaint. If EPA decides that there is "no violation," it will dismiss the complaint. 40 C.F.R. § 7.120(g).

123.    If a complaint is accepted, EPA is required to "attempt to resolve complaints informally whenever possible." 40 C.F.R. § 7.120(d)(2).

124.    "When a complaint cannot be resolved informally, OCR shall follow the procedures established by paragraphs (c) through (e) of § 7.115." 40 C.F.R. § 7.120(d)(2)(i). Those provisions

provide, *inter alia*, that "[w]ithin 180 days from the start of the … complaint investigation, the OCR will notify the recipient in writing by certified mail, return receipt requested, of: (i) preliminary findings; (ii) recommendations, if any, for achieving voluntary compliance; and (iii) recipient's right to engage in voluntary compliance negotiations where appropriate." 40 C.F.R. § 7.115(c).

125.    If the complaint cannot be resolved informally, EPA must issue a preliminary finding of noncompliance, with which the recipient may agree or contest. 40 C.F.R. § 7.115.

126.    In 2015, EPA proposed to amend its regulations implementing Title VI. 80 Fed. Reg. 77,284 (Dec. 14, 2015). EPA explained that it had "compar[ed] its Title VI and other nondiscrimination regulations to those of over twenty other federal agencies." *Id.* at 77,285. "The EPA found that the other agencies' regulations were the same or extremely similar, while the EPA's regulations were different." *Id.* Other agencies' regulations, for example, "explicitly affirm the agency's discretion to appropriately tailor complaint resolution paths based on the nature and complexity of the allegations presented." *Id.*

127.    EPA repeatedly called the deadlines in its Title VI regulations "arbitrary," and explained that "[b]y eliminating **arbitrary** deadlines, the EPA will be better positioned to strategically manage its administrative complaint docket." 80 Fed. Reg. at 77,285 (emphasis added).

128.    As particularly relevant here,

EPA propose[d] to remove the provision to provide postreview notice to a recipient within 180 calendar days from the start of a compliance review or complaint investigation pursuant to 40 CFR 7.115(c)(1). Instead of this calendar deadline, the EPA propose[d] to conform to the regulations of over twenty other federal agencies that state that complaints will be "promptly" investigated. The EPA proposes to adopt this language because it has found that this self-imposed, inflexible deadline is **impracticable** given the inherent scientific complexity associated with determining which and how populations are impacted by environmental pollutants; the number of discrimination allegations and theories that may be asserted in any one complaint under Title VI or the other nondiscrimination statutes; and the volume of the complaints received. Without the burden of an **unrealistic**, self-imposed deadline, the EPA will be in a better position to improve the entire External Compliance and Complaints Program….

80 Fed. Reg. at 77,287 (emphasis added).

129.    Despite conceding that the 180-day deadline in 40 C.F.R. § 7.115(c)(1) is "arbitrary," "impracticable," and "unrealistic," EPA failed to finalize its proposed rule. But the agency has never withdrawn or disavowed its conclusion that the deadline is "impracticable" and "unrealistic."

### THE CLEAN AIR ACT

130.    The Clean Air Act ("CAA") is intended "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). That commitment is not myopic, however, and regulators are required to take into account the achievability of emissions reductions and the cost of regulations. *See, e.g.*, 42 U.S.C. § 7412(d)(2) (requiring the EPA Administrator to "tak[e] into consideration the cost of achieving such emission reduction"); *Michigan v. EPA*, 576 U.S. 743, 751-60 (2015).

131.    States play a key role in implementing the Clean Air Act. Indeed, Congress made an express finding that "the prevention and control of air pollution at its source is the primary responsibility of States and local governments." Pub. L. 88-206, 77 Stat. 392 (1963) (codified at 42 USC 7401(a)(3)).

132.    Consistent with that finding, when Congress enacted a source-specific permitting scheme as part of the Clean Air Act Amendments of 1990, Pub. L. 101-549, 104 Stat. 2399, it gave States the principal role in air-emission permitting. *See* 42 U.S.C. § 7661a(d).

133.    But States' acceptance of that role was secured through coercion: failure to develop and submit to the EPA Administrator a permit program meeting the requirements of the Clean Air Act could result in the application of sanctions, including a broad loss of federal highway funding. *See* 42 U.S.C. § 7661a(d) (authorizing application of the sanctions specified in 42 U.S.C. § 7509(b)).

134.    In contrast to the States, Congress relegated EPA to a largely supervisory role. To that end, State permitting authorities are required to "transmit to the [EPA] Administrator a copy of each permit application … or such portion thereof, including any compliance plan, as the Adminis-

trator may require to effectively review the application and otherwise to carry out the Administrator's responsibilities under [the Clean Air Act]," together with "a copy of each permit proposed to be issued and issued as a final permit." 42 U.S.C. § 7661d(a)(1). "If any permit contains provisions that are determined by the [EPA] Administrator as not in compliance with the applicable requirements of [the Clean Air Act], … the [EPA] Administrator shall … object to its issuance." 42 U.S.C. § 7661d(b)(1). An objection will either prevent the issuance of the permit or cause the permit to be modified, terminated, or revoked. *See* 42 U.S.C. § 7661d(b).

135.    Put simply, the Clean Air Act is "'an experiment in cooperative federalism' that divides responsibilities between EPA and the states." *Environmental Integrity Project v. EPA*, 969 F.3d 529, 535 (5th Cir. 2020) (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012)). EPA overstepping its bounds under this cooperative federalism scheme is both unlawful and subject to judicial review and correction. *Luminant*, 675 F.3d at 932-33.

136.    In Louisiana, LDEQ's Air Permits Division has responsibility for Clean Air Act permitting under the cooperative federalism system established by the CAA.

## FACTUAL ALLEGATIONS

### EPA FUNDING GRANTS TO LOUISIANA AGENCIES

137.    EPA has provided many monetary grants to numerous Louisiana agencies over the past six years, including the Louisiana Department of Environmental Quality ("LDEQ"), and the Louisiana Department of Health ("LDH"), thus extending the mandates of Title VI to Louisiana agencies for the duration of their respective grants. The sums are substantial. For example, according to usaspending.gov, since FY2008, EPA awarded grants to LDEQ totaling over $32,800,000, and awarded grants to LDH totaling over $287,000,000.

138.    By way of illustration, EPA obligated $17,470,000 for the period July 1, 2020, through June 30, 2022, to capitalize LDEQ's Clean Water State Revolving Fund (FAIN 22000220);

EPA obligated $17,467,000, for the period July 1, 2021, through June 30, 2023, to capitalize LDEQ's Clean Water State Revolving Fund (FAIN 22000221); and EPA obligated $12,720,000, for the period August 1, 2022, through June 30, 2024, to capitalize LDEQ's Clean Water State Revolving Fund (FAIN 22000222).

139.    Similar examples exist for LDH. EPA obligated $26,930,000 for the period October 1, 2022, through September 30, 2026, to LDH to capitalize Louisiana's Drinking Water State Revolving Fund (FAIN 02F22701); EPA obligated $16,465,000 for the period July 1, 2021, through June 30, 2025, to LDH to capitalize Louisiana's Drinking Water State Revolving Fund (FAIN 99696824); EPA obligated $16,480,000, for the period July 1, 2020, through June 30, 2024, to LDH to capitalize Louisiana's Drinking Water State Revolving Fund (FAIN 99696823); EPA obligated $16,625,000, for the period July 1, 2019, through June 30, 2024, to LDH to capitalize Louisiana's Drinking Water State Revolving Fund (FAIN 99696822); and EPA obligated $16,626,000 for the period July 1, 2018, through June 30, 2022, to LDH to capitalize Louisiana's Drinking Water State Revolving Fund (FAIN 99696821).

140.    Upon information and belief, Louisiana agencies have undisbursed grant funding, and the agencies will seek additional grant funding from EPA in the future.

141.    Upon information and belief, EPA has at all relevant times purported to condition those grants on the recipient "comply[ing] with … Title VI of the Civil Rights Act of 1964" and "comply[ing] with all applicable EPA civil rights regulations, including … For Title VI … 40 CFR Part 7." EPA further purports to condition those grants on "the recipient acknowledge[ing] it has an affirmative obligation to implement effective Title VI compliance programs and ensure that its actions do not involve discriminatory treatment and do not have discriminatory effects even when fa-

cially neutral."[4]

### GRANT OF CLEAN AIR ACT PERMITS FOR THE DENKA AND FORMOSA FACILITIES

142.     On January 6, 2020, LDEQ issued CAA permits for the Denka and Formosa facilities, allowing them to continue operations. It issued a "Basis for Decision" ("BFD") on the same day.

143.     Upon information and belief, EPA was aware that LDEQ was considering issuing the permits at issue, had an opportunity to provide input on those decisions, and did not object to issuance of any of the permits, although it was empowered to do so if the agency had concerns. *See* 42 U.S.C. § 7661d(b).

144.     EPA does not contend that issuance of those permits violates the Clean Air Act. Defendant Dorka has specifically acknowledged that LDEQ was "following the environmental law" in granting the permits. Instead, EPA's stated concerns have related solely to Title VI.

145.     EPA has been perfectly clear that it does not view compliance with the CAA as sufficient to justify the permits for the Denka and Formosa Facilities, with one official saying: "Sometimes … in order to address what appears to be a disparate impact, disparate harm, you may need to go beyond [environmental statutory] authorities."

### EPA "JOURNEY TO JUSTICE TOUR"

146.     According to Administrator Regan, "[f]rom [his] first day at EPA, [he] ha[s] committed to embedding equity, environmental justice, and civil rights into the DNA of the Agency's programs, policies, and processes, and to delivering tangible results to underserved communities."

147.     In November 2021, Administrator Regan embarked on what EPA called the "Journey to Justice Tour." During his tour, he visited multiple Louisiana parishes and met with various environmental activists and groups.

---

[4]  https://www.epa.gov/system/files/documents/2022-09/fy_2022_epa_general_terms_and_conditions_effective_october_1_2022_or_later.pdf

148.    Upon information and belief, Administrator Regan did not meet with any groups representing industry.

149.    During his tour, Administrator Regan met with groups that have advocated initiation of Title VI disparate impact enforcement actions relating to the Denka and Formosa Facilities. For example, Mr. Regan's meeting with the Deep South Center for Environmental Justice in New Orleans was "marked by calls for the federal agency to … launch a civil rights investigation into 'Cancer Alley.'"

150.    During the tour, Administrator Regan stated that EPA needed to "leverage our enforcement." He further stated that, with respect to the Denka Facility, "we have enforcement authority that we're taking a very close look at to bring the facility into compliance."

151.    Administrator Regan's politically oriented tour was particularly surprising given that EPA had rebuffed Louisiana's request for assistance with, e.g., emissions monitoring in that same area.

152.    An investigative journalist subsequently published an article that provided additional insight. The Louisiana Bucket Brigade – founded and directed by a white woman, based in New Orleans, and who had previously been charged with felony terrorizing of an industry executive — had urged EPA to advance a Title VI claim against industrial facilities that had long been a target of activist ire.

### SPECIAL INTEREST GROUPS FILE COMPLAINTS

153.    Shortly following the Journey for Justice Tour, complaints alleging disparate impact were filed against LDEQ and LDH with EPA pursuant to Part 7. The complainants included entities and groups that met with Administrator Regan during his Journey to Justice tour.

154.    On January 20, 2022, the Concerned Citizens of St. John ("CCSJ") and the Sierra Club filed Complaint Nos. 01R-22-R6 (*LDEQ and the Denka Facility)* ("Complaint #1") and 02R-22-

R6 (*LDEQ and the Denka Facility*) ("Complaint #2") against the LDEQ and LDH "for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and the U.S. Environmental Protection Agency's ("EPA") implementing regulations, 40 C.F.R. Part 7."[5] These two complaints primarily related to the Denka Facility and the agency actions regarding or relating to the Denka Facility.

155.     On February 1, 2022, Tulane Environmental Law Clinic on behalf of Stop the Wallace Grain Terminal, Inclusive Louisiana, RISE St. James, and the Louisiana Bucket Brigade filed a complaint No. 04R-22-R6 (*LDEQ and the Industrial Corridor and the Formosa Facility*) ("Complaint #3") against the LDEQ "under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the EPA's implementing regulations, 40 C.F.R. Part 7."[6] This complaint related to the LDEQ's actions regarding and related to permitting of the FG LA LLC facility in St. James Parish (the "Formosa Facility") and other actions within the Industrial Corridor.

156.     All three complaints were untimely. EPA regulations require that complaints "must be filed within 180 calendar days of the alleged discriminatory acts," unless EPA waives the "time limit for good cause." 40 C.F.R. §7.120(b)(2). EPA must "promptly" investigate all such complaints. 40 C.F.R. §7.120.

157.     EPA has not identified any such "good cause." Nor does such "good cause" exist.

158.     On April 6, 2022, EPA accepted all three complaints.

159.     LDEQ and LDH were notified of the Three Complaints and offered an opportunity to participate in informal resolution discussions to which they both agreed.

160.     Without warning to the LDEQ or LDH, the EPA then substantially departed from its normal procedure by issuing a Letter of Concern and releasing it to the general public on Octo-

---

[5] https://www.epa.gov/system/files/documents/2022-09/01R-22-R6%20Complaint_Redacted.pdf
[6] https://www.epa.gov/system/files/documents/2022-06/04R-22-R6%20Complaint%20Redacted.pdf

ber 12, 2022. In its Letter of Concern, EPA claimed that "Title VI prohibits … acts that have an unjustified disparate impact on the basis of race, color, or national origin."

161.    EPA's investigation underlying that letter was a perfunctory pretext that, upon information and belief, consisted of extensive communications with the complainants, review of an "environmental justice" law review article and an article in *The Atlantic* magazine, but little else beyond a cursory review of LDEQ's and LDH's websites. The articles EPA reviewed and block quoted in its Letter of Concern provided a ready, non-discriminatory explanation for the siting of the industrial facilities EPA was attacking: "a pattern of large, contiguous blocks of open land under single ownership" combined with "easy access to some of the world's busiest shipping lanes." EPA simply ignored that geographic explanation. Worse, upon information and belief, at least LDEQ sought to participate in the investigation, but was told by EPA to wait for the Letter of Concern to be issued. EPA then, without apparent shame, faulted LDEQ for not participating in its pre-letter investigation—even though LDEQ had done so *at EPA's specific suggestion*.

162.    To be clear, this action does not directly challenge EPA's issuance of the Letter of Concern. Instead, the Letter of Concern support the State's challenges to other actions by EPA that are reviewable by this Court. The Letter of Concern further provides strong evidence that the State faces a realistic threat of enforcement of Title VI by Defendants based on theories that the State's actions cause disparate impacts and that the State is contravening extra-regulatory requirements that EPA has invented.

### INFORMAL RESOLUTION NEGOTIATIONS

163.    Informal resolution discussions began via a telephone conference on November 16, 2022. LADOJ inquired as to "exactly" what EPA believes LDEQ and LDH are doing wrong, and explained that EPA's letters of concern do not identify specific actions. LADOJ accordingly asked

that EPA specifically identify any provisions in Louisiana law, any actions, or any inactions that EPA believed were in conflict with Title VI, and that EPA provide supporting legal analysis.

164.    EPA refused to do so. Instead, the agency merely reiterated the elements of a disparate impact claim, then stated "this is not an environmental engagement per se." Underscoring the fundamental disconnect between the agency's environmental mission and its Title VI regulations, EPA officials expressly stated that "compliance with environmental laws is not a shield to Title VI."

165.    Throughout the informal resolution discussions, EPA consistently refused to identify the specific actions or inactions that purportedly underlay its Title VI concerns. For example, in a December 12, 2022, telephone conference, an EPA representative said EPA was "not looking at actual permit issuance and what happened each time a permit was issued."

166.    Defendant Dorka then elaborated that no specific action is at issue, and EPA is targeting the cumulative impact of LDEQ's actions. But Dorka then contradicted herself only three weeks later, in a January 4, 2023, telephone conference: When LADOJ noted EPA "still had not identified any specific thing … you think creates a civil rights problem, other than outcome," Dorka responded "this is not about procedures," claimed "it's your method of administering your air program in a couple of different instances … we find strong evidence that the method of administering the air program … resulted in some harms, some impacts, and that those impacts were born disproportionately on the basis of race."

167.    LADOJ again asked EPA to identify the specifics: "[W]hat are the criteria or methods of administration EPA believes are creating a disparate impact, specifically?" Starting a long-running pattern of dismissive responses, Dorka stated "that's not going to move forward our conversation today," then again generically pointed to LDEQ's "administration of the air program." When pressed, EPA pointed to LDEQ's issuance of a single permit, and said "that subjected people

to discrimination." EPA then refused to state whether its Letter of Concern represented a complete statement of EPA's concerns.

168.    LADOJ noted "the remedy [EPA is] entitled to is one-for-one with [any] non-compliance." Dorka continued to dismiss LADOJ's concerns, stating that discussions of "remedy" would only come with formal findings. LADOJ again explained: "The statutory requirement is for compliance, [and] that's all EPA is entitled to;" "EPA is statutorily obligated to provide us with notice of how [LDEQ] purportedly failed to comply" with Title VI; "[w]e need to know specifically where EPA thinks there's non-compliance" in order to meaningfully negotiate; but EPA is only pointing to undefined "methods of administration."

169.    At that point, LADOJ explained that EPA was not making the process productive: "[W]e are asking you to identify the very specific things" where EPA believes there is any non-compliance" with Title VI. LADOJ continued: "We keep having these calls where EPA … throw[s] out pretty important, significant accusations," but EPA is not wanting to memorialize those accusations and is "not wanting to actually engage with us on what the legal requirements are and what the legal defects are."

170.    EPA kept intoning "disparate impact" as if those words were a magic talisman that entitled the agency to impose upon LDH and LDEQ any requirement that EPA cares to invent. But EPA failed to apply even the basic requirements of its chosen theory of disparate impact: Dorka stated that EPA is not looking at a comparison with a similarly situated action or population, merely whether alleged harms fall on communities that are predominately black.

171.    Dorka finally admitted "you're not going to see in any letter where we think [LDEQ or LDH] violated the law," but "part of what we're saying here, is in the future, put a process in place, as we've been engaging with many, many states … other states … so that you yourself can do an analysis … both from an [environmental justice] perspective [and] from a civil rights perspective,

that gives you an idea of whether the actions you may be about to take could have a disparate impact on the basis of race." Entirely absent from that discussion was the source of authority for EPA's demand.

172.    On January 18, 2023, Dorka stated that the initial draft informal resolution agreements ("IRAs") that EPA presented included a lot of "standard boilerplate procedural safeguards commitments that [EPA] share[s] with all recipients," she expected the agencies "to get back to [EPA] as to whether you already have certain things in place," together with any amendments to those sections, "so that we don't spend our time on procedurals because we could talk for days on those things." An LADOJ attorney noted he was "flabbergasted that we're being presented … with a boilerplate and asked to redline things that have no apparent application to the complaint," some of which "are far beyond what the statute or regulations contemplate." He elaborated that "EPA has a nondiscretionary duty to attempt to resolve this through … voluntarily compliance, and starting out like this … is an utter failure to comply with that duty."

173.    In that same January 18, 2023, telephone conference, Dorka continued her demand that the agencies agree to things nowhere required by Title VI or any implementing regulation. She made clear, for example, that EPA expected NEPA-like pre-decisional analysis of the potential for disparate impact, including express consideration of race: "Did you consciously think wow, you know, this permit exists in a community of color; they already face x, y, z, challenge … not to mention there's limited English proficiency; the population is aging; and all of those different factors. Did you even consider those before making decisions? This is to put a framework in place for the future … for permits for other actions you might be considering."

174.    In a subsequent telephone conference, LADOJ asked for the statutory or regulatory basis for requiring a NEPA-like pre-decisional process. Dorka responded that "what we're putting in place is totally based on a Title VI approach" and volunteered that "in informally resolving a num-

ber of these types of cases, we are helping folks put into place a framework, a Title VI disparate im-
pact, identify and address-type of framework" "to address this prospectively." But Dorka was unable
to point to any specific provision of Title VI or EPA's implementing regulations that required such
an analysis, instead pointed to the general language in EPA regulations at 40 C.F.R. § 7.35, then
acknowledged "[n]othing's gonna say that it requires [an analysis] to be conducted before" a permit-
ting action.

175.    In that same January 18, 2023, telephone conference, Dorka also made clear that
EPA expected LDEQ to add permitting conditions not authorized by environmental statutes:
"Sometimes … in order to address what appears to be a disparate impact, disparate harm, you may
need to go beyond [environmental statutory] authorities. For example, if a facility … has really ad-
verse effects with respect to odor. Technically the [environmental statutory] authorities may not
need you to discuss odor within the construct of that permit. You may need to anyway. You may
need to have an odor management plan." "Odor, traffic, safety, things like that that are nevertheless
from a civil rights perspective adversities that could be caused by certain actions." In subsequent
conferences, LDEQ explained that some of those items were not under LDEQ's purview, pointing
to impacts from traffic as an example of something that could not be the basis for LDEQ lawfully
denying an air permit. EPA made clear, however, that it wanted LDEQ to "consider [things] beyond
the four corners of the Clean Air Act" in its permitting decisions. "[I]t goes beyond just air emis-
sions … all of the other factors that you see make up recommended disparate impact assessment,
not just the individual permit."

176.    LDEQ repeatedly explained that it does not have authority to address social inequi-
ties like limited education, limited access to healthcare, age of the housing, or traffic in the context
of an air permit review. LDEQ pointed to the Clean Air Act's statutory standard. Dorka responded
by giving away the game: she complained that "in essence, [LDEQ is] treating … that [minority]

community the same as you would any other community….”—*i.e.*, EPA's true objection is that the State is *not* discriminating on the basis of race. Dorka then acknowledged that LDEQ is "following the environmental law," but complained "what about the civil rights, what about the other impacts … that folks are already suffering?"

177.    Dorka then tried to flip the basics of agency law on its head, claiming "you may not have the authority to do it under your own environmental law, although I … don't see where it prohibits … you from going beyond the permit." Dorka continued: "You just consider what else you need to do, in addition to the parameters of the permit."

178.    When LDEQ asked how EPA's Region 6—which covers Louisiana—is implementing this so-called civil rights framework in areas where it directly issues permits, Dorka blithely dismissed the question: "[F]ortunately for them, they don't have a Title VI complaint filed against them," and pointed to "FAQs" that EPA released the prior summer. LDEQ clarified it was "asking for examples of real-world applications, not FAQs, not guidance documents… how are these principles being applied by EPA in permitting?" Dorka acknowledged it was "a reasonable request," but dodged the question, again with a dismissive remark: She was "talking about [LDEQ's] compliance with [Title VI]," and she was not going to discuss EPA's permitting process. Dorka never denied that Region 6's permitting standards would violate the standards Defendants are attempting to foist upon LDEQ here.

179.    In short, EPA not only demanded ex-ante NEPA-like analysis to unlawfully facilitate decision-making on the express basis of race, EPA demanded that LDEQ conduct "cumulative impact assessments" as part of LDEQ's permitting process, notwithstanding the absence of statutory authority for requiring such assessments. Indeed, as Dorka envisioned it, cumulative impact analyses don't "necessarily have to be in response to a specific permit review. It … could be more affirmatively done."

180.    At one point, EPA asserted that even if LDEQ obtained an 85% reduction in emissions in the course of renewing a permit—i.e., a significant environmental benefit—EPA believed that renewing that permit could result in a disparate impact that would violate Title VI. Dorka confirmed her subordinate's point: EPA "would want to capture … any permit" with its civil rights framework.

181.    Illustrating the vast scope of micro-management EPA believes its generic Title VI regulations authorize, EPA stated that LDH and LDEQ should have "community meetings" to address a "perceived lack of community involvement," and that the State's speakers at those meetings be subject to various "protocols." When LADOJ asked EPA to identify problems with, e.g., LDEQ's current processes for public participation, EPA pointed to a single, off-the-cuff remark by the Secretary of LDEQ at a public meeting. LADOJ noted that "pragmatically, this reflects an utter failure [by EPA to consider] human factors and reality … by parsing what someone said word-by-word at a public hearing." "[I]f that's the level of perfection you're expecting … [LADOJ's] advice [to State agencies] would be … [t]o read from bullet points and nothing else."

182.    EPA agreed with that implication. For its part, LDEQ noted the specific example EPA identified was about "a risk number … that is an EPA-formulated risk number that is a matter of some dispute" and, indeed, is the subject of litigation. Dorka responded that EPA "received these complaints, and we investigated … preliminarily, and [EPA] came to the conclusion that certain things needed to be put in place in order to informally address the issues that were raised in the complaints. This is one of them. I mean, we're not going to argue about whether this is something that we feel needs to address the issues of the complaint …. It was an issue that was raised. We need something in place to address all of the issues that were raised …. That's what this agreement is about."

183.     In short, EPA believes the informal resolution process gives it free reign to make demands of State agencies—including public adherence to EPA's talking points on disputed scientific issues—regardless of whether those demands are tied to what Title VI itself demands or "effectuat[ing] the provisions of" Title VI. 42 U.S.C. 2000d-1.

184.     EPA implicitly acknowledged as much. EPA repeatedly distinguished between compliance with Title VI and compliance with any involuntary resolution agreement. Indeed, notwithstanding the vast breadth of EPA's demands, EPA made clear that it does not view compliance with any involuntary resolution agreement as a safe harbor against violation of Title VI.

185.     In a February 23, 2023, telephone conference, EPA explained that—after three months of negotiations—it had just then shared all provisions of the proposed IRA for LDEQ; it had not yet shared all provisions for LDH; further negotiation was required; and parts of informal resolution agreements EPA was proposing went beyond EPA's Title VI concerns. LADOJ noted surprise that "EPA is demanding that an agency solicit the opinion of counsel on a very complicated agreement, and get a response in two business days," but "it turns out EPA hasn't even submitted for consideration everything it wants. If this [proposed agreement] is so straight forward, and clear, and so what the law demands," it "was absolutely flabbergast[ing] that a complete [proposed] agreement hasn't been shared." LADOJ then re-emphasized that "the informal resolution process is provided in regulation, it's not an optional thing."

186.     Despite EPA's regulations mandating that the agency resolve Title VI disputes "*informally whenever possible*," 40 C.F.R. § 7.120 (emphasis added), Dorka responded by claiming EPA had "total discretion" regarding informal resolution: "We don't have to enter into informal resolution. Ok? We do not." Dorka continued: "Quite frankly, we also have the discretion not to offer informal resolution. That is the agency's prerogative." "We don't have the discretion, though, not to tell you what we think you're doing wrong. We have to tell you what we think you're doing wrong, and that

comes by way of preliminary findings, and then formal findings, etc." "I disagree that we have no discretion in terms of informal resolution. We have total discretion."

187.    This exchange is both illustrative and revealing: despite EPA's operative regulations mandating informal resolution "whenever possible," Defendants believe that they have "total discretion" to ignore that explicit legal requirement. Indeed, Dorka repeated that "total discretion" premise a second time, thereby dispelling any doubts as to the chasm between EPA's actual regulatory authority and Defendants' view of their authority here.

188.    That departure from law was not isolated. Consistent with the Clean Air Act, LDEQ explained it is mandated to consider the balance between social and economic benefits of a project or an application it is considering, on the one hand, and the potential harm from environmental impact, on the other. Yet when LADOJ pressed EPA on its assuming "traffic" is a *per se* adverse impact—noting that many small communities consider traffic an economic benefit—Dorka responded with a dismissive "oh, come on," then stated she was not considering the economic impact, only "the health impact … because after all, our joint mission — [LDEQ] and EPA — is protection of health and the environment."

189.    Throughout the negotiations, EPA acted in close concert with the activist complainants. For example, in a February 9, 2023, EPA stated that it had "making a lot of progress," but the activists raised an objection to the presence of certain attorneys representing the State because those attorneys also represented industry. EPA refused to identify the purported "members of the community" with whom they were coordinating, only that those "members of the community" were represented by the Tulane Law Clinic.

190.    On March 9, 2023, EPA disclosed how far that concerted activity went. Dorka disclosed that "there are some terms to the agreement that the complainant group wanted," the complainants "wanted to be able feel like they are being allowed an opportunity to weigh in on the draft

IRA," Dorka agreed with that, and EPA therefore agreed to "share … the full clean draft that [EPA] sent over to LDEQ and the full clean draft that [EPA] sent over LDH." EPA's "interest is to get comments back from them," which EPA had already received from lawyers representing the complainants. EPA "would consider those," and "to the extent that … EPA thinks appropriate, [EPA] will include them as we make our changes to the original" proposed resolution agreement. Dorka concluded: "That is what [EPA] committed to doing, [and] that is what we're going to do."

191.    LDEQ objected to that depth of involvement by complainants and complainants as unfair and not previously disclosed. Dorka responded that "under this Administration, we've made a pledge to be more transparent and to be more inclusive in terms of bringing stakeholders to the table." Dorka implied the sharing was a quid pro quo for complainants agreeing to consent to negotiation: EPA "did not think it was a very high price … in order to get a 120-day extension for the purpose of continuing what we think is a very productive discussion [and] negotiation." Indeed, EPA had "walked complainants through [EPA's] draft[s]" and "talked through with them what [EPA] had included."

192.    LADOJ noted that EPA's actions gave the appearance of "EPA acting as the complainants' lawyers rather than a party to the negotiation[.]" LADOJ then asked "since it's [supposedly] a reasonable condition [to share EPA's communications with the State as quid pro quo for the 120-day extension], can we receive a copy of [EPA's] communications with the complainants?" Dorka refused.

193.    On March 2, 2023, EPA announced yet another departure from its regulations. As she had previously, Dorka acknowledged that EPA, LDEQ, and LDH had "really productive conversations" and had "made a lot of progress." But Dorka then stated she "cannot imagine how we would be able to finalize something by the [March 13] deadline" under EPA's then-current agreement with complainants. Dorka accordingly had "asked our [EPA] group to continue … their dili-

gence on the IRA, but also to prepare, just in case, we needed to issue preliminary findings. So we have been proceeding on both tracks." Dorka accordingly said would ask complainants for another extension of time during a meeting with complainants the following day. Dorka made clear that if she asked for an additional 90 days, complainants would probably push back.

194.     Dorka explained that for other cases—not involving these particular complainants—EPA's policy is to toll the 180-day timeframe. EPA could not do so in this case due to a judgment from the Northern District of California that applied to the complainants in *one* of the complaints underlying EPA's Letter of Concern. EPA had used that judgment throughout the discussions, pointing to "tight deadlines and constraints" to push back on, e.g., LDH taking time to review drafts with counsel.

195.     LADOJ repeatedly explained to EPA that Louisiana law restricts State agencies from expending public funds without getting anything in return unless required to do so by law, and that State law further restricted an official's ability to commit to restrictions on the exercise of agency discretion. EPA nevertheless proceeded to offer its own interpretations of state law and suggest LADOJ and LDEQ were wrong about the scope of the agencies' authority under Louisiana law.

196.     On April 26, 2023, Dorka wrote to the Secretary of the Louisiana Department of Environmental Quality, stating that "[w]hile EPA appreciates LDEQ's engagement in the IRA process and is encouraged by the negotiations to date, we have not yet reached an IRA. Therefore, as EPA has previously conveyed to LDEQ, EPA must continue its fact-finding on a parallel track with the IRA process to ensure that EPA … is in a position to resolve the complaint through the issuance of Preliminary Findings, should EPA and LDEQ not be able to reach an IRA by the agreed upon date."

197.     EPA attached an extraordinarily burdensome discovery requests to its letter, purportedly pursuant to its authority under 40 C.F.R. 7.115 and 7.120, attached hereto as Exhibit A.

### HARMS TO THE STATE

198.     By subjecting the State to a concededly arbitrary deadline and governmental processes in which the federal Executive illegally delegated governmental powers to non-governmental entities, Defendants have violated the Constitution and the APA, and they have inflicted irreparable injury upon the State.

199.     Similarly, by attempting to impose illegal disparate-impact-based and extra-regulatory requirements upon the State, Defendants have inflicted sovereign, quasi-sovereign, and proprietary injuries upon the State.

200.     These illegal requirements constrain the State's authority to regulate and otherwise exercise its sovereignty within its own borders, thereby inflicting irreparable harm upon the State.

201.     In addition, the State has a sovereign right to unambiguous clarity in any conditions that the federal government intends to impose upon it based on Congress's Spending Clause powers. Violation of that right establishes injury and Article III standing. *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022) ("States have standing when an allegedly unconstitutional funding offer is made to them, and they do not need to first violate a condition of an allegedly unconstitutional contract to have standing to challenge it.").

202.     Similarly, Defendants' illegal requirements are not costless to comply with, and the resulting compliance costs inflict cognizable injury. And because the State cannot recover damages from the federal government, those irrecoverable injuries constitute irreparable harm. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994); *Temple Univ. v. White*, 941 F.2d 201, 214–15 (3d Cir. 1991).

203.    In addition, because the State is the "object of the [governmental] action at issue," its standing to challenge those actions is "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)).

## CLAIMS FOR RELIEF

## COUNT I

### Violation of The Constitution Under The Private Non-Delegation Doctrine
### Asserted Under The Constitution, Federal Courts' Equitable Powers, And Non-Statutory Cause Of Action

204.    The State repeats and incorporate by reference each of the Complaint's allegations stated above.

205.    The U.S. Constitution, under the private non-delegation doctrine, forbids delegation of governmental power to non-governmental actors. *Schechter Poultry*, 295 U.S. at 537; *National Horsemen's*, 53 F.4th at 880.

206.    By delegating to Private Special Interest Groups the power to veto EPA's continuation of informal negotiations to secure voluntary compliance past 180 days, EPA has delegated governmental power to the groups in a manner that violates the Constitution. In particular, while the Constitution demands that the groups may only "function subordinately to the supervising agency," EPA has delegated power such that the agency functions subordinate to the Private Special Interest Groups: EPA can only proceed with the course of action it judges appropriate with their consent. *National Horsemen's*, 53 F.4th at 881. This "delegation of power is unconstitutional." *Id.* at 881.

207.    The State's challenge to this unconstitutional delegation of power "arises under the Constitution." *Cochran*, 20 F.4th at 199.

208.    Alternatively, federal courts have authority to hear this challenge under the "power of federal courts of equity to enjoin unlawful executive action." *Armstrong*, 575 U.S. at 327; *accord Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cas-

es). The State therefore may invoke "the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946).

209.    The State also has authority to assert this claim under the "non-statutory cause of action," to challenge *ultra vires* actions of the Executive. *Reich*, 74 F.3d at 1328.

210.    The injury inflicted by the unlawful delegation is both an accomplished fact and ongoing. That injury gives rise to a ripe dispute here, particularly as the non-delegation issue is "purely legal." *See, e.g.*, *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985) (A case is typically ripe where the "issue presented … is purely legal, and will not be clarified by further factual development.").

## COUNT II

### EPA's Delegation Is Contrary To Law And Arbitrary and Capricious
### Asserted Under The Administrative Procedure Act, 5 U.S.C. §§ 704, 706

211.    The State repeats and incorporates by reference each of the Complaint's allegations stated above.

212.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious … or otherwise not in accordance with law." 5 U.S.C. § 706(2).

213.    As set forth above, EPA's delegation of veto power to the Private Special Interest Groups violates the Constitution. As such it is "not in accordance with law." 5 U.S.C. § 706(2).

214.    EPA's delegation is also arbitrary and capricious—by the agency's own admission. EPA has previously conceded that resolving Title VI complaints in 180 days is "unrealistic," "inflexible," and "impracticable given the inherent scientific complexity associated with determining which and how populations are impacted by environmental pollutants; the number of discrimination allegations and theories that may be asserted in any one complaint under Title VI or the other nondiscrimination statutes; and the volume of the complaints received." 80 Fed. Reg. at 77,287. Indeed,

EPA went so far as to describe the 180-day requirement of its regulations as an "arbitrary dead-line[]." *Id.*

215.    By agreeing to deadlines that the agency has previously admitted are "unrealistic," "inflexible," and "impractical" without supplying any contrary reasoning, EPA has acted in an arbitrary and capricious manner. That is particularly so as EPA itself admitted that its deadlines were "arbitrary"—only to then delegate to Private Special Interest Groups the right to compel the agency to abide by those admittedly "arbitrary" and "unrealistic" dates. *See, e.g., Dillmon v. Nat. Transp. Safety Bd.*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009) ("Reasoned decision making, therefore, necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent. Applying the corollary of this requirement, 'agency action is arbitrary and capricious if it departs from agency precedent without explanation.'" (citation omitted)).

216.    EPA's conferral of veto powers to Private Special Interest Groups and March 2023 inquiry to those groups as to whether they wished to exercise that veto power with respect to the informal proceedings at issue here are final agency actions within the meaning of the APA. EPA's decision to delegate to those groups governmental power is in no way "tentative or interlocutory [in] nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). And legal consequences have already flowed from those decisions: the Private Special Interest Groups were unconstitutionally given governmental authority that they may not lawfully possess.

217.    In addition, subjecting the State to governmental proceedings in which non-governmental actors possessed veto power over the agency's exercise of its authority was final agency action with respect to the non-delegation issue.

## COUNT III

**EPA's Title VI Disparate-Impact Regulations Exceed The Executives Power Under § 602 Asserted Under Asserted Under The Administrative Procedure Act, 5 U.S.C. §§ 704, 706 And Non-Statutory Cause of Action**

218.    The State repeats and incorporates by reference each of the Complaint's allegations stated above.

219.    As set forth above, Section 602 does not authorize imposition of disparate-impact-based requirements.

220.    EPA's attempt to impose disparate-impact-based requirements in its Title VI regulations (*e.g.*, 40 C.F.R. § 7.35) exceeds the agency's authority under Title VI and is *ultra vires*.

221.    Although EPA's Title VI regulations were last amended in 2010, this Court has authority to consider the State's challenge to them.

222.    The Fifth Circuit has recognized that when "when an agency *applies* a rule, the limitations period running from the rule's publication will not bar a claimant from challenging the agency's statutory authority. *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997). Therefore, "[i]t is possible … to challenge a regulation after the limitations period has expired, provided that the ground for the challenge is that the issuing agency exceeded its constitutional or statutory authority. To sustain such a challenge, however, the claimant must show some direct, final agency action involving the particular plaintiff within six years of filing suit." *Id.*; *accord American Stewards of Liberty v. DOI*, 960 F.3d 223, 229 (5th Cir. 2020) ("[A] plaintiff who misses this window may still obtain effective review of the regulation by instead bringing a challenge within six years of a later final agency action that applies the regulation to the plaintiff.").

223.    This exception explicitly includes a "challenge … on the grounds that [the regulation] 'conflicts with the statute from which its authority derives,'" *Weaver v. Fed. Motor Carrier Safety*

*Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014) (citation omitted)—*e.g.*, EPA's Title VI regulations conflicting with Section 602's limited grant of authority to "effectuate" Section 601.

224.    Here, EPA has applied its Title VI regulations to the State's agencies within the last six years and purported to re-bind LDEQ and LDH to its disparate-impact-based mandates.

225.    Alternatively, the State asserts this claim as a pre-enforcement challenge to EPA's potential enforcement of Title VI against the State in the form of putative disparate-impact-based mandates.

226.    The State faces a "credible threat" of enforcement of Title VI by EPA with respect to disparate-impact-based mandates. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)

227.    The realistic threat of enforcement is particularly apparent given EPA's October 12, 2022 Letter of Concern, which provides strong evidence of threatened enforcement of Title VI against the State with respect to disparate-impact-based requirements.

### COUNT IV

### DOJ's Title VI Disparate-Impact Regulations Exceed The Executives Power Under § 602 Asserted Under Asserted Under The Administrative Procedure Act, 5 U.S.C. §§ 704, 706 And Non-Statutory Cause of Action

228.    The State repeats and incorporates by reference each of the Complaint's allegations stated above.

229.    As set forth above, Section 602 does not authorize imposition of disparate-impact-based requirements.

230.    DOJ's attempt to impose disparate-impact-based requirements in its Title VI regulations (*e.g.*, 40 C.F.R. § 7.35) exceeds the agency's authority under Title VI and is *ultra vires*.

231.    Agencies of the State have received grants from DOJ within the last six years, which purport to bind the agencies to DOJ's disparate-impact-based requirements.

232.    In addition, EPA's Title VI regulations, including their disparate-impact require-ments, are premised on DOJ's regulations and necessarily reliant on them for their legal validity. Any application of EPA's Title VI regulations on the State and its agencies is thus necessarily also an ap-plication of DOJ's regulations on the State.

233.    DOJ's Title VI regulations are also challengeable under the reopening doctrine as they relate to the disparate-impact-based requirements.

234.    "The reopening doctrine allows an otherwise stale challenge to proceed because 'the agency opened the issue up anew,' and then 'reexamined and reaffirmed its prior decision.'" *P&V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1023-24 (D.C. Cir. 2008) (citations omitted) (cleaned up). Thus, if "the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision, the agency's second action (the reaffirmance) is reviewable.… In that event, the reaf-firmance, rather than the original decision, starts the limitation period. But if the agency merely reaf-firmed its decision without *really* opening the decision back up and reconsidering it, the agency's ini-tial action is the only final agency action to review—so the limitation period runs from the first deci-sion by the agency." *Texas v. Biden*, 20 F.4th 928, 951 (5th Cir. 2021), *rev'd on other grounds* 142 S. Ct. 2528 (2022) (cleaned up).

235.    DOJ effectively reopened its Title VI regulations in December 2020-January 2021.

236.    On December 21, 2020, DOJ submitted to the Office of Management and Budget ("OMB") a proposed final rule that would have amended DOJ's Title VI regulations to eliminate any disparate-impact-based requirements. *See* Wagner, Annalise, Note, *Rolling Back DOJ's Title VI Protections: Trump's Abandoned Attempt and Potential Impacts on EJ Enforcement* (Apr. 2021), https://eelp.law.harvard.edu/2021/04/doj-title-vi/. The final rule did so on the basis of DOJ's view that disparate-impact-based requirements could not be lawfully imposed consistent with Title VI and Section 602. *Id.*

237.     OMB approved DOJ's proposed rule on January 8, 2021. *Id.* As a result, it should have been published in the Federal Register and become effective 30 days after publication.

238.     DOJ's rule was never published in the Federal Register. Upon information and belief, the Biden Administration prevented the rule from being published and subsequently withdrew it.

239.     Defendants had no lawful basis for delaying publication of the rule and certainly have never supplied any. By indefinitely delaying publication of the final rule adopted by OMB, Defendants violated the APA. *See, e.g., Air Alliance Houston v. EPA*, 906 F.3d 1049, 1065 (D.C. Cir. 2018) (Agencies "may not employ delay tactics to effectively repeal a final rule while sidestepping the statutorily mandated process for revising or repealing that rule.").

240.     The *de facto* adoption and subsequent withdrawal of a final rule repealing DOJ Title VI disparate-impact regulations constitute reopening within the meaning of the reopening doctrine. As a result, the Biden Administration's "reaffirmance [of Title VI disparate-impact regulations], rather than the original decision, starts the limitation period." *Texas v. Biden*, 20 F.4th at 951 (cleaned up).

## COUNT V

### Defendants' Disparate-Impact-Based Title VI Mandates Violate The Spending Clause
### Asserted Under The Constitution, Federal Courts' Equitable Powers, The Non-Statutory Cause Of Action, And The Administrative Procedure Act, 5 U.S.C. §§ 704, 706

241.     The State repeats and incorporates by reference each of the Complaint's allegations stated above.

242.     Article I of the U.S. Constitution enumerates the powers of Congress.

243.     Article I, § 8, cl. 1 empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

244.    While Congress may provide conditional grants to the states under the Spending Clause, those conditions are subject to several limitations, including that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

245.    Because Title VI generally, and Section 602 in particular, do not unambiguously (1) impose disparate-impact requirements or (2) give Defendants authority to impose such requirements, Defendants' attempt to impose disparate-impact-based mandates on the States runs afoul of this Spending Clause requirement.

246.    As a result, Defendants' attempt to impose disparate-impact-based requirements upon the State under Title VI violates the Constitution. For similar reasons, Defendants' attempts to impose disparate-impact-based requirements under Title VI are *ultra vires* agency actions.

## COUNT VI

### EPA's Attempt To Impose Extra-Regulatory Requirements Violates The Constitution Under Article II Vesting Clause And Separation Of Powers And Is *Ultra Vires*

### Asserted Under The Constitution, Federal Courts' Equitable Powers, And Non-Statutory Cause Of Action

247.    The State repeats and incorporates by reference each of the Complaint's allegations stated above.

248.    Although Congress may delegate authority to agencies, "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986).

249.    To implement *any* regulations or requirements under Title VI, agencies are required to comply with the APA. *See generally* 5 § 501 *et seq.* By attempting to impose requirements that have never been adopted through APA-compliant procedures, Defendants are acting in an *ultra vires* manner here.

250.     In addition to the APA generally, Title VI imposes a specific and explicit mandate that any "rule, regulation, or order [implementing Title VI] shall [not] become effective *unless and until approved by the President*." 42 U.S.C. § 2000d-1 (emphasis added).

251.     Congress thus conditioned the delegation of *any* implementing authority to agencies upon receiving the requisite Presidential approval. *Any* attempt to impose requirements not ratified by the President (or those delegated to exercise that power on his behalf) thus violates the Constitution, by exercising authority that Congress has not delegated to the agency.

252.     In addition, EPA has attempted to impose upon the State requirements that the agency itself does not follow itself, such as cumulative-impacts-analysis mandates. In doing so, EPA has violated Section 602's mandate that "rules, regulations, or orders" effectuating Section 601 must be "of general applicability." 42 U.S.C. § 2000d-1.

253.     EPA's attempts to impose extra-regulatory requirements here thus violates the Constitution, Title VI, and the APA, and are *ultra vires.*

## COUNT VII

### EPA's "Parallel Tracks" Violates Its Title VI regulations

### Asserted Under The Administrative Procedure Act, 5 U.S.C. §§ 704, 706

254.     The State repeats and incorporates by reference each of the Complaint's allegations stated above.

255.     EPA's regulations, including 40 C.F.R. §7.115 and 7.120, establish the processes that EPA must follow when investigating and resolving Title VI complaints.

256.     40 C.F.R. §7.120(d), titled "Complaint processing procedures," establishes a sequence that EPA must follow when evaluating Title VI complaints. That regulation further provides that "OCR shall attempt to resolve complaints informally whenever possible." 40 C.F.R.

§7.120(d)(2). Only "[w]hen a complaint cannot be resolved informally, OCR shall follow the procedures established by paragraphs (c) through (e) of § 7.115." *Id.*

257.    EPA thus may only proceed to "follow the procedures established by paragraphs (c) through (e) of § 7.115" *after* it was determined that "a complaint cannot be resolved informally." *Id.*

258.    EPA has violated the sequencing required by its regulations here. As explained above, EPA has begun the compliance processes of § 7.115 by, in Dorka's description, "continu[ing] its fact-finding on a parallel track with the IRA process to ensure that EPA … is in a position to resolve the complaint through the issuance of Preliminary Findings, should EPA and LDEQ not be able to reach an IRA by the agreed upon date."

259.    By proceeding to the processes of § 7.115 without first concluding that the "complaint cannot be resolved informally" and terminating informal resolution proceedings, EPA has violated the sequencing requirement of 40 C.F.R. §7.120(d).

260.    EPA's decision to proceed to the processes of § 7.115 is final agency action within the meaning of the APA.

**PRAYER FOR RELIEF**

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

1.    Declaring, under 28 U.S.C. § 2201, that EPA's delegation of governmental power to the Private Special Interest Groups is unconstitutional and/or arbitrary and capricious;

2.    Declaring, under 28 U.S.C. § 2201, that EPA's and DOJ's regulations purporting to impose disparate-impact-based requirements under Title VI are unlawful;

3.    Declaring, under 28 U.S.C. § 2201, that EPA's attempt to impose extra-regulatory requirements under Title VI is unlawful;

4.    Vacating the challenged actions and regulations;

5.  Preliminarily and permanently enjoining the challenged actions and regulations without bond;

6.  Awarding the State its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7.  Granting any and all other such relief as the Court finds appropriate.

Dated:   May 22, 2023

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

By: */s/ Elizabeth B. Murrill*

DREW C. ENSIGN *
  Special Assistant Solicitor General
202 E. Earll Drive
Suite 490
Phoenix, AZ 85004
drewensignlaw@gmail.com

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
TRACY SHORT (La #23940)
  Assistant Attorney General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

*\*Pro Hac Vice admission application forthcoming*