**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

THE STATE OF LOUISIANA,
By and through its Attorney General, Jeff Landry,

PLAINTIFF,

v.

CIVIL ACTION NO. 2:23-cv-00692

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; et al.,

DEFENDANTS.

## DECLARATION OF RYAN SEIDEMANN

1.      My name is Ryan M. Seidemann. I am an Assistant Attorney General employed by the Louisiana Department of Justice.

2.      I hold a B.A. and an M.A. in anthropology, a Ph.D. in urban studies/urban anthropology, and a J.D. and B.C.L. in law. I am licensed to practice law in Louisiana (Bar No. 28991) and Vermont (Bar No. 6170), and have focused my practice over nearly 20 years on matters of environmental and natural resources law.

3.      I have been the Chief of the Lands and Natural Resources Section of the Louisiana Department of Justice since 2007, and I have also served as the Acting Chief of the Environmental Section from 2007-2010 and 2019-2023. Among my duties with the Louisiana Department of Justice since being hired in 2005 are legal representation of agencies such as the Louisiana Department of Environmental Quality, the Louisiana Department of Natural Resources, the Louisiana Department of Wildlife and Fisheries, the Louisiana Oil Spill Coordinator's Office, and the Louisiana Coastal Protection and Restoration Authority.

4.      Through my representation of these agencies, I have participated in and have experience in matters of environmental, natural resources, and other public trust laws at the federal, state, and local level. This work has included legal counsel and representation of the agencies on environmental topics before the U.S. Court of Appeals for the Fifth Circuit, the Louisiana Supreme Court, and the Arkansas Supreme Court.

5.      I have taught undergraduate, graduate, and law school courses in environmental and public trust law topics from 2011 through the present (at both Southern University Law Center and the University of New Orleans).

6.      Nearly half of my more than 100 professional publications and 150 professional presentations have covered topics of environmental and public trust law. The remaining publications and presentations cover topics related to archaeology, anthropology, and other scientific matters, most of which are peer reviewed.

7.      Since late-2022, I have participated in numerous telephone conferences among the United States Environmental Protection Agency ("EPA"), the Louisiana Department of Health ("LDH"), the Louisiana Department of Environmental Equality ("LDEQ"), and the Louisiana Department of Justice ("LADOJ"). I have also received numerous emails from the same parties regarding those conferences and the informal resolution agreements that were the subject of those conferences. I make this declaration based on my personal knowledge and documents available to me as a result of my position.

**A CONCLUSION PRE-ORDAINED:**
**ADMINISTRATOR REGAN'S JOURNEY TO JUSTICE TOUR**

8.      An EPA press release quotes Administrator Michael S. Regan as stating that "[f]rom [his] first day at EPA, [he] ha[s] committed to embedding equity, environmental justice, and civil rights into the DNA of the Agency's programs, policies, and processes, and to delivering tangible results to

underserved communities." A true and accurate copy of that press release is attached as Exhibit 1, as obtained from www.epa.gov.

9.      According to another EPA press release, in November 2021, Administrator Regan "embarked on a 'Journey to Justice' tour, travelling throughout Mississippi, Louisiana, and Texas to spotlight longstanding environmental justice concerns in historically marginalized communities …." The EPA press release documents meetings with "environmental justice and community leaders" in, *inter alia*, St. John the Baptist Parish, St. James Parish, Orleans Parish, and Calcasieu Parish, Louisiana. The press release notably does not mention any meetings with elected officials or industry leaders. A true and accurate copy of that press release is attached as Exhibit 2, as obtained from www.epa.gov.

10.     The press release quotes Administrator Regan as stating the Biden Administration's Build Back Better Agenda "is a huge opportunity for these environmental justice communities that have disproportionately been impacted for far too long."

11.     Press reports indicate that officials actually elected by the communities visited by Administrator Regan are supportive of the industry in their communities, and some of those local officials believe non-local environmental activists are funding "astroturfed" opposition to that industry.  A true and accurate copy of one such press report is attached hereto as Exhibit 3.

12.     Following Administrator Regan's "Journey to Justice" tour, in Spring 2022, EPA released an "Equity Action Plan" stating that EPA "has committed to making equity, environmental justice, and civil rights a centerpiece of the agency's mission." A true and accurate copy of that Equity Action Plan is attached as Exhibit 4, as obtained from www.epa.gov.[1]

---

[1] https://www.epa.gov/system/files/documents/2022-04/epa_equityactionplan_april2022_508.pdf

13.     EPA's "FY 2022-2026 EPA Strategic Plan" similarly includes numerous "environmental justice" goals and objectives. A true and accurate copy of that Strategic Plan is attached as Exhibit 5, as obtained from www.epa.gov.[2]

14.     Administrator Regan then created "a new national office charged with advancing environmental justice and civil rights" to be led by a Senate-confirmed Assistant Administrator, so as to "elevate environmental justice and civil rights at EPA" to "the same playing field as the Office of Air [and] Office of Water." The new office will be supported by 229 Full Time Equivalent ("FTE") personnel, of which 170 FTEs reflect new positions. True and accurate copies of supporting documents are attached as Exhibits 6[3] and 7[4], as obtained from www.epa.gov.

15.     An article by a senior EPA official specifically ties EPA's new "Office of Environmental Justice and External Civil Rights" to activists and activism, stating that "[o]ur work must translate into change on the ground, and we know that we can depend on activists … to make sure we fulfill our commitments to them." A true and accurate copy of that article is attached as Exhibit 8, as obtained from www.epa.gov.[5]

16.     A *Bloomberg News* article quotes Defendant Dorka as summarizing EPA's new focus: "This agency wants to be a civil rights agency." The article went on to paraphrase Dorka as saying EPA is "pivoting from a largely reactive stance on civil rights to one that aggressively ventures into the field on its own initiative, scanning for areas of greatest concern and kicking off tough compliance reviews." A true and accurate copy of that article is attached as Exhibit 41.

17.     An environmental lawyer at a prominent national law firm noted that "impacted entities might challenge the EPA," and "[i]f actions taken to advance environmental justice are

---

[2] https://www.epa.gov/system/files/documents/2022-03/fy-2022-2026-epa-strategic-plan-overview.pdf
[3] https://www.epa.gov/newsreleases/icymi-epa-administrator-regan-launches-new-national-office-dedicated-advancing
[4] https://www.epa.gov/system/files/documents/2022-10/OEJECR.pdf
[5] https://www.epa.gov/perspectives/epas-new-office-environmental-justice-and-external-civil-rights-moment-history

premised merely on findings of disparate impact without discriminatory intent, such challenges could have success. The Supreme Court has already written that Title-VI-implementing regulations like … the EPA's are in 'considerable tension' with the Court's Title VI precedents." Attached as Exhibit 9 is a true and accurate copy of an "Environmental Law Update" by a partner at Winston & Strawn LLP.[6] That lawyer's public biography states that he served as the Acting Assistant Attorney General for the Environmental and Natural Resources Division (ENRD) of the USDOJ.[7]

## THE COMPLAINTS AND LETTER OF CONCERN

18.     I am informed and believe that EPA received a series of Title VI complaints in early-2022 from Concerned Citizens of St. John, Sierra Club, Stop the Wallace Grain Terminal, Inclusive Louisiana, RISE St. James, and the Louisiana Bucket Brigade. Consistent with that information, EPA's External Civil Rights docket reflects that EPA received complaint 01R-22-R6 on January 20, 2022, received complaint 02R-22-R6 on January 20, 2022, and received complaint 04R-22-R6 on February 2, 2022. A true and accurate printout of EPA's External Civil Rights docket is attached as Exhibit 10, as obtained from www.epa.gov.[8] I calculate that 180 days after those complaints were received by EPA would be July 19, 2023, and August 1, 2023, respectively.

19.     On November 2, 2022, EPA provided LADOJ with a copy of a Letter of Concern sent to the Louisiana Department of Environmental Quality and Louisiana Department of Health, as well as a case resolution manual. A true and accurate copy of that Letter of Concern, dated October 12, 2022, is attached as Exhibit 11.[9] A true and accurate copy of that Case Resolution Manual is attached as Exhibit 12.[10]

---

[6] https://www.winston.com/en/winston-and-the-legal-environment/epa-to-affirmatively-enforce-title-vi.html
[7] https://www.winston.com/en/who-we-are/professionals/brightbill-jonathan-d.html
[8] https://www.epa.gov/external-civil-rights/external-civil-rights-docket-2014-present
[9]                                                    https://www.epa.gov/system/files/documents/2022-10/2022%2010%2012%20Final%20Letter%20LDEQ%20LDH%2001R-22-R6%2C%2002R-22-R6%2C%2004R-22-R6.pdf
[10] https://www.epa.gov/sites/default/files/2021-01/documents/2021.1.5_final_case_resolution_manual_.pdf

20.     The Case Resolution Manual EPA provided to LADOJ states that "ECRCO will suspend its complaint investigation and will issue letters to the recipient and the complainant notifying them when informal resolution agreement discussions have commenced. At that point, the 180-day time period for issuing preliminary findings under the complaint investigation process is tolled."

21.     During subsequent telephone conversations with EPA, representatives of LDEQ and LDH stated that their agencies had elected to pursue informal resolution.

## INFORMAL RESOLUTION DISCUSSIONS

22.     Informal resolution discussions began via a telephone conference on November 16, 2022. LADOJ inquired as to "exactly" what EPA believes LDEQ and LDH are doing wrong, and explained that EPA's letters of concern do not identify specific actions.

23.     LADOJ accordingly asked that EPA specifically identify any provisions in Louisiana law, any actions, or any inactions that EPA believed were in conflict with Title VI, and that EPA provide supporting legal analysis.

24.     EPA generally refused to do so. Instead, the agency reiterated the elements of a disparate impact claim, then stated "this is not an environmental engagement per se."

25.     Underscoring the fundamental disconnect between the agency's environmental mission and its Title VI regulations, EPA officials expressly stated that "compliance with environmental laws is not a shield to Title VI."

26.     Throughout the informal resolution discussions, EPA consistently refused to identify the specific actions or inactions that purportedly underlay its Title VI concerns. For example, in a December 12, 2022, telephone conference, an EPA representative said EPA was "not looking at actual permit issuance and what happened each time a permit was issued."

27.     Defendant Dorka then elaborated that no specific action is at issue, and EPA is targeting the cumulative impact of LDEQ's actions. But Dorka then contradicted herself only three

weeks later, in a January 4, 2023, telephone conference: When LADOJ noted EPA "still had not identified any specific thing … you think creates a civil rights problem, other than outcome," Dorka responded "this is not about procedures," claimed "it's your method of administering your air program in a couple of different instances … we find strong evidence that the method of administering the air program … resulted in some harms, some impacts, and that those impacts were born disproportionately on the basis of race."

28.     LADOJ again asked EPA to identify the specifics: "[W]hat are the criteria or methods of administration EPA believes are creating a disparate impact, specifically?" Starting a long-running pattern of dismissive responses, Dorka stated "that's not going to move forward our conversation today," then again generically pointed to LDEQ's "administration of the air program." When pressed, EPA pointed to LDEQ's issuance of a single permit, and said "that subjected people to discrimination." EPA then refused to state whether its Letter of Concern represented a complete statement of EPA's concerns.

29.     LADOJ noted "the remedy [EPA is] entitled to is one-for-one with [any] non-compliance." Dorka continued to dismiss LADOJ's concerns, stating that discussions of "remedy" would only come with formal findings.

30.     LADOJ then again explained: "The statutory requirement is for compliance, [and] that's all EPA is entitled to;" "EPA is statutorily obligated to provide us with notice of how [LDEQ] purportedly failed to comply" with Title VI; "[w]e need to know specifically where EPA thinks there's non-compliance" in order to meaningfully negotiate; but EPA is only pointing to undefined "methods of administration."

31.     At that point, LADOJ explained that EPA was not making the process productive: "[W]e are asking you to identify the very specific things" where EPA believes there is any non-compliance with Title VI. LADOJ continued: "We keep having these calls where EPA … throw[s]

7

out pretty important, significant accusations," but EPA is not wanting to memorialize those accusations and is "not wanting to actually engage with us on what the legal requirements are and what the legal defects are."

32.     EPA kept intoning "disparate impact" as if those words had talismanic effect that automatically entitled the agency to impose upon LDH and LDEQ any requirement that EPA cared to invent. But EPA failed to apply even the basic requirements of its chosen theory of disparate impact: Dorka stated that EPA is not looking at a comparison with a similarly situated action or population, merely whether alleged harms fall on communities that are predominately black.

33.     Dorka finally admitted "you're not going to see in any letter where we think [LDEQ or LDH] violated the law," but "part of what we're saying here, is in the future, put a process in place, as we've been engaging with many, many states … other states … so that you yourself can do an analysis … both from an [environmental justice] perspective [and] from a civil rights perspective, that gives you an idea of whether the actions you may be about to take could have a disparate impact on the basis of race."

34.     Entirely absent from that discussion was the source of authority for EPA's demand that Louisiana put any particular processes in place. Nor did EPA explain how such federal micro-management was consistent with the cooperative federalism approach of the Clean Air Act and other environmental statutes.

35.     LADOJ twice sought to confirm EPA's positions via letters memorializing the informal resolution discussions. True and accurate copies of memorialization letters are attached as Exhibits 13 and 15.

36.     EPA responded that it would "not be responding at this time to [one letter's] specific points.…" A true and correct copy of that response is attached as Exhibit 14.

37.     On January 18, 2023, Dorka stated that the initial draft informal resolution agreements ("IRAs") that EPA presented included a lot of "standard boilerplate procedural safeguards commitments that [EPA] share[s] with all recipients," and that she expected the agencies "to get back to [EPA] as to whether you already have certain things in place," together with any amendments to those sections, "so that we don't spend our time on procedurals because we could talk for days on those things."

38.     An LADOJ attorney noted he was "flabbergasted that we're being presented … with a boilerplate and asked to redline things that have no apparent application to the complaint," some of which "are far beyond what the statute or regulations contemplate." He elaborated that "EPA has a nondiscretionary duty to attempt to resolve this through … voluntarily compliance, and starting out like this … is an utter failure to comply with that duty."

39.     In that same January 18, 2023, telephone conference, Dorka continued her demand that the agencies agree to things that—to my knowledge—are nowhere required by Title VI or any implementing regulation. Dorka made clear, for example, that EPA expected NEPA-like pre-decisional analysis of the potential for disparate impact, including express consideration of race: "Did you consciously think wow, you know, this permit exists in a community of color; they already face x, y, z, challenge … not to mention there's limited English proficiency; the population is aging; and all of those different factors. Did you even consider those before making decisions? This is to put a framework in place for the future … for permits for other actions you might be considering."

40.     In a subsequent telephone conference, LADOJ asked for the statutory or regulatory basis for requiring a NEPA-like pre-decisional process. Dorka responded that "what we're putting in place is totally based on a Title VI approach" and volunteered that "in informally resolving a number of these types of cases, we are helping folks put into place a framework, a Title VI disparate impact, identify and address-type of framework" "to address this prospectively."

9

41.     Dorka was unable to point to any specific provision of Title VI or EPA's implementing regulations that required such an analysis, instead pointed to the general language in EPA regulations at 40 C.F.R. § 7.35. She further acknowledged explicitly that "[n]othing's gonna say that it requires [an analysis] to be conducted before" a permitting action.

42.     In that same January 18, 2023, telephone conference, Dorka also made clear that EPA expected LDEQ to add permitting conditions not authorized by environmental statutes: "Sometimes … in order to address what appears to be a disparate impact, disparate harm, you may need to go beyond [environmental statutory] authorities. For example, if a facility … has really adverse effects with respect to odor. Technically the [environmental statutory] authorities may not need you to discuss odor within the construct of that permit. You may need to anyway. You may need to have an odor management plan." "Odor, traffic, safety, things like that that are nevertheless from a civil rights perspective adversities that could be caused by certain actions."

43.     In subsequent conferences, LDEQ explained that some of those items were not under LDEQ's purview, pointing to impacts from traffic as an example of something that could not be the basis for LDEQ lawfully denying an air permit. EPA made clear, however, that it wanted LDEQ to "consider [things] beyond the four corners of the Clean Air Act" in its permitting decisions. "[I]t goes beyond just air emissions … all of the other factors that you see make up recommended disparate impact assessment, not just the individual permit."

44.     LDEQ repeatedly explained that it does not have authority to address social inequities like limited education, limited access to healthcare, age of the housing, or traffic in the context of an air permit review. LDEQ pointed to the Clean Air Act's statutory standard. Dorka responded by giving away the game: she complained that "in essence, [LDEQ is] treating … that [minority] community the same as you would any other community…."—*i.e.*, EPA's true objection is that the State is *not* discriminating on the basis of race. Dorka further acknowledged that LDEQ is "following

the environmental law," but complained "what about the civil rights, what about the other impacts …

that folks are already suffering?"

45.    Dorka then tried to flip the basics of administrative law on its head, claiming "you may

not have the authority to do it under your own environmental law, although I … don't see where it

prohibits … you from going beyond the permit." Dorka continued: "You just consider what else you

need to do, in addition to the parameters of the permit."

46.    When LDEQ asked how EPA's Region 6—which covers Louisiana—is implementing

this framework in areas where it directly issues permits, Dorka dismissed the question: "[F]ortunately

for them, they don't have a Title VI complaint filed against them," and pointed to "FAQs" that EPA

released the prior summer.

47.    LDEQ clarified it was "asking for examples of real-world applications, not FAQs, not

guidance documents… how are these principles being applied by EPA in permitting?" Dorka

acknowledged it was "a reasonable request," but dodged the question, again with a dismissive remark:

She was "talking about [LDEQ's] compliance with [Title VI]," and she was not going to discuss EPA's

permitting process. Dorka never denied that EPA Region 6's permitting standards would violate the

standards Defendants are attempting to foist upon LDEQ here.

48.    In short, EPA not only demanded ex-ante NEPA-like analysis to unlawfully facilitate

decision-making on the express basis of race, EPA demanded that LDEQ conduct "cumulative impact

assessments" as part of LDEQ's permitting process, notwithstanding the absence of statutory

authority for requiring such assessments. Indeed, as Dorka envisioned it, cumulative impact analyses

do not "necessarily have to be in response to a specific permit review. It … could be more affirmatively

done."

49. At one point, EPA asserted that even if LDEQ obtained an 85% reduction in emissions in the course of renewing a permit—*i.e.*, a significant environmental benefit—EPA believed that renewing that permit could result in a disparate impact that would violate Title VI.

50. Dorka confirmed her subordinate's point: EPA "would want to capture … any permit" with its civil rights framework. To put a finer point on it: it is not enough for LDEQ to improve the environment for *all* citizens of Louisiana. As I understood EPA's position, unless LDEQ redistributes those benefits on explicit race-based criteria in line with EPA's vision of "equity" and "social justice," then unambiguous environmental benefits for everyone, made on conceded racial-blind criteria, somehow violates Title VI.

51. For example, in a February 28, 2023, telephone conference, EPA rejected LDEQ's suggestion to only apply EPA's framework to permitting actions in the Industrial Corridor mentioned in EPA's Letter of Concern, stating that such a limitation would "not meet the Title VI needs." EPA instead demanded that LDEQ use EPA's framework "without exception" including for "all renewals of all permits." EPA confirmed that its demand was for LDEQ to "commit to doing a disparate impact screening assessment for every renewal permit application for any major source or synthetic minor source across the state." LDEQ noted that EPA's demand "goes beyond … resolving the concerns raised in the complaint[s] and … some renewals don't propose any changes at all." EPA responded that "the issue is [if] there are already disparate impacts, then you keep renewing it without looking and trying to figure out how to try and reduce them."

52. Illustrating the vast scope of micro-management EPA believes its generic Title VI regulations authorize, EPA stated that LDH and LDEQ should have "community meetings" to address a "perceived lack of community involvement," and that the State's speakers at those meetings be subject to various "protocols."

53.     When LADOJ asked EPA to identify problems with, *e.g.*, LDEQ's current processes for public participation, EPA pointed to a single, off-the-cuff remark by the Secretary of LDEQ at a public meeting. LADOJ noted that "pragmatically, this reflects an utter failure [by EPA to consider] human factors and reality … by parsing what someone said word-by-word at a public hearing." "[I]f that's the level of perfection you're expecting … [LADOJ's] advice [to State agencies] would be … [t]o read from bullet points and nothing else."

54.     EPA agreed with that implication. For its part, LDEQ noted the specific example EPA identified was about "a risk number … that is an EPA-formulated risk number that is a matter of some dispute" and, indeed, is the subject of litigation. Dorka responded that EPA "received these complaints, and we investigated … preliminarily, and [EPA] came to the conclusion that certain things needed to be put in place in order to informally address the issues that were raised in the complaints. This is one of them. I mean, we're not going to argue about whether this is something that we feel needs to address the issues of the complaint …. It was an issue that was raised. We need something in place to address all of the issues that were raised …. That's what this agreement is about."

55.     EPA's focus on controlling the public narrative came out in other ways, too. EPA demanded that LDH adopt a scientific integrity policy—subject to EPA's approval—supported by dozens of personnel. EPA explained that it "want[s] to ensure that the studies that are being conducted … follow a scientific integrity policy" satisfactory to EPA, and that the policy provide "a framework for every single study, every document that comes out that informs [the] public of the study information."

56.     In short, EPA believes the informal resolution process gives it free reign to make demands of State agencies—including public adherence to EPA's talking points on disputed scientific issues—regardless of whether those demands are tied to what Title VI itself demands or "effectuat[ing] the provisions of" Title VI. 42 U.S.C. 2000d-1.

57.     EPA implicitly acknowledged as much. EPA repeatedly distinguished between compliance with Title VI and compliance with any involuntary resolution agreement. Indeed, notwithstanding the vast breadth of EPA's demands, EPA made clear that it does not view compliance with any involuntary resolution agreement as a safe harbor against violation of Title VI.

58.     In a February 23, 2023, telephone conference, EPA explained that—after three months of negotiations—it had just then shared all provisions of the proposed IRA for LDEQ; it had not yet shared all provisions for LDH; further negotiation was required; and parts of informal resolution agreements EPA was proposing went beyond EPA's Title VI concerns. A true and accurate copy of a draft IRA EPA sent to LDEQ on February 23, 2023, is attached as Exhibit 16.

59.     In that telephone conference, LADOJ noted surprise that "EPA is demanding that an agency solicit the opinion of counsel on a very complicated agreement, and get a response in two business days," but "it turns out EPA hasn't even submitted for consideration everything it wants. If this [proposed agreement] is so straight forward, and clear, and so what the law demands," it "was absolutely flabbergast[ing] that a complete [proposed] agreement hasn't been shared." LADOJ then re-emphasized that "the informal resolution process is provided in regulation, it's not an optional thing."

60.     Despite EPA's regulations mandating that the agency resolve Title VI disputes "*informally whenever possible*," 40 C.F.R. § 7.120 (emphasis added), Dorka responded by claiming EPA had "total discretion" regarding informal resolution: "We don't have to enter into informal resolution. Ok? We do not."

61.     Dorka continued: "Quite frankly, we also have the discretion not to offer informal resolution. That is the agency's prerogative." "We don't have the discretion, though, not to tell you what we think you're doing wrong. We have to tell you what we think you're doing wrong, and that

14

comes by way of preliminary findings, and then formal findings, etc." She added: "I disagree that we have no discretion in terms of informal resolution. We have total discretion."

62.     This exchange is both illustrative and revealing: despite EPA's operative regulations mandating informal resolution "whenever possible," Defendants believe that they have "total discretion" to ignore that explicit legal requirement. Indeed, Dorka repeated that "total discretion" premise a second time, thereby dispelling any doubts as to the chasm between EPA's actual regulatory authority and Defendants' view of their authority here.

63.     That departure from law was not isolated. Consistent with the Clean Air Act, LDEQ explained it is mandated to consider the balance between social and economic benefits of a project or an application it is considering, on the one hand, and the potential harm from environmental impact, on the other. Yet when LADOJ pressed EPA on its assuming "traffic" is a *per se* adverse impact— noting that many small communities actually consider increased traffic passing through an economic benefit—Dorka responded with a dismissive "oh, come on," then stated she was not considering the economic impact, only "the health impact … because after all, our joint mission—[LDEQ] and EPA—is protection of health and the environment."

64.     Throughout the negotiations, EPA acted in close concert with the activist complainants. For example, in a February 9, 2023, EPA stated that it had "ma[de] a lot of progress," but the activists raised an objection to the presence of certain attorneys representing the State because those attorneys also represented industry. EPA refused to identify the purported "members of the community" with whom they were coordinating, only that those "members of the community" were represented by the Tulane Environmental Law Clinic.

65.     On March 2, 2023, EPA announced yet another departure from its regulations. As she had previously, Dorka acknowledged that EPA, LDEQ, and LDH had "really productive conversations" and had "made a lot of progress." But Dorka then stated she "cannot imagine how we

would be able to finalize something by the [March 13] deadline" under EPA's then-current agreement with complainants. Dorka accordingly had "asked our [EPA] group to continue … their diligence on the IRA, but also to prepare, just in case, we needed to issue preliminary findings. So we have been proceeding on both tracks." Dorka accordingly said that EPA would ask complainants for another extension of time during a meeting with complainants the following day. Dorka made clear that if she asked for an additional 90 days, complainants would probably push back.

66.     Dorka explained that for other cases—not involving these particular complainants—EPA's policy is to toll the 180-day timeframe. EPA could not do so in this case due to a judgment from the Northern District of California that applied to the complainants in *one* of the complaints underlying EPA's Letter of Concern. EPA had used that judgment throughout the discussions, pointing to "tight deadlines and constraints" to push back on, *e.g.*, LDH taking time to review drafts with counsel.

67.     On March 9, 2023, EPA revealed how far that concerted activity went. Dorka disclosed that "there are some terms to the agreement that the complainant group wanted," the complainants "wanted to be able feel like they are being allowed an opportunity to weigh in on the draft IRA," Dorka agreed with that, and EPA therefore agreed to "share … the full clean draft that [EPA] sent over to LDEQ and the full clean draft that [EPA] sent over LDH." EPA's "interest is to get comments back from them," which EPA had already received from lawyers representing the complainants. EPA "would consider those," and "to the extent that … EPA thinks appropriate, [EPA] will include them as we make our changes to the original" proposed resolution agreement. Dorka concluded: "That is what [EPA] committed to doing, [and] that is what we're going to do."

68.     EPA's sharing of those drafts were in direct contravention of its promise of confidentiality to LDH, LDEQ, and LADOJ. Indeed, Dorka emailed LDH, LDEQ, and LADOJ officials on December 9, 2022, and stated, *inter alia*,

16

Within 60 calendar days of December 13, 2022, EPA will make an assessment of the progress of negotiations and the likelihood of resolution through an Informal Resolution Agreement (IRA). Based on that assessment, EPA will determine whether to proceed with IRA negotiations and resolve the complaints through informal resolution, or end negotiations and proceed to issue Preliminary Findings. EPA will notify the Complainants and Recipients of its decision. If negotiations are productive and EPA determines to proceed, **EPA will at that time share with Complainants a summary of any agreements in principle reached. EPA will not otherwise disclose details of its negotiations with Recipients.**

A true and accurate copy of that email is attached as Exhibit 17.

69.     LDEQ objected to that depth of involvement by complainants and complainants as unfair and not previously disclosed. Dorka responded that "under this Administration, we've made a pledge to be more transparent and to be more inclusive in terms of bringing stakeholders to the table." Dorka implied the sharing was a *quid pro quo* for complainants agreeing to consent to negotiation: EPA "did not think it was a very high price … in order to get a 120-day extension for the purpose of continuing what we think is a very productive discussion [and] negotiation." Indeed, EPA had "walked complainants through [EPA's] draft[s]" and "talked through with them what [EPA] had included."

70.     LADOJ noted that EPA's actions gave the appearance of "EPA acting as the complainants' lawyers rather than a party to the negotiation[.]" LADOJ then asked "since it's [supposedly] a reasonable condition [to share EPA's communications with the State as *quid pro quo* for the 120-day extension], can we receive a copy of [EPA's] communications with the complainants?" Dorka refused.

71.     LDH estimated that EPA demands related to a scientific integrity policy would require numerous additional personnel, costing several million dollars.

72.     LADOJ repeatedly explained to EPA that Louisiana law restricts State agencies from expending public funds without getting anything in return unless required to do so by law, and that State law further restricted an official's ability to commit to restrictions on the exercise of agency

discretion. EPA nevertheless proceeded to offer its own interpretations of state law and suggest LADOJ and LDEQ were wrong about the scope of the agencies' authority under Louisiana law.

73.     On April 26, 2023, Dorka wrote to the Secretary of the Louisiana Department of Environmental Quality, stating that "[w]hile EPA appreciates LDEQ's engagement in the IRA process and is encouraged by the negotiations to date, we have not yet reached an IRA. Therefore, as EPA has previously conveyed to LDEQ, EPA must continue its fact-finding on a parallel track with the IRA process to ensure that EPA … is in a position to resolve the complaint through the issuance of Preliminary Findings, should EPA and LDEQ not be able to reach an IRA by the agreed upon date."

74.     EPA attached an extraordinarily burdensome discovery request to its letter, purportedly pursuant to its authority under 40 C.F.R. §§ 7.115 and 7.120. A true and accurate copy of that letter and request are attached hereto as Exhibit 18.

75.     EPA repeatedly made clear that it demanded any informal resolution agreements apply agency-wide, including in areas entirely beyond EPA's regulatory authority. For example, in a May 2 telephone conference, LDH raised a "big concern" that "all [LDH's] Medicaid notices and such are designed to conform with whatever Medicaid-related requirements the federal government has concerning … disparate impact, civil rights," etc. LDH explained that if its Medicaid operations were included in an IRA with EPA, LDH "would have to go and compare all the Medicaid notices that we have to provide, which are voluminous, to ensure they both correspond with whatever EPA's requirements are, as well as that doesn't conflict with what CMS's requirements are." So LDH asked to "carve out Medicaid and … just have [LDH] agree that [LDH] will abide with any equivalent or comparable requirements of CMS or other relevant entities related to the Medicaid program so we don't have to try to figure all that out." EPA rejected that proposal, stating, *inter alia*, "there may be things that EPA is asking you to go above what Medicaid is asking."

76.     LDH elaborated that "it just seems like [EPA] could allow us to just follow [CMS's] rules, particularly as it relates to their program, unless you don't believe their rules are sufficient." EPA reiterated that "[t]his [IRA] applies to LDH as a whole. It's not just the Medicaid program, it's not one part of the program, it's LDH as a whole." EPA acknowledged that it sought "a lot of different details … that are beyond probably what Medicaid is asking you to do, beyond the Medicaid program. So it would be important for us for [LDH] to implement these procedure safeguards for your whole agency."

## POST-COMPLAINT EVENTS

77.     On May 24, 2023, LDH provided a redline of a draft IRA to EPA via email. Defendant Dorka replied and stated that EPA "will plan to walk through this with you during our call tomorrow afternoon …." A true and accurate copy of that email exchange is attached as Exhibit 19.

78.     Contemporaneous with that email, the Complaint in this matter was filed on May 24, 2023. The as-filed complaint was then emailed to Defendant Lilian Dorka and at least one EPA attorney on May 25, 2023, at 11:06 a.m. Defendant Dorka then cancelled a long-standing bi-weekly "IRA Conversation" with LDH and LDEQ at 11:42 a.m., and she did so without any explanation. A true and accurate copy of that cancellation is attached as Exhibit 20.

79.     Defendant Dorka next cancelled the long-standing bi-weekly "IRA Conversation" on May 30, 2023, on less than five hours' notice. A true and accurate copy of that cancellation is attached as Exhibit 21.

80.     On June 1, 2023, Defendant Dorka emailed LDEQ at 8:38 a.m. asking "whether LDEQ wants to continue negotiations to informally resolve" EPA's Title VI Complaints. LDEQ responded that it "remains willing to continue informal resolution negotiations" and provided "access to all LDEQ books, records, accounts, and other sources of information" pursuant to EPA's Title VI Case Resolution Manual. A true and accurate copy of that email chain is attached as Exhibit 22.

81. On June 1, 2023, Defendant Dorka emailed LDH at 11:14 a.m. asking if "LDH is still interested in pursuing informal resolution agreement discussions." LDH responded that it was and would "walk you through [LDH's] edits at 2pm today." Defendant Dorka then cancelled that long-scheduled 2 p.m. call at 1:47 p.m—*i.e.*, 13 minutes before it was set to begin. A true and accurate copy of that email chain is attached as Exhibit 23.

82. On June 9, 2023, LDEQ provided edits to EPA's draft IRA. A true and accurate copy of the email transmitting those edits is attached as Exhibit 24.

83. Defendant Dorka repeatedly cancelled long-standing "IRA Conversation" calls the day those calls were supposed to occur or the day before. True and accurate copies of those cancellations are attached as Composite Exhibit 25. To the best of my knowledge, since the Complaint was filed, EPA has neither provided comments to LDH or LDEQ regarding the proposed IRA, nor had substantive communications with LDH, LDEQ, or LADOJ regarding informal resolution. Instead, EPA has cancelled multiple successive scheduled meetings (*i.e.*, all post-complaint meetings) with scant advanced notice.

84. According to EPA's docket, on or about May 31, 2023, EPA received a Title VI complaint against LDEQ. *See* Exh. 10.[11] A true and correct copy of a correspondence from EPA regarding that complaint, as received from LDEQ, is attached as Exhibit 26.

85. RISE St. James, Vessel Project of Louisiana, For a Better Bayou, Deep South Center for Environmental Justice, Healthy Gulf, Louisiana Bucket Brigade, and Sierra Club filed a petition with EPA regarding purported cumulative impacts that purportedly result in "disproportionate and detrimental impacts on communities that [LDEQ is] obligated to consider and protect under Title VI of the Civil Rights Act." The petition also asks that EPA "consider [the] petition to also constitute a

---

[11] https://www.epa.gov/external-civil-rights/external-civil-rights-docket-2014-present

Title VI complaint and initiate investigation on LDEQ's ongoing practice of violating the Civil Rights Act of 1964." I have reason to believe this petition is the complaint identified above.

86.     On June 20, 2023, LDEQ emailed EPA regarding the last-minute cancellations, noted that EPA's conduct reflects a deviation from its Case Resolution Manual, and asking whether EPA remains committed to working on an informal resolution agreement. Defendant Dorka responded later that day with an email, *inter alia*, "cancel[ling] the rest of the meetings" and accusing LDEQ of not responding to EPA's document requests, notwithstanding LDEQ's written provision of access to its books and records pursuant to Section 2.4(2) of EPA's Case Resolution Manual. A true and accurate copy of that email chain is attached as Exhibit 27.

## EPA AND DOJ FUNDING TO LOUISIANA AGENCIES

87.     According to usaspending.gov, the State of Louisiana and its agencies have received $21.4 billion dollars in awards from federal agencies since FY2008.[12]

87a.    According to usaspending.gov, the State of Louisiana and its agencies have received millions of dollars in grants from the U.S. Department of Justice from FY2018 through FY2023, and have substantial unexpired grant funds still available.[13] A true and accurate excerpt of data downloaded from usaspending.gov is attached as Exhibit 45.

88.     According to usaspending.gov, LDEQ received millions of dollars in grants awarded by EPA from FY2018 through FY2023, and has substantial unexpired grant funds still available.[14] A true and accurate excerpt of data downloaded from usaspending.gov is attached as Exhibit 28.

---

[12] https://www.usaspending.gov/recipient/04a3ad4b-d652-8781-9dc8-c17fabbcb31b-P/latest
[13] https://www.usaspending.gov/search/?hash=cb5ce29a79091bd33d310b9c2e45f939
[14] https://www.usaspending.gov/search/?hash=44fbf57e12d1bd12181d496824505a0d

89.     According to usaspending.gov, LDH received millions of dollars in grants awarded by EPA from FY2018 through FY2023, and has substantial unexpired grant funds still available.[15] A true and accurate excerpt of data downloaded from usaspending.gov is attached as Exhibit 29.

89a.    According to usaspending.gov, LDH received over one million dollars in grants from the U.S. Department of Justice since FY2018.[16]

90.     In a March 7, 2023, telephone conference, LDH frustratingly noted that its involvement in this dispute resulted from accepting an approximately $80,000 grant from EPA to conduct a study related to the Denka Ponchartrain Works facility, and that "taking the $80,000 might have put [LDH] in jeopardy of losing the $200,000,000" in funds it has received from EPA. Dorka responded that LDH "took a lot more than $80,000," pointed to the "Clean [*sic*, Safe] Drinking Water Fund" as "millions of dollars that come from EPA," then pointed to "a total awarded amount of $263.1 million dollars, and there are others, and that one doesn't expire until 2024." Dorka also pointed to funds that do not expire until 2025 and 2026. Dorka elaborated that "[i]f you take a penny of EPA's funds, you must be compliant with EPA's regs."  Dorka continued: "[i]t is in essence a contractual agreement that says if you're gonna take this money, including that $280,000,000 [*sic*] that I just talked about, then you have to agree to comply with EPA's regulations. And so it's not just the grant for the Denka study.… This is why we're asking the whole department to sign off on this."

91.     Attached as Exhibit 30 is a true and accurate copy of EPA General Terms and Conditions Effective October 1, 2022, as obtained from www.epa.gov.[17]

92.     Attached as Exhibit 31 is a true and accurate copy of EPA General Terms and Conditions Effective November 12, 2020, as obtained from www.epa.gov.[18]

---

[15] https://www.usaspending.gov/search/?hash=a9ce3251e04bac62ca4e1d77a9e1d998
[16] https://www.usaspending.gov/search/?hash=2785d3d9911fbc9574e4d46483dd9e29
[17]                                                         https://www.epa.gov/system/files/documents/2022-09/fy_2022_epa_general_terms_and_conditions_effective_october_1_2022_or_later.pdf
[18]                                                         https://www.epa.gov/system/files/documents/2021-09/fy_2021_epa_general_terms_and_conditions_effective_november_12_2020_0.pdf

93.     Attached as Exhibit 32 is a true and accurate copy of EPA General Terms and Conditions Effective October 1, 2020, as obtained from www.epa.gov.[19]

94.     Attached as Exhibit 33 is a true and accurate copy of EPA General Terms and Conditions Effective October 1, 2019, as obtained from www.epa.gov.[20]

95.     Attached as Exhibit 34 is a true and accurate copy of EPA General Terms and Conditions Effective October 1, 2018, as obtained from www.epa.gov.[21]

## **MISCELLANEOUS**

96.     Attached as Exhibit 35 is a true and accurate copy of an Administrative Order on Consent that includes measures "designed to reduce actual chloroprene emissions at the Facility by 85%," as obtained from LDEQ.[22]

97.     Attached as Exhibit 36 is a true and accurate copy of an unpublished "final rule" as obtained from *The Washington Post.*[23]

98.     Attached as Exhibit 37 is a true and accurate copy of a December 8, 2022, email from EPA regarding a deadline extension.

99.     Attached as Exhibit 38 is a true and accurate copy of a draft IRA EPA emailed to LDH on March 2, 2023. In the accompanying email, EPA stated that "[t]his version includes the entirety of EPA's draft LDH IRA."

100.     Attached as Exhibit 39 is a true and accurate copy of a PDF of *Better Living* magazine, as obtained from the Hagley Library Digital Archives.[24]

---

[19] https://www.epa.gov/sites/default/files/2020-09/documents/fy_2020_epa_general_terms_and_conditions_effective_october_1_2020.pdf
[20] https://www.epa.gov/sites/default/files/2019-09/documents/fy_2020_epa_general_terms_and_conditions_effective_october_1_2019.pdf
[21] https://www.epa.gov/sites/default/files/2019-05/documents/fy_2019_epa_general_terms_and_conditions_effective_october_1_2018_or_later.pdf
[22] https://edms.deq.louisiana.gov/app/doc/view?doc=10457076
[23] https://www.washingtonpost.com/context/read-the-document-justice-department-s-proposed-amendment-to-title-vi-regulations/78790299-551d-4c6f-b93b-f55c07bfde86/?itid=lk_readmore_manual_9
[24] https://digital.hagley.org/Better_Living_20_01#page/1/mode/2up

101.     Attached as Exhibit 40 is a true and accurate copy of EPA's Compliance Toolkit, as obtained from www.epa.gov.[25]

102.     Attached as composite Exhibit 42 is a true and accurate copy of email correspondence regarding an extension, together with its attachments.

103.     Attached as Exhibit 43 is a true and accurate copy of correspondence obtained from www.epa.gov.[26]

104.     Attached as Exhibit 44 is a true and accurate copy of correspondence obtained from www.epa.gov.[27]

105.     Attached as Exhibit 46 is a true and accurate copy of a publication obtained from www.epa.gov.[28]

106.     Attached as Exhibit 47 is a true and accurate copy of a publication obtained from www.epa.gov.[29]

107.     Attached as Exhibits 48, 49, and 50 are true and accurate copies of litigation documents obtained from Westlaw.

108.     Attached as Exhibit 51 is a true and accurate excerpt of data downloaded from LDEQ's "Check Permit Status" tool.[30]

109.     To the best of my recollection, EPA did not accuse LDEQ or LDH of intentional racial discrimination during any of the telephone conversations I participated in.

110.     Further declarant sayeth naught.

---

[25] https://www.epa.gov/sites/default/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf
[26] https://www.epa.gov/system/files/documents/2022-10/01R-22-R6%20Acceptance%20Letter%20REC.pdf
[27] https://www.epa.gov/system/files/documents/2022-10/04R-22-R6%20Acceptance%20Letter%20REC.pdf
[28] https://www.epa.gov/system/files/documents/2022-08/EJ%20and%20CR%20in%20PERMITTING%20FAQs%20508%20compliant.pdf
[29] https://www.epa.gov/system/files/documents/2022-12/bh508-Cumulative%20Impacts%20Addendum%20Final%202022-11-28.pdf
[30] https://internet.deq.louisiana.gov/portal/ONLINESERVICES/CHECK-PERMIT-STATUS#

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF LOUISIANA THAT THE FOREGOING IS TRUE AND CORRECT. 28 U.S.C. § 1746**.

Sworn and subscribed this 21st day of June, 2023, in Baton Rouge, Louisiana

/s/ Ryan M. Seidemann

_____
RYAN M. SEIDEMANN, Ph.D.