EXHIBIT 4



# E.O. 13985
# EQUITY ACTION PLAN:
## U.S. ENVIRONMENTAL PROTECTION AGENCY

### APRIL 2022



# E.O. 13985 EQUITY ACTION PLAN:
# U.S. ENVIRONMENTAL PROTECTION AGENCY

## APRIL 2022

## Executive Summary

Under the leadership of Administrator Michael S. Regan, the U.S. Environmental Protection Agency (EPA) has committed to making equity, environmental justice, and civil rights[1] a centerpiece of the agency's mission. EPA's strategic plan for FY2022-2026—finalized in February 2022—includes "Take Decisive Action to Advance Environmental Justice and Civil Rights" as Strategic Goal 2 and outlines the following key objectives:

> • **Objective 2.1:** Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels
>
> • **Objective 2.2:** Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities
>
> • **Objective 2.3:** Strengthen Civil Rights Enforcement in Communities with Environmental Justice Concerns

EPA discussed Strategic Goal 2 and its underlying objectives with the National Environmental Justice Advisory Council (NEJAC) at public meetings on November 10, 2021, and January 5, 2022, where NEJAC members and other members of the public provided EPA with advice on how to achieve these objectives and hold the agency accountable. EPA officials heard that the agency needs to act quickly and decisively on key priorities and provide clear lines of accountability. To drive short term action by the end of FY2023, EPA also established the following Agency Priority Goal in its strategic plan:

> **Deliver tools and metrics for EPA and its Tribal, state, local, and community partners to advance environmental justice and external civil rights compliance.** By September 30, 2023, EPA will develop and implement a cumulative impacts framework, issue guidance on external civil rights compliance, establish a set of indicators to track EPA's performance in eliminating disparities in environmental and public health conditions, and train staff and partners on how to use these resources.

Executive Order (EO) 13985 directs the EPA and other federal agencies to assess whether underserved communities and their members face systemic barriers in accessing benefits and opportunities available pursuant to EPA's policies and programs. E.O. 13985 then directs agencies to develop equity action plans to overcome these barriers. EPA's Equity Action Plan aligns with its FY2022-2026 Strategic Plan and will support accountable and transparent implementation of Strategic Goal 2, the Agency Priority Goal, and cross-cutting strategies related to ensuring workplace equity and science-based decision-making. EPA has identified six priority actions as the core of its E.O. 13985 Equity Action Plan:

---

1    Civil rights in this context refers to EPA's responsibility to enforce several civil rights laws that prohibit discrimination on the basis of race, color, or national origin (including on the basis of limited-English proficiency); sex; disability; age; and retaliation by applicants for and recipients of federal financial assistance from EPA. *See* Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. EPA is also responsible for enforcing Section 13 of the Federal Water Pollution Control Act Amendments of 1972, which prohibits discrimination based on sex under programs or activities receiving financial assistance under the Clean Water Act.

**Priority Action #1:** Develop a comprehensive framework for considering cumulative impacts in relevant EPA decisions and operationalize that framework in EPA's programs and activities.

**Priority Action #2:** Build the capacity of underserved communities to provide their experience to EPA and implement community-led projects.

**Priority Action #3:** Develop EPA's internal capacity to engage underserved communities and implement clear and accountable processes to act based on communities' input.

**Priority Action #4:** Strengthen EPA's external civil rights compliance program and ensure that civil rights compliance is an agency-wide responsibility.

**Priority Action #5:** Integrate community science into EPA's research and program implementation.

**Priority Action #6:** Make EPA's procurement and contracting more equitable.

EPA's Equity Action Plan is not inclusive of all actions the agency intends to take on equity, environmental justice, and civil rights in the coming years. Rather, these six priority actions form a critical foundation on which to build meaningful engagement with underserved communities; achieve more equitable and just outcomes, including pollution reductions in communities with environmental justice concerns; and deliver other tangible benefits to underserved communities, consistent with applicable legal authorities.

# EPA's Six Priority Actions

E.O. 13985 directed all federal agencies to embed equity into their programs and activities to ensure the "consistent and systematic fair, just, and impartial treatment of all individuals." Given EPA's mission to protect human health and the environment, the agency's pursuit of equity must include environmental justice (EJ). EPA has defined environmental justice as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation and enforcement of environmental laws, regulations and policies."[2] In practice, this means everyone enjoys the same degree of protection from environmental and health hazards and equal access to the benefits of environmental resources and the decision-making process. To achieve the "same degree of protection" and "equal access," EPA also must consider individuals living in communities overburdened by pollution who may be even more vulnerable or marginalized, such as persons with disabilities or limited English proficiency (LEP). Scientific research consistently and increasingly demonstrates that the disproportionate levels of pollution experienced by communities with environmental justice concerns result in adverse health outcome disparities directly associated with these exposures.[3]

EPA has identified six cross-cutting priority actions that are essential to implementing the agency's FY2022-2026 Strategic Plan and achieving equity and environmental justice across all agency programs, processes, and policies. These six priority actions do not represent all of EPA's planned work on equity, environmental justice, and civil rights. As shown in Appendix 1, EPA has released several additional plans and strategies to advance equity, environmental justice, and civil rights as part of its core programmatic work.

---

2    See https://www.epa.gov/environmentaljustice.

3    See, e.g., Morello-Frosch et.al., "Understanding the cumulative impacts of inequalities in environmental health: implications for policy," Health Affairs, May 2011, 30(5):879-87; Steve Lerner, Sacrifice Zones: The Front Lines of Toxic Chemical Exposure in the United States, Cambridge, MA: MIT Press, 2010.

Notably, successful implementation of all six of these priority actions depend on meaningful engagement. Members of the White House Environmental Justice Advisory Council (WHEJAC) have defined "meaningful participation" as a process wherein "potentially affected populations have an opportunity to participate in decisions that will affect their health or environment, that the population's contributions can influence the agency's decisions, that the viewpoints of all participants involved will be considered in the decision-making process, and that the agency will seek out and facilitate the involvement of the population potentially affected, including consultation with Tribal and indigenous communities and by providing culturally appropriate information, access for people with disabilities, and language access for persons with Limited English Proficiency (LEP), considering issue of access raised by location, transportation, and other factors affecting participation, and by making available technical assistance to build community-based capacity for participating."[4] EPA will strive to achieve this vision for meaningful engagement with communities and fulfill the unique Tribal consultation commitments laid out in President Biden's *Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships*.[5]

## Priority Action #1:

### *Develop a comprehensive framework for considering cumulative impacts in relevant EPA decisions and operationalize that framework in EPA's programs and activities.*

### Barriers to Equitable Outcomes

For decades, EPA, state environmental regulators, and local zoning officials have made decisions that contributed to the disproportionate pollution burden on people of color and underserved communities across the country, such as decisions to site and permit new industrial facilities in ways that concentrate them within these communities.[6] Communities overburdened by pollution often raise concerns about the cumulative impacts of these individual environmental management decisions on public health and quality of life. EPA recognizes that the effect of cumulative impacts is best understood and addressed in individual situations to appropriately address public health risk. EPA is now developing a consistent and comprehensive framework for assessing and considering cumulative impacts on populations and communities in its decision-making. Such a framework needs to incorporate the vulnerabilities and susceptibilities related to the accumulation of multiple environmental and social stressors, such as persistent poverty and noise pollution, that lead to adverse health and quality of life outcomes.

Without this framework, EPA programs and the agency's many governmental partners at the federal, Tribal, state, territorial, and local levels may continue to make decisions that affect community health and well-being without considering and addressing the full context of cumulative impacts, including exposures through multiple pathways and from multiple sources. Developing a clear and consistent

---

4    WHEJAC, *Final Recommendations: Justice40 Climate and Economic Justice Screening Tool & Executive Order 12898 Revisions*, May 2021, at https://www.epa.gov/sites/default/files/2021-05/documents/whiteh2.pdf.

5    The White House, *Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships*, January 26, 2021, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-tribal-consultation-and-strengthening-nation-to-nation-relationships/.

6    See, for example, Bullard, Mohai, Saha, and Wright, 2008. "Toxic wastes and race at twenty: Why race still matters after all of these years." *Environ Law* 38: 371-411.

ability to apply cumulative impacts throughout the environmental and public health regulatory endeavor is a necessary precondition for fully achieving EPA's mission to protect the human health and the environment, including all communities and individuals at all life stages.[7]

Information from many sources suggests that addressing cumulative impacts is foundational to achieving EPA's mission and realizing environmental justice, including:

- Numerous studies have shown a greater burden of environmental exposures, environmentally linked disease, and adverse impacts on health and well-being experienced by people of color and underserved communities.[8]

- Given the concentration of polluting facilities in communities with environmental justice concerns, and the ways in which non-chemical stressors can compound the effects of pollution, communities, EJ leaders, the NEJAC, and scientists have identified cumulative impacts as a central concern and issue for EPA to address.[9]

- EPA hosted a series of listening sessions and research planning workshops in fall 2021, during which Tribal, state, and local government agencies, academic experts, and community leaders shared with EPA their perspectives on research and policy needs related to cumulative impacts.

- EJ community mapping tools, including EPA's EJSCREEN and various state tools such as California's CalEnviroScreen and Washington State's Environmental Health Disparities Map, have documented where multiple social and environmental stressors are concentrated and offer models for considering the relative impact of chemical and non-chemical stressors in decision-making to improve protection of human health.[10]

- Exposures and impacts across all life stages, which can manifest over long periods of time and across generations, are an essential consideration for cumulative impacts assessment and amelioration.[11]

## Planned Actions to Overcome the Barriers

EPA will develop a comprehensive framework for considering cumulative impacts in relevant EPA decisions and operationalize that framework in EPA's policies, programs, and activities, including permit conditions, mitigation, and potential denial of permits. This framework will employ quantitative and qualitative analysis of multiple, cumulative, and disproportionate impacts. It will go beyond characterizing problems to identifying solutions. It will identify ways to account for vulnerability and susceptibility in multiple regulatory contexts. Finally, it will develop and employ fit-for-purpose decision tools. EPA will:

- Identify and promote uses of cumulative impacts analysis for multiple decision contexts, such as permitting, compliance monitoring and enforcement, cleanups, and rulemaking.

---

7   The Executive Order on Children's Health (EO 13045) directs federal agencies to "make it a high priority to identify and assess environmental health risks and safety risks that may disproportionately affect children" and "ensure that its policies, programs, activities, and standards address disproportionate risks to children that result from environmental health risks or safety risks."

8   See supra note 3.

9   See, e.g., NEJAC recommendations to EPA about cumulative impacts, https://www.epa.gov/sites/default/files/2015-02/documents/nejac-cum-risk-rpt-122104.pdf (2004); NEJAC recommendations on permitting, https://www.epa.gov/sites/default/files/2015-02/documents/ej-in-permitting-report-2011.pdf (2011) and https://www.epa.gov/sites/default/files/2015-02/documents/2013-ej-in-permitting.pdf (2013); WHEJAC recommendations focusing on cumulative impacts, https://www.epa.gov/sites/default/files/2021-05/documents/whiteh2.pdf (2021)

10  See, e.g., EJSCREEN, https://www.epa.gov/ejscreen; Konisky, et.al., *Mapping for Environmental Justice: An Analysis of State Level Tools*, https://eri.iu.edu/documents/ej-mapping-tools-report.pdf (2021)

11  See supra note 3.

- Summarize current strategies, available data, and promising practices to account for cumulative impacts in analytical and decision-making contexts such as permitting, compliance monitoring and enforcement, cleanup, and rulemaking, including existing approaches at the state, Tribal, and local levels. Such a summary will provide a comprehensive understanding of progress to date among practitioners on which to build.

- Conduct a critical review of existing methods and data for accounting for vulnerabilities and susceptibilities associated with cumulative (total) burden from multiple stressors. This review will identify opportunities within the various decision contexts to address cumulative impacts and appropriate information to support such decisions.

- Develop recommendations on strategies to account for and address vulnerabilities and susceptibilities from co-exposure to multiple stressors within EPA decision-making, including the permitting, compliance monitoring and enforcement, cleanup, and rulemaking contexts. These recommendations will form the basis for policy guidance.

- Produce one or more policy guidance documents on the application of the framework, associated tools, and data. These policy guidance documents will be critical to operationalizing the cumulative impacts framework and integrating it within environmental decision-making.

- Enhance EJSCREEN to assign cumulative impacts index score(s) to areas facing disproportionate environmental burdens.

- The Office of Research and Development (ORD) will work with program and regional offices to expand its portfolio of cumulative impacts research a focus on supporting immediate and short-term decision needs on top of longer-term needs. ORD is pursuing "solutions-oriented research with a bias for action."

- Ensure meaningful community/stakeholder engagement throughout the process and communicate how the agency is using new tools to inform decision-making.

EPA prioritized this action because communities, EJ leaders, and EPA staff have identified addressing cumulative impacts as critical to achieving equitable and just outcomes across EPA programs in permitting, compliance monitoring and enforcement, cleanup, rulemaking, and other contexts. Quantifying such impacts and operationalizing them in decision-making is a shared priority of both the EJ movement and EPA. EPA also is committed to the continual development of the science on disproportionate impacts. Science substantiates the importance of this issue and will continue to underpin decision-making throughout the environmental regulatory endeavor to protect public health for all communities.

## Tracking Our Progress

Over the short and mid-term (2-4 years), EPA's initial focus will be on developing a framework, modeling promising practices, and producing guidance that will operationalize this framework. This foundational work will enable other specific outcomes and Long-Term Performance Goals (LTPGs) in EPA's FY2022-2026 Strategic Plan. EPA will:

- Form a team of EPA staff with appropriate legal and technical expertise and experience in implementing cumulative impacts analysis and policy to address cumulative impacts (3 months).

- Develop a draft framework to fully understand the decision contexts for considering cumulative and disproportionate impacts, legal and technical considerations, and appropriate information for supporting policy relevant decisions (1 year).

- Pilot case studies on considering cumulative impacts and document promising practices (minimum of one pilot per year).

- Develop and begin to apply guidance on cumulative impact analyses by EPA programs that operationalizes the framework (2 years).

In its FY2022-2026 Strategic Plan, EPA establishes an Agency Priority Goal that commits to developing and implementing a cumulative impacts framework by the end of FY2023.

In the long-term (5-8 years out), EPA will seek to achieve the following:

- Build cumulative impacts analyses into more decisions at the federal, state, and local levels, including permitting decisions made by delegated authorities.

- Continue to refine analytical techniques, based on best available science, for assessing the cumulative (total) burden from multiple stressors and their sensitivity to interventions.

- Increase the body of data and knowledge about how vulnerabilities and susceptibilities from co-exposures to multiple stressors across time and space influence the relationships between exposure, health, and well-being. This includes both negative features that require prevention or mitigation as well as positive features that promote health, resilience, and sustainability.

- Provide advanced guidance based upon lessons learned on the integration of cumulative impacts analysis for decision-making in major EPA programs.

- Develop systems to track and quantify pollution reduction and other benefits in communities from integration of cumulative impacts into the agency's decision-making.

- Over the long-term, EPA will use outcome-based metrics to demonstrate progress, including quantifiable pollution reduction benefits in communities that result from decisions that factor in cumulative impacts.

## Ensuring Accountability

EPA will identify a senior leader to spearhead this effort in the Office of Environmental Justice and/or the Immediate Office of the Administrator. This senior leader will brief other senior EPA leadership on a quarterly basis on progress. The agency also is accountable internally and to Congress and the public through reporting on the goals and objectives contained within the FY2022-2026 Strategic Plan. In addition, EPA will report on progress to the NEJAC, Science Advisory Board, National Tribal Caucus, Children's Health Protection Advisory Committee, and other regular public engagement forums.

## Priority Action #2:

*Build the capacity of underserved communities to provide their experience to EPA and implement community-led projects.*

### Barriers to Equitable Outcomes

Communities with environmental justice concerns and other underserved communities are often on the frontlines of the outcomes of environmental policymaking. Yet these underserved communities—by virtue of being systematically denied a full opportunity to participate in aspects of economic, social, and civic life[12]—can face multiple resource and capacity challenges to engaging with EPA or accessing its programs. These communities often have experienced decades of chronic underinvestment in infrastructure. They may lack technological, financial, and/or human capital-related capacity to engage in decisional processes, prepare competitive proposals, or manage federal awards. EPA and other federal partners may fail to coordinate their funding and assistance programs, thereby transferring the burden of coordinating complementary programs to the community. These barriers most affect communities that are smaller; are economically or otherwise disadvantaged; have limited English proficiency or disabilities that prevent full access to meetings and information; and/or lack access to digital infrastructure.

Community members have clearly and consistently raised these concerns across a range of EPA engagement forums, including regular EJ national community engagement calls, public testimony during NEJAC meetings, and formal NEJAC recommendations to the agency.[13]

They also have pointed out underrepresentation of affected communities in rulemaking and permitting public comment periods and reported limited success in competing for financial assistance. EPA must provide robust support to help communities overcome these challenges and ensure their ability to meaningfully engage with EPA and other government agencies, participate in decision-making processes, and benefit from federal funding opportunities and investments.

### Planned Actions to Overcome the Barriers

EPA has prioritized the following actions as those that will produce the greatest possible benefit in the near- to mid-term to build the capacity of communities to engage with EPA and manage community-led projects to reduce pollution and improve outcomes on the ground.

**Build the technological, financial, and human capital-related capacity of underserved communities.**

Consistent with the agency's FY2022-2026 Strategic Plan and dependent on congressional appropriations, EPA will:

- Provide more capacity-building grants and technical assistance to more communities.
- Offer more grant trainings to help underserved and under-resourced communities apply for

---

12   E.O. 13985 defines "underserved community" using this language.

13   See, e.g., NEJAC's model guidelines for public participation, which discuss the barriers to effective community engagement. Available at https://www.epa.gov/sites/default/files/2015-02/documents/recommendations-model-guide-pp-2013.pdf.

specific competitive grant opportunities.

- Work with EPA's Office of Grants and Debarment to develop submission flexibilities to help applicants from underserved communities apply for competitive grant opportunities. These flexibilities may include allowing applicants to submit applications through the mail (rather than online) and other submission options.

- Establish capacity-building centers across the country to deliver support and resources to build the base of underserved communities. This support, which is wholly contingent on congressional appropriations, would focus on community-based organizations; minority serving institutions, including HBCUs; and local, Tribal, or territorial governments in rural areas.

**Enhance EPA's engagement with disadvantaged and underserved communities with an eye toward building their capacity.**

- Develop an EPA public engagement guide that uses a consistent set of definitions for "community," "community-based organization," "underserved community," "disadvantaged community," and other terms crucial to approaching and tracking the agency's work in a consistent manner.

- Ensure all EPA public meetings, stakeholder meetings, and external-facing materials provide crucial information in a non-technical, actionable manner and are accessible for communities with disabilities and LEP.

- Develop paid fellowships, internships, and clerkships at EPA to offer individuals—including representatives from disadvantaged communities and potentially leveraging relationships with minority-serving institutions and HBCUs—the opportunity to work inside EPA and build a deeper understanding of how the agency operates.

- Implement a community centered approach to protecting health and the environment that focuses on coordination and collaboration across both the implementation of EPA programs and the deployment of EPA relationships with other federal agencies and state, Tribal, and local governmental partners.

**Ensure EPA's investments in infrastructure and pollution remediation benefit disadvantaged and underserved communities.**

- Implement the Biden Administration's Justice40 initiative to ensure that disadvantaged communities receive at least 40% of the benefits of EPA's investments in clean energy, pollution cleanup, and infrastructure programs. Justice40's initial pilot includes six EPA programs. The three pilot water programs represent more than 30% of the agency's budget: The Clean Water SRF, the Drinking Water SRF, and the Reducing Lead in Drinking Water grant program under the WIIN Act.

- Ensure that funds appropriated to EPA through the Infrastructure Investment and Jobs Act, signed into law on November 15, 2021, exceed the goals of the Justice40 initiative.

- Ensure early, ongoing, and meaningful community and partner engagement on Justice40 implementation. EPA will deploy a centralized agency-wide platform for partner and stakeholder engagement, organized by the Office of Environmental Justice, and a more targeted outreach approach for the Justice40 pilot and covered programs tailored to their unique legal, regulatory, and programmatic considerations.

## Tracking Our Progress

In the near- to mid-term, EPA will track its progress at least quarterly through 2026, consistent with the LTPGs in the FY2022-2026 Strategic Plan and other outcome-based metrics, such as:

- EPA programs often request feedback and comment from the public, such as during a rulemaking public comment period. EPA has set an LTPG to increase the percentage of programs that provide capacity building resources to communities with EJ concerns to ensure they can meaningfully engage and provide useful feedback to the agency.

- EPA relies on the input, knowledge, and efforts of community leaders and community-based organizations to craft our engagement activities and receive meaningful feedback for consideration during policy processes, such as rulemakings. EPA has set an LTPG to ensure that all EPA programs that make use of such support provide adequate financial remuneration to those leaders and organizations.

- EPA will measure the percentage of EPA programs that work in and with communities with environmental justice concerns in ways that are community-driven, coordinated, collaborative, and support equitable and resilient community development.

- EPA awards EJ grants to build the capacity of community-based organizations to effectively advocate for governments to respond in ways that address community concerns. EPA has set an LTPG to increase the percentage of such community grants that result in a governmental response related to the objectives of the grants.

- EPA will measure the percentage of EPA infrastructure investments that benefit disadvantaged communities, consistent with Justice40, and the number of new grantees that receive funding.

In the long term, the agency expects to see more durable community capacity built across an expanding universe of communities through more concerted and informed agency efforts. Expanding capacity in communities should result in an increasing number of communities successfully applying for technical assistance and project-specific grants, including but not exclusive to EPA's EJ grants.

## Ensuring Accountability

This proposed action aligns with EPA's FY2022-2026 Strategic Plan Goal 2, Objective 2.1. The agency is accountable internally and to Congress and the public through reporting on the goals and objectives contained within the strategic plan. EPA also will report on progress to the NEJAC, National Tribal Caucus, and other regular public engagement forums.

## Priority Action #3:

### *Develop EPA's internal capacity to engage underserved communities and implement clear and accountable processes to act based on communities' input.*

### Barriers to Equitable Outcomes

EPA's budget, internal processes, and culture can slow or impede meaningful engagement with underserved communities. Fundamentally, EPA lacks adequate staffing to support the wide variety and volume of external-facing stakeholder engagement demands, including the important task of disseminating stakeholder feedback to the right agency staff to create responsive actions. Some EPA staff also may lack awareness of, or appreciation for, non-traditional stakeholder communities (*e.g.*, informal EJ or community groups, faith groups, civil rights organizations) and the extra time and care required to authentically engage. The NEJAC raised several of these barriers—inadequate staffing, language and cultural differences, a lack of cultural competency among those trying to cultivate relationships, and a lack of trust between community members, regulatory agencies, and industry—in a 2013 report to EPA on model community engagement.[14]

In addition, legal and policy deadlines often drive the pace of action at EPA. With tight budgets and even tighter timelines, EPA staff may feel pressure to prioritize scientific research, legal review, and economic analysis over deep outreach and engagement. Agency processes do not necessarily accommodate the timeline needed for robust engagement and may not offer accountability to ensure it occurs and that resulting decisions are transparently responsive to the received feedback. Narrow reading of authorizing legislation that EPA uses to limit the scope of topics, analysis, and engagement also may impede meaningful stakeholder engagement.

### Planned Actions to Overcome the Barriers

To address these barriers, EPA must increase its internal capacity—measured as FTEs, training, resources, and expertise—to engage with underserved communities in a way that is meaningful and accessible and works to overcome the communities' barriers to participation. But EPA cannot stop at engagement. EPA must build the processes and internal infrastructure to be able to translate the learnings from community engagement into actions to address stakeholder concerns.

Changing the way EPA conducts its core work to be more responsive to community input will require a multi-year effort and a sustained commitment from EPA leadership. EPA can take several actions in the short-term to assemble the necessary building blocks—new FTEs, new internal processes, new accountability mechanisms—for durable success.

**Strengthen EPA's capacity and ability to engage meaningfully with stakeholders in underserved communities.**

EPA's efforts to improve its capacity to engage with underserved communities must begin immediately but will continue over the short- and long-term. EPA will:

---

14    See, for example, NEJAC's model guidelines for public participation, which discuss the barriers to effective community engagement. Available at https://www.epa.gov/sites/default/files/2015-02/documents/recommendations-model-guide-pp-2013.pdf.

- Increase the number of outreach staff in EPA's regional offices, assuming adequate congressional appropriations, with a focus on supporting community driven solutions.

- Strengthen EPA's language assistance and other services to improve access for people with LEP or disabilities by developing and implementing access plans for each program and region, providing EPA-wide training on access, and putting in place a disability access contract to ensure accessibility in public engagement.

- Implement a comprehensive and program-tailored training program on equity, environmental justice, and civil rights for all relevant EPA staff, as directed by the Agency Priority Goal for the first two years in EPA's FY2022-2026 Strategic Plan.

- Improve internal EPA processes to weave equity, environmental justice, and civil rights into the fabric of the agency's day-to-day work and provide multiple lines of accountability.

- Launch a new National Program Office, the Office of Environmental Justice and External Civil Rights Compliance, contingent on the outcome of FY2022 appropriations decisions.

- Require EPA's programs and regions to develop implementation plans, consistent with national program guidance, for achieving the objective of Goal 2 in EPA's FY2022-2026 Strategic Plan.

- Where relevant, ensure EPA rulemakings account for and respond to environmental justice concerns and consider disproportionate pollution impacts in underserved communities.

- Integrate equity, environmental justice, and civil rights benchmarks into the annual performance plans and reviews for relevant EPA staff, after thorough and transparent discussions with EPA's senior career leadership and employee unions, as relevant.

- Include commitments to address disproportionate pollution impacts in all written agreements (e.g., grant work plans) between EPA and states and Tribes implementing their delegated authorities.

- Establish a set of indicators to track EPA's performance in eliminating disparities in environmental and public health conditions, as directed by the Agency Priority Goal for the first two years in EPA's FY2022-2026 Strategic Plan.

- Investigate opportunities and consider establishing partnerships with organizations such as the Government Alliance on Race and Equity (GARE) to integrate the regular use of tools, such as equity assessments, to assess the impact of EPA's programs, policies, and activities on underserved and disadvantaged communities.

## Tracking Our Progress

In the short- and medium-term, EPA will focus on output-related measures to mark important milestones, such as creation of the new National Program Office of Environmental Justice and External Civil Rights Compliance; deployment of more outreach and engagement staff in EPA's regions, consistent with appropriations; delivery of trainings to EPA staff; and integration of equity-minded metrics in staff performance plans and national program guidance. These proposed actions respond to Goal 2, Objectives 2.1 and 2.2 in EPA's FY2022-2026 Strategic Plan and align with the following LTPGs for completion by September 30, 2026:

- Increasing the percentage of all significant EPA actions with EJ implications that clearly demonstrate how the action is responsive to EJ concerns and addresses disproportionate impacts. These actions will include significant EPA rulemakings.

- Ensuring EPA programs with direct implementation authority take at least 100 significant actions that will result in measurable improvements in Indian country.

- Ensuring all EPA programs and regions identify and implement opportunities to integrate civil rights compliance in their planning, guidance, policy directives, monitoring, and review activities.

- Ensuring all EPA programs and regional offices have in place and implement program- and region-specific language assistance plans to ensure that every EPA community outreach and engagement activity considers the needs of community members with LEP and that they secure the language services necessary to provide individuals with LEP meaningful access to EPA programs and activities.

- Ensuring all EPA programs and regional offices have in place and implement program-specific disability access plans to ensure every EPA community outreach and engagement activity considers the needs of persons with disabilities and provides persons with disabilities reasonable accommodations and appropriate auxiliary aids and services where necessary so they may effectively participate in EPA programs and activities.

As noted above, EPA's FY2022-2026 Strategic Plan establishes an Agency Priority Goal to establish a set of indicators to track EPA's performance in eliminating disparities in environmental and public health conditions. These indicators—such as blood lead levels and asthma prevalence in low-income communities—will help measure EPA's long-term success in delivering on promises to imbed equity, environmental justice, and civil rights into its work.

## Ensuring Accountability

This proposed action aligns with EPA's FY2022-2026 Strategic Plan Goal 2, Objectives 2.1 and 2.2. The agency is accountable internally and to Congress and the public through reporting on the goals and objectives contained within the strategic plan. EPA also will report on progress to the NEJAC, National Tribal Caucus, and other regular public engagement forums. Individual EPA employees may be held accountable to metrics related to equity, environmental justice, and civil rights in their annual performance plans.

## Priority Action #4:

### *Strengthen EPA's external civil rights compliance program and ensure that civil rights compliance is an agency-wide responsibility.*

### Barriers to Equitable Outcomes

EPA has not fully used its civil rights implementation and enforcement authority to vigorously enforce federal civil rights laws. Federal law authorizes EPA and federal agencies generally to enact rules, regulations, or orders to achieve the laws' objectives. Specifically, EPA's nondiscrimination regulation prohibits recipients of EPA financial assistance from taking actions in their programs or activities that are intentionally discriminatory and/or have a discriminatory effect. Robust enforcement of civil rights law provides the strongest tool to address disparities on the basis of race, color, national origin (including LEP), and disability.

EPA's External Civil Rights Compliance Office (ECRCO) has been consistently underfunded across administrations. As a result, ECRCO has relied primarily on a reactive rather than proactive approach to civil rights enforcement. ECRCO also is not fully and meaningfully engaging with internal (all EPA program and regional offices) and external (states, overburdened communities, and advocates) stakeholders. Moreover, EPA has not integrated civil rights compliance throughout its programs and activities and has not elevated it as a strategic goal. Over time, the U.S. Commission on Civil Rights[15] and NEJAC[16] have repeatedly voiced concerns about EPA's external civil rights program and made several recommendations for how to improve outcomes.

The classifications protected by federal civil rights laws encompass many of the underserved and overburdened communities that have been exposed to a disproportionate level of harmful environmental, quality of life, and health impacts from pollution sources. An effective civil rights compliance program creates accountability to ensure that the actions, policies, and practices of recipients of federal funds advance equity rather than exacerbate these disparities.

### Planned Actions to Overcome the Barriers

To strengthen civil rights compliance and enforcement, EPA's external civil rights program will shift from being primarily reactive, responding only to complaints, to proactively initiating compliance activities. Community representatives reaffirmed these priorities during EPA's first ever public listening session about external civil rights compliance on October 27, 2021. With those community perspectives as a guide, and with sufficient appropriations, EPA will:

- Initiate proactive pre-award and post-award civil rights compliance activities, including affirmative compliance reviews to address the impacts of potentially discriminatory activities on overburdened communities.

---

15   U.S. Commission on Civil Rights, *Not in My Backyard: Executive Order 12,898 and Title VI as Tools for Achieving Environmental Justice U.S. Commission on Civil Rights* (October 2003); *Environmental Justice: Examining the Environmental Protection Agency's Compliance and Enforcement of Title VI and Executive Order 12898* (September 2016); *Are Rights a Reality? Evaluating Federal Civil Rights Enforcement* (November 2019).

16   See, e.g., the NEJAC's letter to EPA Administrator Scott Pruitt (July 31, 2017), regarding Title VI of the Civil Rights Act. Available at https://www.epa.gov/sites/default/files/2018-01/documents/nejac-title-vi-letter-8-1-17-final.pdf. NEJAC has been raising concerns about Title VI enforcement for decades.

- Develop and implement clear and strong civil rights guidance and corresponding training and technical assistance to increase recipients' compliance with civil rights laws, including in the permitting context.

- Conduct timely and effective civil rights complaint investigations and resolutions, including investigations and informal resolution agreements that effectively address adverse disparate impacts.Enhance communication and engagement with environmentally overburdened communities to meaningfully inform EPA's civil rights work and to empower and increase their participation in critical decision-making.

- Increase transparency by affirmatively providing information to the public.

- Strengthen federal interagency collaboration and coordination on complaints, compliance reviews, and policy guidance to enforce federal civil rights laws.

Furthermore, as civil rights vigilance is an EPA-wide responsibility, EPA will undertake the following agency-wide actions:

- Engage all EPA program and regional offices in civil rights compliance activities to identify whether recipient programs and activities are consistent with civil rights laws.

- Communicate requirements and expectations to EPA staff through education, training, outreach, and technical assistance to enhance civil rights enforcement awareness and strengthen intra-agency collaboration.

- Include applicable civil rights requirements in EPA non-civil rights guidance, program strategic planning, environmental policy directives, rulemakings, enforcement, and siting and permitting decisions by EPA recipients.

## Tracking Our Progress

EPA will initially focus on output-focused metrics in the short and mid-term, such as:

- Completion, distribution, and implementation of clear guidance on compliance with Title VI and other civil rights requirements.

- Number of civil rights post-award affirmative compliance reviews initiated annually.

- Number of civil rights audits initiated annually to ensure compliance with procedural requirements.

- Percentage of state recipients of EPA financial assistance that have foundational civil rights programs in place.

- Number of information sharing sessions and outreach and technical assistance events with overburdened and underserved communities, community groups, and other partners on civil rights and environmental justice issues.

- Number of opportunities identified and implemented by program and regional offices to achieve civil rights compliance in their planning, guidance, policy directives, monitoring, and review activities.

In the long-term, EPA will seek to develop outcome-based metrics, including systems to track and quantify the pollution reduction benefits in communities that result from integration of civil rights and environmental justice into the agency's decision-making.

## Ensuring Accountability

EPA will hold itself accountable to this action through its direct alignment with agency-wide long-term and annual performance goals and objectives in Goal 2 of EPA's FY2022-2026 Strategic Plan. The agency is accountable internally and to Congress and the public through reporting on the goals and objectives contained within the strategic plan. In addition, EPA made several commitments to the Office of the Inspector General in response to its audit titled *Improved EPA Oversight of Funding Recipients' Title VI Programs Could Prevent Discrimination*.[17] EPA also will report on progress to the NEJAC and hold listening sessions with stakeholders.

## Priority Action #5:

### *Integrate community science into EPA's research and program implementation.*

## Barriers to Equitable Outcomes

"Community science" is defined as research and science conducted by the community and/or a third party on its own behalf to inform decision-making. In contrast to traditional initiatives led by government agencies or research scientists, community-led projects are often characterized by use of local and traditional ecological knowledge (TEK) and/or locally generated and validated data. Communities collect this information to address environmental, public health, social, and economic justice issues important for environmental self-determination. Community science can generate fit-for-purpose data to inform a range of decisions associated with improved environmental management, including resource allocation, screening and fence-line monitoring, network expansion, inclusion of local conditions in environmental mapping tools and other analyses, and alerts and regulatory protection.

Communities may face multiple barriers when attempting to conduct community science. They may have insufficient financial and human resources, and government funding for community science projects is limited and competitive. Communities also may lack expertise or access to expertise in relevant science disciplines and policy contexts; have differing expectations regarding what constitutes sufficient information quality for decision-making; lack trust in scientists and government agencies; and need more actionable information on how data can influence government decisions and how and in what form the data should be delivered. Tribes engaging in community science activities may have unique concerns about sharing sacred cultural and TEK with government agencies that may be compelled to disclose it publicly.[18]

At the same time, EPA and other agencies at all levels of government have historically struggled to use data collected by community scientists. Government agencies may have unfamiliarity with or bias against using community-led science and TEK rather than traditional peer-reviewed science; insufficient clarity on what types and quality of data can be used in different situations (e.g., screening level data vs. regulatory data); inadequate processes and procedures for data management and inclusion in decision-making; and insufficient staff resources and training.

---

[17]   See https://www.epa.gov/system/files/documents/2021-10/_epaoig_20-e-0333_agency_response2.pdf.
[18]   See, e.g., Kari Hedin, Cynthia Naha and Demi Gary, *Tribal Citizen Science: Investigating Current Activities and Future Aspirations*, February 26, 2021, https://itec.cherokee.org/media/tknc42l1/tribal-citizen-science_white-paper_february-26-2021.pdf.

These barriers and opportunities have been described in reports by the National Advisory Council for Environmental Policy and Technology,[19] the WHEJAC,[20] the NEJAC,[21] and the Biden Administration's November 2021 *Memorandum on Indigenous Traditional Ecological Knowledge and Federal Decision Making.*[22] In addition, EPA's Board of Scientific Counselors Executive Committee met on July 6, 2021, to consult with stakeholders about incorporating equity and environmental justice in research and community science. Discussion at that meeting re-affirmed these barriers.[23]

## Planned Actions to Overcome the Barriers

EPA's vision is that community science is equitably supported, viewed, and used as an asset in the range of decisions associated with environmental management by local, state, and federal programs.[24] To achieve this, EPA will advance actions to overcome barriers to broad engagement in community science, along with policies and procedures that will help the agency overcome barriers to using these data in decisions.

### Build capacity for community science and access to community data

EPA will take several actions to address resource and technical barriers to community science:

- *Fund community science grants:* EPA will fund community science initiatives through grant programs in support of environmental justice and equity priorities, including through American Rescue Plan appropriations. EPA will award funds to support community and local efforts to monitor environmental quality and to promote partnerships between communities and government agencies.

- *Expand the availability of data and tools:* EPA will continue to expand the availability of data and capacity for community environmental monitoring. This will include free, publicly accessible tools[25] to provide community scientists with environmental and demographic data, mapping tools, tutorials, and information to characterize, map, and develop plans to address environmental conditions in their communities.

- *Increase staff support and training for community science:* EPA will assign staff to serve in community science liaison positions to support community science activities, including work in Tribal communities, and provide outreach and on-line training materials.

- *Conduct research to create new community science tools and demonstration projects:* EPA, working with communities, states, and Tribes, will improve methods for community science to address

---

19    National Advisory Council for Environmental Policy and Technology, *Environmental Protection Belongs to the Public: A Vision for Citizen Science at EPA* (2016), available at https://www.epa.gov/sites/default/files/2020-04/documents/nacept_cs_report_final_508.pdf; *Information to Action—Strengthening EPA Citizen Science Partnerships for Environmental Protection* (2018), available at https://www.epa.gov/sites/default/files/2020-04/documents/nacept_2018_citizen_science_publication_eng_final_v3_508.pdf.

20    WHEJAC, *Final Recommendations: Justice40 Climate and Economic Justice Screening Tool & Executive Order 12898 Revisions,* May 2021, at https://www.epa.gov/sites/default/files/2021-05/documents/whiteh2.pdf.

21    NEJAC, *Recommendations for Integrating Environmental Justice into the EPA's Research Enterprise* (2014), https://www.epa.gov/sites/production/files/2015-02/documents/nejac-research-recommendations-2014.pdf; *Ensuring risk reduction in communities with multiple stressors: environmental justice and cumulative risks/impacts* (2004), https://www.epa.gov/sites/default/files/2015-02/documents/nejac-cum-risk-rpt-122104.pdf.

22    Executive Office of the President, *Memorandum on Indigenous Traditional Ecological Knowledge and Federal Decision Making,* November 15, 2021, https://www.whitehouse.gov/wp-content/uploads/2021/11/111521-OSTP-CEQ-ITEK-Memo.pdf. This memorandum recognizes TEK as "one of the many important bodies of knowledge that contributes to the scientific, technical, social, and economic advancements of the United States and to our collective understanding of the natural world."

23    BOSC July 2021 Executive Committee Meeting, https://www.epa.gov/bosc/bosc-july-2021-executive-committee-meeting.

24    See "Citizen Science at EPA: Engaging the Public in Environmental Protection," at https://arcg.is/C8mKe.

25    See, for example, EJSCREEN, EnviroAtlas, UST (Underground Storage Tank) Finder, Cleanups in my Community, Toxics Release Inventory, How's My Waterway, Bloomwatch, EPA Sanitary Survey App for Fresh and Marine Waters, etc.

environmental concerns of underserved communities and will support research projects that demonstrate air, water, and soil pollution monitoring and other data generation using community science to inform environmental management.

**Issue policies and guidance documents to support the use of community science**

EPA will issue several policies and guidance documents by the third quarter of 2022 to address institutional barriers to the use of community science, including:

- *EPA Vision and Strategy for Community/Citizen Science*, which will outline EPA principles for supporting community science and identifying opportunities to incorporate in EPA actions.

- *Multi-Stakeholder Plan for Improved Data Flow to Decision Makers,* which will advance community science data infrastructure and flow from data-producers to data-users, based on the results of the November 2021 EPA/state/Tribal workshop on data management.

- *EPA Policy Guidelines for Conducting Community/Citizen Science*, which will include guidance on project development and quality assurance and an internal checklist to help EPA staff comply with legal and administrative requirements when supporting community science projects, such as ethical issues that arise in projects, data ownership, and privacy.

- *Inclusion of community science data management in the E-Enterprise Leadership Council Digital Strategy*, where the E-Enterprise Leadership Council (EELC) will continue to advance strategies using the data quality handbook, data management standards, and community science networks to expand the use of community science in local, state, Tribal, and federal government environmental decisions. The EELC includes senior EPA, state, and Tribal leaders.

- EPA will be participating with the Interagency Working Group on Traditional Ecological Knowledge to develop guidance on TEK.

## Tracking Our Progress

In the short-term, EPA will measure its success based on the following outputs:

- Public release of the EPA Strategy and Vision, Data Management Plan, and EPA Internal Policy Guidelines by the third quarter of calendar year 2022.

- Percentage and/or number of EPA community grant funds that support science to address environmental justice and equity concerns, including Tribal community science projects.

The long-term objective is that EPA's support for community science policies, methods, and data will expand the capacity of communities and local, state, Tribal, and federal governments to share in embracing community science as a valued and routine asset in environmental management.

## Ensuring Accountability

These proposed actions align with EPA's FY2022-2026 Strategic Plan Goal 2, Objective 2.1 and Cross-Agency Strategy 1 ("Ensure Scientific Integrity and Science-Based Decision Making"). EPA is accountable internally and to Congress and the public through reporting on the goals and objectives contained within the agency strategic plan and within the Office of Research and Development's Strategic Research Action Plans. EPA also will report on progress through its advisory committees, including the Board of Scientific Counselors, the NEJAC, and the National Tribal Caucus, and through other public engagement forums.

## Priority Action #6:

### *Make EPA's procurement and contracting more equitable*

### Barriers to Equitable Outcomes

EPA has a history of engagement with small and socioeconomically disadvantaged businesses and Minority-Serving Institutions (MSI), including Historically Black Colleges and Universities (HBCUs). Because of this engagement, the agency is well-aware of several common barriers to procurement equity. These include:

- Underserved/underrepresented businesses may lack access to EPA programmatic decisionmakers, limiting their opportunity to demonstrate their business capabilities.

- Potential contractors from underserved/underrepresented communities may face unreasonable or unnecessary requirements for vendor past performance. Requiring extensive past performance and/or narrowly considering qualifying past performance may limit the ability of small and socioeconomically disadvantaged businesses and MSIs to compete against large businesses with more extensive federal contracting experience. While these businesses and MSIs may have innovative approaches, subcontractor experience, and experience with contracting in state, local, and private arenas, the evaluation process often places a greater "value" on federal prime contracting experience.

- EPA program offices may prefer incumbent vendors because of familiarity and a desire for continuity.

- Federal procurement regulations and processes are cumbersome. Small, disadvantaged, and underrepresented businesses may lack the resources to successfully navigate the process. Contract requirements can be ambiguous and are often task-based instead of performance-based, stifling competition and innovation. The scope and size of acquisitions also can have a chilling effect on small and disadvantaged business participation. Contracting officials may assume that these businesses lack capacity to deliver results at the same level as larger businesses. In truth, many have the capacity to perform the work but may need support to compete for the work in the federal arena.

Several existing policies can perpetuate these barriers. Members of the underserved and underrepresented business community, for example, told EPA that the Federal Acquisition Regulation (FAR) is cumbersome, unclear, and difficult and costly to navigate. Also, some of the rules in the FAR that are intended to level the playing field for underserved and underrepresented businesses are not consistently implemented, and none of the rules include MSIs or LGBTQ+ owned small businesses. EPA's internal acquisition guidance implements the FAR at the agency and therefore reflects the same concerns. In addition, federal category management policies that require and favor the creation and use of large multiple award contracts (that are often consolidations of smaller requirements) can have an adverse impact on underserved and underrepresented businesses that may not have the capacity to compete for larger contracts.

The populations most affected by these barriers include small businesses, including socioeconomically disadvantaged small businesses; MSIs and HBCUs; and LGBTQ+-owned businesses. During the

summer of 2021, EPA conducted two listening sessions with stakeholders from the underserved and underrepresented business community to receive feedback on the barriers they have experienced in accessing federal procurement opportunities and their ideas for eliminating those barriers. These listening sessions confirmed the barriers cited above.

## Planned Actions to Overcome the Barriers

EPA has identified several actions to overcome these common barriers. EPA will:

- Challenge EPA program offices and regions (including senior leadership) to conduct and participate in agency outreach events to provide the underserved and underrepresented business community with access to EPA decision makers.

- Develop and implement policies and procedures to promote the utilization of underserved and underrepresented businesses and level the playing field between incumbent contractors and new firms, such as using "anonymous" technical evaluations; expanding the use of oral presentations; broadening the scope of qualifying past performance; and revamping category management policies.

- Facilitate programmatic acquisition forecasting, acquisition planning, and requirements development to eliminate ambiguity and increase opportunities for underserved and underrepresented businesses.

- Provide technical assistance to facilitate productive navigation of the federal contracting process internally and externally.

EPA has prioritized these actions due to their ease of implementation, measurability, and direct impact on barrier reduction.

## Tracking Our Progress

EPA will track progress by establishing measures for the following factors/areas:

- **Increased performance against EPA's socioeconomic small business goals.** In the FY2022-2026 Strategic Plan, EPA established an LTPG (through 2026) of awarding 4% of EPA contract spending to small businesses located in Historically Underutilized Business Zones (HUBZones) compared with the FY2018-FY2020 average annual baseline of 2.2%.

- **Increased diversification of EPA's vendor base by tracking its contracts with "new entrants" (vendors that have never had a prime contract with EPA), socioeconomic small businesses, and MSIs.** In FY2022, EPA will develop a mechanism to capture data associated with this measure and establish a baseline. In FY2023, EPA will implement annual targets for diversification of its vendor base for FY2023-2027. This will measure the agency's progress in addressing the past performance and incumbency barriers identified above.

- **Increased engagement (including technical assistance) with socioeconomic small businesses and MSIs by EPA's program offices and contracting offices.** In FY2022, EPA will baseline its engagement activities with the populations most affected by this barrier. In FY2023, EPA will define and implement annual targets for engagement and technical assistance activities for program offices, regions, and contracting offices, including participation by EPA decision-makers for FY2023-2027.

EPA will measure long-term success as institutionalizing these factors and the activities associated with achieving them in the agency's business culture.

## Ensuring Accountability

These proposed actions align with Cross-Agency Strategy 3, "Advance EPA's Organizational Excellence and Workforce Equity," in EPA's FY2022-2026 Strategic Plan. This cross-agency strategy seeks to foster a diverse, equitable, and inclusive workforce within an effective and mission-driven workplace. EPA is accountable internally and to Congress and the public through reporting on the goals and objectives contained within the strategic plan.

To further reinforce accountability for senior managers at the SES and GS levels, EPA intends to include standards in their performance plans for hosting or participating in engagement opportunities for underserved and underrepresented businesses. EPA will also host "Procurement Equity Forums" to provide opportunities for engagement, listening, and business capability sharing and to provide the underserved and underrepresented business community with updates on EPA's procurement equity progress. Finally, EPA will develop a "Procurement Equity Dashboard" to track our quarterly progress against the three measures cited above.

# Summary of Early Accomplishments

(as of January 20, 2022)

Although EPA has identified these six priority actions as forward-looking objectives, the agency has been working since the beginning of Administrator Regan's tenure to advance equity, environmental justice, and external civil rights compliance. Below we highlight some progress made under each of the priority actions to date. In addition, Administrator Regan outlined EPA's work on environmental justice in response to specific questions from the NEJAC. The Administrator's letter to the NEJAC, dated October 29, 2021, is available on EPA's website.[26]

In November 2021, Administrator Regan embarked on a "Journey to Justice" tour, traveling to Mississippi, Louisiana, and Texas to spotlight longstanding environmental justice concerns in historically marginalized communities and hear firsthand from residents dealing with the impacts of pollution. Throughout the tour, the Administrator highlighted the benefits of President Biden's Bipartisan Infrastructure Law and the Build Back Better agenda, focusing on historic investments in water infrastructure, Superfund, Brownfields, and in air quality improvements that will lead to lasting public health protections in communities that need them most.

**Priority Action #1: Develop a comprehensive framework for considering cumulative impacts in relevant EPA decisions and operationalize that framework in EPA's programs and activities.**

- The framework will recognize that approaches to incorporating cumulative impacts into decision-making will be fit for purpose. Toward this end, the External Civil Rights Compliance Office has committed to issuing guidance on disparate impact analysis in FY2022, which will include incorporation of cumulative impacts analysis under civil rights law.

- In 2021, EPA's Office of Research and Development (ORD) held state and Tribal listening sessions on cumulative impacts assessment. These listening sessions served to confirm the importance of cumulative impacts assessment to states, Tribes, and communities for addressing environmental justice and to identify remaining challenges for incorporating vulnerabilities due to cumulative impacts into environmental decision making. The listening sessions echoed the recommendations from NEJAC, WHEJAC, and ORD's Board of Scientific Counselors that EPA has begun to implement.

- EPA established a Community of Practice for integration of environmental justice and civil rights in permitting.

**Priority Action #2: Build the capacity of underserved communities to provide their experience to EPA and implement community-led projects.**

- During calendar year 2021, EPA awarded more environmental justice grant funding to community-based organizations, Tribal and indigenous organizations, and other partners than it awarded altogether in the preceding decade.

- EPA has prioritized significant portions of American Rescue Plan Act funding to provide technical assistance and capacity building opportunities directly to communities and their local partners, such as additional Brownfields resources, funding for energy communities in Appalachia, and more specific assistance programs focused on supporting community resilience to respond to climate change issues such as wildfires and extreme heat events.

---

26   See https://www.epa.gov/system/files/documents/2021-11/nejac-100-day-letter-final-signed.pdf.

- EPA has initiated the formation of regional NEJAC working groups for all ten of EPA's regional offices to ensure better long-term relationship building and feedback on priority efforts as EPA implements its equity, environmental justice, and civil rights activities.

- EPA has initiated biweekly national EJ engagement calls to offer a regular venue for communities and their partners to regularly receive information and updates on priority actions, particularly efforts to implement Justice40, and to provide feedback directly to EPA leadership and staff. From August 31-December 7, 2021, EPA hosted eight such calls with more than 2,700 participants.

- EPA is implementing three key water infrastructure programs as pilots for early action under President Biden's Justice40 Initiative. These programs represent more than 30% of the agency's budget: The Clean Water SRF, the Drinking Water SRF, and the Reducing Lead in Drinking Water grant program under the WIIN Act.

- On December 17, 2021, EPA announced a $1 billion investment from the Bipartisan Infrastructure Law to initiate cleanup and clear the backlog of 49 previously unfunded Superfund sites and accelerate cleanup at dozens of other sites across the country.

## Priority Action #3: Develop EPA's internal capacity to engage underserved communities and implement clear and accountable processes to act based on communities' input.

- For the first time, EPA is including equity, environmental justice, and civil rights compliance as a distinct and core goal of EPA's multiyear strategic plan. No longer will the agency's work to advance justice and live up to its civil rights responsibilities be left outside of the EPA's bedrock planning documents.

- In 2021, EPA's Office of Enforcement and Compliance Assurance issued four memoranda directing a renewed focus on environmental justice across EPA enforcement activities with a consistent direction for enforcement staff to regularly engage with communities with environmental justice concerns as a regular part of program implementation. *(See Appendix for more detail)*

- In December 2021, Deputy Administrator McCabe directed EPA's National Program Managers to integrate equity, environmental justice, and civil rights in their national program guidance documents for 2022, in accordance with Goal 2 of the FY2022-2026 Strategic Plan.

- In January 2022, EPA's Office of Land and Emergency Management released a draft Environmental Justice Action Plan for public comment that addresses how the office will address land cleanup issues in overburdened communities across several programs.

## Priority Action #4: Strengthen EPA's external civil rights compliance program and ensure that civil rights compliance is an agency-wide responsibility.

- In March and June 2021, EPA issued two Preliminary Findings of Non-Compliance to recipient agencies that did not have in place required nondiscrimination programs, such as procedural safeguards and programs and policies to ensure meaningful access for persons with LEP and persons with disabilities.

- On October 27, 2021, EPA held its first ever public listening session on civil rights enforcement and heard input from more than 200 stakeholders.

- On September 20, 2021, EPA sent a detailed response to the EPA Office of Inspector General, which had raised concerns about EPA's implementation of Title VI in a 2020 report. In that response, EPA

committed to several specific actions to strengthen this program at EPA. EPA's response is available in full on its website.[27]

## Priority Action #5: Integrate community science into EPA's research and program implementation.

- On October 2, 2021, EPA announced 47 members to the agency's Science Advisory Board, including members of the first-ever Environmental Justice Science Committee.

- On July 6, 2021, EPA's Office of Research and Development (ORD) held a consultation with the Board of Scientific Counselors (BOSC) and community stakeholders to discuss potential avenues to further integrating community science into EPA's 2023-2026 Strategic Research Action Plan and to help ORD set its research and development agenda. Additionally, ORD held a series of workshops with other offices within the agency and other key stakeholders to discuss ideas on how to develop community science projects in the various national research programs. EPA is renewing and structuring the BOSC, including creating a Social and Community Science Subcommittee to provide advice on these priorities in research planning and implementation.

- In December 2021, EPA's Office of Air and Radiation launched a $20 million grant competition that calls for proposals to conduct monitoring of pollutants of greatest concern in communities with health outcome disparities. EPA's objective in issuing these awards is to empower communities to monitor their own air quality and promote monitoring partnerships between communities and Tribal, state, and local governments.

## Priority Action #6: Make EPA's procurement and contracting more equitable.

- Based on the provisional federal procurement data for FY2021 that will be finalized over the next few months:

- EPA awarded more than 44% or $679 million in contract dollars to small businesses, far exceeding the agency's negotiated goal of 37% and the government-wide goal of 23%. This goal achievement represents an $86 million increase from last fiscal year.

- Also, for the first time in the agency's history, EPA exceeded all five of the established statutory socioeconomic goals, including the never before realized goal of 3% for small businesses located in Historically Underutilized Business Zones (HUBZones).

- EPA awarded the highest percentage of dollars to 4 of the 5 small business categories in more than a decade.

---

27    See https://www.epa.gov/system/files/documents/2021-10/_epaoig_20-e-0333_agency_response2.pdf.

# Appendix 1:

## Additional EPA Plans and Strategies to Prioritize Equity, Environmental Justice, and External Civil Rights Compliance in its Programs, Policies, and Processes

In addition to the six priority actions detailed in this equity action plan, EPA has released several additional plans and strategies to deliver equity and environmental justice in its programs, policies, and processes. This is current as of January 20, 2022.

## Environmental Enforcement and Compliance Directives

Consistent with the mandate in Executive Order 14008, Administrator Regan directed the Office of Enforcement and Compliance Assurance (OECA) to "strengthen enforcement of environmental violations with disproportionate impact on underserved communities." In response, OECA issued four directives:

- *Strengthening Enforcement in Communities with Environmental Justice Concerns* (April 30, 2021).[28] Regarding civil regulatory enforcement, this memo directs an increase in the number of facility inspections in overburdened communities, enhancements to remedies, and an increase in community engagement.

- *Strengthening Environmental Justice through Criminal Enforcement* (June 21, 2021).[29] This memo directs better detection of environmental crimes in overburdened communities through effective civil-criminal coordination on investigations and cases, improved assistance to crime victims, and enhanced remedies sought in environmental crime cases.

- *Strengthening Environmental Justice through Cleanup Enforcement Actions* (July 1, 2021).[30] This memo directs EPA's cleanup enforcement staff to require responsible parties to take early and prompt cleanup actions, press for more robust enforcement instruments, and increase cleanup oversight.

- *Using All Appropriate Injunctive Relief Tools in Civil Enforcement Settlements* (April 26, 2021).[31] This memo encourages use of the full array of policy and legal tools to ensure benefits to affected individuals and communities, including advanced monitoring, audits, electronic reporting, and posting of compliance data.

## Draft Strategy to Reduce Lead Exposures and Disparities in U.S. Communities

On October 28, 2021, EPA released the draft *Strategy to Reduce Lead Exposures and Disparities in U.S. Communities* to lay out an all-of-EPA plan to strengthen public health protections and address legacy lead contamination for communities with the greatest exposures.[32] EPA is seeking public comment on this draft strategy through a public docket, hosting listening sessions, and targeting outreach to communities that are disproportionately harmed by exposures to lead as well as other key stakeholder

---

28   Available at https://www.epa.gov/sites/default/files/2021-04/documents/strengtheningenforcementincommunitieswithejconcerns.pdf.
29   Available at https://www.epa.gov/system/files/documents/2021-07/strengtheningejthroughcriminal062121.pdf.
30   Available at https://www.epa.gov/system/files/documents/2021-07/strengtheningenvirjustice-cleanupenfaction070121.pdf.
31   Available at https://www.epa.gov/sites/default/files/2021-04/documents/
     usingallappropriateinjunctivereliefltoolsincivilenforcementsettlement0426.pdf.
32   U.S. EPA, *Strategy to Reduce Lead Exposures and Disparities in U.S. Communities*, October 28, 2021, https://www.epa.gov/lead/draft-strategy-reduce-lead-exposures-and-disparities-us-communities.

groups, including Tribes, states, territories, local governments, non-governmental organizations, and industry. To provide access for persons with LEP, EPA translated the draft strategy into 10 different languages and posted them on EPA's website.

## PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024

On October 18, 2021, EPA Administrator Regan released the agency's PFAS Strategic Roadmap, which lays out a whole-of-agency approach to addressing PFAS.[33] The roadmap sets timelines by which EPA plans to take specific actions and commits to bolder new policies to safeguard public health, protect the environment, and hold polluters accountable. EPA will strive to understand the challenges facing individuals and communities grappling with PFAS contamination to understand their lived experiences and determine the most effective interventions. As recommended by the NEJAC, EPA will meet with affected communities in each EPA Region to hear how PFAS contamination affects their lives and livelihoods. EPA will use the knowledge gained from these engagements to inform the implementation of the actions described in the roadmap. The PFAS Strategic Roadmap is already available in Spanish and is being translated into other languages to provide access for persons with LEP.

## EPA Plan for Implementing the Policies and Directives of E.O. 13175: Consultation and Coordination with Indian Tribal Governments

EPA is committed to honoring Tribal sovereignty and including Tribal voices in policy deliberations, as called for in President Biden's January 26, 2021, memorandum on Nation-to-Nation relationships with American Indian and Alaska Native Tribal Nations. EPA has a long history of engagement and consultation with Tribal governments. In 2011, it was among the first federal agencies to issue a Tribal consultation policy, and in the 10 years since the policy was issued EPA has conducted more than 680 Tribal consultations. Continued implementation of EPA's Consultation Policy remains a top priority for the agency as EPA strives to learn from its past consultations and ongoing engagements with federally recognized Indian Tribes. This plan, which builds upon EPA's existing policies and practices, identifies current and future actions the agency is taking to meet the directives of Executive Order 13175 and to build on and strengthen its consultation policies and practices.[34]

## Office of Water Action Plan: Strengthening the Nation-to-Nation Relationship with Tribes to Secure a Sustainable Water Future

On October 14, 2021, EPA released an action plan to strengthen the agency's partnership with Tribes and Alaska Native Villages on water issues. The action plan focuses on promoting robust coordination and meaningful consultation with Tribal nations; strengthening and expanding water governance in Indian country; increasing infrastructure funding and capacity development; and honoring the federal trust responsibility and protecting Tribal reserved rights related to water resources.[35]

---

33  U.S. EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024*, October 2021, https://www.epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024.

34  U.S. EPA, *EPA Plan for Implementing the Policies and Directives of E.O. 13175: Consultation & Coordination with Indian Tribal Governments*, https://www.epa.gov/tribal/epa-plan-implementing-policies-and-directives-eo-13175-consultation-coordination-indian.

35  Office of Water, *Strengthening the Nation-to-Nation Relationship with Tribes to Secure a Sustainable Water Future*, October 2021, https://www.epa.gov/system/files/documents/2021-10/2021-ow-tribal-action-plan_508_0.pdf.

## Office of Land and Emergency Management Environmental Justice Action Plan

On January 5, 2022, EPA's Office of Land and Emergency Management (OLEM) released a draft Environmental Justice Action Plan for public comment.[36] This draft plan covers projects and activities intended to address land cleanup issues in overburdened communities across several programs, including Superfund, Brownfields, Emergency Response, Solid Waste Management and Corrective Action, and Underground Storage Tanks. The draft plan outlines strategies to enhance nearly two dozen projects while addressing the need for stronger compliance, increased environmental justice considerations in EPA regulations, and improved community engagement.

---

36    Office of Land and Emergency Management, *Draft EJ Action Plan: Building Up Environmental Justice in EPA's Land Protection and Cleanup Programs*, January 5, 2020, https://www.epa.gov/aboutepa/draft-environmental-justice-action-plan-epas-land-protection-and-cleanup-programs.

