# EXHIBIT 15



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

January 3, 2023

*Via Electronic Mail*

James "Jim" Payne
Deputy General Counsel for Environmental
 Media and Regional Law Offices
1200 Pennsylvania Avenue, NW
Washington, DC 20460
payne.james@epa.gov

      Re:    Memorialization of December 12, 2022, Telephone Conference
              EPA Complaint Nos. 01R-22-R6, 02R-22-R6, and 04R-22-R6

Mr. Payne:

      I write to memorialize aspects of our December 2, 2022, telephone conference. Our December 12 call started at approximated 10:30 a.m. Central Time, and continued until approximately 11:40 a.m. Central Time. Representatives of USEPA, LDEQ, LDH, and LADOJ were on the call. Lilian Dorka and Mary O'Lone were the primary speakers on behalf of USEPA.

**Extension *CARE* Litigation Deadline**

      Ms. Dorka opened the call by recounting our previous telephone conversation. She stated that EPA sought an agreement with complainants to extend the time to resolve this case to March 13, 2023, and EPA hoped to have the extension in place by close of business. Ms. Dorka then indicated that our next conversation would include more substantive conversations so EPA, LDEQ, and LDH "can put pen to paper" on an informal resolution agreement.

**Legal Basis for Letter of Concern**

      Ms. O'Lone referenced EPA's Letter of Concern as providing the legal basis of EPA's claims. She stated that compliance with environmental law does not guarantee compliance with Title VI. Ms. O'Lone elaborated that the main purpose of Title VI is to prevent federal funds from subsidizing discrimination, and Title VI serves a different purpose than environmental laws.

      On the merits, Ms. O'Lone stated that the focus of discriminatory impact / discriminatory effects is on the consequences of actions or failures to act. EPA's position is that to establish adverse disparate impact, EPA must identify a specific policy, establish disparity, and establish causation. With respect to the complaints at issue, EPA claims to have identified populations with

adverse impacts of cancer exposure based on relative risk, then used a "civil rights analytical framework" to determine disparate impact. EPA believes the evidence it identifies suggests disparate impact in St. John Parish and St. James Parish, including as a result of LDEQ's implementation of its air permitting program regarding chloroprene. EPA further believes LDH contributed to that disparate impact by failing to make meaningful recommendations to protect residents from chloroprene. Accordingly, EPA stated that its informal resolution agreement will include commitments designed to address these concerns, including specific timelines for policy and procedures implementing non-discrimination.

### Ambiguity in Actions at Issue

As it did previously, LADOJ inquired as to the specific actions at issue, as well as the comparables EPA purportedly identified. EPA stated that with respect to the Denkla facility, EPA is focused on LDEQ's failure to act over time, and EPA is examining the impacts from that facility on the community. EPA explained that it is "not looking at actual permit issuance and what happened each time a permit was issued." Rather, Ms. Dorka elaborated that no one specific action is at issue, it's the cumulative impact from LDEQ's overall action.

LADOJ responded that meaningful discussion required identification of discrete actions, and specific comparables. Ms. Dorka again stated that EPA's concern is not based on discrete actions, and EPA does not investigate cases in that manner. Ms. Dorka then stated that "to a great extent, not just in the case law, all our policy and guidance, [and concern] can also be based on inactions." She then stated that EPA is "looking at first and foremost the harms that could be attributable to the way the agencies are conducting or administering their programs." Ms. Dorka then stated that EPA regulations provide that funding recipients cannot use criteria or methods of administering their programs that have the effect of harming on the basis of race. She then tried to describe the issue as a pattern of actions that would give rise to harm.

With respect to disproportionality, Ms. Dorka stated that EPA is not looking at a comparison with a similarly situated action or population. Rather, EPA is looking at whether the harms fall based on race or national origin in communities that are predominately black. Ms. O'Lone elaborated that comparison to another action is a different theory of discrimination than what EPA is asserting, and that EPA did not perform such an analysis.

LADOJ again inquired as to the pattern that was at issue. Ms. Dorka referenced a pattern of disparities, or a series of actions or inactions that have caused harms. LADOJ noted that the entirety of the pattern identified in EPA's letter of concern consists of two licensing actions. Ms. Dorka responded that those two actions are just the ones that EPA based its letter of concern on. Ms. O'Lone interjected that EPA's claims are based on LDEQ's implementation of the permitting program, with the two actions identified in EPA's letter being instances of that implementation, and claimed that EPA looked at the whole program. LADOJ then noted that EPA's claim about the "whole program" necessarily implicated more than two actions. Ms. Dorka concurred, explaining that EPA would not just be looking at denial or approval of a permit. Rather, EPA looks at other actions relative to that permit or the emissions, and, with respect to the so-called Industrial Corridor, yet more actions. Ms. Dorka then insisted EPA's letter laid out all the actions that it looked at that could have resulted in harm to the surrounding communities. She acknowledged that

2

EPA does not focus on denial or approval of permits, because "that probably wouldn't have panned out with respect to the permits that we're looking at."

Mr. Isales of USEPA interjected that he understood LADOJ's inquiry to be to the effect of "if we don't know what we did wrong, how can we fix it?" LADOJ elaborated that that the State is entitled to very detailed notice of what its agencies purportedly did wrong, at a very fundamental level. Ms. Dorka agreed, and stated that EPA tried to identify one-by-one the actions or inactions EPA thought had resulted in disproportionate harm.

LDH echoed LADOJ's concern and explained, for example, that timeliness needs to be evaluated based on specific actions. LDH elaborated that when EPA's recommendations go beyond the two specific permitting actions to what EPA defines as the "Industrial Corridor" (which has been differently defined by different groups), EPA seems to be using complaints about two specific facilities as a springboard to a larger area. Indeed, LDH noted that EPA's recommendations go beyond the actual scope of the complaints and are overbroad.

Ms. O'Lone responded by stating that the complaints raise issues about facilities in other parishes. She stated that EPA was using the definition of "Industrial Corridor" that Louisiana uses. The particular parishes included in that definition could be subject to discussion, but Ms. O'Lone identified the "Industrial Corridor" as the area of intense industrial development. Similarly, Ms. Dorka explained that in addition to addressing specific instances – Denka and chloroprene; Formosa – EPA is looking much more broadly. EPA is not merely looking at the permitting of Formosa, but cumulative impacts. With respect to the Industrial Corridor, Formosa is an aspect of EPA's concern, but EPA wants cumulative impact assessments that would be able to assess how, why, and under what circumstances emissions can be addressed. Ms. Dorka further elaborated that with respect to the Industrial Corridor, EPA is hoping to work together prospectively to conduct the necessary analysis before taking actions about specific permits. She then emphasized that the "wonderful thing" about informal resolution is that EPA does not make findings about compliance or not.

Ms. Dorka stated that if Louisiana has specific questions about specific things in EPA's letter, it should ask. LDH noted that it still had unanswered questions that will be an impediment to informal resolution. LDH pointed to questions that EPA did not answer in this call, as well as issues raised in the previous call that was partially reduced to a letter that still remains unanswered. LDH noted that EPA's actions were broadly lacking in transparency.

With respect to transparency, LDH noted, for example, that it understood from its initial call with EPA that the informal resolution process would be handled confidentially. EPA then made that process public without LDH's knowledge, and it was never made clear to LDH that publicity was a possibility until months later. Ms. Dorka apologized if LDH had that impression, and stated that EPA has never made a representation that its process would only be shared with recipients. LDH noted that it might have proceeded differently had it known a Letter of Concern would be publicly issued.

* * * * *

Please promptly let me know if this letter does not accurately reflect our call.

3

On that point, we note we memorialized a previous conversation in a letter dated December 9, 2022. EPA did not respond to that letter until December 29, 2022, stated only that it “does not agree with all of the characterizations in [LADOJ’s] letter” and affirmatively declined to respond to the specific points raised in LADOJ’s letter. We call your attention to EPA’s statutory obligations to “advise[] the appropriate person or persons of the failure to comply with [42 U.S.C. 2000d-1]” and determine “that compliance cannot be secured by voluntary means.” 42 U.S.C. 2000d-1. We believe these provisions require EPA to engage in good faith discussions and answer questions about the actions that purportedly violate Title VI.

We look forward to tomorrow’s telephone conference.

Very truly yours,

Joseph Scott St. John
Deputy Solicitor General