EXHIBIT 16

Informal Resolution Agreement     PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6    02/23/2023



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D C. 20460

Office of Environmental Justice and External Civil Rights
Office of External Civil Rights Compliance

**INFORMAL RESOLUTION AGREEMENT**
**between the**
**LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY**
**and the**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**EPA COMPLAINTS NO. 01R-22-R6 AND 04R-22-R6**

**I.  PURPOSE AND JURISDICTION**

 A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 (Title VI) and other federal nondiscrimination laws, and United States Environmental Protection Agency's (EPA) implementing regulations at 40 C.F.R. Parts 5 and 7 prohibit discrimination on the basis of race, color, national origin, disability, sex, age, and intimidation or retaliation in the programs, services and activities of applicants for or recipients of federal financial assistance.[1]

 B. The Louisiana Department of Environmental Quality (LDEQ) receives federal financial assistance from the EPA and, therefore, must ensure nondiscrimination in its programs or activities pursuant to federal nondiscrimination laws and EPA's implementing regulations.

 C. On January 20, 2022, EPA received Complaint No. 01R-22-R6, which alleged discrimination by LDEQ based on race.  In response to the complaint, on April 6, 2022, EPA accepted for investigation the following issues:

   1. Whether LDEQ uses criteria or methods of administering its air pollution control program that have the intent and/or effect of subjecting persons to discrimination on the basis of race in violation of Title VI of the Civil Rights Act of 1964 and EPA's implementing regulation at 40 C.F.R. Part 7 § § 7.30 and 7.35, including, but not limited and with respect to, LDEQ's acts or failures to undertake certain actions related to the Denka facility in connection with its air pollutant emissions, and the predominantly Black residents of St.

---

[1] Title VI of the Civil Rights Act of 1964, 42 United States Code §§ 2000d to 2000d-7 (Title VI); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Title IX of the Education Act Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq.; Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 et seq.; Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500 § 13, 86 Stat. 903 (codified as amended at 33 U.S.C. § 1251 (1972)); 40 C.F.R. Parts 5 and 7.

Informal Resolution Agreement                        PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              02/23/2023

John the Baptist Parish.

2.  Whether LDEQ has and is implementing the procedural safeguards required
    under 40 C.F.R. Parts 5 and 7 that recipients of federal assistance must have
    in place to comply with their general nondiscrimination obligations,
    including specific policies and procedures to ensure meaningful access to
    LDEQ services, programs and activities for individuals with limited-English
    proficiency and individuals with disabilities, and whether the LDEQ has a
    public participation policy and process that is consistent with Title VI and
    the other federal civil rights laws, and EPA's implementing regulation at 40
    C.F.R. Parts 5 and 7.

E.  On February 2, 2022, EPA received Complaint No. 04R-22-R6, which alleged
    discrimination by LDEQ based on race.  In response to the complaint, on April 6,
    2022, EPA accepted for investigation the following issues:

1.  Whether LDEQ uses criteria or methods of administering its air pollution
    control program that have the intent and/or effect of subjecting persons to
    discrimination on the basis of race in violation of Title VI of the Civil Rights
    Act of 1964 and EPA's implementing regulation at 40 C.F.R. Part 7 § § 7.30
    and 7.35, including, but not limited and with respect to, LDEQ's decision to
    reaffirm issuance of 14 new air permits for the Formosa facility, and the
    predominantly Black residents of St. James Parish.

2.  Whether LDEQ has and is implementing the procedural safeguards required
    under 40 C.F.R. Parts 5 and 7 that recipients of federal assistance must have in
    place to comply with their general nondiscrimination obligations, including
    specific policies and procedures to ensure meaningful access to LDEQ
    services, programs and activities for individuals with limited-English
    proficiency and individuals with disabilities, and whether the LDEQ has a
    public participation policy and process that is consistent with Title VI and the
    other federal civil rights laws, and EPA's implementing regulation at 40
    C.F.R. Parts 5 and 7.

F.  During EPA's investigation into Complaint Nos. 01R-22-R6 and 04R-22-R6,
    LDEQ agreed to engage in the voluntary Informal Resolution Agreement
    (Agreement) process in order to resolve the complaints.

G.  This Agreement is entered into by LDEQ and EPA.

H.  This Agreement is entered into pursuant to the authority granted to EPA under the
    federal non-discrimination laws, including Title VI of the Civil Rights Act of 1964,
    and the EPA's implementing regulation found at 40 C.F.R. Parts 5 and 7, and resolves
    Complaint Nos. 01R-22-R6 and 04R-22-R6.

2

Informal Resolution Agreement                     PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                        02/23/2023

    I.   This Agreement is entered into voluntarily by LDEQ and does not constitute an
admission by LDEQ of a violation of, or a finding of compliance or noncompliance
by the EPA with, Title VI or 40 C.F.R. Parts 5 and 7.

    J.   [Factual Background]

> **Commented [A1]: LDEQ:** The agreement will also
> contain provisions stating facts including but not limited to
> recent relevant enforcement actions. We will discuss those
> EPA proposes to include as well as those LDEQ may
> propose to include.

> **Commented [A2]: LDEQ:** We will flesh out the
> commitments for these topic areas during our resolution
> discussions.

**II.   Commitments Regarding LDEQ's Methods of Administration (Issue 1)**

    A. Process to Identify and Address Potential Adverse Disparate Effects of Air Permitting
Decisions

        1.  <u>**CAA SOURCE PRE-APPLICATION – INITIAL SCREENING**</u>

When an Applicant approaches the LDEQ expressing interest in obtaining an
air permit (*e.g.*, new permit, permit modification, renewal), LDEQ will
conduct an initial screening, which:

        a. Characterizes the community potentially adversely affected by the
proposed permit action to identify populations vulnerable to impacts of
pollution (for example, considering age, disabilities, health status,
access to critical services such as food, transportation, health services,
etc.,); populations identifiable on the basis of race, color or national
origin including limited English proficient populations; and already
existing environmental burdens;

        b. Ensures that public involvement efforts will be tailored to the
demographics and needs of the community;

        c. Compares the demographics, vulnerabilities, and environmental
burdens of the affected area with those of an appropriate region (*e.g.*,
county, city, LDEQ region) and/or state as a whole. This comparison
may be conducted using a screening tool;

        d. Evaluates readily available additional information about potential
impacts; and

        e. Seeks input from the impacted community about the potential adverse
impacts and potential mitigation measures.

        2.  <u>**POST APPLICATION ADDITIONAL ANALYSIS AND EVALUATION**</u>

After the application has been submitted to LDEQ and if the initial analysis in
Section II.A. above indicates that the permitting action could cause or
contribute to adverse disparate impacts on the basis of race, color or national
origin, LDEQ will conduct additional analysis, as needed, to evaluate:

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                   02/23/2023

   a. Any potential adversity/harm[2] (this can examine not only the burdens
      and harms resulting from each individual policy, decision or action,
      and borne disproportionately on the basis of race, but also on the total
      or cumulative burdens including exposures throughout a person's
      lifetime borne disproportionately by a community, especially in light
      of the characteristics of that community[3]);

   b. Whether the adversity/harm identified in B.1. above is borne
      disproportionately by individuals on the basis of race, color or national
      origin; and,

   c. Whether there is a causal connection between the permitting action
      and the adversity/harm identified in B.1. above (that are "sufficiently
      substantial to raise an inference of causation"[4]).

   **Methodology for Additional Analysis and Evaluation**

   d. LDEQ will develop a methodology to conduct additional analysis and
      evaluation described in Section II.B. above.  Information relevant to
      the additional analysis and evaluation may include but is not limited
      to:
         i. Anticipated health effects of proposed permit emissions on
            potentially impacted populations, taking into account all
            potential pathways of exposure to the air pollutants of concern
            (*e.g.,* inhalation, ingestion of contaminated soil, drinking water
            contamination);
        ii. Non-health effects of proposed facility operation on those
            living in proximity to the facility including quality of life (*e.g.,*

---

[2] E.g., *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 487, *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J.) (discussing the methods used to "evaluate the 'adversity' of the impact" and considering whether the impacts at issue were "sufficiently adverse" to establish a prima facie case), *rev'd on other grounds*, 274 F.3d 771 (3d Cir. 2001). *See also Bryan v. Koch*, 627 F.2d 612, 617 (2d Cir. 1980) (indicating that adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm).

[3] EPA's Office of Research and Development defines cumulative impacts as "the totality of exposures to combinations of chemical and non-chemical stressors and their effects on health, well-being, and quality of life outcomes. Cumulative impacts include contemporary exposures to multiple stressors as well as exposures throughout a person's lifetime. They are influenced by the distribution of stressors and encompass both direct and indirect effects to people through impacts on resources and the environment. Cumulative impacts can be considered in the context of individuals, geographically defined communities, or definable population groups. Cumulative impacts characterize the potential state of vulnerability or resilience of a community." U.S. EPA, Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development. *U.S. Environmental Protection Agency*, Washington, D.C., EPA/600/R-22/014a, 2022. p. 4, https://www.epa.gov/system/files/documents/2022-09/Cumulative%20Impacts%20Research%20Final%20Report_FINAL-EPA%20600-R-22-014a.pdf.

[4] *Smith v. Xerox Corp.*, 196 F.3d 358, 364 (2nd Cir. 1999), citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-995 (1988), *NAACP v. Town of East Haven*, 70 F.3d 219, 225 (2nd Cir. 1995).

4

Informal Resolution Agreement

PRIVILEGED/DELIBERATIVE

EPA Complaints No. 01R-22-R6 and 04R-22-R6

02/23/2023

noise, odor, lights), safety (*e.g.,* industrial truck traffic), and economic impacts;

iii. Existing burdens, which may include:

    a. a range of activities that impact quality of life (*e.g.,* odor, noise, lights), safety (*e.g.,* industrial truck traffic), and/or

    b. community exposure or vulnerability from multiple sources of pollution including:

        i. Sources permitted by EPA, LDEQ or local governments;

        ii. Other regulated sources – such as those subject to federal or state requirements for reporting of waste generation or emissions (*e.g.,* Toxics Release Inventory reporters, Resource Conservation and Recovery Act hazardous waste generator sites);

        iii. Regulated but usually unpermitted sources, including fugitive emissions and nonpoint sources (*e.g.,* some paint stripping or metal finishing operations, mobile sources, sources of surface water runoff); and

        iv. Unregulated sources (*e.g.,* household lead paint, highways, railroads);

        v. Public health data on health conditions with significant environmental determinants *(e.g.,* asthma, heart disease, lead poisoning, low birth weight);

        vi. Other indicators of population vulnerability including social determinants of health;[5]

        vii. Location of sensitive populations or places near the proposed facility, including:

            1. Schools,
            2. Hospitals,
            3. Day care centers (*e.g.,* children, elders),
            4. Culturally significant resources (*e.g.,* cemeteries, places of worship);

        viii. Residence locations affected by the proposed facility, including identifying public housing, jails/prisons, communal living facilities (*e.g.,* assisted living, nursing home);

        ix. Factors that may increase community member exposure or vulnerability as compared to other

---

[5] https://health.gov/healthypeople/objectives-and-data/social-determinants-health#:~:text=Social%20determinants%20of%20health%20(SDOH,of-life%20outcomes%20and%20risks.

5

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
02/23/2023

populations (*e.g.,* cultural practices, subsistence fishing, hunting, foraging information);

x.  Compliance information on facilities in the area (*e.g.,* EPA's Enforcement and Compliance History Online (ECHO)[6]);

xi.  Community supplied information such as complaints submitted through, for example:

1.  LDEQ's civil rights grievance procedure,
2.  LDEQ's Citizen Environmental Complaint system,
3.  EPA's ECHO;

xii.  Drinking and surface water quality;

xiii.  Census data (*e.g.,* race, national origin, limited English proficiency, population density);

xiv.  Information relevant to assessment of disparities, including appropriate comparison populations will depend on the action and the facts involved;

1.  Relevant comparison populations may be those who live within a reference area in LDEQ's jurisdiction (*e.g.,* the state, an area of responsibility for a branch office), within a political jurisdiction (*e.g.,* town, county, state), or an area defined by environmental criteria such as an airshed.
2.  The legally relevant "population base" for a statistical measure of adverse disparate impact is generally all persons the policy or practice affects or who could possibly be affected by some change in (or the elimination of) the policy or practice;
3.  disparities by comparing the demographic characteristics of the population potentially adversely affected by the permitting decision to an appropriate comparison population;

xv.  Information about the adversely affected population, including the proportion of persons in the protected class who are adversely affected by the challenged policy or practice and the

---

[6] https://echo.epa.gov/

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                      02/23/2023

proportion of persons not in the protected class who are adversely affected;[7]

**Analysis of Substantial Legitimate Justification and Less Discriminatory Alternatives**

e.  Once LDEQ has completed the additional analysis above, if LDEQ determines that the permitting action likely[8] causes or contributes an adverse disparate impact, LDEQ will determine:
    i.   Whether the policy or practice in question has a substantial legitimate justification that is "necessary to meet a goal that is legitimate, important, and integral to [its] institutional mission."
    ii.  Whether the justification is demonstrably related to its mission.

f.  If LDEQ determines that there is a substantial legitimate justification, LDEQ will need to determine:
    i.   Whether there are less discriminatory alternatives, and
    ii.  Whether any mitigation measures implemented can reduce or eliminate the adverse disparate impacts and demonstrate there are no less discriminatory alternatives.[9] If there are no mitigation measures that can address the disparate impacts, the only "less discriminatory alternative" is denial of the permit.

g.  When identifying and evaluating potential mitigation measures and less discriminatory alternatives, LDEQ will:
    i.   Identify and exercise all available legal authority under:
        a.  environmental laws and regulations to include enforceable permit terms that mitigate or avoid creating identified disparate impacts.
        b.  other laws (*e.g.,* state civil rights laws, state environmental justice laws) to mitigate or avoid creating identified disparate impacts.
    ii.  Seek public comment on appropriate mitigation measures/less discriminatory alternatives during the permit review process and consider the input when developing permit conditions.

> **Commented [A3]: For LDEQ:** We recommend that you begin looking at your authorities and areas of discretion early on in this process.

---

[7] In analyzing disparity under Title VI, EPA looks at whether a disproportionate share of the adversity/harm discussed above is borne by individuals based on their race, color, or national origin. Disparity is a fact-specific inquiry that involves identifying an appropriate measure.
[8] "EPA utilizes the "preponderance of the evidence" (more likely than not) standard in its investigations to determine whether or not a recipient has violated federal civil rights laws." EPA Civil Compliance Toolkit Chapter 1 at https://www.epa.gov/sites/default/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf
[9] A less discriminatory alternative is a comparably effective practice that causes less of a disparate impact than the challenged practice. Mitigation measures that would lessen or eliminate the demonstrated adverse disparate impacts, could be part of a less discriminatory alternative; however, alternatives may also include practices or policies of a different manner or other actions that ameliorate the adverse disparate impact.

7

PRIVILEGED/DELIBERATIVE
02/23/2023

   iii. Potential mitigation measures to address disparate impacts might include:

     a. enhancing compliance assurance provisions, including monitoring, recordkeeping and continuous reporting (*e.g.,* SCADA system) to assure the facility is meeting its permitted limits and following industry best practices;

     b. developing a fugitive particulate matter operating program/plan (or enhancements to existing program/plan);

     c. requiring increased emission testing;

     d. health monitoring;

     e. community based participatory research;

     f. evaluating whether a proposed permit warrants air quality modeling scrutiny as part of the permit review, particularly where EJ community has experienced historical impacts from existing or recently constructed projects;

     g. requiring enforceable modeling assumptions (*e.g.,* hours of operation, meteorological assumptions like wind direction or speed);

     h. requiring odor monitoring of third-party complaints and system to address such complaints;

     i. ensuring data regularly generated by the facility to comply with the permit are made publicly available on an easily accessible website;

     j. developing new and revised regulations that consider sources contributing to local impacts;

     k. prioritizing grant funding for projects that reduce emissions in impacted areas;

     l. conducting special studies to measure and model local pollution impacts;

     m. requiring conditions on permits of other facilities contributing to the impacts;

     n. negotiating with applicant over site selection;

     o. using pollution prevention techniques; and

     p. requiring the development and implementation of enforceable agreements (*e.g.,* community benefit agreements).

  h. If LDEQ exercises all legal authority and implementation of mitigation measures/less discriminatory alternatives such as those described above and they do not adequately mitigate disparate impacts, then

8

Informal Resolution Agreement                      PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6             02/23/2023

LDEQ should evaluate whether compliance with Title VI can only be achieved by[10]:

    i.   not issuing or renewing the permit, or
    ii.  siting the facility in alternate locations.

3. **OBTAINING PERMIT SPECIFIC PUBLIC COMMENT ON TITLE VI ANALYSIS**

LDEQ will obtain public comment on LDEQ's Title VI Analysis, including for permits that do not require notice and comment under the Clean Air Act and/or Louisiana's Clean Air Act Program. LDEQ will:

    a.  Issue a public notice that it is undertaking a Title VI analysis; and
    b.  Provide meaningful public comment opportunities, including holding a public meeting in the affected community on its Title VI analysis (*e.g.*, potential adverse impacts, potential mitigation measures) and addressing those public comments prior to issuing a final decision.

> **Commented [A4]: For LDEQ:** LDEQ may combine the Title VI Analysis notice and comment process with the CAA permit notice and comment process.  It need not be a separate process.  However, if there will be no notice and comment on the draft permit, LDEQ will provide an opportunity for notice and comment on the Title VI Analysis.

4. **POST PERMITTING**

LDEQ will conduct post-permitting activities which will include:

    a.  Establishing a point of contact within LDEQ for the community;
    b.  Providing an explanation of requirements/enforceable provisions in the permit (*e.g.,* monitoring, record keeping, web reporting);
    c.  Monitoring of all mitigation measures implemented but not included in the issued permit including those that require the participation of other federal, state, and local authorities;
    d.  Providing information as appropriate, about how community members can use that information to assess compliance; and
    e.  Providing periodic public updates.

5. **DUE DATES FOR SECTION II – PROCESS FOR TITLE VI ANALYSIS IN THE LDEQ CAA PERMITTING PROGRAM**

    a.  Within 90 days of the date of this agreement, LDEQ will submit to EPA for review and approval the draft process for Title VI analysis in the CAA Permitting as outlined in Section III.A-D above (Process).
    b.  Within 30 days of EPA approval of the draft Process, LDEQ will publish the draft Process for public comment.
    c.  Within 60 days of end of the public comment period LDEQ will submit to EPA a copy of all public comments received and the LDEQ draft response to public comments.

---

[10] Failure to exercise all available discretion to substantially reduce or eliminate the disparate impacts, including denial of the permit, if necessary, may leave LDEQ vulnerable to a finding of discrimination if the exercise of available discretion would have resulted in a comparably effective alternative that would result in less adverse impact.

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                        02/23/2023

      d.  Within 30 days EPA will provide any comments to the draft response
          to comments.
      e.  Within 30 days of receipt of EPA comments, LDEQ will submit to
          EPA its final draft of the Process for approval.
      f.  Within 30 days of approval by EPA, LDEQ will publish the final
          Process.

6.  **EVALUATION OF IMPLEMENTATION**

Annually for five years after this Agreement, LDEQ shall submit to EPA and
publish on its website an evaluation of the results of the implementation of the
Process in its CAA permitting program.

B.  Cumulative Impact Analyses

1.  LDEQ will conduct a cumulative impact analysis (CIA) in the area of
Reserve, St. John the Baptist Parish, in the area of Welcome, St. James Parish,
and in each of the other five parishes (East Baton Rouge Parish, West Baton
Rouge Parish, Iberville Parish, Ascension Parish and St. Charles Parish)
within the Industrial Corridor at a location to be determined via a convening
process set forth below. The scope of the CIA includes characterizing
community and environmental conditions with respect to these factors and
then developing recommendations of prioritized actions to manage the
exposures and effects identified.

1.  With respect to the CIAs in East Baton Rouge Parish, West Baton Rouge
Parish, Iberville Parish, Ascension Parish, and St. Charles Parish, LDEQ and
the respective CIA Working Groups will include within its activities within
Elements 1 and 2 set forth below, the appropriate geographic scope for
performance of the CIA within each of the parishes. To the extent that such a
discussion is necessary with respect to the CIAs in St. John the Baptist Parish
and St. James Parish, the respective CIA Working Groups will address it.

2.  Prior to initiating any of the location specific CIAs, LDEQ and representatives
of Complainants for EPA Complaint Nos. 01R-22-R6 and 04R-22-R6 will
collaborate on a screening analysis to guide the identification of geographic
focus for the CIAs within each Parish. This analysis for each parish will begin
with screening via the use of EPA's EJ SCREEN, the Agency of Toxic
Substances and Disease Registry's EJ Index, and the Council on
Environmental Quality's Climate and Economic Justice Screening Tool. The
screening analysis will also incorporate consideration of community-identified
human health, ecological, and vulnerability concerns; anticipated changes in
the community or environment due to permitting or other activities; evidence
of existing elevated prevalence of human illness or perception of such
increases in a community; or measured or perceived elevations in pollutant
concentrations.

Informal Resolution Agreement                                   PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                    02/23/2023

3. EPA is available to provide technical assistance with respect to convening the group and with respect to any of the screening tools. This initial screening analysis will be completed within sixty days of the effective date of this Agreement.

4. Each individual CIA in paragraph B. 1. above will include the following elements and each element will be completed within the time frame identified below:

    a. Element 1, Stakeholder Convening:

        i. LDEQ will contract with both a project manager and a third-party facilitator to manage and facilitate the convening process.

        ii. LDEQ will identify a process by which it will identify the appropriate stakeholders to participate in the oversight of the cumulative impact assessment, including, but not limited to, representatives from LDEQ, LDH, the community, local government and industry.

        iii. LDEQ will identify and convene all appropriate stakeholders to participate in the oversight of the cumulative impact assessment. This group will be referred to hereinafter as the CIA Working Group. Both the selection criteria for participation in the CIA Working Group and those selected for participation in the CIA Working Group will be published on the LDEQ website.

        iv. The CIA Working Group will, through a consensus process, create a formal charter which establishes roles and responsibilities (*e.g.,* means for oversight for all elements of the CIA, means for resolving potential conflicts of interest, updates to the charter as necessary and changes in membership of the CIA Working Group, if necessary), shared goals for the CIA, criteria to be used in the selection of subject matter experts, required documentation, timeline, and any additional milestones not identified herein.

        v. LDEQ will make the Charter publicly available on the LDEQ website.

        vi. EPA is available to provide technical assistance with respect to convening and facilitating discussions among the CIA Working Group for purposes of creating its formal charter.

11

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                      02/23/2023

    b.  Element 1 shall be completed within 150 days from the effective date of this Agreement.

    c.  <u>Element 2, Scoping</u>:

        i.  The CIA Working Group will:

        1.  Consult subject matter experts as necessary in this stage and throughout the assessment process (Element 3);

        2.  As set forth in paragraph XXXX, identify and agree on potential exposures and effects of concern;

        3.  Prioritize endpoints of concern to be analyzed for the current condition and any additional scenarios defined by the stakeholder group;

        4.  Prepare a draft Cumulative Impact Scoping Document, draft Peer Review Plan, and a draft Quality Assurance Project Plan (QAPP);

        5.  Include within the QAPP:

            a.  Specific decisions from section XXX and XXX about chemical and non-chemical exposures and stressors, effects, endpoints, and scenarios to analyze;

            b.  Demographic categories, and geographical, and temporal boundaries for impact analysis;

            c.  Evidence sources and research methods for each research question in the analysis;

            d.  Evaluation approach(es) for historic, current, and potential future exposures and effects and their distribution (could be quantitative, semi-quantitative, and/or qualitative);

            e.  Specific roles for experts and key participants, including disclosure of any potential conflicts of interest; and

            f.  Range of decision alternatives to be considered, including any relevant permit application conditions and any options that could lead to

mitigation of cumulative impacts of concern, (*e.g.,* permitting decision-making, voluntary mitigation measures, community public health monitoring efforts).

6. LDEQ will make the draft Cumulative Impact Scoping Document, draft QAPP, and draft Peer Review Plan available for public review and comment for a minimum of 30 days.

7. LDEQ, in consultation with the CIA Working Group, will prepare a final Cumulative Impact Scoping Document, QAPP, and Peer Review Plan which will include a response to comments.

ii. LDEQ, in consultation with the CIA Working Group, will develop a Communication Plan for the both the draft and final versions of the Cumulative Impact Scoping Document, Peer Review Plan, CIA Report, Recommendations Report, LDEQ Implementation Report, and the Oversight and Adaptive Management Plan which:

1. Identifies communication challenges, such as language or cultural barriers, outreach methods, and approaches to overcome challenges.

2. Includes a strategy for timely and adequate public review and comment, including preparation of response to comment documentation.

3. Includes a strategy for disseminating findings and recommendations, including a public website documenting activities.

4. Follows the policies and procedures adopted in Paragraphs XXX and YYY on Risk Communication, Participation, Language Access, and Disability Access adopted pursuant to Paragraphs XXX below.

iii. Element 2 will be completed within 210 days from completion of Element 1.

iv. LDEQ will submit to EPA the Charter, the final Cumulative Impact Scoping Document, the QAPP, Peer Review Plan, and Communication Plan within 30 days of the completion of Element 2.

Informal Resolution Agreement                                   PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                    02/23/2023

        v.  LDEQ will make the final Cumulative Impact Scoping Document, the QAPP, and Communication Plan publicly available on the LDEQ website.

    d.  <u>Element 3, Assessment</u>:

        i.  The CIA Working Group will:

           1.  **Collect Best Available Data**.  The assessment will be based on best available evidence to address the assessment questions defined during scoping.  This includes but is not limited to performing a literature search and gathering existing local exposure and health data.  Evidence can be qualitative (*e.g.,* lived experience), semi-quantitative (*e.g.,* categorical data), or quantitative. When available, EPA peer reviewed research, or other peer reviewed information, should be used. The analysis should include an evaluation of the strength of the body of evidence transparently, including identifying uncertainties.

           2.  **Data Repository**. Create a publicly available data repository for data and metadata in a consistent and accessible format and include documentation.

           3.  **Baseline Analysis**. To the extent not previously conducted, assess existing current, historic and potential future stressors, exposures and effects on health, well-being and quality of life, as well as community assets and vulnerabilities. The Baseline Analysis will consider:

               a.  Multiple sources of chemical and non-chemical stressors from the built, natural, and social environments;

               b.  Multiple exposure pathways across media;

               c.  Exposures to stressors in the relevant past, current or potential future (e.g., pending permitting decisions), especially during vulnerable lifestages or developmental windows of susceptibility;

14

d.  Combined impacts across multiple chemical and non-chemical stressors; including but not limited to chloroprene and ethylene oxide exposures and other stressors distinct to local communities;

e.  Community vulnerability, sensitivity, adaptability, and resiliency. When assessing baseline conditions, pay close attention to susceptible populations (*e.g.,* children). This analysis will also take into consideration:

f.  Community demographics: race/ethnicity, age, linguistic isolation, economic hardship; including in comparison to rest of the parish and state;

g.  Community health status, access to care, burden of disease; including in comparison to rest of parish and state;

h.  Measures of vulnerability to weather- or climate-related events, such as natural disasters and extreme weather events;

i.  Proximity to mobile sources of pollution;

j.  Proximity or more direct indicators of exposure/risk to potential environmental stressors such as facilities that report to the Toxics Release Inventory, Superfund sites, hazardous waste corrective action sites, facilities with emissions to air and water, nearby facilities with a history of non-compliance using data from EPA's Enforcement and Compliance History Online website (https://echo.epa.gov/), and other information that is available through EJSCREEN or state or local level databases.

k.  Existing health and well-being benefits/mitigating factors (*e.g.,* greenspace, access to parks or clean air);

l.  Uncertainty and variability associated with the data and information;

15

Informal Resolution Agreement                             PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                  02/23/2023

        m. A refined approach for how to integrate data and information to assess cumulative impacts.

4. **Prioritize Exposures and Effects.** Using the results from the Baseline Analysis prioritize exposures and effects for mitigation, including exposures to chemical or non-chemical stressors, or effects on health, wellbeing, and quality of life outcomes.

5. **Identify decision alternatives for evaluation**. The CIA Working Group will determine the decision alternatives that will be analyzed in 6, that could lead to mitigation of the prioritized exposures and effects from step 4. These decision alternatives may include, for example, conditions on permitting decision-making, voluntary mitigation measures, community public health monitoring efforts. In addition to defining the decision alternatives, the responsible party should be identified. These decision alternatives will form the basis of the impact assessment in step 6.

6. **Assess Impacts of Decision Alternatives on Priority Exposures and Effects**. Assess exposures and effects related to decision alternatives identified in step 5. Considerations may include:

        a. What are the exposures/effects affected by the decision alternative?

        b. What are the pathways by which the prioritized exposures/effects would be affected by decision alternatives?

        c. How much would exposure/effects be reduced?

        d. How are susceptible populations impacted by each decision alterative?

        e. How are different demographic groups impacted by each decision alternative?

ii. Deliverables:

1. The draft CIA Report shall:

    a.  Include the purpose, analytical methods, assessment of historic and current stressors, exposures and effects (Baseline Analysis), prioritization of exposures and effects to mitigate, development and assessment of decision alternatives, and a synthesis of the main findings with regard to cumulative concerns and impacts;

    b.  Identify the CIA Working Group, as well as all other participants and their roles and contributions;

    c.  Document the process, including stakeholder convening and scoping stages;

    d.  Document funding sources supporting this effort;

    e.  Include a publicly available data repository;

    f.  Be written in plain language and accessible to stakeholders with different levels of formal education. Where appropriate, the Draft CIA Report will be translated in order to be accessible to residents with Limited English Proficiency. All stakeholders should be able to understand the findings of the report;

2. LDEQ will make the draft CIA Report available for public review and comment for a minimum of 30 days.

3. LDEQ, in consultation with the CIA Working Group, will prepare a final CIA Report will include a response to comments.

4. LDEQ will make the final CIA Report publicly available on the LDEQ website.

5. Element 3 shall be completed within 365 days from completion of Element 2.

    e.  <u>Element 4, Recommendations</u>:

        i.  Based on the results of the decisions alternative analysis in paragraph ==XX== above, the CIA Working Group will:

17

Informal Resolution Agreement          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6          02/23/2023

    1. Develop clear criteria for identifying and evaluating recommendations (*e.g.,* mitigation of predicted impacts, technical feasibility, project costs, enforceability, authority of decision-makers), benefits;

    2. Develop recommendations of prioritized actions to manage the exposures and effects identified and enhance health, well-being, and quality of life benefits. Actions may include those which inform the immediate decision and mitigating exposures and effects, as well as potential pathways for achieving mitigation measures that are beyond the scope of the current decision;

    3. Include implementation steps, leads, and estimated timeline to implement each recommendation.

  ii. Deliverable: Draft and Final Recommendations Report

    1. The CIA Working Group shall develop a draft and final Recommendations Report summarizing the information from Element 4 steps above.

    2. The Reports will be written in plain language and accessible to stakeholders with different levels of formal education. Where appropriate, the draft and final Recommendations Report will be translated to be accessible to residents with Limited English Proficiency. All stakeholders should be able to understand the findings of the Reports.

    3. LDEQ will make the draft Recommendations Report available for public review and comment for a minimum of 30 days.

    4. The CIA Working Group will prepare a final Recommendations Report which will include a response to comments.

    5. LDEQ will make the Final Recommendations Report publicly available on the LDEQ website.

  iii. Element 4 should be completed within 180 days from completion of Element 3.

f.   <u>Element 5, Implementation:</u>

18

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
02/23/2023

    i.    LDEQ will prepare a draft Implementation Report which will describe the elements of the Final Recommendations Report it will and will not implement and provide a timeline for implementation.

    ii.    LDEQ will make the draft Implementation Report available for public comment for a minimum of 30 days.

    iii.    LDEQ will prepare a final Implementation Report which describes the elements of the Final Recommendations Report it will implement; provide a timeline for implementation; and respond to all comments indicating how the public comment was addressed, and if not addressed, why not.

    iv.    LDEQ will make its final Implementation Report publicly available on the LDEQ website.

    v.    Element 5 should be completed within 120 days from completion of Element 4.

g.   Element 6, Oversight and Adaptive Management Plan:

    i.    LDEQ and CIA Working Group shall develop an Oversight and Adaptive Management Plan for the implementation that includes:

        1.   Goals for short- and long-term oversight;

        2.   Indicators of progress, such as pollution reduction, health outcomes, biomonitoring, or others;

        3.   Triggers or thresholds that may lead to follow up action/revisiting decision or implementation approach;

        4.   Resources required to conduct, complete, and report the oversight; and

        5.   A mechanism to report outcomes to decision-makers and stakeholders.

    ii.    The Oversight and Adaptive Management Plan will be completed within 90 days from completion of Element 5.

    iii.    LDEQ will make the Oversight and Adaptive Management Plan publicly available on the LDEQ website.

19

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                          02/23/2023

    h.   <u>Element 7, LDEQ Tracking of its Implementation</u>:

        i.   LDEQ will periodically, at an interval defined in the Oversight and Adaptive Management Plan, evaluate progress being made towards the measures identified in the Implementation Report and adapt as needed;

        ii.   LDEQ will hold public meetings every six months following issuance of the Implementation Report through completion of implementation to update the public on the progress of the recommendations being implemented; and

        iii.   LDEQ will prepare annual written progress reports which will be made publicly available on the LDEQ website.

C.  Community Meetings

    1.  Within 45 days from the effective date of this Agreement, LDEQ will collaborate with LDH to host at least one community meeting, to be held virtually and in person, to discuss the commitments made by LDEQ in this Agreement in each of the communities below:

> **Commented [A5]: LDEQ:** EPA is willing to provide technical assistance as well as professional facilitation for these meetings.

        a.   Reserve, Louisiana[11] (the community impacted by the Denka Performance Elastomer LLC (Denka) facility in St. John the Baptist Parish);

        b.   [NSERT NAME] (a community potentially impacted by the proposed FG LA, LLC (Formosa) facility in St. James Parish); and

        c.   in other communities within the Industrial Corridor as appropriate.

    2.  LDEQ will provide the public and EPA at least 15 days advance written notice of the date, location, and time of the public meeting.

    3.  LDEQ will ensure that the selection of the meeting locations, dates, and times will consider the availability and schedules of public transportation and consideration of residents' work hours; and ensure that the location(s), dates, and times will allow for meaningful participation/involvement by individuals with limited English proficiency (LEP) and individuals with disabilities. EPA is available to provide technical assistance to LDEQ to ensure the meetings are meaningfully accessible to all residents.

    4.  If LDEQ plans to communicate any information related to risk from exposures to air toxics at the meetings held pursuant to Paragraph II. A. 1., LDEQ will

_____

Informal Resolution Agreement                            PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              02/23/2023

employ EPA's SALT Framework: A Process Framework to Guide Risk
Communication discussed in Paragraph II. G. 2.

D.  Scientific Integrity and Risk Communication

    1.  **SCIENTIFIC INTEGRITY**

        a.  Within 30 days of the effective date of this Agreement, LDEQ will
appoint a Scientific Integrity Official to champion scientific integrity
throughout LDEQ. The Scientific Integrity Official will chair a
standing committee of Deputy Scientific Integrity Officials
representing each LDEQ Program Office and Region. These officials
will be senior-level employees and will provide oversight for the
implementation of the Scientific Integrity Policy at LDEQ, act as
liaisons for their respective Programs and/or Regions and are available
to address any questions or concerns regarding this policy and its
implementation.

        b.  Within 150 days of the effective date of this Agreement, LDEQ will
submit a draft Scientific Integrity Policy to EPA to demonstrate that
LDEQ will require that the decision-making process is supported and
driven by best available science. EPA recommends that LDEQ model
its Scientific Integrity Policy on EPA's Scientific Integrity Policy
found at https://www.epa.gov/sites/default/files/2014-
02/documents/scientific_integrity_policy_2012.pdf.  EPA will review
the draft Policy in accordance with Paragraph IV.C. of this Agreement.

        c.  LDEQ will issue its Scientific Integrity Policy within 20 days of final
approval by EPA in accordance with Paragraph IV.C. of this
Agreement. The Policy will apply to all LDEQ employees, including
scientists, managers, and political appointees, who will follow this
policy when engaging in, supervising, managing, or influencing
scientific activities; communicating information in an official capacity
about LDEQ scientific activities; and utilizing scientific information in
making LDEQ's policy or management decisions relevant to science
and health. In addition, all contractors, grantees, collaborators, and
student volunteers who engage in scientific activities are expected to
uphold the standards established by LDEQ Scientific Integrity policy.

        d.  Within 90 days of EPA approval of LDEQ's Scientific Integrity
Policy, LDEQ will train all employees involved in the activities
described in Paragraph 3 above on its Scientific Integrity Policy and
all plans, policies and procedures created to implement the policy.
Within 20 days of completion of the initial training in this Paragraph,
LDEQ will provide EPA a copy of any training materials, a list of staff
who received the training, and the dates the training was provided.

  e. Within 30 days of the initial training implemented pursuant to
     Paragraph 4 above, LDEQ will submit to EPA for review a draft plan
     for ensuring that such training is also a routine part of the on-boarding
     process for new employees and is given regularly as refresher training
     to all employees and relevant contractors. EPA will review the draft
     training in accordance with Paragraph IV.C. of this Agreement. LDEQ
     will forward a final copy of the training plan to EPA and implement
     the above plan.

  2. **RISK COMMUNICATION**

  a. Within 60 days of the effective date of this Agreement, LDEQ will
     adopt EPA's SALT Framework: A Process Framework to Guide Risk
     Communication (https://www.epa.gov/risk-communication/salt-
     framework) and will provide confirmation of the adoption of the
     framework to EPA.

  b. Within 60 days of the adoption of the SALT Framework LDEQ will
     ensure all its staff and relevant contractors have training on LDEQ's
     SALT Framework policies, practices, and procedures. Within 20 days
     of the training, LDEQ will provide EPA with a copy of any training
     materials, a list of staff who received the training, and the dates the
     training was provided. EPA is available to provide this training.

  c. Within 30 days of the initial training implemented pursuant to
     Paragraph ii above, LDEQ will forward to EPA for review a draft plan
     for ensuring that such training is also a routine part of the on-boarding
     process for new employees and is given regularly as refresher training
     to all employees and relevant contractors.

E. Air Emissions Monitoring

  1. For facilities that currently or propose to emit EtO or chloroprene, LDEQ will
     incorporate into new permits or permit renewals a three-year fenceline
     monitoring requirement for those pollutants.

F. Actions to Related to Denka Emissions

  1. LDEQ agrees to publish for comment the revised draft permit(s) for the Denka
     facility that incorporates any new management practices that result from
     resolution of any EPA and/or LDEQ enforcement actions w/in 60 days of the
     resolution of those enforcement actions.

  2. LDEQ agrees to publish for comment the revised draft permit(s) for the Denka
     facility that incorporates the successful Emission Reduction Project that

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
02/23/2023

results from EPA's enforcement action, Docket No. RCRA-06-2023-0906,
w/in 60 days of the resolution of that enforcement action.

3. Within 60 days of the effective date of this Agreement, LDEQ will issue the
Denka draft Title V permit for public comment.

4. LDEQ's public notice and comment process on the Denka permits will follow
LDEQ's Public Participation Plan, Language Access Plan, and Disability
Access Plan adopted pursuant to Paragraphs XXX below.

5. Within 30 days of the resolution of any LDEQ or LDEQ/EPA enforcement
actions at the Denka facility (*e.g.,* Consent Agreement and Final Order),
LDEQ will provide information to the public on the terms of the resolution of
the enforcement action and the schedule for any permit actions LDEQ will
undertake to incorporate any requirements into the relevant permits.

G. Actions Regarding Other Facilities in the Industrial Corridor

1. LDEQ will work to limit air emissions of carcinogens including chloroprene
and ethylene oxide (EtO) which have a mutagenic mode of action. The goal
will be to limit future air emissions of those pollutants to levels that result in a
carcinogenic risk level below that defined in guidance or standards for LDEQ
(*e.g.,* below 1 in 1,000,000 risk) based on existing EPA IURs. This may
warrant reducing emissions to the maximum achievable levels without
consideration of costs.

2. To implement in part the general commitment in Paragraph E. 1 above, LDEQ
will develop a process to update LDEQ's current Ambient Air Standards
(AAS); regularly update the standards; and to add chronic standards beginning
with mercury and hydrogen sulfide. When considering data for both acute and
chronic standards, LDEQ will use the best available data (*i.e.,* for chronic
standards utilize U.S. EPA Reference Concentrations (RfCs) or Inhalation
Unit Risks (IURs)). Within 180 days of the effective date of this Agreement,
LDEQ will provide EPA confirmation of the adoption of this process.

3. Within XX days of the effective date of this Agreement, LDEQ will conduct
HEMS modelling of EtO and chloroprene emissions from facilities in St.
James and St. John the Baptist Parishes.

4. Within 90 days of completing the HEMS modelling in Paragraph E. 3 above,
LDEQ will provide a risk communication presentation about the results of the
HEMS modelling to residents and Parish government agencies including
school boards.

H. Public Engagement

23

Informal Resolution Agreement                           PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              02/23/2023

1.  LDEQ will include in Title V permit file copies of all written communications
    and notes of meetings or other oral communication with permit applicants and
    other outside parties regarding permit applications that are releasable under
    Louisiana Open Records law (*e.g.,* applicant's comments on draft permit
    monitoring terms and conditions, emissions limitations).

2.  LDEQ will post relevant Title V permit files on its website at least 45 days
    before a draft Title V permit is published for comment.

3.  LDEQ will notify the public via LDEQ's website when it receives a minor
    source permit application for which LDEQ regulations do not require public
    notice and comment.

4.  Within 180 days, LDEQ will develop and implement a policy to provide
    public notice and comment for all minor source permit applications.

5.  LDEQ's public notice and comment and public hearing on draft Title V and
    minor source permits will follow LDEQ's Public Participation Plan, Language
    Access Plan, and Disability Access Plan adopted pursuant to Paragraphs XXX
    below.

III.  **Commitments Regarding LDEQ's Procedural Safeguards (Issue 2)**

LDEQ agrees to the following commitments:

A.  Notice of Non-Discrimination under the Federal Non-Discrimination Laws[12]

1.  LDEQ will post a notice of non-Discrimination (Notice) on LDEQ's website
    homepage, in all LDEQ's offices and facilities, and in future general publications
    that are distributed to the public (*e.g.,* public outreach materials, such as
    brochures, notices, fact sheets or other information on rights and services;
    applications or forms to participate in or access LDEQ programs, processes or
    activities). LDEQ will ensure that its Notice is accessible to individuals with
    limited-English proficiency (LEP) and individuals with disabilities, including
    ensuring that the Notice as posted on its Website Homepage is accessible to
    persons who are blind or have low vision.

2.  The Notice will contain, at a minimum, the following recommended text:

    a.  LDEQ does not discriminate on the basis of race, color, national origin
        (including limited English proficiency), disability, age, or sex in
        administration of its programs or activities.

---

[12] 40 C.F.R. §7.95

24

b.  For LDEQ programs that are covered by 40 C.F.R. Parts 5 and 7, the notice shall also contain text that LDEQ does not intimidate or retaliate against any individual or group because they have exercised their rights to participate in or oppose actions protected/prohibited by 40 C.F.R. Parts 5 and 7, or for the purpose of interfering with such rights.

c.  [Insert name and title of non-discrimination coordinator] is responsible for coordination of compliance efforts and receipt of inquiries concerning non-discrimination requirements implemented by 40 C.F.R. Parts 5 and 7 (Non-Discrimination in Programs or Activities Receiving Federal Assistance from the Environmental Protection Agency), including Title VI of the Civil Rights Act of 1964, as amended; Section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975; Title IX of the Education Amendments of 1972; and Section 13 of the Federal Water Pollution Control Act Amendments of 1972 (hereinafter referred to collectively as the federal non-discrimination laws).

d.  If you have any questions about this notice or any of LDEQ's non-discrimination programs, policies or procedures, you may contact:

> (Name)
> (Position)
> (Organization/Department)
> (Address)
> (Phone Number)
> (Email)

e.  If you believe that you have been discriminated against with respect to an LDEQ program or activity, you may contact the [insert title of non-discrimination coordinator] identified above or visit our website at [insert Recipient website address] to learn how and where to file a complaint of discrimination.

3.  Within 30 days after the effective date of this Agreement, LDEQ will submit to the EPA for review a draft copy of its Notice of Non-Discrimination that is consistent with 40 C.F.R. Parts 5 and 7. EPA's review of the draft Notice of Non-Discrimination will be in accordance with Paragraph IV.C. of this Agreement. Following final approval by EPA, LDEQ will prominently publish in print and on its website the Notice of Non-Discrimination.

4.  If the identity of the Non-Discrimination Coordinator changes, then LDEQ will promptly update materials as appropriate.

PRIVILEGED/DELIBERATIVE
02/23/2023

B.  <u>Grievance Procedures to Process Discrimination Complaints filed under the Federal Non-Discrimination Laws[13]</u>

1.  LDEQ will post Grievance Procedures to promptly and fairly process and resolve discrimination complaints filed under federal nondiscrimination statutes and, where applicable, the EPA's implementing regulations at 40 C.F.R. Parts 5 and 7 on LDEQ's website homepage(s), in all LDEQ's offices and facilities, and in its general publications as appropriate that are distributed to the public. LDEQ will ensure that its Grievance Procedures are accessible to individuals with LEP and individuals with disabilities, including ensuring that the Grievance Procedures posted on LDEQ's Website Homepage is accessible to individuals who are blind or have low vision.

2.  The Grievance Procedures will:

    a.  Clearly identify the Non-Discrimination Coordinator, including name and contact information;

    b.  Explain the role of the Non-Discrimination Coordinator relative to the coordination and oversight of the Grievance Procedures;

    c.  State who may file a complaint under the Grievance Procedures and describe the appropriate bases for filing a complaint;

    d.  Describe the processes available for filing complaints;

    e.  State that the preponderance of the evidence standard will be applied during the analysis of the complaint;

    f.  Contain assurances that intimidation and retaliation are prohibited and that claims of intimidation and retaliation will be handled promptly and fairly pursuant to your Grievance Procedures in the same manner as other claims of discrimination;

    g.  Assure the prompt and fair resolution of complaints which allege violations of federal non-discrimination laws;

    h.  State that written notice will be promptly provided about the outcome of the investigation, including whether discrimination is found and the description of the investigation process.

    i.  Be reviewed on an annual basis (for both in-print and online materials), and revised as necessary, to ensure prompt and fair resolution of discrimination complaints.

---

[13] 40 C.F.R. §7.90

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                          02/23/2023

    3.  Within 120 days after the effective date of this Agreement, LDEQ will submit to
        EPA for review a draft copy of its Grievance Procedures. EPA will review the
        draft Grievance Procedures in accordance with Paragraph IV.C. of this
        Agreement. LDEQ will prominently publish in print and on its website the final
        Grievance Procedures in print and on its website.

C.  <u>Designation of Non-Discrimination Coordinator</u>[14]

    1.  LDEQ will designate at least one Non-Discrimination Coordinator to ensure
        compliance with the federal non-discrimination laws, who will:

        a.  Provide information to individuals internally and externally that LDEQ does
            not discriminate on the basis of race, color, national origin, disability, age, or
            sex in the administration of LDEQ's programs or activities, and, where
            applicable, the EPA's implementing regulations at 40 C.F.R. Parts 5 and 7;

        b.  Provide information to individuals both internally and externally that LDEQ
            does not intimidate or retaliate against any individual or group because they
            have exercised their rights to participate in or oppose actions
            protected/prohibited by 40 C.F.R. Parts 5 and 7, or for the purpose of
            interfering with such rights;

        c.  Provide notice of LDEQ's grievance processes and the ability to file a
            discrimination complaint;

        d.  Establish a mechanism (*e.g.,* an investigation manual) for implementation of
            LDEQ's Grievance Procedures to ensure that all discrimination complaints
            filed with LDEQ under federal non-discrimination laws and the EPA
            implementing regulations 40 C.F.R. Parts 5 and 7 are processed promptly
            and fairly. One element of any policy and procedure or mechanism must
            include providing meaningful access for individuals with limited English
            proficiency and individuals with disabilities to LDEQ's programs and
            activities;

        e.  Track all complaints filed with LDEQ under federal nondiscrimination laws,
            in order to identify any patterns or systemic problems;

        f.  Conduct semiannual reviews/analysis of all complaints filed with LDEQ
            under the federal non-discrimination laws, identified in 40 CFR Parts 5 and 7
            to identify and address any patterns, systematic problems or any trends
            identified;

---

[14] 40 C.F.R. §7.85(g)

g.  Ensure that appropriate training is provided for LDEQ staff in the processes available to resolve complaints filed with LDEQ under federal non-discrimination laws;

h.  Ensure that appropriate training is provided for LDEQ staff and all relevant contractors on LDEQ's non-discrimination policies and procedures, as well as the nature of LDEQ's obligation to comply with federal non-discrimination laws;

i.  Ensure that complainants are updated on the progress of their complaints filed with LDEQ under federal non-discrimination laws and are promptly informed as to any determinations LDEQ has made;

j.  Undertake periodic evaluations of the efficacy of LDEQ's efforts to provide services, aids, benefits, and participation in any of LDEQ's programs or activities without regard to race, color, national origin, disability, age, sex or prior exercise of rights or opposition to actions protected under federal non-discrimination laws.

k.  Coordinate with the LDEQ's designated Point of Contact for completion of the Preaward Compliance Review Report for All Applicants and Recipients Requesting EPA Financial Assistance (Form 4700-4) to ensure that an accurate Form is submitted with applications for EPA assistance.

> **Commented [A6]: For LDEQ:** This new provision relates to the Form 4700-4 process.

2.  The Non-Discrimination Coordinator will not have other responsibilities that create a conflict of interest (*e.g.,* serving as LDEQ's Non-Discrimination Coordinator as well as its legal advisor or representative on civil rights issues).

3.  Within 90 days after the effective date of this Agreement, LDEQ will identify at least one individual who will serve as Non-Discrimination Coordinator(s) consistent with the regulatory requirements of 40 C.F.R. §5.135, §7.85(g), and §7.95(a).

4.  Within 90 days of appointment of a Non-Discrimination Coordinator, LDEQ will forward to EPA proof that the responsibilities have been included in the incumbent's statement of duties and that the incumbent has accepted the duties.

D.  Public Participation

1.  LDEQ understands that meaningful public participation consists of informing, consulting, and working with potentially affected communities at various stages of the environmental decision-making process to address their questions and concerns. Therefore, LDEQ will:

a.  Ensure that its public involvement process is available to all persons regardless of race, color, national origin, disability, age, sex, or prior

Informal Resolution Agreement                                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                              02/23/2023

exercise of rights protected, or opposition to actions prohibited, by 40 C.F.R. Parts 5 and 7 and the federal non-discrimination laws;

b.  Ensure that the factors used to determine the appropriate time, place, location, duration, and security at public meetings are developed and applied in a non-discriminatory manner;

c.  Develop, publicize, and implement written public participation procedures (consistent with the federal civil rights laws and the *Title VI Public Involvement Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs (Recipient Guidance)[15]*), that include implementation of the following steps for effective public participation that is accessible to all persons regardless of race, color, national origin (including LEP), disability, age, and sex each time LDEQ engages in a public participation or public involvement process:

d.  Develop a description of the relevant/affected community based on the action being considered (including demographics, history, and background, for example/such as, percentage of the service area that is minority, has less than a high school education, has members of households who speak a language other than English and/or speak English less than very well, has a history of filing complaints, has an inability to access traditional communication channels or the internet);

e.  Provide a contact list for relevant staff members on LDEQ's website, including phone numbers and email addresses, to allow the public to communicate via phone or internet;

f.  Develop a list of past and present community concerns (including any complaints filed under the federal nondiscrimination laws), and actions undertaken in response to such concerns;

g.  Develop and implement a detailed plan of action (including outreach activities) LDEQ will take to address concerns raised by the public;

h.  Develop and implement a contingency plan for unexpected events that may impact public meetings or other public participation avenues;

i.  Identify location(s) where public meetings will be held (considering the availability and schedules of public transportation), and ensure that the location(s) will allow for meaningful participation/involvement by individuals with LEP and individuals with disabilities;

---

[15] 71 Fed. Reg. 14207 (March 21, 2006), available at https://www.epa.gov/sites/default/files/2020-02/documents/title_vi_public_involvement_guidance_for_epa_recipients_2006.03.21.pdf

29

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                      02/23/2023

     j.  Develop and maintain a list of contact names for obtaining reasonable accommodations at no cost for individuals with disabilities and language assistance services for limited-English proficient persons, including translation of documents and/or interpreters for meetings;

     k.  Develop and maintain a list of appropriate local media contacts (based on the cultural and linguistic needs of the community).

2. LDEQ will, during times of national, state, or local emergency, ensure that any public meetings occurring virtually are held in such a manner as to ensure the meaningful participation/involvement of individuals with limited English proficiency and individuals with disabilities. LDEQ may seek technical assistance from EPA about how it may achieve this outcome.

3. LDEQ will ensure that a Public Participation Plan is developed and prominently highlighted on the LDEQ website, which will explain how residents can participate in LDEQ's programs, activities, and services. LDEQ will also solicit and consider public input into development of the Public Participation Plan. This plan will also be posted in other publicly accessible locations such as local public libraries, and LDEQ will ensure that it incorporates the following elements:

     a.  A description of how LDEQ will meaningfully engage the public prior to and during LDEQ programs, activities, and services (*e.g.* how the public can request to participate during LDEQ public engagement opportunities such as public hearings, townhalls, etc., including criteria on how these events are determined);

     b.  A description of what methods LDEQ will implement to ensure the public can access publicly available information and documents regarding LDEQ programs, activities, and services, which includes providing clear instructions for public users on how and where to access LDEQ's electronic and hardcopy documents and information.

4. The Non-Discrimination Coordinator(s) will ensure that appropriate LDEQ staff and all relevant contractors receive training in best practices related to public involvement in all processes undertaken by LDEQ that include public engagement.

5. LDEQ will provide a mechanism for residents to access relevant hard copy information in a centralized public location near to a proposed LDEQ activity (*e.g.* proposed health report or study) in addition to providing the public with access to internet and digitally provided information relating to that activity;

6. LDEQ will provide a mechanism for obtaining public feedback and answering inquiries about any information regarding a LDEQ activity or public health issue;

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                      02/23/2023

7. Within 120 days of the effective date of this Agreement, LDEQ will prepare a draft copy of its Public Participation Plan(s). LDEQ will submit its draft Public Participation Plan(s), including a translated Public Participation Plan(s) in all appropriate languages, for public comment for thirty days. After the public comment period ends, LDEQ will review comments and finalize the Public Participation Plan(s) within 30 days and submit it to EPA for review in accordance with Paragraph IV.C. of this Agreement. Within 30 days of EPA's review, LDEQ will review and incorporate comments and will publish the final Public Participation Plan(s), translated in all appropriate languages, on its website and in print.

8. Within one year after the effective date of this Agreement, the Non-Discrimination Coordinator(s) will coordinate and host regional panels for each of the following parishes: St. John the Baptist Parish, St. James Parish, Ascension Parish, East Baton Rouge Parish, West Baton Rouge Parish, Iberville Parish, and St. Charles Parish. These panels will include representatives from communities affected by environmental and human health risks, and possibly a facilitator, to gather information from affected community members, including any expressions of community concerns, experiences, engagement needs and requests. LDEQ will prominently advertise requests for participation on these regional panels to interested community members and will publish a summary of the discussions, including recommendations for actions.

E. <u>LDEQ Plan to Ensure Meaningful Access to Programs and Activities for Persons with Limited English Proficiency (LEP)</u> [16]

1. LDEQ will conduct an appropriate analysis as described in EPA's LEP Guidance, to identify the appropriate language groups and determine what language services or mix of language services LDEQ needs to provide (*e.g.,* interpreters and translators), to ensure that individuals with limited-English proficiency can meaningfully participate in LDEQ's programs and activities.

---

[16] *See* Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000(d) (prohibiting discrimination on the basis of national origin,) *Lau v Nichols 414 U.S. 563, 568-69* (1974) (finding that the government properly required language services to be provided under a recipient's Title VI obligations not to discriminate based on national origin.) On June 25, 2004, EPA issued Guidance to Environmental Protection Agency Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons (LEP Recipient Guidance). The LEP Recipient Guidance clarifies recipients' existing legal obligations to provide meaningful access to limited English proficient persons in all programs and activities that receive federal financial assistance from EPA. The LEP Recipient Guidance also provides a description of the factors recipients should consider in fulfilling their responsibilities to persons with limited-English proficiency to ensure meaningful access to recipients' programs and activities and the criteria EPA uses to evaluate whether recipients are in compliance with Title VI and the Title VI implementing regulation. LEP Recipient Guidance, 69 FR 35602, 35606-35607 (June 25, 2004), at https://www.govinfo.gov/content/pkg/FR-2004-06-25/pdf/04-14464.pdf; 40 C.F.R. § 7.35(a) (prohibiting discrimination on the basis of national origin in the programs or activities of a recipient of EPA assistance).

2.  LDEQ will develop, publicize, and implement a written Language Access Plan to ensure meaningful access to all LDEQ services, programs and activities for individuals with LEP, at no cost to those individuals. LDEQ shall also solicit and consider public input into development of the Language Access Plan. LDEQ will:

    a.  Translate vital documents[17] of general interest into prominent languages for individuals with LEP who are served or likely to be encountered by LDEQ's programs and activities;

    b.  Translate vital documents of individual interest to a particular individual with LEP or group individuals with LEP (*e.g.*, an individual or group of individuals with LEP wishing to file a grievance or complaint);

    c.  Provide for simultaneous oral interpretation of live proceedings (*e.g.*, town hall meetings and public hearings) in prominent languages, and the ability for individuals with LEP to participate in those proceedings to the same extent as persons with English proficiency can participate; and

    d.  Provide for simultaneous interpretation of proceedings, meetings, etc., for an individual LEP person(s) participating in LDEQ programs or activities (*e.g.*, an individual with LEP wishing to provide comments during a hearing).

3.  Within 120 days of the effective date of this Agreement, LDEQ will prepare a draft copy of its Language Access Plan. LDEQ will then submit its draft Language Access Plan, including a translated Language Access Plan in all appropriate languages, for public comment for thirty days. After the public comment period ends, LDEQ will review comments and finalize the Language Access Plan within XX days and submit it to EPA for review in accordance with Paragraph IV.C. of this Agreement. Within 30 days of EPA's review, LDEQ will review and incorporate comments and LDEQ will publish the final Language Access Plan, translated in all appropriate languages, on its website and in print.

F.  LDEQ Plan to Ensure Meaningful Access to Programs and Activities for Persons with Disabilities[18]

    1.  LDEQ will develop, publicize and implement a Disability Access Plan to ensure meaningful access to all LDEQ programs, services and activities for individuals

---

[17] Whether or not a document (or the information it disseminates or solicits) is "vital" may depend on the importance of the program, information, encounter or service involved, and the consequence to individual(s) with the LEP if the information in question is not provided accurately or in a timely manner. (*See* EPA's LEP Recipient Guidance).
[18] *See* 40 C.F.R. §§ 7.45 - 7.75; Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794(a). Section 504, and EPA's implementing regulation prohibit discrimination on the basis of disability in any programs or activities receiving federal financial assistance.

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                     02/23/2023

with disabilities.[19] As part of the development, LDEQ shall also solicit and consider public input into development of the Disability Access Plan.

2.  LDEQ will provide, at no cost, auxiliary aids and services to individuals with disabilities, (including, but not limited to, for example, qualified interpreters to individuals who are deaf or hard of hearing, and to other individuals, as necessary), to ensure effective communication and an equal opportunity to participate fully in benefits, activities, programs, and services provided by LDEQ in a timely manner in such a way as to protect the privacy and independence of the individual.

3.  LDEQ will ensure that its facilities and other facilities utilized by LDEQ (*e.g.* if LDEQ holds a public hearing at a school or recreational center) are physically accessible to, individuals with disabilities.

4.  Within 120 days of the effective date of this Agreement, LDEQ will submit to EPA for review a draft copy of its Disability Access Plan. EPA will review the draft Disability Access Plan in accordance with Paragraph IV.C. of this Agreement. LDEQ will prominently publish in print and on its website the final Disability Access Plan.

G.  <u>Training</u>

1.  Within 60 days of the EPA approval of all other deliverables noted throughout the Agreement, LDEQ will ensure all its staff and relevant contractors have training on federal non-discrimination obligations and all plans, policies and procedures created and implemented as part of this Agreement. LDEQ may request assistance from EPA for any of the training required in this Agreement, including having the training be provided by EPA staff. LDEQ should consider the inclusion of community representatives as a part of the staff training.  Following the training, LDEQ will provide EPA with a copy of any training materials, a list of staff who received the training and the dates the training was provided.

2.  Within 30 days of the initial training implemented following sub-section 1 above, LDEQ will forward to EPA for review a draft plan for ensuring that such training is also a routine part of the on-boarding process for new employees and is given regularly as refresher training to all employees and relevant contractors. EPA will review the draft training in accordance with Paragraph IV.C. of this Agreement. LDEQ will forward a final copy of the training plan to EPA and implement the above plan.

IV.    **GENERAL CONSIDERATIONS**

---

[19] *See* Disability Nondiscrimination Plan Sample, at https://www.epa.gov/sites/production/files/2020-02/documents/disability_nondiscrimination_plan_sample_for_recipients_2020.01.pdf

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                    02/23/2023

   A.  In consideration of LDEQ's implementation of commitments and actions described in
       Sections II and III of this Agreement, EPA will end its investigation of Complaint No.
       02R-22-R6 and not issue a decision containing findings on the merits of the
       complaint.

   B.  EPA will monitor compliance with the commitments in Sections II and III of this
       Agreement, as appropriate, to ensure they are fulfilled. Once the terms of this
       Agreement are satisfied, EPA will issue a letter documenting completion of the
       commitments, closure of its monitoring actions and closure of Complaint No. 02R-
       22-R6 as of the date of that letter.

   C.  EPA will review and provide feedback about any documentation submitted by LDEQ
       demonstrating completion of each commitment and will provide an assessment, to
       include verbal and/or written feedback, as to whether the documentation satisfies the
       commitment within 30 days of receipt of each such submission. Following that,
       should there be negotiations and/or edits needed to address EPA's comments, the
       parties will resolve those within 30 days and LDEQ will finalize and submit the
       deliverable within this 30-day period.  This 30-day period for negotiations and edits
       may be extended if agreed to in writing by both the Deputy Assistant Administrator
       for External Civil Rights, Office of Environmental Justice and External Civil Rights,
       EPA, and the Secretary of LDEQ.

   D.  EPA will, upon request, provide technical assistance to LDEQ regarding any of the
       civil rights obligations previously referenced. This may be in written or oral form.


V.   **COMPUTATION OF TIME AND NOTICE**

   A.  As used in this Agreement, "day" will mean a calendar day. In computing any period
       of time under this Agreement, where the last day would fall on a Saturday, Sunday,
       or federal holiday, the period will run until the close of business of the next working
       day.

   B.  Service of any documents required by this Agreement may be made by electronic
       service as outlined below. Documents forwarded by email for review are to be sent in
       native format for draft documents and PDF format for documents intended to be final.

   C.  Electronic documents submitted by LDEQ to the EPA via email will be sent to Lilian
       Dorka at Dorka.Lilian@epa.gov,  Anhthu Hoang at Hoang.Anhthu@epa.gov, and
       Zahra Khan at Khan.Zahra@epa.gov.

   D.  Documents submitted by the EPA to LDEQ will be sent to [ TBD ].

   E.  Either EPA or LDEQ may change the persons identified above in Paragraphs V.C.
       and V.D. by providing written notice of such change.

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                      02/23/2023

**VI.    EFFECT OF THE AGREEMENT**

A. LDEQ understands that, if necessary, EPA may visit LDEQ, interview staff, and
   request such additional reports or data as are necessary for EPA to determine whether
   LDEQ has fulfilled the terms of this Agreement.

B. LDEQ understands that the EPA will not close its monitoring of this Agreement until
   EPA determines that LDEQ has fully complied with this Agreement and that a failure
   to satisfy any term in this agreement may result in the EPA re-opening an
   investigation.

C. With the exception of the provisions of Paragraphs IV.C. and V.E., if either Party
   desires to modify any portion of this Agreement because of changed conditions making
   performance impractical or impossible, or due to material change to LDEQ's program
   or authorities, or for other good cause, the Party seeking a modification will promptly
   notify the other in writing, setting forth the facts and circumstances justifying the
   proposed modification. Any modification(s) to this Agreement will take effect only
   upon written agreement by the Secretary of LDEQ or their designee and the Deputy
   Assistant Administrator for External Civil Rights, Office of Environmental Justice
   and External Civil Rights, EPA.

D. This Agreement constitutes the entire Agreement between LDEQ and EPA regarding
   the matters addressed herein, and no other statement, promise, or agreement, made by
   any other person will be construed to change any commitment or term of this
   Agreement, except as specifically agreed to by LDEQ and EPA in accordance with the
   provisions of Paragraph VI.C. above.

E. This Agreement does not affect LDEQ's continuing responsibility to comply with
   Title VI or other federal nondiscrimination laws and the EPA's regulations at 40
   C.F.R. Parts 5 and 7, nor does it affect EPA's investigation of any other Title VI or
   other federal civil rights complaints or address any other matter not covered by this
   Agreement.

F. The effective date of this Agreement is the date by which both Parties have signed the
   Agreement. This Agreement may be signed in counterparts. The individuals signing
   this Agreement represent that they are authorized to execute this Agreement and
   legally bind the parties to the Agreement.

On Behalf of the Louisiana Department of Environmental Quality:

_____          _____
Dr. Chuck Carr Brown, Secretary                            (Date)
Louisiana Department of Environmental Quality

35

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                          02/23/2023

On behalf of the Office of External Civil Rights Compliance, Office of Environmental Justice
and External Civil Rights, U.S. Environmental Protection Agency:

_____          _____
Lilian S. Dorka                                    (Date)
Deputy Assistant Administrator for Civil Rights
Office of Environmental Justice and External Civil Rights



36