EXHIBIT 40



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**WASHINGTON, D.C. 20460**

EXTERNAL CIVIL RIGHT COMPLIANCE OFFICE
OFFICE OF GENERAL COUNSEL

January 18, 2017

Dear Colleague:

All applicants for and recipients of EPA financial assistance[i] have an affirmative obligation to comply with federal civil rights obligations.[ii]  EPA's External Civil Rights Compliance Office (formerly Office of Civil Rights (OCR), within the Office of General Counsel, (ECRCO),[iii] also has a duty to ensure that applicants for and recipients of federal financial assistance ("EPA recipients") comply with federal civil rights laws in their programs or activities that apply for and receive federal financial assistance (including subrecipients of EPA financial assistance).  All persons, regardless of race, color, national origin, age, disability or sex, are entitled to receive the benefits of and participation in the programs and activities of EPA recipients without discrimination.[iv]  EPA ensures compliance with federal civil rights laws in several ways – through complaint investigations, compliance reviews, technical assistance, community engagement, and policy formulation.[v]

Strong civil rights compliance and enforcement are essential.  Furthermore, enforcement of civil rights laws and environmental laws are complementary and can be achieved in a manner consistent with sustainable economic development and that ensures the protection of human health and the environment.

The purpose of this letter is to introduce the **U.S. EPA's External Civil Rights Compliance Office Compliance Toolkit ("Toolkit")**, which is a clarification of existing law and policy intended to provide guidance to promote and support EPA recipients' compliance with federal civil rights laws.  With this letter, we are issuing **Chapter 1 of the Toolkit**, which highlights the application of the federal civil rights laws and the legal standards used in investigating and resolving civil rights complaints at EPA.  In addition, we are including a companion **Frequently Asked Questions (FAQs)** document to assist in responding to potential questions addressed in Chapter 1.

**What is the purpose of the Toolkit?**

The overall purpose of the Toolkit is to support and advance our external civil rights compliance and enforcement efforts.  We have now finalized the External Civil Rights Compliance Office Strategic Plan for FY 2015-2020 ("Strategic Plan") to promote mission-critical program accountability through measurable goals.[vi]  The Strategic Plan

Toolkit Chapter 1 Dear Colleague Letter – January 18, 2017

is one part of a multi-prong approach to prompt, effective and efficient docket management that includes a Case Resolution Manual together with a Strategic Case Assessment Management Plan,[vii] and deployment of EXCATS,[viii] which is ECRCO's internal docket management system.  The Toolkit is previewed in the Strategic Plan to support EPA's goals of enhancing its strategic docket management and developing a proactive compliance program.[ix]

We designed the Toolkit to help you comply with your federal civil rights obligations.  The information, guidance, and examples or hypotheticals are intended to assist you in conducting your programs and activities in a nondiscriminatory manner.  We created the Toolkit with an understanding that you build a civil rights program around a legal analytical framework that depends upon the legal standards pursued and the nature of facts gathered, such as, direct or indirect/circumstantial evidence.  In other words, we recognize that a "one-size-fits-all" approach to civil rights compliance may not adequately address all of your needs.  You may have different civil rights concerns in communities within your jurisdiction, different amounts of resources, and different organizational structures.

The Toolkit does not address every scenario that may arise under federal civil rights laws; nor does the Toolkit come with a guarantee that you will not receive a civil rights complaint if you abide by and implement the guidance contained within it.  The Toolkit may not apply in a particular situation based upon the circumstances, and EPA retains discretion to adopt approaches on a case-by-case basis that differ from those discussed in the Toolkit where appropriate.  Importantly, the Toolkit does not change in any way, your obligation to comply with applicable environmental laws or create any new legal rights or responsibilities.

The Toolkit is a "living document." EPA may revise it from time to time to make improvements, reflect emerging case law or reflect policy changes in EPA's approach to implementing federal civil rights laws.

In introducing the Toolkit, EPA affirms its commitment to work with EPA recipients to achieve their compliance with federal civil rights laws; that is, for recipients to operate and administer their programs and activities in a manner free from discrimination.  We

Toolkit Chapter 1 Dear Colleague Letter – January 18, 2017

look forward to issuing additional Toolkit Chapters that address other civil rights compliance areas. Please do not hesitate to contact me if you have questions relating to the content of this letter and the Toolkit, or if we can otherwise assist you in your federal civil rights compliance efforts.

Sincerely,

Lilian S. Dorka
Director
EPA External Civil Rights Compliance Office
Office of General Counsel

Toolkit Chapter 1 Dear Colleague Letter – January 18, 2017

---

[i] "Applicant means any entity that files an application or unsolicited proposal or otherwise requests EPA assistance." 40 C.F.R. § 7.25. Generally, a recipient means an entity that receives financial assistance from EPA. EPA regulations define recipient as follows:

> Recipient means, for the purposes of this regulation, any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which *Federal financial assistance is extended directly or through another recipient*, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance. 40 C.F.R. § 7.25 (emphasis added).

[ii] *See, e.g.,* http://apply07.grants.gov/apply/forms/sample/SF424B-V1.1.pdf.

[iii] This document generally references EPA throughout. Within EPA, ECRCO is the primary office that enforces federal civil rights laws.

[iv] EPA enforces and ensures compliance with federal civil rights laws that together prohibit discrimination on the bases of race, color, national origin (including limited-English proficiency), disability, sex and age. The five federal civil rights laws that we enforce are as follows: Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq.*); Title IX of the Education Amendments of 1972, as amended (20 U.S.C. §§ 1681 *et seq.*); Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794); Age Discrimination Act of 1975 (42 U.S.C. §§ 6101 *et seq.*); and the Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500 § 13, 86 Stat. 903 (codified as amended at 33 U.S.C. §§ 1251 *et seq.* (1972)). *See also* 40 C.F.R. Parts 5 and 7 (EPA's nondiscrimination regulations).

[v] EPA is required to seek the cooperation of applicants and recipients in securing compliance EPA's nondiscrimination regulations and is available to provide help in that regard. 40 C.F.R. § 7.105. Members of the public who believe that he or she or a specific group of persons have been discriminated against may file a complaint alleging discrimination in violation of federal civil rights laws. 40 C.F.R. § 7.120. In such cases, EPA is authorized to investigate and resolve these complaints, as a part of its responsibility to develop and administer a means of ensuring compliance with federal civil rights laws. *See Alexander v. Sandoval*, 532 U.S. 275, 293 (2001) (holding that there is no private right of action to enforce disparate impact regulations promulgated under Title VI). EPA is also authorized to initiate compliance reviews to determine compliance with the civil rights laws enforced by EPA. *See* 40 C.F.R. §§ 7.110, 7.115. This regulatory provision is incorporated by reference in the regulations implementing other statutes enforced by ECRCO. *See* 40 C.F.R. § 5.605. *See also* External Civil Rights Compliance Office Strategic Plan (2015-2020), at 12 ( https://www.epa.gov/sites/production/files/2017-01/documents/final_strategic_plan_ecrco_january_10_2017.pdf ).

[vi] *See* Strategic Plan at 5.

[vii] See ECRCO Case Resolution Manual ( https://www.epa.gov/sites/production/files/2017-01/documents/final_epa_ogc_ecrco_crm_january_11_2017.pdf ).

[viii] *See* Strategic Plan at 11 (discussing EXCATS).

[ix] *Id.* at 13.

4

January 18, 2017

## U.S. EPA's EXTERNAL CIVIL RIGHTS COMPLIANCE OFFICE
## COMPLIANCE TOOLKIT

## CHAPTER 1:  Application of the federal civil rights laws and the civil rights legal standards used in investigating and resolving civil rights complaints at EPA

### I.    Who is Covered by Federal Civil Rights Laws?

Federal civil rights laws apply to the programs and activities of applicants for and recipients of federal financial assistance.[1]  EPA's nondiscrimination regulation[2] defines a "recipient" to include both public[3] and private entities, such as a State, public or private agency, institution, organization, or other entity or person to which Federal financial assistance is extended.[4]

Applicants for EPA financial assistance must submit an assurance with their applications stating that they will comply with federal civil rights laws.[5]  In turn, the acceptance of EPA financial assistance is an acceptance of federal civil rights obligations.[6]  Some programs and activities involve more than one recipient of EPA financial assistance.  The "primary recipient" is the entity that directly receives the federal financial assistance.  The primary recipient then may distribute the funds to a separate entity, known as a "subrecipient,"[7] to carry out a program or activity.  Whether you are a primary recipient or subrecipient, you are covered by and must conform your

> *State Department of Environmental Quality (SDEQ) is the recipient of an EPA Brownfields revolving loan fund grant.  SDEQ makes a subgrant to one of its counties, Green County, to carry out cleanup activities at a brownfield site within the county. Therefore, Green County is a subrecipient of EPA financial assistance.*

conduct to federal civil rights laws.[8]  Generally, a recipient can also include one that is a successor (*e.g.* one who legally acquires the rights and obligations of another through merger, buy-out, or other means), transferee (*i.e.*, one to whom a transfer of property has been made), or assignee (*i.e.,* one to whom an assignment – a transfer of rights – is made) of EPA financial assistance.[9]

As a recipient, you also may not release yourself of your federal civil rights obligations by hiring a contractor or agent to perform or deliver assistance to beneficiaries.  EPA's regulations clearly state that prohibitions against discriminatory conduct, whether intentional or through facially neutral means that have a disparate impact, apply to a recipient, whether committed directly or through contractual or other arrangements.[10]

## II.    What is Covered by Federal Civil Rights Laws?

Civil rights laws prohibit discrimination in "any program or activity" of recipients of federal financial assistance.  With regard to certain recipients, such as public institutions, the "program or activity" that Title VI covers encompasses the entire institution and not just the part of the institution that receives the federal financial assistance.[11]  For example, many state environmental agencies receive federal funding for their regulatory and environmental protection functions.  Those agencies should be aware that all actions, not just permitting decisions, taken by state agencies funded by EPA are subject to federal civil rights laws.

> *Note: If in a given circumstance you are complying with applicable environmental laws, that fact alone does not necessarily mean that you are complying with federal civil rights laws.*

It is also important to note that civil rights laws and environmental laws function separately.  Thus if, in a given circumstance, you are complying with applicable environmental laws that fact alone does not necessarily mean that you are complying with federal civil rights laws.

## III.    Analyzing Discrimination Complaints at EPA

Federal civil rights laws prohibit recipients from intentionally discriminating[12] based on race, color, national origin, disability, sex and age.  In addition, federal law authorizes federal agencies to enact "rules, regulations, or orders of general applicability" to achieve the law's objectives.[13]  The Supreme Court has held that such regulations may validly prohibit practices that have a *disparate impact* on protected groups.  This includes policies, criteria or methods of administering programs that are neutral on their face but have the effect of discriminating.[14]  Therefore, both intentionally discriminatory actions (as discussed in section A below) and actions that have the effect of subjecting individuals to discrimination (as discussed in section B below) are prohibited.[15]

In 1973, EPA issued such nondiscrimination regulations and revised them in 1984.[16]  Under these regulations, recipients of EPA financial assistance are prohibited from taking actions in their programs or activities that are intentionally discriminatory and/or have a discriminatory effect.  EPA regulations also prohibit retaliation and intimidation.[17]  No applicant, recipient nor other person may intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has either taken action or participated in an action to secure rights protected by the non-discrimination statutes that the EPA External Civil Rights Compliance Office (ECRCO) enforces.[18]

2

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

A complainant does not have the burden to cite to specific evidence supporting the claim of discrimination, but may wish to provide supporting information for its complaint. A complainant reports what he or she believes is an act violating federal civil rights laws by an EPA recipient of financial assistance. EPA is not in an adjudicatory role, evaluating evidence produced by opposing sides. Rather, if the jurisdictional criteria in 40 C.F.R. § 7.120 have been established (*see also* ECRCO's Case Resolution Manual, at § 2.4),[19] EPA will investigate the allegations about its recipient to determine if a federal civil rights violation has occurred, even absent specific supporting evidence from a complainant.

### A.   *What constitutes intentional discrimination (disparate treatment)?*

Federal civil rights laws prohibit recipients from intentionally discriminating in their programs and activities based on race, color, or national origin, disability, age, or sex. This is also referred to as *disparate treatment*. A claim of intentional discrimination alleges that a recipient intentionally treated individuals differently or otherwise knowingly cause them harm because of their race, color, or national origin, disability, age or sex. Intentional discrimination requires a showing that a "challenged action was motivated by an intent to discriminate."[20] Evidence of "bad faith, ill will or any evil motive of the part of the [recipient] is not necessary.[21] Evidence in a disparate treatment case will generally show that the recipient was not only aware of the complainant's protected status, but that the recipient acted, at least in part, because of the complainant's protected status.[22]

Various methods of proof are available to organize evidence to show whether intentional discrimination has occurred. These methods are described briefly below and one or more of these methods may apply to the facts in an investigation. EPA will evaluate the "totality of the relevant facts" including direct, circumstantial, and statistical evidence to determine whether intentional discrimination has occurred.[23]

The clearest case of intentional discrimination involves direct evidence, such as with a policy or decision that is discriminatory on its face. For example, a policy or decision that includes explicit language requiring individuals or groups of one race to be treated differently from individuals or groups of another race – such as explicitly conditioning the receipt of benefits or services on the race, color, or national origin of the beneficiary – evidences an express classification and thus, direct evidence of intentional discrimination. Comments or conduct by decision-makers that express a discriminatory motive, such as racist or similar discriminatory statements or actions, are also direct evidence that can establish intentional discrimination.

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

Intentional discrimination also occurs when a policy or decision that is facially neutral (for instance, if the language used does not explicitly differentiate between groups on

*SDEQ has a policy on its website stating that it provides fair and equal access to its programs and activities and does not discriminate based on race, color, national origin, disability, sex, age or any other protected category under law.  SDEQ is aware that individuals in the community with physical mobility disabilities wish to participate in a public meeting regarding a proposed environmental action; however, SDEQ decides to hold the meeting at a facility that is inaccessible to those individuals because the facility is more centrally located for SDEQ staff.  This action, though based on an apparently neutral rationale, may constitute a viable intentional disability discrimination.*

the basis of race) is administered by the recipient in a discriminatory manner that is motived, at least in part, by the race, color, national origin, disability, age or sex of the alleged victims of discriminatory treatment.

*SDEQ determines to hold a public hearing on the permitting of a controversial landfill in Green County Township.  SDEQ decides it will hold public hearings in different sections of the Township to cover the two main areas of town.  SDEQ holds two hearings in the East Section, a predominantly white part of the Township and one hearing several miles away in the West Section, a predominately African-American part of the Township.*

*The East Section hearings are held during the daytime, as well as in the evening after work hours, and both hearings provide three-hour time slots for community comments.  The hearing that is held in the West Section is held during the day hours only and limits comments from the community to one hour.  Armed security officers also attend the West Section hearing.*

*SDEQ's decision to hold three public hearings appears to reflect an effort to provide access to all areas of the Township.  However, the fact that the hearing in the West Section provides significantly less time for community comment and is scheduled and staffed differently than the two hearings in the East Section raises different treatment concerns.  Given these facts, SDEQ's actions may result in a viable claim of disparate treatment based on race.*

4

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

Direct proof of discriminatory motive is often unavailable.  However, EPA will consider both direct and circumstantial evidence of discriminatory intent.  For example, evidence to be considered may include:

- statements by decision makers,

- the historical background of the events in issue,

- the sequence of events leading to the decision in issue,

- a departure from standard procedure (*e.g.*, failure to consider factors normally considered),

- legislative or administrative history (*e.g.*, minutes of meetings),

- the foreseeability of the consequences of the action,

- a history of discriminatory or segregated conduct.[24]

Finally, disparate treatment can be shown based on evidence of a substantial disparate impact on a protected group, together with other evidence of motive, such as that listed in the bulleted list above, showing that the recipient acted with discriminatory intent.[25]

*SDEQ granted a permit to operate a cement grinding facility.  Plaintiffs timely filed an intentional discrimination complaint against SDEQ under Title VI. Plaintiffs alleged:  1) the operation of a cement grinding facility would have a disparate impact upon the predominantly minority community of Waterfront South; 2) SDEQ was well-aware of the potential disproportionate and discriminatory burden placed upon that community and failed to take measures to avoid, minimize, or mitigate that burden; and 3) SDEQ had historically engaged in a statewide pattern and practice of granting permits to polluting facilities to operate in communities where most of the residents are African-American and/or Hispanic to a greater extent than in predominately white communities.  These facts may establish circumstantial evidence of intentional discrimination.*

*An offshore oil spill has caused contamination affecting a Vietnamese community in Green County Township.  The spill has contaminated the local beachfront and killed fish and waterfowl.  SDEQ does not provide initial response to the incident until four days after receiving notification of the spill, exposing the community to health effects, including stinging eyes, rashes, nausea, dizziness, headaches, coughs and other*

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

*respiratory symptoms. The response time has resulted in additional adverse impacts, such as economic impact to the local fishing industry and food supply from the fish kill. During the past few years, SDEQ has provided initial response to six other environmental events, including two oil spills within 12 to 24 hours of being notified. Each of those events occurred in areas outside of the Vietnamese community, in areas with a majority white population. These facts may establish a viable discrimination complaint from the Vietnamese community based on disparate treatment.*

Additionally, in situations where direct proof of discriminatory motive is unavailable, EPA may analyze claims of intentional discrimination using the Title VII[26] burden shifting analytic framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green.*[27]  This framework is usually most applicable where a complaint is about one or a few individuals, and involves easily identifiable, similarly-situated individuals not in the protected class.  To establish a prima facie case of disparate treatment under the *McDonnel Douglas* framework, EPA must determine that:

(1) the complainant is a member of a protected class;

(2) the complainant was eligible for the recipient's program, activity or service;

(3) the complainant was excluded from that program, activity or service or was otherwise treated in an adverse manner; **and**

(4) an individual who was similarly situated with respect to qualifications, but was not in the complainant's protected group, was given better treatment.

If a prima facie case of disparate treatment is established, the recipient then has the burden of producing a legitimate, non-discriminatory reason for the challenged policy or decision and the different treatment.[28]  If the recipient articulates such a reason, EPA must then determine if there is evidence that the proffered reason is false, *i.e.*, that the nondiscriminatory reason or reasons or the defendant gives for its actions are not the true reasons and are actually a pretext for discriminatory intent.[29]

The chart below illustrates this burden-shifting framework as applied in an administrative complaint.

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017



## Intentional Discrimination – McDonnell-Douglas Framework

Has an EPA recipient denied services, benefits or opportunities to an individual or group protected by federal civil rights laws by treating them differently from another *identifiable* individual or group that is in a similar situation?

Is there a prima facie case? EPA must determine that:
(1) the complainant is a member of a protected class;
(2) the complainant was eligible for the recipient's program, activity or service;
(3) the complainant was excluded from that program, activity or service or was otherwise treated in an adverse manner; and
(4) an individual who was similarly situated with respect to qualifications, but was not in the complainant's protected group, was given better treatment.

**Yes**

**No**

Can the recipient provide specifics supporting a legitimate, non-discriminatory reason for the challenged policy or decision and the different treatment?

EPA would likely find insufficient evidence to determine that the recipient had engaged in intentional discrimination.

**Yes**

**No**

Is the recipient's justification actually a pretext (excuse) for discrimination?  For example, is there historical evidence of underlying discriminatory purpose; a series of events indicating discriminatory intent; departures from procedural or substantive requirements; statements by decision-makers or administrative history, such as meeting minutes?

EPA would likely find sufficient evidence to determine that the recipient had engaged in intentional discrimination.

**Yes**

**No**

EPA would likely find sufficient evidence to determine that the recipient had engaged in intentional discrimination.

EPA would likely find insufficient evidence that the recipient had engaged in intentional discrimination.

Similar principles may be used to analyze claims that a recipient has engaged in a *pattern or practice* – or systemic violations – of unlawful discrimination.[30]  A showing of more than the mere occurrence of isolated, accidental or sporadic discriminatory acts may prove such claims.[31]  In such cases, EPA would look to determine if the recipient regularly engaged in less favorable treatment of a protected group in some aspect of its program as part of its standard policy or operating procedure.[32]  A standard policy or operating procedure may be established by a strong statistical disparity that affects a large number of individuals.[33]  Statistical evidence can sometimes serve by itself to establish a prima facie case of a pattern or practice of unlawful discrimination[34] but in many cases, statistics are coupled with anecdotal evidence of an intent to treat the protected class unequally.[35]  Once the existence of such a discriminatory pattern has been shown, it may be presumed that every disadvantaged member of the protected class was a victim of the discriminatory policy, unless the recipient can rebut the inference that its standard operating policy or operating procedure is discriminatory.[36]

Finally, it is important to understand that establishing that a recipient acted because of race, color, or national origin does not mean that the recipient's actions automatically violate Title VI.  Race may be used when a governmental entity has a compelling interest supporting its use, and that use is narrowly tailored to support the stated compelling interest.[37]  EPA regulations recognize circumstances under which recipients' consideration of race may be permissible, including providing remedies to those injured by past discrimination.[38]

### B.    What constitutes disparate impact discrimination?

The second primary method for proving a federal civil rights violation is based on federal nondiscrimination regulations and is known as the *disparate impact* or *discriminatory effects* standard.[39]  As noted previously, EPA and other federal agencies are authorized to enact regulations to achieve the law's objectives in prohibiting discrimination.  For example, EPA regulations state:

> A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination. ...[40]

In a disparate impact case, EPA must determine whether the recipient uses a facially neutral policy or practice that has a sufficiently adverse (harmful) and disproportionate effect based on race, color, or national origin.  This is referred to as the prima facie case.  To establish an adverse disparate impact, EPA must:

(1) identify the specific policy or practice at issue;
(2) establish adversity/harm;[41]
(3) establish disparity;[42] **and**
(4) establish causation.[43]

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

The focus here is on the consequences of the recipient's policies or decisions, rather than the recipient's intent.[44]  The neutral policy or decision at issue need not be limited

> *SDEQ issued a Clean Air Act permit for the construction and operation of a power station to be located in Green County Township.  Although the site for the power station is zoned for industry, the majority of residents in the immediate vicinity of the power station are African-American.  If those residents have reason to believe that SDEQ's permitting of the power station will cause them to suffer adverse health impacts at comparatively higher rates than other communities without a significant African-American population, then this may potentially raise a viable disparate impact claim and provide a reason to file a federal civil rights complaint.*

to one that a recipient formalizes in writing, but also could be one that is understood as "standard operating procedure" by recipient's employees.[45]  Similarly, the neutral practice need not be affirmatively undertaken, but in some instances could be the failure to take action, or to adopt an important policy.[46]

If the evidence establishes a prima facie case of adverse disparate impact, as discussed above, EPA must then determine whether the recipient has articulated a "substantial legitimate justification" for the challenged policy or practice.[47]  "Substantial legitimate justification" in a disparate impact case, is similar to the Title VII employment concept of "business necessity," which in that context requires a showing that the policy or practice in question is demonstrably related to a significant, legitimate employment goal.[48]  The analysis requires balancing recipients' interests in implementing their policies with the substantial public interest in preventing discrimination.

Although determining a substantial legitimate justification is a fact-specific inquiry, EPA will generally consider whether the recipient can show that the challenged policy was "*necessary* to meeting a goal that was *legitimate, important, and integral to the [recipient's] institutional mission*" in order to establish a "substantial legitimate justification."[49]  EPA will evaluate whether the policy was "necessary" by requiring that the justification bear a "manifest demonstrable relationship" to the challenged policy.[50]  As part of its assessment, EPA will generally consider not only the recipient's perspective, but the views of the affected community in its assessment of whether a permitted facility, for example, will provide direct, economic benefits to that community.

If a recipient shows a "substantial legitimate justification" for its policy or decision, EPA must also determine whether there are any comparably effective alternative practices that would result in less adverse impact.  In other words, are there "less discriminatory alternatives?"[51]  Thus, even if a recipient demonstrates a "substantial legitimate

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

justification," the challenged policy or decision will nevertheless violate federal civil rights laws if the evidence shows that "less discriminatory alternatives" exist.

The chart below illustrates the analysis that EPA utilizes in the investigation of a case involving disparate impact.

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017



### 1.  Disparate Impact: Adversity prong of prima facie case-NAAQS Example

Referring back to the power station example cited above, this section will focus on the adversity portion of the *prima facie* case analysis, as this issue has been the topic of previous EPA draft guidance papers.[52]

Under these facts, assume that EPA has jurisdiction over a complaint.  The complaint alleges that SDEQ's issuance of a construction and operating permit for the power station under its Clean Air Act permitting program has resulted in discrimination.  The complaint asserts that SDEQ's action has caused a disparate impact based on alleged adverse health effects that are occurring or will occur from the power station's emission of pollutants for which EPA has established National Ambient Air Quality Standards (NAAQS).  In addition, for the purpose of this example, assume that the area in which the power station is located is designated as being in attainment for all of the NAAQS.

In analyzing the complaint, EPA will follow the disparate impact analysis framework in the discussion and chart above.  EPA will consider the information provided in the complaint, including any information pertinent to whether the air quality in the area in question does not meet the NAAQS.  EPA will examine whether site-specific information demonstrates the presence of adverse health effects from the NAAQS pollutants, even though the area is designated attainment for all such pollutants and the facility recently obtained a construction and operating permit that ostensibly meets applicable requirements.[53]  For instance, EPA's assessment would seek to establish whether a localized adverse health impact, as indicated by the NAAQS, exists in the area at issue and has been (or will be) caused by the emissions from the power station even though the impact of the facility had previously been modeled to demonstrate that the source met the criteria for obtaining a construction permit.  (Note that some NAAQS, especially those that are source-oriented in nature, are more likely to be associated with localized air quality impacts than those that are more regional.) The localized adverse health impact may result from the increased emissions from the power station, but was not identified at the time of the permit review.

EPA's assessment of such evidence will likely, but not always, be based on gathering pre-existing technical data, including data generated by air quality monitors, general air quality assessments, records from source-specific permitting actions, and information provided by a complainant, rather than EPA generating new data.  Such an assessment would not seek to reexamine the characteristics of the NAAQS itself. Rather, EPA's purpose in seeking such evidence is to assess whether a policy or practice of a grant recipient is preventing the area in question from benefiting from the protection of the NAAQS.

Two critical points about the preceding discussion warrant clarification.

1.  The fact that the area is designated as in attainment with the NAAQS and that the recent permitting record shows that emissions from the facility would not

cause a violation of the NAAQS would be insufficient by themselves to find that no adverse impacts are occurring for purposes of Title VI and other federal civil rights laws.  EPA's investigation would seek to ascertain the existence of such adverse impacts (*e.g.*, violations of the NAAQS) in an area regardless of the area's designation and the prior permitting record.  As stated previously, compliance with environmental laws does not necessarily constitute compliance with federal civil rights laws.[54]

2. Complainants do not bear the burden of proving adversity.  EPA recognizes that it is responsible for conducting an investigation of the allegations to determine if there is adverse impact.[55]

That said, to the extent that a complainant is able to provide precise allegations and quantified information about the location and nature of the adverse impact from higher-than expected concentrations of the NAAQS pollutant, EPA may be in a better position to conduct a timely and responsive investigation of that complaint.  Accordingly, EPA encourages complainants to provide as much information to EPA as they are able to and as early in the process as possible.[56]

> *For example, a complainant could – but is not required to – provided ECRCO with information that shows a localized adverse health impact based on air monitoring data or air quality modeling that has been prepared using publicly available simple screening tools. (See Air Quality Dispersion Modeling - Screening Models | Support Center for Regulatory Atmospheric Modeling (SCRAM) | US EPA). Complainants may also be able to provide ECRCO with information about relevant university research, or a public interest or industry investigation that has been reported.*

EPA will determine if a health-based NAAQS is likely not being met at the location in question, and whether the likely localized violation of a NAAQS is due, at least in part, to the impact of the particular source of air pollution that has recently obtained permits to construct and operate. While the complainant does not bear the burden of proof, any relevant information that the complainant provides could assist the Agency in its analysis.[57]

13

## 2. *Disparate Impact – Municipal Solid Waste Landfill Permit example*

*SDEQ, which has an approved State program to issue permits to municipal solid waste landfills, renewed a permit to operate a municipal solid waste landfill in State Center, a city in Green County.  The facility site is located near neighborhoods that are predominately Latino. Representatives of the neighborhoods filed a civil rights complaint with EPA alleging race and national origin discrimination by SDEQ in reissuing the permit.*

*The complainants allege the following based on local, recent census data: Green County is 8% Latino and 92% white, African-American and other groups; within State Center, 20% are Latino; and close to the site of the facility, the population is 67% Latino.*

*Complainants state that during the public participation process leading up to the permitting of the facility, the community raised concerns about anticipated adverse health effects from the facility.  Complainants assert that the facility was not appropriately managing waste, which resulted in water run-off polluting the drinking water.  Complainants also assert that SDEQ ignored those community concerns.  They allege that SDEQ's actions disparately impact Latinos because the Latino population near the facility site is disproportionately affected when compared with other groups in the greater State Center and Green County by adverse health effects stemming from the site.  The alleged adverse health effects include headaches; dizziness; burning eyes, nose and throat; nausea; seizures and other chronic illnesses.*

*In addition, complainants allege that they suffer at a disproportionate level other adverse effects, including economic (e.g., depressed property values); nuisance odors; increased truck traffic and noise; vermin and other vectors.*

Given these facts, again assume that EPA has jurisdiction over the complaint and it involves alleged adverse effects that are occurring at the State Center facility, which is regulated under Subtitle D of the Resource Conservation and Recovery Act (RCRA).

In analyzing the complaint, EPA will follow the disparate impact analysis framework in the discussion and chart above.  Thus, to find a prima facie violation, EPA's

investigation must establish by a preponderance of the evidence that SDEQ's permitting action resulted in adverse and disparate effects on the Latino community identified in the complaint.

EPA will analyze available data, including site-specific data, to determine whether it shows sufficient adverse health effects from site-related pollutants.  As mentioned in the NAAQS example, EPA's assessment of health effects will likely, but not always, be based on gathering pre-existing technical data, including information provided by a complainant, rather than generating new data.[58]  With respect to the non-health harms alleged (*e.g.*, economic, traffic, noise), Title VI allows agencies to consider whether these effects are occurring and, if so, whether they are sufficiently harmful to support a violation finding.[59]

EPA will consider whether SDEQ's methods of administering the programs at issue subjected the Latino community to disproportionate harm.  In evaluating disproportionality, EPA must evaluate population or demographic information of the impacted community as compared to an appropriate comparison population that is similarly situated.  The exact areas EPA will evaluate, including distance from the site and specific population centers, will necessarily vary based on the facts and circumstances of each case.

If EPA finds that SDEQ's actions in this case caused adverse and disproportionate impacts on Latinos, SDEQ has the opportunity to justify its permitting actions.  To justify the action, the SDEQ must offer evidence that its policy or decision in question is demonstrably related to a significant, legitimate goal related to its mission.  For example, have SDEQ's actions resulted in a benefit delivered directly to the affected community, such as public health or environmental benefits?  Are there broader interests, such as economic development, as a result of the permitting action that would serve as an acceptable justification?  Are the benefits delivered directly to the affected population and is the broader interest legitimate, important, and integral to SDEQ's mission?  Will the Latino community, in fact, realize any of these benefits?  In evaluating the justification, EPA would likely consider not only SDEQ's perspective, but also the views of the affected community, as appropriate.

Assuming SDEQ establishes such justification, EPA must further look to determine whether there are less discriminatory alternatives; that is, approaches that cause less disparate impact but are practicable and comparably effective in meeting the needs identified by recipient.  For example, EPA may find evidence that SDEQ had the capacity to prevent any adverse and disproportionate effects by requiring that the facility be operated in a manner that would eliminate or mitigate its disproportionate impact; by modifying permit conditions or employing practicable mitigation measures to lessen or eliminate the demonstrated adverse disparate impacts; or by not renewing the permit. EPA will also examine whether the asserted justification is merely a pretext or excuse for discrimination.

---

[1] 40 C.F.R. § 7.15.

[2] 40 C.F.R. Part 7 (https://www.gpo.gov/fdsys/pkg/CFR-2011-title40-vol1/pdf/CFR-2011-title40-vol1-part7.pdf).

[3] A federal agency is not a recipient under federal civil rights laws.

[4] *See* 40 C.F.R. § 7.25.

[5] 40 C.F.R. § 7.80(a)(1).

[6] *Id.*

[7] The term "subrecipient" generally refers to an entity that receives federal financial assistance from EPA through a primary recipient. *See* http://www.grants.gov/web/grants/learn-grants/grant-terminology.html#S (definition of subrecipient).

[8] A recipient is not the same as a beneficiary (*i.e.*, one who is entitled to receive a benefit). An ultimate beneficiary of any program or activity is not considered to be a recipient. *See* 40 C.F.R. § 7.25. *See also U.S. Dep't of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 606-07 (1986). Federal civil rights obligations apply those who receive the aid, but do not apply to those who benefit from the federal financial assistance. *See id.* at 607. Beneficiaries do not enter into any formal contract or agreement with the federal government where compliance with federal civil rights laws is a condition of receiving the federal financial assistance. *See id.* at 605.

[9] *See* 40 C.F.R. § 7.25.

[10] 40 C.F.R. § 7.35(a), (b).

[11] *See* 40 C.F.R. § 7.25.

[12] *See Alexander v. Choate*, 469 U.S. 287, 293 (1985); *Guardians Ass'n. v. Civil Serv. Comm'n*, 463 U.S. 582 (1983). *Alexander* and *Guardians* are Title VI cases. However, Title VI is the model for several subsequent laws that prohibit discrimination on other grounds in federally assisted programs or activities, including Title IX (discrimination in education programs prohibited on the basis of sex) and Section 504 (discrimination prohibited on the basis of disability). *See Paralyzed Veterans*, 477 U.S. at 600 n.4; *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984) (Title IX was patterned after Title VI); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984) (Section 504 patterned after Titles VI and IX). Accordingly, courts have "relied on case law interpreting Title VI as generally applicable to later statutes," *Paralyzed Veterans*, 477 U.S. at 600 n.4.

[13] 42 U.S.C. § 2000d-1.

[14] *Guardians*, 463 U.S. 582; *Alexander*, 469 U.S. at 292-94; *see Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993). Under the disparate impact analysis, a recipient, in violation of agency regulations, uses a neutral procedure or practice that has a disparate impact on individuals of a particular race, color, or national origin, and such practice lacks a "substantial legitimate justification." *Larry P. v. Riles*, 793 F.2d 969, 983 (9th Cir. 1984); *New York Urban League v. New York*, 71 F.3d 1031,

1038 (2d Cir. 1995); *Elston*, 997 F.2d at 1407. Title VI disparate impact claims are analyzed using principles similar to those used to analyze Title VII disparate impact claims. *Young by and through Young v. Montgomery Cty. (Ala.) Bd. of Educ.*, 922 F. Supp. 544, 549 (M.D. Ala. 1996).

[15] The discussion of legal standards in this document focuses on Title VI because the majority of complaints received by ECRCO allege discrimination based on race, color, or national origin. Importantly, the analyses under other civil rights laws are not always the same. For example, section 504 requires "reasonable accommodation," an obligation not discussed in this chapter. 40 C.F.R. § 7.60.

[16] 38 Fed. Reg. 17968 (1973), as amended by 49 Fed. Reg. 1656 (1984) (codified at 40 C.F.R. Part 7).

[17] Specifically, the regulation states:

> No applicant, recipient, nor other person shall intimidate, threaten, coerce, or discriminate against any individual or group, either:
> (a) For the purpose of interfering with any right or privilege guaranteed by the Acts or this part, or (b) Because the individual has filed a complaint or has testified, assisted or participated in any way in an investigation, proceeding or hearing under this part, or has opposed any practice made unlawful by this regulation. 40 C.F.R. § 7.100

EPA plans to issue further information on the prohibition of retaliation and intimidation in the future.

[18] *See* 40 C.F.R. § 7.100. Any individual alleging such harassment or intimidation may file a complaint with EPA. EPA would investigate such a complaint if the situation warranted.

[19] ECRCO Case Resolution Manual, at § 2.4 ( https://www.epa.gov/sites/production/files/2017-01/documents/final_epa_ogc_ecrco_crm_january_11_2017.pdf ).

[20] *Elston*, 997 F.2d at 1406.

[21] *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984).

[22] Congress has prohibited acts of intentional discrimination based on the protected bases identified in Section I. These protections are statutory, not constitutional, and the analysis under the civil rights statutes at issue here may differ from the different levels of protections the Equal Protection Clause provides to classifications based on sex; disability; and race, color, and national origin.

[23] *See Washington v. Davis*, 426 U.S. 229, 242 (1976).

[24] *See Arlington Heights v. Metro. Hous. Redevelopment Corp.*, 429 U.S. 252 at 266-68 (1977) (evaluation of intentional discrimination claim under the Fourteenth Amendment).

[25] *Elston*, 997 F.2d at 1406. *Arlington Heights,* 429 U.S. at 266-68 (proof of disproportionate impact on an identifiable group can satisfy the intent requirement if it tends to show that some invidious or discriminatory purpose underlies the policy). The first text box example is based on *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 254 F. Supp. 2d 486, 497-498 (D.N.J. 2003) (reversed on other grounds, case history omitted).

[26] Title VII of the Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e *et seq.* (1964).

[27] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Baldwin v. Univ. of Texas Med. Branch at Galveston*, 945 F. Supp. 1022, 1031 (S.D. Tex. 1996); *Brantley v. Indep. Sch. Dist. No. 625, St. Paul Pub. Sch.*, 936 F. Supp. 649, 658 n.17 (D. Minn. 1996).

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

---

[28] The recipient's explanation of its legitimate reason(s) must be clear and reasonably specific.  Not every proffered reason will be legally sufficient to rebut a prima facie case.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, 258 (1981).

[29] *See Burdine,* 450 U.S. at 255-56; *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162-63 (11th Cir. 2006).

[30] *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

[31] *Id.; EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286-87 (11th Cir. 2000).

[32] *Teamsters*, 431 U.S. at 336.

[33] *Teamsters*, 431 U.S. at 336, 339 n.20; *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir. 1984).

[34] *Teamsters*, 431 U.S. at 336; *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").

[35] *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991); *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) (citing *Teamsters*, 431 U.S. at 340).

[36] *Teamsters*, 431 U.S. at 361-2.

[37] *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

[38] 40 C.F.R. § 7.35(a)(7).

[39] *Guardians,* 463 U.S. at 582*; Choate*, 469 U.S. at 293.  Many subsequent cases have also recognized the validity of Title VI disparate impact claims.  *See Villanueva v. Carere*, 85 F.3d 481 (10th Cir. 1996); *New York Urban League v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995*); Chicago v. Lindley*, 66 F.3d 819 (7th Cir. 1995); *David K. v. Lane*, 839 F.2d 1265 (7th Cir. 1988); *Gomez v. Illinois State Bd. Of Educ.*, 811 F.2d 1030 (7th Cir. 1987); *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403 (11th Cir. 1985); *Larry P. v. Riles*, 793 F.2d 969 (9th Cir. 1984). United States v. Maricopa Cty, 915 F. Supp. 2d 1073, 1081 (D. Ariz. 2012) (plaintiff properly stated a disparate impact claim where limited-English proficient Latino inmates had diminished access to jail services such as sanitary needs, food, clothing, legal information, and religious services).  In addition, by memorandum dated July 14, 1994, the Attorney General directed the Heads of Departments and Agencies to "ensure that the disparate impact provisions in your regulations are fully utilized so that all persons may enjoy equally the benefits of [f]ederally financed programs."  Attorney General Memorandum on the use of the Disparate Impact Standard in Administrative Regulations under Title VI of the Civil Rights Act of 1964 (July 14, 1994) (Attorney General July 14, 1994 Memorandum on the use of the Disparate Impact Standard in Administrative Regulations Under Title VI | AG | Department of Justice).

[40] 40 C.F.R. § 7.35(b).

[41] Adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm.

[42] In analyzing disparity, EPA analyzes whether a disproportionate share of the adversity/harm is borne by individuals based on their race, color, national origin, age, disability or sex.  A general measure of disparity compares the proportion of persons in the protected class who are adversely affected by the challenged policy or decision and the proportion of persons not in the protected class who are adversely

affected. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576-77 (2d Cir. 2003).  When demonstrating disparity using statistics, the disparity must be statistically significant.

[43] *See N.Y.C. Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 69 (2d Cir. 2000) (plaintiffs must "allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities").

[44] *Lau v. Nichols*, 414 U.S. 563, at 568 (1974).

[45] If as part of a recipient's permitting of a facility, a recipient makes a decision with respect to the siting of a facility; such decision may not intentionally discriminate or have a discriminatory effect on a protected population.  The regulation states:

> A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program or activity to which this part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.  40 C.F.R. § 7.35(c).

[46] *See, e.g., Maricopa Cty.*, 915 F. Supp. 2d at 1079 (disparate impact violation based on national origin properly alleged where recipient "failed to develop and implement policies and practices to ensure [limited English proficient] Latino inmates have equal access to jail services" and discriminatory conduct of detention officers was facilitated by "broad, unfettered discretion and lack of training and oversight" resulting in denial of access to important services).

[47] *Georgia State Conf.*, 775 F.2d at 1417.

[48] *Wards Cove Packing Inc. v. Antonio*, 490 U.S. 642, 659 (1989); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-36 (1971).  Notably, the concept of "business necessity" does not transfer exactly to the Title VI context because "business necessity" does not cover the full scope of recipient practices that Title VI covers, which applies far more broadly to many types of public and non-profit entities.  *See Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2522-24 (2015) (recognizing the limitations on extension of the business necessity concept to Fair Housing Act complaints).

[49] *Elston*, 997 F.2d at 1413 (emphasis added); *See* EPA Draft Revised Guidance for Investigating Title VI Administrative Complaints Challenging Permits, 65 Fed. Reg. 39,667, 39683 (2000) (Draft Revised Investigation Guidance) ("Determining what constitutes an acceptable justification will necessarily be based on the facts of the case.  Generally, the recipient would attempt to show that the challenged activity is reasonably necessary to meet a goal that is legitimate, important, and integral to the recipient's institutional mission.") (https://www.epa.gov/sites/production/files/2013-09/documents/frn_t6_pub06272000.pdf).

[50] Georgia State Conf., 775 F.2d. at 1418.

[51] *Elston*, 997 F.2d at 1407.

[52] In its 2000 *Draft Revised Investigation Guidance*, EPA stated that a demonstration in the permitting context that construction of a stationary source will not cause a violation of health-based NAAQS creates a rebuttable presumption that no adverse impacts are caused by the environmental permit at issue with respect to the relevant NAAQS pollutant for purposes of Title VI. That presumption could be overcome with other relevant information about the area.  *See* Draft Revised Investigation Guidance, 65 Fed. Reg. at 39,680-81.  Stakeholders raised concerns that EPA should more clearly distinguish between environmental compliance and civil rights compliance.  Consequently, in 2013, EPA proposed to clarify that the Agency would no longer apply a rebuttable presumption in such a context and instead would consider whether an area was attaining NAAQS concurrently with other information, such as the

EPA External Civil Rights Compliance Office, Toolkit – Chapter I, January 18, 2017

---

presence of "hot spots."  *See* Adversity and Compliance with Environmental Health-Based Thresholds, 78 Fed. Reg. 24,739 (2013) (https://www.gpo.gov/fdsys/pkg/FR-2013-04-26/pdf/2013-09922.pdf).  Following its review of comments on the 2013 draft, as well as subsequent external engagement with interested stakeholders, EPA will apply the approach described here. This approach supersedes the corresponding discussions in the two prior Federal Register notices and eliminates application of the rebuttable presumption.

Both prior positions and the approach described here are predicated on the application of health-based environmental standards such as the NAAQS.  Under the Clean Air Act, a primary NAAQS must, in the judgment of the Administrator, protect public health with an adequate margin of safety.  This judgment is based on a thorough review of the available scientific literature, including assessments of sensitive sub-populations.  The NAAQS and its underlying science are then reviewed periodically to ensure that they remain sufficiently protective.  Implementation of a NAAQS requires proper characterization of air quality, generally involving the use of ambient monitors over time, in order to determine whether the NAAQS are being met.

[53] Separately, complainants who believe the permits were issued in error may seek to appeal those permit decisions under administrative or judicial procedures applicable under a state permitting program. In addition, parties may petition EPA to object to a Title V operating permit.  These procedures and remedies are distinct from a complaint under civil rights laws, and they are not addressed in the Toolkit.

[54] *See, e.g.*, 78 Fed. Reg. at 24,742; 65 Fed. Reg. at 39,680 (2000).

[55] EPA will exercise its reasonable enforcement discretion to determine whether a violation has occurred.

[56] In evaluating and receiving a complaint and supporting information from complainants, ECRCO will assist the complainant in understanding ECRCO's jurisdiction and the complainant's nondiscrimination rights under the statutes and regulations enforced by ECRCO according to its Role of Complainants and Recipients in the Title VI Complaints and Resolution Process policy paper (May 4, 2015) (https://www.epa.gov/ocr/epas-title-vi-policies-guidance-settlements-laws-and-regulations) and Case Resolution Manual (https://www.epa.gov/sites/production/files/2017-01/documents/final_epa_ogc_ecrco_crm_january_11_2017.pdf).

[57] This example addresses how compliance with environmental health-based thresholds relates to "adversity" in the context of disparate impact claims about environmental permitting.  The approach described here does not address allegations about intentional discrimination, allegations about pollutants that are not addressed by NAAQS, most non-permitting fact patterns, or technology- and cost-based standards.  However, the principle described here or another similar approach may apply in other contexts where appropriate.  Furthermore, this approach in no way diminishes EPA's emphasis on informal resolutions of federal civil rights complaints, which may be undertaken before completion of the analysis described here.  In addition, as outlined above, adversity is only one part of the disparate impact analysis.

[58] ECRCO may give due weight to relevant adverse impact analyses and disparity analyses submitted by recipients or complainants that, at a minimum, generally conform to accepted scientific approaches.  The weight that ECRCO gives to any evidence and the extent to which ECRCO may rely on it in its decision will likely vary depending upon:

- relevance of the evidence to the alleged impacts;
- the validity of the recipient's methodologies;
- the completeness of the documentation that is submitted by the recipient;
- the degree of consistency between the methodology used and the findings and conclusions; and
- the uncertainties of the input data and results.

EPA External Civil Rights Compliance Office, Toolkit – Chapter 1, January 18, 2017

Consequently, EPA experts would undertake a scientific review of submitted materials. If the analyses submitted meet the factors above, ECRCO will not seek to duplicate or conduct such analyses, but instead will evaluate the appropriateness and validity of the relevant methodology and assess the overall reasonableness of the outcome or conclusions at issue.

If ECRCO's review reveals that the evidence contains significant deficiencies with respect to the factors above, then the analysis will likely not be relied upon in ECRCO's decision.

[59] EPA has substantial discretion to determine the types of harms, on a case by case basis, that warrant investigatory resources and are sufficiently harmful to violate Title VI: "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impact upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts." *Choate*, 469 U.S. at 293–94; *see also Alexander v. Sandoval*, 532 U.S. 275, 306 (2001) (Stevens, J., dissenting). And lower courts have consistently recognized and deferred to agency interpretations of the disparate impact standard. *See, e.g., United States v. Maricopa Cty*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (agency interpretation of its own regulations "controlling unless plainly erroneous or inconsistent with the regulations"). Historically, EPA has focused primarily on those impacts that could fall under a recipient's authority.

**January 18, 2017**

## FREQUENTLY ASKED QUESTIONS (FAQs) FOR CHAPTER 1 OF THE U.S. EPA'S EXTERNAL CIVIL RIGHTS COMPLIANCE OFFICE COMPLIANCE TOOLKIT

**1)  Why is EPA issuing a Civil Rights Compliance Toolkit ("Toolkit")?**

The overall purpose of the Toolkit is to support and advance the External Civil Rights Compliance Office's (ECRCO) proactive compliance and enforcement efforts.  ECRCO ensures that applicants for and recipients of EPA federal financial assistance comply with federal civil rights laws[1] in their programs or activities in several ways –through complaint investigations, compliance reviews, technical assistance, community engagement, and policy formulation.  Accordingly, EPA is issuing the Toolkit to clarify existing law and policy and to provide guidance to promote and support applicant and recipient compliance with federal civil rights laws.

In issuing the Toolkit, EPA affirms its commitment to work with its financial assistance applicants and recipients to help achieve their compliance with federal civil rights laws, that is, that applicants for and recipients of financial assistance operate and administer their programs and activities in a manner free from discrimination.  The Toolkit also provides members of the public with information about the civil rights laws and implementing regulations that ECRCO enforces and how those laws are enforced.

**2)   What does the Toolkit contain?**

The Toolkit contains information and policy guidance to inform recipients about how EPA evaluates whether they are complying with their legal obligations pursuant to federal civil rights laws,[2] including through discussion and clear examples of the application of foundational civil rights legal standards (*i.e.*, intentional discrimination and disparate impact) used in investigating and resolving civil rights complaints at EPA.

The Toolkit is a "living document." EPA may revise it from time to time to make improvements, reflect emerging case law or reflect policy changes in EPA's approach to implementing federal civil rights laws.

**3)   Who is covered by federal civil rights laws?**

Federal civil rights laws apply to the programs and activities of applicants for and recipients of federal financial assistance[3]  as well as any subrecipients[4] who receive funds from a recipient to carry out its programs and activities.  EPA's nondiscrimination regulation defines a recipient to include both public and private entities, including any State, public or private agency, institution, organization, or other entity or person to which federal financial assistance is extended.[5]

**4) What is covered by federal civil rights laws?**

Civil rights laws prohibit discrimination in "any program or activity" of recipients of federal financial assistance. With regard to certain recipients, such as public institutions, the "program or activity" that Title VI covers encompasses the entire institution and not just the part of the institution that receives the federal financial assistance.[6] For example, many state environmental agencies receive federal funding for their regulatory and environmental protection functions. Those agencies should be aware that all actions, not just permitting decisions, taken by state agencies funded by EPA are subject to federal civil rights laws.

**5) What conduct is prohibited by federal civil rights laws and EPA's nondiscrimination regulation?**

Recipients of EPA financial assistance are prohibited from taking actions in their programs or activities that are intentionally discriminatory and/or have a discriminatory effect. Violations of federal civil rights laws can result not only from intentional discrimination, but from discrimination based on disparate impact, *i.e.,* policies and practices that are neutral on their face, but have the effect of discriminating.[7] In addition, recipients may not intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has either taken action or participated in an action to secure rights protected by the non-discrimination statutes ECRCO enforces.[8]

**6) What is intentional discrimination?**

Intentional discrimination (or different treatment) occurs when a recipient intentionally treated individuals differently or otherwise knowingly cause them harm because of their race, color, national origin, disability, age or sex. Intentional discrimination requires a showing that a challenged action was motivated by an intent to discriminate but does not require showing bad faith, ill will, or evil motive.

**7) What is disparate impact?**

Disparate impact (or discriminatory effect) results when a recipient uses a facially neutral procedure or practice that has a significantly adverse (harmful) and disproportionate effect based on race, color, or national origin. In a disparate impact case, the focus is on the consequences of the recipient's policies or decisions, including the failure to take action, rather than the recipient's intent.

If there is evidence of adverse disparate impact, EPA must then determine whether the recipient has asserted a "substantial legitimate justification" for the challenged policy or practice. "Substantial legitimate justification" in a disparate impact case, is similar to the Title VII concept of "business necessity," which requires a showing that the policy or practice in question is demonstrably related to a significant, legitimate employment goal.[9] The analysis requires balancing recipients' interests in implementing their

2

policies with the substantial public interest in preventing discrimination.  If there is no such showing, EPA would likely find that the recipient has engaged in discrimination.  If the recipient makes such an assertion, EPA must also determine if there are any "equally effective alternative practices" that would result in less adverse impact and/or whether the asserted justification is not just an excuse for discrimination.  If EPA makes such a determination about available alternatives or finds pretext, it would likely find that discrimination occurred.

### 8)  What legal standard does EPA apply in its civil rights investigations?

EPA utilizes the "preponderance of the evidence" (more likely than not) standard in its investigations to determine whether or not a recipient has violated federal civil rights laws.

### 9)  Does compliance with environmental laws in a given situation equate to compliance with federal civil rights laws?

No.  If in a given circumstance a recipient is in compliance with applicable environmental laws that fact alone does not necessarily mean that the recipient is in compliance with federal civil rights laws.

### 10) Does the EPA apply a "rebuttable presumption" to the adversity prong of its disparate impact analysis?

EPA addresses this issue directly in the Toolkit through an example involving issuance of permits authorizing construction and operation of a power station.  To put this question in context, EPA, in its 2000 *Draft Revised Investigation Guidance*, stated that a demonstration in the permitting context that construction of stationary source will not cause a violation of the health-based National Ambient Air Quality Standards (NAAQS) creates a rebuttable presumption that no adverse impacts are caused by the environmental permit at issue with respect to the relevant NAAQS pollutant for purposes of Title VI.[10]  In 2013, EPA proposed to clarify that the Agency would no longer apply a rebuttable presumption in such a context and instead would consider whether an area was attaining NAAQS concurrently with other information, such as the presence of "hot spots."[11]

Following its review of comments on the 2013 draft, as well as subsequent external engagement with interested stakeholders, EPA will apply the approach to adversity that is discussed in the Toolkit.  Specifically, EPA will examine whether site-specific information demonstrates the presence of adverse health effects from NAAQS pollutants, even though the area is designated attainment for all such pollutants and the facility recently obtained a construction and operating permit that ostensibly meets applicable requirements. EPA's assessment would seek to establish whether a localized adverse health impact, as indicated by the NAAQS, exists in the area at issue and has been (or will be) caused by the emissions from the power station even though the impact of the facility had previously been modeled to demonstrate that the source met

Compliance Toolkit Chapter 1 – FAQs, January 18, 2017

the criteria for obtaining a construction permit. As stated previously, compliance with environmental laws does not necessarily constitute compliance with federal civil rights laws.

While the adversity example in the Toolkit involves permits authorizing construction and operation of a power station, the approach described here or another similar approach may apply in other contexts where appropriate.  Ultimately, this approach supersedes the corresponding discussions in the two prior Federal Register notices and eliminates application of the rebuttable presumption.

## 11) What types of harm does EPA consider when determining whether there has been an adverse and disproportionate impact on individuals?

EPA's nondiscrimination regulation does not define discriminatory effects but simply states that a recipient may not administer its program or activity in a manner which has the effect of subjecting individuals to discrimination because of their race, color, national origin, age, disability status, or sex.[12] This language encompasses a broad range of effects caused by a recipient's administration of its program.  Therefore, in analyzing a claim of disparate impact, EPA will consider environmental harms and adverse health effects (*e.g.*, asthma and other respiratory illnesses, cancer, cardiac disease, stroke, allergies, *etc.*) that have allegedly been caused disproportionately based on race, color, or national origin, by a recipient's policy or practice.  EPA will also consider non-health harms, including, among other things, economic (*e.g.*, depressed property values), nuisance odors, traffic congestion, noise and vermin. With respect to the non-health harms alleged (*e.g.*, economic, traffic, noise), Title VI allows agencies to consider whether these effects are occurring and, if so, whether they are sufficiently harmful to support a violation finding.[13]

Compliance Toolkit Chapter 1 – FAQs, January 18, 2017

---

[1] EPA's ECRCO is responsible for enforcing several civil rights laws which, together, prohibit discrimination on the basis of race, color, national origin (including on the basis of limited-English proficiency), sex, disability, and age, by applicants for and recipients of federal financial assistance from EPA.

[2] Note:  The Toolkit is a guidance document and does not add requirements to applicable federal civil rights laws.  The Toolkit is not a rule; it is not legally enforceable; and it does not create or confer legal rights or legal obligations upon any member of the public, recipient, the EPA, state and local governments, tribes, or any other agency.  For instance, it includes references to statutes, regulations and case law, but it does not change or substitute for any legal requirements contained in those sources. While EPA has made every effort to ensure the accuracy of the information discussed in the Toolkit, the relevant statutes, regulations, and other legally binding requirements determine your obligations as a recipient. In the event of a conflict between the discussion in the Toolkit and any statute or regulation, the Toolkit would not control.

The Toolkit does not address every scenario that may arise under federal civil rights laws; nor does the Toolkit come with a guarantee that you will not receive a civil rights complaint if you abide by and implement the guidance contained within it. The Toolkit may not apply in a particular situation based upon the circumstances, and EPA retains discretion to adopt approaches on a case-by-case basis that differ from those discussed in the Toolkit where appropriate. Importantly, the Toolkit does not change in any way, your obligation to comply with applicable environmental laws.

[3] 40 C.F.R. § 7.15.

[4] The term "subrecipient" generally refers to an entity that receives federal financial assistance from EPA through a primary recipient. *See* http://www.grants.gov/web/grants/learn-grants/grant-terminology.html#S (definition of subrecipient).

[5] *See* 40 C.F.R. § 7.25.

[6] *Id.*

[7] The discussion of legal standards in this document and the Toolkit, generally, focuses on Title VI because the majority of complaints received by ECRCO allege discrimination based on race, color, or national origin.  Importantly, the analyses under other civil rights laws are not always the same.  For example, section 504 requires "reasonable accommodation," an obligation not discussed in this chapter. 40 C.F.R. § 7.60.

[8] *See* 40 C.F.R. § 7.100.

[9] *Wards Cove Packing Inc. v. Antonio*, 490 U.S. 642, 659 (1989); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-36 (1971). Notably, the concept of "business necessity" does not transfer exactly to the Title VI context because "business necessity" does not cover the full scope of recipient practices that Title VI covers, which applies far more broadly to many types of public and non-profit entities. *See Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2522-24 (2015) (recognizing the limitations on extension of the business necessity concept to Fair Housing Act complaints).

[10] *See* Draft Revised Guidance for Investigating Title VI Administrative Complaints Challenging Permits, 65 Fed. Reg. 39,667, 39,680-81 (June 27, 2000).

---

[11] *See* Adversity and Compliance with Environmental Health-Based Thresholds, 78 Fed. Reg. 24,739 (April 26, 2013).

[12] 40 C.F.R. § 7.35(b).

[13] EPA has substantial discretion to determine the types of harms, on a case by case basis, that warrant investigatory resources and are sufficiently harmful to violate Title VI: "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impact upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts." *Alexander v. Choate*, 469 U.S. 287, 293-94 (1985); *see also Alexander v. Sandoval*, 532 U.S. 275, 306 (2001) (Stevens, J., dissenting). And lower courts have consistently recognized and deferred to agency interpretations of the disparate impact standard. *See, e.g., United States v. Maricopa Cty*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (agency interpretation of its own regulations "controlling unless plainly erroneous or inconsistent with the regulations"). Historically, EPA has focused primarily on those impacts that could fall under a recipient's authority.