# EXHIBIT 46



# Environmental Protection Agency

## *Interim*
## Environmental Justice and Civil Rights in Permitting
## Frequently Asked Questions

August 2022

Office of General Counsel
Office of Policy

U.S. Environmental Protection Agency
Washington, D.C. 20460

This document discusses a variety of federal statutory and regulatory provisions, but does not itself have legal effect, and is not a substitute for those provisions and any legally binding requirements that they may impose. It does not expressly or implicitly create, expand, or limit any legal rights, obligations, responsibilities, expectations or benefits to any person.  To the extent there is any inconsistency between this document and any statutes, regulations or guidance, the latter take precedence. EPA retains discretion to use or deviate from this document as appropriate.

# Acknowledgements

The EPA *Interim Environmental Justice and Civil Rights in Permitting Frequently Asked Questions (FAQs)* benefitted from significant input from across the Agency. This effort spawned from questions and topics raised from within the agency, from external partners such as National Environmental Justice Advisory Council (NEJAC) and from states. It was informed by earlier NEJAC recommendations and experience with state partners and was coordinated through the Environmental Justice and Civil Rights in Permitting Community of Practice (Permitting CoP), led by EPA's Office of Policy (OP) and Office of General Counsel (OGC). The subcommittee on FAQs from the Permitting CoP was comprised of representatives of OP, OGC, External Civil Rights Compliance Office (ECRCO), Office of Water, Office of Air and Radiation, Office of Land and Emergency Management, and Regions 2, 5, 8 and 9. OGC, ECRCO and Region 5's Tribal and Multimedia Programs Office and Air and Radiation Division took a leadership role, working with OP (including Office of Environmental Justice and Office of Federal Activities-Permitting Policy Division) and expert staff from the Permitting CoP to carry the work through fruition. Many thanks, also, to staff in EPA programs and regions for their input, and to all EPA staff who contributed to this valuable resource. We look forward to continued engagement and refinement on this iterative living document, including with our state partners and the NEJAC.

# Table of Contents

1.  Why is it important for permitting programs to ensure consideration of environmental justice and comply with federal civil rights laws, including Title VI of the Civil Rights Act of 1964, as well as state civil rights and environmental justice laws? ................................................................ 1

2.  What are EPA's responsibilities under federal environmental justice policy, including with respect to permitting? ................................................................................................ 2

3.  What responsibilities do EPA staff and managers with permit issuance and review responsibilities have to ensure compliance with civil rights laws by recipients of EPA financial assistance? ................................................................................................................ 3

4.  What is the relationship between EJ and civil rights compliance, particularly in the context of environmental permitting? ......................................................................................... 4

5.  Does an entity's full compliance with the federal environmental laws in carrying out its permitting programs and decisions equate to compliance with the federal civil rights laws? ........... 6

6.  How could a permitting decision raise a statutory civil rights compliance concern about intentional discrimination, or have a discriminatory effect? ................................................ 6

7.  In addition to federal civil rights laws, what other laws and regulations support consideration of environmental justice in permitting? ........................................................................ 7

8.  How can states and other recipients screen for EJ and civil rights concerns with respect to their permitting programs and decisions? ........................................................................... 8

9.  If the screening analysis indicates that a proposed permitting action raises civil rights and/or environmental justice concerns, what additional steps can a permitting program consider to address EJ concerns and ensure compliance with Title VI? ............................................... 10

10. What are promising practices in conducting an EJ analysis? .............................................. 11

11. What is a disparate impact analysis under Title VI? .......................................................... 12

12. How would EPA consider "cumulative impacts" within the Title VI disparate impact analysis? ....... 13

13. What if a Title VI disparate impact analysis by a permitting program concludes that the permit decision will have adverse disparate impacts on the basis of race, color, or national origin (including LEP status)? ............................................................................................... 14

14. What are some examples of measures that a permitting program may be able to take to mitigate adverse and disproportionate impacts and/or develop and implement less discriminatory alternatives? ......................................................................................... 15

15. When and how should permitting programs conduct community engagement? ...................... 16

16. How does tribal consultation differ from community engagement? .................................... 19

17. What are some resources on environmental justice, civil rights, and tribal consultation? ............. 20

18. How do I get additional information or provide feedback on the FAQs? ............................... 22

# Introduction

These Frequently Asked Questions (FAQs) provide information to federal, state, and local environmental permitting programs to help them meet their responsibilities to integrate environmental justice (EJ) and civil rights into relevant environmental permitting processes. They do not change obligations to comply with applicable environmental and civil rights laws or create any new legal rights or responsibilities.[1] This is a "living document" that EPA will update and refine as the practice of integrating EJ and civil rights into permitting advances.

> **1** **Why is it important for permitting programs to ensure consideration of environmental justice and comply with federal civil rights laws, including Title VI of the Civil Rights Act of 1964, as well as state civil rights and environmental justice laws?[2]**

EPA's mission is to protect human health and the environment. EPA is committed to achieving our mission for all people in the United States, regardless of race, color, national origin (including limited English proficiency [LEP] status), disability, age, sex, or income. For decades, many people of color, as well as low-income and indigenous populations, have been disproportionately burdened by pollution and denied equal access to a healthy environment.[3] This legacy of environmental injustice represents a systemic deficit in public health and environmental protection. Finding solutions is not only the right thing to do; it is also our collective obligation.

Federal environmental justice policy directs EPA to address environmental injustices to the full extent authorized by law.[4] This policy was based, in part, on the nation's civil rights laws, which were enacted

---

[1] EPA is committed to issuing additional guidance in the near future to update and clarify information about investigative and legal standards applicable to external civil rights claims, including those concerning permitting.

[2] As discussed below, Title VI and EPA Title VI implementing regulations do not apply to the federal government itself. Moreover, these FAQs provide general information about integrating environmental justice and civil rights obligations, where applicable, recognizing that the implementation of these principles by permitting programs will vary depending on their statutory and regulatory authority. *See generally* EPA Legal Tools to Advance Environmental Justice (2022), https://www.epa.gov/ogc/epa-legal-tools-advance-environmental-justice.

[3] *See, e.g.,* Tessum, C.W., Paolella, D.A., Chambliss, S.E., Apte, J.S., Hill, J.D., & Marshall, J.D. *PM2.5 polluters disproportionately and systemically affect people of color in the United States,* Science Advances 7(18) (2021), 10.1126/sciadv.abf4491; Ihab Mikati, Adam F. Benson, Thomas J. Luben, Jason D. Sacks, & Jennifer Richmond-Bryant, *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status,* Am J Public Health. 108(4): 480–485 (2018), 10.2105/AJPH.2017.304297; U.S. Env't Prot. Agency, *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis,* Section 4, https://www.epa.gov/sites/default/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf); Catherine Jampel, *Intersections of Disability Justice, Racial Justice, and Environmental Justice,* Environmental Sociology (2018); 10.1080/23251042.2018.1424497; USGCRP, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II,* Chapter 19 (discussing rural communities) [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)], U.S. Global Change Research Program, Washington, DC, USA, 1515 pp. doi: 10.7930/NCA4.2018 (2018), https://nca2018.globalchange.gov.

[4] Executive Order 12898: "Federal actions to address environmental justice in minority populations and low-income populations," https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf.

to address all forms of discrimination.[5] To date, most federal enforcement action in the civil rights arena has focused on other sectors, e.g., education, employment, housing, and transportation—and not on environmental protection. EPA recognizes that it is time to use the full extent of its enforcement authority under federal civil rights laws, including Title VI of the Civil Rights Act of 1964.

EPA also recognizes that it does not and need not stand alone in pursuing environmental justice. More than 40 states and the District of Columbia have laws, policies, or programs pertaining to environmental justice. Several states (e.g., California, Minnesota, and New Jersey) and municipalities have enacted laws to address cumulative and disproportionate impacts in the permitting context, and others are considering such legislation.[6] In addition, most states and many local jurisdictions also have civil rights laws. These state and local laws may provide independent authority to advance environmental justice and ensure protection of civil rights. EPA greatly values the contribution of its partners in this critical effort.

Historically, industrial facilities have been sited, have expanded, and have added to the pollution burden in already vulnerable communities without due consideration of whether, either intentionally or in effect, the decisions allowing such outcomes are discriminatory under civil rights law or unfair under environmental justice policies. By considering the principles of environmental justice, complying with federal civil rights laws, and complying with applicable state environmental justice and civil rights policies and laws, environmental permitting programs can better identify and address discriminatory or unfair permitting processes and outcomes. EPA intends these FAQs to help permitting programs consider these critical issues.

## 2    What are EPA's responsibilities under federal environmental justice policy, including with respect to permitting?

Three Executive Orders (E.O.s) establish federal policy on equity and environmental justice:

- E.O. 12898 *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (1994)* lays the foundation of EPA's EJ policy. It directs each listed federal agency, including EPA, to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." Agencies must do this to the "greatest extent practicable and permitted

---

[5] *See* Memorandum on Environmental Justice (Feb. 11, 1994), https://www.govinfo.gov/content/pkg/WCPD-1994-02-14/pdf/WCPD-1994-02-14-Pg279.pdf (requiring federal agencies to ensure that all programs or activities receiving federal financial assistance that affect human health or the environment do not "use criteria, methods, or practices that discriminate on the basis of race, color, or national origin"). *See also* Title VI of the Civil Rights Act of 1964, 42 United States Code §§ 2000d to 2000d-7 (Title VI); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 *et seq.*; Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 *et seq.*; Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500 § 13, 86 Stat. 903 (codified as amended at 33 U.S.C. § 1251 (1972)); 40 C.F.R. Parts 5 and 7.

[6] *See generally* Environmental Justice for All: A Fifty State Survey of Environmental Justice Legislation, Policies and Cases (2007), https://www.issuelab.org/resources/3124/3124.pdf.

by law." The Presidential memorandum accompanying E.O. 12898 notes that existing environmental and civil rights statutes provide many opportunities to ensure that all communities and persons live in a safe and healthful environment.

- E.O. 14008 *Tackling the Climate Crisis at Home and Abroad (2021)* reaffirms the importance of environmental justice and makes explicit that agencies should address "climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts.'' It also establishes a federal policy ''to secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution and underinvestment in housing, transportation, water and wastewater infrastructure, and health care.''

- E.O. 13985 *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (2021)* establishes a whole-of-government equity agenda to address entrenched disparities in our laws and policies and to promote equal opportunity for underserved communities that have been denied fair, just, and impartial treatment.

| 3 | What responsibilities do EPA staff and managers with permit issuance and review responsibilities have to ensure compliance with civil rights laws by recipients of EPA financial assistance? |
|---|---|

As a federal agency, EPA is responsible for civil rights enforcement. EPA is also committed to carrying out its permitting processes in a nondiscriminatory manner and improving the accessibility of its programs and activities to ensure meaningful access for persons with disabilities and persons with limited English proficiency.[7]

As discussed below, EPA civil rights regulations prohibit state, local, or other entities that receive federal financial assistance, either directly or indirectly from EPA ("recipients"), from taking actions that are intentionally discriminatory as well as practices that have an unjustified discriminatory effect, including on the basis of race, color, or national origin. Two provisions of EPA's civil rights regulations are particularly relevant to recipients' permitting processes:

> "*A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, …or have the effect of defeating or substantially impairing*

---

[7] Title VI is inapplicable to EPA actions because it only applies to programs and activities of recipients of federal financial assistance, not to federal agencies. Nonetheless, EPA is committed to a policy of nondiscrimination in its own permitting programs. The equal protection guarantee in the Due Process Clause of the U.S. Constitution prohibits the federal government from engaging in intentional discrimination. Moreover, section 2–2 of Executive Order 12898, *Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*, directs federal agencies to ensure, in part, that federal actions substantially affecting human health or the environment do not have discriminatory effects based on race, color, or national origin. *See* 40 C.F.R. Part 12: "NONDISCRIMINATION ON THE BASIS OF HANDICAP IN PROGRAMS OR ACTIVITIES CONDUCTED BY THE ENVIRONMENTAL PROTECTION AGENCY; Executive Order 13166, *Improving Access to Services for Persons With Limited English Proficiency*, https://www.govinfo.gov/content/pkg/FR-2000-08-16/pdf/00-20938.pdf; EPA LEP Guidance and Materials, https://www.epa.gov/ogc/assisting-people-limited-english-proficiency.

> *accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, [or] national origin ...*"[8]

> "*A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program or activity to which this part applies on the grounds of race, color, or national origin...; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.*"[9]

When accepting assistance, recipients of EPA funding acknowledge that they have an affirmative obligation "to implement effective Title VI compliance programs" and to ensure that their actions "do not involve discriminatory treatment and do not have discriminatory effects even when facially neutral."[10] When reviewing environmental permits issued by states and other recipients, EPA staff and managers with permit review responsibilities have authority and are encouraged to work with their servicing legal office as needed to provide comments on environmental justice and civil rights issues raised by such permits, including the potential for adverse and disproportionate impacts from a permit decision, as well as issues regarding meaningful involvement and fair treatment of any population adversely and disproportionately affected by a permit. EPA also offers technical assistance on civil rights compliance.

## 4     What is the relationship between EJ and civil rights compliance, particularly in the context of environmental permitting?

Environmental justice and civil rights compliance are complementary. Integrating environmental justice in decision-making and ensuring compliance with civil rights laws can together address the strong correlation between the distribution of environmental burdens and benefits and the racial and ethnic composition, as well as income level, of communities.

EPA defines environmental justice as the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. Environmental justice policies and laws, provisions requiring that cumulative impacts be identified and addressed in a permit decision, and many other measures that ensure fair treatment and empower communities affected by government decisions all represent pathways to fairer distribution of environmental burdens and benefits. Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,* establishes executive branch policy on environmental justice on the federal level.

---

[8] 40 C.F.R. § 7.35(b).

[9] 40 C.F.R. § 7.35(c).

[10] EPA, General Terms and Conditions Effective October 1, 2021, at 26, https://www.epa.gov/system/files/documents/2021-09/fy_2022_epa_general_terms_and_conditions_effective_october_1_2021.pdf.

For recipients of federal financial assistance, civil rights compliance is mandatory—and it is a critical tool for achieving environmental justice when a permitting action is likely to have an adverse and disproportionate impact, particularly on the basis of race, color, or national origin. Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin by recipients of federal funds, is the civil rights law that is most frequently invoked in the permitting context. It applies to public and private entities that receive federal financial assistance but does not apply to the federal government itself. It covers all of the operations of programs or activities that receive federal financial assistance without regard to whether specific portions of the program or activity are federally funded. The term "program or activity" means all of the operations of a department, agency, or the entity to which federal financial assistance is extended.[11] Title VI covers both intentional discrimination and acts that have an unjustified disparate impact on the basis of race, color, or national origin. The disparate impact analysis under Title VI of the Civil Rights Act of 1964 and EPA regulations includes not only an assessment of whether a permit will have a disproportionate impact on the basis of race, color, or national origin, but also whether there is a substantial and legitimate justification for any such disproportionate impact, as well as whether there is a less discriminatory alternative. See FAQ #11.

As discussed at more length below, environmental justice and civil rights analyses undertaken by permitting authorities may overlap substantially. Environmental justice policies and laws and civil rights laws generally incorporate procedural requirements, and EPA has long recognized the value of "early, inclusive and meaningful public involvement throughout the entire permitting process."[12] See FAQ #15. As noted above, both environmental justice policies at the federal level—and, in many cases, at state and local levels—and civil rights laws call on decision-makers to identify and address whether programs and activities, including permitting decisions, have adverse disproportionate impacts on the basis of race, color and national origin (including LEP status). At the federal level, Executive Order 12898 and environmental justice policies more generally also address disproportionate impacts on the basis of income. In both contexts, decision-makers should consider the potential impacts of a permitted activity in light of cumulative impacts in overburdened communities. Methodologies for conducting environmental justice analyses, such as health impact assessments (HIAs), create opportunities for considering a range of mitigations that can be pursued if appropriate under federal or state environmental and environmental justice laws and can also be relevant to consideration of civil rights compliance. See FAQ #10.

---

[11] See DOJ, *Title VI Legal Manual*, https://www.justice.gov/crt/fcs/T6manual5 (discussing "Program or Activity").

[12] Title VI Public Involvement Guidance, 71 Fed. Reg. at 14210 (discussing belief that meaningful public involvement will help ensure compliance with Title VI and EPA's Title VI implementing regulations); *see also* EPA, Learn About Environmental Justice, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (defining "meaningful involvement").

| 5 | Does an entity's full compliance with the federal environmental laws in carrying out its permitting programs and decisions equate to compliance with the federal civil rights laws? |
|---|---|

State, local, and other recipients of federal financial assistance have an independent obligation to comply with federal civil rights laws with respect to all of their programs and activities, including environmental permitting programs.[13]

A recipient's compliance with the requirements of federal environmental laws with respect to permitting activities and decisions does not necessarily mean that the recipient is complying with federal civil rights laws. Federal civil rights laws prohibit recipients of federal financial assistance from taking actions that discriminate based on race, color, national origin, disability, age, and sex. Enforcement of federal civil rights laws and implementation of environmental laws are complementary. Used together, these laws help to ensure the non-discriminatory protection of human health and the environment.

| 6 | How could a permitting decision raise a statutory civil rights compliance concern about intentional discrimination, or have a discriminatory effect? |
|---|---|

Intentional discrimination can occur when a recipient makes a permitting decision or takes an action that deliberately treats individuals differently or otherwise knowingly causes them harm because of their race, color, national origin (including LEP status), disability, age, or sex. Evidence of intentional discrimination can be direct, such as a comment by a decision-maker that expresses a discriminatory motive. A claim of intentional discrimination can also be shown with different types of indirect or circumstantial evidence that, taken together, allow an inference that the recipient acted, at least in part, because of race, color, national origin (including LEP status), disability, age, or sex.

For example, intentional discrimination may be present in the following scenario: a recipient decides to hold public hearings about a proposed permit for a facility in a town that has racially identifiable neighborhoods. The facility is to be sited in the west section of a town, which has a population that is predominantly Black. The east section of town is predominantly White. The recipient holds two hearings in the east section of town and provides opportunities to participate in both the daytime and in the evening after work hours. By contrast, the recipient holds only one daytime hearing in the west section of town—and that hearing is shorter. Armed security officers also attend the west section hearing. The differences in the time for community comment, when the hearings are scheduled, and how the

---

[13] *See* EPA, *U.S. EPA's External Civil Rights Compliance Office Compliance Toolkit* (EPA ERCO's Toolkit) Chapter I (January 18, 2017), https://www.epa.gov/sites/default/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf.

hearings are staffed in the predominantly White community compared to the predominantly Black community raise different treatment concerns.[14]

Discrimination may also occur under Title VI and EPA's implementing regulation when a recipient's permitting decision has an adverse and disproportionate impact based on race, color, or national origin (including LEP status). The focus in a "disparate impact" case of discrimination[15] is on whether the consequences of the recipient's permitting policies, decisions, and actions, or failure to act, has had or will have the effect of subjecting persons to discrimination, regardless of the recipient's intent. For example, a recipient approves a Clean Air Act permit for a power plant. The population living in proximity to the plant ("residents") is disproportionately Black, as compared to the rest of the town, county, or state. If those residents have reason to believe that the recipient's permitting of the power plant will cause them to suffer adverse health and/or non-health impacts, such as odor, noise, or decrease in property values, at comparatively higher rates as compared to the larger population of persons not adversely impacted, then this may potentially raise a viable disparate impact claim and provide a reason to file a federal civil rights complaint.[16] As discussed in FAQ #11, the question of whether there is a disparate impact is not the end of the inquiry in evaluating whether the permit approval might violate civil rights law.

<div style="background-color:#2e4a7b; color:white; padding:10px;">

# 7

### In addition to federal civil rights laws, what other laws and regulations support consideration of environmental justice in permitting?

</div>

Specific provisions of the nation's environmental statutes authorize and may require consideration of environmental justice in permitting, including the National Environmental Policy Act and state policy review laws, Clean Air Act, Clean Water Act, Safe Drinking Water Act, and Resource Conservation and Recovery Act. EPA's 2022 *Legal Tools to Advance Environmental Justice* provides an overview of these authorities, among others.[17]

As noted at FAQ #1, many states and municipalities have also enacted laws that support consideration of environmental justice, including in the environmental permitting process. Permitting programs should carefully review applicable authorities for opportunities to incorporate environmental justice considerations and to ensure that such considerations are adequately and appropriately incorporated into permitting decisions.

---

[14] *See* EPA ECRCO's Toolkit Chapter I at p. 4, *supra* note 13. If a prima facie case of disparate treatment is established, the recipient then has the burden of producing a legitimate, non-discriminatory reason for the challenged policy or decision and the different treatment. If the recipient articulates such a reason, EPA must then determine if there is evidence that the proffered reason is false, i.e., that the nondiscriminatory reason(s) the defendant gives for its actions are a pretext for discriminatory intent. *See* DOJ, *supra* note 11.

[15] The terms "disparate impact" and "discriminatory effect" are used interchangeably in this document.

[16] *See generally* DOJ, *supra* note 11.

[17] *See* EPA, *EPA Legal Tools to Advance Environmental Justice* (2022), https://www.epa.gov/ogc/epa-legal-tools-advance-environmental-justice.

| 8 | How can states and other recipients screen for EJ and civil rights concerns with respect to their permitting programs and decisions? |
|---|---|

States and other recipients administering environmental permitting programs can adopt a routine process of screening for EJ and civil rights concerns early in the permitting process.[18] If a permit applicant initiates pre-application discussions, knowledge gained from conducting an early EJScreen can make early discussions more meaningful and productive and add predictability and efficiency to the permitting process.

This type of screening will indicate whether a permitting decision has the potential to cause or contribute to significant public health or environmental impacts, whether the community may be particularly vulnerable to any adverse effects of the proposed permitting action, and whether the community is already disproportionately bearing public health or environmental burdens. A sound screening practice will also provide important information to states and other recipients as to whether there are residents of the affected community who could be disproportionately subjected to adverse health, environmental, and/or quality of life impacts on the basis of race, color, or national origin (including LEP status).

This screening process will also provide valuable information for the development of plans to meaningfully involve the affected community. For example, demographic information gathered during this screening process will help inform action to ensure meaningful access for persons with limited English proficiency, persons with disabilities, persons of different ages, and persons who are low-income who may lack access to the internet or necessary equipment. For more information about meaningful community engagement, see FAQ #15.

Finally, and critically, screening may inform recipients as to whether a more extensive analysis of potential disproportionate impacts would aid them in avoiding a violation of Title VI. See FAQs #9-10.

**Best Practices for Screening:**

- Geographic Information System (GIS) tools such as EPA's EJScreen[19] or state EJ mapping tools[20] can be used as a starting point to assess whether the permitting action raises environmental justice or civil rights concerns, using indicators of community characteristics and existing conditions in the potentially affected community. Considered together with readily available information on community concerns, these tools can help the permitting program quickly assess and document the extent of community vulnerability and pollution burden and the associated potential for disproportionate impacts. They can also support consistent approaches by using standard benchmarks to characterize the potential for disproportionate impacts. EJScreen

---

[18] The term "EJ concerns" is used to indicate the "actual or potential lack of fair treatment or meaningful involvement of minority populations, low-income populations, tribes, and indigenous peoples in the development, implementation and enforcement of environmental laws, regulations and policies." https://www.epa.gov/sites/default/files/2015-06/documents/considering-ej-in-rulemaking-guide-final.pdf at p. 9.

[19] EPA, *EJScreen: Environmental Justice Screening and Mapping Tool,* https://www.epa.gov/ejscreen.

[20] A number of state EJ mapping tools are linked at https://www.epa.gov/ejscreen/additional-resources-and-tools-related-ejscreen#other-maps.

indices simplify the use of benchmarks for initial screening by highlighting indices at the 80th, 90th, and 95th percentiles in terms of the potential for disproportionate impacts relative to state, regional, and national averages.

- Identify and record responses to key questions such as: is there the potential that the affected population already experiences disproportionate impacts? How likely are the potential impacts of the permit under consideration to cause or contribute to disproportionate impacts?

- Especially when GIS tools or known community concerns suggest a potential for disproportionate impacts, review other readily available data. For example, EJScreen makes a range of demographic and environmental data layers readily available for review. It also identifies additional resources and tools for further analysis.[21] State databases or GIS tools may also include additional data. Other information relevant to screening for disproportionate impacts includes:

  o Other permitted facilities in the area, including whether these facilities are major or minor sources of pollution and contribute to community risk. An area with an above average number of sources, especially if those sources are large or close to people in the area, is a sign of concern.[22]

  o Applicant compliance record.

  o Demographic data including race and national origin,[23] age (percent less than 5 years, older than 64 years), percent non-English speakers, income, and education.[24]

  o Environmental data that reflects pollutant measurements (e.g., ambient concentrations, total loadings in waterbody, etc.), presence of other significant emissions sources (e.g., woodstoves, ports, freight facilities, highways), facilities handling hazardous materials, etc.

  o Health data such as mortality rates, asthma, incidence of infant mortality, and incidence of low birth weight. Data on unhoused populations and healthcare access.

- Local knowledge and information from past community engagement are important components of the screening process for potential environmental justice or civil rights concerns. This is best

---

[21] *Id.*

[22] EPA's ECHO mapping tool (https://echo.epa.gov/) can be used to identify all regulated facilities in a given area together with information on their permits and compliance monitoring and enforcement history.

[23] EJSCREEN defines "people of color" as people "who list their racial status as a race other than white alone and/or list their ethnicity as Hispanic or Latino" in the U.S. Census. The Census Bureau provides the following choices for people to self-identify racial status: American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, White, or "Some Other Race." People may report multiple races. For ethnicity, the Census Bureau, based on the Office of Management and Budget standards, classifies individuals in one of two categories: "Hispanic or Latino" or "Not Hispanic or Latino." The Census Bureau uses the term "Hispanic or Latino" interchangeably with the term "Hispanic," and also refers to this concept as "ethnicity." *See* https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/release/faqs-race-ethnicity.html.

[24] The Centers for Disease Control also considers factors such as the experience of racism to be "social determinants of health." *See* CDC, *NCHHSTP Social Determinants of Health*, https://www.cdc.gov/nchhstp/socialdeterminants/index.html. "The social determinants of health are the conditions in which people are born, grow, live, work and age as well as the complex, interrelated social structures and economic systems that shape these conditions. Social determinants of health include aspects of the social environment (e.g., discrimination, income, education level, marital status), the physical environment (e.g., place of residence, crowding conditions, built environment [i.e., buildings, spaces, transportation systems, and products that are created or modified by people]), and health services (e.g., access to and quality of care, insurance status)" (citations omitted).

accomplished by establishing early and ongoing relationships in a community, particularly those with a history of EJ and civil rights concerns. Such relationships assist in the trust and communication needed to gain input from impacted residents, stakeholders, local agencies, tribal governments, and others. For more information about community engagement, see FAQ #15.

- Relevant information may be found in public complaints to federal, state, tribal, and local authorities; media reports; and national, state, or local environmental or health data. Complaints may directly relate to the permitting action at issue (e.g., anticipated facility traffic or emissions) or reflect conditions in the community (e.g., high rates of asthma, unemployment, or elderly populations).

| 9 | If the screening analysis indicates that a proposed permitting action raises civil rights and/or environmental justice concerns, what additional steps can a permitting program consider to address EJ concerns and ensure compliance with Title VI? |
|---|---|

The screening analysis identified in FAQ #8 may identify EJ concerns and possible issues of civil rights compliance, i.e., questions about whether a state's or other recipient's permitting decision may violate Title VI and EPA implementing regulations by disproportionately subjecting persons to adverse health, environmental, and/or quality of life impacts on the basis of race, color, or national origin (including LEP status). In such cases, states and other recipients can consider conducting additional analysis.

In the EJ context, EPA has generally referred to this additional consideration as an EJ analysis. Although they may overlap, conducting an EJ analysis will not satisfy Title VI requirements. In the civil rights context, the analysis used to evaluate whether a recipient's action has an adverse and disproportionate impact on the basis of race or national origin is generally referred to as a disparate impact analysis. In many respects, the line of inquiry is similar to the environmental justice analysis: Who is being affected by the action? How, and how much? Compared to whom? Can we and how do we mitigate the effects? There are, however, several particular considerations in the civil rights context. In FAQs #11-13, we explain these unique considerations.

When a screening analysis identifies potential EJ or civil rights concerns, the permitting program can consider the following steps:

- Conducting an appropriately scoped EJ analysis or disparate impact analysis as needed to further evaluate and address adverse and disproportionate impacts, and to inform and support enhanced community engagement – see FAQ #15;

- Exercising relevant statutory and regulatory authority and discretion under federal, state, and local environmental laws, as well as applicable environmental justice and civil rights laws, to prevent or mitigate any adverse disproportionate impacts that would otherwise violate Title VI; and

- To the extent mitigation included in the permit is not sufficient to address adverse and disproportionate impacts that would otherwise violate Title VI; consider implementing mitigation outside the context of the permit, coordinating across agency programs, state agencies, community organizations, NGOs, etc. See FAQ #14.

## 10   What are promising practices in conducting an EJ analysis?

There is a significant body of practice, policy, and caselaw about EJ analysis in permitting upon which permitting programs can draw when developing and conducting an EJ analysis.

First, additional EJ analysis should be tailored to the specific permitting decision. The scope may depend on several factors, including but not limited to the potential for adverse and disproportionate impacts associated with a given facility, community concerns, and potential cumulative impacts. EPA recognizes that permits vary widely in purpose and effect, and that there is no "one size fits all" approach to EJ analysis. Appropriately scoped, additional EJ analysis should accomplish two purposes: (1) it should address the principle of fair treatment by further evaluating adverse and disproportionate impacts beyond the screening results and identifying ways to prevent or mitigate such impacts; and (2) it should address the principle of meaningful involvement by fostering enhanced community engagement in the permitting decision.

One promising practice for conducting EJ analyses is the Health Impact Assessment (HIA), which systematically evaluates how a proposed action may impact health and well-being. [25] HIAs explicitly consider potential distributive effects (e.g., whether there will be disproportionate impacts) and inform decision-makers of potential outcomes before the decision is made. HIAs generally:

- Determine the potential effects of a proposed decision on the health of a population and the distribution of those effects within the population;

- Consider input from stakeholders, including those impacted by the decision;

- Use different types of qualitative and quantitative evidence and analytical methods;

- Are flexible based on available time and resources; and

- Provide evidence and recommendations to decision-makers in a timely manner. [26]

---

[25] *See* EPA, *The Health Impact Assessment (HIA) Resource and Tool Compilation* (2016), https://www.epa.gov/sites/default/files/2017-07/documents/hia_resource_and_tool_compilation.pdf; *see also* HIA report issued by the City of Chicago, Chicago Department of Public Health, Health Impact Report, RMG/Southside Recycling Recycling Permit Application (February 2022), https://www.chicago.gov/content/dam/city/sites/rgm-expansion/documents/RMG_RecyclingPermit_HealthImpactAssessment_Feb2022.pdf; *see also* different HIA applications at https://www.epa.gov/healthresearch/epa-health-impact-assessment-case-studies.

[26] *See* EPA, *Health Impact Assessments*, https://www.epa.gov/healthresearch/health-impact-assessments.

A permitting program may find it helpful to organize an EJ analysis by applying HIA practice standards and elements, including by adapting the six key steps that guide the HIA process:

1. **Screening.** Determines the need for and value of an HIA. (See FAQ #8 for application to an EJ analysis.)

2. **Scoping.** Identifies the project partners, health and social impacts requiring assessment, methodology for the analysis, and a work plan.

3. **Assessment.** Provides an analysis of existing conditions; an assessment of the policy, plan, project, or program under study; and an evaluation of the potential impacts of the policy, plan, project, or program on existing conditions.

4. **Recommendations.** Develops a set of recommendations for maximizing health outcomes.

5. **Reporting.** Develops a report and communicates findings and recommendations.

6. **Monitoring.** Tracks the impact of the HIA on the proposed policy, plan, project, or program and the impacts of the final policy, plan, project, or program on existing conditions.[27]

## 11     What is a disparate impact analysis under Title VI?

Title VI disparate impact regulations ensure that federal financial assistance is not spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination. Recipients are prohibited from practices having a discriminatory effect on members of a group identified by race, color, or national origin, even if the actions or practices are not intentionally discriminatory. The disparate impact analysis under Title VI examines a number of critical questions to evaluate whether a recipient's policy or practice has an unjustified disparate impact prohibited by Title VI.[28]

- **Disparate impact**: Does a recipient's criteria or method of administering its program or activities adversely and disparately affect members of a group identified by race, color, or national origin?

  - **Adverse Impacts**: Is there an adverse impact of the policy or practice? Adverse impacts could include harmful health effects, odor, noise, decrease in property values, etc.

---

[27] See EPA, *A Review of Health Impact Assessments in the U.S.: Current State-of-Science, Best Practices, and Areas of Improvement* (2014), https://www.epa.gov/sites/default/files/2013-12/documents/health-impact-assessment-factsheet_0.pdf; HIP, *HIA Minimum Elements and Practice Standards for HIA*, https://humanimpact.org/hipprojects/hia-minimum-elements-and-practice-standards.

[28] Courts have developed analytical frameworks to assess disparate impact claims in litigation that inform agencies' investigative process. *See* DOJ, *supra* note 11. The disparate impact analysis described in FAQ #11 is used not only by EPA, but also by twenty-five other federal agencies that also have Title VI regulations that include provisions addressing the discriminatory effects/impacts standard.

- o **Disproportionality**: Is a disproportionate share of the adversity borne based on race, color, or national origin (including LEP status)? Disparity is a fact-specific inquiry that involves identifying an appropriate measure.[29]

- o **Causation**: Is there a causal link between the recipient's policy or practice and the disparate impact?[30]

- **Justification**: If so, is there a substantial legitimate justification for the policy or practice? This question is unique to a disparate impact analysis. See [FAQ #13](#).

- **Less discriminatory alternative**: Even if there is a substantial legitimate justification for the policy or practice causing the disparate impact, is there an alternative practice that may be comparably effective with less disparate impact?[31]

Questions about the disparate impact and less discriminatory alternative may have been evaluated, at least in part, during the EJ analysis. See [FAQs #9-10.](#) The "less discriminatory alternative" inquiry, however, may go beyond mitigation measures usually examined in an EJ analysis. See [FAQ #13](#).

## 12 How would EPA consider "cumulative impacts" within the Title VI disparate impact analysis?

In the context of Title VI investigations, EPA considers cumulative impacts when evaluating whether there is an adverse impact from the recipient's policy or practice.[32] That is, EPA considers whether any adverse impact caused by the permitting decision—and borne disproportionately by persons on the basis of race, color, or national origin (including LEP status)—may be even greater considering cumulative impacts from other chemical and non-chemical stressors.

As EPA notes in guidance on considering cumulative impacts in the NEPA context, "cumulative impacts result when the effects of an action are added to or interact with other effects in a particular place and within a particular time."[33] EPA's Office of Research and Development recently offered an operational

---

[29] *See, e.g., S. Camden Citizens in Action v. New Jersey Dept. of Envtl. Protec.*, 145 F. Supp. 2d 446, 493 (D.N.J. 2001), *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J. 2001), *rev'd*, 274 F.3d 771 (3d Cir. 2001) (disparity analysis); *see also* DOJ, *supra* note 11.

[30] Texas Dep't of Hour. & Cmty. Affairs v. Inclusive Communities, 135 S. Ct. 2507, 2523 (citing Wards Cove, 490 U.S. at 653); *See also* U.S. DOJ, *supra* note 11.

[31] *Id.* See also ECRCO's Toolkit Chapter I and FAQ, *supra* note 13; see also U.S. DOJ, *supra* note 11.

[32] *See, e.g.,* Final Genesee Complaint Letter to Director Grether, 19-23 (Jan. 19, 2017), [https://www.epa.gov/sites/default/files/2017-01/documents/final-genesee-complaint-letter-to-director-grether-1-19-2017.pdf](https://www.epa.gov/sites/default/files/2017-01/documents/final-genesee-complaint-letter-to-director-grether-1-19-2017.pdf) (consideration of cumulative air toxics data from point sources countywide); *see also S. Camden Citizens in Action v. New Jersey Dept. of Envtl. Protec.*, 145 F. Supp. 2d 446, 490 (D.N.J. 2001), *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J. 2001), *rev'd*, 274 F.3d 771 (3d Cir. 2001) (interpreting EPA methodology as requiring consideration of the totality of the circumstances and cumulative environmental burdens and finding that plaintiffs demonstrated that permitting and operation of a facility was likely to have adverse impacts in context of "current health conditions and existing environmental burdens" in the community).

[33] U.S. EPA Office of Federal Activities, *Consideration of Cumulative Impacts in EPA Review of NEPA Documents*, (2252A) EPA 315-R-99-002/May 1999 (1999), [https://www.epa.gov/sites/default/files/2014-08/documents/cumulative.pdf](https://www.epa.gov/sites/default/files/2014-08/documents/cumulative.pdf).

13

definition of "cumulative impacts" based on definitions developed by various state and federal agencies, as follows:

> **"Cumulative impacts"** *refers to the total burden – positive, neutral, or negative – from chemical and non-chemical stressors and their interactions that affect the health, well-being, and quality of life of an individual, community, or population at a given point in time or over a period of time.* Cumulative impacts include contemporary exposures in various environments where individuals spend time and past exposures that have lingering effects. Total burden encompasses direct health effects and indirect effects to people through impacts on resources and the environment that affect human health and well-being. Cumulative impacts provide context for characterizing the potential state of vulnerability or resilience of the community, i.e., their ability to withstand or recover from additional exposures under consideration.[34]

## 13 | What if a Title VI disparate impact analysis by a permitting program concludes that the permit decision will have adverse disparate impacts on the basis of race, color, or national origin (including LEP status)?

If the permitting action will have a disparate impact on the basis of race, color, or national origin (including LEP status) (i.e., it raises a possible violation of Title VI), then the next steps in a civil rights disparate impact framework discussed in FAQs #9 and #11-12 include:

- Identify a substantial legitimate justification for the challenged policy or practice.[35] That is, can the recipient show that the challenged policy was "necessary to meet a goal that was legitimate, important, and integral to the [recipient's] institutional mission" in order to establish a "substantial legitimate justification"?[36]

- Even if the recipient identifies a substantial legitimate justification, a sufficient Title VI analysis evaluates whether there are any comparably effective alternative practices that would achieve the same legitimate objective but with a less discriminatory effect. That is, is there a comparably effective alternative decision or action that would result in less adverse impact? For example, can the recipient prevent any adverse and disproportionate effects by requiring that the facility be operated in a manner that would eliminate or mitigate its disproportionate impact, e.g., by

---

[34] Cumulative Impacts Recommendation for ORD Research EXTERNAL REVIEW DRAFT at p. 6, January 2022.

[35] ECRCO's Toolkit Chapter I and FAQs at pp. 9-10, *supra* note 13.

[36] EPA will evaluate whether the policy was "necessary" by requiring that the justification bear a "manifest demonstrable relationship" to the challenged policy. As part of its assessment, EPA will generally consider not only the recipient's perspective, but the views of the affected community in its assessment of whether a permitted facility, for example, will provide direct, economic benefits to that community. ECRCO's Toolkit Chapter I and FAQs, *supra* note 13. *See also* U.S. DOJ, *supra* note 11.

modifying permit operating conditions, employing practicable mitigation measures to lessen or eliminate the demonstrated adverse impacts, or by not renewing the permit?[37]

- If there are no mitigation measures the permitting authority can take, whether within or outside the permitting program, that can address the disparate impacts, and there is no legally sufficient justification for the disparate impacts, denial of the permit may be the only way to avoid a Title VI violation. Whether denial of a permit is required to avoid a Title VI violation is a fact-specific determination that would take into account an array of circumstances, including whether the facility will have an unjustified racially disproportionate impact, as well as the less discriminatory alternatives available.[38]

| 14 | What are some examples of measures that a permitting program may be able to take to mitigate adverse and disproportionate impacts and/or develop and implement less discriminatory alternatives? |
| --- | --- |

Under a civil rights analysis pursuant to Title VI and EPA's implementing regulations, recipients are obligated to adopt a comparably effective less discriminatory alternative to address an unjustified disparate impact on the basis of race, color, or national origin (including LEP status). If a permitting program's decision is likely to have an adverse and disproportionate effect on the basis of race, color, or national origin (including LEP status), then the program should consider broadly the availability of less discriminatory alternatives. This might include the range of mitigation measures discussed below or working with the permit applicant for alternative siting. However, as discussed in FAQ #13, if there are no mitigation measures that can address the unjustified disparate impacts, denial of the permit may be the only means of avoiding a Title VI violation. This will be a fact-specific determination.

EJ principles and practices call for consideration of whether mitigation measures will reduce or eliminate unfair treatment. Whether mitigation will effectively address adverse and disproportionate impacts will depend on the unique circumstances of each permit, the community in which the pollution source is or will be located, and other factors.

Some proactive mitigation measures that a state or other recipient might explore include the following:

Permit terms:

- Enforceable requirements for continuous compliance monitoring equipment (e.g., opacity cameras) to ensure proper operation of control devices, compliance with permitted limits, and adherence to industry best practices.

---

[37] ECRCO's Toolkit Chapter I and FAQs at p. 15, *supra* note 13.

[38] *See generally* ECRCO's Toolkit Chapter I and FAQs at 14-15, *supra* note 13 (discussing disparate impact- municipal solid waste landfill permit example).

- Enhancements to compliance assurance provisions, including additional continuous or periodic monitoring, recordkeeping, or reporting requirements.

- Establishment of a public-facing website with all relevant compliance information about the facility and real-time data measurements.

- Additional pollution controls or more stringent limits.

- Inclusion of enforceable work practices, operating plans, and/or best practices for minimizing emissions and/or discharges (e.g., a fugitive emission plan).

- Incorporating modeling assumptions as legally and practically enforceable limits or work practices (e.g., hours of operation).

- Expansion of buffers or modification of operational hours.

The use of non-environmental authorities:

- Use public health authority to implement a mobile health monitoring program in the affected community.

- Use transportation authority to develop new traffic plan to reduce diesel emissions in the affected community.

- Use public health authority to establish a citizen hotline with a 24-hour response time.

Other potential commitments:

- Third-party monitoring of community complaints.

- Support for public transparency of monitoring information, including community-driven monitoring.

- Other enforceable agreements (e.g., community benefit agreements).

## 15     When and how should permitting programs conduct community engagement?

Community engagement should occur as soon as possible and should go far beyond simply posting public notices. With respect to permitting actions that could result in significant health, environmental and quality of life impacts, the stakes are often that much higher for communities with EJ concerns. The goal of community engagement is to ensure that the people most affected by the permit have input into the decisions that will impact their lives. Community engagement is an active process that requires permitting programs to be proactive in outreach to the public. While some of these activities are required to satisfy statutory obligations and comply with environmental justice directives, going beyond such requirements when called for is good government practice. Among other things, it builds ongoing

relationships with community leaders necessary for a deeper level of engagement. Robust community engagement is crucial for making informed permitting decisions that meaningfully consider the site-specific circumstances of the permitting action.[39]

In addition, it is important that states and other recipients ensure that community engagement and other public participation actions be conducted consistent with the federal civil rights law, which require that no person shall be excluded on the basis of race, color, national origin, or other prohibited grounds from participation in any program or activity receiving EPA financial assistance.[40] Meaningful involvement consists of informing, consulting, and working with potentially affected communities at various stages of the environmental decision-making process to address their questions and concerns.[41] This includes:

- Ensuring that public involvement processes are available to all persons regardless of race, color, national origin (including LEP status), disability, sex, and age, or prior exercise of rights or opposition to actions protected by 40 C.F.R. Parts 5 and 7 and the federal non-discrimination laws;

- Ensuring that the factors used to determine the appropriate time, place, location, duration, and security at public meetings are developed and applied in a non-discriminatory manner; and

- Ensuring that public participation processes specifically address the needs of persons with limited English proficiency, persons with disabilities, and persons of different ages. Best practice and environmental justice policy would also call for ensuring that processes are accessible to persons without access to digital communication, and other members of the recipient's communities who may have limited access to information.

Best practice to demonstrate compliance is to have in place a public involvement plan, yet EPA recognizes that a recipient's staff size, available resources, and the nature of its programs and activities may dictate the type and scope of written public involvement policies and procedures. EPA guidance identifies as a best practice that all government entities – for example, state, regional, county, and local government entities – have written and published public involvement procedures that are consistent with the federal civil rights laws and EPA's Public Participation Guidance.[42]

By implementing the following steps, states and other recipients will be in a better position to provide opportunities for effective public participation that is meaningfully accessible to all persons regardless of race, color, national origin (including LEP status), disability, age, and sex each time they engage in a process involving public participation:

- Develop a description of the relevant/affected community (including demographics, history, and background, such as: percentage of the area that includes people of color, has less than a high

---

[39] "Community engagement," "public involvement," and "public participation" are used interchangeably in this document.

[40] *See* Title VI of the Civil Rights Act of 1964, 42 United States Code §§ 2000d to 2000d-7 (Title VI); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq.; Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 et seq.; Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500 § 13, 86 Stat. 903 (codified as amended at 33 U.S.C. § 1251 (1972)); 40 C.F.R. Parts 5 and 7. *See also* EPA, *supra* note 12.

[41] "Meaningful involvement" and "meaningful participation" are used interchangeably for purposes of this document.

[42] *See* EPA, *supra* note 12.

school education, has members of households who speak a language other than English and/or speak English less than very well, has a history of filing complaints, has an inability to access traditional communication channels, internet, etc.);[43]

• Provide a contact list for relevant staff members on the recipient's website, including phone numbers and email addresses, to allow the public to communicate via phone or internet;

• Develop a list of past and present community civil rights concerns (including any complaints filed under the federal non-discrimination laws), and actions undertaken in response to such concerns;

• Develop and implement a detailed plan of action (including outreach activities) the recipient will take to address concerns raised by the public;

• Develop and implement a contingency plan for unexpected events that impact public meetings or other public participation avenues;

• Identify location(s) where public meetings will be held (considering the availability and schedules of public transportation), and ensure that public meetings are held at times and in locations that allow for meaningful involvement by individuals with LEP and individuals with disabilities;

• Develop and maintain a plan for providing reasonable modifications and auxiliary aids and services at no cost for individuals with disabilities and language assistance services for limited English proficient persons, including translation of documents and/or interpreters for meetings;

• Develop and maintain a list of appropriate local media contacts (based on the cultural and linguistic needs of the community);

• Develop guidance to help ensure the meaningful involvement of individuals with limited English proficiency and individuals with disabilities at any in-person public meetings and when in-person meetings are not possible due to national, state, or local emergencies; and

• In addition, develop public involvement plans with public input. The plans should be prominently highlighted online for the benefit of interested residents and should explain how interested residents can participate in the permitting process under various environmental laws.

• The public involvement plan and other plans to provide meaningful access should also be made available for the public in areas that would be easily accessible to the community (e.g., libraries, community centers, etc.).

---

[43] *See* EPA, *Guidance to Environmental Protection Agency Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons* (2004), https://www.federalregister.gov/documents/2004/06/25/04-14464/guidance-to-environmental-protection-agency-financial-assistance-recipients-regarding-title-vi.

Also, to be most effective, recipients' public involvement plans should incorporate the following elements:

- How the recipient will meaningfully engage the public prior to and during significant activities (e.g., how the public can request a public hearing and criteria for determining whether public hearings will be held);

- How the recipient will effectively communicate and engage with the public regarding its programs, activities, and services (e.g., public notice procedures for submitting public comment during permit comment periods); and

- What methods the recipient will implement to ensure the public can access publicly available information and documents regarding its programs, activities, and services.

## 16     How does tribal consultation differ from community engagement?

Tribal consultation is a process of meaningful communication and coordination between EPA and tribal officials prior to EPA taking actions or implementing decisions that may affect tribes.[44] Executive Order 13175: *Consultation and Coordination with Indian Tribal Governments* (November 6, 2000) describes important elements of the federal government's consultation with federally recognized tribes and calls for federal agencies to have an accountable process to ensure meaningful and timely input by tribal officials in the development of certain regulatory actions and policies that have tribal implications. EPA's tribal consultation policy calls for EPA to consult on a government-to-government basis with federally recognized tribes on a broad range of EPA actions and decisions that may affect tribal interests. Tribal consultation is an important element of fulfilling the federal government's trust responsibility that arises from treaties, statutes, executive orders, and the historical relations between the United States and tribes. Conducting government-to-government tribal consultation is separate and distinct from EPA's obligations to involve the public as required by environmental laws. Conducting community engagement, including with tribal and indigenous communities, cannot replace tribal consultation, and tribal consultation cannot replace community engagement.

Apart from EPA consultation with tribes, it is also appropriate for States to consider tribal interests in their permitting processes by reaching out to and coordinating with affected tribal governments to ensure their views are obtained and appropriately factored into permitting decisions.

---

[44] *See* EPA, Response to Tribal Consultation & Coordination Comments on Plan EJ 2014 Strategy and Implementation Plans, EPA Policy on Consultation and Coordination with Indian Tribes (2011) (https://www.epa.gov/tribal/epa-policy-consultation-and-coordination-indian-tribes). See also EPA, *Plan for Implementing Executive Order 13175: Consultation and Coordination with Indian Tribal Governments*, https://www.epa.gov/system/files/documents/2021-08/epa-plan-to-implement-eo-13175.pdf.

# 17 What are some resources on environmental justice, civil rights, and tribal consultation?

EPA has many tools to help permitting programs engage in public outreach. The following additional resources and references on Community Engagement and Tribal Consultation may be helpful:

Environmental Justice

- Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (1994): https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf

- Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government* (2021): https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/

- Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad* (2021): https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/

- EPA Activities to Promote Environmental Justice in the Permit Application Process, 78 Fed. Reg. 27220 (May 9, 2013): https://www.federalregister.gov/documents/2013/05/09/2013-10945/epa-activities-to-promote-environmental-justice-in-the-permit-application-process

- Regional Environmental Justice Implementation Plans: https://www.epa.gov/environmentaljustice/environmental-justice-your-community

- EPA Legal Tools to Advance Environmental Justice (2022): https://www.epa.gov/ogc/epa-legal-tools-advance-environmental-justice

- Promising Practices for Environmental Justice Methodologies in NEPA Reviews (2016): https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf (focusing on the agency practices identified by the EJ IWG NEPA Committee concerning the interface of environmental justice considerations through NEPA processes)

- Guidance on Considering Environmental Justice During the Development of a Regulatory Action (2015): https://www.epa.gov/sites/default/files/2015-06/documents/considering-ej-in-rulemaking-guide-final.pdf; and Technical Guidance for Assessing Environmental Justice in Regulatory Analysis (2016): https://www.epa.gov/sites/default/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf (while focused on the rulemaking process, these guidance documents provide useful information when considering and addressing disproportionate impacts in other contexts as well).

In addition, the National Environmental Justice Advisory Council (NEJAC) provides independent advice and recommendations to the EPA Administrator on a broad range of issues related to environmental justice. NEJAC produced three recommendations related to EJ in permitting:

- Environmental Justice in the Permitting Process (2000): https://www.epa.gov/sites/default/files/2015-02/documents/permit-recom-report-0700.pdf

- Enhancing Environmental Justice in EPA Permitting Programs (2011): https://www.epa.gov/sites/default/files/2015-02/documents/ej-in-permitting-report-2011.pdf

- Recommendations Regarding EPA Activities to Promote Environmental Justice in the Permit Application Process (2013): https://www.epa.gov/sites/default/files/2015-02/documents/2013-ej-in-permitting.pdf.

Civil Rights

- Guidance to Environmental Protection Agency Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 69 Fed. Reg. 35602 (June 25, 2004): https://www.govinfo.gov/content/pkg/FR-2004-06-25/pdf/04-14464.pdf

- The Title VI Public Involvement Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs (Recipient Guidance), 54 Fed. Reg. 14207 (Mar. 21, 2006): https://www.epa.gov/sites/default/files/2020-02/documents/title_vi_public_involvement_guidance_for_epa_recipients_2006.03.21.pdf

- EPA's External Civil Rights Compliance Office Toolkit at https://www.epa.gov/sites/default/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf

- DOJ Title VI Legal Manual (Updated April 22, 2021): https://www.justice.gov/crt/fcs/T6Manual7#W

Tribal Consultation

- EPA Policy for the Administration of Environmental Programs on Indian Reservations (1984): https://www.epa.gov/sites/default/files/2015-04/documents/indian-policy-84.pdf

- EPA Policy on Consultation and Coordination with Indian Tribes: Guidance for Discussing Tribal Treaty Rights (2016): https://www.epa.gov/tribal/forms/consultation-and-coordination-tribes#policy_consultation_coordination

- U.S. Environmental Protection Agency (EPA) Response to Tribal Consultation & Coordination Comments on Plan EJ 2014 Strategy and Implementation Plans (2012): https://www.epa.gov/sites/default/files/2015-02/documents/plan-ej-tribal-consult-responses.pdf

- Policy on Environmental Justice for Working with Federally Recognized Tribes and Indigenous Peoples (2014) : https://www.epa.gov/environmentaljustice/epa-policy-environmental-justice-working-federally-recognized-tribes-and

- EPA Plan for Implementing Policies & Directives of E.O. 13175 (2021): https://www.epa.gov/tribal/epa-plan-implementing-policies-and-directives-eo-13175-consultation-coordination-indian

## 18    How do I get additional information or provide feedback on the FAQs?

Please email EJ.permitting@epa.gov with any questions or feedback.