## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

THE STATE OF LOUISIANA,
By and through its Attorney General, Jeff Landry,

PLAINTIFF,

v.

CIVIL ACTION NO. 2:23-cv-00692

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; et al.,

DEFENDANTS.

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..........................................................................................................V

INTRODUCTION ........................................................................................................................1

BACKGROUND ...........................................................................................................................5

TITLE VI OF THE CIVIL RIGHTS ACT......................................................................................6

TITLE VI IMPLEMENTING REGULATIONS ...........................................................................8

COMPLAINTS AND INFORMAL NEGOTIATIONS..................................................................8

    Untimely Complaints Relating To Denka and Formosa Facilities ...............................8

    Informal Negotiations With EPA ....................................................................................9

THIS SUIT AND SUBSEQUENT EVENTS...............................................................................11

LEGAL STANDARD..................................................................................................................12

ARGUMENT...............................................................................................................................12

I.      THIS COURT HAS JURISDICTION TO REVIEW AND ENJOIN DEFENDANTS'
      ACTIONS ...........................................................................................................................12

    A.   Sovereign Immunity Is Waived Here. ......................................................................12

    B.   The State Has Article III Standing. ..........................................................................12

    C.   The State Has Viable Causes of Action. ...................................................................13

    D.   The State's Claims Are Timely. .................................................................................14

    E.   The State's Claims Are Ripe......................................................................................15

II.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THEIR NON-DELEGATION
      CLAIM AND THEIR APA 180-DAY CLAIM ........................................................................15

    A.   The Constitution Forbids Delegation Of Governmental Power To Non-
         Governmental Actors................................................................................................15

    B.   The Decision To Continue Or Terminate Informal Negotiations Under Title
         VI Is An Exercise Of Governmental Power. ..................................................................16

    C.   EPA Has Violated The Non-Delegation Doctrine By Delegating Away Its
         Authority To Continue Informal Negotiations. ........................................................17

D. The State's Injury Is Both An Accomplished Fact And Ongoing. ..........................18

E. EPA's "Total Discretion" Position Misapprehends The Agency's Authority. ....19

F. Application Of The 180-Day Deadline In 40 C.F.R. 7.115(c) Is Arbitrary And Capricious. ..................................................................................................................20

III. SECTION 602 DOES NOT AUTHORIZE DISPARATE-IMPACT MANDATES ..........20

A. The Plain Text Of Title VI Precludes Defendants' Imposition Of Disparate-Impact Mandates By Regulation. ..........................................................................20

1. Disparate Impact Requirements Do Not "Effectuate" Title VI's Prohibition Purely On Intentional Discrimination. .................................................................21

2. Disparate Impact Requirements Frustrate Section 601's Prohibition Rather Than Effectuating It. ...............................................................................................24

3. The Lack Of A Good-Faith Defense Underscores The Regulation's Invalidity. ..........25

B. Statutory Context Confirms That Defendants Lack Authority To Issue Disparate-Impact Regulations. ..........................................................................26

C. Defendants' Interpretation Contravenes Canons Of Construction. .................29

1. Different/Omitted Words ................................................................................29

2. Federalism .......................................................................................................30

3. Presumption of Good Faith ............................................................................30

4. Constitutional Avoidance ...............................................................................31

D. Defendants' Disparate Impact Regulations Violate The Spending Clause As Applied To The States And Raise Grave Constitutional Doubts More Generally. ................................................................................................................32

1. Defendants' Regulations Violate The Spending Clause As Applied To The States. ......32

2. Defendants' Disparate-Impact Mandates Invite Severe Doubts As To Their Constitutionality Under The Equal Protection Clause. ...................................34

E. The Major Questions Doctrine Further Establishes That Defendants Lack Power To Adopt Disparate-Impact Mandates Under Section 602 .........................35

IV. EPA LACKS AUTHORITY TO IMPOSE EXTRA-REGULATORY REQUIREMENTS ..............................................................................................................37

A. EPA Can Only Create Requirements Under Title VI With Presidential Approval And Through Compliance With APA Procedures. ...................................37

B. EPA Has Attempted To Impose Extra-Regulatory Requirements On The State. ................................................................................................................38

V. THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED ................................................................................................................41

A. The State Will Suffer Irreparable Harm Without An Injunction. .......................41

B. The Balance of Harms And Public Interest Support he State. ...............................42

CONCLUSION .........................................................................................................................42

APPENDIX .........................................................................................................................1

## TABLE OF AUTHORITIES

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935)..........................................................................................................15

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967)..........................................................................................................15

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018)................................................................................................ 15, 31

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)............................................................................................................1

*Alabama Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021)......................................................................................................35

*Alabama-Coushatta Tribe of Texas v. United States,*
  757 F.3d 484 (5th Cir. 2014)....................................................................................... 12, 13

*Alexander v. Choate,*
  469 U.S. 287 (1985)..........................................................................................................40

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)...................................................................................................passim

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982)..........................................................................................................41

*Arizona v. Yellen,*
  34 F.4th 841 (9th Cir. 2022)..............................................................................................41

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006)..........................................................................................................33

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015)..........................................................................................................13

*Axon Enter., Inc. v. FTC,*
  143 S. Ct. 890 (2023).................................................................................................. 18, 41

*Azar v. Allina Health Servs.,*
  139 S. Ct. 1804 (2019)......................................................................................................30

*Batson v. Kentucky,*
  476 U.S. 79 (1986)............................................................................................................37

*Brnovich v. DNC,*
    141 S. Ct. 2321 (2021)..................................................................................................27

*Brown v. Gardner,*
    513 U.S. 115 (1994)....................................................................................................29

*CARE v. E.P.A.,*
    2018 WL 11434811 (N.D. Cal. June 13, 2018) ..................................................... 10, 20

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................................13

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021) (en banc) *aff'd* 140 S. Ct. 890...................................13

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    142 S. Ct. 1562 (2022) ................................................................................................33

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.,*
    112 F.3d 1283 (5th Cir. 1997)....................................................................................14

*East Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020)....................................................................................42

*Esquivel-Quintana v. Sessions,*
    137 S. Ct. 1562 (2017)................................................................................................21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010)....................................................................................................13

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991)............................................................................................. 30, 32

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)........................................................................................... 7, 34, 35

*In re Flint Water Cases,*
    482 F. Supp. 3d 601 (E.D. Mich. 2020) .....................................................................23

*Jama v. ICE,*
    543 U.S. 335 (2005)....................................................................................................26

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018).......................................................................................... 31, 35

*Kamps v. Baylor Univ.,*
    592 F. App'x 282 (5th Cir. 2014) ........................................................................ 3, 26

*Knight v. Commissioner,*
    552 U.S. 181 (2008) ................................................................................................29

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006) ............................................................................................ 1, 2

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ................................................................................................36

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................................13

*Luminant Gen. Co. v. E.P.A.,*
    675 F.3d 917 (5th Cir. 2012) ..................................................................................23

*Mays v. City of Flint,*
    871 F.3d 437 (6th Cir. 2017) ..................................................................................23

*Mitchell v. Dakota Cnty. Soc. Servs.,*
    959 F.3d 887 (8th Cir. 2020) ..................................................................................31

*National Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................................32

*National Horsemen's Benevolent & Protective Ass'n v. Black,*
    53 F.4th 869 (5th Cir. 2022) ........................................................................ 4, 16, 17

*New York Urb. League, Inc. v. New York,*
    71 F.3d 1031 (2d Cir. 1995) ..................................................................................25

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................................42

*Opulent Life Church v. City of Holly Springs, Miss.,*
    697 F.3d 279 (5th Cir. 2012) ..................................................................................12

*Owasso Indep. Sch. Dist. v. Falvo,*
    534 U.S. 426 (2002) ................................................................................................30

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ...............................................................................4, 34, 35, 37

*Pena-Rodriguez v. Colorado,*
    137 S. Ct. 855 (2017) ........................................................................................ 22, 37

*Raytheon Co. v. Hernandez,*
    540 U.S. 44 (2003) .......................................................................................21, 22, 24

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ..................................................................................................passim

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas,*
   6 F.4th 633 (5th Cir. 2021) ........................................................................................ 3, 7

*SAS Inst., Inc. v. Iancu,*
   138 S. Ct. 1348 (2018) ..................................................................................................29

*Save Our Valley v. Sound Transit,*
   335 F.3d 932 (9th Cir. 2003) .........................................................................................22

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020)...................................................................................................18

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002) ............................................................................ 8, 11, 13

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers,*
   531 U.S. 159 (2001) ......................................................................................................31

*Sossamon v. Lone Star State of Texas,*
   560 F.3d 316 (5th Cir. 2009), *aff'd, 563* U.S. 277 (2011) ............................................31

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ......................................................................................................33

*Sunshine Antracite Coal Co. v. Adkins,*
   310 U.S. 381 (1940)......................................................................................................17

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................................... 14, 15

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015)......................................................................................................34

*Texas Educ. Agency v. U.S. Dep't of Educ.,*
   992 F.3d 350 (5th Cir. 2021) .........................................................................................33

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court,* 136 S. Ct. 2271 (2016) ........................42

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
   140 S. Ct. 1837 (2020)...................................................................................................28

*United States v. Calamaro,*
   354 U.S. 351 (1957) ......................................................................................................24

*United States v. LULAC,*
  793 F.2d 636 (5th Cir. 1986)..............................................................................................25

*United Technologies Corp. v. EPA,*
  821 F.2d 714 (D.C. Cir. 1987) ...........................................................................................37

*Utility Air Reg. Grp. v. E.P.A.,*
  573 U.S. 302 (2014) ...........................................................................................................35

*Venetian Casino Resort, L.L.C. v. Equal Emp't Opportunity Comm'n,*
  409 F.3d 359 (D.C. Cir. 2005) ...........................................................................................15

*Virginia Dep't of Educ. v. Riley,*
  106 F.3d 559 (4th Cir. 1997)..............................................................................................33

*Wages & White Lion Invs., L.L.C. v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) ........................................................................................5, 42

*West Virginia State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ...........................................................................................................39

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022)..................................................................................................35, 36

*Whitman v. Am. Trucking Ass'ns, Inc.,*
  531 U.S. 457 (2001) ...........................................................................................................28

*Winter v. NRDC,*
  555 U.S. 7 (2008) ...............................................................................................................12

**STATUTES**

5 U.S.C. § 553 .........................................................................................................................38

5 U.S.C. § 702 .........................................................................................................................12

5 U.S.C. § 704 .........................................................................................................................13

28 U.S.C. § 2401(a) .................................................................................................................14

42 U.S.C. § 2000d............................................................................................................passim

42 U.S.C. § 2000d-1.........................................................................................................passim

42 U.S.C. § 2000e–2(a)(2) .......................................................................................................26

42 U.S.C. § 7401(a)(3)..............................................................................................................30

42 U.S.C. § 7661d ...................................................................................................................9

52 U.S.C. § 10301(a) ...........................................................................................................27

**OTHER AUTHORITIES**

"Effectuate," *American Heritage Dictionary* (1st ed. 1969) ...........................................22

80 Fed. Reg. 77,284, 77,287 (Dec. 14, 2015)....................................................................20

DOJ, Title VI Legal Manual, Section VII: Proving Discrimination – Disparate Impact, § VII.C.2
    *available at* https://www.justice.gov/crt/fcs/T6Manual7 ....................................25

EO 12,250, 45 Fed. Reg. 72,995 (1980)..............................................................................8

Orwell, George, *Animal Farm* (1944)..................................................................................1

Safe Drinking Water Act Amendments of 1996, Pub. L. 104-182 § 3, 110 Stat. 1613 (1996) .............23

**REGULATIONS**

28 C.F.R. § 0.51(a) ...............................................................................................................8

28 C.F.R. § 42.104(b)(2) ..........................................................................................8, 25, 34

28 C.F.R. §§ 41.101-12 .........................................................................................................8

40 C.F.R. § 7.115(c)(1) .......................................................................................................20

40 C.F.R. § 7.120(d)(2)(i) .......................................................................................17, 18, 19

40 C.F.R. § 7.35 ...........................................................................................................passim

40 C.F.R. § 7.35(b), (c) .............................................................................................8, 25, 34

40 C.F.R. §§ 7.10-180 ...........................................................................................................8

42 U.S.C. § 2000e–2(k) ................................................................................................8, 26

# INTRODUCTION

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995) (cleaned up). The Federal Defendants (collectively, "Defendants" or "EPA") disagree with that fundamental premise. They accordingly seek to compel deliberate racial discrimination by the State of Louisiana ("State"). Because that demand—and EPA's associated actions in implementing and enforcing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI")—violate the Constitution and exceed EPA's statutory authority, this Court should preliminarily enjoin them.

The State's antipathy to racial discrimination is a primary motivation for this suit. Congress, too, through Title VI, has targeted racial discrimination by recipients of federal funds. But Title VI, by its terms, "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). In logic that would make George Orwell blush, EPA seeks to compel intentional racial discrimination based on authority for "effectuating" Title VI's prohibition against intentional racial discrimination. In that up-is-down interpretation, EPA seeks to compel the State to *engage* in intentional discrimination on the basis of race in order to *avoid* intentionally discriminating on the basis of race. Or more succinctly: in EPA's view, Title VI somehow mandates what it prohibits. Such linguistic contortions are best suited for dystopian systems in which "[a]ll [people] are equal, but some [individuals] are more equal than others." Orwell, George, *Animal Farm* (1944).

"It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurral). But far from possessing any apparent aversion to the sordidness of race-based decisionmaking, EPA has an unmistakable appetite for it. EPA accordingly seeks to judge air and water emissions not by their environmental effects, but rather by the color of the skin of those proximate to them. EPA seeks to do so by imposing disparate-impact-

based requirements that effectively *require* racial discrimination to comply with. *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (Disparate-impact requirements "not only permit[] but affirmatively *require*[] [race-based discrimination] when a disparate-impact violation *would* otherwise result.")

This case is illustrative: EPA has been perfectly clear that it has no quarrel with the Louisiana Department of Environmental Quality's ("LDEQ's") issuance of Clean Air Act ("CAA") permits as a matter of existing environmental law. Indeed, with respect to one of the facilities underlying EPA's concern, LDEQ actions *reduced* allowable air emissions, producing unambiguous environmental benefits for *everyone* involved. But compliance with environmental law—even improved environmental quality—is no longer remotely sufficient for the *Environmental* Protection Agency. Instead, the agency has weaponized Title VI as a blanket grant of authority to veto any and all permitting decisions that offend its vision of environmental justice and "equity." The agency even created an entire new subagency dedicated to that activism. Nor is there any subtlety to EPA's approach: first the agency intends to "divvy[] us up by race," *Perry*, 548 U.S. at 511, and then it will redistribute out benefits and burdens under a racial spoils system of its own devising.

But EPA has no authority to impose the disparate-impact-based mandates under Title VI. The Supreme Court expressly left open whether the Executive can "effectuate" Title VI by imposing disparate-impact-based requirements under Title VI. *Sandoval*, 532 U.S. at 281 ("assum[ing]" legality as it was unchallenged, and explaining that "*no opinion of this Court has held* that" Section 602 authorizes disparate-impact regulations" (emphasis added)). The Court, however, tipped its hand by recognizing "how strange it is to say that disparate-impact regulations are 'inspired by, at the service of, and inseparably intertwined with' § 601 *when § 601 permits the very behavior that the [disparate-impact] regulations forbid.*" *Id.* at 286 n.6 (citation omitted) (emphasis added). But *Sandoval* presented no opportunity for the Court to go further than observing the strangeness underlying Defendants' interpretation.

The Fifth Circuit likewise has not resolved the issue, although it has cast even more doubt as to whether Title VI disparate-impact regulations are lawful. That court explained that "[w]hen Congress wants to allow disparate impact claims, it uses particular language." *Kamps v. Baylor Univ.*, 592 F. App'x 282, 285 (5th Cir. 2014). Title VI (unlike Title VII) has no such disparate-impact language. And *Kamps* specifically went on to hold that the Americans with Disabilities Act ("ADA") did *not* authorize disparate-impact liability based on an explicit analogy to Title VI: "the ADA's prohibition is almost identical to Title VI [], which prohibits only intentional discrimination." *Id.* And, more recently, two judges on the Fifth Circuit have explicitly opined that Title VI disparate-impact requirements are unlawful. *See Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 647-50 (5th Cir. 2021) (Ho, J., concurral) (expressing "concerns about unelected agency officials usurping Congress's authority when it comes to disparate impact theory" under Title VI); *id.* at 647 (Jones, J., concurral) (same).

This case squarely presents the question that the Supreme Court and Fifth Circuits have reserved: does the Executive's limited authority under § 602 to "effectuate" § 601's prohibition—which is purely limited to intentional discrimination—extend to imposing disparate-impact-based liability, an entirely distinct legal theory of discrimination that frequently *requires* intentional discrimination based on race? Or stated more simply: are Title VI disparate-impact regulations lawful?

They are not. Agencies cannot "effectuate" § 601's prohibition purely on intentional discrimination by transmuting that proscription into something entirely distinct. That is an act of mythological alchemy, not interpretation or effectuation. Indeed, intentional-discrimination and disparate-impact regulations are not merely distinct concepts, but ones often at "war" with each other. *Ricci*, 557 U.S. at 595-96. The plain text of Title VI thus prohibits Defendants' disparate-impact interpretation. That conclusion is further supported by many other indicia of statutory meaning, including (1) the statutory context, (2) the applicable canons of construction, (3) the doctrine of

constitutional avoidance, and (4) the major questions doctrine. In the end, "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion). EPA's disparate-impact regulations do not "effectuate" Title VI's prohibition on intentional racial discrimination but rather *perpetuate* the very evil that Title VI forbids.

EPA's lack of authority to issue and enforce Title VI disparate-impact mandates is not the only legal violation here that the State seeks to enjoin. Rather, two other violations stand out and warrant relief. *First*, EPA has defied constitutional limits on its authority through delegating governmental power to non-governmental organizations, which violates the private non-delegation doctrine. That doctrine prohibits "giving public power to private bodies." *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (citation omitted). Here EPA has done so by conferring veto power to certain non-governmental organizations ("Private Special Interest Groups") over whether to continue informal negotiations to resolve Title VI complaints. By its terms, Title VI precludes any enforcement action until "the … agency … has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1. But EPA has outsourced power to make those obtaining-voluntary-compliance-is-futile determinations. Even if EPA believes that continued negotiations are warranted—as EPA did here in December 2022 and March 2023—those negotiations could continue *only if* the Private Special Interest Groups approved. And EPA only secured that approval/non-veto by providing them private information as a quid-pro-quo. That conferral of governmental power to private groups violates the Constitution. Compounding the legal infirmity, the unconstitutional conferral of government power derives from a deadline EPA long-ago conceded is arbitrary and unrealistic, but nevertheless has not eliminated it.

*Second*, EPA is acting in an unlawful and *ultra vires* manner by seeking to impose unauthorized disparate-impact-based requirements. To create requirements under Title VI, an agency must do at

4

least two things: (1) comply with APA rulemaking requirements and (2) have the requirements "approved by the President," 42 U.S.C. § 2000d-1. EPA, however, is attempting to impose mandates violating both requirements, such as demanding that the State conduct public meetings in a particular manner, have its scientific efforts overseen by an EPA-approved committee, refrain from criticizing EPA, and perform detailed cumulative impacts analysis (in a manner that just so happens to mirror two recent EPA reports released without notice-and-comment rulemaking and unratified by the President). EPA's demands that the State submit to these newly concocted mandates is unlawful and should be enjoined.

All of the remaining requirements for a preliminary injunction are satisfied here as well. The State will suffer irreparable injury in the form of sovereign injuries and irrecoverable financial harms. And the balance of harms and public interest also support a preliminary injunction, particularly as "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (citation omitted). This Court should therefore grant the State's motion and enter the proposed injunction.

## BACKGROUND

EPA boldly states that it "wants to be a civil rights agency." Exh. 8. Indeed, notwithstanding that it is the *Environmental* Protection Agency, EPA recently "committed to making equity, environmental justice, and civil rights a centerpiece of the agency's mission." Exh. 4 at 2. So rather than focusing on the environment, EPA is pivoting to an agency that aggressively ventures into the field of civil rights on its own initiative, scanning for areas of greatest concerns. Exh. 41. EPA even touts that it "elevate[d] environmental justice and civil rights" to "the same playing field as the Office of Air [and] Office of Water." Exh. 7 at 2. EPA is walking hand-in-hand with "environmental justice" activists as it pivots, Exh. 2, and agency officials openly proclaim EPA "know[s] that [it] can depend on [those] activists … to make sure [EPA] fulfill[s] [its] commitments to them," Exh. 8 at 4. The tool

of choice for EPA's rapidly-expanding environmental justice component is to use Title VI to force a controversial vision of equity on the States, including by demanding State agencies "consider disparate impacts in state-issued … air and water permits" and address other purported impacts Congress has not seen fit to regulate. Exh. 9.

EPA's authority to reinvent itself is dubious. As one former head of USDOJ's Environmental and Natural Resources Division noted, EPA's pivot is a "significant change" from the agency's prior enforcement efforts, and "impacted entities might challenge the EPA." Exh. 9. He elaborated: "If actions taken to advance environmental justice are premised merely on findings of disparate impact without discriminatory intent, such challenges could have success." *Id.* That's because "[t]he Supreme Court has already written that Title-VI-implementing regulations like the DOJ's and the EPA's are in 'considerable tension' with the Court's Title VI precedents." *Id.* Or, as another former head of the Environmental and Natural Resources Division bluntly stated, "it looks like [EPA is] trying to expand their authority by using their muscle without clear authorization from Congress." Exh. 3 at 3.

## TITLE VI OF THE CIVIL RIGHTS ACT

The principal vehicle for EPA's reinvention is an aggressive interpretation of Title VI that the Supreme Court has condemned as "strange." *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). On its face, Title VI prohibits discrimination on the basis of race, color, and national origin by recipients of federal funds. Its sole operative provision, Section 601, provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. The reach of Title VI is vast; it touches virtually every recipient of federal grants. That includes hospitals, schools, universities, and, *inter alia*, a wide variety of State agencies and departments.

After initially holding that Title VI imposes disparate-impact requirements, the Supreme Court reversed itself. It is now well-established that "[o]nly racial discrimination of the same character as that forbidden by the Equal Protection Clause is prohibited by [Section] 601." *Rollerson*, 6 F. 4th at 639 (citing *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003)). Thus, Section 601 "prohibits only intentional discrimination," not "activities that have a disparate impact on racial groups." *Sandoval*, 532 U.S. at 280, 281.

Among its ancillary provisions, Title VI has a provision governing enforcement and rulemaking, Section 602. Under that provision, agencies are "authorized and directed to effectuate the provisions of [Section 601] … by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1. The rulemaking power is thus limited to actions that "effectuate" Section 601. *Id.* It is further circumscribed by a restriction that "[n]o such rule, regulation, or order shall become effective unless and until approved by the President." *Id.*

The Executive's authority to enforce Title VI is also restricted in several important ways. The remedy for any enforcement action is limited to both the "particular political entity" and "the particular program … in which such noncompliance has been so found." *Id.* Further, no enforcement action can be taken until (1) "the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and [(2)] has determined that compliance cannot be secured by voluntary means," (3) the agency files a report with "with the committees of the House and Senate having [relevant] legislative jurisdiction," and (4) "thirty days have elapsed" after the report's filing. *Id.*

### TITLE VI IMPLEMENTING REGULATIONS

The President has delegated his authority to enforce Title VI and to approve Title VI regulations to the Attorney General of the United States, and directed the Attorney General to "coordinate the implementation and enforcement by Executive agencies" of Title VI. EO 12,250, 45 Fed. Reg. 72,995 (1980). The Attorney General has in turn sub-delegated that authority to "the Assistant Attorney General in charge of the Civil Rights Division." 28 C.F.R. § 0.51(a).

DOJ has adopted regulations to implement Title VI under Section 602. *See* 28 C.F.R. §§ 41.101-12. DOJ's published regulations purport to impose disparate-impact-based requirements. *See, e.g.,* 28 C.F.R. § 42.104(b)(2). In 2003, DOJ acknowledged that "the Supreme Court's statements in *Sandoval* … call the validity of the Title VI disparate impact regulations into question." 68 Fed. Reg. at 51,338. Accordingly, DOJ acted to rescind its disparate impact regulations in 2020, Exh. 36, but inexplicably never published its decision to do so.

EPA also adopted regulations to implement Title VI. *See* 40 C.F.R. §§ 7.10-180. Like DOJ's regulations, EPA's regulations contain a restriction on taking actions with disparate impacts, but those regulations are highly generic and non-specific. *See* 40 C.F.R. § 7.35(b), (c). Although the text of EPA's regulations does not mention any particular disparate impact standard, EPA has interpreted its regulation as establishing a standard that is largely identical to the Title VII disparate-impact regime established by 42 U.S.C. § 2000e–2(k). *See* Exh. 40 (hereinafter, "EPA Compliance Toolkit") at 11. EPA adopted that interpretation despite having joined DOJ in acknowledging that *Sandoval* "call[s] the validity of … Title VI disparate impact regulations into question." 68 Fed. Reg. at 51,338.

### COMPLAINTS AND INFORMAL NEGOTIATIONS

### Untimely Complaints Relating To Denka and Formosa Facilities

The legal disputes here were crystalized by EPA's actions relating to a complaint by Stop the Wallace Grain Terminal, Inclusive Louisiana, RISE St. James, and the Louisiana Bucket Brigade, and a similar complaint by Concerned Citizens of St. John and Sierra Club. Although neither complaint

identified any specific action within the preceding 180 days, EPA accepted those complaints for investigation in April 2022.

### Informal Negotiations With EPA

EPA issued a letter of concern on October 12, 2022. Exh. 11. In that letter, EPA stated that "based on the facts discovered thus far ... significant evidence suggest[s] that [LDEQ's and LDH's] actions or inactions have resulted and continue to result in disparate adverse impacts on Black residents of St. John the Baptist Parish, St. James Parish, and an ill-defined Industrial Corridor. *Id.* at 2. In its letter, EPA made only a cursory attempt to identify similarly situated populations to support EPA's disparate impact claims. EPA instead merely focused on allegations that certain Black communities are adversely affected by certain facilities that are permitted by LDEQ pursuant to the Clean Air Act. *See id.* at 30-34, 43-48, 53-54. Much of the letter constituted disagreement with LDEQ's and LDH's scientific analysis. *Id.* at 36-40. Entirely unmentioned was EPA's role in setting the standards by which LDEQ issues permits, or EPA's authority to cause those permits to be modified, terminated, or revoked if they violate the Clean Air Act. *See* 42 U.S.C. § 7661d. The clear implication is that EPA found no fault with LDEQ's compliance with substantive environmental law. *See also id.* at 53 ("EPA is not stating … that the projected EtO emissions from Formosa are per se adverse.").

In a stark departure from its ordinary practice, EPA made its letter of concern public. Nevertheless, consistent with EPA's regulations, LDEQ and LDH opted to pursue informal resolution negotiations. Seidemann Decl. ¶ 21. During those negotiations, EPA repeatedly refused to identify with specificity what it believed LDEQ and LDH are doing wrong. *Id.* ¶¶ 23-33; Exhs. 13, 15. EPA—at best—offered contradictory statements and pointed to undefined "methods of administration" for LDEQ's programs. EPA made clear, however, that "this is not an environmental engagement per se." Seidemann Decl. ¶ 24. EPA never alleged any intentional racial discrimination, either, and its concerns appear to be based entirely on alleged disparate racial impacts, as measured by

"cumulative impact[s]" that Congress has not seen fit to regulate. *See id.* ¶¶ 27, 109; Exh. 11. Indeed, Defendant Dorka ultimately admitted that "you're not going to see in any letter where we think [LDEQ or LDH] violated the law." Seidemann Decl. ¶ 33.

While EPA was fuzzy as to the alleged violations of Title VI, it was perfectly clear that it viewed the protections afforded by environmental laws to be insufficient, telling the State that "compliance with environmental laws is not a shield to Title VI." *Id.* ¶¶ 25, 57. Instead, Defendant Dorka frankly demanded that "in order to address what appears to be a disparate impact, disparate harm, you may need to go beyond [environmental statutory] authorities. *Id.* ¶ 42. Indeed, during the negotiations, EPA demanded the State agree to requirements unrelated to the complaints, and some that were not even found in EPA's regulations. Those demands included (1) holding community meetings and conducting them in particular way, (2) subjecting the State's scientific evaluations to review by an EPA-approved committee, (3) refraining from criticism of EPA, (4) conducting NEPA-like pre-decisional analysis of the potential for disparate impact, including express consideration of race, and (5) cumulative impacts analysis. *Id.* ¶¶ 37-55, 71 & Exhs. 16, 38. EPA also made clear that its demands were not limited to the particular permits or parishes underlying the complaints. Rather EPA insisted on "agency-wide" adherence by LDH and LDEQ to EPA's demands, even in areas like Medicaid over which EPA has no regulatory authority, and even if the federal agency that does regulate that area is satisfied with the State's conduct. Seidemann Decl. ¶¶ 51, 75-76. That compliance with EPA's diktats would cost the State millions of dollars was no moment. *Id.* ¶ 71.

In February/March 2023, EPA recounted the negotiations to date had been "really productive" and had "made a lot of progress," so EPA determined that extending informal negotiations was warranted. *Id.* ¶ 69. But because of court judgments the agency had acquiesced in, *see CARE v. E.P.A.*, 2018 WL 11434811 (N.D. Cal. June 13, 2018), EPA was required to obtain the approval of the Private Special Interest Groups to extend informal negotiations vis-à-vis the complaint

submitted by Sierra Club. *Id.* ¶ 70. EPA only secured that approval by trading non-public information to those groups, in the form of draft proposed agreements, notwithstanding its express commitment not to do so. Seidemann Decl. ¶¶ 65-68 & Exh. 17. Defendant Dorka also announced yet another departure from EPA's regulations: she had "asked our [EPA] group to continue … their diligence on the IRA, but also to prepare, just in case, we needed to issue preliminary findings. So we have been proceeding on both tracks." Seidemann Decl. ¶ 65. In a transparent attempt to exert pressure, Dorka reiterated that point in an April 26 letter to the Secretary of LDEQ, stating that "[w]hile EPA appreciates LDEQ's engagement in the IRA process and is encouraged by the negotiations to date, we have not yet reached an IRA. Therefore, as EPA has previously conveyed to LDEQ, EPA must continue its fact-finding on a parallel track with the IRA process to ensure that EPA … is in a position to resolve the complaint through the issuance of Preliminary Findings, should EPA and LDEQ not be able to reach an IRA by the agreed upon date." Exh. 18. Dorka attached an extraordinarily burdensome discovery request to her letter, purportedly pursuant to EPA's authority under 40 C.F.R. §§ 7.115 and 7.120. *Id.*

### THIS SUIT AND SUBSEQUENT EVENTS

After it became apparent that EPA could not be persuaded to desist from its unlawful actions, the State filed this suit on May 24, 2023. Dkt. 1. The State emailed a copy of the complaint to EPA, and EPA responded by repeatedly cancelling regularly-scheduled informal resolution discussions. Seidemann Decl. ¶¶ 78-83 & Exhs. 20, 21. EPA eventually inquired whether LDEQ and LDH remained interested in informal resolution. Both agencies responded that they were. Exhs. 22, 23. EPA stressed the July 11 deadline for resolution, but continued cancelling all previously-scheduled discussions at the last minute. Exh. 25. On June 20, emailed EPA regarding the last-minute cancellations, noted that EPA's conduct reflects a deviation from its Case Resolution Manual, and asked whether EPA remains committed to working on an informal resolution agreement. Defendant

Dorka responded later that day, *inter alia*, "cancel[ling] the rest of the meetings" and accusing LDEQ of not responding to EPA's document requests, notwithstanding LDEQ's written provision of access to its books and records pursuant to Section 2.4(2) of EPA's Case Resolution Manual. Exh. 27. In short, EPA is relying on pretext to run out its self-imposed clock, and it appears unwilling to abandon its unlawful course. The State accordingly moves for a preliminary injunction.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiff States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *accord Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.   THIS COURT HAS JURISDICTION TO REVIEW AND ENJOIN DEFENDANTS' ACTIONS

Because EPA's actions here are manifestly unlawful, the State anticipates that Defendants will raise an avalanche of arguments contending that those actions are not reviewable or that this Court lacks jurisdiction. The State therefore briefly addresses those issues, which is also discussed in greater detail in the Complaint. *See* Dkt. 1 ¶¶ 98-100, 198-203, 207-09, 233-40.

#### A.   Sovereign Immunity Is Waived Here.

5 U.S.C. § 702 waives sovereign immunity for the claims at issue here. *See Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014); Dkt. 1 ¶¶ 99-100.

#### B.   The State Has Article III Standing.

The State has Article III standing on several distinct bases. As discussed below for irreparable harm, Defendants' actions have inflicted four distinct types of sovereign, quasi-sovereign, or proprietary harms, which constitute injuries-in-fact. *See infra* § V.A; Dkt. 1 ¶¶ 198-203. In addition, because the State "is 'an object of the action (or forgone action) at issue' … [the State's] standing to

seek review of administrative action is *self-evident*." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (emphasis added). The State's injuries are also readily traceable to Defendants' actions and regulations, and an injunction would redress the States harms. *Id.*

### C.     The State Has Viable Causes of Action.

The State's claims here are properly asserted under several non-statutory causes of action: those (1) "arising under the Constitution" itself, *Cochran v. SEC*, 20 F.4th 194, 199 (5th Cir. 2021) (en banc) *aff'd* 140 S. Ct. 890; (2) an equitable cause of action arising from the "power of federal courts of equity to enjoin unlawful executive action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *accord Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)); and (3) a "non-statutory cause of action" to challenge "[w]hen an executive acts ultra vires," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also* Dkt. 1 ¶¶ 98, 207-09. Notably, each of these causes of action does *not* require final agency action. *Alabama-Coushatta Tribe*, 757 F.3d at 488 ("There is no requirement of 'finality'" for these non-APA claims).

In addition, the State can assert its challenges under the private non-delegation doctrine and to Defendants' disparate-impact regulations (*infra* §§ II, III) under the APA's cause of action, 5 U.S.C. § 704. As to the former, EPA has taken final agency action by conveying governmental veto power upon the Private Special Interest Groups, and then took further final agency action by seeking (and obtaining) their approval to continue informal negotiations past December 2022 and again past March 2023. Seidemann Decl. ¶¶ 65-69 & Exhs. 17, 37, 42

As to Defendants' disparate-impact regulations, Defendants have taken final agency action in the form of making grants to the State and its agencies and purporting to condition those grants on compliances with Defendants' unlawful disparate-impact mandates. Seidemann Decl. ¶¶ 87-90 &

Exhs. 28-34. In addition, DOJ's reopening of its disparate impact regulations in 2020-21 constitutes additional reviewable final agency action. *See* Exh. 36.

> **D.      The State's Claims Are Timely.**

The State's challenges are also timely. EPA's actions that violate the private non-delegation doctrine and attempt to impose Extra-Regulatory Requirements upon the State have occurred within the last six years (and indeed, last six months). They are therefore timely. *See* 28 U.S.C. § 2401(a).

Defendants' disparate-impact regulations were not issued within the last six years, but can be challenged here because "when an agency applies a rule, the limitations period running from the rule's publication will not bar a claimant from challenging the agency's statutory authority. *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997). The State can therefore "challenge … that the issuing agency exceeded its constitutional or statutory authority" by pointing to some direct, final agency action involving the particular plaintiff within six years of filing suit." *Id.;* Dkt. 1 ¶¶ 222-24.

Here, both DOJ and EPA have taken final agency action in the last six years by making grants to the State and its agencies and purporting to condition those grants on adherence to Defendants' disparate-impact regulations. Seidemann Decl. ¶¶ 87-90; Exhs. 28-34. The States' challenges to the validity of those regulations as exceeding Defendants' statutory and constitutional authorities are therefore timely.

They are also timely for two additional reasons. *First*, DOJ's attempt to repeal its disparate-impact regulations, followed by its 180-degree reversal and resulting retention of those regulations without change, constitute a "reopening" under the reopening doctrine. *See* Complaint ¶¶ 233-240. *Second*, the State's claims are alternatively cognizable as pre-enforcement challenges to threatened actions by Defendants, "for which there is credible threat" of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *accord* Complaint ¶¶ 225-27; *see generally* Seidemann Decl. & Exh.

11. Because those threatened enforcement actions have not yet taken place, the limitations clock has not begun running on them.

### E.    The State's Claims Are Ripe.

The State's claims here are also ripe. The issues presented are "purely legal" in nature, and thus are thus "fit[] … for judicial decision." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *accord Venetian Casino Resort, L.L.C. v. Equal Emp't Opportunity Comm'n*, 409 F.3d 359 (D.C. Cir. 2005) ("[P]urely legal questions … [are] presumptively suitable for judicial review"). The State would also suffer substantial "hardship … [from] withholding court consideration" for all of the reasons explained below, *Abbott Labs*, 387 U.S. at 149. *See infra* §V.A.

In addition, the State faces a "credible threat" of enforcement by Defendants. *Susan B. Anthony List*, 573 U.S. at 159. Defendants have made clear that they intend to enforce disparate-impact regulations against the State and to impose Extra Regulatory requirements upon it. *See* Seidemann Decl. ¶¶ 18-76 & Exhs. 11, 16, 38. That credible threat will be further underscored if, as expected, Defendants refuse to disavow an intent to enforce their regulations against the State or impose particular Extra-Regulatory requirements upon the State in their opposition brief.

## II.   PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THEIR NON-DELEGATION CLAIM AND THEIR APA 180-DAY CLAIM

### A.    The Constitution Forbids Delegation Of Governmental Power To Non-Governmental Actors.

The Constitution forbids delegating governmental power to non-governmental actors. By conferring veto power on the Private Special Interest Groups, EPA has violated the Constitution. Delegation of federal governmental power to non-governmental actors is "is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935). That principal is known as the private non-delegation doctrine. That doctrine has substantially more bite than the public non-delegation doctrine, which governs what powers Congress can delegate to the Executive.

The Fifth Circuit recently reiterated these principles: "While the [Supreme] Court has allowed limited delegations of authority to government agencies, it has set its face against giving public power to private bodies." *National Horsemen*, 53 F.4th at 880 (citation omitted) (invalidating statute under the private non-delegation doctrine). The court went on to explain the dividing line between permissible and unconstitutional involvement of private actors: "Congress may formalize the role of private parties in proposing regulations *so long as that role is merely as an aid to a government agency* that retains the discretion to approve, disapprove, or modify them. *If the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional*." *Id.* at 881 (cleaned up) (citation omitted) (emphasis added). In *National Horsemen*, the Fifth Circuit invalidated the statutory delegation because the agency's "oversight [wa]s too limited to ensure the [private organization] 'function[ed] subordinately' to the agency." *Id.* at 885 (citation omitted).

As explained below, the issue here is even starker: EPA does not merely lack sufficient oversight powers, but instead is subject to a veto power by the Private Special Interest Groups.

**B.     The Decision To Continue Or Terminate Informal Negotiations Under Title VI Is An Exercise Of Governmental Power.**

EPA's decision to continue or terminate informal negotiations under Title VI is a quintessential exercise of governmental power subject to the private non-delegation doctrine. The absence of a private cause of action to enforce Title VI regulatory requirements, *see Sandoval*, 532 U.S. at 293, alone means that *all* enforcement of Title VI regulations—including putative disparate-impact mandates—is necessarily an exercise of governmental power.

In addition, Title VI and EPA's implementing regulations place duties specifically *on EPA*. Section 602 limits enforcement power by providing that "no such [enforcement] action shall be taken until *the … agency … has determined* that compliance cannot be secured through voluntary means." 42 U.S.C. § 2000d-1 (emphasis added). *EPA* thus make that determination—a duty that cannot be delegated in contravention of the private non-delegation doctrine.

16

Similarly, EPA's own regulations require that the agency's Office of Civil Rights "shall attempt to resolve complaints informally whenever possible." 40 C.F.R. § 7.120(d)(2)(i). That again imposes a duty *on EPA* to determine whether informal resolution is "possible." And here, there can be little doubt that EPA has always viewed informal resolution as "possible"—EPA repeatedly said the parties were having "a very productive discussion [and] negotiation," "really productive conversations," and the parties had "made a lot of progress." Seidemann Decl. ¶¶ 65, 69.

The upshot is that enforcement of Title VI disparate-impact mandates is necessarily governmental in nature—including determinations of whether voluntary compliance can be secured and whether informal resolution is possible. EPA must perform those duties and make the necessary determinations *itself*. It cannot constitutionally render itself subordinate to private groups in doing so.

## C.  EPA Has Violated The Non-Delegation Doctrine By Delegating Away Its Authority To Continue Informal Negotiations.

EPA has done precisely what the private non-delegation doctrine forbids by giving the Private Special Interest Groups veto power over continuation of informal negotiations/efforts to secure voluntary compliance past 180 days. Here, the question is not even whether EPA's "oversight is too limited," *National Horsemen*, 53 F.4th at 884—EPA does not have *any* oversight or control over whether the Private Special Interest Groups exercise their veto powers, and is at their complete mercy as to how they do so. The complete lack of oversight power *alone* violates the private non-delegation doctrine. *Id.*

But EPA's actions are worse than that. Rather than ensuring that the Private Special Interest Groups "'function[] subordinately'" to the agency, EPA instead has intentionally made itself subordinate to the private groups. *Id.* (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). If those groups command EPA to terminate informal negotiations after 180 days, EPA *must* obey without question. In doing so, EPA has violated the private non-delegation doctrine.

EPA has committed that very violation here. With the 180-day clock approaching in late February/early March 2023, EPA itself had determined that continued negotiations were warranted—*i.e.*, the agency had (1) "determined" that "voluntary" "compliance" could still potentially "be secured," 42 U.S.C. § 2000d-1 and (2) concluded that informal resolution was still "possible," 40 C.F.R. § 7.120(d)(2)(i). Seidemann Decl. ¶¶ 65, 69.

But EPA's own determinations were no longer sufficient. Instead, EPA reached out to the Private Special Interest Groups to receive their approval/non-veto. Seidemann Decl. ¶¶ 65-70; Exh. 17, 42. Only upon receiving their acquiesce was EPA permitted to act upon its own determinations and judgment as to how governmental power should be exercised. Seidemann Decl. ¶ 66; Exh. 13, 15. And that acquiescence was only achieved by horse trading non-public information, contrary to EPA's representations to the State. Seidemann Decl. ¶¶ 67-68. By rendering itself subordinate to the Private Special Interest Groups as to how to exercise its Title VI enforcement powers, EPA violated the Constitution.

### D.     The State's Injury Is Both An Accomplished Fact And Ongoing.

By seeking and receiving the approval of the Private Special Interest Groups in March 2023, EPA inflicted injury-in-fact upon the State. The Supreme Court has made clear that "'being subjected' to 'unconstitutional agency authority' … [constitutes] 'a here-and-now injury.'" *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903 (2023) (citations omitted); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) (holding that when an agency "violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court" (citation omitted)). The far-reaching effects of the constitutional violation is underscored by EPA's admission that it bargained non-public information to the Private Special Interest Groups to secure their non-veto in a quid-pro-quo. This injury constitutes irreparable harm since "that injury is impossible to remedy once the proceeding is over." *Axon Enterprise*, 143 S. Ct. at 903.

That injury is also both (1) an accomplished fact, since the State has endured proceedings in which EPA had unlawfully delegated governmental power to private groups and (2) ongoing, since the State has received several grants from EPA (and DOJ), and will be subject to unconstitutional proceedings for all future Title VI complaints that proceed to informal negotiations.

###### E.      EPA's "Total Discretion" Position Misapprehends The Agency's Authority.

In discussions with EPA, it appears that the agency believes that it has authority to delegate governmental power to the Private Special Interest Groups because the agency, in its view, possesses "total discretion" to continue or terminate informal negotiations/efforts to secure voluntary compliance. Indeed, Defendant Dorka twice repeated the "total discretion" position, dispelling any doubts as to how EPA perceives its own authority. Seidemann Decl. ¶¶ 60-62. Even if such discretion existed, the Executive has no discretion *whatsoever* to violate the Constitution, let alone "total" discretion. Such "total discretion" is the hallmark of totalitarian governments and absolute monarchies, and is not remotely compatible with our constitutional republic. The private non-delegation doctrine simply has no "discretion" exception.

Even if "total discretion" to violate the Constitution was a viable legal concept, EPA has grossly misapprehended its authority under Title VI and EPA's implementing regulations. Section 602 mandates that "*no such [enforcement] action shall be taken until* the department or agency … has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1 (emphasis added). Until EPA can make and has made such a determination, the agency possesses precisely *zero* discretion to terminate negotiations about voluntary compliance. Similarly, under its own regulations, EPA is without authority to terminate the informal resolution process until it determines that informal resolution is not "possible." 40 C.F.R. § 7.120(d)(2)(i). EPA's actions in extending the negotiation deadline concede its determination that informal resolution is, indeed, "possible."

Ultimately, EPA possesses neither its self-professed "total discretion" nor authority to violate

the Constitution even if it did. Furthermore, the agency's repeatedly expressed belief that it possesses "total discretion" underscores just how rogue the agency has gone.

### F. Application Of The 180-Day Deadline In 40 C.F.R. 7.115(c) Is Arbitrary And Capricious.

What remains is the vehicle by which EPA accomplished its unlawful delegation—a 180-day deadline. EPA long-ago conceded its "self-imposed [Title VI] regulatory deadlines are impracticable" and "arbitrary," and EPA specifically characterized the 180-day deadline of 40 C.F.R. § 7.115(c)(1) as "unrealistic." 80 Fed. Reg. 77,284, 77,287 (Dec. 14, 2015). The facts here make clear that EPA was correct: after receiving complaints on January 22, 2022, and February 2, 2022, EPA accepted those complaints for investigation on April 6, 2022. Exhs. 43-44. EPA did not issue a Letter of Concern until October 12, 2022. Exh. 11. And although EPA believed it was having "a very productive discussion [and] negotiation" with LDH and LDEQ, EPA made clear that it could not complete the informal resolution process before its self-imposed deadline. Hence the need for consent by the Private Special Interest Groups for EPA to continue negotiating. *See CARE*, 2018 WL 11434811. But EPA's concession that its deadline is arbitrary and unrealistic—and the facts proving that deadline is arbitrary and unrealistic as applied here—requires the deadline to be set aside.

## III. SECTION 602 DOES NOT AUTHORIZE DISPARATE-IMPACT MANDATES

By its own terms, Title VI does not impose any disparate-impact-based requirements. That much is incontestable. *Sandoval*, 532 U.S. at 280. Defendants' attempts to create an extra-textual disparate-impact mandate under Title VI by mere regulation fail because Section 602 gives them no power to do so. That conclusion is compelled by Title VI's plain text, and is reinforced by (1) the statutory context, (2) the applicable canons of construction, (3) the doctrine of constitutional avoidance, and (4) the major questions doctrine.

### A. The Plain Text Of Title VI Precludes Defendants' Imposition Of Disparate-Impact Mandates By Regulation.

This Court's inquiry should "begin, as always, with the text." *Esquivel-Quintana v. Sessions*, 137

S. Ct. 1562, 1568 (2017). Here, the text of Sections 601 and 602 unequivocally bar Defendants' interpretation that they can impose disparate-impact-based requirements by regulation.

Under binding precedent, it is indisputable that Section 601 "prohibits only intentional discrimination" by its own terms. *Sandoval*, 532 U.S. at 280.[1] Defendants' attempt to add an entirely new and distinct theory of liability in the form of disparate impact requirements does not "effectuate" Section 601, but rather transubstantiates it into something fundamentally different. Much as Defendants lack the power to transform water into wine, they do not possess the ability to transmute Title VI from an intentional-discrimination-only provision into a system of disparate-impact-based mandates.

> **1.      Disparate Impact Requirements Do Not "Effectuate" Title VI's Prohibition Purely On Intentional Discrimination.**

A fundamental problem for Defendants is that intentional discrimination and disparate impact theories are not mere variations of the same essential concept, but rather entirely distinct legal theories. EPA thus cannot "effectuate" the former by sweeping the latter into its scope.

The Supreme "Court has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). "Disparate treatment [*i.e.*, intentional discrimination] is the most easily understood type of discrimination. The [decision-maker] simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic. Liability in a disparate-treatment case depends on whether the protected trait ... actually motivated the [decision-maker] decision." *Id.* Such intentional discrimination is precisely—and *all* of—what Section 601 forbids. *Sandoval*, 532 U.S. at 280. And Section 601 is the *only* operative prohibition within Title

---

[1]  Although the Supreme Court has held otherwise, the best reading of Section 601 is that it bans *all* race-based classifications, rather than mirroring the Equal Protection Clause standard. *See, e.g.,* https://tinyurl.com/b4evyb9j. The State preserves this argument, but recognizes that this Court is bound by the Supreme Court's repeated holdings that Section 601 is coextensive with the Fourteenth Amendment.

VI, with all other provisions addressing matters such as enforcement and judicial review. *See* 42 U.S.C. § 2000d-2000d-7.

"By contrast, disparate-impact claims 'involve [challenged] practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business [or policy] necessity. Under a disparate-impact theory of discrimination, a facially neutral … practice may be deemed illegally discriminatory without evidence of the [decision-maker's] subjective intent to discriminate that is required in a 'disparate-treatment' case." *Raytheon*, 540 U.S. at 52-53 (cleaned up) (citations omitted).

Intentional discrimination and disparate impact are fundamentally distinct, and the Supreme Court has expressly admonished that agencies and "courts *must be careful to distinguish between these theories.*" *Id.* at 53 (emphasis added). But Defendants' regulations do nothing of the sort: rather than being "careful to distinguish" between intentional-discrimination and disparate-impact standards, their regulations obliterate the distinction by claiming that the former can be expanded so broadly as to swallow the latter. This is far beyond what Section 602's text will bear: "A regulation cannot 'effectuate' a statutory right by creating a new and different right." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003). And that is precisely what Defendants' regulations purport to do here.

That much follows from the ordinary meaning of "effectuate"—*i.e.*, "To cause; to make happen; bring about; effect; accomplish." "Effectuate," *American Heritage Dictionary* (1st ed. 1969). That definition admits of no power to *alter* Section 601 but instead limits agencies to taking actions that bring about or accomplish Section 601's prohibition on *intentional* discrimination. And it certainly supplies no license to compel fund recipients to take actions on race-conscious terms—*i.e.*, to engage in the very discrimination on the basis of race that Title VI forbids. Instead, the Equal Protection Clause and Title VI seek "to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017).

22

This conclusion is reinforced by the majority opinion in *Sandoval*, which noted "how strange it is to say that disparate-impact regulations are 'inspired by, at the service of, and inseparably intertwined with' § 601 *when § 601 permits the very behavior that the [disparate-impact] regulations forbid.*" 532 U.S. at 286 n.6 (citation omitted) (emphasis added). That strangeness stems from Defendants stretching "effectuate" well past its breaking point. Two judges on the Fifth Circuit have similarly cast severe doubt on the legality of Defendants' Title VI disparate-impact regulations. *Supra* at 3.

The unlawfulness of Defendants' disparate-impact regulations is further underscored by Section 602's restriction that implementing regulations must "be consistent with achievement of the objectives of the statute authorizing the financial assistance." 42 U.S.C. § 2000d-1. But Defendants' regulations presume that disparate-impact mandates are appropriate everywhere and always for *all* statutes, regardless of their true purposes—thus unlawfully reading that restriction out of Section 602. Defendants' regulations presume that Congress has *never* passed a single statute authorizing federal grants whose purpose is not "consistent" with disparate-impact mandates. That cannot be the law.

EPA, for example, has signaled that its intent is to "capture" and redistribute on race-based grounds environmental benefits. *See* Seidemann Decl. ¶¶ 42-43, 49-51. But the Clean Air Act is an *environmental* statute, not a free-ranging mandate for bureaucrats to "do equity" as they see fit. EPA's attempt to use Title VI to veto permits that comply with the CAA's environmental standards is not consistent with the CAA, particularly given the CAA is a "cooperative federalism" statute that gives states primacy. *See Luminant Gen. Co. v. E.P.A.*, 675 F.3d 917, 932 (5th Cir. 2012). The Safe Drinking Water Act—the source of some of the funds EPA relies on for jurisdiction, Seidemann Decl. ¶ 90— is similarly a "cooperative federalism" environmental statute that gives states primacy. *See In re Flint Water Cases*, 482 F. Supp. 3d 601, 622 (E.D. Mich. 2020) (citing *Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017)); *see also* Safe Drinking Water Act Amendments of 1996, Pub. L. 104-182 § 3, 110 Stat. 1613 (1996). EPA micromanagement is thus inconsistent with both statutes. And EPA tellingly does

not rule out accepting *worse* environmental outcomes so long as they avoid disparate impacts. EPA's disparate impact regulations thereby violate the consistency requirement of Section 602.

In the end, regulations are necessary invalid where they "attempt[] addition to the statute of something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359 (1957). But attempting to shoehorn disparate-impact standards into Section 601's intentional-discrimination-only prohibition, Defendants have done just that.

### 2.     Disparate Impact Requirements Frustrate Section 601's Prohibition Rather Than Effectuating It.

Intentional-discrimination and disparate-impact-based mandates are not merely *distinct* legal standards, however, but ones in severe tension with each other. Indeed, they often are in fundamental conflict—even outright "war"—with each other. *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 595-962009) (Scalia, J., concurring).

A prohibition on intentional racial discrimination mandates that decision-makers act without consideration of race. *See, e.g.*, *Raytheon*, 540 U.S. at 52. But disparate-impact standards often mandate the opposite: where an action would have a disparate impact, a decision-maker is often compelled to act intentionally on the basis of racial considerations to avoid the disparate impact. Disparate-impact regulations thus "require[e] [decision-makers] to evaluate the racial outcomes of their policies, and *to make decisions based on (because of) those racial outcomes*." *Ricci*, 557 U.S. at 594 (Scalia, J., concurring, emphasis added). For example, Title VII—which, unlike Title VI, has an *explicit statutory* disparate-impact requirement—"not only permits but affirmatively *requires* such actions [that discriminate on the basis of race] when a disparate-impact violation *would* otherwise result." *Id.* This severe tension between the standards further makes plain that Defendants' disparate-impact regulations do not "effectuate" Section 601's purpose, but rather obstruct and contravene it.

### 3. The Lack Of A Good-Faith Defense Underscores The Regulation's Invalidity.

The fundamental conflict between EPA's and DOJ's disparate-impact regulations and § 601 is also made obvious by a simple fact: provable absence of discriminatory intent is not a complete defense under Defendants' regulations. *See* 28 C.F.R. § 42.104(b)(2) (DOJ regulation, no such defense); 40 C.F.R. § 7.35(b), (c) (EPA regulation, same). Because Defendants' regulations allow liability even where a grant recipient can prove with certainty that it did not act on the basis of race, they necessarily go far beyond merely "effectuating" Section 601's intentional-discrimination-only prohibition.

Defendants' Title VI disparate-impact regulations purport to establish a standard equivalent to Title VII. *See, e.g.*, *New York Urb. League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995); *United States v. LULAC*, 793 F.2d 636, 648 (5th Cir. 1986). And Title VII notably "fail[s] to provide an affirmative defense for good-faith (i.e., nonracially motivated) conduct." *Ricci*, 557 U.S. at 595. Instead, it allows defenses such as "business necessity," rather than absence of discriminatory intent. *Id.*

DOJ guidance similarly makes plain that absence of discriminatory intent is *insufficient* to escape liability under its Title VI regulations: "In contrast to intentional discrimination cases … *a justification in a disparate impact case that merely dispels inferences of illegitimate intent is inadequate*." DOJ, Title VI Legal Manual, Section VII: Proving Discrimination – Disparate Impact, § VII.C.2 *available at* https://www.justice.gov/crt/fcs/T6Manual7 (emphasis added). In other words, proof of absence of discriminatory intent is *not* sufficient to preclude liability. EPA's guidance similarly explains that even where a grant recipient proves "a substantial justification for the challenged policy or decision" *and* proves that the justification is not "actually a pretext (excuse) for discrimination," then EPA will only "*likely find sufficient* evidence that the recipient has engaged in discrimination." *See* EPA Compliance Toolkit at 11 (emphasis added).

By providing for potential liability even where grant recipients can *prove* absence of discriminatory intent, Defendants' regulations have become completely unmoored from Section 601's

intentional-discrimination-only prohibition. Whatever those disparate-impact regulations are doing, they are not "effectuating" Section 601. Instead, they are creating something different entirely.

Because Title VI prohibits only intentional discrimination, it *cannot* lawfully establish liability where a grant recipient can prove it acted without discriminatory intent. Yet Defendants' disparate-impact regulations explicitly permit just that.

**B.    Statutory Context Confirms That Defendants Lack Authority to Issue Disparate-Impact Regulations.**

In addition to the plain text of Title VI, the statutory context confirms that Defendants lack authority to create disparate-impact standards. That is so for three reasons.

*First*, Title VII of the same Civil Rights Act provides a critical contrast. Unlike Title VI, Title VII includes *explicit* disparate impact language: it includes a prohibition on actions that "otherwise adversely affect … status as an employee, because of such individual's race," 42 U.S.C. § 2000e–2(a)(2), as well as an entire subsection unsubtly titled "burden of proof in disparate impact cases" that provides extensive detail on the precise contours of that disparate-impact standard, 42 U.S.C. § 2000e–2(k). Congress, however, provided *nothing* of the sort in the language of Title VI. That omission should be given effect. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

*Second*, the same principle applies to other civil rights statutes more broadly. The Fifth Circuit has specifically reasoned that "[w]hen Congress wants to allow disparate impact claims, it uses particular language." *Kamps*, 592 F. App'x at 285. *Kamps* then held that the ADA does not authorize disparate-impact requirements on that basis. *Id.* at 285-86. Title VI, like the ADA, has no such disparate-impact language and thus similarly cannot support disparate-impact requirements. That

much is made clear by *Kamps* grounding its holding on an explicit analogy to Title VI: "the ADA's prohibition is almost identical to Title VI [], which prohibits only intentional discrimination." *Id*

The Voting Rights Act ("VRA") is particularly illustrative. In its original iteration, section 2 of the VRA lacked disparate impact/effects language and the Supreme Court accordingly held that it then (like Title VI *now*) prohibited only intentional discrimination. *Brnovich v. DNC*, 141 S. Ct. 2321, 2331 (2021). Congress responded by adding explicit "results" language in the VRA, prohibiting some practices that "*result[]* in a denial or abridgement of the right" to vote. 52 U.S.C. § 10301(a) (emphasis added). But even with that express "results" language that explicitly goes beyond intentional discrimination, that was *still insufficient* to justify full-blown Title-VII-like disparate impact regulations. *See Brnovich*, 141 S. Ct. at 2340 ("We also do not find the disparate-impact model employed in Title VII and Fair Housing Act cases useful here…. Demanding such a tight fit" was unsupportable.). The Court thus expressly rejected such a "freewheeling disparate-impact regime." *Id.* at 2341.

Here, in contrast, the Supreme Court has held the language of Section 601 itself cannot impose *any* liability beyond intentionally discriminatory actions. *Sandoval*, 532 U.S. at 280-81. Yet Defendants have transformed Title VI into something that imposes requirements even more "freewheeling" and demanding of "tight fit[s]" than what the VRA §2 allows. *Brnovich*, 141 S. Ct. at 2340. That is untenable. If the explicit "results" language of VRA § 2 cannot support Title VII-like disparate-impact standards, then *a fortiori* neither can complete absence of any equivalent language in Section 601.

*Third*, the rest of Title VI itself provides strong evidence that Congress did not intend to give the Executive the awesome power to conjure entirely new disparate-impact requirements in the guise of merely "effectuating" Section 601's intentional-discrimination prohibition. Recognizing the staggering power that Title VI was conferring upon the Executive, Congress enacted an extraordinarily reticulated scheme for implementation and enforcement. 42 U.S.C. § 2000d-1. Such actions can be taken only if many, *many* safeguards are satisfied. Those protections include:

- Rules and regulations under Title VI must be "approved by the President.";

- Loss of funds applies only to "the particular political entity" and "particular program … in which … noncompliance has been so found.";

- The agency must give notice to "appropriate person … of the failure to comply" and that the agency has "determined that compliance cannot be secured by voluntary means.";

- The agency must first provide, *pre*-termination, a "fully written report of the circumstances and grounds for such action" to the "committees of the House and Senate having legislative jurisdiction."; and

- A prohibition on taking action "until thirty days have elapsed" from supplying those reports.

42 U.S.C. § 2000d-1.

Congress thus provided numerous, detailed, and extensive protections before the Executive can take *any* actions under Title VI against grant recipients, demonstrating that Congress was intent on constraining the Executive's power to implement and enforce Title VI. The prospect that the same Congress nonetheless conferred the enormous power to impose on grant recipients full-blown Title-VII-like disparate-impact mandates through an ancillary provision—which merely authorizes the Executive to "effectuate" Section 601—is fanciful.

"[W]hen Congress wishes to 'alter the fundamental details of a regulatory scheme,' as respondents contend it did here through delegation, we would expect it to speak with the requisite clarity to place that intent beyond dispute." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849 (2020) (citation omitted). "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not ... hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). Courts thus must "not presume that the act of delegation, rather than clear congressional command, [can] work[] [a] vast expansion of the" Executive's authority. *Cowpasture River*, 140 S. Ct. at 1849. But that is precisely what Defendants' disparate-impact regulations claim to do.

C.     **Defendants' Interpretation Contravenes Canons of Construction.**

Canons of statutory interpretation further confirm that Section 602 does not authorize Defendants to create disparate-impact mandates, including the (1) different/omitted words canon, (2) the federalism canon, (3) the presumption of good faith, and the (4) canon/doctrine of constitutional avoidance.

### 1.     Different/Omitted Words

The Supreme Court has repeatedly made clear that "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Similarly, "Congress's choice to depart from the model of a closely related statute is a choice neither [courts] nor the agency may disregard." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018).

This canon should control here: As set forth above (*supra* § II.A.2), Congress included explicit and detailed disparate-impacts language in Title VII and *nothing* of the sort for Title VI. Yet Defendants have not merely construed Title VI to impose *some* form of disparate-impact requirements, but to adopt the *same essential standard as Title VII*. Defendants have thus squarely violated this canon by giving differing words identical meanings.

Defendants may protest that they give effect to the differing language by reading Title VII to impose disparate-impact liability on its own but Title VI to give the Executive the option to do so. But if that was what Congress intended, why not just say *that*? That would be far clearer and more coherent than drafting two distinct titles with two different standards—only to give the Executive the option of obliterating those distinctions at will in the guise of "effectuating" one of the titles. "The fact that [Congress] did not adopt this readily available and apparent alternative strongly supports rejecting [Defendants'] reading." *Knight v. Commissioner*, 552 U.S. 181, 188 (2008). Here "we're left with

nothing but the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019).

### 2.    Federalism

Defendants' interpretation also flouts the federalism canon, under which federal courts "hesitate before interpreting the statute to effect such a substantial change in the balance of federalism unless that is the manifest purpose of the legislation." *Owasso Indep. Sch. Dist. v. Falvo*, 534 U.S. 426, 432 (2002). Extending Title VI to include disparate-impact requirements is precisely such a "substantial change." Intentional-discrimination and disparate-impact standards are fundamentally distinct, and extending Title VI to include the latter vastly expands the federal government's power over the States, particularly given ubiquity of federal grants.

This case exemplifies these very concerns. Not only does EPA's regulations and actions vastly expand federal power at the expense of the States, but further involves a level of attempted micro-management entirely inconsistent with our "system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see infra* § IV.B.

EPA's intrusion upon the States' authority is particularly problematic in the Clean Air Act context, where States are supposed to have "primary responsibility" for implementing the statute in permitting decisions. 42 U.S.C. § 7401(a)(3). Likewise in the Safe Drinking Water Act context. But EPA's aggressive exploitation of its disparate-impact regulations allow the agency to micro-manage those permitting decisions and act as the racially-motivated puppet-master pulling the States' strings whenever its notions of "equity" are offended.

### 3.    Presumption of Good Faith

Defendants' disparate-impact regulations also violate the "presumption of good faith," which federal courts accord "government actors [acting] in their sovereign capacity" *Sossamon v. Lone Star*

*State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd, 563* U.S. 277 (2011); *accord Abbott v. Perez,* 138 S. Ct. 2305, 2324 (2018) (same) *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 899 (8th Cir. 2020) ("Because state officials are presumed to act in good faith, the plaintiff has the burden of establishing the presence of discrimination.").

Defendants' disparate-impact regulations turn this presumption on its head: effectively presuming bad faith (*i.e.*, discriminatory intent) of State officials whenever there is a disparate impact, and shifting the burden of proof to the State to disprove discriminatory intent. *Ricci*, 557 U.S. at 578 (majority opinion). But they are worse than that: the presumption is effectively unrebuttable, since the State cannot defeat liability by proving that its actions were not motivated by discriminatory intent alone. *Id.* at 595 (Scalia, J., concurring); *supra* § III.A.3.

### 4.      Constitutional Avoidance

If "a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that [courts must] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted). As discussed next, application of Title VI to impose disparate-impact requirements on the States violates the Spending Clause. *Infra* § III.D.1. And the disparate-impact regulations raise at least severe doubts under the Equal Protection Clause. *Infra* § III.D.2. It is therefore incumbent on this Court to read Title VI to avoid such constitutional concerns—which it can readily do by giving "effectuate" its ordinary meaning, rather than Defendants' untenably expansive one.

The constitutional avoidance canon/doctrine has particular force in the administrative context, as the Supreme Court has demanded clear Congressional authorization "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001). "This requirement stems from [federal courts'] prudential desire not to needlessly reach constitutional issues and our

assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Id.* at 172-73.

For Defendants to possess the power they assert they would thus need to point to "clear indication that Congress intended that result." *Id.* at 172. A bare authorization to "effectuate" an intentional-discrimination-only prohibition in Section 601 is nothing of the sort.

### D. Defendants' Disparate Impact Regulations Violate The Spending Clause As Applied To The States And Raise Grave Constitutional Doubts More Generally.

Defendants' disparate-impact regulations implicate two distinct limitations on governmental power: the Spending Clause and the Equal Protection Clause. Defendants' regulations squarely violate the Spending Clause as applied to the States, because Title VI's plain text does not unambiguously authorize *any* disparate-impact-based requirements. Defendants' regulations also invite severe doubts as to whether their disparate-impact mandates comport with the Equal Protection Clause.

#### 1. Defendants' Regulations Violate The Spending Clause As Applied To The States.

Defendants' attempt to wield Section 602 to impose disparate-impact-based requirements on the States violates the Spending Clause because the text of Title VI does not establish—or even mention—any such requirements unambiguously. And, at a bare minimum, Defendants' attempt to impose such requirements on States creates severe constitutional doubts under the Spending Clause.

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory*, 501 U.S. at 457. The "Federal Government" is one of "limited powers" that are enumerated in the Constitution. *Id.* at 457. Today it is well-established that while Congress's Spending Clause power is "broad," it is subject to important limitations. *See, e.g.*, *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012) (Roberts, C.J.). In particular, if the federal government wishes to impose conditions on the States through spending programs—such as through Title VI—then those conditions must be "unambiguous" in the statute

32

itself. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987); *accord Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (States can be bound only to conditions under the Spending Clause where Congress has provided "clear notice regarding the liability at issue.").

The Supreme Court has recently and expressly applied these principles to Title VI. In *Cummings v. Premier Rehab Keller, P.L.L.C.*, the Court held that for Title VI (like other spending legislation): "'if Congress intends to impose a condition on the grant of federal moneys, *it must do so unambiguously.*'" 142 S. Ct. 1562, 1569-70 (2022) (citation omitted) (emphasis added). Based on these Spending Clause principles, the Court held that Title VI and similar statutes did not permit recovery of emotional distress damages, since those statutes did not provide unambiguous notice to the States that accepting federal funds would make them liable for such damages. *Id.* at 1570-76.

Much like emotional distress damages, Title VI does not provide the requisite unambiguous clarity that accepting federal funds will bind the States to disparate-impact-based mandates. Section 601 unambiguously forbids *only* intentional discrimination. *Sandoval*, 532 U.S. at 280. It thus fails to provide "unambiguous" notice to the States as to any other liability.

And even if, contrary to the other arguments offered here, Section 602's bare "effectuate" text could otherwise be read to supply authority to impose disparate-impact-based requirements at all, it certainly does not do so *unambiguously*. As a result, the States cannot be bound by the Executive's attempt to exploit Congress's Spending Clause power to impose disparate-impact-based requirements.

Nor can agencies supply the requisite unambiguous clarity for conditions. The Fifth Circuit has explicitly they lack constitutional authority to do so. *See Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361-62 (5th Cir. 2021) ("The needed clarity cannot be so provided [by regulation]—it must come directly from the statute."); *see also Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (adopting opinion of Luttig, J., dissenting at panel-stage).

2.     **Defendants' Disparate-Impact Mandates Invite Severe Doubts As To Their Constitutionality Under The Equal Protection Clause.**

Besides violating the Spending Clause, Defendants' disparate impact regulations fairly invite at least severe doubts as their constitutionality under the Equal Protection Clause. Under the doctrine of constitutional avoidance, federal courts are thus obliged to read Title VI not to convey authority to issue disparate-impact mandates and thereby avoid those constitutional concerns. *Supra* at 31.

As the Supreme Court has explained, "[s]erious constitutional questions ... might arise" if "liability were imposed based solely on a showing of a statistical disparity." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015). EPA's disparate-impact provisions require no more than a disparate "effect" 40 C.F.R. § 7.35(b), (c)—*i.e.*, bare statistical disparity alone. Similarly, DOJ's regulations require only disparate "effect." 28 C.F.R. § 42.104(b)(2). Defendants' disparate-impact regulations thus invite "serious constitutional questions." *Inclusive Communities*, 576 U.S. at 540. Indeed, EPA made clear that it was only looking at whether permitting decisions affected communities that have a higher percentage of minorities than the Parish or State as a whole. *See, e.g.*, Seidemann Decl. ¶¶ 32, 39; Exhs. 11 at 30-31; 15 at 2; 16 at 6; 38 at 5-6.

A comparison to *Parents Involved* makes clear the severe constitutional doubts that Defendants' disparate-impact regulations invite. There, Seattle schools used employed race-based criteria, in the form of a "'racial tiebreaker,'" to assign students to high schools to address disparate impacts resulting from the "effects of racially identifiable housing patterns on school assignments." 551 U.S. at 711-13.

The Supreme Court held outright that this use of the "racial tiebreaker" violated the Equal Protection Clause. *Id.* at 733-35. *Parents Involved* "reiterated that 'outright racial balancing' is 'patently unconstitutional.'" *Id.* at 730 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 307 (2003)) (plurality opinion). And it further condemned Seattle's approach of "working backward to achieve a particular type of racial balance," which was intended "to address the consequences of racially identifiable housing patterns" (*i.e.*, disparate impacts). *Id.* at 729-31.

34

The race-based decision-making here is at least as crude, heavy-handed, and constitutionally dubious as in *Parents Involved*. The use of race is no mere "tie-breaker" affecting only "a small number of [individuals]." *Id.* at 733 (majority opinion). Instead, "outright racial balancing" plays an overwhelming role in Defendants' disparate impact standards: from the very outset of identifying "disparate impacts" to the end of the inquiry considering whether there are "comparably effective alternative practices" that have racial distributional effects more to the Executive's liking. *See* EPA Compliance Toolkit at 8-9; *accord* DOJ, Title VI Legal Manual § 7, *supra* at 25.

Ultimately, from top-to-bottom and beginning-to-end, Defendants are overwhelmingly fixated on race and achieving desired "racial balancing." *Grutter*, 539 U.S. at 307; *see also id.* at 330 ("[O]utright racial balancing … is patently unconstitutional."). That overwhelming racial focus creates at least "serious doubt[s]" as to the constitutionality of regulations purporting to authorize it. *Jennings*, 138 S. Ct. at 843. Federal courts are therefore obliged to interpret Title VI to avoid those doubts. *See supra* §§ I.A, I.C.4.

### E.   The Major Questions Doctrine Further Establishes That Defendants Lack Power To Adopt Disparate-Impact Mandates Under Section 602.

The major questions doctrine puts the final nail in the disparate-impact regulations' coffin. That doctrine demands "'*clear congressional authorization*' for the power [the government] claims" when the question posed is a "major" one. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citation omitted) (emphasis added). The use of "effectuate" in Section 602 does not even arguably supply the requisite "clear congressional authorization." *Id.* The dispositive question thus becomes whether the power to create disparate-impact mandates is a "major" one.

It is. It presents issues of "vast 'economic and political significance'" that are the hallmark of the doctrine. *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air*, 573 U.S. at 324) (cleaned up). It further represents a "'transformative expansion in [the agency's] regulatory authority." *West Virginia*, 142 S. Ct. at 2610 (quoting *Utility Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 324

(2014)). EPA's disparate-impact regulations effectively transform the agency from one purely or largely concerned with environmental protection into a free-ranging, social-justice-warrior seeking to impose its vision of "justice" and "equity" upon the States and the American people. There simply is no indication that Congress intended to promote EPA from environmental protector into Philosopher-King, dispensing Solomonic-like judgments about justice and equity from on high.

Indeed, disparate-impact-authority issue unambiguously satisfies *all three* of the independent triggers for the major questions doctrine: (1) it involves a "matter of great political significance," (2) "it seeks to regulate a significant portion of the American economy," and (3) it "intrud[es] into an area that is the particular domain of state law." *West Virginia*, 142 S. Ct. at 2620-21 (Gorsuch, J., concurring) (cleaned up) (collecting cases).

*     *     *

The plain text of Section 602 does not authorize Defendants' disparate-impact regulations, which are accordingly unlawful. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). That conclusion is further supported by context, the canons of construction, the doctrine of constitutional avoidance given the patent Spending Clause and Equal Protection Clause concerns raised, and the major questions doctrine. This Court should accordingly hold that Defendants' disparate-impact mandates are unlawful and enter a preliminary injunction against enforcement of them.

While Defendants will undoubtedly contend otherwise, the State's request here is quite modest: the State merely seeks the ability to treat all of its citizens equally regardless of their race. That's it. The State will thus make permitting decisions free from any race-based considerations and without regard to where various racial groups fall within EPA's latest intersectionality pyramid.

The State in other words seeks to implement the Equal Protection Clause as it was intended: to "put an end to governmental discrimination on account of race," *Batson v. Kentucky*, 476 U.S. 79, 85

36

(1986), and to "rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." *Pena-Rodriguez,* 137 S. Ct. at 867.

The State enthusiastically endorses Section 601's prohibition on intentional racial discrimination and does not seek any relief against that laudable prohibition. But the State does object to Defendants' attempts to turn Section 601 on its head—*i.e.,* to exploit Congress's Spending Clause power and Title VI to *compel* the State to discriminate on the basis of race, all in the guise of "effectuating" a prohibition on racial discrimination. That is precisely backwards. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved,* 551 U.S. at 748. That principle, rather than Defendants' insatiable appetite for race-based decisionmaking, is what "effectuate[s]" Section 601's requirement that federal grant recipients "stop discriminating on the basis of race." *Id.*

## IV.   EPA LACKS AUTHORITY TO IMPOSE EXTRA-REGULATORY REQUIREMENTS

Finally, EPA's attempt to impose unauthorized requirements on the State under Title VI is also unlawful and should be enjoined.

### A.   EPA Can Only Create Requirements Under Title VI With Presidential Approval And Through Compliance With APA Procedures.

Agencies' authority to implement and enforce Title VI is subject to important limitations. Section 602 allows agencies to "issu[e] rules, regulations, or orders of general applicability" to implement and enforce Title VI. But the creation of such regulations is subject to several important constraints. Two are particularly important here. First, "No such rule, regulation, or order shall become effective unless and until approved by the President." 42 U.S.C. § 2000d-1. Second, creation of requirements under Title VI constitutes legislative rulemaking under the APA. *See, e.g., United Technologies Corp. v. EPA,* 821 F.2d 714, 719-20 (D.C. Cir. 1987) ("If … the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is

likely a legislative one."). The promulgation of legislative rules is subject to several important APA requirements, including compliance with notice-and-comment procedures. *See* 5 U.S.C. § 553.

Both DOJ's and EPA's disparate-impact regulations, which are contained in the Code of Federal Regulations, are generally the product of notice-and-comment rulemaking and have received presidential ratification. So far so good. If EPA had limited itself to enforcing requirements found within the four corners of their C.F.R. regulations, the State would have no basis to complain that the agency was violating either the presidential ratification or APA rulemaking requirements.

But that is not what EPA has done here. Instead, the agency has made plain that it intends to go far beyond what its actual regulations provide, and demand that the State comply with newly invented requirements found nowhere in those regulations. Such recently conceived requirements— hereinafter, "Extra-Regulatory Requirements"—have not been ratified by the President and are not the product of APA rulemaking. When EPA demands that the State comply with Extra-Regulatory Requirements, it violates Title VI and the APA. And that is just what EPA has done here.

### B.    EPA Has Attempted To Impose Extra-Regulatory Requirements On The State.

Throughout the informal negotiations, EPA has been clear that it has no intent to limit itself merely to what is found in its Title VI regulations. Instead, EPA has repeatedly demanded that the State submit to new requirements, of its own recent invention, which are neither the product of APA-compliant procedures nor have any indicia of being ratified by the President. While EPA's recent appetite for Extra-Regulatory Requirements knows few apparent bounds, three examples stand out as unequivocally unlawful.

*First*, EPA has demanded that LDEQ and LDH hold "community meetings" to address "perceived lack of community involvement." Seidemann Decl. ¶ 52; Exhs. 16 at 9, 20; 38 at 3, 9. Now such meetings may well be a good idea. But any requirement of holdings community meetings is not even conceivably an extension of EPA's disparate-impact regulations. Those regulations are *purely*

38

*substantive. See* 40 C.F.R. § 7.35. EPA's regulations do not address *procedures* whatsoever, and do not even arguably impose a single procedural requirement, let alone a specific requirement to hold "community meetings." *Id.* Perhaps EPA could create meeting requirements that "effectuate" Section 601 after complying with notice-and-comment rulemaking requirements and receiving presidential ratification. But EPA has done neither, and its attempt to do so here is manifestly *ultra vires* and unlawful.

*Second*, and relatedly, EPA has demanded that the State's speakers as such meetings be subject to EPA "protocols" and word-by-word fly-specking. Seidemann Decl. ¶¶ 52-54; Exhs. 16 at 20-22; 38 at 9-11. In particular, EPA has gone so far as to indicate that State officials be limited to reading from bullet points and expressing no other opinions. Seidemann Decl. ¶¶ 53-54. Even more concerning, EPA objected to State officials disagreeing with EPA's party-line position on contested scientific issues. *Id.* Rather, EPA demands that public statements by State agencies be subject to a "scientific integrity policy" approved by EPA, and that State agencies expressly adopt and follow EPA's policy for "Risk Communication". Exhs. 16 at 20-22; 38 at 9-11.

Again, EPA's regulations do not impose any such requirements. Its regulations are exceedingly short and purely substantive. 40 C.F.R. § 7.35(b)-(c). They say nothing about meetings, and they certainly say nothing about refraining from criticism of EPA in such meetings. *Id.* Moreover, a governmental requirement that grant recipients refrain from criticizing the granting agency is, *at best*, constitutionally dubious under the First Amendment. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

But EPA intends to make its own viewpoint the only acceptable orthodox speech, rendering all other viewpoints blasphemous and disqualifying from receiving federal funds.  It is quite doubtful

that any such requirement could ever pass muster under the First Amendment or the bedrock principles of federalism. And it is outrageous that EPA would ever even seriously contemplate that it has authority to impose such a "no critical speech" requirement. In the end, EPA's eagerness to impose non-criticism requirements is powerful evidence that the agency's ambitions are as lawless as its skin is thin.

*Third*, EPA has demanded that the State perform pre-decisional cumulative-impacts analysis akin to that required under the National Environmental Policy Act ("NEPA"). Seidemann Decl. ¶¶ 39-41, 48; Exhs. 16 at 3-9, 38 at 2-7. But EPA's regulations do not impose any such requirement, even though the analog NEPA-based requirements are explicitly spelled out by regulation, *see* 40 C.F.R. § 1508.1(g)(3), and the Supreme Court has made clear that such burdensome requirements cannot be imposed via general regulations, *Alexander v. Choate*, 469 U.S. 287, 307 & n.32 (1985). EPA thus stacks illegality upon illegality—*i.e.*, disparate cumulative impacts upon disparate-impact requirements that are not authorized at all. *See supra* § III. But even if EPA even theoretically had the authority to impose such requirements, it could only do so by complying with the APA and securing the necessary presidential approval. EPA has done neither.

The unlawfulness of EPA's actions are made apparent by two recent publications: (1) an August 2022 EPA publication: Exh. 46, *Interim Environmental Justice and Civil Rights in Permitting, Frequently Asked Questions ("2022 FAQ")* (Aug. 2022), and (2) a January 2023 document: Exh. 47, *EPA Legal Tools to Advance Environmental Justice: Cumulative Impacts Addendum ("2023 Cumulative Impacts Addenedum")*. Those documents, issued without notice-and-comment rulemaking, purport to spell out cumulative-impacts requirements that EPA seeks to impose. *See, e.g.*, 2022 FAQ at 12-13. These non-rule publications expressly attempt to import cumulative-impacts requirements from NEPA into the Title VI context, drawing an explicit analogy to "cumulative impacts in the NEPA context." *Id.*

These reports makes clear that EPA's attempt to impose cumulative-disparate-impacts-

analysis do not arise from EPA's Title VI disparate-impact regulations, which pre-date both recent publications. Nor does it arise from the ether either. Instead, EPA is flagrantly engaged in legislative rulemaking by inventing new cumulative impacts requirements without pretense of APA compliance or presidential ratification. That violates both Title VI and the APA.

## V.    THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED

### A.    The State Will Suffer Irreparable Harm Without An Injunction.

The States will suffer irreparable injury without a preliminary injunction for four reasons.

*First*, the States will suffer sovereign injury. As sovereigns within our federal system, the States have "the power to create and enforce a legal code" within their borders. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ("Snapp")*, 458 U.S. 592, 601 (1982). The State would prefer to exercise its sovereign authority by regulating in a race-neutral manner within its borders. Defendants' actions prevent it from doing so, thereby inflicting sovereign injury. Similarly, Defendants' Extra-Regulatory Requirements limit the State's ability to exercise its own sovereignty, and thereby inflict sovereign injury.

*Second*, the States have a sovereign right to unambiguous clarity in the conditions being imposed by federal grants. *See supra* § III.D.1. Because Title VI's plain text fails to provide unambiguous clarity that accepting federal funds will compel the State to accept disparate-impact-based requirements, Defendants' actions inflict sovereign injury. *See, e.g., Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022).

*Third*, Defendants' unconstitutional actions that violate the private non-delegation doctrine inflict "'here-and-now injury.'" *Axon*, 143 S. Ct. at 903 (citations omitted); *see also supra* § II.D.

*Fourth*, Defendants' disparate-impact regulations and Extra-Regulatory Requirements would create compliance costs for the States. And due to due to sovereign immunity, the States cannot recover damages from the federal government. Those irrecoverable injuries thus constitute irreparable

harm. *See, e.g., Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016); *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020).

### B.      The Balance of Harms and Public Interest Support he State.

Finally, the balance of harms and public interest, which merge here,[2] support the State. "The 'public interest is in having governmental agencies abide by the federal laws that govern their existence and operations.' And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up). The public interest thus favors enjoining Defendants' illegal actions and regulations.

The public interest is further served by serving the purposes of the Fourteenth Amendment. The State here seeks to treat all of its citizens equally, without considering their race. Defendants' attempts to compel the States to make distinctions on the basis of race serve neither the Fourteenth Amendment nor the public interest. *Supra* at 33-35.

### CONCLUSION

For the foregoing reasons, this Court should grant the State's Motion for a Preliminary Injunction.

---

[2] *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party.").

Dated:   June 21, 2023

Respectfully submitted,

By: */s/ Joseph S. St. John*

DREW C. ENSIGN *
  Special Assistant Solicitor General
  * *Pro Hac Vice forthcoming*
202 E. Earll Drive
Suite 490
Phoenix, AZ 85004
drewensignlaw@gmail.com

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
TRACY SHORT (La #23940)
  Assistant Attorney General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

## APPENDIX

### 42 U.S.C. 2000d

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

### 42 U.S.C. 2000d-1

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of **section 2000d** of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however*, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

**28 C.F.R. § 42.104**

Discrimination prohibited

(a) General. No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this subpart applies.

(b) Specific discriminatory actions prohibited.

(1) A recipient to which this subpart applies may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin:

(i) Deny an individual any disposition, service, financial aid, or benefit provided under the program;

(ii) Provide any disposition, service, financial aid, or benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any disposition, service, financial aid, or benefit under the program;

(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program;

(v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership, or other requirement or condition which individuals must meet in order to be provided any disposition, service, financial aid, function or benefit provided under the program; or

(vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program (including the opportunity to participate in the program as an employee but only to the extent set forth in paragraph (c) of this section).

(vii) Deny a person the opportunity to participate as a member of a planning or advisory body which is an integral part of the program.

(2) A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

App-2

(3) In determining the site or location of facilities, a recipient or applicant may not make selections with the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program to which this subpart applies, on the ground of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act or this subpart.

(4) For the purposes of this section the disposition, services, financial aid, or benefits provided under a program receiving Federal financial assistance shall be deemed to include all portions of the recipient's program or activity, including facilities, equipment, or property provided with the aid of Federal financial assistance.

(5) The enumeration of specific forms of prohibited discrimination in this paragraph and in paragraph (c) of this section does not limit the generality of the prohibition in paragraph (a) of this section.

(6)(i) In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination.

(ii) Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin.

(c) Employment practices.

(1) Whenever a primary objective of the Federal financial assistance to a program to which this subpart applies, is to provide employment, a recipient of such assistance may not (directly or through contractual or other arrangements) subject any individual to discrimination on the ground of race, color, or national origin in its employment practices under such program (including recruitment or recruitment advertising, employment, layoff, or termination, upgrading, demotion, or transfer, rates of pay or other forms of compensation, and use of facilities). That prohibition also applies to programs as to which a primary objective of the Federal financial assistance is (i) to assist individuals, through employment, to meet expenses incident to the commencement or continuation of their education or training, or (ii) to provide work experience which contributes to the education or training of the individuals involved. The requirements applicable to construction employment under any such program shall be those specified in or pursuant to part III of Executive Order 11246 or any Executive order which supersedes it.

(2) In regard to Federal financial assistance which does not have providing employment as a primary objective, the provisions of paragraph (c)(1) of this section apply to the employment practices of the recipient if discrimination on the ground of race, color, or national origin in such employment practices tends, on the ground of race, color, or national origin, to exclude persons from participation in, to deny them the benefits of or to subject them to discrimination under the program receiving Federal financial assistance. In any such case, the provisions of paragraph (c)(1) of this section shall apply to the extent necessary to assure equality of opportunity to and nondiscriminatory treatment of beneficiaries.

App-3

**40 C.F.R. § 7.35**

Specific prohibitions.

(a) As to any program or activity receiving EPA assistance, a recipient shall not directly or through contractual, licensing, or other arrangements on the basis of race, color, national origin or, if applicable, sex:

    (1) Deny a person any service, aid or other benefit of the program or activity;

    (2) Provide a person any service, aid or other benefit that is different, or is provided differently from that provided to others under the program or activity;

    (3) Restrict a person in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, aid, or benefit provided by the program or activity;

    (4) Subject a person to segregation in any manner or separate treatment in any way related to receiving services or benefits under the program or activity;

    (5) Deny a person or any group of persons the opportunity to participate as members of any planning or advisory body which is an integral part of the program or activity, such as a local sanitation board or sewer authority;

    (6) Discriminate in employment on the basis of sex in any program or activity subject to section 13, or on the basis of race, color, or national origin in any program or activity whose purpose is to create employment; or, by means of employment discrimination, deny intended beneficiaries the benefits of EPA assistance, or subject the beneficiaries to prohibited discrimination.

    (7) In administering a program or activity receiving Federal financial assistance in which the recipient has previously discriminated on the basis of race, color, sex, or national origin, the recipient shall take affirmative action to provide remedies to those who have been injured by the discrimination.

(b) A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, national origin, or sex.

(c) A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program or activity to which this part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.

(d) The specific prohibitions of discrimination enumerated above do not limit the general prohibition of § 7.30.