# Exhibit A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C. 20460**

**Office of Environmental Justice and External Civil Rights**

June 27, 2023

**In Reply Refer to:**
EPA Complaint Nos. 01R-22-R6 and 04R-22-R6

Roger Gingles, Secretary
Louisiana Department of Environmental Quality
602 North Fifth Street
Baton Rouge, LA  70802
officesec@la.gov
roger.gingles@la.gov

**Re: Administrative Closure EPA Complaint Nos. 01R-22-R6 and 04R-22-R6**

Dear Secretary Gingles:

This letter is to advise you that the U.S. Environmental Protection Agency (EPA), Office of Environmental Justice and External Civil Rights, Office of External Civil Rights Compliance (OECRC) has closed its investigation of a complaint filed by Earthjustice and the Lawyers' Committee for Civil Rights Under Law on behalf of Concerned Citizens of St. John and Sierra Club (No. 01R-22-R6), and a complaint filed by Tulane Environmental Law Clinic on behalf of Stop the Wallace Grain Terminal, Inclusive Louisiana, RISE St. James, and the Louisiana Bucket Brigade (No. 04R-22-R6).[1] These Complaints allege civil rights violations by the Louisiana Department of Environmental Quality (LDEQ) involving its program for air pollution regulation. As explained below, based on information now available including multiple significant developments, OECRC is closing these Complaints administratively as of the date of this letter.[2]  As a result of its administrative closure, EPA will not initiate under Title VI or other civil rights laws any further action, enforcement or otherwise, in response to these Complaints.

On April 6, 2022, OECRC initiated an investigation of the Complaints under the authority of federal civil rights laws, including Title VI of the Civil Rights Act of 1964 (Title VI), and EPA's implementing regulation at 40 C.F.R. Parts 5 and 7.  OECRC accepted for investigation the following issues:

---

[1] These two complaints collectively are called "the Complaints," and their complainants collectively are called "the Complainants."
[2] U.S. EPA, Office of External Civil Rights Compliance (formerly, External Civil Rights Compliance Office) *Case Resolution Manual*, available at https://www.epa.gov/sites/default/files/2021-01/documents/2021.1.5_final_case_resolution_manual_.pdf.  See Section 2.5 (prudential administrative closure).

Secretary Gingles P a g e | 2

1. Whether LDEQ uses criteria or methods of administering its air pollution control program that have the intent and/or effect of subjecting persons to discrimination on the basis of race in violation of Title VI of the Civil Rights Act of 1964 and EPA's implementing regulation at 40 C.F.R. Part 7 §§ 7.30 and 7.35, including, but not limited and with respect to:
    a. LDEQ's acts or failures to undertake certain actions related to the Denka[3] facility in connection with its air pollutant emissions, and the predominantly Black residents of St. John the Baptist Parish; and
    b. LDEQ's decision to reaffirm issuance of 14 new air permits for the Formosa[4] facility, and the predominantly Black residents of St. James Parish.

2. Whether LDEQ has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that all recipients of federal assistance must have in place to comply with their general nondiscrimination obligations, including specific policies and procedures to ensure meaningful access to LDEQ services, programs, and activities, for individuals with limited English proficiency (LEP) and individuals with disabilities, and whether LDEQ has a public participation policy and process that is consistent with Title VI and the other federal civil rights laws, and EPA's implementing regulation at 40 C.F.R. Parts 5 and 7.2.

On October 12, 2022, OECRC issued a Letter of Concern to LDEQ and the Louisiana Department of Health (LDH) to convey the results of its initial fact finding and analysis of civil rights issues raised in the two Complaints concerning LDEQ and a third complaint concerning LDH.[5] The Letter of Concern helped inform and facilitate the subsequent Informal Resolution Agreement (IRA) process for EPA, LDEQ and LDH to seek an informal resolution of each complaint.[6] It did not specifically address whether LDEQ has been implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7,[7] but indicated that OECRC found several

---

[3] Denka Performance Elastomer, LLC. in LaPlace, Louisiana.

[4] FG LA, LLC (Formosa) facility in St. James Parish, Louisiana.

[5] OECRC's investigation of these complaints was conducted under the authority of the federal civil rights laws, including Title VI, and EPA's implementing regulation at 40 C.F.R. Parts 5 and 7, and consistent with the January 2021 *Case Resolution Manual* available at https://www.epa.gov/sites/default/files/2021-01/documents/2021.1.5_final_case_resolution_manual_.pdf.

[6] *See* 40 CFR § 7.120(d)(2) (informal resolution).

[7] *See* Title VI, 42 U.S.C. 2000(d) *et seq.*; Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; *Lau v. Nichols*, 414 U.S. 563, 568-69 (1974) (finding that the government properly required language services to be provided under a recipient's Title VI obligations not to discriminate based on national origin); 40 C.F.R. § 7.35(a). See also U.S. EPA, *Guidance to Environmental Protection Agency Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons.* 69 Fed. Reg. 35602 (June 25, 2004) (available at https://www.epa.gov/sites/production/files/2020-02/documents/title_vi_lep_guidance_for_epa_recipients_2004.06.25.pdf); U.S. EPA, *Title VI Public Involvement Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs*, 71 Fed. Reg. 14207 (Mar. 21, 2006) (available at https://www.epa.gov/sites/production/files/2020-02/documents/title_vi_public_involvement_guidance_for_epa_recipients_2006.03.21.pdf); U.S. EPA, *Procedural Safeguards Checklist for Recipients* (rev. Jan. 2020) (available at https://www.epa.gov/sites/production/files/2020-02/documents/procedural_safeguards_checklist_for_recipients_2020.01.pdf (which provides a more detailed explanation of nondiscrimination obligations and best practices); U.S. EPA, *Disability Nondiscrimination Plan Sample* (2017) (available at https://www.epa.gov/sites/production/files/2020-02/documents/disability_nondiscrimination_plan_sample_for_recipients_2020.01.pdf).

Secretary Gingles P a g e | 3

deficiencies in LDEQ's nondiscrimination programs. The Letter of Concern stated OECRC would discuss those with LDEQ as part of the IRA process.

EPA, LDEQ and LDH[8] actively engaged in regular IRA negotiations for several months to discuss draft provisions for Informal Resolution Agreements, including to address recommendations OECRC made in its Letter of Concern and deficiencies regarding LDEQ's procedural safeguards. EPA also met with Complainants to provide status updates on the IRA negotiations, and Complainants provided comments on two draft versions of an Informal Resolution Agreement.

For these Complaints,[9] EPA must issue preliminary findings or otherwise resolve the allegations accepted for investigation within 180 days of acceptance, unless EPA, the Complainants, LDEQ, and LDH agree to an extension of time. EPA, the Complainants, LDEQ, and LDH have agreed to a series of three extensions to allow EPA, LDEQ, and LDH to pursue negotiated IRAs by July 11, 2023. The IRA negotiations proceeded as described above. As of the date of this letter, however, the negotiations have not resulted in IRAs. EPA has not received LDEQ's response to the majority of the provisions in the second draft IRA that EPA shared on May 18, 2023. OECRC assesses that it is not feasible to reach agreement for an IRA by July 11, 2023.

**EPA Complaint No. 01R-22-R6, Issue 1. a.**

The complaint alleged that the concentration of chloroprene emissions from the Denka facility in Reserve, Louisiana posed increased lifetime cancer risks for nearby residents.

OECRC's Letter of Concern representing its initial fact finding and analysis stated that, under LDEQ's air permitting program, the Denka facility regularly exposed nearby residents and children who attended St. John the Baptist Parish's Fifth Ward Elementary School to average annual concentrations of chloroprene in ambient air at levels associated with increased lifetime cancer risk. The Letter indicated that one hundred in one million (100-in-1 million) generally represents the upper bound of acceptability for estimated excess cancer risk over a 70-year lifetime.[10] The Letter also indicated that residents of neighborhoods surrounding the Denka facility were routinely exposed to chloroprene concentrations that placed them at greater than an estimated 100-in-1 million risk of developing chloroprene-linked cancers over a 70-year lifetime.

---

[8] Per its request, the Louisiana Department of Justice also participated in the IRA negotiations.
[9] 40 C.F.R. §§ 7.115(c), 7.120. In *Californians for Renewable Energy (CARE), et al. v. EPA,* Case No. 4:15-cv-03292-SBA, as relevant here, the U.S. District Court for the Northern District of California ordered that, for any Title VI complaint submitted by a CARE Plaintiff and accepted for investigation, EPA must issue preliminary findings or otherwise resolve the complaint within 180 days of the date of acceptance, "subject to any extension agreement between the complainant and the party complained against under 40 C.F.R. § 7.120." *Amended Judgment (October 2, 2020).* CARE Plaintiff Sierra Club is a complainant as to a portion of the Complaints.
[10] As set forth in the *Residual Risk Report to Congress*, EPA will "consider the extent of the estimated risk if an individual were exposed to the maximum level of a pollutant for a lifetime, i.e., maximum individual risk (MIR)." "The EPA will generally presume that if the risk to that individual is no higher than approximately 1 in 10 thousand [i.e., 100-in-1 million], that risk level is considered acceptable and EPA then considers the other health and risk factors to complete an overall judgment on acceptability." U.S. EPA, https://www.epa.gov/sites/default/files/2013-08/documents/risk_rep.pdf, page B-4.

Secretary Gingles P a g e | **4**

Separate and apart from its Title VI authorities, EPA has taken a series of significant actions directed at or otherwise resulting in reducing the impacts of chloroprene emissions from the Denka facility.

First, on December 20, 2022, EPA issued a consent agreement and final order (CAFO) under the Resource Conservation and Recovery Act (RCRA) ordering Denka to improve waste management practices to lower chloroprene emissions.

Second, on February 28, 2023, EPA filed in federal court a Clean Air Act (CAA) § 303 civil complaint against Denka to compel immediate measures to eliminate the imminent and substantial endangerment posed by its chloroprene emissions and address and mitigate the harm to public health. EPA's CAA § 303 civil complaint and OECRC's Letter of Concern relied on data from the same chloroprene monitors and reached similar conclusions about cancer risk to residents living near Denka due to chloroprene emissions.

Third, and more broadly, on April 25, 2023, EPA published a proposed rule under Section 112 of the CAA[11] to significantly reduce emissions of toxic and other harmful air pollutants, including chloroprene and ethylene oxide (EtO), from Denka and other chemical plants nationwide. EPA's proposed rule would reduce by 96% the number of people with elevated excess lifetime cancer risk due to breathing air toxics near these chemical plants. EPA is required by court order, issued by the District Court of the District of Columbia in Texas Environmental Justice Advocacy Services, et. al. v. Regan, No. 1:20-cv-07733, to issue a final rule by March 29, 2024.

Fourth, for the community near the Denka Facility in particular, based on EPA's fact finding regarding the significant pollution exposure for this community, EPA plans to conduct a cumulative impact assessment (CIA) in this area.[12] This analysis, which is not under Title VI and would not impose any obligations on the State agencies, will include the totality of exposures to combinations of chemicals and non-chemical stressors and their effects on health, well-being, and quality of life outcomes. A CIA is a process of evaluating various types of data, including health and environmental data, at the same time to inform a decision. It helps characterize the current baseline cumulative health risks and burdens, and the potential state of vulnerability or resilience of a community.

The first step of the CIA process will be to convene a multi-stakeholder workgroup of locally affected parties that will create a charter. The charter will describe roles, responsibilities, goals of the CIA, deliverables, and timeline for those deliverables. Community participation is critical to identifying problems and potential intervention and decision points to improve community health and well-being. Participation by LDEQ and LDH, while not required, would be valuable in identifying problems and potential intervention and decision points to improve community health and well-being. EPA has invited LDEQ and LDH to participate. EPA is in the process of organizing the EPA resources that will be devoted to the CIA.

---

[11] *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 F.R. 25080 (April 25, 2023).
[12] This CIA is consistent with EPA's purpose and functions as reflected in 40 CFR §1.3. See also, e.g., Clean Air Act § 103; Clean Water Act § 104; and Resource Conservation and Recovery Act § 8001.

Secretary Gingles P a g e | **5**

The main work of the CIA will be to review and analyze available data to assess priority baseline exposures to both chemical and non-chemical stressors and effects of concern in the community. The CIA will identify and recommend, but not require, decision alternatives for mitigation that address stakeholder goals and assess projected effectiveness of different decision alternatives for meeting those goals. The CIA report will be a plain language report that includes the purpose of the CIA and the analytical methods used; a prioritization of exposures and effects to mitigate; a description of the development and assessment of decision alternatives; a summary of the main findings; voluntary recommendations for prioritized mitigation actions; potential implementation steps and estimated timelines; and voluntary recommendations for monitoring to ensure that the goals are being met.

Finally, to promote greater transparency regarding inspections of the Denka facility and actions taken because of the inspections, EPA Region 6 provides a variety of information on its public website *LaPlace, St. John the Baptist Parish, Louisiana* (https://www.epa.gov/la/laplace-st-john-baptist-parish-louisiana), including final RCRA inspection reports; the RCRA CAFO; air monitoring data; and EPA's CAA §303 imminent and substantial endangerment civil complaint.

In sum, based on the totality of actions discussed above, OECRC is administratively closing its investigation and no further action will be taken regarding Issue 1. a. under Title VI.[13]

**EPA Complaint No. 04R-22-R6, Issue 1. b.**

On September 16, 2019, RISE St. James, Louisiana Bucket Brigade, Sierra Club, Center for Biological Diversity, Healthy Gulf, Earthworks, No Waste Louisiana, and 350 New Orleans petitioned EPA to object to LDEQ's draft Title V air operating permit for the planned Formosa facility. This Title V petition is still pending. Complainants were particularly concerned with proposed Ethylene oxide (EtO) emissions from the planned facility. On September 8, 2022, Louisiana's 19th Judicial District Court Parish of East Baton Rouge in *Rise St. James et al. v. LDEQ,* Docket No. 694,029, vacated the Formosa permits issued by LDEQ and remanded them to LDEQ. LDEQ has appealed that decision.

After careful consideration, OECRC has determined that, given the pending state court litigation, whether and when the Formosa facility will receive the permits, and the levels of EtO and other hazardous air pollutants it will be allowed to emit, OECRC is administratively closing its investigation and no further action will be taken regarding Issue 1. b. under Title VI.[14]

**Procedural Safeguards, Issue 2**

LDEQ expressed interest in addressing its procedural safeguards, including through the recommendations identified by OECRC during Informal Resolution Agreement discussions. OECRC is available to work with and provide voluntary technical assistance to LDEQ to address its procedural safeguards. OECRC is administratively closing its investigation of Issue 2.[15]

---

[13] *See Case Resolution Manual*, at Section 2.5.
[14] *Id.*
[15] *Id.*

Secretary Gingles P a g e | **6**

**Conclusion**

Based on the information discussed above, OECRC is administratively closing EPA Complaint Nos. 01R-22-R6 and 04R-22-R6 as of the date of this letter. This letter sets forth EPA's final disposition of EPA Complaint Nos. 01R-22-R6, and 04R-22-R6. This letter is not a formal statement of EPA policy and should not be relied upon, cited, or construed as such.

If you have any questions, please feel free to contact me at dorka.lilian@epa.gov, or (202) 564-9649.

               Sincerely,

               Lilian S. Dorka
               Deputy Assistant Administrator
                for External Civil Rights

cc: Ariadne Goerke
   Deputy Associate General Counsel
   Civil Rights & Finance Law Office

   Stacey Dwyer
   Deputy Regional Administrator
   Deputy Civil Rights Official
   US EPA Region 6

   James McGuire
   Regional Counsel
   US EPA Region 6

   Courtney Burdette
   Executive Counsel, LDEQ
   Courtney.Burdette@LA.GOV

   Stephen Russo, Secretary
   Louisiana Department of Health
   Stephen.Russo@LA.GOV

   Ryan Seidemann
   Assistant Attorney General
   Louisiana Department of Justice
   SeidemannR@ag.louisiana.gov