**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

THE STATE OF LOUISIANA,

                Plaintiff,

      v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

                Defendants.

No. 2:23-cv-00692-JDC-KK

**DEFENDANTS' COMBINED MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................3

I.     STATUTORY AND REGULATORY BACKGROUND ..........................................3

    A.    Title VI of the Civil Rights Act of 1964 ............................................................3

    B.    Agency Regulations Prohibiting Unjustified Discriminatory Effects ...............4

    C.    EPA's Process for Title VI Complaint Investigations ......................................6

II.    FACTUAL BACKGROUND ..................................................................................8

III.   THIS LITIGATION .............................................................................................10

ARGUMENT ....................................................................................................................11

I.     THE COURT LACKS SUBJECT MATTER JURISDICTION. ..............................11

    A.    Plaintiff's claims suffer from a lack of Article III standing or are unripe. ........11

        1.    Plaintiff lacks standing for its nondelegation claims (Counts I and II)……........................................................................................................12

        2.    Plaintiff lacks standing to challenge EPA's disparate-impact regulations (Counts III and V). .............................................................16

        3.    Plaintiff lacks standing to challenge DOJ's disparate-impact regulations (Counts IV and V). .............................................................22

        4.    Plaintiff lacks standing to challenge EPA's alleged attempt to impose "extra-regulatory requirements" (Count VI)......................................22

        5.    Plaintiff lacks standing to challenge EPA's "parallel track" proceedings (Count VII). ...................................................................23

    B.    The closure of the challenged Title VI complaints renders moot any claims for which Plaintiff may have once had standing. ...............................................24

    C.    The Court lacks jurisdiction to review Counts II-VII because Congress provided an adequate, alternative path for judicial review. ................................27

    D.    Plaintiff identifies no timely final agency action for any of its APA claims.........29

        1.    Plaintiff identifies no timely final agency action for its APA challenges to the EPA and DOJ disparate-impact regulations (Counts III and IV)……........................................................................29

2.      Plaintiff identifies no reviewable "final agency actions" for its nondelegation and "parallel track" APA claims (Counts II and VII). ............32

3.      To the extent Plaintiff's "extra-regulatory requirements" claim asserts an APA violation, it identifies no final agency action (Count VI). .................34

4.      Plaintiff cannot evade the APA's finality requirement by invoking equitable non-statutory ultra vires causes of action. ...........................35

II.     PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS ON EACH CLAIM. ...................................................35

A.      Plaintiff's nondelegation claims are meritless (Counts I and II)...................36

B.      Plaintiff's claims challenging Defendants' disparate-impact regulations are meritless (Counts III, IV, and V). ..................................................................39

1.      The Supreme Court has recognized the validity of Defendants' disparate-impact regulations, which are amply supported by Title VI's broad delegation of rulemaking power, its legislative history, the agencies' consistent and reasonable interpretation, and congressional ratification. ............................................................................................39

2.      Plaintiff's contrary arguments have no merit.......................................44

C.      Plaintiff's challenge to DOJ's alleged failure to publish a Title VI rule in 2021 is meritless (Count IV)..............................................................................50

D.      Plaintiff's "extra-regulatory requirements" claim is meritless (Count VI)...................50

E.      Plaintiff's claim that EPA proceeding on "parallel tracks" in response to a Title VI complaint violates the APA should be dismissed (Count VII)......................51

F.      Plaintiff's claims against the President should be dismissed. .........................53

III.    PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED..............................................................................................................54

A.      Plaintiff fails to establish irreparable harm absent a preliminary injunction...............55

1.      Plaintiff's fifty-year delay in bringing suit disproves irreparable harm…...................................................................................................56

2.      Plaintiff's asserted injuries are neither imminent nor irreparable. ..................57

B.      The balance of the equities and public interest factors do not support a preliminary injunction. ...................................................................................59

CONCLUSION................................................................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Acker v. EPA,*
   290 F.3d 892 (7th Cir. 2002) ................................................................. 31

*Alexander v. Choate,*
   469 U.S. 287 (1985) ...................................................................... 5, 40

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) .................................................................. 5, 39, 40

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982) ......................................................................... 16

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
   878 F.2d 806 (5th Cir. 1989) ............................................................... 54

*Am. Airlines, Inc. v. Hermann,*
   176 F.3d 283 (5th Cir. 1999) ............................................................... 35

*Am. Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) ........................................................................ 35

*Arizona v. Yellen,*
   34 F.4th 841 (9th Cir. 2022) ........................................................... 17, 58

*Ark. Project v. Shaw,*
   775 F.3d 641 (5th Cir. 2014) ............................................................... 59

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................... 36

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
   178 F.3d 350 (5th Cir. 1999) ............................................................... 23

*Audubon Life Ins. Co. v. FTC,*
   543 F. Supp. 1362 (M.D. La. 1982) ......................................................... 57

*Auer v. Robbins,*
   519 U.S. 452 (1997) ....................................................................... 53

*Axon Enterprises, Inc. v. FTC*
   143 S. Ct. 890 (2023) .................................................................. 13, 27

*Bain v. California Tchrs. Ass'n,*
   891 F.3d 1206 (9th Cir. 2018) .............................................................. 26

*Bank of La. v. FDIC,*
   919 F.3d 916 (5th Cir. 2019) ............................................................... 28

*Barnhart v. Walton*,
  535 U.S. 212 (2002) ............................................................................................... 42

*Bazzrea v. Mayorkas*,
  --- F. Supp. 3d ----, No. 3:22-cv-265, 2023 WL 3958912 (S.D. Tex. June 12, 2023) ..................... 26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 36

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) ............................................................................................ 56

*Bennett v. Kentucky Dep't of Educ.*,
  470 U.S. 656 (1985) ............................................................................................... 47

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................... *passim*

*Bluefield Water Ass'n v. City of Starkville*,
  577 F.3d 250 (5th Cir. 2009) ..................................................................................... 55

*Boire v. Pilot Freight Carriers, Inc.*,
  515 F.2d 1185 (5th Cir. 1975) ............................................................................... 56, 57

*Bowen v. Mass.*,
  487 U.S. 879 (1988) ............................................................................................... 29

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021) ..................................................................................... 42

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
  345 F.3d 347 (5th Cir. 2003) ..................................................................................... 49

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*,
  468 U.S. 491 (1984) ............................................................................................... 20

*Bruni v. Hughs*,
  468 F. Supp. 3d 817 (S.D. Tex. 2020) ............................................................................. 16

*Burkhart v. Univ. Interscholastic League*,
  No. 1:22-CV-1026-RP, 2023 WL 2940026 (W.D. Tex. Apr. 13, 2023) .................................................. 55

*California v. Texas*
  141 S. Ct. 2104 (2021) ............................................................................................ 18

*Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*,
  No. 1:23-CV-433-RP, 2023 WL 4291992 (W.D. Tex. June 30, 2023) .............................................. 55, 59

*Carr v. Saucier*,
  582 F.2d 14 (5th Cir. 1978) ...................................................................................... 25

*Cay v. Estelle*,
   789 F.2d 318 (5th Cir. 1986) ............................................................................... 53

*Charles v. Verhagen*,
   348 F.3d 601 (7th Cir. 2003) ............................................................................... 47

*City of Hearne v. Johnson*,
   929 F.3d 298 (5th Cir. 2019) ........................................................................ 23, 24

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................... *passim*

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ............................................................................... 21

*Ctr. for Individual Freedom v. Carmouche*,
   449 F.3d 655 (5th Cir. 2006) ............................................................................... 24

*Currin v. Wallace*,
   306 U.S. 1 (1939) ............................................................................................... 37

*Dailey v. Vought Aircraft Co.*,
   141 F.3d 224 (5th Cir. 1998) ............................................................................... 25

*Delta Com. Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*,
   364 F.3d 269 (5th Cir. 2004) ............................................................................... 23

*Dep't of Homeland Sec. v. Regents of the Univ. of California*
   140 S. Ct. 1891 (2020) ........................................................................................ 60

*Dorce v. City of New York*,
   2 F.4th 82 (2d Cir. 2021) .................................................................................... 26

*Dow Chemical Co. v. EPA*,
   832 F.2d 319 (5th Cir. 1987) ............................................................................... 30

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*,
   112 F.3d 1283 (5th Cir. 1997) ...................................................................... 30, 33

*Dyson v. Sky Chefs, Inc.*,
   No. 3:16-CV-3155-B, 2017 WL 2618946 (N.D. Tex. June 16, 2017) ............................. 13

*E. Bridge, LLC v. Chao*,
   320 F.3d 84 (1st Cir. 2003) ................................................................................. 59

*Eden, LLC v. Justice*,
   36 F.4th 166 (4th Cir. 2022) ............................................................................... 26

*El Paso Cnty. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ............................................................................... 11

*Empower Texans, Inc. v. Nodolf,*
    306 F. Supp. 3d 961 (W.D. Tex. 2018) ................................................................. 20

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
    762 F.2d 464 (5th Cir. 1985) .............................................................................. 54

*Env't Conservation Org. v. City of Dallas,*
    529 F.3d 519 (5th Cir. 2008) ........................................................................ 24, 25

*Equity In Athletics, Inc. v. Dep't of Educ.,*
    639 F.3d 91 (4th Cir. 2011) ............................................................................... 51

*Exxon Chem. Am. v. Chao,*
    298 F.3d 464 (5th Cir. 2002) .............................................................................. 35

*First Indiana Fed. Sav. Bank v. FDIC,*
    964 F.2d 503 (5th Cir. 1992) ........................................................................ 25, 26

*Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.,*
    647 F.3d 1296 (11th Cir. 2011) .......................................................................... 26

*Foley v. Biden,*
    No. 4:21-cv-01098, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021) ...................... 53

*Fontenot v. McCraw,*
    777 F.3d 741 (5th Cir. 2015) .............................................................................. 11

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................................... 53

*Franks v. Nimmo,*
    683 F.2d 1290 (10th Cir. 1982) .......................................................................... 18

*Freedom From Religion Found., Inc. v. Abbott,*
    58 F.4th 824 (5th Cir. 2023) .............................................................................. 26

*FTC v. Standard Oil Co.,*
    449 U.S. 232 (1980) ............................................................................... 30, 32, 33

*Fullilove v. Klutznick,*
    448 U.S. 448 (1980) .................................................................................... 40, 47

*Garcia v. McCarthy,*
    649 F. App'x 589 (9th Cir. 2016) ......................................................................... 7

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998) ........................................................................................... 41

*Gen. Fin. Corp. v. FTC,*
    700 F.2d 366 (7th Cir. 1983) .............................................................................. 35

*Georgia State Conf. of Branches of NAACP v. Georgia,*
775 F.2d 1403 (11th Cir. 1985) ........................................................... 48

*GPA Midstream Ass'n v. DOT,*
67 F.4th 1188 (D.C. Cir. 2023) ........................................................ 32, 50

*Griggs v. Duke Power Co.,*
401 U.S. 424 (1971) ........................................................................... 42

*Guardians Ass'n v. Civil Serv. Comm'n of N.Y.,*
463 U.S. 582 (1983) ................................................................... *passim*

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ....................................................................... 36

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC,*
No. 3:09-CV-00393, 2009 WL 1766095 (N.D. Tex. June 23, 2009) ........................................... 56, 57

*Haaland v. Brackeen,*
143 S. Ct. 1609 (2023) ....................................................................... 12

*Hazardous Waste Treatment Council v. Reilly,*
938 F.2d 1390 (D.C. Cir. 1991) ........................................................... 34

*Hinojosa v. Horn,*
896 F.3d 305 (5th Cir. 2018) (per curiam) ..................................... 28, 29

*Holmberg v. Armbrecht,*
327 U.S. 392 (1946) ........................................................................... 56

*Humana, Inc. v. Jackson,*
804 F.2d 1390 (5th Cir. 1986) ............................................................. 55

*Humane Soc'y of the United States v. U.S. Dep't of Agric.,*
41 F.4th 564 (D.C. Cir. 2022), *reh'g denied,* 54 F.4th 733 (D.C. Cir. 2022) ........................ 32, 33, 50

*Inclusive Communities Project, Inc. v. Dep't of Treasury,*
946 F.3d 649 (5th Cir. 2019) ............................................................... 13

*Inner City Press v. Bd. of Governors of Fed. Rsrv. Sys.,*
130 F.3d 1088 (D.C. Cir. 1997) ........................................................... 18

*Int'l Bhd. of Teamsters v. United States,*
431 U.S. 324 (1977) ........................................................................... 45

*Jarkesy v. SEC,*
803 F.3d 9 (D.C. Cir. 2015) ................................................................. 28

*Johnson v. BOKF Nat'l Ass'n,*
15 F.4th 356 (5th Cir. 2021) ............................................................... 53

*Justin Indus., Inc. v. Choctaw Secs., L.P.,*
   920 F.2d 262 (5th Cir. 1990) .................................................................................... 55

*Kentucky v. EPA,*
   No. 3:23-CV-00007-GFVT, 2023 WL 3326102 (E.D. Ky. May 9, 2023) ...................... 21

*Kirby Corp. v. Pena,*
   109 F.3d 258 (5th Cir. 1997) .................................................................................... 35

*Lau v. Nichols,*
   414 U.S. 563 (1974) ...................................................................................... 40, 46, 47

*Leedom v. Kyne,*
   358 U.S. 184 (1958) .................................................................................................. 35

*Lewis v. Casey,*
   518 U.S. 343 (1996) .................................................................................................. 11

*Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,*
   70 F.4th 872 (5th Cir. 2023) ............................................................................... 11, 58

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................... 11, 12, 14

*Machete Prods., L.L.C. v. Page,*
   809 F.3d 281 (5th Cir. 2015) ............................................................................... 14, 19

*Martinez v. Mathews,*
   544 F.2d 1233 (5th Cir. 1976) .................................................................................. 54

*Maryland v. King,*
   567 U.S. 1301 (2012) ........................................................................................... 58, 60

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) .................................................................................. 47

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ............................................................................................. 54, 58

*McCoy v. Stokes,*
   No. 08-CV-1918, 2010 WL 411143 (W.D. La. Jan. 28, 2010) ................................. 54

*McKay v. Federspiel,*
   823 F.3d 862 (6th Cir. 2016) .................................................................................... 20

*McKinley v. Brazier,*
   No. 3:21-CV-528-DPJ-FKB, 2022 WL 3692663 (S.D. Miss. Aug. 25, 2022) ................. 54

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007) .................................................................................................. 11

*Miss. State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ................................................................ 19, 55, 59

*Mississippi v. Johnson,*
  71 U.S. (4 Wall.) 475 (1866) ................................................................ 53

*Montana Env't Info. Ctr. v. Stone-Manning,*
  766 F.3d 1184 (9th Cir. 2014) ................................................................ 11

*Morrisey v. U.S. Dep't of the Treasury,*
  59 F.4th 1124 (11th Cir. 2023) ................................................................ 58

*Mourning v. Family Publ'ns Serv., Inc.,*
  411 U.S. 356 (1973) ................................................................ 42

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................................................................ 47

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
  53 F.4th 869 (5th Cir. 2022) ................................................................ 38

*Nat'l Pork Producers Council v. EPA,*
  635 F.3d 738 (5th Cir. 2011) ................................................................ 31

*Ness v. City of Bloomington, No. 19-cv-2882,*
  2020 WL 4227156 (D. Minn. July 23, 2020) ................................................................ 20

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 54

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ................................................................ 60

*New York City Env't Just. All. v. Giuliani,*
  214 F.3d 65 (2d Cir. 2000) ................................................................ 48

*New York Urban League, Inc. v. New York,*
  71 F.3d 1031 (2d Cir. 1995) (per curiam) ................................................................ 48

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................ 60

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ................................................................ 35

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ................................................................ 14, 18, 23, 24

*Oklahoma v. United States,*
  62 F.4th 221 (6th Cir. 2023) ................................................................ 38

*Parker v. D.C.*,
   478 F.3d 370 (D.C. Cir. 2007) .................................................................................. 19

*Pennhurst State School & Hospital v. Halderman*,
   451 U.S. 1 (1981) .................................................................................................... 47

*Peoples Nat'l Bank v. Off. of Comptroller of Currency of the United States*,
   362 F.3d 333 (5th Cir. 2004) ............................................................................ 29, 33

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
   45 F.4th 816 (5th Cir. 2022) ............................................................................ 12, 17

*Pharm. Rsch. & Manufacturers of Am. v. DHHS*,
   --- F. Supp. 3d ---, No. CV 20-3402 (TJK), 2023 WL 1795644 (D.D.C. Feb. 6, 2023) ................ 21

*Pittston Co. v. U.S.*,
   368 F.3d 385 (4th Cir. 2004) .................................................................................. 38

*Plains Cotton Co-op. Ass'n v. Goodpasture Comp. Serv. Inc.*,
   807 F.2d 1256 (5th Cir. 1987) ............................................................................... 59

*Quarles v. Oxford Mun. Separate Sch. Dist.*,
   868 F.2d 750 (5th Cir. 1989) ............................................................................ 46, 48

*Raines v. Byrd*,
   521 U.S. 811 (1997) ............................................................................................... 11

*Regents of Univ. of California v. Bakke*,
   438 U.S. 265 (1978) ............................................................................................ 3, 39

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ............................................................................................... 17

*Robishaw Eng'g Inc. v. United States*,
   891 F. Supp. 1134 (E.D. Va. 1995) ....................................................................... 34

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*,
   6 F.4th 633 (5th Cir. 2021) ............................................................................... 40, 41

*Sanderson Farms, Inc. v. NLRB*,
   651 F. App'x 294 (5th Cir. 2016) ........................................................................... 35

*SEC v. First Fin. Group of Tex.*,
   645 F.2d 429 (5th Cir. Unit A 1981) ...................................................................... 54

*Seila L. LLC v. Consumer Fin. Prot. Bureau*
   140 S. Ct. 2183 (2020) ........................................................................................... 13

*Sierra Club v. Lynn*,
   502 F.2d 43 (5th Cir. 1974) .................................................................................... 38

*Sierra Club v. U.S. Army Corps of Eng'rs.*,
    482 F. Supp. 3d 543 (W.D. Tex. 2020) ................................................................................ 59

*Silver v. IRS*,
    531 F. Supp. 3d 346 (D.D.C. 2021) ...................................................................................... 21

*Smith v. Ohio State Univ.*,
    191 F.Supp.3d 750 (S.D. Ohio 2016) ................................................................................. 13

*Solofill, LLC v. Rivera,*
    No. 16-cv-2702, 2017 WL 514589 (S.D. Tex. Feb. 8, 2017) .......................................... 56

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ............................................................................................................ 47

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ..................................................................................................... 11, 23

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269, (2008) ......................................................................................................... 11

*State v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ................................................................................. 31, 37, 38

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ....................................................................................................... 13, 24

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ............................................................................................. 14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................................................... 23

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................................ 11, 18, 19

*Texas Dept. of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.,*
    576 U.S. 519 (2015) ........................................................................................ 42, 46, 48, 49

*Texas Education Agency v. United States Dep't of Educ.,*
    992 F.3d 350 (5th Cir. 2021) ....................................................................................... 47, 48

*Texas v. Becerra,*
    623 F. Supp. 3d 696 (N.D. Tex. 2022) .............................................................................. 58

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ............................................................................................. 19

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................................................. 16

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ............................................................................................................ 27, 28

*Town of Chester v. Laroe Ests., Inc.,*
  581 U.S. 433 (2017) ................................................................................................................ 11

*Trinity Indus., Inc. v. Martin,*
  963 F.2d 795 (5th Cir. 1992) .................................................................................................. 15

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ................................................................................................................ 29

*U.S. Parole Comm'n v. Geraghty,*
  445 U.S. 388 (1980) ................................................................................................................ 24

*U.S. Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir. 2004) ................................................................................................ 37

*United States v. Jefferson Cnty. Bd. of Educ.,*
  372 F.2d 836 (5th Cir. 1966), *on reh'g,* 380 F.2d 385 (5th Cir. 1967) ................................ 50

*United States v. Vega,*
  960 F.3d 669 (5th Cir. 2020) .................................................................................................. 25

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ................................................................................................................ 54

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ................................................................................................................ 49

*Va. ex rel. Cuccinelli v. Sebelius,*
  656 F.3d 253 (4th Cir. 2011) .............................................................................................. 16, 17

*VanDerStok v. Garland,*
  633 F. Supp. 3d 847, 859 (N.D. Tex. 2022) .......................................................................... 59

*Veldhoen v. United States Coast Guard,*
  35 F.3d 222 (5th Cir. 1994) ................................................................................................ 30, 34

*Virginia Department of Education v. Riley,*
  106 F.3d 559 (1997) (en banc) (per curiam) .......................................................................... 48

*Vita Nuova, Inc. v. Azar,*
  458 F. Supp. 3d 546 (N.D. Tex. 2020) ................................................................................... 16

*Washington v. Davis,*
  426 U.S. 229 (1976) ............................................................................................................ 17, 42

*Watson v. Fort Worth Bank & Trust,*
  487 U.S. 977 (1988) ................................................................................................................ 45

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ............................................................................ 49

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ............................................................................... 14

*Williams v. Parker,*
   843 F.3d 617 (5th Cir. 2016) ................................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................. 54, 57

*Yarls v. Bunton,*
   905 F.3d 905 (5th Cir. 2018) ............................................................ 25, 26

*Yogi Metals Grp., Inc. v. Garland,*
   38 F.4th 455 (5th Cir. 2022) .................................................................... 36

*Zimmerman v. City of Austin, Texas,*
   881 F.3d 378 (5th Cir. 2018) ............................................................ 18, 19

**Legislative Materials**

110 Cong. Rec. 6543 (1964) ........................................................................ 3, 45

134 Cong. Rec. 229 (1988) ............................................................................... 43

*Civil Rights: Hearings Before the House Comm. on the Judiciary, 88th Cong., 1st Sess. Pt. 4* (1963) ................ 42

*Civil Rights: Hearings Before the House Comm. on Rules, 88th Cong., 2d Sess. Pt. 1* (1963) .......................... 42

*Civil Rights—The President's Program, 1963: Hearings Before the Senate Comm. on the Judiciary,*
   88th Cong., 1st Sess. 398 (1963) ............................................................ 41

**Statutes**

5 U.S.C. § 703 ................................................................................................. 35

5 U.S.C. § 704 ................................................................................................. 29

5 U.S.C. § 706 ................................................................................................. 36

15 U.S.C. § 719o ............................................................................................. 43

15 U.S.C. § 775 ............................................................................................... 43

20 U.S.C. § 1682 ............................................................................................. 51

23 U.S.C. § 324 ............................................................................................... 43

28 U.S.C. § 2401 ............................................................................................. 30

40 U.S.C. § 122 ............................................................................................... 43

40 U.S.C. § 476 ............................................................................................... 43

42 U.S.C. § 2000d ................................................................................... *passim*

42 U.S.C. § 2000d-1 ................................................................................ *passim*

42 U.S.C. § 2000d-2 ................................................................ 4, 27, 28, 29

42 U.S.C. § 2000d-4a ...................................................................................... 43

42 U.S.C. § 6709 ............................................................................................... 43

42 U.S.C. § 18116 ............................................................................................. 43

43 U.S.C. § 1863 ............................................................................................... 43

44 U.S.C. § 1507 ............................................................................................... 50

49 U.S.C. § 47123 ............................................................................................ 43

**Rules**

Fed. R. Civ. P. 56 ............................................................................................ 36

**Regulations**

2 C.F.R. § 1500.15 ........................................................................................... 27

2 C.F.R. § 1500.17 ........................................................................................... 27

28 C.F.R. § 42.104 ........................................................................................ 5, 46

40 C.F.R. § 7.35 ............................................................................................ 5, 46

40 C.F.R. § 7.80 ................................................................................................ 47

40 C.F.R. § 7.115 ..................................................................................... 9, 15, 52

40 C.F.R. § 7.120 ..................................................................................... *passim*

40 C.F.R. § 7.130 ..................................................................................... *passim*

45 C.F.R. § 80.3 ................................................................................................. 4

31 Fed. Reg. 10,265 (July 29, 1966) ......................................................... 4, 5

38 Fed. Reg. 17,968 (July 5, 1973) ........................................................... 4, 5

58 Fed. Reg. 51,735 (Sept. 30, 1993) .......................................................... 32

67 Fed. Reg. 41,455 (June 18, 2002) ......................................................... 5, 6

68 Fed. Reg. 47,311 (Aug. 8, 2003) .............................................................. 6

70 Fed. Reg. 74,087 (Dec. 14, 2005) ............................................................ 6

80 Fed. Reg. 77284, 77,287 (Dec. 14, 2015) ............................................. 15

**Federal Register Notices**

29 Fed. Reg. 16,274 (Dec. 4, 1964) ............................................................... 4

31 Fed. Reg. 10,265 (July 29, 1966) ......................................................... 4, 5

38 Fed. Reg. 17,968 (July 5, 1973) ........................................................... 4, 5

58 Fed. Reg. 51,735 (Sept. 30, 1993) .......................................................... 32

67 Fed. Reg. 41,455 (June 18, 2002) ......................................................... 5, 6

68 Fed. Reg. 47,311 (Aug. 8, 2003) .................................................................................. 6

70 Fed. Reg. 74,087 (Dec. 14, 2005) ................................................................................ 6

80 Fed. Reg. 77,284 (Dec. 14, 2015) .............................................................................. 15

**Other Authorities**

U.S. EPA, Office of External Civil Rights Compliance (formerly, External Civil Rights Compliance Office), Case Resolution Manual (2021) ............................................................................ 7, 15

U.S. DOJ, Title VI Legal Manual ..................................................................................... 48

U.S. EPA, U.S. EPA External Civil Rights Compliance Office, Compliance Toolkit (Jan. 2017) ...... 48

*Webster's New World Dictionary of the American Language* 445 (2d college ed. 1970) ................................. 41

**INTRODUCTION**

After decades of assenting to the Environmental Protection Agency's (EPA) regulations to effectuate Title VI of the Civil Rights Act of 1964, the State of Louisiana filed suit to challenge certain of those regulations.  But the Supreme Court has already approved substantively identical Title VI regulations to those challenged here, and the State thus repackages its already-rejected arguments by attacking EPA's negotiating positions in relation to two now-closed complaint proceedings brought against State agencies.  The complaints alleged, collectively, that two Louisiana agencies that receive financial assistance from EPA—the Louisiana Department of Environmental Quality (LDEQ) and the Louisiana Department of Health (LDH)—violated Title VI by discriminating against Black communities through their actions and inactions regarding chemical emitting facilities in an area of Louisiana known as "cancer alley."

After following its Title VI regulatory process to conduct an investigation and attempt to informally resolve these complaints, EPA closed these complaints without a finding of a violation or threat of enforcement action under Title VI.  It is undisputed that EPA made no finding that either recipient had failed to comply with Title VI.  Nor did EPA undertake any statutory or regulatory prerequisite to enforcement action, let alone actually take any enforcement action against the State. Instead, before reaching a negotiated informal resolution, EPA fully and finally closed the complaints. There is *no* pending EPA Title VI investigation within the State of Louisiana.

Notwithstanding the absence of any adverse outcome, the State argues that EPA's Title VI regulations prohibiting disparate-impact discrimination—which were first promulgated in 1973—are unconstitutional and exceed EPA's statutory authority.  The State's legal claims suffer from a myriad of fundamental jurisdictional and merits-based flaws.

For one, the State lacks Article III injury.  The State cannot point to a single action undertaken by EPA against Louisiana or any of its agencies that depended on the disparate-impact regulations. The only actions taken by EPA that are relevant to this lawsuit were to investigate complaints and negotiate settlements, which imposed no legally actionable effect on anyone.

And, had any enforcement proceedings ensued from the complaint investigations—which they did not—the State would have been able to raise all of its legal objections in defense to those proceedings, and could thereafter have obtained judicial review had it suffered an adverse outcome. That is exactly the remedial scheme that Congress designed.  Each of these fundamental flaws deprives this Court of jurisdiction to address the State's challenges to EPA's regulations.

The State's challenges to EPA's Title VI regulations fare no better on their merits.  The Supreme Court long ago approved substantively identical disparate-impact regulations under Title VI and has not held otherwise since.  And even if this Court were writing on a blank slate, the challenged regulations prohibiting discriminatory effects clearly "effectuate" the statutory prohibition on discrimination, as Congress instructed EPA to do.

The State's ancillary challenge to the Department of Justice's (DOJ) Title VI implementing regulations—first promulgated in 1966—is also meritless.  DOJ's regulations were inapplicable to EPA investigations.  And Louisiana has never alleged that DOJ's Title VI implementing regulations apply to LDEQ or LDH, let alone in a way that would inflict injury on Plaintiff.  Louisiana has failed to identify *any* nexus between the challenged DOJ regulations and any alleged harm Louisiana has suffered.

Without any meritorious challenge to EPA's (or DOJ's) Title VI regulations, the State resorts to overheated rhetoric to assail EPA's negotiating positions and the complaint process itself as unconstitutional or otherwise outside the scope of EPA's statutory authority.  Louisiana's claims here, too, suffer from the same fundamental jurisdictional and merits-based flaws.  The State cannot show that merely receiving a settlement proposal inflicts any legally cognizable injury on the State.  Nor can the state identify any final agency action sufficient to confer jurisdiction—indeed, the only final action here was the *closure* of the complaints against the State's agencies, which the State is not challenging. And, as with the State's challenges to EPA's regulations, it is pursuing its claims in the wrong forum.

Finally, this Court need not reach the State's motion for a preliminary injunction because it can resolve the entire action on Defendants' dispositive motions.  But even if the State's claims survive, they do not warrant preliminary relief given the State's fifty-year delay in challenging EPA's disparate-

impact regulations—with which Louisiana has repeatedly promised to comply absent injury for decades—and absent any irreparable harm.  Indeed, the closure of the two complaints underscores the stark absence of any imminent harm—irreparable or otherwise—as the State itself recognized by narrowing its motion for a preliminary injunction.

For these reasons, this Court should grant Defendants' motion to dismiss or, in the alternative, motion for summary judgment, and should deny Plaintiff's motion for a preliminary injunction.

## BACKGROUND

## I.  STATUTORY AND REGULATORY BACKGROUND

### A.  Title VI of the Civil Rights Act of 1964

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, was enacted as part of a comprehensive effort to combat discrimination on the basis of race, color, and national origin. Congress enacted Title VI, in particular, to ensure that federal agencies, through the provision of federal financial assistance, did not support entities that engaged in such discrimination.  *See* 110 Cong. Rec. 6543 (1964) ("Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination.") (statement of Sen. Humphrey, quoting President Kennedy's message to Congress).

Section 601, "majestic in its sweep," *Regents of University of California v. Bakke*, 438 U.S. 265, 284 (1978), sets forth Title VI's anti-discrimination mandate:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  To promote that objective, in Section 602, Congress "authorized and directed" each federal agency responsible for distributing federal funds to "effectuate" Section 601 "by issuing rules, regulations, or orders of general applicability" that are "consistent with achievement of the objectives of the statute authorizing the financial assistance."  42 U.S.C. § 2000d-1.  Such rules, regulations, and orders must be approved by the President before taking effect.  *Id.*

The statute details the precise circumstances by which agencies can seek compliance with their rules and regulations through fund termination or "other means authorized by law." *Id.* Among other carefully delineated requirements, an agency cannot enforce its regulations until it has (1) determined a recipient has failed to comply with Title VI, (2) determined compliance cannot be secured voluntarily, (3) notified the recipient of these determinations, and (4) in the case of fund termination, provided an express finding on the record after an opportunity for a hearing and notified relevant committees in the House and the Senate. *Id.* The statute provides for judicial review of any "agency action taken pursuant to [42 U.S.C.] section 2000d-1," including any agency effort to enforce its regulations by "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any [section 2000d-1] requirement." 42 U.S.C. § 2000d-2.

### B. Agency Regulations Prohibiting Unjustified Discriminatory Effects

Shortly after Title VI was enacted, a Presidential task force and DOJ drafted model Title VI regulations to effectuate the anti-discrimination mandate of Section 601. *See generally Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 618 (1983) (Marshall, J., dissenting) (summarizing history). These model regulations included a provision that recipients of federal funds may not use "criteria or methods of administration which have the *effect* of subjecting individuals to discrimination" on the basis of race, color, or national origin. *See* 45 C.F.R. § 80.3(b)(2) (1964) (emphasis added); 29 Fed. Reg. 16,274-16,309 (1964).

In 1966 and 1973, respectively, DOJ and EPA promulgated their Title VI regulations with presidential approval. *See* Nondiscrimination in Federally Assisted Programs—Implementation of Title VI of the Civil Rights Act of 1964, 31 Fed. Reg. 10,265 (July 29, 1966) (DOJ) (Administrative Record ("AR") 1-5); Nondiscrimination Programs Receiving Federal Assistance from the Environmental Protection Agency, 38 Fed. Reg. 17,968 (July 5, 1973) (EPA) (AR286-90). From the beginning, both agencies followed the model regulations to prohibit recipients of federal financial assistance from administering programs in a manner that has the effect of subjecting individuals to

discrimination based on race, color, or national origin.[1]  *Id.*  These regulations—sometimes referred to as disparate-impact regulations—have been amended periodically but their discriminatory-effect provisions have in substance remained unchanged for five decades.  *Compare* 28 C.F.R. § 42.104(b)(2) *with* 31 Fed. Reg. 10,266 (AR2), *and* 40 C.F.R. § 7.35(b) *with* 38 Fed. Reg. 17,968 (AR286).

In 2001, the Supreme Court ruled in *Alexander v. Sandoval*, 532 U.S. 275 (2001), that Title VI does not create an implied private right of action to enforce disparate-impact regulations promulgated under the statute.  *See id.* at 293.  The Court stated that it had previously decided that the text of Section 601 of Title VI prohibited only intentional discrimination.  *Id.* at 281 (quoting *Alexander v. Choate*, 469 U.S. 287, 293 (1985)).  But the Court recognized that a majority of Justices in *Guardians Association v. Civil Service Commission of New York City*, 463 U.S. 582 (1983), had "voiced th[e] view" that "regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601."  See *Sandoval*, 532 U.S. at 281-82.  Although the Court stated that this view was "in considerable tension with the rule . . . that §601 forbids only intentional discrimination," it "assume[d] for the purposes of deciding th[e] case that the DOJ and [Department of Transportation (DOT)] regulations proscribing activities that have a disparate impact on the basis of race are valid."  *Id.* at 282.

Following the decision in *Sandoval*, some commenters urged several federal agencies to eliminate the disparate-impact provisions from their regulations.  These agencies, however, rejected that proposal and reaffirmed the validity of the Title VI regulations.  *See, e.g.*, DOJ, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455 (June 18, 2002) (reiterating DOJ's "commitment to implement Title VI through regulations reaching language barriers

---

[1] Even in its 1973 regulations, EPA prohibited a recipient from "mak[ing] a selection of a site or location of a facility if the purpose of that selection, or its *effect* when made, is to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity to which this rules applies, on the ground of race, color, or national origin."  38 Fed. Reg. at 17,970 (emphasis added) (AR288); *see also* 40 C.F.R. § 7.35(c) (1973).  DOJ added a similar provision in 1973.  38 Fed. Reg. at 17,955 (AR108); *see also* 28 C.F.R. § 42.104(b)(3).

is long-standing and is unaffected by recent judicial action precluding *individuals* from bringing judicial actions seeking to enforce those agency regulations"); *id.* at 41,458 & n.3 (repeating DOJ's view that *Sandoval* did not address the validity of the disparate-impact regulations or otherwise limit the authority of federal grant agencies to enforce their own implementing regulations); Dep't of Health & Human Services, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 68 Fed. Reg. 47,311 (Aug. 8, 2003); DOT, Policy Guidance Concerning Recipients' Responsibilities to Limited English Proficient (LEP) Persons, 70 Fed. Reg. 74,087 (Dec. 14, 2005).

In late 2020, DOJ considered a draft rulemaking that would have sought to eliminate disparate-impact requirements from its Title VI regulation.  Compl. ¶¶ 236-238.  But no such rule was ever filed for public inspection with the Office of Federal Register, much less published.  Indeed, although DOJ submitted a draft Title VI rulemaking for review to the Office of Management and Budget (OMB) on December 21, 2020, DOJ shortly thereafter notified OMB that the Department had decided not to proceed with publication of that draft rule and requested an end to OMB's review on January 14, 2021.  AR279.  In March 2021, OMB updated its public-facing webpage to reflect DOJ's formal withdrawal of the draft rule.  AR280.

The disparate-impact regulations at both EPA and DOJ have therefore been in force continuously for more than fifty years.  And although agencies have at times been urged to abandon these regulations, they have never done so.

## C.  EPA's Process for Title VI Complaint Investigations

In its regulations, EPA established a process by which "[a] person who believes that he or she or a specific class of persons has been discriminated against . . . may file a complaint."  40 C.F.R. § 7.120(a).  Within 20 days of acknowledging receipt of a Title VI complaint, EPA reviews the complaint for acceptance, rejection, or referral to another appropriate federal agency.  *Id.* § 7.120(d)(1)(i).  If EPA accepts the complaint, it conducts an investigation to determine compliance

with Title VI and EPA implementing regulations,[2] which includes an opportunity for the recipient to "make a written submission responding to, rebutting, or denying the allegations raised in the complaint."  *Id.* § 7.120(d)(1)(ii).  Whenever possible in the course of such an investigation, EPA attempts to reach informal resolution.  *Id.* § 7.120(d)(2).

At the conclusion of its investigation, absent an Informal Resolution Agreement ("IRA"), EPA can proceed along one of two routes.  If EPA does not find evidence of noncompliance with Title VI or its regulations, it will dismiss the complaint and notify both the complainant and funding recipient of that dismissal.  40 C.F.R. § 7.120(g).  If EPA finds evidence of noncompliance, it must follow a series of procedural steps before initiating enforcement proceedings.  Alternatively, EPA may close a complaint at any time for prudential reasons, in which case it may not initiate under Title VI or other civil rights laws any further action, enforcement or otherwise.  U.S. EPA, Office of External Civil Rights Compliance (formerly, External Civil Rights Compliance Office), Case Resolution Manual, § 2.5 (prudential administrative closure) (2021) available at https://www.epa. gov/sites/default/files/2021-01/documents/2021.1.5_final_case_resolution_manual_.pdf.

By design, these preliminary steps provide multiple means by which EPA can reach a resolution of a matter without engaging in enforcement.  Specifically, "[w]ithin 180 calendar days from the start of the . . . complaint investigation," assuming it does not dismiss or otherwise close the complaint, EPA must notify the funding recipient of a preliminary finding of noncompliance and make recommendations, if any, for voluntary compliance.  40 C.F.R. § 7.115(c).  But a preliminary finding of noncompliance is not enough to commence an enforcement action.  Instead, such a finding provides another opportunity for a funding recipient to (1) agree to the recommendations for voluntary compliance; or (2) rebut EPA's preliminary finding and compliance recommendations by submitting written objections.  *Id.* § 7.115(d)(1)-(2).  EPA can dismiss the complaint based on the

---

[2] The scope of EPA's investigation is not limited by the complaint's allegations, including any legal theory articulated by the complainant.  *See Garcia v. McCarthy*, 649 F. App'x 589, 591 (9th Cir. 2016) (explaining that "EPA's plenary authority" to accept a complaint "must necessarily include the lesser power to determine the scope of the investigation in the event the complaint is accepted").

recipient's written objections.  *Id.* § 7.120(g).  If the recipient takes neither action, EPA sends it a formal determination of noncompliance.  *Id.* § 7.115(d)(2).  EPA then starts enforcement proceedings only if the recipient does not voluntarily comply.  *Id.* § 7.115(e).  Section 7.130—the Title VI enforcement regulation—permits, but does not require, EPA to "terminate or refuse to award or to continue assistance" or to "use any other means authorized by law to get compliance, including a referral of the matter to the [DOJ]."  *Id.* § 7.130(a).  If it receives a referral, DOJ has discretion whether to then initiate enforcement through a civil suit in federal court.  42 U.S.C. § 2000d–1.

In the fifty years since EPA adopted its Title VI implementing regulations, it has never issued a formal determination of noncompliance or initiated an enforcement proceeding under the disparate-impact regulations described above and has never sent a referral to DOJ.  Declaration of Anhthu Hoang ("Hoang Decl.") ¶ 23.

## II.   FACTUAL BACKGROUND

EPA provides tens of millions of dollars in federal financial assistance every year to LDEQ and LDH.  *See* Declaration of Christopher Watkins ("Watkins Decl.") ¶ 4.  Like all of EPA's funding recipients, LDEQ and LDH must comply with Title VI and EPA's regulations.  In accordance with the conditions imposed by EPA's regulations, these state agencies have repeatedly, across decades, submitted signed contractual assurances to EPA promising to comply with Title VI and EPA's implementing regulations, including those prohibiting disparate-impact discrimination.  *Id.* ¶¶ 8-11.

In April 2022, EPA accepted for investigation two Title VI complaints submitted by (1) Concerned Citizens of St. John and Sierra Club, and (2) Stop the Wallace Grain Terminal, Inclusive Louisiana, RISE St. James, and the Louisiana Bucket Brigade.[3]  Hoang Decl. ¶¶ 9-10.  Together, these complaints alleged that LDEQ and LDH violated Title VI by discriminating against Black communities through their actions and inactions regarding pollution emitting facilities in an area of Louisiana known as "cancer alley."   EPA's acceptance letters did not limit its investigation of these

_____

[3] Although three complaints were filed, EPA conducted a single investigation pertaining to two of those complaints.  Hoang Decl. ¶ 9.  Defendants' references in this memorandum to two complaint proceedings encompass all three complaints.

allegations to alleged disparate-impact discrimination.  Rather, EPA indicated it would investigate "[w]hether LDEQ uses criteria or methods of administering its air pollution program that have the *intent and/or effect* of subjecting persons to discrimination," ECF No. 12-43 at 3 (emphasis added), and "[w]hether LDH subjects Black residents of St. John the Baptist Parish, including students of the Fifth Ward Elementary School, to *discrimination* on the basis of race in violation of [Title VI and EPA implementing regulations]," ECF No. 12-44 at 3 (emphasis added).

On April 13, 2022, and May 16, 2022, respectively, LDEQ and LDH requested to engage in informal resolution discussions to resolve these complaints.  Hoang Decl. ¶¶ 11-12.

On October 12, 2022, after conducting a preliminary investigation, including reviewing responses from LDEQ and LDH, EPA issued a Letter of Concern to LDH and LDEQ about these complaints.  Hoang Decl. ¶ 13.  The stated purpose of the Letter of Concern was to "convey the results of EPA's initial fact finding and analysis of the issues EPA accepted for investigation in [cited] Complaint[s]."  ECF No. 12-11 at 2.  The Letter of Concern was not a notice of noncompliance under 40 C.F.R. § 7.115(c).

Subsequently, between November 2022 and May 2023, EPA, LDH, and LDEQ worked collaboratively to informally resolve the complaints, continuing these efforts even after Louisiana filed this lawsuit.[4]  This voluntary process included at least sixteen meetings and the trading of multiple drafts of IRAs.  Hoang Decl. ¶¶ 14-15. During this period, EPA's investigation was ongoing; at no time did EPA advise Louisiana that its investigation was concluded.  *Id.* ¶ 14.

During this time period, EPA also met periodically with the complainants to provide status updates on the investigation and informal resolution efforts, and to obtain information necessary for EPA to determine the desirability of continuing resolution talks.  *Id.* ¶ 16.  EPA sought and received

---

[4] On May 24, 2023, and June 9, 2023, respectively, LDH and LDEQ last returned to EPA proposed edits to the Informal Resolution Agreements.  Hoang Decl. ¶ 15.

complainants' (and recipients') consent to extend those talks past the 180-day regulatory deadline, 40 C.F.R. § 7.115(c), as ordered by a court in another case and consistent with 40 C.F.R. § 7.120.[5]

On June 27, 2023, EPA closed both complaints. *See* ECF No. 18. As a result of the closures, "EPA will not initiate under Title VI any further action, enforcement or otherwise, in response to these Complaints." *Id.* In its now-closed investigations, EPA made no finding about LDEQ's or LDH's compliance with Title VI or its regulations. EPA did not issue preliminary findings, seek LDEQ's or LDH's voluntary compliance with or objections to preliminary findings, consider LDEQ's or LDH's responses to preliminary findings, or issue a formal determination of noncompliance, all steps required by EPA regulations prior to initiating any enforcement action. Without having made and communicated these determinations to LDEQ or LDH, EPA could not—and did not—initiate fund termination proceedings or pursue other means to enforce Title VI. Both complaints at issue in this lawsuit are fully and finally closed.

Although not alleged by Plaintiff in this case, EPA has also recently closed two other Title VI complaints alleging discrimination by Louisiana. Hoang Decl. ¶¶ 20-22. As a result, there is *no* pending EPA Title VI investigation within the State of Louisiana. *Id.* ¶ 22.

## III.   THIS LITIGATION

On May 24, 2023, Plaintiff filed its Complaint asserting seven Counts against Defendants. ECF No. 1. On June 21, 2023, Plaintiff moved for a preliminary injunction. ECF No. 10, ECF No. 15. Following EPA's closure of the two Title VI complaints at issue in this case, Plaintiff notified the Court that it was narrowing its request for preliminary injunctive relief. ECF No. 21. The parties then conferred and agreed that the case may be fully resolved by cross-motions for dispositive relief,

---

[5] In *Californians for Renewable Energy, et al. v. EPA,* Case No. 4:15-cv-03292-SBA (*CARE*), the U.S. District Court for the Northern District of California ordered that, for any Title VI complaint submitted by a *CARE* Plaintiff and accepted for investigation, EPA must issue preliminary findings or otherwise resolve the complaint within 180 days of the date of acceptance, "subject to any extension agreement between the complainant and the party complained against under 40 C.F.R. § 7.120." *CARE*, ECF No. 145, Amended Judgment (Oct. 2, 2020). *CARE* Plaintiff Sierra Club submitted one of the complaints against LDEQ and LDH.

and the Court set a briefing schedule.  ECF Nos. 22, 23.  Defendants now oppose Plaintiff's motion for a preliminary injunction and move to dismiss Plaintiff's Complaint or, in the alternative, for summary judgment on all claims.

## ARGUMENT

## I.     THE COURT LACKS SUBJECT MATTER JURISDICTION.

### A.  Plaintiff's claims suffer from a lack of Article III standing or are unripe.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Since these elements are "an indispensable part of the plaintiff's case, each element must be supported [] with the manner and degree of evidence required at the successive stages of the litigation."  *El Paso Cnty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020).  Thus, "[t]o resist summary judgment, Louisiana [i]s required to present evidence of a 'concrete and particularized invasion of a legally protected interest.'"  *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 880 (5th Cir. 2023) ("*NOAA*") (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273, (2008)).  Plaintiff "can no longer rest on [] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to establish standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  And this "standing inquiry [must be] especially rigorous" because "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

Because "standing is not dispensed in gross," *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996)), Plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).  The State cannot do so for any of its claims here.[6]

---

[6] "The justiciability problem that arises when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing . . . or in terms of ripeness."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.2 (2007).  Consistent with Supreme

1.      **Plaintiff lacks standing for its nondelegation claims (Counts I and II).**

Plaintiff's nondelegation claims concern an interim measure that EPA may take to extend the 180-day deadline contained in EPA's regulations to issue preliminary findings of discrimination, if any. 40 C.F.R. §§ 7.120, 7.115(c)(1).  Specifically, an exception to the 180-day deadline exists where EPA believes informal resolution of a complaint is possible and both the complainant and the funding recipient "agree to a delay pending settlement negotiations."  40 C.F.R. § 7.120.  Plaintiff argues that this exception impermissibly delegates governmental authority to private parties because it requires EPA to obtain the complainant's agreement to an extension.  *See* Compl. ¶ 19.  This Court need not reach the merits of the State's nondelegation claims (addressed *infra* 36-38) because the State lacks Article III standing to pursue these claims.

a.      Louisiana has not suffered an actual injury redressable by this Court sufficient to confer standing for Plaintiff's nondelegation claims.[7]  Louisiana's alleged harm of being subjected to "illegally delegated governmental powers," Compl. ¶ 198, is no more than a generalized "interest in proper application of the Constitution and laws," and thus "does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.  Indeed, it is well-settled that a plaintiff may not establish injury merely by asserting a constitutional violation:  instead, the plaintiff must identify a concrete and particularized injury in fact caused by that constitutional violation.  *See, e.g.*, *Haaland v. Brackeen*, 143 S. Ct. 1609, 1641 (2023) ("Because Texas is not injured by the placement preferences," it "does not have standing to bring … its nondelegation claims."); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022) ("A plaintiff always needs a concrete injury to bring suit.").  Regardless, Plaintiff is not

---

Court "practice," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014), this brief primarily uses the term "standing."  But because the inquiries "boil down to the same question," *id.*, Plaintiff's claims may also be dismissed on ripeness grounds.  *See Montana Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 (9th Cir. 2014) ("Regardless of whether we use the verbal formulations developed for standing or the ones developed for ripeness, our analysis is materially unchanged.").

[7] Plaintiff argues the same injury confers standing for both Counts I and II.  *See* ECF No. 15 at 18-19 (describing "the State's injury" for its nondelegation claim and 180-day claim).  Although that injury is insufficient to confer standing to assert either count, Plaintiff is correct that its asserted injury is the same—the only harm that Plaintiff argues flows from the 180-day deadline is Plaintiff becoming subject to the alleged unlawfully delegated authority, *see* ECF No. 1 ¶ 194.

subject to any allegedly illegitimate exercise of government power because the complainants had *already approved* the extensions when the instant Complaint was filed, *see* Compl. ¶ 27, and were therefore (under Plaintiff's theory) not continuing to exercise any government authority.

Indeed, when asserting irreparable harm, Plaintiff relied on *Axon Enterprises, Inc. v. FTC*, 143 S. Ct. 890 (2023) to argue that the State's purported injury cannot be remedied by this Court once the proceeding ends (and they have now ended). *See* ECF No. 15 at 18 (quoting *Axon*, 143 S. Ct. at 903). This argument is in fact a concession. That this Court cannot issue meaningful relief is independently fatal to Plaintiff's standing to assert its nondelegation claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."); *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) ("plaintiff must show that it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.") (quotation omitted). Moreover, that Plaintiff alleges its nondelegation injury is caused by the judgment in *CARE*, *see* Compl. ¶ 20, is another reason Plaintiff's injury is not redressable: this Court cannot compel Defendants to violate the judgment in that case.

Plaintiff's attempts to particularize its generalized interest in constitutional governance by asserting that EPA "bargained non-public information" to the complainants is also unavailing. *See* ECF No. 15 at 18. The mere limited release of non-public information does not constitute an injury in fact absent "a concrete consequential damage." *Smith v. Ohio State Univ.*, 191 F. Supp. 3d 750, 757 (S.D. Ohio 2016) (absent concrete consequence, alleged privacy violations are insufficient); *Dyson v. Sky Chefs, Inc.*, No. 3:16-CV-3155-B, 2017 WL 2618946, at *7 (N.D. Tex. June 16, 2017) (no injury in fact where plaintiff fails to establish "injury as a result of Defendants having procured his credit report"). Plaintiff does not explain how this limited release of information to the complainant caused it any injury in the proceedings (or anywhere else) and cannot do so because both proceedings were

finally closed.  *See* ECF No. 18.[8]  And this injury would not be traceable to Defendants because LDEQ freely gave to complainant the very "non-public information" that it accuses EPA of disclosing. Hoang Decl. ¶ 17.

b.  Regardless, Plaintiff's alleged past injury is insufficient to confer standing on the State's claims for prospective injunctive and declaratory relief.  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" because a plaintiff must show a "real and immediate threat of repeated injury."  *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101-08 (1983).  Thus, standing "does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, which is always true when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past."  *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); *see also Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) ("past exposure to illegal conduct, by itself, . . . cannot establish standing" to seek prospective relief).

c.  Nor can Plaintiff establish a future injury sufficiently imminent to confer standing to assert its nondelegation claims.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (To support Article III standing, "an injury must be concrete, particularized, and actual or imminent.").  The imminence requirement "ensure[s] that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*."  *Id.* (emphasis added) (quoting *Lujan*, 504 U.S. at 565 n.2).  To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending' … and that 'allegations of possible future injury' are not sufficient."  *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

---

[8] Plaintiff's authorities are inapposite for this reason.  In *Axon*, the Supreme Court held plaintiffs asserted a "'here-and-now injury'" from being "subject[ed] to an illegitimate proceeding, led by an illegitimate decisionmaker," which would be "impossible to remedy once the proceeding is over."  143 S. Ct. at 903.  And in *Seila Law LLC v. Consumer Financial Protection Bureau*, the Court found standing because "Petitioner is compelled to comply with the civil investigative demand" issued by the unlawfully constituted agency "and to provide documents it would prefer to withhold."  140 S. Ct. 2183, 2196 (2020).  No such injury exists here because Plaintiff has not been compelled to take any action (unwanted or otherwise), as the proceedings were closed without EPA imposing a penalty or other obligations.  ECF No. 18.

Plaintiff has asserted a hypothetical, future nondelegation injury that is at most "possible," and far from "certainly impending." *Clapper*, 568 U.S. at 409.  Specifically, the State asserts that an injury may occur sometime in the future because Louisiana received grants from EPA and "will be subject to unconstitutional proceedings for all future Title VI complaints that proceed to informal negotiations."  ECF No. 15 at 19.  But that prediction rests on the following "speculative chain of possibilities," *Clapper*, 568 U.S. at 414, each of which must occur before Plaintiff will suffer any nondelegation harm:  (1) a third-party must file a Title VI complaint with EPA against Louisiana, 40 C.F.R. § 7.120(a); (2) that complaint must comply with EPA's jurisdictional requirements such that EPA accepts the complaint, *id.* § 7.120(d)(1); (3) EPA must decline to apply a prudential consideration to reject the complaint, such as a lack of sufficiently detailed allegations, an insufficient factual basis for the allegations, or mootness of the allegations, *see* U.S. EPA, Office of External Civil Rights Compliance, Case Resolution Manual § 1.8, available at: https://www.epa.gov/sites/default/files/2021-01/documents/2021.1.5_final_case_resolution_manual_.pdf;  (4) EPA must choose to pursue informal resolution negotiations, 40 C.F.R. § 7.120(d)(2); (5) EPA must determine that it requires more than 180 days to conduct and complete informal resolution discussions before issuing preliminary findings, and request an extension from the complainant and the federal funding recipient, *id.* §§ 7.120, 7.115(c)(1); (6) the complainant must either reject EPA's extension request or condition approval on some concession that itself constitutes an injury in fact to the State, *id.* § 7.120; and (7) the EPA must then accept that condition of approval, *id.* §§ 7.120, 7.115(c)(1).

This chain of hypothetical future steps makes clear that the State's injury is not "certainly impending," *Clapper*, 568 U.S. at 409.  As the Fifth Circuit has observed, a bare "possibility, that maybe, in the future, if a series of events occur, [plaintiff] might suffer some injury is clearly too impalpable to" confer standing. *Trinity Indus., Inc. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992).  And Plaintiff pleads only that, "by EPA's own admission, it *frequently* cannot reach a . . . determination within 180 days as

15

to whether[] compliance can 'be secured by voluntary means.'"  Compl. ¶ 22.[9]  That EPA *frequently* requires more than 180 days to reach such a determination does not establish that EPA certainly *will* require more than 180 days in any hypothetical future complaint filed against the State, much less that each of the remaining contingencies occur.  Accordingly, because each one of these contingent "layers of conjecture" must occur before Louisiana could suffer an alleged injury, the alleged future injury is insufficient to confer Article III standing.  *Vita Nuova, Inc. v. Azar*, 458 F. Supp. 3d 546, 556 (N.D. Tex. 2020) ("Without certainty for" any of these "antecedent event[s]," each prediction is "conjectural," not "certainly impending."); *Bruni v. Hughs*, 468 F. Supp. 3d 817, 824 (S.D. Tex. 2020) (similar).

### 2. Plaintiff lacks standing to challenge EPA's disparate-impact regulations (Counts III and V).

a. Plaintiff similarly lacks standing to challenge EPA's disparate-impact regulations because the State has not suffered an actual injury caused by EPA's regulations redressable by this Court.  The State claims it has suffered a "sovereign injury" to its "'power to create and enforce a legal code'" because it cannot "exercise its sovereign authority by regulating in a race-neutral manner within its borders." ECF No. 15 at 41 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (*Snapp*)).  But that type of interest is infringed only when an actual conflict arises between state and federal exercise of "sovereign power over individuals and entities within the relevant [state] jurisdiction," *Snapp*, 458 U.S. at 601, such as when a federal regulatory scheme preempts a similar state program, *see Texas v. United States*, 809 F.3d 134, 154 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (citing *Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011), for the proposition that the conflicting laws at issue must actually "regulate[] behavior or provide[] for the administration of a state program").  The State identifies no such regulatory or administrative programs with which EPA's disparate-impact

---

[9] Plaintiff's allegation is also factually wrong.  EPA did not "admi[t]," Compl. ¶ 22, that it cannot reach in 180 days a determination as to whether compliance can be secured by voluntary means—rather, the cited notice of proposed rulemaking states only that it would be impractical "given the inherent scientific complexity" to complete its investigation and issue preliminary findings.  EPA, Nondiscrimination in Programs or Activities Receiving Federal Assistance from the Environmental Protection Agency, 80 Fed. Reg. 77,284, 77,287 (Dec. 14, 2015).

regulations interfere.   Accordingly, the State does not identify any instance where it is actually taking race-conscious action to comply with EPA's disparate-impact regulation.

Instead, citing only to a non-controlling concurrence, Plaintiff suggests disparate-impact standards "compel the State to discriminate on the basis of race," contrary to the State's laws prohibiting racial discrimination.  Compl. ¶ 5 (citing *Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring)).   But *Ricci* does not stand for the proposition that combatting disparate-impact discrimination *requires* intentional discrimination.  Instead, the Court held "only that, under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability."  557 U.S. at 587.  And even in that narrow context, the Supreme Court has recognized that prohibitions on actions with the effect of discrimination on the basis of race support prohibitions on intentional discrimination because "invidious discriminatory purpose may often be inferred from the fact, if it is true, that the law bears more heavily on one race than another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).  Hence, Plaintiff has not shown any "genuine conflict" between state and federal law that might be "capable of producing injury-in-fact" from EPA's disparate-impact regulations.  *Cuccinelli*, 656 F.3d at 270.

Plaintiff also asserts a "sovereign injury" to its "right to unambiguous clarity in the conditions being imposed by federal grants."  ECF No. 15 at 41.  But "confusion, absent more, is not a concrete injury under Article III."  *Perez*, 45 F.4th at 825.  In any event, there is no dispute that the conditions attending EPA's grants and the assurances the State signed are unambiguously clear in prohibiting actions that have the effect of discriminating on the basis of race.  *See, e.g.*, Compl. ¶ 220 (alleging EPA's Title VI regulations "impose disparate-impact-based requirements").  Indeed, the State would not be challenging EPA's regulations otherwise.[10]

---

[10] *Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022), is inapposite for this reason.  In that case, the plaintiff argued that "the Offset Provision's ambiguity prevents Arizona from being able to exercise its choice voluntarily to accept ARPA funds and understand the consequences of agreeing to ARPA's conditions."  *Id.* at 851.  Plaintiff does not (and cannot) argue that it lacks an understanding of the

The mere existence of two prior Title VI complaints asserting disparate-impact allegations against the State also does not confer standing. For one, the State had not incurred any penalty or been subjected to any remedial measures resulting from those Title VI complaints at the time the Complaint was filed, and cannot suffer any adverse consequences going forward because the Title VI complaints were closed, *see* ECF No. 18. It suffered no injury at all as a result, let alone a legally cognizable injury in fact. *Inner City Press v. Bd. of Governors of Fed. Rsrv. Sys.*, 130 F.3d 1088, 1089 (D.C. Cir. 1997) ("participation in administrative proceedings before . . . any agency, does not, without more, satisfy a petitioner's Article III injury-in-fact requirement") (citation omitted); *Franks v. Nimmo*, 683 F.2d 1290, 1293 (10th Cir. 1982) (where "there was no final disposition of the administrative proceedings," "outcome" of those "proceedings was speculative in terms of any injury in fact [plaintiff] may suffer"). But even if Louisiana had suffered some cognizable injury through the mere existence of those proceedings, they have since been terminated, and that past injury could not be redressed through the prospective relief Plaintiff seeks. *O'Shea*, 414 U.S. at 495-96; *City of Los Angeles*, 461 U.S. at 101.

Moreover, any injury arising from the mere existence of those proceedings would not be traceable to EPA's disparate-impact regulations because EPA could have initiated those very proceedings upon complaints alleging only intentional discrimination—none of the complained-of EPA actions required the existence of EPA's disparate-impact regulations. Indeed, EPA did not proceed exclusively under its disparate-impact regulations and was in fact investigating possible intentional discrimination. *Supra* 8-9. Accordingly, the "injury" of being subjected to complaint proceedings "is not 'fairly traceable' to any 'allegedly unlawful conduct'" of Defendants, precluding standing. *California v. Texas*, 141 S. Ct. 2104, 2114 (2021).

b. Nor can Plaintiff establish standing for its challenges to EPA's disparate-impact regulations by asserting this claim as a "pre-enforcement challenge." Compl. ¶ 225. Such a challenge requires Plaintiff to "produce evidence of [1] an intention to engage in a course of conduct [2] arguably affected

---

conditions placed on EPA's funds here, particularly given EPA prohibitions on disparate-impact discrimination have existed since 1973, *supra* 4-6.

with a constitutional interest, but proscribed by statute,' as well as [3] 'credible threat of prosecution.'" *Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 391 (5th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). The State cannot make those required showings.

*First*, Plaintiff does not express any intention to engage in conduct that amounts to disparate-impact discrimination prohibited by EPA's Title VI regulations. To the contrary, the State has repeatedly and for decades signed assurances promising that the State does not and will not engage in disparate-impact discrimination. Watkins Decl. ¶¶ 10-11. "Without concrete plans or any objective evidence to demonstrate 'a serious interest' in" committing the proscribed conduct, Plaintiff "suffered no threat of *imminent* injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008); *see also Zimmerman*, 881 F.3d at 389 (no standing where plaintiff "did not take steps" to "demonstrate a serious intent to violate the statute."); *Machete Prods.*, 809 F.3d at 288 (plaintiff must show "concrete and imminent plans"). And the State's mere assertion (Compl. ¶¶ 226-27) that it is likely to be subject to future enforcement proceedings brought under EPA's disparate-impact regulations does not constitute evidence of its intention to engage in proscribed conduct; "standing is not created by a declaration in court pleadings." *Miss. State Dem. Party*, 529 F.3d at 546.

*Second*, the State fails to show the credible threat of prosecution necessary for pre-enforcement review. As an initial matter, there is no reason to believe EPA's disparate-impact regulations—first issued in 1973—were intended to target Plaintiff, meaning Plaintiff has identified no more "than a general threat of prosecution," which is insufficient to support pre-enforcement review. *Parker v. D.C.*, 478 F.3d 370, 374 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008). "[H]istory of past enforcement," *Susan B. Anthony List*, 573 U.S. at 164, also indicates that future prosecution is unlikely because EPA has *never* taken the enforcement steps outlined under 40 C.F.R. § 7.130 against *any state* to obtain compliance with EPA's disparate-impact regulations. Hoang Decl. ¶ 23.

The record here illustrates as much. EPA first closed the complaints alleging disparate-impact discrimination by LDEQ and LDH without penalizing Plaintiff or requiring any remedial actions. ECF No. 18. Although not alleged by Plaintiff, EPA then declined to accept two additional

complaints asserting disparate-impact discrimination by the State.  *Id.* ¶¶ 20-21.[11]   Accordingly, none of the complaints that were conceivably at issue in this action—or, indeed, any complaint ever filed under EPA's Title VI regulations—reached the enforcement stage, demonstrating the prospect of enforcement is too remote to confer standing.  *McKay v. Federspiel*, 823 F.3d 862, 870 (6th Cir. 2016) (no threat of enforcement where "[t]here is simply no evidence in the current record that anyone has even been held in contempt—or even subject to contempt proceedings—for violating the challenged order"); *cf. Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 512 (1984) (claim "not ripe for review" where, "[b]ecause the Commission never imposed this sanction . . ., we are presented with no concrete application of [challenged] law").

And even if other complaints asserting disparate-impact discrimination were pending, "[t]he government's review of a private citizen's complaint does not create a 'threat of prosecution' substantial enough to meet the Constitution's injury-in-fact requirement."  *Empower Texans, Inc. v. Nodolf*, 306 F. Supp. 3d 961, 967 (W.D. Tex. 2018); *see also Ness v. City of Bloomington*, No. 19-cv-2882, 2020 WL 4227156, at *7 (D. Minn. July 23, 2020), *aff'd in part, dismissed in part*, 11 F.4th 914 (8th Cir. 2021) (government's mere "investigation of citizen complaints does not amount to a credible threat of prosecution").  In any event, EPA's hypothetical acceptance of a Title VI complaint in the future does not translate into inevitable enforcement against the State of the disparate-impact provisions challenged here.  Before enforcement under 40 C.F.R. § 7.130 could occur, EPA would have to accept a complaint, investigate and not resolve it informally, make a preliminary finding of noncompliance, issue a formal determination of noncompliance, choose to pursue enforcement, and prevail against the State before an Administrative Law Judge after notice and a hearing, *see* 40 C.F.R. § 7.130(b)(2). But again, EPA has never issued a formal determination of noncompliance with its discriminatory-

---

[11] The absence of accepted enforcement proceedings distinguishes this case from *Texas v. Equal Employment Opportunity Commission*, in which a state agency had "already been required to respond to a charge of discrimination filed with EEOC."  933 F.3d 433, 447 n.26 (5th Cir. 2019).  Moreover, the state in that case established an injury in fact because it was already engaging in the proscribed conduct—Texas categorically excluded felons from many positions of public employment.  *Id.* at 447. Here, Louisiana has not shown that it even intends to engage in disparate-impact discrimination, *supra* 16-18.

effects regulations or initiated an enforcement proceeding under those regulations.

The State also alleges that enforcement is likely given "EPA's October 12, 2022 Letter of Concern." Compl. ¶ 227. But that letter did not set out a future enforcement strategy—it pertained only to the specific allegations of the now-closed Title VI complaints against LDEQ and LDH, and its "purpose" was "to convey the results of EPA's initial fact finding and analysis of the issues EPA accepted for investigation in [cited] Complaint[s]." ECF No. 12-11 at 2. In any event, the record flatly contradicts the State's assertion that the October 12, 2022 letter makes future enforcement proceedings more likely. EPA closed the two Title VI complaints at the center of Plaintiff's lawsuit, ECF No. 18, and declined to accept the other Title VI complaint Plaintiff later cited in ECF No. 21 at 2, Hoang Decl. ¶¶ 18-22.

c. Finally, Plaintiff asserts EPA's disparate-impact regulations "would create compliance costs for the State[]." ECF No. 15 at 41. But Plaintiff fails to identify *any* costs associated with compliance with the disparate impact provisions of EPA's Title VI regulations, and therefore cannot meet its burden of showing any actual or potential harm attributable to these regulatory provisions. *Kentucky v. EPA*, No. 3:23-CV-00007-GFVT, 2023 WL 3326102, at *3 (E.D. Ky. May 9, 2023) (conclusory assertion that a state will "'likely' need to hire more individuals and divert resources" is "too speculative"); *see also Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (state "required to demonstrate"—"supported by [] facts"—"that [it] will incur costs because of the [challenged] program"). Plaintiff does not substantiate any asserted future compliance costs, and its "unadorned statement of future [such] injury" is insufficient to carry "Plaintiff['s] burden at this stage." *Silver v. IRS*, 531 F. Supp. 3d 346, 361-62 (D.D.C. 2021).

In any event, Plaintiff's alleged compliance costs are mere "efforts to mitigate potential future injury" from hypothetical future Title VI enforcement proceedings, and therefore are "inseparable from the imminence of the future" enforcement proceedings "themselves." *Pharm. Rsch. & Manufacturers of Am. v. DHHS*, --- F. Supp. 3d ----, No. CV 20-3402 (TJK), 2023 WL 1795644, at *12 (D.D.C. Feb. 6, 2023). Accordingly, the "cognizability" of those future compliance costs "depends on whether Plaintiffs have met the standard for alleging a 'substantial increase in the risk of harm.'"

*Id.*  Plaintiff has not.  *Supra* 16-18.  Indeed, that the State waited fifty years after EPA's disparate-impact regulations issued and without suffering any penalty before even raising the possibility of incurring compliance costs demonstrates the State is merely attempting to "buy standing via self-inflicted expenditures," which it cannot do.  *Pharm. Rsch.*, 2023 WL 1795644, at *12; *see also Clapper*, 568 U.S. at 416.

      **3.**    **Plaintiff lacks standing to challenge DOJ's disparate-impact regulations (Counts IV and V).**

      Plaintiff's standing to challenge DOJ's disparate-impact regulations stands on even weaker footing.  *First*, the State cannot establish "sovereign injury" to its "power to create and enforce a legal code," ECF No. 15 at 41, flowing from DOJ's disparate-impact regulations because the State does not identify any of its own regulatory or administrative programs that conflict with the challenged regulations, *supra* 16-18.  Nor can Plaintiff assert sovereign injury flowing from the alleged ambiguity regarding conditions imposed on DOJ grants in light of Plaintiff's admission that no such ambiguity exists.  *See* Compl. ¶ 231 (pleading DOJ grants "purport to bind [State] agencies to DOJ's disparate-impact-based requirements").  *Second*, Plaintiff neither alleges the existence of any enforcement proceedings brought under DOJ's disparate-impact regulations nor even asserts that pre-enforcement review is warranted because such future enforcement proceedings are likely.  *See* Compl. ¶¶ 228-40.  Accordingly, the State fails even to assert, let alone establish, standing for a pre-enforcement challenge.  *Supra* 18-21.  *Third*, Plaintiff's conclusory assertion that it would incur costs to comply with DOJ's disparate-impact regulations, Compl. ¶ 202, fails to establish an injury in fact because those costs are speculative and unsubstantiated.  *Supra* 21.

      **4.**    **Plaintiff lacks standing to challenge EPA's alleged attempt to impose "extra-regulatory requirements" (Count VI).**

      Plaintiff's "extra-regulatory" claim alleges only that EPA, during the informal resolution process, proposed that a potential settlement agreement include requirements beyond those in EPA's Title VI regulations.  *See, e.g.*, ECF No. 15 at 38 ("Throughout the informal negotiations, EPA . . . has repeatedly demanded that the State submit to new requirements.").  But merely receiving EPA's

proposal is not an injury in fact—as the State itself demonstrated when it rejected the proposed agreement.  Indeed, even assuming EPA's proposals were unlawful (they were not), Plaintiff does not allege that EPA forced Plaintiff to accept them and cannot do so because the complaints were closed without Plaintiff agreeing to *any* informal resolution, ECF No. 18.  Thus, the State's interest in prohibiting EPA from demanding compliance with certain "extra-regulatory" conditions is no more than a "generalized interest in proper application" of EPA's regulations, an interest which "is not by itself an injury in fact."  *Delta Com. Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004).

Moreover, the State would have had to accept those proposals before they took force.  This, too, precludes Plaintiff from establishing an injury in fact because a plaintiff "cannot obtain standing to sue . . . as a result of self-inflicted injuries."  *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999); *Clapper*, 568 U.S. at 416.  Finally, to the extent merely receiving proposals during unsuccessful informal resolution discussions constitutes an injury in fact (and it does not), that past injury does not confer standing on the State's claims for prospective relief.  *O'Shea*, 414 U.S. at 495-96; *City of Los Angeles*, 461 U.S. at 101.

### 5.   Plaintiff lacks standing to challenge EPA's "parallel track" proceedings (Count VII).

a.  Plaintiff has not suffered an injury in fact arising from EPA's decision to continue "its fact-finding on a parallel track with the IRA process."  Compl. ¶ 258.  This would in any event be no more than a procedural injury because "the claimed injury arises from an alleged failure on the part of the injury-causing party to adhere to a prescribed process in adjudicating the petitioner's substantive rights, rather than from the substantive decision itself."  *City of Hearne v. Johnson*, 929 F.3d 298, 301 (5th Cir. 2019) ("These injuries occur when a defendant 'fails to follow a procedure …'").  "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Spokeo*, 578 U.S. at 342.

Plaintiff does not establish any concrete interest that was affected by this use of a "parallel

track" or otherwise allege any injury caused by EPA conducting fact-finding while also continuing to negotiate. *See* Compl. ¶¶ 254-60. Nor could the State do so: the complaints were closed without any finding of noncompliance. *See* ECF No. 18. Thus, EPA's alleged failure "to follow some required procedure" did not cause "an injury 'connected to a substantive result'" of the proceedings. *City of Hearne*, 929 F.3d at 301. And because "it is not enough . . . to claim that the process for handling [a] petition was not followed," Plaintiff did not suffer an injury in fact sufficient to confer standing to assert its parallel-track claim. *Id.*[12]

b. Even if EPA's use of a parallel investigatory track did cause injury, that injury cannot be remedied by this Court because the challenged enforcement proceedings are closed, *see* ECF No. 18, and any putative harm Plaintiff suffered could not be undone. This alone precludes a finding of Article III standing for the parallel-track claim. *Steel*, 523 U.S. at 107. Likewise, an alleged past parallel-track injury could not confer standing for Louisiana's claims for prospective relief—there is no "real and immediate threat" that EPA will impose the alleged parallel track process in the future, *O'Shea*, 414 U.S. at 495-96, because there is no pending complaint against Louisiana. Hoang Decl. ¶ 22.

**B. The closure of the challenged Title VI complaints renders moot any claims for which Plaintiff may have once had standing.**

As shown above, Plaintiff could not have established standing through alleged injury from the Title VI complaint proceedings that were ongoing at the time the instant action was filed. Even if the State could have established standing, however, Plaintiff's claims are now moot and must be dismissed for this independent reason. "Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). "As a general rule, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders

---

[12] Nor does the State's mere receipt of a document request appended to EPA's letter referencing a parallel-track process, *see* Compl. ¶¶ 196-97, transform a procedural injury into a cognizable injury in fact. *Williams v. Parker*, 843 F.3d 617, 623 (5th Cir. 2016) ("It is not sufficient for Article III purposes to state that the issuance of a subpoena in and of itself violates a constitutional right.").

that action moot." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (quotation omitted).  To remain a justiciable controversy, then, the plaintiff must "maintain a 'concrete interest in the outcome'" and "effective relief" must remain "available to remedy the effect of the violation." *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998).  Accordingly, "[a] moot case exists when the court cannot grant relief that would affect the parties and redress the plaintiff's alleged wrongs." *First Indiana Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992).  And, as with standing, "the court must evaluate mootness on a claim-by-claim basis to determine whether each claim satisfies the constitutional requirements for Article III jurisdiction." *United States v. Vega*, 960 F.3d 669, 673 (5th Cir. 2020).

Here, EPA's closure of the two Title VI complaints against LDEQ and LDH without penalty or consequence for the State constitutes a "set of circumstances that eliminates actual controversy after the commencement of a lawsuit," *Env't Conservation*, 529 F.3d at 527.  As to each claim, Plaintiff no longer "maintains a 'concrete interest in the outcome'" and "effective relief" is no longer "available to remedy the effect of the violation," *Dailey*, 141 F.3d at 227.  Aside from Plaintiff's lack of standing, this Court also lacks subject matter jurisdiction because the State's claims are moot.  *Carr v. Saucier*, 582 F.2d 14, 16 (5th Cir. 1978).

a.  Specifically, EPA's closure of the two Title VI complaints moots Plaintiff's nondelegation claims because, even assuming Plaintiff was subject to unlawfully delegated authority sufficient to confer standing at the time the Complaint was filed, Plaintiff is no longer subject to that authority. The only circumstance in which Plaintiff alleges that third-party complainants exercise unconstitutionally delegated authority is where EPA seeks to continue "informal negotiations . . . past 180 days."  Compl. ¶ 206.  Because the complaints out of which those negotiations arose are now closed, *see* ECF No. 18, there is no prospect that EPA will seek an extension.  Plaintiff's nondelegation claims are thus no longer "live." *Yarls v. Bunton*, 905 F.3d 905, 910-11 (5th Cir. 2018).  That this Court cannot issue relief to redress Plaintiff's already-suffered nondelegation injuries, *supra* 13-14, confirms those claims are moot. *First Indiana*, 964 F.2d at 507.

The closure of the Title VI complaints also moots Plaintiff's claims challenging EPA's

disparate-impact regulations and alleged "extra-regulatory requirements" (Counts III-VI).  Insofar as Plaintiff's standing to assert these claims may have once rested on the then-ongoing informal resolution discussions, the closure of those complaints ensures that any harm Plaintiff suffered is no longer redressable by the *prospective* relief Plaintiff seeks, rendering those claims moot.  *Id.*; *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1303 (11th Cir. 2011).  The closing of the complaints also renders the prospect of future enforcement far too speculative to maintain an active case.  *See Bazzrea v. Mayorkas*, --- F. Supp. 3d ----, No. 3:22-cv-265, 2023 WL 3958912, at *6 (S.D. Tex. June 12, 2023) (case moot where "the possibility [] of . . . future adverse actions is speculative and hypothetical"); *Bain v. California Tchrs. Ass'n*, 891 F.3d 1206, 1214 (9th Cir. 2018) (case moot where "[plaintiff] has not shown … imminent injury-in-fact to preserve standing").

Plaintiff's parallel-track claim is likewise moot because the Title VI proceedings in which this alleged procedural violation occurred are now closed.  *Dorce v. City of New York*, 2 F.4th 82, 95-96 (2d Cir. 2021) (prospective relief "against future actions by a defendant does not remedy the harm done by that defendant's past acts").  Assuming this Court could ever have remedied an alleged harm to the State from "parallel tracks," intervening events have since foreclosed that possibility, rendering these claims moot.  *E.g.*, *First Indiana*, 964 F.2d at 507.

b.  The voluntary-cessation exception to mootness does not apply here because Defendants' actions are not mere "litigation posturing."  *Yarls*, 905 F.3d at 910.  There is no question that the challenged proceedings are now closed.  EPA expressly stated that, "[a]s a result of its administrative closure, EPA will not initiate under Title VI or other civil rights laws any further action, enforcement or otherwise, in response to these Complaints."  ECF No. 18-1 at 1; ECF No. 18-2 at 1.  And, as "governmental entities," Defendants "bear a 'lighter burden' in proving that the challenged conduct will not recur once the suit is dismissed as moot" because courts "presume that state actors . . .  act in good faith."  *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023).  Accordingly, Plaintiff could at best identify no more than the "mere ability to reimpose" new proceedings if similar complaints were filed in the future, which "is not enough to show a reasonable chance of recurrence." *Eden, LLC v. Justice*, 36 F.4th 166, 172 (4th Cir. 2022).

26

**C. The Court lacks jurisdiction to review Counts II-VII because Congress provided an adequate, alternative path for judicial review.**

Judicial review is also barred by the doctrine discussed in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), because Congress in Title VI created a statutory review scheme which provides a judicial remedy only when administrative enforcement proceedings culminate in certain specified agency action, none of which occurred here.  *Id.* at 207, 216 (quotation omitted). Specifically, in 42 U.S.C. § 2000d-2, entitled "Judicial review," Congress allowed judicial review for "agency action taken pursuant to [42 U.S.C.] section 2000d-1" for "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any [section 2000d-1] requirement."  Plaintiff has not shown that either of these necessary conditions are satisfied.[13]

In determining whether a plaintiff's claim is "'of the type Congress intended to be reviewed within this statutory structure,'" courts consider three factors: (1) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?", (2) "is the claim 'wholly collateral to [the] statute's review provisions'?", and (3) "is the claim 'outside the agency's expertise'?"  *Axon*, 143 S. Ct. at 900 (quoting *Thunder Basin*, 510 U.S. at 212-13).  Here, each *Thunder Basin* factor weighs in favor of the conclusion that Congress intended legal challenges to EPA and DOJ interpretations of Title VI (and regulations promulgated pursuant to Title VI) to be brought within the procedural scheme for administrative enforcement proceedings that culminates in the opportunity for judicial review.

*First*, even if it cannot pursue its claims *now*, Plaintiff would have the opportunity for meaningful judicial review should it actually suffer any injury.  In any actual enforcement proceeding— *i.e.*, once the State could plausibly allege injury—Plaintiff could raise the same challenges to those regulations that it advances here, both before the agency and on judicial review of the agency's

---

[13] A DOJ civil enforcement suit—rather than enforcement by EPA—would also allow meaningful judicial review of any challenge by the State to EPA's regulations.  *See id.* § 2000d-1.  Likewise, the State could separately obtain judicial review of EPA's regulatory conditions on federal grants by submitting a dispute over the objectionable grant terms to EPA pursuant to 2 C.F.R. § 1500.15, and, if resolved unfavorably, appealing that unfavorable outcome to a district court.  *See id.* § 1500.17(b)- (e) (final dispute determinations constitute "final agency action").

determination in district court. *See supra* 4; 40 C.F.R. § 7.130(b)(2) (providing for proceedings before ALJ to obtain compliance with EPA Title VI regulations); 42 U.S.C. § 2000d-2 (providing for judicial review of any decision to terminate or refuse to grant funding upon a finding of a failure to comply with Title VI requirement).  Plaintiff in those proceedings could likewise challenge any "extra-regulatory" requirements that EPA allegedly sought to impose (Count VI) or any alleged procedural infirmities in those proceedings (Count VII).

 *Second*, Plaintiff's claims are not "wholly collateral" to the administrative review scheme.  *Bank of La. v. FDIC*, 919 F.3d 916, 928 (5th Cir. 2019).  Instead, their claims challenging EPA and DOJ regulations are "inextricably intertwined" with the issue that would be at the heart of a future enforcement proceeding:  whether certain conduct constitutes unlawful discrimination under Title VI's prohibition on discrimination.  *Id.*  Likewise, Plaintiff's claims arising from "alleged irregularities in the agency enforcement proceedings" can be raised "as defenses," and are therefore not "wholly collateral" to the administrative enforcement scheme.  *Id.*

 *Third*, Plaintiff's claims, which concern the obligations of State agencies under civil rights laws as administered by EPA and DOJ, are within the heartland of EPA and DOJ's expertise because they require "interpretations of statutes authorizing agency action."  *Id.* at 929.  "[T]here are precious few cases involving" such questions "in which [judicial] review is not aided by the agency's statutory construction."  *Id.* (quotation omitted); *see also Thunder Basin*, 510 U.S. at 214 (1994) (claims that require interpretation of a statute enforced by an agency "fall squarely" within that agency's expertise, and lead to the conclusion that "exclusive review before the [agency] is appropriate").  Accordingly, this Court lacks jurisdiction to review Plaintiff's claims in Counts II-VII outside the context of the regulatory scheme created by Congress for administrative enforcement and judicial review under the civil rights statutes.

 At a minimum, judicial review is unavailable as to Plaintiff's Administrative Procedure Act (APA) claims on these counts because the APA limits judicial review to "those agency actions which otherwise lack an 'adequate remedy in a court.'"  *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (*per curiam*) (quoting *Bowen v. Mass.*, 487 U.S. 879, 903 (1988)); 5 U.S.C. § 704 (review available for "final

agency action for which there is no other adequate remedy in a court"). Here, an adequate remedy in a court is available. If EPA or DOJ wished to terminate federal funding on the basis of any of the challenged regulations or otherwise enforce those regulations, EPA or DOJ would first need to give notice of a potential violation, attempt to resolve the issue through voluntary means, and provide the recipient with a formal administrative hearing, with the administrative determination subject to judicial review. *See* 40 C.F.R. § 7.130(b)(2); 42 U.S.C. § 2000d-2. In any such hypothetical enforcement action, Plaintiff would be able to raise legal objections during the administrative proceedings and again on judicial review. The civil rights statutes thus "provide[] a direct and guaranteed path to judicial review," precluding this Court's exercise of jurisdiction. *Hinojosa*, 896 F.3d at 312.

### D.  Plaintiff identifies no timely final agency action for any of its APA claims.

The APA provides jurisdiction to review only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Plaintiff does not, and could not, claim that any alleged action by Defendants is "made reviewable by statute," so it must therefore point to "final agency action" to proceed with its APA claims. Agency action is "final" when it both (1) marks "the consummation of the agency's decisionmaking process[,]" and (2) determines a party's "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 596-600 (2016). An agency action that "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is not final for purposes of this requirement. *Peoples Nat'l Bank v. Off. of Comptroller of Currency of the United States*, 362 F.3d 333, 337 (5th Cir. 2004) (citation omitted). And "[i]f there is no 'final agency action,' a federal court lacks subject matter jurisdiction." *Id.* at 336 (citation omitted). All of Louisiana's APA claims fail this requirement.

### 1.  Plaintiff identifies no timely final agency action for its APA challenges to the EPA and DOJ disparate-impact regulations (Counts III and IV).

Although Defendants do not dispute that the promulgation of a federal regulation constitutes "final agency action" under the APA, the disparate-impact rules Louisiana purports to challenge were first published over fifty years ago and last amended (in minor technical fashion) over twenty years

ago—well past the applicable six-year statute of limitations.  AR286; 28 U.S.C. § 2401(a) (barring civil actions not commenced within six years).  The State's facial challenge to these provisions is therefore untimely, as the State itself acknowledges.  *See* ECF No. 15 at 14; *see also Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997) ("On a facial challenge to a regulation, the limitations period begins to run when the agency publishes the regulation in the Federal Register.").  And to prevail on an as-applied challenge to the regulations, Louisiana must instead "show some direct, final agency action involving the particular plaintiff within six years of filing suit." *Id.*  Plaintiff's as-applied APA challenges to the EPA and DOJ disparate-impact regulations fail because it cannot identify a final agency action applying these regulations to the State in the past six years within the meaning of the APA.

*First*, Louisiana alleges "final agency action" by way of EPA's alleged application of its Title VI disparate-impact regulations to the State when responding to the LDEQ and LDH complaints, Compl. ¶ 224.  This argument is foreclosed by controlling precedent.  In *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994), the Fifth Circuit held that "[a]n agency's initiation of an investigation does not constitute final agency action," (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 239-45 (1980)), since an "allegation made in an enforcement suit does not impose the kind of legal obligation with which the finality doctrine is concerned," *Dow Chemical Co. v. EPA*, 832 F.2d 319, 325 (5th Cir. 1987).  "Normally, the plaintiff must await resolution of the agency's inquiry and challenge the final agency decision . . . .  An attack on the authority of an agency to conduct an investigation does not obviate the final agency action requirement." *Veldhoen,* 35 F.3d at 225 (internal citations omitted).  Moreover, where the LDEQ and LDH complaints were recently closed with no action taken, let alone any action taken under the EPA's disparate-impact regulations, EPA's investigation imposed no "rights or obligations" upon the State for purposes of an as-applied APA challenge. *Bennett*, 520 U.S. at 178.

*Second*, the State cannot use its acceptance of new federal grants conditioned on adherence to decades-old preexisting regulations, *see* ECF No. 15 at 13; Compl. ¶¶ 224, 231, to assert a challenge to those regulations which would otherwise be time-barred.  It is not enough that the challenged action

is "one by which rights or obligations have been determined, or from which legal consequences will flow." *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) (quoting *Bennett*, 520 U.S. at 177-78). Rather, the Fifth Circuit has held that "[t]hese rights, obligations, or legal consequences *must be new*." *Id.* (emphasis added) (citing *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 756 (5th Cir. 2011)). In *National Pork Producers Council*, the court considered whether letters issued by EPA to regulated parties purporting to "obligate them to obtain a permit if they discharge manure or litter through ventilation fans or face legal consequences" constituted reviewable final agency action. 635 F.3d at 756. The court held they did not, because the letters did not "create *new* legal consequences nor affect [plaintiffs'] rights or obligations," but "merely restate[d] [a preexisting] prohibition against discharging pollutants without a[] permit. . . . Moreover, an agency's actions are not reviewable when they merely reiterate what has already been established." *Id.* (internal citations omitted). There is therefore no final action where an agency only "impose[s] upon [the regulated entity] the already-existing burden of complying with the [statute] and its implementing regulations." *Acker v. EPA*, 290 F.3d 892, 894 (7th Cir. 2002). Here too, as in *National Pork Producers Council*, the obligatory language Louisiana points to in EPA's and DOJ's grants merely obligates the State to comply with the same requirements they have been subject to for decades. *See* Watkins Decl. ¶¶ 10-11 ("since 1973, every application for financial assistance submitted to EPA has been required to include a statement of assurance that the recipient will conduct the program in compliance with all requirements imposed by 40 C.F.R. Part 7"). The State cannot revive its untimely challenge to EPA's and DOJ's disparate-impact regulations by pointing to longstanding terms of federal funding grants, to which the State has for decades repeatedly acceded when seeking and accepting funding.

*Third*, the State appears to argue that DOJ's withdrawal in early 2021 of a draft rule which would have allegedly eliminated disparate-impact requirements constitutes a final agency action within the meaning of the APA. *See* ECF No. 15 at 14. It is not clear whether Louisiana intends to assert an independent APA claim challenging the withdrawal itself, or whether it believes that the cited withdrawal somehow permits it to circumvent the statute of limitations which otherwise bars its challenge to DOJ's regulations. *See id.*; Compl. ¶ 239. In either event, however, Plaintiff's claim fails

because pre-publication withdrawal of a draft rule does not constitute a final agency action for purposes of the APA.

Until a rule "is filed for public inspection with the Office of the Federal Register," it is "'not valid' and enforceable against the public at large." *GPA Midstream Ass'n v. DOT*, 67 F.4th 1188, 1195 (D.C. Cir. 2023).  Lacking enforceability, such an unpublished rule is not, therefore, an action by which "rights or obligations have been determined" or from which "legal consequences will flow," as required under the APA.  *Bennett*, 520 U.S. at 178.  Moreover, submission of a draft rule to OMB for evaluation and OMB's eventual pass-back of a draft to an agency for further action does not mark the "consummation" of DOJ's decision-making process, but merely constitutes a "tentative or interlocutory" step in a process that may, eventually, culminate in publication of the final rule by the Office of the Federal Register.  *Id.* at 177-78.  *See generally* Exec. Order No. 12,866 §§ 6, 8, 58 Fed. Reg. 51,735 (Sept. 30, 1993) (requiring agencies to "adhere to" specified "procedures" prior to "publish[ing] a rule] in the Federal Register or otherwise issu[ing] to the public any regulatory action that is subject to review").  Indeed, for the purposes of exercising judicial review, courts have consistently understood publication in the Federal Register as the relevant moment a substantive rule becomes final agency action.  *See, e.g.*, *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980) (explaining "publication" of regulations constituted "final agency action subject to judicial review"); *see also Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564, 579 (D.C. Cir. 2022) ((Rao, J., dissenting) (citing cases), *reh'g denied*, 54 F.4th 733 (D.C. Cir. 2022).

### 2.    Plaintiff identifies no reviewable "final agency actions" for its nondelegation and "parallel track" APA claims (Counts II and VII).

Louisiana also purports to assert APA challenges to a swath of interlocutory steps taken during EPA's negotiations with the State regarding the LDEQ and LDH complaints.  Those steps include the agency's alleged provision of "veto power" to "Private Special Interest Groups" when it consulted with the LDEQ and LDH complainants to evaluate the prospects for a successful informal resolution agreement, ECF No. 15 at 13 (Count II), and EPA's decision to continue "its fact-finding on a parallel track with the IRA process to ensure that EPA . . . is in a position to resolve the complaint," Compl.

¶ 258 (Count VII).  As to the former, the State identifies "EPA's conferral of veto powers to Private Special Interest Groups[,]" its "March 2023 inquiry to those groups as to whether they wished to exercise that veto power with respect to the informal proceedings[,]" and EPA's "subjecting the State to governmental proceedings in which nongovernmental actors possessed veto power over the agency's exercise of its authority" as final agency actions under the APA.  *Id.* ¶¶ 216-17.  And as to its "parallel track" claim, the State asserts that "EPA's decision to proceed to the processes of § 7.115 is final agency action within the meaning of the APA."  *Id.* ¶ 260.  But none of these alleged actions satisfy the requirements of *Bennett*, or amount to "direct, final agency action involving the [State]."  *See Dunn-McCampbell*, 112 F.3d at 1287.[14]

Merely obtaining input on the desirability of continuing talks from the parties to a prospective informal resolution agreement "is not a definitive statement of position," but rather "represents a threshold determination that further inquiry is warranted."  *Standard Oil*, 449 U.S. at 241.  If, as *Standard Oil* held, an agency's issuance of an administrative complaint to initiate proceedings is not final agency action, then one of many interlocutory steps in the course of such proceedings likewise cannot amount to final agency action.  *Id.*  After all, an agency action that "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is not final for purposes of the APA.  *Peoples Nat'l Bank*, 362 F.3d at 337 (citation omitted).  EPA's decision to seek input from complainants, like its decision to structure its internal operations to enable more efficient processing of complaints by proceeding on "parallel tracks" of investigation and negotiation, imposes no "rights and obligations" on Louisiana, nor marks "the consummation of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 177-78 (citation omitted).  Indeed, these procedural steps were interlocutory parts of EPA's broader investigation—an investigation which

---

[14] Insofar as the State seeks to advance a facial challenge to the regulation authorizing EPA to extend the 180-day deadline in agreement with the complainant and complained-against party, 40 C.F.R. § 7.120, that challenge falls outside the 6-year statute of limitations.  Section 7.120 was last amended in 2010, and "[o]n a facial challenge to regulation, the limitations period begins to run when the agency publishes the regulation in the Federal Register."  *Dunn-McCampbell*, 112 F.3d at 1287.

itself "does not constitute final agency action" under the APA. *Veldhoen*, 35 F.3d at 225. Plaintiff's challenges to these interlocutory steps must be dismissed for lack of final agency action.

### 3.    To the extent Plaintiff's "extra-regulatory requirements" claim asserts an APA violation, it identifies no final agency action (Count VI).

If Louisiana intended to assert an APA claim for Count VI, *see* Compl. ¶¶ 249, 253, that claim also fails for lack of final agency action. According to the State, "[t]hroughout the informal negotiations, EPA . . . has repeatedly demanded that the State submit to new requirements, of its own recent invention." ECF No. 15 at 48. But merely hearing EPA's proposal—by its very nature a tentative and interlocutory suggestion—does not obligate the State to obey its terms, particularly as the complaints were closed rather than settled. Accordingly, statements and proposals made during voluntary negotiations do not constitute final agency action. *See Robishaw Eng'g Inc. v. United States*, 891 F. Supp. 1134, 1150-51 (E.D. Va. 1995) (statements by Army officials during negotiations with patentee expressing view that United States held royalty-free license in patents were not final agency action); *Hazardous Waste Treatment Council v. Reilly*, 938 F.2d 1390, 1396 (D.C. Cir. 1991) ("statements and allegations," including EPA's "repeated warnings that it might withdraw North Carolina's [hazardous waste management] authorization when asked its opinion . . . . do not constitute a definitive position with a direct and immediate impact on the rights of petitioners such that they represent a final statement of the agency's position").

The State's passing reference to two recent EPA guidance documents—the "2022 FAQ" and "2023 Cumulative Impacts Addendum", ECF No. 15 at 40—cannot save its argument. On their face, these documents both disclaim any power to "create, expand, or limit any legal rights, obligations, responsibilities, expectations, or benefits." ECF Nos. 12-46 and 12-47 at 1. And in practice, EPA's express disavowal of these two documents as binding authority was confirmed by the course of negotiations at issue here, where the State faced no obligation to obey the complained-of "extra-regulatory requirements." Because neither EPA's statements during negotiations nor its later guidance documents imposed any rights, obligations, or legal consequences—and because Plaintiff complains

of no more than tentative proposals, never accepted—none of the steps the State identifies can serve as final agency actions for purposes of judicial review.

      **4.**      **Plaintiff cannot evade the APA's finality requirement by invoking equitable non-statutory *ultra vires* causes of action.**

Five of Louisiana's claims also identify an alternative cause of action pursuant to non-statutory "*ultra vires*" review. *See* Compl. ¶¶ 209, 220, 230, 246, 249, 253 (Counts I, III, IV, V and VI). Claims of agency action in excess of statutory or constitutional authority are properly pled under the APA, not as *ultra vires* claims. *See e.g., Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) ("You may not bypass the specific method that Congress has provided for reviewing adverse agency action . . .") (citing 5 U.S.C. §§ 703, 704). *Ultra vires* review is a "rarely invocable," "narrow exception" to the APA's final agency action requirement that permits judicial intervention for only the most "egregious error[s]" where a party is "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its rights." *Am. Airlines, Inc. v. Hermann*, 176 F.3d 283, 293-94 (5th Cir. 1999); *see also Leedom v. Kyne*, 358 U.S. 184 (1958); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). Indeed, seeking *ultra vires* review under *Kyne* "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.). To support such a claim, allegations that an agency has acted in excess of statutory authority may not "simply involve a dispute over statutory interpretation," as Plaintiff here has sought to do. *See Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997); *Exxon Chem. Am. v. Chao*, 298 F.3d 464, 469 (5th Cir. 2002) (rejecting jurisdiction based on the *Kyne* exception where the plaintiff "can obtain meaningful judicial review" upon exhausting administrative proceedings). And courts may not engage in *ultra vires* review to "police" the "purity" of hypothetical agency actions "long before the administrative process is over." *Sanderson Farms, Inc. v. NLRB*, 651 F. App'x 294, 298 (5th Cir. 2016). Instead, under clear Fifth Circuit precedent, the Court should dismiss the State's *ultra vires* claims for lack of subject matter jurisdiction.

II.   **PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS ON EACH CLAIM.**

Even if the Court concludes that it has subject matter jurisdiction to decide any of Plaintiff's claims, those claims should nonetheless be dismissed for failure to state a claim, or in the alternative summary judgment should be granted for Defendants.  To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court accepts well-pleaded allegations, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id.* at 678, 681.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When reviewing agency action under the APA on a motion for summary judgment, a court may set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Yogi Metals Grp., Inc. v. Garland*, 38 F.4th 455, 458 (5th Cir. 2022) (quoting 5 U.S.C. § 706(2)(A)).  This "narrow standard of review does not seek the court's independent judgment; it asks only whether the agency engaged in reasoned decision making based on consideration of the relevant factors." *Id.*

### A.  Plaintiff's nondelegation claims are meritless (Counts I and II).

The nondelegation doctrine prohibits Congress from vesting other entities with "powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (internal quotes and citations omitted).  Although Plaintiff nominally asserts a claim under the nondelegation doctrine, it does not contend that Congress has sought to vest legislative power in a private entity, and it therefore fails to meet the basic requisites of a nondelegation claim.

Instead, Plaintiff's purported nondelegation concern is over a minor interim measure that EPA sometimes takes in the course of responding to a Title VI complaint.  By regulation, EPA has committed itself to "promptly investigate all [Title VI] complaints" and, if applicable, to issue

preliminary findings of discrimination "within 180 calendar days" from the start of the investigation. 40 C.F.R. §§ 7.120, 7.115(c)(1).  But an exception to this promptness requirement exists where EPA believes informal resolution of the complaint is possible and both the complainant and the funding recipient "agree to a delay pending settlement negotiations."  *Id.* § 7.120.

This procedural condition to which Plaintiff objects—seeking consent from the complainants to extend the deadline—is not an exercise of governmental power.  As the Fifth Circuit has explained, "an agency does not improperly subdelegate its authority when it 'reasonabl[y] condition[s]' federal approval on an outside party's determination of some issue; such conditions only amount to legitimate requests for input."  *Rettig*, 987 F.3d at 531 (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566-67 (D.C. Cir. 2004)) (alterations in original).  Seeking concurrence on extending's EPA's regulatory deadline to allow for continuing resolution talks is a sensible and efficient process.  Plainly, "there is a reasonable connection between the outside entity's decision and the federal agency's determination." *Id.* at 531 (quotation omitted).  No more is required to satisfy the private nondelegation doctrine.

What is more, it is EPA that at all times retains the sole authority to investigate discrimination allegations and, if it makes a finding of discrimination (which it did not do here), to consider enforcing its Title VI regulations.  *See* 40 C.F.R. § 7.130(a) (providing that EPA "may" take enforcement action absent a recipient's compliance).  A Title VI complainant, by contrast, has no power to take any Title VI disparate-impact enforcement action.  Plaintiff is thus flatly wrong when it contends that EPA has "render[ed] itself subordinate to private groups" in enforcing Title VI.  ECF No. 15 at 16-17.

Courts have upheld against nondelegation challenges far more substantial private conditions on federal action than what Plaintiff has alleged here.  In *Currin v. Wallace*, Congress had authorized the Agriculture Secretary to regulate tobacco auctions but not "unless two-thirds of the [tobacco] growers, voting at a prescribed referendum, favor it."  306 U.S. 1, 6 (1939).  The Supreme Court rejected as "untenable" the claim that this effective veto over federal regulation was an unconstitutional delegation of government power to the private growers: "[T]he required referendum does not involve any delegation of legislative authority.  Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers

voting favor it.'"  *Id.* at 15.  If the full weight of governmental power to regulate can be conditioned on the approval of the regulated entities *themselves*, then surely EPA can abandon informal resolution efforts if the affected parties do not think it will be worthwhile.  *See also Pittston Co. v. U.S.*, 368 F.3d 385, 395 (4th Cir. 2004) (concluding that private entity's implementation of a federal retirement program did not violate private nondelegation doctrine); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) (private developer can, without violating the nondelegation doctrine, assist agency in preparing an environmental impact statement for project in which the developer is an interested party).

Plaintiff relies heavily on the Fifth Circuit's decision in *National Horsemen's Benevolent & Protective Association v. Black*, 53 F.4th 869 (5th Cir. 2022).  But that decision invalidated a statute that granted to a private entity the authority to prescribe *all* nationwide rules regulating horseracing.  The supervising agency, the Federal Trade Commission, in fact lacked "meaningful oversight" because it "does not write the rules, cannot change them, and cannot second-guess their substance."  *Id.* at 872.  A Title VI complainant, by contrast, has no authority to prescribe any rules to anyone, let alone those affecting EPA's investigation.  Under EPA's regulatory scheme, the complainant does not "create[] the law or retain[] full discretion over any regulations."  *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023).  Indeed, the complainant has no role whatsoever in any of EPA's investigative decisions, and it is EPA, not the complainant, which determines whether to reach any informal resolution agreement with the recipient.  Plaintiff's assertion that EPA has a "complete lack of oversight power" is nothing more than misplaced hyperbole.  ECF No. 15 at 17.  Because the complainant is not purporting to enforce Title VI or to investigate the recipient, there is nothing for EPA to oversee.

At bottom, a Title VI complainant wields no governmental power and the nondelegation doctrine does not apply here.  Even if a complainant's (and a recipient's) right to object to more time for negotiations could somehow be construed as an exercise of governmental power, there is no doubt that the complainant "functions subordinately" to EPA, and that EPA has "authority and surveillance" over whatever Title VI activities the complainant undertakes, rendering such delegations permissible.  *Rettig*, 987 F.3d at 532.  Plaintiff's nondelegation claims should be dismissed, or summary judgment entered for Defendants.

**B. Plaintiff's claims challenging Defendants' disparate-impact regulations are meritless (Counts III, IV, and V).**

Section 601 of Title VI ensures that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Section 602, in turn, "authorize[s] and direct[s]" each Federal agency responsible for distributing federal funds to "effectuate" Section 601 "by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. Based on its decision in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), the Supreme Court has understood Section 601 to prohibit, of its own force, only intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). As the Supreme Court has previously recognized, this reading of Section 601 does not undercut the validity of Defendants' disparate-impact regulations, issued under Section 602. *See Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 607 n.27 (1983) (opinion of White, J.) ("*Guardians*"). The regulations are fully consistent with Section 602's directive to federal agencies to "effectuate" Section 601's prohibition on intentional discrimination.

> **1. The Supreme Court has recognized the validity of Defendants' disparate-impact regulations, which are amply supported by Title VI's broad delegation of rulemaking power, its legislative history, the agencies' consistent and reasonable interpretation, and congressional ratification.**

Plaintiff acts as if the validity of Defendants' Title VI disparate-impact regulations is an open question for this Court to decide. It is not. The Supreme Court found the federal agencies' disparate-impact regulations to be valid in *Guardians*, and neither the Court nor the Fifth Circuit has held otherwise since. Even if it were an open question, Title VI's text and legislative history show Congress's intent to delegate broad powers to federal funding agencies to determine how best to "effectuate" the anti-discrimination mandate of Section 601, including by proactively prohibiting unjustified discriminatory effects as a means to uncover and stop perpetuating intentional discrimination. And even if the text and legislative history did not supply a ready answer, Congress has subsequently ratified Defendants' reasonable and consistent interpretation.

a.  The Supreme Court has long recognized that the Title VI regulations validly prohibit practices having an unjustified discriminatory effect on protected groups, even if the funding recipient's actions or practices cannot be proven to be intentionally discriminatory.  In *Guardians*, five Justices "form[ed] a majority for upholding the validity of the regulations incorporating a disparate-impact standard."  463 U.S. at 607 n.27 (opinion of White, J.); *see also id.* at 623 n.15 (Marshall, J., dissenting); *id.* at 642-45 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting).  The Court later reaffirmed that it had "held [in *Guardians*] that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI."  *Alexander v. Choate*, 469 U.S. 287, 293 (1985).[15]

The Supreme Court in *Sandoval* questioned, but did not disturb, this conclusion.  532 U.S. at 281-82.  There, the Court considered whether a private right of action existed to enforce the disparate-impact regulations promulgated by DOJ and DOT.  *Id.* at 278.  The Court acknowledged that, although fractured across multiple opinions, "five Justices in *Guardians* voiced [their] view," at least as alternative grounds for their decisions, that the regulations promulgated under Section 602 "may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601."  *Id.* at 281-82 (citations omitted).  The Court also recognized that "dictum in *Alexander v. Choate* is to the same effect."  *Id.* at 282 (citation omitted).  Despite stating that there was "considerable tension" between these statements and the rule from *Bakke* that Section 601 prohibits only intentional discrimination, the Court continued to "assume for the purposes of deciding th[at] case that the [agencies'] regulations proscribing activities that have a disparate impact on the basis of race are valid."  *Id.*  The Supreme Court has not since held otherwise.

The Fifth Circuit has recognized that *Sandoval* "left untouched *Choate*'s apparent approval of the promulgation and enforcement of disparate-impact regulations by federal agencies."  *Rollerson v.*

---

[15] Even before *Guardians*, the Supreme Court in *Lau v. Nichols*, 414 U.S. 563 (1974), relied in part on an agency's Title VI disparate-impact regulation to order prospective relief in the absence of a finding of discriminatory intent.  *Id.* at 568; *see also id.* at 569-71 (Stewart, J., concurring); *accord Fullilove v. Klutznick*, 448 U.S. 448, 479 (1980) (Burger, C.J.).

*Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, 6 F.4th 633, 643 (5th Cir. 2021).  Although two judges expressed doubts about the underlying conclusions in *Guardians* and *Choate*, *id.* at 647 (Jones, J., concurring); *id.* at 648-50 (Ho, J., concurring in part), the Fifth Circuit has not held that it could deviate from this Supreme Court precedent.  *See id.* at 643 n.6 ("assum[ing] arguendo that the DOD's disparate-impact regulations are valid").

b.  Even if the issue were undecided, Title VI's text and legislative history evince Congress's broad delegation of authority to agencies to accomplish the anti-discrimination mandate of Section 601, which federal agencies have reasonably and consistently interpreted for more than fifty years. Section 602's plain text "authorize[s] and direct[s]" each agency empowered to extend federal financial assistance "to effectuate" the antidiscrimination mandate of Section 601 "by issuing rules, regulations, or orders of general applicability."  42 U.S.C. § 2000d-1.  Although "effectuate" is not defined in the statute, its plain meaning is to "bring about" or "cause to happen."  *Webster's New World Dictionary of the American Language* 445 (2d college ed. 1970).  Section 602 thus empowers federal agencies to determine how best to prohibit intentional discrimination by their funding recipients.  *Cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998) (recognizing that agencies "generally have authority to promulgate and enforce" broad administrative requirements to "effectuate" a statute's nondiscrimination mandate).

The legislative history confirms that Congress expected federal agencies to elucidate what conduct would be prohibited to make Section 601 effective.  During the Senate hearings on the Civil Rights Act, for example, Senator Ervin observed that the agencies would be writing definitions of the term "discrimination" and "prescribing the acts and omissions which shall constitute illegal discrimination."  *Civil Rights—The President's Program, 1963: Hearings Before the Senate Comm. on the Judiciary*, 88th Cong., 1st Sess. 398 (1963).  Attorney General Kennedy confirmed that it would be up to the administrator of each agency to write rules setting out "not only what constitutes discrimination in their programs but also what acts or omissions are to be forbidden."  *Id.* at 399-400.  Congress understood that, in setting out such rules, the agencies would be acting to "prevent," "preclude," "end" or "get away from" discrimination, to "insure" that discrimination would not occur, and that

"discrimination does not result from" the award of federal funds.  *See, e.g.*, *Civil Rights: Hearings Before the House Comm. on the Judiciary*, 88th Cong., 1st Sess. Pt. 4, at 2683, 2774 (1963); *Civil Rights: Hearings Before the House Comm. on Rules*, 88th Cong., 2d Sess. Pt. 1, at 94; Pt. 2, at 321, 330, 346, 348.

In line with this mandate, Defendants' discriminatory-effect regulations are prophylactic measures that "effectuate" Section 601's prohibition on intentional discrimination in at least two ways. First, a regulation prohibiting discriminatory effects helps to root out intentional discrimination that is otherwise hard to detect or prove.  It is well-recognized that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see also Texas Dept. of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015) (*Inclusive Communities*).  Second, a regulation prohibiting discriminatory effects ensures that programs accepting federal funds are not perpetuating the effects of past intentional discrimination.  As the Supreme Court has explained, the disparate impact of certain actions may well be traceable to the long history of invidious race discrimination.  See *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-31 (1971); *see also City of Rome v. United States*, 446 U.S. 156, 176-77 (1980).

Defendants' disparate-impact regulations—consistent, longstanding, and widely adopted by other federal agencies in their interpretations of Title VI—are entitled to "particular deference."  *See Barnhart v. Walton*, 535 U.S. 212, 219-20 (2002).  The model regulation, drafted by a Presidential task force with the Department of Justice, was promulgated almost contemporaneously with Title VI itself and has not substantively changed in the decades since.  *See Guardians*, 463 U.S. at 618 (Marshall, J., dissenting) (summarizing history).  Defendants' disparate-impact regulations are, at very least, reasonably related to the purposes of the enabling legislation.  *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973); *see also Brackeen v. Haaland*, 994 F.3d 249, 354 (5th Cir. 2021) (en banc) (Dennis, J., writing for the en banc majority in Part II(D)(2)) (analyzing *Mourning* under *Chevron* step two), *rev'd in part on other grounds*, 143 S. Ct. 1609 (2023).

c.  If the regulations' validity were somehow still in doubt, Congress's subsequent legislative actions have repeatedly ratified the more than 50-year-old disparate-impact regulations.  In that time,

Congress has not only failed to repudiate the regulations when amending Title VI, but has actively incorporated them or preserved them in other legislation.

With full awareness of the disparate-impact regulations, Congress has refused to amend the statute to bar the agencies' interpretation.  In 1966, the House defeated a proposal to amend Title VI to prohibit only intentional discrimination.  *See Guardians*, 463 U.S. at 620 & n.8 (Marshall, J., dissenting).  And in the Civil Rights Restoration Act of 1987 (CRRA), Pub. L. No. 100-259, 102 Stat. 28, Congress amended Title VI to expand the definition of "program or activity."  *See id.* § 6,102 Stat. 31 (codified at 42 U.S.C. § 2000d-4a).  Although Congress at that time was aware of *Guardians* and that "the Federal courts have upheld the use of an effect standard," 134 Cong. Rec. 229 (1988) (statement of Sen. Kennedy), it made no move to limit the disparate-impact regulations.

Far from repudiating the agencies' interpretations, Congress has used the Title VI regulations as a model for other legislation.  Congress enacted several statutes in the 1970s and early 1980s that specifically required agencies to promulgate regulations "similar" to those under Title VI.  *See* 15 U.S.C. § 719o; 49 U.S.C. § 47123; 43 U.S.C. § 1863; *see also* Pub. L. No. 93-153, § 403, 87 Stat. 590 (1973).  In the same time frame, Congress enacted additional statutes providing that a prohibition on sex discrimination in federally assisted programs would be enforced through "agency provisions and rules similar to those already established . . . under title VI."  15 U.S.C. § 775; *see* 40 U.S.C. § 122 (formerly 40 U.S.C. § 476); 42 U.S.C. § 6709; 23 U.S.C. § 324; *see also Guardians*, 463 U.S. at 620 & n.9 (Marshall, J., dissenting) (identifying 10 statutes Congress enacted that were modeled on Title VI, none of which defined discrimination to require proof of intent).

Even after *Sandoval*, Congress left the administrative regime untouched.  In 2010, in Section 1557(b) of the Patient Protection and Affordable Care Act (ACA), Congress specifically provided that "[n]othing in this title . . . shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964," among other statutes.  42 U.S.C. § 18116.

## 2.    Plaintiff's contrary arguments have no merit.

Despite the Supreme Court's decisions, the statute's text and legislative history, federal agencies' reasonable interpretations, and Congress's subsequent ratification, Plaintiff presses this Court to be the first to invalidate Defendants' Title VI disparate-impact regulations.  This Court should reject Plaintiff's entreaty.

a.   Referencing statutory context, Plaintiff seems to argue (ECF No. 15 at 26-30) that Congress did not intend to prohibit disparate impact when passing Title VI so the agencies should not be able to do so either.  But this misses the point.  The question at this juncture is not whether Congress itself intended to prohibit disparate impact, but whether Congress intended to allow the agencies, in their expertise, the power to do so.  As explained above, the plain meaning of the broad textual delegation in Section 602 supports, and the legislative history confirms, Congress's intent to allow the agencies to determine how best to uncover and stamp out discrimination.  The agencies' determination is at the very least reasonable.

Plaintiff is incorrect that a comparison to other civil rights statutes undercuts this argument. *See* ECF No. 15 at 26-27, 29-30.  As Plaintiff notes, Title VII of the Civil Rights Act and the Voting Rights Act each include provisions that expressly prohibit disparate effects in the body of the statute. *See id.* at 26-27.  Plaintiff argues that the omission of similar language in Title VI "should be given effect." *Id.* at 26; *see also id.* at 29.  But Plaintiff predicts the response that the statutes are simply designed differently; while "Title VII . . . impose[s] disparate-impact liability on its own," "Title VI  . . . give[s] the Executive the option to do so." *Id.* at 29.  "But if that was what Congress intended," Plaintiff asks, "why not just say *that*?" *Id.*  The answer, of course, is that it did.  Congress explicitly "authorized" and "directed" the agencies to "effectuate" the prohibition in Section 601, giving the Executive the option to prohibit a greater array of conduct than that directly prohibited.  42 U.S.C. § 2000d-1.

Likewise, Plaintiff is mistaken that the statutory safeguards regarding agency enforcement suggest Congress's intent to give the agencies *less* discretion. *See* ECF No. 15 at 27-28.  Plaintiff argues that it is "fanciful" to think that Congress intended federal agencies to be able to regulate broadly

given the "numerous, detailed, and extensive protections before the Executive can take *any* actions under Title VI against grant recipients." *Id.* at 28.  To the contrary, the broad "latitude" given "to the executive in drafting rules and regulations" is precisely what led Congress to adopt the unusual requirement that the President approve each agency's Title VI regulations.  *See* 110 Cong. Rec. at 2499 (Rep. Lindsay); 42 U.S.C. § 2000d-1.

b.  Plaintiff also argues (ECF No. 15 at 21-24) that Defendants' disparate-impact regulations not only fail to "effectuate," but in fact "frustrate," the prohibition on intentional discrimination in Section 601.  Not so.  As explained above, the text and legislative history demonstrate Congress's intent to enable agencies to determine how best to effectuate Section 601's anti-discrimination provision.  Here, Defendants' disparate-impact regulations root out discrimination where intent is hard to prove and ensure that the effects of past discrimination are not perpetuated.

Rather than being "in severe tension" with each other (ECF No. 15 at 24), the theories of intentional discrimination and disparate impact simply recognize two different forms that invidious discrimination may take.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).  As explained in the Title VII context, intentional discrimination, or disparate treatment, "is the most easily understood type of discrimination" in which some people are treated less favorably than others because of a protected characteristic.  *See id.*  Unlawful disparate impact occurs when practices are "facially neutral in their treatment of different groups but [] in fact fall more harshly on one group than another" and cannot be justified by a defense.  *Id.*  As the Supreme Court has explained, "the necessary premise of the disparate impact approach is that some . . . practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988).

The lack of a good-faith defense for disparate-impact claims does not demonstrate, as Plaintiff argues, a "fundamental conflict" between the Section 602 regulations and Section 601's prohibition on intentional discrimination.  *See* ECF No. 15 at 25-26, 30-31.  Again, disparate treatment and disparate impact are two manifestations of the same problem.  It is precisely because intentional discrimination is hard to prove or unintentionally perpetuated that a prohibition on disparate impact

may be needed.  *See Inclusive Communities*, 576 U.S. at 540 (explaining that "[r]ecognition of disparate-impact liability . . . permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment").

While there is no good-faith defense, that does not mean that the reach of the disparate-impact regulations is unchecked or that funding recipients have no defense in the face of statistical disparities in their programs or activities.  First, as Plaintiff notes (ECF No. 15 at 23), Section 602 requires regulations effectuating Section 601 to "be consistent with achievement of the objectives of the statute authorizing the financial assistance."  42 U.S.C. § 2000d-1.  Second, while Plaintiff maintains (ECF No. 15 at 23), that it "cannot be the law" that disparate-impact regulations are consistent with the achievement of the purpose of all spending statutes, the regulations target only programs or activities that "have the effect of subjecting individuals to discrimination."  *See* 28 C.F.R. § 42.104(b)(2); 40 C.F.R. § 7.35(b).  Critically, to have an unlawful discriminatory effect means that there is no substantial legitimate justification for the disparate impact, or, if there is a legitimate justification, that there is no less discriminatory alternative to achieve that justification or that the justification is a pretext for discrimination.  *Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 754 n.3 (5th Cir. 1989).  In no spending statute has Congress authorized federal funds to be spent in a discriminatory manner without a legitimate justification.

c.  As a final resort, Plaintiff attempts to muddy the waters with inapposite constitutional and administrative law issues.  Its arguments regarding the Spending Clause, the Equal Protection Clause, and the major questions doctrine (Doc. 15, at 32-36) are without merit.

*First*, whatever the limits of Congress's spending power, "they have not been reached here." *Lau v. Nichols*, 414 U.S. 563, 569 (1974).  Plaintiff argues that Defendants' disparate-impact regulations violate the Spending Clause because Title VI does not unambiguously impose such requirements in the statute's text.  ECF No. 15 at 32-33; *see also* Compl. ¶¶ 241-46.  However, Title VI unambiguously requires federal funding recipients to refrain from discrimination and to follow validly promulgated regulations effectuating that prohibition, as Congress directed.  Plaintiff cannot credibly claim to have lacked notice of its obligations under the statute and Defendants' long-standing disparate-impact

regulations, particularly when it signed assurances to that effect when applying for EPA's funds.  *See* 40 C.F.R. § 7.80(a)(1).

In *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), the Supreme Court held that, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."  *Id.* at 17; *see also id.* at 24.  Nevertheless, "it is simply impossible" for Congress to "delineate every instance in which a State may or may not comply with" a specified funding condition. *Charles v. Verhagen*, 348 F.3d 601, 608 (7th Cir. 2003); *see also Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).  So long as the statute is clear that acceptance of federal funds obligates the State to comply with a condition, the implementing agency can regulate the details.  *Cf. Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 670 (1985) (noting that an agency must comply with "the legal requirements in place when the grants were made," including "statutory provisions, *regulations*, and other guidelines" (emphasis added)).

With respect to Title VI and its implementing regulations, the Supreme Court in *Lau* already found no cause for concern under the Spending Clause.  *See* 414 U.S. at 569.  And, the Supreme Court in *South Dakota v. Dole*, 483 U.S. 203 (1987), cited *Lau* for the principle that Congress can use its spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory *and administrative* directives."  *Id.* at 206-07 (emphasis added) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)).[16]

Plaintiff's citation (ECF No. 15 at 33) to the Fifth Circuit's decision in *Texas Education Agency v. United States Department of Education*, 992 F.3d 350 (5th Cir. 2021), does not absolve it of its Title VI obligations.  In that case, the Fifth Circuit considered whether Texas had waived its sovereign immunity under the National Defense Authorization Act of 2013 by accepting federal grant funds. *Id.* at 358.  The Fifth Circuit held that "the clarity required for a waiver of sovereign immunity to be 'knowing' [cannot] be met by regulations clarifying an ambiguous statute."  *Id.* at 361.  The "knowing"

---

[16] For the same reason, Plaintiff's resort to the "federalism canon" is unavailing.  *See* ECF No. 15 at 30.  Congress may alter the federal-state balance when validly legislating pursuant to its Spending Clause power.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).

standard for the waiver of sovereign immunity, however, is not identical to the requirement that conditions on federal funding be "unambiguous."  *Cf. id.* at 361-62 (noting that it would be "odd" but not foreclosing that a "regulation could be satisfactory for one but not the other").  Regardless, that case is best understood as standing for the unremarkable point that a funding condition or a waiver of sovereign immunity must be unambiguous in the statute.  Congress met that bar in Title VI:  the requisite clarity can be found in Section 601, which unambiguously prohibits discrimination as a condition of funding, and Section 602, which directs agencies to "effectuate" that restriction.[17]

*Second*, this Court need not consider whatever constitutional questions might arise if "liability were imposed based solely on a showing of a statistical disparity."  *Inclusive Communities*, 576 U.S. at 540.  To be clear, Plaintiff is wrong to suggest (ECF No. 15 at 34) that recipients of federal financial assistance may be held liable for "bare statistical disparity alone."  Courts employ a three-part burden-shifting framework to determine liability.  *See Quarles*, 868 F.2d at 754 n.3; *accord New York Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) (per curiam); *Georgia State Conf. of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985).  To "establish a prima facie case of adverse disparate impact," the plaintiff must "allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities."  *New York City Env't Just. All. v. Giuliani*, 214 F.3d 65, 69 (2d Cir. 2000).  If met, "the burden then shifts to the defendant to provide a substantial legitimate justification for its practice."  *Quarles*, 868 F.2d at 754 n.3.  The plaintiff may then prevail only "by proffering an equally effective alternative practice which results in less racial disproportionality or proof that the legitimate practices are a pretext for discrimination."  *Id.*  As Plaintiff seems to acknowledge, this is exactly the standard that Defendants follow.  *See* ECF No. 15 at 8, 35; *see also* U.S. Dep't of Just., Title VI Legal Manual, § 7, at 6-7, available at: https://www.justice.gov/crt/fcs/T6manual;  EPA External Civil Rights Compliance Office,

---

[17] Plaintiff also cites (ECF No. 15 at 33) the Fourth Circuit's decision in *Virginia Department of Education v. Riley*, 106 F.3d 559 (1997) (en banc) (per curiam) (adopting the dissenting panel opinion of Luttig, J.).  That decision is neither binding nor apposite.  Critically, there, the court found nothing in the text or purpose of the statute to support the condition which the agency sought to impose.  *See id.* at 563-64, 568.

Compliance Toolkit (Jan. 2017), at 8-11, available at:  https://www.epa.gov/sites/default/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf.

In *Inclusive Communities*, the Court found functionally similar disparate-impact standards to "avoid" constitutional concerns.  *See* 576 U.S. at 540.  The Court there explained that disparate-impact liability under Title VII and the Fair Housing Act was "properly limited" because it "g[a]ve . . . leeway to state and explain the valid interest served by [the challenged] policies" and included "[a] robust causality requirement."  *Id.* at 541-42.  The same conclusion applies to Title VI, for which courts use an analogous framework with the same "safeguards."  *See id.* at 542.

*Third*, the "major questions doctrine" has no application here.  That doctrine is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citations omitted).  But this case is far afield from the situation where an agency has "'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'"  *West Virginia*, 142 S. Ct. at 2610 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)) (alteration in original).  Defendants have not just now "claimed to discover" disparate-impact standards.  The model Title VI regulation including the disparate-impact language was promulgated in 1964, almost contemporaneously with the passage of Title VI itself.  DOJ's regulations followed shortly thereafter in 1966.  And the EPA first proposed its regulations in 1971, the year following its creation.  Adopting disparate-impact regulations did not "transform" the nascent EPA when it put those standards in place just as it began to operate.  To the contrary, prohibiting disparate impacts has been part of EPA's regulatory approach since the agency's inception more than fifty years ago.[18]

---

[18] Plaintiff suggests in a footnote that, contrary to *Bakke*, "the best reading of Section 601 is that it bans *all* race-based classifications, rather than mirroring the Equal Protection Clause standard."  ECF No. 15 at 21 n.1.  This is insufficient to preserve an argument that would require a sea change in the Court's precedent.  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003).  Regardless, if the Supreme Court were inclined to reconsider *Bakke*, the results-focused passive voice used in Section 601 would actually "counsel[] in favor of recognizing disparate-impact liability."  *Inclusive Communities*, 576 U.S. at 534.

**C.  Plaintiff's challenge to DOJ's alleged failure to publish a Title VI rule in 2021 is meritless (Count IV).**

Insofar as Louisiana asserts an independent APA claim based on DOJ's alleged failure to publish a draft rule purportedly eliminating disparate-impact requirements, Compl. ¶¶ 236-40, Louisiana has failed to state a claim.[19]  Until a rule "is filed for public inspection with the Office of the Federal Register," "it may be withdrawn *without explanation* or notice and comment and is 'not valid' and enforceable against the public at large."  *GPA Midstream*, 67 F.4th at 1195 (emphasis added).  That is because "[m]aking a document available for public inspection 'is sufficient to give notice of the contents of the document to a person subject to or affected by it,'" and "[a] document 'is not valid as against a person who has not had actual knowledge of it until it is made available for public inspection.'"  *Humane Soc'y*, 41 F.4th at 569 (internal alterations omitted; quoting 44 U.S.C. § 1507).  Louisiana does not allege that DOJ's draft rule ever reached that stage, *see* Compl. ¶¶ 118-19, and the record establishes it did not, AR279-80.  Accordingly, Louisiana cannot state a claim under the APA for DOJ's alleged failure to publish the draft rule.

**D.  Plaintiff's "extra-regulatory requirements" claim is meritless (Count VI).**

Louisiana's contention that EPA violated Title VI by proposing that the State voluntarily adopt certain practices during negotiations, such as community meetings and impact assessments, is meritless.  Title VI provides that agencies like EPA may "issu[e] rules, regulations, or orders of general applicability[,]" provided that:

> No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance . . . or (2) by any other means authorized by law[.]

42 U.S.C. § 2000d–1.  But a statement uttered by an agency employee during settlement negotiations does not constitute an enforceable "rule, regulation, or order" requiring presidential approval.  *See United States v. Jefferson Cnty. Bd. of Educ.*, 372 F.2d 836, 857-58 (5th Cir. 1966), *on reh'g*, 380 F.2d 385 (5th Cir. 1967) (holding that agency guidelines, which "d[id] not purport to be a rule or regulation or

---

[19] Defendants accept the State's characterization of the rule for purposes of its Rule 12(b)(6) motion as to this claim only because this Court need not reach the content of the rule to dismiss.

order[,]" were "not regulations requiring the approval of the President" but rather "a statement of policy" to let "the general public [] know the criteria the Commissioner uses in determining whether a school meets the requirements for eligibility to receive financial assistance.").

Here, Louisiana does not contend that EPA ever effected compliance with any "rule, regulation, or order" through "termination of or refusal to grant or to continue assistance" in a manner that would first require presidential approval.  Instead, what Louisiana claims violates Title VI are merely EPA's proposals offered during negotiations, including EPA's suggestion that state agencies adopt certain best practices like "pre-decisional impacts analysis" and "community meetings" designed "to address a 'perceived lack of community involvement.'"  Compl. ¶¶ 76-77.  Plaintiff's claim fails because these proposals during settlement negotiations were not enforceable "rules, regulations, or orders" within the meaning of 42 U.S.C. § 2000d–1.  Contrary to Plaintiff's impractical and legally unsupported assertion, the President is not required to approve each and every voluntary suggestion offered by an agency engaged in informal resolution negotiations under Title VI.

Plaintiff's passing reference to two agency guidance documents, *see* ECF No. 15 at 40-41, does not transform EPA's demonstrably voluntary proposals into "rules, regulations, or orders" requiring presidential approval.  On their face, both documents disclaim any power to "create, expand, or limit any legal rights, obligations, responsibilities, expectations, or benefits."  ECF Nos. 12-46 and 12-47 at 1.  The State does not allege—nor could it—that these guidance documents were ever enforced against it.  But even if it had, "the requirement of presidential approval does not apply to the issuance of interpretive guidelines." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 106 (4th Cir. 2011) (considering an identical provision of Title IX, 20 U.S.C. § 1682).

### E.  Plaintiff's claim that EPA proceeding on "parallel tracks" in response to a Title VI complaint violates the APA should be dismissed (Count VII).

Plaintiff asserts that EPA violated its own Title VI regulations by proceeding on "parallel tracks."  Compl. ¶¶ 254-60.  According to Plaintiff, EPA may not respond to a Title VI complaint by simultaneously pursuing an investigative track and a negotiation track, and is instead barred from investigating until it has "terminat[ed] informal resolution proceedings." *Id.* ¶ 259.  Assuming the

Court finds this claim to be justiciable (which it should not), Plaintiff has misread EPA's regulations and failed to state a claim in Count VII.

The first sentence of 40 C.F.R. § 7.120—titled "Complaint investigations"—states that EPA "shall promptly investigate all complaints filed under this section." This language alone dispatches Plaintiff's contention that EPA must await the outcome of informal resolution talks before beginning to investigate. Just the opposite: EPA is *required* to promptly investigate once it has accepted a complaint.

Plaintiff also notes that § 7.120(d)(2)(i) provides that EPA "shall attempt to resolve complaints informally whenever possible." 40 C.F.R. §7.120(d)(2)(i); Compl. ¶ 256. True enough, but investigating a complaint while also attempting to resolve it informally with the recipient—*i.e.*, proceeding on parallel tracks—presents no inconsistency with a requirement to attempt the latter.

Finally, Plaintiff seizes on the second sentence of § 7.120(d)(2)(i), which provides: "When a complaint cannot be resolved informally, [EPA] shall follow the procedures established by paragraphs (c) through (e) of § 7.115." 40 C.F.R. § 7.120(d)(2)(i); Compl. ¶ 256. The referenced paragraphs in § 7.115, in turn, prescribe the detailed steps and timetables for EPA when it makes preliminary findings, and potentially a formal determination of noncompliance. Thus, the second sentence of § 7.120(d)(2)(i) does no more than direct EPA to the proper processes to follow "when a complaint cannot be resolved informally." Section 7.120(d)(2)(i) does not, as Plaintiff mistakenly contends, circumscribe the *only* scenario in which EPA may resort to preliminary findings as a result of investigating a complaint. Section 7.115(c) itself provides that its specified actions are to be measured "from the start of the . . . complaint *investigation*." 40 C.F.R. § 7.115(c). Indeed, what Plaintiff proposes in Count VII—that EPA "may only" investigate a complaint "after" EPA has determined that it cannot be resolved—is directly at odds with § 7.120's foremost command that EPA "shall promptly investigate all complaint filed under this section."[20] 40 C.F.R. § 7.120. What is more, some measure

---

[20] Section 7.120 does permit EPA to refrain from prompt investigation if "the complainant and the party complained against agree to a delay pending settlement negotiations." But nothing in that provision purports to obligate EPA to suspend all investigative activity while agreed settlement

of investigation will always be needed in order to determine that informal resolution should be pursued, and what remedies should be considered in any agreement.

If the Court finds that it has jurisdiction to consider Count VII, that claim should be dismissed or summary judgment entered for Defendants.[21]

### F. Plaintiff's claims against the President should be dismissed.

Although Plaintiff named the President as a Defendant in his official capacity, *see* Compl. ¶ 94, the Complaint is bereft of any allegations against him, let alone any claim for relief asserted against the President, *see id.* Prayer For Relief ¶ 1-7.  For that reason alone, the Court should dismiss the President from this action because Plaintiff has failed to allege any plausible allegations against him. *See Cay v. Estelle*, 789 F.2d 318, 323 n.5 (5th Cir. 1986) (courts must review "allegations to determine whether they adequately state a claim against each defendant").  Even assuming claims were pled against the President, they would have to be dismissed because Plaintiff's requested equitable and declaratory relief is categorically unavailable under Supreme Court precedent concerning the separation of powers.  *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498, 501 (1866).  Accordingly, as "to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief[.]" *Foley v. Biden*, No. 4:21-cv-01098, 2021 WL 7708477, at *2 (N.D. Tex. Oct. 6, 2021) (quoting

---

negotiations are underway, as Plaintiff contends.  Rather, the regulation reflects the reasonable calculus that the ordinary prompt investigation, and the resources that undertaking often requires, need not be pursued in full while an alternative disposition may yet be available.

[21] EPA submits that § 7.120 is not ambiguous, and that Plaintiff's claim fails under a straightforward reading of its text.  (Plaintiff appears to agree, declining to contend that the regulation is ambiguous.)  If the Court disagrees, however, and concludes that § 7.120 is ambiguous, deference under *Auer v. Robbins*, 519 U.S. 452 (1997), "dictates that an agency's interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.'"  *Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 362 (5th Cir. 2021) (quoting *Auer*, 519 U.S. at 461).  Such deference would be warranted here.

*Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)).  The Court must therefore dismiss the President as a Defendant.

## III.   PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED.

If this Court grants Defendants' motions to dismiss and for summary judgment, it need not reach Plaintiff's motion for a preliminary injunction, which can be denied summarily as moot.  *See, e.g.*, *McCoy v. Stokes*, No. 08-CV-1918, 2010 WL 411143, at *1 (W.D. La. Jan. 28, 2010) (granting defendants' motion for summary judgment and denying as moot plaintiff's motion for a preliminary injunction); *McKinley v. Brazier*, No. 3:21-CV-528-DPJ-FKB, 2022 WL 3692663, at *1 (S.D. Miss. Aug. 25, 2022) (same).  But even if this Court denies all or part of Defendants' motions to dismiss and for summary judgment, Plaintiff cannot carry its burden to obtain the "extraordinary remedy"—"never awarded as of right"—of a preliminary injunction, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain preliminary relief, Plaintiff must "by a clear showing" establish that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without an injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Failure to satisfy any one requirement precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiff bears a heavy burden on each requirement, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).  Plaintiff's burden is even higher because it seeks a preliminary injunction that would alter the status quo.  *See, e.g.*, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (such injunctions "particularly disfavored").

As a threshold matter, a preliminary injunction should not issue here because the "limited purpose" of a "preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 435 n.8 (5th Cir. Unit A 1981) (limited purpose of such relief "simply [to] preserve[] the status quo pending final determination of the action after a full hearing").  No such preservation is necessary after the parties agreed to submit the entire case for resolution at the same

time as Plaintiff's motion for preliminary injunction.  *See* ECF No. 22.

In any event, Plaintiff cannot make the clear showing on each factor necessary to obtain preliminary relief.  For those claims on which Plaintiff seeks preliminary injunctive relief, it cannot establish a likelihood of success on the merits for the same reasons Defendant's motion to dismiss (or, in the alternative, for summary judgment) should be granted, *supra* 35-53.  But even if Plaintiff were likely to prevail, Plaintiff cannot make a clear showing of irreparable harm given Plaintiff's fifty-year delay in bringing its motion for preliminary injunction and the absence of imminent injury, particularly given EPA's closure of the two Title VI complaints on which the State's Complaint was based.  And the balance of equities and public interest also disfavor preliminary relief because of the disruption to longstanding agency operations such an injunction would cause.

### A.  Plaintiff fails to establish irreparable harm absent a preliminary injunction.

Because Plaintiff cannot establish an ongoing or imminent future injury sufficient to confer Article III standing, *supra* 11-24, Plaintiff also cannot make the showing of irreparable harm necessary for an injunction to issue.  *See, e.g.*, *City of Los Angeles*, 461 U.S. at 111.  But even if Plaintiff suffered an injury sufficient to confer Article III standing, that injury "does not necessarily equate to a likelihood of irreparable harm that justifies preliminary injunctive relief."  *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, --- F. Supp. 3d ----, No. 1:23-CV-433-RP, 2023 WL 4291992, at *5 (W.D. Tex. June 30, 2023); *see also Burkhart v. Univ. Interscholastic League*, No. 1:22-CV-1026-RP, 2023 WL 2940026, at *3 (W.D. Tex. Apr. 13, 2023) (similar).

Rather, Plaintiff must "clearly carr[y] the burden of persuasion" to show imminent irreparable harm, *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (citation omitted), as "is *required* for injunctive relief."  *Montient Corp. v. Dondero*, 529 F.3d 532, 538 (5th Cir. 2008) (emphasis added).  To show irreparable harm, Plaintiff must demonstrate "a *significant threat* of injury from the impending action, that the injury is *imminent*."  *Humana, Inc. v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (emphases added).  And that irreparable injury must be likely to occur "during the pendency of the litigation."  *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990).

     1.       **Plaintiff's fifty-year delay in bringing suit disproves irreparable harm.**

Plaintiff's *half-century* delay in filing suit to challenge EPA's and DOJ's disparate-impact regulations disproves any suggestion of irreparable harm. Plaintiff's narrowed request for preliminary relief—which no longer seeks relief pertaining to Counts I, II, and VII—centers on Plaintiff's opposition to "Defendants' attempts to impose disparate-impact-based requirements on the State" through Title VI disparate-impact regulations. Compl. ¶ 5; *see also* ECF No. 15 at 3 ("This case squarely presents the question . . . . are Title VI disparate-impact regulations lawful."). But the regulations that Plaintiff challenges were issued more than fifty years ago in 1966 (DOJ), and 1973 (EPA). *Supra* 4-6. And, just like all federal funding recipients, Louisiana state agencies have for decades certified their compliance with these disparate-impact regulations, refuting any suggestion that harm from such compliance is irreparable.

Thus, even if Plaintiff could show any ongoing or imminent harm arising from application of the challenged disparate-impact regulations (and they cannot, *infra* 57-59), Plaintiff's substantial delay in seeking relief from the existence of the agencies' disparate-impact provisions refutes any assertion that such harms are irreparable. A "party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)); *id.* at 1945 (finding that "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request"). "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC*, No. 3:09-CV-00393, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009). Indeed, courts have found that even a delay of "five months" or less "is sufficient to rebut a presumption of irreparable harm." *H.D. Vest, Inc.*, 2009 WL 1766095, at *4; *see also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (delay of three months cut against granting immediate relief); *Solofill, LLC v. Rivera*, No. 16-cv-2702, 2017 WL 514589, at *4 (S.D. Tex. Feb. 8, 2017) ("Months-long to years-long delays . . . have been enough for courts to hold against a finding of irreparable injury.").

Nor may Plaintiff assert the now-closed Title VI complaints asserting disparate-impact claims

as a source of irreparable harm because those complaints are fully and finally closed.  ECF No. 18.

Accordingly, Plaintiff's decades-long delay in challenging the disparate-impact regulations establishes

the absence of imminent, irreparable harm.[22]

### 2.    Plaintiff's asserted injuries are neither imminent nor irreparable.

Even if Plaintiff had not waited five decades before bringing suit, Plaintiff's asserted harms do

not rise to the level of imminent, irreparable injury.  By Plaintiff's own account, its asserted injuries

"crystalized" only when—in Plaintiff's telling—Defendants sought to enforce the challenged

regulations and requirements against Plaintiff in the course of the Title VI investigations.  *See, e.g.*,

ECF No. 15 at 8 ("The legal disputes here were crystalized by EPA's actions relating to [two]

complaint[s] by ….").  But those complaints were closed before reaching any enforcement stage, and

Plaintiff can point to no pending EPA proceedings against Louisiana to enforce either the challenged

disparate-impact regulations or the purported "extra-regulatory requirements."  *See* ECF No. 18.  Even

if Plaintiff could do so, any harm arising from potentially adverse outcomes in future enforcement

proceedings (a stage EPA has *never* reached, *see* Hoang Decl. ¶ 23) is insufficiently imminent to justify

a preliminary injunction.  *Winter*, 555 U.S. at 22 (mere "possibility of irreparable harm" is insufficient).

Indeed, even if any pre-enforcement proceedings were ongoing, merely subjecting Plaintiff to such

proceedings does not raise the prospect of irreparable harm:  because "expense and annoyance of

litigation is part of the social burden of living under government," "[l]egal expenses . . . from contesting

the legality of an agency investigation [] do not constitute irreparable harm."  *Audubon Life Ins. Co. v.*

*FTC*, 543 F. Supp. 1362, 1369 (M.D. La. 1982).  Accordingly, none of Plaintiff's four asserted injuries

warrant preliminary relief.

*First*, as discussed above, Plaintiff asserts that it will suffer "sovereign injury" because the

---

[22] Even the alleged "extra-regulatory requirements" at issue in Plaintiff's motion for a preliminary injunction were purportedly described over seven months ago in August 2022 and January 2023.  *See* ECF No. 15 at 40-41.  That delay, too, is more than sufficient to refute Plaintiff's assertion of irreparable harm.  *H.D. Vest, Inc., 2009 WL 1766095*, at *4 (four-month delay); *Boire*, 515 F.2d at 1193 (three-month delay).  In any event, Plaintiff cannot establish imminent or ongoing injury that flows from mere descriptions of EPA policy absent evidence that EPA is in fact enforcing those alleged requirements against Plaintiff.

challenged regulations prevent it from "exercis[ing] its sovereign authority by regulating in a race-neutral manner."  ECF No. 15 at 41.  To establish that injury constitutes irreparable harm, Plaintiff must make a "clear showing," *Mazurek*, 520 U.S. at 972, that the challenged regulations prevent Louisiana from enforcing duly-enacted state statutes that would effectuate disparate-impact discrimination.  *See, e.g.*, *Texas v. Becerra*, 623 F. Supp. 3d 696, 736 (N.D. Tex. 2022) ("As to Texas's sovereign injury, irreparable harm exists when a federal agency action prevents a state's enforcement of its duly enacted laws."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (similar).  But unlike in those cases in which sovereign injury amounts to irreparable harm, Plaintiff does not identify any "duly enacted laws" that it would enforce but for the challenged disparate-impact regulations, *supra* 16-17.  And mere assertions that the State would enforce differently a general prohibition on intentional discrimination but for the challenged regulations do not establish irreparable harm.  *See NOAA*, 70 F.4th at 881 ("[T]he declaration does not 'connect the dots' [] as to . . . the State's ostensible sovereign injury.  Instead, . . . [the] testimony is couched in speculative, general language.").

*Second*, Plaintiff claims irreparable harm arising from its "sovereign right to unambiguous clarity in the conditions being imposed by federal grants."  ECF No. 15 at 41.  But as noted above, the State cannot credibly claim that it was "coerced into accepting an offer with an unascertainable condition," *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023), as is necessary to establish irreparable injury, because the terms of funding it accepted unequivocally prohibited disparate-impact discrimination, *supra* 17.  Plaintiff's sole cited authority, *Arizona*, 34 F.4th 841, is not to the contrary.  There, the Ninth Circuit held only that allegations of sovereign injury grounded in ambiguity were sufficient to confer standing at the motion to dismiss stage.  *Id.* at 851.  In the current posture, the State cannot adduce the evidence of ambiguity necessary to satisfy that standard when the statute unambiguously prohibits discrimination and the regulations, by the State's admission, unequivocally impose disparate-impact requirements.

*Third*, Plaintiff asserted that Defendants' "actions that violate the private nondelegation doctrine inflict 'here-and-now injury.'"  ECF No. 15 at 41.  But Plaintiff "no longer seeks preliminary injunctive relief as to its nondelegation and 180-day claims," ECF No. 21 at 1.

*Finally*, Plaintiff asserts that the challenged disparate-impact regulations "would create compliance costs for the States," and because damages cannot be recovered from the federal government, irrecoverable injuries constitute irreparable harm.   ECF No. 15 at 41-42.   But unsubstantiated compliance costs do not constitute irreparable injury, and the State has failed to allege what measures it has been or currently is being forced to take to comply with EPA's disparate-impact regulations.   *Career Colleges*, 2023 WL 4291992, at *9 (denying assertion of irreparable harm in the form of unrecoverable compliance costs where allegations "provide no meaningful information about . . . these costs, nor any concrete indication that they impose more than a de minimis burden"); *E. Bridge, LLC v. Chao*, 320 F.3d 84, 90 (1st Cir. 2003) ("If the cost of compliance created an imperiling burden, we would expect the plaintiffs to have alleged such facts in this challenge.").   Accordingly, Plaintiff "has failed to substantiate its alleged irreparable injury with concreteness and specificity."   *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 859 (N.D. Tex. 2022); *see also Sierra Club v. U.S. Army Corps of Eng'rs.*, 482 F. Supp. 3d 543, 559 (W.D. Tex. 2020) (similar).

In sum, rather than demonstrate four instances of irreparable harm, Plaintiff has done no more than allege a past violation of law.   But "[f]ederal courts are not obligated to grant an injunction for every violation of law."   *Ark. Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014).   Plaintiff offers no explanation as to how the alleged past violations of law cause Plaintiff injury, nor how that injury is ongoing, imminent, or irreparable absent preliminary relief.

No further analysis is necessary to deny Plaintiff's motion for a preliminary injunction, which cannot issue absent irreparable harm.   *Motient Corp. v. Dondero*, 529 F.3d 532, 538 (5th Cir. 2008) ("[A] showing of irreparable harm is required for injunctive relief."); *Plains Cotton Co-op. Ass'n v. Goodpasture Comp. Serv. Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987).

### B.  The balance of the equities and public interest factors do not support a preliminary injunction.

Measured against Plaintiff's lack of irreparable harm, Defendants would suffer significant harm were the Court to enjoin the use of EPA's and DOJ's disparate-impact regulations.   EPA and DOJ have included disparate-impact provisions as part of their Title VI regulatory approach for five

decades, *supra* 4-6, and both the agencies and Title VI recipients have thus "engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).   Indeed, EPA and DOJ rely on those provisions to meet Congress's anti-discrimination mandate in Title VI.  An injunction against their use would inhibit the agencies "from effectuating statutes enacted by representatives of its people," and they would therefore "suffer[] a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  If this Court were to foreclose EPA and DOJ from relying on disparate-impact theories of discrimination in Louisiana, it would severely hamper the manner in which those agencies conduct investigations into allegations of discriminatory conduct by federal funding recipients, and significantly narrow their ability to identify acts of prohibited discrimination.  At a minimum, EPA and DOJ would be required to develop new policies for conducting investigations and resolving complaints that implicate disparate-impact discrimination and retrain staff.

Meanwhile, the broader public in Louisiana, which is protected from unlawful discrimination by these disparate-impact provisions, would also suffer if federal funding recipients could take actions that had an unjustified discriminatory effect.  To permit that outcome would frustrate Congress's objective that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  For the same reasons the balance of harms tips toward Defendants, the public interest also favors denying injunctive relief since these factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted or, in the alternative, summary judgment should be entered for Defendants, and Plaintiff's motion for a preliminary injunction should be denied.

Dated: August 16, 2023

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief, Federal Coordination and
Compliance Section

DARIA NEAL
Deputy Chief, Federal Coordination and
Compliance Section

*/s/ Katharine F. Towt*
KATHARINE F. TOWT (MA Bar No. 690461)
Attorney
U.S. Department of Justice
Civil Rights Division, Federal Coordination and
Compliance Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Phone: (202) 353-5054
Email: katie.towt@usdoj.gov

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRANDON B. BROWN
United States Attorney

KAREN J. KING
Assistant United States Attorney

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

*/s/ M. Andrew Zee*
M. ANDREW ZEE (CA Bar No. 272510)
ALEXANDER W. RESAR
ANDREW J. RISING
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Phone: (415) 436-6646
Email:    m.andrew.zee@usdoj.gov

*Attorneys for Defendants*