**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

THE STATE OF LOUISIANA,
By and through its Attorney General, Jeff Landry,

PLAINTIFF,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

DEFENDANTS.

CIVIL ACTION NO. 2:23-cv-00692

**STATE'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

GLOSSARY ...................................................................................................................... x

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 4

I.   THIS COURT HAS JURISDICTION TO REVIEW AND ENJOIN DEFENDANTS'
     ACTIONS ............................................................................................................... 4

     A.   THE STATE HAS ARTICLE III STANDING ............................................................... 5

          1.   As The Object Of Defendants' Regulations, The State Has "Self-Evident"
               Standing ..................................................................................................... 5

          2.   Defendants' Violations Of Louisiana's Rights Under The Spending Clause Confers
               Standing ..................................................................................................... 6

          3.   Subjecting The State To Proceedings Infected By Private Non-Delegation Doctrine
               Violations Confers Standing ........................................................................ 8

          4.   Defendants' Disparate-Impact Regulations And Extra-Regulatory Requirements
               Create Compliance Costs That Establish Standing ..................................... 10

          5.   The State Also Has Standing Based On The Threat Of Enforcement ............ 13

          6.   The State Has Standing To Assert Claims Against DOJ ............................... 17

          7.   The State Faces Imminent Harms ............................................................... 18

          8.   The State's Harms Are Traceable To Defendants' Regulations And Actions ... 18

          9.   Redressability ............................................................................................. 19

     B.   THE STATE'S CLAIMS ARE NOT MOOT ............................................................... 20

          1.   Defendants' Actions And Regulations Are Inflicting Ongoing Injury ............ 20

          2.   Defendants' Actions To Moot This Case Fall Within The Voluntary-Cessation
               Exception ................................................................................................... 22

          3.   The Non-Delegation Claims Are Capable of Reptation Yet Evading Review ..... 27

          4.   Jurisdictional Discovery Is Warranted If This Court Believes There Are Genuine
               Issues Of Material Fact ............................................................................... 28

C.   THE STATE HAS VIABLE NON-APA CAUSES OF ACTION ..........................................28

    1.   The State's Constitutional And Equitable Causes Of Action Are Distinct From Its *Ultra Vires* Claim And Not Subject To *Kyne* Limitations.................................................28

    2.   The State's Non-Statutory *Ultra Vires* Claim Easily Passes Muster Under Fifth Circuit Precedent ..........................................................................................................................29

D.   THE STATE'S APA CLAIMS CHALLENGE FINAL AGENCY ACTION .........................31

    1.   Non-Delegation Claims.....................................................................................................31

    2.   Disparate-Impact Claims...................................................................................................32

    3.   Cumulative Impacts Claims. .............................................................................................34

E.   THE STATE'S CLAIMS ARE TIMELY .....................................................................35

F.   CONGRESS HAS NOT PRECLUDED JUDICIAL REVIEW HERE ...................................38

    1.   *Thunder Basin* doctrine does not apply here. ...................................................................38

    2.   The *Thunder Basin* factors favor review here....................................................................40

II.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ITS NON-DELEGATION CLAIM ............................................................................................. 41

A.   EPA'S DELEGATION OF POWER TO PRIVATE GROUPS VIOLATES THE CONSTITUTION....41

B.   EPA'S ACTIONS VIOLATE THE APA ......................................................................42

III.   DEFENDANTS' DISPARATE-IMPACT REGULATIONS VIOLATE THE SPENDING CLAUSE ................................................................................................ 43

A.   THE SPENDING CLAUSE PROHIBITS ENFORCEMENT OF AMBIGUOUS CONDITIONS AGAINST THE STATES.........................................................................................43

B.   SECTION 602 DOES AUTHORIZE DEFENDANTS' DISPARATE IMPACT MANDATES ..............44

C.   THE REQUISITE CLARITY MUST BE PROVIDED BY STATUTE UNDER CONTROLLING FIFTH CIRCUIT PRECEDENT .........................................................................................46

IV.   SECTION 602 DOES NOT AUTHORIZE DISPARATE-IMPACT MANDATES .....47

A.   *GUARDIANS* IS NOT PRECEDENTIAL ON THE DISPARATE-IMPACT ISSUES HERE................47

B.   DEFENDANTS' DISPARATE-IMPACT MANDATES VIOLATE THE PLAIN TEXT OF TITLE VI 48

    1.   Disparate Impact Requirements Do Not "Effectuate" Section 601's Prohibition On Intentional Discrimination..............................................................................................48

2.    Disparate-Impact Mandates Actually *Conflict* With Section 601 ..................................... 49

3.    The Lack Of A Good-Faith Defense Dooms Defendants' Regulations ....................... 50

C.   Statutory Context Confirms That Defendants Lack Authority To Issue Disparate-Impact Regulations ................................................................................. 51

D.   Canons Of Construction ........................................................................................ 52

E.   Defendants' Interpretation Creates Severe Constitutional Doubts ................. 53

F.   The Major Questions Doctrine Controls This Case ...................................... 54

G.   This Court Owes No Deference To Defendants' Interpretations ...................... 55

H.   Defendants' Resort To Legislative History Is Unpersuasive................................. 56

**V.   EPA'S EXTRA-REGULATORY REQUIREMENTS ARE UNLAWFUL.................... 57**

**VI.  THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED ........................................................................................................ 58**

A.   The State Will Suffer Irreparable Harm Without An Injunction ........................ 58

B.   The Balance of Harms and Public Interest Support The State .............................. 59

**VII. ALTERNATIVELY, THIS COURT SHOULD VACATE DEFENDANTS' CHALLENGED ACTIONS AND REGULATIONS.................................................... 60**

**CONCLUSION ................................................................................................................ 60**

## TABLE OF AUTHORITIES

**CASES**

*Adarand Constructors, Inc. v. Slater,*
    528 U.S. 216 (2000).............................................................................. 22, 26

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.,*
    851 F.3d 507 (5th Cir. 2017)......................................................................29

*Alabama Ass'n of Realtors v. HHS ("Alabama Realtors"),*
    141 S.Ct. 2485 (2021)..............................................................................55

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)...........................................................................passim

*Alliance for Hippocratic Med. v. FDA,*
    78 F.4th 210 (5th Cir. 2023).......................................................................37

*Animal Legal Def. Fund v. USDA,*
    789 F.3d 1206 (11th Cir. 2015)....................................................................33

*Apter v. HHS*
    __ F.4th __, 2023 WL 5664191 (5th Cir. Sept. 1, 2023).................................... 29, 30

*Arizona v. Yellen,*
    34 F.4th 841 (9th Cir. 2022).........................................................................7

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006)...........................................................................passim

*Arons v. New Jersey State Bd. of Educ.,*
    842 F.2d 58 (3d Cir. 1988) ..........................................................................8

*Assocation of Am. Railroads v. DOT,*
    721 F.3d 666 (D.C. Cir. 2013) .....................................................................42

*Axon Enter., Inc. v. FTC,*
    143 S.Ct. 890 (2023)...........................................................................passim

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) .....................................................................30

*Bell v. Hood,*
    327 U.S. 678 (1946)..................................................................................29

*Bennett v. Spear,*
    520 U.S. 154 (1997)..................................................................................31

*Biden v. Nebraska,*
    143 S.Ct. 2355 (2023)................................................................................56

*Bond v. United States,*
    134 S.Ct. 2077 (2014)................................................................................52

*Braidwood Mgmt., Inc. v. EEOC,*
    70 F.4th 914 (5th Cir. 2023)........................................................................14

*Brnovich v. DNC,*
    141 S.Ct. 2321 (2021)............................................................................ 45, 55

*Brown v. Gardner,*
  513 U.S. 115 (1994) ..................................................................................56

*California Trucking Ass'n v. Bonta,*
  996 F.3d 644 (9th Cir. 2021) ......................................................................14

*Carter v. Fenner,*
  136 F.3d 1000 (5th Cir. 1998) ....................................................................20

*Cochran v. SEC,*
  20 F.4th 194 (5th Cir. 2021) .......................................................................29

*Contender Farms, L.L.P. v. USDA,*
  779 F.3d 258 (5th Cir. 2015) ................................................................5, 16

*Correctional Services Corp. v. Malesko,*
  534 U.S. 61 (2001) .....................................................................................29

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
  142 S.Ct. 1562 (2022) ......................................................................3, 44, 45

*Currin v. Wallace,*
  306 U.S. 1 (1939) .......................................................................................42

*Department of Commerce v. New York,*
  139 S.Ct. 2551 (2019) ..............................................................................2, 60

*Dillmon v. Nat. Transp. Safety Bd.,*
  588 F.3d 1085 (D.C. Cir. 2009) ..................................................................43

*Duarte v. City of Lewisville,*
  759 F.3d 514 (5th Cir. 2014) ..........................................................5, 10, 14

*Ex parte Young,*
  209 U.S. 123 (1908) ...................................................................................29

*Exxon Chemicals Am. v. Chao,*
  298 F.3d 464 (5th Cir. 2002) ......................................................................31

*FEC v. Wisconsin Right To Life, Inc.,*
  551 U.S. 449 (2007) ...................................................................................27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ..............................................................................10, 29

*Freeman v. United States,*
  556 F.3d 326 (5th Cir. 2009) ......................................................................28

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ...................................................................................22

*Garrison v. Louisiana,*
  379 U.S. 64 (1964) .....................................................................................51

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ...................................................................................52

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) ...............................................................................6, 52

*Guardians Ass'n v. Civ. Serv. Comm'n of City of New York,*
  463 U.S. 582 (1983) ..................................................................................................47

*Interstate Circuit v. United States,*
  306 U.S. 208 (1939) ..................................................................................................25

*Jama v. ICE,*
  543 U.S. 335, (2005) .................................................................................................57

*Johnson v. Bd. of Educ. of Prince George's Cnty.,*
  No. CIV. PJM 11-1195, 2014 WL 3778603 (D. Md. July 29, 2014) ......................33

*Jones v. United States,*
  526 U.S. 227 (1999) ..................................................................................................51

*Kamps v. Baylor Univ.,*
  592 F. App'x 282 (5th Cir. 2014) .............................................................................51

*King v. Burwell,*
  576 U.S. 473 (2015) ..................................................................................................55

*Knox v. SEIU,*
  567 U.S. 298 (2012) ............................................................................................ 20, 21

*Lau v. Nichols,*
  414 U.S. 563 (1974) ..................................................................................................44

*League of United Latin Am. Citizens v. Perry,*
  548 U.S. 399 (2006) ..................................................................................................54

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.,*
  741 F.3d 1309 (D.C. Cir. 2014) ...............................................................................43

*Los Angeles Cnty. v. Davis,*
  440 U.S. 625 (1979) ............................................................................................ 20, 21

*Louisiana v. Biden,*
  55 F.4th 1017 (5th Cir. 2022) ............................................................................. 11, 58

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................... 5, 6, 10

*Marbury v. Madison,*
  5 U.S. 137 (1803) .......................................................................................................7

*Marks v. United States,*
  430 U.S. 188 (1977) ..................................................................................................47

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ..................................................................................................17

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ...............................................................................37

*Metro. Stevedore Co. v. Rambo,*
  515 U.S. 291 (1995) ..................................................................................................48

*Murphy v. Smith,*
  138 S.Ct. 784 (2018) .................................................................................................39

*National Horsemen's Benevolent & Protective Ass'n v. Black,*
   53 F.4th 869, 880 (5th Cir. 2022) ............................................................................ 20, 41

*National Parks Conservation Ass'n v. Semonite,*
   925 F.3d 500 (D.C. Cir. 2019) ..................................................................................... 60

*NFIB v. OSHA,*
   142 S.Ct. 661 (2022) ............................................................................................. 55, 60

*NLRB v. SW Gen., Inc.,*
   137 S.Ct. 929 (2017) ..................................................................................................... 56

*Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
   508 U.S. 656 (1993) ...................................................................................................... 26

*Ohio v. EPA,*
   838 F.2d 1325 (D.C. Cir. 1988) ................................................................................... 37

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) ....................................................................................... 59

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.,*
   465 F.3d 977 (9th Cir. 2006) ....................................................................................... 34

*Owasso Indep. Sch. Dist. v. Falvo,*
   534 U.S. 426 (2002) ...................................................................................................... 52

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ........................................................................................................ 4

*Parklane Hosiery Co. v. Shore,*
   439 U.S. 322 (1979) ...................................................................................................... 20

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.,*
   45 F.4th 816 (5th Cir. 2022) .......................................................................................... 8

*Planned Parenthood of New York City, Inc. v. HHS,*
   337 F. Supp. 3d 308 (S.D.N.Y. 2018) ........................................................................ 32

*Prop. Cas. Insurers Ass'n of Am. v. Donovan,*
   66 F. Supp. 3d 1018 (N.D. Ill. 2014) ............................................................... 5, 11, 12

*Rattlesnake Coal. v. EPA,*
   509 F.3d 1095 (9th Cir. 2007) ..................................................................................... 32

*Raytheon Co. v. Hernandez,*
   540 U.S. 44 (2003) ........................................................................................................ 48

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ................................................................................. 49, 50, 53, 54

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas,*
   6 F.4th 633 (5th Cir. 2021) .......................................................................................... 48

*Save Our Valley v. Sound Transit,*
   335 F.3d 932 (9th Cir. 2003) ....................................................................................... 48

*Seals v. McBee,*
   898 F.3d 587 (5th Cir. 2018) ....................................................................................... 15

*Seila Law LLC v. CFPB,*
   140 S.Ct. 2183 (2020) ............................................................................................9

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002) .......................................................................... 1, 5

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers,*
   531 U.S. 159 (2001) ..........................................................................................56

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ..................................................................16, 22, 23

*Sprint Comm'ns Co., L.P. v. APCC Servs., Inc.,*
   554 U.S. 269 (2008) ...................................................................................12, 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("Fair Admissions"),*
   143 S.Ct. 2141 (2023) ...............................................................................4, 53, 54

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .............................................................................13, 16, 35

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015) ..........................................................................................54

*Tex. Educ. Agency v. U.S.D.O.E.,*
   992 F.3d 350, 361 (5th Cir. 2021) ................................................................ 7, 46

*Texas Educ. Agency v. U.S. Dep't of Educ.,*
   992 F.3d 350 (5th Cir. 2021) ......................................................................... 3, 45

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) .............................................................................27

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ...................................................................... 31, 34

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .............................................................................56

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ........................................................... 38, 39, 40, 41

*Tucker v. Gaddis,*
   40 F.4th 289 (5th Cir. 2022) ...................................................................... 22, 26

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
   140 S.Ct. 1837 (2020) .......................................................................................52

*United States v. Bass,*
   404 U.S. 336 (1971) ..........................................................................................52

*United States v. Concentrated Phosphate Export Assn., Inc.,*
   393 U.S. 199 (1968) ..........................................................................................22

*United States v. Craft,*
   535 U.S. 274 (2002) ..........................................................................................56

*United States v. Gonzales,*
   520 U.S. 1 (1997) ..............................................................................................39

*United States v. Shabani,*
   513 U.S. 10(1994) ............................................................................... 39

*United Steel v. Mine Safety & Health Admin.,*
   925 F.3d 1279 (D.C. Cir. 2019) .......................................................... 60

*United Technologies Corp. v. EPA,*
   821 F.2d 714 (D.C. Cir. 1987) ............................................................ 58

*Va. Dep't of Educ. v. Riley,*
   106 F.3d 559 (4th Cir. 1997) (en banc) ............................................. 46

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ............................................................ 59

*West Virginia v. EPA,*
   142 S.Ct 2587 (2022)  ........................................................... 52, 55, 26

*West Virginia v. U.S. Dep't of the Treasury,*
   59 F.4th 1124 (11th Cir. 2023) .................................................7, 8, 46, 59

*Whole Woman's Health v. Paxton,*
   10 F.4th 430 (5th Cir. 2021 ............................................................... 47

*Yarls v. Bunton,*
   905 F.3d 905 (5th Cir. 2018) ............................................................... 2

*Zimmerman v. City of Austin, Texas,*
   881 F.3d 378 (5th Cir. 2018) ............................................................. 16

## STATUTES

42 U.S.C. §2000d ................................................................... ix, 33, 38

5 U.S.C. §706(2)(B) ........................................................................... 42

5 U.S.C. §551 ..................................................................................... 32

## OTHER AUTHORITIES

Civil Rights Act Of 1991, Pub. Law 102–166, 105 Stat 1071 (1991) ...................... 57

## RULES

28 C.F.R. §42.105 ............................................................................. 33

28 C.F.R. §42.104 ............................................................................. 32

40 C.F.R. §7.80 ................................................................................. 33

40 C.F.R. §§7.35 ............................................................................... 32

# GLOSSARY

| Acronym | Meaning/Full Title/Cite |
| --- | --- |
| 2022 FAQ | EPA, *Interim Environmental Justice and Civil Rights in Permitting, Frequently Asked Questions* (Aug. 2022) (Exh. 46) |
| 2023 Cumulative Impacts Addendum | EPA *Legal Tools to Advance Environmental Justice: Cumulative Impacts Addendum* (Exh. 47) |
| CAA | Clean Air Act, 42 U.S.C. §7401 *et seq.* |
| DOJ | U.S. Department of Justice |
| EPA | U.S. Environmental Protection Agency |
| June 16 Objection | EPA Objection to Title V Operating Permit Number 3086-V10 (June 16, 2023) (Exh. 84) |
| LA DOJ | Louisiana Department of Justice |
| LDEQ | Louisiana Department of Environmental Quality |
| LDH | Louisiana Department of Health |
| OEJECR | EPA Office of Environmental Justice and External Civil Rights |
| Opp. | Defendants' brief in opposition to the State's motion for a preliminary injunction and cross-motion to dismiss and/or for summary judgment, Doc. 29-1 |
| P.I. | The State's brief in support of its motion for a preliminary injunction, Doc. 11-1 |
| Private Special Interest Groups | The plaintiffs in *Californians for Renewable Energy v. EPA*, No. 4:15-cv-3292, who possess rights under the judgments to which EPA acquiesced, which the State alleges violates the private non-delegation doctrine. |
| Title VI | Title VI of the Civil Rights Act of 1964, 42 U.S.C. 42 U.S.C.A. §2000d *et seq.* |
| VRA | Voting Rights Act of 1965, 52 U.S.C. §10101 *et seq.* |

## INTRODUCTION

In law, as in life, actions often speak louder than words. So it is here. Defendants' (hereafter, "EPA's") brief advances a multitude of arguments contending that the State's claims are unreviewable and meritless. As Defendants tell it, there is "nothing to see here." But a mere *six days* after the State moved for a preliminary injunction, EPA abruptly abandoned the Title VI investigations specifically raised in the State's claims, and EPA did so in a manner that defies all possible explanations except as a frantic response to the State's putatively meritless claims.

EPA's abandonment of its enforcement efforts is all the more remarkable given that significant policy gains were *readily in its grasp*, at least if EPA's principal objective were anything other than avoiding judicial review here. EPA could have achieved substantial relief from Louisiana Department of Environmental Quality ("LDEQ") and Louisiana Department of Health ("LDH") simply by accepting their last offers/redlines. Those on-the-table offers would have constituted a "major win" and a "tremendous step forward" in the words of EPA-aligned environmental groups, and all EPA had to do to achieve them was say "yes." Exh. 62, 68.[1] Instead, EPA walked away *completely*, thereby achieving *precisely nothing* for its year-plus-long investigation—save the opportunity to argue mootness here. Those are not the actions of an agency with nothing to fear from the State's challenges.

EPA's actions betray the severe legal vulnerability of its disparate-impact regulations. Thus, as the State correctly predicted, EPA now "raise[s] an avalanche of arguments contending that [its regulations/actions] are not reviewable or that this Court lacks jurisdiction." *See* Doc. 11-1 ("P.I.") at 12. EPA's shotgun blast of defenses all fail.

As the "object" of the regulation at issue here, the State's standing is "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). The State further has cognizable injuries from (1) Defendants' violation of the State's right under the Spending Clause not to be bound by ambiguous

---

[1] Unless otherwise noted, all references to "Exh." are to exhibits of the Seidemann Declaration, Seidemann Supplemental Declaration, or Burdette Declaration, which have sequentially numbered exhibits in a single sequence.

conditions, (2) being subject to unconstitutional proceedings infected by a non-delegation doctrine violation, (3) compliance costs from Defendants' mandates, and (4) the credible threat of enforcement that existed on the date this suit was filed. Any *one* of these bases for standing would suffice here. Together they removed any conceivable doubt as to the State's standing.

Equally unavailing are EPA's transparent and shameless attempts to moot this case. To begin with, the State continues to suffer ongoing injury, notwithstanding EPA's litigation-induced abandonment of its investigations. Defendants' disparate-impact and cumulative-impact requirements continue to be in legal force, purporting to bind the State and imposing compliance costs on an everyday basis. LDEQ, for example, must consider disparate impacts for *every* permit it issues—not just those that EPA will subsequently investigate. Indeed, EPA specifically vetoed LDEQ's issuance of a Clean Air Act ("CAA") permit on explicit disparate-impact and cumulative-impact grounds on June 16—*after* this suit was filed—demonstrating the State's continued exposure to liability and enforcement under Defendants' regulations. This ongoing injury defeats any mootness.

But even if this case would otherwise be moot, it readily falls within the exception for voluntary cessation, which "evaluates the risk that a defendant is engaging in 'litigation posturing' to avoid judicial review." *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018). Defendants' actions are transparently just that: an abrupt, 180-degree turn that is inexplicable *except* as "litigation posturing to avoid judicial review." *Id.* That's not just the State's view, but also the candid assessment of Defendants' ideological allies and seemingly every third-party commentator. Accepting Defendants' characterization of their complete capitulation as non-litigation-based—a contention tellingly advanced without *any* sworn declaration attesting to EPA's actual motivations and deliberations—would require this Court "'to exhibit a naiveté from which ordinary citizens are free.'" *Department of Commerce v. New York*, 139 S.Ct. 2551, 2575 (2019) (citation omitted). Suffice it to say, Defendants' remaining procedural defenses fare no better.

2

Defendants' arguments on the merits are equally lacking. As to the non-delegation claims, EPA implausibly argues that the Private Special Interest Groups only act in an advisory or concurring role. That contention simply blinks reality as to who is pulling the strings. In truth, Sierra Club enjoyed an *absolute veto* as to how federal governmental power would be exercised at a critical juncture—so much so that EPA had little choice but to engage in horse-trading to regain its delegated-away power on a one-off basis. EPA's resort to bartering and haggling to regain power it *could never constitutionally give away in the first place* powerfully demonstrates the constitutional violation.

The State's disparate-impact claims are most readily resolved under the Spending Clause. Supreme Court and Fifth Circuit precedent—wholly ignored by Defendants—make incontestably clear that the Spending Clause precludes imposition of *any and all* conditions that are not *unambiguously* established by the *statutory* text. Here, Title VI unambiguously prohibits only *intentional discrimination*— a proscription that the State accepts with enthusiasm. But neither §601 nor §602 establishes any disparate-impact liability or Defendants' authority to impose such liability—let alone does so *unambiguously.* Defendants try to escape this result by claiming that the Spending Clause only demands that statutes establish the existence of "*a* condition" that is unambiguous, Opp.47 (emphasis added), but the Supreme Court has repeatedly rejected that premise—including in *Arlington Central Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) and *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022). Indeed, *Cummings* held as much specifically for Title VI. The Fifth Circuit then made crystal clear that the required clarity "must come directly from the statute," not regulations. *Texas Educ. Agency v. U.S. DoEd*, 992 F.3d 350, 362 (5th Cir. 2021).

But even under *de novo* review, it is clear Defendants lack authority under §602 to impose disparate-impact liability. Section 602 only gives them authority to "effectuate" §601—which only prohibits *intentional* discrimination. Imposing disparate-impact liability does not "effectuate" that prohibition, but rather transforms it into something radically different. That is made clear by the lack

3

of a "good faith" defense: because §601 prohibits only intentional discrimination, any regulation permitting liability in the teeth of provable absence of discriminatory intent necessarily *flouts* rather than "effectuates" §601's prohibition on intentional discrimination.

The State's disparate-impact claims are powerfully supported by two other considerations. *First*, Defendants' disparate-impact regulations invite *at least* severe doubts as to their constitutionality. That much is made plain by (1) *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)—a case cited prominently by the State, to which Defendants have no apparent response and (2) *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("Fair Admissions")*, 143 S.Ct. 2141 (2023), which was decided after the State's motion and which makes plain that Defendants' intentionally race-conscious regulations are of doubtful constitutionality *at best*. *Second*, Defendants' regulations fail under the major questions doctrine. Defendants do not deny that any of the *three independent triggers* identified by the State (P.I. at 35-36) are *all* present here, demanding application of the doctrine. Nor do Defendants even attempt to argue that the requisite clear congressional authorization exists if the doctrine applies.

Finally, EPA's defense of its Extra Regulatory Requirements—now principally its cumulative-impact mandates—rests on their reality-blinking contention that those requirements are mere non-binding guidance. EPA's actions and actual statements in their "guidance" bely those contentions.

For all of these reasons, this Court should deny Defendants' motion and enter judgment for the State.

## <u>ARGUMENT</u>

## I.   THIS COURT HAS JURISDICTION TO REVIEW AND ENJOIN DEFENDANTS' ACTIONS

Defendants brief (at 11-35) unleashes an astounding *25 pages* of putative procedural defenses—almost literally DOJ's entire administrative law playbook. Although voluminous, all fail.[2]

---

[2]  The State specifically argued that sovereign immunity was waived for all the States' claims. *See* P.I. at 12. Defendants never contest this point and do not argue sovereign immunity themselves.

A. **The State Has Article III Standing**

Defendants raise (at 11-24) a multitude of arguments that the State lacks Article III standing. While these issues are somewhat esoteric and complex, their resolution here is clear: the State has standing on multiple independent grounds, any *one* of which suffices.

1. **As The Object Of Defendants' Regulations, The State Has "Self-Evident" Standing**

The State's standing here is straightforward here because the State is "an object of the action … at issue" as a regulated party. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When that is so, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62. Indeed, in this context, "standing to seek review of administrative action is *self-evident*"—so much so that plaintiffs typically need not "supplement the record" with any standing evidence *at all*. *Sierra Club v. EPA*, 292 F.3d at 899-900 (emphasis added); *accord Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014) ("It follows from *Lujan* that if a plaintiff is an object of a government regulation, then that plaintiff ordinarily has standing to challenge that regulation."). As a practical matter then, this Court can begin *and end* its standing analysis with the recognition that the State is the object of regulation here. *See also Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1043-44 (N.D. Ill. 2014) (recognizing object-of-regulation/"self-evident" standing by companies that were "'objects' of the [challenged HUD] Disparate Impact Rule.").

This venerable self-evident-standing principle makes perfect sense: if a regulation is unlawful, the imposition of *any* burden by it constitutes "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 561. And regulations invariably create compliance, familiarization, and planning costs—all of which are cognizable and redressable injuries that flow from illegal regulations. For that reason, "[a]n increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015) (holding that plaintiffs had object-of-regulation standing).

5

This object-of-regulation doctrine reflects common sense. Much as the object of a punch or a headbutt has self-evident standing to assert a tortious battery claim against his batterer, the State, as an object of Defendants' unlawful regulations and actions, has obvious Article III standing to challenge the legality of those actions/regulations, which were foisted upon it *directly*. Defendants tellingly make no effort to address the State's standing as an "object of the action … at issue," *Lujan*, 504 U.S. at 561—and certainly do not deny that the State is just such an "object." Nor could they have been unaware of the object-of-regulation/self-evident-standing doctrine: the State's prior filings repeatedly cited it. *See* P.I. at 12-13; Complaint ¶203. They simply have no answer to it.

### 2.   Defendants' Violations Of Louisiana's Rights Under The Spending Clause Confers Standing

The State also has sovereign injury under the Supreme Court's Spending Clause jurisprudence. Under those precedents, Congress's power to impose conditions on States through spending grants is subject to critical limitations. In particular, the State has a specific and concrete right to clarity in Spending Clause-based conditions. That right to clear conditions has two crucial facets here: (1) a pre-agreement right to clarity in the contours of the conditions and (2) a post-agreement right not be to be bound by any restriction that is not *unambiguous* from the *text* of the statute itself. Put differently, the federal government violates the Constitution *either* when (1) Congress presents the States with unclear conditions *or* (2) the Executive or Judiciary tries to enforce a Spending Clause condition against the States that goes beyond what the statutory text of the condition unambiguously establishes. These are *sovereign* rights that the States possess under our "system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

A classic example of the latter type of right/violation is *Arlington Central*. There, the Individuals with Disabilities Education Act ("IDEA") unambiguously told States that acceptance of relevant federal funds would make them liable to prevailing parties for "reasonable attorneys' fees as part of the costs." 548 U.S. at 293-94. There was accordingly no confusion as to liability for attorneys' fees in

6

IDEA cases, and no sovereign injury on that front. Nor was the existence of *a* condition contestable. But when the Judiciary tried to extend that liability to expert fees, which the IDEA did not establish unambiguously, that expansion violated the Spending Clause; instead, the States could be bound *only* if "the IDEA g[ave] a State *unambiguous notice* regarding liability for expert fees." *Id.* at 301 (emphasis added); *accord id.* at 296 (Statute must "furnish[] clear notice regarding the liability at issue.").

Unsurprisingly then, violation of these sovereign constitutional rights creates cognizable injury. Thus, in *Arizona v. Yellen*, 34 F.4th 841, 851-53 (9th Cir. 2022), the Ninth Circuit held that whenever the federal government "extends a federal grant with ambiguous … terms to the States, … this offer offends state sovereignty and gives rise to a cognizable injury." The Eleventh Circuit reached the same conclusion in *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). That is essentially—*by definition*—how constitutional rights work: when violated, they give rise to injury that courts can redress. After all, "[i]t is a settled and invariable principle, that every right, when withheld, must have a remedy." *Marbury v. Madison*, 5 U.S. 137, 147 (1803).

So it is here: (1) the State has a constitutional right to not to be bound by any condition in Title VI beyond what its *statutory text* unambiguously establishes, (2) Defendants' disparate-impact regulations violate that right by doing just that, and (3) the State therefore has cognizable sovereign injury. EPA resists this obvious result by suggesting the State is improperly relying on subjective confusion—arguing (at 17) that the State lacks standing because the "assurances the State signed are unambiguously clear." But that is mistaken on three levels. *First*, the State does not merely possess a right to clarity in the conditions, but also the right not to be bound by any restriction not unambiguously clear in the statutory text. *Second*, neither regulations nor signed assurances can provide the necessary clarity—only the statutory text can. *Texas Educ. Agency*, 992 F.3d at 361; *see also* P.I. at 33; *infra* §III.C. *Third*, neither *Arizona* nor *West Virginia* rely on any theory of subjective confusion, as Defendants do, but instead turn entirely on the *objective effects* of the statutory text. And both decisions

make clear that *every time* that Defendants extend an offer of a funding grant with unconstitutional strings attached—something that Defendants are constantly doing by offering grants that bind the States to ever-longer terms of Title VI compliance—that offer creates new cognizable injury.[3]

Consider also the absurd implications of Defendants' position. Under their logic, the Executive can violate the Spending Clause with impunity by imposing conditions beyond what the statutory text will unambiguously bear *as long as it is clear enough about its intent to do so*—thereby avoiding any subjective "confusion" by the States. That cannot be—and is not—the law, as *Arizona* and *West Virginia* make plain. Indeed, by Defendants' logic, the Arlington Central School District should have lacked standing since *longstanding* circuit precedent from across the Hudson River gave the district clear (albeit erroneous) notice that acceptance of IDEA funds would subject the States to liability for expert fees. *See Arons v. New Jersey State Bd. of Educ.*, 842 F.2d 58, 62 (3d Cir. 1988).

Ultimately, the issue here is not one of subjective "confusion" but rather of objective *authority*. The Executive is wholly without constitutional power to impose Spending Clause conditions that exceed what Congress has unambiguously provided in the statutory text, and the States have a corresponding right not to be so bound. *Arlington Central*, 548 U.S. at 296, 301. Defendants' trampling of that fundamental constitutional limitation creates cognizable injury to the State.

### 3.    Subjecting The State To Proceedings Infected By Private Non-Delegation Doctrine Violations Confers Standing

For similar reasons, the State has suffered cognizable injury from EPA's violations of the non-delegation doctrine: *i.e.*, the State had a right to be free of the exercise of federal governmental power dictated by private parties and EPA's violation of that right injured the State. As the State has explained (P.I. at 18-19), "'being subjected' to 'unconstitutional agency authority' … [constitutes] 'a here-and-

---

[3] For this reason, EPA's reliance (at 17) on *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 825 (5th Cir. 2022) is unavailing. The State is not relying upon its own subjective confusion to establish standing, but rather Defendants' violation of the State's constitutional right not to be bound by any Spending Clause condition beyond what its statutory text unambiguously provides. Nor does *Perez* involve the Spending Clause or any related considerations whatsoever.

now injury.'" *Axon Enter., Inc. v. FTC*, 143 S.Ct. 890, 903 (2023) (citations omitted). Indeed, *even in Defendants' own telling* the Article III injury was realized in *Axon* when the plaintiff was "'subject[ed] to an illegitimate proceeding, led by an illegitimate decisionmaker,'" Opp. at 14 n.8 (quoting *Axon*, 143 S.Ct. at 903). *That is this case*: the State specifically argued that it was (1) "subjected to an illegitimate proceeding"—*i.e.*, investigations infected by a non-delegation doctrine violation, and one which was (2) "led by an illegitimate decisionmaker"—*i.e.*, the Private Special Interest Groups pulling EPA's strings. EPA thus flunks its own articulation of the *Axon* standard.

Despite the State falling within EPA's own characterization of *Axon*'s holding, the agency tries (at 14 n.8) to distinguish *Axon* on the basis that the State "has not been compelled to take any action (unwanted or otherwise)." But the injury in *Axon* was not predicated upon Axon taking any action. In any event, much like *Seila Law*, EPA did issue a "'civil investigative demand'" and the State was required "'to provide documents it would prefer to withhold.'" Opp at 14 n.8 (quoting *Seila Law LLC v. CFPB*, 140 S.Ct. 2183, 2196 (2020)); Exh. 18. EPA's attempted distinction of *Seila Law* (at 14 n.8) on the facts is thus factually erroneous. (How EPA's April 26 document demands do not qualify as "civil investigative demands" in the agency's mind also goes entirely unexplained.)

More generally, EPA's contention that the State was not required "to take any action" simply blinks reality. The potential penalty for violating Title VI is loss of all relevant federal funds—a veritable Sword of Damocles. The idea that the State could flatly refuse to participate in informal negotiations and defy its document demands is, quite frankly, absurd. Has any State *ever* done that? EPA certainly identifies no such example, and instead admits that *no one* has ever run that colossal risk in "the fifty years since EPA adopted its Title VI implementing regulations." Opp.8.

Instead, the State had little choice but to engage in a drawn-out process: producing documents upon demand, reviewing and redlining proposed settlement agreements, responding to the Letter of Concern, joining innumerable conference calls, and indulging EPA's pronounced habit of cancelling

meetings at the last minute. Seidemann Decl. ¶¶ 22-76; Exh. 18-25, 81-83. As a practical matter, EPA's actions forced the State to take all these actions. Nor were these actions costless, Burdette Decl. ¶¶16-25, and the irrecoverability of those costs establishes irreparable injury. *See* P.I. at 41-42.

Federal courts have jurisdiction to resolve these sorts of disputes and "do not require plaintiffs to 'bet the farm' … before 'testing the validity of the law.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010) (citation omitted). But that is precisely what EPA seeks to mandate here: requiring the State to expose itself to potentially ruinous penalties as the price for obtaining judicial review. Article III demands no such thing and instead permits pre-enforcement challenges.

EPA further contends (at 14-16) that standing is lacking because the State's injury is speculative, focusing on the agency's post-suit capitulation of its then-pending Title VI investigations. EPA is mistaken. Standing is judged "under the facts existing when the complaint is filed." *Duarte*, 759 F.3d at 520 (quoting *Lujan*, 504 U.S. at 569-70 n.4). Here, the State was subject to EPA's Title VI investigations in which private groups were pulling the strings and the non-delegation doctrine violation was thus ongoing when the complaint was filed. The State's exposure to those constitutionally tainted proceedings on May 24, 2023 constituted "here-and-now injury." *Axon*, 143 S.Ct. at 903. EPA's post-Complaint surrender on the pending Title VI investigations cannot defeat the State's standing. Instead, it could be relevant only to EPA's mootness argument—which fails as set forth below. *See infra* §I.B.[4]

### 4. Defendants' Disparate-Impact Regulations And Extra-Regulatory Requirements Create Compliance Costs That Establish Standing

The State's costs in complying with Defendants' disparate-impact regulations also readily establishes the State's standing here. It is a truism that "complying with a regulation later held invalid

---

[4] EPA misapprehends (at 13-14) the import of its horse-trading non-public information. The fact that EPA felt compelled to engage in a *quid pro quo*—and characterized itself to be doing just that (which its brief does not deny)—confirms the non-delegation violation and resulting injury. Why would EPA need to barter with the Private Special Interest Groups to *regain* its authority to extend negotiations on a one-off basis if the agency had not already delegated that authority away wholesale in the first place? That constitutional violation inflicted "here-and-now injury," *Axon*, 143 S.Ct. at 903.

almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (cleaned up) (emphasis in original). And so it is here. Defendants' contrary arguments (at 21-22) are flawed both conceptually and factually. And they also contradict EPA's own explicit statements to Congress in seeking massive funding increases specifically to perform the analysis that it brazenly contends in this Court can be done without cost.

While EPA focuses on the State's costs in enforcement proceedings, Defendants' mandates create compliance costs *far* more broadly and frequently than that. Indeed, while Defendants have unceremoniously (and strategically) capitulated their pending investigations, they have *not* disavowed their position that LDEQ must comply with disparate-impact mandates *every* time it issues a permit. That is something that LDEQ does *regularly*. Burdette Decl. ¶17. And each time it performs the demanded, not-costless disparate-impact analysis, the State incurs new injury in the form of new compliance costs. *See id.* ¶¶17-22.

The required disparate-impact analysis imposes costs separate from complying with Title VI's intentional-discrimination prohibition, which requires only confirmation of the absence of illicit intent. That is quite cheap to comply with since a decision-maker *knows* whether its decision in motivated by unlawful animus. Ascertaining one's *own* intent is neither complicated nor costly.

Not so for disparate-impact compliance. By its very nature, avoiding disparate-impact liability requires regulated entities to conduct statistical analysis to understand whether there is a disparate racial impact that may need to be addressed. *See, e.g., Donovan*, 66 F. Supp. 3d at 1043-44 (finding standing based on compliance costs resulting from challenged disparate-impact rule because such mandates "require the [regulated entities] to begin collecting and reviewing information regarding applicants' race, color, [etc.] to monitor their compliance with the Rule" and thereby "*causes [the regulated parties] to incur costs*." (emphasis added)). Indeed, DOJ's own Title VI Legal Manual recognizes that "statistical evidence is often necessary" to comply with disparate-impact mandates. Exh. 61 at 18.

Nor is running such statistical analyses costless: it requires gathering data, coding it, designing proper regression analysis, and analyzing the results. *See Donovan*, 66 F. Supp. 3d at 1043-44. Indeed, merely skimming EPA's and DOJ's guidance on disparate-impact requirements—with its page-long flow chart and *58 footnotes* (EPA) and *138 pages of detail* (DOJ)—is sufficient to dispel any conceivable doubt that Title VI disparate-impact compliance could be accomplished without cost. Exh. 40 at 11-21; Exh. 61. So too with EPA's extraordinarily complex cumulative impacts "guidance" documents. Exh. 46-47; Burdette Declaration ¶¶23-24. And even "a dollar or two" of injury suffices to establish standing. *Sprint Comm'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008).

Underscoring the ubiquity of EPA's disparate-impact and cumulative-impact mandates, EPA *explicitly* objected to another LDEQ permit on June 16 on those grounds *after* this suit was filed, and has not withdrawn that objection (unlike its investigations). *See* Exh. 84 ("June 16 Objection"). In doing so, EPA demanded that the State must undertake analysis under "civil rights regulations" to avoid "unjustified discriminatory effect" (*i.e.*, Title VI disparate-impact mandates). *Id.*[5] EPA even added a cumulative-impacts demand, insisting that the State consider "whether the community is *already disproportionately impacted* either by public health or environmental burdens." *Id.* at 2 (emphasis added). Does EPA *really* think the State could perform all that analysis without cost? It can't, as the Burdette Declaration makes clear. *See* Burdette Declaration ¶¶18-25. Indeed, the now-Secretary of LDH estimated that compliance with EPA's disparate-impact-related demands would "cost[] several million dollars." Seidemann Decl. ¶71.

---

[5] EPA strangely contends (at 22) that the State's compliance costs are the product of "self-inflicted expenditures." That is unserious and is comprehensively belied by EPA's repeated *demands* that the State conduct disparate-impact analysis—reflected in its regulations, its guidance documents, its letter of concern, its June 16 Objection, its disparate-impact-based document demands, and innumerable statements in informal negotiations. The costs resulting from complying with *EPA's demands* are inflicted *by EPA*—not the State itself.

   EPA's June 16 Objection further belies EPA's categorical contention (at 1) that the State "cannot point to a single action undertaken by EPA against Louisiana or any of its agencies that depend on the disparate-impact regulations." EPA's contention is further contradicted by the document demands that EPA sent the State. Exh. 18. And, more generally, EPA's demand that the State avoid disparate impacts in *all* permitting decisions are further such actions.

More generally, EPA's premise that disparate-impact analysis could be costless flouts the agency's *own understanding*—which is manifestly the opposite. EPA sought from Congress an additional *$11.6 million* and 50 new full-time employees for fiscal year 2023 to "address actions, policies, and practices by recipients of EPA funding that have a *discriminatory impact* on overburdened and disadvantaged communities," Exh. 52 at 393-94 (emphasis added)—*i.e.*, to analyze and enforce Title VI disparate impacts, including cumulative disparate impacts. It similarly seeks "an additional $42.3 million and 9.5 FTE [full-time employees]" for fiscal year 2024 to "to modernize [EPA's] national enforcement and compliance data system and to expand compliance monitoring efforts to address environmental justice issues." Exh. 53 at 241.

Much of that new money is explicitly for the purpose of performing "affirmative compliance reviews to address the impacts of potentially discriminatory activities on overburdened communities," Exh. 53 at 53; *accord* Exh. 52 at 390-94—*i.e.*, EPA will *inter alia* conduct the same disparate-impact analysis as the grant recipients to see if EPA reaches the same conclusion. *Id.* And just as that duplicated analysis is not free for EPA to conduct, it is equally not costless for the State to do so.

In the end, it is rather astounding that EPA would advance to this Court arguments built on a disparate-impact-analysis-is-costless premise that the agency plainly *does not believe itself*—and is contrary to what it told Congress. EPA understands all too well that this disparate-impact analysis is not free. Its willingness to advance arguments contrary to that clear understanding is deeply (if inadvertently) revealing of the liberties with facts, law, and common sense that its arguments take here.

### 5.     The State Also Has Standing Based On The Threat Of Enforcement

The State also has standing to assert its claims against EPA based on the "credible threat" of enforcement by EPA that existed on the day that this suit was filed. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Duarte*, 759 F.3d at 520 n.3 (standing evaluated at time of complaint's filing).

When this suit was filed, there is no doubt that the State faced just such a credible threat of

enforcement: EPA (1) had accepted complaints against LDEQ and LDH, (2) issued a letter of concern with detailed allegations of Title VI disparate-impact violations and demanded that the State "[c]onduct cumulative impacts analyses," (3) was drafting findings of violations, and (4) was set to move to formal enforcement proceedings a mere 48 days after the Complaint was filed, on July 11. Exh 11 at 3-5; Exh. 22-23; Seidemann Decl. ¶¶18, 73. That is not a "general threat of prosecution" as EPA contends (at 19), but one *specifically targeted* at the State. Nor does the State need to show specific targeting in any event. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 925 (5th Cir. 2023) ("[C]ourts allowed litigation to proceed based on a credible-threat analysis without a showing of specific targeting.").

EPA does not appear to genuinely deny that a credible threat of enforcement existed *on May 24, 2023*. Instead, its analysis (at 18-21) appears directed at the state of the world *after* it had surrendered away all of its pending investigations, thereby attempting to smuggle post-suit actions into the standing analysis. But that is *not* when Article III standing is evaluated. *Duarte*, 759 F.3d at 520 n.3. Its *only* potential relevance is to EPA's mootness arguments, which lack merit. *See infra* §I.B. But even under EPA's erroneous view that the threat of enforcement is evaluated for standing purposes based on current facts, the State *still* faces a credible threat *now* for five reasons.

*First*, EPA's June 16 Objection makes plain that EPA's intent to enforce its mandates against the State is an *ongoing and absolute certainty*. *See* Exh. 84. That objection—which carries the force of law—makes unequivocally clear that EPA *is* enforcing the challenged disparate-impact and cumulative-impacts regulations against the State and has *not* abandoned its intent to do so. *Supra* at 12.

*Second*, Defendants have *not* disavowed their position that States must comply with their challenged mandates when issuing permits or taking other relevant actions. That "refusal to disavow enforcement … is strong evidence … that [the State] face[s] a credible threat" of enforcement. *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021), *cert. denied* 142 S.Ct. 2903 (2022); *see*

*also Seals v. McBee*, 898 F.3d 587, 592 & n.9 (5th Cir. 2018) ("Whether the government disavows prosecution is a factor in finding a credible threat of prosecution."). Absent a clear disavowal that EPA will not enforce *any* disparate-impact or cumulative-impact mandate against the State—which its brief tellingly refuses to supply—the risk of enforcement against the State is manifest.

*Third*, EPA's recent and dramatic expansion of its Title VI enforcement efforts in the name of "environmental justice" supports the State's standing. EPA has recently created the alphabet-soup Office of Environmental Justice and External Civil Rights ("OEJECR"), expanded its head count, and sought millions of dollars from Congress to expand further its Title VI enforcement. Exh. 8; Exh. 52 at 393-94; Exh. 53 at 241. It also has remarkably elevated that office to equal standing as the Air, Water, and Chemical Safety and Pollution Prevention Offices—*i.e.*, the offices tasked with carrying out the *actual environmental protection* mission of the Environmental Protection Agency. Exh. 8.

And Defendants have also vastly expanded their Title VI enforcement efforts against States, successfully coercing Michigan, Missouri, and Alabama into Title VI settlements in the last year alone. *See* Exh. 54-57. And even after their tactical retreat here, EPA has instituted a new Title VI enforcement action against Delaware on September 8. Exh. 67. EPA's recent budget request also makes clear the agency's sweeping disparate-impact ambitions. In it, EPA commits itself to extracting from *all* States "*commitments to address disproportionate impacts* in all written agreements between EPA … and states" in the next three years. Exh. 53 at 48 (emphasis added). Similarly, EPA's "Journey to Justice" tour in 2021 makes perfectly clear that the agency has placed Louisiana squarely in its crosshairs for future enforcement actions. *See* Exh. 1-3.

*Fourth*, EPA's contention (at 19) that standing is lacking because the State "does not express any intention to engage in conduct that amounts to disparate-impact discrimination" is mistaken both legally and factually. On the law, "'Nothing in [the Supreme Court's] decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.'"

*Contender Farms*, 779 F.3d at 267-68 (quoting *Susan B. Anthony List*, 573 U.S. at 163). Thus, in *Contender Farms* the plaintiffs were not required to confess to soring horses to obtain standing to challenge anti-horse-soring regulations; instead they only needed to show that they "intend[ed] to participate in these events [certain horse competitions] in the future." 779 F.3d at 68.[6] Here it is undeniable that LDEQ intends to participate in the sort of actions that could lead to EPA enforcement: *i.e.*, granting environmental permits that are subject to Title VI compliance.[7]

On the facts, Defendants' enforcement priorities are now so warped that virtually *any action* could become a target of enforcement. Recall what is *undisputed* about the CAA permits triggering EPA's investigations here. They: (1) complied with *all* substantive environmental standards, (2) *reduced* allowable air emissions, (3) thereby produced environmental benefits in manner *disparately benefiting* racial minorities, and (4) their issuance could have been stopped by EPA, but the agency declined to object then. If EPA is willing to initiate Title VI enforcement proceedings in this context—with *positive disparate benefits*—virtually *any* permit granted by the State could trigger an enforcement action.[8]

*Fifth*, EPA's contention (at 20) that no person or entity in the United States faces a credible risk of enforcement because no Title VI complaint has ever "reached the enforcement stage" misapprehends the obvious import of that remarkable fact. As explained above (at 9-10), the reason

---

[6] EPA's reliance (at 18-19) on *Zimmerman v. City of Austin, Texas*, 881 F.3d 378 (5th Cir. 2018) is misplaced. There, the plaintiff "failed to establish a serious intention to engage in conduct" at issue, and thus lacked a credible threat of enforcement. Here, there is no doubt that the State intends to engage in granting permits and funding requests, and thus "intend[s] to participate in these [activities] in the future." *Contender Farms*, 779 F.3d at 68. Nor does the State need to show that its activities *would* violate disparate-impact mandates, only that those activities are "'*arguably proscribed*' by the law. *Susan B. Anthony List*, 573 U.S. at 162 (emphasis added) (citation omitted).

[7] EPA also fails to account for the fact that the State is largely bringing *facial* claims. "Whereas 'there must be some evidence that a rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge,' *that is not the case for facial challenges*." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 334 (5th Cir. 2020) (citation omitted) (cleaned up) (emphasis added). Instead, "'courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.'" *Id.* (citation omitted). Defendants do not even attempt to rebut that presumption here.

[8] Defendants' skewed enforcement priorities are similarly shown by the settlement they browbeat out of Alabama. As part of that agreement, Alabama was prohibited from enforcing its *criminal laws against illegal sewage discharges*, purely in one county that is majority minority—thereby exposing those county residents to greater risk of adverse health impacts from sewage pollution. Exh. 57. That Defendants did so in the name of enforcing Title VI is deeply illustrative of how ordinary activities—such as enforcing environmental laws against unlawful sewage discharges—risk enforcement actions by Defendants.

that has never occurred is that actual enforcement is such a quintessential Sword of Damocles that targets of Title VI investigations almost invariably accede to the Executive's demands—much as a nuclear arsenal that is never used still functions as a powerful deterrent.

Defendants thus, for example, had no apparent trouble securing settlements from Alabama, Michigan, and Missouri in the last twelve months alone. *Supra* at 15. But if EPA were correct that there was no credible threat of enforcement, those States could simply have told Defendants to pound sand rather than accede to resolution agreements. None did, given that manifest risk. Nor are States required to "bet the farm" to obtain judicial review of the legality of the proverbial guns that Defendants have placed to their heads. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).[9]

### 6.     The State Has Standing To Assert Claims Against DOJ

The State has standing to challenge DOJ's disparate-impact regulations for the same essential reasons as apply to EPA: (1) the State's Department of Justice is the object of those DOJ regulations, (2) DOJ's attempt to impose disparate-impact liability exceeds the unambiguous text of Title VI thereby causing sovereign injury, and (3) the Louisiana Department of Justice is bound to Title VI by funding grants from DOJ and itself takes actions that are subject to DOJ's disparate-impact mandates, which result in compliance costs. *See* Sinquefield Decl. ¶¶ 3-9.

---

[9] *Medimmune* is particularly instructive here. In that case, the Court held that a patent licensee (Genentech) had standing to challenge the validity of the patent it was licensing—even though Genentech could simply have continued making royalty payments and thereby rendered the threat of infringement liability "at least remote, if not nonexistent." 549 U.S. at 120-22, 126-37. Because Genentech was bound by the terms of the license for its duration absent judicial relief, standing and ripeness existed because the "threat-eliminating behavior was effectively coerced" and the plaintiff was still bound by the terms of the license absent invalidation of the patent. *Id.* at 129.

The same analysis demonstrates standing exists here: by accepting federal funds, the State is bound by the terms of Title VI and its implementing regulations (if valid) for the duration of the grants and is coerced by the possibility of losing federal funds into complying with them. That binding effect establishes a "case or controversy" that permits the State to challenge the validity of the disparate-impact and cumulative-impact mandates under *MedImmune.* Just as Genentech did not need "to terminate or be in breach of its license agreement before" seeking judicial review, the State need not violate or terminate its federal funding grants before seeking review of the lawfulness of the conditions to which Defendants purport to bind it. *Id.* at 128-29 ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."). Instead, States may challenge the validity of the Title VI regulations much as Genentech could challenge the validity of MedImmune's patent.

### 7.    The State Faces Imminent Harms

Defendants' contentions (at 14-15, 18-19) that the State's harms are not sufficient imminent also lack merit, and again fail to analyze standing from the facts that *existed when the State's complaint was filed*. On that day, the non-delegation violation was not merely imminent in the future, but *actually ongoing*. *Supra* at 8-10. In addition, EPA was threatening to issue findings of a violation within 48 days (by the July 11 deadline) if the State did not agree to a settlement agreement. *See* Exh. 18.

The imminence of the threatened harms is further underscored by the fact that not even *one month* passed before EPA specifically objected to a permit issued by the State on disparate-impact and cumulative-impacts grounds, *supra* at 12—an objection that carried the force of law, *see* 42 U.S.C. §7661d, and inflicted further injury. What better proof of imminent future injury could there be than that injury actually coming to pass a mere 22 days later?

More generally, as explained above, the State faces new and ongoing injury *every* time it issues a permit and is required to comply with Defendants' fluid, ever-increasing disparate impact mandates. *Supra* §I.A.4. Given the highly repetitive nature of such actions, the State will realistically never be free from imminent harms for as long as Defendants' regulations remain on the books, since the need to decide whether to grant or deny particular permits or grants will always be pressing. *Id.*

### 8.    The State's Harms Are Traceable To Defendants' Regulations And Actions

EPA offers a strange suggestion (at 18) that the State's harms are not traceable to its disparate-impact regulations "because EPA could have initiated those very proceedings upon complaints alleging only intentional discrimination." That is mistaken for two reasons.

*First*, no matter what EPA "could" theoretically have done (Opp.18), that is *not* what it did. *See* Seidemann Decl. ¶109. That is akin to arguing that parties may not challenge illegal agency actions where the agency *could* have acted lawfully. Has such a "but we could have acted legally (but didn't)" defense *ever* worked? The single case cited by EPA (at 18) certainly did not hold as much.

Here EPA's actions were either overwhelmingly or exclusively driven by disparate-impact theories, rather than intentional discrimination. EPA's letter of concern, document demands, and the mandates it sought to impose during the informal negotiations all make that clear. *See* Exh. 11 at 3-5; Exh. 18; Exh. 81-83. At no point did EPA offer any credible or serious allegation that the State's actions were motivated by intentional discrimination. *See* Seidemann Decl. ¶109. EPA's eleventh-hour contention that intentional discrimination was a significant component of its investigation is a revisionist retelling. And it is tellingly offered without any supporting declaration.

*Second*, even if *some* of the State's harms were theoretically traceable to Title VI's intentional-discrimination prohibition, the State would still have standing. That is because at least *some* harms at issue would still be attributable to the disparate-impact regulations, such as conducting the relevant statistical analysis, *supra* at 11-13), or addressing EPA's *specific and explicit disparate-impact-based objections*. *See* Exh. 11, 42. Because even "a dollar or two" of injury suffices to establish standing, tracing *any* of the State's injuries to the challenged mandates is sufficient. *Sprint Communications*, 554 U.S. at 289.

### 9.    Redressability

Not content to let any single standing element go unargued, EPA finally contends (at 13) that Article III redressability is lacking for the State's non-delegation claims because this Court putatively lacks authority to "issue meaningful relief." Not so. Vacatur of EPA's self-imposed 180-day deadline or an injunction against EPA forbidding it from following any directions from the Private Special Interest Groups (and thereby requiring it to exercise its own independent and untainted judgment) would fully remedy the State's non-delegation-doctrine injuries.

EPA further protests (at 13) that "this Court cannot compel Defendants [to] violate the judgment in [the *CARE*] case." But it offers no citation for that proposition, which is wrong. EPA can, in theory, comply with the CARE judgment by completing its reviews within 180 days, consistent with EPA's self-imposed regulatory deadline. EPA just can't do that in practice. So EPA can comply

19

with its regulation, or its concededly arbitrary regulation can be set aside. What EPA can't do is use the *CARE* judgment as a vehicle to give power to private actors. The delegation of governmental power to private actors violates the non-delegation doctrine, no matter which branch does the delegating or blesses it. *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022); *see also Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998).[10]

## B.    The State's Claims Are Not Moot

EPA also contends (at 24-26) that its post-suit abandonment of the Title VI complaints moots this action. Not so. This case is not moot under ordinary mootness standards and, even if it were, this case readily falls within the voluntary cessation exception because EPA's actions are transparent "'litigation posturing' to avoid judicial review." *Yarls*, 905 F.3d at 910. In addition, the State's non-delegation claim satisfies the "capable of repetition, yet evading review" exception to mootness.

### 1.    Defendants' Actions And Regulations Are Inflicting Ongoing Injury

"The burden of demonstrating mootness 'is a heavy one.'" *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). "A case becomes moot only *when it is impossible for a court to grant any effectual relief whatever to the prevailing party.*" *Knox v. SEIU*, 567 U.S. 298, 307 (2012) (cleaned up) (emphasis added). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* at 307-08 (cleaned up). Defendants cannot satisfy this "heavy burden" of demonstrating ordinary mootness here even taking their post-suit surrenders at face value.

Even with EPA's abrupt capitulations, the State continues to face injuries from Defendants' disparate-impact and cumulative-impact mandates. As explained above, the injuries inflicted by these

---

[10]   In addition, EPA's citation-less argument creates yet another constitutional violation, this time of the Due Process Clause. EPA cannot rely on a judgment to which the State was not a party to bind the State and violate its constitutional rights: "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979).

   EPA's argument thus amounts to contending that it can violate the State's rights under non-delegation doctrine with impunity simply because it *acquiesced* in other adverse judgments to which the State was not a party. That brazen suggestion not only merits decisive rejection, but also serves to confirm just how lawless the agency's ambitions have become: EPA cannot surrender its way to powers that exceed the Constitution. And its attempt to wield *offensively* adverse judgments to which it *acquiesced* is illustrative of the depths of the shenanigans the agency is pulling.

mandates incur essentially *every* time that the State considers whether to grant a permit, make a funding grant, or take any other relevant action governed by Title VI. *Supra* §I.A.4. Defendants' regulations and rules are still on the books and they continue to bind the State in *all* relevant decisions here. *Id.* Accordingly, this is *not* a case in which subsequent "events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631. Instead, Defendants' abandonment of two investigations has only provided relief for *part* of the State's harms, while leaving the rest in place for *all* future permitting/funding decisions.

The State will *continue* to incur compliance costs for as long as the challenged mandates remain in existence, and the State will *remain* an object of the regulations. It is therefore not "impossible for [this] [C]ourt to grant any effectual relief." *Knox*, 567 U.S. at 307. Instead, granting the State's requested relief will instantly and completely lessen the State's regulatory burdens in *all* relevant permitting/funding decisions, and also remedy the State's sovereign/Spending Clause injury.

The ongoing nature of the State's injuries is further shown by EPA's June 16 Objection: demanding once again that the State comply with disparate-impact and cumulative-impacts-based mandates, and thereby inflicting fresh (and uncapitulated) injury. *Supra* at 12. And because that objection was not swept up in EPA's surrender-its-way-to-mootness ploy, it alone defeats mootness.

Similarly, a credible threat of enforcement still exists. EPA tellingly did not take *even a month* after this suit was filed to make its June 16 Objection, which carried the force of law. And the threat of enforcement against the State remains credible, particularly given EPA's current (and curious) enforcement priorities. *Supra* §I.A.5. Indeed, given EPA's willingness to institute enforcement proceedings for permits that produced *disparate environmental benefits*, it is hardly "impossible" that EPA would seek to enforce its mandates against the State again.[11]

---

[11]  For similar reasons, the State's non-delegation claims are not moot because it there is a reasonable prospect of recurrence. The Private Special Interest Groups file numerous Title VI complaints with EPA. Sierra Club, for example, filed one just seven days after this suit (though its bad timing got it swept up in EPA's mootness machinations). Exh. 59. It filed another disparate-impact complaint on August 25 against the Florida Forest Service, which explicitly cited Sierra

2.    **Defendants' Actions To Moot This Case Fall Within The Voluntary-Cessation Exception**

Even if the State's claims were otherwise moot under the ordinary mootness standards, EPA's actions here readily fall within the voluntary cessation exception to mootness.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant ... free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up) (citations omitted). Even where the voluntary cessation is by governments, "Voluntary cessation … moots a case … only if it is '*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)) (rejecting government defendant's mootness argument).

For voluntary cessation to establish mootness, federal courts "'must be certain that a defendant's voluntary acts are not mere 'litigation posturing'—and that 'the controversy is actually extinguished.'" *Tucker v. Gaddis*, 40 F.4th 289, 295 (5th Cir. 2022) (Ho, J., concurring) (quoting *Yarls*, 905 F.3d at 910). Here EPA's actions flunk both requirements: (1) its actions are obvious "litigation posturing" and (2) even after EPA's voluntary abdications, the dispute here is *far* from "actually extinguished." *Id.* In addition, *all* of the *Fenves* factors that the Fifth Circuit have identified for overcoming the presumption of good faith are present here.

a.    *Litigation Posturing*

EPA's putatively mooting conduct—its abrupt, post-suit abandonment of its Title VI investigations and rejection of new complaints—is plainly "litigation posturing" for six reasons.

---

Club's privileged right to resolution within 180 days under the *CARE* judgement. Exh. 60 at 44. By EPA's own admissions, its 180-day deadline for concluding investigations is rarely met as that deadline is "impracticable," "arbitrary," and "unrealistic." P.I. at 20. So it is hardly impossible that any new investigation against the State would drag on, thus requiring the consent of the Private Special Interest Groups and triggering a new private non-delegation doctrine violations.

*First*, the timing of EPA's surrenders fairly cries out as litigation posturing. EPA did so only *after* this suit was filed and the State sought a preliminary injunction on June 21, seeking a decision by July 11. EPA did so quite quickly: a mere *six days* later and using that closure as basis to avoid answering the State's preliminary injunction on an expedited basis *the very same day*. *See* Doc. 18. That timing militates against mootness. *See, e.g., Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (holding that "the suspicious timing of the change" weighed against mootness).

*Second*, the stage of the informal negotiations makes plain EPA's litigation-based motivation. At no point pre-suit had EPA ever previously hinted that it might walk away without obtaining a scintilla of relief. Exh. 18. EPA had even revealed that—contrary to its own regulations, 40 C.F.R. §7.120(d)—it was proceeding on "parallel tracks" and drafting findings of violations to exert maximum pressure. *See* Seidemann Decl. ¶73; Exh. 18.

Notably, EPA had traded multiple drafts of resolution agreements with tracked changes and the parties were not far apart. Exh. 81-83. EPA could thus have readily achieved substantial benefits simply by agreeing to the terms of LDH's and LDEQ's last redlines. *Id.* At that point, the parties were, in the words of one of the Title VI complainants with which EPA was sharing then-non-public drafts, "pretty close to an agreement." Exh. 65. Reporting based on subsequent FOIA requests for the draft agreements further explained that the agreements would have "*ingrained sweeping new procedures* to ensure that future permitting decisions included an in-depth analysis into … the adverse [disparate] impacts" and represented a "*major win*" for EPA. Exh. 68 at 3 (emphasis added). Environmental groups have also been clear that those agreements would have provided substantial gains. Had EPA accepted those offers the agency would have, in those groups' view:

- Achieved "meaningful reform." (Deep South Center for Environmental Justice Director of Law and Policy Monique Harden). Exh. 62 at 4.

- Attained a "tremendous step forward." (Harden.) *Id.*

- "[G]iven LDEQ all of the tools that it could need to do a better job than what it has done." (Lisa Jordan, Head of Tulane Environmental Law Clinic. *Id.*).

But rather than accept the "major win" and "meaningful reform" that was readily in its grasp, EPA instead insisted on walking away with *absolutely nothing except its current mootness argument*. EPA's willingness to abandon *all* of the many policy achievements manifestly on the bargaining table—for no apparent purpose *except* gaining a mootness argument—underscores the transparent litigation gamesmanship of its actions. As the leader of the complainant Tulane Environmental Law Clinic explained, "I don't know that I've ever seen somebody instantly give up [like this] ... and I've been litigating for 30 years." Exh. 65 at 2.

Moreover, EPA's stated reason for closing the investigations—inability to resolve the investigations by July 11—is obvious pretext. Agreements were in hand *if EPA wanted them*. Moreover, the investigation had already dragged on for more than a year. There was nothing magical or remarkable about the July 11 deadline—save from its potential effect on justiciability here. And there is every reason to believe that EPA could have tolerated another extension, particularly given its lethargic pace in issuing its letter of concern and initiating informal negotiations. It also is doubtful that Sierra Club would have objected to an extension given the potential policy victory at hand—for anyone preferring policy success over a legal mootness argument at least. But after the State sought a preliminary injunction, EPA's slow train to somewhere suddenly became a bullet train to nowhere.[12]

*Third*, EPA's squirrely conduct after this suit was filed underscores the irregularity of its actions. Before the State's Complaint, the parties had met by teleconference twice every week like clockwork, with rare exceptions like holidays. *See* Seidemann Decl. ¶¶78-79; Burdette Decl. ¶16; Exh.

---

[12]  The strategic nature of EPA's machinations is further demonstrated by its parallel conduct in Michigan. There, EPA had (as here) been insisting that Michigan comply with sweeping disparate-impact and cumulative-impacts mandates—and appeared to be on the cusp of a landmark agreement to that effect. Exh. 66 at 1-3. But after the State's suit and motion, EPA executed yet another 180-degree turn that similarly astounded environmental justice advocates, including a former EPA official who called it a "travesty" and "grotesque." *Id.* at 1, 3. And the groups specifically connected that retreat in Michigan to the same strategy in which "EPA dropped high-profile civil rights investigations in Louisiana." *Id.* at 2.

17. But after this suit was filed, EPA began cancelling all teleconferences, but only at the last minute—thereby gratuitously and high-handedly wasting the time of State officials. P.I. at 11-12. EPA's conduct—which abruptly turned on a dime—is only explainable as a response to this litigation.

*Fourth*, EPA's *enormous* reliance (at 11-26) on its investigation capitulations for its standing and mootness arguments further supports finding that those actions were motivated by this litigation.

*Fifth*, the State's view that EPA's actions were mere litigation ploys is widely shared: indeed, it is now the broad consensus of commentators and interested parties. For example, Lisa Jordan of the Tulane Environmental Law clinic opined that "EPA's and DOJ's *entire rationale*, we think, for having dismissed this complaint is *to poise itself well to succeed in this litigation*." Exh. 62 at 6 (emphasis added). Similarly, an environmental attorney at Beverage & Diamond explained that he "'anticipate[d] that EPA took this action to mitigate the risk' of a bad court ruling." Exh. 70 at 2. *No one*—save Defendants—appears to have the slightest difficulty connecting the dots here.

*Sixth*, EPA's refusal to provide any declaration attesting under oath that its actions were not litigation-motivated gravely undermines its contention here. Rather than swearing to that fact and providing *actual evidence* of its intent, it instead points (at 26) *only* to its unsworn, self-serving, and post-suit statement, which was offered in the shadow of the State's preliminary injunction motion. As the Supreme Court has explained, "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.... Silence then becomes evidence of the most convincing character." *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939). So it is here: EPA's telling refusal to provide any sworn evidence that its action were not litigation posturing provides "evidence of the most convincing character" that they were just that. *Id.*

### b.  *Not "Absolutely Clear" That The Conduct Will Not Recur*

This dispute is not actually extinguished, and thus not moot, because EPA cannot meet its "'heavy burden'" or demonstrating that it is "'*absolutely* clear that the allegedly wrongful behavior could

not reasonably be expected to recur.'" *Adarand Constructors*, 528 U.S. at 222 (applying standard to governmental entity and holding case not moot). EPA does not even acknowledge that "absolutely clear" standard (at 24-26), let alone attempt to satisfy it.

This case is controlled by *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993). In rejecting a governmental entity's voluntary cessation argument, the Court explained: "This is an *a fortiori* case. There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so." *Id.* at 662. The same is true here. Not only is there a risk that EPA will again attempt to enforce its disparate-impact and cumulative-impacts mandates against the State, "it has already done so." *Id.* Specifically, EPA's June 16 Objection did just that and has *not* been withdrawn by the agency. *Supra* at 12.

EPA's June 16 Objection also demonstrates the patent error in EPA's central premise (at 26) that the State "could at best identify no more than the 'mere ability to reimpose' new proceedings." Instead of "mere ability" to recur, the State has conclusive *evidence of actual recurrence*. EPA ignores its June 16 Objection—of which it could not have been unaware, since the action was *its own*. EPA owed this Court more candor.[13]

Because it is not "'*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" this case is not moot. *Adarand Constructors*, 528 U.S. at 222 (citation omitted).

### c. **Fenves *Factors***

Finally, this case readily falls within the voluntary cessation exception under the three factors

---

[13] *West Virginia v. EPA* strongly supports the State here as well. There, the Court that the case was not moot because EPA "'nowhere suggests that if this litigation is resolved in its favor it will not' reimpose emissions limits …; indeed, it 'vigorously defends" [its ability to do so]." 142 S.Ct. 2587, 2607 (2022) (citation omitted). Here too EPA *never* commits not to enforcing its challenged mandates or avoiding future non-delegation violations if it were to prevail here. And it further "vigorously defends" the legality of its actions in this Court. *Id.*

Similarly, the Fifth Circuit concluded the voluntary cessation exception did not apply where "the government has not even bothered to give [the plaintiff] any assurance that it will permanently cease engaging in the very conduct that he challenges." *Tucker v. Gaddis*, 40 F.4th 289, 293 (5th Cir. 2022). So too here: EPA does not offer *any* assurance that it will not enforce its challenged mandates against the State in the future, and offers only vague contentions that it is unlikely to do so—which simply ignore its actual actions, such as the June 16 Objection.

that the Fifth Circuit has established. In "*Fenves*, [the Fifth Circuit] explained three factors that can overcome the presumption [of good faith]. They are: (1) the absence of a controlling statement of future intention not to repeat the challenged policy; (2) the suspicious timing of the change; and (3) the governmental entity's continued defense of the challenged policy after the supposedly mooting event. If all three factors obtain, the case isn't moot." *Texas v. Biden*, 20 F.4th 928, 962 (5th Cir. 2021) *rev'd on other grounds* 142 S.Ct. 2528 (2022) (cleaned up) (citations omitted). That is just so here.

*First*, EPA has offered nothing remotely approaching a "a controlling statement of future intention not to repeat the challenged policy." Nor would any such statement be credible in light of EPA's still-pending/non-abandoned June 16 Objection. *See* Exh. 84.

*Second*, the timing of EPA's post-suit *volte face* is obviously suspicious, particularly given the other indicia of irregularity, as set forth above (at 23).

*Third*, EPA's brief undeniably offers a "continued defense of the challenged policy after the supposedly mooting event." *Texas*, 20 F.4th at 962.

Because all three *Fenves* factors are satisfied here, "th[is] case isn't moot." *Id.*

### 3. The Non-Delegation Claims Are Capable of Reptation Yet Evading Review

The State's non-delegation claims also "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007). That "exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Id.* (citation omitted).

Both requirements are satisfied here. Title VI investigations are inherently shorter than the time necessary to fully litigate a case to judgment and through appeal. Although they often last longer than 180 days, there is no indication that they routinely take more than two years—which the Supreme Court has held is insufficient time to fully litigate a case to judgment and through appeal. *Id.*

Similarly, as explained above, there is "a reasonable expectation that the State 'will again be subjected to the alleged illegality,'" *Id.* at 463. That is particularly true as Sierra Club regularly files Title VI complaints and EPA routinely takes more than 180 days to resolve them. *Supra* at 21-22 n.11.

### 4.    Jurisdictional Discovery Is Warranted If This Court Believes There Are Genuine Issues Of Material Fact

As shown above, the record plainly establishes that this case is not moot. But, at a bare minimum, these factual propositions are at least fairly debatable. This Court should order jurisdictional discovery if it believes there are material issues of fact on mootness. *See, e.g.*, *Freeman v. United States*, 556 F.3d 326, 342 (5th Cir. 2009). Similarly, if this Court entertains any genuine doubts as to the State's standing, jurisdictional discovery is appropriate—particularly as EPA itself appears to harbor no doubts that conducting disparate-impact analysis is *not* costless and the State should be permitted to explore EPA's evidence/understanding. *Supra* at 13.

### C.    The State Has Viable Non-APA Causes Of Action

The State has asserted three types of non-APA claims here: (1) claims arising from the Constitution, (2) claims at equity, and (3) non-statutory claims challenging *ultra vires* actions. *See* Complaint ¶¶ 98, 204-10, 218-253. Contrary to EPA's arguments (at 35), all of them are available here.

### 1.    The State's Constitutional And Equitable Causes Of Action Are Distinct From Its *Ultra Vires* Claim And Not Subject To *Kyne* Limitations

EPA attempts (at 35) to lump all of the State's claims together under the umbrella of "*ultra vires* review under *Leedom v. Kyne*, 358 U.S. 184 (1958), which it contends are subject to extremely rigorous limitations that make them akin to a "Hail Mary pass." But the State's equitable and constitutional causes of action neither derive from *Kyne* nor are *ultra vires* claims. They are thus *not* subject to the same limitations.

***Equitable Cause of Action.*** The Supreme Court notably considered the cause of action at equity in *Free Enterprise Fund* and cited several cases recognizing the availability of that type of claim. 561 U.S. at 491 n.2 (collecting cases). In *not one* of those cases did the Court treat those claims as being

28

*Kyne*-based or "ultra vires" causes of action, and indeed the words "*ultra vires*" do not appear in *any* of them. *See generally id.*; *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001); *Bell v. Hood*, 327 U.S. 678 (1946); *Ex parte Young*, 209 U.S. 123 (1908). Instead, in each case the Court treated the claims as ones permitting direct review of the legality of the challenged acts without any need to satisfy the *Kyne* or *Kyne*-like obstacles that EPA tries to conjure here. *Id.*

Notably, the State's equitable cause of action that is the same one that federal courts apply in when considering claims under the doctrine of *Ex Parte Young. See Free Enterprise Fund,* 561 U.S. at 491 n.2. But federal courts do not impose the limitations of *Kyne* for such suits when the question is whether state officials are complying with federal law. *See, e.g., Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017). The same result should obtain when the shoe is on the other foot, and the claim at equity is that *federal* officials are violating federal law.

*Constitutional Cause of Action.* The Fifth Circuit has similarly entertained a cause of action arising under the Constitution in *Cochran*, without imposing any similar limitations. *See Cochran v. SEC*, 20 F.4th 194, 199-200 (5th Cir. 2021) (en banc), which the Supreme Court affirmed in *Axon*.

## 2. The State's Non-Statutory *Ultra Vires* Claim Easily Passes Muster Under Fifth Circuit Precedent

EPA's arguments regarding the State's non-statutory *ultra vires* claims also wrongly conflate distinct claim types in a misguided attempt to augment the State's burden. As the Fifth Circuit has recently explained, *ultra vires* claims come in many flavors. *Apter v. HHS* __ F.4th __, 2023 WL 5664191, at *4 (5th Cir. Sept. 1, 2023) (discussing three potential "paths"). Here, as in *Apter*, the State seeks to "use[] the APA to assert a 'non-statutory cause of action'—such as an *ultra vires* claim." *Id.* at *6 (5th Cir. Sept. 1, 2023). When a party does so, they must satisfy two requirements: the plaintiff must (1) "identify some agency action affecting [it] in a specific way" and (2) "show that he has been adversely affected or aggrieved by that action." *Id.* (cleaned up). "The action need not be final" and there is *absolutely no* mention of satisfying the *Kyne* standard or any miracle-adjacent hurdles. *Id.*

29

Both procedural requirements are satisfied here. The agency-action requirement is governed by the APA's definition of "rule," which is defined "broadly enough to include virtually every statement an agency may make," including "'non-binding agency policy statements and guidance documents interpreting existing rules.'" *Id.* (citations and semi-colon omitted); *see also Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980) ("The breadth of this definition [of 'rule'] cannot be gainsaid."). Here there is "agency action" in the form of EPA's demands that the State comply with disparate-impact and cumulative-impact mandates, as reflected in *inter alia*: (1) Defendants' disparate-impact regulations, (2) EPA's letter of concern, (3) EPA's June 16 Objection, and (4) EPA's cumulative-impacts guidance documents. Similarly, EPA's March 2023 decision to allow Sierra Club to make the decision about whether to extend informal proceedings was agency action. And the aggrievement requirements is satisfied here for the reasons explained herein and previously regarding standing and irreparable injury. *See supra* §I.A; P.I. at 12-15. Nor does EPA raise any zone-of-interest defense here (which would fail in any event).

*Apter* also makes plain that the State satisfies the substantive requirements for the non-statutory *ultra vires* claim that it asserts. In *Apter*, it was sufficient that plaintiffs asserted that FDA lacked authority to "recommend treatments or give other medical advice." 2023 WL 5664191, at *5. And even though FDA possessed authority to "'make public statements'"—which might involve some line-drawing exercises between "statements" and "advice"—the plaintiffs had stated a valid non-statutory *ultra vires* claim because it was sufficient to argue "FDA d[id] not have express authority to recommend against off-label uses of drugs approved for human use." *Id.* at *5-6.

The State has valid claims under *Apter* here *a fortiori* as its claims are even more clearly categorical and require even less line drawing. Specifically, the State argues that (1) EPA was wholly without power to delegate governmental authority to Private Special Interest Groups, (2) Defendants are entirely without authority to impose disparate-impact mandates, both generally and specifically as

30

to the States under the Spending Clause, and (3) Defendants are entirely without power to enforce substantive mandates under Title VI without obtaining Presidential ratification and complying the APA rulemaking requirements. *Apter* thus compels rejection of Defendants' *ultra vires* arguments.[14]

### D.      The State's APA Claims Challenge Final Agency Action

While the States' APA claims do require final agency, that requirement is satisfied here too.

"[T]wo conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). The Supreme Court has "long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up) (citations omitted). Here, final agency action exists for all the State's APA claims.

#### 1.      Non-Delegation Claims

EPA's delegations of governmental power to Private Special Interest Groups are final agency actions, which occurred at both a macro- and micro-level. On a big-picture level, EPA's decision to accede to the private groups' demands and permit their proposed judgments to be entered against it satisfies both *Bennett* requirements. The decision was not "tentative or interlocutory" in any way. *Bennett*, 520 U.S. at 177-78 (cleaned up). And "rights" were "determined" and "legal consequences … flow[ed]," as EPA conveyed new rights on the Private Special Interest Groups—and no one else—to dictate how EPA's investigatory powers would be exercised.

On a more granular level, EPA engaged in final agency action here in March 2023, when EPA decided not to exercise its own judgment about whether to continue informal negotiations, but instead

---

[14]   In contrast, the *Kyne* exception applies where a party is attempting to overcome a statutory provision that "*expressly precluding* such review." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 468 (5th Cir. 2002) (emphasis added). No such provision exists here, as Defendants are at most arguing *implicit* preclusion, and without merit.

submit the matter to Sierra Club as to how EPA would proceed. *See* Seidemann Decl. ¶¶65-70.

There was nothing "tentative or interlocutory" about EPA's decision, and EPA has never suggested that it was anything other that completely bound by Sierra Club's decision, whatever it might be. When EPA submitted the matter to Sierra Club for their approval, "rights" were "determined" and "legal consequences … flow[ed]"—specifically Sierra Club was given the right to control EPA's actions and veto continued informal negotiations if it desired.

### 2.    Disparate-Impact Claims

The State's disparate-impact claims also challenge final agency action. Defendants do not appear to dispute that their issuance of their disparate-impact regulations, 40 C.F.R. §§7.35(b), (c) and 28 C.F.R. §42.104(b)(2), were final agency action. Nor could they. And while they contest timeliness of the State's challenges, those arguments fail for the reasons below.

Similarly, *every* grant of funds that binds the State to Title VI and its implementing regulations is a new final agency action. The APA specifically defines "grant of money" as a form of "relief," and thus "agency action." 5 U.S.C. §551(11), (13). And grants are final agency action once executed: money changes hands and, much like a contract, neither side can breach freely. In addition, legal consequences flow in the form of the binding effect of those Title VI conditions on the grant recipients.

For that reason, courts generally recognize that granting funds is final action: the requisite finality exists when the agency "completes its review of the grant application and decides to disburse the appropriated funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007). To be sure, many courts have found final action *even earlier* without any actual grants of funds. For example, "courts routinely hold that agency action is final where it affects grant eligibility criteria." *Planned Parenthood of New York City, Inc. v. HHS*, 337 F. Supp. 3d 308, 329 (S.D.N.Y. 2018) (collecting cases). But Defendants do not cite *any* authority holding that an actual grant of federal funds is not final action.

Instead, Defendants contend (at 30-31) that grants are not final agency action because the

obligations they impose are not "new." But Defendants misapprehend both the case law and the nature of the grants here.

By their very nature, Title VI obligations only last for as long as the "program or activity [is] *receiving* Federal financial assistance"—*present tense.* 42 U.S.C.A. §2000d (emphasis added). A grant recipient is thus bound to Title VI obligations only for the duration of the grant. Both EPA's and DOJ's regulations are clear on this point.[15] As are "courts[, which] have consistently held that the funds must be received during the relevant time period" for Title VI to apply. *Johnson v. Bd. of Educ. of Prince George's Cnty.,* No. CIV. PJM 11-1195, 2014 WL 3778603, at *1 (D. Md. July 29, 2014).

Because Title VI obligates recipients only for the term of the grants, new grants create new obligations by extending the time in which the recipient is bound to Title VI mandates—and are thus final agency actions. That is why, for example, permit renewals are challengeable as final agency action even though there are no "new" obligations beyond the extension of obligations. *See, e.g., Animal Legal Def. Fund v. USDA,* 789 F.3d 1206, 1215 (11th Cir. 2015) (holding that "renewal of [company's] license [wa]s a final agency action subject to judicial review"). But by Defendants' logic, renewals of contracts, permits, licenses, etc. would not constitute final agency action unless they imposed new obligations beyond additional duration. They cite nothing for that proposition.

EPA's reliance (at 30-31) on *State v. Rettig,* 987 F.3d 518 (5th Cir. 2021) and *National Pork Producers Council v. EPA,* 635 F.3d 738 (5th Cir. 2011) is thus misplaced. In *Rettig,* HHS had taken actions that merely "restated" the existing obligations, without extending them further into the future. 987 F.3d at 529-30. Similarly, in *National Pork Producers* the guidance at issue "merely restate[d] [a statutory] prohibition against discharging pollutants without an NPDES permit," and thus "d[id] not change any rights or obligations and only reiterate what ha[d] been well-established." 635 F.3d at 756.

---

[15] *See* 28 C.F.R. §42.105 (grants "shall obligate the recipient for the *period during which Federal financial assistance is extended*" (emphasis added)) (DOJ); 40 C.F.R. §7.80 (financial grants "obligate the recipient for as long as EPA assistance is extended").

Thus, while mere restatement of existing obligations is not final agency action, extension of existing obligations further into the future is precisely the sort of action that by "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. Moreover, as explained below, even if EPA's premise were correct, the State's action would still be timely because EPA has changed the substantive character of the Title VI obligations within the last six years—separately creating "new" obligations. *Infra* at 36-37.

EPA also committed further final agency action in its June 16 Objection. That alone demanded compliance with its disparate-impact and cumulative-impacts mandates. *Supra* at 12.

### 3.    Cumulative Impacts Claims.

EPA's promulgation of regulations masquerading as mere guidance—which, in reality, effectively mandate consideration of cumulative disparate impacts—are also final agency actions, since they are binding as a practical matter. EPA's promulgation of the 2022 FAQ and 2023 Cumulative Impacts Addendum are not in any way tentative or interlocutory. And for the second *Bennett* requirement, "What matters is whether the document 'has *practical binding effect'* such that 'affected private parties are *reasonably led to believe* that failure to conform will bring adverse consequences." *Texas v. EEOC*, 933 F.3d at 442 (cleaned up) (citation omitted) (emphasis added). An action is binding "'if it either appears on its face to be binding or *is applied by the agency in a way that indicates it is binding*." *Id.* at 442 (cleaned up) (citation omitted) (emphasis added). Here, EPA's actions belie any contention that its actions are not binding under the pragmatic and practical final-agency-action inquiry.

EPA argument (at 34) that the State cannot challenge its regulations because they contain boilerplate disclaimers that they do not "create, expand, or limit any legal rights [etc.]" is thus unavailing. Those lawyerly disclaimers are irrelevant as it "is the effect of the action and not its label that must be considered." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 985 (9th Cir. 2006). Here, EPA's actions belie its contention that its cumulative-impacts guidance is not binding.

Despite their *pro forma* disclaimers, EPA's "guidance" *on its face* contains statements that make plain its binding nature. The 2022 FAQ, for example, declares unequivocally that "[i]n the context of Title VI investigations, *EPA considers cumulative impacts when evaluating whether there is an adverse impact from the recipient's policy or practice.*" Exh. 46 at 13 (emphasis added). Similarly, EPA's 2023 Cumulative Impacts Addendum declares definitively that Title VI "*grants EPA the authority to consider cumulative impacts*" and further that "Addressing cumulative impacts is … *integral to protecting civil rights.*" Exh. 47 at 3-4 (emphasis added). Nor is any disinterested observer confused about the binding effect of this guidance: as Brian Israel, who was deputized to defend EPA's actions, forthrightly explained: "is very clear, to get a permit from this EPA *or a state that is being guided or monitored by EPA*, *you have to consider cumulative impacts.*" Exh. 64 at 3 (emphasis added).

In addition, EPA's actions confirm that it actually regards its guidance as binding. EPA remarkably glosses over the fact that it submitted proposed settlement agreements that would have imposed cumulative-impact requirements that precisely match its regulations, *see* Seidemann Decl. ¶¶44-48, Burdette Decl. ¶11, Exh. 82; and also demanded cumulative-impacts analysis in its letter of concern, Exh. 11 at 5-6, 22—facts that it does not deny. Thus, while negotiating positions may not be independently challengeable actions, they certainly can serve as evidence about whether EPA's guidance is binding as a practical matter. In any event, EPA's post-suit demand in its June 16 Objection that the State conduct cumulative-impacts analysis eliminates any doubt as to whether EPA is treating its "guidance" as legally binding mandates. *Supra* at 12. And even in this Court, EPA tellingly will not disclaim its prior position that States must consider cumulative disparate impacts, further betraying that its "guidance" is in reality binding.

### E.     The State's Claims Are Timely

EPA also contests (at 29-34) the timeliness of the State's claims, at least insofar as they are raised under the APA. Its arguments are unavailing for four reasons.

*First*, the State's non-APA claims are timely because they require only "agency action" which need not be final. P.I. at 13; Complaint ¶¶100-03. Defendants do not dispute they have made funding grants triggering Title VI obligations within the last six years, which APA unequivocally defines to be "agency action." *Supra* at 32. The State therefore may challenge the lawfulness of the strings attached to those grants made within the last six years. For similar reasons, the State's non-APA non-delegation claim is timely, as they challenge acts that were all taken with the last six years.

Ironically, EPA's own case, *National Pork Producers* (cited at 31) makes this clear: although it dismissed the plaintiffs' *APA claims* as untimely because of a lack of *final* agency action within the prior six years, it reached the merits of the non-delegation and Spending Clause claims because they do not require final agency action. 987 F.3d at 529-34. Nor does EPA even appear to offer any timeliness argument for the State's non-APA claims. *See* Opp. at 29-35.

*Second*, EPA does not dispute (at 29-35) that a credible threat of future enforcement would make the State's claims timely. As explained above, just such a threat existed when this suit was filed—which both (1) continues to exist today and (2) is not mooted due to EPA's voluntary cessation in any event. *Supra* at 14-17, 22-27. The State's APA claims are thus timely on that basis alone.

*Third*, even if EPA's arguments (at 30-31) that funding grants did not create "new" obligations—even where they extend the duration of Title VI obligations—were correct generally, EPA's is wrong that there are no new obligations created within the last six years. Instead, EPA's recent and *radical* shift to hyper-aggressive enforcement and creation of novel cumulative-impacts mandates represents a fundamental change in the character of EPA's Title VI obligations.

As recently as July 2015, EPA's enforcement of Title VI was so thoroughly moribund as to approach *complete non-existence*. For example, following journalists' inquiries, EPA was sheepishly forced to admit that it "didn't check this complaint inbox for civil-rights concerns from June 2014 to July 2015," during which there were "149 messages," including "29 e-mails [that] raised discrimination-

related concerns"—all of which went completely ignored during that time, with EPA still "crafting its responses in April 2016." Exh. 72 at 2-3. As a practical matter, the creation of *any obligation at all* under EPA's disparate-impact regulations represents a "new" obligation as compared to that year-plus thump-twiddling period of EPA enforcement.

In stark contrast, the current Administration has made no secret of its intent to change fundamentally the character, frequency, and intensity of Title VI enforcement by EPA. *See, e.g.*, Exh. 4-9; Exh. 41; Exh. 52 at 390-94; Exh. 53 at 53, 241. That is reflected in its self-congratulatory announcements, its creation of a new division, the OEJECR, giving it with equal status as the Air and Water Divisions, and its pre-suit enforcement here despite a conceded *disparate environmental benefit*. *Supra* at 15-16. Similarly, EPA points to nothing like its EPA's binding-as-a-practical-matter cumulative-impact mandates prior to President Biden's inauguration. More generally, Defendants' enforcement priorities are now so radically altered that they coerced Alabama into *not* enforcing its criminal laws against illegal sewage discharges in a majority-minority county, thereby affirmatively subjecting those residents to disparate environmental impacts. *Supra* at 16 n.8. All these actions amount to "substantive change[s] that restart[] the statute of limitations clock." *Mendoza v. Perez*, 754 F.3d 1002, 1018-19 (D.C. Cir. 2014).

*Fourth*, DOJ's disparate-impact regulations can be timely challenged under the reopening doctrine, which explicitly permits "a plaintiff to challenge an agency action past the ordinary timeline" when an agency has reopened an issue. *Alliance for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023). The central inquiry under the reopening doctrine is whether the agency has "undert[aken] a 'serious, substantive reconsideration'" of its policy. *Id.* at 243 (citation omitted). Merely taking public comments on the possible repeal and responding to them is generally sufficient reconsideration to trigger a reopening. *See, e.g.*, *Ohio v. EPA*, 838 F.2d 1325, 1328-29 (D.C. Cir. 1988). But here DOJ ventured *far* further down the road to repeal than that—*well beyond* mere potential reconsideration to

adopting a formal repeal that was final for DOJ purposes, which was subsequently pulled from OMB review. AR279. The reopening doctrine is thus triggered here *a fortiori*.

Defendants' contention (at 31-32) that "withdrawal of a draft rule does not constitute a final agency action for purposes of the APA" is inapt. The final agency action is DOJ's initial promulgation of its disparate-impact mandates, and the State's challenge to that action is timely under the reopening doctrine. And although the State *specifically* raised the reopening doctrine (P.I. at 14; Complaint ¶¶ 233-240), Defendants offer no response—thereby conceding the doctrine applies.

### F.     Congress Has Not Precluded Judicial Review Here

Finally, EPA argues (at 27-29) that Congress has precluded judicial review here under the doctrine of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Two problems with that: (1) that doctrine does not apply here *at all*, and (2) even if it did, it does not preclude judicial review under the *Thunder Basin* factors. Instead, 42 U.S.C. §2000d-2 *affirmatively confirms* that judicial review is available here, rather than restricting it in any relevant way. And Defendants' arguments here demonstrate that they have yet to internalize the lessons of their stinging *unanimous* defeat in *Axon*.

#### 1.     *Thunder Basin* doctrine does not apply here.

To begin with, the threshold for applying *Thunder Basin* doctrine—a "special statutory review scheme … [that] preclude[s] district courts from exercising jurisdiction," which "typically … [is] review in a court of appeals following the agency's own review process," *Axon*, 598 U.S. at 185, is simply not present here *at all*. Section 2000d-2 does not vest review in courts of appeals following final decisions. Instead, by its terms it remarkably (1) neither vest review in *any* particular court (2) nor requires any final agency action. *Id.* Section 2000d-2 is thus not a "special statutory review scheme" at all. *Axon*, 598 U.S. at 185. Indeed, far from providing any "comprehensive review process," *id.* at 186, §2000d-2 does not even provide a bare-bones scheme: vesting review in no particular court, under no particular timetable, with no particular specialized procedures. Instead, it is a *non-specific borrowing*

*provision*: explicitly adopting whatever judicial review provisions "may otherwise be provided by law," *id.*—*i.e.*, the very antithesis of any "special statutory scheme."

Instead of any special or comprehensive scheme, §2000d-2 merely confirms Congress's intent that judicial review be available *very* broadly. It thus explicitly provides that "*[a]ny … agency action* taken pursuant to section 2000d-1 of this title *shall be subject to such judicial review*." §2000d-2 (emphasis added).

Every single aspect of this sentence is at odds with EPA's contentions. *First*, the omission of "final" is presumptively intentional. *United States v. Shabani*, 513 U.S. 10, 14 (1994 ("When a statutory term is absent in one statute, but is explicit in analogous statutes, 'Congress' silence … speaks volumes.'" (citation omitted)). Yet EPA's interpretation effectively smuggles "final" back into §2000d-2 by insisting that only *post-enforcement* review is available, thereby flouting Congress's intent.

*Second*, Congress's use of "any … agency action" means just that—*any* agency action is reviewable, whether final, post-enforcement, or neither. *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is 'one or some indiscriminately of whatever kind.'") (citation omitted)). But EPA's interpretation nullifies Congress's use of "any" and instead renders vast swaths of "agency action taken pursuant to [Section 602]" unreviewable.

*Third*, EPA's interpretation also obliterates Congress's use of the word "shall," since the "mandatory 'shall' normally creates an obligation impervious to judicial discretion." *Murphy v. Smith*, 138 S.Ct. 784, 787 (2018). But while Congress has commanded that EPA's actions here "*shall* be subject to judicial review," EPA's *Thunder Basin* arguments turn that statutory command upside-down.

The State's interpretation is reinforced by §2000d-2's explicit preclusion any committed-to-agency-discretion defense, further confirming Congress's intent to make judicial review *broadly available* rather than preclude all pre-enforcement review.

In contrast, EPA's arguments essentially rely exclusively on the second sentence of §2000d-2, which applies to "action, not otherwise subject to judicial review, terminating or refusing to grant or

to continue financial assistance upon a finding of [a violation.]" By its terms that sentence does not apply here at all, since no such action has taken place. Instead, this case is governed by the *first sentence*, which applies to "*[a]ny* … agency action" under Title VI. §2000d-2 (emphasis added). And even within this second sentence, Congress's intent is clear: to make judicial review available even if it would "not otherwise [be] subject to judicial review," *id.*—further confirming Congress's intent to make judicial review broadly available, rather than preclude it.

For all of these reasons, the predicates for *Thunder Basin* doctrine applying are wholly lacking here and there is no basis even to reach the *Thunder Basin* factors.

### 2. The *Thunder Basin* factors favor review here

Even if Congress in §2000d-2 had created a "special statutory review scheme" and "comprehensive review process" that could serve as the predicate for applying *Thunder Basin* doctrine, the *Thunder Basin* factors all decisively point away from precluding review, particularly under *Axon*.

***Functional Denial of Judicial Review.*** Here, as in *Axon*, the State asserts that it is "'being subjected' to 'unconstitutional agency authority'"—*i.e.*, subject to mandates that violate the Spending Clause and proceedings infected with a non-delegation-doctrine violation. 142 S.Ct. at 191. As in *Axon*, deferred review of the State's "constitutional claims would come too late to be meaningful." *Id.* In addition, EPA itself backhandedly acknowledges the functional unavailability of post-enforcement judicial review. Even in its own telling (at 8), the stakes are so high no party has ever persevered long enough to obtain judicial review in "the fifty years since EPA adopted its Title VI implementing regulations."

***Collateral To Review Provisions.*** As in *Axon*, because the State is "challenging [EPA's and DOJ's] power to proceed at all," its challenges "qualif[y] as 'collateral.'" Here, the State contends that EPA is wholly without power to delegate power to private groups and impose disparate-impact and cumulative-impact mandates *at all*. Full stop. Accepting EPA's contrary arguments here, as in *Axon*,

"would strip the collateralism factor of its appropriate function." 142 S.Ct. at 193.

*Outside Agency Expertise.* As Defendants conceded in *Axon*, agencies "'lack[] expertise in interpreting the Constitution." *Id.* at 195 (citation omitted). Also as in *Axon*, the State "allege[s] injury … from subjection to all agency authority" since all relevant authority here is *ultra vires*. *Id.* "Those claims of here-and-now harm would remain no matter how much expertise could be 'brought to bear' on the other issues these cases involve." *Id.* (citation omitted)

*Axon.* Finally, although EPA cites (at 27) *Axon* for what the three *Thunder Basin* factors are, it notably makes *zero attempt* to wrestle with *Axon*'s reasoning as to *any* of those factors. EPA's silence on that front speaks volumes and renders their *Thunder Basin* arguments unserious.

## II.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ITS NON-DELEGATION CLAIM

### A.   EPA's Delegation Of Power To Private Groups Violates The Constitution

EPA first suggests (at 36) that it immune to private non-delegation doctrine because only Congress can violate it. But EPA is conflating the two non-delegation doctrines. While the *public* non-delegation doctrine governs what powers Congress can delegate to the Executive, the *private* non-delegation doctrine recognizes that the "[o]ur Constitution permits only the federal government to exercise federal power." *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022). That foundational principle is violated *whenever* governmental power is delegated to private groups, whether the perpetrator is Congress or the Executive.

The rest of EPA's defense relies on mischaracterizing the nature of the delegation here, contending (at 37-38) that the Private Special Interest Groups "'functions subordinately' to EPA," and that EPA was merely "[s]eeking concurrence on extending EPA's regulator deadline." But EPA never disputes that Sierra Club *possessed an absolute veto over extension of informal negotiations that it could exercise singularly*. That is the sort of power wielded by absolute monarchs—not mere subordinates. Indeed, by EPA's logic, the Fifth Circuit functions subordinately to this Court, since this Court by its

judgments can propose outcomes that are merely subject to the court of appeal's "concurrence."

The transfer of governmental power to the Private Special Interest Groups is confirmed by the fact that EPA felt compelled to horse-trade non-public information to secure Sierra Club's blessing. *See* Seidemann Decl. ¶¶ 65-70; P.I. at 18. EPA *never* denies doing just that. But why would EPA need to barter with Sierra Club to *regain* the right to exercise governmental power in the manner that EPA preferred if it had not delegated that power away to begin with? That sordid quid-pro-quo makes perfectly clear who is subordinate to whom.

EPA's is similarly mistaken in contending (at 38) that the private groups "ha[ve] no role whatsoever in any of EPA's investigative decision." In March 2023, Sierra Club could—if it wanted—have compelled EPA either to issue formal findings of violations or terminate its investigation entirely, neither of which EPA judged appropriate. Sierra Club's ability to compel EPA to exercise government power in a manner that EPA judged unwarranted belies EPA's "no role whatsoever" characterization. Instead, Sierra Club had a *commanding role* and EPA was compelled to follow its direction.

EPA also points to *Currin v. Wallace*, 306 U.S. 1 (1939) as supporting its actions here. By *Currin* upheld a *ratification requirement* by a *broad community*, not an absolute veto that could be exercised by one organization singularly. Assuming it remains good law, *Curren* is thus inapposite where, as here, the delegation "leaves [the agency] impotent to choose its [policy] without [the private group's singular] permission." *Assocation of Am. Railroads v. DOT*, 721 F.3d 666, 671 (D.C. Cir. 2013) *rev'd on other grounds* 575 U.S. 43 (2015).

**B.    EPA's Actions Violate The APA**

EPA's delegation of its governmental powers, both globally and specifically in March 2023, also violates the APA. The constitutional violation alone contravenes the APA. 5 U.S.C. §706(2)(B). But EPA's actions also arbitrary and capricious, and thus §706(2)(A), for two reasons.

*First*, EPA has *never* offered any rationale for why it agreed to the 180-day deadline given its

prior admissions such a timetable was "impracticable," "arbitrary," and "unrealistic." P.I. at 20. EPA's failure to proffer *any* supporting rationale violates the APA. *See, e.g.*, *Dillmon v. NTSB*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009) ("'[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation.'" (citation omitted)). Indeed, APA violations are rarely come so glaring as admitting a self-imposed deadline is both "arbitrary" and "impracticable" then acquiescing to a judgment requiring it to follow that regulation without explanation.

*Second*, EPA has never explained why it conferred rights purely on the Private Special Interest Groups. It would be one thing if EPA imposed the 180-day deadline *globally* for *everyone's* complaints. But EPA has instead created a two-tiered system of justice in which only favored groups enjoy special rights that their plebian counterparts lack. Even assuming such a system is legally defensible *at all*, EPA has yet to offer any actual defense of it. *See, e.g.*, *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) ("[A]n agency cannot treat similar situated entities differently unless it 'supports the disparate treatment with a reasoned explanation.'" (cleaned up)).

Because EPA's decision to delegate new rights to the Private Special Interest Groups lacks any offered justification—even one offered *post hoc*—the State is entitled to judgment on its Count II.

## III.  DEFENDANTS' DISPARATE-IMPACT REGULATIONS VIOLATE THE SPENDING CLAUSE

The State's disparate-impact claims are readily and most easily resolved under the Spending Clause, which forbids imposition of *any conditions* that are not *unambiguously* established in statutory text. Title VI's text does not unambiguously impose any potential disparate-impact liability.

### A.  The Spending Clause Prohibits Enforcement Of Ambiguous Conditions Against The States

Much like their standing arguments, EPA's arguments about the merits of the State's Spending Clause claim ignore critical aspects of Supreme Court doctrine—specifically the prohibition on enforcing any condition not *unambiguously* established by statutory text. *See supra* at 6-8. EPA thus contends that it is enough that "the statute is clear that acceptance of federal funds obligates the State

to comply with *a* condition," Opp.47 (emphasis added)—rather than the specific condition at issue.

EPA's argument squarely violates *Arlington Central*. There, it was undeniably clear that acceptance of federal funds bound the States to *a* condition: *i.e.*, paying costs including *attorneys' fees* to prevailing parties in IDEA litigation. 548 U.S. at 293-94. So EPA's position were the actual Spending Clause standard, the Court would have stopped there and simply affirmed.

Instead, *Arlington Central reversed* for the same reasons that EPA's arguments fail here: it is not enough to be clear about *a* condition. Instead, the Spending Clause also prohibits enforcement of *any* condition that is not "set out 'unambiguously'" in the statutory text. *Id.* at 296; *accord id.* at 301 (statute must be "unambiguous notice"). And because the IDEA *statute* did not unambiguously establish the State's liability for *expert fees*, the Constitution forbade imposition of *that condition*. The Supreme Court has even applied this principle *specifically to Title VI*, holding that emotional distress damages were unavailable because 'if Congress intends to impose a condition on the grant of federal moneys, *it must do so unambiguously*.'" *Cummings*, 142 S.Ct. at 1569-70 (citation omitted) (emphasis added). But EPA ignores this principle—as well as *Arlington Central* and *Cummings*—entirely. Those evasions concede this issue.[16] Because §601 prohibits *only* intentional discrimination, the applicable question under *Arlington Central* and *Cummings* is whether §602 "unambiguously" establishes Defendants' authority to impose disparate-impact mandates. Defendants do not even genuinely argue that it does.

### B. Section 602 Does Authorize Defendants' Disparate Impact Mandates

Defendants do not appear to even *attempt* to argue that the *statutory text* of §602 *unambiguously* gives them authority to impose disparate-impact mandates. The closest they come on that front (at 17) tellingly attempts to smuggle in "the conditions attending EPA's grants and the assurances the

---

[16]  *Lau v. Nichols*, 414 U.S. 563, 569 (1974) does not address this unambiguous-text aspect of Spending Clause doctrine, and indeed rejects a claim under the Tenth Amendment rather than the Spending Clause. Moreover, if *Lau* were the blanket blessing under the Spending Clause that EPA contends, *Cummings* would have come out the other way.

Similarly, even if Defendants were correct about *Guardians* (and they are not), it was evaluating Section 602 under *de novo* review, rather than the unambiguous-clarity standard that Spending Clause doctrine demands.

State signed." But the requisite clarity "must come directly from the statute." *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d at 361-62.

Defendants similarly argue (at 48) that Section 601 "unambiguously prohibits discrimination." True enough for *intentional* discrimination. But the contours of that prohibition and Defendants' authority to "effectuate" it must be *unambiguously clear* to bind States to the specific requirement at issue, as both *Arlington Central* and *Cummings* make clear. Much as courts cannot expand Spending Clause conditions like "attorneys' fees include expert fees" and "damages include emotional distress damages," Defendants cannot backfill that "discrimination" in §601 includes disparate-impact liability—particularly given "how strange it is to say that disparate-impact regulations are 'inspired by, at the service of, and inseparably intertwined with' §601, when §601 permits the very behavior that the regulations forbid." *Alexander v. Sandoval*, 532 U.S. 275, 286 n.6 (2001) (citation omitted); *see also Arlington Central*, 548 U.S. at 300-303.

In any event, for all the reasons that §602 does not grant Defendants disparate-impact authority under *de novo* review (P.I. at 20-37; *infra* §IV), it cannot do so when the burden is elevated to unambiguous clarity as Supreme Court precedent demands. Another case ignored by Defendants makes this particularly clear: *Brnovich v. DNC*, 141 S.Ct. 2321 (2021) (raised prominently: P.I. at 27).

In *Brnovich*, the Court held that the text of §2 of the VRA was insufficient to impose the "freewheeling disparate-impact regime" that was "employed in Title VII." *Id.* at 2340-41. It is undisputed that Defendants' regulations adopt mandates equivalent to Title VII's "freewheeling disparate-regime" here. *Id.* But their authority to do so is *far* weaker than in *Brnovich* for two reasons. *First*, VRA §2—like many other civil rights provisions, but not Title VI—contained *explicit results language. See* 52 U.S.C. §10301. If *some* results statutory language is insufficient to adopt Title VII-like mandates, *no such language at all* is necessarily wanting *a fortiori. Second, Brnovich* was construing VRA §2 *de novo*, rather than evaluating whether the statutory text *unambiguously* established Title VII-like

mandates. What statutory text does not establish *at all* certainly does not do so *unambiguously*.

### C. The Requisite Clarity Must Be Provided By Statute Under Controlling Fifth Circuit Precedent

The Fifth Circuit has held *categorically and unequivocally*: "The needed clarity cannot be so provided [by regulation]—it must come directly from the statute." *Texas Educ. Agency*, 992 F.3d at 361. Indeed, "relying on regulations to present the clear condition … is an acknowledgment that Congress's condition was not unambiguous" and thus violates the Spending Clause. *Id.* The Fourth and Eleventh Circuits have equivalent categorical holdings. *Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc); *West Virginia*, 59 F.4th at 1147-48.

EPA grudgingly appears to accept this premise, arguing (at 48) that *Texas Education Agency* "stand[s] for the unremarkable point that a funding condition or a waiver of sovereign immunity *must be unambiguous in the statute*." Opp. 48 (emphasis added). But EPA's arguments are based on its erroneous premise (at 47) that it is sufficient that the existence of "a condition" must be unambiguous. *Arlington Central* and *Cummings* make plain that even where the existence of *a condition* is unambiguous, the contours of the specific liability at issue must also be.

Section 601 does not unambiguously include disparate-impact liability. Indeed, its plain text unambiguously establishes the opposite: that *only* intentional discrimination is prohibited. *Sandoval*, 532 U.S. at 280. The only *clear* imposition of disparate-impact liability comes from *regulations*, which *Texas Education Agency* squarely rejects as insufficient. And "[a]llowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'" *West Virginia*, 59 F.4th at 1147 (quoting *Texas Education Agency*, 992 F.3d at 362). Because no disparate-impact mandate is unambiguously established by Title VI's text alone, Defendants' regulations are unconstitutional. Nor does §602's bare "effectuate" text provide Defendants authority to impose disparate-impact mandates at all, let alone do so unambiguously. *See* P.I. at 20-37; *infra* §IV.

## IV.   SECTION 602 DOES NOT AUTHORIZE DISPARATE-IMPACT MANDATES

Even under *de novo* review, Defendants lack authority under §602 to impose disparate-impact mandates.

### A.   *Guardians* Is Not Precedential On The Disparate-Impact Issues Here

Contrary to Defendants' contentions (at 5, 39-41), the Supreme Court's decision in *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582 (1983) does not provide any precedential authority upholding their authority to impose disparate-impact mandates. *Guardians* was a fractured decision with no opinion for the Court. Its precedential effect is thus governed by *Marks v. United States*: "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977). In *Guardians* the actual holding was thus that "in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs"—which was a fully sufficient (and the narrowest) basis to affirm the judgment below. 463 U.S. at 584.

Defendants' contrary contentions not only misread *Guardians*, but further violate *Marks* by trying to cobble together a holding from one majority and *four dissenting votes*, even though *Marks* makes plain that the only positions that count come from "Members who *concurred* in the judgment[]." 430 U.S. at 193 (emphasis added); *accord Whole Woman's Health v. Paxton*, 10 F.4th 430, 440 (5th Cir. 2021) (en banc) (The *Marks* "principle 'is only workable where there is some common denominator upon which all of the justices *of the majority* can agree.'" (citation omitted) (emphasis added)).

In any event, even if Defendants' reading of the precedential effect of *Guardians* was ever defensible, it no longer is. That is because the Supreme Court subsequently resolved that question conclusively *itself* in *Sandoval*. There, in discussing Guardians, the Court explained that "*no opinion of this Court has held*" that "regulations promulgated under §602 of Title VI may validly proscribe activities that have a disparate impact on racial groups" *even though* "five Justices in Guardians voiced that view."

532 U.S. at 281 (emphasis added). That passage definitively resolves what the precedential effect of *Guardians*. "No opinion … has held" means just that: no binding precedent exists. *Id.* That holding is further confirmed by the fact that *Sandoval* "assume[d]" that disparate-impact regulations were valid— something the Court would have *zero need to assume* if it had already *held* as much.[17]

### B.  Defendants' Disparate-Impact Mandates Violate The Plain Text Of Title VI

#### 1.  Disparate Impact Requirements Do Not **"Effectuate"** Section 601's Prohibition On Intentional Discrimination

Defendants' argument that their disparate-impact mandates "effectuate" §601's prohibition purely of intentional discrimination squarely contravenes the plain meaning of "effectuate." Defendants never deny that "[a] regulation cannot 'effectuate' a statutory right by creating a new and different right." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003) (holding that a Title VI "disparate-impact regulation cannot create a new right"). And the Supreme Court "*consistently recognized a distinction* between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact" and demanded that "courts *must be careful to distinguish between these theories*." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (emphasis added). But Defendants' construction obliterates these distinctions and thereby "create[s] a new and different right." *Save Our Valley*, 335 F.3d at 944. Indeed, the federal government *itself* has characterized its disparate-impact regulations as "contain[ing] *rights-creating language*." *Sandoval*, 532 U.S. at 291 (emphasis added). That is *far* beyond what the plain text of "effectuate" will bear.

Defendants' textual analysis is quite scant, consisting of a single paragraph (at 41). It all boils

---

[17]  For similar reasons, EPA's reliance on statement that "*Sandoval* 'left untouched *Choate's* apparent approval of the promulgation and enforcement of disparate-impact regulations by federal agencies'" is unavailing. Opp. at 40-41 (quoting *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 643 (5th Cir. 2021)). "Apparent approval" is not binding precedent rule any more than a cobbled-together view of dissenters and one Justice in the majority. "Apparent approval" is *at best* dicta. And "[b]reath spent repeating dicta does not infuse it with life." *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 300 (1995).

Further underscoring *Rollerson*'s lack of precedential effect on this issue, that opinion expressly stated that "there is a reasonable argument that *Choate's* approval of such regulations was mere dictum," rather than a holding, and the panel therefore only "assume[d] arguendo that the DOD's disparate-impact regulations [we]re valid." 6 F.4th at 643 n.6. Federal courts do not *assume* what they have already *held*.

down to their contention that "effectuate" "empowers federal agencies to determine *how best to prohibit intentional discrimination*." Opp.41 (emphasis added). But that premise is readily refuted by *Sandoval*. If prohibiting actions with disparate impacts was really just another way of "prohibit[ing] intentional discrimination" (Opp.41), then such a disparate-impact prohibition would be enforceable by Title VI's private right of action: after all, "regulations applying §601's ban on intentional discrimination are covered by the [private] cause of action." *Sandoval*, 532 U.S. at 283. But it is precisely *because* disparate-impact mandates are *not* a form of prohibiting intentional discrimination that they are not privately enforceable under *Sandoval*. Defendants' sole textual argument thus violates that binding authority.

## 2. Disparate-Impact Mandates Actually *Conflict* With Section 601

Defendants also implicitly concede that disparate-impact mandates cannot "effectuate" §601's prohibition purely of intentional discrimination if there is severe tension between the two standards. Instead, they argue only (at 47) that no such severe tension exists. Not so.

Justice Scalia's concurrence in *Ricci v. DeStefano*, 557 U.S. 557 (2009) could not be clearer on this point, as the State's brief made plain (at 3, 24). Defendants make no effort to engage with *any* of that reasoning, which gravely undermines their denial of tension between the two standards. True, Justice Scalia's *Ricci* concurrence is not binding precedent. But it is persuasive authority, and Defendants' inability or unwillingness to address its reasoning effectively concedes its correctness.

In any event, the *majority opinion* in *Ricci is* binding precedent. And it is clear about the conflict between intentional-discrimination and disparate-impact standards: explicitly identifying the potential "statutory *conflict*" and "*conflict* between the disparate-treatment and disparate-impact provisions," as well as their "*competing expectations*." *Ricci*, 557 U.S. at 583-84, 593 (emphasis added). The Court's opinion in *Ricci* thus expressly recognized the very conflict that Defendants implausibly deny.

The conflict between disparate-impact and intentional-discrimination standards is also particularly apparent given the defining characteristics of the two standards: *i.e.*, that they do—and *do*

*not*—require proof of intent, respectively. Indeed, transmuting lead into gold is a less radical transformation than what Defendants' regulations attempt to pull off here: at least both are still metals. In contrast, Defendants' regulations effectively transform §601's intentional-discrimination-only prohibition into its antithesis and an oxymoron to boot: a putative *intentional*-discrimination standard that *requires no actual proof of intent*. That is not effectuation, but rather metamorphosis.

In truth, Defendants' arguments here resemble nothing so closely as the *dissent* in *Ricci*, which contended there was not "even a hint of 'conflict' between … disparate-treatment and disparate-impact provisions" because they "advance the same objectives." *Ricci*, 557 U.S. at 624-25 (Ginsburg, J., dissenting). Instead, like EPA here, the dissent saw only a "supposed 'conflict.'" *Id.* at 627. Whatever the merits of those arguments might have been *pre-Ricci*, they are now foreclosed in its aftermath.

More generally, Defendants never deny that disparate-impact mandates often *require* governmental actors to make race-conscious decisions. As explained previously and below, that is in severe tension with—and often outright violates—the Equal Protection Clause, whose standards Title VI mirrors. P.I. at 24, 34-35; *infra* §IV.E.

### 3.    The Lack Of A Good-Faith Defense Dooms Defendants' Regulations

Defendants admit (at 45) their regulations do not permit any good-faith/lack-of-discriminatory-intent defense. That admission is fatal.

Because §601 only prohibits actions taken with intentional discriminatory intent, it cannot—*by definition*—impose liability where a decision-maker could prove the absence of discriminatory intent. Such liability *flouts* rather than "effectuates" §601. *See* P.I. at 25-26. That is like a regulation "effectuating" a prohibition on murder that criminalizes non-fatal assaults. One cannot "effectuate" a statutory provision *by obliterating its defining feature*. But that is precisely what Defendants have done.

EPA points (at 45-46) to its "substantial legitimate justification" defense as rendering its approach lawful. But that defense merely mitigates the *harms* caused by its illegal regulations. They do

50

nothing to address the foundational flaw that their regulations permit liability in the complete absence of intentional discrimination, thereby making of mockery of the claim to be "effectuating" §601.

EPA's arguments ultimately are akin to arguing that a libel statute could "effectuate" the First Amendment even when it does not make truth a complete defense. That would be a constitutional abomination as the First Amendment does not permit *any* libel liability for truthful speech. *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). So too with Section 601: it does not countenance *any* liability in the where intentional discriminatory intent is provably absent. Because Defendants' regulations concededly authorize just that, they are patently unlawful.

### C. Statutory Context Confirms That Defendants Lack Authority To Issue Disparate-Impact Regulations

EPA offers only scant response to the State's arguments about context. It notably does not deny the State's central premise: that, under its interpretation, Title VI sticks out like a sore thumb within civil rights statutes. In virtually every other case where disparate-impact liability exists, it is *because Congress created it with explicit statutory language. See* P.I. at 26-27. Because a statute giving the Executive the free option to choose whether or not to impose disparate-impact liability would be a *radical* outlier within civil rights laws, that is a strong indication that Congress intended no such thing. *See, e.g., Jones v. United States*, 526 U.S. 227, 234 (1999) (It is a "fair assumption that Congress is unlikely to intend any radical departures from past practice without making a point of saying so.").

EPA also does not even attempt to hazard a response to *Kamps v. Baylor Univ.*, 592 F. App'x 282 (5th Cir. 2014). And it certainly does not explain how its disparate-impact regulations could even conceivably survive under the standard *Kamps* sets out: *i.e.*, that "[w]hen Congress wants to allow disparate impact claims, it uses particular language," which is absent in both the ADA and "Title VI." *Id.* at 285-86. Following the logic of *Kamps* would be fatal to Defendants here, and Defendants tellingly refuse to identify any flaws in that logic.

### D.      Canons Of Construction

Defendants' textual arguments are particularly unserious as notably refuse to engage with many of the applicable canons of construction identified by the State (at 29-32). Indeed, the word "canon" appears only once in EPA's brief—in a footnote (at 47 n.16).

***Presumption of Good Faith.*** Defendants neither acknowledge the presumption of good faith for State actors (P.I. at 30-31), nor denies that their regulations violate it. That alone strongly supports the State's interpretation. Defendants' silence is particularly jarring because they are quick to claim a presumption of good faith for their actions under mootness (at 26), yet refuse to acknowledge the federal courts presume the good faith of *state* officials too.

***Federalism Canon.*** Despite Defendants' doubts—snarkily expressed by use of scare quotes (at 47 n.16)—the federalism canon very much exists and is supported by a *mountain* of Supreme Court precedent.[18] Indeed, the Court has specifically recognized that canon *by name. See, e.g., West Virginia v. EPA*, 142 S.Ct. at 2621 (Gorsuch, J., concurring) (referencing "another *longstanding* clear-statement rule—*the federalism canon*" (emphasis added)). Defendants would have done well to reconcile themselves to the canon's existence.

Defendants' remaining response is a non-sequitur, contending (at 47 n.16) that "Congress may alter the federal-state balance when validly legislating pursuant to its Spending Clause power." Sure, it often *can*. But the entire point of the federalism canon is that courts presume that Congress *has not done so* unless it supplies a clear statement that "make its intention clear and manifest." *Gregory*, 501 U.S. at 460-61. Indeed, for Spending Clause legislation, Congress must do so *unambiguously. Supra* §III.A. The federalism canon thus also strongly supports the State here, since "effectuate" is hardly a clear expression of intent to "alter the federal-state balance." *Gregory*, 501 U.S. at 460-61.

---

[18]  *See, e.g., Bond v. United States*, 134 S.Ct. 2077, 2089 (2014); *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S.Ct. 1837, 1849-50 (2020); *Owasso Indep. Sch. Dist. v. Falvo*, 534 U.S. 426, 432 (2002); *Gregory,* 501 U.S. at 460-61; *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006); *United States v. Bass*, 404 U.S. 336, 349 (1971).

*Omitted Words Canon.* Defendants' implicit-only response to the omitted-words canon fails as explained above regarding context. *Supra* §IV.C.

### E.     Defendants' Interpretation Creates Severe Constitutional Doubts

Defendants' interpretation of §602 is also precluded by the doctrine of constitutional avoidance, since disparate-impact mandates often *compel* discrimination based on race to avoid liability in a manner that the Equal Protection Clause condemns. And the doubts previously identified by the State are now even stronger following *Fair Admissions*, which was decided in the interim.

Defendants do not even attempt to respond to the State's demonstration that their disparate-impact regulations involve the use of raced-based decision-making in a manner that is "at least as crude, heavy-handed, and constitutionally dubious as in *Parents Involved*]" P.I. at 34-35. The use of race in *Parents Involved* was held to be outright unconstitutional. Defendants' conduct here is thus *at least* constitutionally doubtful, triggering avoidance doctrine.

Defendants also tellingly never deny that disparate-impact mandates often "*require*[] intentional discrimination," instead only arguing that "*Ricci* does not stand for th[at] proposition." Opp.17. Justice Scalia's concurrence plainly does, but Defendants steadfastly refuse to engage with its reasoning. Nor would any such denial be credible. Under the borrowed-Title-VII standard, whenever there is a statistical disparity, the decision-maker is obliged to reduce or eliminate it—a task that can only be performed *by taking race-conscious actions. Ricci*, 557 U.S. at 594-95 (Scalia, J., concurring) Indeed, how else could one even know if actions taken to eliminate disparate impacts were working *except* by evaluating results in explicitly race-based terms?

By refusing to deny that their disparate-impact mandates often *require* race-based decision-making, Defendants' position ultimately boils down to an implicit contention that such consideration of race is a sort of "good discrimination" that comports with the Constitution. The Supreme Court begs to differ: "'Distinctions between citizens solely because of their ancestry are by their very nature

*odious to a free people* whose institutions are founded upon the doctrine of equality.'" *Fair Admissions*, 143 S.Ct. at 2160 (citation omitted) (emphasis added). And "*all 'racial classifications*, however compelling their goals,' *[a]re 'dangerous.*'" *Id.* at 2156 (citation omitted) (emphasis added).

But disparate-impact mandates mandate are predicated precisely on making just such "odious" and "dangerous" classifications. After all, unless there is a disparate impact to a group high up enough in EPA's intersectionality pyramid, EPA simply could not care less about it under its disparate impact regulations. Race is the alpha and omega of those regulations. Indeed, Defendants' Title VI disparate-impact mandates simply cannot function *whatsoever* without first making "racial classifications" and then engaging in the "sordid business [of] divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurral). The "inherent folly of that approach—of trying to derive equality from inequality" is manifest, particularly as it amounts to "pick[ing] winners and losers based on the color of their skin." *Fair Admissions*, 143 S.Ct. at 2160, 2175.

In applying both the Equal Protection Clause and Title VI, the Supreme Court has made plain that "[e]liminating racial discrimination *means eliminating all of it.*" *Id.* at 2161 (emphasis added). Because disparate-impact mandates often "affirmatively *require[]* [race-based decisionmaking] when a disparate-impact violation *would* otherwise result" and engaging in a "type of racial decisionmaking is … discriminatory," *Ricci*, 557 U.S. at 594 (Scalia, J., concurring), they are part of that "all" discrimination for which elimination is required. *Fair Admissions*, 143 S.Ct. at 2161.[19]

### F.    The Major Questions Doctrine Controls This Case

Defendants do not deny (at 49) that *all three* independent triggers for the major questions doctrine exist here: *i.e.*, the issue of Defendants' authority to impose disparate-impact mandates is (1) a

---

[19]  EPA attempts (at 48-49) to distinguish *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) on the basis of putative "safeguards" in EPA's disparate-impact regulations. But their regulations do not actually contain any such safeguards, which permit liability based on "effect" alone. *See* 40 C.F.R. §7.35(b), (c). And this case makes clear just how unconstrained liability is under those regulations, where EPA for more than a year believed that liability could be premised on disparate environmental *benefits*, *supra* at 16—and only retreated from that position after this suit was filed.

"matter of great political significance," (2) "it seeks to regulate a significant portion of the American economy," and (3) it "intrud[es] into an area that is the particular domain of state law." *West Virginia v. EPA*, 142 S.Ct. 2587, 2620-21 (2022) (Gorsuch, J., concurring). Because any *one* of these is sufficient to trigger the doctrine, those concessions are fatal here.

Ignoring all these standards, Defendants only argue that doctrine is inapplicable because disparate-impact mandates are not a "'transformative expansion in [its] regulatory authority.'" Opp. at 49 (quoting *West Virginia*, 142 S.Ct. at 2609). But while "transformative expansion" is sufficient to trigger the doctrine, it hardly is necessary. The Supreme Court, for example, had no difficulty in applying the major questions doctrine in *Alabama Realtors* and *NFIB*, without even *mentioning* any such putative "transformational expansion" of "long-extant statutes," let alone insisting on one. *Alabama Ass'n of Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021); *NFIB v. OSHA*, 142 S.Ct. 661, 664-65 (2022). While Defendants no doubt *wish* the major questions doctrine was limited to "transformational expansion[s]" of "long-extant statute[s]," both decisions make plain that it is not.

In any event, Defendants' disparate-impact mandates are quite literally a "transformational expansion": they transform Title VI from the pure intentional-discrimination-only prohibition into one so expansive as to be akin to the "freewheeling disparate-impact regime" of Title VII. *Brnovich*, 141 S.Ct. at 2340-41. Similarly, EPA's construction of §602 results in a radical transformation of the agency's Clean Air Act authority, converting that statute from one regulating specific pollutants and environmental impacts into a tool for *far*-reaching social engineering in the name of "equity."

Even in mythology, alchemists would struggle to pull off such a transformation.

### G.    This Court Owes No Deference To Defendants' Interpretations

For similar reasons, Defendants are not entitled to deference to their interpretation of Title VI as authorizing disparate-impact liability. Deference does not apply where the "question [is] of deep 'economic and political significance.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (citation omitted).

The State specifically argued that this was the case for the disparate-impact-authority question (at 35-36), and EPA's response does not deny *either* the economic or political significance here—thereby conceding both the significance and deference issues. *Id.*; *accord Biden v. Nebraska*, 143 S.Ct. 2355, 2375 (2023); *Texas v. United States*, 809 F.3d 134, 181-82 (5th Cir. 2015) *aff'd by equally divided court* 136 S.Ct. 2271 (2016). Deference is particularly unwarranted as Congress typically resolves the whether civil rights statutes permit disparate-impact liability *itself*. P.I. at 26-27; *supra* §IV.C. And deference is further inapplicable given the constitutional doubts raised by Defendants' interpretation. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001).[20]

## H.    Defendants' Resort To Legislative History Is Unpersuasive

Lacking credible arguments under the text and context of Title VI, and the canons of construction, Defendants seek refuge in legislative history. That attempt fails for two reasons.

*First*, Defendants' reliance (at 41-42) on a single floor statement and second statement by a non-legislator is worth little, as "floor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW Gen., Inc.*, 137 S.Ct. 929, 943 (2017). In any event, the statements stand only for the unremarkable proposition that agencies would fill in *some* details under §602. They do not even address disparate-impact liability specifically.

*Second*, Defendants' reliance (at 42-43) on Congressional *in*action as ratification is unavailing. "'"[C]ongressional silence lacks persuasive significance ... *particularly where administrative regulations are inconsistent with the controlling statute*'"—as is the case here. *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (emphasis added). Similarly, "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *United States v. Craft*, 535 U.S. 274, 287 (2002).

In any event, whatever inferences might be drawn from Congress's *in*action are overwhelmed

---

[20]  The State preserves the argument that deference does not apply because *Chevron* should be overruled—a question that the Supreme Court is currently considering expressly in *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023) (granting certiorari of that question).

by the actual *action* Congress did take: In 1991 it specifically codified disparate-impact liability for Title VII, but did not lift a finger to ratify Defendants' putative authority to impose disparate-impact mandates under Title VI. *See* Civil Rights Act of 1991, Pub. Law 102–166, 105 Stat 1071 (1991). That strongly militates against reading any ratification here. *See, e.g.*, *Jama v. ICE*, 543 U.S. 335, 341 (2005). Moreover, the Supreme Court in *Sandoval* rejected a similar ratification/acquiescence argument. *Sandoval*, 532 U.S. at 292-93.

## V.      EPA'S EXTRA-REGULATORY REQUIREMENTS ARE UNLAWFUL

EPA offers two defenses of its Extra-Regulatory Requirements (at 50-51): (1) they were mere "suggestions" offered only in informal negotiations and (2) its cumulative-impacts mandates are mere "guidance" and not binding requirements. Neither can withstand scrutiny.

Extending EPA the benefit of the doubt here, its right hand appears not to know what its left hand is doing. EPA's June 16 Objection was clear that EPA was demanding evaluation of cumulative impacts, insisting that the State consider "whether the community is already disproportionately impacted by public health or environmental burdens." Exh. 84 at 2. That objection carried the force of law (else LDEQ's proposed permit grant would have become effective). *See* 42 U.S.C. §7661d. And the June 16 Objection singularly refutes EPA's "mere suggestions" defense. In any event, EPA's Letter of Concern makes plain its formal position that cumulative disparate-impacts analysis is required, demanding that the State "[c]onduct cumulative impact analyses" and setting forth a "minimum" for what those analyses should contain. Exh. 11 at 5-7; *id.* at 22 ("[S]uch an analysis should have been performed by LDEQ.").

Moreover, EPA tellingly does not disavow its position that Title VI and its regulations demand consideration of cumulative disparate impacts and conducting public meetings. Absent such a disavowal, the clear import of EPA's actions and positions is that the agency believes such requirements exist and that the agency intends to enforce them. *Supra* at 14-15.

Similarly, as set forth above (at 34-35), EPA's putative "guidance" is actually binding as a practical matter—which is EPA no doubt intends it to be. Indeed, mere "guidance" could *not* create any binding requirement to consider cumulative disparate impacts. Yet EPA's guidance is unequivocal that EPA has authority to mandate their consideration. *Supra* at 35.

The nature of Title VI also precludes EPA's "mere guidance" defense. It is undisputed that Section 601 by itself does not create *any* disparate-impact requirements, let alone a mandate to consider *cumulative* disparate impacts. So EPA cannot "interpret" Section 601 to recognize any such mandates through guidance alone, instead it could only *create* them by legislative rulemaking employing its putative Section 602 authority to "effectuate" Section 601. *See, e.g.*, *United Technologies Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987) (holding that if a "rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one"). But such legislative rulemaking requires notice-and-comment compliance and Presidential ratification—both of which concededly have not occurred here.

EPA's cumulative-impacts mandates are thus unlawful.

## VI.   THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED

Defendants also advance *at length* (at 54-60) the remarkable contention that even if their actions were illegal or unconstitutional, they still should be permitted to stand. Those arguments violate both controlling Fifth Circuit precedent and bedrock principles of equity.

### A.   The State Will Suffer Irreparable Harm Without An Injunction

Although Defendants spend considerable ink arguing otherwise (at 55-59), the issue of irreparable harm is remarkably straightforward under Fifth Circuit precedent. As noted above, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Louisiana v. Biden*, 55 F.4th at 1034 (cleaned up) (emphasis in original). This case falls comfortably within that "almost always." More generally, because sovereign

immunity precludes recovering monetary damages against the federal government, any financial harms incurred by the State are irrecoverable injuries that constitute irreparable harm. *Id.* [21]

Similarly, Defendants' constitutional violations under the Spending Clause and private non-delegation doctrine cause irreparable harm, as "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (citation omitted); *accord Johnson v. Johnson*, 244 F.3d 135 (5th Cir. 2000); *West Virginia*, 59 F.4th at 1149.

Defendants also contend (at 56-57) that the State's suit comes too late to establish irreparable harm. That contention is, of course, difficult to reconcile with Defendants' repeated contentions that the State's suit is *premature* and that only post-enforcement judicial review is available. Defendants thus contend that the State *never* has had standing to bring a suit like this one and also that it unreasonably delayed making such a futile attempt. That shameless contradiction goes entirely unexplained.

Inconsistencies aside, when exactly was the State supposed to bring the suit? When EPA's enforcement was so comatose that Title VI complaints were not even checked for more than a year? *Supra* at 36-37. One can only imagine what EPA would have said about a suit filed then. Instead, EPA's recent and radical shift to hyper-aggressive (and lawless) enforcement of its Title VI policies greatly intensified the State's injuries, which makes this suit's timing perfectly appropriate. *Supra* at 36-37.

## B.    The Balance of Harms and Public Interest Support The State

The State agrees that the final two factors merge. Furthermore, as the Fifth Circuit has repeatedly made clear, "'there is generally no public interest in the perpetuation of unlawful agency action.'" *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up).

---

[21] Much of Defendants' irreparable-harm arguments simply regurgitates their arguments about justiciability or the merits. They fail for the reasons set forth above.

Defendants do not even *acknowledge* this holding, let alone attempt to explain why it is not controlling here. And while Defendants assert (at 60) that they would suffer irreparable harm from an injunction, an injunction "will do [them] no harm whatsoever. Any interest [they] may claim in enforcing an unlawful (and likely unconstitutional) [regulation] is illegitimate." *BST Holdings, LLC. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) *aff'd* 142 S.Ct. 661 (2022).

Defendants' speculative concern (at 60) about potential resulting discrimination rings hollow as their challenged regulations *require* discrimination. And Defendants' reliance (at 60) on reliance interests is difficult to credit where EPA both (1) admits that it has never taken a final enforcement action *ever* and (2) went for a year-long-plus stretch without even bothering to check its Title VI inbox. In any event, the reliance-interest requirement of *Department of Commerce* applies to agencies, not courts.

## VII.   ALTERNATIVELY, THIS COURT SHOULD VACATE DEFENDANTS' CHALLENGED ACTIONS AND REGULATIONS

Even if injunctive relief were unavailable here, this Court should follow "the ordinary practice[, which] is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Indeed, "vacatur is the default remedy to correct defective agency action." *National Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019).

Although the State did not seek vacatur in its preliminary injunction motion—there is no such thing as "preliminary vacatur"—vacatur is an available and appropriate form of permanent relief here. Nor do Defendants even attempt to argue that remand without vacatur would be appropriate.

## CONCLUSION

For the foregoing reasons, this Court should grant the State's motion for a preliminary injunction, deny Defendants' cross-motion, and enter judgment for the State.

Dated:   September 29, 2023

Respectfully submitted,

By: */s/ J. Scott St. John*

DREW C. ENSIGN *
  Special Assistant Solicitor General
202 E. Earll Drive
Suite 490
Phoenix, AZ 85004
drewensignlaw@gmail.com

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

*Pro Hac Vice admission application forthcoming*

61