## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

THE STATE OF LOUISIANA,
By and through its Attorney General, Jeff Landry,

PLAINTIFF,

v.

CIVIL ACTION NO. 2:23-cv-00692

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; et al.,

DEFENDANTS.

### DECLARATION OF COURTNEY J. BURDETTE

1.      My name is Courtney Burdette. I am an attorney employed by the Louisiana Department of Environmental Quality ("LDEQ"). My current job title is Executive Counsel. I make this declaration in support of the State of Louisiana. I make this declaration based on my personal knowledge, and I could competently testify to its contents if called to do so.

2.      I received a Bachelor of Arts degree from Howard University in 2003, and Juris Doctorate and Bachelor of Civil Law degrees from Louisiana State University in 2006.

3.      I have been licensed to practice law in Louisiana since October 2006. I have been employed by LDEQ since January 2014.  Prior to my appointment to the position of Executive Counsel in 2022, I served the Department in the positions of Attorney, Attorney Supervisor and General Counsel. In the course of my employment with LDEQ, I have represented LDEQ in permitting matters before state district and appellate courts, as well as administrative law tribunals. I have also reviewed LDEQ permitting decisions for legal sufficiency, in particular, compliance with federal and state laws.

## LDEQ'S RECEIPT OF EPA GRANTS

4.      LDEQ routinely applies for and receives grants from federal agencies, including the Environmental Protection Agency.

5.      According to usaspending.gov, LDEQ received millions of dollars in grants awarded by EPA from FY2018 through FY2023, and has substantial unexpired grant funds still available.[1] That information is consistent with my knowledge.

6.      LDEQ intends to continue applying for grants from federal agencies in the future, including grants from EPA. LDEQ expects that it will continue to receive grants from EPA in every year for the foreseeable future.

## THE COMPLAINTS AND LETTER OF CONCERN

7.      I am informed and believe that EPA received a series of Title VI complaints in early-2022 from Concerned Citizens of St. John, Sierra Club, Stop the Wallace Grain Terminal, Inclusive Louisiana, RISE St. James, and the Louisiana Bucket Brigade. Consistent with that information, EPA's External Civil Rights docket reflects that EPA received complaint 01R-22-R6 on January 20, 2022, received complaint 02R-22-R6 on January 20, 2022, and received complaint 04R-22-R6 on February 2, 2022. LDEQ subsequently received a Letter of Concern from EPA in connection with those complaints on or about October 12, 2022.

## INFORMAL RESOLUTION DISCUSSIONS

8.      Informal resolution discussions began via a video and telephone conference on or about November 16, 2022.

9.      During those discussions, EPA officials stated that compliance with environmental laws is not a shield to Title VI.

---

[1] https://www.usaspending.gov/search/?hash=44fbf57e12d1bd12181d496824505a0d

10.     During those discussions, EPA asserted that LDEQ should undertake an analysis of the impact of LDEQ permitting decisions on purportedly disadvantaged populations such as racial minorities.

11.     EPA also asserted that LDEQ should conduct "cumulative impact assessments" as part of LDEQ's permitting process. In doing so, EPA made clear its position that undertaking cumulative impacts analysis was required to comply with Title VI.

12.     At one point, EPA asserted that even though LDEQ had achieved an 85% reduction in chloroprene emissions from the Denka Performance Elastomers (DPE) facility in St. John the Baptist Parish through the negotiation of an agreement, an Administrative Order on Consent, with DPE —*i.e.*, a significant environmental benefit—EPA believed that LDEQ's renewing that permit could result in a disparate impact that would violate Title VI. A true and correct copy of the Administrative Order on Consent that reduced a facility's emissions of chloroprene by 85% was previously filed as Seidemann Declaration Exhibit 35 (Dkt. 12-35).

13.     EPA official Lilian Dorka explained that EPA "would want to capture ... any permit" with its civil rights framework. For example, in a February 28, 2023, telephone conference, EPA rejected LDEQ's suggestion to only apply EPA's framework to permitting actions in the Industrial Corridor mentioned in EPA's Letter of Concern, stating that such a limitation would "not meet the Title VI needs." EPA instead stated that LDEQ should use EPA's framework "without exception" including for "all renewals of all permits." EPA confirmed that its expectation was for LDEQ to "commit to doing a disparate impact screening assessment for every renewal permit application for any major source or synthetic minor source across the state." LDEQ noted that EPA's demand "goes beyond ... resolving the concerns raised in the complaint[s] and ... some renewals don't propose any changes at all." EPA responded that "the issue is [if] there are already disparate impacts, then you keep renewing it without looking and trying to figure out how to try and reduce them."

14.    EPA asserted that Louisiana agencies should have "community meetings" to address a perceived lack of community involvement, and that the State's speakers at those meetings should be subject to various "protocols." EPA contemplated LDEQ hiring dedicated "risk communicators," despite LDEQ informing EPA that LDEQ did not employ such persons.

15.    EPA asserted that Louisiana agencies should adopt a scientific integrity policy, subject to EPA's approval. EPA explained that it "want[s] to ensure that the studies that are being conducted … follow a scientific integrity policy" satisfactory to EPA, and that the policy provide "a framework for every single study, every document that comes out that informs [the] public of the study information."

16.    LDEQ expended considerable resources in responding to EPA's Title VI investigation and engaging in informal resolution discussions. I, along with General Counsel Jill Clark,   participated in all or nearly all of the twice-weekly telephone conferences with EPA. Members of LDEQ's executive staff, including two assistant secretaries, also participated in the majority of these calls. Other LDEQ employees, including attorneys and technical staff, spent considerable time reviewing EPA's letter of concern, responding to the letter of concern, and evaluating the merits of EPA's assertions throughout the course of EPA's investigation and the associated informal resolution discussions. Suffice it to say, personnel time reflects an expenditure of State funds and further reflects a diversion of resources from tasks LDEQ would otherwise engage in, such as reviewing permit applications and enforcing environmental laws. Here, the diversion of resources was substantial. Responding to any future Title VI investigation would likely require similar significant expenditures of LDEQ resources.

## COST TO LDEQ OF COMPLYING WITH EPA'S DEMANDS

17.    LDEQ is the primary agency in Louisiana concerned with environmental protection and regulation. LDEQ administers various permitting programs, including those under the federal

Clean Air Act. LDEQ reviews and renders final decisions on hundreds of permit applications, including permit renewals, every year.

DISPARATE IMPACT ANALYSIS

18.      Conducting a disparate-impact analysis requires expenditure of agency resources, including staff time. Performing that analysis requires LDEQ to collect and review information regarding the race, color, and national origin, of communities around any site that is the subject of a permit application or permit renewal. Collecting and reviewing that information additionally causes LDEQ to incur costs related to determining what additional data it needs, how to obtain that data, collecting that data in accordance with federal and state laws, and monitoring the data to ensure compliance with EPA's demands.

19.      Conducting a disparate-impact analysis also requires LDEQ to collect and review information regarding the race, color, and national origin of communities to be used as a comparator for the site that is the subject of a permit action. Collecting and reviewing that information causes LDEQ to incur costs related to determining what additional data it needs, how to obtain that data, collecting that data in accord with federal and state laws, and monitoring the data to ensure compliance with EPA's demands.

20.      LDEQ has conducted racial demographic-based analyses in the past and will be required to do so in the future for as long as Defendants continue to maintain regulations that impose disparate-impact mandates. In each instance where LDEQ has performed this analysis, it has incurred costs, including use of staff time and resources like computers to assist with the required statistical analysis. LDEQ expects that disparate-impact analysis will continue not to be costless in the future and is not aware of any reason that it would ever fail to consume some resources.

21.      Many or all of these costs would not be incurred if LDEQ were no longer subject to federal disparate-impact-based mandates.

22.    On the other hand, costs to LDEQ would increase if LDEQ is required to perform additional disparate impact analyses on, e.g., permit renewals.

CUMULATIVE IMPACT

23.    Complying with EPA's proposed cumulative impacts framework would require LDEQ to collect and review information about environmental impacts outside of the permit application or renewal, including information regarding the race, color, and national origin, of communities around any site that is the subject of a permit application or permit renewal. Further, and as LDEQ has informed EPA, much of the information required by EPA's cumulative impacts framework falls outside the scope of LDEQ's jurisdiction and would likely require the cooperation of a number of other state and local government entities. Collecting and reviewing that information would cause LDEQ to incur costs related to determining what additional data it needs, how to obtain that data, collecting that data in accord with federal and state laws, and monitoring the data to ensure compliance with EPA's demands.

24.    Complying with EPA's cumulative impacts framework would require LDEQ to collect and review information about an apparently open-ended set of health and socioeconomic concerns, including information regarding the race, color, and national origin, of affected communities. Collecting and reviewing that information would cause LDEQ to incur costs related to determining what additional data it needs, how to obtain that data, collecting that data in accord with federal and state laws, and monitoring the data to ensure compliance with EPA's demands.

RELATED DEMANDS

25.    Complying with EPA's demands for public meetings, dedicated "risk communicators," and a restrictive "scientific integrity policy" would cause LDEQ to incur costs to host meetings and hire additional employees. And restricting LDEQ's communication with the public would hinder or prevent LDEQ officials from providing Louisiana citizens with information that

LDEQ believes should be provided to those citizens, particularly on issues that are subject to scientific dispute.

## MISCELLANEOUS

26.    A true and accurate copy of an EPA "Request for Information" received by LDEQ, together with the cover email, were previously filed as Seidemann Declaration Exhibit 18 (Dkt. 12-18).

27.    Attached as Composite Exhibit 81 is a true and accurate copy of an email and attached redline of portions of a draft informal resolution agreement, as emailed to EPA on March 22, 2023.

28.    Attached as Composite Exhibit 82 is a true and accurate copy of an email and attached redline of a draft informal resolution agreement, as received from EPA on May 18, 2023.

29.    Attached as Composite Exhibit 83 is a true and accurate copy of an email and LDEQ's attached last redline of a section of a draft informal resolution agreement, as emailed to EPA on June 9, 2023.

30.    Attached as Exhibit 84 is a true and accurate copy of an EPA Objection letter received by LDEQ.

31.    Further declarant sayeth naught.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF LOUISIANA THAT THE FOREGOING IS TRUE AND CORRECT. 28 U.S.C. § 1746.**

Sworn and subscribed this 29th day of September, 2023, in Baton Rouge, Louisiana

COURTNEY BURDETTE