Exhibit 82

## St. John, Joseph

| | |
|---|---|
| **From:** | Dorka, Lilian (she/her/hers) <Dorka.Lilian@epa.gov> |
| **Sent:** | Thursday, May 18, 2023 8:53 PM |
| **To:** | Courtney Burdette; Bliss Higgins |
| **Cc:** | Payne, James (Jim); Scott, Ronald; Isales, Daniel; Khan, Zahra; Hoang, Anhthu; O'Lone, Mary; Rhodes, Julia (she/her/hers); McGuire, James; Payne, James (Jim); Stephen Russo; Seidemann, Ryan; McKinney, Cheryl; Moncrieffe, Marcia; Bates, Warren; Montegut, Ryan; David McCay; Neal Elliott; Murrill, Elizabeth; Bliss Higgins; St. John, Joseph; Tim.Hardy@bswllp.com; Jones, Jasimiel; Celena Cage; Andrews, Suzanne; jill.clark@la.gov; Brungard, Morgan; Freel, Angelique; John B. King; Carroll Devillier; Danielle L. Borel; Schoellkopf, Lynde (she/her/hers); Payne, James (Jim); Chaudhary, Dimple |
| **Subject:** | [WARNING: UNSCANNABLE EXTRACTION FAILED]RE: Revised/Updated EPA Draft IRA for LDEQ: EPA Complaint Nos. 01R-22 R6, 02R-22-R6, and 04R-22-R6 |
| **Attachments:** | 2023.05.18 draft 2 IRA 01R-22-R6 and 04R-22-R6 to LDEQ.docx |
| | |
| **Importance:** | High |

*CAUTION:  This email originated outside of Louisiana Department of Justice.  Do not click links or open attachments unless you recognize the sender and know the content is safe.*

Hello Courtney,

Attached, please find EPA's updated/revised Informal Resolution Agreement for LDEQ. We would appreciate your comments no later than June 2, 2023. Thanks, and please let us know if you have any questions.

Best regards,

Lilian

Lilian Sotolongo Dorka
Deputy Assistant Administrator for External Civil Rights
Office of Environmental Justice and External Civil Rights
U.S. Environmental Protection Agency
202-564-9649 - Office
202-695-9888 – Cell
Pronouns: she/her/ella
Hablo español
The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Informal Resolution Agreement                              PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                05/18/2023



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D C. 20460

Office of Environmental Justice and External Civil Rights
Office of External Civil Rights Compliance

**INFORMAL RESOLUTION AGREEMENT**
between the
**LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY**
and the
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**EPA COMPLAINTS NO. 01R-22-R6 AND 04R-22-R6**

I.      **PURPOSE AND JURISDICTION**

A.      Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 (Title VI) and other federal nondiscrimination laws, and United States Environmental Protection Agency's (EPA) implementing regulations at 40 C.F.R. Parts 5 and 7 prohibit discrimination on the basis of race, color, national origin, disability, sex, age, and intimidation or retaliation in the programs, services and activities of applicants for or recipients of federal financial assistance.[1]

B.      The Louisiana Department of Environmental Quality (LDEQ) receives federal financial assistance from the EPA and, therefore, must ensure nondiscrimination in all of its operations pursuant to federal nondiscrimination laws and EPA's implementing regulations.

C.      On January 20, 2022, EPA received Complaint No. 01R-22-R6, which alleged discrimination by LDEQ based on race.  In response to the complaint, on April 6, 2022, EPA accepted for investigation the following issues:

---

[1] Title VI of the Civil Rights Act of 1964, 42 United States Code §§ 2000d to 2000d-7 (Title VI); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Title IX of the Education Act Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq.; Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 et seq.; Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500 § 13, 86 Stat. 903 (codified as amended at 33 U.S.C. § 1251 (1972)); 40 C.F.R. Parts 5 and 7.

1

Informal Resolution Agreement                                  PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                    05/18/2023

    1.      Whether LDEQ uses criteria or methods of administering its air pollution control program that have the intent and/or effect of subjecting persons to discrimination on the basis of race in violation of Title VI of the Civil Rights Act of 1964 and EPA's implementing regulation at 40 C.F.R. Part 7 § § 7.30 and 7.35, including, but not limited and with respect to, LDEQ's acts or failures to undertake certain actions related to the Denka facility in connection with its air pollutant emissions, and the predominantly Black residents of St. John the Baptist Parish.

    2.      Whether LDEQ has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that recipients of federal assistance must have in place to comply with their general nondiscrimination obligations, including specific policies and procedures to ensure meaningful access to LDEQ services, programs and activities for individuals with limited-English proficiency and individuals with disabilities, and whether the LDEQ has a public participation policy and process that is consistent with Title VI and the other federal civil rights laws, and EPA's implementing regulation at 40 C.F.R. Parts 5 and 7.

D.      On February 2, 2022, EPA received Complaint No. 04R-22-R6, which alleged discrimination by LDEQ based on race.  In response to the complaint, on April 6, 2022, EPA accepted for investigation the following issues:

    1.      Whether LDEQ uses criteria or methods of administering its air pollution control program that have the intent and/or effect of subjecting persons to discrimination on the basis of race in violation of Title VI of the Civil Rights Act of 1964 and EPA's implementing regulation at 40 C.F.R. Part 7 § § 7.30 and 7.35, including, but not limited and with respect to, LDEQ's decision to reaffirm issuance of 14 new air permits for the Formosa facility, and the predominantly Black residents of St. James Parish.

    2.      Whether LDEQ has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that recipients of federal assistance must have in place to comply with their general nondiscrimination obligations, including specific policies and procedures to ensure meaningful access to LDEQ services, programs and activities for individuals with limited-English proficiency and individuals with disabilities, and whether the LDEQ has a public participation policy and process that is consistent with Title VI and the other federal civil rights laws, and EPA's implementing regulation at 40 C.F.R. Parts 5 and 7.

E.      During EPA's investigation into Complaint Nos. 01R-22-R6 and 04R-22-R6, LDEQ agreed to engage in the voluntary Informal Resolution Agreement (Agreement) process in order to resolve the complaints.

Informal Resolution Agreement                                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                              05/18/2023

F.      On October 12, 2022, EPA issued a Letter of Concern (Letter) to LDEQ[2] to convey the results of EPA's initial fact finding and analysis of the civil rights issues EPA accepted for investigation in Complaint No. 01R-22-R6 (LDEQ Denka Complaint) and Complaint No. 04R-22-R6 (LDEQ Formosa Complaint). The Letter addresses LDEQ's implementation of its air pollution control permit program and raised concerns that LDEQ's methods of administering its programs and activities and actions or inactions related to air pollution control and health risk mitigation and communication may have resulted and continue to result in disparate adverse impacts on Black residents: (1) living and attending school near the Denka Performance Elastomer LLC (Denka) facility in St. John the Baptist Parish, LaPlace, Louisiana; (2) living near the proposed FG LA, LLC (Formosa) facility in St. James Parish; and (3) living in  Louisiana's Industrial Corridor.[3] The Letter provided a series of recommendations for LDEQ.

G.      This Agreement is entered into pursuant to the authority granted to EPA under the federal non-discrimination laws, including Title VI of the Civil Rights Act of 1964, and the EPA's implementing regulation found at 40 C.F.R. Parts 5 and 7, and resolves Complaint Nos. 01R-22-R6 and 04R-22-R6.

H.      This Agreement is entered into voluntarily by LDEQ and does not constitute an admission by LDEQ of a violation of, or a finding of compliance or noncompliance by the EPA with, Title VI or 40 C.F.R. Parts 5 and 7.

I.      A recipient of federal financial assistance's compliance with the requirements of federal environmental laws with respect to permitting activities and decisions does not necessarily mean that the recipient is complying with federal civil rights laws. Recipients have an independent obligation to comply with federal civil rights laws with respect to all of their programs and activities, including environmental permitting programs.

J.      The disparate impact analysis under Title VI examines whether the permitting action under consideration will cause or contribute to an adverse disparate impact on the basis of race, color or national origin, which involves determining whether[4]:

        1.      there is a neutral policy and practice (*e.g.,* permit decision);

---

[2] The Letter was also addressed to the Louisiana Department of Health and contained initial fact finding and analysis of the civil rights issues EPA accepted for investigation in Complaint No. 02R-22-R6 (LDH Denka Complaint).
[3] St. John the Baptist, St. James, Ascension, East Baton Rouge, West Baton Rouge, Iberville, and St. Charles Parishes.
[4] *See EPA Title VI Toolkit*, p. 8, https://www.epa.gov/sites/production/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf.

3

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                            05/18/2023

    2.    the permitting action will cause or contribute to adversity/harm[5] when considering the total or cumulative burdens[6] including exposure to pollution throughout a person's lifetime;

    3.    the adversity/harm identified is borne disproportionately by individuals on the basis of race, color or national origin, or borne disproportionately by a community, especially in light of the characteristics of that community and,

    4.    there is a causal connection between the permitting action and the adversity/harm identified (that are "sufficiently substantial to raise an inference of causation"[7]).

K.    EPA Enforcement Actions Related to the Denka Facility.

---

[5] *E.g., S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 487, *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J.) (discussing the methods used to "evaluate the 'adversity' of the impact" and considering whether the impacts at issue were "sufficiently adverse" to establish a prima facie case), *rev'd on other grounds*, 274 F.3d 771 (3d Cir. 2001). *See also Bryan v. Koch*, 627 F.2d 612, 617 (2d Cir. 1980) (indicating that adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm). *See EPA Title VI Toolkit*, p. 8, https://www.epa.gov/sites/production/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf.
[6] EPA's Office of Research and Development defines cumulative impacts as "the totality of exposures to combinations of chemical and non-chemical stressors and their effects on health, well-being, and quality of life outcomes. Cumulative impacts include contemporary exposures to multiple stressors as well as exposures throughout a person's lifetime. They are influenced by the distribution of stressors and encompass both direct and indirect effects to people through impacts on resources and the environment. Cumulative impacts can be considered in the context of individuals, geographically defined communities, or definable population groups. Cumulative impacts characterize the potential state of vulnerability or resilience of a community." U.S. EPA, Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development. *U.S. Environmental Protection Agency*, Washington, D.C., EPA/600/R-22/014a, 2022. p. 4, https://www.epa.gov/system/files/documents/2022-09/Cumulative%20Impacts%20Research%20Final%20Report_FINAL-EPA%20600-R-22-014a.pdf.
[7] *Smith v. Xerox Corp.*, 196 F.3d 358, 364 (2nd Cir. 1999), citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994-995 (1988), *NAACP v. Town of East Haven*, 70 F.3d 219, 225 (2nd Cir. 1995).

Informal Resolution Agreement                                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                       05/18/2023

1.      On December 28, 2022, EPA's Region 6 entered into a consent agreement
with Denka Performance Elastomer, LLC and issued a final order to address
waste management practices at the Denka facility that contribute to its emissions
of chloroprene. Pursuant to the consent agreement, beginning January 31, 2023,
Denka stopped transferring "Poly Kettle Strainer Waste" to an outside, open-air
brine pit and instead met hazardous waste regulatory requirements for both
storage and ultimate disposal of the waste. The terms of the consent agreement
also require Denka to manage the "Poly Kettle Strainer Waste" as hazardous
waste until a more robust sampling and hazardous waste determination effort can
be completed by the company through a waste determination plan. Denka will
continue testing additional emissions reductions measures to reduce chloroprene
emissions from the management of this waste. These projects and any
modifications will be subject to EPA review and approval.  If successful, the
emissions reduction projects alone have the potential to eliminate approximately 2
tons of chloroprene emissions per year.

2.      On February 28, 2023, the U.S. Department of Justice, on behalf of EPA,
filed a complaint in the U.S. District Court for the Eastern District of Louisiana
under Section 303 of the Clean Air Act (CAA) against Denka to compel it to
significantly reduce hazardous chloroprene emissions from the facility. The relief
sought by the CAA Section 303 Complaint is that Denka immediately take all
necessary measures to eliminate the imminent and substantial endangerment
posed by chloroprene emissions from the facility and take all other actions as may
be necessary to address and mitigate the harm to public health and welfare that
Denka's chloroprene emissions have caused.

L.      On April 25, 2023, EPA announced a proposed rule[8] to significantly reduce
emissions of toxic and other harmful air pollution, including ethylene oxide (EtO) and
chloroprene from a number of chemical plants nationwide including 51 facilities in
Louisiana. EPA's proposed rule would reduce by 96% the number of people with
elevated cancer risk from breathing air toxics near these chemical plants. The proposal
also requires plants subject to the rule to conduct fenceline monitoring if they use,
produce, store, or emit EtO, chloroprene, benzene, 1,3-butadiene, ethylene dichloride or
vinyl chloride.

M.      *[Include provision that describes all current fenceline monitoring networks at
Denka and length of time they will stay.]*

> **Commented [OM1]: LDEQ:** You proposed deleting the provision later in the IRA about monitoring of chloroprene because Denka currently has fenceline monitoring. It would be useful then to describe the current monitoring including what is being monitored, who is doing it, & how long it will continue. Please also provide citation in support of your description.

---

[8] *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 FR 25080.

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                          05/18/2023

N.    Pursuant to EPA Grant No. XXX, LDEQ will install and operate a Temporary Located Community (TLC) monitoring station in [*specific location*], St. James Parish, with an anticipated monitoring period of ~March 2024 through February 2026. *The pollutants being monitored are . . . .*

> **Commented [OM2]: LDEQ:** You proposed this provision in the monitoring commitment section, but it is a factual statement. We would like it to include information about when it will operate (if that has been decided) and the pollutants that will be monitored and why they were chosen.

## II.    COMMITMENTS REGARDING LDEQ'S METHODS OF ADMINISTRATION (ISSUE 1)

> **Commented [A3]:** LDEQ must verify its statutory and regulatory authority for each of these commitments prior to finalization of an IRA

> **Commented [OM4R3]:** LDEQ appears to have broad authority under the Louisiana Environmental Quality Act (the Act), La. R.S. 30:2001, *et seq.*, particularly La. R.S. 30:2011 (D)(2), (7), (8,) and (14).

A.    Process to Identify and Address Potential Adverse Disparate Effects of Air Permitting Decision.

1.    LDEQ will:

a)    Consider relevant demographic information and information developed through past interactions with the community to tailor public involvement efforts to the demographics and needs of the community.

b)    Identify populations in potentially impacted areas which will include but is not limited to those populations within ¼ mile, ½ mile, 1 mile, and 3 miles measured from the pollution source or the fenceline of the facility and, as appropriate to the anticipated potential impacts, another distance. In determining other appropriate distances, LDEQ will consider:

> **Commented [OM5]:** LDEQ may also want to include 2 miles b/c it appears the legislature had some basis to believe that those living w/in 2 miles are most impacted.
>
> Regarding public hearings on permits for facilities, the presiding officer shall give preference for speaking up to one hour after the initial thirty-minute presentation of each hearing: first to those citizens who live within a two-mile radius of the location of the facility; second to those citizens who work within a two-mile radius of the location of the facility; and third to those citizens who live within the parish of the location of the facility.
>
> § 2017. Public hearings; presiding officer; authority, R.S. 30:2017 B. (1)

(1)    The type of permit;

(2)    Type of pollutant; and

(3)    Potential adverse impacts associated with the facility (*e.g.,* odors, closure of evacuation routes, traffic, noise).

c)    Conduct an analysis to evaluate any potential adversity/harm which will consider not only the burdens and harms resulting from the permit action at issue and borne disproportionately on the basis of race, color or national origin, but also on the total or cumulative burdens including exposures throughout a person's lifetime borne disproportionately by a community, especially in light of the characteristics of that community. This analysis of impacted areas/populations will use a screening process that:

Informal Resolution Agreement                              PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              05/18/2023

 (1) considers indicators (not indexes) that provide information on:

  (a) existing environmental burdens from air and other pollution sources[9];

  (b) existing burden of disease and health vulnerabilities for the population living in the impacted area; and

  (c) social conditions that contribute to a population's vulnerability to air pollution.

 (2) uses all indicators available in EPA's EJScreen and ATSDR's Environmental Justice Index.

> **Commented [OM6]:** https://www.atsdr.cdc.gov/placeandhealth/eji/indicators.html

 (3) uses indicators with the most recent information available[10] and indicators with the smallest geographic census unit available.[11]

 (4) considers the indicators for all Census tracts that are bisected by the boundary of the impacted areas for a tool that only provides indicator information about the whole Census tract;

 (5) considers both indicators if there are indicators with similar labels but the method of calculating the indicator value differs.[12] If the two different versions lead to the same outcomes and conclusions, that should increase confidence in the conclusions. If the indicators lead to different outcomes, LDEQ may conduct further investigation and analysis to determine why.

 d) Conduct the disparity analysis in paragraph II.A.1. (f) below if any indicator value for the impacted area is equal to or greater than the appropriate threshold below:

---

[9] It is important not to limit examination of environmental indicators to just those related to air pollution. The non-air pollution related indicators each represent a stressor on the population that may make them more vulnerable to adverse health impacts from air pollution and multiple pollutants can contribute to the etiology of a disease, and the population affected likely suffers from a range of diseases.

[10] For example, both EJScreen and EJI have an Air Toxics Cancer Risk Indicator; however, EJScreen Air Toxics uses 2017 EPA NATA data while ATSDR uses 2014 NATA data. In this case, the Recipient's screening process would use EJScreen's Air Toxics Cancer Risk Indicator.

[11] For example, EJScreen has Environmental Indicators not found in EJI (*e.g.,* Air Toxics Respiratory Hazard Index, Underground Storage Tanks (UST) and Leaking UST (LUST)) while ATSDR's EJI includes indicators not currently available in EJScreen such as indicators for health vulnerabilities (*e.g.,* High Estimated Prevalence of Asthma, High Estimated Prevalence of Heart Disease); for social vulnerabilities (*e.g.,* Lack of Health Insurance, Mobile Homes); and environmental indicators (*e.g.,* Impaired Surface Waters, TRI Sites).

[12] For example, both EJScreen and EJI have an indicator to account for potential exposure to lead paint and for proximity to facilities with Risk Mitigation Plans; however, the method used to calculate each indicator value differs.

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              05/18/2023

    (1)    80th percentile as compared to State where possible and compared to the U.S where it is not.

    (2)    75th percentile for indicators of high estimated prevalence of chronic health conditions in EJI Health Vulnerability Module.

e)    Consider compliance and complaint information for the facility at issue and other facilities in the impacted area to determine whether the facilities contribute to adverse non-health impacts including quality of life (*e.g.,* noise, odor, lights) and safety (*e.g.,* industrial truck traffic, closure of evacuation routes) from information sources including:

    (1)    Title VI complaints filed with EPA or through LDEQ's civil rights grievance procedure,

    (2)    LDEQ's environmental complaint system, and

    (3)    Compliance information on the facility at issue and facilities in the area (*e.g.,* EPA's Enforcement and Compliance History Online (ECHO), LDEQ's [*equivalent of ECHO?*]).

f)    Conduct a disparity analysis to determine whether a disproportionate share of the adversity/harm from the permit action will be borne by individuals based on their race, color, or national origin using the information gathered in II.A.1. (b) – (e). LDEQ will determine whether the adverse impacts identified affect a significantly higher proportion of protected class members (defined by race, color or national origin) than non-protected class members using at a minimum each of the following comparisons:

    (1)    the population living in the impacted area as compared to the State[13] or

    (2)    the children younger than 17 living in the impacted area as compared to the State's population of children younger than 17[14] or

**Commented [OM7]: LDEQ:** You proposed greater than 5% of the state average as your measure of disproportionality.  Please explain the basis for your determination that this is a valid/reliable measure of disproportionality to apply across the board.

---

[13] The process should use the most recent Census or ACS data available.
[14] The process should use the most recent Census or ACS data available.

Informal Resolution Agreement                                      PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                     05/18/2023

(3)     the children[15] attending schools (preschool through 12th grade)
located in the impacted area as compared to the State's population of
school children.[16]

g)      Seek public comment before deciding not to proceed with:

(1)     the disparity analysis in paragraph II.A.1. (f) if no threshold
in paragraph II.A.1. (d) above is met or exceeded, but at least one
environmental indicator is above the 70th percentile or

(2)     the mitigation process if the disparity analysis shows the
disproportionality is near but not exceeding the significance
threshold.

h)      Identify and implement mitigation measures that will adequately
mitigate adverse disparate impacts identified and demonstrate there are no
less discriminatory alternatives.[17] The process will:

(1)     Determine whether there is a substantial legitimate
justification for the action that is necessary to meet a goal that is
legitimate, important, and integral to LDEQ's institutional mission.

(2)     Seek public comment during the permit review process on
the assessment conducted in paragraphs II.A.1. (b) – (g) above and
appropriate mitigation measures/less discriminatory alternatives
identified and considered including those in paragraph II.A.1. (i)
and consider the public comment when developing permit
conditions.

i)      Identify appropriate measures to mitigate the adverse disparate
impacts identified through the analysis in paragraphs II.A.1. (b) – (e)
which:

(1)     will include but are not limited to:

---

[15] Children may be at greater risk to environmental contaminants than adults due to differences in behavior and
biology and that the effects of early life exposures may also arise in adulthood or in later generations. EPA's 2021
Policy on Children's Health (October 5, 2021).
[16] The screening process should use the most recent demographic data from the U.S. Department of Education,
National Center for Education Statistics, https://ocrdata.ed.gov/.
[17] A less discriminatory alternative is a comparably effective practice that causes less of a disparate impact than the
challenged practice. Mitigation measures that would lessen or eliminate the demonstrated adverse disparate impacts,
could be part of a less discriminatory alternative; however, alternatives may also include practices or policies
of a different manner or other actions that ameliorate the adverse disparate impact.

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                    05/18/2023

    (a)    permit conditions necessary to assure compliance with Title VI[18] including but not limited to;

        (i)    enhanced compliance assurance permit provisions, including but not limited to monitoring, recordkeeping and reporting to assure the facility is meeting its permitted limits and following industry best practices;

        (ii)    enforceable permit conditions to reflect modeling assumptions on which a compliance demonstration was based (*e.g.*, hours or mode of operation);

> **Commented [OM8]: LDEQ:** we accepted your proposed wording.

    (b)    alternative sites and alternative projects;

    (c)    require an enhanced fugitive emissions detection and repair program for pollutants of concern;

> **Commented [OM9]: LDEQ:** we accepted your proposed language

    (d)    require an odor monitoring and response program/plan to address third-party complaints;

> **Commented [OM10]: LDEQ:** we accepted your proposed wording

    (e)    evaluate whether a proposed permit warrants air quality modeling scrutiny as part of the permit review, particularly where community has experienced historical impacts from existing or recently constructed projects;

    (f)    implement appropriate pollution prevention techniques;

    (g)    Notify other governmental agencies who have authority to take action to reduce the adverse disparate impacts.

    (h)    develop new and revised regulations that consider sources contributing to local impacts;

    (i)    prioritizing grant funding for projects that reduce emissions in impacted areas;

---

[18] R.S. 30:2011 "(D) The secretary shall have the following powers and duties: . . .(2) The secretary shall have the general power to require such conditions in individual instances as are necessary to assure compliance with applicable federal laws and regulations relating to this Subtitle. In those instances in which a permit or license is required prior to construction of a new or modified facility, the secretary may issue construction authorizations prior to issuance of a permit in appropriate circumstances where there is a positive human health or environmental benefit. . ."

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                    05/18/2023

(j)    enforceable agreements (*e.g.,* community benefit agreements);

(k)    permit denial;

(l)    permit conditions to reduce impacts (*e.g.,* reduced hours of operation; reduced through put) or reopen permit which take immediate effect if evaluation in paragraph X below demonstrates the mitigation measures did not adequately address the adverse disparate impacts; and

(m)    prioritizing compliance inspections and any resulting enforcement initiatives for the facility and/or other sources contributing to the identified adverse disparate impacts.

j)    identify indicators and implement methods to track progress on reaching implementation goals within a reasonable time frame and the thresholds for follow up actions if goals are not achieved in the specified time frame including:

(1)    increased emissions monitoring;

(2)    inspections;

(3)    review of records and monitoring reports;

(4)    health monitoring;

(5)    community based participatory research; and

(6)    special studies to measure and model local pollution impacts which could include collaboration with other State and Federal agencies.

k)    take appropriate immediate remedial action if the evaluation in paragraph j demonstrates that the mitigation measures did not perform as projected. Remedial measures may include but are not limited to:

(1)    reopen the permit;

11

(2)    prioritize compliance inspections and any resulting enforcement initiatives for the facility and/or other sources contributing to the identified adverse disparate impacts;

(3)    implement additional permit conditions designed to reduce the adverse disparate impacts identified but whose operation was contingent upon finding from the evaluation in paragraph 9. e. below that the mitigation measures implemented did not perform as projected; and

(4)    require conditions on permits of other facilities contributing to the adverse disparate impacts.

2.    LDEQ will conduct the Process to Identify and Address Potential Adverse Disparate Effects of Air Permitting Decisions in Section II. A. for the following types of air permit applications:

a)    New major source as defined at LAC 33:III.502;

b)    New major stationary source or major modification as defined at LAC 33:III.509;

c)    New facility with proposed facility-wide emissions greater than 80% of the relevant major source threshold (synthetic minor source);

d)    Title V permit renewals that propose an allowable emissions increase greater than 80% of a major source threshold; and

e)    New air permits not listed in paragraphs i through iii; and a permit amendment; modification, or renewal for any permit:

(1)    where concerns about environmental justice issues or discriminatory impacts have been raised by the public;

(2)    in an identified area of concern (*e.g.,* area where LDEQ has received consistent odor complaints); or

(3)    for the type of facility that communities generally raise concerns about (*e.g.,* chemical plants, refineries, grain terminals).

**Commented [OM11]: LDEQ:** On the 3/2 call you said you would provide proposed language describing how LDEQ has or would define an area of concern (*e.g.,* would the whole Industrial Corridor be one of the areas of concern? Lake Charles? Baton Rouge? all designated industrial areas under RS 33:130.11?, identified through some other methodology?) and the process for the public to raise concerns especially if there is no notice or a comment period for a particular permit.

3.    Post Permitting Public Outreach

a)    Establishing a point of contact within LDEQ for the community;

12

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                        05/18/2023

     b)     Providing an explanation of requirements/enforceable provisions in the permit (e.g., monitoring, record keeping, web reporting);

     c)     Monitoring of all mitigation measures implemented but not included in the issued permit including those that require the participation of other federal, state, and local authorities;

     d)     Providing information as appropriate, about how community members can use that information to assess compliance;

     e)     Providing periodic public updates;

     f)     LDEQ will conduct ongoing public education and outreach through:

          (1)     Enviroschool training for the public on LDEQ's permitting procedures and how to engage in the permitting process;

          (2)     Periodic public meetings/listening sessions to be conducted in the Industrial Corridor; and

> **Commented [OM12]: LDEQ**: Please define periodic.

          (3)     Encouraging facilities to engage in community outreach through public meetings, formation of citizen advisory panels, etc.

4.     Due Dates for Section II A

     a)     Within 90 days of the effective date of this Agreement, LDEQ will submit to EPA for review and approval the draft process for its Process to Identify and Address Potential Adverse Disparate Effects of Air Permitting Decision (Title VI DI Analysis) in II. A. above.

     b)     Within 30 days of EPA approval of the draft Title VI DI Analysis, LDEQ will publish the draft Title VI DI Analysis for public comment.

     c)     Within 60 days of end of the public comment period LDEQ will submit to EPA a copy of all public comments received and the LDEQ draft response to public comments.

     d)     Within 30 days EPA will provide any comments to the draft response to comments.

     e)     Within 30 days of receipt of EPA comments, LDEQ will submit to EPA its final draft of the Title VI DI Analysis for approval.

Informal Resolution Agreement                           PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              05/18/2023

      f)     Within 30 days of approval by EPA, LDEQ will publish the final Title VI DI Analysis on its Air Permitting webpage with links to the webpage with LDEQ's Title VI information (*e.g.,* grievance procedures, LEP plan). website.

      g)     Within 60 days of EPA approval of the Title VI DI Analysis, LDEQ will submit the materials developed to train LDEQ employees on the Title VI DI Analysis.

      h)     Within 30 days of submitting the training materials, LDEQ will provide EPA with the dates the training was provided to current LDEQ employees and confirmation that the training has been added to new employee training requirements.

5.     LDEQ will submit to EPA for review and approval changes to LDEQ's Title VI DI Analysis during the period of this Agreement.

      a)     Within 30 days EPA will provide any comments to the proposed changes.

      b)     LDEQ will publish the revised Title VI DI Analysis on its website.

6.     Evaluation of Implementation

      Annually for five years after the effective date of this Agreement, LDEQ shall submit to EPA and publish on its website an evaluation of the results of the implementation of the Title VI DI Analysis in its air permitting program.

B.     Cumulative Impacts Assessments

1.     Cumulative Impact Assessment for St. John the Baptist Parish

      a)     EPA will fund a cumulative impact assessment (CIA) for Reserve, St. John the Baptist Parish. The scope of the CIA includes characterizing community and environmental conditions with respect to exposures to chemical and non-chemical stressors and then developing recommendations of prioritized actions to manage the exposures and effects identified.

      b)     LDEQ commits to being part of the Cumulative Impact Assessment Working Group described below.

14

Informal Resolution Agreement                        PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                           05/18/2023

c)    The CIA will include the following elements and each element will be completed within the time frames identified below.

(1)    **Create foundation for success by strengthening relationships and trust among stakeholders through convening a working group and establishing a charter.**

(a)    EPA will hire an independent facilitator or use the services of the EPA Conflict Prevention and Resolution Center and establish a Cumulative Impact Assessment Working Group (CIAWG) and establish a workgroup charter.

(b)    The CIAWG will be comprised of an equitable representation of stakeholders that will oversee the CIA and will ensure that those who traditionally have had no voice in these processes are included. Consideration will be given to representation from community members from St. James Parish to the extent it assists in the CIA and may provide efficiencies for performance of the CIAs in both St. John the Baptist Parish and St. James Parish.

(c)    The charter will describe roles, responsibilities, goals of the CIA, deliverables beyond those required below, and timeline for those deliverables.

(d)    EPA, in consultation with the CIAWG, will establish a mechanism for providing the community of Reserve, and surrounding communities, notice of the upcoming CIA activities

(e)    Element 1 will be completed within 150 days from effective date of this agreement.

(2)    **Identify and come to consensus on boundaries of CIA project through scoping.**

(a)    The CIAWG will prioritize non-chemical and chemical exposures and effects of concern to evaluate in the assessment.

15

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

(b)      The CIAWG will develop a scoping document that will describe selected methods for conducting baseline and scenarios analyses. The scoping document will include a quality assurance, peer review project plan, and a communication plan for all aspects of the CIA including the scoping document and final report.

(c)      Element 2 will be completed within 120 days of the completion of Element 1.

(3)      **Determine current cumulative impacts and establish data for the baseline and decision alternatives through conducting CIA and preparing formal CIA report**.

(a)      The CIAWG will:

(i)      review and analyze available data to assess baseline exposures and effects of concern;

(ii)      identify decision alternatives for mitigation that address stakeholder goals and assess projected effectiveness of different decision alternatives for meeting those goals;

(iii)      produce a plain language report that includes purpose, analytical methods, prioritization of exposures and effects to mitigate, description of development and assessment of decision alternatives, and summary of the main findings; and

(iv)      post a draft report and underlying data for public review and comment.

(b)      The Element 3 final report that addresses public comments will be completed within 365 days from completion of Element 2.

(4)      **Identify feasible strategies to mitigate adverse impacts identified through CIA and develop recommendations**.

(a)      The CIAWG will:

16

(i)     develop clear criteria for evaluating the decision alternatives assessed in Element 3 to prioritize mitigation actions and implementation steps and estimated timelines; and

(ii)     post a draft recommendations report for public comment.

(b)     The Element 4 final report that addresses public comments will be completed within 120 days from completion of Element 3.

(5)     **Develop tenable plan and implement priority recommendations.**

(a)     LDEQ will work with EPA and other agencies and organizations, as appropriate, to develop an implementation plan based on which recommendations will be implemented.

(b)     EPA and LDEQ will post a draft implementation plan, including a timeline, for public comment.

(c)     The Element 5 final implementation plan that addresses public comments will be completed within 120 days from completion of Element 4.

(d)     LDEQ will implement final implementation plan.

17

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                    05/18/2023

    (6)    **Track progress on implementation and execute adaptive management approaches through evaluation strategy.**

        (a)    EPA and LDEQ will work with the CIAWG and other agencies and organizations, as appropriate, to draft a monitoring and adaptive management plan that will identify indicators and monitoring methods to track progress on reaching implementation goals, and triggers for follow up actions if goals are not going to be achieved in the specified timeframe.

        (b)    EPA, LDEQ, and the CIAWG will prepare annual written progress reports which will be made publicly available.

        (c)    The monitoring and adaptive management plan will be completed within 90 days from completion of Element 5.

2.    Cumulative Impact Assessment for St. James Parish

    a)    LDEQ will fund a cumulative impact assessment (CIA) for Welcome, St. James Parish.

    b)    The scope of the CIA includes characterizing community and environmental conditions with respect to exposures to chemical and non-chemical stressors and then developing recommendations of prioritized actions to manage the exposures and effects identified.

    c)    The CIA will include the following elements and each element will be completed within the time frame identified below.

    (1)    **Create foundation for success by strengthening relationships and trust among stakeholders through convening a working group and establishing a charter.**

        (a)    LDEQ will hire an independent facilitator and establish a Cumulative Impact Assessment Working Group (CIAWG) and with the CIAWG, establish a workgroup charter.

18

(b)     The CIAWG will be comprised of an equitable representation of stakeholders that will oversee the CIA and will ensure that those who traditionally have had no voice in these processes are included.

(c)     The charter will describe roles, responsibilities, goals of the CIA, deliverables beyond those required below, and timeline for those deliverables.

(d)     LDEQ in consultation with the CIAWG, will establish a mechanism for providing the community of Welcome, and surrounding communities, notice of the upcoming CIA activities

(e)     Element 1 will be completed within 150 days from effective date of this agreement.

(2)     **Identify and come to consensus on boundaries of CIA project through scoping.**

(a)     The CIAWG will:

(i)     prioritize non-chemical and chemical exposures and effects of concern to evaluate in the assessment; and

(ii)     develop a scoping document that will describe selected methods for conducting baseline and scenarios analyses. The scoping document will include a quality assurance, peer review project plan, and a communication plan for all aspects of the CIA including the scoping document and final report.

(b)     Element 2 will be completed within 120 days of the completion of Element 1.

(3)     **Determine current cumulative impacts and establish baseline data through conducting CIA and preparing formal CIA report.**

(a)     CIAWG will:

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                           05/18/2023

      (i)     review and analyze available data to assess baseline exposures and effects of concern;

      (ii)    identify decision alternatives for mitigation that address stakeholder goals and assess projected effectiveness of different decision alternatives for meeting those goals;

      (iii)   produce a plain language report that includes purpose, analytical methods, prioritization of exposures and effects to mitigate, development and assessment of decision alternatives, and summary of the main findings; and

(b)    LDEQ will post the draft report and underlying data for public review and comment on the LDEQ website.

(c)    The Element 3 final report that addresses public comments will be completed within 365 days from completion of Element 2.

(4)    **Identify feasible strategies to mitigate adverse impacts identified through CIA and develop recommendations**.

(a)    The CIAWG will develop clear criteria for evaluating the decision alternatives assessed in Element 3 to prioritize mitigation actions and implementation steps and estimated timelines.

(b)    LDEQ will post the draft recommendations report for public comment on the LDEQ website.

(c)    The Element 4 final report that addresses public comments will be completed within 120 days from completion of Element 3.

(5)    **Develop tenable plan and implement priority recommendations.**

(a)    LDEQ, EPA, and other agencies and organizations, as appropriate, will develop an implementation plan based on which recommendations will be implemented.

20

    (b)    LDEQ will post a draft implementation plan, including a timeline, for public comment on the LDEQ website.

    (c)    The Element 5 final implementation plan that addresses public comments will be completed within 120 days from completion of Element 4.

    (d)    LDEQ will implement final implementation plan.

  (6)    **Track progress on implementation and execute adaptive management approaches through evaluation strategy.**

    (a)    LDEQ will work with the CIAWG and other agencies and organizations, as appropriate, to draft a monitoring and adaptive management plan that will identify indicators and monitoring methods to track progress on reaching implementation goals, and triggers for follow up actions if goals are not going to be achieved in the specified timeframe.

    (b)    LDEQ and the CIAWG will prepare annual written progress reports which will be made publicly available via posting in the LDEQ website.

    (c)    The monitoring and adaptive management plan will be completed within 90 days from completion of Element 5.

3.    Industrial Corridor Parishes Screening Assessments

a)    Separate from and as a corollary to the Title VI DI Analysis performed on individual permits under Section II.A of this Agreement, LDEQ will conduct a screening assessment for each Parish within the Industrial Corridor (Parish-level Screening Assessments) with respect to existing conditions to identify communities potentially at risk of disproportionate adverse impacts.

b)    The Parish-level Screening Assessments will:

PRIVILEGED/DELIBERATIVE
05/18/2023

(1)     include characterizing communities with respect to the factors considered in the permit application screening process at the time the assessment is conducted and other community-identified human health, ecological, and vulnerability concerns;

(2)     solicit community input at the outset in order to receive suggestions from Parish residents as to factors to be considered during the screening process;

(3)     use EPA's EJ SCREEN, the Agency of Toxic Substances and Disease Registry's Environmental Justice Index, or other available tools. To the extent available, if there are additional environmental or health and disease data collected at the State, Parish, or community level, the assessment will also review such data; and

(4)     include a review of emission trends, modeling and monitoring results conducted within the Industrial Corridor.

c)     LDEQ will consult with LDH in conducting the Parish-level Screening Assessment.

d)     LDEQ will complete the Parish-level Screening Assessments within 180 days of the effective date of this Agreement.

e)     LDEQ will make the results of the Parish-level Screening Assessments available for public review and comment on the LDEQ website prior to finalizing each Parish-level Screening Assessment.

f)     LDEQ will issue a report describing the methodologies and data utilized in the Parish-level Screening Assessments and providing tabular and visually mapped identification of communities as potentially at risk.

4.     Cumulative Impact Assessments for the Industrial Corridor

a)     LDEQ commits to apply for Federal funding opportunities that may become available for conducting cumulative impact analyses in any of the Parishes within the Industrial Corridor. Funding opportunities include not only those offered to State agencies, but also those offered to State agencies in collaboration with community groups.

22

b)      Beginning within 180 days from the effective date of this Agreement and every 180 days thereafter, LDEQ will provide updates to EPA on its efforts to seek appropriate funding and technical assistance. Those updates shall include the specific steps that LDEQ has taken to secure funding or technical assistance, including designating a person responsible for identifying and applying for any appropriate funding or program identifying potential funding sources, and the status of any applications for those funding sources.

c)      This provision remains in effect for five years from the effective date of this Agreement.

C.      Community Meetings

1.      Within 60 days from the effective date of this Agreement, LDEQ will host four community meetings to discuss the commitments made by LDEQ in this Agreement as specified below:

a)      One meeting will be held in St. John the Baptist Parish as close to Reserve as possible;
b)      One meeting will be held in St. James Parish as close to Welcome as possible; and
c)      Two additional meetings will be held in other Parishes within the Industrial Corridor.

2.      At least 15 days in advance of the meeting in St. John the Baptist Parish, LDEQ will mail notice of the date, location, and time of the public meeting to the resident of Reserve, Louisiana and post it on LDEQ's public notice webpage and website calendar.

3.      At least 15 days in advance of the meeting in St. James Parish, LDEQ will mail notice of the date, location, and time of the public meeting to the resident of Welcome, Louisiana and post it on LDEQ's public notice webpage and website calendar.

4.      At least 15 days in advance of the meetings in paragraph II. C. 1. c., LDEQ will post notice of the date, location, and time of the public meetings on its public notice webpage and website calendar.

**Commented [OM13]: LDEQ:** EPA is willing to provide technical assistance as well as professional facilitation for these meetings.

**Commented [A14]:** Public venues do not always accommodate participation by virtual modes. If a meeting is held at LDEQ Galvez Conf Center, that meeting could also be virtual.

**Commented [OM15R14]: Is LDEQ saying** the only virtual meeting it could hold is in LDEQ Galvez Conf Center?  You can't host a virtual meeting anywhere else in the Corridor?  If not, then the 3rd should be at the Galvez Conf. Center which we hope is in Baton Rouge.  LDEQ should propose criteria for selecting the 4th location, maybe the most impacted area left or location that is not far from several Parishes.

**Commented [A16]:** Notice will be by LDEQ public notice webpage and website calendar.

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              05/18/2023

    5.    LDEQ will ensure that the selection of the meeting locations, dates, and
times will consider the availability and schedules of public transportation and
consideration of residents' work hours; and ensure that the location(s), dates, and
times will allow for meaningful participation/involvement by individuals with
limited English proficiency (LEP) and individuals with disabilities.

    6.    EPA is available to provide technical assistance to LDEQ to ensure the
meetings are meaningfully accessible to all residents.

D.    Scientific Integrity and Risk Communication

    1.    Within 30 days of the effective date of this Agreement, LDEQ will
appoint a Scientific Integrity Official to champion scientific integrity throughout
LDEQ. The Scientific Integrity Official will provide oversight for the
implementation of the Scientific Integrity Policy at LDEQ and is available to
address any questions or concerns regarding this policy and its implementation.

    2.    Within 150 days of the effective date of this Agreement, LDEQ will
submit a draft Scientific Integrity Policy to EPA to demonstrate that LDEQ will
require that the decision-making process is supported and driven by best available
science and in accordance with guidance of reputable scientific agencies,
including CDC, NIH, and ATSDR. EPA recommends that LDEQ model its
Scientific Integrity Policy on EPA's Scientific Integrity Policy found at
https://www.epa.gov/sites/default/files/2014-
02/documents/scientific_integrity_policy_2012.pdf. EPA will review the draft
Policy in accordance with Paragraph IV.C. of this Agreement.

    3.    LDEQ will issue its Scientific Integrity Policy within 20 days of final
approval by EPA in accordance with Paragraph IV.C. of this Agreement. The
Policy will apply to all LDEQ employees, including scientists, managers, and
political appointees, who will follow this policy when engaging in, supervising,
managing, or influencing scientific activities; communicating information in an
official capacity about LDEQ scientific activities; and utilizing scientific
information in making LDEQ policy or management decisions relevant to science
and health. In addition, all contractors, grantees, collaborators, and student
volunteers who engage in scientific activities are expected to uphold the standards
established by LDEQ Scientific Integrity policy.

    4.    Within 90 days of the adoption of LDEQ's Scientific Integrity, LDEQ will
provide EPA with a copy of any training materials, the dates the training was
provided to current LDEQ employees, and confirmation that the training has been
added to new employee training requirements.

E.    Risk Communication

24

**Commented [A17]:** This reference (II.A.1) is misplaced. Also, these meetings are to communicate elements of the IRA, not to communicate risk from air toxics.

**Commented [OM18R17]:** Agreed.

**Commented [OM19]: LDEQ:** These are the same revised Scientific Integrity provisions given to LDH. This section no longer includes the requirement for more than one Scientific Integrity Official (SIO) and the council of SIOs. We accepted some of your proposal regarding risk communication from the provision you suggested in lieu of the Scientific Integrity (SI) & Risk Communication sections; however, we have kept the SI provisions regarding an SIO, a written policy, & training.

**Commented [OM20]: LDEQ:** We adopted LDEQ's proposed language regarding a training module and no longer specifically require adoption of EPA's SALT framework.

PRIVILEGED/DELIBERATIVE
05/18/2023

1.  Within 60 days of the effective date of this Agreement, LDEQ will adopt EPA's SALT Framework: A Process Framework to Guide Risk Communication (https://www.epa.gov/risk-communication/salt-framework) or a comparable risk communication framework (LDEQ's Risk Communication Framework) and will provide confirmation of the adoption of the framework to EPA.

2.  Within 120 days of the adoption of LDEQ's Risk Communication Framework, LDEQ will provide EPA with a copy of any training materials, the dates the training was provided to current LDEQ employees, and confirmation that the training has been added to new employee training requirements.

F.  Air Emissions Monitoring

1.  For facilities that currently or propose to emit EtO LDEQ will incorporate into new permits or permit renewals a three-year fenceline monitoring requirement for those pollutants.

**Commented [OM21]: LDEQ:** The rule will not be finalized for a while and its final form is unknown. This provision provides for monitoring now. We have included a provision in the Background about the Denka chloroprene monitoring network which includes fenceline monitors. Would LDEQ commit to deploy the TLC or MAMLs to monitor EtO and other pollutant emissions levels (*e.g.*, H2S) of concern to residents in St. James, St. John the Baptist, and other communities near EtO emitters for meaningful periods of time in the meanwhile?

2.  LDEQ will seek to extend the total monitoring period for the Temporary Located Community (TLC) monitoring station referenced in St. James Parish paragraph I. N. above for an additional two years (March 2024 through February 2026) above, through grant funding, permitting, or enforcement activities.

3.  LDEQ will conduct at least three monitoring events in the Industrial Corridor each year for the next three fiscal years (July 1, 2023, through June 30, 2026) using its Mobile Air Monitoring Labs (MAML).

4.  LDEQ will conduct a public engagement process prior to making decisions that impact the placement, length of time the TLC and MAML monitors will be in place, and monitoring parameters (*e.g.,* NO2, PM2.5, H2S, SO2, Methane/NMOC, THC, VOCs including HAP and ozone precursors) for the monitoring described in paragraph G. 2 and 3 above.

**Commented [OM22]: LDEQ:** Inserted to address resident concerns raised on several occasions about the location of monitors, pollutants LDEQ chose not to monitor, and the duration.

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

5.      LDEQ commits to apply for Federal funding opportunities that may become available for air emissions monitoring in any of the Parishes within the Industrial Corridor. Funding opportunities include not only those offered to State agencies, but also those offered to State agencies in collaboration with community groups.

6.      Beginning within 180 days from the effective date of this Agreement and every 180 days thereafter, LDEQ will provide updates to EPA on its efforts to seek appropriate funding. Those updates shall include the specific steps that LDEQ has taken to secure funding, including designating a person responsible for identifying and applying for any appropriate funding or program identifying potential funding sources, and the status of any applications for those funding sources,

7.      This provision remains in effect for three years from the effective date of this Agreement.

G.      Actions to Related to Denka

1.      LDEQ will issue the proposed Title V renewal permits for public comment for the Denka Chloroprene Unit, Neoprene Unit, and HCl Recovery Unit within 90 days after the conclusion of the CIA in section II. B. above. The proposed renewal permits will incorporate the following permit revisions:

        a)      Emission limits for chloroprene based on the controls and emission reduction projects implemented under the 2017 LDEQ Administrative Order on Consent (AOC);

        b)      Any additional emission reductions achieved by Denka since implementation of the 2017 AOC;

        c)      Compliance assurance measures, which may include emissions testing, emissions and/or operating parameter monitoring, recordkeeping and reporting to demonstrate ongoing compliance with chloroprene emission limits;

        d)      Any planned or ongoing emission reduction projects or changes to work practice standards required by final and effective enforcement actions or agreed to under any settlement or administrative order, with the associated compliance schedule;

        e)      All federally applicable requirements (as defined at LAC 33.III.502), including applicable technology-based emission limitations, work practice standards, and monitoring requirements;

26

f)    Any final and effective revisions to any federally applicable requirement with future compliance dates; and

g)    Any recommendations to LDEQ from the final CIA implementation plan in paragraph II. B. related to the permits for the Denka facility.

2.    LDEQ's public notice and comment process on the Denka Title V permit renewals will follow LDEQ's Title V public participation requirements and will meet any applicable procedural requirements under the Public Participation Plan, Language Access Plan, and Disability Access Plan adopted pursuant to commitments in Section III below.

3.    LDEQ will for the next 5 years update its webpage "Denka: The Path Forward" with a summary of all inspections and enforcement actions taken at the Denka facility including links to relevant documents in EDMS. Summaries will be posted within 30 days of completion of the inspection or enforcement activity.

H.    Updating LDEQ's Ambient Air Standards (AAS)

LDEQ will develop a process to update LDEQ's current Ambient Air Standards (AAS); to regularly update the AAS; and to add chronic standards beginning with mercury and hydrogen sulfide. When considering data for both acute and chronic standards, LDEQ will use the best available data (*e.g.,* for chronic standards utilize U.S. EPA Reference Concentrations (RfCs) or Inhalation Unit Risks (IURs)). Within 180 days of the effective date of this Agreement, LDEQ will provide EPA confirmation of the adoption of this process.

I.    Modelling of Emissions in St. James and St. John the Baptist Parishes

1.    Within XX days of the effective date of this Agreement, LDEQ will conduct HEMS modelling of EtO and chloroprene emissions from facilities in St. James and St. John the Baptist Parishes.

2.    Within 90 days of completing the HEMS modelling in paragraph II. I. 1. above, LDEQ will provide a risk communication presentation about the results of the HEMS modelling to residents and Parish government agencies including school boards.

J.    Public Engagement

**Commented [OM23]:** LDEQ: We added in recognition of information is in EDMS while addressing community concerns about timely information using LDEQ's existing Denka webpage.

**Commented [OM24]:** LDEQ: EPA's draft provision did not presume any outcome as bullet 2 stated nor does the provision make LDEQ's program subject to EPA oversight through the IRA. The provision says LDEQ will come up with a plan to update now, regularly update, & send us a copy of the plan.

**Commented [A25]:** ● LDEQ's Air Toxics Program is a state program, adopted and implemented under state authority. It is not a SIP program subject to EPA oversight. LDEQ will not render the program subject to EPA oversight through the IRA.
● LDEQ AAS are adopted by rule in accordance with the Administrative Procedures Act. LDEQ cannot and will not presume the outcome of any rulemaking.
● If undertaking any rulemaking to revise or add new AAS, LDEQ would rely on the best available data at the time of the rulemaking.

**Commented [A26]:** LDEQ will not agree to HEM4 modeling of ethylene oxide and chloroprene emissions.
● EJScreen incorporates the results of AirToxScreen, which in turn utilizes HAPEM, not HEM, to estimate exposure and risk.
● EPA has (presumably) modeled estimated risks for ethylene oxide and chloroprene emitting facilities, including those in St. James and St. John the Baptist, in conducting the residual risk reviews required under the CAA. These rule revisions, with results of the risk estimates, are to be proposed in March 2023.
● EPA IURs for both ethylene oxide and chloroprene are currently subject to court challenge.

**Commented [OM27]:** LDEQ: Would LDEQ commit to deploy the TLC or MAMLs to monitor EtO and other pollutant emissions levels (*e.g.,* H2S) of concern to residents in St. James, St. John the Baptist, and other communities near EtO emitters for meaningful periods of time in the meanwhile?

**Commented [A28]:** Propose this entire section be eliminated. Public engagement has been addressed in other sections of the draft IRA.

27

Informal Resolution Agreement                              PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                              05/18/2023

1.    LDEQ's practice is to include all meeting records and written communication in the Electronic Data Management System (EDMS) file for the regulated facility. LDEQ will ensure that this includes notes of meetings or other oral communication with permit applicants and written communication and other outside parties regarding permit applications that are releasable under Louisiana Open Records law (*e.g.,* applicant's comments on draft permit monitoring terms and conditions, emissions limitations).

2.    LDEQ will post relevant Title V permit files on its website at least 45 days before a draft Title V permit is published for comment.

3.    LDEQ will provide a link on its Website Homepage to its spreadsheet of all air permit applications received and pending which includes minor source applications.

4.    Within 180 days, LDEQ will develop and implement a policy to provide public notice and comment for minor source permit applications:

    a)    where concerns about environmental justice issues or discriminatory impacts have been raised by the public;

    b)    in an identified area of concern (e.g., area where LDEQ has received consistent odor complaints); and

    c)    for the type of facility that communities generally raise concerns about (e.g., chemical plants, refineries, grain terminals).

5.    LDEQ's public notice and comment and public hearing on draft Title V and minor source permits will follow LDEQ's Title V public participation requirements and will meet any applicable procedural requirements under the Public Participation Plan, Language Access Plan, and Disability Access Plan adopted pursuant to Section III below.

## III.    COMMITMENTS REGARDING LDEQ'S PROCEDURAL SAFEGUARDS (ISSUE 2)

A.    LDEQ agrees to the following commitments:

1.    Notice of Non-Discrimination under the Federal Non-Discrimination Laws[19]

---

[19] 40 C.F.R. §7.95

28

**Commented [A29]:** It is already LDEQ's practice to include all meeting records and written communication in the EDMS file for the regulated facility.

**Commented [OM30R29]:** We incorporated LDEQ's statement about what it already does.  Complainants raised concerns that not all information regarding meetings & oral communications were included in the record. This just spells out that LDEQ already does this.

**Commented [A31]:** This is not a reasonable timeframe. However, a list of all permit applications received by the Department is maintained on LDEQ's website per the statutory requirement in La. R.S. 30:2022.1, and any interested person may request to receive monthly email notifications from the Department regarding applications received.

**Commented [OM32R31]:** What is a reasonable timeframe?

**Commented [A33]:** As noted in our response, we already have a spreadsheet on our website of all applications received and pending which includes minor source applications. We don't need to agree to anything further on this.

**Commented [OM34R33]:** We tried to find the spreadsheet LDEQ refers to in its website & were unsuccessful. Proposed provision is a compromise to our provision:
LDEQ will notify the public via LDEQ's website when it receives a minor source permit application for which LDEQ regulations do not require public notice and comment..

**Commented [A35]:** No, we will not agree to this.

**Commented [OM36]: LDEQ:** In discussions you stated you have discretion & would consider doing more for permits that don't usually have public notice & comment:
• where concerns about environmental justice issues or discriminatory impacts have been raised by the public;
• in an identified area of concern (*e.g.,* area where LDEQ has received consistent odor complaints); and
• for the type of facility that communities generally raise concerns about (*e.g.,* chemical plants, refineries, grain terminals).

**Commented [OM37]:** Tracks language LDEQ provided above about Denka Title V renewal permit process.

**Commented [A38]:** DELETE FROM DOCUMENT-LDEQ already makes the necessary non-discrimination notices as required under both state and federal law.  See Notice of Nondiscrimination | Louisiana Department of Environmental Quality

**Commented [A39R38]: LDEQ:** EPA restored Section III, previously struck in full by LDEQ. As explained during our conversations with LDEQ, LDEQ is not meeting these procedural requirements.

Informal Resolution Agreement                PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                      05/18/2023

a)    LDEQ will post a notice of non-Discrimination (Notice) on LDEQ's website homepage, in all LDEQ's offices and facilities, and in future general publications that are distributed to the public (e.g., public outreach materials, such as brochures, notices, fact sheets or other information on rights and services; applications or forms to participate in or access LDEQ programs, processes or activities). LDEQ will ensure that its Notice is accessible to individuals with limited-English proficiency (LEP) and individuals with disabilities, including ensuring that the Notice as posted on its Website Homepage is accessible to persons who are blind or have low vision.

b)    The Notice will contain, at a minimum, the following recommended text:

(1)    LDEQ does not discriminate on the basis of race, color, national origin (including limited English proficiency), disability, age, or sex in administration of its programs or activities.

(2)    For LDEQ programs that are covered by 40 C.F.R. Parts 5 and 7, the notice shall also contain text that LDEQ does not intimidate or retaliate against any individual or group because they have exercised their rights to participate in or oppose actions protected/prohibited by 40 C.F.R. Parts 5 and 7, or for the purpose of interfering with such rights.

(3)    [Insert name and title of non-discrimination coordinator] is responsible for coordination of compliance efforts and receipt of inquiries concerning non-discrimination requirements implemented by 40 C.F.R. Parts 5 and 7 (Non-Discrimination in Programs or Activities Receiving Federal Assistance from the Environmental Protection Agency), including Title VI of the Civil Rights Act of 1964, as amended; Section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975; Title IX of the Education Amendments of 1972; and Section 13 of the Federal Water Pollution Control Act Amendments of 1972 (hereinafter referred to collectively as the federal non-discrimination laws).

**Commented [A40]:** Prominent Posting and Accessibility: Will LDEQ commit to prominently posting its Notice? Will LDEQ commit to ensuring the Notice is meaningfully accessible to persons with LEP (in all appropriate languages) and persons with disabilities?

This Notice is not prominently posted on the LDEQ homepage. It must be searched in order to be found.

Prominent Posting (virtually) can be accomplished by placing a visible link to LDEQ's Nondiscrimination page **on the homepage** to provide access for the public.

This link must be accessible to persons with LEP (in all appropriate languages) and to persons with disabilities.

The Nondiscrimination Page should include all relevant information for the public including: 1. Notice of Nondiscrimination (including Nondiscrimination Coordinator information), 2. Grievance Procedures, 3. Complaint Forms, if used, 4. Language Access Plan, 5. Public Participation Plan.

**Commented [A41]:** The webpage where this document is included (and the entire LDEQ website) do not have any information or accessibility aid for individuals with disabilities.

29

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

(4)    If you have any questions about this notice or any of LDEQ's non-discrimination programs, policies or procedures, you may contact:

    (a)    (Name)
    (b)    (Position)
    (c)    (Organization/Department)
    (d)    (Address)
    (e)    (Phone Number)
    (f)    (Email)

(5)    If you believe that you have been discriminated against with respect to an LDEQ program or activity, you may contact the [insert title of non-discrimination coordinator] identified above or visit our website at [insert Recipient website address] to learn how and where to file a complaint of discrimination.

c)    Within 30 days after the effective date of this Agreement, LDEQ will submit to the EPA for review a draft copy of its Notice of Non-Discrimination that is consistent with 40 C.F.R. Parts 5 and 7. EPA's review of the draft Notice of Non-Discrimination will be in accordance with Paragraph IV.C. of this Agreement.  Following final approval by EPA, LDEQ will prominently publish in print and on its website the Notice of Non-Discrimination.

d)    If the identity of the Non-Discrimination Coordinator changes, then LDEQ will promptly update materials as appropriate.

2.    Grievance Procedures to Process Discrimination Complaints filed under the Federal Non-Discrimination Laws[20]

a)    LDEQ will post Grievance Procedures to promptly and fairly process and resolve discrimination complaints filed under federal non-discrimination statutes and, where applicable, the EPA's implementing regulations at 40 C.F.R. Parts 5 and 7 on LDEQ's website homepage(s), in all LDEQ's offices and facilities, and in its general publications as appropriate that are distributed to the public. LDEQ will ensure that its Grievance Procedures are accessible to individuals with LEP and individuals with disabilities, including ensuring that the Grievance Procedures posted on LDEQ's Website Homepage is accessible to individuals who are blind or have low vision.

---

[20] 40 C.F.R. §7.90

30

---

**Commented [A42]:** Currently, your notice names Roger Ward and lists his position as "LDEQ Ombudsman." Although I understand you expressly named him as the Nondiscrimination Coordinator in an earlier paragraph, for clarity, his role as "Nondiscrimination Coordinator" should be listed here.

**Commented [A43]:** Will LDEQ commit to placing all relevant nondiscrimination materials on the same "Nondiscrimination" page?

The Notice concludes with the following sentence: "or visit LDEQ's website to learn how and where to file a complaint of nondiscrimination." Where is this directing complainants to go? https://www.deq.louisiana.gov/page/notice-of-nondiscrimination

**Commented [A44]:** DELETE FROM DOCUMENT- LDEQ already has such a grievance procedure.  See Microsoft Word - TITLE VI Grievance Procedure Revised.docx (louisiana.gov)

**Commented [A45R44]:** Is LDEQ willing to revise its Grievance Procedures as described below, prominently post, and make accessible to individuals with LEP and individuals with disabilities?

I have identified omissions and required language additions in the current Grievance Procedures, below.

**Commented [A46]:** Prompt and fair Grievance Procedures (GPs), Prominent Posting, and Accessibility: Will LDEQ commit to 1) revising its current GPs to reflect critical information outlined below, 2) post it prominently on its webpage, and 3) ensure it is accessible to persons with LEP and persons with disabilities?  See also https://www.epa.gov/system/files/documents/2023-01/Form%204700-4%20Technical%20Assistance%20-%20Grievance%20Procedures.pdf

LDEQ's GPs are not complete, prominently posted or accessible. (LDEQ should create one "Nondiscrimination" page for all of its documents.)

The Nondiscrimination Page should include all relevant information for the public including: 1. Notice of Nondiscrimination (including Nondiscrimination Coordinator information), 2. Grievance Procedures – clearly spelling out basis for discrimination, who will investigate, etc. 3. Complaint Forms – LDEQ refers to an "Ombudsman" form which is not identified as a discrimination comple... [1]

**Commented [A47]:** LEP and Disability Access:

This is considered a vital document. It is a necessary component of LDEQ's nondiscrimination program but is not readily available in English and not at all available in any language other than English. LDEQ must translate all vital written materials into the language of each frequently-encountered LEP group eligible to be served and/or likely to be affected by the recipient's program. ... [2]

Informal Resolution Agreement                          PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                          05/18/2023

b)    The Grievance Procedures will:

(1)    Clearly identify the Non-Discrimination Coordinator, including name and contact information;

(2)    Explain the role of the Non-Discrimination Coordinator relative to the coordination and oversight of the Grievance Procedures;

(3)    State who may file a complaint under the Grievance Procedures and describe the appropriate bases for filing a complaint;

(4)    Describe the processes available for filing complaints;

(5)    State that the preponderance of the evidence standard will be applied during the analysis of the complaint;

(6)    Contain assurances that intimidation and retaliation are prohibited and that claims of intimidation and retaliation will be handled promptly and fairly pursuant to your Grievance Procedures in the same manner as other claims of discrimination;

(7)    Assure the prompt and fair resolution of complaints which allege violations of federal non-discrimination laws;

(8)    State that written notice will be promptly provided about the outcome of the investigation, including whether discrimination is found and the description of the investigation process.

(9)    Be reviewed on an annual basis (for both in-print and online materials), and revised as necessary, to ensure prompt and fair resolution of discrimination complaints.

c)    Within 120 days after the effective date of this Agreement, LDEQ will submit to EPA for review a draft copy of its Grievance Procedures. EPA will review the draft Grievance Procedures in accordance with Paragraph IV.C. of this Agreement. LDEQ will prominently publish in print and on its website the final Grievance Procedures in print and on its website.

31

**Commented [DL(48)]:** LDEQ:  We note that LDEQ's upcoming 5-year strategic plan says one of the metrics of The Office of the Secretary is:

Percent of responses by Ombudsman to complaints involving public participation and environmental justice within five business days.

https://deq.louisiana.gov/assets/docs/StrategicPlans/SPFY23-28.pdf

However, civil rights discrimination complaints/ Grievance Procedures are not mentioned. Do you intend to include the civil rights grievance procedures as well in this metric?

**Commented [A49]:** Will LDEQ commit to clarifying Mr. Ward's role?

Same feedback as the last section: Identify Roger Ward's role as Nondiscrimination Coordinator along with or instead of Ombudsman.

**Commented [A50]:** Mr. Ward's role is not clearly explained. Although Roger is included as a possible avenue to receive complaints, his role in the process is not clear.

**Commented [A51]:** There is a typo in the sentence describing "who may file." As for appropriate bases, there are several bases listed that are not linked with laws. For example, T6 will not cover religion or disability, etc. There should be clarity on the federal and state laws which allow for the protected bases LDEQ lists for filing a complaint.

**Commented [A52]:** There is mention of informal resolution as a reason not to investigate a claim but no explanation of the formal or informal resolution process.

**Commented [A53]:** There was no mention of the standard applied for investigation.

**Commented [A54]:** Will LDEQ commit to updating its GPs so as to cover all federally prohibited forms of discrimination by EPA recipients, including retaliation and intimidation?

There is no mention of intimidation and retaliation.

**Commented [A55]:** The grievance must include the appropriate nondiscrimination laws and regulation. (This section does not preclude LDEQ from also including its state laws and protected bases).

**Commented [A56]:** LDEQ's current policy states that written notice will be provided within 120 days of the resolution of the complaint but there is no indication that complainants will be provided a description of the investigation process.

**Commented [A57]:** This is not explicitly stated in the grievance procedures, LDEQ what is your practice for reviewing the grievance procedures?

PRIVILEGED/DELIBERATIVE
05/18/2023

3.   Designation of Non-Discrimination Coordinator[21]

   a)   LDEQ will designate at least one Non-Discrimination Coordinator to ensure compliance with the federal non-discrimination laws, who will:

      (1)   Provide information to individuals internally and externally that LDEQ does not discriminate on the basis of race, color, national origin, disability, age, or sex in the administration of LDEQ's programs or activities, and, where applicable, the EPA's implementing regulations at 40 C.F.R. Parts 5 and 7;

      (2)   Provide information to individuals both internally and externally that LDEQ does not intimidate or retaliate against any individual or group because they have exercised their rights to participate in or oppose actions protected/prohibited by 40 C.F.R. Parts 5 and 7, or for the purpose of interfering with such rights;

      (3)   Provide notice of LDEQ's grievance processes and the ability to file a discrimination complaint;

      (4)   Establish a mechanism (e.g., an investigation manual) for implementation of LDEQ's Grievance Procedures to ensure that all discrimination complaints filed with LDEQ under federal non-discrimination laws and the EPA implementing regulations 40 C.F.R. Parts 5 and 7 are processed promptly and fairly. One element of any policy and procedure or mechanism must include providing meaningful access for individuals with limited English proficiency and individuals with disabilities to LDEQ's programs and activities;

      (5)   Track all complaints filed with LDEQ under federal non-discrimination laws, in order to identify any patterns or systemic problems;

      (6)   Conduct semiannual reviews/analysis of all complaints filed with LDEQ under the federal non-discrimination laws, identified in 40 CFR Parts 5 and 7 to identify and address any patterns, systematic problems or any trends identified;

      (7)   Ensure that appropriate training is provided for LDEQ staff in the processes available to resolve complaints filed with LDEQ under federal non-discrimination laws;

---

[21] 40 C.F.R. §7.85(g)

32

**Commented [A58]:** DELETE FROM DOCUMENT- LDEQ already designates a non-discrimination coordinator.

**Commented [A59R58]:** But not appropriately so. See prior comments.

**Commented [A60]:** Is LDEQ willing to draft and implement the following job duties for LDEQ's designated Nondiscrimination Coordinator, including ensuring his role does not have a conflict of interest with any other role for the agency?

**Commented [A61]:** Roger Ward is the designated Nondiscrimination Coordinator.

EPA has worked with Recipients to ensure their Nondiscrimination Coordinators have clear job descriptions that incorporate the items listed here. LDEQ can use its own job description documents to include the items listed under Roger's work as a nondiscrimination coordinator. This document is not publicly posted like the other nondiscrimination deliverables, but it is an important part of the procedural safeguards for nondiscrimination programs.

Does Roger Ward's current job description include any of these items?

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                    05/18/2023

    (8)    Ensure that appropriate training is provided for LDEQ staff and all relevant contractors on LDEQ's non-discrimination policies and procedures, as well as the nature of LDEQ's obligation to comply with federal nondiscrimination laws;

    (9)    Ensure that complainants are updated on the progress of their complaints filed with LDEQ under federal non-discrimination laws and are promptly informed as to any determinations LDEQ has made;

    (10)    Undertake periodic evaluations of the efficacy of LDEQ's efforts to provide services, aids, benefits, and participation in any of LDEQ's programs or activities without regard to race, color, national origin, disability, age, sex or prior exercise of rights or opposition to actions protected under federal non-discrimination laws.

    (11)    Coordinate with the LDEQ's designated Point of Contact for completion of the Preaward Compliance Review Report for All Applicants and Recipients Requesting EPA Financial Assistance (Form 4700-4) to ensure that an accurate Form is submitted with applications for EPA assistance.

b)    The Non-Discrimination Coordinator will not have other responsibilities that create a conflict of interest (e.g., serving as LDEQ's Non-Discrimination Coordinator as well as its legal advisor or representative on civil rights issues).

c)    Within 90 days after the effective date of this Agreement, LDEQ will identify at least one individual who will serve as Non-Discrimination Coordinator(s) consistent with the regulatory requirements of 40 C.F.R. §5.135, §7.85(g), and §7.95(a).

d)    Within 90 days of appointment of a Non-Discrimination Coordinator, LDEQ will forward to EPA proof that the responsibilities have been included in the incumbent's statement of duties and that the incumbent has accepted the duties.

4.    Public Participation

a)    LDEQ understands that meaningful public participation consists of informing, consulting, and working with potentially affected communities at various stages of the environmental decision-making process to address their questions and concerns. Therefore, LDEQ will:

33

---

**Comments:**

**Commented [A62]:** For LDEQ: This new provision relates to the Form 4700-4 process.

**Commented [A63]:** There is no basis in law for this requirement.

**Commented [A64R63]:** It is ethically imperative that a Nondiscrimination Coordinator's role be separated from the role as an LDEQ legal advisor or representative. For example, you do not want the same person defending the agency to be the person providing information to complainants to file complaints against the agency. There needs to be separation for the integrity of the process. Otherwise this person may not be able to provide "fair and prompt" grievance procedure.

**Commented [A65]:** DELETE FROM DOCUMENT- LDEQ already has public participation procedures. Such procedures were upgraded as part of prior settlement agreements with EPA. Also, in cooperation with the Governor's Office of Emergency Preparedness, the State of Louisiana, including the LDEQ, has contingencies in place for the event of an emergency.

**Commented [A66R65]:** Will LDEQ commit to developing public participation plan/policy/procedures that are consistent with the civil rights requirements (accessible, available to the public, etc.)? See also guidance at: https://www.epa.gov/sites/default/files/2020-02/documents/title_vi_public_involvement_guidance_for_epa_recipients_2006.03.21.pdf

During our last call, Roger Ward acknowledged that LDEQ does not have a Public Participation Plan but is willing to draft and implement one. Is LDEQ willing to draft and implement a Public Participation Plan in accordance with the following provisions, prominently post, and ensure accessibility for individuals with LEP and individuals with disabilities?

Resending Guidance: https://www.federalregister.gov/documents/2006/03/21/06-2691/title-vi-public-involvement-guidance-for-epa-assistance-recipients-administering-environmental

**Commented [A67]:** Prominent Posting and Accessibility: Will DEQ commit to publishing on its website public participation plan/policy procedures that 1)Are accessible to persons with LEP, 2) persons with disabilities 2) that the plan/policy/procedures/ are implemented in a non-discriminatory manner?

When the Public Participation Plan is drafted, LDEQ should include it on a "Nondiscrimination" page for all of its documents.

The Nondiscrimination Page should include all relevant information for the public including: 1. Notice of Nondiscrimination (including Nondiscrimination Coordinator information), 2. Grievance Procedures, 3. ... [3]

(1)    Ensure that its public involvement process is available to all persons regardless of race, color, national origin, disability, age, sex, or prior exercise of rights protected, or opposition to actions prohibited, by 40 C.F.R. Parts 5 and 7 and the federal non-discrimination laws;

(2)    Ensure that the factors used to determine the appropriate time, place, location, duration, and security at public meetings are developed and applied in a non-discriminatory manner;

(3)    Develop, publicize, and implement written public participation procedures (consistent with the federal civil rights laws and the Title VI Public Involvement Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs (Recipient Guidance)[22]), that include implementation of the following steps for effective public participation that is accessible to all persons regardless of race, color, national origin (including LEP), disability, age, and sex each time LDEQ engages in a public participation or public involvement process:

(4)    Develop a description of the relevant/affected community based on the action being considered (including demographics, history, and background, for example/such as, percentage of the service area that is minority, has less than a high school education, has members of households who speak a language other than English and/or speak English less than very well, has a history of filing complaints, has an inability to access traditional communication channels or the internet);

(5)    Provide a contact list for relevant staff members on LDEQ's website, including phone numbers and email addresses, to allow the public to communicate via phone or internet;

(6)    Develop a list of past and present community concerns (including any complaints filed under the federal non-discrimination laws), and actions undertaken in response to such concerns;

(7)    Develop and implement a detailed plan of action (including outreach activities) LDEQ will take to address concerns raised by the public;

---

[22] 71 Fed. Reg. 14207 (March 21, 2006), available at https://www.epa.gov/sites/default/files/2020-02/documents/title_vi_public_involvement_guidance_for_epa_recipients_2006.03.21.pdf

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

(8)     Develop and implement a contingency plan for unexpected events that may impact public meetings or other public participation avenues;

(9)     Identify location(s) where public meetings will be held (considering the availability and schedules of public transportation), and ensure that the location(s) will allow for meaningful participation/involvement by individuals with LEP and individuals with disabilities;

(10)     Develop and maintain a list of contact names for obtaining reasonable accommodations at no cost for individuals with disabilities and language assistance services for limited-English proficient persons, including translation of documents and/or interpreters for meetings;

(11)     Develop and maintain a list of appropriate local media contacts (based on the cultural and linguistic needs of the community).

b)     LDEQ will, during times of national, state, or local emergency, ensure that any public meetings occurring virtually are held in such a manner as to ensure the meaningful participation/involvement of individuals with limited English proficiency and individuals with disabilities. LDEQ may seek technical assistance from EPA about how it may achieve this outcome.

c)     LDEQ will ensure that a Public Participation Plan is developed and prominently highlighted on the LDEQ website, which will explain how residents can participate in LDEQ's programs, activities, and services. LDEQ will also solicit and consider public input into development of the Public Participation Plan. This plan will also be posted in other publicly accessible locations such as local public libraries, and LDEQ will ensure that it incorporates the following elements:

(1)     A description of how LDEQ will meaningfully engage the public prior to and during LDEQ programs, activities, and services (e.g. how the public can request to participate during LDEQ public engagement opportunities such as public hearings, townhalls, etc., including criteria on how these events are determined);

35

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

(2)     A description of what methods LDEQ will implement to ensure the public can access publicly available information and documents regarding LDEQ programs, activities, and services, which includes providing clear instructions for public users on how and where to access LDEQ's electronic and hardcopy documents and information.

d)     The Non-Discrimination Coordinator(s) will ensure that appropriate LDEQ staff and all relevant contractors receive training in best practices related to public involvement in all processes undertaken by LDEQ that include public engagement.

e)     LDEQ will provide a mechanism for residents to access relevant hard copy information in a centralized public location near to a proposed LDEQ activity (e.g. proposed health report or study) in addition to providing the public with access to internet and digitally provided information relating to that activity;

f)     LDEQ will provide a mechanism for obtaining public feedback and answering inquiries about any information regarding a LDEQ activity or public health issue;

g)     Within 120 days of the effective date of this Agreement, LDEQ will prepare a draft copy of its Public Participation Plan(s). LDEQ will submit its draft Public Participation Plan(s), including a translated Public Participation Plan(s) in all appropriate languages, for public comment for thirty days. After the public comment period ends, LDEQ will review comments and finalize the Public Participation Plan(s) within 30 days and submit it to EPA for review in accordance with Paragraph IV.C. of this Agreement. Within 30 days of EPA's review, LDEQ will review and incorporate comments and will publish the final Public Participation Plan(s), translated in all appropriate languages, on its website and in print.

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6              05/18/2023

   h)   Within one year after the effective date of this Agreement, the
        Non-Discrimination Coordinator(s) will coordinate and host regional
        panels for each of the following parishes: St. John the Baptist Parish, St.
        James Parish, Ascension Parish, East Baton Rouge Parish, West Baton
        Rouge Parish, Iberville Parish, and St. Charles Parish. These panels will
        include representatives from communities affected by environmental and
        human health risks, and possibly a facilitator, to gather information from
        affected community members, including any expressions of community
        concerns, experiences, engagement needs and requests. LDEQ will
        prominently advertise requests for participation on these regional panels to
        interested community members and will publish a summary of the
        discussions, including recommendations for actions.

5.   LDEQ Plan to Ensure Meaningful Access to Programs and Activities for
     Persons with Limited English Proficiency (LEP) [23]

**Commented [A68]:** DELETE FROM DOCUMENT-
LDEQ has had a LEP policy in place since 2007.  Policy was
previously presented EPA for review during prior Title VI
complaint settlement processes.  There has been no change
in Title VI law since that time, so   LDEQ's position is that
it's LEP policy is adequate. LDEQ's LEP Policy can be
found on its website.  See LEP-Memo-McDaniel-2007.pdf
(louisiana.gov)   The LEP Policy also is accessible on
LDEQ's EDMS. See,
https://edms.deq.louisiana.gov/app/doc/view?doc=13636014

**Commented [A69R68]:** Based on my evaluation of
LDEQ's website and the nondiscrimination documents it
currently has available, LDEQ is not implementing the LEP
memo shared in its comment. The available
nondiscrimination documents and entire LDEQ website are
only accessible in English and do not have any information
about translation or interpretation in or into any other
language.

The 2007 Memorandum contemplates that there will be a
formal plan memorialized but it has not been updated, a
formal plan was not drafted, and the document in its current
form is not being implemented. LDEQ must create a formal
Language Access Plan (LAP) and LDEQ must implement
the LAP it creates. LAP plans must be updated routinely to
appropriately reflect changing population and language
needs. Louisiana's language needs now are different than
their language needs in 2007, but there is no indication in the
plan that LDEQ is routinely evaluating the publics language
access needs.

**Commented [A70]:** Will LDEQ commit to draft, and
implement a LAP in accordance with the provisions below,
prominently post, and ensure accessibility for individuals
with LEP (in all appropriate languages) and individuals with
disabilities? Also, see guidance at:
https://www.epa.gov/sites/default/files/2020-
02/documents/title_vi_lep_guidance_for_epa_recipients_200
4.06.25.pdf

---

[23] *See* Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000(d) (prohibiting discrimination on the basis of
national origin,) *Lau v Nichols 414 U.S. 563, 568-69* (1974) (finding that the government properly required language
services to be provided under a recipient's Title VI obligations not to discriminate based on national origin.) On
June 25, 2004, EPA issued Guidance to Environmental Protection Agency Financial Assistance Recipients
Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient
Persons (LEP Recipient Guidance). The LEP Recipient Guidance clarifies recipients' existing legal obligations to
provide meaningful access to limited English proficient persons in all programs and activities that receive federal
financial assistance from EPA. The LEP Recipient Guidance also provides a description of the factors recipients
should consider in fulfilling their responsibilities to persons with limited-English proficiency to ensure meaningful
access to recipients' programs and activities and the criteria EPA uses to evaluate whether recipients are in
compliance with Title VI and the Title VI implementing regulation. LEP Guidance, 69 FR 35602, 35606-
35607 (June 25, 2004), at https://www.govinfo.gov/content/pkg/FR-2004-06-25/pdf/04-14464.pdf; 40 C.F.R. §
7.35(a) (prohibiting discrimination on the basis of national origin in the programs or activities of a recipient of EPA
assistance).

37

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

a)      LDEQ will conduct an appropriate analysis as described in EPA's LEP Guidance, to identify the appropriate language groups and determine what language services or mix of language services LDEQ needs to provide (e.g., interpreters and translators), to ensure that individuals with limited-English proficiency can meaningfully participate in LDEQ's programs and activities.

> **Commented [A71]:** EPA Notes that:  LDEQ's website includes no information – whether environmental or civil rights information, in any language other than English. Also, the "LEP Memo" noted by LDEQ dates back to 2007 and, to be relevant, these plans must be periodically revised.
> .

b)      LDEQ will develop, publicize, and implement a written Language Access Plan to ensure meaningful access to all LDEQ services, programs and activities for individuals with LEP, at no cost to those individuals. LDEQ shall also solicit and consider public input into development of the Language Access Plan. LDEQ will:

(1)      Translate vital documents[24] of general interest into prominent languages for individuals with LEP who are served or likely to be encountered by LDEQ's programs and activities;

> **Commented [A72]:** LDEQ's Memo contemplates translating vital documents, but EPA cannot find any translated documents or evidence of implementation of the plan or execution of a four-factor analysis.

(2)      Translate vital documents of individual interest to a particular individual with LEP or group individuals with LEP (e.g., an individual or group of individuals with LEP wishing to file a grievance or complaint);

(3)      Provide for simultaneous oral interpretation of live proceedings (e.g., town hall meetings and public hearings) in prominent languages, and the ability for individuals with LEP to participate in those proceedings to the same extent as persons with English proficiency can participate; and

(4)      Provide for simultaneous interpretation of proceedings, meetings, etc., for an individual LEP person(s) participating in LDEQ programs or activities (e.g., an individual with LEP wishing to provide comments during a hearing).

> **Commented [A73]:** The memo briefly contemplates some interpretation services – but not in a way that ensures meaningful access. Also, EPA can find no evidence of any ionteretaion practice being implemented.

---

[24] Whether or not a document (or the information it disseminates or solicits) is "vital" may depend on the importance of the program, information, encounter or service involved, and the consequence to individual(s) with the LEP if the information in question is not provided accurately or in a timely manner. (*See* EPA's LEP Recipient Guidance).

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                    05/18/2023

    c)    Within 120 days of the effective date of this Agreement, LDEQ will prepare a draft copy of its Language Access Plan. LDEQ will then submit its draft Language Access Plan, including a translated Language Access Plan in all appropriate languages, for public comment for thirty days. After the public comment period ends, LDEQ will review comments and finalize the Language Access Plan within XX days and submit it to EPA for review in accordance with Paragraph IV.C. of this Agreement. Within 30 days of EPA's review, LDEQ will review and incorporate comments and LDEQ will publish the final Language Access Plan, translated in all appropriate languages, on its website and in print.

6.    LDEQ Plan to Ensure Meaningful Access to Programs and Activities for Persons with Disabilities[25]

    a)    LDEQ will develop, publicize and implement a Disability Access Plan to ensure meaningful access to all LDEQ programs, services and activities for individuals with disabilities.[26] As part of the development, LDEQ shall also solicit and consider public input into development of the Disability Access Plan.

    b)    LDEQ will provide, at no cost, auxiliary aids and services to individuals with disabilities, (including, but not limited to, for example, qualified interpreters to individuals who are deaf or hard of hearing, and to other individuals, as necessary), to ensure effective communication and an equal opportunity to participate fully in benefits, activities, programs, and services provided by LDEQ in a timely manner in such a way as to protect the privacy and independence of the individual.

    c)    LDEQ will ensure that its facilities and other facilities utilized by LDEQ (e.g. if LDEQ holds a public hearing at a school or recreational center) are physically accessible to, individuals with disabilities.

    d)    Within 120 days of the effective date of this Agreement, LDEQ will submit to EPA for review a draft copy of its Disability Access Plan. EPA will review the draft Disability Access Plan in accordance with Paragraph IV.C. of this Agreement. LDEQ will prominently publish in print and on its website the final Disability Access Plan.

---

[25] *See* 40 C.F.R. §§ 7.45 - 7.75; Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794(a). Section 504, and EPA's implementing regulation prohibit discrimination on the basis of disability in any programs or activities receiving federal financial assistance.

[26] *See* Disability Nondiscrimination Plan Sample, at https://www.epa.gov/sites/production/files/2020-02/documents/disability_nondiscrimination_plan_sample_for_recipients_2020.01.pdf

39

**Commented [A74]:** DELETE FORM DOCUMENT- LDEQ has an existing plan to ensure meaningful access to programs and activities for persons with disabilities. See https://intranet.deq.louisiana.gov/IntranetDEQ/Portals/0/Forms/Policies_Procedures/1041-16.pdf Further, LDEQ has added a link entitled "ADA and State of Louisiana Disability Resources" to its website. Louisiana has a Statewide ADA Coordinator through its Division of Administration. See https://doa.louisiana.gov/doa/office-of-state-ada-coordinator/

**Commented [A75R74]:** LDEQ I was unable to retrieve any information about LDEQ's Disability Policy in the links provided. There may be a typo in the first link, as it was broken and inaccessible.

I independently searched the LDEQ website but I was unable to identify an LDEQ disability policy.

**Commented [A76]:** Is LDEQ willing to draft and implement a Disability Policy in accordance with the provisions below, prominently post, and make accessible to individuals with LEP and individuals with disabilities? See also https://www.epa.gov/system/files/documents/2023-01/Disability%20Nondiscrimination%20Sample%20TA%20Policy.pdf

**Commented [A77]:** Is LDEQ willing to make the additions outlined below to the Notice of Nondiscrimination, prominently post a link on the homepage, and make this and the other required nondiscrimination documents accessible for individuals with LEP and individuals with disabilities?

See also the "Checklist" guidance which includes sample language for the Notice, at https://www.epa.gov/sites/default/files/2020-02/documents/procedural_safeguards_checklist_for_recipients_2020.01.pdf

Informal Resolution Agreement                                        PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                                        05/18/2023

7.    Training

a)    Within 60 days of the EPA approval of all other deliverables noted
throughout the Agreement, LDEQ will ensure all its staff and relevant
contractors have training on federal non-discrimination obligations and all
plans, policies and procedures created and implemented as part of this
Agreement. LDEQ may request assistance from EPA for any of the
training required in this Agreement, including having the training be
provided by EPA staff. LDEQ should consider the inclusion of community
representatives as a part of the staff training.  Following the training,
LDEQ will provide EPA with a copy of any training materials, a list of
staff who received the training and the dates the training was provided.

b)    Within 30 days of the initial training implemented following sub-
section 1 above, LDEQ will forward to EPA for review a draft plan for
ensuring that such training is also a routine part of the on-boarding process
for new employees and is given regularly as refresher training to all
employees and relevant contractors. EPA will review the draft training in
accordance with Paragraph IV.C. of this Agreement. LDEQ will forward a
final copy of the training plan to EPA and implement the above plan.

## IV.    GENERAL CONSIDERATIONS

A.    In consideration of LDEQ's implementation of commitments and actions
described in Sections II and III of this Agreement, EPA will end its investigation of
Complaint No. 02R-22-R6 and not issue a decision containing findings on the merits of
the complaint.

B.    EPA will monitor compliance with the commitments in Sections II and III of this
Agreement, as appropriate, to ensure they are fulfilled. Once the terms of this Agreement
are satisfied, EPA will issue a letter documenting completion of the commitments,
closure of its monitoring actions and closure of Complaint No. 02R-22-R6 as of the date
of that letter.

**Commented [A78]:** Is LDEQ willing to complete the above provisions in Section III and train all staff on the nondiscrimination materials as required in the provisions below?

**Commented [A79]:** What kind of non-discrimination does EPA envision.  Most training that the State of Louisiana offers to employees is developed and made available via its Comprehensive Public Training Program, most of which is online self-directed study.  Also, not all LDEQ staff has interaction with the regulated community.  (For example, mail room personnel, student workers).  Why would such training be needed?

**Commented [A80R79]:** LDEQ, these trainings must be conducted for all existing staff, relevant contractors, on an annual basis and all new and onboarded staff. Many recipients utilize their existing training systems to input and require the nondiscrimination training on an annual basis. When we get to this point, EPA can provide additional technical assistance and training materials for implementing this Section III.G. Also, EPA may be able to assist in delivering the training.

**Commented [A81]:** Reinstating all of these provisions.

40

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                    05/18/2023

C.      EPA will review and provide feedback about any documentation submitted by LDEQ demonstrating completion of each commitment and will provide an assessment, to include verbal and/or written feedback, as to whether the documentation satisfies the commitment within 30 days of receipt of each such submission. Following that, should there be negotiations and/or edits needed to address EPA's comments, the parties will resolve those within 30 days and LDEQ will finalize and submit the deliverable within this 30-day period.  This 30-day period for negotiations and edits may be extended if agreed to in writing by both the Deputy Assistant Administrator for External Civil Rights, Office of Environmental Justice and External Civil Rights, EPA, and the Secretary of LDEQ.

D.      EPA will, upon request, provide technical assistance to LDEQ regarding any of the civil rights obligations previously referenced. This may be in written or oral form.

## V.      COMPUTATION OF TIME AND NOTICE

A.      As used in this Agreement, "day" will mean a calendar day. In computing any period of time under this Agreement, where the last day would fall on a Saturday, Sunday, or federal holiday, the period will run until the close of business of the next working day.

B.      Service of any documents required by this Agreement may be made by electronic service as outlined below. Documents forwarded by email for review are to be sent in native format for draft documents and PDF format for documents intended to be final.

C.      Electronic documents submitted by LDEQ to the EPA via email will be sent to Lilian Dorka at Dorka.Lilian@epa.gov,  Anhthu Hoang at Hoang.Anhthu@epa.gov, and Zahra Khan at Khan.Zahra@epa.gov.

D.      Documents submitted by the EPA to LDEQ shall be sent via email to Courtney Burdette at Courtney.Burdette@la.gov, Jill Clark at Jill.Clark@la.gov, and Roger Ward at Roger.Ward@la.gov .

**Commented [A82]:** Contact information inserted.

E.      Either EPA or LDEQ may change the persons identified above in Paragraphs V.C. and V.D. by providing written notice of such change.

## VI.      EFFECT OF THE AGREEMENT

A.      LDEQ understands that, if necessary, EPA may visit LDEQ, interview staff, and request such additional reports or data as are necessary for EPA to determine whether LDEQ has fulfilled the terms of this Agreement.

41

Informal Resolution Agreement
EPA Complaints No. 01R-22-R6 and 04R-22-R6

PRIVILEGED/DELIBERATIVE
05/18/2023

B.      LDEQ understands that the EPA will not close its monitoring of this Agreement until EPA determines that LDEQ has fully complied with this Agreement and that a failure to satisfy any term in this agreement may result in the EPA re-opening an investigation.

C.      With the exception of the provisions of Paragraphs IV.C. and V.E., if either Party desires to modify any portion of this Agreement because of changed conditions making performance impractical or impossible, or due to material change to LDEQ's program or authorities, or for other good cause, the Party seeking a modification will promptly notify the other in writing, setting forth the facts and circumstances justifying the proposed modification. Any modification(s) to this Agreement will take effect only upon written agreement by the Secretary of LDEQ or their designee and the Deputy Assistant Administrator for External Civil Rights, Office of Environmental Justice and External Civil Rights, EPA.

D.      This Agreement constitutes the entire Agreement between LDEQ and EPA regarding the matters addressed herein, and no other statement, promise, or agreement, made by any other person will be construed to change any commitment or term of this Agreement, except as specifically agreed to by LDEQ and EPA in accordance with the provisions of Paragraph VI.C. above.

E.      This Agreement does not affect LDEQ's continuing responsibility to comply with Title VI or other federal nondiscrimination laws and the EPA's regulations at 40 C.F.R. Parts 5 and 7, nor does it affect EPA's investigation of any other Title VI or other federal civil rights complaints or address any other matter not covered by this Agreement.

F.      The effective date of this Agreement is the date by which both Parties have signed the Agreement. This Agreement may be signed in counterparts. The individuals signing this Agreement represent that they are authorized to execute this Agreement and legally bind the parties to the Agreement.

On Behalf of the Louisiana Department of Environmental Quality:

_____          _____
Roger W. Gingles, Secretary                              (Date)
Louisiana Department of Environmental Quality

42

Informal Resolution Agreement                    PRIVILEGED/DELIBERATIVE
EPA Complaints No. 01R-22-R6 and 04R-22-R6                        05/18/2023

On behalf of the Office of External Civil Rights Compliance, Office of Environmental Justice and External Civil Rights, U.S. Environmental Protection Agency:


_____          _____
Lilian S. Dorka                                (Date)
Deputy Assistant Administrator for Civil Rights
Office of Environmental Justice and External Civil Rights

43

| Page 30: [1] Commented [A46] | Author |
|---|---|

**Prompt and fair Grievance Procedures (GPs), Prominent Posting, and Accessibility:  Will LDEQ commit to 1) revising its current GPs to reflect critical information outlined below, 2) post it prominently on its webpage, and 3) ensure it is accessible to persons with LEP and persons with disabilities?  See also https://www.epa.gov/system/files/documents/2023-01/Form%204700-4%20Technical%20Assistance%20-%20Grievance%20Procedures.pdf**

LDEQ's GPs are not complete, prominently posted or accessible. (LDEQ should create one "Nondiscrimination" page for all of its documents.)

The Nondiscrimination Page should include all relevant information for the public including: 1. Notice of Nondiscrimination (including Nondiscrimination Coordinator information), 2. Grievance Procedures – clearly spelling out basis for discrimination, who will investigate, etc. 3. Complaint Forms – LDEQ refers to an "Ombudsman" form which is not identified as a discrimination complaint form, does not ask questions related to "discrimination", and thus, is confusing. 4. Language Access Plan, 5. Public Participation Plan.

| Page 30: [2] Commented [A47] | Author |
|---|---|

**LEP and Disability Access:**

This is considered a vital document. It is a necessary component of LDEQ's nondiscrimination program but is not readily available in English and not at all available in any language other than English. LDEQ must translate all vital written materials into the language of each frequently-encountered LEP group eligible to be served and/or likely to be affected by the recipient's program.

The webpage where this document is included does not have any information or accessibility aid for individuals with disabilities.

| Page 33: [3] Commented [A67] | Author |
|---|---|

**Prominent Posting and Accessibility: Will DEQ commit to publishing on its website public participation plan/policy procedures that**
   1) **Are accessible to persons with LEP, 2) persons with disabilities 2) that the plan/policy/procedures/ are implemented in a non-discriminatory manner?**

When the Public Participation Plan is drafted, LDEQ should include it on a "Nondiscrimination" page for all of its documents.

The Nondiscrimination Page should include all relevant information for the public including: 1. Notice of Nondiscrimination (including Nondiscrimination Coordinator information), 2. Grievance Procedures, 3. Complaint Forms, if used, 4. Language Access Plan, and 5. Public Participation Plan.