Exhibit 84



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1201 ELM STREET, SUITE 500
DALLAS, TEXAS 75270

June 16, 2023

Ms. Bliss M. Higgins, Assistant Administrator
Office of Environmental Services
Louisiana Department of Environmental Quality
P.O. Box 4313
Baton Rouge, LA  70821-4313

RE:   EPA Objection to Title V Operating Permit Number 3086-V10
        Nucor Steel Louisiana LLC; Convent, St. James Parish, Louisiana

Dear Ms. Higgins:

This letter is in response to the Louisiana Department of Environmental Quality (LDEQ) submittal to our office containing the proposed renewal of the title V permit for the Nucor Steel Louisiana, LLC (Nucor) Facility permit referenced above. The United States Environmental Protection Agency has a 45-day review period which began on May 5, 2023, and ends on June 20, 2023. We have reviewed the LDEQ's proposed title V permit action and Statement of Basis. In accordance with 40 CFR § 70.8(c) and 42 U.S.C. § 7661d(b)(1), EPA is objecting to the proposed permitting action. Section 505(b)(1) of the federal Clean Air Act (CAA, or the Act) requires EPA to object to the issuance of a proposed title V permit during its 45-day review period if EPA determines that the permit is not in compliance with applicable requirements of the Act or requirements under 40 CFR Part 70. The enclosure to this letter provides the specific reasons for each objection and a description of the terms and conditions that the permit must include to respond to the objection.

Section 505(c) of the Act and 40 CFR § 70.8(c)(4) provide that if the permitting authority fails, within 90 days of the date of the objection, to submit a permit revised to address the objections, then EPA will issue or deny the permit in accordance with the requirements of 40 CFR Part 71. Because the State must respond to our objection within 90 days, we suggest that the revised permit be submitted with sufficient advance notice so that any outstanding objection issues may be resolved prior to the expiration of the 90-day period.

EPA Region 6 has conducted an analysis using EPA's EJScreen to assess key demographic and environmental indicators within a five-kilometer radius of the Nucor Steel Facility. This analysis shows a total population of approximately 1,921 residents within a five-kilometer radius of the facility, of which approximately 1,649 or 86% are people of color, 47% are low income and 23% have less than a high school education. The air toxics cancer risk (lifetime risk per million) is 54, whereas the state risk is on average 40. In addition, the EPA reviewed the EJScreen EJ Indices, which combine certain demographic indicators with 12 environmental indicators. The results show that 6 of the EJ Indices in this five-kilometer radius area exceed the 80th percentile in the State of Louisiana, with 2 of the 12 EJ Indices exceeding the 90th percentile. As you are aware, the Nucor facility is in an area that is heavily populated by industrial facilities that can contribute to health disparities among the residents of the area.

Tools to address Environmental Justice concerns have been and continue to be developed by EPA to assist states and stakeholders in evaluating environmental justice. To fully assess equity considerations for overburdened communities during the permitting process, EPA believes that an EJ analysis should include input received from the community, an evaluation of existing environmental data, use of known demographic information, and other relevant information as much as possible. We encourage LDEQ to screen permitting actions for EJ concerns and to consider potential compliance issues related to civil rights of the communities potentially impacted early in the permitting process by utilizing EJScreen and knowledge of the impacted area. This screening will indicate whether a permitting decision has the potential to contribute to significant public health or environmental impacts, if the community may be particularly vulnerable to impacts from the proposed permit, and whether the community is already disproportionately impacted either by public health or environmental burdens. A sound screening practice will also provide important information as to whether there are residents of the affected community who could be disproportionately subjected to adverse health, environmental and/or quality of life impacts on the basis of income, national origin (including LEP status), or other demographic factors. LDEQ should take into consideration other permitted facilities in the area, including whether these facilities are major or minor sources of pollution and contribute to community risk. An area with an above average number of sources, especially if those sources are large or in close proximity to residents, is a sign of concern.

Finally, EPA notes that civil rights regulations prohibit state, local, or other entities that receive federal financial assistance, either directly or indirectly from EPA (recipients) from taking actions that are intentionally discriminatory as well as practices that have an unjustified discriminatory effect, including on the bases of race, color, or national origin. EJ and civil rights compliance are complementary. Integrating environmental justice in decision making and ensuring compliance with civil rights laws can, together, address the strong correlation between the distribution of environmental burdens and benefits and the racial and ethnic composition, as well as income level of communities. EPA is committed to advancing environmental justice and incorporating equity considerations into all aspects of our work. The title v process can allow public participation to serve as a motivating factor for applying closer scrutiny to a title v source's compliance with applicable CAA requirements. Communities can use the title v process to help ensure that each title v permit contains all of a source's applicable requirements, and other conditions necessary to assure the source's compliance with those requirements. When LDEQ responds to this EPA objection, please consider utilizing some form of enhanced public outreach to notify the public of the Executive Director's response to comments and opportunity to petition the EPA to object to the proposed permit.

We are committed to working with the LDEQ to ensure that the final title V permit issued to Nucor is consistent with all CAA applicable title V permitting requirements and the EPA approved Louisiana title V operating permitting program. If you have any questions or wish to discuss further, please contact me or your staff can contact either Cynthia Kaleri, Air Permits Section Supervisor at (214) 665-6772, or Brad Toups, Louisiana Permit Coordinator at (214) 665-7258. Thank you for your cooperation.

                                                                                                                          Sincerely,

DAVID GARCIA
Digitally signed by DAVID GARCIA
Date: 2023.06.16 08:33:20 -05'00'

David F. Garcia, P.E.
Director
Air and Radiation Division

Enclosure

# ENCLOSURE
## EPA Objections to LDEQ Title V Permit No. 3086-V10
### *Nucor Steel Louisiana LLC*

1. **Objection for Failure to Justify Use of AP-42 Emission Factors to Estimate Emissions**

A fundamental requirement of a title V permit is that it include all "testing, monitoring, reporting and record-keeping requirements sufficient to assure compliance with the terms and conditions of the permit, "40 CFR § 70.6(c)(1). The proposed title V renewal permit does not satisfy this requirement because it relies on EPA's AP-42, Compliance of Air Pollutant Emissions Factors (AP-42) to estimate and assess the facility's compliance with emissions limits and does not properly justify why the factors are representative of the facility's actual emissions.

In response to a commenter's concern (see two comments nos. 6 & 29) regarding the use of AP-42 emissions factors to estimate emissions for various processes, the Louisiana Department of Environmental Quality (LDEQ) response contained conclusive statements without providing adequate justification. This generalized response fails to provide the "legal and factual basis for use of AP-42 factors" as required by 40 CFR § 70.7(a)(5).

In response to comments on this issue, LDEQ stated:

> Notwithstanding the "Introduction to AP-42" or EPA's Enforcement Alert, EPA has consistently allowed the use of AP-42 factors to estimate potential emissions.
>
> EPA's "White Paper for Streamlined Development of Part 70 Permit Applications," dated July 10, 1995, states "the emissions factors contained in EPA's publication AP-42 and other EPA documents may be used to make any necessary calculation of emissions."71 EPA's draft New Source Review Workshop Manual also indicates that methods of estimating potential to emit may include AP-42 emission factors.72
>
> More recently, EPA has recognized that "the use of emissions factors has expanded beyond developing emissions inventories to other uses (*e.g.,* developing emissions limits for incorporation into New Source Review (NSR) and Title V operating permits, determining applicability to air pollution regulations, determining compliance with emissions standards, conducting air quality impact analyses, developing control strategies, and performing risk analyses (*i.e.,* section 112(f) residual risk requirements)).

Although LDEQ has cited two different EPA publications regarding the use of AP-42 emission factors, the response above does not provide the proper context and intent of the Enforcement Alert (i.e., Publication no. EPA 325-N-20-001 issued in November 2020 after the 1995 White Paper, and with specific intent to restrict the use of AP-42 emission factors when not appropriate). Therefore, EPA offers clarification that LDEQ should consider in setting renewal permit limits, and in responding to commenters.

The Enforcement Alert is self-explanatory in terms of EPA's position that emission factors (EFs) should only be used as a "last resort" for setting permit limits and the Alert even highlights language directly from the current AP-42 Manual (Ch 1 Introduction) about the values being only an average and of course dependent upon the specific type of process unit operations and control device(s) implemented for that unit – even acknowledging between-source variability within the main categories covered in the

Manual. Some permitting authorities have relied too heavily on EFs as the basis for initial permit limits, and a company may not be required to ground-truth actual emissions via specific engineering assessments, or even provide a manufacturer emissions guarantee for particular process units and controls in use as part of their permit application prior to required performance testing. Ultimately, the permitting authority does have the challenge of using the best data possible to establish permit limits and this really depends on the applicant providing representative emissions estimates based upon the specific configurations of Air Pollution Control Equipment (APCE) for various process units and operating conditions that are site-specific.

As a general example, EPA always prefers performance testing for combustion units and their APCE (including monitoring of process ancillary equipment operations during such tests), prior to setting permit limits or approving alternative monitoring plans – such testing being designed to demonstrate compliance using representative fuel and operating conditions, with the intent and consideration of exhibiting worst case emissions. EPA would point out that some heaters, engines, and even enclosed combustors (e.g., under NSPS Subpart OOOOa) have had rigorous emissions testing by the manufacturer and can provide an "emissions guarantee" that can be used where such testing has met certain established QA/QC criteria. However, we would point out that a vendor's marketing brochure may overstate emission reductions and is not a replacement for an emissions guarantee by the manufacturer. In fact, some permit applicants may also add excessive "compliance margins" or "safety factors" to emission limit calculations to determine potential to emit (PTE) of individual units. In such cases, the permitting authority needs to be aware that use of such inflated emission estimates is unacceptable for permitting purposes and can easily correct and document the correction in the permit record, prior to permit issuance.

RTC at 29. LDEQ also stated that:

> EPA has also recommended the use of AP-42 emission factors when site-specific data is not available.
>
> > When direct emission monitoring or site-specific emission factors are not available, then default emission factors may be the only way to estimate emissions. The EPA has developed emission factors for various types of combustion sources, which are compiled in AP-42. . . . The emission factors in AP-42 are the recommended default emission factors, and AP-42 should be consulted to obtain the appropriate emission factors for criteria pollutants such as SO2, NOX, PM, and CO

Again, EPA's AP-42 document describes various approaches to emission estimation and illustrates them in a hierarchical format. AP-42 emission factors may be used to estimate emissions in air permitting and other applications if applicants or permitting agencies demonstrate that data are lacking, and other preferred approaches are not available. EPA advised users to exercise professional judgement to verify that a particular emission factor is sufficiently representative of emissions from the activity or source to which it is to be applied. AP-42 states the following:

> Before simply applying AP-42 emission factors to predict emissions from new or proposed sources, or to make other source-specific emission assessments, the user should review the latest literature and technology to be aware of circumstances that might cause such sources to exhibit emission characteristics different from those of other, typical existing sources. Care should be taken to assure that the subject source type and design, controls, and raw material input are those of the source(s) analyzed to produce the emission factor,

While it can be acceptable for a Title V permit to rely on an emission factor for calculating a facility's emissions where continuous emissions monitoring is not required, the permitting authority must provide a reasonable explanation in the permit record for why the selected emission factor is sufficiently reflective of the facility's actual emissions to ensure continuous compliance with the relevant applicable requirement. See, e.g., In re Piedmont Green Power LLC, Order on Petition No. IV201502, at 15 (EPA, Dec. 13, 2016) ("Piedmont Green Power Order"); see also In re Tesoro Refining and Marketing Co., Order on Petition No. IX-2005-6, at 32–33 (EPA, Mar. 15, 2005) ("Tesoro Order"). No such explanation appears in the permit record for the Nucor's proposed title V permit.

An applicant should use the most representative emissions data when determining applicability, applying for a permit, or demonstrating compliance with permit limits. There are more accurate alternatives to AP-42 emission factors are available. For example, vendor guarantees and stack testing or Continuing Emissions Monitoring System (CEMS) data from similar process at other facilities.

Based on EPA's review of response to comment nos. 29 and 6, LDEQ has not justified its conclusion that AP-42 emission factors are appropriate to estimate emissions from Nucor's various processes, specifically for a renewal permit.

In responding to this objection, LDEQ should amend the permit and permit record as necessary and ensure that the record is complete by documenting a sufficient justification for the emission estimates in the permit record.

2. **Objection for Failure to Justify Use of Emission Factors Purported to be "Guarantees" from Vendors to Estimate Emissions**

During the public comment period for this proposed permit, one of the commentators in comment no. 30 pointed out that the permit application relies in many instances on emissions factors purported to be "guarantees" from vendors. Specifically, commentator pointed out that no specific documentation is provided supporting these guarantees, and importantly, the permit application and supporting documentations lacks any mention of any limitations that attach to such guaranteed, which are common – such as limiting vendor guarantees to specific process and operating conditions of the emissions units.

In response to a commenter's concern in comment no. 30 regarding the use of vendor guarantees for emissions factors to estimate emissions for various processes, LDEQ's response contained conclusive statements without providing justification. This generalized response fails to provide the "legal and factual basis for use of AP-42 factors as required by 40 CFR 70.7(a)(5).

In response to comments on this issue, LDEQ stated:

> LAC 33:III.517.D.9 requires an application for an air permit to contain "calculations on which the information in the application is based, provided in sufficient detail to allow a determination of the appropriateness and accuracy of such calculations."
>
> There are no federal or state regulations which require every variable or assumption therein to be substantiated by vendor documentation. However, a responsible official must certify (under penalty of law) that the statements and information contained in the application are "true, accurate, and complete,"[75] and a professional engineer must certify that "the engineering calculations . . . are true

and accurate." Thus, LDEQ is not persuaded that Nucor is misrepresenting the emission factors provided by equipment vendors or otherwise applying the emission factors to operational scenarios that they were not intended to address.

The permit records EPA reviewed do not contain information supporting the LDEQ's determination that vendor guarantees accurately determine emissions from Nucor's many emission units in terms of mass per unit of time and assure ongoing compliance with permitted emission limits. Where a title V permit allows a permit holder to use an emission factor to determine compliance with an applicable limit guaranteed by equipment vendors, the relevant emission factor must be listed in the permit application and permit documents. LDEQ and applicant failed to provide any technical support, design calculations or vendor literature certified by manufacturer of the equipment with test data to support its assumption that the stated emissions limit can be achieved while operating at certain operating conditions. Not only are the control efficiencies unsupported in the permit record, but the permit record does not provide design or operational limits to assure that any of these efficiencies are in fact achieved. For the PTE to be an enforceable limit, such design and operational parameters must be included in the Permit and documented in the permit record.

Based on EPA's review of response to comment nos. 30, LDEQ has not justified its conclusion that emission factors supplied by vendors under their guarantees are appropriate to estimate emissions and ensure appropriate permit limits have been developed for Nucor's many processes.

In responding to this objection, LDEQ should amend the permit and permit record as necessary and must ensure that the record is complete by documenting a sufficient justification for the emission estimates in the permit record including vendor suggested design and operation parameters along with any restrictions on physical and climate/weather related conditions.

3. **Objection for Failure to Justify Basis for Assumption of Control Efficiency above 99% for the Enclosed Conveying Systems for Material Handling**

As indicated in comment nos. 31 and 47, the application relies on engineering judgement, supported by no documentation or analysis for the calculation of fugitive particular matter control efficiency of 99.9% from conveyors. Not only are these control efficiencies unsupported by any evidence, vendor guarantees, or other documentation, but there are also no design or operational limits to assure that any of these efficiencies are in fact achieved. In order for the PTE to be an enforceable limit, such design and operational parameters must be included in the proposed title V permit. EPA does not consider a vendor guarantee alone to be sufficient justification that a control option will work. Generally, decisions about technical feasibility of the specific pollutant control will be based on chemical, and engineering analyses (as discussed above) in conjunction with information about vendor guarantees. Permitting authorities should ensure that the BACT requirements contained in the permits are supported and justified by the information and analysis presented in a thorough and complete permit record. The record should clearly explain the reasons for selection or rejection of possible control and emissions reductions options and include appropriate supporting analysis.[1]

---

[1] In re Knauf Fiber Glass, GmbH, 8 EAD. 121, 131 (EAB 1999) ("The BACT analysis is one of the most critical elements of the PSD permitting process. As such, it should be well documented in the administrative record."); In

*Enclosure – EPA Objections*
*LDEQ Title V Permit No. 3086-V10*                                                                 Page 5 of 7

In response to comments on this issue, LDEQ stated:

> The control efficiency of 99.9 percent is based on engineering judgment. The conveyor systems at the DRI Facility are enclosed on three sides, and all material drop, and transfer points are located within enclosed buildings. In addition, the iron ore transported along the receiving conveyors is wetted or treated with chemical dust suppressants to minimize fugitive emissions.

Based on EPA's review of response to comment nos. 31 and 47 and review of permit application (EDMS Document 1280367), LDEQ has not justified its conclusion that the 99.9% control efficiency relied on engineering judgement is based on any historical data collections, observations, or calculations. If these engineering judgements are being used to demonstrate compliance with short term and long-term PM limits, then this calculation methodology should be specified in the permit and supporting documents including any assumptions used. As with the BACT analysis, the entire process, including sources for data, assumptions and calculations made, and results must be summarized in a Technical Support Document (TSD), which is provided as part of a major PSD Permit Application.

In responding to this objection, LDEQ should amend the permit and permit record as necessary and must ensure that the record is complete by documenting a sufficient justification with engineering analysis and calculations for the proposed control efficiency in the permit record.

4. **Failure to Adequately Address EPA's Comments Provided to LDEQ about Authorizing Uncontrolled Emissions During Upsets Associated with Bypassing the SulfurOx Unit.**

As indicated in comment no. 49, EPA raised some concerns about emissions from Process Heater/Acid Gas absorption vent common stack (PH-1/AV-1). Specifically, in our comment EPA stated that "It would appear that in an endeavor to reduce upsets in the process, such as those associated with bypassing the SulfurOx Unit, the LDEQ is authorizing uncontrolled emissions, upsets if you will, of an indeterminant frequency. Such emissions include 226.9 lb/hr of H2S." EPA recommended that LDEQ consider mandating further engineering studies followed by permit modifications to eliminate these emissions events.

Authorizing uncontrolled emissions during upsets associated with bypassing the SulfurOx Unit and exemptions to comply with the BACT limit in the proposed title V permit violates the CAA requirement for emissions standards and limitations to apply continuously, including during startup, shutdown, and maintenance (SSM) events. A mere "general duty" to minimize emissions during SSM events violates the Act. See Sierra Club v. EPA, 551 F.3d 1019, 1028 (D.C. Cir. 2008) ("Because the general duty is the only standard that applies during SSM events— and accordingly no section 112 standard governs these events—the SSM exemption violates the CAA's requirement that some section 112 standard apply continuously."); see also EPA, State Implementation Plans: Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction, 80 Fed. Reg. 33840, 33976 ("In order to be permissible in a SIP, an

---

re Steel Dynamics, Inc. , 9 EAD. 165, 224-25 (EAB 2000) (remanding BACT limitation where permit issuer failed to provide adequate explanation for why limits deviated from those of other facilities).

emission limitation must be applicable to the source continuously, i.e., cannot include periods during which emissions from the source are legally or functionally exempt from regulation.").

Based on EPA's review of response to comment no. 49 and permit records, LDEQ has not addressed the content of the comment and recommendation submitted by EPA. Instead, the LDEQ concludes that the Nucor has undertaken all reasonable efforts to further reduce emissions from this source (PH-1/AV-1). Facilities cannot avoid continuous compliance with an emission limit in the permit by complying with other work-practice standards if those standards do not assure compliance with the applicable permit limit. LDEQ did not provide a direct response to EPA's comment and recommendations, instead only a reference back to the Consolidated Compliance Order & Notice of Potential Penalty AE-CN-19-01088. However, such reference does not address EPA's comments and recommendations on this topic.

In responding to this objection, LDEQ should amend the permit and permit record as necessary and must ensure that the record is complete by documenting a sufficient justification with engineering analysis in the permit record to address EPA's concerns about upsets emissions.

5. **Failure to Limit Sulfur Content in the Natural Gas Fuel and Iron Ore, and Lack of Monitoring and Recordkeeping Requirements to Demonstrate Compliance with Permit Limits**

All sources subject to title V must have a permit to operate that "assures compliance by the source with all applicable requirements." See 40 CFR § 70.1(b); CAA section 504(a). Applicable requirements are defined in section 70.2 to include: "(1) any standard or other requirement provided for in the applicable implementation plan approved or promulgated by EPA through rulemaking under Title I of the [Clean Air] Act. . . ." Such applicable requirements include the requirement to obtain preconstruction permits that comply with applicable preconstruction review requirements under the Act, EPA regulations, and SIP's. See generally CAA sections 110(a)(2)(C), 160-69, & 173; 40 CFR §§ 51.160-66 & 52.21.

Pursuant to EPA policy, the Agency generally will not object to the issuance of a title V permit due to concerns over BACT, LAER, or related determinations made long ago during a prior preconstruction permitting process. However, regarding recently issued NSR/PSD permits, note that EPA policy is to provide adverse comments concerning the substantive or procedural deficiencies of a preconstruction permit during the NSR/PSD permitting process.

During EPA's review of Nucor's proposed title V permit, we noticed that the PSD permit no. PSD-LA-751(M5) does not contain sulfur content limits for natural gas fuel or iron ore which is primary raw material for DRI production. Specifically, the Basis for Decision document for Nucor's PSD and proposed title V permits mentioned use of pipeline quality natural gas but there are no specific conditions to restrict usage of only pipeline quality natural gas in the specific requirements documents. Conditions within the Specific Requirements document only use the term natural gas as fuel and not pipeline quality natural gas, which has low sulfur content. Pipeline Quality Natural Gas means natural gas fuel with a total fuel sulfur content of 0.5 grains per 100 standard cubic feet or less.

Similarly, the Basis for Decision document page 5, under As-Built Reconciliations section, Nucor has admitted that it has discovered that the sulfur content in the iron ore varies more than previously anticipated, thereby resulting in variability in emissions rates. This changes in the sulfur content in iron ore and natural gas fuel can spike emissions of sulfur dioxides ($SO_2$ and $SO_3$), sulfuric acid mist ($H_2SO_4$) and hydrogen sulfides ($H_2S$) and may violate allowable short term and long-term emissions limits. Additionally, the specific conditions do not require a maximum raw material usage limit in terms of

*Enclosure – EPA Objections*
*LDEQ Title V Permit No. 3086-V10*                                                                                         *Page 7 of 7*

metric tons per hour or metric tons per year and do not have corresponding recordkeeping requirements, nor does the permit record explain why it is not necessary to establish such limits. In addition, we also note for LDEQ that sulfuric acid mist emissions specifically from this facility has been a long-standing complaint from the local community with regard to impacts on nearby residents and their physical property.

In responding to this objection, LDEQ should amend the permits and permit records as necessary and must ensure that the permit records are complete by documenting a sufficient justification with engineering analysis and calculations to address EPA's concerns about missing monitoring and recordkeeping requirements for fuel and raw material usage for various process equipment that ensure compliance with emissions limits. These monitoring and recordkeeping requirements may include analyzing a sample of fuel and raw material iron ore to show that it meets the specifications or obtaining a sulfur analysis certificate from the vendor for each batch to meet testing requirements; the permittee must establish and maintain records of the sulfur content of the fuel used at the facility. The permit and supporting documents also need to specify the frequency of these monitoring and recordkeeping requirements. LDEQ must revise the Permit and/or permit record to ensure that the Permit contains sufficient and practically enforceable monitoring and recordkeeping requirements to assure compliance with all applicable federal requirements, including the specific emission limits.