# Exhibit 61

# TITLE VI LEGAL MANUAL



## CIVIL RIGHTS DIVISION

## U.S. DEPARTMENT OF JUSTICE

## ABOUT THIS DOCUMENT

The Civil Rights Division's *Title VI Legal Manual* provides an overview of Title VI legal principles. This document is intended to be an abstract of Title VI principles and issues; it is not intended to provide a complete, comprehensive directory of all cases or issues related to Title VI. For example, this manual does not address all issues associated with private enforcement. In addition, although the manual includes cases interpreting both Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq., and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, where their interpretation overlaps with Title VI, the manual should not be considered to be an overview of any statute other than Title VI.

The Civil Rights Division periodically issues policy guidance, directives, or other memoranda to federal agencies regarding statutes the Division enforces. The manual discusses, as appropriate, current guidance documents and directives relating to Title VI. Persons referring to the manual periodically should check the Division's websites (www.usdoj.gov/crt and www.lep.gov) for guidance documents and directives issued subsequent to the publication of the manual. Comments on the manual, and suggestions as to future updates, including published and unpublished cases, may be addressed to:

> Federal Coordination and Compliance Section
> Civil Rights Division
> U.S. Department of Justice
> 950 Pennsylvania Avenue NW - NWB
> Washington, D.C. 20530
> Telephone and TDD (202) 307-2222
> FAX (202) 307-0595
> E-mail FCS.CRT@USDOJ.GOV

The Civil Rights Division issues the *Title VI Legal Manual* pursuant to its responsibility under Executive Order 12250, 28 C.F.R. pt. 41, app. A, to coordinate federal government compliance with the requirements of Title VI and other federal financial assistance statutes and to foster consistent and coordinated Title VI enforcement. The manual is intended only to provide general assistance to interested persons and is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States. Finally, because the law changes frequently, the Civil Rights Division cannot guarantee that all information is current. Updates will be issued from time to time; please refer to the date issued for each chapter.

# TITLE VI LEGAL MANUAL

   **I.**    **Introduction**

  **II.**    **Synopsis of Legislative History & Purpose**

 **III.**    **Department of Justice Role Under Title VI**

 **IV.**    **Interplay of Title VI with Other Laws**

  **V.**    **Defining Title VI**

 **VI.**    **Proving Discrimination- Intentional Discrimination**

**VII.**    **Proving Discrimination- Disparate Impact**

**VIII.**    **Proving Discrimination- Retaliation**

 **IX.**    **Private Right of Action & Individual Relief Through Agency Action**

  **X.**    **Employment Coverage**

## I.     INTRODUCTION

In 1964, after years of intensive work on the part of civil rights advocates and their supporters in Congress, President Lyndon B. Johnson signed the landmark Civil Rights Act of 1964. Included among the Civil Rights Act's eleven titles is Title VI, codified at 42 U.S.C. § 2000d et seq. In 1963, President John F. Kennedy explained the need for Title VI:  "Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious." Title VI directly addresses the then-common practice of denying certain persons access to federally funded services, programs, and activities based on their race, color, or national origin.



At the March on Washington for Jobs and Freedom, on August 28, 1963, a demonstrator carries a placard calling for the passage of Title VI, *"No U.S. Dough to Help Jim Crow Grow."*

Specifically, Section 601 states the following:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.[1]

---

[1] The Title VI Legal Manual provides an overview of Title VI legal principles.  This document is intended to be an abstract of the general principles and issues that concern federal agency enforcement; it is not intended to provide a complete, comprehensive directory of all cases or issues related to Title VI.  For example, this Manual does not address all issues associated with private enforcement.  In addition, although the Manual refers to cases interpreting

The Civil Rights Division of the U.S. Department of Justice (DOJ) is responsible for coordinating the Title VI implementation and enforcement efforts of federal agencies pursuant to Executive Order 12250, 28 C.F.R.pt. 41, app. A. As part of its coordination role, the Division periodically issues policy guidance, directives, or other memoranda to federal agencies regarding Title VI. The Title VI Legal Manual summarizes current DOJ guidance documents and directives relating to Title VI. Persons referring to the manual should check the Division's websites (www.justice.gov/crt and www.lep.gov) for guidance documents and directives issued subsequent to the publication of this document.

---

Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq., and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, where their interpretation overlaps with Title VI, the Manual should not be considered to be an overview of any statute other than Title VI.

## II:    SYNOPSIS OF LEGISLATIVE HISTORY AND PURPOSE OF TITLE VI

The Civil Rights Act of 1964 was a product of the growing demand during the early 1960s for the federal government to launch a nationwide offensive against racial discrimination. In calling for its enactment, President John F. Kennedy stated:

> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination. Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation.

*See* H.R. Misc. Doc. No. 124, 88th Cong., 1st Sess. 3, 12 (1963).

Title VI was not the first attempt to ensure that the federal government not finance discrimination based on race, color, or national origin. Beginning with Franklin Roosevelt, presidents issued Executive Orders prohibiting racial discrimination in hiring. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 720 & n.3 (1979) (White, J., dissenting).[1]  Various prior Executive Orders prohibited racial discrimination in, for instance, the armed forces, employment by federally funded construction contractors, and federally assisted housing.[2]  As Rep. Emanuel Celler, Chairman of the House Judiciary Committee and floor manager for the Civil Rights Act in the House of Representatives, noted:

> In general, it seems rather anomalous that the Federal Government should aid and abet discrimination based on race, color, or national origin by granting money and other kinds of financial aid. It seems rather shocking, moreover, that while we have on the one hand the 14th amendment, which is supposed to do away with discrimination since it provides for equal protection of the laws, on the other hand, we have the Federal Government aiding and abetting those who persist in practicing racial discrimination.
>
> It is for these reasons that we bring forth title VI. The enactment of title VI will serve to override specific provisions of law which contemplate Federal assistance to racially segregated institutions.

110 Cong. Rec. 2467 (1964) (*quoted in Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 330-31 (1978) (opinion of Marshall, J.). Congress recognized the need for a statutory nondiscrimination

---

[1] *See also Cooper v. Aaron*, 358 U.S. 1 (1958); *Simkins v. Moses H. Cone Mem'l Hosp.*, 323 F.2d 959 (5th Cir. 1963).

[2] Exec. Order No. 9981, 13 Fed. Reg. 4313 (July 26, 1948) (equal opportunity in the armed services); Exec. Order No. 10479, 18 Fed. Reg. 4899 (Aug. 13, 1953) (equal employment opportunity by government); Exec. Order No. 11063, 27 Fed. Reg. 11,527 (Nov. 20, 1962) (equal opportunity in housing), as amended by Exec. Order No. 12259, 3 C.F.R. § 307 (1981), *reprinted in* 42 U.S.C. § 3608.

provision to apply across-the-board "to make sure that the funds of the United States are not used to support racial discrimination." 110 Cong. Rec. 6544 (statement of Sen. Humphrey).

Senator Humphrey, the Senate manager of the Civil Rights Act of 1964, identified several reasons for the enactment of Title VI. *Id.* First, several federal financial assistance statutes, enacted prior to *Brown v. Bd. of Education*, 347 U.S. 483 (1954), expressly provided for federal grants to racially segregated institutions under the "separate but equal" doctrine that *Brown* overturned. Although *Brown* made the validity of these programs doubtful, the decision did not automatically invalidate these statutory provisions.

Second, Title VI would eliminate any doubts that some federal agencies may have had about their authority to prohibit discrimination in their programs.

Third, through Title VI, Congress would "insure the uniformity and permanence to the nondiscrimination policy" in all programs and activities involving federal financial assistance. 110 Cong. Rec. 6544 (1964). Title VI would eliminate the need for Congress to debate nondiscrimination amendments in each new piece of legislation authorizing federal financial assistance.[3]  As stated by Representative Celler, "Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of the desirability of particular Federal assistance programs. Its enactment would avoid for the future the occasion for further legislative maneuvers like the so-called Powell amendment." *Id.* at 2468.[4]

Fourth, the supporters of Title VI considered it an efficient alternative to ponderous, time-consuming, and uncertain litigation. Prior legal challenges demonstrated that litigation involving private discrimination proceeded slowly, and the adoption of Title VI was seen as an alternative to such an arduous route. *See* 110 Cong. Rec. 7054 (1964) (statement by Sen. Pastore).

Further, federal funds continued to subsidize racial discrimination. For example, Senator Pastore addressed how North Carolina hospitals received substantial federal monies for construction, that the hospitals discriminated against Blacks as patients and as medical staff, and that, in the absence of legislation, judicial action was the only means to end these discriminatory practices.

> That is why we need Title VI of the Civil Rights Act, H.R. 7152—to prevent such discrimination where Federal funds are involved…. Title VI is sound; it is morally right; it is legally right; it is constitutionally right…. What will it accomplish?  It will guarantee that the money collected by colorblind tax

---

[3] *See* 6 Op. O.L.C. 83, 93 (1982) ("The statutes [Title VI, Title IX, Section 504, and the Age Discrimination Act] … [are] intended to apply to all programs or activities receiving federal financial assistance without being explicitly referenced in subsequent legislation.  They should therefore be considered applicable to all legislation authorizing federal financial assistance … unless Congress evidences a contrary intent.")

[4] The "Powell amendment" refers to the effort of Representative Adam Clayton Powell to add nondiscrimination clauses to federal legislation.  *See* 110 Cong. Rec. 2465 (1964) (Statement by Rep. Powell).

collectors will be distributed by Federal and State administrators who are equally colorblind. Let me say it again: The title has a simple purpose—to eliminate discrimination in Federally financed programs.

*Id.; see also Simkins v. Moses H. Cone Mem'l Hosp.*, 323 F.2d 959, 969 (4th Cir. 1963) (federal provisions undertaking to authorize segregation by state-connected institutions are unconstitutional).[5]

President Lyndon Johnson signed the Civil Rights Act of 1964 into law on July 2, 1964, after more than a year of hearings, analyses, and debate. During the course of congressional consideration, Title VI was one of the most debated provisions of the Act.

---

[5] At issue in *Simkins* was a provision of the Hill-Burton Act (Hospital Survey and Construction Act), 60 Stat. 1041 (1946), as amended, 42 U.S.C. § 291e(f), which "authorize[d] the construction of hospital facilities and the promotion of hospital services with funds of the United States on a 'separate-but-equal' basis." *Simkins*, 323 F.2d at 961.  The Act included a general nondiscrimination provision, but further stated that "'an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of  need for facilities and services of like quality for each such group;….'" *Id.* at 969 (quoting 42 U.S.C. § 291e(f)).

### III:   DEPARTMENT OF JUSTICE ROLE UNDER TITLE VI

Title VI authorizes and directs federal departments and agencies that extend financial assistance to issue rules, regulations, or orders that effectuate the prohibition on discrimination on the basis of race, color, or national origin. Title VI assigns the Department of Justice (DOJ) two key government-wide roles: coordinator of federal agency implementation and enforcement, and legal representative of the United States.[1]

### A.   Ensuring Consistent and Effective Enforcement Across the Federal Government

Under Executive Order 12250, 28 C.F.R. pt. 41, app. A, the President tasked the Attorney General to "coordinate the implementation and enforcement by Executive agencies" of Title VI, Title IX, and Section 504. Executive Order 12250 further provided that the Attorney General coordinate

> any other provision of Federal statutory law which provides, in whole or in part, that no person in the United States shall, on the ground of race, color, national origin, handicap, religion, or sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

Exec. Order No. 12250 § 1-201. Accordingly, DOJ is charged with ensuring the consistent and effective implementation of Title VI across the federal government.

Initially, the Title VI coordination responsibility was assigned to a President's Council on Equal Opportunity, which was created by Executive Order 11197, 3 C.F.R. 1964-1965 Comp. 278 (Feb. 5, 1965). The Council was abolished after six months and the responsibility was reassigned to the Attorney General pursuant to Executive Order 11247. 3 C.F.R. 1964-1965 Comp. 348 (Sept. 24, 1965). Executive Order 11247 provided that the Attorney General was to assist federal departments and agencies in coordinating their Title VI enforcement activities and in adopting consistent, uniform policies, practices, and procedures. During this period, DOJ issued its "Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964," 28 C.F.R. § 50.3, which are still in force today.

In 1974, the President signed Executive Order 11764, designed "to clarify and broaden the role of the Attorney General with respect to Title VI enforcement." Exec. Order No. 11764, 3A C.F.R. § 124 (1974 Comp.). The Order gave the Attorney General broad power to ensure the effective and coordinated enforcement of Title VI. In 1976 and pursuant to this Executive Order,

---

[1] The DOJ has a third role, of course: ensuring that its own recipients of funding abide by their Title VI (and other federal funding statute) obligations.  This Manual chapter focuses on the Department's unique Title VI obligations.

DOJ promulgated its Coordination Regulations describing specific implementation, compliance, and enforcement obligations of federal funding agencies under Title VI. *See* 28 C.F.R. §§ 42.401-42.415.[2] Every agency that extends Title VI covered federal financial assistance is subject to the Coordination Regulations as well as Title VI guidelines and directives issued by DOJ.

On November 2, 1980, the President signed Executive Order 12250, which directed the Attorney General to oversee and coordinate the implementation and enforcement responsibilities of the federal agencies pursuant to Title VI. For the first time, and notwithstanding that no rules, regulations, or orders of general applicability "shall become effective unless and until approved by the President," 42 U.S.C. § 2000d-1, the President delegated approval power over regulations to the Attorney General. Exec. Order No. 12250, at § 1-1. This Executive Order further charges the Attorney General with specific Title VI oversight responsibilities, which, with the exception of the approval of agency regulations implementing Title VI and the issuance of coordinating regulations, the Attorney General has delegated to the Assistant Attorney General for Civil Rights:

- Review existing and proposed rules, regulations, and orders of general applicability of the Executive agencies in order to identify those that are inadequate, unclear, or unnecessarily inconsistent (§ 1-202);
- Develop specific standards and procedures for taking enforcement actions and for conducting investigations and compliance reviews (§ 1-203);
- Issue guidelines for establishing reasonable time limits on efforts to secure voluntary compliance, on the initiation of sanctions, and for referral to DOJ of enforcement where there is noncompliance (§ 1-204);
- Establish and implement a schedule for the review of the agencies' regulations that implement Title VI and related statutes (§ 1-205);
- Establish guidelines and standards for the development of consistent and effective recordkeeping and reporting requirements for Executive agencies; for the sharing and exchange of agency compliance records, findings, and supporting documentation; for the development of comprehensive employee training programs; and for the development of cooperative programs with state and local agencies, including sharing of information, deferring of enforcement activities, and providing technical assistance (§ 1-206);
- Initiate cooperative programs between and among agencies, including the development of sample memoranda of understanding, designed to improve the coordination of Title VI and related statutes (§ 1-207).

---

[2] These regulations were amended slightly after the signing of Executive Order 12250 in 1980 to identify correctly the applicable Executive Order, but in substance they have not been changed since being issued in 1976.

Under the Attorney General's delegation, the Civil Rights Division is responsible for reviewing and providing clearance of subregulatory guidance interpreting Title VI. While each federal agency extending federal financial assistance has primary responsibility for implementing Title VI with respect to its recipients, overall coordination in identifying legal and operational standards, and ensuring consistent application and enforcement, rests with DOJ's Civil Rights Division. The section within the Civil Rights Division that provides Title VI assistance and oversight to agency civil rights offices is the Federal Coordination and Compliance Section (FCS).

The Civil Rights Division employs a variety of strategies for meeting its coordination mandate, some of which are discussed in more detail below.

### 1.    Department of Justice Clearance Authority

Executive Order 12250 provides that the Attorney General must approve federal regulations that effectuate Title VI (and other civil rights statutes, including Title IX and Section 504). 42 U.S.C. § 2000d-1; Exec. Order No. 12250 at § 1-1. This includes the provisions of comprehensive regulations that govern, in part, a federal agency's Title VI implementation or enforcement. For example, if a federal agency drafts a rule governing administrative complaints, the rule is subject to DOJ clearance requirements to the extent it affects how Title VI may be enforced.

In addition, federal implementing directives (whether in the nature of regulations or implementing guidance) that agencies issue under any of the laws covered by Executive Order 12250 are "subject to the approval of the Attorney General, who may require that some or all of them be submitted for approval before taking effect." *Id.* § 1-402. These documents include regulations issued to effectuate statutes that "provide in whole or in part, that no person in the United States shall, on the ground of race, color, national origin, handicap, religion, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." *Id.* § 1-201(d). The authority to review such guidance documents has been delegated to the Assistant Attorney General for Civil Rights. 28 C.F.R. § 0.51(a) ("The Assistant Attorney General in charge of the Civil Rights Division shall, except as reserved herein, exercise the authority vested in and perform the functions assigned to the Attorney General by Executive Order 12250 ('Leadership and Coordination of Nondiscrimination Laws'")).

The DOJ clearance role is critical to its responsibility to ensure consistent and effective enforcement. Agencies should contact FCS early in the development of documents encompassed within the DOJ clearance requirements.

## 2.    Legal and Policy Guidance

DOJ develops formal and informal guidance regarding implementation of Title VI, including legal interpretations of the statute and regulations. DOJ, including the Civil Rights Division, has issued guidance in a range of formats, including notice-and-comment rulemaking; directives; frequently asked questions; tips and tools documents; promising practices documents; and correspondence to federal agencies, recipients, or beneficiaries. These documents generally are sent directly to interested stakeholders and also made available online. Because of DOJ's unique government-wide coordination function, such interpretations of Title VI are entitled to special deference from the courts. *See, e.g.*, *United States v. Maricopa Cty.*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) (citing *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634 (1984); *Andrus v. Sierra Club*, 442 U.S. 347, 357-58 (1979)).[3]

DOJ's legal guidance review function plays a particularly important role in ensuring consistency of legal interpretation across the federal government. For example, where two agencies have conflicting interpretations of what constitutes federal financial assistance under Title VI, DOJ's coordination role authorizes it to determine the final government-wide position on the matter.

## 3.    Legal Counsel and Technical Assistance

DOJ, through the Civil Rights Division's FCS, provides ongoing technical assistance, including legal and policy review, to federal funding agencies. On an almost daily basis, the FCS staff answers questions from staff working in other federal agencies. FCS also provides direct assistance to individual agencies, including legal or technical assistance on novel or complex investigations.

FCS also conducts periodic in-depth reviews of agency Title VI enforcement programs, including both Case Assistance Reviews (CAR) and Technical Assistance Reviews (TAR). Section 1-302 of Executive Order 12250 directs the Attorney General periodically to evaluate the implementation of the nondiscrimination provisions of the laws the Executive Order covers, including Title VI; advise the heads of the agencies concerned on the results of those

---

[3] Federal civil rights agency interpretations of their own Title VI regulations are entitled to "substantial deference" where they "reflect its 'fair and considered judgment on the matter in question.'" *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96-97 (2d Cir. 2012) (affording deference to U.S. Department of Education policy guidance interpreting Title IX); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (agency's permissible interpretation of its own regulation normally "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation"); *T.E. v. Pine Bush Cent. Sch. Dist.*, No. 12-CV-2303 KMK, 2014 WL 5591066, at *18 (S.D.N.Y. Nov. 4, 2014) ("agency interpretations of ambiguities in an agency's own regulation merit 'substantial deference'"). Because multiple agencies provide federal financial assistance to a wide variety of recipients, many of which issue guidance and other similar documents, the coordination role delegated to the Civil Rights Division under 28 C.F.R. § 0.51(a) seeks to ensure consistent federal government interpretation of Title VI and other federal financial assistance statutes.

evaluations; and provide recommendations for needed improvement in implementation or enforcement. A Title VI CAR involves a holistic assessment of an agency's administrative case docket in order to identify the critical enforcement matters requiring legal assistance and potential preparation for judicial enforcement, identify and develop solutions to any recurring barriers to effective enforcement, and inform the development of DOJ's technical assistance and training programs. A Title VI TAR is a focused assessment of selected aspects, functions, or issues concerning an agency's Title VI implementation and enforcement. A TAR is designed to yield helpful and practical recommendations to strengthen and improve an agency's Title VI enforcement. FCS undertakes both types of reviews cooperatively with the agency.

### 4. Coordination and Clearinghouse

When a complainant files a complaint either with multiple funding agencies that fund a particular recipient or a complaint that implicates multiple agencies, FCS sometimes coordinates the investigation. FCS's role may involve bringing together representatives from the various agencies to ensure that they approach and conduct their investigations in a consistent manner. In other instances, FCS may partner with an agency in an investigation. In addition, FCS has significant government-wide coordination responsibilities to act as a clearinghouse for review and referral of mail from the public; non-governmental organizations; federal, state, and local agencies; and others concerning civil rights matters. Agencies should contact FCS when they receive complaints as to which they do not have jurisdiction and do not know where the complaint should be forwarded.

DOJ also leads the Title VI Interagency Working Group, a forum for federal civil rights leadership, staff, and counsel to leverage resources, training, promising practices, and problem-solving opportunities with the goal of creating more effective and consistent Title VI enforcement programs across government.

### 5. Oversight and Coordination

In implementing Executive Order 12250, DOJ periodically evaluates Title VI implementation as well as the implementation of the other nondiscrimination provisions of the laws that the Order covers. DOJ does this in a variety of ways, including requiring agencies that administer federal financial assistance to submit reports to FCS describing their past year's performance and upcoming plans to implement Title VI. DOJ also can request information on the major components of an agency's civil rights enforcement program, including budget and staffing for external civil rights activities, complaint investigations, pre-award and post-award compliance reviews, regulatory and policy development, outreach and technical assistance, and training. Pursuant to Executive Order 12250, Section 1-401, agencies must cooperate with any such requests. Information gathered in these reports plays an essential role in refining DOJ's coordination and compliance activities.

## B.        Judicial Enforcement of Title VI

DOJ also serves as the federal government's litigator. Title VI authorizes DOJ to enforce Title VI through the filing of civil actions. DOJ, on behalf of Executive agencies, may seek injunctive relief, specific performance, or other remedies when agencies have referred determinations of recipients' noncompliance to DOJ for judicial enforcement. DOJ may also file statements of interest and amicus briefs regarding Title VI issues in private litigation. Litigation is assigned to DOJ's Civil Rights Division. In addition, DOJ is responsible for representing agency officials should they be named as defendants in private Title VI litigation.

A 1965 guidance, now codified at 28 C.F.R. § 50.3, specified that court enforcement may be obtained through the following:

> (1) a suit to obtain specific enforcement of assurances, covenants running with federally provided property, statements of compliance, or desegregation plans filed pursuant to agency regulations; (2) a suit to enforce compliance with other titles of the 1964 Act, other Civil Rights Acts, or constitutional or statutory provisions requiring nondiscrimination; and (3) initiation of or intervention or other participation in, a suit for other relief designed to secure performance.

31 Fed. Reg. 5292, 5292 (Apr. 2, 1966).[4]  In subsequent regulations, agencies were directed, upon failure to obtain voluntary compliance from a noncomplying program or activity, to "initiate appropriate enforcement procedures" in accordance with the 1965 Title VI guidelines. 41 Fed. Reg. 52,669 (Dec. 1, 1976) (now codified at 28 C.F.R. § 42.411). In this regard, the Coordination Regulations direct agencies to advise DOJ if they are unable to achieve voluntary compliance and to request that DOJ assist in seeking resolution of the matter. *Id*. § 42.411(a). Agencies should submit Title VI and other civil rights matters for litigation if they cannot be resolved administratively (that is, when the agency determines that informal resolution or fund termination is not a viable solution). FCS provides assistance to agencies in making determinations of noncompliance, including providing pre-enforcement legal counsel when it appears it may be difficult to obtain a voluntary resolution.

---

[4] In the 1965 guidance, the Department identified three alternative measures that could be undertaken to secure compliance: (1) court enforcement, including "initiation of or intervention or other participation in, a suit for other relief designed to secure performance;" (2) administrative action; and (3) other efforts to induce voluntary compliance.  *Id*.

## IV:     INTERPLAY OF TITLE VI WITH TITLE IX, SECTION 504, THE FOURTEENTH AMENDMENT, AND TITLE VII

Title VI prohibits discrimination based on race, color, or national origin in programs and activities receiving federal financial assistance. Specifically, Title VI provides as follows:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Title VI served as the model for several subsequently promulgated statutes that prohibit discrimination on other grounds in federally assisted programs or activities, including Title IX (sex discrimination in education programs) and Section 504 (disability discrimination). *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 600 n.4 (1986); *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984) (Title IX was patterned after Title VI); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984) (Section 504 patterned after Titles VI and IX).[1]  Accordingly, courts have "relied on case law interpreting Title VI as generally applicable to later statutes." *Paralyzed Veterans*, 477 U.S. at 600 n.4.

The three statutes do not treat all issues identically. For example, Title VI statutorily restricts claims of employment discrimination to instances where a "primary objective" of the financial assistance is to provide employment. 42 U.S.C. § 2000d-3. An employment discrimination claim against a recipient of federal financial assistance that otherwise might raise a Title VI issue must be brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., if a "primary objective" is not employment. No such restriction applies to Title IX or Section 504. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982) ("[T]he legislative history thus corroborates our reading of the statutory language and verifies the Court of Appeals' conclusion that employment discrimination comes within the prohibition of Title IX."); *Bentley v. Cleveland Cty. Bd. of Comm'rs,* 41 F.3d 600 (10th Cir. 1994) (Section 504 claim alleging discriminatory termination of former employee).

Courts also have held that Title VI adopts or follows the Fourteenth Amendment's standard of proof for intentional discrimination, *see Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 412-18 (1978); and, generally, the Title VII standard of proof for disparate impact. *See Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 639 (1983); *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1405 n.11, 1407 n.14 (11th Cir. 1993) (*see, infra,* Section V, ch. 1). Accordingly, cases under these constitutional and statutory provisions may shed light on the Title VI analysis in a given situation.

---

[1] In addition, Title II of the Americans with Disabilities Act of 1990, as amended, uses Title VI enforcement procedures through reference to the process noted in Section 504.  42 U.S.C. § 12131.

Finally, cases decided under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. § 3601 et seq., may also be instructive regarding the disparate impact analysis under Title VI.

## V:    DEFINING TITLE VI

### A.    Who Is Protected Under Title VI?

Title VI protects *everyone* who is "in the United States" (which is separately defined below).

> **NO PERSON** in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Title VI states "no person" shall be subject to discrimination because of race, color, or national origin. It is well-settled that the word "person" includes citizens and noncitizens alike and that undocumented individuals in the United States are protected from discrimination on the basis of race, color, and national origin. The Supreme Court has addressed "person" in the context of challenges brought under the Fifth and Fourteenth Amendments. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976). The Court has held that undocumented individuals are considered "persons" under the equal protection and due process clauses of the Fifth and Fourteenth Amendments. *Plyler*, 457 U.S. at 210–11; *Mathews*, 426 U.S. at 77.[1] These cases provide persuasive authority as to the scope of "persons" protected by Title VI because the Supreme Court has found that Title VI is limited by the Fifth and Fourteenth Amendments  *See Guardians Ass'n v. Civil Serv. Comm.*, 463 U.S. 582, 589–90 (1983); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978).[2]

Under Title VI, a private entity is also a "person" when it receives federal financial assistance from a recipient and may bring suit alleging discriminatory allocation of funds. Similarly, a private entity also is a "person" when it seeks to contract with a recipient.

Where a recipient receiving federal financial assistance enters the marketplace seeking to contract for goods or services, it cannot discriminate among entities seeking to do business with it. In *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1209 (9th Cir. 1984), the court noted that a contractor, corporate or individual, may be deemed a "person" and covered by Title VI. *See, e.g.*, *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 705–06 (2d Cir. 1982) (holding that corporate plaintiffs had standing to pursue racial discrimination claims pursuant to Title VI); *Bogdan v. Housing Auth. of Winston-Salem,* No. 1:05CV00568, 2006 WL 3848693 *6 (M.D.N.C. Dec. 29, 2006) (finding that Title VI covered a contractor if he has a logical nexus to

---

[1] In *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973), a Title VII case, the Court ruled that an employer's distinction between a citizen and noncitizen for employment purposes did not violate the prohibition against national origin discrimination. It also noted that because the employer did not discriminate among the citizens it did hire based on national origin, it did not violate Title VII. *Id.* at 93 n.5.
[2] Fifth and Fourteenth Amendment equal protection claims are coextensive and "indistinguishable from each other." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 217 (1995).

a federally funded program, as a beneficiary, applicant, or participant in the program); *Carnell Const. Corp. v. Danville Redev. and Hous. Auth.*, 745 F.3d 703, 715 (4th Cir. 2014) (Carnell has Title VI standing because its president and sole shareholder is African–American, it was eligible for consideration as a contractor on a federally funded public project, and it alleged that defendants discriminated against it based on race), *cert. denied*, 135 S. Ct. 357 (2014); *see also United States v. Harris Methodist Ft. Worth*, 970 F.2d 94, 97 (5th Cir. 1992) (holding that Title VI protected from discrimination private physicians who were neither beneficiaries nor employees of the hospital); *J.A. Croson Co. v. City of Richmond*, 488 U.S. 469 (1989) (corporate standing to sue for race discrimination under the Equal Protection Clause).

In contrast, an entity's receipt of a procurement contract with the federal government does not subject the contractor to coverage under Title VI. *See, e.g.*, *Fredricks v. City of New York*, No. 12 CIV. 3734, 2013 WL 839584, at *5 (S.D.N.Y. Mar. 6, 2013); *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1060 (2d Cir. 1990) (receipt of Army procurement contracts does not render the company a "program or activity receiving federal financial assistance").

Once an entity receives federal financial assistance, jurisdiction under Title VI attaches and if the recipient's program includes selection of contractors to carry out its various functions, then Title VI covers that selection process. For example, if a state agency receives funds pursuant to a federal program to establish and operate homeless shelters and uses some of the federal money to hire a food service company to provide meals in the shelter, the food service contractor is a participant in the homeless shelter program. Title VI would operate not only to ensure nondiscrimination against homeless people—the ultimate beneficiaries—but would also require the recipient to select the food service contractor in a nondiscriminatory manner. An essential purpose of Title VI—to prevent discrimination—would be undermined if it were limited to ensuring that a homeless shelter was operated in a nondiscriminatory manner, while the process by which such a facility is constructed, supplied, and serviced were free of any such restraints.

A number of courts have held that cities, political subdivisions, and other state instrumentalities are not Title VI-defined "persons" and do not have Title VI standing to bring suit against the state. In *United States v. Alabama*, 791 F.2d 1450 (11th Cir. 1986), the United States, later joined by intervenors, Alabama State University (ASU), a majority-black institution, along with faculty, staff, students, and graduates of ASU, filed suit against the state of Alabama, state educational authorities, and all four-year state institutions of higher education, claiming that Alabama operated a dual system of segregated higher education. Based on the language of Title VI and a review of its legislative history, the court concluded that "[n]othing in Title VI or its legislative history suggests that Congress conceived of a state instrumentality as a 'person' with rights under this statute" and the court "decline[d] to infer such a right of action by judicial fiat." *Id.* at 1456–57. The court further stated there are other avenues of recourse to remedy Title VI violations, including a private right of action for individuals under Title VI and Title VI's

comprehensive scheme of administrative enforcement. *Id.* at 1456, (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1978)). *See also Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 688 (3d Cir. 2011) (explaining that a charter school did not meet definition of "person"); *Dekalb Cty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 689 (11th Cir. 1997) (noting that a state created political subdivision has no standing to bring a Title VI claim against the state). Nevertheless, this should not preclude entities such as a school district or other political subdivision from bringing a Title VI administrative complaint either on its own behalf or on behalf of its students or other constituents. It also would not preclude individual students or other constituents from bringing a private Title VI suit against the state recipient in appropriate cases. *See, e.g.*, *Coalition for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 519–20 (D. Md. 2013).

## B.    Where Does Title VI Apply?

Title VI states that no person "in the United States" shall be discriminated against based on race, color, or national origin by an entity receiving federal financial assistance. The phrase "in the United States" is intended to be broadly inclusive. Agency Title VI regulations, including those of the Department of Justice (DOJ), define "recipients" or "United States" to encompass, inter alia, territories and possessions.[3]

> No person **IN THE UNITED STATES** shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Although no court has addressed the scope of "United States" or the validity of regulations that extend coverage to territories and possessions, cases interpreting the Fifth and Fourteenth Amendments again provide guidance in this analysis. Title VI covers all areas under the sovereignty of the United States that fall within the combined jurisdiction of the Fifth and Fourteenth Amendments. By separate covenant, Title VI applies to the Trust Territories of the Pacific Islands, which includes the Commonwealth of the Northern Marianas Islands. *See Temengil v. Trust Territory of the Pac. Islands*, No. 81-0006, 1983 WL 30363, at *32 (D.N. Mar. I. Mar. 22, 1983), *rev'd in part*, *aff'd in part on other grounds*, 881 F.2d 647 (9th Cir. 1989); *see also Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1088 (9th Cir. 2006) (applying Title IX analysis in a case from the Northern Marianas Islands).

Whether Title VI applies extraterritorially presents a separate question. It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian*

---

[3] Individual agency descriptions of "United States" can be found in the following regulations, *see,*, *e.g.*, 24 C.F.R. § 1.2(d) (HUD); 28 C.F.R. § 42.102(b) (DOJ); 29 C.F.R. § 31.2(j) (DOL); 38 C.F.R. § 18.13(d) (VA); 45 C.F.R. § 80.13(e) (HHS); and 49 C.F.R. § 21.23(f) (DOT).

*American Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). Title VI may apply to discriminatory conduct outside the United States in certain narrow circumstances, depending on how much control the recipient exercises over the overseas operation and how integral the overseas operation is to the recipient's program in the U.S.

To date, however, the only application of extraterritoriality appears in cases involving schools and study abroad programs. For example, a district court ruled that Title IX protects students who participate in study abroad programs through American universities. *King v. Bd. of Control of E. Mich. Univ.*, 221 F. Supp. 2d 783, 790–91 (E.D. Mich. 2002) (because study abroad programs have become an integral part of college education, equality of opportunity in study abroad programs is "unquestionably mandated by Title IX" and requires extraterritorial application of Title IX); *but see Phillips v. St. George's Univ.*, No. 07-CV-1555, 2007 WL 3407728, at *5 (E.D.N.Y. 2007) (Title IX does not apply where the plaintiff was attending a school in Grenada and alleged that she was harassed by a school employee in Grenada and that the school employees ignored her complaints in Grenada); and *Archut v. Ross Univ. Sch. of Veterinary Med.*, No. 10-1681, 2012 WL 5867148 (D.N.J. 2012) (Section 504 of the Rehabilitation Act does not apply to a foreign educational institution even if it is receiving federal financial aid and has a U.S. parent). Whether the rationale of these cases might be applicable to other matters remains to be determined.

## C.    Federal Financial Assistance

Title VI states that no program or activity receiving "Federal financial assistance" shall discriminate against individuals based on their race, color, or national origin. Section V.E presents a detailed discussion of "program or activity." The focus here is on what is and what is not federal financial assistance; why it is necessary to establish that a recipient is receiving federal financial assistance; and things to consider when conducting a Title VI investigation or review.

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving **FEDERAL FINANCIAL ASSISTANCE**.

### 1.    What is Federal Financial Assistance?

The clearest example of federal financial assistance is the award or grant of money. An agency also might provide federal financial assistance in nonmonetary form; that is, "whatever thing of value is extended by the grant statute." *See United States Dep't of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 607 n.11 (1986) ("Although the word 'financial' usually indicates 'money,' federal financial assistance may take nonmoney form," citing *Grove City Col. v. Bell*, 465 U.S.

555, 564–65 (1984)). As discussed below, federal financial assistance may include the use or rental of federal land or property at below market value, federal training, a loan of federal personnel, subsidies, and other arrangements with the intention of providing assistance. Federal financial assistance does not encompass contracts of guarantee or insurance, regulated programs, licenses, procurement contracts by the federal government at market value, or programs that provide direct benefits.[4] Note, however, that federal financial assistance is contractual in the sense that the recipient agrees to use the assistance in a manner consistent with the terms of the award and, in most instances, should have signed an assurance agreement binding it to comply with certain terms and conditions.

It is important to remember that the availability of remedies may depend on the timing of an entity's receipt of federal financial assistance. For example, while past funding alone may not support prospective relief such as an injunction, past funding may support a claim for backward-looking relief, such as back pay, restitution, or damages. *See Huber v. Howard Cty.*, 849 F. Supp. 407, 415 (D. Md. 1994) (Section 504 matter, finding that the recipient received federal financial assistance during the time of plaintiff's employment and discharge); *James v. Jones*, 148 F.R.D. 196, 201 (W.D. Ky. 1993) (state "does not presently receive [federal] funds, but … has appealed its suspension from the program and it maintains its hope of receiving future funds"). Moreover, the amount of federal financial assistance does not affect Title VI coverage. *See, e.g., K.H. v. Vincent Smith Sch.*, CV 06-0319(ERK) (JO), 2006 WL 845385, *11 (E.D.N.Y. Mar. 29, 2006) (court could find "no support in the law for the *de minimis* exception the [recipient] School advocates").[5]

Agency regulations use similar, if not identical, language to define Federal financial assistance:

 (1) Grants and loans of Federal funds,
 (2) The grant or donation of Federal property and interests in property,
 (3) The detail of Federal personnel,
 (4) The sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and

---

[4] *See* Letter from Robert Kennedy, Attorney General, to Hon. John Sherman Cooper (April 29, 1964), *reprinted in* 110 Cong. Rec. 10075, 10076 (1964) ("Title VI does not apply to procurement contracts, or to other contracts which do not involve financial assistance by the United States.").

[5] One court ruled that the entity must receive more than de minimis federal assistance. *See Marshall v. Sisters of Holy Family Nazareth*, 399 F. Supp. 2d 597, 602–03 (E.D. Pa. 2005) (finding school's participation in a national school lunch program where only one student received a free lunch and the school received no proceeds from the sale did not constitute financial assistance). In our view, however, the sounder approach is that the amount of federal financial assistance is not relevant. Rather, what is important is whether the recipient receives federal assistance in some form or amount and thus becomes obliged to ensure that it acts in a nondiscriminatory manner.

     (5) Any Federal agreement, arrangement, or other contract which has as one of its
       purposes the provision of assistance.

28 C.F.R. § 42.102(c) (Department of Justice regulations).

### a.    Grants and loans of federal funds

The clearest example of Title VI-covered federal financial assistance is money provided through federal grants, cooperative agreements, and loans. An entity may receive grant money directly from an agency or indirectly through another entity. In either case, the direct recipient as well as the secondary or subrecipient are considered to have received federal funds. In other instances, the funding may be directed to the funding beneficiaries but another entity ultimately receives the funding. For example, a college or university receives federal financial assistance indirectly where it enrolls United States military veterans for whom the federal government provides tuition payments. Although federal payments go directly to the veterans and indirectly to the university, the university is receiving federal financial assistance that neither it nor the students would have received but for students' enrollment and entitlement. *See Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) (*superseded by statute on other grounds by* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988)); *Spann ex rel. Hopkins v. Word of Faith Christian Ctr. Church*, 589 F. Supp. 2d 759, 767 (S.D. Miss. 2008) (state may be recipient of the funds but it is not the ultimate recipient, serving as a conduit of funds earmarked for payment to the child care provider).

### b.    Federal property

As set forth in the regulations, federal financial assistance may be in the form of a grant or donation of land or use (rental) of federal property for the recipient at no or reduced cost. It also could be in the form of other tangible goods. *See Marable v. Ala. Mental Health Bd.*, 297 F. Supp. 291, 295–96 (M.D. Ala. 1969) (defendant received federal financial assistance in the form of, among other things, surplus food commodities from the U.S. Department of Agriculture through the Food Distribution Program and surplus property under the Federal Property and Administrative Services Act of 1949); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1013 (2d Cir. 1986) (plaintiff made plausible claim that defendant "received federal financial assistance in the form of services of federal personnel or the use of Government property in the form of satellite launching facilities and technology or, perhaps, federal lands"); *Staley v. Nat'l Capital Area Council, Boy Scouts of Am.*, No. RWT 10CV2768, 2011 WL 2416724, at *12 (D. Md. June 9, 2011) (discovery allowed to determine whether defendant received federal financial assistance because it was allowed to use federal land at no cost for scouting activities). Ownership of land, rental property, or other tangible goods is considered federal financial assistance if the recipient does not pay or pays less than market value. Recipients typically sign assurance documents at the

time the assistance is conferred and agree that assistance is ongoing for as long as the land or property is being used for the original or a similar purpose to that for which the assistance was intended. *E.g.*, 28 C.F.R. § 42.105. Moreover, regulations bind the successors and transferees of this property as long as the original purpose or a similar objective is pursued. *Id.* Thus, if at the time of the alleged discriminatory act, the recipient uses the land or rents the property for the same or similar purpose, the recipient is receiving federal financial assistance, irrespective of when the land was granted or donated. For example:

- Sixteen years ago, the Department of Defense (DOD) donated land from a closed military base to a state as the location for a new prison. The prison has been built and currently houses 130 inmates. Black and Hispanic inmates complain that they tend to be in long-term segregation more often than white inmates, and allege racial discrimination by the prison administrators. Because the state still uses the DOD-donated land for its original (or similar) purpose, the state is still receiving federal financial assistance. *See* 32 C.F.R. § 195.6.

- A police department has a branch office located in a housing project built, subsidized, and operated with Department of Housing and Urban Development funds. The police department is not charged rent. The police department is receiving federal financial assistance and is subject to Title VI.

- A railroad company receives federal funds to rehabilitate railroad crossings the railroad company owns. The railroad benefits from receiving federal funds because federal money is being used to pay for repairs to the railroad's property that the railroad otherwise would have had to pay for itself. Because the railroad benefits from the federal funds through the upgrade to its own property, the railroad company is receiving federal financial assistance and is covered by Title VI. *See Moreno v. Consol. Rail Corp.*, 99 F.3d 782 (6th Cir. 1996) (Section 504 case). Note that a railroad that is paid under contract by the federal government to maintain federal property may not be covered under Title VI.

### c.    Detail of federal personnel

Under the Intergovernmental Personnel Act of 1970, federal agencies may allow a temporary assignment of personnel (also known as a detail) to state, local, and Indian tribal governments, institutions of higher education, federally funded research and development centers, and certain other organizations for work of mutual concern and benefit. *See* 5 U.S.C. § 3372. This detail of federal personnel to a state or other entity is considered federal financial assistance even if the entity reimburses the federal agency for some (but not all) of the detailed employee's federal salary. *See Paralyzed Veterans*, 477 U.S. at 612 n.14. For example, two research scientists from

the National Institute of Health are detailed to a research organization for two years to help research treatments for cancer. NIH pays for three-fourths of the salary of the two detailed employees, while the organization pays the remaining portion. The research organization is receiving federal financial assistance because the federal government is paying a portion of the salary of the detailed federal employees. The research organization is subject to Title VI.

### d.    Tax Benefits

Typical tax benefits—tax exemptions, tax deductions, and most tax credits—are not considered federal financial assistance. Unlike grants, most typical tax benefits are not included in the statutory or regulatory definitions of federal financial assistance because they are not contractual in nature. *See, e.g.,* 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.102(c); 31 C.F.R. § 28.105. Most courts that have considered the issue have concluded that typical tax benefits are not federal assistance. *See, e.g.*, *Paralyzed Veterans of Am. v. Civil Aeronautics Bd.*, 752 F.2d 694, 708–09 (D.C. Cir. 1985); *Johnny's Icehouse, Inca v. Amateur Hockey Ass'n of Ill., Inc.*, 134 F. Supp. 2d 965, 971–72 (N.D. Ill. 2001); *Chaplin v. Consol. Edison Co.*, 628 F. Supp. 143, 145–46 (S.D.N.Y. 1986).

However, while these cases suggest that typical tax benefits are not federal financial assistance, a few courts have found instances where a tax benefit would be considered federal financial assistance. *See McGlotten v. Connally*, 338 F. Supp. 448, 462 (D.D.C. 1972) (provision of a tax deduction for charitable contributions is a grant of federal financial assistance within the scope of the 1964 Civil Rights Act); *see also Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989) (jurisdiction under Title VI and Title IX because "the League receives federal assistance indirectly through its tax exemption and directly through grants from the Department of Energy and the EPA."); *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 802 n.12 (11th Cir. 1999) (although not deciding the issue, the court observed that "appellant's allegation that tax-exempt status constitutes 'Federal financial assistance' is neither immaterial nor wholly frivolous … [and that] appellant contends [that] a direct grant and a tax exemption should be treated the same; because a grant constitutes 'Federal financial assistance' under Title IX, tax-exempt status also should satisfy this element of the statute"). Other courts have ruled otherwise, however, stating that assistance requires the transfer of funds or something of value to a recipient. S*ee, e.g., Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983); *Johnny's Ice House*, 134 F. Supp. 2d at 972.

### e.    Training

The regulations also state that federal financial assistance can be in the form of any federal agreement, arrangement, or other contract that has as one of its purposes the provision of assistance. A typical example is training conducted by federal personnel. For example, a city

police department sends several police officers to training at the FBI Academy at Quantico without cost to the city. The police department is considered to have received federal financial assistance. *See Delmonte v. Dep't of Bus. & Prof'l Regulation*, 877 F. Supp. 1563, 1566–67 (S.D. Fla. 1995) (training state officers received from DEA, FBI and DOT constituted receipt of federal financial assistance pursuant to Section 504 of the Rehabilitation Act of 1973).

### 2.  What Is Not Federal Financial Assistance

The receipt of some types of items of value in nonmonetary form may not constitute federal financial assistance.

### a.  Licenses

Licenses impart a benefit because they entitle the licensee to engage in a particular activity, and they can be quite valuable. However, in *Community Television of Southern California. v. Gottfried*, 459 U.S. 498, 509–12 (1983), the Supreme Court noted that the Federal Communications Commission is not a funding agency and television broadcasting licenses do not constitute federal financial assistance. *Accord, Cal. Ass'n of the Physically Handicapped v. FCC*, 840 F.2d 88, 92–93 (D.C. Cir. 1988) (same). Similarly, the court ruled in *Herman v. United Bhd. of Carpenters*, 60 F.3d 1375, 1381–82 (9th Cir. 1995), that certification of a union by the National Labor Relations Board is akin to a license, and not federal financial assistance under Section 504.

### b.  Statutory programs or regulations

Similarly, statutory programs or regulations that directly or indirectly support or establish guidelines for an entity's operations are not federal financial assistance. *Herman*, 60 F.3d at 1382 (neither labor regulations establishing apprenticeship programs nor Davis-Bacon Act wage protections are federal financial assistance.); *Steptoe v. Savings of Am.*, 800 F. Supp. 1542, 1548 (N.D. Ohio 1992) (mortgage lender subject to federal banking laws does not receive federal financial assistance); *Rannels v. Hargrove*, 731 F. Supp. 1214, 1222–23 (E.D. Pa. 1990) (federal bank regulations are not federal financial assistance under the Age Discrimination Act).

### c.  Programs owned and operated by the federal government

Programs "owned and operated" by the federal government, such as the air traffic control system, generally do not constitute federal financial assistance to the beneficiaries of those programs where they cannot be categorized as recipients of that assistance. As stated by then-Deputy Attorney General Nicholas Katzenbach to chairman Emanuel Celler of the Committee on the Judiciary for the House of Representatives:

Activities wholly carried out by the United States with Federal funds, such as river and harbor improvements and other public works, defense installations, veteran's hospitals, mail service, etc. are not included in the list [of federally assisted programs]. Such activities, being wholly owned by, and operated by or for, the United States, cannot fairly be described as receiving Federal "assistance." While they may result in general economic benefit to neighboring communities, such benefit is not considered to be financial assistance to a program or activity within the meaning of Title VI.

110 Cong. Rec. 13380 (1964). *See Paralyzed Veterans*, 477 U.S. at 612 ("[T]he air traffic control system is not 'federal financial assistance' at all. Rather, it is a federally-conducted program that has many beneficiaries but no recipients."); *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1213 (9th Cir. 1984) (Congress put in place a mechanism to charge airlines for their share of the cost of air traffic control system; therefore, airlines were not recipients of federal financial assistance).

### d.    Guaranty and insurance contracts

Title VI specifically states that it does not apply to "Federal financial assistance … extended by way of a contract of insurance or guaranty." 42 U.S.C. § 2000d-1. In *United States v. Baylor University Medical Center,* 736 F.2d 1039, 1048 (5th Cir. 1984), for example, the court noted that the legislative history of Title VI makes it abundantly clear that Congress intended to exempt individual bank accounts in a bank with federally guaranteed deposits from Title VI. *See also Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 277 (6th Cir. 1996) (default insurance for bank's disbursement of federal student loans is a "contract of insurance," and excluded from Section 504 coverage of agency regulations); *Butler v. Capitol Fed. Sav.*, 904 F. Supp. 1230, 1233 (D. Kan. 1995) ("Title VI specifically exempts a contract of insurance from the definition of 'federal financial assistance.'").[6]

### e.    Procurement contracts

Like guaranty and insurance contracts, procurement contracts are also not considered federal financial assistance. *See* Letter from Robert Kennedy, Attorney General, to Hon. John Sherman Cooper (April 29, 1964), *reprinted in* 110 Cong. Rec. 10075, 10076 (1964) ("Title VI does not apply to procurement contracts, or to other contracts which do not involve financial assistance by the United States."); *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421 (4th Cir. 2005) (defendant's "status as a government contractor is irrelevant to Title VI liability [because Title VI] coverage turns on the receipt of "federal financial assistance", not the existence of a contractual relationship"); *LaBouve v. Boeing Co.*, 387 F. Supp. 2d 845, 854 (N.D. Ill. 2005)

---

[6] On the other hand, in *Moore v. Sun Bank*, 923 F.2d 1423, 1427 (11th Cir. 1991), the court ruled that loans guaranteed by the Small Business Administration constituted federal financial assistance because Section 504—as contrasted with Title VI—does not exclude contracts of insurance or guaranty from coverage.

(Department of Defense contract with a corporation for the procurement of a fighter aircraft did not constitute federal financial assistance); *Gallagher*, 89 F.3d at 277 (interest subsidies are akin to procurement contracts); *Cook v. Budget Rent-A-Car Corp.*, 502 F. Supp. 494, 496–97 (S.D.N.Y. 1980) (contracts involving goods or services purchased by the government at fair market value do not constitute "assistance" because the word connotes a transfer of funds at reduced consideration or as a subsidy).

### f.    Assistance to ultimate beneficiaries

Finally, Title VI does not apply to direct, unconditional assistance to ultimate beneficiaries, the intended class of private citizens receiving federal aid. For example, social security payments and veterans' pensions are not federal financial assistance. *Soberal-Perez v. Heckler*, 717 F.2d 36, 40 (2d Cir. 1983); *but see Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 602, n.16 (D.S.C. 1974) (distinguishing pensions from payments to veterans for educational purposes because payments for education require or are conditioned on the individual participating in a program or activity). During debate preceding passage of the Civil Rights Act, members of Congress responded to concerns about the scope of Title VI by explaining that Title VI would not apply to direct benefit programs: "The title does not provide for action against individuals receiving funds under federally assisted programs—for example, widows, children of veterans, homeowners, farmers, or elderly persons living on social security benefits." 110 Cong. Rec. 15866 (1964) (statement of Sen. Humphrey); *see* 100 Cong. Rec. 6544 (1963) (statement of Sen. Humphrey); *see also* 110 Cong. Rec. 1542 (1964) (statement of Rep. Lindsay); 110 Cong. Rec. 13700 (1964) (statement of Sen. Javits).

### 3.    Why Establish Federal Financial Assistance?

Under Title VI and similar statutes, a federal agency has jurisdiction over a recipient's conduct through the federal financial assistance that it gives to the recipient. Before an agency can undertake a complaint investigation, it first needs to establish that it has or is providing federal financial assistance to the recipient alleged to be engaging in discriminatory conduct. *See, e.g., Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1261 (D.N.J. 1983) (defendant received funds during the period of alleged discrimination); *cf. Johnson v. Bd. of Educ. of Prince George's Cty.*, No. PJM 11-1195, 2014 WL 3778603, at *1 (D. Md. July 29, 2014) (court noted that "funds must be received during the relevant time period of the alleged discrimination for a cause of action to survive."); *Vanes v. Ind. Comm'n on Pub. Records*, No. 2:07-CV-00063 RLYWGH, 2008 WL 763374, at *4 (S.D. Ind. Mar. 20, 2008) (court stated that "the entity must be a recipient of federal financial assistance during the time of the alleged discriminatory conduct; otherwise, the entity cannot be liable under Section 504.").

The financial assistance does not have to relate to a program in which the complainant participates or seeks to participate or used for the complainant's benefit. Rather, an agency only

has to prove that the entity received federal financial assistance when the alleged discrimination occurred. *See Howe v. Hull*, 874 F. Supp. 779, 789 (N.D. Ohio 1994) ("Defendant cannot receive federal funds on the one hand, and on the other deny he is covered by the [federal Rehabilitation Act] simply because he received no federal funds for his involvement with [complainant]."); s*ee also Estate of Alcalde v. Deaton Specialty Hosp. Home, Inc.* 133 F. Supp. 2d 702, 708 (D. Md. 2001) (motion to dismiss denied in case where the court emphasized "the receipt of federal funds when determining liability under [Section 504 of the Rehabilitation Act]" where defendant claimed he was not subject to federal financial assistance requirements because he saw the patient in his office and not at the hospital and it was the hospital that entered into the grant with the federal agency).

An agency unable to establish that it provided federal financial assistance to an entity would not have the authority to conduct a complaint investigation or seek recourse under Title VI unless it is jointly investigating with another federal agency that provides the federal financial assistance, the unresolved complaint has been referred to DOJ for litigation, or DOJ is considering potential participation in a private Title VI case and needs to conduct some investigation to determine if such participation is appropriate. In the absence of these circumstances, the Title VI coordination regulations require the agency to "refer the complaint to another federal agency or advise the complainant." 28 C.F.R. § 42.408(b).[7]

## 4. Determining Whether an Entity Receives Federal Financial Assistance

When trying to identify funding sources of a recipient who has allegedly engaged in discriminatory acts, agencies should:

- Seek information from program offices responsible for providing grants;
- Use a data request to ask the target of the investigation directly for the information;
- Contact possible primary recipients for assistance identifying pass-through funds;
- Conduct internet research (e.g., county board minutes);
- Contact funding component program staff for leads;
- Research entities on the USA Spending.gov website (includes data about recipients and sub-recipients of various types of contracts, grants, loans, and other possible federal financial assistance);

---

[7] The Civil Rights Division is able to file statements of interest in matters pending in U.S. District Courts, including on matters brought by private litigants involving recipients of funds from non-DOJ sources. For example, the Division filed a statement of interest in a case involving a recipient's obligation to provide language assistance to limited English proficient individuals seeking driver's licenses. *Faith Action for Cmty. Equity v. Hawaii Dep't. of Transp.*, 13-CV-00450 (D. Haw. filed Mar. 28, 2014) *available at http://www.lep.gov/resources/DOJ_SOI_Hawaii.pdf* (last visited Apr. 12, 2016).

- Contact other federal agencies to discuss possible coordination. Some agencies have accessible online databases. *E.g.*, https://taggs.hhs.gov/ (the TAGGS database is a central repository of grants awarded by the eleven HHS Operating Divisions); the DOJ, Office of Justice Programs has a public website that provides award information; similarly, the Community Oriented Policing Services website, a component within DOJ, also has grant information on line. Other agencies also post award information.

Finally, agency offices addressing Title VI complaints should confirm receipt of any federal financial assistance before concluding that the agency has jurisdiction.

**D.     What/Who Is a Recipient?**

In simple terms, a Title VI recipient is an entity that receives, directly or indirectly, financial assistance from a federal agency.

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity **RECEIVING** Federal financial assistance.

**1.     Regulations**

A "recipient" is an entity or person that receives federal financial assistance. Under Title VI, it is the recipient who is barred from discriminating against persons because of race, color, or national origin with respect to the operation of covered programs or activities.

All agency Title VI regulations use a similar if not identical definition of "recipient," as follows:

> (f) The term *recipient* means any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or other entity, or any individual, in any State, to whom Federal financial assistance is extended, directly or through another recipient, including any successor, assign [sic] or transferee thereof, but such term does not include any ultimate beneficiary.

> (g) The term *primary recipient* means any recipient which is authorized or required to extend Federal financial assistance to another recipient for the purpose of carrying out a program.

28 C.F.R. §§ 42.102(f), (g) (Department of Justice regulations).

In plain language, the regulation provides:

- A recipient may be a public entity (e.g., a state, local or municipal agency), a private entity, or an individual;
- Title VI does not apply to the federal government;
- There may be more than one recipient in a program; that is, a primary recipient (e.g., state agency) that transfers or distributes assistance to a subrecipient (local entity) for distribution to an ultimate beneficiary;[8]
- A recipient also encompasses a successor, transferee, or assignee of the federal assistance (property or otherwise), under certain circumstances; and
- As discussed below, there is a distinction between a recipient and a beneficiary.

A recipient also may receive federal assistance either directly from the federal government or indirectly through a third party, who is not necessarily another recipient (e.g., schools are indirect recipients when they accept payments from students who directly receive federal financial aid).[9]

If a recipient distributes federal financial assistance to other entities, it must monitor Title VI compliance for subrecipients and implement procedures to receive and investigate complaints or other information indicating potential noncompliance. Federal agency regulations generally require that the primary recipient obtain compliance reports from its subrecipients and make efforts to ensure that subrecipients permit access to information. *See*, *e.g.*, 28 C.F.R. §§ 42.106(b), (c) (DOJ regulations). A recipient can be liable for failure to take steps to ensure the compliance of its subrecipients. *Cf. United States v. Maricopa Cty.*, 915 F. Supp. 2d 1073 (D. Ariz. 2012) (ruling that the county government is a proper Title VI defendant under principles of municipal liability).

## 2.    Direct Recipient

A direct recipient of federal financial assistance for Title VI purposes is an entity that accepts financial assistance from a federal agency and, therefore, becomes subject to the requirements of Title VI. Federal financial assistance can be monetary or non-monetary and includes federal grants, loans, or contracts (other than a contract for goods or services at fair market value or of insurance or guaranty). For example:

- City Police Department (CPD) applies for and receives a grant from DOJ for its community outreach programs. CPD is a recipient of federal financial assistance.

---

[8] An ultimate beneficiary usually does not receive a "distribution" of the federal money. Rather, the beneficiary enjoys the benefits of enrollment in the program.

[9] *See Grove City Coll. v. Bell*, 465 U.S. 555, 563 (1984) (student financial aid office received federal financial assistance in the form of loans to students provided for the purpose of paying for college); *see also Liberty Res., Inc. v. Philadelphia Hous. Auth.,* 528 F. Supp. 2d 553, 558 (E.D. Pa. 2007) (public housing authority that receives federal financial assistance from HUD through a voucher program).

- CPD also received a grant for the purchase of bulletproof vests. CPD remains a recipient as long as it uses the vests purchased with grant funds.
- CPD is given excess military equipment from the Defense Department that it continues to use. CPD remains a recipient as long as it uses the equipment.
- Ten years ago, Smithtown University applied for and received federal grants, loans, and interest subsidies in excess of $7 million from the Department of Education. The University used this assistance to construct a law school. The University is a "recipient" through the present day because it used federal financial assistance during construction and it continues to use the building for its original (or similar) purpose.
- Airport operators voluntarily accept federal funds under a statutory program for airport construction and capital development. The airport operators are recipients subject to nondiscrimination provisions as long as they use the facilities constructed with federal funds for their original (or similar) purposes. *See Paralyzed Veterans*, 477 U.S. at 606–07.

The clearest means of identifying a "recipient" of federal financial assistance is to determine whether the entity has voluntarily entered into a relationship with the federal government and receives federal assistance under a condition or assurance of compliance with Title VI (and/or other nondiscrimination obligations). *Id.* at 605–06. ("By limiting coverage to recipients, Congress imposes the obligations of § 504 [and Title VI] upon those who are in a position to accept or reject those obligations as part of the decision whether or not to 'receive' federal funds."). As one court noted:

> By accepting the funds, one accepts the obligations that go along with it, namely, the obligation not to exclude from participation, deny benefits to, or subject to discrimination an otherwise qualified handicapped individual solely by reason of her handicap. Only by declining the federal financial assistance can one avoid this obligation.

*Chester v. Univ. of Wash.*, No. C11-5937, 2012 WL 3599351, at *4 (W.D. Wash. Aug. 21, 2012).

The acceptance of federal assistance triggers Title VI coverage and becomes formalized when a recipient signs an assurance: a contract whereby the recipient agrees to comply with the nondiscrimination provisions as a condition of receiving federal assistance.[10]  Even without a

---

[10] A recipient's written assurance and certification documents can provide an independent contractual basis for enforcement of nondiscrimination requirements. For example, the assurance document from the Office of Justice Programs, a Department of Justice component, states, inter alia, "[The Applicant] will comply, and all its contractors will comply, with the nondiscrimination requirements of the [Safe Streets Act, Title VI, Section 504, Title IX ….]." The United States may bring civil actions to enforce Title VI contractual assurances. *See* Department of Justice, *Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964*, 28 C.F.R. § 50.3, pt. I.B.1 (listing various "[p]ossibilities of judicial enforcement," including suits to enforce contractual assurances).

written or signed assurance, however, acceptance of federal financial assistance triggers
coverage under Title VI. *See Paralyzed Veterans*, 477 U.S. at 605 ("the recipient's acceptance of
the funds triggers coverage under the nondiscrimination provision"). *See also Grove City Coll. v.
Bell*, 465 U.S. 555, 560–61, 563 (1984) (finding that Grove City College was a recipient even
though it refused to sign an assurance); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582,
630 (1983) (Marshall, J., dissenting) (citing 3 R. Cappalli, *Federal Grants* § 19:20, at 57, and
n.12 (1982) ("[W]ritten assurances are merely a formality because the statutory mandate applies
and is enforceable apart from the text of any agreement.").

### 3.    Indirect Recipient

Finding that an entity directly receives federal financial assistance is usually the easiest way to
identify a Title VI recipient. It is not, of course, the only way.[11]  A recipient may receive funds
either directly or indirectly. *Grove City*, 465 U.S. at 564–65.[12]  In *Grove City*, the Supreme Court
found the college was a "recipient" under Title IX because students paid for their educational
expenses, in part, with federally subsidized loans. *Id.* at 569–70. The Court reasoned that
colleges and universities were the intended recipients of the grant program because Congress
created the grants to supplement the financial aid programs of institutions of higher education.
*Id.* at 565–66. The *Grove City* Court concluded that Congress never intended to "elevat[e] form
over substance by making the application of the nondiscrimination principle dependent on the
manner in which a program or activity receives federal assistance." *Id.* at 564; *see also Bennett-
Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 452 (5th Cir. 2005) (finding that a university
was a "recipient" under Section 504 because its students received federal work study assistance
and grants); *Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 602 (D.S.C. 1974) ("payments are
specifically tied to the beneficiary's participation in an educational program or activity," and go
to the university "recipient")*, aff'd*, 529 F.2d 514 (4th Cir. 1975).[13]

Nevertheless, there are limits to the concept of an indirect recipient. As the Supreme Court
explained in *Paralyzed Veterans*, an entity that merely enjoys indirectly the benefits of federal
financial assistance is not an intended recipient: "While *Grove City* stands for the proposition
that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly

---

[11] The remaining text of this section distinguishes various scenarios for recipients and beneficiaries. While captions
are used to distinguish different circumstances, courts do not uniformly use the same phrase to explain the same
funding pattern. Thus, a court may refer to an "indirect recipient" when the situation more closely fits the paradigm
of "primary recipient/subrecipient."

[12] As noted in the Manual, the Supreme Court's analysis in *Grove City* of the scope of "program or activity" was
reversed by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988). The Court's
discussion of other principles, however, including direct and indirect recipients, remains undisturbed.

[13] Similarly, in *Spann v. Word of Faith Christian Center Church*, 589 F. Supp. 2d 759, 765–67 (S.D. Miss. 2008),
the court found that a daycare center was a recipient of federal financial assistance because it accepted a federally
funded voucher from a family to pay for part of the cost of child care. The court reasoned that the daycare center
was an intended recipient because the funds were earmarked for a child care provider and the purpose of the subsidy
was to "improve the quantity and quality of child care available to low income families." *Id.* at 767.

or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid." *Paralyzed Veterans*, 477 U.S. at 607 (citing *Grove City*, 465 U.S. at 564).

Along these lines, the Supreme Court in *NCAA v. Smith*, 525 U.S. 459, 468–70 (1999), citing both *Grove City* and *Paralyzed Veterans*, ruled that the NCAA was not an indirect recipient of federal financial assistance under Title IX. The NCAA received dues from colleges and universities who were recipients of federal financial assistance, but the assistance to those institutions was not earmarked for the NCAA. *Id.* at 468. The court concluded that "[a]t most, the [NCAA's] receipt of dues demonstrates that it indirectly benefits from the federal assistance afforded its members." *Id.* But, the Court stated, "[t]his showing, without more, is insufficient to trigger Title IX coverage." *Id.*

The Court in *Smith* specifically did not address DOJ's argument that "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless whether it is itself a recipient." *Id.* at 469–70. The Eleventh Circuit found enough of a connection, however, in *Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007). In this Title IX case, the court noted that the plaintiff "alleged that [the University of Georgia], a funding recipient, has ceded control over one of its programs, the athletic department, to [the University of Georgia Athletic Association] and provided extensive funding to UGAA." *Id.* at 1294. Based on this contention, the court ruled that to not extend Title IX coverage to the University in this case would allow "funding recipients to cede control over their programs to indirect funding recipient" but "avoid Title IX liability." *Id.* (citing *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n,* 80 F. Supp. 2d 729, 733–34 (W.D. Mich. 2000).

### 4.    Primary/Subrecipient Programs

Many programs have two or more recipients. The primary recipient directly receives the federal financial assistance. The primary recipient then distributes the federal assistance to a subrecipient to carry out a program. *See*, *e.g.*, 28 C.F.R. § 42.102(g). The primary recipient and all the subrecipients are covered by and must conform their actions to Title VI. For example:

- A state agency, such as the Department of Children and Family Services, receives a substantial portion of its funding from the federal government. The state agency, as the primary recipient or conduit, in turn, funds local social service organizations in part with its federal funds. The local agencies receive federal financial assistance, and thus are subject to Title VI. *See Graves v. Methodist Youth Servs., Inc.*, 624 F. Supp. 429 (N.D. Ill. 1985) (Section 504 case).[14]

---

[14] The *Graves* court described the local agency as an "indirect" recipient because the federal money flowed "through another recipient," and it compared this situation to Grove City College's indirect receipt of financial aid funds from

- A state subcontracts with a private company to operate a state institution for individuals with developmental disabilities. The state receives federal funding and uses those funds to pay the private company for its services. The state is the recipient of federal financial assistance and the private company is a subrecipient. As a subrecipient, the company must comply with any program-specific statutes through which it receives funding, as well as Title VI. *See, e.g.*, *Brown v. Fletcher*, 624 F. Supp. 2d 593, 607 (E.D. Ky. 2008) (Section 504 case).

- Under the Older Americans Act, the Department of Health and Human Services gives funds to state agencies. Those agencies, in turn, distribute funds according to funding formulas to local agencies operating programs for elderly Americans. Title VI applies to the local agencies as subrecipients of federal financial assistance as well as to the state agencies that directly receive the funds. *See Chicago v. Lindley*, 66 F.3d 819 (7th Cir. 1995).

In many instances, a recipient receives funds with the purpose and expectation that it will distribute the funds to one or more sub-grantees or indirect recipients.[15]  For example, in *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir. 1996) (en banc), the United States Department of Transportation provided funds to Michigan for use in upgrading railroad crossings. The state, in turn, provided these funds to Conrail. In finding that Conrail was a recipient of federal financial assistance, the court noted that "[i]t makes no difference, in our view, that the federal funds of which Conrail is the recipient come to it through the State of Michigan rather than being paid to it by the United States directly." *Id.* at 787. Similarly, in *Rogers v. Board of Education*, 859 F. Supp. 2d 742, 752 (D. Md. 2012), the court held that the county board of education received federal financial assistance because the State Department of Education received federal funds and, through its Department of Treasury, distributed funds to county boards of education. *Id.*

---

students. *Graves,* 624 F. Supp. at 433. Given that the funding was distributed to a state agency and a portion allocated to a local entity, the more accurate description is that of primary/subrecipient.

[15] The Title VI Coordination Regulations, codified at 28 C.F.R. § 42.401 et seq., are designed to provide agencies with a set of standards for use in developing and implementing a Title VI enforcement and compliance program. One provision addresses grants that go to a central state office with an expectation that the state will distribute the funds to subrecipients:

> Each state agency administering a continuing program which receives federal financial assistance shall be required to establish a Title VI compliance program for itself and other recipients which obtain federal assistance through it. The federal agencies shall require that such state compliance programs provide for the assignment of Title VI responsibilities to designated state personnel and comply with the minimum standards established in this subpart for federal agencies, including the maintenance of records necessary to permit federal officials to determine the Title VI compliance of the state agencies and the sub-recipient.

*Id.* § 42.410.

5.      **Contractor and Agent**

A recipient may not absolve itself of its Title VI obligations by hiring a contractor or agent to perform or deliver assistance to beneficiaries. Agency regulations consistently state that prohibitions against discriminatory conduct apply to a recipient, whether committed "directly or through contractual or other arrangements." *E.g.*, 28 C.F.R. §§ 42.104(b)(1), (2). For example:

- A recipient public housing authority contracts with a residential management company for the management and oversight of a public housing complex. Employees of the contractor reject prospective tenants based on their race, color, or national origin. The recipient is liable under Title VI for the contractor's actions as the contractor is performing a program function of the recipient. (For the reasons discussed below, the contractor may also be liable under Title VI).

- In addition, Title VI may cover a contractor that performs an essential function for the recipient, making the contractor itself a recipient. In *Frazier v. Bd. of Trustees.*, 765 F.2d 1278, 1290, *amended,* 777 F.2d 329 (5th Cir. 1985), a Section 504 case, the court noted that the defendant hospital contracted out core medical functions, for which it received federal financial assistance, to a contractor. The court ruled that this financial assistance to the hospital "would not have been [provided] at all were it not for [the contactor's] performance as a de facto subdivision of [the hospital]." *Frazier*, 765 F.2d at 1290; *but see Rose v. Cahee,* 727 F. Supp. 2d 728, 739 (E.D. Wis. 2010) (court declined to follow *Frazier*, limiting coverage of the funding assistance nondiscrimination cover the contractor of a recipient requirement to those entities receiving the funds directly and that "are in a position to choose whether to do so"). Of significance, core hospital functions were at issue in *Frazier.* Failure to extend Title VI protection in this case arguably would have permitted the hospital to contract out all of its federally funded functions and deprive the beneficiaries of protection under the Title VI and the other federal financial assistance statutes.[16]  See also the discussion of indirect recipients, above.

---

[16] As the court noted in *Frazier*:

> It is this mutual benefit that distinguishes [the contractor's] womb-like financial situation from that of a private contractor with no material relationship to the recipient's receipt of federal funds. Unlike the hospital's privately contracted mower of lawns, sweeper of floors, or supplier of aspirin, [the contractor] contributes in a direct and tangible way to the hospital's claims for reimbursement under Medicare and Medicaid. That the federal check does not bear [the contractor's] name is no answer to the fact that the check would not have been written at all were it not for [the contractor's]performance as a de facto subdivision of [the hospital].

*Frazier*, 765 F.2d at 1290.

### 6.    Transferees and Assignees

When the federal government provides financial assistance related to real or personal property, such as by partially financing construction or renovations on a building, a "recipient" is defined more broadly. In such circumstances, successors, transferees, assignees, and contractors all may be recipients under Title VI. Agency regulations and assurances often include specific statements on the application of Title VI in situations involving real or personal property. For example, DOJ's regulations state:

> In the case where Federal financial assistance is to provide or is in the form of personal property, or real property or interest therein or structures thereon, such assurance shall obligate the recipient, or in the case of a subsequent transfer, the *transferee*, for the period during which the property is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits …. The responsible Department official shall specify the form of the foregoing assurances, and the extent to which like assurances will be required of subgrantees, contractors, and subcontractors, transferees, successors in interest, and other participants.

28 C.F.R. § 42.105(a)(1) (emphasis added).

Furthermore, land that originally was acquired through a program receiving federal financial assistance must include a covenant binding on subsequent purchasers or transferees that requires nondiscrimination for as long as the land is used for the original or a similar purpose for which the federal assistance is extended. 28 C.F.R. § 42.105(a)(2).[17]

### 7.    Recipient v. Beneficiary

Finally, in analyzing whether an entity is a recipient, it is necessary to distinguish a recipient from a beneficiary: the former must comply with Title VI while the latter does not. *See Paralyzed Veterans*, 477 U.S. at 606–07.[18] An assistance program may have many beneficiaries, that is, individuals and entities that directly or indirectly receive an advantage through the operation of a federal program. Beneficiaries, however, do not enter into any formal contract or

---

[17] In contrast, in *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F. Supp. 1328, 1341 (N.D. Cal. 1993), the transfer of property at issue occurred before the effective date of HUD regulations stating that transferees or purchasers of real property are subject to Section 504. The San Francisco agency was a recipient of funds under a block grant to assemble and clear land for redevelopment. The purchaser of the land, who built housing units, was considered a beneficiary. *Id.*

[18] Most agency Title VI regulations state that the term recipient "does not include any ultimate beneficiary under the program." *See, e.g.*, 28 C.F.R. § 42.102(f) (DOJ).

agreement with the federal government where compliance with Title VI is a condition of receiving the assistance.[19]

> In almost any major federal program, Congress may intend to benefit a large class of persons, yet it may do so by funding—that is, extending federal financial assistance to—a limited class of recipients. Section 504, like Title IX in *Grove City*, draws the line of federal regulatory coverage between the recipient and the beneficiary.

*Id.* at 609–10.

In distinguishing between recipients and beneficiaries, courts have considered both the intent of Congress and a party's ability to accept or reject the federal financial assistance. *Alfano v. Bridgeport Airport Servs.*, 373 F. Supp. 2d 1, 5 (D. Conn. 2005) (citing *Paralyzed Veterans*, 477 U.S. at 605–06). In *Paralyzed Veterans*, the Court held that commercial airlines were beneficiaries of an airport improvement program, and not recipients under Section 504. *Id.* at 607.[20] The Court reasoned that the purpose of the program was to improve airports, not to give aid to individual airlines. *Id.* at 604–05. The Court rejected the argument that the airlines were indirect recipients because airport operators converted federal funds into runways and other property improvements for the airlines. *Id.* at 606–07. The Court noted that there was no evidence that the airlines were intended recipients of the aid or that the airport operators were mere conduits of the funds. *Id.* at 607 (citing *Grove City*, 465 U.S. at 564). The Court found that the airport operators were the recipients because they received federal funds, agreed to comply with civil rights statutes as a condition of the assistance, and could terminate their participation in the program at any time. *Id.* at 604–06 (citing *Grove City*, 465 U.S. at 565 n.13).

## E.    "Program or Activity"

Title VI prohibits discrimination in "any program or activity," any part of which receives Federal financial assistance. *See* 42 U.S.C. §§ 2000d, 2000d-4(a). Interpretations of "program or

---

[19] For example, in *Cuffley v. Mickes*, 208 F.3d 702 (8th Cir. 2000), plaintiffs Knights of the Ku Klux Klan brought suit against the Missouri Highway and Transportation Commission for denying its application to participate in Missouri's Adopt-a-Highway program. Among the state's reasons for denying the application was that allowing the Klan to participate in the Adopt-a-Highway program would violate Title VI and would cause the state to lose its federal funding. The Eighth Circuit ruled that "Title VI clearly does not apply directly to prohibit the Klan's discriminatory membership criteria" and that the Klan is not a direct recipient of federal financial assistant through the Adopt-A-Highway program, but merely a beneficiary of the program. Therefore, the state's Title VI-based denial of the Klan's application was invalid. *Id.* at 710.

[20] In response to *Paralyzed Veterans*, Congress passed the Air Carrier Access Act (ACAA) in 1986, requiring that Department of Transportation regulations ensure that air carriers traveling within the United States do not discriminate against passengers based on disability.

activity" depend on whether one is analyzing the scope of Title VI's prohibitions or evaluating what part of the entity is subject to a potential fund termination or refusal. As described in greater detail elsewhere in the manual, "a recipient may be only a part of a larger entity. Title VI often covers, and prohibits discrimination in, the larger entity, rather than the smaller program that directly receives the funding." This section focuses on coverage.

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any **PROGRAM OR ACTIVITY** receiving Federal financial assistance.

### 1.    Introduction

When enacted in 1964, Title VI did not include a definition of "program or activity." Congress had made its intentions clear, however: Title VI's prohibitions were meant to be applied institution-wide, and as broadly as necessary to eradicate discriminatory practices in programs that federal funds supported. 110 Cong. Rec. 6544 (statement of Sen. Humphrey); *see* S. Rep. No. 64, 100th Cong., 2d Sess. 5–7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3, 7–9. The courts, consistent with congressional intent, initially interpreted "program or activity" broadly to encompass the entire institution in question. For example, Title VI covered all of the services and activities of a university even where the sole federal assistance was federal financial aid to students. *See, e.g.*, *Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 603 (D.S.C. 1974), *aff'd,* 529 F.2d 514 (4th Cir. 1975); S. Rep. No. 64 at 10, *reprinted in* 1988 U.S.C.C.A.N. at 12. In 1984, the Supreme Court in *Grove City College v. Bell*, 465 U.S. 555, 571 (1984), severely narrowed the interpretation of "program or activity." The Court ruled that Title IX's prohibitions against discrimination applied only to the specific office of an institution's operations that received the federal funding. Because the college received federal funds as a result of federal financial aid to students, the Court found that the "program or activity" was the college's financial aid program. *Id.* at 574.

In response to *Grove City*, Congress passed the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988) (CRRA). The CRRA includes virtually identical amendments to broadly define "program or activity" (for coverage purposes) for the four cross-cutting civil rights statutes: Title VI, Title IX, Section 504, and the Age Discrimination Act.[21]  Congress

---

[21] The Age Discrimination Act of 1975, as amended, 42 U.S.C. § 6101 et seq. (ADA 1975), similar to Title VI, provides that "no person in the United States shall, on the basis of age, be excluded from participation, in be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." *Id.* § 6102. The ADA 1975 does not include age limits; that is, there are neither minimum nor maximum age parameters that would limit coverage to young or old persons. The Act includes a provision giving the Department of Health and Human Services responsibility for issuing regulations addressing the Act, *id.* at § 6103, as well as other coordination and oversight responsibilities. Similar to the other federal financial assistance statutes,

determined that legislative action was "necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered." CRRA § 2. Congress explained that it always had been its intent that Title VI and its progeny "be given the broadest possible interpretation" so that federal agencies may "assist in the struggle to eliminate discrimination from our society by ending federal subsidies of such discrimination." S. Rep. No. 64 at 7, *reprinted in* 1988 U.S.C.C.A.N. at 9;[22] s*ee also Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 942 (9th Cir. 2009) (citing *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009)) (the term "program or activity" should be viewed as expansive in meaning and application); *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 771, 775 (W.D. Tex. 2006) (citing *Barden v. City of Sacramento,* 292 F.3d 1073, 1076 (9th Cir. 2002)) ("Courts have broadly construed the "services, programs, or activities" language in … the Rehabilitation Act to encompass "anything a public entity does.").[23]

With regard to public institutions or private institutions that serve a public purpose, the "program or activity" that Title VI covers encompasses the entire institution and not just the part of the institution that receives federal financial assistance. 42 U.S.C. § 2000d-4a. Moreover, the part of the program or activity that receives assistance can be, and often is, distinct from the part that engages in the allegedly discriminatory conduct. *See White v. Engler*, 188 F. Supp. 2d 730, 745–47 (E.D. Mich. 2001) (plaintiffs could pursue a Title VI claim against a scholarship program, even though the program operated without federal financial assistance, because it was part of a department that received federal funds); *D.J. Miller & Assocs. v. Ohio Dep't of Admin. Servs.*, 115 F. Supp. 2d 872, 878 (S.D. Ohio 2000) (granting a preliminary injunction under Title VI regarding alleged discrimination in a state contract where the contract was administered by a department that received federal funds).

In *Lucero v. Detroit Public Schs.*, 160 F. Supp. 2d 767, 785–86 (E.D. Mich. 2001), plaintiffs claimed that school officials violated Title VI when they relocated a largely minority elementary school to a site with alleged environmental toxins. The court held that it was irrelevant that the construction of the new school did not involve federal financial assistance because the term "program or activity" broadly encompassed the entire school district. *Id.* at 785. The court reasoned that the construction of the new school was "an operation of" or "part of" the larger

---

however, each grant making agencies are responsible for addressing allegations that their recipients have violated the Act.

[22] The Senate further stated that "[t]he purpose of the Civil Rights Restoration Act of 1987 is to reaffirm pre-*Grove City* judicial and executive branch interpretations and enforcement practices which provided for broad coverage of the anti-discrimination provisions of these civil rights statutes." *Id.*

[23] In 1999, the Third Circuit held that the CRRA's statutory definition of "program or activity" did not apply to the effects test created by Title VI regulations. *Cureton v. NCAA*, 198 F.3d 107 (3d Cir. 1999). The court reasoned that because the Title VI regulations in question had not been amended to reflect the CRRA's definition, the effects test only applied to specifically funded programs. In response to the decision, federal agencies amended their regulations to make clear that CRRA's broad definition of "program or activity" applies to claims brought under the effects test enunciated in regulations, as well as to intentional discrimination. *See, e.g.*, 34 C.F.R. §§ 100.13(g); 104.3(k); 106.2(h) (Dep't of Educ.); 45 C.F.R. §§ 80.13; 86.2; 91.4 (HHS).

school district. *Id.* Therefore, it was sufficient that the school district received federal funds for other purposes to extend Title VI coverage to the construction of the school in question. *Id.*

### 2.    State and Local Governments

The following instrumentalities of a state or local government may constitute a "program or activity" under Title VI:

> [A]ll of the operations of
> (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(1). The legislative history confirms Congress intended a broad application to state and local governments:

> [W]hen any part of a state or local government department or agency is extended federal financial assistance, the entire agency or department is covered. If a unit of a state or local government is extended federal aid and distributes such aid to another governmental entity, all of the operations of the entity which distributes the funds and all of the operations of the department or agency to which the funds are distributed are covered.

S. Rep. No. 100-64, at 16 (1988), *reprinted in* 1988 U.S.C.C.A.N. 18. As such, when an office or operation is part of a larger department or entity, the relevant "program or activity" is the larger entity.

In *Haybarger v. Lawrence Cty. Adult Probation & Parole*, 551 F.3d 193, 199–203 (3d Cir. 2008), the plaintiff alleged that Lawrence County Adult Probation and Parole Department (LCAPPD) engaged in unlawful employment discrimination practices that Section 504 prohibits. *Id.* at 196–97. While LCAPPD did not receive federal funds, "the Domestic Relations Section (DRS) of the Fifty–Third Judicial District did receive federal funds under Title IV–D of the Social Security Act." *Id.* at 197. The court explained that "although a particular function or operation might be the State's only link to federal funds … [Title VI] applies to 'all the operations' of the entity receiving federal funds." *Id.* at 200.[24]  Because the court found the DRS

---

[24] While federal law controls in determining whether an entity is a covered "program or activity" under Title VI, state or local law can inform the decision of whether a particular entity is independent or a subunit of another entity. *See Haybarger*, 551 F.3d at 200–01; *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009).

to be a sub-unit of the Fifty–Third Judicial District, which is in turn part of Pennsylvania's Unified Judicial System, the DRS's receipt of federal funds effectuated a waiver of Eleventh Amendment immunity for not just the DRS, but for all subunits of the Fifty–Third Judicial District, including the LCAPPD. *Id*. at 202. The court concluded that the relevant "program or activity" was the entire Judicial District because the LCAPPD formed a part of the Judicial District. *Id.* at 202–03 (citing *Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir. 1995)).[25] *See also Huber v. Howard Cty.*, 849 F. Supp. 407, 415 (D. Md. 1994) ("if one part of a department receives federal financial assistance, the whole department is considered to receive federal assistance"), *aff'd* 56 F.3d 61 (4th Cir. 1995); *Starr v. Hawaii*, CV05-00665, 2007 WL 3254831 *3 (D. Haw. Nov. 2, 2007) (citing cases).

An entire state or local government generally is not considered a "program or activity" where the funding goes to an agency or department within the entity and not to the state or local government specifically.[26] *See Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002) ("The term 'program or activity' … does not encompass all the activities of the State. Instead, it only covers all the activities of the department or the agency receiving federal funds.");[27] *see also Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991).[28] The following examples illustrate this point:

- If federal health assistance is extended to a part of a state health department, the entire health department, including its components, would be covered in all of its operations.

---

[25] In *Thomlison*, the court stated, "Because the definition of program or activity covers all the operations of a department, here the Public Safety Department, and part of the Department received federal assistance, the entire Department is subject to the Rehabilitation Act." 63 F.3d at 789. In this case, the civil action involved the Fire Department, which was part of the Public Safety Department that also included the Police, and Communications Departments. Because the Police Department received federal financial assistance, the entire Public Safety Department was covered, including the Fire Department.

[26] At least one court, however, has held that an entire county was the "program or activity." *See Bentley v. Cleveland Cty. Bd. of Comm'rs*, 41 F.3d 600 (10th Cir. 1994)  *See also Thorpe v. Borough of Jim Thorpe*, 2013 WL 1703572 *13–15 (M.D. Pa. 2013) (extended discussion of federal funding issues), *aff'd in part and rev'd in part on other grounds,* 770 F.3d 255 (3d Cir. 2014).

[27] In *Hodges by Hodges v. Pub. Bldg. Comm'n of Chicago*, 864 F. Supp. 1493, 1506 (N.D. Ill. 1994), the court framed the test as follows:

> In the post-CRRA era, whether or not an entity receives federal funds is no longer the *sine qua non* of a Title VI action. Consistent with the broad definition of "program or activity," courts have rejected such a formalistic approach in favor of examining the defendant's relationship to the entity receiving the federal funds.

[28] In *Schroeder*, the court stated:

> But the amendment was not, so far as we are able to determine—there are no cases on the question—intended to sweep in the whole state or local government, so that if two little crannies (the personnel and medical departments) of one city agency (the fire department) discriminate, the entire city government is in jeopardy of losing its federal financial assistance.

*Id.*

However, the entire state government is not considered a covered program just because the health department receives federal financial assistance.

- If the office of a mayor receives federal financial assistance and distributes it to departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies that actually receive the aid from the Mayor's office.
- If a state receives funding that is designated for a particular state prison, the entire State Department of Corrections is considered the covered "program or activity" (but not, however, the entire state).

An entire state or local government may, however, be liable for Title VI violations if it is partially responsible for the discriminatory conduct, is contractually obligated to comply with Title VI, or has a responsibility to monitor subrecipients. In *United States v. City of Yonkers*, 880 F. Supp. 212, 232 (S.D.N.Y. 1995), *vacated and remanded on other grounds*, 96 F.3d 600 (2d Cir. 1996), the court rejected the state's argument that sovereign immunity applied because it is not a "program or activity." The court stated that, not only does the plain language of § 2000d-7 defeat the state's assertion, but also

> [N]othing in the legislative history of Title VI compels the conclusion that an entity must be a 'program' or 'activity' to be a Title VI defendant…. We therefore hold that the State of New York can be sued under Title VI as long as it, along with those of its agencies receiving federal financial assistance, is alleged to have been responsible for a Title VI violation.

*Id.* (note omitted).[29]  *See also N.Y. Urban League v. Metro. Transp. Auth.*, 905 F. Supp. 1266, 1273 (S.D.N.Y.), *vacated on other grounds*, 71 F.3d 1031 (2d Cir. 1995).

Further, when accepting federal financial assistance, state and local governments should be required to obligate themselves to comply with Title VI by a separate contract of assurance. Often times, this contractual arrangement is formalized when a state or local government signs an assurance agreement. *See*, *e.g.*, *United States v. Maricopa Cty.*, 2:10-cv-01878-LOA (D. Ariz. filed Sept. 13, 2010) (United States sues county government for Title VI violations, in part, because of its obligations under contractual assurances); *United States v. Maricopa Cty.*, 2:12-cv-00981-ROS (D. Ariz. filed May 10, 2012) (same). Even absent a written contract, the state or local government obligates itself to comply with Title VI if the entire governmental unit accepts federal financial assistance. *Cf. Paralyzed Veterans*, 477 U.S. at 605 (noting that "the recipient's

---

[29] Plaintiffs had alleged that the state, through its legislature, contributed to the alleged school segregation by passing laws that impeded desegregation efforts and providing limited financial assistance for such efforts. *Id.* at 232 n.25. It is unclear whether the plaintiffs introduced evidence in support of these allegations. In a subsequent opinion, the court did not address these facts and rejected plaintiffs' arguments that a state, solely by its failure to prevent alleged discrimination, could be held vicariously liable for a local agency's discriminatory acts under either an intent or discriminatory effect standard. *United States v. City of Yonkers*, 880 F. Supp. 591, 597–98 (S.D.N.Y. 1995), *vacated and remanded*, 96 F.3d 600 (2d Cir. 1996).

acceptance of the funds triggers [contractual] coverage under the nondiscrimination provision")
(citing *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983)).

### 3.    Educational Institutions

In the educational context, Title VI provides that the following institutions constitute a "program
or activity":

> all of the operations of
> (2)(A) a college, university, or other postsecondary institution, or a public system
> of higher education; or
> (B) a local educational agency (as defined in Section 7801 of Title 20), system of
> vocational education, or other school system;
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(2) (emphasis added). Section 2(A) specifically overturns *Grove City* by
including all of the operations of a postsecondary institution when any part of that institution is
extended federal financial assistance.[30] *See Knight v. Alabama*, 787 F. Supp. 1030, 1364 (N.D.
Ala. 1991) (entire statewide university system constituted "program or activity," notwithstanding
limited autonomy of institutions and even though not all institutions received federal assistance),
*aff'd in part, rev'd in part, and vacated in part*, 14 F.3d 1534 (11th Cir. 1994).

Senate Report 64 provides several examples of the scope of an educational "program or
activity." Federal funding to one school subjects the entire school system to Title VI. S. Rep. No.
64 at 17, *reprinted in* 1988 U.S.C.C.A.N. at 19. Congress explained that the phrase "all of the
operations of" encompasses, but is not limited to, "traditional educational operations, faculty and
student housing, campus shuttle bus service, campus restaurants, the bookstore, and other
commercial activities." *Id.*

The courts have followed this broad interpretation by ruling that a local educational agency
includes school boards, their members, and agents of such boards. *Horner v. Kentucky High Sch.
Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) (Title IX case); *Rogers v. Bd. of Educ.*, 859 F.
Supp. 2d 742, 752 (D. Md. 2012); *Meyers ex rel. Meyers v. Bd. of Educ.*, 905 F. Supp. 1544 (D.
Utah 1995);[31] *see also Young ex rel. Young v. Montgomery Cty. Bd. of Educ.*, 922 F. Supp. 544
(M.D. Ala. 1996) (court addressed the merits of Title VI claims against the county board of
education without comment or question as to the propriety of such claims). In *Rogers*, for

---

[30] "Postsecondary institution is a generic term for any institution which offers education beyond the twelfth grade.
Examples of postsecondary institutions would include vocational, business and secretarial schools." S. Rep. No. 64
at 16, *reprinted in* 1988 U.S.C.C.A.N. at 18.
[31] The court in *Meyers* opined that the Department of Education's regulations have a narrower definition of
"program or activity" than is set forth in the statute. *Id.* at 1574 n.37. Nonetheless, the definition was broad enough
to encompass the program at issue in the case.

example, the court held that the county board of education received federal financial assistance because the state's Department of Education received federal funds and, through its Department of Treasury, distributed funds to county boards of education. *Rogers*, 869 F. Supp. 2d at 752. The court concluded that the county board of education was a proper defendant under Title VI because it fit the definition of a "local educational agency" under the statutory language for covered programs or activities. *Id.* at 745 (citing 42 U.S.C. § 2000d-4a(2)(B)).

### 4.        Corporations and Private Entities

While the CRRA restored institution-wide definitions of a program or activity for public entities or entities that serve a public purpose, it left in place a more narrow definition for private entities. *See Boswell v. Skywest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002) ("[W]ith respect to private organizations such as [the defendant], the statutory definition of 'program or activity' was not expanded to the pre-*Grove City* institution-wide definition."), *aff'd*, 361 F.3d 1263 (10th Cir. 2004) (court did not address the definition of program or activity). The scope of "program or activity" as it applies to a corporation or other private entity depends on the operational purpose of the entity, the purpose of the funds, and the structure of the entity. Title VI provides:

> For the purposes of this subchapter, the term "program or activity" and the term "program" mean all of the operations of
> (3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship--
> (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or
> (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or
> (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship;
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(3).

When federal financial assistance broadly supports an entire private organization, all of its operations are subject to Title VI. 42 U.S.C. § 2000d-4a(3)(A)(i). Funds are given to an entity "as a whole" when such funds further the central or primary purpose of the entity, or the funds are not for a specific, narrow purpose. For example, funds provided to ensure the continued operation of a corporation such as by preventing bankruptcy, are assistance to the entity "as a whole." S. Rep. No. 100-64 at 17, *reprinted in* 1988 U.S.C.C.A.N. at 19. By contrast, funds for a specific purpose or funds that support one of several functions of the private entity are not assistance to the recipient "as a whole." When the funding is narrowly tailored, Title VI covers

only the part of the recipient's operations that receives funds. The following are examples of funding for a specific purpose that does not apply to the entity "as a whole":

- An airline that receives Department of Transportation funds for certain rural routes. *Boswell*, 217 F. Supp. 2d at 1217–19.
- A company that receives funds for job training. S. Rep. No. 100-64 at 17, *reprinted in* 1988 U.S.C.C.A.N. at 19.
- A religious organization that receives a grant to enable it to extend assistance to refugees, which is just one of a number of activities of the organization. *Id.*

The notion that federal aid "frees up" funds for other purposes or the fungibility of money does not expand the application of Title VI beyond the principles described above. *Id.* at 17–18, *reprinted in* 1988 U.S.C.C.A.N. at 19–20.

When federal assistance is extended to a plant or any other comparable, geographically separate corporate facility or other private entity, Title VI covers only the operations of the specific plant or facility. 42 U.S.C. § 2000d-4a(3)(B). Congress gave the following example to illustrate this point: the federal government extended federal financial assistance to the Michigan State Department of Health, which in turn provided funding for first aid training to the General Motors Dearborn, Michigan plant. As a result, Title VI covers all Dearborn plant operations, as well as the State Department of Health that distributed the federal money. Title VI does not, however, cover other geographically separate General Motors facilities merely because of the assistance to the Dearborn plant. S. Rep. No. 100-64 at 18-19, *reprinted in* 1988 U.S.C.C.A.N. at 20–21.

The definition of "program or activity" is broader for private entities that engage in certain public works. For recipients "principally engaged" in the business of providing education, health care, housing, social services, or parks and recreation, the term "program or activity" has an institution-wide application. 42 U.S.C. § 2000d-4a(3)(A)(ii). In other words, Title VI covers the entire entity when any part of it receives federal financial assistance. For example, Nursewell Corporation owns and runs a chain of five nursing homes as its principal business. One of the five nursing homes receives federal financial assistance under the Older Americans Act. Because the corporation is principally engaged in the business of providing social services and housing for elderly persons, aid to one home will subject the entire corporation to the requirements of Title VI. *See* S. Rep. No. 64 at 18, *reprinted in* 1988 U.S.C.C.A.N. at 20; *see also* Mary Crossley, *Infected Judgment: Legal Responses to Physician Bias*, 48 Vill. L. Rev. 195, 265 (2003).

The terms "education, health care, housing, social service, or parks and recreation" should be construed broadly consistent with ordinary meaning. In an Eighth Circuit case, the court addressed the scope of "social services" and "education."

> In terms of what businesses might qualify as providing education, the statute
> envisions that education is not limited to the sort of instruction received in a
> traditional school system. As noted above, formal educational systems are
> covered by a separate provision, § 794(b)(2). Section 794(b)(3)(A)(ii), then,
> covers the sort of education offered by stand-alone schools or by other private
> organizations seeking to train and develop individuals. As to what constitutes a
> social service, it is "an activity designed to promote social well-being" such as
> "organized philanthropic assistance of the sick, destitute, or unfortunate."

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 527 (7th
Cir. 2015) (citing *Doe v. Salvation Army,* 685 F.3d 564, 570 (6th Cir. 2012), quoting Merriam
Webster's Collegiate Dictionary 1115 (10th Ed.1995)). In *Doe*, 685 F.3d at 571, the court noted
that the notion of "'principally engaged' has been interpreted in other statutory contexts as
referring to the primary activities of a business, excluding only incidental activities" (citing
*Carrington v. Lawson's Milk Co.,* No. 86–3264, 1987 WL 36691, at *3 (6th Cir. Mar. 6, 1987)
(unpublished opinion) (convenience store not "'principally engaged in selling food' for onsite
consumption because service was 'incidental to some other business.'") (quoting *Newman
v. Piggie Park Enters., Inc.*, 377 F.2d 433, 435–36 (4th Cir. 1967) (holding term "principally"
does not require a specific percentage); *United States* v. *Baird*, 85 F.3d 450, 454 (9th Cir. 1996)
(construing "principally engaged in selling food for consumption on the premises," as directed to
"the issue of principal and peripheral uses"); *Fazzio Real Estate Co.* v. *Adams*, 396 F.2d 146,
150 (5th Cir. 1968) (it is "clear" that sales from refreshment counter constituting from eight to
eleven percent of gross revenue were "not de minimus [sic] [and] that the operation of the
refreshment counter was not an insignificant adjunct of the operation of bowling alley"; thus,
refreshment counter was "principally engaged in sale of food for consumption on the premises").

Moreover, the statute requires that Title VI's anti-discrimination requirements apply institution-
wide if, in the aggregate, the organization is principally engaged in the business of providing any
of the services enumerated in the statute. In other words, the conjunction "or" does not mean that
only one item on the list *by itself* must be a principal activity. Rather, Title VI covers all
operations of a private recipient if it is principally engaged in providing these services alone or in
combination. *Runnion,* 786 F.3d at 528 ("There is no reason to think Congress was laying out
mutually exclusive conditions."). In sum, a covered "program or activity" under Title VI broadly
applies to entire institutions, except when the institution in question is a private entity that does
not serve a public purpose.

It is important to reiterate that even if a private institution does not fit into one of the broad
categories of coverage, Title VI covers the recipient's facility that receives funds.

### 5.      Catch-All/Combinations of Entities

Finally, the term "program or activity" includes the operations of entities formed by any combination of the aforementioned entities. Title VI provides that a "program or activity" includes:

> [A]ll of the operations of
> (4) any other entity which is established by two or more of the entities described in paragraph (1) [instrumentalities of state or local government], (2) [educational institutions], or (3) [corporations or private entities];
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(4) (emphasis added). This catch-all provision recognizes the complex nature of entities that serve a public purpose. For example, the provision ensures that "a multistate, regional transportation commission which received federal financial assistance would be covered in its entirety, like a state Transportation Department." Rep. No. 64 at 19, *reprinted in* 1988 U.S.C.C.A.N. at 21.

Unlike the limitations placed on private entities described above, this provision ensures that all of the operations of a partnership between public entities or between a public and private entity, such as a school and a private corporation, would be subject to Title VI. It is the public nature of these hybrid institutions that led Congress to expand Title VI coverage:

> [A]n entity which is established by two or more entities described in [paragraphs] (1), (2), or (3) is inevitably a public venture of some kind, i.e., either a government-private effort (1 and 3), a public education-business venture (2 and 3) or a wholly government effort (1 and 2). It cannot be a wholly private venture under which limited coverage is the general rule. The governmental or public character helps determine institution-wide coverage…. Even private corporations are covered in their entirety under (3) if they perform governmental functions, i.e., are "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation."

*Id.* at 19–20, *reprinted in* 1988 U.S.C.C.A.N. at 21–22. While coverage under paragraph (4) applies to the hybrid entity; coverage of the separate entities that comprise the partnership or joint venture must be determined independently. *Id.* at 20, *reprinted in* 1988 U.S.C.C.A.N. at 22.

### SECTION VI: PROVING DISCRIMINATION – INTENTIONAL DISCRIMINATION

**A.    Introduction**

**B.    Proving Intentional Discrimination**

    **1.  Direct Evidence of Discriminatory Motive**

        a.  Express classifications

        b.  Other forms of direct evidence

    **2.  The *Arlington Heights* Framework**

    **3.  The *McDonnell-Douglas* Framework**

**C.    Other Issues Affecting Title VI Cases Involving Intent**

    **1.  Proof of Systemic or Widespread Discrimination (Pattern or Practice)**

    **2.  Permissible Use of Race**

    **3.  Intentional Discrimination by a Third Party**

## A.    Introduction

Title VI prohibits discrimination based on "race, color, or national origin …under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The purpose of Title VI is simple: to ensure that public funds are not spent in a way that encourages, subsidizes, or results in discrimination on these bases. Toward that end, Title VI bars intentional discrimination. *See Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607–08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292–93 (1985). A Title VI discriminatory intent claim alleges that a recipient intentionally treated persons differently or otherwise knowingly caused them harm because of their race, color, or national origin. Agency regulations implementing Title VI also prohibit intentional discrimination based on race, color, or national origin, covering any disposition, service, financial aid, or other benefits provided under the recipient's program, the determination of the site or location of facilities, or other aspects of program operations. *See*, *e.g.*, 28 C.F.R. § 42.104(b) (Department of Justice regulations).

Private parties seeking judicial enforcement of Title VI's nondiscrimination protections must prove intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). Private parties may also file administrative complaints with federal agencies alleging that a recipient of the agency's federal financial assistance has engaged in intentional discrimination; the federal agency providing the assistance may investigate these complaints.[1]

This section provides an overview of the types of evidence necessary to prove intentional discrimination under Title VI. Much of the discussion in this section relies on judicial precedent developed in private plaintiffs' intent claims for damages, and therefore focuses on standards applied in that context. Those standards may not always apply to agency investigations, which often follow a non-adversarial model in which the agency collects all relevant evidence and then determines whether the evidence establishes discrimination. Under this model, agencies do not "shift the evidentiary burdens" between complainant and recipient when making findings. The burden-shifting framework may nevertheless serve as a useful paradigm for organizing and analyzing the evidence.

> **AGENCY PRACTICE TIP**
>
> Investigating agencies can look to case law for guidance on proving intentional discrimination, but are not bound by case law concerning burden shifting between plaintiff and defendant (that is, as between a complainant and a recipient). An agency need not use the same sequential process as courts, where a plaintiff first offers prima facie evidence and the defendant then offers rebuttal evidence. Rather, an agency has discretion to gather and evaluate all relevant evidence as part of its initial investigation, or may choose to make a preliminary prima facie finding then require recipients to articulate defenses.

---

[1] Unlike when seeking judicial enforcement, private parties may file administrative complaints under any theory of liability, including disparate impact. Section VII of the Title VI Legal Manual provides an analysis of the disparate impact theory.

## B.        Proving Intentional Discrimination

Courts have developed a number of analytical frameworks for assessing intent claims. The elements of a Title VI intent claim derive from and are similar to the analysis of cases decided under the Fourteenth Amendment's Equal Protection Clause[2] and Title VII of the Civil Rights Act of 1964, as amended.[3] Because the Title VI statutory prohibition on discrimination is based on the Equal Protection Clause, the constitutional analysis of intentional discrimination should be applied under Title VI.[4] *See Grutter v. Bollinger*, 539 U.S. 306, 343–44 (2003) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.").

Generally, intentional discrimination occurs when the recipient acted, at least in part, because of the actual or perceived race, color, or national origin of the alleged victims of discriminatory treatment. *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011). While discriminatory intent need not be the only motive, a violation occurs when the evidence shows that the entity adopted a policy at issue "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Some assume that the intentional use of race should be carefully scrutinized only when the intent is to harm a group or an individual defined by race, color, or national origin. That is not true: the Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989), and *Adarand Constructors, Inc., v. Pena*, 515 U.S. 200, 226 (1995), established that any intentional use of race, whether for malicious or benign motives, is subject to the most careful judicial scrutiny.[5] Accordingly, the record need not contain evidence of "bad faith, ill will or any evil motive on the part of the [recipient]." *Williams v. City of Dothan,* 745 F.2d 1406, 1414 (11th Cir. 1984).

This section discusses a variety of methods of proof to consider when evaluating recipient behavior to determine whether it meets the legal standard for intentional discrimination. A method of proof—or analytical framework—is an established way of organizing the evidence in an investigation or lawsuit in order to show why that evidence amounts to intentional discrimination.

---

[2] U.S. Cons. amend. XIV, § 1.

[3] 42 U.S.C. § 2000e et seq.

[4] Note that the analyses under these civil rights laws are not always the same, particularly to the extent that the Equal Protection Clause affords different levels of protection to classifications based on sex and disability vs. race, color, and national origin.

[5] At times in this section "race" is used to refer to "race, color, and national origin." This shorthand is used merely for ease of discussion and should not be read as a limitation on the applicability of the principles discussed.

Those methods are as follows:

**Methods that focus on direct evidence**

- **Express classifications.** Express classifications are the clearest form of direct evidence of discriminatory intent. If a recipient explicitly conditions the receipt of benefits or services on the race, color, or national origin of the beneficiary, or directs adverse action to be taken based on race, color, or national origin, such a policy or practice constitutes an express classification. See Section B.1.a.

- **Comments or conduct by decision-makers as direct evidence of intent.** The direct method of proof typically involves a statement from a decision-maker that expresses a discriminatory motive. See Section B.1.b.

**Methods that focus on circumstantial evidence**

- **The *Arlington Heights* mosaic of factors.**[6] This method of proof, originally developed for Equal Protection Clause cases, uses a number of different types of circumstantial evidence that, taken collectively, can demonstrate that the recipient acted, at least in part, because of race, color, or national origin. This framework is most commonly applied in cases alleging discrimination against a group. Agencies can use this method for many different types of cases, but will find it particularly useful where the complaint is about the treatment of a group, not individuals, and the investigation reveals many different kinds of evidence. Agencies should be sure to consider this method where a complaint challenges an expressly neutral practice that has an effect on a larger class defined by race, color, or national origin. For instance, a complaint alleging that a state agency adopted a new policy with the purpose of reducing the number of minority participants could be investigated using this method. See Section B.2.

- **The *McDonnell-Douglas* framework.**[7] Plaintiffs use this framework, originally developed for Title VII employment cases, to show that a defendant treated similarly situated individuals differently because of race, color, or national origin. The framework is most commonly applied in cases alleging discrimination in individual instances. Agencies should consider using this method for investigations involving the selection of individuals, such as for program participation, benefits, or services, particularly where the recipient provides a nondiscriminatory explanation for its decision. This method is most likely to be helpful where the complaint is about one or a few individuals, and involves easily identifiable

---

[6] *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–68 (1977).
[7] The *McDonnell-Douglas* framework refers to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

similarly situated individuals not in the protected class. For instance, a complaint alleging that a state agency denied benefits to a family because of that family's national origin might be investigated using this method. See Section B.3.

More than one type of analysis may apply to facts disclosed in an investigation or trial to determine race-based intent. Agencies and plaintiffs can use them individually or together and may combine both direct and circumstantial evidence. Ultimately, the "totality of the relevant facts" will determine whether the recipient has engaged in intentional discrimination in violation of Title VI. *See Washington v. Davis*, 426 U.S. 229, 242 (1976) (discussing analysis of intentional discrimination generally).

Regardless of the method or methods of proof ultimately employed, the central question remains whether the recipient acted intentionally based on race, color, or national origin. In evaluating the totality of relevant facts, courts and federal funding agencies look to either direct or circumstantial evidence to establish whether a recipient engaged in intentional discrimination. Often, the available proof consists of a combination of these different kinds of evidence, and therefore more than one method of proof may be appropriate. The box below cross-references the major types of evidence with the related methods of proof discussed in this section.

---

**TYPES OF EVIDENCE**

**Direct evidence.** Direct evidence often involves a statement from a decision-maker that expresses a discriminatory motive. Direct evidence can also include express or admitted classifications, in which a recipient explicitly distributes benefits or burdens based on race, color, or national origin. Other than instances where a recipient uses race expressly to achieve diversity or implement a race-based remedy for past discrimination, finding direct evidence is rare; most recipients are circumspect enough to avoid making overtly discriminatory statements. As a result, most Title VI litigation and administrative investigations focus on circumstantial evidence. See methods of proof discussed in Section B.1.

**Circumstantial evidence.** Circumstantial evidence, also known as indirect evidence, requires the fact finder to make an inference or presumption. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). "Circumstantial evidence can include suspicious timing, inappropriate remarks, and comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic…." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994); *accord Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). See methods of proof discussed in Sections B.2 and B.3.

**Statistical evidence.** Statistical evidence can often be critical in a case where the exercise of race-based motive is alleged. A plaintiff or agency investigation can use

statistics in several ways to establish a claim of intentional discrimination. For example, statistics can be used show that an ostensibly race-neutral action actually causes a pattern of discrimination, a racially disproportionate impact, or foreseeably discriminatory results. While statistical evidence is not required to demonstrate intentional discrimination, plaintiffs often successfully use statistics to support, along with other types of evidence, a claim of intentional discrimination. See methods of proof discussed in Sections B.2 and C1.

Finally, it is important for agencies to remember that even if a recipient is found to have engaged in the intentional consideration of race, color, or national origin, this is not the end of the inquiry. Some uses of race are permissible. This is discussed more extensively beginning at page 30.

Title VI case law has traditionally borrowed jurisprudence from other civil rights laws with a similar structure and purpose.[8] The remainder of this section examines methods of proving intentional discrimination in greater detail, with reference to case law not only under Title VI and the Equal Protection Clause, but also under Title VII; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, among other laws. Importantly, the analyses under these civil rights laws are not always the same, but this discussion identifies principles that are applicable to Title VI.

## 1.    Direct Evidence of Discriminatory Intent

Direct evidence of discriminatory intent is evidence that, "if believed, proves the fact [of discriminatory intent] without inference or presumption." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citation omitted).

Occasionally, a recipient official admits to having considered race during the decisional process as a basis for its action. In other instances, a recipient explicitly conditions the receipt of benefits or services on the race, color, or national origin of the beneficiary, or explicitly directs action be taken based on race, color, or national origin. These kinds of requirements are often referred to as "express classifications," and are the clearest form of direct evidence.

Short of an express classification, other direct evidence of discrimination includes "any statement or document which shows on its face that an improper criterion served as the basis … for [an] adverse … action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). On the other hand, "remarks by non-decisionmakers or remarks unrelated to the decision

---

[8] *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title IX …. The two statutes operate in the same manner …."); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 346 (11th Cir. 2012) ("Title IX, like the [Rehabilitation Act] was modeled after Title VI, and the text of all three acts [is] virtually identical …."); *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011) (looking to Title VII jurisprudence to analyze Title VI claims).

making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

### a.  Express classifications

The Equal Protection Clause requires strict scrutiny of any government policy or practice that classifies individuals based on race, color, or national origin. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny."); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (applying strict scrutiny to student admissions policies that considered race as a factor). Similarly, Title VI requires recipients to demonstrate that any intentional use of race, color, or national origin classification is "narrowly tailored" to achieve a "compelling" government interest. *Parents Involved*, 551 U.S. at 720.

A recipient's express or admitted use of a classification based on race, color, or national origin establishes intent without regard to the decision-makers' animus or ultimate objective. Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters*, 904 F. Supp. 845, 849–50 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 128 (3d Cir.1983) (Sloviter, J., dissenting)). Where a plaintiff demonstrates, or an agency determines, that a challenged policy overtly and expressly singles out a protected group for disparate treatment, "a plaintiff need not prove the malice or discriminatory animus of a defendant …." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *see also Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not prerequisites of intentional discrimination."). Rather, the focus is on the "explicit terms of the discrimination," *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); that is, how the recipient's actions specifically deprived or otherwise adversely affected the individual or individuals of access to a federally funded program or benefit. Even benign motivations for racial classifications are presumptively invalid and trigger strict scrutiny in Equal Protection Clause and Title VI cases. *Adarand*, 515 U.S. at 223–24 (1995); *Grutter*, 539 U.S. at 326.

### b.  Other forms of direct evidence of intent

Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring);[9] *Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir. 1997) (direct evidence includes "evidence which in and of itself suggests" that someone with managerial authority was "animated by an illegal ... criterion."). For example, a statement of an official involved in the decision stating that an ostensibly race-neutral action was taken in order to limit minority individuals' eligibility for a federally funded benefit or program is direct evidence of race-based intent. Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir. 1998) (citations omitted).

This type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." *Venters*, 123 F.3d at 973. For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999); *see Venters*, 123 F.3d at 973. The court in *Venters* explained that "the evidence need not be this obvious to qualify as direct evidence." *Id.* And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." *Sheehan,* 173 F.3d at 1044. The direct evidence of such remarks must, however, establish that race was an important factor motivating the challenged action. "Stray remarks," "derogatory comments," even those uttered by decision-makers, may not constitute direct evidence of discrimination if unrelated to the adverse decision. *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring); *Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994). Evidence of such remarks or comments is nevertheless important in an intent case, and can help to establish circumstantial or indirect evidence of intent. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 368 (3d Cir. 2008); *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 877 (8th Cir. 2008) (same); *see also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1224 (10th Cir. 2015) *(*citing Kerri Lynn Stone*, Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law*, 77 Mo. L. Rev. 149, 177 (2012) ("[S]tray remarks can prove to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace.... [They] may bespeak a workplace culture in which certain language or sentiments are tolerated and perhaps encouraged or rewarded.")).

By way of illustration, in *Wilson v. Susquehanna Township Police Dep't*, 55 F.3d 126 (3d Cir. 1995), a Title VII case, a female plaintiff alleged that she was not promoted because of her sex. The plaintiff's evidence revealed a number of discriminatory occurrences, including the daily circulation of sexually explicit drawings, the posting of obscene notices (some referring to female employees by name), sexual conversations between officers and female employees, the

---

[9] *Price Waterhouse* has been superseded by statute in the employment discrimination context under Title VII, but as discussed below, its framework remains instructive when considering how to prove mixed motives cases in other civil rights contexts.

showing of an x-rated movie and graphic home videos in the station house, the Chief's regular discussion of sex lives and employees' anatomy, the Chief's bemused dismissal of the plaintiff's complaint about an indecent assault committed by an officer, and the Chief's comment that he did not promote the plaintiff because the town manager "wanted a man." *Id.* at 127–29. The court of appeals described that evidence as direct evidence of intentional sex discrimination, explaining that "[t]he record clearly goes beyond 'stray remarks' and evinces strong gender bias in the police department.... This evidence, which included 'conduct or statements by persons involved directly reflecting the discriminatory attitude,' ... constitutes 'direct evidence' of discriminatory animus." *Id.* at 130 (citations and quotations omitted).

In *In re Rodriguez*, 487 F.3d 1001, 1006–08 (6th Cir. 2007), a case originally brought under Michigan's Civil Rights Act, which borrows legal standards from federal civil rights laws including Title VII,[10] the court found that a Hispanic employee was not selected for promotion based on a manager's impression about the applicant's "language" and "how he speaks." This evidence, the court held, was direct evidence of discrimination. Stating that "the [EEOC] recognizes linguistic discrimination as national origin discrimination" and that "discrimination based on manner of speaking can be national origin discrimination," the court found that the plaintiff's "Hispanic speech pattern and accent" played a motivating part in the manager's decision to deny the plaintiff a promotion. *Id.* at 1008–09; *accord, Diaz v. Jiten Hotel Mgmt., Inc.*, 762 F. Supp. 2d 319, 337 (D. Mass. 2011) ("racially, sexually, or ageist offensive language is necessarily prejudicial, precisely because it is highly probative").

A clean "direct evidence" case—where direct evidence alone establishes that discrimination was the sole reason for an adverse decision—is rare. *Price Waterhouse*, 490 U.S. at 271 ("[D]irect evidence of intentional discrimination is hard to come by.") (O'Connor, J., concurring). After all, decision-makers seldom will admit that they based decisions on race or ethnic origin, or used either as a criterion. *See, e.g.*, *SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012).

## 2.    The *Arlington Heights* Framework

Many cases of intentional discrimination are not proven by a single type of evidence. Rather, many different kinds of evidence—direct and circumstantial, statistical and anecdotal—are relevant to the showing of intent and should be assessed on a cumulative basis.

---

[10] *See* Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.* (2016); *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999)(When an employer is liable under the Michigan Civil Rights Act, it would also be liable under Title VII).

*Arlington Heights,* 429 U.S. at 266–68, and its progeny set forth a variety of factors probative of intent to discriminate.[11] Under this method of proving intent, the court or investigating agency analyzes whether discriminatory purpose motivated a recipient's actions by examining factors such as statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones; "[T]he historical background of the decision"; "[T]he specific sequence of events leading up to the challenged decision"; the defendant's departures from its normal procedures or substantive conclusions, and the relevant "legislative or administrative history." *Faith Action for Cmty. Equity v. Hawai'i*, No. CIV. 13-00450 SOM, 2015 WL 751134, at *7 (D. Haw. Feb. 23, 2015) (Title VI case citing *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2013)); *see also Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995) (adding to the *Arlington Heights* factors evidence of a "consistent pattern" of actions of decision-makers that have a much greater harm on minorities than on non-minorities). When a recipient applies different procedural processes or substantive standards to requests of minorities and non-minorities, the use of such different processes or standards, when a non-minority receives more favorable treatment, may raise an inference of discriminatory intent. "These factors are non-exhaustive." *Pac. Shores Props.*, 730 F.3d at 1159.

---

**AGENCY PRACTICE TIP**

Agencies can use the *Arlington Heights* framework for many different types of cases, but will find it particularly useful where the complaint is about the treatment of a group, not individuals, and the investigation reveals many different kinds of evidence. Agencies should be sure to consider this method where a complaint challenges an expressly neutral policy or practice that has an effect on a larger class defined by race, color, or national origin. For instance, an agency could use this method when investigating a complaint alleging that a state agency adopted a new policy with the purpose of reducing the number of minority participants.

---

In court and agency investigations, evaluation of these factors "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Moreover, when a plaintiff relies on the *Arlington Heights* method to establish intent, "the plaintiff need provide very little such evidence ... to raise a genuine issue of fact ...; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props.*, 730 F.3d at 1159 (citations omitted).

---

[11] Though the *Arlington Heights* test was developed to detect discriminatory intent in the context of a Fourteenth Amendment Equal Protection claim, the test also applies to claims of intentional discrimination under some federal statutes, including Title VI. *See Pac. Shores Props.*, 730 F.3d at 1158 n.21; *see also Gallagher v. Magner*, 619 F.3d 823, 833 (8th Cir. 2010) (Fair Housing Act case applying the *Arlington Heights* factors); *Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1283–84 (11th Cir. 2006) (same); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 579–80 (2d Cir. 2003) (same in Fair Housing Act and Americans with Disabilities Act contexts).

| FACTORS/CIRCUMSTANTIAL EVIDENCE PROBATIVE OF INTENT |
|---|
| • Statistics demonstrating a clear pattern of discriminatory effect;<br><br>• The historical background of the decision and other decisions on comparable matters;<br><br>• The sequence of events leading up to the decision, as compared to other decisions on comparable matters;<br><br>• Departures from normal procedures or substantive conclusions;<br><br>• Relevant legislative or administrative history; and<br><br>• Consistent pattern of actions of decision-makers that impose much greater harm on minorities than on non-minorities. |

Critically, *Arlington Heights* directs courts and agencies to engage in a cumulative assessment of the evidence. By way of illustration, in *North Carolina State Conference of NAACP v. McCrory*, No. 1:13CV658, 2016 WL 1650774, at *5 (M.D.N.C. Apr. 25, 2016), plaintiffs challenged provisions of a North Carolina election law, alleging that discriminatory intent to disenfranchise African-American voters motivated the legislature in violation of the Fourteenth and Fifteenth Amendments and the Voting Rights Act. The Fourth Circuit agreed. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). The district court's error in holding otherwise, the Fourth Circuit explained, "resulted from the court's consideration of each piece of evidence in a vacuum, rather than engaging in the totality of the circumstances analysis required by *Arlington Heights*." *Id.* at 233. The district court "missed the forest in carefully surveying the many trees." *Id.* at 214. Instead, agencies evaluating possible intentional discrimination by recipients must conduct a cumulative assessment of all the available evidence.

This case also illustrates the kinds of evidence relevant to each of the *Arlington Heights* factors described above:

- **Historical background of the decision.** First, the court considered the historical background in the state generally and related to voting in particular, identifying "North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" as particularly relevant. *Id.* at 223. Against this background of historical discrimination in the state, the court found "the record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to dilute the voting rights of African Americans" and

pointed to the numerous instances of "Department of Justice and federal court determinations have determined that the North Carolina General Assembly acted with discriminatory intent ...." *Id.* The court found these examples revealed "a series of official actions taken for invidious purposes," and held that the district court "erred in minimizing these facts." *Id.* (citing *Arlington Heights*, 429 U.S. at 267).

- **Sequence of events leading to the decision.** Next, the court turned to an examination of the sequence of events leading to the legislature's passage of the challenged provisions, finding these events "devastating" to the defense. *N.C. State Conf. of NAACP*, 831 F.3d at 227. The court found that the undisputed sequence of events—"the General Assembly's eagerness to … rush through the legislative process the most restrictive voting law North Carolina has seen since the era of Jim Crow—bespeaks a certain purpose …. Although this factor, as with the other Arlington Heights factors, is not dispositive on its own, it provides another compelling piece of the puzzle of the General Assembly's motivation." *Id.* at 229.

- **Legislative history leading to the decision.** As instructed by *Arlington Heights*, the court also considered the sequence of events described above from the perspective of "legislative history" because such evidence "may be highly relevant, especially where there are contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* (citing *Arlington Heights*, 429 U.S. at 268). The record revealed that the General Assembly requested a report on voting patterns, and that data established that African Americans in North Carolina disproportionately used early voting, same-day registration, and out-of-precinct voting. *N.C. State Conf. of NAACP*, 831 F.3d at 230. The court held that "relying on this data, the General Assembly enacted legislation restricting all—and only—practices disproportionately used by African Americans …. [W]e cannot ignore the choices the General Assembly made with this data in hand." *Id.*

- **Impact.** The first *Arlington Heights* factor, statistics demonstrating a clear pattern of discriminatory effect, acknowledges that disparate impact evidence can be probative of discriminatory intent. *Arlington Heights*, 429 U.S. at 266 (discussing the importance of the impact of the official action, including "whether it bears more heavily on one race than another"). Here, the court analyzed the available impact data and held that the same data showing that African Americans disproportionately used each of the voting mechanisms removed by the new provisions also established "sufficient disproportionate impact" for an *Arlington Heights* analysis. *N.C. State Conf. of NAACP*, 831 F.3d at 231.

The court conducted a cumulative assessment of this evidence:

> [T]he totality of the circumstances—North Carolina's history of voting discrimination; the surge in African American voting; the legislature's knowledge that African Americans voting translated into support for one party; and the swift elimination of the tools African Americans had used to vote and imposition of a new barrier at the first opportunity to do so—cumulatively and unmistakably reveal that the General Assembly used [the new law] to entrench itself.

*Id* at 233. Accordingly, when viewed collectively, the evidence in the record established intentional discrimination based on race. *Id.*

Finally, it is important to understand that under the *Arlington Heights* framework, evidence identifying similarly situated comparators is helpful but not required. In this regard, the relationship between the *Arlington Heights* framework and the *McDonnell-Douglas* framework is sometimes misunderstood. As discussed more extensively below in Section B.3., the *McDonnell-Douglas* method of proof requires a showing that the recipient treated one or a few similarly situated individuals differently because of race, color, or national origin. However, plaintiffs alleging intentional discrimination under civil rights statutes "need not demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiff in order to prevail." *Pac. Shores Props.,* 730 F.3d at 1158-59 (explaining that a plaintiff need not rely on the *McDonnell-Douglas* approach to intentional discrimination but may instead produce circumstantial evidence of intentional discrimination using the *Arlington Heights* method). *McDonnell Douglas* "is not a straightjacket requiring the plaintiff to demonstrate that such similarly situated entities exist" but is just *one* way to prove intentional discrimination. *Id*. at 1159.

**Impact evidence.** In many cases, including many litigated under *Arlington Heights*, evidence will show that an ostensibly race-neutral practice has had a much more harmful effect on minorities than on non-minorities. *Arlington Heights* instructs courts and agencies to consider "the impact of the official action" including whether "it bears more heavily on one race than another." 429 U.S. at 266 (citations and quotations omitted). Accordingly, the discriminatory impact of a facially neutral policy or practice (frequently, but not always, demonstrated through the use of statistics) can be used as part of the evidentiary showing in an intentional discrimination case. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822, 902 (D. Ariz. 2013) (awarding injunctive relief to Title VI plaintiffs and finding that plaintiffs demonstrated "racially disparate results" and "additional indicia of discriminatory intent") (citing *Feeney*, 442 U.S. at 272); *see also Arlington Heights*, 429 U.S. at 264–66; *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) (Title VI and equal protection case finding that statistical evidence was sufficient to create inference of intent where race-neutral precondition to receiving municipal services served to exclude Latino-majority neighborhoods)).

In only rare instances will a showing of disparate impact by itself support a showing of discriminatory intent—for example, where racially variant results cannot be explained on other grounds, such as in cases of a dramatic mismatch between jury representation and the composition of a surrounding community. *Castaneda v. Partida*, 430 U.S. 482, 495–96 (1977). In most instances, however, "impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266, 267–68 (enumerating factors that indicate evidence of intent) (footnotes omitted).

When attempting to rely on impact evidence in an intent case, the plaintiff must, as an initial matter, precisely identify the "facially neutral policy or practice" at the heart of the discrimination claim. (The Title VI Legal Manual's disparate impact section discusses this requirement in detail.) In addition, in *Arlington Heights*, the selection of a similarly situated comparator group is a key feature of cases where plaintiffs proffer impact evidence. By its nature, "disparate impact" evidence involves showing a disparity. Plaintiff must show that the extent of harm the policy or practice causes minorities and non-minorities is different. The level or degree of impact that a plaintiff alleging discriminatory intent must show depends on a variety of factors, including the strength of the impact evidence and the strength of other indicators of intent under *Arlington Heights*. But, as one court noted, "[i]t would be improper to posit a quantitative threshold above which statistical evidence of disparate racial impact is sufficient as a matter of law to infer discriminatory intent, and below which it is insufficient as a matter of law." *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 551 (9th Cir. 1982). Because disparate impact is not the only factor in an *Arlington Heights* case, "showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *N. Carolina State Conference of NAACP*, 831 F.3d at 231.

In addition, impact evidence most often involves the presentation of statistical evidence. *Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922, 926 (4th Cir. 1990). However, statistical evidence, while extremely beneficial, is not a necessity in impact cases. *Id.* Indeed, a series of "discrete episodes" negatively affecting minorities can raise a plausible inference of discriminatory impact. *McCoy v. Canterbury*, No. 3:10-0368, 2010 WL 5343298, at *5 (S.D.W. Va. Dec. 20, 2010), *aff'd*, 428 Fed. App'x 247 (4th Cir. 2011). Accordingly, non-statistical evidence of harm to minorities and non-minorities that is significantly different will be relevant evidence in an *Arlington Heights* case.

Moreover, statistics alone will seldom prove discriminatory intent. There may be cases where statistics establish "a clear pattern, unexplainable on grounds other than race," "but such cases are rare." *Arlington Heights*, 429 U.S. at 266, No matter how "devastating or reliable" the statistics appear to be, *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980) (per curiam), they must reveal that some "invidious discriminatory purpose" is causing the disparate

outcomes. *Arlington Heights*, 429 U.S. at 266; *see also Feeney*, 442 U.S. at 279 (plaintiff must show that the rule was promulgated or reaffirmed "'because of,' not merely 'in spite of,' its adverse impact on" persons in the plaintiff's class); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) (citing *Feeney*). As such, and in most instances, "the question whether the facts proved are sufficient to permit a legal inference of discriminatory intent cannot properly be reduced into a mere battle of statistics." *Gay*, 694 F.2d at 552.[12] Absent a "stark" pattern, then, discriminatory intent requires more than discriminatory impact. *Arlington Heights,* 429 U.S. at 266.

**Recipient's awareness of the impact.** Also consistent with the *Arlington Heights* factors is an inquiry into whether the discriminatory impact of the challenged action was foreseeable:

> [A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.... [T]he foreseeable effects standard [may be] utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn.... Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence ... is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979); *see United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Foreseeability is a common feature of Title VI and equal protection claims, and allegations that properly package foreseeability together with factors such as impact and history of defendant's actions, have succeeded.[13] *See, e.g.*, *N.C. State Conf. of NAACP*, 831 F.3d at 223; *Dowdell v. City of Apopka*, 698 F.2d 1181, 1186 (11th Cir. 1983) (discussing "obviously foreseeable" outcome of the town's decision to spend nearly all of its revenue-sharing monies on the white community, at the expense of communities of color); *United States v. Bannister*, 786 F. Supp. 2d 617, 665–66 (E.D.N.Y. 2010) (expressing support for using discriminatory impact, foreseeable consequences, and historical background to demonstrate intent in enacting mandatory minimums for crack cocaine, but determining that court could not find intentional discrimination where Second Circuit already made finding on the specific issue under consideration).

---

[12] For a detailed case analysis of statistical evidence, circumstantial evidence, the strength of each, and the cumulative picture of intent presented by both types of evidence together in the Title VII context, *see Gay*, 694 F.2d at 555–56.

[13] Similarly, an agency may be able to use impact evidence under the deliberate indifference framework, originally developed to analyze hostile environment harassment claims, to show that the recipient knew a federally protected right was substantially likely to be violated and failed to act despite that knowledge. This approach is closely related to the *Arlington Heights* framework. As in the cases discussed in this section, foreseeability or knowledge of harm is a key feature of this method of proof. *See infra* section C.3.

Additional examples of successful outcomes where impact and foreseeable consequences combine with other *Arlington Heights* factors, such as history of state action, include the following:

- Spanish-speaking food stamp beneficiaries alleged that state agencies administering the state food stamp program continued a policy of failing to ensure bilingual services for food stamp applicants who were limited English proficient. The plaintiffs alleged that the defendants continued this policy while knowing that Spanish-speaking applicants and beneficiaries were being harmed as a consequence. The court found that such knowledge was sufficient to state a Title VI claim that the defendants purposefully acted based on national origin, finding that "disparate impact, history of the state action, and foreseeability and knowledge of the complainants' onus placed upon the complainants" is the type of circumstantial evidence upon which a case of intentional discrimination is often based. *Almendares v. Palmer*, 284 F. Supp. 2d 799, 806 (N.D. Ohio 2003) (citations omitted)

- A facially neutral NCAA rule (Proposition 16) raising the minimum academic requirements for incoming college athletes to qualify for athletic scholarships and compete in college sports applied to all incoming college athletes but had a statistically greater adverse impact on black athletes. The NCAA was aware that the impact of the proposed rule would reduce the number of black athletes qualifying for athletic scholarships, and adopted the rule specifically to promote higher academic standards among black athletes. The court held that plaintiffs had stated a claim of purposeful discrimination under Title VI. *Pryor v. NCAA*, 288 F.3d 548, 562 (3d Cir. 2002). *Pryor* directly addressed the *Arlington Heights* standards for intentional discrimination, concluding that the plaintiffs met the intent test where the NCAA had actual notice and knowledge of the impact on black athletes, and affirmatively considered that impact in reaching its decision to adopt Proposition 16.[14]

- Plaintiffs claimed intentional discrimination based partly on the defendant's knowledge of the impact that placement of a cement grinding facility would have on the minority community, together with allegations regarding historical practices and a specific sequence of events leading to the placement decision. The court found that the plaintiffs "not only showed that the operation of the cement grinding facility would have a disparate impact upon the predominantly minority community … but also that the [defendant] was well-aware of the potential disproportionate and discriminatory burden

---

[14] The *Pryor* court partially distinguished *Feeney*, 442 U.S. at 256, in which the Court refused to find that a Massachusetts veterans' preference statute deprived women of equal protection of the laws. It noted that the NCAA had actual notice and knowledge of the impact on the minority students, while the Court in *Feeney* could only *infer* that the "legislature almost certainly was aware" that the law benefiting veterans would disadvantage women. *Pryor*, 288 F.3d at 564.

placed upon that community and failed to take measures to assuage that burden." The court further determined that the plaintiffs had stated a claim of intentional discrimination under Title VI, sufficient to survive the defendant's motion to dismiss. The court set forth that "the controlling decisions of the Supreme Court and the Third Circuit make it clear that a case of intentional discrimination is often based upon the type of circumstantial evidence which the … Plaintiffs allege …, namely, disparate impact, history of the state action, and foreseeability and knowledge of the discriminatory onus placed upon the complainants." *S. Camden*, 254 F. Supp. at 496–97 (citing *Arlington Heights*, 429 U.S. at 267; *Penick*, 443 U.S. at 465 (1979); *Pryor*, 288 F.3d at 563).[15]

### 3.    The *McDonnell-Douglas* Framework

Another common way to prove intentional discrimination is to establish that a recipient treated similarly situated individuals differently because of race, color, or national origin.

#### 1)    Step 1—The prima facie case

Plaintiff must first prove a prima facie case of discrimination by a preponderance of the evidence. To establish a prima facie case of intentional discrimination under Title VI using the *McDonnell-Douglas* framework from Title VII, a plaintiff typically shows that he or she is a member of a particular protected group, was eligible for the recipient's program, activity or service, and was not accepted into that program or otherwise treated in an adverse manner, and that an individual who was similarly situated with respect to qualifications, but was not in the plaintiff's protected group was given better treatment. *See, e.g., Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (Title VI case where court found that plaintiff's case "falls apart because of a failure to locate a similarly situated individual").[16]

---

[15] In a subsequent proceeding, the court granted summary judgment for the defendants on the issue of intentional discrimination under Title VI by noting that "assuming, *arguendo,* that Plaintiffs are correct that '[t]he disparate impact of [issuing the permit to the defendant] was clearly [foreseeable]' to [the defendants], Pls.' Opp. at 71, such a foreseeable impact is of no aid to Plaintiffs at this juncture because it, alone, is insufficient to establish a constitutional violation." *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, No. Civ. A. 01-702 (FLW), 2006 WL 1097498 at *36 (D.N.J. Mar. 31, 2006) (citing *Penick*, 443 U.S. at 465). In so ruling, the court found insufficient evidence of *Arlington Heights* factors alleged at the motion to dismiss stage, such as a history of discrimination on the part of the defendant. *S. Camden,* 2006 WL 1097498 at *26–28. The court determined that, in the absence of the other *Arlington Heights* factors raised at the motion to dismiss stage, foreseeable impact alone is insufficient to demonstrate intent. *Penick* has cautioned that "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation." *Penick,* 443 U.S. at 464. *See also Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 536 n.9 (1979) (foreseeable adverse impact may be relevant evidence in proving purposeful discrimination, but foreseeability by itself has not been held to make out a case of purposeful discrimination).

[16] The elements of a prima facie case are the same under both Title VI and VII. *Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998).

---

**AGENCY PRACTICE TIP**

Agencies can use the *McDonnell-Douglas* framework for investigations involving the selection of individuals, such as for program participation, benefits, or services, particularly where the recipient provides a nondiscriminatory explanation for its decision. This method is most likely to be helpful where the complaint is about one or a few individuals, and involves easily identifiable similarly situated individuals not in the protected class. For instance, a complaint alleging that a state agency denied benefits to a family because of that family's national origin might be investigated using this method.

---

With respect to what constitutes adverse action or "harm," there are "no bright-line rules," *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997), so courts and agencies must make that determination in each case. As such, whether conduct rises to the level of "adverse action" is a fact-specific inquiry. The harm need not be physical in nature, or even the type of harm that would permit an award of compensatory damages. For example, the Supreme Court has held that intentional racial segregation is a harm in and of itself. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). Similarly, the stigma that intentional discrimination may cause is a cognizable harm. *See generally Johnson v. California,* 543 U.S. 499, 507 (2005) ("racial classifications 'threaten to stigmatize individuals by reason of their membership in a racial group'") (quoting *Shaw v. Reno,* 509 U.S. 630, 643 (1993)). The provision of fewer or inferior services or benefits to a person or class of persons will satisfy the adversity requirement, but adversity can be established even without the loss of specific services or benefits; threatened or imminent harm can satisfy the adverse action requirement.

Moreover, Title VI's broad nondiscrimination mandate means that investigating agencies generally should take an inclusive approach to determining legally sufficient harms. Title VI's plain language supports this approach. The statute states that no person shall on the ground of race, color, or national origin "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Agency regulations further state that recipients may not administer their programs or activities in a manner that "den[ies] any individual *any disposition, service, financial aid, or benefit* provided under the program," 28 C.F.R. § 42.104(b)(1)(i) (DOJ) (emphasis added), or "restrict[s] an individual *in any way* in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program," *Id.* § 42.104(b)(1)(iv) (emphasis added). This language is best read to encompass a broad range of "adverse actions" that may be caused by a recipient's administration of its program.[17]

---

[17] The DOJ regulations quoted here are similar to those of other agencies.

For a more detailed discussion of case law addressing the harms cognizable under Title VI, see Section VII, Section C.1.b., which discusses the threshold showing of adversity required under the disparate impact standard.

### 2) Step 2 – The defendant must articulate a legitimate non-discriminatory reason

If the plaintiff establishes a prima facie case, the burden in court shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009). The defendant's explanation of its legitimate reasons must be clear and reasonably specific; not all proffered reasons would be legally sufficient to rebut a prima facie case. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 258 (1981).  For example, in the employment context, a defendant may not merely state that the employment decision was based on the hiring of the "best qualified" applicant, but must provide specifics regarding that applicant's qualifications, such as seniority, length of service in the same position, personal characteristics, general education, or experience in comparable work, and must demonstrate why that person's qualifications were considered superior to those of the plaintiff. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1075–76 (11th Cir. 2003).

### 3) Step 3 – The plaintiff must demonstrate pretext

If the defendant meets the Step 2 burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is false—that is, that the nondiscriminatory reason(s) the defendant gives for its actions are not the true reasons and are actually a pretext for the exercise of prohibited discriminatory intent. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162–63 (11th Cir. 2006) (addressing a Title VII race discrimination claim). A plaintiff can show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's proffered legitimate reasons for its action, such that a reasonable fact finder could rationally find them unworthy of credence. *Id.* at 1163 (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)); *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006). Plaintiffs can, for example, present evidence that the defendant's stated reasons for taking the adverse action were false; the defendant acted contrary to a written policy setting forth the action the defendant should have taken under the circumstances; or the defendant acted contrary to an unwritten policy or practice when making the decision. *See Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). A plaintiff may also show pretext through evidence that the "employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action …." *Fuentes*, 32 F.3d at 764.

> **AGENCY PRACTICE TIP**
>
> As mentioned previously, certain procedural aspects of the methods of proof developed in the litigation context do not transfer to the administrative context. Here, the *McDonnell-Douglas* burden-shifting test that applies in litigation to determine whether an institution has engaged in intentional discrimination does not necessarily apply in the context of agency enforcement activities prior to administrative litigation. An agency is free to collect and analyze the evidence described in the steps below as part of its initial investigation, or may choose to make a preliminary prima facie finding and require the recipient to articulate its defense as a next step.

The Supreme Court has cautioned that the four *McDonnell-Douglas* elements are not "an inflexible formulation." *Teamsters*, 431 U.S. at 358. Further, as previously noted, agency Title VI investigations generally follow a non-adversarial model that does not involved burden-shifting. Nevertheless the *McDonnell-Douglas* framework may be useful for complaint investigations, particularly where the investigation uncovers evidence of similarly situated comparators who were treated differently or better. The example below, from joint DOJ and Department of Education guidance, illustrates how the *McDonnell-Douglas* framework would inform an administrative investigation.[18]

> **ILLUSTRATION: MCDONNELL DOUGLAS FRAMEWORK APPLIED TO INVESTIGATION OF ALLEGED DISCRIMINATORY SCHOOL DISCIPLINE**
>
> **Complaint.** Plaintiff alleged discrimination after a school imposed different disciplinary sanctions on two students in the sixth grade—a non-Hispanic student and a Hispanic student—who engaged in a fight. Both students had similar disciplinary histories, having each previously received after-school detention for minor infractions. The Hispanic student received a three-day out-of-school suspension for the student's involvement in the fight, while the non-Hispanic student received a two-day out-of-school suspension for the same misconduct, raising a concern that the students were treated differently based on race.
>
> Based on these facts and circumstances, the Departments of Education and Justice would make an initial determination that the students were **similarly situated**, as they were involved in the same incident and have similar discipline records. If the school provided evidence of facts and circumstances surrounding the incident that would constitute a **legitimate, nondiscriminatory reason** for the different treatment, such as evidence that it disciplined the Hispanic student more severely because the student instigated the fight and directly threatened school officials who tried to break up the fight, then these facts and circumstances might constitute a nondiscriminatory reason for the different treatment. If

---

[18] Dep't of Justice and Dep't of Educ., "Dear Colleague" Letter on the Nondiscriminatory Administration of School Discipline (Jan. 8, 2014), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201401-title-vi.html.

the school failed to provide a legitimate nondiscriminatory reason for imposing a different sanction on either student, the Departments could find that the school had violated Title VI.

If, however, the school did provide a legitimate, nondiscriminatory reason for the different sanction, the Departments would probe further to determine whether the reason given for the enhanced sanction was an accurate statement of the reasons for different treatment of the two students, or constituted a **pretext for racial discrimination**. In making this determination, the Departments would request and consider information such as witness statements, codes of conduct, and student disciplinary records. The Departments would then evaluate, among other things, whether the school conformed to its written policies; whether the Hispanic student did, in fact, instigate the fight; and whether the school had previously imposed a higher sanction on non-Hispanic students who had instigated fights.

## C.     Other Issues Affecting Title VI Cases Involving Possible Intentional Discrimination

### 1.     Proof of Systemic or Wide-Spread Discrimination (Pattern or Practice Discrimination)

Principles similar to those discussed above may be used to establish that a recipient engaged in widespread discrimination in violation of Title VI. In these cases, one means of proving intentional discrimination is through circumstantial evidence showing a statistical disparity that affects a large number of individuals. Agencies investigating complaints alleging widespread discrimination may find useful guidance in Title VII case law that discusses "pattern or practice" discrimination. The phrase "pattern or practice" can be used to describe a systemic violation of Title VI, regardless of the method of proof employed. Although statistical evidence is usually used to establish a pattern or practice of intentional discrimination, it is not required to establish wide-spread or systemic discrimination. This section focuses on the use of statistical evidence of disparity to establish a pattern showing different treatment based on race, color, or national origin.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), a case brought under the "pattern or practice" provision of Title VII, the Court stated that "statistics showing racial or ethnic imbalance are probative … because such imbalance is often a telltale sign of purposeful discrimination." *Id.* at 339 n.20. Accordingly, statistical evidence of a sufficiently "gross disparity" between the affected population and the general population may establish an inference of intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination.").

As previously noted, the term "pattern or practice" can be used broadly to refer to systemic discrimination. The term "pattern or practice" also refers to a technical claim type authorized by various civil rights statutes. These statutes use the term to define the authority of the Attorney General or private parties to bring certain claims in court. *See, e.g.*, Title VII, 42 U.S.C. § 2000e-

6(a); The Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141(b); The
Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d(c)(3). A Title VII
pattern or practice case, for example, will demonstrate that an employer is taking action that
causes the same kind of harm to a great number of individuals. In *Teamsters,* the employer used
job transfer policies that punished individuals, primarily minorities, who tried to transfer from
less desirable jobs to more desirable ones. The "pattern or practice" that was challenged harmed
many minorities in precisely the same manner. While Title VI does not expressly include a
"pattern or practice" claim, principles developed in these contexts and discussed below can
nevertheless inform the investigation and analysis of Title VI claims. *See, e.g., Melendres v.
Arpaio*, 695 F.3d 990 (9th Cir. 2012) (class action alleging pattern or practice of racial profiling
by law enforcement agency in violation of Title VI and the Fourth and Fourteenth Amendments);
Dep't of Justice, Investigation of Los Angeles County Sheriff's Department Stations in Antelope
Valley (June 28, 2013) (Title VI pattern or practice violation).[19]

For Title VI, that kind of widespread or broad discriminatory practice is often viewed or
described as a claim of "systemic discrimination"—a practice that harms a large number of
minority individuals in the same manner. For example, were a written test used to determine
eligibility for a federally funded benefit or program, and the test resulted in a much higher
percentage of minorities than non-minorities being determined ineligible for the benefit or access
to the program, that might present a case of systemic discrimination. The method of proof used
in pattern or practice cases under other statutes can be applied to these kinds of Title VI cases.

To prove such systemic discrimination using this method in a Title VI case, the plaintiff must
show that discrimination was the recipient's standard operating procedure; that is, the plaintiff
must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory
acts." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286–87 (11th Cir. 2000) (quoting
*Teamsters*, 431 U.S. at 336 (internal quotation marks omitted)). Rather, the plaintiff must
establish by a preponderance of the evidence that discrimination is the company's "regular rather
than unusual practice." *Joe's Stone Crab*, 220 F.3d at 1287 (quoting *Teamsters*, 431 U.S. at 336).
A plaintiff in a pattern or practice case can prove that discrimination was the defendant's
"standard operating procedure" by, among other things, presenting statistical evidence of
similarly situated individuals not in the protected class who were treated better than those in the
protected class. *Craik v. Minn. State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir. 1984).

In a case alleging such pervasive or systemic discrimination, the plaintiff need not initially show
discrimination against any particular person; rather the critical showing at the prima facie stage is
one of a pervasive policy of intentional discrimination affecting many individuals. *See
Teamsters,* 431 U.S. at 360; *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 147 (2d Cir. 2012)

---

[19] The report of investigation is located on the following website: http://www.justice.gov/crt/special-litigation-section-cases-and-matters (search "Antelope"; last visited Sept. 15, 2016).

(noting that in such cases "the government need not demonstrate specific losses to specific individuals to establish that injunctive relief is appropriate"). Once the plaintiff has established a prima facie case, the defendant can rebut it by either demonstrating that the plaintiff based his or her statistical calculations on faulty data, flawed computations, or improper methodologies, or by introducing alternative statistical evidence. *Teamsters*, 431 U.S. at 360 & n.46. As in other disparate treatment cases, the ultimate burden of persuasion rests with the plaintiff. *Id.* at 362 n.50 (citing *McDonnell-Douglas*, 411 U.S. at 804–06). If the defendant fails to rebut the inference that arises from the plaintiff's prima facie case, the court can conclude "that a violation has occurred." *Id.* at 361.

---

**AGENCY PRACTICE TIP**

As emphasized above in the *McDonnell-Douglas* discussion, certain procedural aspects of methods of proof developed in the litigation context do not transfer to the administrative context. Here, the Title VII burden-shifting test for formal "pattern or practice" claims that applies in litigation to determine whether an institution has engaged in intentional discrimination does not necessarily apply in the context of agency enforcement activities prior to litigation. An agency is free to collect and analyze all the evidence described in this section as part of its initial investigation, or may choose to make a preliminary prima facie finding and require the recipient to articulate its defense as a next step.

---

As previously stated, statistics typically are used to help establish that a pattern of discrimination based on race, color, or national origin was the recipient's "standard operating procedure." *Teamsters*, 431 U.S. at 336; *Hazelwood,* 433 U.S. at 307. Statistics showing racial or ethnic imbalance are probative in pattern or practice cases because a clear and significant imbalance based on race or ethnicity is often an indication of purposeful discrimination. *Teamsters*, 431 U.S. at 339 n.20; *Lujan v. Franklin Cty. Bd. of Educ.*, 766 F.2d 917, 929 (6th Cir. 1985). In these cases, most often, statistics are "coupled with anecdotal evidence of the … intent to treat the protected class unequally." *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991).[20] Statistical evidence can sometimes serve by itself to establish a prima facie case in the pattern or practice context, in lieu of comparative evidence pertaining to each class member. *Teamsters*, 431 U.S. at 336; *Hazelwood*, 433 U.S. at 307–08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a

---

[20] Note that "the absence of statistical evidence [will not] invariably prove fatal in every pattern or practice case. [In employment cases,] [w]here the overall number of employees is small, anecdotal evidence may suffice." *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1084 (W.D.N.Y. 1994); *accord*, *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1268 (10th Cir. 1988); *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984). Conversely, in certain cases, "a plaintiff's statistical evidence alone might constitute a prima facie case." *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 n.6 (7th Cir. 1985) (citing *Segar v. Smith,* 738 F.2d 1249, 1278 (D.C. Cir. 1984)). "Neither statistical nor anecdotal evidence is automatically entitled to reverence to the exclusion of the other." *Id.* at 533.  However, "[w]hen one type of evidence is missing altogether, the other must be correspondingly stronger for plaintiffs to meet their burden." *In re W. Dist. Xerox Litig.*, 850 F. Supp. at 1085. *Compare Chisholm v. USPS*, 665 F.2d 482, 495 (4th Cir. 1981) (twenty class plaintiffs was sufficient to support the statistical evidence) *with Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981) (seven discriminatory acts coupled with problematic statistical evidence were insufficient to support finding pattern or practice discrimination).

pattern or practice of discrimination.") As one court explained, "strong statistics may prove a case on their own, while shaky statistics may be insufficient unless accompanied by additional evidence." *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) (citing *Teamsters*, 431 U.S. at 340).

While there is no "rigid mathematical formula" for determining whether a disparity is significant, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994–95 (1988), courts have adopted various tests to aid them in making this determination. For example, some courts have looked to whether the disparity is statistically significant. *Hazelwood*, 433 U.S. at 308 n.14 (an inference of discrimination will generally arise where "'the difference between the expected value and the observed number is greater than two or three standard deviations'") (quoting *Castaneda*, 430 U.S. at 496 n.17).[21] Other courts have looked at whether the disparity is both statistically and practically significant. *See Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1510 n.4 (10th Cir. 1987) (suggesting that courts may require, in addition to statistical significance, that the observed disparity be substantial). Still other courts have recognized the usefulness of multiple regression analyses, a statistical tool for understanding the relationship between two or more variables where there are several possible explanations for a given outcome, which, in turn, aids in isolating the most relevant variable and determining its effect on the outcome. *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (observing the usefulness of multiple regression analysis, even one that did not include all measurable variables).

Here are a few cases in which systemic discrimination was proved:

- Latino motorists were deprived of constitutional rights as a result of being detained by a law enforcement agency conducting "saturation patrols" or "sweeps" targeting Latinos suspected of being illegally present in the country. Law enforcement deputies engaged in a pattern of racially profiling Latinos for vehicle stops. *Melendres*, 695 F.3d at 998 (addressing Title VI and equal protection claims).

- The deliberate and systematic exclusion of women from food server positions based on sexual stereotypes associating a "fine-dining ambience" with all–male food service may amount to a pattern or practice. While the court ultimately remanded the case because of conflicting witness testimony and conclusions drawn by the lower court, the decision set forth certain guideposts regarding the kind of evidence that may prove helpful to establish that discrimination was the defendant's "standard operating procedure." For

---

[21] However, "[t]here is no minimum statistical threshold" mandating that plaintiff has demonstrated a violation. *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991); *accord Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 153 (2d Cir. 2012). Courts should take a "'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances." *Waisome*, 948 F.3d at 1376; *Chin*, 685 F.3d at 153 (quoting *Waisome*).

example, the court noted the testimony of several witnesses who described the defendant's active discouragement of women applying for employment. The court explained that a plaintiff may establish systemic discrimination "'through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally.' [Further,] direct evidence of an intent to discriminate' may be used to establish a pattern or practice claim." *Joe's Stone Crab Inc.*, 220 F.3d at 1285, 1287 (Title VII case) (citing *Mozee,* 940 F.2d at 1051, and *Lujan,* 766 F.2d at 929 n.15).

- Defendant's motion for partial summary judgment was denied where the EEOC argued that the defendant's "standard operating procedure—its regular rather than unusual practice"—was to ignore most (if not all) of its female employees' complaints that they were individually, or as a group, being subjected to a sexually hostile and abusive environment. The alleged offensive conduct included unwelcome sexual advances, demands for sexual favors, and other offensive verbal and physical conduct of a sexual nature. The court held that the employer was aware of this possible sexual harassment and its failure to act indicated that it tolerated individual acts of sexual harassment. *EEOC v. Mitsubishi Motor Mfg. of Am.*, 990 F. Supp. 1059, 1069 (C.D. Ill. 1998) (Title VII case).

### 2.    Permissible Use of Race

It is critical for agencies to be aware that the exercise of a race-based motive does not mean that the recipient's actions automatically violate Title VI. The Supreme Court has held that strict judicial scrutiny applies to a governmental entity's intentional use of race, a standard that applies through Title VI to any recipient of Title VI funds. The Court has also held that strict scrutiny does not automatically invalidate the use of race; race may be used when the government has a compelling interest supporting its use, and that use is narrowly tailored to support the stated compelling interest. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

Moreover, agency Title VI implementing regulations recognize circumstances under which recipients' consideration of race may be permissible. First, when "administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination." 28 C.F.R. 42.104(b)(6)(1) (DOJ regulations). Second, "[e]ven in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin." 28 C.F.R. 42.104(b)(6)(2) (DOJ regulations).

Compelling governmental interests, thus far, have included remedying the effects of past discrimination, *United States v. Paradise*, 480 U.S. 149, 161 (1987), and achieving the benefits of diversity in higher education, *Grutter v. Bollinger*, 539 U.S. 303, 333 (2003), and law enforcement, *Wittmer v. Peters*, 87 F.3d 916, 920 (7th Cir. 1996). In addition, a recipient has more latitude to pursue one of these goals through actions that do not award benefits based solely on an individual's race, color, or national origin. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) (distinguishing between race conscious mechanisms to achieve diversity in public schools, such as strategic site selection of new schools, and approaches that treat specific individuals differently based on race); *see also Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 545–46 (3d Cir. 2011) (facially race neutral plan that involved assignment of students based on where they live did not trigger strict scrutiny).

Classifications of individuals based on race, color, or national origin cannot avoid strict scrutiny merely because the recipient asserts a very important interest, such as a public safety justification. "The gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *City of Indianapolis v. Edmond,* 531 U.S. 32, 42 (2000). "No matter how tempting it might be to do otherwise, [courts] must apply the same rigorous standards even where national security is at stake." *Hassan v. City of New York*, 804 F.3d. 277, 306 (3d Cir. 2015). In *Hassan*, the Third Circuit reversed the lower court, ruling that plaintiffs had alleged a viable claim of intentional discrimination where the New York Police Department followed a facially discriminatory policy in surveilling Muslim individuals and businesses in New York and New Jersey, and that this can amount to "direct evidence of intent." *Id.* at 295; *see also Johnson v. California*, 543 U.S. 499, 505–06 (2005) (racial classifications for penological purposes, such as controlling gang activity in prison, subject to strict scrutiny); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885–87 (1975) (law enforcement need "does not justify stopping all Mexican-Americans to ask if they are aliens").

Once a compelling interest is established, a recipient must still demonstrate that it has satisfied narrow tailoring; in other words, that it is using race in the most limited manner that will still allow it to accomplish its compelling interest. *Parents Involved*, 551 U.S. at 720. "Even in the limited circumstance when drawing racial distinctions is permissible to further [an important or] compelling state interest, [the recipient] is still 'constrained in how it may pursue that end.'" *Grutter,* 539 U.S. at 333 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)). Strict scrutiny requires that the decision-maker "ultimately be satisfied that no workable race-neutral alternatives would" further the compelling interest "'about as well and at tolerable administrative expense.'" *Fisher v. Univ. of Tex.*, 133 S. Ct. 2411, 2420 (2013) (quoting *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 n.6 (1986)). In addition, the relationship between the stated justification and the discriminatory classification must "be substantiated by objective evidence." *Patrolmen's Benevolent Ass'n of New York v. City of New York,* 310 F.3d 43, 53 (2d Cir. 2002). "[M]ere speculation or conjecture is insufficient," *id.,* as are appeals to "'common sense' which

might be inflected by stereotypes," *Reynolds v. City of Chicago,* 296 F.3d 524, 526 (7th Cir. 2002).

By way of illustration, in some instances police departments have used race or national origin to direct law enforcement activities, and have attempted to justify their conduct by noting that specific individuals from that race or national origin group engaged in illegal activity. Courts consistently reject this kind of stereotyping when examining expressly discriminatory law enforcement policies. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 ("the Constitution prohibits selective enforcement of the law based on considerations such as race"). One court, in ruling that a police department's policy of focusing on Hispanic persons in immigration enforcement was discriminatory, held "there is no legitimate basis for considering a person's race in forming a belief that he or she is more likely to engage in a criminal violation and the requisite 'exact connection between justification and classification' … is lacking." *Melendres*, 989 F. Supp. 2d at 901 (quoting *Gratz v. Bollinger,* 539 U.S. 244, 270 (2003)); *see also Floyd v. City of New York*, 959 F. Supp. 2d 540, 587 (S.D.N.Y. 2013) (rejecting the City's suggestion that law-abiding members of some racial groups have a greater tendency to appear suspicious than members of other racial groups, ruling that a "stop and frisk" program was racially discriminatory).

Similarly, in *Hassan*, an Equal Protection Clause case involving an express religious classification, the Third Circuit held that the NYPD's blanket monitoring of the Muslim community after the September 11 attacks failed strict scrutiny because the surveillance program was not narrowly tailored. The Third Circuit compared the City's public safety justification to the infamous *Korematsu* case, in which the Supreme Court uncritically accepted the government's national security justification for overt discrimination, leading to the wartime imprisonment of American citizens of Japanese ancestry based solely on national origin.[22] The *Hassan* court stated:

> We have learned from experience that it is often where the asserted interest appears most compelling that we must be most vigilant in protecting constitutional rights. "[H]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 635 (1989) (Marshall, J., dissenting); *see also Grutter,* 539 U.S. at 351 (Scalia, J., concurring in part and dissenting in part) ("The lesson of *Korematsu* is that national security constitutes a 'pressing public necessity,' though the government's use of [a suspect classification] to advance that objective must be [appropriately] tailored."); *Skinner,* 489 U.S. at 635 (Marshall, J. dissenting) ("The World War II relocation-camp cases and the Red scare and McCarthy-era internal subversion cases are only the most extreme reminders that when we allow fundamental freedoms to be

---

[22] *Korematsu v. United States*, 324 U.S. 885 (1944).

sacrificed in the name of real or perceived exigency, we invariably come to regret it." (citations omitted)).

*Hassan*, 804 F.3d at 306–07.

Obviously, when to determine that a recipient's consideration of race is permissible is complex, and is not extensively discussed here. Guidance documents from the Departments of Justice and Education review applicable legal principles and set out detailed considerations for educational institutions. *See* Dep't of Educ. and Dep't of Justice, "Dear Colleague" Letter on the U.S. Supreme Court ruling in *Schuette v. Coalition to Defend Affirmative Action* (May 6, 2014); Dep't of Educ. and Dep't of Justice, "Dear Colleague" Letter and Guidance Documents on the Voluntary use of Race (Dec. 2, 2011). These also may be useful in understanding how and when recipients may consider race in other contexts. Federal investigating agencies are encouraged to review applicable guidance documents and case law, and to consult their legal counsel or the Civil Rights Division for assistance applying applicable legal principles to specific situations. The Department of Education's Office for Civil Rights is also available to provide assistance about the use of race in the educational context.

### 3.    Intentional Discrimination by a Third Party

Hostile environment harassment is another form of intentional discrimination prohibited by Title VI not discussed here extensively. When the recipient does not create the hostile environment, but a third party, who neither speaks for nor represents the recipient, is responsible, the hostile environment framework focuses on the recipient's obligation to respond adequately to the third party's discriminatory conduct. Both courts and federal agencies have addressed this circumstance in the context of hostile environment discrimination in schools.

A recipient violates Title VI if (1) a third party (e.g., a fellow student) harasses a program participant or beneficiary based on race, color, or national origin and the harassing conduct is sufficiently serious to deny or limit the individual's ability to participate in or benefit from the program or activity (i.e., the harassment creates a hostile environment); (2) the recipient knew or reasonably should have known about the alleged harassment, i.e., actual or constructive notice; and (3) the recipient fails to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and address its effects, as appropriate. A recipient is liable under Title VI for its own conduct when it fails to take adequate steps to address discriminatory harassment. [23]

---

[23] Dep't of Educ. Off. for Civ. Rts., "Dear Colleague" Letter: Harassment and Bullying, (Oct. 26, 2010), *available at* http:// www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf; *see also* Dep't of Educ. Complaint Resolution Letter, *Richmond Heights School District (OH)*, No. 15-11-1134 (May 11, 2012); *Revised Sexual Harassment Guidance: Harassment of Students by School Employees*, Other Students, or Third Parties, 66 Fed. Reg. 5512–01 (Jan. 19, 2001).

Liability in private suits for monetary damages involving student-on-student harassment lies "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis v. Monroe Cty. Sch. Bd.*, 526 U.S. 629, 633 (1999). Often, but not always, termed "deliberate indifference" cases, the standard of proof has been most commonly applied to harassment claims, particularly sex- and race-based claims. However, courts have recognized the standard in cases involving other forms of discriminatory conduct. *See*, *e.g.*, *Blunt v. Lower Merion School District,* 767 F.3d 247, 271–73 (3d Cir. 2014) (plaintiffs may establish a school district's liability under Title VI for racially motivated student assignments through a deliberate indifference theory).

Similarly, a private plaintiff or investigating agency may be able to use evidence that a recipient knew or should have known about a third party's intentionally discriminatory conduct and failed to act despite that knowledge.

## SECTION VII: PROVING DISCRIMINATION – DISPARATE IMPACT

**A.**    **Introduction**

**B.**    **Sandoval and the Critical Role of the Federal Funding Agencies**

**C.**    **Proving a Violation of the Disparate Impact Standard**

    **1.**    **Establishing an Adverse Disparate Impact**

        a.    Identifying the facially neutral policy or practice

        b.    Establishing adversity/harm

        c.    Establishing disparity

            i.    Identifying the protected class

            ii.    Determining the need for statistical evidence

            iii.    Relevant comparator population

                (a)    Comparator groups that include the total group to which the policy was applied

                (b)    Comparator evidence that is not coextensive with the population subject to the policy

            iv.    Determining the significance of the disparity

        d.    Establishing causation

        e.    Agency approaches to defining adverse disparate impact

    **2.**    **The Recipient's Substantial Legitimate Justification**

        a.    Is the proffered justification legitimate, integral to the recipient's institutional mission, and  important?

            i.    Legitimate

            ii.    Integral

            iii.    Important

        b.    Does the challenged policy or practice bear a demonstrable relationship to the recipient's stated objective?

        c.    Special considerations: site selection or facility closure

    **3.**    **Less Discriminatory Alternatives**

        a.    Evidentiary burdens

        b.    Specificity of evidence of alternatives and  relationship to the recipient's mission

**D.**    **Agency Data Collection Authority and Measuring Disparate Impact**

## A.    Introduction

Section VI discusses intentional discrimination or disparate treatment as one type of Title VI claim. Another type of Title VI violation is based on agency Title VI implementing regulations and is known as the disparate impact or discriminatory effects standard. While a discriminatory impact or effect may also be evidence of intentional discrimination or disparate treatment, this section discusses disparate impact as a cause of action independent of any intent.

The disparate impact regulations seek to ensure that programs accepting federal money are not administered in a way that perpetuates the repercussions of past discrimination. As the Supreme Court has explained, even benignly-motivated policies that appear neutral on their face may be traceable to the nation's long history of invidious race discrimination in employment, education, housing, and many other areas. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31 (1971); *City of Rome v. United States*, 446 U.S. 156, 176–77 (1980); *Gaston Cty. v. United States*, 395 U.S. 285, 297 (1969). The disparate impact regulations ensure "that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination." H.R. Misc. Doc. No. 124, 88th Cong., 1st Sess. 3, 12 (1963). The Supreme Court explained in *Griggs*, 401 U.S. at 429–30, that under Title VII, which was enacted at the same time as Title VI, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430; *see also Texas Dep't of Hour. & Cmty. Affairs v. Inclusive Communities*, 135 S. Ct. 2507, 2521 (2015) (noting that "[r]ecognition of disparate impact claims is consistent with the [Fair Housing Act's] central purpose" as it "was enacted to eradicate discriminatory practices within a sector of our Nation's economy") (citations omitted). The regulations task agencies to take a close look at neutral policies that disparately exclude minorities from benefits or services, or inflict a disproportionate share of harm on them.

A growing body of social psychological research has also reaffirmed the need for legal tools that address disparate impact. This research demonstrates that implicit bias against people of color remains a widespread problem.[1] Such bias can result in discrimination that federal agencies can prevent and address through enforcement of their disparate impact regulations. Because

---

[1] *See*, *e.g.*, Anthony G. Greenwald et al., *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. Personality & Soc. Psychol. 1464 (1998) (showing that majority of white experiment participants more frequently associate white faces rather than African American faces with "pleasant" factors); Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945, 954–59 (2006); *see also* Nilanjana Dasgupta, *Implicit Ingroup Favoritism, Outgroup Favoritism, and Their Behavioral Manifestations*, 17 Soc. Just. Res. 143 (2004); Gary Blasi, *Advocacy Against the Stereotype: Lessons from Cognitive Social Psychology*, 49 UCLA L. Rev. 1241 (2002); Jerry Kang, *Trojan Horses of Race*, 118 Harv. L. Rev. 1489 (2005); Christine Jolls & Cass R. Sunstein, *The Law of Implicit Bias*, 94 Cal. L. Rev. 969 (2006); Samuel R. Bagenstos, *The Structural Turn and the Limits of Antidiscrimination Law*, 94 Cal. L. Rev. 1, 5–9 (2006).

individual motives may be difficult to prove directly, Congress has frequently permitted proof of only discriminatory impact as a means of overcoming discriminatory practices. The Supreme Court has, therefore, recognized that disparate impact liability under various civil rights laws, "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Id.* at 2522.

In a disparate impact case, the investigation focuses on the consequences of the recipient's practices, rather than the recipient's intent. *Lau v. Nichols*, 414 U.S. 563, 568 (1974). As explained throughout this Section, "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Inclusive Communities*, 135 S. Ct. at 2513 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).[2]

Twenty-six federal funding agencies have Title VI regulations that include provisions addressing the disparate impact or discriminatory effects standard.[3]

| AGENCY TITLE VI DISPARATE IMPACT REGULATIONS |
|---|
| A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration *which have the effect* of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin. <br><br> *See, e.g.*, 28 C.F.R. § 42.104(b)(2) (emphasis added)(DOJ regulations). |

[2] *Lau* was a Title VI case; as noted, *Inclusive Communities* involved the Fair Housing Act, 42 U.S.C. § 3601 et seq. Cases decided under Title VII or the Fair Housing Act may be instructive. Investigating agencies may find Fair Housing Act case law particularly instructive where the employment context does not present ready analogues. For instance, courts applying the Fair Housing Act frequently examine the impact borne in particular geographic areas, such as neighborhoods, towns, or counties, whereas Title VII cases more frequently involve comparisons between various groups of applicants and employees. Finally, investigating agencies might find helpful guidance from cases decided under an intent theory, but which evaluate statistical evidence of the disparate impact of a policy or practice, including Equal Protection Clause case law. Accordingly, this section will discuss disparate impact discrimination with reference to case law not only under Title VI, but also under these other laws.

[3] *See* 7 C.F.R. § 15.3(b)(2)–(3) (USDA); 22 C.F.R. § 209.4(b)(2)–(3) (Agency for Int'l Dev.); 15 C.F.R. § 8.4(b)(2)–(3) (Dep't of Commerce); 45 C.F.R. § 1203.4(b)(2) (Corp. for Nat'l &– Cmty. Serv.); 32 C.F.R. § 195.4(b)(2) (DOD); 34 C.F.R. § 100.3(b)(2)–(3) (Dep't of Educ.); 10 C.F.R. § 1040.13(c)–(d) (Dep't of Energy); 40 C.F.R. § 7.35(b)–(c) (EPA); 41 C.F.R. § 101–6.204–2(a)(2)–(3) (GSA); 45 C.F.R. § 80.3(b)(2)–(3) (HHS); 6 C.F.R. § 21.5(b)(2)–(3) (DHS); 24 C.F.R. § 1.4(b)(2)(i)–(3) (HUD); 43 C.F.R. § 17.3(b)(2)–(3) (Dep't of the Interior); 28 C.F.R. § 42.104(b)(2)–(3)(DOJ); 29 C.F.R. § 31.3(b)(2)–(3) (DOL); 14 C.F.R. § 1250.103–2(b) (NASA); 45 C.F.R. § 1110.3(b)(2)–(3) (Nat'l Found. on the Arts &– Humanities); 45 C.F.R. § 611.3(b)(2)–(3) (NSF); 10 C.F.R. § 4.12(b)–(c) (NRC); 5 C.F.R. § 900.404(b)(2) (OPM); 22 C.F.R. § 141.3(b)(2) (Dep't of State); 18 C.F.R. § 1302.4(b)(2)–(3) (TVA); 49 C.F.R. § 21.5(b)(2)–(3) (DOT); 31 C.F.R. § 22.4(b)(2) (Dep't of Treasury); 38 C.F.R. § 18.3(b)(2)–(3) (VA); 18 C.F.R. § 705.4(b)(2) (Water Resources Council).

In determining the site or location of facilities, a recipient or applicant may not make selections with the purpose *or effect* of excluding individuals from, denying them the benefits of, or otherwise subjecting them to discrimination under any program to which this subpart applies, on the ground of race, color, or national origin; or with the purpose *or effect* of substantially impairing the accomplishment of the objectives of the Act or this subpart.

*See*, *e.g.*, 28 C.F.R. § 42.104(b)(3) (emphasis added)(DOJ regulation).

The Supreme Court has repeatedly held that Title VI regulations validly prohibit practices having a discriminatory effect on protected groups, even if the actions or practices are not intentionally discriminatory. *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 643 (1983) (Stevens, J., dissenting) (citing *Lau,* 414 U.S. at 568, 571 (Stewart, J., concurring) and *Fullilove v. Klutznick,* 448 U.S. 448, 479 (1980) (opinion of Burger, C.J.)); *Alexander v. Choate*, 469 U.S. 287, 293 (1985)). Funding agencies require that entities receiving federal financial assistance enter into standard agreements or provide assurances that the recipient will comply with the funding agency's implementing regulations under Title VI. *See, e.g.*, 28 C.F.R. § 42.105 (DOJ) (requiring applications for federal financial assistance to be accompanied by an assurance of compliance with Title VI implementing regulations); *see also United States v. Marion Cty Sch. Dist.,* 625 F.2d 607, 609, 612–13 (5th Cir. 1980) (confirming legitimacy of assurance requirement); *Guardians*, 463 U.S. at 642 n.13 (Stevens, J., dissenting) (quoting from HUD assurance).[4]

The basic analytical framework for applying the disparate impact standard has remained unchanged for decades; how to prove a violation of the disparate impact standard is discussed below.

## B.    *Sandoval* and the Critical Role of the Federal Funding Agencies

Federal funding agencies play a vital role in enforcing the prohibition on disparate impact discrimination through complaint investigations, compliance reviews, and guidance on how to comply with Title VI. In 1994, the Attorney General directed the "Heads of Departments and Agencies" to "ensure that the disparate impact provisions in your regulations are fully utilized so that all persons may enjoy equally the benefits of federally financed programs."[5] The memorandum stated that agency enforcement "is an essential component of an effective civil

---

[4] The Department of Justice issued its discriminatory effect regulation in 1966. 31 Fed Reg. 10,265 (July 29, 1966). Congress, fully aware of this administrative interpretation, has never altered it. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 620–21 (1983) (Marshall, J., dissenting) (noting, among other things, that Congress has enacted ten additional statutes modeled on Title VI "none of which define discrimination to require proof of intent" and that "Congress has not acted to correct any misinterpretation of its objectives despite its continuing concern with the subject matter").

[5] Memorandum from the Assistant Attorney General to heads of Departments and Agencies that Provide Federal Financial Assistance (Jul. 14, 1994), *available at* http://www.justice.gov/ag/attorney–general–july–14–1994–memorandum–use–disparate–impact–standard–administrative–regulations.

rights compliance program.… Frequently, discrimination results from policies and practices that are neutral on their face but have the *effect* of discriminating[.] Those policies and practices must be eliminated unless they are shown to be necessary to the program's operation and there is no less discriminatory alternative." *Id.* (emphasis added).

The agencies' critical role only increased after the Supreme Court's 2001 decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001). Before *Sandoval*, it was believed that individuals could file civil actions  relying on the Title VI disparate impact standard. In *Sandoval*, however, the Supreme Court held  that *individuals* did not have a right of action to enforce the Title VI disparate impact regulations in federal court. *Id*. at 293. Following *Sandoval*, the Civil Rights Division issued a memorandum  on October 26, 2001, for "Heads of Departments and Agencies, General Counsels and Civil  Rights Directors" that clarified and reaffirmed federal government enforcement of the disparate  impact regulations. The memorandum explained that although *Sandoval* foreclosed private  judicial enforcement of Title VI the regulations remained valid and funding agencies retained
their authority and responsibility to enforce them.[6] Nor does *Sandoval* affect the disparate impact provisions of other laws, such as Title VII or the Fair Housing Act. The agencies' Title VI disparate impact regulations continue to be a vital administrative enforcement mechanism.

**Complaint investigations and compliance reviews.** In addition to the administrative complaint process, federal funding agencies are authorized to initiate affirmative compliance reviews as a mechanism for ensuring recipient compliance. Federal funding agencies should prioritize vigorous enforcement of their Title VI disparate impact provisions both through investigation of complaints and through compliance reviews.

**Agency guidance.** Funding agencies buttress their enforcement role by providing informal and formal guidance clarifying and applying their Title VI disparate impact regulations. The Supreme Court has stated that agencies have a great deal of discretion in establishing discriminatory impact standards: "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impact upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts." *Choate*, 469 U.S. at 293–94; *see also Sandoval*, 532 U.S. at 306 (Stevens, J., dissenting). And lower courts have consistently recognized and deferred to agency interpretations of the disparate impact standard. *See*, *e.g.*, *United States v. Maricopa Cty*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (agency interpretation of its own regulations "controlling unless plainly erroneous or inconsistent with the regulations"); *S. Camden Citizens in Action v.*

---

[6] Memorandum from the Assistant Attorney General to the Heads of Departmental Agencies, General Counsels, and Civil Rights Directors (Oct. 26, 2001) *available at* http://www.justice.gov/crt/about/cor/lep/Oct26Memorandum.php); *see Sandoval*, 532 U.S. at 281 (assuming for purposes of deciding the case "that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups ….").

*N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 496 (D.N.J. 2001) (reviewing Environmental Protection Agency regulations, guidance, and administrative decisions in analyzing claim brought under EPA's disparate impact provision); *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J.), *rev'd on other grounds*, 274 F.3d 771 (3d Cir. 2001).

## C.    Proving a Violation of the Disparate Impact Standard

Understanding the process for establishing Title VI noncompliance in disparate impact cases is crucial in assessing an allegation or matter and determining how an agency conducts its investigation. Courts have developed analytical frameworks to assess disparate impact claims in litigation that inform agencies' investigative processes. In some instances, agencies have issued guidance documents articulating a process for determining compliance in particular types of disparate impact cases.

The elements of a Title VI disparate impact claim are similar to the analysis of cases decided under Title VII. *N.Y. Urban League, Inc. v. New York,* 71 F.3d 1031, 1036 (2d Cir. 1995).[7] Cases decided under the Fair Housing Act, 42 U.S.C. § 3601 et seq., also often employ disparate impact analyses, and HUD's Fair Housing Act implementing regulations, 24 C.F.R. § 100.500, adopt a formulation of the disparate impact standard that is substantially similar to the Title VI and Title VII standard.

Courts have adopted a three-part test to determine whether a recipient's policy or practice violates the Title VI disparate impact regulations. First, does the adverse effect of the policy or practice disproportionately affect members of a group identified by race, color, or national origin? Some courts refer to this first inquiry as the "prima facie" showing. If so, can the recipient demonstrate the existence of a substantial legitimate justification for the policy or practice? *N.Y. Urban League,* 71 F.3d at 1036. A violation is still established if the record shows the justification offered by the recipient was pretextual. *See Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1407 (11th Cir. 1993) (citing *Georgia State Conf. v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985)). Finally, is there an alternative that would achieve the same legitimate objective but with less of a discriminatory effect? If such an alternative is available to the recipient, even if the recipient establishes a justification, the policy or practice will still violate disparate impact regulations.

---

[7] The test has been codified in Title VII at 42 U.S.C. § 2000e–2(k).

<table>
<tr><td align="center"><b>TITLE VI DISPARATE IMPACT VIOLATION</b></td></tr>
</table>

| | |
|---|---|
| 1) | **Disparate impact.** Does the adverse effect of the policy or practice fall disproportionately on a race, color, or national origin group? See Section C.1. |
| 2) | **Justification**. If so, does the record establish a substantial legitimate justification for the policy or practice? See Section C.2. |
| 3) | **Less discriminatory alternative**. Is there an alternative that would achieve the same legitimate objective but with less of a discriminatory effect? See Section C.3. |

In administrative investigations, this court-developed burden shifting framework serves as a useful paradigm for organizing the evidence. Agency investigations, however, often follow a non-adversarial model in which the agency collects all relevant evidence then determines whether the evidence establishes discrimination. Under this model, agencies often do not shift the burdens between complainant and recipient when making findings. For agencies using this method, the following sections serve as a resource for conducting an investigation and developing an administrative enforcement action where appropriate.

> **AGENCY PRACTICE TIP**
>
> Agencies need not address each element in rank order because lack of evidence of any one of these elements results in a "no violation" finding and concludes the analysis. However, in many cases understanding the nature of the harm is an important first step to evaluating its impact on a protected class. The sections below provide additional insight into the potential benefits of proceeding in a particular order through the investigation and analysis.

The example below, adapted from Department of Education guidance, illustrates how the three-part test would inform an administrative investigation of a Title VI complaint alleging that a school discipline policy violates the disparate impact regulation.[8]

---

[8] Dep't of Educ., Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline (Jan. 8, 2014), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague–201401–title–vi.html.

### ILLUSTRATION: DISPARATE IMPACT INVESTIGATION OF SCHOOL DISCIPLINE POLICY

A middle school has a "zero tolerance" tardiness policy. Students who are more than five minutes tardy to class are always referred to the principal's office at a particular school, where they are required to remain for the rest of the class period regardless of their reason for being tardy. The school also imposes an automatic one-day suspension when a student is recorded as being tardy five times in the same semester. Additional tardiness results in longer suspensions and a meeting with a truancy officer. The evidence shows Asian-American students are **disproportionately** losing instruction time under the school's "zero tolerance" tardiness policy, as a result of both office referrals and suspensions for repeated tardiness.



An investigation further reveals that white and Hispanic students are more likely to live within walking distance of the school, while Asian-American students are more likely to live farther away and in an area cut off by an interstate highway that prevents them from walking to school. The majority of Asian-American students are thus required to take public transportation. These students take the first public bus traveling in the direction of their school every morning. Even though they arrive at the bus stop in time to take the first bus available in the morning, they often are not dropped off at school until after school has begun.

As **justification** for the "zero tolerance" tardiness policy, the school articulates the goals of reducing disruption caused by tardiness, encouraging good attendance, and promoting a climate where school rules are respected, all of which the federal funding agency accepts as important educational goals. The agency would then assess the fit between the stated goals and the means employed by the school— including whether the policy is reasonably likely to reduce tardiness for these students under these circumstances.

Assuming there was such a fit, the agency would then probe further to determine the availability of **alternatives** that would also achieve the important educational goals while reducing the adverse effect on Asian-American students (e.g., aligning class schedules and bus schedules, or excusing students whose tardiness is the result of bus delays). If the agency determines that a school's articulated goal can be met through alternative policies that eliminate or have less of an adverse racial impact, the agency would find the school in **violation** of Title VI and require that the school implement those alternatives.

1.      **Establishing an Adverse Disparate Impact**

The first step in analyzing any disparate impact case is determining whether the recipient's criteria or method of administering its programs or activities *adversely* and *disparately* affect members of a protected class. In some cases federal agencies proceed directly to preliminary findings after this step. To establish an adverse disparate impact, the investigating agency must (1) identify the specific policy or practice at issue; (2) establish adversity/harm; (3) establish significant disparity;[1] and (4) establish causation. *See N.Y.C. Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 69  (2d Cir. 2000) (plaintiffs must "allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities.").

| ELEMENTS TO ESTABLISH ADVERSE DISPARATE IMPACT UNDER TITLE VI |
| --- |
| 1)  Identify the specific **policy or practice** at issue; see Section C.3.a.<br>2)  Establish **adversity/harm**; see Section C.3.b.<br>3)  Establish **disparity**; see Section C.3.c.<br>4)  Establish **causation**; see Section C.3.d. |

a.   **Identifying the facially neutral policy or practice**

Accurate disparate impact analyses begin with identifying the policy or practice that allegedly caused the disparate harm. *Inclusive Communities*, 135 S. Ct. at 2523 ("a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity"). Although plaintiffs' claims succeed or fail based on whether they have established adversity/harm, significant disparity, and causation, identifying the policy at issue  informs the evaluation of the evidence put forth at these three stages.

When analyzing disparate impact claims, investigating agencies must accurately and completely define the policy or practice at issue. In some cases, the agency will have to broaden its inquiry beyond the specific complaint allegations in order to conduct this analysis. Courts, however, provide little guidance to agencies in how to separate discrete parts of a recipient's evaluation process. Identifying the relevant parts of any policy or practice is a fact-specific inquiry.

| AGENCY PRACTICE TIP |
| --- |
| While an investigating agency must initially identify the full policy or practice at issue, this does not mean the agency must investigate every application of that practice. For example, in statewide or large–scale investigations, agencies may develop evidentiary sampling methods probative of the merits of such complaints. Sampling methods are discussed further in the disparity section below. |

---

[1] If statistics are used to establish disparity, they must establish statistically significant disparity, as discussed below in section C.3.c.

One method to discern whether the legally relevant policy or practice is broader than the action identified by the complainant involves identifying the negative effect that the challenged action has on the protected group. For example, in *New York City Environmental Justice Alliance*, the court rejected a challenge to New York City's decision to scale back a community garden program benefitting minority neighborhoods. Although the precise action challenged was the City's closing or selling of community gardens, the plaintiffs identified the negative effect of the action as the reduction of the amount of open space/green space available to minority community districts. 214 F.3d at 71. The court saw the issue as the City's overall policy about green spaces, not its decision to sell or close community gardens. So viewed, the City would not violate Title VI unless the overall open space/green space policy disadvantaged predominantly minority neighborhoods significantly more than predominantly white neighborhoods. The plaintiffs' statistics only included calculations that compared available space from community gardens, parks, and playgrounds, and excluded space from regional parks available to the community districts. *Id.*

The court noted that this exclusion meant that they could not actually evaluate the City's overall green space policy: "[T]he plaintiffs fail to explain how 'open space' statistics excluding regional parks adjacent to minority communities—some of the most important open spaces in the City— are meaningful in determining whether, as they assert, there is a disparate impact in minority communities as a whole resulting from the City's sale of garden lots." *Id.* at 71 n.5.

Similarly, in *Greater New Orleans Fair Housing Action Center v. HUD*, 639 F.3d 1078 (D.C. Cir. 2011), the court rejected a challenge to one part of HUD's formula for awarding hurricane relief grants. The plaintiffs alleged that under HUD's formula, African Americans had less access to rebuilding programs after hurricanes Katrina and Rita. *Id.* at 1079. The court held that while that one part of the formula, viewed in isolation from the rest, may have had an adverse impact on African Americans, other parts of the formula may have disproportionately benefitted African Americans. *Id.* at 1086. Thus, the court looked at the Katrina/Rita grant process as a whole. *Id.* The court also rejected plaintiffs' evidence that was limited to a single parish because HUD applied the formula in a much broader geographic area. *Id.*

The *Greater New Orleans* court's focus on the geographic area where the impact occurred provides a related method to ascertain the policy or practice. Specifically, agencies should identify the area where the negative effects occur even if that area is larger than the area that is the focus of the complainant's allegation. For example, in *Coalition of Bedford-Stuyvesant Block Ass'n v. Cuomo*, 651 F. Supp. 1202, 1206 (E.D.N.Y. 1987), the plaintiffs claimed the City of New York located shelters for homeless persons in a manner that had the effect of concentrating all but one of the City-owned homeless shelters in Brooklyn's minority communities in violation of, inter alia, the Fourteenth Amendment. The court, however, considered all of the sites City-wide, and not in Brooklyn, because the relevant policy and practice was the City's siting of shelters generally, not just in one portion of its jurisdiction. *Id.* at 1209. The court rejected plaintiff's data because it only covered the impact in Brooklyn. *Id.*

> **AGENCY PRACTICE TIP**
>
> Agencies should inquire about the challenged action's negative effect—looking at who is impacted and where the impact occurs—in order to identify the legally relevant policy or practice. Agencies should remember that the answer to this question may also come from the disparity/discriminatory effect analysis discussed below.

The importance of avoiding examination of only a portion of the legally relevant policy or practice does not mean that an agency must always examine the entirety of what a recipient does. Where plaintiffs allege discrimination in access or opportunities instead of in outcomes, a policy or portion of that policy can have a discriminatory effect on a protected class even where another policy or portion of that policy has a countervailing effect. As the Supreme Court has stated in the employment context, because a certain group ultimately gets hired or promoted at the same rate as another overall does not preclude claims that some aspect of the hiring or promotion process has a disparate impact on them. *See Connecticut v. Teal*, 457 U.S. 440, 451–52 (1982); *accord Clady v. Cty. of Los Angeles,* 770 F.2d 1421, 1429 (9th Cir. 1985). The *Teal* Court made clear that Title VII ensures equal *opportunities* for individuals, not just equal *outcomes* for groups. 457 U.S. at 451. In *Teal*, the defendant imposed a written examination for promotion candidates that excluded a much greater number of African Americans. It then employed affirmative action with respect to those who did pass to ensure that it promoted a proportionate number of African American candidates. *See id.* at 443–44. The Court held that those whom the test excluded from consideration were entitled to challenge the discriminatory procedure under Title VII, notwithstanding the absence of racial disparity in the "bottom-line," i.e., the final award of promotions. *Id.* at 451, 456.

The *Teal* holding has been applied in Fair Housing Act cases relating to access to nondiscriminatory housing, *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987 (4th Cir. 1984) ("'Bottom-line' considerations of the number and percentage of minorities in the rest of the complex or community are 'of little comfort' to those minority families evicted from Building Three"), and Title VI disparate impact cases relating to access to schools or school programs. *See, e.g., Cureton v. NCAA,* 37 F. Supp. 2d 687, 704–05 (E.D. Pa. 1999) (rejecting NCAA's "bottom-line" defense that pointed to graduation rates in disparate impact case involving initial eligibility standards), *rev'd on other grounds*, 198 F.3d 107 (3d Cir. 1999); *Elston*, 997 F.2d at 1418–20 (finding the increase in the racial identifiability of black-majority school as a result of school transfer practices sufficient to constitute a disparate impact, even if overall racial balances had not changed in either the county or county school system, because the success of desegregation is measured on a school-by-school basis).

Finally, the importance of identifying a specific practice does not necessarily mean that practice must be affirmatively undertaken; sometimes the relevant policy or practice could be the failure to do something, or even the failure to have a policy. In other words, *inaction* can exert a disproportionate adverse effect. Language access cases provide an example. The failure to have a coherent language assistance policy, or to train employees on providing assistance, can prevent individuals who are limited English proficient from benefiting from the recipient's program. Where a recipient does not implement any language assistance policy but instead leaves these individual employees untrained and uninformed to do what they will, the result may be that these employees will often fail to provide appropriate assistance. *See*, *e.g.*, *Maricopa Cty.*, 915 F. Supp. 2d at 1079 (disparate impact violation based on national origin properly alleged where recipient "failed to develop and implement policies and practices to ensure [limited English proficient] Latino inmates have equal access to jail services" and discriminatory conduct of detention officers was facilitated by "broad, unfettered discretion and lack of training and oversight" resulting in denial of access to important services). Similarly, where law enforcement agencies fail to train their officers, a failure to properly assist persons who are limited English proficient often follows. *See*, *e.g.*, *U.S. v. Town of E. Haven*, No. 3:12–cv–1652, 2012 WL 5869974, ¶ 43 (D. Conn. filed Nov. 20, 2012).

###### b.  Establishing adversity/harm

Once the investigating agency has accurately identified the policy or practice, it must evaluate whether the policy or practice "harms" a particular group of people enough to be actionable. This element is sometimes referred to as "adversity of the impact."[9] The investigating agency must determine whether the alleged consequences are sufficiently adverse or harmful. *See Bryan v. Koch*, 627 F.2d 612, 617 (2d Cir. 1980). Adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm. This discussion will use the terms "adversity" and "harm" interchangeably.

Most cases applying the Title VI disparate impact standard do not explicitly address adversity as a separate element. Rather, courts frequently assume that the impacts alleged were sufficiently adverse, impliedly recognizing a wide range of harms, including physical, economic, social, cultural, and psychological. In many administrative investigations, particularly those involving the denial of services or benefits, investigating agencies, too, will be able easily to conclude the harm alleged is legally sufficient.

The expansive language of Title VI and its implementing regulations support this approach: the statute states that no person shall on the ground of race, color, or national origin "be excluded

---

[9] *E.g.*, *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 487 *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J.) (discussing the methods used to "evaluate the 'adversity' of the impact" and considering whether the impacts at issue were "sufficiently adverse" to establish a prima facie case), *rev'd on other grounds*, 274 F.3d 771 (3d Cir. 2001).

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In implementing this provision, agency regulations further state that recipients may not administer their programs or activities in a manner which "den[ies] any individual *any disposition, service, financial aid, or benefit* provided under the program." 28 C.F.R. § 42.104(b)(1)(i) (DOJ) (emphasis added), or "restrict[s] an individual *in any way* in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program," *Id.* § 42.104(b)(1)(iv) (emphasis added). Agency disparate impact regulations do not define discriminatory "effects" but simply state that recipients may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin …." *Id.* § 42.104(b)(2).[10]

---

**AGENCY PRACTICE TIP**

While establishing adversity in most cases presents a low bar, investigating agencies nevertheless should employ a broad definition of adversity/harm, and gather any and all evidence of adversity/harm or risk of adversity/harm, including anecdotal evidence from complaining witnesses. Even though such additional evidence may not be required as a legal matter, it provides important context for the decision–maker. Such evidence also informs development of the appropriate remedy in the case of noncompliance.

---

**Fewer or inferior services or benefits.** Courts have frequently identified Title VI adversity/harm where recipients' policies or practices result in fewer services or benefits, or inferior service or benefits. In this type of case, the recipient denies the plaintiff something deemed desirable. For example, in *Larry P. v. Riles,* 793 F.2d 969 (9th Cir. 1986), the court held that improper placement in special education classes had a "definite adverse effect" because such "classes are dead-end classes which de-emphasize academic skills and stigmatize children improperly placed in them." *Id.* at 983; *see also Elston,* 997 F.2d at 1412 (holding that stigmatization of black children and the risk of closure of a school in a black community, among other things, "might well constitute a disparate impact"). While these cases often arise in the education context, many different types of inferior services and benefits will satisfy the adversity requirement. *See, e.g.*, *Meek v. Martinez*, 724 F. Supp. 888, 906 (S.D. Fla. 1987) (minority seniors harmed when receiving less financial aid for community services than non-minority peers); *Campaign for Fiscal Equity, Inc. v. New York*, 86 N.Y.2d 307, 323–24, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) (adversity properly alleged where minority students received less state financial aid as a group and per pupil than their nonminority peers); *Sandoval v. Hagan*, 197 F.3d 484, 508 (11th Cir. 1999) (lack of drivers' licenses adversely affects individuals in the form of lost economic opportunities, social services, and other quality of life pursuits), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Maricopa Cty.,* 915 F. Supp. 2d at 1081 (adversity properly alleged where limited English proficient Latino inmates had

---

[10] The DOJ regulations quoted here are similar to those of other agencies.

diminished access to jail services such as sanitary needs, food, clothing, legal information, and religious services).

**Distribution of burdens, negative effects.** Recipient practices also can harm protected class members even without the loss of specific services or benefits. In this type of case, the recipient distributes burdens, or something seen as undesirable. For example, in *Coalition of Concerned Citizens Against I-670 v. Damian,* 608 F. Supp. 110, 127 (S.D. Ohio 1984), the court held that disruptions and other impacts of planned highway construction would negatively affect minority residents living in the area under construction. In another case, a court found that plaintiffs established sufficient potential harm to their health resulting from the recipient's issuance of air pollution permits for a cement processing facility, noting that the operation of the facility would "adversely affect [the plaintiffs'] health to a degree that meets the standard of 'adversity' under Title VI." *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 145 F. Supp. 2d 446, 490, *opinion modified and supplemented,* (D.N.J.), *rev'd on other grounds,* 274 F.3d 771 (3d Cir. 2001). The court granted a preliminary injunction and the air permits were vacated. *Id.* at 505; *see also Darensburg v. Metro. Transp. Comm.,* 636 F.3d 511, 520–22 (9th Cir. 2011), (finding that while plaintiffs had not established a prima facie case, a transit expansion plan could result in disproportionate harm to minorities); *Maricopa Cty.,* 915 F. Supp. 2d at 1079 (plaintiff properly stated a disparate impact claim where Latinos, as compared with non-Latinos, were far more likely to be stopped by officers).

**Threatened or imminent harm.** These cases and others also illustrate that threatened or imminent harm may satisfy the adversity requirement.[11] *See, e.g., NAACP v. Med. Ctr., Inc.,* 657 F.2d 1322, 1332–38 (3d Cir. 1981) (en banc) (examining a disparate impact claim under Title VI concerning the future impact of a planned medical center relocation); *Damian,* 608 F. Supp. at 127 (examining a disparate impact claim brought under Title VI concerning the future impact of a planned highway expansion). Notably, the Environmental Protection Agency has determined that based on a technical analysis, a showing of *potential* health effects, depending on their nature and severity (e.g., cancer risk), provides an adequate basis for a finding of adversity under EPA's disparate impact regulation. EPA Investigative Report, *For Title VI Admin. Complaint File No. 16R-99-R9,* at 26–28 (Aug. 25, 2011);[12] EPA Draft Revised Guidance for Investigating Title VI Administrative Complaints Challenging Permits (Draft Revised Investigation Guidance), 65 Fed. Reg. 39,650, 39,679–81 (June 27, 2000).

**Mix of costs and benefits, effects that are difficult to quantify.** In some cases, recipient actions provide a mix of costs and benefits, or the alleged harm may be difficult to quantify.

---

[11] Of course, the challenged policy must be ripe for review by the investigating agency. Where the recipient has not yet adopted the policy because, for instance, several potential options are under consideration, it may be premature to analyze a challenge to that potential policy.

[12] EPA Investigative Report for Title VI Admin. Complaint File No. 16R-99-R9 (Aug. 25, 2011*), available at* http://www.epa.gov/ocr/TitleVIcases/ir-082511.pdf.

These factors may increase the complexity of the adversity/harm analysis. For example, hospital relocations and closures are often challenged on the grounds that they will force residents of predominantly minority neighborhoods to travel greater distances for service, without an attempt to demonstrate that this would cause a hardship or that the quality of service and care would be diminished. In *Bryan*, 627 F.2d at 617, the court addressed a challenge to the closure of a hospital that served a 98% minority population, compared with a 66% minority population in the surrounding city's hospital system. Based on these statistics, the court easily found the closure would affect the minority population disproportionately (this step of the analysis—disparity—is discussed in C.1.c. below). Less easy was "whether the impact of this disparity is sufficiently adverse to create a prima facie Title VI violation …." *Id.* The court pointed out that the great majority of patients would be provided satisfactory care in nearby municipal and voluntary hospitals, and only a small number of emergency room patients "would suffer adverse consequences if the nearest emergency room treatment available were at even slightly more distant locations." *Id.* Ultimately, the court proceeded with the subsequent steps of the impact analysis instead of stopping the analysis based on the weakness of the adversity/harm evidence.

Similarly, in a school closing case, the plaintiffs alleged that the closure and student transfers resulted in a discriminatory effect on Hispanic students by depriving them of the high quality education previously provided. The court found there was no adversity/harm, and thus declined to analyze disparity, because (1) the new schools had comparable facilities, (2) there was no evidence that the new schools would be overcrowded, (3) special education programs would continue at the new schools, and (4) the new schools had similarly high percentages of at-risk and minority students. *Villanueva v. Carere*, 85 F.3d 481, 487 (10th Cir. 1996).[13]

Determining the sufficiency of harm can be a fact-intensive and complicated inquiry, particularly where recipient actions provide both costs and benefits, or where the alleged harm can be difficult to quantify. In *NAACP v. Medical Center,* the court noted that it was a close call whether impacts were sufficiently adverse/harmful. Here, the court questioned (without deciding) the plaintiffs' contention that a hospital's relocation from the inner city to an outlying suburban location caused sufficient harm absent proof that the need to travel a few extra miles inflicted significant harm on patients. At trial, the district court considered whether relocation would result in a slight increase in travel time, a modest decrease in the ability of inner city residents to visit patients at the new suburban site, the possibility that a few high risk patients might miss appointments, and the rare chance that treatment would be inadequate. It then determined these to be such unlikely effects that they failed to establish a prima facie case, particularly when weighed against the numerous benefits of the relocation. *NAACP v. Wilmington Med. Ctr.,* 491 F. Supp. 290, 337 (D. Del. 1980). Although the Third Circuit

---

[13] The factors listed in *Villanueva* are not intended to be exclusive. There are multiple other potentially relevant factors that affect whether a school closing may violate Title VI. Some of the relevant factors, for example, are noted in the Department of Education's "Dear Colleague" letter on resource comparability. *See* http://www2.ed.gov/about/offices/list/ocr/letters/colleague–resourcecomp–201410.pdf.

affirmed without deciding this particular issue, a concurrence addressed the issue directly, finding the countervailing benefits accruing to minority patients a determinative consideration:

> [T]hese specific findings are part of a larger mosaic: the trial court's overarching finding that the level of care for all population groups will improve as a result of the benefits that greater consolidation, better-trained residents and upgraded facilities will confer. Measured against [agency] regulations which define Title VI violations as actions which have "the effect of *defeating or substantially impairing* accomplishment of the objective of the program as respect (sic) individuals of a particular race, color, or national origin," 45 C.F.R. § 80.3(b)(2) (emphasis added), these de minimis impacts simply do not pass muster.

*Med. Ctr.,* 657 F.2d at 1340 (Adams, J., concurring); *see also United States v. Bexar Cty.*, 484 F. Supp. 855, 859 (W.D. Tex. 1980) (finding the increased quality of care at a new medical center "much more than offset and outweigh" possible transportation problems created by relocation).

In both *Medical Center* and *Bexar*, the recipients had taken actions to mitigate the impacts on minorities, and both holdings recognized these efforts as important considerations. In *Medical Center*, the recipient had entered into an agreement with the Department of Health, Education & Welfare (predecessor to the Department of Health and Human Services), obligating it to "designate an ombudsman to receive and act upon complaints of discrimination, to adopt a system of inpatient utilization control, to prevent either [of the two hospitals in the parent system] from becoming racially identifiable," and to set aside nearly three million dollars for the renovation of the existing facility. *Med. Ctr.*, 657 F.2d at 1331–32. In *Bexar*, the hospital understood the new travel burden and had taken steps to alleviate problems by providing mini-bus service. *Bexar*,484 F. Supp. at 860. It is possible that the court may have ruled differently but for these ameliorative measures.

---

**AGENCY PRACTICE TIP**

Investigating agencies should consider the sufficiency of the adversity/harm and carefully consider whether benefits to the affected group offset or outweigh the harms to that group. Agencies should remember that recipients may be able to ensure compliance with Title VI by mitigating any adverse harm that may affect the protected group. Informal resolution efforts often involve identification of mitigation efforts which, if applied, would result in compliance with Title VI by reducing or eliminating adversity/harm.

---

### c.  Establishing disparity

An investigating agency's disparity analysis must answer the question that is the essence of a violation of agency disparate impact regulations: Is a disproportionate *share* of the adversity/harm borne based on race, color, or national origin? If so, a disparity is established.

To establish a disparity, an investigating agency must use an "appropriate measure." *N.Y.C. Envtl. Justice All.*, 214 F.3d at 70 (citation omitted). A typical disparity measure involves a comparison between the proportion of persons in the protected class who are adversely affected by the challenged practice and the proportion of persons not in the protected class who are adversely affected. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576–77 (2d Cir. 2003). A disparity is established if the challenged practice adversely affects a significantly higher proportion of protected class members than non-protected class members. *Id.*

---

**AGENCY PRACTICE TIP**

There is no one-size-fits-all measure for disparity. Investigating agencies must tailor their methodology to the circumstances in each case in order to ensure an accurate measurement. For example, under the Fair Housing Act, HUD noted that deciding whether "a particular practice results in a discriminatory effect is a fact–specific inquiry" and that because there are "numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts." Implementation of the Fair Housing Act's Disparate Impact Standard, 78 Fed. Reg. 11,460, 11,468, (Feb. 15, 2013). Where recurring case types have sufficient commonalities, however, agencies can consider crafting guidelines for measuring and defining adverse disparate impact in their recipients' programs. Where such guidelines apply, the investigating agency should, of course, use the methodologies developed for specific matters.

---

When beginning a disparity analysis, an investigating agency should take two initial steps. First, the agency should identify the protected class. Second, the agency must evaluate whether statistical evidence is available and necessary to evaluate the claim. Next, the agency takes the third and fourth steps, which are the most critical components of the disparity analysis. In the third step, the agency should evaluate on what population the adverse disparate impact must be shown. This highly fact-specific inquiry involves accurately identifying the adversely affected population as well as determining the legally relevant population base from which to draw a comparison population. Finally, the agency must determine whether the disparity shown is sufficiently large to impose legal liability (sometimes termed "practical significance").

i.    Identifying the Protected Class

Typically, the relevant protected class will be evident from the complaint because it alleges harm to a specific group (e.g., "Latinos" or "Blacks"). Other times, however, the complaint may broadly allege harm to "minorities" or to several specific groups collectively, or funding agencies may wish to conduct compliance reviews addressing impacts on such groups in the aggregate. Agencies may conduct disparity analyses in which multiple protected groups are aggregated. Such aggregation is commonplace and presumptively accepted by the courts. *See*, *e.g.*, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650–55 (1989) (conducting a close critique of the statistics used to compare "white" and "nonwhite" workers and indicating that to

prove disparate impact, one must provide statistics of probative value comparing "white" and "nonwhite" individuals under Title VII); *Darensburg*, 636 F.3d at 520–21 (critiquing the district court's statistical methodology comparing effects on "minorities" and "non-minorities" generally under Title VI while raising no complaint with the aggregate statistics used). Many cases accept statistics aggregating "Blacks" and "Hispanics." *E.g.*, *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 584–85 (1979); *Biondo v. City of Chicago,* 382 F.3d 680, 682–83 (7th Cir. 2004); *Cox v. City of Chicago*, 868 F.2d 217, 220 (7th Cir. 1989); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 929 (2d Cir. 1988), *aff'd in part,* 488 U.S. 15 (1988).

On the other hand, agencies should avoid aggregation where two groups are not similarly situated and aggregation may hide disproportionate effects on one of the groups. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975) (aggregating group statistics as between "blacks, women and Chicanos and [Asians] and American Indians" was inappropriate because the practice "rendered the statistics useless, particularly in view of the fact that the [Asians] especially were heavily represented in the upper echelon of the labor force").

---

**AGENCY PRACTICE TIP**

If the recipient's policy or practice exerts an adverse/harmful effect on more than one protected group, agencies may aggregate protected groups unless the groups are not similarly situated.

---

ii.      Determining the Need for Statistical Evidence

Often a disparity can be quantified using statistical evidence. *See Darensburg*, 636 F.3d at 519 (explaining that appropriate statistical evidence can provide a "reliable indicator of a disparate impact" (citing *New York Urban League*, 71 F.3d at 1038)). And the majority of contemporary disparate impact claims involve comparative evidence based on statistical analysis. It is important to remember, however, that even where statistical evidence is available, circumstantial evidence can be a critical supplement. As the Supreme Court has cautioned, the usefulness of statistics "depends on all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977).

While statistical evidence is often necessary, in some cases statistical evidence may not be needed. *Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922, 926 (4th Cir. 1990) ("although disparate impact cases usually focus on statistics, they are neither the exclusive nor a necessary means of proof") (citation omitted). The requisite unfair share of harm can also be shown by evidence of impact on specific individuals. *See, e.g.*, *McCoy v. Canterbury*, No. 3:10–0368, 2010 WL 5343298, at *5 (S.D.W. Va. Dec. 20, 2010) (a "series of discrete episodes" of the challenged practice can "raise a plausible inference that it has a discriminatory impact on minorities"), *aff'd,* 428 Fed. App'x 247 (4th Cir. 2011); *Mitchell v. Bd. of Trustees*, 599 F.2d 582, 585–86 (4th Cir.

1979) (affirming district court's finding of disparate impact "on the basis of the few specific applications of the policy proven, such inferences of likely other applications as these instances could rationally support, and judicial notice of the world as it is and as it is known in common experience to be").

The disparate effect of a recipient's policy or practice is sometimes so obvious or predictable that comparative statistics are simply unnecessary to draw the requisite connection between the policy and harm to a Title VI protected group. For instance, certain recipient language policies have the self-apparent effect of excluding individuals based on their national origin. *See Lau v. Nichols*, 414 U.S. 563, 568 (1974) (finding national origin discrimination without reliance on statistical evidence because instruction takes place only in English and therefore "[i]t seems obvious that the Chinese-speaking minority receive fewer benefits than the English-speaking majority"); *see also Mitchell*, 599 F.2d at 585–86 (upholding district court finding that "a policy that arguably would not renew the contract of any teacher who for any reason could not commit at contract renewal time to a full year's uninterrupted service, but that singled out pregnancy alone for compelled disclosure, would necessarily impact disproportionately upon women").

---

**AGENCY PRACTICE TIP**

Agencies should not immediately dismiss a claim if statistics are not provided or available. Instead, agencies should ask if the requisite unfair share of harm can also be shown by evidence of impact on specific individuals or if the discriminatory effect of a recipient's policy or practice is inherently obvious or predictable.

---

        iii.      Relevant comparator population

If an agency uses statistical evidence, it must determine the particular proportion of protected persons and non-protected persons adversely affected. To do this, the agency must "take into account the correct population base and its racial makeup." *Darensburg*, 636 F.3d at 520. This step in a statistical analysis of disparate impact, therefore, is to identify the base population from which to draw comparative evidence, because the challenged policy must be shown to have a discriminatory effect *within the population or area it affects. See, e.g., Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1286 (11th Cir. 2006). In other words, the legally relevant "population base" for a statistical measure of adverse disparate impact is all persons the policy or practice affects or who could possibly be affected by some change in (or the elimination of) the policy or practice. Normally, this means "persons subject to the challenged … practice." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006). As stated in a Fair Housing Act case, *Housing Investors, Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999), "the starting point is always the subset of the population that is affected by the disputed decision."

As these cases show, because the ultimate question is whether the policy has a discriminatory effect within the population it affects, statistical evidence ideally should be based on comparison groups that include, but do not extend beyond, "the total group to which the policy was applied." *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987 (4th Cir. 1984). Part (a) of this section, below, discusses comparison groups that include the total group to which the policy applies.

Of course, the ideal evidence, i.e., statistical proof that covers the relevant population, is not always available. Investigating agencies may find that additional issues arise in attempting to analyze disparate impact within the affected population or area using statistical evidence that is not always a perfect fit. As discussed in part (b), sometimes the sources of available data may describe only a population smaller or larger than the population actually subject to the challenged policy. Other times, comparison groups are simply unavailable because the disparate effects of the policy or practice cannot be isolated or the policy or practice has a uniform, or near uniform, adverse effect on a predominantly minority population or area. Section (b) provides some additional guidance on methods that may be available to address these complications.

(a)     Comparator groups that include the total group to which the policy was applied

Determining the population to which the challenged policy is applied or area the policy actually affected can present a challenging, fact-intensive element of proof. In certain types of cases involving whole areas, like cities, counties, or states, the investigating agency may use general population data where everyone in that population may be affected. Investigating agencies may find this method more efficient than other options because general population data are often readily available at little or no cost through existing sources. For example, in *Angelita C. v. California Department of Pesticides Regulation*, No. 16R–99–R9, an EPA administrative case, complainants alleged that the use of a particular pesticide caused adverse health risks borne disproportionately by Latino school children. EPA correctly measured disparity within the population base of all students enrolled in California public schools because all school children "could potentially have been affected" by the use of that pesticide, depending on proximity of the school to the farm using the pesticide and meteorological conditions. EPA Office of Civil Rights, *Investigative Report for Title VI Admin. Complaint File No. 16R–99–R9* at 32 (Aug. 25, 2011).[14]

Similarly, in a Fair Housing Act (FHA) disparate impact claim that challenged the effect of a generally applicable zoning ordinance or other local law, the court determined that the legally relevant population base was everyone who lived in the city where the allegedly discriminatory fire code applied. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 577 (2d Cir. 2003) (fire code used to bar group home for recovering alcoholics and drug addicts violated FHA and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12165).

---

[14] The report is available here: http://www.epa.gov/civilrights/TitleVIcases/ir–082511.pdf.

By contrast, in an FHA disparate impact claim that challenge a more focused policy or practice, the court rejected an attempt to use generalized population data. *Betsey*, 736 F.2d at 987–88. In *Betsey*, plaintiffs challenged an apartment complex's institution of a no-children policy in one of its buildings, resulting in the evictions of many African-American residents. *Id.* at 985–86. The court held that the only relevant question was the policy's effect on African-American tenants of that building; it was irrelevant that the policy had little disparate impact on African-American residents community-wide, because the policy did not apply so broadly. *Id.* at 987–88. Because the percentage of minority residents receiving eviction notices was far higher than that of non-minority residents receiving eviction notices, a showing of disparate impact was "self-evident." *Id.* at 988.

The history of Title VII disparate impact claims also suggests that agencies must be very cautious in the use of jurisdiction-wide population statistics. While courts sometimes allowed plaintiffs in early cases to use the population of the surrounding area as the population base for determining whether an employer's hiring practices had an adverse disparate impact on a protected class, *see, e.g.*, *Griggs*, 401 U.S. at 430, it is now clear that the legally relevant population base is the actual applicant pool or qualified applicant pool. *See, e.g.*, *Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002) ("In evaluating the impact of a particular process, we must compare the group that 'enters' the process with the group that emerges from it."); *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) ("Generally, the appropriate population is the applicant pool or relevant labor market from which the positions at issue are filled.") (citing *Wards Cove Packing Co.*, 490 U.S. at 650–51); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977)).

Although Title VI matters are less frequently the subject of litigation than housing or employment cases, the test for determining the relevant population base from which to measure disparity in a Title VI case is the same. In *Larry P. v. Riles*, 793 F.2d 969 (9th Cir. 1984), for example, plaintiffs claimed that California used an IQ test to place children in non-academic track classes, resulting in an adverse impact on black children. The relevant population base was all school children who took the test. The court concluded that plaintiffs made out a prima facie case by showing that "black children as a whole scored ten points lower than white children on the tests, and that the percentage of black children in [non-academic-track] classes was much higher than for whites." *Id.* at 982–83. Similarly, in *Bryan v. Koch*, 627 F.2d 612, 617 (2d Cir. 1980), where plaintiffs alleged that closing a city hospital serving a 98% minority population violated Title VI, the court determined that the relevant population base was "the patients served by the City's municipal hospital system." *Id.* Because the general population was 66% minority—significantly less than the 98% minority population served by the hospital slated for closing—sufficient racial disparity was established. *Id.*

---

**AGENCY PRACTICE TIP**

When, and only when, an agency can reasonably conclude that everyone in the jurisdiction is potentially affected, investigating agencies can rely on Title VII and FHA disparate impact cases to support using an entire jurisdiction as the relevant population base.

---

(b)    Comparator evidence that is not coextensive with the population subject to the policy

While the better practice is to analyze the population actually subject to the challenged policy, courts have recognized that evidence may not be available to measure this directly. For example, if the claim includes an allegation that a particular policy or practice created a pool where a particular group's numbers were low precisely because the policy discouraged that group from applying, then plaintiffs must use some means to accurately estimate what the population makeup would have been without that policy or practice. *See, e.g., Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (noting that "[t]here is no requirement … that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants" in part because "[t]he application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory").

In some cases, agencies facing this limitation may use evidentiary samples that are not coextensive with the population subject to the policy as long as those samples are representative of that population. For example, job applicants who actually take an allegedly discriminatory test, and whose pass rates can be compared for racially disparate results, represent only a portion of the affected population, which includes all potential job applicants. *See* Elaine W. Shoben, *Differential Pass-Fail Rates in Employment Testing: Statistical Proof Under Title VII*, 91 Harv. L. Rev. 793, 794 (1978); *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1452 (D.C. Cir. 1988). That does not mean pass rates are without evidentiary value; it just means decision-makers must attempt to use that information to determine the discriminatory effect the test would have on individuals in the relevant geographic area who could have taken the test.

Courts, in fact, routinely reject evidence when the sample is not sufficiently probative. In *Smith v. Xerox Corp.* 196 F.3d 358 (2d Cir. 1999) (overruled on other grounds by *Meacham v. Knolls Atomic Lab.*, 461 F.3d 134 (2d Cir. 2006)), for example, the court considered the process each Xerox work unit used when deciding which workers to lay off. Plaintiffs, alleging age discrimination company-wide, presented statistics showing the relative retention rates of older and younger workers only within their particular units. The court found this evidence inadequate, as it demonstrated only a varying level of disparity in those particular units and not that such an effect pertained to the company as a whole. *Id.* at 369–70. It concluded that "isolating a few

work-groups and analyzing the effect of [the company's policy] on each work-group is misleading at best" when the challenge is to the effect the policy causes company-wide. *Id.* at 370. Similarly, in *Darensburg*, plaintiffs attempted to challenge the impact of a portion of a transit system's expansion policy by presenting evidence regarding the impact on a particular group of minority bus riders.[15] The court concluded that the expansion policy affected *all* transit users and held that it must therefore analyze the impact of the plan on *all* minority transit users, not just minority bus riders. 636 F.3d at 520.

Other times, the available evidence is of a pool that is *broader* than those affected by the challenged policy. This evidence, too, can be useful as long as that broader pool is representative of the affected population. *See, e.g.*, *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 119 (2d Cir. 1999) (using general population data, in addition to other statistical methods, to estimate the qualified labor pool). For example, in a challenge to a company's requirement that job applicants have high school diplomas or pass standardized tests, the Supreme Court accepted evidence of racial disparity in high school graduation rates statewide and in standardized test pass rates nationally. *Griggs*, 401 U.S. at 430 n.6. Similarly, in *Dothard*, 433 U.S. at 330, the Court accepted nationwide evidence of how many women met challenged height and weight requirements. In both cases, there was no reason to think that local conditions varied significantly from the broader ones.

In contrast, courts may reject evidence of racial disparity gleaned from broad statistics where there is a reason to question whether those statistics are representative of the affected population. For example, in *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1369 (5th Cir. 1992), the court rejected national statistics about education levels by race in a challenge to a company's promotion policy because those statistics were not necessarily representative of workers already working for the company and seeking promotion. Similarly, in *Fletcher v. Berkowitz Oliver Williams Shaw & Eisenbrandt*, 537 F. Supp. 2d 1028, 1030 (W.D. Mo. 2008), in a challenge to an employer's consideration of plaintiff's prior sexual assault conviction, the court rejected as immaterial the argument that African Americans were overrepresented in the larger pool of people with felony convictions. The court stated that the general felony data said nothing about the representation of African Americans among those with sexual assault convictions, which was the reason the employer terminated this employee.

---

[15] The *Darensburg* complaint was brought under state law (California Government Code §11135), which contains language comparable to Title VI and provides explicitly for a private right of action. The court analyzed the prima facie case under Title VI and Title VII standards.

> **AGENCY PRACTICE TIP**
>
> Use of general population data can simplify an agency's disparate impact analysis where local demographic data about the population actually subjected to a challenged policy is simply not available. Part D discusses the critical role of agency data collection authority to meaningful disparate impact analyses. But agencies should use generalized data with caution: some showing must be made that evidence drawn from a national pool, or from another sample that is not coextensive with the population affected, is sufficiently and closely representative of the affected population.

iv.    Determining the significance of the disparity

Once the relevant adversely affected and comparator populations are determined, investigating agencies must determine whether the disparity is large enough to matter, i.e., is it sufficiently significant to establish a legal violation. The magnitude of the disparity necessary may be difficult to define in some cases, but guidance can be drawn both from judicial consideration of this question and from federal agency guidelines. In many cases, courts have shied away from drawing clear lines. *See Clady v. Cty. of Los Angeles*, 770 F.2d 1421, 1428–29 (9th Cir. 1985); *accord Smith v. Xerox Corp.*, 196 F.3d at 366 ("[T]he substantiality of a disparity is judged on a case-by-case basis."); *Groves*, 776 F. Supp. at 1526 ("There is no rigid mathematical threshold that must be met to demonstrate a sufficiently adverse impact."). Some disparities are so self-evidently significant, however, that courts have seen no need to explain their reasoning beyond presentation of the statistical evidence. *See, e.g., Betsey*, 736 F.2d at 988 (building policy resulted in 54.3% of non-white tenant households receiving eviction notices, compared with 14.1% of white households); *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 734 (8th Cir. 2005) (disparate impact caused by planned demolition of public housing units where 46 of the 47 families occupying units were African-American).

Conversely, courts are comfortable rejecting particularly small disparities, or those based on very small sample sizes, without explaining the mathematical basis for their conclusions. For example, one court found insufficient evidence of disparate impact based on sex where women were six of the thirty-eight applicants and received two of the fifteen interviews. As the court observed, if just one more female applicant had received an interview, women actually would have had a higher percentage of interviews granted. *Stout*, 276 F.3d at 1123 & n.2. Another court found insufficient disparate impact where "the pass rate for black applicants … was 93% that of white applicants," without opining on what might be a sufficient showing. *Moore v. Southwestern Bell Tele. Co.*, 593 F.2d 607, 608 (5th Cir. 1979) (per curiam). Importantly, plaintiffs have succeeded in establishing disparate impact, even with very small sample sizes, in cases where statistics were not necessary because the disparate effect was obvious or predictable. This approach is discussed above in subsection ii.

Enforcement agencies have developed guidelines to help identify sufficiently significant disparities in frequently recurring contexts. In employment discrimination cases, where the members of one race or other protected class are selected at four-fifths (or less) the rate of another (80% or less), the EEOC, DOJ, and the Department of Labor have adopted this formula for use in identifying evidence of disparate impact.[16] Some courts have adopted this four-fifths cutoff as a rule of thumb when determining whether the amount of differential impact is sufficient. *See, e.g.*, *Clady*, 770 F.2d at 1429 (finding that written exam for employment adversely affected Hispanics because they passed at less than four-fifths the rate of white applicants).

However, not every type of disparity lends itself to the use of the four-fifths rule, even with respect to employment decisions. Federal guidelines in employment cases clarify that the four-fifths (80%) rule is not dispositive and smaller differences in selection rates may nevertheless constitute adverse impact. 28 C.F.R. § 50.14(4)(D). Some courts have found a prima facie case where the disparity fell just short of four-fifths but the causation analysis (discussed below) was statistically significant (meaning the disparity is less likely due to chance) and, in the court's view, of practical import. *See, e.g.*, *Groves*, 776 F. Supp. at 1527–28 (disparate impact established where defendant's evidence revealed black candidates met testing requirement at 82.3% the rate of white candidates, slightly above the 80% mark, but the causation analysis was "overwhelming[ly] statistically significant, showing that "the test itself, and not merely random sampling, has caused the disproportionate exclusion of blacks"); *Hill v. Metro. Atlanta Rapid Transit Auth.*, 591 F. Supp. 125, 129 (N.D. Ga. 1984) (acknowledging that disparate impact could still be established where minorities' selection rate was 81.55% that of white candidates), *rev'd in part on other grounds*, 841 F.2d 1533 (11th Cir. 1988).

As noted above, in addition to the four-fifths (80%) rule, courts have considered statistical significance—the difference between the expected and observed rates in terms of standard deviations—with a difference of two or three standard deviations to be statistically significant (Hazelwood test). Similarly, the "Shoben formula" recognizes a "Z-value" measuring the difference in the groups' success rates greater than 1.96 standard deviations to be statistically significant. *Groves*, 776 F. Supp. at 1526–28, citing *Richardson v. Lamar Cty. Bd. of Educ.*, 729 F. Supp. 806, 816 (M.D. Ala. 1989).

Some agencies have suggested guidelines for disparity that may be considered significant. Following the focus in *Groves* on overwhelming statistical significance (part of the causation analysis), the Department of Education's Office for Civil Rights has issued guidance in the context of high stakes testing indicating that, in general, a test has a disproportionate adverse impact if a statistical analysis shows a significant difference from the expected random

---

[16] Uniform Guidelines for Employee Selection Procedures. *See* 29 C.F.R. pt. 1607 (EEOC); 28 C.F.R. § 50.14 (DOJ); and 29 C.F.R. ch. 60–3 (DOL).

distribution of test scores and pointing out that different courts have used different methods for determining disparate impact. U.S. Department of Education, Office of Civil Rights, *The Use of Tests as Part of High-Stakes Decision-Making for Students: A Resource Guide for Educators and Policy-Makers* (December 2000).[17] *See also* EPA Investigation Guidance, 65 Fed. Reg. at 39,682 ("[W]here credible measures of [disparity] are at least a factor of 2 times higher in the affected population, OCR would generally expect to find disparate impact under Title VI ….").

Some agencies may use other methods of evaluating disparity. Some disparity measures, for example, may consider differences in the magnitude of adversity/harm (e.g., level of exposure or risk). Agency guidelines may evaluate both the demographic disparity and the differences in the magnitude of the impacts. For example, EPA's Title VI investigations guidance established a sliding scale that takes into account the degree of demographic disparity and the differences of degree in the health impact measure (e.g., rates of cancer risks). *Id.* ("[W]here a large disparity exists in terms of impact and a relatively slight disparity exists with regard to demographics (or vice versa), EPA will ordinarily attempt to balance these factors, taking into account the particular circumstances of the case."). While this does not provide a uniform standard for determining whether any individual matter has a discriminatory effect, it makes clear that the agency regards these two factors— degree of health impact and degree of demographic disparity—as important components of the analysis.

The Federal Transit Administration's approach to disparate impact analysis, like EPA's, recognizes the need for flexibility in determining whether there is disparity and considers differences in degree related to adversity/harm. Certain recipients are required to adopt a disparate impact policy that establishes "a threshold for determining when adverse effects of service changes are borne disproportionately by minority populations." FTA Title VI Circular at Chap. IV–13.[18] The threshold should define "statistically significant disparity and may be presented as a statistical percentage of impacts borne by minority populations compared to impacts borne by non- minority populations." *Id.*

### d. Establishing causation

The final element of adverse disparate impact is causation. Even if the evidence establishes an adverse effect that is borne disproportionately by members of a protected group, this question remains: did the recipient *actually cause* that effect? As the court held in *Flores v. Arizona,* 48 F. Supp. 2d 937, 952 (D. Ariz. 1999), "[p]laintiff's duty to show that the practice has disproportionate effect requires plaintiff to demonstrate a causal link between the practice and the disparate impact identified." To establish a violation of its disparate impact provision, an

---

[17] Available at https://www2.ed.gov/offices/OCR/archives/pdf/TestingResource.pdf.
[18] The Circular is available at http://www.fta.dot.gov/legislation_law/12349_14792.html (last visited Nov. 18, 2016).

investigating agency must determine that the impact is causally linked to a recipient's policy or practice. *See Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1415 (11th Cir. 1993) (citations omitted) (plaintiff cannot make out a prima facie disparate impact claim if the evidence tends to show that even had the defendant not engaged in the challenged practice, the same disparate impact would nonetheless have existed).

Causation is frequently shown with statistics. To establish causation, the investigating agency may identify "statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the exclusion of [a particular group] because of their membership in a protected group." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (emphasis added) (citing *Watson Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). The statistical disparities must be sufficiently significant that they "raise … an inference of causation." *Id.* As should already be clear, this method of proving causation is linked to the statistical proof of disparity discussed above; i.e., the same comparative population evidence is typically used to prove both causation and disparity. While the previous section looked at whether the magnitude of the disparity is large enough to matter, this analysis allows agencies to be sufficiently certain (at the specified statistical level) that the disparity is not caused by chance. In other words, is the difference statistically significant?

As discussed above, statisticians have their own established definitions of statistical significance that federal agencies can readily import in their analyses. *See, e.g.,* 28 C.F.R. § 50.14(4)(D). Federal regulations generally define statistical significance, consistent with the term's typical use in social sciences and other statistical inquiry, as a demonstration that the disparity has "a probability of no more than one (1) in twenty (20) to have occurred by chance." *Id.* § 50.14(14)(B)(5); s*ee also Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977); *Alexander v. Louisiana*, 405 U.S. 625, 630 & n.9 (1972); *Watson*, 487 U.S. at 995 (O'Connor, J., plurality opinion) ("statistical disparities must be sufficiently substantial that they raise … an inference of causation"). However, as discussed above there are multiple tests for statistical significance that allow for different confidence intervals (e.g. the Hazelwood test allows for statistical significance at 2-3 standard deviations from the expected rates and the Shoben formula allows 1.96 standard deviations). *See Groves*, 776 F. Supp. at 1526–28.

Regardless of the statistical significance measure used, the Supreme Court has emphasized the importance of "a robust causality requirement" in ensuring entities are not "held liable for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523 (citing *Wards Cove*, 490 U.S. at 653). Investigating agencies must carefully evaluate the causal connection between the challenged policy and any adverse disparate impacts identified. Yet, it is important to remember that the causation element is not a fault-based inquiry; the proper analysis is not about whether there are actual differences among applicants or beneficiaries of different races or why those differences exist. Rather, the sole question at this phase of the case should be whether the

recipient's policy in fact affects people of different races disproportionately. Causation is established where the evidence establishes that the recipient's policy or practice operates in this manner; there is no need for understanding why the policy results in the disparity at this step of the inquiry.

- Where a requirement that applicants have high school diplomas disproportionately excludes African Americans from the hiring process, it does not matter that the recipient is not at fault for African Americans not having high school diplomas at the same rate as whites. The causation inquiry does not involve consideration of whether societal factors external to the hiring process caused the disparate high school diploma rates. *Griggs*, 401 U.S. at 430–31.

- Where the denial of language assistance excludes individuals from meaningful access to the recipient's program based on national origin, it does not matter that the recipient did not cause students to lack English proficiency. The causation inquiry does not involve consideration of factors external to the education process that caused children not to know English. *Lau*, 414 U.S. at 568.

- Where an I.Q. test results in a disproportionate representation of African American children in special education classes, the overrepresentation cannot be "explained away" by external societal factors such as poor nutrition and poor medical care related to lower socioeconomic status. *Larry P.,* 793 F.2d at 983.

Other types of Title VI cases may involve a different type of causation analysis—one that explores the concrete proof connecting the recipient's practice to the alleged harms. For example, environmental justice cases often involve allegations that a recipient's action or inaction causes harm or that the recipient's permitting of a third party facility causes the harm. In these cases, establishing causation may involve scientific or other quantifiable proof that the challenged practice actually caused the alleged adverse impacts. This may involve proof connecting a specific facility to a specific adverse impact, such as harmful health effects, odor, noise, decrease in property values, etc. When such proof is not obtainable, the statistical tests discussed above will suffice.

For example, in complaint investigations alleging adverse impacts from the operation of recipient-permitted facilities, EPA has explained that the facts and circumstances of each complaint will determine whether a likely causal link exists. EPA recognizes a number of forms and types of evidence that could establish causation, including scientific proof of a direct link, prediction of potentially significant exposures and risks resulting from stressors created by the permitted activities or other sources, and other complex methodologies. EPA Investigations Guidance, 65 Fed. Reg. at 39,679. For an example of a causation analysis involving the risk of

exposure to a pesticide, see EPA's investigatory report in *Angelita C. v. California Department of Pesticides Regulation*, No. 16R–99–R9. EPA Office of Civil Rights, *Investigative Report for Title VI Administrative Complaint File No. 16R–99–R9* at 32–33 (Aug. 25, 2011).[19]

### e.  Agency approaches to defining adverse disparate impact

As mentioned previously, federal funding agencies responsible for Title VI enforcement sometimes engage in rulemaking, issue formal guidance documents, and informal guidance such as letters to inform recipients of the types of adverse disparate impact (discriminatory effects) they must try to avoid. In the following illustrative examples of agency approaches to defining adverse disparate impact in specific applications, agencies have identified specific impacts prohibited by Title VI; identified factors they will consider in making such determinations on a case by case basis; and required (or recommended) that their recipients establish formal definitions.

- The Department of Transportation's Federal Transit Administration, which funds state and local transportation agencies, requires recipients to "define and analyze adverse effects related to major changes in transit service." FTA Circular 4702.1B, Title VI Requirements and Guidelines for Federal Transit Recipients, Chap. IV-13 (Oct. 1, 2012).[20] As part of FTA's requirement that recipients submit a multi-element "Title VI Program," recipients must adopt their own definitions of adversity, subject to DOT approval and subject to the requirement that the effect be "measured by the change between the existing and proposed service levels that would be deemed significant." *Id.* FTA provides additional guidance and examples of the types of service changes that could have an adverse effect, such as elimination of a transit route, rerouting an existing route, and increases in travel time.

- The Department of Justice, which provides funding to state court systems, has determined that court policies failing to provide appropriate language assistance to limited English proficient individuals in all types of proceedings and court-managed services, are adverse under DOJ's disparate impact regulation. DOJ made this determination after considering both the importance of the issues at stake in criminal and civil matters and the critical need for accurate communications. Accordingly, a prima facie violation is established where a court's language services policy or practice causes these types of harms. *See* Language Access Guidance Letter to State Chief Justices and State Court Administrators from the Assistant Attorney General (August 16, 2010).[21]

---

[19] The report is available at https://perma.cc/KP2X-JXFQ (last visited Nov. 18, 2016).
[20] The Circular is available at http://www.fta.dot.gov/documents/FTA_Title_VI_FINAL.pdf.
[21] This letter is available at https://perma.cc/5S4E-L8J6.

- The Departments of Education and Justice have determined that certain student enrollment practices may chill or discourage student participation or exclude students based on their parents' or guardians' actual or perceived citizenship or immigration status, and that such an effect is adverse under agency Title VI disparate impact regulations. The Departments noted that school district must not prevent students from enrolling based either on their own citizenship or that of their parents: "[D]istricts may not request information with the purpose or result of denying access to public schools on the basis of race, color, or national origin. Dep't of Educ. and Dep't of Justice, Dear Colleague Letter on the Rights of All Children to Enroll in Public Schools 2 (May 8, 2014).[22]

- The Environmental Protection Agency, which provides funding to state environmental permitting agencies, has determined that where recipients issue pollution emission permits to facilities that may cause negative effects, these adverse effects could be sufficiently significant to establish adversity. Where agencies have not established specific benchmarks, EPA has provided guidance on the factors that agencies should consider in analyzing adversity. EPA observed that "no single analysis or definition of adverse disparate impact is possible due to the differing nature of impacts (e.g., cancer risk, acute health effects, odors) and the various environmental media (e.g., air, water) that may be involved." Rather, it said that it would "use environmental laws, regulations, policy and science as touchstones for determining thresholds for what is adverse." EPA Investigations Guidance, 65 Fed. Reg. at 39,654, 39,698.

##    2.    The Recipient's Substantial Legitimate Justification

If the evidence establishes a prima facie case of adverse disparate impact, as discussed in the preceding sections, courts then determine whether the recipient has articulated a "substantial legitimate justification" for the challenged policy or practice. *Georgia State Conf. v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985). The justification inquiry is an important and appropriate means of ensuring recipients have "leeway to state and explain the valid interests served by their policies." *Inclusive Communities*, 135 S. Ct. at 2522.

---

**AGENCY PRACTICE TIP**

The sequential process that courts use, where a complainant offers prima facie evidence and the defendant offers a rebuttal or a "substantial legitimate justification" need not be how an agency conducts its investigation. Rather, an agency has discretion to gather and evaluate evidence of "substantial legitimate justification" as part of its initial investigation, or to make a preliminary finding and require recipients to articulate their defenses as a next step. For example, EPA Title VI guidance recognizes the "recipient may offer its justification following its receipt of the notice of complaint, or after a preliminary finding of non–compliance with Title VI or EPA's implementing regulations." EPA Draft Revised Investigations Guidance, 65 Fed. Reg. at 39,683.

---

[22] The letter is available at http://www.justice.gov/crt/about/edu/documents/plylerletter.pdf.

In contrast to intentional discrimination cases, where recipients can offer legitimate non-discriminatory reasons for the challenged actions, a justification in a disparate impact case that merely dispels inferences of illegitimate *intent* is inadequate. "Substantial legitimate justification" in a disparate impact case is similar to the Title VII concept of "business necessity," which requires an employer to show that the policy or practice in question is demonstrably related to a significant, legitimate employment goal. *Griggs*, 401 U.S. 433–36; *Wards Cove*, 490 U.S. at 659. After the plaintiff establishes a prima facie case of disparate impact, the defendant can attempt to show that the challenged practice "serves, in a significant way, the legitimate employment goals of the employer." *Id*. Importantly, the concept of "business necessity" does not transfer exactly to the Title VI context because Title VI covers a broader scope of recipient practices. *See Inclusive Communities*, 135 S. Ct. at 2522–24 (recognizing the limitations on extension of the business necessity concept to Fair Housing Act cases).

Thus, while it is well-established that *unjustified* disparate impact violates agency Title VI regulations, the precise nature of the justification inquiry in Title VI cases is somewhat less clear in application. As discussed in more detail below, courts and agencies have articulated a number of different formulations to describe what constitutes a justification legally sufficient to permit an adverse disparate impact. In all of these formulations, this analysis requires a delicate balancing of recipients' interests in implementing their policies with the substantial public interest in preventing discrimination. Because Title VI covers a vast array of federally funded programs, each with a different institutional mission, this highly fact-specific inquiry must be made carefully case by case.

Although determining a substantial legitimate justification is a fact-specific inquiry, Title VI case law and agency guidance set forth general requirements. For example, courts have required that the recipient show that the challenged policy was "*necessary* to meeting a goal that was *legitimate, important, and integral to the [recipient's] institutional mission*" in order to establish a "substantial legitimate justification." *Elston*, 997 F.2d at 1413 (emphasis added). Courts have evaluated whether the policy was "necessary" by requiring that the justification bear a "manifest demonstrable relationship" to the challenged policy. *Georgia State Conf.*, 775 F.2d. at 1418 (11th Cir. 1985).

| SUBSTANTIAL LEGITIMATE JUSTIFICATION |
| --- |
| Was the challenged policy necessary to meeting a goal that was legitimate, important, and integral to the recipient's institutional mission? |
| Does the justification bear a manifest demonstrable relationship to the challenged policy? |

Agency guidelines or regulations implementing Title VI incorporate similar formulations. *See, e.g.,* EPA Investigations Guidance, 65 Fed. Reg. at 39,654 ("Determining what constitutes an acceptable justification will necessarily be based on the facts of the case. Generally, the recipient would attempt to show that the challenged activity is reasonably necessary to meet a goal that is legitimate, important, and integral to the recipient's institutional mission."); Fair Housing Act Regulations, 24 C.F.R. § 100.500(b)(1), (c)(2) (under the second step of the disparate impact burden shifting analysis, the defendant must prove that the proposed action is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the defendant).

As is clear, this inquiry is fact-specific; this section does not present an exhaustive list of factors, but rather some of the considerations that may guide an investigating agency's analysis.

---

**AGENCY PRACTICE TIP**

Agencies provide guidance concerning types of justifications they expect to consider when investigating particular case types. *See, e.g.,* HUD Office of General Counsel Guidance on Application of the Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate–Related Transactions (April 4, 2016), *available at* https://perma.cc/A49W-XJNC (resident safety and protecting property may be both substantial and legitimate, but housing providers must be able to prove that policies making housing decisions based on criminal history actually assist in protecting resident safety and/or property); EPA Draft Revised Investigations Guidance, 65 Fed. Reg. at 39,683 (explaining that when evaluating justifications for discriminatory environmental permitting decisions, EPA "expects to consider provision of public health or environmental benefits (e.g., waste water treatment plant) to the affected population from the permitting action to be an acceptable justification because such benefits are generally legitimate, important, and integral to the recipient's mission"); DOJ Language Guidance Letter to State Courts, (Aug. 16, 2010), *available at* http://www.lep.gov/final_courts_ltr_081610.pdf (explaining how cost justifications will be evaluated in the language access context).

Federal funding agencies are uniquely qualified to provide such guidance because of their expert knowledge of their funded programs. Courts normally defer to agency guidance in evaluating specific types of disparate impact. *See, e.g., S. Camden Citizens in Action,* 145 F. Supp. 2d 446, 496 (D.N.J. 2001) ("In the absence of guiding legal precedent on the question of what constitutes a 'substantial legitimate justification' or a 'legitimate nondiscriminatory reason' in the context of this case, I shall look to EPA regulations and practice."). As in all aspects of Title VI investigation, agencies should consider not only the recipient's perspective, but also the views of the affected community in assessing whether benefits to the community outweigh the policy's disproportionate adverse effects. *See, e.g.,* EPA Investigations Guidance, 65 Fed. Reg. at 39,683.

---

### a.  Is the proffered justification legitimate, integral to the recipient's institutional mission, and important?

Agencies should first inquire whether the recipient offers a justification that is legitimate, integral to the recipient's institutional mission, and important. *Elston*, 997 F.2d at 1413.

i.   Legitimate

Recipients frequently articulate rationales that appear to be legitimate on their face. These rationales can be objective: for example, showing that the recipient considered multiple alternatives and selected the least damaging/most beneficial path. *See, e.g.*, *New York City Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 72 (2d Cir. 2000); *see also Inclusive Communities*, 135 S. Ct. at 2523 (noting that "[z]oning officials … must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture)" and that "these factors contribute to a community's quality of life and are legitimate concerns for housing authorities.")

Where, however, a federally funded entity insists on implementing a policy despite its adverse disparate impacts, the investigating agency must scrutinize the recipient's rationale to determine whether the evidence adequately supports it. A violation is established if the investigating agency finds that the evidence does not support the entity's justification, and therefore is not legitimate. *See Elston*, 997 F. 2d at 1407. Federal Transit Administration guidance explains this critical point: "[I]f evidence undermines the legitimacy of the [recipient's] asserted justification—that is, that the justification is not supported by demonstrable evidence—the disparate effects will violate Title VI, as the lack of factual support will indicate that there is not a substantial legitimate justification for the disparate effects." FTA Title VI Circular, at ch. IV–16.

Court decisions show that agencies should be particularly skeptical of "subjective rationales" and should thoroughly investigate and analyze the facts to determine whether these rationales are supported by sufficient evidence. *See, e.g.*, *Sandoval v. Hagan*, 197 F.3d 484, 490–91 (11th Cir. 1999), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001). In *Sandoval*, the Eleventh Circuit affirmed the district court's determination that none of the facts supported the recipient state agency's rationale for limiting driver's license examinations only to people who spoke English. *Id.* The state agency offered several justifications for the English-only rule: highway safety concerns, exam administration difficulties, exam integrity, and budgetary constraints. *Id.* The district court found that the recipient had produced no evidence at trial that non-English speakers posed a greater driving safety risk than English speakers; the recipient had undermined its own safety argument by recognizing valid licenses from non-English speakers of other locales; making test accommodations for illiterate, deaf, and disabled drivers; and having previously offered the examination in fourteen languages without administrative difficulty. The court further noted that cost had not been a real factor in making the decision to administer the examination only in English and that the recipient could afford the costs of language assistance in light of its $50 million dollar budget. *Id.* Affirming the district court, the Eleventh Circuit ruled that the state agency's rationales constituted a pretext for the policy despite its established disparate impact on national origin minorities. *Id.*

The justification analysis used in Fair Housing Act disparate impact cases can also provide guidance for Title VI investigating agencies. The justification "must be supported by evidence and may not be hypothetical or speculative." 24 C.F.R. §§ 100.500(c)(2), 100.500(b)(2); *see, e.g.*, *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 16 (D. Conn. 2011) (explaining that where the "defendant presents objective evidence to support his assertions, the court is less wary of subjective explanations") (citing *Soules v. HUD,* 967 F.2d 817, 822 (2d Cir. 1992)). The *Gashi* court found that the evidence did not support a housing authority's justifications for its discriminatory occupancy limitation. The defendant argued that the local fire code mandated the challenged occupancy requirements and that "building infrastructure concerns" necessitated the policy. The court concluded, however, that the fire code defendants cited actually was not binding because it represented only national guidelines, and the defendants had no documentation to support their vague assertions regarding infrastructure concerns. *Id.* at 17–18. *See also Charleston Housing Authority v. U.S. Dep't of Agriculture*, 419 F.3d 729, 741 (8th Cir. 2005) (rejecting as unsupported by the evidence defendant housing authority's claim that demolition of public housing units occupied almost entirely by African Americans was justified by a desire for low-income housing density reduction, need to eliminate a housing design that contributed to the concentration of crime and drug use, and lack of funding for necessary improvements).

It is important for investigating agencies to evaluate the veracity of any cost-based justifications the recipient puts forward. A monetary justification for a policy or practice (or lack thereof) will often fail because of a lack of evidence. *See, e.g.*, *Sandoval v. Hagan*, 7 F. Supp. 2d 1234, 1312 (M.D. Ala. 1998) (finding defendant's cost argument unsupported by the evidence because translation services at issue could be obtained by alternative cost-effective means); *aff'd*, 197 F.3d 484 (11th Cir. 1999) *rev'd sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Charleston Hous. Auth.*, 419 F.3d at 742; Department of Justice, Civil Rights Division, Complaint No. 171–54M–8, *Letter to N.C. Courts from Assistant Attorney General* (March 8, 2012) at 15–16 (rejecting the recipient's cost justification in part because it had access to new funds, none of which increased language access services in the courts; the cost of providing services was a small fraction of its operating budget; and it prevented courts from providing interpreters even when there would be no financial cost to do so);[23] *but see NAACP v. Wilmington Med. Ctr., Inc.*, 491 F. Supp. 290, 342 (1980) (crediting defendant's evidence that the costs associated with avoiding relocation of medical center from an urban to suburban location would require borrowing well beyond defendant's budget).

Finally, a recipient cannot simply contend that it followed other applicable rules governing site selection or permit approvals to establish a legitimate justification. *See S. Camden Citizens in Action*, 145 F. Supp. 2d at 496 (rejecting defendant's argument that the challenged facility's

---

[23] Letter from Assistant Attorney General to Director of North Carolina Administrative Office of the Courts (Mar. 8, 2012), *available at* https://perma.cc/69Q6-NALT.

compliance with the National Ambient Air Quality Standard constitutes a substantial, legitimate justification for its permitting decision). Mere compliance with rules unrelated to civil rights prohibitions does not legitimize a justification that would otherwise be insufficient under Title VI to justify adverse disparate impacts. In most instances, determining compliance with other rules or requirements involves reasoning based exclusively on those rules and "does not include considerations required by Title VI." *Id.* at 496.

### ii.   Integral

Federal funding agencies should also consider the type of recipient in evaluating the adequacy of the recipient's proffered justification. Different types of institutions obviously have different interests. What is central to the mission of one type of recipient may be merely tangential to, or even contrary to, the central mission of another. *See Wilmington Med. Ctr.*, 491 F. Supp. at 316 (acknowledging that Title VI could be applied to a wide range of entities and to an equally diverse range of decisions and, therefore, the nature of the justification required might vary from case to case). For instance, crime reduction may be part of a law enforcement agency's integral institutional mission, but may be only minimally or even unrelated to the mission of other types of public entities.

### iii.   Important

The investigating agency's evaluation of the importance of a recipient's stated justification involves weighing the reason for implementing the challenged policy or practice against the harm it causes. *See NAACP v Med. Ctr., Inc.*, 657 F.2d 1322, 1350 (3d Cir. 1981) (en banc) ("The content of the rebuttal or justification evidence cannot be determined in the abstract. It must be related to the precise impacts suggested by the plaintiffs' evidence."); *see also Gashi*, 801 F. Supp. 2d at 16 (citing *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 929, 937 (2d Cir. 1988), *aff'd,* 488 U.S. 15 (1988) ("After the defendant presents a legitimate justification, the court must weigh the defendant's justification against the degree of adverse effect shown by the plaintiff."). Courts have also recognized that the degree of adverse impact that a challenged policy or practice causes can affect the sufficiency of the recipient's justification. *See, e.g.*, *Clady v. Cty. of Los Angeles*, 770 F.2d 1421, 1432 (9th Cir. 1985) ("As a general principle, the greater the test's adverse impact, the higher the correlation which will be required."). Generally, the more serious, significant, or widespread the adverse disparate impacts the challenged policy causes, the more difficult it will be for the recipient to establish a sufficient reason for implementing the policy.

### b.  Does the challenged policy bear a demonstrable relationship to the recipient's  stated objective?

Even if the recipient points to a  legitimate, important goal that is integral to its institutional mission, the discriminatory policy or  practice must also bear a demonstrable relationship to that goal. *Georgia State Conf.*, 775 F.2d  at 1418. If it does not, implementation of that policy or practice violates Title VI. Accordingly, the investigating agency must take a hard look at the connection between the challenged policy or practice and the recipient's stated objective.

For example, in *Leaders for Equality and Action in Dayton (LEAD) v. City of Beavercreek,* the Federal Highway Administration (FHWA) found that the City Council's refusal to approve the construction of three bus stops caused unjustified disparate impact by denying minority residents public transit access to a shopping mall, a large medical center, jobs, and other essential services in Beavercreek. FHWA Office of Civil Rights, Letter from Associate Administrator for Civil Rights*, DOT #2012–0020, at 15–16 (June 26, 2013). The City attempted to justify its decision by arguing, among other things, that installation of police call boxes and "state of the art" video surveillance would be necessary to protect the public and reduce the risk of crime at the stops. *Id.* at 12. FHWA acknowledged the City had a legitimate, important goal to ensure public safety, but found the record contained insufficient evidence to show the lack of call boxes and video surveillance at other comparable stops presented a public safety risk. *Id*. In other words, the City did not establish that the action taken bore a demonstrable relationship to the stated goal. Moreover, the City offered no evidence that security and public safety were serious issues at comparable bus stops. *Id.* The FHWA concluded that the City failed to prove the necessary connection between the legitimate justification—public safety—and the challenged practice—the refusal to approve the construction of the three bus stops based on the asserted necessity to install police call boxes and video surveillance equipment.

### c.  Special considerations: site selection or facility closure

Many Title VI cases involve challenges to site selection decisions, such as the locations selected for construction of highways or facilities that will have negative consequences for the surrounding community. Site selection cases can also involve challenges to the closure or relocation of desirable facilities, such as schools or hospitals. In such cases, courts have tended to merge the initial justification analysis with the final step of the disparate impact burden shifting framework, i.e., consideration of less discriminatory alternatives. That step is discussed in detail in Section 3 below. In determining the sufficiency of the recipient's proffered reasons for the discriminatory siting or closure decision, courts consider not only whether the construction or closure was necessary to begin with but also whether the recipient can justify selection of the *particular site* over alternatives. *See*, *e.g.*, *Coalition of Concerned Citizens Against I-670 v. Damian*, 608 F. Supp. 110, 127 (S.D. Ohio 1984). These cases show that consideration of less

discriminatory alternatives is often linked to the "substantial legitimate justification" analysis, and agencies therefore should carefully consider recipients' site selection process, including alternatives, when analyzing justification.

For example, in *Damian*, the court found that plaintiffs made a prima facie showing that recipients' decision to build a new freeway would have a discriminatory effect because the freeway would travel through predominately minority neighborhoods, the majority of people displaced by the construction were racial minorities, and the disruptions and other negative impacts caused by the construction and eventual highway operation would fall disproportionately on those minority neighborhoods. *Id.* Nonetheless, the court further found that the recipients had met their burden of justifying the location of the interstate because the major alternative location would have had a substantially greater impact on minorities, and the recipients had selected the final freeway location "so as to minimize impacts upon minority neighborhoods," avoiding most of the neighborhoods that were 90% racial minorities. *Id.* Critically, it was not enough to show that a new freeway was needed; rather, the court demanded that the recipient justify the specific location selected. *See also Bryan*, 627 F.2d at 617–18 (where public officials made a choice to close one of 17 municipal hospitals, it was "the choice of this particular hospital that must be justified").

### 3.    Less Discriminatory Alternatives

If a substantial legitimate justification for the recipient's discriminatory policy or practice is identified, the investigating agency must also determine whether there are alternative practices that may be comparably effective with less disparate impact. Title VI requires recipients to implement a "less discriminatory alternative" if it is feasible and meets their legitimate objectives. *Elston*, 997 F.2d at 1407, 1413; *Georgia State Conf.*, 775 F.2d at 1417. This is a critical—and sometimes overlooked—stage of the investigation. Even if the recipient demonstrates a substantial legitimate justification, the challenged policy will nevertheless violate Title VI if the evidence establishes an alternative that meets this test.

Courts have been willing to thoroughly analyze alternatives, particularly where the recipient had considered and rejected them and thus the record was already developed. *See, e.g., Damian*, 608 F. Supp. 119–20 (conducting a thorough review of alternative sites for highway or other methods, such as light rail or public transportation). Where Title VI plaintiffs challenged broad institutional decisions, however, courts were sometimes reluctant to conduct a searching analysis of alternatives. *See, e.g., Bryan*, 627 F.2d at 619 ("We are skeptical of the capacity and appropriateness of courts to conduct such broad inquiries concerning alternative ways to carry out municipal functions. Once a court is drawn into such a complex inquiry, it will inevitably be assessing the wisdom of competing political and economic alternatives.").

Federal funding agencies, on the other hand, are subject matter experts charged with specific Title VI enforcement duties. As a result, they are well-equipped to analyze alternatives thoroughly and they should evaluate carefully potential less discriminatory alternatives. This section discusses (a) who bears the responsibility to establish less discriminatory alternatives, (b) how evidence of less discriminatory alternatives must be specific, (c) how proposed alternatives must meet the recipient's objectives, and (d) how less discriminatory alternatives may be of a different type than the challenged policy and can be achieved through mitigation measures.

### a.  Evidentiary burdens

In disparate impact lawsuits, once the defendant establishes a substantial legitimate justification, the burden shifts back to the plaintiff to identify less discriminatory alternatives to the challenged policy or practice. *Powell v. Ridge*, 189 F.3d 387, 394 (3d Cir. 1999) (citing *Georgia State Conf.*, 775 F.2d at 1417). In other words, the defendant is not obligated to prove that there were no such alternatives, and the burden of persuasion remains with the plaintiff to prove that there were. *But cf. Damian*, 608 F. Supp. at 128 (recognizing "there would be some question whether defendants were required by federal law to consider alternatives with less disparate impact" under Title VI).

In contrast, in agency Title VI administrative investigations, the evidentiary burden, as previously explained, rests with the investigating agency rather than with the complainant. EPA guidance explains this important distinction:

> The investigation of Title VI administrative complaints by [EPA] does not involve an adversarial process, as in litigation, between the complainant and the recipient. Rather, it should be viewed as EPA investigating allegations that EPA financial assistance is being used improperly. Consequently, the complainants do not have the burden of proving that their allegations are true and *are not obligated to offer less discriminatory alternatives*. Instead, EPA has the responsibility to determine whether a violation exists and, where appropriate, to uncover less discriminatory alternatives. Nonetheless, EPA encourages complainants to provide whatever relevant information they may have.

EPA Investigations Guidance, 65 Fed. Reg. at 39,696 (emphasis added). Moreover, Title VI regulations require the recipient to provide the investigating agency with the data and information necessary to make this determination.

> **AGENCY PRACTICE TIP**
>
> Although agencies bear the burden of evaluating less discriminatory alternatives, agencies sometimes impose additional requirements on recipients to consider alternatives before taking action. These requirements can affect the legal framework by requiring recipients to develop the evidentiary record related to alternatives as a matter of course, before and regardless of whether an administrative complaint is even filed. Such requirements recognize that the recipient is in the best position to complete this task, having the best understanding of its goals, and far more ready access to the information necessary to identify alternatives and conduct a meaningful analysis. *See Med. Ctr.*, 657 F.2d at 1355 (Gibbons, J., concurring and dissenting). Courts have recognized that agencies have authority to impose additional obligations. *See*, *e.g.*, *Damian*, 608 F. Supp. at 128.

Many agencies have established additional requirements related to less discriminatory alternatives, under both Title VI and other authorities. For example, the Federal Transit Administration requires certain recipients to consider alternatives before implementing key decisions. A recipient's failure to do so, and to gather sufficient data to establish it has selected the least discriminatory alternative, is a procedural violation of agency regulatory requirements, and may put the recipient at risk of a substantive violation as well. *See* FTA Title VI Circular, Chap IV–16. FTA explains the requirement to examine alternatives as follows:

> Examining Alternatives. If the transit provider determines that a proposed service change will have a disparate impact, the transit provider shall analyze the alternatives … to determine whether alternatives exist that would serve the same legitimate objectives but with less of a disparate effect on the basis of race, color, or national origin. The existence of such an alternative method of accomplishing the transit provider's substantial and legitimate interests demonstrates that the disparate effects can be avoided by adoption of the alternative methods without harming such interests.… At that point, the transit provider must revisit the service changes and make adjustments that will eliminate unnecessary disparate effects on populations defined by race, color, or national origin. Where disparate impacts are identified, the transit provider shall provide a meaningful opportunity for public comment on any proposed mitigation measures, including the less discriminatory alternatives that may be available.

*Id.*

In some cases, a recipient is responsible for assisting in the development of a record of alternatives because it is involved in a project covered by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. This record may contain evidence that is also relevant and useful in determining compliance with Title VI. For example, recipients of funding from the Federal Highway Administration may be responsible for assisting in the development of the record of alternatives that the FHWA reviews in the NEPA process and related investigations. The FHWA follows the federal-government wide regulations implementing the procedural

provisions of NEPA issued by the Council on Environmental Quality (CEQ) (40 C.F.R. parts 1500–1508) and has supplemented these procedures to take into account its programs. The CEQ regulations require a rigorous assessment of all reasonable alternatives. *See* 40 C.F.R. § 1502.14(a) (explaining that environmental impact statements under NEPA require the entity to "[r]igorously explore and objectively evaluate all reasonable alternatives"). The FHWA regulations require applicants to use early coordination to identify alternatives to the proposed action. *See* 23 C.F.R. §§ 771.119(b), 771.123(b)–(c), and 771.125(a)(1).

### b.  Specificity of evidence of alternatives and relationship to the recipient's mission

Investigating agencies should thoroughly review the evidence regarding potential alternatives. Plaintiffs in private litigation often fail to establish "less discriminatory alternatives" because their evidence of alternatives is not sufficiently specific. *See, e.g.*, *N.Y.C. Envtl. Justice All.*, 214 F.3d at 72 (in challenge to decision to sell community gardens in order to build new housing and foster urban renewal, plaintiffs suggested other vacant lots but presented no evidence that the defendant owned the lots or that they were suitable for housing); *Damian*, 608 F. Supp. at 128 (alternative "indirect" route for challenged highway was too speculative, there was no indication of specific route, economic cost, or social or environmental impacts); *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 797 (E.D. Mich. 2001) (in challenge to school siting decision, plaintiffs argued that an alternate site would have been more appropriate, but failed to identify another viable site). Before finding a Title VI violation due to the availability of a "less discriminatory alternative," agencies should determine that the evidence is sufficient and concrete, and not speculative.

Plaintiffs' claims have also failed, notwithstanding an adverse impact, because plaintiffs could not identify an alternative that satisfies all of the defendants' needs. *See, e.g.*, *Elston*, 997 F.2d at 1413 (the only alternative identified did not provide sufficient land to accommodate defendants' needs); *Damian*, 608 F. Supp. 120 (alternative sites for highway or other transportation options, such as light rail, public transportation, etc., were insufficient to meet the traffic demands served by added highway); *African Am. Legal Def. Fund, Inc. v. New York State Dep't of Educ.*, 8 F. Supp. 2d 330, 338 (S.D.N.Y. 1998) (in challenge to public school funding formula, plaintiff's proposed alternative formula based on enrollment instead of attendance was legally insufficient because it failed to meet the objectives served by the existing formula); *but see Meek v. Martinez*, 724 F. Supp. 888, 906 (S.D. Fla. 1987) (in challenge to state formula for distributing funds under the Older Americans Act, plaintiff demonstrated that less discriminatory alternatives to the current formula were readily available and could be feasibly implemented).

In *Goshen Road Environmental Action Team v. U.S. Dep't of Agriculture*, 176 F.3d 475, 1999 WL 187264 (4th Cir. 1999) (unpublished opinion), the court concluded that the alternatives plaintiffs presented for the siting of a wastewater treatment facility were unsuitable. *Id.* at *3.

The recipient successfully argued that two alternative sites were poor choices because of the risk raw sewage could be released into a major river if the infrastructure in either location were to deteriorate. Other sites were unsuitable because of the poor quality of the soil. Of the two remaining potential sites, engineers selected the existing site because it required slightly less land, had better soil quality, its road frontage provided better access, and it was further from the town. *Id.* The court concluded the plaintiff had adduced "no scientific evidence of its own supporting its claim that other equally effective sites existed." *Id.*

Similarly, in *Darensburg v. Metropolitan Transportation Commission*, 611 F. Supp. 2d. 994, 1060 (N.D. Cal. 2009), the district court held that plaintiffs did not show that the alternatives proposed would be "equally effective while causing less racial disparity." In this challenge to a metropolitan planning organization's complex scheme for allocating funding to various transit projects, plaintiff proposed a number of alternative funding allocation methods. The court took each proposal in turn, holding that plaintiffs failed to adduce sufficient evidence of their plans' effectiveness. *Id*. at 1060–61. For instance, plaintiffs' expert argued the recipient could first use federal funds for operations because it cannot collect interest on those funds, then use the remaining funds, which can earn interest, to pay for longer term projects. The court rejected this alternative because the plaintiff failed to show that the amount of interest that could be earned would be large enough to meet the recipient's needs. *Id*. at 1060.

Importantly, alternatives need not be merely substitutes of the same type as the challenged practice, but may include practices or policies of a different manner or that include other actions by the defendant that ameliorate the disparate impact. *See id*. at 998–1000, 1060–61. For example, in *Medical Center*, plaintiffs challenged the recipient's intention to close some city hospitals and build the primary medical facility in the suburbs, farther away from a predominantly minority community. *Med. Ctr.,* 657 F.2d at 1325. Assuming a discriminatory effect resulted from the new location, the court upheld the action because the recipient considered and rejected various alternatives for legitimate reasons, noting that the alternative locations would not meet the recipient's needs. The court also noted that the recipient had agreed to provide a shuttle service between the several hospitals for patients, visitors, and employees to lessen any hardship on people who needed to use the suburban facility. *Id.* at 1331–32, 1337.

Similarly, in the context of environmental permitting complaints, the use of "practical mitigation measures associated with the permitting action could be considered as less discriminatory alternatives, including, in some cases, modifying permit conditions to lessen or eliminate the demonstrated adverse disparate impact." EPA Investigations Guidance, 65 Fed. Reg. at 39,683.

> **AGENCY PRACTICE TIP**
>
> These cases and guidelines show that "less discriminatory alternatives" may take the form of
> mitigation measures to be applied to the original challenged practice. Accordingly, investigating
> agencies should ensure that they consider not only alternative policies and practices when evaluating
> "less discriminatory alternatives," but also the measures the recipient could implement in order to
> lessen the harm that the challenged practice causes. Informal resolution efforts often involve
> identification of mitigation efforts which, if applied, would result in compliance with Title VI through
> implementation of a less discriminatory alternative.

## D.    Agency Data Collection Authority and Measuring Disparate Impact

In many disparate impact cases, particularly those in which federal guidelines have not already
established the types of impacts that are per se unlawful, demographic data will be important to
the investigating agency's analysis. *See Darensburg,* 636 F.3d at 522 (attributing plaintiffs' loss
to the lack of precise data necessary to determine the extent to which a project harmed minorities
to a greater extent than regional-level statistics may have suggested).

Title VI regulations provide agencies with a clear mandate to collect the data necessary to ensure
compliance with their Title VI disparate impact regulations. The Department of Justice Title VI
coordination regulation states that "[e]xcept as determined to be inappropriate … federal
agencies … shall in regard to each assisted program provide for the collection of data and
information from applicants for and recipients of federal assistance sufficient to permit effective
enforcement of Title VI." 28 C.F.R. § 42.406(a). The coordination regulation then gives various
examples of the types of data that agencies generally should require recipients to submit,
including the racial and ethnic composition of the eligible population, the racial and ethnic
impact of the location of facilities connected with the program, and any relocation involved in
the program. *Id.* § 42.406(b). The coordination regulation also contemplates that agencies will
collect "demographic maps, [and] the racial composition of affected neighborhoods or census
data" where they are necessary to understand the considerations above, but "only to the extent
that it is readily available or can be compiled with reasonable effort." *Id.* § 42.406(c).

Consistent with these provisions, all agency Title VI implementing regulations specifically
require that recipients collect and provide access to information that is necessary to determine
compliance.[24] The applicable provision typically appears under the heading "compliance
reports," and mandates the following:

---

[24] These accountability requirements are not unique to federal financial assistance from DOJ but rather are a
universal feature of the grant–making system. Every agency that has promulgated Title VI regulations includes
similar or identical accountability requirements. *See* 7 C.F.R. § 15.5(b) (USDA); 22 C.F.R. § 209.6(b) (USAID); 15
C.F.R. § 8.7(b) (Dep't of Commerce); 45 C.F.R. § 1203.6(b) (Corp. for Nat'l and Community Serv.); 32 C.F.R.
§ 195.7(b) (DOD); 34 C.F.R. § 100.6(b) (Dep't of Educ.); 10 C.F.R. §1040.89–3 (Dep't of Energy); 40 C.F.R. §

> Each recipient shall keep such records and submit to the responsible Department official or his designee timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the responsible Department official or his designee may determine to be necessary to … ascertain whether the recipient has complied or is complying with this subpart.

*See*, *e.g.*, *id.* § 42.106(b) (DOJ). This provision also requires the primary recipient to obtain from its subrecipients, and have available for agency review, such compliance reports "as may be necessary to enable the primary recipient to carry out its obligations." *Id.*

These regulations permit agencies to exercise broad discretion in determining what sources of information "may be pertinent" to ascertain compliance with Title VI. Although rarely a litigated issue because the vast majority of recipients cooperate with agency data requests, in *United States v. El Camino Community College District*, 600 F.2d 1258, 1260 (9th Cir. 1979), the Ninth Circuit held that "[i]n exercising its investigatory powers" under Title VI, a federal agency "must have substantial latitude in scrutinizing policies and practices of the institution" for possible discrimination.

Moreover, these provisions are not limited to evidence gathered during a formal complaint investigation or compliance review but also allow for agency data collection during monitoring efforts. That is, agencies need not suspect discrimination in order to collect relevant demographic data but may do so to monitor or evaluate compliance. Courts have recognized that routine monitoring is a form of enforcement, *Gillis v. U.S. Dep't of Health and Human Servs.*, 759 F.2d 565, 575 (6th Cir. 1985), and that agencies have broad discretion in selecting the data they need to fulfill the congressional mandate to enforce Title VI through monitoring. *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1126 (6th Cir. 1996) (noting that "enforcement decisions involve a complicated balancing of a number of factors which are peculiarly within the agency's expertise, and the agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.") (citing *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)).

**Agency approaches to data collection.** Under the authorities described above, many agencies collect data that is helpful in ensuring Title VI compliance. For example, the Federal Transit Administration requires its grant recipients that serve areas with populations over 200,000 to collect and analyze racial and ethnic data showing the extent to which members of minority groups are beneficiaries of programs receiving federal financial assistance, including the

---

7.85 (EPA); 41 C.F.R. § 101–6.29–3 (GSA); 45 C.F.R. § 80.6(b) (HHS); 6 C.F.R. § 21.9 (DHS); 24 C.F.R. § 1.6(b) (HUD); 43 C.F.R. § 17.5(b) (Dep't of the Interior); 29 C.F.R. § 31.5(b) (DOL); 14 C.F.R. § 1250.105(b) (NASA); 45 C.F.R. § 1110.6 (Nat'l Found. on the Arts and Humanities); 45 C.F.R. § 611.6(b) (NSF); 10 C.F.R. § 4.33 (NRC); 5 C.F.R. § 900.406 (OPM); 13 C.F.R. § 112.9(b) (SBA); 22 C.F.R. § 141.5(b) (Dep't of State); 18 C.F.R. § 1302.6(b) (TVA); 49 C.F.R. § 21.9(b) (DOT); 38 C.F.R. § 18.6(b) (VA); 18 C.F.R. § 705.6(b) (Water Resources Council).

preparation of demographic and service profile maps and charts. FTA Circular 4702.1B, Title VI
Requirements and Guidelines for Federal Transit Recipients, ch. IV–7 (August 28, 2012). In
addition, FTA requires these recipients to analyze all major service changes to determine their
effects on low income and minority communities. *Id.* Ch. IV–13. These requirements place the
responsibility on recipients to analyze their actions, and to collect the data FTA would require in
order to check its recipients' analyses. Similarly, Department of Labor regulations mandate that
recipients maintain information required for assessing compliance with the nondiscrimination
and equal opportunity provisions of the Workforce Innovation and Opportunity Act. 29 C.F.R.
§§ 38.41-38.43. The "system and format in which the records and data are kept must be designed
to allow … statistical or other quantifiable data analyses to verify the recipient's compliance …
." *Id.* § 38.41(b)(1). The Department of Education maintains extensive reporting requirements to
ensure that public school districts and elementary and secondary schools are meeting their civil
rights obligations. Dep't of Educ., *About the Civil Rights Data Collection (CRDC).*[25]

---

**AGENCY PRACTICE TIP**

The ready availability of demographic data assists agencies in prioritizing complaint investigations,
selecting recipients for compliance reviews, and conducting targeted outreach. Agencies should use
this authority to ensure effective enforcement of their disparate impact regulations. Where a recipient
does not fully cooperate with an agency's request for information, and compliance cannot be achieved
voluntarily, the agency may refer the matter to the Department of Justice for judicial enforcement.
Agencies should consider establishing additional requirements for certain recipients to provide
information routinely to assist in monitoring compliance with the Title VI disparate impact
regulations.

Such data give recipients themselves a better understanding of the impact of their actions and decisions
on protected groups, including the ability to conduct self–assessments of their own compliance with
Title VI. For example, in the context of health disparities, HHS has urged its recipients to consider
strategies to collect and use racial and ethnic data to help eliminate disparities. Letter from Thomas E.
Perez, Director, HHS Office for Civil Rights & David Satcher, Surgeon General, to various recipients
(Jan. 19, 2001) (explaining ways in which health care providers can analyze race and ethnicity data to
ensure provision of services to minorities, identify differences in the quality  of care among various
geographic, cultural, and ethnic groups, provide culturally and linguistically   appropriate services, and
alert recipients to potential Title VI issues). Letter from Dir., Office for Civil Rights, Dep't Health and
Human Servs. and Assistant Sec'y for Health and Surgeon Gen. to President, American Diabetes
Assoc. (Jan. 19, 2001) (on file with Dep't of Justice, Civil Rights  Div.).

---

[25] Dep't of Educ., *About the Civil Rights Data Collection, available at*
http://www2.ed.gov/about/offices/list/ocr/data.html. Data collected by the CRDC are available at
http://ocrdata.ed.gov.

## SECTION VIII: PROVING DISCRIMINATION - RETALIATION

### A.    Introduction

It is well-settled that Title VI supports retaliation claims. *See, e.g., Peters v. Jenney*, 327 F.3d 307, 318 (4th Cir. 2003); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 83 (D.D.C. 2003); *Gutierrez v. Wash. Dep't of Soc. & Health Servs.*, CV-04-3004-RHW, 2005 WL 2346956, at \*5 (E.D. Wash. Sept. 26, 2005). When a person reasonably believes that he or she has been the victim of discrimination that Title VI or other federal law prohibits, or has witnessed another person being discriminated against, that person should be able to report the alleged discrimination without fear of retaliation or fear that doing so will further jeopardize accessing benefits or services. Similarly, a person should be free to access the services, programs, and activities that federal financial assistance supports without fear that a recipient might discriminate against him or her merely for seeking access.

The Supreme Court has defined retaliation as an intentional act in response to a protected action. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). Citing *Jackson*, the court in *Gutierrez* underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." *Gutierrez*, 2005 WL 2346956, at \*5. The complained of matter need not be a complaint; it can be any lawful conduct that an individual engages in connected with a protected right. "The very concept of retaliation is that the retaliating party takes action against the party retaliated against after, and because of, some action of the latter." *Fed. Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 514 (1958). It carries with it the notion of "getting even." *See id.* As noted in a 2011 law review article:

> Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled "troublemakers." Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution.

Ivan E. Bodensteiner, *The Risk of Complaining—Retaliation*, 38 J.C. & U.L. 1, 1 (2011).

This chapter on retaliation provides an overview of the legal authority for a private party to bring a retaliation claim under Title VI to an agency or in court, addresses who has standing to bring a retaliation complaint, and identifies what an agency should look for when assessing the merits of a retaliation allegation.

## B.      Legal Authority

Title VI does not include an express provision prohibiting retaliation.[1] Nonetheless, courts, including the Supreme Court, have held that various anti-discrimination statutes contain an implied cause of action for retaliation based on the general prohibition against intentional discrimination. *See*, *e.g.*, *Jackson*, 544 U.S. at 173 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action"). A statute that prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (a prohibition on racial discrimination includes an implicit prohibition on retaliation against those who oppose the discrimination); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008) (a race discrimination statute encompasses retaliation actions as Congress and long line of precedent intended); *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (ADEA federal-sector provision that prohibits age discrimination implicitly covers claims of retaliation for filing an age discrimination complaint); *Peters*, 327 F.3d at 318-19 (prohibition against retaliation is implicit in the text of Section 601 of Title VI).

In *Jackson*, the Court explained how retaliation constitutes intentional discrimination:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination. Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination "based on sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "based on sex," in violation of Title IX.

*Jackson*, 544 U.S. at 173-74 (citations omitted). The Court also noted that the language in the statute itself supplies sufficient notice to a recipient that it cannot retaliate against those who complain of discrimination. *Id*. at 183.

For Title VI, as discussed elsewhere in this manual, Section 601 prohibits discrimination based on race, color, or national origin, while Section 602 authorizes and directs federal departments

---

[1] By comparison, *see* Fair Labor Standards Act of 1938, 29 U.S.C. § 215(a)(3); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(d); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12203(a)-(b); the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615; the National Labor Relations Act, 29 U.S.C. § 158(a)(4); and the Equal Pay Act, 29 U.S.C. § 215(a)(3).

and agencies that extend financial assistance to issue rules, regulations, or orders to effectuate Section 601. Under this authority, most federal grant-making agencies have included an anti-retaliation provision in their Title VI regulations.[2] The DOJ regulation provides the following:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart.

28 C.F.R. § 42.107(e); *see also Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 695 (W.D. Ky. 2003) (Title IX anti-retaliation provision cuts to the core of [its] ban on intentional discrimination and is covered by that section's existing cause of action).

Retaliatory behavior needs to be barred irrespective of whether the underlying claim is based on intent or disparate impact. Although one Court of Appeals has found that a private plaintiff cannot pursue a retaliation claim in court based on his or her opposition to alleged disparate impact discrimination, Title VI does not grant recipients a license to threaten individuals or prevent them from bringing disparate impact complaints to the government, which has the ability to pursue disparate impact claims in court and in the administrative process.[3]

---

[2] Other federal funding agencies' regulations also bar retaliation. *See* 5 C.F.R. § 900.407(e) (Office of Personnel Mgmt.); 6 C.F.R. § 21.11(e) (Dep't of Homeland Sec.); 7 C.F.R. § 15.7 (Dep't of Agric.); 10 C.F.R. § 1040.104(d) (Dep't of Energy); 10 C.F.R. § 4.45 (Nuclear Regulatory Comm'n); 13 C.F.R. § 112.10(f) (Small Bus. Admin.); 14 C.F.R. § 1250.106(e) (NASA); 15 C.F.R. § 8.9(a) (Dep't of Commerce); 18 C.F.R. § 1302.7(d) (Tenn. Valley Auth.); 18 C.F.R. § 705.7(e) (Water Resources Council); 22 C.F.R. § 141.6(e) (Dep't of State); 22 C.F.R. § 209.7(e) (Agency for Int'l Dev. ); 24 C.F.R. § 1.7(e) (Dep't of Hous. & Urban Dev.); 29 C.F.R. § 31.7(e) (Dep't of Labor); 32 C.F.R. § 195.8(e) (Dep't of Defense); 34 C.F.R. § 100.7(e) (Dep't of Educ.); 38 C.F.R. § 18.7(e) Dep't of Veterans Affairs); 40 C.F.R. § 7.100 (Envtl. Prot. Agency); 41 C.F.R. § 101-6.210-5 (Gen. Servs. Admin.); 43 C.F.R. § 17.6(e) (Dep't of the Interior); 45 C.F.R. § 80.7(e) (Dep't of Health & Human Servs.); 45 C.F.R. § 1110.7(e) (Nat'l Found. on the Arts & Humanities); 45 C.F.R. § 1203.7(e) (Corp. for Nat'l & Cmty. Serv.); 45 C.F.R. § 611.7(e) (Nat'l Science Found.); 45 C.F.R. § 80.7(e) (Dep't of Health & Human Servs.); 49 C.F.R. § 21.11(e) (Dep't of Transp.). In addition, assurance documents from some agencies include a non-retaliation provision.

[3] In *Peters*, the court limited the viability of a private suit for retaliation claim when the underlying allegation addresses unlawful disparate impact. According to *Peters*, a private individual cannot bring a retaliation claim under Title VI based on an underlying complaint of disparate impact. 327 F.3d at 319. DOJ disagrees. A recipient violates Title VI if it retaliates against a private individual who opposes a discriminatory action or participates in a matter alleging discrimination whether the underlying matter concerns intentional discrimination or disparate impact. As noted above, retaliation is a form of intentional discrimination, which Title VI clearly covers. *See Jackson*, 544 U.S. at 173-74 ("Retaliation is, by definition, an intentional act."). If a recipient intentionally takes an adverse action against an individual because he or she alleged that it violated Title VI, it should not matter whether the alleged violation raises an intent or disparate impact claim, particularly within the administrative setting. *Cf. id. at* 544 U.S. at 180 ("Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel.").

Moreover, and as discussed elsewhere in this manual, some courts have found that in certain circumstances, evidence of a disparate impact can also be evidence of intentional discrimination. *See Garcia ex rel. Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 436 F. Supp. 2d 1181, 1192 (D.N.M. 2006). The line between an intent and impact case is not always clear, particularly before the facts are gathered through discovery or an administrative investigation. In such cases, it may be impossible for an individual complainant to know, at the point of his or her complaint, whether a particular discriminatory effect is the result of a neutral policy or practice or was intentional. It is therefore entirely impractical to limit the retaliation protection to underlying intent claims.

It is well-settled that neither an agency nor a court need find that the underlying conduct about which the individual complained is discriminatory in order for the retaliation protection to attach. *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir. 1994) ("[T]here is nothing [in the wording of the participation clause] requiring that the charges be valid, nor even an implied requirement that they be reasonable."); *accord Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344, 358 (D. Mass. 2013) (quoting *Wyatt*), *aff'd*, 799 F.3d 99 (1st Cir. 2015); *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006); *Brower v. Runyon*, 178 F.3d 1002, 1006 (8th Cir. 1999) ("The underlying charge need not be meritorious for related activity to be protected under the participation clause.") (citing *Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 398 (7th Cir. 1999)).

Even if a private plaintiff could not file suit for retaliation for challenging disparate impact discrimination, a federal agency receiving a retaliation complaint would, nonetheless, have jurisdiction to pursue the retaliation claim.

### 1.    Who May File a Retaliation Claim

A retaliation complaint can be filed by the individual who was the target of the recipient's original allegedly discriminatory acts; a person whom the recipient has adversely treated for speaking out against the recipient's allegedly discriminatory acts directed toward a member or members of a protected class; a person who participated in an investigation of alleged discrimination or in the complaint process itself. Title VI does not require that the retaliation victim also be the victim of the discrimination included in the original complaint or a member of the protected class. For example, the Supreme Court has held that an employer violated Title VII when it fired the fiancé of an employee who filed a sex discrimination complaint. *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011). In finding that the plaintiff was an "aggrieved" party, the Court ruled that he fell within the "zone of interests" that the anti-retaliation provision intended to protect. *See also Jackson*, 544 U.S. at 179 (male coach who was retaliated against for complaining about sex discrimination against girl's team had standing to sue for retaliation under Title IX although he was not the victim of the discrimination that was the subject of his original complaints); *Sullivan*, 396 U.S. at 237 (white person who was retaliated against for advocating

for the rights of a black person had standing to sue for retaliation); *Peters*, 327 F.3d at 316 (citing and quoting *Sullivan*); *Reinhardt v. Albuquerque Pub. Sch. Bd.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (teacher advocated for student in Section 504 matter); *Kimmel v. Gallaudet Univ.* 639 F. Supp. 2d 34, 43 (D.D.C. 2009) ("advocacy on behalf of minority students is a protected activity sufficient to support a retaliation claim"). Retaliation protections thus are extended to those who oppose discrimination against others because otherwise individuals who witness discrimination might be reluctant to speak out against it.[4]

### 2.    What Are the Elements of a Retaliation Claim?

If an investigative agency receives a claim of retaliation, the agency should consider whether the evidence establishes the court-developed elements of the claim. Under Title VI, the evidence must show that (1) an individual engaged in protected activity of which the recipient was aware; (2) the recipient took a significantly adverse action against the individual; and (3) a causal connection exists between the individual's protected activity and the recipient's adverse action. *See Peters*, 327 F.3d at 320; *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1223 (9th Cir. 2012); *Palmer v. Penfield Cent. Sch. Dist.,* 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013); *Kimmel*, 639 F. Supp. 2d at 43; *Hickey v. Myers*, 852 F. Supp. 2d 257, 268 (N.D.N.Y. 2012); *Chandamuri*, 274 F. Supp. 2d at 84.

For there to be "protected activity," the evidence must show that a person *opposed* a recipient's actions that the person reasonably and in good faith believed violated Title VI or *participated* in a matter that reasonably or in good faith alleged a violation. *Peters*, 327 F.3d at 320-21; *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1503 (11th Cir. 1990); *Kimmel*, 639 F. Supp. 2d at 43. Opposition or complaints can be oral or written. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) (Congress intended anti-retaliation provisions to protect both oral and written complaints). The evidence does not have to establish that the underlying act violated Title VI, only that the complainant reasonably and in good faith believed that the acts were discriminatory. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69-70 (2006); *Peters,* 327 F.3d at 321; *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) ("plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'").

For a Title VI retaliation claim, an adverse action is an action that would deter a reasonable person from bringing or supporting a charge of discrimination. *See, e.g., Jackson*, 544 U.S. at 179 (giving coach negative evaluations and firing him as a coach was sufficient evidence of

---

[4] In *Crawford v. Metropolitan Government of Nashville & Davidson County,* 555 U.S. 271, 277-78 (2009), the Court ruled that anti-retaliation protection also extends to an employee cooperating with an internal employer investigation of a discrimination complaint: "[N]othing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question."

adverse action); *Burlington*, 548 U.S. at 68, 70 (reassigning employee to a less desirable job and suspending her for 37 days without pay after she complained about work conditions constitutes adverse action); *Palmer*, 918 F. Supp. 2d at 199 (denial of tenure constitutes adverse action). The evidence must show that the actions the recipient took against the complainant were more than trivial harms, minor annoyances, or petty slights. *Burlington*, 548 U.S. at 68; *Morales v. N.Y. Dep't of Labor*, 865 F. Supp. 2d 220, 256 (N.D.N.Y. 2012) (plaintiff alleged only "petty slights"), *aff'd*, 530 Fed. App'x 13 (2d Cir. 2013). An agency should decide what constitutes an adverse action case-by-case, taking into consideration contextual factors or specific circumstances. *See Burlington*, 548 U.S. at 69; *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Lastly, the evidence must show that the protected activity was the likely reason for the recipient's adverse action. The focus here is on determining whether there is a causal connection between the complainant's protected activity and the recipient's alleged adverse action.

A complainant or agency could establish retaliation under one of two methods. Under the first, the direct method of proof, complainants must "offer evidence that [they] engaged in a statutorily protected activity, that the defendants subjected [them] to an adverse employment action, and that a causal connection exists between the two events." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (citing *Treadwell v. Office of Ill. Sec'y of State,* 455 F.3d 778, 781 (7th Cir. 2006)). Under this evidence method, a plaintiff must present evidence of discriminatory intent that does not require support from inferences.

The second method, indirect proof, involves use of circumstantial evidence that the individual's protected activity led to an alleged adverse action, either wholly or in part, in response to the individual's protected conduct. Temporal proximity between the complainant's protected activity and the recipient's adverse actions often is relevant to a determination of causation. *See, e.g.*, *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("an adverse action [that] comes so close on the heels of a protected act that an inference of causation is sensible"); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); *Palmer*, 918 F. Supp. 2d at 199 (allegation that denial of tenure "swiftly followed" complaint about discrimination supported claim of retaliation). There is no bright line rule, however; "the answer depends on context," *Loudermilk*, 636 F.3d at 315; and temporal proximity is not dispositive. *See, e.g., Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993) ("mere passage of time is not legally conclusive proof against retaliation."). "When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse*, 126 F.3d at 503-04.

### 3.        Third-party retaliation

Finally, under certain circumstances, Title VI's prohibition on retaliation extends to third parties, which may include lower-level recipient employees, program beneficiaries or participants, organizations with a relationship to the recipient such as contractors, and others. Agency Title VI regulations provide that "[n]o recipient or *other* person" may retaliate. *See, e.g.*, 28 C.F.R. § 42.107(e) (Department of Justice); 34 C.F.R. § 100.7(e) (Department of Education) (emphasis added). Recipients have two key obligations related to third party retaliation: first, to protect individuals from potential retaliation, recipients are obligated to keep the identity of complainants confidential except to the extent necessary to carry out the purposes of the Title VI regulations, including conducting investigations, hearings, or judicial proceedings; and second, recipients must investigate and respond when a third party engages in retaliatory conduct that Title VI prohibits. As with other types of third party conduct, such as harassment, the extent of the recipient's obligation is tied to the level of control it has over the bad actor and the environment in which the bad acts occurred. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999). Agencies should make this determination case-by-case. For example, universities are required to investigate and respond adequately to retaliatory conduct by their students. *See, e.g.*, Departments of Education and Justice letter resolving DOJ Case No. DJ 169-44-9, OCR Case No. 10126001 (May 9, 2013).[5]

---

[5] The letter is available here: https://perma.cc/2GAC-Y3YK.

## IX.   PRIVATE RIGHTS OF ACTION AND INDIVIDUAL RELIEF THROUGH AGENCY ACTION

### A.   Private Right of Action

The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). The Court previously has stated that it had "no doubt that Congress … understood Title VI as authorizing an implied private cause of action for victims of illegal discrimination." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979) (holding that an individual has a private right of action under Title IX). In *Sandoval*, 532 U.S. at 284-85, the Supreme Court explained that the private right of action under Title VI exists only under Section 601, for cases of intentional discrimination. The Court held that individuals do not have a private right of action to enforce the discriminatory effects regulations implementing Section 602, because "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602." *Id.* at 293.

In *Sandoval*, the Court posited that if Congress intended for Section 602 to be enforced through a private cause of action, it would have to create an express individual right under that Section. *Id.* at 286-87. Looking at Title VI's explicit language, the Court ruled that Section 601 only prohibits intentional discrimination, and the "authorizing portion of § 602 reveals no congressional intent to create a private right of action." *Id.* at 289.[1] Section 602, unlike Section 601, is focused on regulating the funded entity, not providing rights to individuals. *Id.* The Supreme Court held that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Id.* (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). As a result, "*Sandoval* held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005).[2]

---

[1] The *Sandoval* Court stated:

> Whereas § 601 decrees that "[n]o person ... shall ... be subjected to discrimination," 42 U.S.C. § 2000d, the text of § 602 provides that "[e]ach Federal department and agency … is authorized and directed to effectuate the provisions of [§ 601]," 42 U.S.C. § 2000d-1. Far from displaying congressional intent to create new rights, § 602 limits agencies to "effectuat[ing]" rights already created by § 601. And the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection.

*Sandoval*, 532 U.S. at 288-89.

[2] Following the Court's *Sandoval* decision, the Civil Rights Division made clear that federal agencies retained the right to address and remedy disparate impact discrimination. *See* Civil Rights Division, *Memorandum for Heads of Departments and Agencies General Counsels and Civil Rights Directors, Executive Order 13166 (Improving Access*

The Supreme Court's *Sandoval* decision left open the question whether an individual may bring an action under 42 U.S.C. § 1983 to enforce Section 602 regulations. *Sandoval,* 532 U.S. at 300–01 (Stevens, J., dissenting). A year later, the Supreme Court answered this question in a case brought under Section 1983 to enforce the Family Educational Rights and Privacy Act (FERPA), finding that there is no private cause of action via Section 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). The issue before the Court was whether a plaintiff could bring an action under Section 1983 to enforce FERPA, even though FERPA created no private right of action. *Id.* The Supreme Court explained that there is no private right of action: "We have held that '[t]he question whether Congress … intended to create a private right of action [is] definitively answered in the negative' where a statute by its terms grants no private rights to any identifiable class." *Id.* at 283-84 (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576 (1979)). Following *Sandoval* and *Gonzaga*, a majority of circuits have held that where a statute does not confer a private enforceable right, regulations promulgated under the statute cannot create a private right of action.[3] Therefore, the regulations promulgated under Section 602 are unenforceable via a private action under Section 1983.

The private right of action under Section 601 for intentional discrimination cannot be brought against individuals except in their official capacity. *Wood v. Yordy*, 753 F.3d 899, 903, 904 (9th Cir. 2014) (finding, consistent with the 3rd, 4th, 7th, and 10th Circuits, that Spending Clause statutes do "not authorize suits against a person in anything other than an official or governmental capacity"); *see also Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) ("[O]nly public and private entities can be held liable under Title VI."); *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003) ("It is beyond question … that individuals are not liable under Title VI") (footnote omitted); *Mwabira-Simera v. Howard Univ.*, 692 F. Supp. 2d 65, 70 (D.D.C. 2010) ("[N]one of the individual defendants is subject to suit under [Title VI]").

Generally, Title VI does not provide a cause of action for private plaintiffs to sue the federal government directly or to address an allegation that the government has failed to perform its Title VI responsibilities.[4] *See Maloney v. Soc. Sec. Admin.*, 517 F.3d 70, 75-76 (2d Cir. 2008) (concluding "that, as with Title VI, the Age Discrimination Act does not apply to a federal agency implementing a federal program"); *Jersey Heights Neighborhood Ass'n v. Glendening*,

---

*to Services for Persons with Limited English Proficiency)*, (Oct. 26, 2001), http://www.justice.gov/crt/about/cor/lep/Oct26Memorandum.php (last visited Apr. 12, 2016).
[3] *See, e.g., Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 618-20 (6th Cir. 2005) (Section 1983); *Three Rivers Ctr. for Indep. Living v. Hous. Auth. of City of Pittsburgh*, 382 F.3d 412, 423-25 (3d Cir. 2004) (Section 1983 and Section 504); *Save Our Valley v. Sound Transit*, 335 F.3d 932, 936-39 (9th Cir. 2003) (Section 1983).
[4] There may be other causes of action available to private plaintiffs seeking to challenge a federal agency's administration of its responsibilities under Title VI, such as the Administrative Procedures Act. This section addresses only claims brought under Title VI.

174 F.3d 180, 191 (4th Cir. 1999) (Title VI does not provide a cause of action against the United States); *Wash. Legal Found. v. Alexander*, 984 F.2d 483, 487-88 (D.C. Cir. 1993); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750 (D.C. Cir. 1990) [hereinafter *WEAL II*]; *Cottrell v. Vilsack*, 915 F. Supp. 2d 81, 91 (D.D.C.) (finding a nondiscrimination provision in a federal funding statute does not apply to programs "that are conducted directly by a federal agency …."), *aff'd,* 2013 WL 4711683 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 1553 (2014).

In *Jersey Heights*, African-American landowners filed suit against the U.S. Department of Transportation, among others, claiming that it abdicated its duties under Section 602 by not terminating funding to a recipient not in compliance with Title VI. *Jersey Heights*, 174 F.3d at 191. The Fourth Circuit found that Title VI provides two avenues of recourse to address discrimination: private right of action against recipients and petition or complaint to the federal funding agency to secure voluntary compliance by its recipients. *Id.* After reviewing Title VI's legislative history, the court concluded that Congress did not intend for aggrieved parties "to circumvent that very administrative scheme through direct litigation against federal agencies." *Id*.

Similarly, the court in *WEAL II* ruled that, absent congressional authorization, individuals do not have a private right of action under Title VI, Title IX, or Section 504 against the federal government for failing to enforce those statutes against its funding recipients.[5] *WEAL II*, 906 F.2d at 748-50.

## 1.  Injunctive Relief[6]

The most common form of relief sought and obtained through a Title VI private right of action is an injunction ordering a recipient to do or to stop doing something. *See, e.g., Sandoval*, 532 U.S. at 279 ("[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages.").[7] To obtain a permanent injunction, the moving party must demonstrate:

---

[5] The *WEAL II* decision brought to a close the twenty-year history of litigation that began in 1970 alleging that the Department of Health, Education, and Welfare failed adequately to enforce Title VI. *See Adams v. Richardson*, 356 F. Supp. 92 (D.D.C. 1973).

[6] The availability of remedies may depend on the timing of an entity's receipt of federal financial assistance. Past funding alone may not support prospective relief such as an injunction, but it may support a claim for backward-looking relief, such as back pay, restitution, or damages. *See Huber v. Howard Cty.*, 849 F. Supp. 407, 415 (D. Md. 1994) (Section 504 matter, finding that the recipient received federal financial assistance during the time of plaintiff's employment and discharge); *James v. Jones*, 148 F.R.D. 196, 201 (W.D. Ky. 1993) (state "does not presently receive [federal] funds, but … has appealed its suspension from the program and it maintains its hope of receiving future funds").

[7] Not all monetary relief is automatically treated as compensatory or punitive in nature by the courts. In some instances monetary relief is equitable in nature and therefore may not require proof of intentional discrimination. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415-18 (1975)

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L. C.,* 547 U.S. 388, 391 (2010); s*ee also Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 422-23 (2d Cir. 2013).

The factors for a preliminary injunction vary by circuit, but are similar to those considered for a permanent injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (moving party must show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest"); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013); *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012); *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *EEOC v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012).

## 2.  Monetary Damages for Intentional Discrimination[8]

The law is well-settled that private individuals may obtain monetary damages for claims of intentional discrimination under Section 601 of Title VI. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014); *Yakin v. Univ. of Ill.*, 508 F. Supp. 848, 852 (N.D. Ill. 1981), *aff'd*, 760 F.2d 270 (7th Cir. 1985).

Throughout its opinion in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), a case brought under Title IX, the Supreme Court broadly referred to the relief being sanctioned as "monetary damages" or "monetary awards." *Id.* at 74-76. Although the Court did not define these terms, it specifically rejected limiting Title IX plaintiffs to monetary relief that is equitable in nature, such as backpay. *See id.* at 75-76. In these circumstances, a recipient of federal funds is "subject to suit for compensatory damages," *Barnes v. Gorman*, 536 U.S. 181, 186–87 (2002)*,* which traditionally includes damages for both pecuniary and nonpecuniary injuries.[9]

---

[8] As discussed in Section VIII, retaliation is a form of intentional discrimination.  A person proving retaliation thus would be entitled to compensatory damages on the same basis as a person alleging a violation involving one of the specifically identified bases.

[9] Section 903 of the Restatement (Second) of Torts (1979) defines "compensatory damages" as "the damages awarded to a person as compensation, indemnity or restitution for harm sustained." *See also Pro-Pac, Inc. v. WOW Logistics Co.*, 721 F.3d 781, 788 (7th Cir. 2013) (quoting Section 903). 'Non-pecuniary' compensatory damages include "compensation for bodily harm and emotional distress …." Restatement (Second) of Torts §§ 905-906; *Barati v. Metro-N. R.R.*, 939 F. Supp. 2d 143, 151 (D. Conn. 2013) (quoting Sections 904–906). Section 904 states that damages for nonpecuniary harm include damages for bodily harm and emotional distress. *See generally id.*, §§ 901-932.

Similarly, in *Barnes*, the Supreme Court has held that individuals may obtain monetary damages from recipients for claims of intentional discrimination under Title IX. *Barnes*, 536 U.S. at 186-87 (citing *Franklin v. Gwinett*, 503 U.S. 60, 74-75 (1990));[10] *Sandoval*, 532 U.S. at 282-83 ("In *Guardians*, the Court held that private individuals could not recover compensatory damages under Title VI except for intentional discrimination.") (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 611 n.5 (1983) (Powell, J., concurring in judgment)); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 630-31 (1984).

Courts applying *Barnes* and *Franklin* generally have interpreted these decisions to permit the award of the full range of compensatory damages, including damages for emotional distress, as available remedies under Spending Clause legislation. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1198-1204 (11th Cir. 2007) (discussing *Barnes* and *Franklin* and concluding that emotional damages are a form of compensatory damages available for intentional discrimination claims); *Tyler v. City of Manhattan*, 118 F.3d 1400, 1409-14 (10th Cir. 1997) (collecting cases, analyzing *Franklin*, and concluding that compensatory damages, including emotional distress, are appropriate remedies); *Doe v. District of Columbia*, 796 F. Supp. 559, 571 (D.D.C. 1992) (finding compensatory damages are available under Section 504); *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 383-84 (W.D. Pa. 2008) (concluding emotional distress damages are available under Title IX); *see also DeLeo v. City of Stamford*, 919 F. Supp. 70 (D. Conn. 1995) (citing cases equating monetary damages with compensatory damages).

Punitive damages are not an available remedy. In *Barnes*, 536 U.S. at 189, the Court explained:

> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient *compensates* the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure.

The Court also stated that recipients generally are not on notice that they may be subject to a recovery of punitive damages and, more significantly, likely would not seek or agree to receiving federal financial assistance if punitive damages were available. *Id*. at 188 ("Not only is it doubtful that funding recipients would have agreed to exposure to such unorthodox and indeterminate liability; it is doubtful whether they would even have *accepted the funding* if punitive damages liability was a required condition.") (emphasis in original); *see also Moreno v. Consol. Rail Corp.*, 99 F.3d 782, 790-92 (6th Cir. 1996) (collecting cases).

---

[10] The Court stated, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin,* 503 U.S. at 70-71.

### 3.   Availability of Individual Monetary Damages through Agency Action

Compensatory damages are also an available remedy in agency administrative compliance activities. However, compensatory damages are generally unavailable for claims based solely on an agency's disparate impact regulations. *Sandoval,* 532 U.S. at 282–83; *Barnes,* 536 U.S. at 187. The Supreme Court has stated, "where discrimination is unintentional, 'it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition].'" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (quoting *Guardians,* 463 U.S. at 598). In *Franklin,* the Court explained, "[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." *Franklin,* 503 U.S. at 74 (citing *Pennhurst State Sch. and Hosp. v. Halderman,* 451 US 1, 17 (1981)); *See also Davis,* 526 U.S. at 640; *Guardians,* 463 U.S. at 598.[11]

### 4.   No Administrative Exhaustion Requirement

There is no requirement that a plaintiff exhaust administrative remedies prior to bringing a private Title VI civil action. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) ("Title IX has no administrative exhaustion requirement…. Plaintiffs can file directly in court under its implied private right of action and can obtain the full range of remedies."); *Cannon,* 441 U.S. at 706-07 n.41 ("[W]e are not persuaded that individual suits are inappropriate in advance of exhaustion of administrative remedies.").[12] Though *Fitzgerald* and *Cannon* addressed Title IX, courts have applied the same analysis to Title VI and Section 504 claims and held that litigants need not exhaust administrative remedies prior to bringing a Title VI claim in federal court. *See, e.g., Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001) ("[P]laintiff was not required to exhaust administrative remedies before bringing a Title VI claim …."). First, "nothing in the language of [ ] Title VI requires administrative exhaustion." *Freed v. Consol.*

---

[11] *See also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (Section 504 permits "all remedies available under Title VI of the Civil Rights Act of 1964, including monetary damages. However, monetary damages are recoverable only upon a showing of an *intentional* violation.") (citation omitted); *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 690 (6th Cir. 2000) (requiring proof of intentional discrimination to obtain monetary damages under Title IX where facially neutral policy is challenged because of its disparate impact); *Davoll v. Webb*, 194 F.3d 1116, 1142 (10th Cir. 1999) ("[S]tatutes enacted by Congress pursuant to its spending power should not expose funding recipients to compensatory damages liability for unintentional violations."); *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) (compensatory damages are not available under Section 504 absent a showing of discriminatory intent; *Wood v. President & Trustees of Spring Hill Coll.*, 978 F.2d 1214, 1219-20 (11th Cir. 1992) (compensatory damages are not available absent proof of intent under Section 504); *Carter v. Orleans Parish Pub. Schs.,* 725 F.2d 261, 264 (5th Cir. 1984) (finding compensatory damages are not available for unintentional violations of the Rehabilitation Act).

[12] *See also Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 919 (7th Cir. 2012) (finding Title IX claimants "need not exhaust administrative remedies before bringing suit directly in court"); *Brennan v. King*, 139 F.3d 258, 268 n.12 (1st Cir. 1998) ("[Section 504] derives its procedural requirements from Title VI, which does not have an exhaustion requirement."); *Kling v. Los Angeles County*, 633 F.2d 876, 879 (9th Cir. 1980) (concluding "the exhaustion of Title IX administrative remedies is not required before one files a private action").

*Rail Corp.*, 201 F.3d 188, 194 (3d Cir. 2000). Second, as the Court noted in *Cannon*, "[t]he award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute." *Cannon*, 441 U.S. at 705-06.

**B.     States Do Not Have Eleventh Amendment Immunity under Title** VI

The Eleventh Amendment reflects a broad principle of sovereign immunity.[13] Since 1890, the Supreme Court consistently has held that this Amendment protects a state from being sued in federal court without the state's consent. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 n.7 (1996) (citing cases). However, federal courts have jurisdiction over a state if the state has either waived its immunity or Congress has abrogated unequivocally a state's immunity pursuant to valid powers. *See id.* at 68. Congress has unequivocally done so with respect to Title VI and related statutes.

In 1986, Congress enacted 42 U.S.C. § 2000d-7 as part of the Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, Tit. X, § 1003, 100 Stat. 1845 (1986), to abrogate states' immunity from suit for violations of Section 504, Title VI, Title IX, the Age Discrimination Act, and similar nondiscrimination statutes. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1662 (2011); *Sandoval*, 532 U.S. at 280; *Lane v. Peña*, 518 U.S. 187, 199 (1996). Section 2000d-7(a) states:

> (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of … title VI of the Civil Rights Act of 1964, … or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

> (2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C. § 2000d-7 (internal citations omitted). Section 2000d-7 is an unambiguous abrogation that gives states express notice that a condition for receiving federal funds is the requirement that they consent to suit in federal court for alleged violations of Title VI and the other statutes enumerated. *Sossamon*, 131 S. Ct. at 1662.

---

[13] U.S. Const. Amend. XI states: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." *See Hans v. Louisiana*, 134 U.S. 1 (1890).

## X:    EMPLOYMENT COVERAGE

### A.    Scope of Coverage

Title VI prohibits recipients, most of which are employers, from discriminating based on race, color, and national origin. Congress, however, did not intend Title VI to be the primary federal vehicle to prohibit employment discrimination.[1] It does forbid recipients from discriminating in employment in certain situations. Specifically, if "a primary objective" of the federal financial assistance to a recipient is to provide employment, then the recipient's employment practices are subject to Title VI. 42 U.S.C. § 2000d-3. In addition, a recipient's employment practices also are subject to Title VI where those practices negatively affect the delivery of services to ultimate beneficiaries.

An illustration of the Title VI "primary objective" analysis is as follows: If a recipient builds a temporary shelter with funds designed to provide assistance to dislocated individuals, the employment practices of the recipient with respect to the construction of the facility would not be subject to Title VI. However, if the recipient builds the same facility with funds received through a public works program whose primary objective is to generate employment, the employment practices would be subject to Title VI. In the former case, the program's benefit was to provide shelter to dislocated individuals, while in the latter, the benefit was the employment of individuals to build the facility.

One important factor in determining the reach of the employment provision of Title VI is the clear congressional intent that Title VI not "impinge" on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. *Johnson v. Transp. Agency,* 480 U.S. 616, 628 n.6 (1987). Title VII prohibits employment discrimination based on race, color, national origin, religion, and sex. Title VII covers employers with 15 or more employees. To sustain a Title VI claim of employment discrimination under the exception for "a primary objective," the plaintiff has a specific threshold requirement: not only must the plaintiff establish that the recipient receives federal financial assistance, but also that a "primary objective" of the federal funding is to provide employment. *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 91-92 (D.D.C. 2010); *Reynolds v. School Dist. No. 1, Denver*, 69 F.3d 1523, 1531 (10th Cir. 1995) (motion to

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, is the primary vehicle that Congress established to address employment discrimination. Under Title VII, employers with 15 or more employees are prohibited from discriminating based on race, color, national origin, religion, and sex. When Congress enacted Title VI, it made clear its limited reach with respect to employment:

> Nothing contained in [Title VI] shall be construed to authorize action under [Title VI] by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3.

dismiss granted where plaintiff failed to show that a primary purpose of federal assistance was to provide employment); *Ass'n Against Discrimination in Emp't v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981) (plaintiff failed to prove all elements of employment discrimination claim because of lack of evidence of primary purpose of federal funds); *Bass v. Bd. of Cty. Comm'rs*, 38 F. Supp. 2d 1001, 1009 (M.D. Fla. 1999) (summary judgment against plaintiff because of lack of evidence of primary purpose of federal funds); *Thornton v. Nat'l R.R. Passenger Corp.*, 16 F. Supp. 2d 5, 7 (D.D.C. 1998) (complaint dismissed because funding transportation was the primary objective of funding, not employment). In *Reynolds*, the plaintiff's assertion that federal funds paid, in part, the salary of an employee was insufficient, because the plaintiff did not show that a primary objective of the federal funds was employment rather than general funding of school programs. *Id.* at 1532.[2]

By contrast, in *Rogers v. Board of Education*, 859 F. Supp. 2d 742, 744 (D. Md. 2012), the court noted that Maryland public schools "received more than $1 billion through the American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111–5, 123 Stat. 115, and that the [defendant public school system] received such funds 'for the express purpose of creating jobs and maintaining existing ones.'" The court observed that "[t]he statute is clear that this objective need not be exclusive [and that] providing employment need only be *a* primary goal …." *Rogers*, 859 F. Supp. 2d at 751. Although the defendant conceded that it received ARRA and other funds that targeted employment, the school board argued that it did not use these funds for employment. The court denied the defendant's motion for summary judgment on this issue because it determined that the issue was in dispute.[3]

Further, where a recipient's employment discrimination has a secondary effect on the ability of beneficiaries to participate meaningfully in and/or receive the benefits of a federally assisted program in a nondiscriminatory manner, those employment practices are within the purview of Title VI.[4] Agency regulations specifically address this principle in identical or similar language:

---

[2] Cases involving staff privileges at hospitals have led to some apparent inconsistency. As one commenter noted,

> Courts have not been uniform in their handling of staff privileging cases brought under Title VI …. The cases turn on the question of whether a physician is an intended beneficiary of Title VI protections. Where courts find there is no nexus between the allegedly discriminatory practice and the use of federal funds, physician claims have failed …. This "primary objective" exception makes the distinction between employee and non-employee physicians in staff privileging cases important. If physicians are employees of the health care defendant, then there is no colorable Title VI discrimination claim. However, where physicians are independent contractors, a Title VI claim may survive.

Dayna Bowen Matthew, *A New Strategy To Combat Racial Inequality in American Health Care Delivery.* 9 DePaul J. Health Care L. 793, 815-16 (2005).

[3] Subsequently, the court dismissed the plaintiff's harassment complaint, finding that she failed to show that she was the victim of severe or pervasive offending conduct. *Rogers v. Bd. of Educ.*, No. 8:11–CV–01194–PJM (D. Md. July 27, 2012), *aff'd*, 508 Fed.App'x 258 (4th Cir. 2013).

[4] This is oftentimes referred to as the "infection theory."

> In regard to Federal financial assistance which does not have providing
> employment as a primary objective, the provisions of paragraph (c)(1)
> [prohibitions where objective is employment] apply to the employment practices
> of the recipient if discrimination on the grounds of race, color, or national origin
> in such employment practices tends, on the grounds of race, color, or national
> origin, to exclude persons from participation in, to deny them the benefits of or to
> subject them to discrimination under the program receiving Federal financial
> assistance. In any such case, the provisions of paragraph (c)(1) of this Section
> shall apply to the extent necessary to assure equality of opportunity to and
> nondiscriminatory treatment of beneficiaries.

28 C.F.R. § 42.104(c)(2) (DOJ); *see also* 15 C.F.R. § 8.4(c)(2) (Dep't of Commerce); 34 C.F.R. § 100.3(c)(3) (Dep't of Education). In this situation, there is a causal nexus between employment discrimination and discrimination against beneficiaries; that is, the employment discrimination infects the beneficiaries' entitlement of the recipient's services, programs, and activities. *United States v. Jefferson Cty. Bd. of Educ.*, 372 F.2d 836, 883 (5th Cir. 1966) ("faculty integration is essential to student desegregation"); *Ahern v. Bd. of Educ.*, 133 F.3d 975, 983-84 (7th Cir. 1998) (applying infection theory to public school plan for assignment of principals); *Caulfield v. Bd. of Educ.*, 486 F. Supp. 862, 876 (E.D.N.Y. 1979) (characterization of infection theory where employment practices affect beneficiaries, i.e., students); *Marable v. Ala. Mental Health Bd.*, 297 F. Supp. 291, 297 (M.D. Ala. 1969) (patients of state mental health system have standing to challenge segregated employment practices which affect delivery of services to patients.).

Section 2000d-3 only limits Title VI's employment coverage. It does not exempt a recipient's employment practices from other applicable federal statutes, executive orders, or regulations. *United States ex rel. Clark v. Frazer*, 297 F. Supp. 319, 322 (M.D. Ala. 1968); *see also Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 173 (3d Cir. 1971). Furthermore, a recipient's compliance with state and local merit systems for employment may not necessarily constitute compliance with Title VI. *See, e.g.,* 28 C.F.R. § 42.409.

## B.    Regulatory Referral of Employment Complaints to EEOC

In 1983, DOJ and the Equal Employment Opportunity Commission published "Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance." 28 C.F.R. §§ 42.601 – 42.613 (DOJ); 29 C.F.R. §§ 1691.1 – 1691.13 (EEOC) (often referred to as the Title VI/VII rule). The purpose of the regulation is simple: to reduce "duplicative investigations by various Federal agencies of similar complaints of employment discrimination against an employer."

48 Fed. Reg. 3570, 3670 (1983).[5] The regulation further noted that by placing the primary responsibility for addressing employment discrimination with the EEOC, "agencies will be able to focus their efforts on possible instances of systemic employment discrimination or discrimination in the provision of services to beneficiaries of Federally assisted programs." *Id.*

In summary, and as a general rule, the procedures provide that a federal agency receiving a complaint of employment discrimination against a recipient covered by both Title VI (and/or other grant-related prohibitions against discrimination) and Title VII may (and generally does) refer the complaint to the EEOC for investigation and conciliation. *Id.* §§ 42.605(d), 42.609.[6] If the EEOC finds discrimination and is unable to resolve the complaint, the rule calls for the funding agency to evaluate the matter, with "due weight to EEOC's determination that reasonable cause exists," and to take appropriate enforcement action. *Id.* § 42.610. Where a complaint alleges a pattern or practice of discrimination and there is dual coverage, agencies have the option of keeping the complaint rather than referring it.[7]

---

[5] As of the date of this Manual, the EEOC has indicated that it intends to review and revise the joint regulation. The EEOC has not yet issued a Notice of Proposed Rulemaking on this matter but has included it in the Unified Agenda. *See* OMB/OIRA Unified Agenda,
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=3046-AA93 (last visited Oct. 14, 2016).

[6] If the complaint only alleges a violation of Title VII and not Title VI, the matter should be transferred to the EEOC. In addition, the regulation exempts from its application Executive Order 11246, which the Department of Labor's Office of Federal Contracts Compliance Programs enforces. Similarly, the nondiscrimination provisions in the Omnibus Crime Control and Safe Streets Act, as amended, and the Juvenile Justice and Delinquency Prevention Act are not limited as to coverage of employment discrimination. *See* 28 C.F.R. § 42.601.

[7] For example, the Office for Civil Rights (OCR) at the Department of Education generally does not refer such complaints to the EEOC if OCR has jurisdiction and the complaint alleges a pattern or practice of employment discrimination or the complaint also alleges discrimination in other practices of the recipient. *See* OCR Case Processing Manual, Article VI, Section 601 (Special Intake Procedures), (c) Title VI and Title IX Employment Complaints.