# Exhibit 63

9/7/23, 3:57 PM
Shuttered EPA investigation could've brought 'meaningful reform' in Cancer Alley, documents show | AP News
Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 2 of 10 PageID #: 2478




CLIMATE

# Shuttered EPA investigation could've brought 'meaningful reform' in Cancer Alley, documents show



The Marathon Petroleum Refinery is visible in Reserve, La., Thursday, Dec. 2, 2021. Environmental advocates and residents of the Louisiana chemical corridor known as Cancer Alley have spent decades calling for change in the way industrial activity is regulated there. The EPA and the Louisiana environmental agency spent months negotiating an agreement that would have fundamentally changed the state's air pollution permitting program. It ultimately fell apart without an agreement. (AP Photo/Gerald Herbert, File)

Photos  1

BY HALLE PARKER AND WWNO
Updated 7:54 AM MST, September 6, 2023

NEW ORLEANS (AP) — As industrial plants have overtaken historic Black communities and burdened neighborhoods with toxic air pollution, environmental advocates and residents of Louisiana's chemical corridor have spent decades calling for change.

So when the country's top environmental regulator opened a high-profile civil rights investigation into Louisiana's Department of Environmental Quality last year, it felt like a watershed moment.

For the first time, the Environmental Protection Agency stepped in to exercise its oversight and evaluate whether LDEQ has granted permits for companies to build and pollute in a way that has caused disproportionate harm to Black communities. Ultimately, they found signs that it has.

ADVERTISEMENT

9/7/23, 3:57 PM
Shuttered EPA investigation could've brought meaningful reform to Cancer Alley, documents show | AP News
Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23   Page 3 of 10 PageID
 #: 2479

POWERED BY CONCERT

After pledging to clean up Cancer Alley — the nickname for the heavily industrialized, 85-mile stretch of the Mississippi River between Baton Rouge and New Orleans — the EPA issued a letter in October 2022 detailing preliminary evidence of racial discrimination and noncompliance by the state.

### OTHER NEWS



**Louisiana gubernatorial candidates set to debate crime, economy and other issues 5 weeks from vote**



9/7/23, 3:57 PM
Shuttered EPA investigation could bring meaningful reform to Cancer Alley, documents show | AP News
Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 4 of 10 PageID
#: 2480

**Prosecutors seeking new indictment for Hunter Biden before end of September**



**Company gets $2.6 million to relinquish oil lease on Montana land that's sacred to Native Americans**

Advocates like Lisa Jordan, who leads the Tulane Environmental Law Clinic, and the clients she represents were cautiously optimistic.

"We dared to hope," said Jordan, who filed one of the complaints that led to EPA's civil rights investigation.

The EPA's findings brought LDEQ to the negotiating table. Documents and emails newly uncovered by WWNO and WRKF show that staff from the two agencies spent months negotiating a 43-page agreement that would have fundamentally changed Louisiana's air pollution permitting program so that state regulators would have no longer allowed toxic emissions to disproportionately impact certain communities. While the EPA's civil rights investigation could have led to a consent decree that forced LDEQ to change, this voluntary agreement offered a path to reform without punishment.

But, in late June, it all came to a grinding halt.

The EPA abruptly closed the case and ended discussions with the LDEQ, stopping its investigation without coming to a resolution or releasing its findings. The decision blindsided the River Parish residents who took part in the complaints.

"We'd been out here fighting so hard for so long, it felt good to have someone shouldering the burden with us, and it felt good to not be gaslit," said Joy Banner, a St. John the Baptist Parish resident and cofounder of the Descendants Project, in the weeks after. "After all of that fighting, they just abandoned us."

WWNO/WRKF's reporting reveals for the first time the fullest details of the draft agreement and offers a window into how negotiations between the two agencies unraveled. With Louisiana's attorney general now suing the EPA, environmental justice experts and advocates fear that the breakdown could mark the beginning of a major attack on a core aspect of the Civil Rights Act.

9/7/23, 3:57 PM                                    Shuttered EPA Investigation could've brought meaningful reform to Cancer Alley, documents show | AP News

Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 5 of 10 PageID #: 2481

## 'MEANINGFUL REFORM'

In the month before negotiations ended, LDEQ and EPA staff closed in on an agreement. They exchanged a draft resolution on May 18 that would have ingrained sweeping new procedures for the state to ensure that future permitting decisions included an in-depth analysis into whether the adverse impacts of any new polluting facility would be disproportionately felt by people of a certain race, color or nationality -— an outcome also known as "disparate impact."

Had the agreement been finalized, Louisiana environmental advocates would also have received another major win: LDEQ would have begun studying how a proposed facility would add to a community's cumulative burdens. For each permit application, the agency would be required to look at the local area's current exposure to air pollutants as well as how different social or health factors could leave the community vulnerable to harmful effects.

Deep South Center for Environmental Justice Director of Law and Policy Monique Harden, who has more than two decades of law experience, reviewed the May 18 draft of the informal resolution agreement, saying it would have led to "meaningful reform" of the state agency. She wasn't involved in any of the complaints the EPA investigated.

Most significantly, the agreement would have enforced the state's legal obligation to request companies look at alternate sites or even deny a permit to lessen any disparate impacts found during its newly robust analysis.

"You can consider, through mapping and statistical data collection and analysis, environmental justice. You can do that all day long and not have any change on the ground for Black communities," Harden said. "Consideration is weak sauce. We need permit denials. We need reductions in pollution. We need mitigation of hazards. We need a holistic view of appropriate sites."

For years, Harden has watched progress on environmental justice issues stall as agencies quibble over meandering technical debates of definitions and procedures. In a break from the past, she felt the proposed agreement showed a commitment to creating real change.

"This agreement between EPA and LDEQ was headed around results and outcomes, which is a tremendous step forward," Harden said.

Requests for disparity analyses and cumulative impact studies are nothing new. Advocacy groups and environmental lawyers like Harden and Jordan have called for LDEQ to conduct such studies since the 1980s.

A study published in the journal Environmental Challenges in January found that minority communities living in Louisiana's chemical corridor are exposed to levels of toxic air pollution seven to 21 times higher than predominantly white communities.

But time and again, the state agency has maintained that it isn't statutorily required to consider disparate impact under environmental legislation like the Clean Air and Clean Water acts nor under Louisiana law.

"They just never engaged at the level of saying it's not possible or it's too hard, or it would take too long. They just never entertained the idea at all," Jordan said.

9/7/23, 3:57 PM
Shuttered EPA Investigation could've brought meaningful reform to Cancer Alley, documents show | AP News

Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 6 of 10 PageID #: 2482

In the EPA's letter of concern sent on Oct. 12, 2022, it said LDEQ staff should have conducted cumulative impact analyses in the past. It also brought attention to the lack of any written policies internally that guide when LDEQ staff should do such an analysis to comply with the Civil Rights Act.

According to the EPA, LDEQ went as far as to say it only needs to comply with environmental laws, not the Civil Rights Act — an assertion that EPA Deputy Assistant Administrator for External Civil Rights Lilian Dorka called "erroneous."

"LDEQ has two obligations: to ensure legal and lawful administration of Clean Air Act programs and to ensure compliance with Title VI of the Civil Rights Act. And what this informal resolution agreement focuses on is that LDEQ is not doing either," said Harden.

## THE BEGINNING OF THE END

The negotiations were on precarious footing from the start. The EPA worked with LDEQ to make voluntary changes to its permitting process to avoid punishment, while simultaneously conducting a civil rights investigation that would potentially result in a compliance order.

Meanwhile, LDEQ moved forward with the voluntary agreement, even as the state's attorney general (whose office was involved in the voluntary agreement negotiations) prepared a lawsuit against the EPA's investigation. Emails exchanged between LDEQ and the EPA show negotiations began to falter after the federal staff sent a version of the draft agreement back to LDEQ on May 18.

Days after the draft was sent, Louisiana Attorney General Jeff Landry sued the EPA, the Department of Justice and the Biden administration over the civil rights investigation on May 24 in the U.S. District Court for the Western District of Louisiana. The Attorney General office didn't respond to a request for comment.

The new lawsuit appeared to cast doubt over whether any parties were willing to proceed with the negotiations in good faith. But, despite the looming lawsuit, a June 1 email shows LDEQ staff reassured Dorka that the litigation wouldn't change the agency's commitment, promising to continue to flesh out the draft agreement.

The emails show, however, that progress slowed in the waning weeks of the investigation. The EPA and LDEQ traded blame and frustration over the state of negotiations as the draft agreement sat in limbo and regular meetings were canceled.

One week before the case was closed, the tension bubbled over in one final exchange. LDEQ lead counsel Courtney Burdette questioned the EPA's commitment to the ongoing talks, citing the frustration of the state staff.

Within hours of receiving the email, Dorka wrote back, pointing to the lack of a fully revised draft of the agreement from LDEQ as the reason for the series of meeting cancellations.

"Given how busy everyone is, I will go ahead and cancel the rest of the meetings that I had scheduled and then reschedule as needed once we receive the rest of LDEQ's draft IRA mark-up," Dorka replied.

But another meeting wasn't scheduled.

On June 27, the EPA sent a letter to LDEQ Secretary Roger Gingles stating they had closed the investigation, with little explanation beyond stating the EPA's Office of External Civil Rights Compliance felt an agreement wouldn't be reached by their July 11 deadline.

9/7/23, 3:57 PM                    Shuttered EPA Investigation Could Have Brought Meaningful Reform to Cancer Alley, documents show | AP News

Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 7 of 10 PageID
                                              #: 2483

Yet, EPA's case resolution manual states that deadline requirements for ending an investigation are paused while working toward an informal agreement.

The reason for the investigation's untimely end remains unclear. Jordan and other advocates involved in the case have speculated that the litigation from Landry's office increased pressure on the Biden administration to close the case in an attempt to quash a lawsuit that has the potential to evolve into a broader challenge to a key element of the Civil Rights Act if it moves forward.

The Department of Justice wrote in its notice to the court that the EPA had terminated the complaints at the center of Landry's lawsuit, raising the question of whether it should proceed. A response filed by the attorney general's office made clear that the state planned to continue the lawsuit — which challenges any federal review of disparate impact as a result of environmental permits — regardless of the civil rights investigation's untimely end.

"EPA's and DOJ's entire rationale, we think, for having dismissed this complaint is to poise itself well to succeed in this litigation. So our clients sort of feel that they've been sacrificed," Jordan said. "It's not looking like EPA made a good trade if that's what they did."

## TITLE VI PRECEDENT UNDER ATTACK

Since the early days of the EPA's investigation, LDEQ and other state officials have maintained that the agency shouldn't be punished for actions and decisions that comply with environmental laws — even if they result in violations of the Civil Rights Act.

The opposition came as the EPA finally pledged to step up its civil rights enforcement to match protocol that has been used by other federal agencies, from the Department of Housing and Urban Development to the Department of Education, for decades.

"The reason we're here is because EPA was late to fulfill its obligations under the Civil Rights Act of 1964," said Carlton Waterhouse, a former EPA attorney and director of Howard University School of Law's Environmental and Climate Justice Center. "And so now, as the agency is trying to fulfill its obligations, we're finding pushback to say that not only are those not obligations, the agency is acting unlawfully by trying to enforce these regulations."

In the past, the EPA has only investigated cases of "intentional discrimination," or instances of blatant racism or differential treatment. But other agencies have historically taken into account the effect policies have. Even if a decision seems neutral on its face, does it disproportionately harm one group more than another? If so, the policy has a disparate impact, which is illegal. Courts across the country have upheld the use of disparate impact in rulings dating back to the 1970s.

In 2015, the U.S. Supreme Court affirmed the use of disparate impact in a housing discrimination case, writing in the decision that a focus on consequences "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment."

But in his May 24 lawsuit, Attorney General Landry, who is now the leading candidate for Louisiana governor, disagreed. He argued the Civil Rights Act only prohibits "intentional discrimination," and called the EPA's investigation a ploy by "social justice warriors."

"Activities that would be perfectly lawful under environmental law are thus now threatened because EPA believes those activities occur proximate to the 'wrong' racial groups," wrote Landry in the suit.

The logic rings similar to other recent conservative legal attacks, including the argument recently used in overturning precedent on affirmative action, said Waterhouse.

9/7/23, 3:57 PM                    Shuttered EPA investigation could have brought meaningful reform to Cancer Alley, documents show | AP News

Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 8 of 10 PageID #: 2484

"This is the reverse discrimination argument," Waterhouse said. "Use of that is very politically astute and even legally astute to the degree that the ears of the court are very open to those concerns."

As the Supreme Court has grown more conservative, advocates and legal experts have voiced concern over the potential for Landry's case to set back civil rights enforcement if it moves forward — and potentially reverse progress as well, said Waterhouse, by nullifying past wins for agencies like the Department of Education or eliminating the doctrine of disparate impact altogether.

Waterhouse said state agencies should expect to be required to follow more than one law at once, just like the average citizen. He likened it to driving a car.

"Sometimes you get a no speeding and a no passing law. It means that you have to drive 55 (miles per hour) and stay in that right lane, even though somebody is driving slow in it," he said.

"It's not an either-or, so it's a false dichotomy."

## THE FUTURE OF LOUISIANA'S AIR PROGRAM

Even with the EPA's investigation being closed, the draft informal agreement produced in May offers a blueprint for addressing decades-old complaints about LDEQ's permitting process. Research and news investigations have repeatedly demonstrated that Black communities in Louisiana live with more air pollution than white communities.

Legal experts agree that nothing in the law prevents the state agency from implementing the measures developed over the 8-month negotiation to ensure it is in compliance with nondiscrimination laws.

"States have the authority to go well beyond anything that the federal government has put in place," said Waterhouse. "So they can be more protective for their citizens. They can be more attentive to preventing disparities in terms of who bears the burden of pollution. They have all kinds of authority to do that."

The draft agreement offered a step-by-step guide for considering various demographics when permitting, explaining how to analyze for potential disparities and what to do if any are found. It also laid out ways to facilitate a more robust public participation process.

"EPA has given LDEQ all of the tools that it could need to do a better job than what it has done," said Jordan.

Whether LDEQ will use those tools remains an open question. When WWNO/WRKF asked LDEQ whether it planned to use the draft agreement, agency press secretary Greg Langley said, "We are glad to have the complaint closed. LDEQ has no comment about the communications that occurred between EPA and LDEQ."

Langley didn't say if the agency planned to make any changes to its permitting program.

The EPA will still pursue other avenues to address the issues that came up in the complaints, including a major lawsuit it launched earlier this year against a neoprene plant in St. John the Baptist Parish and new proposed rules limiting the emission of certain cancer-causing chemicals plaguing Louisiana's chemical corridor. It also plans to conduct its own cumulative impact study in St. John.

But the federal agency hasn't provided any indication that an overhaul of the state's air permit program is in the cards. EPA staff has offered to help LDEQ implement changes if the state decides to strengthen its safeguards against discrimination.

Unless changes are made, Harden said, LDEQ will continue to have the same problems that the EPA identified — and racial disparities will continue to go unchecked.

9/7/23, 3:57 PM                Shuttered EPA Investigation could've brought meaningful reform to Cancer Alley, documents show | AP News

Case 2:23-cv-00692-JDC-TPL    Document 34-18    Filed 09/29/23    Page 9 of 10 PageID
                                         #: 2485

"Each permit that LDEQ issues in a predominantly Black community in Louisiana is a further violation of civil rights," she said.

ADVERTISEMENT