# EXHIBIT A

March 6, 2023

**By email and first-class mail**

Anhthu Hoang, Acting Director
Office of Environmental Justice and External Civil Rights
Office of External Civil Rights Compliance
United States Environmental Protection Agency
1200 Pennsylvania Ave., NW, Mail Code 2310A
Washington, DC 20460
Hoang.Anhthu@epa.gov
Title_VI_Complaints@epa.gov

Re:    Complaint under Title VI of the Civil Rights Act of 1964 and the Environmental
       Protection Agency's implementing regulations regarding discrimination by the State
       of Alabama and the Alabama Department of Environmental Management in their
       administration of the Clean Water State Revolving Fund

Dear Acting Director Hoang,

The Center for Rural Enterprise and Environmental Justice and the Natural Resources
Defense Council submit this complaint against the Alabama Department of Environmental
Management (ADEM) and the State of Alabama for violating Title VI of the Civil Rights
Act of 1964 and EPA's implementing regulations, 40 C.F.R. Part 7.

There is an urgent need to improve sanitation access for Alabama residents, especially Black
residents. Soil conditions and a long history of discrimination have contributed to a public
health crisis in the state: Many residents, disproportionately Black, lack adequate sanitation.
This environmental inequity is most acute in Alabama's Black Belt, where many people lack
access to a centralized sewage utility and must rely on expensive onsite sanitation systems,
which often fail. Those who cannot afford a functioning onsite system are forced to resort to
makeshift straight pipes that discharge raw sewage outdoors. This threatens people's health,
degrades the local environment, undermines human dignity, and causes economic harm to
individuals, families, and entire communities.

Money from Alabama's Clean Water State Revolving Fund could be used to help. The
purpose of the State Revolving Fund is to provide communities and individuals with low-
cost financing or grants for water quality projects, including projects relating to
decentralized wastewater treatment and onsite sanitation. ADEM administers Alabama's
Clean Water State Revolving Fund, and ADEM is now disbursing money appropriated
under the Infrastructure Investment and Jobs Act through the State Revolving Fund too.
But ADEM administers the Clean Water State Revolving Fund according to a set of policies
that make it impossible for people who need help with onsite sanitation to access this
money. These policies disproportionately harm Alabama's Black residents and perpetuate
an unconscionable situation.

1

ADEM blocks the use of Clean Water State Revolving Fund money for onsite sanitation needs in six ways:

1. Under ADEM regulations, only public bodies can apply for and receive State Revolving Fund support. That rules out individuals, homeowners' associations, community groups, and nonprofit organizations that, under federal law, are otherwise eligible for State Revolving Fund money for onsite sanitation needs.

2. ADEM's project ranking system for State Revolving Fund applications effectively disqualifies people who rely on onsite systems. ADEM allocates an extremely low number of available points for onsite systems in its ranking system, relative to other projects and compared to other states. As a result, onsite sanitation projects are unable to earn enough points to secure any funding.

3. ADEM does not consider financial need in its project ranking system. That means people and communities with the greatest need—including people forced to rely on straight pipes to discharge sewage because they cannot afford a working onsite system—are not prioritized over others for State Revolving Fund support.

4. Federal law requires states to provide additional subsidies for some State Revolving Fund recipients in the form of grants or forgivable loans. For at least the past four years, ADEM has unreasonably limited the amount of additional subsidization it offers, denying available funding to people with financial need.

5. ADEM conducts inadequate outreach to disadvantaged communities regarding the availability of State Revolving Fund money for onsite sanitation. ADEM's inaction means many people in dire need of financial support never apply, because they are unaware of a significant existing resource that could help.

6. According to ADEM, it provides all State Revolving Fund assistance by purchasing bonds from the funding recipient. ADEM does not offer alternative financing options that are available in many other states. This impedes participation by individuals with onsite sanitation needs and organizations that serve them, who are not able to issue bonds.

The result is stark: Alabama has distributed more than one and a half billion dollars in Clean Water State Revolving Fund money since the program's inception in 1987, but it has never awarded any money through the State Revolving Fund to support onsite sanitation needs. This in a state where sanitation inequity has attracted international criticism.

Title VI of the Civil Rights Act prohibits entities that receive federal funding from engaging in activities that subject individuals to discrimination based on race. ADEM and the State of Alabama receive federal financial assistance from EPA and are bound by this prohibition against discrimination. We request that EPA's Office of External Civil Rights Compliance accept this complaint, investigate these allegations, and ensure that ADEM and the State of Alabama eliminate the racially discriminatory effects of their current practices.

## I.    Parties

The complainants are [(b)(6) Privacy, (b)(7)(C) Enf. Privacy] and the Natural Resources Defense Council. This complaint is filed on behalf of Black Alabama residents with onsite sanitation needs.

[(b)(6) Privacy, (b)(7)(C) Enf. Privacy] works to address the lack of wastewater infrastructure in rural communities across the United States. Through direct action and partnerships with institutional collaborators, [(b)(6) Privacy, (b)(7)(C)] prioritizes policy influence, technology innovation, and health research while operating from a framework of human rights and environmental justice principles.

The Natural Resources Defense Council (NRDC) is an environmental and public health nonprofit advocacy organization. NRDC is committed to protecting communities from health threats and works to lessen the disproportionate burdens borne by communities of color and low-income communities from environmental contamination. One of NRDC's priorities is to help create strong, just, and resilient communities, including by improving access to safe and adequate sanitation systems.

The recipients are the Alabama Department of Environmental Management (ADEM) and the State of Alabama.

## II.    Jurisdiction

EPA will accept a complaint for investigation under Title VI if the complaint: (1) is in writing; (2) alleges discriminatory acts that, if true, may violate EPA's Title VI regulations; (3) identifies a recipient of EPA assistance that committed the alleged discriminatory acts; and (4) is either filed within 180 days of the alleged discriminatory acts or asserts a continuing discriminatory policy or practice.[1]

This complaint meets each of these requirements. This written complaint is timely because it alleges ongoing discriminatory conduct and was filed within 180 days of ADEM's most recent Clean Water State Revolving Fund disbursements, announced on September 15, 2022,[2] which relied on the discriminatory criteria and policies outlined in this complaint. The complaint also alleges discriminatory policies that cause disparate harm to Black residents, in violation of EPA's regulations.[3] EPA's annual State Revolving Fund grants to ADEM constitute "assistance," and ADEM and the State of Alabama are both "recipients" under the law.[4]

---

[1] 40 C.F.R. § 7.120(b); U.S. EPA, External Civil Rights Compliance Office, *Case Resolution Manual* 5, 7-8 (Jan. 2021), https://bit.ly/3id3dyj ("EPA, *Case Resolution Manual*").

[2] ADEM, *ADEM Approves $348 Million for Water, Sewer Projects* (Sept. 15, 2022), https://bit.ly/3CoaH8C.

[3] 40 C.F.R. § 7.35(b).

[4] *See id.* § 7.25 (definitions of "EPA assistance" and "recipient").

Title VI applies to "any program or activity" that receives federal assistance.[5] "Program or activity" includes all of the operations of a state agency, "any part of which is extended Federal financial assistance."[6] ADEM's management of the Clean Water State Revolving Fund in Alabama is a program or activity, as is Alabama's enactment of Clean Water State Revolving Fund implementing legislation (at Alabama Code sections 22-34-1 to 22-34-17).[7] ADEM and the State of Alabama are therefore subject to Title VI and EPA's implementing regulations.

There are no prudential reasons for EPA to decline jurisdiction over this complaint.[8] The same allegations are not pending before EPA or any other agency. Nor to our knowledge is there any current EPA Title VI investigation into ADEM's administration of the Clean Water State Revolving Fund.[9] In November 2021, the Department of Justice announced an investigation under Title VI into the onsite wastewater disposal and infectious disease and outbreaks programs of the Alabama Department of Public Health and the Lowndes County, Alabama, Health Department.[10] Although that investigation similarly concerns inadequate sanitation in Alabama, it is limited to disparate harm in one county and to the activities of other state and county agencies. It does not concern ADEM's administration of the Clean Water State Revolving Fund.

## III.    Factual background

### A.    Inadequate sanitation plagues Alabama's Black residents

For decades, many Alabama residents have struggled to access adequate sanitation.[11] The problem is especially severe in the Black Belt, named for its dark, fertile, clayey soils.[12] In

---

[5] 42 U.S.C. § 2000d; 40 C.F.R. § 7.30.

[6] 40 C.F.R. § 7.25.

[7] *Id.*; *see also* U.S. Department of Justice, Civil Rights Division, *Title VI Legal Manual* Section V at 26 (last modified Feb. 2021), https://bit.ly/3ifHNkg ("DOJ, *Title VI Legal Manual*").

[8] *See* EPA, *Case Resolution Manual*, supra n.1, at 10-11.

[9] *See* U.S. EPA, *External Civil Rights Docket, 2014-Present*, https://bit.ly/3jLVpE9 (last edited Feb. 28, 2023).

[10] U.S. Department of Justice, Office of Public Affairs, *Justice Department Announces Environmental Justice Investigation into Alabama Department of Public Health and Lowndes County Health Department* (Nov. 9, 2021), https://bit.ly/3i7XmKU.

[11] *See, e.g.,* Catherine Coleman Flowers, *Waste: One Woman's Fight Against America's Dirty Secret* 4, 9-10, 14 (2020) (Flowers, "*Waste*").

[12] Jiajie He et al., *Assessing the Status of Onsite Wastewater Treatment Systems in the Alabama Black Belt Soil Area*, 28 Envt'l Engineering Sci. 693, 694-95 (2011), https://bit.ly/3Xv7kVC ("He et al., *Assessing the Status of Onsite Wastewater Treatment Systems*") (Ex. 1). This complaint uses the term Black Belt to refer to 17 Alabama counties: Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pike, Russell, Sumter, and Wilcox. *See, e.g.*, Jessica Cook Wedgworth & Joe Brown, *Limited Access to Safe Drinking Water and Sanitation in Alabama's Black Belt: A Cross-Sectional Case Study*, Water Quality, Exposure & Health 2 (June 2013), https://bit.ly/3Xsze4r (using 17-county definition) ("Wedgworth & Brown, *Limited Access to Safe Drinking Water and Sanitation*") (Ex. 2).

4

rural areas, many people are not served by a centralized sewer system and must rely on onsite sewage treatment.[13] In the Black Belt, onsite systems often fail because of the region's impermeable soil,[14] and broken or failed onsite sanitation systems cause raw sewage to back up into homes or pool outside.[15] This problem will worsen as climate change intensifies, leading to rising water tables and more intense rains, which will increase failure rates for onsite sanitation systems.[16]

Black Belt counties are among the state's poorest.[17] The cost of an effective onsite sanitation system—up to tens of thousands of dollars[18]—is out of reach for many.[19] But homeowners in Alabama have the responsibility to install and maintain a state-permitted onsite sanitation system.[20] Those who cannot afford a functioning onsite system are forced to use makeshift straight pipes that discharge raw sewage from homes to yards, woods, or other nearby outdoor areas.[21] At the same time, state laws threaten residents who cannot afford

---

[13] *See* Maxwell Izenberg et al., *Nocturnal Convenience: The Problem of Securing Universal Sanitation Access in Alabama's Black Belt*, 6 Envt'l Justice 200, 201 (Dec. 2013), https://bit.ly/3QeRaNs ("Izenberg et al., *Nocturnal Convenience*") (Ex. 3).

[14] *See id.* at 201-02; Emily Meza, *Examining Wastewater Treatment Struggles in Lowndes County, AL* 5 (Apr. 27, 2018) (Master's thesis, Duke Univ.), https://bit.ly/3i8xgHH ("Meza, *Examining Wastewater Treatment Struggles*") (Ex. 4).

[15] Bill Whitaker, *60 Minutes investigates: Americans fighting for access to sewage disposal*, CBS News (Dec. 19, 2021), https://bit.ly/3ZdrHIE ("Whitaker, *Americans fighting for access to sewage disposal*"); Sabrina Tavernise, *A Toilet, but No Proper Plumbing: A Reality in 500,000 U.S. Homes*, N.Y. Times (Sept. 26, 2016), http://bit.ly/3GzdlJY ("Tavernise, *A Toilet but No Proper Plumbing*").

[16] *E.g.*, Jim Morrison, *Backed-up pipes, stinky yards: Climate change is wrecking septic tanks*, Wash. Post (Apr. 12, 2022), https://bit.ly/3GFIaOe; *see also* U.S. EPA, *What Climate Change Means for Alabama* (Aug. 2016), https://bit.ly/3GIw8Us.

[17] Izenberg et al., *Nocturnal Convenience*, supra n.13, at 201; Stephen G. Katsinas et al., *Poverty, Housing, & GDP in Alabama's Black Belt* 1-4 (Mar. 2022) (Univ. of Ala. Issue Brief No. 58), https://bit.ly/3X3Vu4z ("Katsinas et al., *Poverty, Housing, & GDP in Alabama's Black Belt*") (Ex. 5).

[18] Izenberg et al., *Nocturnal Convenience*, supra n.13, at 202; *see also, e.g.*, Patricia A. Jones & Amber Moulton, *The Invisible Crisis: Water Unaffordability in the United States* 14 (May 2016), https://bit.ly/3GIjsgw.

[19] *E.g.*, Flowers, *Waste*, supra n.11, at 10; Inga T. Winkler & Catherine Coleman Flowers, *"America's Dirty Secret": The Human Right to Sanitation in Alabama's Black Belt*, 49 Colum. Human Rights L. Rev. 181, 188-89 (2017) ("Winkler & Flowers, *America's Dirty Secret*"); U.N. General Assembly, Human Rights Council, *Report of the Special Rapporteur on the human right to safe drinking water and sanitation, Catarina de Albuquerque* ¶ 22 (Aug. 2, 2011), https://bit.ly/3jMfgTL ("U.N. General Assembly, *Report of the Special Rapporteur*"); *see generally* U.S. EPA, *Financing Decentralized Wastewater Treatment Systems: Pathways to Success with the Clean Water State Revolving Fund Program* 3 (Jan. 2022), https://bit.ly/3X4LHen ("[P]rojects to address decentralized systems can be prohibitively expensive for many homeowners, thus delaying important investments in the wastewater infrastructure needed to protect public health and water quality.") ("EPA, *Financing Decentralized Wastewater Treatment Systems*").

[20] Ala. Code § 22-26-2; Ala. Admin. Code §§ 420-3-1-.02, .04(101), .05.

[21] *E.g.*, Ala. Section of the American Society of Civil Engineers, *2022 Report Card for Alabama's Infrastructure* 106, https://bit.ly/3WNCDL8; Tavernise, *A Toilet, but No Proper Plumbing*, supra n.15; Michael Regan, U.S. EPA, Twitter (Aug. 2, 2022, 6:07 PM) (@EPAMichaelRegan), https://bit.ly/3X8Zpx8.

functioning onsite systems with fines, arrests, and potential liens on their homes.[22] Sanitation inequity in Alabama has become notorious, raising human rights concerns and garnering national and international attention.[23]

There is incomplete information on the number of failing onsite systems and the use of straight pipes in Alabama. The U.S. Census has not collected data on sanitation since 1990,[24] and Alabama has not attempted any statewide survey or analysis.[25] But existing information paints a picture of rampant, predictable onsite system failure and pervasive straight pipe use throughout the Black Belt. One study estimated that almost 90 percent of land in the Black Belt is not suited for conventional onsite sanitation.[26] A survey in Wilcox County found that more than 90 percent of unsewered homes had an unpermitted sewage system, 60 percent with a visible straight pipe and 33 percent with a buried straight pipe or other unpermitted system.[27] A concurrent survey in Hale County found that 65 percent of unsewered homes lacked permitted onsite systems, and six percent had visible straight pipes.[28] Another study reported that 18 percent of households in one surveyed Black Belt county lack access to any wastewater treatment.[29] And in Lowndes County, 15 percent of survey respondents reported that they had a failing onsite sanitation system or no wastewater treatment at all.[30] The Alabama Department of Public Health thinks the number is much higher: it has estimated that 40 to 90 percent of all Lowndes County households have inadequate or no onsite sanitation.[31]

---

[22] Ala. Code §§ 22-26-1, 22-26-6, 45-43-171; Flowers, *Waste*, supra n.11, at 14; Ala. Ctr. for Rural Enter. et al., *Flushed and Forgotten: Sanitation and Wastewater in Rural Communities in the United States* 28-29 & nn. 253-261 (May 2019), http://bit.ly/3IMswSN ("ACRE, *Flushed and Forgotten*").

[23] *E.g.*, U.N. General Assembly, *Report of the Special Rapporteur*, supra n.19, at ¶¶ 19-23, 89; Winkler & Flowers, *America's Dirty Secret*, supra n.19, at 209-20; U.N. Human Rights, Office of the High Comm'r, *Statement on Visit to the USA, by Professor Philip Alston, United Nations Special Rapporteur on extreme poverty and human rights* ¶¶ 7, 37 (Dec. 15, 2017), https://bit.ly/3Gf3qch ("U.N. Human Rights, *Statement on Visit to the USA*"); Whitaker, *Americans fighting for access to sewage disposal*, supra n.15; Tavernise, *A Toilet, but No Proper Plumbing*, supra n.15.

[24] U.S. Census Bureau, *Historical Census of Housing Tables: Plumbing*, https://bit.ly/3VR9r4K; U.S. EPA, Office of Water, *Report to Congress on the Prevalence through the U.S. of Low- and Moderate-Income Households without Access to a Treatment Works and the Use by States of Assistance under Section 603(c)(12) of the Federal Water Pollution Control Act* 4 (July 2021), https://bit.ly/3Zp7u2H ("EPA, *Access to a Treatment Works*").

[25] U.N. Human Rights, *Statement on Visit to the USA*, supra n.23, at ¶ 44.

[26] He et al., *Assessing the Status of Onsite Wastewater Treatment Systems*, supra n.12, at 695.

[27] EPA Webinar, *Surface Discharge of Raw Wastewater Among Unsewered Homes in Central Alabama* 31 (March 28, 2017), https://bit.ly/3ZbiRel ("EPA, *Surface Discharge of Raw Wastewater*") (Ex. 6); Ala. Water Res. Research Inst., *Annual Technical Report, FY 2016* 25, https://bit.ly/3WOnQjm (Ex. 7).

[28] EPA, *Surface Discharge of Raw Wastewater*, supra n.27, at 36.

[29] Wedgworth & Brown, *Limited Access to Safe Drinking Water and Sanitation*, supra n.12, at 4.

[30] Meza, *Examining Wastewater Treatment Struggles*, supra n.14, at 30. Given the threat of fines and criminal sanctions, these self-reported responses likely underrepresent true conditions. *Id*. at ii, 31.

[31] *See* U.N. General Assembly, *Report of the Special Rapporteur*, supra n.19, at 6 ¶ 20.

Sanitation access in Alabama is linked with race. Census data from 1990 (the most recent available on sanitation) shows that 3.9 percent of Black households in Alabama lacked complete plumbing, compared to 0.7 percent of White households.[32] In rural areas, 11.1 percent of Black households lacked complete plumbing, compared to 1.2 percent of White households.[33] Nationwide, "[i]nadequate and failing sanitation systems disproportionately impact rural areas and communities of color,"[34] and race is the strongest predictor of a lack of adequate water and sanitation access.[35] According to a recent report, Black and Latino households nationally are twice as likely as white households to lack complete plumbing.[36] EPA has recognized that the harms from inadequate onsite sanitation "disproportionately affect rural, minority, and economically disadvantaged communities that struggle to address these impacts given their limited financial capacity."[37] The link between race, poverty, and sanitation inequity in the Black Belt is a product of centuries of racism and discrimination that can be traced directly to slavery, sharecropping, and enforced racial segregation.[38]

## B.    Inadequate onsite sanitation causes severe harms in Alabama

Exposure to raw sewage from failing systems and straight pipes increases the risk of gastrointestinal illnesses, tropical diseases, antimicrobial resistance, anemia, miscarriages, and preterm births.[39] Untreated or inadequately treated sewage can also contaminate the groundwater used for drinking water wells, creating an elevated risk of waterborne disease.[40]

Sewage discharges from straight pipes and failing onsite systems also pollute streams and rivers and cause water quality impairment.[41] And inadequate sanitation causes community-

---

[32] ACRE, *Flushed and Forgotten*, supra n.22, at 17. Complete plumbing in the 1990 Census was defined to mean hot and cold piped water, a bathtub or shower, and a flush toilet. U.S. Census Bureau, *Historical Census of Housing Tables: Plumbing*, https://bit.ly/3VR9r4K.

[33] ACRE, *Flushed and Forgotten*, supra n.22, at 17.

[34] *Id*. at 18.

[35] George McGraw & Radhika Fox, *Closing the Water Access Gap in the United States* 22 (2019), https://bit.ly/3IMhZXB.

[36] George McGraw, *Draining: The Economic Impact of America's Hidden Water Crisis* 11 (2022), https://bit.ly/3vXtiVD ("McGraw, *Draining*").

[37] EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 4.

[38] *E.g.*, Jennifer S. Carrera & Catherine Coleman Flowers, *Sanitation Inequity and the Cumulative Effects of Racism in Colorblind Public Health Policies*, Am. J. of Economics & Sociology (Oct. 29, 2018), https://bit.ly/3XXOlUk (Ex. 8); ACRE, *Flushed and Forgotten*, supra n.22, at 25; Katsinas et al., *Poverty, Housing, & GDP in Alabama's Black Belt*, supra n.17, at 1, 9.

[39] *E.g.*, McGraw, *Draining*, supra n.36, at 36; Global Communities, *Closing the U.S. Sanitation Equity Gap: Exploring Opportunities to Learn from the Global Sanitation Sector Experience* 3 (Sept. 2021), https://bit.ly/3if9Kso; ACRE, *Flushed and Forgotten*, supra n.22, at 6; Megan L. McKenna et al., *Human Intestinal Parasite Burden and Poor Sanitation in Rural Alabama*, Am. J. of Tropical Medicine & Hygiene (Sept. 2017), https://bit.ly/3X7sFnS (Ex. 9).

[40] U.S. EPA, *Septic System Impacts on Water Sources*, http://bit.ly/3GJ2JbH.

[41] EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 4.

wide economic harm: "You can't really attract any kind of businesses into a community if you don't have adequate wastewater treatment."[42]

Finally, inadequate onsite sanitation degrades people's quality of life and takes a toll on mental health.[43] The smell from sewage on the ground can be a near-constant nuisance.[44] Some residents dread the sound of rainfall, because it means a likely sewage backup in their homes.[45] Other residents bar their children from playing in their yards because of the risk of exposure to human waste.[46] These conditions undermine human dignity and cause profound psychological harm.[47] Entire communities have endured this injustice for decades.[48]

## IV.    Legal framework

### A.    The Clean Water State Revolving Fund

The Clean Water State Revolving Fund is a financial assistance program for wastewater infrastructure and water quality projects.[49] Through the State Revolving Fund, EPA provides capitalization grants to states for further distribution to recipients within each state. States can use the funds to provide financial assistance for "the construction, repair, or replacement of decentralized wastewater treatment systems that treat municipal wastewater or domestic sewage."[50] States can also use the funds to support a qualified nonprofit entity to assist "an eligible individual" for "the repair or replacement of existing individual household decentralized wastewater treatment systems" or "in a case in which an eligible individual resides in a household that could be cost-effectively connected to an available publicly owned treatment works, for the connection of the applicable household to such treatment works."[51] An "eligible individual" under this subsection means a member of a low-income household, as defined in the Clean Water Act.[52] Additional uses of State

---

[42] Alexis Okeowo, *The Heavy Toll of the Black Belt's Wastewater Crisis*, New Yorker (Nov. 30, 2020), http://bit.ly/3w2nslz (quoting Catherine Coleman Flowers).

[43] ACRE, *Flushed and Forgotten*, supra n.22, at 6.

[44] *Id*. at 30; Winkler & Flowers, *America's Dirty Secret*, supra n.19, at 189.

[45] ACRE, *Flushed and Forgotten*, supra n.22, at 30.

[46] Yamiche Alcindor, *In rural Alabama, raw sewage spurs investigation into racial inequality*, NBC News (April 22, 2022), https://bit.ly/3jWiZ0U.

[47] Glenn Thrush, *An Alabama Town's Sewage Woes Test Biden's Infrastructure Ambitions*, N.Y. Times (Jan. 12, 2022), https://bit.ly/3GSafSw.

[48] ACRE, *Flushed and Forgotten*, supra n.22, at 19; *cf.* Administrator Michael Regan, *Remarks for Office of Environmental Justice and External Civil Rights Launch* (Sept. 24, 2022), https://bit.ly/3jMg3UJ.

[49] *See* 33 U.S.C. §§ 1381–1388.

[50] *Id*. § 1383(c)(4).

[51] *Id*. § 1383(c)(12).

[52] *Id*. § 1383(j).

Revolving Fund monies include financial assistance for construction of publicly owned treatment works, for measures to reduce or recapture stormwater, for efforts to promote water conservation and reduce demand for wastewater treatment, and for projects to reduce energy consumption at publicly owned treatment works, among other things.[53] The Clean Water State Revolving Fund program is the largest dedicated source of funding for wastewater infrastructure in the country,[54] and it has been "the foundation of water infrastructure investments" for decades.[55]

A state can use the Clean Water State Revolving Fund to provide various types of financial assistance, including to offer low-interest loans or to refinance, purchase, or guarantee local debt.[56] States can also employ alternative financing strategies— including sponsorship, pass-through loans, linked deposit loans, and sub-state revolving funds—to allow the distribution of money directly to individuals or nonprofits.[57] Each state must also provide a certain amount of assistance in the form of additional subsidies, including grants or forgiveness of principal, for qualifying projects. Projects eligible for additional subsidies include those that serve communities facing affordability challenges.[58]

Each state must prepare an annual plan identifying the intended uses of its Clean Water State Revolving Fund money, referred to as an Intended Use Plan.[59] The Intended Use Plan must describe, among other things, the state's long- and short-term goals for its revolving fund, and it must explain the criteria the state will use for selecting projects to fund.[60] States generally satisfy the latter requirement by creating a point system to rank project proposals based on how well they meet certain objectives. An Intended Use Plan must be made available for public comment before it is submitted to EPA for review and approval each year.[61] Apart from certain minimum requirements, EPA affords states "a high degree of flexibility for operating their revolving funds."[62]

---

[53] *Id.* § 1383(c).

[54] Becky Hammer & Katy Hansen, *A Fairer Funding Stream, How Reforming the Clean Water State Revolving Fund Can Equitably Improve Water Infrastructure Across the Country* 6 (Oct. 2022), https://bit.ly/3W1QCfv ("Hammer & Hansen, *Fairer Funding*").

[55] U.S. EPA, *Implementation of the Clean Water and Drinking Water State Revolving Fund Provisions of the Bipartisan Infrastructure Law* 1 (March 8, 2022), https://bit.ly/3QhDEsC ("EPA, *Implementation Memo*").

[56] 33 U.S.C. § 1383(d).

[57] *See* EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 14-23.

[58] 33 U.S.C. §§ 1383(i)(1), (i)(2), (i)(3)(B).

[59] 40 C.F.R. § 35.3150(a).

[60] *Id.* § 35.3150(b).

[61] *Id.* § 35.3150(a).

[62] *Id.* § 35.3100(a).

Nationwide, Clean Water State Revolving Fund programs have been used successfully to help address decentralized wastewater treatment needs.[63] States "have been working with local stakeholders to provide valuable assistance for decentralized wastewater projects in small, rural, and economically disadvantaged communities nationwide for more than 30 years."[64] That assistance includes over $469 million in funding for decentralized wastewater treatment projects.[65] Clean Water Act amendments in the past decade broadened the types of decentralized sanitation projects that can receive financing.[66] More than half of states nationwide have now funded decentralized wastewater projects,[67] and 16 states currently have active decentralized wastewater programs.[68] States have the flexibility to direct loans to individual homeowners to help with onsite sanitation.[69]

In 2021, Congress enacted the Infrastructure Investment and Jobs Act, also known as the Bipartisan Infrastructure Law.[70] That law appropriated an additional $11.7 billion for the Clean Water State Revolving Fund program nationwide, over a five-year period.[71] Of that amount, 49 percent must be distributed as additional subsidies in the form of principal forgiveness or grants.[72] This gives States "the power to open the door to disadvantaged communities who for too long have struggled to compete for financing from traditional [State Revolving Funds] and other loan programs."[73]

## B.    Alabama's State Revolving Fund

Alabama established its own revolving fund to administer the federal program in 1987.[74] Projects eligible for financial assistance through the fund in Alabama include, among other

---

[63] EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 2 ("Across the country," State Revolving Fund programs "have developed successful decentralized system financing programs based on strong relationships with community leaders and stakeholders to target financial assistance to populations with the greatest need.").

[64] *Id.* at 6 ("Nationally, the [Clean Water State Revolving Fund] provided more than $3.4 billion in combined assistance, since the program's inception, for various types of decentralized wastewater projects and septic-to-sewer conversions.").

[65] EPA, *Access to a Treatment Works*, supra n.24, at 8.

[66] *See* EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 6; U.S. EPA, *Overview of Clean Water State Revolving Fund Eligibilities* 15 (May 2016), https://bit.ly/3jT4rPD (citing 33 U.S.C. §§ 1383(c)(2), (3), (4), & (7)).

[67] EPA, *Access to a Treatment Works*, supra n.24, at 8, 47.

[68] EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 13.

[69] *Id.* at 6-8.

[70] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021).

[71] Pub. L. No. 117-58, 135 Stat. 429, 1399.

[72] *Id.*

[73] Letter from Michael S. Regan, Administrator, U.S. EPA, to State Governors 2 (Dec. 2, 2021), https://bit.ly/3ZfYUTQ.

[74] Ala. Code § 22-34-3.

things, "[c]onstruction, repair or replacement of decentralized wastewater systems that treat . . . domestic sewage," or "[a]ny other use allowable by the United States Environmental Protection Agency and consistent with this Act."[75]

Under ADEM regulations—unlike under federal law—only public bodies can apply for and receive State Revolving Fund assistance in Alabama.[76] And per ADEM policy, the state provides all State Revolving Fund support by purchasing bonds issued by the borrower,[77] although both federal and state law allow ADEM to finance projects in other ways.[78]

ADEM has created a ranking system and project priority list to evaluate applications for State Revolving Fund money.[79] As required by EPA regulations,[80] ADEM's Intended Use Plans provide further details on its ranking system and the projects it intends to support each year. ADEM's priority ranking system awards points in seven categories: (1) enforcement and compliance (up to 50 points); (2) water quality (up to 135 points); (3) water/energy efficiency (up to 65 points); (4) stormwater management (up to 50 points); (5) agricultural/non-point source pollution (up to 35 points); (6) sustainability (up to 90 points); and (7) growth (up to 50 points).[81] Applicants must submit a pre-application form that identifies the number of points claimed, out of 475 available, and in what categories.[82] Applicants must also attach a description of the proposed project, including its location, purpose, and estimated cost, along with maps, the name of the project engineer, an engineering report, and additional information.[83]

Based on the applications it receives, ADEM prepares a project priority list and publishes a draft Intended Use Plan.[84] After public comment and EPA review, ADEM publishes its final Intended Use Plan, which identifies the projects it will finance that year, how much

---

[75] Ala. Admin. Code §§ 335-11-1-.03(1)(d), (n). The Alabama Department of Public Health and county health departments oversee permitting for the construction and installation of onsite sanitation systems. *Id.* §§ 420-3-1-.05, 420-3-1-.06. But ADEM has jurisdiction over the Clean Water State Revolving Fund in Alabama, *see* Ala. Code § 22-34-3(b), which includes the authority to disburse State Revolving Fund awards for onsite sanitation projects, *see* Ala. Admin. Code §§ 335-11-1-.03(1)(d), (n).

[76] Ala. Admin. Code §§ 335-11-1-.01(e), (t) (limiting definition of "applicant" and "recipient" to include only public bodies); *id.* § 335-11-1-.01(s) (defining "public body" to mean "any county, state agency, incorporated city or town, or their instrumentality created by or pursuant to state law and having jurisdiction over the disposal of sewage"); *id.* § 335-11-1-.02 (limiting eligible applicants to public entities); *id.* § 335-11-1-.09(10) (loans shall only be made to public entities that meet certain criteria).

[77] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022* 5, https://bit.ly/3vCCFcT.

[78] *See* 33 U.S.C. § 1383(d); Ala. Code § 22-34-3(a); Ala. Admin. Code §§ 335-11-1-.01(g), 335-11-1-.09.

[79] *See* Ala. Admin. Code §§ 335-11-1-.04, 335-11-1-.05.

[80] 40 C.F.R. § 35.3150.

[81] *E.g.*, ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, Att. 5 at 2-5.

[82] *E.g.*, *id.* at Att. 5.

[83] *Id.* at Att. 5 at 1, 5; Ala. Admin. Code § 335-11-1-.11.

[84] *See* ADEM, *State Revolving Fund (SRF)* ("How to Apply"), https://bit.ly/3VLDMBG; Ala. Admin. Code §§ 335-11-1-.01(q), 335-11-1-.03(2), 335-11-1-.04.

assistance it will provide for each, and what amount of that assistance will be additional subsidies.[85]

### C.    Title VI and EPA's Title VI regulations

Title VI prohibits recipients of federal funding from discriminating based on race.[86] A recipient of federal funds must commit to and practice non-discrimination in all its activities.[87]

Congress directed federal agencies to publish rules to effectuate Title VI.[88] Under EPA's regulations, "[n]o person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race."[89] This extends beyond intentional discrimination to practices that cause disparate harm: "A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race . . . or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race."[90]

To establish a prima facie case of disparate impact, EPA must (1) identify the specific policy or practice at issue, (2) establish harm, (3) establish disparity, and (4) establish causation.[91]

### V.    ADEM and the State of Alabama are violating Title VI and EPA's implementing regulations by preventing use of the Clean Water State Revolving Fund for onsite sanitation needs, which causes disparate harm to Black residents

Despite the glaring need in Alabama, ADEM has never used the Clean Water State Revolving Fund to support onsite sanitation projects. Instead, it has adopted a combination of rules and policies that make doing so impossible. This causes disparate harm to Black residents, in violation of Title VI.

### A.    Alabama's administration of the Clean Water State Revolving Fund bars the award of funds to support onsite sanitation needs

---

[85] *See, e.g.*, ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, Att. 1 & 2.

[86] 42 U.S.C. § 2000d.

[87] *Id*. §§ 2000d, 2000d-4a.

[88] *Id*. § 2000d-1.

[89] 40 C.F.R. § 7.30.

[90] *Id*. § 7.35(b).

[91] U.S. EPA, *External Civil Rights Compliance Office Compliance Toolkit* 8 (Jan. 18, 2017), https://bit.ly/3XdtOdH ("EPA, *Toolkit*"); *N.Y. City Env't Justice All. v. Giuliani*, 214 F.3d 65, 69 (2d Cir. 2000); DOJ, *Title VI Legal Manual*, supra n.7, Section VII at 9. Complainants themselves need not prove disparity or harm; complainants need only allege facts that, if true, may violate EPA's Title VI regulations. *See* 65 Fed. Reg. 39,650, 39,672 (June 27, 2000); EPA, *Case Resolution Manual*, supra n.1, at 17.

1.      **ADEM unduly limits recipient eligibility to public bodies**

ADEM regulations only allow public bodies to apply for and receive State Revolving Fund support.[92] In Alabama, people who rely on onsite sanitation must pay for it themselves; towns, counties, and other public bodies do not assume the cost. ADEM's rules exclude potential recipients who would otherwise be eligible under the Clean Water Act to receive State Revolving Fund money for onsite sanitation needs at individual households.[93]

Many other states do not have this restriction. Rhode Island, for example, defines eligible recipients broadly and includes corporations and persons, not just local governments.[94] Delaware similarly makes loans not just to municipalities, but also to private organizations, nonprofit organizations, and private individuals.[95] Oregon lends to "nonprofit Community Development Financial Institutions for the specific purpose of lending to individual homeowners for the repair or replacement of a failing septic system, or connection to a public sewer system."[96] West Virginia coordinates with two intermediary lenders, which receive State Revolving Fund money and then make loans directly to homeowners to repair or replace failing onsite sewage systems.[97] Other states, including Iowa, Maryland, and Missouri, provide similar opportunities.[98] But Alabama's program strictly limits State Revolving Fund awards to public bodies.[99]

---

[92] Ala. Admin. Code §§ 335-11-1-.01(e), 335-11-1-.01(t), 335-11-1-.01(s), 335-11-1-.02, 335-11-1-.09(10).

[93] 33 U.S.C. § 1383(c)(12).

[94] 250 R.I. Admin. Code § 150-20-1.6.A; *see also* State of R.I., *State Fiscal Year (SFY) 2023 Intended Use Plan* 3, https://bit.ly/3il8vYB (Rhode Island's State Revolving Fund "aim[s] to provide financial assistance to eligible local governmental units, persons, corporations, and sewer authorities for a variety of clean water infrastructure projects.").

[95] *See* Del. Dep't of Natural Res. & Envt'l Control, *Delaware Water Pollution Control Revolving Fund*, https://bit.ly/3Cpmm7a.

[96] Ore. Dep't of Envt'l Quality, *Clean Water State Revolving Fund, Program Overview, Loan Eligibility*, https://bit.ly/3QelUhI.

[97] W.Va. Dep't of Envt'l Prot., *Clean Water State Revolving Fund, FY 2022 Annual Report* 12 (Oct. 11, 2022), https://bit.ly/3GHtj6f.

[98] Iowa Dep't of Natural Res., *Investing in Iowa's Water, FY 2023 Intended Use Plans* 12 (June 21, 2022), https://bit.ly/3Cs8SYf ("On-Site Wastewater Assistance Program . . . provides loans to homeowners to replace inadequate septic systems."); Md. Dep't of the Envt., *Linked Deposit WQRLF & DWRLF*, https://bit.ly/3IIxUfz (describing availability of Clean Water State Revolving Fund money to homeowners and private entities through the state's Linked Deposit program, to replace failing onsite septic systems); Mo. Dep't of Natural Res., *Clean Water State Revolving Fund Intended Use Plan and Project Priority Lists for Federal Fiscal Year 2023* 4, 13 (Nov. 4, 2022), https://bit.ly/3X0PHfY (describing Onsite Wastewater System Grant program for qualified nonprofits to offer grants to repair or replace failing or poorly functioning onsite wastewater systems serving private, single-family homes); *see also, e.g.*, EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 18, 22, 30 (additional examples).

[99] ADEM's regulations might conceivably allow an award of Clean Water State Revolving Fund money to the Alabama Department of Public Health to support individual homeowners' onsite sanitation needs, but that would be ill-advised and possibly counterproductive. Residents are understandably distrustful of ADPH because it has discretion to penalize those who cannot afford functioning onsite sanitation systems with fines or even refer them for criminal prosecution. *See* supra n.22. And ADPH is itself the subject of a pending

It is unclear whether this limitation is mandated by Alabama state law; the statute is ambiguous.[100] Even if mandated by state law, it is no less relevant under Title VI; it would mean the State of Alabama, through the legislature, is responsible alongside ADEM for the effects of this restriction.[101] Because public entities are not responsible for the cost of onsite sanitation in Alabama, this restriction impedes the use of Clean Water State Revolving Fund money for onsite sanitation needs.

## 2.    ADEM's priority ranking system makes it impossible for onsite sanitation projects to compete for funding

Separately, ADEM's priority ranking system for State Revolving Fund applications excludes applicants that rely on onsite sanitation from competing for an award. Alabama's priority ranking system is attached to each year's Intended Use Plan.[102] Out of 475 total points, ADEM awards 10 points for projects that will "upgrade or replace existing failing or inadequate decentralized wastewater treatment systems, or construct septage treatment facilities that are crucial to the proper operation of decentralized wastewater treatment systems."[103] An additional five points are available for projects that will implement a Total Maximum Daily Load (TMDL) for pathogens, and another five points for projects that will implement a TMDL for organic enrichment/dissolved oxygen, either of which conceivably could apply to an onsite sanitation remediation project (but only if that project will eliminate or reduce pollution in an impaired surface water with a TMDL).[104] None of the other factors in ADEM's priority ranking system is relevant to onsite sanitation.

With at most 20 out of 475 available points, it is effectively impossible for an applicant with onsite sanitation needs to qualify for funding. In 2022, for example, ADEM did not fund

---

discrimination complaint and ongoing federal investigation related to its onsite wastewater disposal program. *See supra* n.10.

[100] *See* Ala. Code § 22-34-2 (statutory intent of Alabama's Clean Water State Revolving Fund program is "to aid in the prevention and control of water pollution, to provide state financial aid *to public bodies* for the prevention and control of water pollution, and to these ends . . . to pay such portion of the estimated reasonable cost of the projects of each *public body* as may be required to meet the water quality goals of the Federal Clean Water Act" (emphasis added)). But state law also provides that money in the revolving loan fund shall be available to provide for any expenditure "consistent with the federal grant program and state law," *id*. § 22-34-3(a), which would allow the award of funds to nonprofits and not just public entities, per 33 U.S.C. § 1383(c)(12), (j). And state law gives ADEM the authority to enter into contracts not just with public bodies but also "other parties," as necessary to implement the revolving loan fund. Ala. Code § 22-34-3(b).

[101] *See* DOJ, *Title VI Legal Manual*, supra n.7, Section V at 26 ("An entire state … may, however, be liable for Title VI violations if it is partially responsible for the discriminatory conduct."); *United States v. City of Yonkers*, 880 F. Supp. 212, 232 & n.25 (S.D.N.Y. 1995) (holding that "the State of New York itself," not just state agencies, may be sued under Title VI), *vacated and remanded on other grounds*, 96 F.3d 600 (2d Cir. 1996); *see also* 40 C.F.R. § 7.25 (defining "recipient" for purposes of Title VI applicability to include "any State *or* its political subdivision" (emphasis added)).

[102] *See, e.g.*, ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, Att. 5.

[103] *Id*. Att. 5 at 3.

[104] *Id*.

any project that earned fewer than 100 points through the regular Clean Water State Revolving Fund program,[105] or fewer than 65 points through the Bipartisan Infrastructure Law appropriation.[106] The way ADEM's ranking system is designed, onsite sanitation projects cannot compete.

Other states provide a far greater percentage of available points for onsite sanitation needs. North Carolina awards 15 out of 100 possible points for projects that would eliminate failed onsite wastewater systems.[107] Illinois awards 200 out of 1455 possible points available for projects to provide wastewater treatment and collection services in communities that do not have centralized wastewater treatment and that discharge to surface waters.[108] Relatively speaking, both states provide about five times more weight to onsite sanitation needs than Alabama. Some states, including Arkansas and Massachusetts, bypass their point systems entirely in order to dedicate some State Revolving Fund money just for onsite sanitation.[109]

Under the Clean Water Act and EPA regulations, states retain significant discretion to adopt project ranking criteria.[110] ADEM has used that discretion to foreclose the chance of onsite sanitation projects ever winning State Revolving Fund support.

### 3.    ADEM refuses to consider financial need when ranking project applications

ADEM does not consider financial need in its priority ranking system.[111] Affordability comes into play only as a tiebreaker: if multiple projects are assigned an identical point rating, the project that serves a community with the lowest median household income will be ranked first.[112] Again, many other states do include affordability within their priority ranking systems, including Colorado, Illinois, and North Carolina.[113] And although a recent

---

[105] *Id.* Att. 1 (fourth column).

[106] ADEM, *CWSRF BIL Intended Use Plan, Fiscal Year 2022* Att. 1 (fourth column), https://bit.ly/3QhFPMO.

[107] *See, e.g.*, N.C. Div. of Water Infrastructure, *North Carolina Clean Water State Revolving Fund and Bipartisan Infrastructure Law CWSRF General Supplemental Funds Intended Use Plan Fiscal Year 2022* Appx. C at C-2 (Aug. 8, 2022), https://bit.ly/3HwLBpR ("N.C. Div. of Water Infrastructure, *Intended Use Plan FY22*").

[108] 35 Ill. Admin. Code § 365.345(f).

[109] Ark. Dep't of Agric., *State of Arkansas, Clean Water Revolving Loan Fund Program (CWSRF) Intended Use Plan, State Fiscal Year 2023* 11 (Oct. 24, 2022), https://bit.ly/3vBJnjo ($2 million pilot project to assist residents "in remediating their failing onsite septic systems"); Comm. of Mass., Dep't of Envt'l Prot., *Final 2022 Intended Use Plan for the Clean Water State Revolving Fund* 2 (May 9, 2022), https://bit.ly/3CnYFMD (directing $5 million to the Commonwealth's Community Septic Management Program to "remediate failed septic systems in participating communities").

[110] *See* 40 C.F.R. § 35.3150.

[111] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, Att. 5 at 2-5.

[112] Ala. Admin. Code § 335-11-1-.04(3).

[113] *See* Colo. Water Pollution Control Revolving Fund, *2021 Intended Use Plan* Att. I, https://bit.ly/3VMIxec; 35 Ill. Admin. Code § 365.345(k); N.C. Div. of Water Infrastructure, *Intended Use Plan FY22*, supra n.107, Appx. C at C-5.

EPA memo advised that states may need to redistribute project priority points "to ensure disadvantaged communities are receiving funding,"[114] ADEM has not done so.

By not considering financial need in the ranking system, ADEM prevents those with the most severe sanitation needs—including people with straight pipes—from moving up the priority list. These residents tend to be low-income or to live in communities that qualify as disadvantaged, and they are therefore in the greatest need of federally subsidized Clean Water State Revolving Fund support.[115]

### 4. ADEM withholds available subsidies that would benefit onsite sanitation projects for low-income residents

For at least the past four years, ADEM has limited its planned amount of additional subsidy to the bare minimum required by federal law, rather than providing it to more people and communities with financial need. In recent years, the Clean Water Act, in combination with annual appropriations bills, has required states to provide at least 10 percent and up to 30 percent of each year's capitalization grant as additional subsidization.[116] (In 2022, the minimum was 20 percent, and the maximum was 40 percent.[117])

Since 2019, ADEM has announced in its Intended Use Plans that it will provide the minimum amount of additional subsidy required by law.[118] And in practice, ADEM has

---

[114] EPA, *Implementation Memo*, supra n.55, at 4.

[115] In the Black Belt counties with data on straight pipe prevalence—Wilcox, Hale, and Lowndes—the percentage of people living below the poverty line is much higher than the state average. And poverty in all three counties is divided along racial lines, with a significantly greater percentage of Black than white residents living below the poverty line. An estimated 27.4 percent of people in Wilcox County, 24.9 percent of people in Hale County, and 21.5 percent of people in Lowndes County live below the poverty line, compared to an estimated 16.1 percent statewide. In Wilcox County, 35.7 percent of Black residents live below the poverty line, compared to 6.4 percent of white residents. In Hale County, 32.3 percent of Black residents live below the poverty line, compared to 11.7 percent of white residents. In Lowndes County, 25.8 percent of Black residents live below the poverty line, compared to 8 percent of white residents. *See* U.S. Census Bureau, American Community Survey Table S1701, Poverty Status in the Past 12 Months, http://bit.ly/3Yq4NwU (Wilcox County), http://bit.ly/3JVrq7P (Hale County), http://bit.ly/3lpsoiz (Lowndes County), http://bit.ly/3YC21UL (Alabama statewide).

[116] 33 U.S.C. § 1383(i)(3)(B) (2014) (as amended by the Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, 128 Stat. 1193, 1325-26 (June 10, 2014)) (codifying 30 percent maximum subsidization amount); Pub. L. No. 116-6, 133 Stat. 13, 238 (Feb. 15, 2019) (setting 10 percent minimum subsidization amount for FY19); Pub. L. No. 116-94, 133 Stat. 2534, 2719 (Dec. 20, 2019) (10 percent minimum for FY20); Pub. L. No. 116-260, 134 Stat. 1182, 1511 (Dec. 27, 2020) (10 percent minimum for FY21).

[117] 33 U.S.C. § 1383(i)(3)(B)(i); Pub. L. No. 117-103, 136 Stat. 49, 384-85 (Mar. 15, 2022); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, at 3 (stating requirement to provide additional subsidization for not less than 20 percent of the capitalization grant in FY22).

[118] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2019* 3-4, Att. 1 at 1, https://bit.ly/3ZnxsDE (sixth column, showing intended subsidy of $1,776,700); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2020* 3, Att. 1 at 1, https://bit.ly/3Coit2u (intended subsidy of $1,777,000); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2021* 3,

awarded even less than the minimum: in fiscal years 2019 through 2021, ADEM fell short of its planned additional subsidy totals by more than $360,000 combined.[119]

By providing additional subsidies up to the maximum allowed by federal law, ADEM could cover the cost for low-income homeowners with urgent unmet needs.[120] Instead, ADEM has withheld more than $13 million in potential additional subsidies since 2019.[121]

Moreover, until 2022, ADEM's subsidization policy included two restrictions that prevented people with onsite sanitation needs from receiving a subsidized Clean Water State Revolving Fund award at all. ADEM only awarded additional subsidies to green infrastructure projects intended to mitigate or prevent stormwater pollution.[122] That blocked subsidies for onsite sanitation. ADEM also limited loan forgiveness to no more than 50 percent of a project's cost.[123] That closed the door to potential low-income applicants who needed a 100 percent subsidy.

Last year, ADEM amended its policy to allow it to subsidize a broader range of projects, at up to 100 percent cost.[124] But by routinely limiting its intended subsidy amount to the minimum required, ADEM denies available funds to those who desperately need them.[125]

---

Att. 1 at 1, https://bit.ly/3GD9mxg (intended subsidy of $1,776,700); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, at 3, Att. 1 at 1 (intended subsidy of $2,587,600).

[119] EPA, *Clean Water NIMS Data Report, Clean Water SRF Program Information for the State of Alabama*, https://bit.ly/3icmNLh (row 324, page 67, columns 2019 to 2021, showing total annual subsidy provided of $4,966,300 for those three years) ("EPA, *Clean Water NIMS Data Report*").

[120] Izenberg et al., *Nocturnal Convenience*, supra n.13, at 203 ("Because the need for costly installation of alternative systems or repair/replacement of poorly functioning or failing septic systems is locally great, low-income households and communities require external funds if they are to fix the problem themselves.").

[121] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2019*, supra n.118, Att. 1 (subsidizing $1,776,700 out of a possible $5,330,100); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2020*, supra n.118, Att. 1 ($1,777,000 out of $5,331,000); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2021*, supra n.118, Att. 1 ($1,776,700 out of $5,330,100); ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, Att. 1 ($2,587,600 out of $5,175,200).

[122] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2021*, supra n.118, Att. 4 at 3-4.

[123] *Id.*

[124] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, Att. 4.

[125] Under the Clean Water Act, additional subsidization is limited to "a municipality or intermunicipal, interstate, or State agency"; it is not available for individuals, non-profits, or businesses. 33 U.S.C. § 1383(i)(1)(A). But as explained below, many states (not including Alabama) use financing mechanisms that facilitate pass-through of financial support from municipalities to individuals. *See* EPA, *Interpretive Guidance for Certain Amendments in the Water Resources Reform and Development Act to Titles I, II, V, and VI of the Federal Water Pollution Control Act* 17 (Jan. 6, 2015), https://bit.ly/3VGaTH6 ("[E]ligible recipients of a principal forgiveness or negative interest loan may use a 'pass through' loan structure to pass the subsidy along to any eligible recipient of [Clean Water State Revolving Fund] assistance for projects that would otherwise be eligible to receive additional subsidization under this subsection, including non-profits and other private entities.") ("EPA, *Interpretive Guidance*").

### 5.    ADEM does not conduct meaningful outreach to people with onsite sanitation needs

ADEM conducts inadequate outreach to individuals and communities with onsite sanitation needs, and ADEM does not appear to have any written outreach plan. Even if ADEM changed its policies to allow funding to individuals or to facilitate pass-through grants or loans, the State Revolving Fund will only be valuable to individuals and communities who know about it and apply for support.

There is no evidence of outreach to underserved or marginalized communities on ADEM's State Revolving Fund website.[126] Nor is there evidence that ADEM conducts outreach to promote the State Revolving Fund's availability for onsite sanitation. In contrast, ADEM "actively solicited" applications for green infrastructure projects, by sending a notice to approximately 1,000 addresses on ADEM's email and direct mail list.[127] ADEM should actively solicit applications from underserved communities and for onsite sanitation in particular. "A passive approach yields a disproportionate number of applications from well-resourced communities,"[128] which disadvantages low-income communities and individuals with onsite sanitation needs.

Other states are more proactive. Delaware, for example, has a Community Septic System Outreach program, to help homeowners take advantage of the State Revolving Fund for septic system rehabilitation.[129] Delaware's outreach initiative affirmatively "identifies low- and moderate-income homeowners . . . that may need financial assistance to replace failed and/or failing septic systems," with a goal of replacing 100 failed or failing systems each year.[130]

Public interest advocates filed comments with ADEM in September 2022, urging the state to expand its public outreach efforts.[131] Those comments recommended that ADEM hold public outreach meetings around the state, accessible both in terms of timing and location for disadvantaged community members, and especially in rural areas of the state.[132] ADEM offered a dismissive response that did not identify any affirmative outreach to disadvantaged communities or to individuals with onsite sanitation needs.[133]

---

[126] ADEM, *State Revolving Fund (SRF)*, https://bit.ly/3VLDMBG.

[127] ADEM, *FY2020 CWSRF Annual Report* 1, 6 (Sept. 30, 2020), https://bit.ly/3GiZ9EG.

[128] Hammer & Hansen, *Fairer Funding*, supra n.54, at 15.

[129] Del. Dep't of Natural Res. & Envt'l Control, *Community Septic System Outreach*, https://bit.ly/3WOgQmD.

[130] *Id.*

[131] Letter from [REDACTED] (b)(6) Privacy, (b)(7)(C) Enf. Privacy, et al., to Brian Espy, ADEM 6-7 (Sept. 2, 2002) (Ex. 10).

[132] *Id.* at 7.

[133] Letter from Russell A. Kelly, ADEM, to [REDACTED] (b)(6) Privacy, (b)(7)(C) Enf. Privacy, et al. 3 (Sept. 28, 2022) (Ex. 11).

Unless ADEM conducts meaningful outreach, many people and communities with onsite sanitation needs will never apply for Clean Water State Revolving Fund support.

### 6.    ADEM restricts financing options in a way that blocks awards for onsite sanitation projects

ADEM does not offer flexible financing mechanisms that would allow it to support onsite sanitation needs. ADEM's Intended Use Plans state that Alabama's State Revolving Fund program "provides all assistance by purchasing outstanding debt obligations (bonds) from the borrower."[134] That bars participation by nonprofits, individuals, homeowners' associations, and communities that do not issue bonds. These potential recipients are already ineligible because of the public body restriction discussed above; ADEM's bond purchase policy creates a separate and additional hurdle. This limitation is apparently an informal policy, repeated annually in ADEM's Intended Use Plans but not required by state statute or regulation.[135] This policy closes off both conventional and alternative financing opportunities used in many other states for onsite sanitation needs.

Other states structure their awards to allow money to support individual onsite sanitation needs. Common options include pass-through lending, linked deposit mechanisms, and sponsorship.[136] This is especially important to enable additional subsidization to low-income residents for onsite systems: Without pass-through loans, individuals cannot benefit from additional subsidization at all.[137] Many states use innovative financing mechanisms precisely so that State Revolving Fund money can "reach individual homeowners for decentralized wastewater projects and upgrades."[138] Alabama does not.

ADEM's financing policy thus limits potential funding recipients to a single route for securing State Revolving Fund support. A wider range of financing options—combined with a change to ADEM's recipient eligibility requirement—would dramatically expand the pool of applicants who could win State Revolving Fund support for onsite sanitation projects.

*    *    *

These six policies operate separately and together to preclude Clean Water State Revolving Fund awards for onsite sanitation in Alabama. Correcting one policy in isolation will not cure the problem. Expanding recipient eligibility alone, for example, will not help if ADEM does not also allow alternative financing mechanisms, revise the ranking system, conduct meaningful outreach, and provide greater subsidies. Enhanced outreach, on its own, will not help if onsite sanitation projects are ineligible for an award, cannot compete under the project ranking system, and are not subsidized.

---

[134] ADEM, *CWSRF Intended Use Plan, Fiscal Year 2022*, supra n.77, at 5.

[135] Ala. Code § 22-34-3(a); Ala. Admin. Code §§ 335-11-1-.01(g), 335-11-1-.09.

[136] EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 14-23, 30.

[137] *See* EPA, *Interpretive Guidance*, supra n.125, at 17.

[138] EPA, *Financing Decentralized Wastewater Treatment Systems*, supra n.19, at 8.

To illustrate: A homeowner with straight pipes will not know about available funding to help with onsite sanitation because ADEM does not conduct adequate outreach. Even if the homeowner happens to find out about it, they cannot apply for money directly or through a local nonprofit because individuals and nonprofits are not eligible. Even if their town or county is willing to apply on their behalf and then forward the funds, it still might not be affordable for the homeowner because ADEM offers so little loan forgiveness. Even if they had a chance at complete loan forgiveness, their application would not be selected for funding because it could not get enough points in the ranking system. These independent barriers make ADEM's State Revolving Fund program uniquely inhospitable to onsite sanitation projects.

Yet the Clean Water State Revolving Fund can and should be a "robust source of funding for decentralized wastewater projects."[139] Indeed, other states provide significant financial support for onsite sanitation through their revolving fund programs: Massachusetts, for example, has awarded $128.8 million in total for decentralized wastewater projects; Minnesota more than $95 million; Ohio more than $63 million, and Washington more than $42 million.[140] EPA has specifically highlighted state efforts to use revolving fund money to replace straight pipes elsewhere in the country.[141] In contrast to other states, Alabama has never used the Clean Water State Revolving Fund to support onsite sanitation needs,[142] despite the obvious and widespread need.[143]

---

[139] U.S. EPA, *2019 Annual Report: Building the Project Pipeline, Clean Water State Revolving Fund* 3 (Sept. 2020), https://bit.ly/3jVVipS.

[140] EPA, *Access to a Treatment Works*, supra n.24, at 9.

[141] U.S. EPA, *Clean Water State Revolving Fund Programs, 2018 Annual Report, Funding Water Quality Solutions: Expanding the CWSRF* 18 (Apr. 2019), https://bit.ly/3vEXTXS.

[142] EPA, *Clean Water NIMS Data Report*, supra n.119 (row 162, pages 26-29, columns 1988 to 2021). ADEM did announce plans to support sewer system rehabilitation in the Town of Hayneville in its 2022 Bipartisan Infrastructure Law Intended Use Plan. ADEM, *CWSRF BIL Intended Use Plan, Fiscal Year 2022*, supra n.106, Att. 1 at 1, Att. 2 at 2. The decrepit sewer system in Hayneville has exposed residents to raw sewage backups and overflows for years. The sewer rehabilitation in Hayneville is an important project that, if competently performed, will reduce or eliminate residents' exposure to raw sewage. But it is not an onsite sanitation or decentralized wastewater system project. In Hayneville's project application, it did not claim any points for an onsite sanitation component. *See* Town of Hayneville, *Form 340: Clean Water State Revolving Fund Preapplication* 3 (Jan. 28, 2022), https://bit.ly/3Itiupt. The rebuilt system will rely on septic tanks with effluent pumps that connect to sewer mains, and those tanks will be operated and maintained by the Town of Hayneville and not individual residents. *See* Town of Hayneville, *Preliminary Engineering Report* 3 (Apr. 26, 2022), https://bit.ly/3id6UUH.

[143] Last year, the Alabama legislature made a one-time appropriation of "up to" $5 million from American Rescue Plan Act funds to provide "grants to install clustered decentralized wastewater system demonstration utilizations . . . in the Alabama Black Belt areas of low population density, rural [poverty], and/or soils with poor perc characteristics, where there is a finding of discharge of raw sewage onto the ground due to the utilization of straight pipes, failing septic systems, or similar circumstances." Memorandum of Agreement between the State of Alabama Department of Finance and the Alabama Department of Environmental Management for the Distribution of Coronavirus State Fiscal Recovery Funds 2, 9 (March 2022), https://bit.ly/3IlpdBx. ADEM did not disburse this funding through the Clean Water State Revolving Fund, and this is not a recurring or multi-year appropriation.

### B.  Alabama's administration of the Clean Water State Revolving Fund causes disproportionate harm to Black residents

ADEM's failure to support onsite sanitation needs through the Clean Water State Revolving Fund disproportionately harms Black residents of Alabama.

As noted above, there is incomplete information on onsite sanitation system failure and the use of straight pipes in Alabama (in significant part because of the state's historic indifference to this problem and punitive enforcement of state laws).[144] But all existing data shows that Black residents are disproportionately burdened by lack of sanitation access. In a survey in Hale County—more than 57 percent Black[145]—65 percent of unsewered homes lacked permitted onsite systems.[146] In a survey in Wilcox County—more than 70 percent Black[147]—90 percent of unsewered homes relied on straight pipes or other unpermitted sewage system.[148] And in Lowndes County—more than 72 percent Black[149]—40 to 90 percent of households have inadequate or no onsite sanitation.[150]

Black Alabama residents are almost four times as likely as white residents to live in the Black Belt.[151] Problems with sanitation access are especially acute in the Black Belt, where many homes must rely on onsite sanitation systems. The region's impermeable soil is not suitable for conventional onsite sanitation,[152] and systems that are engineered to function better in low permeable soils cost much more money.[153] Most counties in the Black Belt also have high rates of poverty compared to other Alabama counties, and thus many of the region's residents are simply unable to afford functioning onsite sanitation on their own.[154] The result is rampant onsite sanitation system failure and widespread straight pipe use throughout the Black Belt, with accompanying harms to people's health, the environment, and quality of life.

---

[144] Flowers, *Waste*, supra n.11, at 19-20; ACRE, *Flushed and Forgotten*, supra n.22, at 5, 28-29; U.N. Human Rights, *Statement on Visit to the USA*, supra n.23, at ¶ 44.

[145] U.S. Census Bureau, *QuickFacts, Hale County, Alabama*, https://bit.ly/3RjpLe7.

[146] EPA, *Surface Discharge of Raw Wastewater*, supra n.27, at 35-36.

[147] U.S. Census Bureau, *QuickFacts, Wilcox County, Alabama*, https://bit.ly/3Hmpm65.

[148] EPA, *Surface Discharge of Raw Wastewater*, supra n.27, at 31.

[149] U.S. Census Bureau, *QuickFacts, Lowndes County, Alabama*, https://bit.ly/3wDafAb.

[150] *See* U.N. General Assembly, *Report of the Special Rapporteur*, supra n.19, at 6 ¶ 20.

[151] Probability for Black residents = 0.23; probability for white residents = 0.06. Probabilities calculated from U.S. Census Bureau's American Community Survey (ACS) 2017-2021 5-year estimates, Table B03002, https://bit.ly/3kgDUfH.

[152] He et al., *Assessing the Status of Onsite Wastewater Treatment Systems*, supra n.12, at 693, 697-99.

[153] *E.g.*, Izenberg et al., *Nocturnal Convenience*, supra n.13, at 202.

[154] *Id.* at 201, 202; Katsinas et al., *Poverty, Housing, & GDP in Alabama's Black Belt*, supra n.17, at 1-4.

The map below shows that 76 percent of Black Belt counties are characterized by both high poverty and a high percentage of people who identify as Black.[155] The Alabama counties with high rates of poverty and high percentages of people who identify as Black are concentrated in the Black Belt,[156] where roughly 90 percent of the land is unsuited to conventional onsite sanitation.[157]



---

[155] Mapped data from U.S. Census Bureau, American Community Survey (ACS) 2017-2021 5-year estimates, Tables B03002 (https://bit.ly/3XcDxkP) and S1701 (http://bit.ly/3YiJixq), created on Esri ArcGIS Pro.

[156] Of the 17 counties in the Black Belt, 13 have high rates of poverty (top third) and high percentages of people who identify as Black (top third) and are shown as deep purple on the map: Barbour, Bullock, Choctaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Russell, Sumter, and Wilcox. Two Black Belt counties, Butler and Montgomery, have medium rates of poverty (middle third) and high percentages of people who identify as Black (top third) and are shown in light purple on the map. One Black Belt county, Pike, has high rates of poverty (top third) and a medium percentage of people who identify as Black (middle third) and is shown as blue on the map. And one Black Belt county, Crenshaw, has low rates of poverty (bottom third) and a medium percentage of people who identify as Black (middle third) and is shown as pink on the map. Calculated from U.S. Census Bureau, American Community Survey (ACS) 2017-2021 5-year estimates, Tables B03002 and S1701.

[157] He et al., *Assessing the Status of Onsite Wastewater Treatment Systems*, supra n.12, at 695.

Thus, this subset of the state population—low-income or low-wealth Black residents in the Black Belt—are more likely to need financial support through the State Revolving Fund for onsite sanitation access. And the harms from inadequate onsite sanitation disproportionately undermine these residents' health, local environmental conditions, and quality of life. By thwarting use of the State Revolving Fund for onsite sanitation needs, ADEM and the State of Alabama not only perpetuate these harms but deny Black residents an equal opportunity to compete for federal funding, in violation of Title VI.[158]

## VI.    Conclusion

Complainants respectfully request that EPA accept this complaint and investigate the State of Alabama and ADEM's violations of Title VI and EPA's implementing regulations. Complainants further request that the State of Alabama and ADEM be brought into compliance by requiring them to:

1.  Allow disbursement of State Revolving Fund money to eligible nonprofit organizations, individuals, homeowners' associations, and other entities for onsite sanitation needs, as authorized by federal law;
2.  Amend the state's priority ranking system, after public notice and comment, to eliminate the current handicap for onsite sanitation projects and to prioritize projects based on the applicant's financial need;
3.  Provide State Revolving Fund awards through fully forgivable loans to the maximum extent allowed by federal law, and direct those subsidized awards to communities with the greatest financial need;
4.  Develop a comprehensive, written outreach plan, after public notice and comment, to promote state-wide awareness of the availability of State Revolving Fund grants and loans for onsite sanitation projects, and conduct outreach to disadvantaged and historically marginalized communities in compliance with that plan;
5.  Adopt alternative financing mechanisms to allow State Revolving Fund money to reach individual residents with onsite sanitation needs to the greatest possible extent.

EPA's guiding principles for implementing Title VI are relevant here: All persons, regardless of race, are entitled to a safe and healthful environment. Strong civil rights enforcement is essential. And enforcement of civil rights and environmental laws can be achieved together.[159]

---

[158] The potential availability of other funding sources for onsite sanitation needs, including for example through USDA, does not excuse discriminatory administration of the Clean Water State Revolving Fund. And the Clean Water State Revolving Fund is "the largest source of federal funding" for wastewater infrastructure projects in the country. U.S. EPA, *Utilization of Additional Subsidization Authority in the Clean Water and Drinking Water State Revolving Fund Programs, Report to Congress* 2 (Apr. 2014), https://bit.ly/3HiXKP8.

[159] *See* 65 Fed. Reg. at 39,669. Note that improved funding availability for onsite sanitation systems is only one step—but an important and meaningful step—towards an ultimately just solution to the problem of sanitation inequity in Alabama. Other components of the problem include the state's failure to require warranties against manufacturing and installation defects for onsite systems; inadequate climate resilience policies; discriminatory enforcement of state laws governing onsite sanitation; insufficient capacity to treat septage; and poorly managed, outdated centralized wastewater treatment facilities in some areas.

We appreciate your prompt consideration of this complaint.

Respectfully,

*/s/ Micah West*

Micah West
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36130
micah.west@splcenter.org
334-314-8976
For Complainants ███████ and NRDC



*/s/ Aaron Colangelo*

Aaron Colangelo
Sarah Tallman
Dr. Stacy Woods
Rebecca Hammer
Kimberly Leefatt
Alyssa Brown
Natural Resources Defense Council
acolangelo@nrdc.org
stallman@nrdc.org
swoods@nrdc.org
rhammer@nrdc.org
kleefatt@nrdc.org
alyssabrown@nrdc.org

cc:    JuanCarlos M. Hunt, Director, EPA Office of Civil Rights