IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **THE STATE OF LOUISIANA,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 2:23-cv-00692-JDC-KK** |
| | § | |
| **U.S. ENVIRONMENTAL** | § | |
| **PROTECTION AGENCY,** *et al.*, | § | |
| **Defendants.** | § | |


*AMICUS CURIAE* BRIEF OF
THE AMERICAN CIVIL RIGHTS PROJECT AND
THE HAMILTON LINCOLN LAW INSTITUTE
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND SUPPORT OF SUMMARY JUDGMENT FOR PLAINTIFF UNDER FED. R.
<u>CIV. P. 56(F)</u>

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

INTEREST OF AMICI CURAIE ...................................................................................... viii

SUMMARY OF ARGUMENT .............................................................................................. 2

ARGUMENT ......................................................................................................................... 4

    I.  The Regulation is Not and Cannot Constitutionally Be a Catch-All, All-Purpose
      Disparate-Impact Regulation ..................................................................................... 4

    A. The Regulation is Not a Disparate-Impact Regulation ............................................... 5

    B. The Regulation Could Not Constitutionally Be a Catch-All, All-Purpose Disparate-
      Impact Regulation .................................................................................................... 7

        1. Constitutional Law Establishes the Difference Between Enforcing a Rule and
          Altering its Meaning, Providing Guidance on the Proper Scope of Title VI
          Regulations ........................................................................................................ 8

        2. If the Regulation Prohibited Disparate Impacts as a General Matter, the EPA
          Lacked Power to Issue It .................................................................................... 9

        3. Consistency of Analysis with Supreme Court Jurisprudence ................................ 12

        a. *Guardians* Barely Supports EPA's Position .......................................................... 12

        b. Post-*Guardians* Development Guts EPA's Preferred Reading of *Guardians'*
          Dicta .................................................................................................................. 12

    C. The Canon of Constitutional Avoidance Dictates That the Court Should Reject the
      EPA's New Interpretation and Read the Regulations Not to Be Catch-All, All-
      Purpose Disparate-Impact Regulations ..................................................................... 18

    D. If the Court Defers to the EPA on the Regulation's Meaning, It Must Declare the
      Regulation Unconstitutional ..................................................................................... 19

    II.  EPA's Timing Extrapolation Contradicts Itself ...................................................... 19

    A. The EPA's Current Interpretation of the Regulation and the Regulation Itself are Not
      Co-Extensive .......................................................................................................... 20

B. Claims for Constitutional Harms are Litigable When They Arise, Whether or Not Caused by Nominal Reliance on an Existing Regulation ........................................... 20

C. The EPA's Inconsistent and Contradictory Positions Bar Challenge to the Regulation's Propriety ............................................................................................... 21

III. The Administration Seeks to Evade Judicial Review of its "Whole of Government" Misdeployment of Disparate-Impact Analysis (of Which the EPA's Reinterpretation of the Regulation is a Part) .................................................................................... 22

A. The "Whole of Government" Misdeployment of Disparate-Impact Analysis Has Vast Scope ................................................................................................................... 22

B. The Federal Government Has Repeatedly Evaded Litigation Over the Propriety of Disparate-Impact Enforcement of Title VI .................................................. 24

C. The Court Must Reject the Administration's Gamesmanship ................................... 25

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

### CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) .......................................................................................... 19

*Alexander v. Choate*,
469 U.S. 287 (1985) ............................................................................................ 8

*Alexander v. Sandoval*,
532 U.S. 275 (2011) .......................................................................... 8, 10, 13, 14

*Bailey v. United States*,
508 F.3d 736 (5th Cir. 2007).............................................................................. 20

*Board of Trustees of the University of Alabama v. Garrett*,
531 U.S. 356 (2001) ............................................................................................ 9

*B.R. v. Garland*,
26 F.4th 827 (9th Cir. 2022)............................................................................... 18

*Catholic Bishop of Chicago*,
440 U.S. 490 (1979) .......................................................................................... 18

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ........................................................................................ 8, 9

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988) .......................................................................................... 18

*Employment Division v. Smith*,
494 U.S. 872 (1990) ............................................................................................ 8

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013) .......................................................................................... 19

*Gartrell v. Gaylor*,
981 F.2d 254 (5th Cir. 1993).............................................................................. 20

*Gomez v. United States*,
490 U.S. 858 (1989) .......................................................................................... 18

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................................ 8

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) .............................................................................. 19

*Guardians Ass'n. v. Civil Serv. Comm'n of New York City*,
  463 U.S. 582 (1983) ............................................. 8, 12, 13, 14, 17

*Lau v. Nichols*,
  414 U.S. 563 (1974) ...................................................................... 13, 14

*Nat'l Mining Ass'n v. Kempthorne*,
  512 F.3d 702 (D.C. Cir. 2008) ........................................................ 18

*N.L.R.B. v. Catholic Bishop of Chicago*,
  440 U.S. 490 (1979) ........................................................................................

*Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Personnel of Tex., Inc.*
  343 F.3d 355 (5th Cir. 2003) ........................................................... 12

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ................................................................................ 8

*Rep. Nat'l Comm. v. FEC*,
  316 U.S. App. D.C. 139 (D.C. Cir. 1996) ..................................... 18

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) .............................................................................. 18

*Rust v. Sullivan*,
  500 U.S. 224 (1991) .............................................................................. 18

*Students for Fair Admissions Inc. v. President & Fellows of Harvard College*,
  143 S.Ct. 2141, 2156, n. 2 (2023) ................................... 5, 8, 19

*United States v. CITGO Petroleum Corp.*,
  801 F.3d 477 (5th Cir. 2015) ........................................................ 18

*United States v. Courtney*,
  463 F.3d 333 (5th Cir. 2006) ........................................................... 12

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ................................................................................ 8

*West Virginia v. EPA*,
    142 S. Ct. 2587, 2022 U.S. LEXIS 3268 (2022)................................... 7, 13, 14, 15, 16, 17

## STATUTES AND REGULATIONS

40 C.F.R. § 7.35 ................................................................................................... 2, 4

Fed. Reg. Vol. 38, No. 128 (Jul. 5, 1973), p. 17969, 7.4(b)(2)................................................. 4

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 24 ............................................ *passim*

## OTHER AUTHORITIES

Linda Brown, (May 19, 2021), Biography ............................................................ 20

Michael Casey,
    *Education Dep't Opens Investigation into Harvard's Legacy Admissions*,
    AP (Jul. 25, 2023) ............................................................................................ 23

Comment on Dep't of Ed.'s Potential Guidance on Nondiscriminatory Administration of
    School Discipline, The ACR Project (Jul. 23, 2021) ....................................... 24

*EPA Nominee Regan Clears Senate Committee, Appears Headed for an Easy Confirmation*,
    *The News and Observer* (Feb. 9, 2021)............................................................ 20

Erin Fitzgerald,
    *EGLE, EPA Retreat from Civil Rights Agreement with Flint Groups*,
    Earthjustice (Aug. 10, 2023) ............................................................................ 24

Gail Heriot,
    *Title VII Disparate Impact Liability Makes Almost Everything Presumptively Illegal*,
    14 NYU J.L. & LIBERTY 1 (2020) .................................................................... 24

Gail Heriot and Alison Somin,
    The Dept. of Education's Obama-Era Initiative on Racial Disparities in School Discipline:
    Wrong for Students and Teachers, Wrong on the Law,
    22 TEX. REV. L. & POLITICS 471 (2018)......................................................... 5, 10

Guiding Principles for Creating Safe, Inclusive, Supportive, and Fair School Climates,
    Dep't of Ed., (Mar. 24, 2023)........................................................................... 24

Albert Huang, Environmental Justice and Title VI of the Civil Rights Act: A Critical
    Crossroads, American Bar Association (Mar. 1, 2012) .................................... 11

Interim Resolution Agreement Between the U.S. Dep't of Just. and the Dep't of HHS and the
    Ala. Dep't of Pub. Health, Dep't of Just. No. 171-3-14;
    HHS Office of Civil Rights No. 22-451932 ......................................................................... 23

Memorandum of Agreement Between the United States of America and the Liberty County
    Sheriff's Office, Dep't of Just. No. 171-19-24 ................................................................. 23

Plato & Allan Bloom, The Republic (2016) .......................................................................... 20

Request for Information Regarding Nondiscriminatory Administration of School
    Discipline—Office of Civil Rights
    (Docket ID ED-2021-OCR-0068), (Fed. Reg. Vol. 86, No. 108, pp. 30449-30453) ......... 23

Resource on Confronting Racial Discrimination in Student Discipline,
    Dep't of Ed.'s OCR and DOJ's Civil Rights Division (May 2023) .................................. 24

U.S.C.C.R. Report: Environmental Justice: Examining the Environmental Protection
    Agency's Compliance and Enforcement of Title VI and Executive Order 12,898 (Sep.
    2016) .................................................................................................................................... 16

## INTEREST OF *AMICI CURAIE*

The American Civil Rights Project (the "<u>ACR Project</u>") is a public-interest law firm, dedicated to protecting and where necessary restoring the equality of all Americans before the law.

Hamilton Lincoln Law Institute ("<u>HLLI</u>" and, with the ACR Project, the "<u>Amici</u>") is a public-interest law firm dedicated to protecting free markets, free speech, limited government, and separation of powers, and against regulatory abuse and rent-seeking. Its subunit, the Center for Class Action Fairness represents class members *pro bono* in class actions where class counsel employs unfair class-action procedures to benefit themselves at the expense of the class.

The Amici have invested substantial time and resources investigating the confluence of American non-discrimination statutes and the U.S. Constitution with other substantive areas of law. The Amici believe their resulting expertise will benefit the Court in its consideration of this case.

The American Civil Rights Project (the "ACR Project") and the Hamilton Lincoln Law Institute ("HLLI" and, with the ACR Project, the "Amici") respectfully submit this *Amici Curiae* brief in support of the State's Motion for Preliminary Injunction (the "Motion") filed by the State of Louisiana ("Louisiana") and in opposition to the Defendants' Cross-Motion to Dismiss or for Summary Judgment.[1]

## SUMMARY OF ARGUMENT

In this litigation, the U.S. Environmental Protection Agency (the "EPA") argues that its Title VI regulation from the early 1970s (as amended, the "Regulation")[2] has always been a catch-all, all-purpose, disparate-impact regulation, forbidding the EPA's funding recipients from making decisions that have unjustified, racially disparate impacts. It argues that its dismissal of its investigations into whether a pair of Louisiana's permitting decisions had such unjustified racially disparate impacts, and so allegedly violated the Regulation, moots Louisiana's challenge to the EPA's otherwise systematic national application of its current interpretation of the Regulation. It insists that any argument to the contrary comes fifty (50) years too late and conflicts with Supreme Court precedent.

The EPA misstates the content of the Regulation and the state of substantive law. The Regulation's text and modern constitutional law show that it is not and could not constitutionally be a catch-all, all-purpose, disparate-impact regulation. The Court should apply the canon of constitutional avoidance to refuse to so read it or hold that the Regulation unconstitutionally exceeds the EPA's power.

The EPA's timing argument belies itself. It conflates the EPA's *current interpretation* of the Regulation with the Regulation itself. It wrongly extrapolates from

---

[1]   Dkt. 29 at p. 5 (the "EPA Cross-Motion").
[2]   40 C.F.R. § 7.35.

the Administrative Procedures Act's process for challenging new rules a prohibition against litigating new harms from new interpretations of preexisting rules. It advances that extrapolation, while both arguing for the sufficiency of raising constitutional concerns as defenses to agency enforcement actions and admitting that the EPA has *never* brought such an enforcement action to enforce the Regulation against *anyone*.

The EPA advances its substantively wrong arguments in strategic bad faith. Previously, for decades, the EPA contended that policing the disparate impacts of nondiscriminatory environmental decisions would run contrary to its statutory mandate, which is to improve the environmental quality of America, not to reallocate environmental risks among Americans. It eventually entertained the notion that such policing *could* be proper, but never, over decades, found *any* policy with a disparate impact not to be justified. Only over the last three years has the EPA redirected its decision-making processes to focus on avoiding (select) racially disparate impacts of otherwise proper environmental decisions. EPA took these steps as part of the current administration's concerted "whole of government" pursuit of so-called "equity," a wide-scale, multi-agency reinterpretation of Title VI's regulations to *compel* race-based decisions producing racially balanced results. Now that Louisiana has challenged the propriety of the EPA's actions, the EPA backtracked, shutting down its related investigations, claiming that despite its reinterpretation of the Regulation, there is nothing new here, and denying that its interpretation is subject to judicial review. The Court cannot allow the EPA to continue to pursue illegal "enforcement" of its reinterpretation of the Regulation against everyone else, while hiding the ball whenever that illegal enforcement is challenged.

The Court should grant summary judgment to Louisiana, both because the EPA is wrong on the law and because the EPA has engaged in bad-faith gamesmanship to try to avoid judicial scrutiny of how very wrong on the law it is.

## ARGUMENT

### I.   THE REGULATION IS NOT AND CANNOT CONSTITUTIONALLY BE A CATCH-ALL, ALL-PURPOSE DISPARATE-IMPACT REGULATION

In relevant part, the Regulation provides that:

> A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, national origin, or sex.[3]

EPA contends this is a "disparate-impact regulation[ ]" whose "discriminatory-effect provisions have in substance remained unchanged for five decades."

This language has remained substantially similar with regard to Title VI's subject matter since 1973.[4] But that 50-year-old language establishes that *the Regulation does*

---

[3]   40 C.F.R. § 7.35(b). § 7.35(c) more specifically applies to recipients' "cho[ice of] a site or location of a facility[.]" As the re-permitting decisions that triggered this litigation involved existing facilities, they involved no choice of a site. § 7.35(c)'s interpretation otherwise parallels § 7.35(b)'s.

[4]   Fed. Reg. Vol. 38, No. 128 (Jul. 5, 1973), p. 17969, 7.4(b)(2) ("A recipient … may not … utilize criteria or methods of administration which have or may have the effect of subjecting individuals to discrimination because of race, color, or national origin, or which have or may have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, or national origin."). The addition of "sex" was untethered to Title VI or to any other general legislation. It began in 1974 as a separate regulation enforcing the Clean Water Act's prohibition on sex discrimination. To reduce duplication, the EPA combined the two rules in 1984. EPA's 1984 streamlining broadened its remit to police sex discrimination beyond the Clean Water Act without any Congressional authorization.

*not* impose disparate-impact liability.[5] If it did, the Court would need to confront the constitutional impossibility of the EPA having authority to transform Title VI, in all its EPA applications, from the disparate-treatment statute the Supreme Court has ruled it to be into a disparate-impact regime through a single, blanket rulemaking.

The Court need not take that step. The EPA is wrong about the Regulation's meaning, so the Court need not invalidate it. Under the canon of constitutional avoidance, the Court may instead rule that the Regulation authorizes no disparate-impact analysis.

### A.      The Regulation is Not a Disparate-Impact Regulation

The Regulation includes two prohibitions. They bar recipients from steps: (1) "which have the effect of subjecting individuals to discrimination because of" their ancestry; and (2) which "have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race."

The first prohibition doesn't bar disparate impacts. Its bar on "subjecting individuals to discrimination because of" their ancestry parallels Title VI's language, which the Supreme Court has interpreted to prohibit only intentional discrimination.[6] The phrase "which have the effect" changes nothing; rather than obliterating the Regulation's intent element, this language establishes that recipients cannot use indirect or pretextual methods to advance *actual* discrimination. Intent remains the central component that must be proven to trigger the bar's application.

---

[5]    The analysis below draws heavily on Gail Heriot and Alison Somin's analysis of the parallel regulations of DOJ and the U.S. Department of Education ("DOE"). Gail Heriot and Alison Somin, *The Dept. of Education's Obama-Era Initiative on Racial Disparities in School Discipline: Wrong for Students and Teachers, Wrong on the Law*, 22 TEX. REV. L. & POLITICS 471, 548-556 (2018) (also available on SSRN at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3104221).

[6]    *Students for Fair Admissions Inc. v. President & Fellows of Harvard College*, 143 S.Ct. 2141, 2156, n. 2 (2023) ("*SFFA*").

The second prohibition likewise does not bar unjustified disparate impacts. Its bar on acts that "have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race" conspicuously avoids the words "discrimination" "because of race," which the Supreme Court has held to require discriminatory intent. Still, it does not look for disparate impacts by comparing a policy's effects on different populations or invite consideration of any justifications for policies having them. It imposes an absolute, higher standard, invalidating recipient steps *defeating* or *substantially impairing* the accomplishment of program objectives for whole classes of "individual*s* of a particular race."[7]

The difference is material in the permitting decisions Louisiana makes in enforcing the Clean Air Act. A particular permit could have a disparate impact on some members of a race living close to a facility. No permit could possibly *defeat* or *substantially impair* the accomplishment of the Clean Air Act's objectives for the aggregated set of "individual*s* of a[ny] particular race," nearly all of whom definitionally *do not* live close by: all Louisianans of all races who do not live close by receive all the same benefits from Louisiana's permitting decisions as do all Louisianans of other races or ethnicities living elsewhere. No permitting decision could possibly "defeat" or "substantially impair" the purposes of the Clean Air Act for any statewide racial group.

The Regulations simply do not say what the EPA contends. They neither authorize, nor require disparate-impact analysis. They do not ask whether any policy with a

---

[7]    As all individuals are of at least one "particular race," the plural "individual*s*" must indicate that this language looks for impacts on whole sets of individual*s*, rather than on any individual.

disparate impact is "unjustified." They focus on different matters entirely: (a) the intent of recipients; and (b) the sweeping impact of policies on whole racial groups.

### B.     The Regulation Could Not Constitutionally Be a Catch-All, All-Purpose Disparate-Impact Regulation

Section 602 of Title VI authorizes agencies to implement § 601's prohibition on intentional racial discrimination. The EPA may, in appropriate circumstances, use it to impose duties on regulated entities beyond those of Title VI itself – no one doubts that the EPA could require recipients to report information it needs to carry out its mandate. That *does not* authorize the EPA to issue substantive, prophylactic rules imposing a disparate-impact standard, which instead of enforcing Title VI, would rewrite it.

Title VI "authorized and directed" agencies "to effectuate" its prohibition on racial discrimination in federally-funded programs.[8] It did not authorize them to expand Title VI's reach for its own sake. Potentially, on a showing that no evidence suggests is possible in the context of Clean Air Act permitting decisions, the EPA could craft a disparate-impact regulation applicable *solely* to some narrow portion of its programming.[9] But no regulation applying across the entirety of the EPA's programs could be sufficiently congruent and proportional to a demonstrated species of intentional discrimination to qualify as constitutional. Modern constitutional jurisprudence leads to the same conclusion: the EPA cannot transform Title VI into a different kind of statute through issuance of a blanket, catch-all, all-purpose regulation.[10]

---

[8]     Civil Rights Act of 1964, Pub. L. No. 88-352, § 602, 78 Stat. 241, 252.

[9]     *See* Section I.B.1-I.B.2, below.

[10]    *E.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2022 U.S. LEXIS 3268 (2022).

1.   **Constitutional Law Establishes the Difference Between Enforcing a Rule and Altering its Meaning, Providing Guidance on the Proper Scope of Title VI Regulations**

Constitutional law provides an analogical basis to gauge how far afield agencies can go to enforce Title VI. The Fourteenth Amendment has both substantive requirements (Section 1) and an enforcement provision that allows Congress to enforce the amendment (Section 5). The Supreme Court reads the latter to impose limits on Congress's use of this power. When Congress disagreed with a Supreme Court ruling interpretating the free exercise clause's application against a state, Congress passed legislation (nominally using its enforcement power from Section 5 of the Fourteenth Amendment) to overrule it. The Supreme Court rejected Congress's effort – "Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation."[11]

Similarly, Title VI grants agencies authority to "effectuate," not to redefine, Title VI. The Supreme Court long ago determined that Title VI bars only intentional discrimination, paralleling the free-exercise clause's intent requirement.[12, 13] *Alexander v. Sandoval* expressly required the same intent to discriminate for Title VI violations.[14]

Administrative agencies – as delegees of Congressional authority – stand parallel to Congress in its role as the American people's Constitutional delegee of legislative

---

[11]   *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).

[12]   *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) (requiring intent as an element of an equal-protection violation); *SFFA*, 143 S.Ct. at 2156 n.2 (citing *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003) (applying the equal protection clause's standard for states and their subdivisions to federal funding recipients in assessing Title VI violations)).

[13]   *Employment Division v. Smith*, 494 U.S. 872 (1990) (requiring intent for a free-exercise violation).

[14]   532 U.S. 275, 280-281 (2011) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Guardians Ass'n. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582 (1983); and *Alexander v. Choate*, 469 U.S. 287 (1985)).

authority. Just as *City of Boerne* limited Congress to "enforcing" what the Constitution already protects, Title VI gives agencies the responsibility for "effectuat[ing] the provisions of section 2000d of [Title VI]," not for broadening them. The EPA's regulatory powers under Title VI do not include a power to change Title VI's standard from intentional discrimination to disparate impact, as a blanket matter.

### 2. If the Regulation Prohibited Disparate Impacts as a General Matter, the EPA Lacked Power to Issue It

In analyzing the Fourteenth Amendment's enforcement provision, the Court held that any enforcement measures must be *congruent* and *proportional* to actual Fourteenth Amendment violations Congress sought to remedy.[15] The congruence and proportionality test applies beyond the free-exercise clause context. In *Board of Trustees of the University of Alabama v. Garrett*, the Supreme Court employed it to consider the proper scope of the Americans with Disabilities Act.[16] The Court held that the ADA's requirement of reasonable accommodations was not a valid exercise of Congress's Fourteenth Amendment, Section 5 power,[17] because the equal protection clause is violated only when a state unreasonably treats a disabled person differently from a nondisabled person, while failing to accommodate a disabled person is not in itself a violation of the equal protection clause.[18] Requiring accommodations conferred a benefit rather than providing a congruent, proportional remedy for a denial of equal protection.

In *City of Boerne* and *Garrett*, the Supreme Court made clear that Section 5 *only* authorizes legislation that is congruent and proportional to a Section 1 injury it prevents

---

[15]   *City of Boerne*, 521 U.S. at 520, 530–32.
[16]   531 U.S. 356 (2001).
[17]   *Id.* at 374.
[18]   *Id.* at 367.

or remedies. Congress's authority to promulgate preventive or remedial legislation could extend beyond the prohibitions of Section 1, *only* when Congress's aim was to prevent or remedy actual Section 1 violations.

Similarly, in *Alexander v. Sandoval*, the Supreme Court acknowledged that agencies *might* have the power to issue regulations *somewhat* beyond Title VI's prohibition of intentional discrimination, if only when aimed at rooting out intentional Title VI violations. Any valid, Title VI disparate-impact regulation must be congruent and proportional to an actual, specific kind of Title-VI injury it seeks to prevent or remedy.

A hypothetical offered by U.S. Civil Rights Commissioner Gail Heriot and Alison Somin clarifies the limits of the resulting administrative power to impose disparate-impact liability.[19] They suggest that, in some future, the DOE learns that many selective colleges give preferences to students who play lacrosse (a sport their hypothetical administrators might believe to be more often played by White athletes) as a covert method of giving preferences to Whites. There is no doubt that the DOE would be within its authority under Title VI to investigate and eventually withdraw federal funds from colleges so intentionally discriminating through a facially neutral policy. No resort to disparate-impact liability would be necessary given the recipient's discriminatory intent.

Heriot and Somin then expand their hypothetical to imagine that: (a) some colleges prefer recruiting and funding lacrosse programs to other athletic teams as a subterfuge for racial discrimination; while (b) other colleges do so because they want a strong lacrosse program for nonracial reasons; but (c) DOE has trouble figuring out which are which. With sufficient fact-finding on how common such a subterfuge was and how material the

---

[19]  *Supra*, n. 6.

violation, DOE could potentially justify issuing a disparate-impact regulation specifically prohibiting federal-funding recipients from enshrining preferences for lacrosse programs. Any such valid use of a disparate-impact trigger would necessarily be targeted, narrow, and supported by specific fact-finding. No set of facts established concerning college lacrosse programs could justify a broad, meta-regulation prohibiting *all* facially neutral, evenhandedly administered policies that yield disparate impacts, until and unless those policies are "justified" to the DOE or a court. Such a catch-all, all-purpose regulation would change the statute up-to-everywhere, at the discretion of a federal agency.

At most, existing law allows agencies to craft situationally specific regulations, making use of disparate-impact triggers for defunding to deal with fields where intentional discrimination has been established to be systemically underway. There is *no* evidence of wide-spread, intentional discrimination based on race in states' environmental protection decisions. Indeed, we have identified only *one* (1) instance since the EPA's 1970 creation where it has found *any* intentional racial discrimination.[20] Without *any* evidence of a widespread pattern of intentional discrimination, prohibiting disparate impacts (whether "justified" or not) as a blanket matter *could not meet* the congruence and proportionality test. If the Regulation is, as the EPA would have it, a disparate-impact regulation, EPA lacked the power to issue it.

---

[20]   Albert Huang, *Environmental Justice and Title VI of the Civil Rights Act: A Critical Crossroads*, American Bar Association (Mar. 1, 2012) (https://www.americanbar.org/groups/environment_energy_resources/publications/trends/2011_12/march_april/environmental_justice_title_vi_civil_rights_act/#:~:text=On%20April%2022%2C%202011%2C%20EPA,facie%20violation%20of%20Title%20VI.   (last visited, Sep. 10, 2023) ("On April 22, 2011, EPA … for the first time in EPA's history … made a preliminary finding that the evidence … demonstrated a *prima facie* violation of Title VI."); *Title VI – Settlements and Decisions* (https://19january2017snapshot.epa.gov/ocr/title-vi-settlements-and-decisions_.html) (last visited, Sep. 10, 2023) (identifying *no* additional settlements or decisions including a finding of intentional racial discrimination).

### 3.    Consistency of Analysis with Supreme Court Jurisprudence

While the EPA insists that such a ruling would conflict with *Guardians*' binding precedent, the agency's analysis is deeply flawed and ignores major developments in the intervening constitutional jurisprudence. The EPA Cross-Motion reads *Guardians* to accept the authority of agencies to adopt disparate-impact Title VI regulations.[21] While the EPA Cross-Motion's arguments are consistent with dicta found in the *Guardians* opinions, developments in constitutional law in the intervening four (4) decades have so undermined *Guardians* as to render that dicta no longer a reliable authority on the matter.

### a.    *Guardians* Barely Supports EPA's Position

Even if *Guardians* were still good law, it cannot bear the weight that the EPA places upon it. In *Guardians*, a deeply divided Court split across six opinions in assessing whether private plaintiffs pursuing claims under Title VI or its regulations could recover compensatory damages without showing intentional discrimination.[22] The EPA emphasizes that five justices would have ruled that the relevant regulations could legally be disparate-impact regulations.[23] And, indeed, while "[s]even Members of the Court agree[d] that a violation of the statute itself requires proof of discriminatory intent[,]"[24] three Justices both accepted this fact and contended that agencies had the power to impose disparate-impact liability through regulations.[25] Both Justice White and Justice Marshall denied that Title VI only prohibited intentional discrimination, while stating that

---

[21]   *E.g.*, EPA Cross-Motion at 40.

[22]   "It is well established that when we are confronted with a plurality opinion, we 'look to that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006), quoting *Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Personnel of Tex., Inc.* 343 F.3d 355, 358 (5th Cir. 2003). The controlling holding is the narrowest rationale essential to the result across opinions. *See Pedcor Mgmt. Co.,* 343 F.3d at 358-59.

[23]   *E.g.*, *Id.*

[24]   *Guardians Ass'n*, 463 U.S. at 608 n. 1 (Powell, J., concurring).

[25]   *Id.* at 642-45 (Stevens, J., concurring with Brennan and Blackmun, J.J.).

– if it did – "the regulations are valid" in doing so.[26] Notably, despite these five Justices agreement on this point, the Supreme Court *affirmed* the Court of Appeals' denial of any relief under Title VI or its regulations.[27] Also notably, Justice Marshall provided *no* reasoning for his administrative law contention at all, while Justice White relied for reasoning entirely on a concurrence from *Lau v. Nichols*.[28]

The EPA's read of *Guardians* thus draws entirely on dicta, supported by only a concurring opinion in *Lau* and no other substantive reasoning.

### b.   Post-*Guardians* Development Guts EPA's Preferred Reading of *Guardians*' Dicta

Later cases – specifically, *Sandoval* and *West Virginia v. EPA* – deny the *Guardians* dicta the precedential effect the EPA assigns it, leaving it powerless in the present.

Twenty-eight years after *Guardians*, because the "petitioners ha[d] not challenged the regulations[,]" the *Sandoval* court had no occasion to directly address the EPA's preferred reading of *Guardians*.[29] Still, *Sandoval* gutted the *substance* of that reading. Most directly, *Sandoval* focused on the whether a private plaintiff could *ever* enforce a Title VI regulation (whatever that regulation's content or propriety), concluding that no private plaintiff could do so.[30] More importantly for our purposes, *Sandoval* rightly concluded that "no opinion of this Court" – expressly including *Guardians* – "has **held** that" "regulations promulgated under § 602 of Title VI may validly proscribe activities

---

[26]   *Id*. at 584, n. 2 (White, J.) and 624, n. 15 (Marshall, J.).
[27]   *Id.* at 593 (White, J.).
[28]   *Id.* at 592 (White, J.) (citing 414 U.S. 563 (1974)).
[29]   *Sandoval*, 532 U.S. at 282.
[30]   *Sandoval*, 532 U.S. at 291-93 ("…it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself…. Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602.").

that have a disparate impact on racial groups, even though such activities are permissible under § 601."[31] Accordingly, for more than a decade, the Supreme Court has recognized that the EPA's reading relies on dicta. It also specifically addressed the alleged vibrancy of the *Lau* concurrence as a precedent, noting that "the five Justices who made up the majority did not [agree], and their holding is not made coextensive with the concurrence because their opinion does not expressly preclude … the concurrence's approach."[32] As the Court explained, it would be "odd" if a "concurring minority … could force the majority to address a point they found it unnecessary (and did not wish) to address."[33] *Sandoval* thus rejected the only authority on which either Justice White or Justice Marshall relied in joining Justice Stevens' *Guardians* dissent in asserting as dicta that agencies could impose disparate impact through Title VI regulations.

If *Guardians*' dicta continues to carry *any* authority post-*Sandoval*, it could do so only as an unsupported implication of the propriety of agencies enforcing disparate-impact Title VI regulations adopted to expand the reach of the underlying statute. But the Supreme Court's *West Virginia* opinion rejects *Guardians*' dicta on even that point, by adopting the "major questions" doctrine and so rejecting administrative agencies' transformation on their own authority of the regulatory regimes adopted by Congress.[34] Just as the EPA lacked the authority to transform through regulations Congress's Clean Air Act into a "Clean Power Plan," the EPA lacks the authority to transform Title VI through the Regulation into a mandate for states to license or re-permit only polluting facilities situated near demographically representative populations.

---

[31]   *Id*. at 281 (emphasis added).
[32]   *Id*. at 285 n.5.
[33]   *Id*.
[34]   *West Virginia*, 2022 U.S. LEXIS, at *38.

In *West Virginia v. EPA*, after decades of contrary agency practice, the EPA promulgated rules under a "gap-filler" provision of the Clean Air Act.[35] These rules declared carbon dioxide a pollutant and sought to regulate its production by existing coal and gas plants through a "Clean Power Plan" requiring an industry-wide shift to renewable energy sources.[36] Litigation followed, which eventually made its way before the Supreme Court.[37]

The Supreme Court resolved it by invoking the "major questions doctrine," finding "'reason to hesitate before concluding that Congress' meant to confer such authority."[38] It cautioned that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s][,]'"[39] and noted that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme."[40] It ruled that "[a]gencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line."[41] "Thus, … both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there[,]" reasoning justifying the conclusion that "[t]he agency …

---

[35] For promulgation, see *id.*, at *20; for authorizing provision's "gap-filler" status, see *id.* at *18.

[36] *Id.* at *20-*23 and *49.

[37] The way was tortured. Mid-litigation, the next administration's EPA repealed the relevant rules, based on a "conclu[sion] that the Clean Power Plan had been 'in excess of its statutory authority.'" *Id.* at *27 (internal citations omitted). Dozens of parties then sued to enjoin the repeal and dozens more intervened to defend it. *Id.* at *29. The suit the Supreme Court heard involved these challenges to the abandonment of the Clean Power Plan, rather than its adoption.

[38] *Id.* at *35 (internal citations omitted).

[39] *Id.* at *37-*38 (internal citations omitted).

[40] *Id.* at *38 (internal citations omitted).

[41] *Id.*

must point to 'clear congressional authorization' for the power it claims."[42]

The Supreme Court found no clear authorization. It held that "EPA's [view of its] authority … effected a 'fundamental revision of the statute, changing it from [one sort of] scheme of … regulation' into an entirely different kind."[43] Accordingly, it reversed the lower court rulings blocking the EPA's repeal of the Clean Power Plan rules.[44]

The parallels are legion. The EPA "initially viewed its traditional authorities as being in conflict with [any] environmental justice [or] Title VI obligations."[45] As in *West Virginia*, the EPA's reassessment of its role enforcing Title VI reflects a tidal change away from a "'contemporaneous' and long-held Executive Branch interpretation … entitled to some weight as evidence of the … original charge to an agency[.]"[46]

The Clean Power Plan rules affected "[t]he electric power sector[,]" which "is among the largest in the U.S. economy, with links to every other sector[.]"[47] The EPA's reinterpretation of the Regulation applies it to *all* the agency's actions and so to its interactions with *all* its funding recipients and *all* the American people. Definitionally, that effects a larger share of the economy than did the Clean Power Plan.

Just as the EPA's imposition of a Clean Power Plan in *West Virginia* "claim[ed] the power to resolve a matter of great 'political significance[,]'" and to "end an 'earnest and profound debate across the country[,]'"[48] its deployment of the Regulation to reshape the agency and all its decisions seeks to end debate over the placement of industrial facilities.

---

[42] *Id.*

[43] *Id.* at *44-45.

[44] *Id.* at *54.

[45] U.S.C.C.R. Report: *Environmental Justice: Examining the Environmental Protection Agency's Compliance and Enforcement of Title VI and Executive Order 12,898* (Sep. 2016), p. 15.

[46] *West Virginia*, 2022 U.S. LEXIS 3268, at *71 (Gorsuch, J., concurring).

[47] *Id.* at *68 (Roberts, C.J., majority opinion).

[48] *Id.* at *64-65 (Gorsuch, J., concurring).

The systematic threats at play in *West Virginia* are clearly implicated here as well. Justice Gorsuch's fear that executive policy reversals untethered to any new, clear Congressional action could "dash[ the] whole scheme" of Article I, rendering lawmaking "nothing more than the will of the current President, or, worse yet, the will of unelected officials barely responsive to him[,]"[49] is here an observable history. As the EPA Cross Motion notes, the last administration had all-but completed a rulemaking process intended to assure that the EPA would *not* engage in disparate-impact analysis, which this administration reversed, now newly reinterpreting the Regulation to mandate a vast expansion of the same.[50] No longer hypothetical, then, "[s]tability [has been] lost, with [the enforced interpretation] of laws changing with every new presidential administration."[51] As a result, no party can view the current deployment of the Regulation as "embody[ing] a wide social consensus and input from minority voices[;]" instead it "bear[s] the support only of the party currently in power."[52]

And, as in *West Virginia*, Title VI provides no clear congressional authorization for the EPA's reinterpretation of the Regulation. With no notice or comment, the agency's reinterpretation of the Regulation works a "fundamental revision of the statute, changing it from [one sort of] scheme of … regulation' into an entirely different kind."

To the extent that *Guardians*' dicta *ever* had any precedential value, the intervening jurisprudence makes clear that it no longer does. The Supreme Court has clearly indicated that it has never *held* the issuance of disparate-impact Title VI regulations to be proper and that no administrative agency *can* fundamentally transform America's substantive

---

49   *Id*. at *60 (Gorsuch, J., concurring).
50   EPA Cross-Motion at 23.
51   *West Virginia v. EPA*, 2022 U.S. LEXIS, at *60.
52   *Id.* at *60-*61.

law by regulation. Whether on the initial merits or because of these later developments, the EPA lacks the power to sweepingly impose disparate-impact liability, without Congress's involvement.

### C. The Canon of Constitutional Avoidance Dictates That the Court Should Reject the EPA's New Interpretation and Read the Regulations Not to Be Catch-All, All-Purpose Disparate-Impact Regulations

In *N.L.R.B. v. Catholic Bishop of Chicago*, applying the doctrine of constitutional avoidance, the Supreme Court declined to interpret a statute in a way that would require it to resolve "difficult and sensitive" constitutional questions.[53] The canon governs the interpretation of regulations as well as statutes.[54] Disparate-impact liability's constitutionality is "difficult and sensitive."[55] The EPA's conversion of Title VI into a disparate-impact regime without Congressional involvement can only be more so.

If the Regulation were a blanket, catch-all, all-purpose disparate-impact regulation, it would be unconstitutional. It would compel the EPA and the states to racially classify Americans and to incorporate racial balancing into their substantive decision-making.

---

[53]   440 U.S. 490 (1979).

[54]   *E.g.*, *Rust v. Sullivan*, 500 U.S. 224, 238 (1991) (applying canon to a regulation); *B.R. v. Garland*, 26 F.4th 827, 837 (9th Cir. 2022) (interpreting "the regulation … in the light of the canon of constitutional avoidance (to avoid potential due process violations)"); *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 483 n.6 (5th Cir. 2015) (under "the canon of constitutional avoidance… courts must 'avoid an interpretation of a [regulation] [SIC] that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.'") (citing *Gomez v. United States*, 490 U.S. 858, 864 (1989)); *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) (requiring deployment of "canon of constitutional avoidance" to challenge to a regulation, even at expense of "*Chevron* deference" when "it 'presents serious constitutional difficulties.'") (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-577 (1988) and *Rep. Nat'l Comm. v. FEC*, 316 U.S. App. D.C. 139 (D.C. Cir. 1996)).

[55]   *Catholic Bishop of Chicago*, 440 U.S. 490 (1979); *see also, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557 (2009) (Scalia, J., concurring) ("I join the Court's opinion in full, but write separately to observe that its resolution of this dispute merely postpones the evil day on which the Court will have to confront the question: Whether, or to what extent, are the disparate-impact provisions of Title VII of the Civil Rights Act of 1964 consistent with the Constitution's guarantee of equal protection? The question is not an easy one.").

Such race-based policymaking is only ever constitutional when it meets strict scrutiny.[56] If the Regulation were what the EPA contends, it plainly could not meet that standard. There is no proof or even reason to believe that Louisiana or any other state is engaged in widespread, intentional discrimination in administering environmental laws. Even if such a showing could be made in some specific context, it would be impossible for a blanket regulation—one applicable *anywhere* at the discretion of EPA—to be narrowly tailored to address that context.

No agency-wide regulation treating disparate impact alone as a violation of Title VI *can* be constitutional. The Court should reject the EPA's reading of the Regulation, in order to avoid holding the Regulation in its entirety to be unconstitutional.

> ### D.  If the Court Defers to the EPA on the Regulation's Meaning, It Must Declare the Regulation Unconstitutional

However, should the Court find that *Auer* or any other deference canon requires it to accept the EPA's current interpretation of the Regulation, the result would be clear. Title VI offers the EPA no authority to transform it into a disparate-impact regime. If the Regulation nonetheless imposes disparate-impact liability on funding recipients, it oversteps the EPA's regulatory authority and must be declared unconstitutional.

## II.  EPA's Timing Extrapolation Contradicts Itself

(a) The disparity between the Regulation and the EPA's current interpretation of the Regulation; (b) fundamental, universal principals of claim accrual; and (c) a series of the EPA's other contentions in this litigation, together, establish why its argument that this litigation comes 50 years too late cannot prevail.

---

[56]  *SFFA*, 143 S.Ct. at 2162 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995), *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003), and *Fisher v. Univ. of Tex. at Austin* (Fisher I), 570 U.S. 297, 311 (2013)).

### A.    The EPA's Current Interpretation of the Regulation and the Regulation Itself are Not Co-Extensive

As explained, above, the Regulation is not a disparate-impact regulation. Like a shadow on a cave wall,[57] the EPA's current interpretation of the Regulation is not the Regulation itself. The two have different meanings, histories, and implications. One went through notice-and-comment procedures fifty years ago; the other emerged as an administrative priority in 2021.[58] One cannot even hypothetically gauge the timeliness of a challenge to the EPA's two-year-old interpretation of the Regulation by reference to the fact that the EPA promulgated the Regulation a half century earlier.

### B.    Claims for Constitutional Harms are Litigable When They Arise, Whether or Not Caused by Nominal Reliance on an Existing Regulation

Black-letter law provides that a claim "accrues when the plaintiff is 'in possession of the critical facts that he has been hurt and who has inflicted the injury.'"[59] It is of no moment whether the specific constitutional wrong at issue arose out of a policy that had been in place for decades: when Topeka refused to allow Oliver Brown to enroll his daughter Linda in a local public school in 1950,[60] that gave rise to a new, timely constitutional claim, regardless of the fact that Kansas began segregating schools long before her birth in 1879. The age of the policy was irrelevant to the plaintiff's right to litigate new harms as they arose.

---

[57]   Plato & Allan Bloom, The Republic (2016).

[58]   The Current EPA Administrator pledged to make environmental justice central to the agency at his confirmation hearing. Brian Murphy, *EPA Nominee Regan Clears Senate Committee, Appears Headed for an Easy Confirmation*, *The News and Observer* (Feb. 9, 2021) (https://www.newsobserver.com/news/politics-government/article248975865.html).

[59]   *Bailey v. United States*, 508 F.3d 736, 740 (5th Cir. 2007) (citing *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993)).

[60]   For biographical details, see: Linda Brown, (May 19, 2021), Biography (https://www.biography.com/activist/linda-brown).

Louisiana's challenge to the EPA's current interpretation of the Regulation is no different. Because the Regulation is not a disparate-impact regulation, Louisiana possessed no knowledge of the critical facts indicating that EPA might later assert that it was or seek to compel Louisiana to create an entirely new state-regulatory structure to gauge whether otherwise proper environmental decisions might have disparate impacts on populations of different races until the events giving rise to this litigation unfolded.

### C.   The EPA's Inconsistent and Contradictory Positions Bar Challenge to the Regulation's Propriety

Nor do the EPA's related arguments against the propriety of this litigation cohere.

Taken separately, the EPA may be able to raise various colorable assertions concerning this litigation. It may be able to contend that advancing the unconstitutionality of a standard defensively, when an agency applies it against a defendant, affords a sufficient remedy. It may be able to argue that if no one has ever challenged the propriety of the Regulation over its fifty-year history, that could itself be telling. It may be able to contend that it has never enforced the Regulation against anyone, anywhere, ever.

It cannot, though, coherently maintain *all* these arguments simultaneously. The EPA cannot with a straight-face argue that a Regulation may only be attacked defensively (in litigation the agency has never brought over half a century) *and* that the failure of any defendant to defensively assert the unconstitutionality of the Regulation (as newly construed in 2021) in response to nonexistent enforcement actions during that time demonstrates the legality of the Regulation (as newly construed in 2021). Such a position denies the target of an enforcement action any opportunity to challenge the Regulation and effectively insulates the Regulation (as well as any agency "reinterpretation" of any

other sparsely deployed regulations) from judicial review.

### III. THE ADMINISTRATION SEEKS TO EVADE JUDICIAL REVIEW OF ITS "WHOLE OF GOVERNMENT" MISDEPLOYMENT OF DISPARATE-IMPACT ANALYSIS (OF WHICH THE EPA'S REINTERPRETATION OF THE REGULATION IS A PART)

#### A. The "Whole of Government" Misdeployment of Disparate-Impact Analysis Has Vast Scope

From its first day in office, the current administration has ordered federal agencies, effectively, to embed disparate-impact analysis into *all* their operational decisions. In Executive Order 13985, President Biden instructed all agencies to "assess whether underserved communities and their members face systemic barriers in accessing benefits and opportunities available pursuant to" the agencies' programs. EO 13985 specifically defined "underserved communities" as "populations sharing a particular characteristic[,]" with listed examples defined by race and ethnicity, along with "persons otherwise adversely affected by persistent poverty." These definitions embedded assessments of *all* federal grants for racially disparate impacts into the instructed conduct of *all* federal agencies. The only conceivable statutory peg for that order would be Title VI, which (as explained above), does not support it.

In February, through Executive Order 14091, President Biden more specifically required *all* federal agencies to "use their respective civil rights authorities" "to advance equity for all," including through "prevent[ing] and remedy[ing] discrimination, including … algorithmic discrimination." Again, the definitions give away the game, defining "underserved communities" by reference to EO 13985, "equity" primarily by reference to racial, ethnic, and other demographic classifications allegedly "adversely

affected by persistent poverty or inequality[,]" and "algorithmic discrimination" as when automated systems unintentionally "contribute to unjustified different treatment."

The EPA's elevation of "environmental justice" serves as a prime example, but not a lonely one, of how the agencies have complied. The Education Department spent years promising to ban (nominally under Title VI and its regulations) school funding recipients from even-handedly applying facially neutral disciplinary policies that had racially disparate impacts.[61] The Department of Justice concluded at least one investigation of a local law enforcement agency under Title VI "and its implementing regulations" based exclusively on allegations that its policies had a disparate impact.[62] Without any finding *or even allegation* of intentional discrimination, relying on the authority of its Title VI regulations, HHS forced Alabama to *halt* enforcing the state's laws against dumping untreated sewage in a predominantly Black county.[63] And just months ago, DOE loudly launched an investigation into whether Harvard's admissions preferences for legacies and donors' children – while facially race-neutral and both adopted and maintained without any intent to discriminate – violate its Title VI regulations.[64] The example of Alabama in

---

[61] Request for Information Regarding Nondiscriminatory Administration of School Discipline—Office of Civil Rights (Docket ID ED-2021-OCR-0068), (Fed. Reg. Vol. 86, No. 108, pp. 30449-30453).

[62] Memorandum of Agreement Between the United States of America and the Liberty County Sheriff's Office, Dep't of Just. No. 171-19-24 (specifically noting that the local agency "found no evidence that its officers relied upon race" in their activities and omitting any contrary finding of DOJ).

[63] Interim Resolution Agreement Between the U.S. Dep't of Just. and the Dep't of HHS and the Ala. Dep't of Pub. Health, Dep't of Just. No. 171-3-14; HHS Office of Civil Rights No. 22-451932. Unstated in the agreement, but obvious to a reader, had Alabama on its own adopted precisely the policy of non-enforcement of its sewage dumping laws in the same county, the administration could (and likely would) have challenged that policy, too, as violating its Title VI regulations through its disparate impact on the health of the same predominantly Black residents.

[64] Michael Casey, *Education Dep't Opens Investigation into Harvard's Legacy Admissions*, AP (Jul. 25, 2023).

particular illustrates the catch-22 inherent in disparate-impact analysis, which renders virtually *every* government action a presumptive violation of Title VI's regulations. [65]

**B.      The Federal Government Has Repeatedly Evaded Litigation Over the Propriety of Disparate-Impact Enforcement of Title VI**

But every time a party appears ready to contest in federal court the administration's use of disparate impact under Title VI, the administration has sought to avoid judicial review of its legality. Here, the EPA abruptly closed its investigations following Louisiana's request for injunctive relief.[66] Elsewhere, the DOE – faced with comments filed by states and public-interest groups highlighting the unconstitutionality of the teased disciplinary guidance[67] – published something radically different than promised.[68] The

---

[65]   Virtually *any* action has disparate impact within a diverse jurisdiction. Gail Heriot, *Title VII Disparate Impact Liability Makes Almost Everything Presumptively Illegal*, 14 NYU J.L. & LIBERTY 1 (2020) (documented in the Title VII context, but applying in all others). Consider EPA's investigation concerning Louisiana's re-permitting for the Denka facility based on disparate impact to "people who identify as Black" in St. John the Baptist and St. James Parishes. Dkt. 34-28 at 8. With no parish's demography perfectly matching those of the whole state, Louisiana could permit such a facility in *no* parish *without* having a disparate impact on some protected class.

It could not do so in St. Tammany Parish: that would disparately impact its disproportionately Italian population. US Census, https://data.census.gov/profile?g=050XX00US22103 (visited Oct. 5, 2023). It could not do so in New Orleans Parish: that would disparately impact its disproportionately Sicilian population. *See* Wikipedia, Italians in New Orleans, https://en.wikipedia.org/wiki/Italians_in_New_Orleans (visited Oct. 5, 2023). It could not do so in St. Martin, Vermillion, or Evangeline Parishes: that would disproportionately impact their uniquely French- and Cajun-speaking populations. *See* Wikipedia, "List of Louisiana Parishes by French-speaking population," https://en.wikipedia.org/wiki/List_of_Louisiana_parishes_by_French-speaking_population (visited Oct. 5, 2023). It could not do so in Plaquemines or Jefferson's Parishes: that would disparately impact their disproportionately Asian populations. It could not do so in Sabine or Terrebone Parishes: that would disparately impact their disproportionately Native American populations. Eight parishes have greater Black representation than does St. James, so those are presumably out as well. (Calculated using the US Census tool available at https://www.census.gov/library/stories/state-by-state/louisiana-population-change-between-census-decade.html.).

These examples are illustrative. Without a totally fantastical, enforced distribution of all Americans by race, color, and national origin group between parishes (or any other geographical unit), *no* conceivable permitting decision could *ever* satisfy the EPA's interpretation of the Regulation.

[66]   A similar pattern unfolded in Michigan. Erin Fitzgerald, *EGLE, EPA Retreat from Civil Rights Agreement with Flint Groups*, Earthjustice (Aug. 10, 2023) (https://earthjustice.org/press/2023/egle-epa-retreat-from-civil-rights-agreement-with-flint-groups).

[67]   *See, e.g.*, Comment on Dep't of Ed.'s Potential Guidance on Nondiscriminatory Administration of School Discipline, The ACR Project (Jul. 23, 2021)

only apparent exceptions have seen aligned defendants (like Liberty County) agree to the administration's shared agenda (as Harvard, presumably, will do).

### C.      The Court Must Reject the Administration's Gamesmanship

The President committed the "whole of government" from his first day in office to pursuing the interpretation of Title VI's regulations at issue in this litigation. The administration uses the hammer of investigations based on this interpretation to force actors to adopt policies Title VI does not compel (or, arguably, allow). Time and again, when faced with refusals to comply by those with the capacity to fight, the administration has sought to moot the issue and deny the courts the chance to address the legality of this day-one priority of the administration's agenda.

The Court cannot allow the EPA to continue this pattern of evasion. If the administration is going to center across the entire government an interpretation of Title VI and its regulations prescribed by the Supreme Court, this Court should require the EPA to litigate the merits and live with the consequences.

## CONCLUSION

Here, those consequences should include summary judgment for Louisiana and an injunction against any enforcement of the EPA's current interpretation of the Regulation.

---

(https://www.americancivilrightsproject.org/blog/comment-on-department-of-educations-potential-new-guidance-on-nondiscriminatory-administration-of-school-discipline/).

68  Guiding Principles for Creating Safe, Inclusive, Supportive, and Fair School Climates, Dep't of Ed., (Mar. 24, 2023) (omitting any suggestion that any system could violate Title VI unintentionally); Resource on Confronting Racial Discrimination in Student Discipline, Dep't of Ed.'s OCR and DOJ's Civil Rights Division (May 2023) (pegging DOE's authority to consider statistical data *exclusively* to its implications for intent: "While racial disparities in student discipline alone do not violate the law, ensuring compliance with Federal nondiscrimination obligations can involve examining the underlying causes of such disparities.").

Dated: October 6, 2023

Respectfully submitted.

 /s/ *Anna St. John*
Anna St. John (LBN 36034)
*Trial Attorney*
Hamilton Lincoln Law Institute
1629 K St. NW, Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

-AND-

The American Civil Rights Project
Daniel I. Morenoff
Joseph A. Bingham
P.O. Box 12207
Dallas, Texas 75225
(214) 504-1835
dan@americancivilrightsproject.org
joe@americancivilrightsproject.org

*Counsel for* Amici Curiae

## Certificate of Service

I certify that this document has been filed with the clerk of the court and served by ECF upon all counsel of record.

 /s/ *Anna St. John*
Anna St. John
*Counsel for* Amici Curiae