# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

|  |  |
|---|---|
| THE STATE OF LOUISIANA,<br><br>        Plaintiff,<br><br>   v.<br><br>U.S. ENVIRONMENTAL PROTECTION<br>AGENCY, et al.,<br><br>        Defendants. | No. 2:23-cv-00692-JDC-KK |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................1

ARGUMENT .....................................................................................................................................1

I.      LOUISIANA HAS NOT ESTABLISHED SUBJECT MATTER JURISDICTION. ............1

    A.   Plaintiff lacks Article III standing or ripeness for each claim.......................................1

    B.   Any claims for which Plaintiff once may have had standing are now moot. .............8

    C.   The *Thunder Basin* doctrine precludes jurisdiction over Counts II-VII. .....................9

    D.   Plaintiff's claims are untimely. ..................................................................................12

        1.   The reopening doctrine does not revive Plaintiff's untimely claims...................15

        2.   Plaintiff cannot evade the high bar applicable to *ultra vires* claims ....................16

II.     PLAINTIFF'S CLAIMS FAIL ON THE MERITS..............................................................17

    A.   Plaintiff's claims (Count I & II) that EPA violated the nondelegation doctrine are meritless. ...................................................................................................................17

    B.   Defendants' disparate-impact regulations are valid under Section 602.....................18

        1.   Supreme Court precedent confirms the validity of Defendants' disparate-impact regulations..........................................................................................................18

        2.   Title VI's text, legislative history, and longstanding agency construction support the regulations' validity. ...................................................................................20

        3.   Congress's subsequent ratification of Title VI's disparate-impact regulations further confirms their validity...........................................................................22

        4.   A comparision to other statutes does not change this analysis given the specific structure of Title VI. ........................................................................................22

        5.   Plaintiff's reliance on canons of construction is unavailing. .................................23

        6.   Defendants' disparate-impact regulations do not raise constitutional doubts. .................23

        7.   The major questions doctrine does not apply. .....................................................24

    C.   Consistent with the Spending Clause, Plaintiff's disparate-impact obligations under Title VI were unambiguous when its agencies accepted federal funds. .....................25

    D.   EPA's proposed terms for voluntary settlement and its guidance documents comply with Title VI and APA requirements. ...........................................................................29

III.    THE ALTERNATIVE REQUEST FOR UNIVERSAL VACATUR IS
         IMPROPER...................................................................................................................................30

CONCLUSION.................................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Paxton,*
  65 F.4th 204 (5th Cir. 2023) ............................................................................................................ 3, 6

*Adams v. Bell,*
  711 F.2d 161 (D.C. Cir. 1983) ..........................................................................................................11

*Alexander v. Choate,*
  469 U.S. 287 (1985) .................................................................................................................... 19, 23

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ...........................................................................................................................19

*All. for Fair Bd. Recruitment v. SEC,*
  --- F.4th ----, 2023 WL 6862856 (5th Cir. 2023) ............................................................................25

*All. for Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) .............................................................................................................15

*Apter v. Dep't of Health & Human Servs.,*
  80 F.4th 579 (5th Cir. 2023) ...................................................................................................... 16, 17

*Arizona v. Yellen,*
  34 F.4th 841 (9th Cir. 2022) ..............................................................................................................3

*Arlington Central School District v. Murphy,*
  548 U.S. 291 (2006) .................................................................................................................. 4, 27, 28

*Athletics, Inc. v. Dep't of Educ.,*
  639 F.3d 91 (106) ...................................................................................................................... 29, 30

*Axon Enterprises, Inc. v. FTC,*
  143 S. Ct. 890 (2023) ................................................................................................................... 2, 16

*Bank of La. v. FDIC,*
  919 F.3d 916 (5th Cir. 2019) ...................................................................................................... 11, 12

*Barnes v. Gorman,*
  536 U.S. 181 (2002) ...........................................................................................................................27

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. Dep't of Educ.,*
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................................................................10

*Bennett v. Kentucky Dep't of Educ.,*
  470 U.S. 656 (1985) ...................................................................................................................... 26, 27

*Biden v. Missouri,*
   595 U.S. 87 (2022) ............................................................................................................26

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) ......................................................................................................15

*Brnovich v. Democratic Nat'l Cmte.,*
   141 S. Ct. 2321 (2021) ......................................................................................................28

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ..........................................................................................................30

*California Trucking Ass'n v. Bonta,*
   996 F.3d 644 (9th Cir. 2021) ..............................................................................................6

*Charles v. Verhagen,*
   348 F.3d 601 (7th Cir. 2003) ............................................................................................26

*Clapper v. Amnesty Int'l, USA,*
   568 U.S. 398 (2013) ..................................................................................................2, 3, 6

*Cochran v. SEC,*
   20 F.4th 194 (5th Cir. 2021) ............................................................................................16

*Commodity Futures Trading Comm'n v. Schor,*
   478 U.S. 833 (1986) ..........................................................................................................22

*Contender Farms, L.L.P. v. USDA,*
   779 F.3d 258 (5th Cir. 2015) ....................................................................................1, 2, 5

*Crane v. Johnson,*
   783 F.3d 244 (5th Cir. 2015) ..............................................................................................8

*Ctr. for Auto Safety v. NHTSA,*
   452 F.3d 798 (D.C. Cir. 2006) ........................................................................................14

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
   596 U.S. 212 (2022) ..................................................................................................25, 28

*Danos v. Jones,*
   652 F.3d 577 (5th Cir. 2011) ............................................................................................16

*Davis v. Monroe Cnty. Bd. of Educ.,*
   526 U.S. 629 (1999) ..........................................................................................................27

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.,*
   112 F.3d 1283 (5th Cir. 1997) ..............................................................................12, 13, 14

*Equity in Athletics, Inc. v. Dep't of Educ.,*
    639 F.3d 91 (4th Cir. 2011) ...................................................................................29

*Ex Parte Young,*
    209 U.S. 123 (1908) ..............................................................................................16

*Fed. Express Corp. v. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ..............................................................................17

*Fullilove v. Klutznick,*
    448 U.S. 448 (1980) ..............................................................................................27

*Funk v. Stryker Corp.,*
    631 F.3d 777 (5th Cir. 2011) ..................................................................................5

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ..........................................................................................30

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) ..............................................................................................18

*Gruver v. La. Bd. of Supervisors,*
    959 F.3d 178 (5th Cir. 2020) ................................................................................27

*Guardians Ass'n v. Civil Service Commission of New York,*
    463 U.S. 582 (1983) ..............................................................................................18

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ..............................................................................................16

*Inner City Press v. Bd. of Governors of Fed. Rsrv. Sys.,*
    130 F.3d 1088 (D.C. Cir. 1997) ..............................................................................3

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ........................................................................................20, 21

*Kamps v. Baylor University,*
    592 F. App'x 282 (5th Cir. 2014) ........................................................................23

*Kennecott Utah Copper Corp. v. Dep't of Interior,*
    88 F.3d 1191 (D.C. Cir. 1996) ..............................................................................15

*Lau v. Nichols,*
    414 U.S. 563 (1974) ..............................................................................................27

*Libertarian Party v. Dardenne,*
    595 F.3d 215 (5th Cir. 2010) ..................................................................................8

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) .................................................................................................30

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................................................................1

*Mann Mfg., Inc. v. Hortex, Inc.,*
    439 F.2d 403 (5th Cir. 1971) ..............................................................................................17

*Marks v. United States,*
    430 U.S. 188 (1977) ............................................................................................................18

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ............................................................................................26

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ..............................................................................................................6

*Mourning v. Family Publ'ns Serv., Inc.,*
    411 U.S. 356 (1973) ............................................................................................................20

*NAACP v. Wilmington Med. Ctr., Inc.,*
    453 F. Supp. 280 (D. Del. 1978) ........................................................................................10

*NAACP, W. Region v. Brennan,*
    360 F. Supp. 1006 (D.D.C. 1973) ......................................................................................12

*Nat'l Mining Ass'n v. Dep't of Interior,*
    70 F.3d 1345 (D.C. Cir. 1995) ...........................................................................................15

*National Pork Producers Council v. EPA,*
    635 F.3d 738 (5th Cir. 2011) ..............................................................................................13

*Nichols v. United States,*
    511 U.S. 738 (1994) ............................................................................................................18

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ..............................................................................................................15

*NRDC v. EPA,*
    571 F.3d 1245 (D.C. Cir. 2009) .........................................................................................15

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ..............................................................................................................2

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ............................................................................................................21

*Pennhurst State Sch. & Hosp. v. Halderman,*
   451 U.S. 1 (1981) ..........................................................................................................25

*Pharm. Rsch. & Manufacturers of Am. v. HHS,*
   --- F. Supp. 3d ----, 2023 WL 1795644 (D.D.C. Feb. 6, 2023) ...........................7

*Quarles v. Oxford Mun. Separate Sch. Dist.,*
   868 F.2d 750 (5th Cir. 1989) ......................................................................................21

*Rashdan v. Geissberger,*
   764 F.3d 1179 (9th Cir. 2014) ....................................................................................21

*Raytheon Co. v. Hernandez,*
   540 U.S. 44 (2003) ..........................................................................................................20

*Regents of Univ. of Cal. v. Bakke,*
   438 U.S. 265 (1978) ........................................................................................................18

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ........................................................................................................21

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.,*
   6 F.4th 633 (5th Cir. 2021) .........................................................................................19

*Save Our Valley v. Sound Transit,*
   335 F.3d 932 (9th Cir. 2003) ......................................................................................20

*Sch. Dist. of City of Saginaw, Mich. v. U.S. Dep't of Health, Educ. & Welfare,*
   431 F. Supp. 147 (E.D. Mich. 1977) ........................................................................11

*Seals v. McBee,*
   898 F.3d 587 (5th Cir. 2018) .................................................................................. 3, 6

*Sebelius v. Auburn Reg'l Med. Ctr.,*
   568 U.S. 145 (2013) ........................................................................................................22

*Sierra Club v. EPA,*
   551 F.3d 1019 (D.C. Cir. 2008) .................................................................................15

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ................................................................................................25, 27

*Southwest Airlines Co. v. Saxon,*
   142 S. Ct. 1783 (2022) ..................................................................................................10

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ........................................................................................9

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ..................................................................................................... 1

*State v. Rettig,*
  987 F.3d 518 (5th Cir. 2021) ............................................................................ 13, 17

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ....................................................................................................... 3

*Students for Fair Admissions v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ............................................................................................ 21, 23

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................................................... 4

*Taylor v. Cohen,*
  405 F.2d 277 (4th Cir. 1968) ............................................................................ 10, 11

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021),
  *rev'd and remanded,* 142 S. Ct. 2528 (2022) ....................................................... 15

*Texas Dep't of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.,*
  576 U.S. 519 (2015) ............................................................................................ 20, 24

*Texas Education Agency v. U.S. Dep't of Educ.,*
  992 F.3d 350 (5th Cir. 2021) ................................................................................. 28

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) ............................................................................................. 30

*United States v. Becton,*
  632 F.2d 1294 (5th Cir. 1980) ............................................................................... 19

*United States v. Texas,*
  143 S. Ct. 1964 (2023) ............................................................................................. 30

*United States v. Vega,*
  960 F.3d 669 (5th Cir. 2020) ................................................................................... 8

*Utility Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ................................................................................................. 24

*Veldhoen v. U.S. Coast Guard,*
  35 F.3d 222 (5th Cir. 1994) ................................................................................... 14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ............................................................................................ 20, 21

*Virginia Dep't of Educ. v. Riley,*
    106 F.3d 559 (4th Cir. 1997) ................................................................ 29

*Watson v. Fort Worth Bank & Tr.,*
    487 U.S. 977 (1988) ........................................................................... 20

*West Virginia v. Dep't of the Treasury,*
    59 F.4th 1124 (11th Cir. 2023) ........................................................ 3, 29

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ................................................................. 24, 25

*Yarls v. Bunton,*
    905 F.3d 905 (5th Cir. 2018) ............................................................... 8

*Zimmerman v. City of Austin,*
    881 F.3d 378 (5th Cir. 2018) ........................................................... 4, 5

**STATUTES**

5 U.S.C. § 701(a)(2) .......................................................................... 16

5 U.S.C. § 704 ................................................................................. 10

28 U.S.C. § 2401(a) ........................................................................... 12

42 U.S.C. § 2000d ............................................................................. 25

42 U.S.C. § 2000d-1 ..................................................................... *passim*

42 U.S.C. § 18116(b) .......................................................................... 22

Pub. L. No. 100-259, 102 Stat. 28 ......................................................... 22

**LEGISLATIVE MATERIALS**

100 Cong. Rec. at 2499 (Rep. Lindsay) ..................................................... 22

134 Cong. Rec. 229 (1988) (statement of Sen. Kennedy) ................................... 22

**RULES**

Fed. R. Evid. 201(b)(2) ......................................................................... 5

REGULATIONS

2 C.F.R. § 200.403(a) ...................................................................................................7

2 C.F.R. § 1500.15 .....................................................................................................13

28 C.F.R. § 42.104(b)(2) ............................................................................................20

40 C.F.R. § 7.35(b) ....................................................................................................20

40 C.F.R. § 7.80(a)(1) ................................................................................................26

40 C.F.R. § 7.80(a)(2) ................................................................................................14

40 C.F.R. § 7.120 ...............................................................................................14, 17

40 C.F.R. § 7.130 .........................................................................................................5

# GLOSSARY

| Acronym or Abbreviation | Meaning/Full Title/Cite |
|---|---|
| Br. | Defendants' Brief in Opposition to the State's Motion for a Preliminary Injunction and Cross-Motion to Dismiss and/or for Summary Judgment, ECF No. 29-1 |
| Burdette Decl. | Declaration of Courtney J. Burdette, ECF No. 34-1 |
| *CARE* | *Californians for Renewable Energy, et al. v. EPA*, Case No. 4:15-cv-03292-SBA. |
| DOJ | U.S. Department of Justice |
| EPA | U.S. Environmental Protection Agency |
| EPA 2007 Press Release | EPA Release, *EPA Awards Over $400,000 to LSU* (Sept. 24, 2007), https://perma.cc/FC2S-UWM5 |
| Ex. D | LDEQ, Response Letter to EPA (August 16, 2023) |
| Ex. E | LDEQ, Permit Renewal Approval Cover Letter (September 20, 2023) |
| Ex. F | LDH, Louisiana Annual Report SFY 2022 https://ldh.la.gov/assets/oph/Center-EH/DrinkWaterRevolve/DWRLF_Financial/Annual_Report_SFY2022.pdf |
| Ex. G | LDEQ, Clean Water State Revolving Fund Annual Report SFY 2016 (Feb. 14, 2017), https://perma.cc/M52N-7GW6 |
| Hoang Decl. | Declaration of Anhthu Hoang, ECF No. 29-3 |
| June 16 Objection | EPA Objection to Title V Operating Permit Number 3086-V10 (June 16, 2023), ECF No. 34-5 |
| LDEQ | Louisiana Department of Environmental Quality |
| LDH | Louisiana Department of Health |
| Opp. | Plaintiff's Memorandum in Opposition to Defendants' Cross-Motion to Dismiss or for Summary Judgment and Reply in Support of Motion for Preliminary Injunction, ECF No. 34 |
| Sinquefield Decl. | Declaration of John W. Sinquefield, ECF No. 34-32 |
| Watkins Decl. | Declaration of Christopher Watkins, ECF No. 29-4 |

**INTRODUCTION**

In its opposition brief, Plaintiff presses this Court to invalidate federal anti-discrimination regulations that date back over half a century, and to which the State of Louisiana has for decades acceded in exchange for hundreds of millions of dollars in federal funding.  In its effort to eliminate Defendants' longstanding prohibitions on disparate-impact discrimination, the State advances a host of errant arguments, inapplicable legal theories, and positions unreconcilable with the factual record. It also fails to grapple with Congress's express direction to Defendants to promulgate the challenged regulations, the validity of which the Supreme Court has recognized for decades.  The Court should dismiss this case or, in the alternative, grant summary judgment for Defendants.

**ARGUMENT**

**I.   LOUISIANA HAS NOT ESTABLISHED SUBJECT MATTER JURISDICTION.**

**A.  Plaintiff lacks Article III standing or ripeness for each claim.**

***Plaintiff does not possess "self-evident" standing***.  Plaintiff first suggests that, as the object of government regulation, it need not establish (1) an injury in fact (2) fairly traceable to the challenged conduct of the defendant and (3) redressable by a favorable judicial decision to possess Article III standing on any of its claims.  Opp. 5-6.  But those "three elements" are the "'irreducible constitutional minimum' of standing" that "the party invoking federal jurisdiction" always "bears the burden of establishing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The State cites no authority that would absolve it of this burden.  *Lujan v. Defenders of Wildlife* states only that, for a plaintiff that is the object of the challenged action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing . . . the action will redress it."  504 U.S. 555, 561 (1992).  That such showings can "ordinarily" be made does not render such showings unnecessary, particularly in the unusual circumstance where the State challenges regulations to which it has acceded for decades.

The Fifth Circuit's approach in *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258 (5th Cir. 2015) (cited at Opp. 5), makes clear that the object of a challenged action does not have an automatic ticket

to Article III standing.  Although the plaintiffs were the object of the challenged regulation, the court nonetheless assessed whether they "demonstrate a concrete injury resulting from the Regulation that would be redressable by a favorable decision of this Court."  779 F.3d at 266.  So while "[a]n increased regulatory burden typically satisfies the injury in fact requirement," *id.*, Plaintiff still must make such a showing for each form of relief that is sought.  Plaintiff fails to do so for the reasons explained *infra* 2-8, and its theory of "self-evident" standing therefore fails.  *See also* Br. 11-24.

**Plaintiff lacks standing to assert non-delegation claims (Counts I-II)**.  The State asserts standing for its nondelegation claims because it is allegedly "being subjected" in the "here-and-now" to governmental authority unconstitutionally exercised by private parties.  Opp. 8-11.  Specifically, Plaintiff takes issue with EPA's purported grant to private organizations of "the power to veto continuation of informal resolution discussion that lasts more than 180 days."  Compl. ¶ 19.  But at the time the complaint was filed, the private organizations (and the State itself) had *already* approved the extension of negotiations—far from the "here-and-now" injury the State asserts.  And Plaintiff does not dispute that this "[p]ast exposure to illegal conduct" cannot confer standing to seek prospective injunctive relief.  *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *see also* Br. 14.  For this reason, *Axon Enterprises, Inc. v. FTC*, has no bearing.  143 S. Ct. 890 (2023).  In *Axon*, the challenged proceedings were ongoing, *id.* at 903, whereas Plaintiff here challenges an isolated private action that had already occurred at the time the complaint was filed and cannot be remedied prospectively.

Plaintiff counters that the investigations were "infected by a non-delegation doctrine violation" even after the allegedly unconstitutional act had occurred.  Opp. 9.  But the State provides no evidence of "infected" proceedings beyond the convoluted claim that EPA obtained the private parties' consent to extend negotiations through the release of non-public information.  That contention is erroneous:  Plaintiff does not dispute that it released the very information it accuses EPA of disclosing, Br. 13-14; Hoang Decl. ¶ 17, and a party "cannot manufacture standing merely by inflicting harm on themselves."  *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 416 (2013).  Nor does Plaintiff allege that the private parties exercised authority over EPA's investigation.  Compl. ¶¶ 19-29.

Plaintiff also alleges injuries from the mere existence of the investigations and settlement

negotiations, such as "producing documents upon demand" and "joining innumerable conference calls." Opp. 9. But just participating in proceedings "does not, without more, satisfy a petitioner's Article III injury-in-fact requirement." *Inner City Press v. Bd. of Governors of Fed. Rsrv. Sys.*, 130 F.3d 1088, 1089 (D.C. Cir. 1997). And Plaintiff does not challenge EPA's ability to conduct investigations—it merely challenges the existence of a condition on extending the time for settlement discussions. Its asserted injuries from the investigation therefore cannot confer standing for Louisiana's nondelegation claims because the relief sought—invalidation of the condition—would not preclude the possibility of future investigations and their associated burdens. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot" confer standing); Br. 13.

**Plaintiff lacks standing to challenge EPA's disparate-impact regulations (Counts III & V).** *First*, Plaintiff claims standing for its Spending Clause challenge to EPA's (and, by extension, DOJ's) disparate-impact regulations because violation of its "sovereign constitutional right[]" to textually unambiguous conditions on federal funding necessarily "creates cognizable injury." Opp. 6-8. "But the Supreme Court has long rejected the argument that a 'claim that the Constitution has been violated' is enough on its own 'to confer standing.'" *Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023) (citation omitted); *see also Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018). Plaintiff must instead show a "concrete, particularized, and actual or imminent" injury flowing from that alleged constitutional violation. *Clapper*, 568 U.S. at 409. It has failed to do so.

Plaintiff's cited authorities make clear that an injury in fact is distinct from the generalized constitutional violation that it alleges. In *West Virginia v. Department of the Treasury*, the plaintiff states alleged "that they were coerced into accepting an offer with an unascertainable condition, they did accept the offer with the condition, and the terms of the resulting contract are presently in force and effect." 59 F.4th 1124, 1136 (11th Cir. 2023). Similarly, in *Arizona v. Yellen*, the plaintiff state argued "the Offset Provision's ambiguity prevents Arizona from being able to exercise its choice voluntarily to accept ARPA funds and understand the consequences of agreeing to ARPA's conditions." 34 F.4th 841, 851 (9th Cir. 2022). Here, by contrast, the State has not alleged "ambiguity" or "unascertainability" in the half-century-old condition accompanying federal funds; indeed, it claims

just the opposite, that EPA has conditioned grants on the recipient specifically "acknowledg[ing] it has an affirmative obligation to . . . ensure that its actions . . . do not have discriminatory effects." Compl. ¶ 141 (quotation omitted).  Finally, Article III standing was not addressed in *Arlington Central School District v. Murphy*, 548 U.S. 291 (2006) (cited at Opp. 6-7).  Instead, the Supreme Court addressed whether the Individuals with Disabilities Education Act conditioned receipt of federal funds on payment of expert fees incurred by plaintiffs in litigation brought under that Act, or only attorneys' fees.  Because the plaintiff had paid out-of-pocket expenses, the parties did not question whether it had suffered an injury in fact because of this ambiguous condition.  Thus, a cognizable Spending Clause injury occurs when a recipient accepts funding under ambiguous conditions it may have rejected had they been ascertainable, as in *West Virginia* and *Arizona*, or suffers some concrete harm as a result of ambiguous conditions, as in *Arlington Central*.  Plaintiff identifies no similar injury here.

*Second*, Louisiana asserts standing to challenge EPA's disparate-impact regulations under a pre-enforcement review theory.  Opp. 13-17.  But a pre-enforcement challenge requires evidence of a plaintiff's "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, as well as credible threat of prosecution."  *Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (quotations omitted).  Plaintiff largely ignores the first part of this requirement, asserting that it need not "confess that [it] will in fact violate that law."  Opp. 15.  True, but it must establish that it will engage in conduct at least "arguably proscribed" by the law.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014).  The State musters no evidence that it intends to engage in disparate-impact discrimination prohibited by EPA's Title VI regulations.  Br. 19.[1]  This failure precludes standing to assert a pre-enforcement challenge.  *Zimmerman*, 881 F.3d at 391 (no standing where plaintiff failed "core requirement . . . to establish such an intention"); Br. 19.

---

[1] The mere existence of two now-closed Title VI complaints asserting disparate-impact violations at the time the complaint was filed is no substitute for proof of an intention by *the State* to engage in disparate-impact discrimination.  For one, EPA retains discretion to investigate under any theory of discrimination, regardless of the complainant's theory.  And the investigations that arose from the now-closed complaints are not traceable to EPA's disparate-impact regulations because EPA was also investigating possible intentional discrimination.  Br. 8-9, 18.  In any event, participation in such pre-enforcement administrative proceedings does not give rise to an injury in fact.  *Id.* at 18.

*Contender Farms*, 779 F.3d at 268, is not to the contrary.  There, the Fifth Circuit held that the challenged regulation was likely to result in enforcement against the plaintiffs because the regulation targets "a practice that yields a large number of 'false positives.'"  *Id.*  Here, there is no possibility of a "false positive" enforcement because EPA has *never* taken the enforcement steps outlined under 40 C.F.R. § 7.130 against any state to obtain compliance with the challenged regulations.  Br. 19.

Plaintiff's arguments regarding threat of enforcement are equally unavailing.  For one, no complaint ever filed under EPA's Title VI regulations has reached the enforcement stage.  Enforcement was therefore neither likely nor imminent even at the time the now-dismissed complaints were pending.  Br. 19-20.  Louisiana's mischaracterization of EPA's June 16 Objection, ECF No. 34-5, does not alter this analysis.  EPA's Air and Radiation Division objected to the State's proposed permit renewal solely on technical grounds under the Clean Air Act, because LDEQ failed to justify the methodology it used to estimate the permittee's emissions, failed to account for uncontrolled emissions, and failed to limit sulfur content according to permit limits.  *Id.* at 5-11.  EPA never objected on disparate-impact grounds as the State contends (Opp. 12), and Plaintiff does not (and cannot) explain how disparate impact or Title VI generally drove any of EPA's technical objections.  Although EPA's cover letter to the June 16 Objection referenced environmental justice, ECF No. 34-5 at 3, it never once purported to apply its disparate-impact regulations against the State.  The absence of any disparate-impact mandate in the June 16 Objection is further evident from the State's own response, which did not contest or even mention EPA's environmental justice recommendations.  *See* Ex. D.  Moreover, LDEQ issued the permit on September 20, 2023, and the facility is operating, belying the State's persistent implication that it was stymied by EPA's disparate-impact regulation.  *See* Ex. E.[2]

Similarly, that EPA has not disavowed enforcement of its disparate-impact regulations does not establish a credible threat of enforcement, and Plaintiff's proffered authorities (Opp. 14-15) are readily distinguishable.  In *Seals v. McBee*, the challenged statute had a "history of enforcement," unlike

---

[2] LDEQ's response, Ex. D, and its issued permit, Ex. E, are publicly available on Louisiana's website— https://perma.cc/8VRX-4TVZ—and therefore subject to judicial notice.  *See* Fed. R. Evid. 201(b)(2); *Funk v. Stryker Corp.*, 631 F.3d 777, 781, 783 (5th Cir. 2011).  The same is true of the annual reports cited *infra* 13-14.

here.  898 F.3d at 592.  *California Trucking Association v. Bonta* involved a state that had already "commenced a number of prosecutions" under the challenged statute, 996 F.3d 644, 653 (9th Cir. 2021)—in contrast EPA has not brought any Title VI disparate-impact enforcement proceedings.  In any event, given EPA's disparate-impact regulations have existed for over fifty years, the lack of enforcement history outweighs any speculative possibility of future enforcement.  *Cf. id.* (weight of "history of enforcement" depends on whether the challenged law "is 'relatively new'").

The State's observation (Opp. 15) that EPA's Office of Environmental Justice and External Civil Rights expanded its head count and sought congressional funding is irrelevant absent evidence, which Plaintiff does not provide, that that expansion and funding were sought specifically to address disparate-impact prohibitions.  Likewise, the settlements involving Alabama, Michigan, and Missouri (*see* Opp. 15) have no relevance here.  Even if Plaintiff could somehow stand in for those other states, *but see Abdullah*, 65 F.4th at 210, it could not establish standing through a self-inflicted injury, *Clapper*, 568 U.S. at 416, which is the only injury that can result from any voluntary settlement.  Nor does Plaintiff even argue, much less establish, that disparate-impact regulations were a meaningful aspect of those settlements.  *See, e.g.*, Opp. 24 n.12 (conceding no disparate-impact component to Michigan settlement).  Further, under no circumstances does a *voluntary* settlement amount to enforcement.[3]

*Third*, Louisiana asserts that, notwithstanding decades of acceding to EPA's disparate-impact regulations without complaint, its alleged "compliance costs" confer standing.  Opp. 10-13.  But a plaintiff cannot establish standing "simply by making an expenditure based on a nonparanoid fear." *Clapper*, 568 U.S. at 416; *id.* (attempt to show standing "based on costs [plaintiffs] incurred in response to a speculative threat" was just "a repackaged version of [their] first failed theory of standing").  For the same reasons Plaintiff has failed to establish a credible threat of enforcement, *supra* 4-6, it cannot show that its purported costs are cognizable injury.

---

[3] *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (cited at Opp. 17), is inapposite.  In that case, there was no dispute that if the plaintiff was wrong on the underlying legal question, it would face "treble damages and the loss of 80 percent of its business."  *Id.* at 134.  Here, the challenged regulations have existed for over fifty years without Louisiana suffering any consequence, despite claiming that it does not perform disparate-impact analysis, Sinquefield Decl. ¶ 6.

The State argues that it incurs compliance costs whenever it renews a permit.  Opp. 11.  But any such costs may be funded by the grant itself, *see* 2 C.F.R. § 200.403(a), leaving the State with no bill to foot.  In any event, the Burdette Declaration does not state that Louisiana conducts a disparate-impact analysis prior to renewing permits; it implies the opposite, stating "costs to LDEQ *would* increase if LDEQ is required to perform *additional* disparate impact analyses on, e.g., permit renewals." Burdette Decl. ¶ 22 (emphases added).  If EPA's regulations—which are over fifty years old—actually require costly disparate-impact analyses with every permit renewal, Louisiana has effectively admitted that it failed to comply but nonetheless avoided any injury.  Asserting new, future compliance costs owing to the very mandates the State has ignored without consequence for decades is a naked attempt to "buy standing." *Pharm. Rsch. & Manufacturers of Am. v. HHS*, --- F. Supp. 3d ----, 2023 WL 1795644, at *12 (D.D.C. 2023).  Without adequate evidence of a risk of enforcement, this theory fails.  *Id.*[4]

Plaintiff also cites EPA's FY 2023 Justification of Appropriation Estimates (Opp. 13) to support its argument that disparate-impact regulations must impose additional compliance costs.  Its misleading synopsis cites EPA's budget *request* and neglects the wide scope of civil rights work EPA does that is not required of recipients.  Furthermore, Plaintiff ignores that the challenged regulations were promulgated in 1973, not 2023, and therefore do not impose additional or new costs.

***Plaintiff lacks standing as to claims against DOJ (Counts IV-V).***  Louisiana advances just one unique standing argument for its claims against DOJ—that funding grants from DOJ to the Louisiana Department of Justice result in compliance costs.  Opp. 17.  But the record does not support this assertion.  Plaintiff's declarant testifies that the State "does not conduct a disparate impact analysis before engaging in law enforcement activities, and [] intends to engage in the same law enforcement activities it traditionally has without conducting a disparate impact analysis."  Sinquefield Decl. ¶ 6. Accordingly, the record establishes only that Louisiana, by its own admission, has not incurred and

---

[4] For the same reason, Plaintiff lacks standing for Count VI, which challenges the alleged extra-regulatory requirements, such as "the proposed cumulative impacts framework," Opp. 57.  The State does not state that LDEQ is currently complying with that framework, and instead asserts only that compliance "would cause LDEQ to incur costs." Burdette Decl. ¶ 23.  Yet, Louisiana has not suffered any injury from its failure to conduct these purportedly mandatory analyses—to the contrary, EPA closed the two complaints without Louisiana suffering any adverse consequences.  *See* ECF No. 18.

will not incur any costs as an object of DOJ's sixty-year-old disparate-impact regulations.  It therefore lacks standing.  *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (state "required to demonstrate"—"supported by [] facts"—"that [it] will incur costs because of the [challenged] program").

**B. Any claims for which Plaintiff once may have had standing are now moot.**

1.  Louisiana's nondelegation claims are moot because it is no longer subject to the allegedly unconstitutional settlement extension condition.  Br. 25.  That mootness is compounded because the apparent target of Louisiana's nondelegation claims is the judgment in *CARE*.  *See, e.g.*, Opp. 20.  But that judgment has now expired.  *See CARE*, ECF No. 116 at 2 (N.D. Cal. June 13, 2018) ("The requirements of this paragraph shall continue for a period of five years from the date judgment is entered.").  And Louisiana does not even argue it is suffering any ongoing nondelegation injury, asserting only that it "continues to face injuries" arising from its other claims.  Opp. 20.  But ongoing injuries for one set of claims do not create a live controversy as to all claims alleged:  mootness is evaluated "on a claim-by-claim basis."  *United States v. Vega*, 960 F.3d 669, 673 (5th Cir. 2020).

Plaintiff's cited exceptions to the mootness doctrine are inapplicable.  The *CARE* judgment lapsed on its own terms, meaning the voluntary-cessation exception does not apply.  *See Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018) (voluntary-cessation exception requires defendant to attempt to "moot a case simply by ending its unlawful conduct once sued").  Nor has Louisiana carried its burden to show the alleged nondelegation injury is capable of repetition yet evading review because it has not "'demonstrated probability' . . . that [it] will 'be subject to the same'" allegedly unlawful action again. *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010).  Given the expired *CARE* judgment, EPA is not under any court injunction to seek consented settlement extensions from parties such as Sierra Club.  In any event, the chain of at least seven steps necessary for such a private party to allegedly exercise governmental power is far too attenuated to create an Article III controversy.  *See* Br. 15, 26.

2.  Louisiana's claims challenging disparate-impact regulations and extra-regulatory requirements are similarly moot.  EPA closed the two investigations many steps short of enforcement of its disparate-impact regulation, a point the State does not contest.  *Id.* at 25-26.  Thus, there is no

longer a live controversy with respect to those two investigations.

The voluntary-cessation exception does not salvage these claims.  *See id.* at 26.  Closure of the complaints was not mere litigation "posturing."  EPA was obligated to resolve the investigations by July 11, 2023, and EPA had achieved goals for reducing harmful emissions at the facilities through other measures.  *See* ECF No. 18-1 at 5-6.  It is also absolutely clear that the conduct will not recur in light of EPA's statement that it "will not initiate under Title VI or other civil rights laws any further action, enforcement or otherwise, in response to these Complaints." *Id.* at 1; ECF No. 18-2 at 1.[5]

### C.  The *Thunder Basin* doctrine precludes jurisdiction over Counts II-VII.

1.  Plaintiff argues that the *Thunder Basin* doctrine does not apply because Section 2000d-2 does not create a "special statutory review scheme" that forecloses jurisdiction over Louisiana's claims here. Opp. 38-40.  Plaintiff cites no authority construing Section 2000d-2 for this proposition, and instead arrives at that conclusion only by selectively removing individual words and clauses in the statute from their context.  Specifically, Plaintiff claims that Section 2000d-2 "confirms Congress's intent that judicial review be available *very* broadly" because it "explicitly provides that '[a]ny . . . agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review.'"  Opp. 39 (quoting § 2000d–2; emphasis omitted).  But the sentence in the statute does not end with the period that the State misleadingly inserts.  Instead, Section 2000d-2 continues with the critical limitation that agency action "shall be subject to such judicial review *as may otherwise be provided by law for similar action taken by such department or agency on other grounds*."  (emphasis added).  That language must be accounted for when construing the first half of the sentence.  *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (phrases "must be read and interpreted in their context, not in isolation") (quotations omitted).

With Plaintiff's omitted clause restored, Section 2000d-2 is not a catchall guarantee of immediate judicial review at any point in administrative proceedings, but rather a limited authorization for judicial review "as may otherwise be provided by law"—*i.e.*, only after administrative review

---

[5]  Because this case is moot under the demanding assessment of voluntary cessation, this Court need not even consider the factors of *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020), to afford Defendants the presumption that the challenged conduct is unlikely to recur.

resulting in final action occurs at the agency level, as is true of similar actions.  *See generally* 5 U.S.C. § 704.  Section 2000d-2 thus authorizes judicial review only at the end of the "elaborately and carefully constructed enforcement mechanism" of Title VI, as a "'final barrier' against the possibility of federal officials improperly construing their statutory obligations."  *NAACP v. Wilmington Med. Ctr., Inc.*, 453 F. Supp. 280, 294 (D. Del. 1978).

As the *en banc* Fourth Circuit explained in *Taylor v. Cohen*, "[f]inal action" under Title VI capable of giving rise to judicial review is "the decision to terminate or continue financial assistance."  405 F.2d 277, 280 (4th Cir. 1968).  "Until this decision has been made, judicial intervention is not sanctioned by statute."  *Id.*; *see also id.* at 279-81 (finding no jurisdiction where department "has only taken intermediate steps, including deferral of new applications, consultation, and negotiation" because "[j]udicial review must await the outcome of the administrative hearing" on funding determination).  This precisely describes a special statutory scheme subject to the *Thunder Basin* doctrine.  *Bd. of Educ. of the Highland Loc. Sch. Dist. v. Dep't of Educ.*, 208 F. Supp. 3d 850, 862 (S.D. Ohio 2016) ("virtually identical" Title IX provision providing for judicial review "as may otherwise be provided by law for similar action taken by such department or agency on other grounds" establishes a special statutory scheme for purposes of *Thunder Basin*).

Louisiana's arguments to the contrary emphasize individual words (or their absence) at the expense of Section 2000d-2 as a whole, and are thus unavailing.  Defendants do not "smuggle[]" the finality requirement under the APA "back into § 2000d-2," Opp. 39.  Rather, Defendants' construction gives meaning to Section 2000d-2's command to limit judicial review to that which would "otherwise be provided by law"—such as under the APA, which contains an express finality requirement—"for similar action taken by such department or agency."  *See also Adams v. Bell*, 711 F.2d 161, 201-02 (D.C. Cir. 1983) (Wright, J., dissenting) (explaining Section 2000d-2 "authorizes judicial review of Department action" where plaintiffs can identify "'final agency action' which 'aggrieves' or 'adversely affects' them within the meaning of the APA" or where "if upon review of the administrative record, the Secretary makes a 'final' decision that the recipient has not complied and that funds should therefore be terminated, the recipient becomes 'aggrieved'").  Nor does Defendants' construction

nullify the words "any" or "shall"—instead, it merely subjects those words to the very limitation that Congress imposed in the statute, and which Plaintiff ignores entirely.

2.  Plaintiff is also mistaken that the three *Thunder Basin* factors favor immediate judicial review. Opp. 40-41.  *First*, immediate review is unnecessary because the State retains the ability to seek meaningful judicial review after administrative proceedings.  Following an enforcement proceeding, the State could raise the same challenges to EPA's regulations and processes that it advances here. *Sch. Dist. of City of Saginaw, Mich. v. Dep't of Health, Educ. & Welfare*, 431 F. Supp. 147, 154 (E.D. Mich. 1977) ("Before any agency decision to terminate funds can become effective," plaintiff "will be able to seek judicial review as provided for in Title VI.").  And that reviewing court would "have the power to postpone further the date of termination of funding if such a postponement is required to avoid harm to plaintiffs," *id.*, which refutes Plaintiff's assertion (Opp. 40) that judicial review would be too late to be meaningful.  *See also Taylor*, 405 F.2d at 279.

*Second*, Plaintiff claims it is challenging EPA and DOJ's "power to proceed at all," rendering its claims collateral and available for immediate review.  Opp. 40.  But Louisiana is not challenging EPA and DOJ's ability to impose conditions under Title VI or to conduct Title VI investigations; indeed, there is no dispute that EPA and DOJ possess such authority.  *See* 42 U.S.C. § 2000d-1.  Rather, the State is challenging a specific set of regulations, and whether those regulations do in fact effectuate Title VI's general prohibition on discrimination.  These claims "do not arise 'outside' the [agency] administrative enforcement scheme—they arise from actions the [agency] took in the course of that scheme." *Bank of La. v. FDIC*, 919 F.3d 916, 928 (5th Cir. 2019).  Indeed, to challenge specific demands made as part of the informal resolution process, Plaintiff "allege[s] agency misdeeds *during*" purported "enforcement proceedings themselves," and does not raise "*wholly* collateral" claims.  *Id.*

*Third*, whether regulations combatting disparate impact effectuate a general prohibition on discrimination in the context of funding for environmental programs is a question squarely within EPA's expertise.  Br. 28.  The same goes for whether EPA's regulations governing Title VI investigatory processes fulfill a statutory purpose.  And this was Congress's very intent in the Title VI context.  *See NAACP, W. Region v. Brennan*, 360 F. Supp. 1006, 1017 (D.D.C. 1973) ("Under Title

VI . . . the requirement that the agency exhaust every effort at informal negotiations and correction of noncompliance dictate that a thorough exercise of administrative discretion be had prior to the Court's active interference.").  Plaintiff's response (Opp. 41) that agencies lack expertise in interpreting the Constitution is wrong on the law:  there are "various ways an agency might deploy its expertise on constitutional questions" including if the agency resolves "accompanying statutory claims," as are present here, or if "an agency's interpretation of the law . . . might answer or shed light on a constitutional challenge."  *Bank of La.*, 919 F.3d at 929 (cleaned up).[6]  It is also irrelevant for the claims that do not arise under the Constitution (Counts II-III, VI, VII), all of which should be dismissed.

### D.  Plaintiff's claims are untimely.

The State's myriad attempts to circumvent the long-expired statute of limitations lack merit. It is undisputed that "[o]n a facial challenge to a regulation, the limitations period begins to run when the agency publishes the regulation in the Federal Register."  *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997).  And here, the State has expressly conceded that it "is largely bringing facial claims."  Opp. 16 n.7.  Because the regulations in question were first published over fifty years ago and last amended over twenty years ago, all of the State's facial challenges are barred by the statute of limitations and should be dismissed.  *See* AR286; 28 U.S.C. § 2401(a).

Plaintiff attempts to muddy the waters and evade the statute of limitations by recharacterizing its self-described facial challenges as as-applied claims.  Opp. 31-38.  Even accepting this inconsistency, any residual as-applied claims cannot revive untimely facial challenges to the regulations themselves, which expired six years after publication in the Federal Register.  *See Dunn-McCampbell*, 112 F.3d at 1287.  In any event, Plaintiff's refashioned as-applied claims are untimely too because Plaintiffs do not "show some direct, final agency action involving the particular plaintiff within six years of filing suit."  *Id.*  In *Dunn-McCampbell*, the plaintiffs raised similar APA and constitutional claims, arguing that "the [agency] has exceeded its constitutional and statutory authority in passing

---

[6] Plaintiff's persistent reliance on *Axon* is inapposite.  Unlike in this case where there is no question that EPA is statutorily entitled to conduct investigations under Title VI, the plaintiffs in *Axon* challenged an allegedly "illegitimate proceeding, led by an illegitimate decisionmaker," which also rendered their claims collateral.  598 U.S. at 191.

the . . . regulations." *Id.* at 1286.   Nevertheless, the Fifth Circuit dismissed both the APA and constitutional challenges because the regulations at issue were more than six years old (precluding any facial challenge), and because the agency had not applied the regulations to the plaintiffs, precluding an as-applied challenge.  *See id.* at 1287-88.  The same result should obtain here.

Plaintiff admits that EPA's "restatement of existing obligations is not final agency action" for purposes of its challenge to the disparate-impact regulations arising through provision of grant funding.  Opp. 34.  Under *State v. Rettig,* that fact alone defeats the State's argument that its receipt of new grants, but with unchanged obligations, is sufficient to restart the limitations period.  *See* 987 F.3d 518, 529 (5th Cir. 2021).  Instead, Plaintiff argues that EPA's grants have extended the State's preexisting Title VI obligations further into the future, and that any such extension within the past six years is sufficient to make an as-applied claim regarding such a grant timely.  *See* Opp. 32-33.  But any as-applied challenge to a grant's terms and conditions is precluded by Louisiana's failure to pursue it through the grant-objection process described at 2 C.F.R. § 1500.15, and those terms therefore cannot serve as a timely final agency action for Plaintiff's claims.  *See supra* 9-12; Br. 27 n.13.

In any event, Louisiana has not identified a specific grant issued by Defendants within the past six years that extended any of its existing Title VI obligations further into the future such that they could be characterized as "new" obligations under *National Pork Producers Council v. EPA,* 635 F.3d 738, 756 (5th Cir. 2011).  To the contrary, the State has for decades continuously accepted EPA assistance for LDEQ's Clean Water State Revolving Fund (CWSRF) and LDH's Drinking Water Revolving Loan Fund (DWRLF), while declaring that it intends to continue operating such funds "into perpetuity."  Ex. F at 3; *see id.* at 1 ("Since the program was initiated in SFY 1999, 199 loans have been awarded. The projects associated with 155 loans are fully constructed or complete and in operation."); Ex. G at 1 ("Since inception of the program in 1988, the CWSRF has been awarded 26 federal grants from EPA.").  Louisiana has long assured EPA that "LDEQ and all recipients of CWSRF funds are required to comply with applicable Federal authorities and regulations" when accepting this funding.  *Id.* at 7; *see also id.* ("Completed loan agreements include these federal assurances.").  Those assurances first obligated LDEQ and LDH to comply with EPA's Title VI

regulations well over six years ago, and the State's continued acceptance of such federal funding for programs which the State itself has characterized as "intended to last into perpetuity" undercuts its argument that the unspecified new grants it alludes to impose such obligations anew.  Ex. F at 3.

The State's argument fails for yet another reason:  because LDEQ and LDH have used EPA funding for real property construction projects, they are also bound by 40 C.F.R. § 7.80(a)(2).  *See* Ex. G at 1, 3 (citing as of 2016 over $455 million EPA had granted to LDEQ for such projects, including funds to "[e]xpedite project development and construction"); *see also, e.g., id.* at 3 ("LDEQ was able to work with St. Bernard Parish to begin construction within one year of placement in the FY15 Intended Use Plan"); Ex. F at i (funding, *inter alia*, "construction of eligible infrastructure projects").  When EPA awards grants of this type, which take the form of "assistance to acquire real property, or structures on the property," the terms and conditions—including Title VI obligations—continue to apply for as long as "the real property or structures are used for the purpose for which EPA assistance is extended, or for another purpose in which similar services or benefits are provided."  40 C.F.R. § 7.80(a)(2).  And the CWSRF and DWRLF programs are not the only such grants to the State.  For example, in 2007, EPA provided $433,650 to Louisiana State University to plan, design, and construct a watershed management field station and other facilities, *see* EPA 2007 Press Release, which remain in use.  *See* LSUS, Red River Watershed Mgmt. Inst., https://www.lsus.edu/community/rrwmi. Therefore, the State has not, within the past six years, undertaken any "new" obligations that differ from those to which it has long been subject.

Plaintiff's nondelegation and extra-regulatory requirements challenges are also untimely.  If the State presses a facial challenge to the regulation authorizing EPA to extend the 180-day deadline with the concurrence of the complainant and recipient, that too falls outside the six-year statute of limitations because 40 C.F.R. § 7.120 was last amended in 2010.  *See Dunn-McCampbell*, 112 F.3d at 1287.  And any as-applied challenge to this regulation based on a misguided collateral attack on the *CARE* judgment or EPA's consultation with Sierra Club fails because such consultation is interlocutory by nature, had no impact on the State, and is therefore not final action.  *See* Br. 33-34. Indeed, the investigation itself "does not constitute final agency action."  *Veldhoen v. U.S. Coast Guard*,

35 F.3d 222, 225 (5th Cir. 1994). Plaintiff's challenge to EPA guidance documents likewise fails because the guidance is non-binding. *Infra* 29-30. And even if the State had voluntarily conducted cumulative-impact analyses (which it appears not to have actually done), that would not establish the requisite legal consequences. *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 811 (D.C. Cir. 2006).[7]

### 1. The reopening doctrine does not revive Plaintiff's untimely claims.

The reopening doctrine does not render Plaintiff's claims timely. For one, the Supreme Court has "never adopted" the doctrine, casting doubt on whether it even exists. *Biden v. Texas*, 142 S. Ct. 2528, 2545 n.8 (2022) (the doctrine "appears to be inapposite to the question of final agency action"). And the doctrine does not apply here. An agency reopens a prior decision by holding out the existing decision "as a proposed regulation" and soliciting and responding to comments in re-examining the existing regulation. *Sierra Club v. EPA*, 551 F.3d 1019, 1024 (D.C. Cir. 2008) (quotation omitted). After their longstanding disparate-impact regulations took effect, neither DOJ nor EPA ever held them out as proposed regulations and solicited or responded to public comments. When DOJ terminated the 2021 draft rule Plaintiff identifies, it did so before any proposal was promulgated, without even soliciting written comments, and without undertaking the "serious, substantive reconsideration" required for reopening. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 243-44 (5th Cir. 2023) (FDA's 2016 amendments and consideration of a 2019 citizen petition did not meet the "high bar" for reopening); *see also Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) (no reopening "when the agency merely responds to an unsolicited comment by reaffirming its prior position"); Br. 6, 31-32.

An agency can also "constructively reopen a rule" if its later decision "significantly alters the stakes of judicial review." *Sierra Club*, 551 F.3d at 1025 (quotations omitted). But EPA's discretionary choice to modify the tenor of its public remarks does not change "the stakes of judicial review," *id.*, or alter "the basic regulatory scheme," *NRDC v. EPA*, 571 F.3d 1245, 1266 (D.C. Cir. 2009). Nor

---

[7] Louisiana also belatedly asserts that EPA's June 16 Objection constitutes reviewable agency action. Opp. 34. But the June 16 Objection is not an application of the disparate-impact regulation, *supra* 5, so it cannot restart the statute of limitations for those claims.

does a change in administration following a presidential election constitute a "circumscribed, discrete agency action[]"under the APA.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-63 (2004).  The basic regulatory regime—prohibiting disparate-impact discrimination by federal funding recipients—has remained unchanged for decades.  If a change in tone by officials and voluntary agreements by non-parties were "sufficient to restart the . . . clock" on judicial review, no agency rule would ever be final. *Nat'l Mining Ass'n v. Dep't of Interior*, 70 F.3d 1345, 1351 (D.C. Cir. 1995); *see Texas v. Biden*, 20 F.4th 928, 953 (5th Cir. 2021) ("incremental adjustments to existing regulations" insufficient) (quotation omitted), *rev'd and remanded*, 142 S. Ct. 2528 (2022).  And if the State had sought to challenge EPA's enforcement discretion as a change in circumstance resetting its statute of limitations, that challenge would be foreclosed under *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *see* 5 U.S.C. § 701(a)(2).

### 2.  Plaintiff cannot evade the high bar applicable to *ultra vires* claims.

Lacking any timely final agency action on which to base its claims, Louisiana asserts that it can pursue an "equitable cause of action that is the same one that federal courts apply in when [*sic*] considering claims under the doctrine of *Ex Parte Young*," 209 U.S. 123 (1908), or a "cause of action arising under the Constitution," as entertained in *Axon*, 143 S. Ct. 890, all without making the extraordinary showing required for *ultra vires* review.  Opp. 28-29.  As the State acknowledges, however, *Ex Parte Young* involved claims that state officials had violated federal law.  Plaintiff cites no authority that its nominal *Ex Parte Young* claim "that *federal* officials are violating federal law" may be pursued against those officials absent the high bar required for *ultra vires* claims.  Opp. 28-29.  *Accord Apter v. Dep't of Health & Human Servs.*, 80 F.4th 579, 593 (5th Cir. 2023) (declining to consider the viability of a freestanding common law *ultra vires* claim, while noting that "under our precedent, Congress apparently 'd[id] away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity' when it amended the APA in 1976") (citation omitted).

Plaintiff likens its action (Opp. 29) to *Axon* and *Cochran v. SEC*, but those cases involved "structural constitutional claims" arising under Article II and the Appointments Clause, 20 F.4th 194, 198 (5th Cir. 2021), and challenges to an allegedly "illegitimate proceeding, led by an illegitimate

decisionmaker," "not to anything particular about how that power was wielded," *Axon*, 598 U.S. at 898, 905.  Plaintiff, by contrast, objects precisely to "how [EPA's] power was wielded."  *Id.* at 905.

The State's attempt to downplay the burden it must carry on its *ultra vires* cause of action asserted through the APA's waiver of sovereign immunity also fails, and the cases cited by Plaintiff only reinforce how narrow this avenue for relief is.  In *Apter* (cited at Opp. 29-31), the court applied the strict test from *Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011), to the plaintiffs' *ultra vires* claims asserted through the APA.  That test demands a plaintiff "do more than simply allege that the actions of the officer are illegal or unauthorized.  Rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority." *Apter*, 80 F.4th at 587-88 (alterations and quotations omitted); *cf. Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764-65 (D.C. Cir. 2022) (*ultra vires* claims are a "Hail Mary" confined to instances of "extreme agency error" "so plainly beyond the bounds" or "so clearly in defiance" of statutory authority).  And unlike in *Apter*, where the FDA "d[id] not argue that it actually does have authority" and "never point[ed] to any authority that allows it to" perform the acts in question, 80 F.4th at 588, Defendants have pointed to statutory text that expressly authorizes them to effectuate Title VI's broad prohibition on discrimination.  *See infra* 18-24.  Louisiana's claims at most challenge Defendants' statutory interpretation, and their quest for non-statutory jurisdiction therefore fails at the threshold.  At the very least, Defendants have identified a colorable basis to exercise their authority, which is all that is required to foreclose Plaintiff's *ultra vires* cause of action.  *See Apter,* 80 F.4th at 588.

## II.  PLAINTIFF'S CLAIMS FAIL ON THE MERITS.

### A.  Plaintiff's claims (Count I & II) that EPA violated the nondelegation doctrine are meritless.

EPA obtaining the concurrence of the complainant and the federal funding recipient to extend settlement negotiations in a Title VI proceeding does not impermissibly delegate federal power.  EPA's regulatory provision conditioning an extension of its 180-day deadline for Title VI complaint investigations on concurrence from the complainant and recipient, *see* 40. C.F.R. §§ 7.120, 7.115(c)(1), is not a grant of governmental power.  Br. 36-37.  Plaintiff offers nothing to contest that proposition,

17

other than unsupported bombast that this bare procedural step is "the sort of power wielded by absolute monarchs." Opp. 41. But the Fifth Circuit has squarely held that "an agency does not improperly subdelegate its authority when it 'reasonabl[y] condition[s]' federal approval on an outside party's determination of some issue." *Rettig*, 987 F.3d at 531. And insofar as Plaintiff is seeking to have this Court somehow collaterally invalidate or modify the *CARE* judgment, its request is improper. *See, e.g.*, *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971). In any event, the *CARE* judgment expired in June 2023. *Supra* 8.

### B. Defendants' disparate-impact regulations are valid under Section 602.

Despite decades of signed assurances that it would comply with Defendants' disparate-impact regulations, Plaintiff now seeks to invalidate them. Its arguments should be rejected.

#### 1. Supreme Court precedent confirms the validity of Defendants' disparate-impact regulations.

Plaintiff cannot and does not dispute that five Justices recognized the validity of disparate-impact regulations under Title VI in *Guardians Association v. Civil Service Commission of New York*, 463 U.S. 582 (1983). As Justice White summarized, five Justices "form[ed] a majority for upholding the validity of the regulations incorporating a disparate-impact standard." *Id.* at 607 n.27; *see also id.* at 584 n.2 (opinion of White, J.); *id.* at 623 n.15 (Marshall, J., dissenting); *id.* at 642-645 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). No controlling authority has held otherwise since.

Plaintiff instead contests (Opp. 47) Defendants' reliance on *Guardians* because it includes the views of Justices who otherwise dissented. In *Marks v. United States*, the Court explained that, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (quotations and citation omitted). The Court has recognized, however, that the principle of *Marks* is sometimes "more easily stated than applied to the various opinions supporting the result." *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (discussing the fractured decision in *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)) (quoting *Nichols v. United States*, 511 U.S. 738, 745-746 (1994)). Accordingly, "[i]t does not

seem useful to pursue the *Marks* inquiry to the utmost logical possibility" in every case. *Id.* (internal quotation marks and citation omitted).

No separate *Marks* inquiry is necessary here since the Supreme Court has itself analyzed the fractured opinions in *Guardians* and summarized the "two-pronged holding" that "emerged in that case." *Alexander v. Choate*, 469 U.S. 287, 293 (1985). "First, the Court held that Title VI itself directly reached only instances of intentional discrimination." *Id.* "Second, the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI." *Id.*

Plaintiff nevertheless argues (Opp. 47-48) that the Supreme Court "conclusively" resolved the precedential value of *Guardians* in *Alexander v. Sandoval*, 532 U.S. 275 (2001). But the discussion of *Guardians* in *Sandoval* is far from conclusive. The Court there "assume[d] . . . that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601." *Id.* at 281. The Court recognized that no one of its opinions had held as much, but that "five Justices in *Guardians* voiced that view of the law at least as alternative grounds for their decisions" and that "dictum in . . . *Choate* is to the same effect." *Id.* at 281-82. The Court questioned this view of the law but did not purport to resolve the issue in that case. *See id.* at 282. As a result, this Court is left with the decision in *Guardians*, as summarized by *Choate*.

Even if *Guardians* and *Choate* were not binding, they remain highly persuasive. In *Rollerson v. Brazos River Harbor Navigation District of Brazoria County*, 6 F.4th 633 (5th Cir. 2021), Judge Haynes noted some uncertainty as to whether *Choate*'s approval of disparate-impact regulations under Title VI was "mere dictum" or "a binding ruling." *Id.* at 643 n.6. In a parenthetical, Judge Haynes stated that, although the Fifth Circuit is not bound by its own dicta, "[d]icta of the Supreme Court are, of course, another matter." *Id.* (quoting *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980)).

## 2. Title VI's text, legislative history, and longstanding agency construction support the regulations' validity.

Section 602 is clear in its broad direction to agencies to "effectuate" the anti-discrimination mandate of Section 601.  42 U.S.C. § 2000d-1.  The legislative history confirms that, with this grant of authority, Congress intended agencies to define for themselves what constitutes discrimination and how best to eradicate it in federal programs.  *See* Br. 41-42 (summarizing history).  Taking up this mantle, Defendants promulgated longstanding disparate-impact regulations, which deserve deference because they are, at the very least, reasonably related to the purposes of the enabling legislation.  *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973).[8]

Plaintiff argues that Defendants' disparate-impact regulations do not "effectuate" the prohibition on intentional discrimination in Section 601 but instead create a "new and different right." Opp. 48 (quoting *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003) (concluding that an agency's disparate-impact regulation did not create an individual right enforceable under 42 U.S.C. § 1983))).  Rather than create a new right, Defendants' regulations delineate the forms of prohibited discrimination.  Disparate treatment (*i.e.*, intentional discrimination) and disparate impact are two ways to prove invidious discrimination.  *See Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15 (1977); *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988).  Courts should indeed "be careful to distinguish between these theories," but that is simply "[b]ecause 'the factual issues, and therefore the character of the evidence presented, differ.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (citation omitted).  It is precisely because of the differences in proof that "[r]ecognition of disparate-impact liability" helps effectuate a prohibition on discrimination by "counteract[ing] unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *See Texas Dep't of Hous. & Comty. Aff. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015).[9]

---

[8]  Plaintiff's response regarding deference recycles its arguments on other points.  *See* Opp. 55-56.  Having rebutted those arguments elsewhere, *infra* 23-25, there is no reason not to defer to the agencies that Congress tasked with effectuating Title VI.

[9]  Even in intentional-discrimination cases, courts have looked to proof of disparate impact for an inference of intent.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Plaintiff goes further to argue that Defendants' disparate-impact regulations in fact conflict with Section 601 because "disparate-impact mandates often *require* governmental actors to make race-conscious decisions." Opp. 50-51. But Defendants' disparate-impact regulations do not require race-conscious actions; instead, they prohibit a recipient from using "criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, [or] national origin." 40 C.F.R. § 7.35(b); *see also* 28 C.F.R. § 42.104(b)(2). Disparate-impact liability, *if proven*, means that a "facially neutral" practice "in fact f[e]ll more harshly on one group than another" and could not be justified by a defense. *Teamsters*, 431 U.S. at 335 n.15. Whatever the specific remedial action that might be required by a finding of such liability, this scenario is a far cry from cases in which entities made race-conscious decisions without a strong basis in evidence that an unlawful disparate impact existed, *see Ricci v. DeStefano*, 557 U.S. 557 (2009), or without sufficiently compelling or measurable justifications, *see Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007).

Plaintiff's final contention (Opp. 50-51) is that the lack of a good-faith defense for a disparate-impact claim highlights the supposed conflict with the prohibition on intentional discrimination. But the differences in proof for the two theories simply result in different defenses; they do not prove an incompatibility. Just as a defendant may respond to circumstantial evidence of intent in a disparate-treatment case by establishing that it would have made the same decision regardless of the impermissible motive or articulating a legitimate, nondiscriminatory reason for the challenged action, a defendant may respond to evidence of an adverse disparate effect in a disparate-impact case by providing a substantial, legitimate justification for the challenged practice. *Compare Vill. of Arlington Heights*, 429 U.S. at 270 n.21 *and Rashdan v. Geissberger*, 764 F.3d 1179, 1182 (9th Cir. 2014), *with Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 754 n.3 (5th Cir. 1989); *see* Br. 48-49. Depending on the evidentiary framework used, the burden may then shift back to the plaintiff to establish pretext or an equally effective alternative practice that results in less adverse impact. *See, e.g.*, *Quarles*, 868 F.2d at 754 n.3; *Rashdan*, 764 F.3d at 1182.

### 3. Congress's subsequent ratification of Title VI's disparate-impact regulations further confirms their validity.

Congress has ratified Defendants' longstanding disparate-impact regulations.  *See* Br. 42-43.  Briefly and unpersuasively, Plaintiff attempts to minimize what it describes as "Congressional *in*action" regarding Title VI.  Opp. 56.  However, "[i]t is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."  *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (internal quotation marks and citation omitted); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) (quoting same).  Critically, disparate-impact regulations had been in place for 20 years when Congress revisited Title VI in passing the Civil Rights Restoration Act of 1987 (CRRA), Pub. L. No. 100-259, 102 Stat. 28.  Congress's failure to amend Section 602 at the same time, despite knowing that "the Federal courts have upheld the use of an effect standard," 134 Cong. Rec. 229 (1988) (statement of Sen. Kennedy), evinces Congress's approval.

In addition, Plaintiff simply ignores congressional *action* to incorporate or preserve the disparate-impact regulations under Title VI.  Namely, in the 1970s and 1980s, Congress specifically required agencies to promulgate regulations "similar" to those under Title VI to effectuate other statutes.  *See* Br. 43 (collecting statutes).  And, in 2010, Congress ensured that nothing in Section 1557(b) of the Patient Protection and Affordable Care Act (ACA) would "invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964."  42 U.S.C. § 18116(b).

### 4. A comparison to other statutes does not change this analysis given the specific structure of Title VI.

Plaintiff argues that Congress's decision to impose disparate-impact liability directly in other civil rights statutes calls into doubt whether Congress granted agencies the discretion to do so in Title VI.  *See* Opp. 51, 57.  But the plain text of the statute makes clear that Congress directed agencies to

determine how best to prohibit discrimination by their funding recipients.[10]  "In essence," the Court explained in *Choate*, "we held [in *Guardians*] that Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts."  469 U.S. at 293-94.

Plaintiff's reliance (Opp. 51) on *Kamps v. Baylor University*, 592 F. App'x 282 (5th Cir. 2014), is thus misplaced.  There, the Fifth Circuit held that there was no private right of action for disparate impact under the ADA because, like Section 601 of Title VI, the statute prohibited only intentional discrimination.  *Id.* at 285-86.  Plaintiff's observation about Section 601's reach does not resolve whether Congress in Section 602 intended to allow agencies in their discretion to promulgate regulations that prohibit disparate impact by funding recipients.  That separate question is answered by Title VI's text and legislative history, as well as longstanding agency interpretation and congressional ratification.

### 5.  Plaintiff's reliance on canons of construction is unavailing.

Plaintiff repackages several arguments as canons of construction, but they fare no better in this light.  *See* Opp. 52.  As explained elsewhere, the absence of a good-faith defense does not render the disparate-impact regulations incompatible with the prohibition on intentional discrimination, *supra* 21; the lack of language in the statute itself creating disparate-impact liability does not undercut the fact that Congress directed and authorized agencies to decide how best to eradicate discrimination, *supra* 20-21; and the federal-state balance is not impermissibly altered by valid Spending Clause legislation, *infra* 25-28.  Regardless, the Court need not resort to canons of construction when the text itself clearly authorizes Defendants' regulations.

### 6.  Defendants' disparate-impact regulations do not raise constitutional doubts.

---

[10]  To the extent this structure was unusual among civil rights statutes, Congress answered with an unusual safeguard.  The broad "latitude" given "to the executive in drafting rules and regulations" is precisely what led Congress to adopt the requirement that the President approve each agency's Title VI regulations.  *See* 100 Cong. Rec. at 2499 (Rep. Lindsay); 42 U.S.C. § 2000d-1.  Plaintiff conspicuously ignores this detail when discussing Title VI's structure.

Plaintiff continues to argue that constitutional doubts arise because, "whenever there is a statistical disparity, the decision-maker is obliged to reduce or eliminate it . . . *by taking race-conscious actions.*" Opp. 53.   But a funding recipient may also address racial disparities by taking race-neutral actions. *See, e.g.*, *Students for Fair Admissions*, 600 U.S. at 284 (Thomas, J., concurring) ("Race-neutral policies may thus achieve the same benefits of racial harmony and equality . . . ."); *id.* at 300 (Gorsuch, J., concurring).  The key point is that by accepting federal funds under Title VI, recipients are "obliged" to ensure that their policies and practices do not have an unlawful disparate effect that is *not justified* by a legitimate rationale.  *See Inclusive Cmtys.*, 576 U.S. at 524.  As previously explained, in determining liability for disparate impact, courts employ a three-part burden shifting framework that includes "[a] robust causality requirement" and "give[s] . . . leeway to state and explain the valid interest served by [the challenged] policies."  *Id.* at 541-42; *see* Br. 48-49.  Disparate-impact liability under Defendants' Title VI regulations, as under the Fair Housing Act (FHA) and Title VII, is thus "properly limited in key respects that avoid the serious constitutional questions that might arise . . . if such liability were imposed based solely on a showing of a statistical disparity."  *Inclusive Cmtys.*, 576 U.S. at 540.

### 7.  The major questions doctrine does not apply.

Plaintiff maintains that the major questions doctrine applies to Defendants' disparate-impact regulations.  Opp. 54-55.  But that doctrine applies when an agency "'discover[s] in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  Neither of the Supreme Court decisions Plaintiff cites (Opp. 55) in its attempt to distance itself from this proposition compels the doctrine's application here.  And Plaintiff's backup contention that EPA's disparate-impact regulations have transformed the agency strains common sense when those regulations date back to the agency's inception in the early 1970s.  *See* Br. 49.

Plaintiff contends that "three independent triggers" for the major questions doctrine apply. Opp. 54-55.  Never mind that Plaintiff's articulation of these supposedly governing "triggers" comes from Justice Gorsuch's concurring opinion in *West Virginia*, and is not a test ever announced by the majority in that case.  142 S. Ct. at 2616-26 (Gorsuch, J., concurring).  But even working within the

concurrence's framework, Plaintiff's conclusory argument fails.  First, Defendants' disparate-impact regulations are not an arrogation to agencies of a "matter of great 'political significance,'" *id.* at 2620, but rather a fulfilment of the congressional directive to effectuate Title VI's discrimination prohibition. *See also All. for Fair Bd. Recruitment v. SEC*, --- F.4th ----, 2023 WL 6862856, at *18 (5th Cir. 2023) (declining to apply major questions doctrine where the agency's authority to regulate was "plain on the face of the [statute]").  Second, it is far from evident, as Plaintiff apparently believes, that the disparate-impact regulations, in and of themselves, amount to regulation of a "significant portion of the American economy." *West Virginia*, 142 S. Ct. at 2621.  In any event, Plaintiff has cited no factual basis for this assertion.  Finally, if the disparate-impact regulations "intrud[e] on powers reserved to the States," *id.*, Plaintiff has failed to identify what those powers are.

### C. Consistent with the Spending Clause, Plaintiff's disparate-impact obligations under Title VI were unambiguous when its agencies accepted federal funds.

Under the Spending Clause, "[i]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" to ensure that "the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17.  The Court thus "construe[s] the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (citation omitted).

Here, Plaintiff cannot plausibly claim to have lacked notice of Defendants' prohibition on disparate impact when its agencies accepted federal funds.  First, Section 601 is unambiguously clear that recipients of federal financial assistance may not discriminate on the basis of race, color, or national origin.  42 U.S.C. § 2000d.  Second, Section 602 is unambiguously clear that recipients of federal financial assistance must comply with agency regulations effectuating Section 601. *Id.* § 2000d-1.  Third, Defendants promulgated the unambiguous disparate-impact regulations *before* LDH and LDEQ accepted federal funds and signed assurances that they "would fully comply with all applicable

civil rights statutes and *EPA regulations*." Watkins Decl. ¶¶ 8-9 (emphasis added); *see* 40 C.F.R. § 7.80(a)(1); Br. 8, 46-47.

The thrust of Plaintiff's counterargument is that Congress needed to specifically and unambiguously provide for disparate-impact liability in the text of Title VI. *See* Opp. 43-46. But having clearly prohibited discrimination in Section 601, Congress was not required to delineate every conceivable circumstance that would violate that specified funding condition. *See Charles v. Verhagen*, 348 F.3d 601, 608 (7th Cir. 2003); *see also Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002). Instead, with Section 602, Congress put recipients on notice that federal agencies would be promulgating regulations to effectuate Section 601 with which they must comply. *See* 42 U.S.C. § 2000d-1. So long as Congress sets forth the relevant funding condition (here, the prohibition on discrimination), the agencies that Congress explicitly charged with effectuating the condition could elaborate, by regulation, what they would consider to be a violation. *Cf. Biden v. Missouri*, 595 U.S. 87, 93-94 (2022) (per curiam) (recognizing that an agency may flesh out a statutory directive beyond "a list of bureaucratic rules").

In *Bennett v. Kentucky Department of Education*, for example, the Supreme Court, in addressing conditions on funds under the Elementary and Secondary Education Act, considered regulations that "elaborated" upon a statutory prohibition. 470 U.S. 656, 660 (1985). The Court did not decide whether recipients would be bound by regulations that *post*-dated acceptance of federal funds, but it made clear that the state "agreed to comply with, and its liability is determined by, the legal requirements *in place when the grants were made*," including "statutory provisions, *regulations*, and other guidelines provided by the [agency] at that time." *Id.* at 670 (emphases added).

Here, "the legal requirements in place when the grants were made" include the unambiguous disparate-impact regulations, which Defendants promulgated fifty years ago and with which the State's agencies have repeatedly promised to comply. LDEQ and LDH have received financial assistance from EPA since at least 1984 and 1981, respectively. Watkins Decl. ¶ 4. From the very beginning, EPA has required applicants to sign a statement of assurance that they would comply with the requirements in the regulations. *Id.* ¶ 10. Starting in 1984, applicants certified that they would "fully

comply with all applicable civil rights statutes and EPA regulations." *Id.* ¶¶ 8b, 11.  Even more specifically, EPA's General Terms and Conditions state that "the recipient acknowledges it has an affirmative obligation to . . . ensure that its actions do not involve discriminatory treatment and do not have discriminatory effects even when facially neutral." *See, e.g.,* ECF No. 12-30, at 26.  EPA is entitled to hold Plaintiff's agencies to their commitments.  *See Bennett*, 470 U.S. at 663.  As the Fifth Circuit explained in a different context, "[t]he fact that the State has long accepted . . . dollars notwithstanding the challenged conditions may be an additional relevant factor in the contract-like analysis the court has in mind for assessing the constitutionality of Spending Clause legislation." *Gruver v. La. Bd. of Supervisors*, 959 F.3d 178, 184 (5th Cir. 2020) (citation omitted) (rejecting argument that a sovereign-immunity waiver was coercive).  The same reasoning should apply to the ambiguity analysis. *Cf. Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (stating that "the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable").

Critically, in *Lau v. Nichols*, the Supreme Court considered Title VI and an agency's disparate-impact regulations in light of the Federal Government's "power to fix the terms on which its money allotments to the States shall be disbursed."  414 U.S. 563, 568-69 (1974).  "Whatever may be the limits of that power," the Court concluded, "they have not been reached here."  *Id.* at 569.  The Court has since cited *Lau*'s conclusion for the principle that Congress can use its spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory *and administrative* directives."  *Dole*, 483 U.S. at 206-07 (emphasis added) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)); *see also Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (citing *Lau*).  Relegating *Lau* to a footnote (Opp. 44 n.16), Plaintiff instead makes three flawed arguments.

*First*, Plaintiff invokes (Opp. 44) *Arlington Central School District Board of Education v. Murphy*, where the Supreme Court held that a statutory condition requiring the payment of "attorneys' fees" did not require the payment of expert fees, 548 U.S. 291, 293-94 (2006), and *Cummings*, *supra*, where the Court held that emotional-distress damages were not among the "usual contract remedies" for which a funding recipient would expect to be liable if it "breach[ed] its Spending Clause 'contract' with the Federal Government," 596 U.S. at 221.  These cases stressed the issue of notice in the ambiguity

analysis.  *See Arlington Central*, 548 U.S. at 296; *Cummings*, 596 U.S. at 219-20.  The Court held that the statutory text in *Arlington Central* and background principles of contract law in *Cummings* did not supply recipients with ample notice of the conditions attached to federal funds when they were accepted.  That is not the case here given the unambiguous statutory language and pre-existing regulations.

*Second*, Plaintiff argues (Opp. 44-45) that Section 602 does not specifically and unambiguously give agencies the authority to impose disparate-impact mandates.  But having unambiguously prohibited discrimination and unambiguously directed agencies to effectuate that prohibition, Congress was not required to delineate the ways in which agencies could choose to do so.  Again, once Congress makes clear that a condition on the use of federal funds is mandatory and enforceable, it may delegate to an agency charged with administering the spending program the authority to elaborate, by regulation, what conduct it will consider to violate the condition in order to effectuate it.  Indeed, Plaintiff elsewhere concedes the "unremarkable proposition that agencies would fill in *some* details under §602."  *Id.* at 56.[11]

*Third*, Plaintiff argues (Opp. 46) that Defendants' disparate-impact regulations run afoul of the Fifth Circuit's decision in *Texas Education Agency v. U.S. Department of Education* because the court there held that the requisite clarity for a waiver of sovereign immunity could not be provided by a regulation "clarifying an ambiguous statute."  992 F.3d 350, 361 (5th Cir. 2021).  But even if this principle applied beyond waivers of sovereign immunity, it would not answer the question here.  As described above, this is not an ambiguous statute.  Congress unambiguously prohibited discrimination in Section 601 and unambiguously directed agencies to effectuate that prohibition in Section 602.  The statute provided recipients of federal funds with notice that they must comply with agency regulations promulgated to effectuate the anti-discrimination mandate, which included Defendants' longstanding disparate-impact regulations, and Plaintiff's agencies signed assurances committing to do so.[12]

---

[11]  *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021) (cited at Opp. 45-46), did not involve a federal regulation or the Spending Clause, and thus has no bearing on this analysis.

[12]  Plaintiff also cites (Opp. 46) *West Virginia v. U. S. Department of Treasury*, 59 F.4th 1124 (11th Cir. 2023).  But, in *West Virginia*, the Eleventh Circuit did not question that a state must comply with "the

### D. EPA's proposed terms for voluntary settlement and its guidance documents comply with Title VI and APA requirements.

Neither EPA's proposed terms to negotiate an informal resolution with the State nor its guidance documents—the alleged "extra-regulatory" requirements—violate Title VI or the APA. Opp. 57-58. The State agrees that EPA can attempt to achieve voluntary resolution of a Title VI complaint by proposing terms that are not expressly contemplated by statute or regulation, without violating Title VI or the APA. Proposals during settlement negotiations are neither enforceable "rules, regulations, or orders" within the meaning of 42 U.S.C. § 2000d–1, nor regulations subject to APA rulemaking requirements. *See* Opp. 35 (conceding "negotiating positions may not be independently challengeable actions"). If the State voluntarily agrees to "extra-regulatory" terms in a settlement, it is the settlement itself that is binding. And no such agreement was ever executed here.

EPA guidance documents are also not binding rules, regulations, or orders, and the State points to nothing to the contrary. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 106 (4th Cir. 2011). During negotiations, EPA may have proposed measures to the State that are similar to components in EPA guidance documents—namely, pre-decisional impact analysis and community meetings. But EPA following its own guidance is hardly surprising and does not transform those measures—never agreed to by the parties—into binding requirements. Nor has EPA ever contended that "Title VI and its regulations *demand* consideration of cumulative disparate impacts and conducting public meetings." Opp. 57 (emphasis added). Rather, the guidance documents explain when it can be appropriate (but not mandatory) to consider cumulative impacts or hold community meetings, among other actions. Nothing in the guidance documents imposes binding requirements on the State.

Plaintiff also resorts to its gross mischaracterization of the June 16 Objection. But that objection did not "demand" that the State evaluate cumulative impacts as Plaintiff claims; at most, EPA's cover letter provided a general reminder of LDEQ's civil rights obligations. Other than

---

legal requirements in place when the grants were made," which "include existing regulations." *Id.* at 1148. *See also* Br. 48 n.17 (distinguishing *Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997) (en banc) (per curiam) (adopting the dissenting panel opinion of Luttig, J.) (cited at Opp. 46)).

satisfying the Clean Air Act, which the State promptly did resulting in the issuance of the permit, *see* Ex. E, the June 16 Objection imposed no requirement that the State do anything, *see* ECF No. 34-5.

## III. THE ALTERNATIVE REQUEST FOR UNIVERSAL VACATUR IS IMPROPER.

As an alternative to its request for a preliminary injunction, Plaintiff asks this Court to vacate the challenged disparate-impact regulations. Opp. 60. But Plaintiff concedes it "did not seek vacatur in its preliminary injunction motion," *id.*, which instead limited the requested relief to Plaintiff, *see* ECF No. 10-1. And Plaintiff has also opted not to move for summary judgment. *See* ECF No. 35. It thus presents no procedural basis for the Court to award such alternative relief.

In any event, universal vacatur of challenged agency action is not "required or even the norm." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). Members of the Supreme Court have also sharply questioned the propriety of universal vacatur. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (universal remedies are "inconsistent with longstanding limits on equitable relief and the power of Article III courts"); *United States v. Texas*, 143 S. Ct. 1964, 1985 (2023) (Gorsuch, J., concurring in the judgment) (universal vacatur requires "truly extraordinary circumstances").

Any relief thus must be limited to Louisiana, the sole Plaintiff. *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("[A] plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury.'") (citation omitted); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). Where "party-specific relief can adequately protect the plaintiff's interests," entering "broader relief is an abuse of discretion." *Texas*, 143 S. Ct. at 1980, 1986. This Court should not "make a binding judgment for the entire country," where "many states that have not brought suit may well have accepted and even endorsed [those regulations]." *Louisiana*, 20 F.4th at 263.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted or, in the alternative, summary judgment should be entered for Defendants.

Dated: October 30, 2023

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief, Federal Coordination and
Compliance Section

DARIA NEAL
Deputy Chief, Federal Coordination and
Compliance Section

*/s/ Katharine F. Towt*
KATHARINE F. TOWT (MA Bar No. 690461)
Attorney
U.S. Department of Justice
Civil Rights Division, Federal Coordination and
Compliance Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Phone: (202) 353-5054
Email: katie.towt@usdoj.gov

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRANDON B. BROWN
United States Attorney

KAREN J. KING
Assistant United States Attorney

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

*/s/ M. Andrew Zee*
M. ANDREW ZEE (CA Bar No. 272510)
ALEXANDER W. RESAR
ANDREW J. RISING
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Phone: (415) 436-6646
Email:    m.andrew.zee@usdoj.gov

*Attorneys for Defendants*