IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


STATE OF LOUISIANA            *   Docket No. 2:23-cv-692
                              *
                              *
VERSUS                        *   January 9, 2024
                              *
                              *
U.S. ENVIRONMENTAL            *
PROTECTION AGENCY, ET AL      *   Lake Charles, Louisiana

*****************************************************************

OFFICIAL TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JAMES D. CAIN, JR.,
UNITED STATES DISTRICT JUDGE

*****************************************************************

**A P P E A R A N C E S**


FOR THE PLAINTIFF:    JOSEPH SCOTT ST. JOHN
                      Louisiana Attorney General's Office
                      909 Poydras, Suite 1850
                      New Orleans, LA 70112


FOR THE DEFENDANTS:   ALISA PHILO
                      ALEXANDER W. RESAR
                      ANDREW JAMES RISING
                      U.S. Department of Justice
                      P.O. Box 14403
                      Washington, DC 20044

                      MICHAEL ANDREW ZEE
                      U.S. Department of Justice
                      450 Golden Gate Avenue #7-5395
                      San Francisco, CA 94102


REPORTED BY:          DEIDRE D. JURANKA, CRR
                      USDC - Western District of LA
                      611 Broad Street
                      Lake Charles, LA 70601

|        |    |                                                      |
|--------|----|------------------------------------------------------|
| 10:06AM | 1  | **COURT PROCEEDINGS**                               |
| 10:06AM | 2  | (Call to Order of the Court.)                        |
| 10:06AM | 3  | THE COURT:  Good morning.  How y'all doing?  Y'all   |
| 10:06AM | 4  | be seated.  All right.  Sorry I'm running a little bit |
| 10:07AM | 5  | behind.  I'm not too bad.  Actually doing okay.  Good |
| 10:07AM | 6  | morning.  If I could -- let me call this case up real |
| 10:07AM | 7  | quick and I'll have y'all make your appearances.  It is |
| 10:07AM | 8  | the State of Louisiana versus the United States       |
| 10:07AM | 9  | Environmental Protection Agency, Civil Docket         |
| 10:07AM | 10 | No. 23-cv-692.  If I could have counsel make their    |
| 10:07AM | 11 | appearances, please.                                  |
| 10:07AM | 12 | MR. ST. JOHN:  Morning, Judge.  Joseph Scott          |
| 10:07AM | 13 | St. John, Deputy Solicitor for the State of Louisiana. |
| 10:07AM | 14 | MR. RESAR:  Good morning, Your Honor.  Alexander      |
| 10:07AM | 15 | Resar from the Department of Justice for the defendants. |
| 10:07AM | 16 | MS. PHILO:  Alisa Philo for the defendants from the  |
| 10:07AM | 17 | Department of Justice.                                 |
| 10:07AM | 18 | THE COURT:  Okay.                                     |
| 10:07AM | 19 | MR. RISING:  Andrew Rising for the Department of      |
| 10:07AM | 20 | Justice for defendants.                               |
| 10:07AM | 21 | MR. ZEE:  Good morning, Your Honor.  Andrew Zee      |
| 10:07AM | 22 | also from the DOJ on behalf of defendants.            |
| 10:07AM | 23 | THE COURT:  We have a Filo attorney here in Lake     |
| 10:08AM | 24 | Charles.  You're not related, are you?                |
| 10:08AM | 25 | MS. PHILO:  No.  I heard, though, that there's a     |

10:08AM    1         similar namesake.

10:08AM    2              THE COURT:  You couldn't get into town without

10:08AM    3         somebody asking you about that.  Very good.

10:08AM    4              Okay.  Well, it's your motion if you want to begin.

10:08AM    5         You can certainly argue from there or come to the

10:08AM    6         podium, whatever you prefer.  Doesn't matter.

10:08AM    7              MR. ST. JOHN:  I'll come up, Judge.

10:08AM    8              THE COURT:  Sure.  No problem.

10:08AM    9              MR. ST. JOHN:  Morning, Your Honor.  Scott St. John

10:08AM   10         for the plaintiff state.  Attorney General Murrill told

10:08AM   11         me to give you her regards when I had dinner --

10:08AM   12              THE COURT:  She got sworn in yesterday.

10:08AM   13              MR. ST. JOHN:  Sunday actually.  She took office at

10:08AM   14         noon yesterday.

10:08AM   15              THE COURT:  I saw that, where they all -- the

10:08AM   16         weather was getting bad and they all had to --

10:08AM   17              MR. ST. JOHN:  It was still a chilly one.  She said

10:08AM   18         to give you her regards and that this is the first

10:08AM   19         hearing of her administration so my instructions were,

10:08AM   20         politely, don't mess it up.

10:08AM   21              THE COURT:  So no pressure, huh.

10:09AM   22              MR. ST. JOHN:  No pressure at all, Your Honor.  Let

10:09AM   23         me begin by three framing points, first the facts.

10:09AM   24         There are five declarations or five declarants in this

10:09AM   25         case.  The key narrative is an assignment declaration.

10:09AM 1      It's essentially undisputed.  The facts are pretty

10:09AM 2   outrageous.  EPA thinks that it can manage the State's

10:09AM 3   Medicaid program and that it has the power to restrict

10:09AM 4   statements by state cabinet officials to the public.

10:09AM 5      Want to flag the importance for the Court of

10:09AM 6   distinguishing between the factual record in those

10:09AM 7   declarations and attorney argument.  Twice in the last

10:09AM 8   week the Fifth Circuit has chastised the Department of

10:09AM 9   Justice for this.  That was in the *Wages & White Lion* en

10:09AM 10  banc and yesterday in *Louisiana v. Department of Energy.*

10:09AM 11  So we really need to focus on what is in the

10:09AM 12  declarations, not what's in the briefs.  Also want to

10:10AM 13  flag the importance of what the defendants do not say.

10:10AM 14  Mr. Hoang, the decision-maker, filed a declaration and

10:10AM 15  that declaration notably does not aver that EPA dropped

10:10AM 16  its investigations for any reason other than this

10:10AM 17  litigation.

10:10AM 18      The second kind of framing issue is there's a

10:10AM 19  persistent attempt to blur standing and mootness.

10:10AM 20  Standing is measured as of the time the complaint was

10:10AM 21  filed.  The EPA subsequently abandoned its

10:10AM 22  investigations for litigation-driven reasons.  Can be

10:10AM 23  inferred from the circumstances that doesn't affect

10:10AM 24  standing.  That's a mootness question.  Inference that

10:10AM 25  it was a litigation-driven abandonment is unrebutted by

10:10AM  1    declaration.  Again, we have Mr. Hoang as a declarant

10:10AM  2    and that triggers a mandatory adverse inference under

10:10AM  3    Supreme Court precedent.  That's *Interstate Circuit v.*

10:10AM  4    *United States.*  It's evidence "of the most convincing

10:10AM  5    character."

10:11AM  6         There's an utter failure by defendants to grapple

10:11AM  7    with the *Fenves* factors.  Judge Oldham has told us that

10:11AM  8    when the *Fenves* factors are satisfied as they are here

10:11AM  9    the case is not moot, full stop.  That was relegated to

10:11AM  10   a footnote, *Fenves* was, in defendants' reply.

10:11AM  11        The final framing factor, framing issue that I want

10:11AM  12   to draw the Court's attention to is there's a lot of

10:11AM  13   tension in the defendants' arguments.  It's not

10:11AM  14   surprising.  There's a hundred pages of briefing on each

10:11AM  15   side, give or take.  But the problem when you shotgun

10:11AM  16   defenses is sometimes the defenses interact in ways that

10:11AM  17   are not so great for your arguments.  We see that with a

10:11AM  18   challenge to the 180 day rule.  Defendants say, oh, we

10:11AM  19   were just following an injunction but the injunction was

10:11AM  20   consistent with our regulation; but now that

10:11AM  21   injunction's not here anymore, it's expired, so the case

10:11AM  22   is moot or the challenge is moot.  Well, if it's

10:12AM  23   consistent with your regulation and a U.S. District

10:12AM  24   Court Judge has construed your regulation in that way,

10:12AM  25   there's a presumption of good faith.  EPA is going to

10:12AM  1    keep following its own regulation.  There's a tension

10:12AM  2    there.

10:12AM  3        Defendants argue that Louisiana lacks standing

10:12AM  4    because it hasn't indicated an intent to violate the

10:12AM  5    law; but then their reply, Docket 42, ECF Page 19,

10:12AM  6    "Louisiana has effectively admitted that it failed to

10:12AM  7    comply" for many years.  So whatever Louisiana is doing

10:12AM  8    violates the law, but Louisiana hasn't indicated an

10:12AM  9    intent to continue violating the law.  A lot of tension

10:12AM  10   there.  It's effectively a concession.

10:12AM  11       The defendants argue for deference.  They do so at

10:12AM  12   Docket 29-1, ECF Page 59.  The Fifth Circuit has made

10:12AM  13   clear, though, if an agency is arguing for deference

10:12AM  14   that means the statute is ambiguous.  The statute's

10:12AM  15   ambiguous if they're arguing for deference.  Under *Texas*

10:13AM  16   *Education Agency*, the State wins under the spending

10:13AM  17   clause because you can't have an ambiguous spending

10:13AM  18   condition.

10:13AM  19       More broadly, in trying to prevail on the merits

10:13AM  20   the defendants' argument, going to try to summarize

10:13AM  21   this, is, okay, we have cases over a 40 year period,

10:13AM  22   give or take, and if you squint closely at one of them

10:13AM  23   and you cobble together a one justice opinion from the

10:13AM  24   majority and two dissenting opinions and we ignore the

10:13AM  25   *Marks* rule, which is controlling, and we ignore the

10:13AM   1    linguistic distinction in the statute and we ignore the

10:13AM   2    Supreme Court castigating this construction as, quote,

10:13AM   3    strange in a subsequent opinion, if we do all that, then

10:13AM   4    the defendants have the authority under Title VI.  But

10:13AM   5    if we're have go that far, if we're having to squint

10:14AM   6    like that, if we're having to cobble together dissents

10:14AM   7    with majorities and ignore the *Marks* rule, that's

10:14AM   8    ambiguity.  Not only has the Supreme Court not decided

10:14AM   9    what Title VI means, it can't even give a consistent

10:14AM   10   opinion about what it has said about what Title VI

10:14AM   11   means.  So how is the State supposed to have the

10:14AM   12   requisite clarity if the Supreme Court can't even agree

10:14AM   13   on not only what the statute means but what it has said

10:14AM   14   about what the statute means.

10:14AM   15        Then EPA is asking this Court to do what even

10:14AM   16   Justice Marshall wouldn't do in *Choate*.  So let's turn

10:14AM   17   to the argument.  Judge, I'm here for you so when you

10:14AM   18   have questions interrupt.  Series of activist complaints

10:14AM   19   led EPA to seek informal resolution about permits that

10:14AM   20   there's no dispute were entirely lawful under the Clean

10:14AM   21   Air Act.  This was not an environmental engagement per

10:14AM   22   se.  That's EPA's words.  Indeed, one of those permits

10:15AM   23   was a renewal at a facility that had been in that same

10:15AM   24   location since the 1960s.  The permit resulted in an

10:15AM   25   85 percent reduction in pollution, an unqualified

10:15AM   1    benefit to everyone.  EPA's theory is, well, that

10:15AM   2    renewal can still be a disparate impact because the

10:15AM   3    facility that's been there for 50 years is in an area

10:15AM   4    that has a higher density of African Americans than

10:15AM   5    other parts of the state.  No attempt to compare to

10:15AM   6    similarly situated areas, just it's a naked racial

10:15AM   7    balancing.

10:15AM   8         In the discussions EPA repeatedly refused to tell

10:15AM   9    the State what it supposedly did wrong.  No actus reus.

10:15AM  10    What did we do wrong.  Tell us.  We want to fix this.

10:15AM  11    If there's a problem, we want to fix it.  We need to

10:15AM  12    know what did we do wrong.  That's not helpful.  That's

10:16AM  13    what Ms. Dorka said.  This is all an assignment

10:16AM  14    declaration and it's in quotation marks for a reason

10:16AM  15    because those are her words and nobody has disputed

10:16AM  16    them.

10:16AM  17         So EPA generally waives its hands about cumulative

10:16AM  18    effects and disparate impacts and defines both to

10:16AM  19    encompass non-pollution related factors like education

10:16AM  20    or traffic.  Going back to where Justice Marshall

10:16AM  21    refused to tread, EPA demanded ex ante NEPA-like

10:16AM  22    analyses.  EPA even claimed it can regulate the State's

10:16AM  23    Medicaid program.  There's an entire agency of the

10:16AM  24    Federal Government, Health and Human Services, that

10:16AM  25    regulate Medicaid.  They're happy with what Louisiana is

10:16AM  1    doing.  EPA is not because EPA has appointed itself --

10:16AM  2         THE COURT:  What's Medicaid got to do with the EPA

10:16AM  3    in these air permits?  How are those two things tied

10:16AM  4    together?

10:16AM  5         MR. ST. JOHN:  The Louisiana Department of Health

10:17AM  6    accepted an $80,000 grant from EPA to conduct a study

10:17AM  7    about the impact of one of the permits and EPA used that

10:17AM  8    $80,000 grant as a hook to bring LDH into this and then

10:17AM  9    said not only did you accept that $80,000 grant, you

10:17AM 10    accepted safe drinking water funds, and so we're going

10:17AM 11    to try to micromanage what Medicaid says because that's

10:17AM 12    run by LDH.  That's the --

10:17AM 13         THE COURT:  What's that got to do with this

10:17AM 14    disparate impact study?  How does the Department of --

10:17AM 15    the Louisiana Department of Health have anything to do

10:17AM 16    with this?  I'm going to be honest with you, these were

10:17AM 17    some long briefs, convoluted.  It's a very convoluted

10:17AM 18    mess.  And so I'm still trying to navigate my way

10:17AM 19    through some of this, but maybe you can clarify that.

10:17AM 20         MR. ST. JOHN:  Absolutely, Judge.  So what Title VI

10:17AM 21    says is that if you -- if a state agency accepts federal

10:17AM 22    funds --

10:17AM 23         THE COURT:  I got all that.

10:17AM 24         MR. ST. JOHN:  Okay.  LDH accepted federal funds in

10:18AM 25    a variety of ways, hundreds of millions of dollars, from

2:23-cv-692; Motion Hearing 1/09/24                    10

10:18AM    1    EPA.  And so LDH was asked to perform a study.  They

10:18AM    2    performed a study.  Basically, EPA was unhappy with the

10:18AM    3    results of that study.

10:18AM    4        THE COURT:  Is that true?  Y'all were unhappy with

10:18AM    5    the study?  It's a yes or no question.

10:18AM    6        MR. RESAR:  I'm not sure what study is being

10:18AM    7    referenced.  I apologize.

10:18AM    8        MR. ST. JOHN:  They were asked to perform a study

10:18AM    9    related to permitting.  It's in the EPA's

10:18AM   10    jurisdictional --

10:18AM   11        THE COURT:  I'll be honest with you, you know, I

10:18AM   12    grew up in south Louisiana right here, whole industrial

10:18AM   13    complex right across the road.  Most of that was

10:18AM   14    built -- maybe y'all can comment.  Most of that was

10:18AM   15    built for the war effort.  There was nobody living over

10:18AM   16    there.  People moved in after the facilities were built.

10:18AM   17    Think about it.  Interstate 10 runs right through the

10:18AM   18    middle of multiple chemical refineries.  They were there

10:18AM   19    before the interstate.  I doubt you'd build an

10:19AM   20    interstate through there today, but it's there.  They're

10:19AM   21    not going to move it.  We're not going to move it

10:19AM   22    because of that.

10:19AM   23        MR. ST. JOHN:  This facility's been there since the

10:19AM   24    '60s.  Same thing.

10:19AM   25        THE COURT:  And Westlake is surrounded, the little

10:19AM    1        town of Westlake right here, surrounded by Conoco,
10:19AM    2        Phillips 66, Sasol.  It's 70 percent white.  I don't
10:19AM    3        understand this whole disparate -- I don't understand
10:19AM    4        it.  I'm trying to understand what's the end game on all
10:19AM    5        this.
10:19AM    6             MR. ST. JOHN:  Are we shortcutting to --
10:19AM    7             THE COURT:  I'm shortcutting.  What's the end game?
10:19AM    8        What's trying to be accomplished?
10:19AM    9             MR. ST. JOHN:  Shut all these facilities down.
10:19AM   10             THE COURT:  It's cheaper to move the people.  Why
10:19AM   11        don't the EPA just move the people.  You're going to
10:19AM   12        shut the facilities down?  I mean --
10:19AM   13             MR. ST. JOHN:  That's the administration --
10:19AM   14             THE COURT:  -- is that what y'all's position is,
10:19AM   15        just shut the facilities down?
10:19AM   16             MS. PHILO:  No, Your Honor.  I'm happy to jump in
10:19AM   17        on the merits, but I don't want to interrupt my
10:19AM   18        colleague.
10:19AM   19             MR. ST. JOHN:  I don't know how else to go about it
10:19AM   20        because the conditions that are attempting to be
10:19AM   21        imposed, there's no other way to do it other than shut
10:20AM   22        down the facilities.  Yeah, it's in a community that's
10:20AM   23        slightly more African American than the rest of the
10:20AM   24        state.  The EPA is, well, you approved a permit there.
10:20AM   25        That's disparate impact.  That's straight to the point,

10:20AM  1    Judge.  If you pollute more --

10:20AM  2        THE COURT:  My last check, pollution doesn't really

10:20AM  3    discriminate based on race.  It pollutes whoever's, you

10:20AM  4    know, there.

10:20AM  5        MR. ST. JOHN:  I agree, Your Honor.  We have --

10:20AM  6    Congress enacted a program.  We have the Clean Air Act

10:20AM  7    that governs pollution, but there's no dispute that the

10:20AM  8    Clean Air Act has been satisfied here.  EPA told us

10:20AM  9    that.  This is not an environmental engagement.  They

10:20AM 10    never disputed that the Clean Air Act had been met.  But

10:20AM 11    there's a disparate impact because that entirely lawful

10:20AM 12    pollutant, cumulatively or because it's in a community

10:20AM 13    that supposedly already has health problems, even though

10:20AM 14    the permit is fully legal under the controlling statute,

10:20AM 15    the Clean Air Act, you have to consider Title VI.  I

10:20AM 16    disagree with that, Judge.  When you have an on-point

10:20AM 17    statute you don't get to look over to the generic.

10:21AM 18    That's a basic specific versus general.

10:21AM 19        But EPA is saying, well, you have to comply with

10:21AM 20    both; and it's not enough that you comply with the Clean

10:21AM 21    Air Act which regulates chemical by chemical by

10:21AM 22    chemical, you have to consider all of them together

10:21AM 23    along with education and health and wealth disparities.

10:21AM 24    This is all in the assignment declaration, Judge, and

10:21AM 25    those facts are undisputed.  That's EPA's theory.

| | | |
|---|---|---|
| 10:21AM | 1 | That's why we're here and that's why the State said no. |
| 10:21AM | 2 | It does not work like this.  That's a major questions |
| 10:21AM | 3 | issue.  That's a lack of clarity under the spending |
| 10:21AM | 4 | clause.  It's outrageous. |
| 10:21AM | 5 | Yeah, EPA knows it's got a gun.  Defendants come in |
| 10:21AM | 6 | and they say, hey, we've never had to take one of these |
| 10:21AM | 7 | to judgment in 50 something years of Title VI.  Well, |
| 10:21AM | 8 | yeah, because if you tell a state agency we're going to |
| 10:21AM | 9 | recoup $500 million from you, state agency folds. |
| 10:21AM | 10 | That's what happens.  So EPA is walking around -- Judge, |
| 10:21AM | 11 | you and I are both old enough to remember the '70s and |
| 10:22AM | 12 | '80s, mutually assured destruction.  You got somebody |
| 10:22AM | 13 | with a nuclear bomb, you're going to tread carefully. |
| 10:22AM | 14 | That's what EPA is walking around with.  They point it |
| 10:22AM | 15 | at Louisiana and Louisiana is the first state to say no, |
| 10:22AM | 16 | we're not going to play that game, because it went too |
| 10:22AM | 17 | far. |
| 10:22AM | 18 | THE COURT:  Well, this thing has been around for a |
| 10:22AM | 19 | long time.  From my reading of all y'all's briefs, it |
| 10:22AM | 20 | really hadn't been utilized in the environmental world |
| 10:22AM | 21 | until recently.  I mean, what's -- did they just go find |
| 10:22AM | 22 | this and pull it out of the closet recently?  Had it |
| 10:22AM | 23 | been approved through the Administrative Procedures Act? |
| 10:22AM | 24 | MR. ST. JOHN:  The regulations have been in place. |
| 10:22AM | 25 | THE COURT:  I'm talking about the disparate impact. |

10:22AM  1    I know the Clean Air Act, Clean Water, all that's been

10:22AM  2    out there.

10:22AM  3        MR. ST. JOHN:  It has -- I would say it has not

10:22AM  4    been applied.  There's been some cognizance of this as a

10:22AM  5    theory.  EPA and DOJ acknowledged, I think we pointed

10:23AM  6    out in the Federal Register post, *Sandoval*, that the

10:23AM  7    Supreme Court kind of undercut that, called it into

10:23AM  8    doubt, I believe was the viability of that.  So was it

10:23AM  9    there as a possibility, yes.  Did anybody ever really do

10:23AM  10   anything with it, no.  Did the Supreme Court call it

10:23AM  11   into doubt, yes.  And so nobody wanted to touch it

10:23AM  12   because it's a weak theory, right.  Now you've got the

10:23AM  13   Biden administration issuing executive orders saying

10:23AM  14   environmental justice, environmental justice.

10:23AM  15   Administrator Regan comes down, we have a big showdown

10:23AM  16   here about how he's going to crack down on this

10:23AM  17   pollution, and here we are.  This is the theory that EPA

10:23AM  18   went with.

10:23AM  19       THE COURT:  Are they picking particular permits

10:23AM  20   when they come up strategically, in your review, or are

10:23AM  21   they doing all the permits?

10:23AM  22       MR. ST. JOHN:  There's some strategy to it.

10:23AM  23   There's some strategy to it.  This was -- let's cut to

10:24AM  24   the chase, right.  It was -- you had an outgoing

10:24AM  25   governor that was sympathetic to the administration.

2:23-cv-692; Motion Hearing 1/09/24                    15

10:24AM   1        THE COURT:  I don't really care about the politics

10:24AM   2    of it that much.  I mean, I don't really care about the

10:24AM   3    politics of it.  What I'm saying is you have facilities

10:24AM   4    throughout -- I'm going to stick with Louisiana.  You

10:24AM   5    have facilities throughout Louisiana that need air

10:24AM   6    permits.  Are they -- are they requiring the LDEQ to do

10:24AM   7    disparate impact studies on all air permits or are they

10:24AM   8    just strategically picking certain ones?

10:24AM   9        MR. ST. JOHN:  No, EPA was very clear they expected

10:24AM  10    this to be done on every single permit.  That's why

10:24AM  11    we're in your court, Judge, why we're in your court,

10:24AM  12    because EPA may it unequivocally clear --

10:24AM  13        THE COURT:  My reading is there were four, y'all

10:24AM  14    had resolved the four, my reading of the briefs here.  I

10:24AM  15    got Post-It notes.  I'm old school.  I don't use

10:24AM  16    computers.  I do use computers.  I don't want to say

10:25AM  17    that.

10:25AM  18        MR. ST. JOHN:  EPA got sued and they dropped the

10:25AM  19    claims.

10:25AM  20        THE COURT:  Yeah, it says that they -- State cannot

10:25AM  21    point to a single action undertaken by the EPA against

10:25AM  22    Louisiana or that, dependent on the disparate impact

10:25AM  23    regulations, the only actions taken by EPA that are

10:25AM  24    relevant to this that were investigated were to

10:25AM  25    investigate complaints, negotiate settlements which

10:25AM  1   impose no legal actionable effect on anyone.  That's

10:25AM  2   what the EPA says.  I guess they investigated some

10:25AM  3   complaints and didn't find that there were any

10:25AM  4   violations under the disparate impact regulations.  Is

10:25AM  5   that a fair assessment?  You didn't find any violations

10:25AM  6   under -- utilizing the disparate impact analysis?

10:25AM  7       MR. RESAR:  That's correct, Your Honor.  The

10:25AM  8   complaint investigations were closed without any finding

10:25AM  9   of disparate impact.

10:25AM  10      MR. ST. JOHN:  They were abandoned, Judge.

10:26AM  11      THE COURT:  Well, at the end of the day I take that

10:26AM  12  as they didn't find any violations and I guess they

10:26AM  13  backed off.  Right?

10:26AM  14      MR. ST. JOHN:  No.  Judge, let's be very clear.

10:26AM  15  There was no --

10:26AM  16      THE COURT:  That's what I'm trying to get to.  I'm

10:26AM  17  trying to find clarity.

10:26AM  18      MR. ST. JOHN:  This is the difference --

10:26AM  19      THE COURT:  I find a lot of muddy water here.

10:26AM  20      MR. ST. JOHN:  This is the difference between a

10:26AM  21  jury saying not guilty and finding someone not guilty.

10:26AM  22  EPA walked away because we called their bluff.  We're

10:26AM  23  here in front of you.

10:26AM  24      THE COURT:  A win's a win.

10:26AM  25      MR. ST. JOHN:  Judge, I'm concerned about all the

2:23-cv-692; Motion Hearing 1/09/24                           17

10:26AM   1      other permit actions.

10:26AM   2           THE COURT:  Well, we're going to talk about that,

10:26AM   3      too, because what I -- we'll get to that.

10:26AM   4           MR. ST. JOHN:  That's the ultimate issue.  EPA's

10:26AM   5      view of the law is that we have to -- we, the State,

10:26AM   6      have to consider disparate impact in every single

10:26AM   7      permitting decision including renewals.  So this

10:26AM   8      facility that's been there for 40, 50 years, facilities

10:26AM   9      that have been there since World War II, when their

10:27AM   10     Clean Air Act renewals come up LDEQ has to perform a

10:27AM   11     disparate impact analysis and if the wrong races are

10:27AM   12     affected, got to have a naked consideration of race,

10:27AM   13     wrong races are affected then LDEQ has to take that into

10:27AM   14     account.  And if the Federal Government's going to stand

10:27AM   15     up here and say no, you do not have to perform a

10:27AM   16     disparate impact analysis, there's no such thing, Judge,

10:27AM   17     you can enter an order accordingly and we'll take

10:27AM   18     judicial estoppel.  I suspect they're not going to do

10:27AM   19     that, though.

10:27AM   20          Put bluntly, Louisiana doesn't want to

10:27AM   21     discriminate.  Under state law, we don't do is there a

10:27AM   22     compelling government interest to justify

10:27AM   23     discrimination.  The State of Louisiana does not

10:27AM   24     discriminate on the basis of race, and performing a

10:27AM   25     disparate impact analysis requires the State to

| | | |
|---|---|---|
| 10:27AM | 1 | discriminate on the basis of race.  That's what *Ricci v.* |
| 10:27AM | 2 | *DeStefano* said.  If you're doing disparate impact you're |
| 10:28AM | 3 | required to consider race.  So there's a war there. |
| 10:28AM | 4 | THE COURT:  Is that to be intentional |
| 10:28AM | 5 | discrimination? |
| 10:28AM | 6 | MR. ST. JOHN:  No.  That's the difference, right, |
| 10:28AM | 7 | is disparate impact does not require intentional |
| 10:28AM | 8 | discrimination.  The State as a matter of state law |
| 10:28AM | 9 | cannot consider race, full stop, full stop.  We are a |
| 10:28AM | 10 | color blind state, Judge.  We don't want to consider |
| 10:28AM | 11 | race.  We don't think Title VI requires us to consider |
| 10:28AM | 12 | race.  If it did, there's just a straight up conflict |
| 10:28AM | 13 | with state law.  Setting that aside -- |
| 10:28AM | 14 | THE COURT:  Like I said earlier, pollution doesn't |
| 10:28AM | 15 | discriminate, doesn't care what color you are. |
| 10:28AM | 16 | MR. ST. JOHN:  Correct, Judge. |
| 10:28AM | 17 | THE COURT:  Clean water, clean air for everyone to |
| 10:28AM | 18 | breathe. |
| 10:28AM | 19 | MR. ST. JOHN:  Correct, Judge.  That is the State's |
| 10:28AM | 20 | position and that's why the State has its Clean Air Act |
| 10:28AM | 21 | program.  We've run these permits through the State's |
| 10:28AM | 22 | Clean Air Act analysis.  The Clean Air Act regulates |
| 10:29AM | 23 | chemical by chemical.  Chemical X, you can have this |
| 10:29AM | 24 | many parts per million in your ambient air.  It doesn't |
| 10:29AM | 25 | look at things cumulatively.  That's not the program |

10:29AM    1    Congress set up.  The other thing is it gives the State

10:29AM    2    primacy.  The EPA has continually lost on this again and

10:29AM    3    again and again.  I think the case we cited, the

10:29AM    4    exemplar case, is *Luminant,* primacy.  The State is

10:29AM    5    supposed to run these programs.  EPA is not supposed to

10:29AM    6    micromanage.  But here they're coming in and saying not

10:29AM    7    only are we going to micromanage your air program, we're

10:29AM    8    going to require you to, contrary to the Clean Air Act,

10:29AM    9    consider cumulative impact, contrary to the Clean Air

10:29AM   10    Act, not consider the economic costs, because the Clean

10:29AM   11    Air Act requires us to consider economic costs.  EPA was

10:29AM   12    unhappy about that.  Quote, we're all environmental

10:29AM   13    agencies.  That's not what the Clean Air Act does but

10:29AM   14    that's what EPA thinks Title VI requires, just a pure

10:30AM   15    focus on the environment.

10:30AM   16         Judge, it's probably helpful to turn to standing.

10:30AM   17    Or do you have any more questions about the facts?

10:30AM   18         THE COURT:  Not now.  I may in a minute.

10:30AM   19         MR. ST. JOHN:  We're focussed on Title VI so why

10:30AM   20    don't we keep on that.  The standing question is largely

10:30AM   21    resolved by *MedImmune*.  That was a patent case.  Patent

10:30AM   22    licensee wanted to challenge the underlying patent even

10:30AM   23    though the license provided the licensee a no threat of

10:30AM   24    suit.  Supreme Court analogized that the case's holding

10:30AM   25    that a plaintiff doesn't have to expose himself to

2:23-cv-692; Motion Hearing 1/09/24                      20

10:30AM   1    liability before bringing suit to challenge the basis of
10:30AM   2    the threat, here that would be the law or regulation,
10:30AM   3    that's because the threat eliminating behavior following
10:30AM   4    the law is effectively coerced.  So the plaintiff
10:30AM   5    doesn't have to breach or repudiate the contract before
10:31AM   6    suing to invalidate the underlying issue.  There the
10:31AM   7    patent, here the regulations.
10:31AM   8         There's no contest that if the State has to
10:31AM   9    consider disparate impact there would be an increased
10:31AM  10    regulatory burden.  LDH said complying with EPA's
10:31AM  11    request would cost millions of dollars.  That's in the
10:31AM  12    record.  I don't think -- let's just be practical.  If
10:31AM  13    you're having employees do something, that costs money.
10:31AM  14    And we know it costs a lot of money because we see EPA
10:31AM  15    asking for a $50 million addition to its budget to do
10:31AM  16    exactly this on the regulatory side.
10:31AM  17         This isn't a general threat.  The President
10:31AM  18    ordered -- issued two executive orders on this.
10:31AM  19         THE COURT:  They're position I'm assuming --
10:31AM  20         MR. ST. JOHN:  Say again.
10:31AM  21         THE COURT:  I don't want to state your position for
10:31AM  22    you; but I'm assuming their position is, hey, we had
10:32AM  23    four complaints, we investigated them, we found no
10:32AM  24    violations, we walked away, we didn't make you do
10:32AM  25    anything, you got to issue your permits.  Right?  That's

10:32AM     1              what they're going to say?
10:32AM     2                   MR. ST. JOHN:  That's what they're going to say.
10:32AM     3                   THE COURT:  So no harm, no foul, I guess is their
10:32AM     4         position; but you're saying there's more to come.
10:32AM     5                   MR. ST. JOHN:  There's more to come.
10:32AM     6                   THE COURT:  Is that what you're trying to say?
10:32AM     7                   MR. ST. JOHN:  Yes, Judge.
10:32AM     8                   THE COURT:  That brings me to a question, then.
10:32AM     9         The State of Louisiana filed another complaint, Docket
10:32AM    10         No. 23-1774, against the EPA --
10:32AM    11                   MR. ST. JOHN:  Yes, Judge.
10:32AM    12                   THE COURT:  -- on December 19th regarding a FOIA
10:32AM    13         request.
10:32AM    14                   MR. ST. JOHN:  Yes, Judge.
10:32AM    15                   THE COURT:  Are y'all familiar with this?
10:32AM    16                   MR. RESAR:  We're not the attorneys representing
10:32AM    17         EPA in that case.
10:32AM    18                   THE COURT:  You're representing EPA today --
10:32AM    19                   MR. RESAR:  We know it exists.
10:32AM    20                   THE COURT:  -- and you're here and this is relevant
10:32AM    21         to me.  And I know they -- I don't think they've been
10:32AM    22         served but I know --
10:33AM    23                   MR. ST. JOHN:  They have been served and they've
10:33AM    24         acknowledged --
10:33AM    25                   THE COURT:  My question to you is what are you

2:23-cv-692; Motion Hearing 1/09/24                    22

10:33AM   1    digging for in this FOIA request to EPA.  Is this going
10:33AM   2    to -- are you looking for something?
10:33AM   3            MR. ST. JOHN:  Yeah.
10:33AM   4            THE COURT:  Obviously.  You sent a FOIA request.
10:33AM   5    That's kind of a -- but my point is what are you looking
10:33AM   6    for, because I'm assuming it might be relevant to this
10:33AM   7    issue.
10:33AM   8            MR. ST. JOHN:  So, Judge, we asked --
10:33AM   9            THE COURT:  You don't really say what you're
10:33AM  10    looking for in here.  You just say they hadn't responded
10:33AM  11    as required by the statute.
10:33AM  12            MR. ST. JOHN:  So --
10:33AM  13            THE COURT:  And if it's not relevant to this, tell
10:33AM  14    me it's not relevant and I'll let it go.
10:33AM  15            MR. ST. JOHN:  Judge, one of my items today was to
10:33AM  16    ask you to take judicial notice of the pendency of that
10:33AM  17    litigation.
10:33AM  18            THE COURT:  I got that right here.
10:33AM  19            MR. ST. JOHN:  The FOIA request or appended to it
10:33AM  20    as one of the letters, we asked for their -- for EPA's
10:33AM  21    communications with the activists.
10:33AM  22            THE COURT:  With who?
10:33AM  23            MR. ST. JOHN:  The activists, the folks that filed
10:34AM  24    the complaints.
10:34AM  25            THE COURT:  Oh, you want the correspondence

10:34AM  1    between --

10:34AM  2         MR. ST. JOHN:  Between them --

10:34AM  3         THE COURT:  -- and the people who filed the

10:34AM  4    complaints.

10:34AM  5         MR. ST. JOHN:  Should be -- as someone who's been

10:34AM  6    involved a little bit in the state of FOIA, that's an

10:34AM  7    easy ask because when something leaves the sandbox, your

10:34AM  8    in-house sandbox, going to known e-mail addresses you

10:34AM  9    can have your tech folks say, okay, I'm going to pull

10:34AM  10   everything going to SierraClub.com.  That is a super

10:34AM  11   easy ask.  Here we are six, seven months down the road

10:34AM  12   and --

10:34AM  13        THE COURT:  I'll be quite honest with you, you did

10:34AM  14   say that in here.  I had not really read this complaint.

10:34AM  15   I just knew it was out there.

10:34AM  16        MR. ST. JOHN:  That's what we asked for.

10:34AM  17        THE COURT:  It does say the initial response

10:34AM  18   letter.  How is that relevant? Maybe it's not.  I just

10:34AM  19   wanted to know because I don't typically get multiple

10:34AM  20   lawsuits against the EPA here.

10:34AM  21        MR. ST. JOHN:  So part of the challenge here is the

10:34AM  22   EPA's 180-day action requirement.  Okay.  They've been

10:35AM  23   blowing that off for years.  EPA has admitted that it's

10:35AM  24   impracticable, arbitrary.  That was when they

10:35AM  25   reconsidered in 2016.  It's all in the Federal Register.

2:23-cv-692; Motion Hearing 1/09/24                    24

10:35AM   1   We cited to it in the brief.  EPA can't meet the 180

10:35AM   2   days.  They got sued by Sierra Club.  Sierra Club got an

10:35AM   3   injunction saying you will meet the 180 days unless

10:35AM   4   Sierra Club agrees to grant you an extension.  The

10:35AM   5   problem with that is twofold.  One, that makes clear

10:35AM   6   that the 180 days is arbitrary.  Two, for purposes here,

10:35AM   7   that's a delegation to a private litigant, a delegation

10:35AM   8   of Government power.  Are we going to continue this

10:35AM   9   investigation?  Let me ask Sierra Club for permission.

10:35AM  10   So the State as a sovereign in its interaction with EPA

10:35AM  11   was subject to permission from Sierra Club.

10:35AM  12        So we just asked for -- the Government's coming in

10:35AM  13   here and saying oh, it was merely conferring.  Well, you

10:36AM  14   had an injunction.  That's not voluntarily conferring

10:36AM  15   when a judge tells you to do something via an

10:36AM  16   injunction.  But okay, if you're going to say you were

10:36AM  17   merely conferring, it was all on the up-and-up, just

10:36AM  18   give us your e-mail.  Easy ask again.  Give me the

10:36AM  19   e-mail leaving the sandbox going to or from

10:36AM  20   SierraClub.com or .org.  But here we are six, seven

10:36AM  21   months later, they haven't coughed them up.  That's an

10:36AM  22   easy ask.  This is another item, Judge, where you can

10:36AM  23   take an adverse inference.

10:36AM  24        THE COURT:  Well, I'm not ruling on that today.

10:36AM  25        MR. ST. JOHN:  You're not ruling on that but --

2:23-cv-692; Motion Hearing 1/09/24                    25

10:36AM    1        THE COURT:  I mean, they haven't even been served.
10:36AM    2    Well, I guess they have been served but they haven't --
10:36AM    3        MR. ST. JOHN:  Hadn't responded.
10:36AM    4        THE COURT:  Their time to respond to that -- I just
10:36AM    5    bring it up only to ask if there's something there
10:36AM    6    that's going to support your standing argument,
10:36AM    7    something you're looking for that's relevant that you
10:36AM    8    don't have.  That's the reason I -- that's the only
10:36AM    9    reason I brought it up.
10:36AM   10        MR. ST. JOHN:  What was the back and forth between
10:37AM   11    the EPA and folks that were --
10:37AM   12        THE COURT:  Filing the complaints.
10:37AM   13        MR. ST. JOHN:  Filing the complaints and having to
10:37AM   14    give EPA permission to continue the investigation rather
10:37AM   15    than make findings.
10:37AM   16        THE COURT:  You mean EPA was asking them, in your
10:37AM   17    theory -- your theory is EPA's asking them if they can
10:37AM   18    continue or discontinue their investigation?
10:37AM   19        MR. ST. JOHN:  Judge --
10:37AM   20        THE COURT:  Or you don't know.
10:37AM   21        MR. ST. JOHN:  No, we know.  It's not a theory.
10:37AM   22    One of the documents in the record is the three-way
10:37AM   23    signed contractual agreement agreeing to extend the
10:37AM   24    period.  So EPA couldn't, even if it wanted to, continue
10:37AM   25    investigating beyond 180 days.

| | | |
|---|---|---|
| 10:37AM | 1 | THE COURT:  Well, let's jump to your judicial |
| 10:37AM | 2 | notice to see if that helps, too, because I'm trying to |
| 10:37AM | 3 | get clarity on this.  I have one motion for request for |
| 10:37AM | 4 | judicial notice that's Docket No. 23-cv-692 where you, |
| 10:37AM | 5 | the State, asks the Court to take judicial notice of |
| 10:38AM | 6 | EPA's October 3rd, 2023 acceptance for investigation of |
| 10:38AM | 7 | a Title VI complaint alleging only disparate impact by |
| 10:38AM | 8 | facility -- by a facially non-discriminatory policy. |
| 10:38AM | 9 | What facility is this?  That's one thing I asked my law |
| 10:38AM | 10 | clerk, what facility.  I mean, you're giving the date; |
| 10:38AM | 11 | but what facility are we talking about? |
| 10:38AM | 12 | MR. ST. JOHN:  I believe these are scattered across |
| 10:38AM | 13 | the country.  EPA is saying we're not going to do this |
| 10:38AM | 14 | or we're not -- you in Louisiana have nothing to fear. |
| 10:38AM | 15 | At the same time they're commencing these investigations |
| 10:38AM | 16 | against Alabama, Michigan, all these other states on |
| 10:38AM | 17 | disparate impact theory so -- |
| 10:38AM | 18 | THE COURT:  But what do you care if it's Alabama? |
| 10:38AM | 19 | It's not Louisiana. |
| 10:38AM | 20 | MR. ST. JOHN:  The law is the law, Judge. |
| 10:38AM | 21 | THE COURT:  I hear you.  Alabama's not in this |
| 10:38AM | 22 | case, huh? |
| 10:38AM | 23 | MR. ST. JOHN:  Alabama is not in this case. |
| 10:38AM | 24 | THE COURT:  I'm just saying, I mean, I understand |
| 10:38AM | 25 | if they're over there doing it in Alabama but they're |

10:39AM    1    not doing it here --

10:39AM    2        MR. ST. JOHN:  That goes to mootness, Judge.  It's

10:39AM    3    not moot.  The fact that EPA got sued and dropped this

10:39AM    4    case like a hot potato doesn't moot the case,

10:39AM    5    particularly when they're continuing to do the same

10:39AM    6    things conveniently avoiding Louisiana while this case

10:39AM    7    is pending right now.  And the minute -- if you were to

10:39AM    8    dismiss this case, I have very little doubt a couple

10:39AM    9    months later we'd see another one of these

10:39AM   10    investigations.

10:39AM   11        What it boils down to is EPA -- or Louisiana does

10:39AM   12    not want to -- let me back up.  Louisiana does not

10:39AM   13    believe that the disparate impact regulations are

10:39AM   14    lawful.  EPA's disparate impact regulations are not

10:39AM   15    lawful, ultra vires, arbitrary and capricious.

10:39AM   16    Louisiana needs to know --

10:39AM   17        THE COURT:  Give me in a nutshell why you say it's

10:40AM   18    not lawful.

10:40AM   19        MR. ST. JOHN:  Section -- the Supreme Court has

10:40AM   20    said Title VI only directly reaches intentional

10:40AM   21    discrimination.  I don't think either side disputes

10:40AM   22    that.  That is clear.  The question is what does

10:40AM   23    Section 602, which is the regulatory authority,

10:40AM   24    authorize.  And it says agencies can, quote, effectuate

10:40AM   25    Section 601.  It's a disparate impact regulation within

| | | |
|---|---|---|
| 10:40AM | 1 | that authority to effectuate. |
| 10:40AM | 2 | THE COURT:  And your answer is no. |
| 10:40AM | 3 | MR. ST. JOHN:  No.  That's what five justices of |
| 10:40AM | 4 | the Supreme Court said. |
| 10:40AM | 5 | THE COURT:  Stop right there. |
| 10:40AM | 6 | MR. ST. JOHN:  Yeah. |
| 10:40AM | 7 | THE COURT:  What's your response to that? |
| 10:40AM | 8 | MS. PHILO:  It does effectuate Section 601.  I'm |
| 10:40AM | 9 | happy to -- |
| 10:40AM | 10 | THE COURT:  Let's stop right there for a minute.  I |
| 10:40AM | 11 | want to hear -- because we can run over -- I want to |
| 10:40AM | 12 | address -- because I think this is, you know, the issue |
| 10:41AM | 13 | in a nutshell right here.  Go ahead. |
| 10:41AM | 14 | MS. PHILO:  So yes, the defendants' disparate |
| 10:41AM | 15 | impact regulations are pursuant to that direct statutory |
| 10:41AM | 16 | authority in Section 602 to effectuate the |
| 10:41AM | 17 | antidiscrimination mandate in Section 601. |
| 10:41AM | 18 | THE COURT:  But does it have to be intentional? |
| 10:41AM | 19 | MS. PHILO:  The disparate impact regulations do not |
| 10:41AM | 20 | require intentional discrimination. |
| 10:41AM | 21 | THE COURT:  He says it does.  No, you said no.  You |
| 10:41AM | 22 | said the Supreme Court -- |
| 10:41AM | 23 | MR. ST. JOHN:  The difference -- Section 601, what |
| 10:41AM | 24 | Title VI reaches independently is intentional |
| 10:41AM | 25 | discrimination.  The statute says no intentional |

10:41AM  1    discrimination.  I think we agree on that.

10:41AM  2        MS. PHILO:  We agree that the Court has interpreted

10:41AM  3    Section 601 to directly reach only intentional

10:41AM  4    discrimination, yes, Your Honor.

10:41AM  5        MR. ST. JOHN:  Both sides are yes on that.

10:41AM  6        THE COURT:  Both sides are yes on that.  Let's move

10:41AM  7    on to 602.

10:41AM  8        MR. ST. JOHN:  602 is the effectuate 601,

10:42AM  9    effectuate being the key word.  It gives agencies

10:42AM  10   granting funds the power to issue regulations that,

10:42AM  11   quote, effectuate 601.  So can an entirely different

10:42AM  12   theory of discrimination effectuate a ban on intentional

10:42AM  13   discrimination.

10:42AM  14       THE COURT:  Let me hear from you on that.

10:42AM  15       MS. PHILO:  It can.

10:42AM  16       THE COURT:  And how and why?

10:42AM  17       MS. PHILO:  So we agree that the regulations

10:42AM  18   prohibit a broader array of conduct in reaching

10:42AM  19   disparate impact, unlawful disparate impact within the

10:42AM  20   statute itself.  The Supreme Court has already

10:42AM  21   recognized the validity of that.  In *Guardians* seven

10:42AM  22   justices recognized that the statute was limited to

10:42AM  23   directly reach only intentional discrimination, but five

10:42AM  24   justices still formed a majority to recognize the

10:42AM  25   validity of the disparate impact regulations.  And I

**2:23-cv-692; Motion Hearing 1/09/24**                    30

10:42AM   1    know my colleague is going to say that three of them
10:42AM   2    were in the dissent, but the same is true for the
10:43AM   3    *Guardians* proposition --
10:43AM   4         THE COURT:  Not a majority if three of them
10:43AM   5    dissented, you know.  That's first year law school stuff
10:43AM   6    right there.
10:43AM   7         MR. ST. JOHN:  Judgments, not opinions, Judge.
10:43AM   8         MS. PHILO:  The Court itself said that five
10:43AM   9    justices are forming a majority.  Two years later a
10:43AM   10   unanimous court in *Choate* characterized that as a
10:43AM   11   holding.  I would stress, Your Honor, that --
10:43AM   12        THE COURT:  What's the cases again?  Because I want
10:43AM   13   to really zero in on --
10:43AM   14        MR. ST. JOHN:  *Choate* was a -- okay.  You have
10:43AM   15   *Guardians* which is split.  We can agree it's split.
10:43AM   16        MS. PHILO:  It's a fractured decision.
10:43AM   17        MR. ST. JOHN:  It's a fractured opinion.  The next
10:43AM   18   case is *Choate*.
10:43AM   19        MS. PHILO:  *Alexander v. Choate*.
10:43AM   20        MR. ST. JOHN:  *Alexander v. Choate.*  That was
10:43AM   21   Justice Marshall.  It was a Rehabilitation Act case.
10:43AM   22   And he said in *Guardians* we held and then he cobbles
10:43AM   23   together the dissent.  And then the next case is
10:43AM   24   *Sandoval*.
10:43AM   25        THE COURT:  You agree with that?

10:43AM     1          MS. PHILO:  Yes.

10:43AM     2          MR. ST. JOHN:  *Sandoval*.

10:43AM     3          THE COURT:  Try to find what we can agree on.

10:44AM     4          MS. PHILO:  Of course, Your Honor.

10:44AM     5          MR. ST. JOHN:  This is good, Judge.  I appreciate

10:44AM     6     this.

10:44AM     7          THE COURT:  I want to find what we can agree on to

10:44AM     8     try to get it boiled down.

10:44AM     9          MR. ST. JOHN:  *Sandoval* says it was the majority.

10:44AM    10     Justice Scalia wrote, five justices, we have never held

10:44AM    11     that disparate impact -- that Title VI permits disparate

10:44AM    12     impact regulations.  Never held.

10:44AM    13          THE COURT:  You agree with that?

10:44AM    14          MS. PHILO:  He says no opinion has held.  There is

10:44AM    15     no one opinion.  Of course, it's a fractured decision.

10:44AM    16     But Justice Scalia goes on to do the same math that five

10:44AM    17     justices voiced that view of the law and that *Choate* has

10:44AM    18     to the same effect.

10:44AM    19          MR. ST. JOHN:  And then he says that would be a

10:44AM    20     strange -- and there's footnote, we note that that would

10:44AM    21     be a very strange, his word, majority's word, actually

10:44AM    22     five votes for that --

10:44AM    23          THE COURT:  This sounds like some kind of mean,

10:44AM    24     cruel Bar exam question that they would put on the

10:44AM    25     constitutional law part of the Bar where there's really

10:44AM    1    no answer right now.

10:44AM    2        MR. ST. JOHN:  Judge, it does actually get to the

10:45AM    3    answer.  So we've been discussing the merits of what

10:45AM    4    does 602 authorize.  That's this we've got a fractured

10:45AM    5    opinion and then we've got -- well, *Sandoval* explicitly

10:45AM    6    calls *Choate* dictum.  So you have a majority saying

10:45AM    7    we've never held that and that was dictum and then

10:45AM    8    you've got *Sandoval*.

10:45AM    9        So, Judge, yeah it's fractured all the way around

10:45AM   10    on the question of, one, what does title -- Section 602

10:45AM   11    of Title VI authorize.  Can we agree on that?  There are

10:45AM   12    conflicting -- you have a -- *Guardians* is split and then

10:45AM   13    *Choate* and *Sandoval* make opposite statements.  Can we

10:45AM   14    agree on that?

10:45AM   15        MS. PHILO:  *Choate* makes clear that it's a holding,

10:45AM   16    and I would say that Scalia in *Sandoval* never disavows

10:45AM   17    that holding.  He recognizes the tension.  He does not

10:45AM   18    hold differently.

10:45AM   19        MR. ST. JOHN:  We would disagree because he assumes

10:45AM   20    without finding.  He says no opinion has ever held this

10:46AM   21    so we assume without finding because nobody challenged

10:46AM   22    that.  If an opinion's held --

10:46AM   23        THE COURT:  So wasn't before the Court at that

10:46AM   24    point.

10:46AM   25        MR. ST. JOHN:  Wasn't before the Court.  And courts

2:23-cv-692; Motion Hearing 1/09/24                    33

10:46AM   1        don't assume without finding --

10:46AM   2             THE COURT:  I agree.

10:46AM   3             MR. ST. JOHN:  -- finding precedent.

10:46AM   4             MS. PHILO:  Your Honor, before we move on --

10:46AM   5             THE COURT:  No, no, no, please, go ahead.

10:46AM   6             MS. PHILO:  I want to make --

10:46AM   7             THE COURT:  No, I'm glad you're -- I'm just really

10:46AM   8        trying to cull this out.

10:46AM   9             MS. PHILO:  It's complicated.  So in the *Marks*

10:46AM  10        principle it does state that when you have these

10:46AM  11        fractured opinions which are very complicated you look

10:46AM  12        for the assent of five justices who are concurring in

10:46AM  13        the result, but the Supreme Court itself has said that

10:46AM  14        that is often more easily stated than applied in these

10:46AM  15        cases.  And here we have the Supreme Court, a unanimous

10:46AM  16        decision.  My colleague doesn't disagree that *Choate*

10:46AM  17        puts forth the two-pronged holding.  It does the

10:46AM  18        analysis for us regarding *Guardians*, and there's two

10:46AM  19        parts of that holding.  The first one, which my

10:46AM  20        colleague and I agree on, is that the statute itself

10:46AM  21        only intentionally reaches -- sorry, only itself reaches

10:47AM  22        intentional discrimination.  That holding also relies on

10:47AM  23        three justices in dissent.  If seven justices reach that

10:47AM  24        conclusion, three of them are in dissent.  So if we're

10:47AM  25        applying *Marks* formalistically, then that holding is

| | | |
|---|---|---|
| 10:47AM | 1 | also in contention.  The second holding is the one at |
| 10:47AM | 2 | issue here, that's that the disparate impact regulations |
| 10:47AM | 3 | are valid even if the statute itself only directly |
| 10:47AM | 4 | reaches intentional discrimination.  And those are both |
| 10:47AM | 5 | characterized as holdings of *Guardians*. |
| 10:47AM | 6 | And I agree *Sandoval* expressed some concern with |
| 10:47AM | 7 | the tension, but it does not hold differently.  So this |
| 10:47AM | 8 | Court is left with *Guardians* as described by *Choate* |
| 10:47AM | 9 | until the Supreme Court decides differently, and the |
| 10:47AM | 10 | Fifth Circuit recognized that in *Rollerson.*  Judge |
| 10:47AM | 11 | Haynes in *Rollerson* said *Choate* left untouched -- sorry, |
| 10:47AM | 12 | *Sandoval* left untouched *Choate*'s apparent approval of |
| 10:47AM | 13 | these regulations.  And even if it's dicta, even if you |
| 10:47AM | 14 | disagree with the math on that, it's Supreme Court dicta |
| 10:47AM | 15 | which is entitled to a different weight. |
| 10:47AM | 16 | MR. ST. JOHN:  And *Rollerson* then, as with the |
| 10:48AM | 17 | Supreme Court, assumed without deciding because, as Your |
| 10:48AM | 18 | Honor is being confronted, it's what a fighter pilot |
| 10:48AM | 19 | would call a furball where it's pointing in a lot of |
| 10:48AM | 20 | different directions.  But I can make life easier for |
| 10:48AM | 21 | you, Judge. |
| 10:48AM | 22 | THE COURT:  I'm always open to that. |
| 10:48AM | 23 | MR. ST. JOHN:  This is a discussion of what does |
| 10:48AM | 24 | 602 actually authorize. |
| 10:48AM | 25 | THE COURT:  Yeah.  It's a great intellectual |

2:23-cv-692; Motion Hearing 1/09/24                    35

10:48AM  1      discussion for sure.

10:48AM  2          MR. ST. JOHN:  It's a great intellectual discussion

10:48AM  3      but --

10:48AM  4          THE COURT:  But I need help getting to an answer,

10:48AM  5      which I'm sure one of you are going to go ahead and take

10:48AM  6      it on up to the U.S. Fifth Circuit.  That's fine with

10:48AM  7      me.

10:48AM  8          MR. ST. JOHN:  This will probably go higher than

10:48AM  9      that, Judge.

10:48AM  10         THE COURT:  I'll do exactly what they tell me.

10:48AM  11         MR. ST. JOHN:  There are two underlying -- two

10:48AM  12     answers here.  Going back to what does 602 mean, the

10:48AM  13     particular regulation -- are you familiar with the term

10:48AM  14     general article, Judge?

10:49AM  15         THE COURT:  Uh-huh.

10:49AM  16         MR. ST. JOHN:  The Title VI has this very

10:49AM  17     reticulated scheme for regulations.  It's not a

10:49AM  18     traditional APA.  The President has to approve the

10:49AM  19     regulations.  They have this whole process.  Someone

10:49AM  20     once upon a time was like, aha, we can write a general

10:49AM  21     article and so the regulation is effectively a general

10:49AM  22     article and then we don't have to tell you exactly what

10:49AM  23     it means, we don't have to go through this reticulated

10:49AM  24     process, we don't have to go ask the President for

10:49AM  25     approval on specific regulations, we have a general

|         |    |                                                             |
|---------|----|-------------------------------------------------------------|
| 10:49AM | 1  | article.  So that's what EPA's disparate impact             |
| 10:49AM | 2  | regulation is, is a general article.                        |
| 10:49AM | 3  | THE COURT:  You agree with that?                            |
| 10:49AM | 4  | MS. PHILO:  I may be missing quite the import of            |
| 10:49AM | 5  | why this is a general article, but the statute was          |
| 10:49AM | 6  | passed in 1964 almost contemporaneously with the passage    |
| 10:49AM | 7  | of the statute of presidential task force and DOJ           |
| 10:49AM | 8  | promulgated regulations that included the prohibition on    |
| 10:50AM | 9  | unlawful disparate impact.  DOJ passed its --               |
| 10:50AM | 10 | promulgated its regulation in 1966, EPA promulgated         |
| 10:50AM | 11 | their regulation in 1973, both with presidential            |
| 10:50AM | 12 | approval.  I disagree that it doesn't tell people what      |
| 10:50AM | 13 | to do.  It very clearly unambiguously prohibits unlawful    |
| 10:50AM | 14 | disparate impact.                                           |
| 10:50AM | 15 | MR. ST. JOHN:  We disagree on that point.  Let me           |
| 10:50AM | 16 | continue the easy out for you, Judge.  We're in this        |
| 10:50AM | 17 | furball of what does 602 mean, and I think we can agree     |
| 10:50AM | 18 | the Supreme Court has given decisions their intention.      |
| 10:50AM | 19 | Can we say that?  There's some tension there.               |
| 10:50AM | 20 | MS. PHILO:  There is a holding and Scalia                   |
| 10:50AM | 21 | recognizes some tension but doesn't hold otherwise.         |
| 10:50AM | 22 | MR. ST. JOHN:  We disagree there's a holding.               |
| 10:50AM | 23 | You're in a furball, Judge.  You're in a furball.  And      |
| 10:50AM | 24 | if we have to disregard the *Marks* rule and say, okay,     |
| 10:51AM | 25 | we're going to cobble together two dissents with a          |

`2:23-cv-692; Motion Hearing 1/09/24`                    37

10:51AM  1    majority opinion followed by dicta that a subsequent

10:51AM  2    Supreme Court opinion has, EPA's words in the Federal

10:51AM  3    Register, called it into doubt, if that's what we're

10:51AM  4    having to do to say that 602's effectuate authority, can

10:51AM  5    cover disparate impact, then that runs squarely afoul of

10:51AM  6    the clear and -- the requirement for clarity and lack of

10:51AM  7    ambiguity in the spending clause and under the major

10:51AM  8    questions doctrine.  If we're having to disregard the

10:51AM  9    *Marks* rule and we're having all these questions because

10:51AM  10   the Supreme Court not only apparently can't agree on

10:51AM  11   what 602 means but can't even agree about what it has

10:51AM  12   said about what 602 means, how can the State have the

10:51AM  13   requisite lack of ambiguity and the requisite clarity to

10:52AM  14   make an informed decision about accepting funds.

10:52AM  15         MS. PHILO:  So the spending clause issue is a kind

10:52AM  16   of different merits issue before we get to whether or

10:52AM  17   not this exceeded the authority under Title VI.  I'm

10:52AM  18   happy to move to the spending clause or stick with the

10:52AM  19   statutory issue first, whichever Your Honor would

10:52AM  20   prefer.

10:52AM  21         THE COURT:  Let's wait on the spending clause.

10:52AM  22         MR. ST. JOHN:  I just want to tie it to the merits

10:52AM  23   because it's complicated.

10:52AM  24         THE COURT:  I understand your point on that.  I

10:52AM  25   just want to hear her response to that.  I find it a

10:52AM  1      little easier for me to kind of jump back and forth

10:52AM  2      because these are a lot of issues.

10:52AM  3           MR. ST. JOHN:  Absolutely.

10:52AM  4           THE COURT:  And I used to hate sitting there having

10:52AM  5      to listen to other lawyers talk and I'd go, God, I need

10:52AM  6      to say something right now.

10:52AM  7           MS. PHILO:  I appreciate that, Your Honor.  So on

10:52AM  8      the question of whether or not it exceeds the statutory

10:52AM  9      authority under Title VI, we think the easy answer is

10:52AM  10     that this is governed by precedent.  You can't read the

10:52AM  11     tea leaves unless and until the Supreme Court holds

10:52AM  12     differently.  But if you disagree on the precedent, even

10:53AM  13     looking at this issue anew, this is the right outcome

10:53AM  14     based on this is -- the defendants promulgated their

10:53AM  15     regulations pursuant to a direct statutory authority as

10:53AM  16     confirmed by legislative history, the consistent and

10:53AM  17     widespread agency interpretation, and congressional

10:53AM  18     ratification since.

10:53AM  19          So to start with the text, effectuate is clearly

10:53AM  20     the most important word but you also have Congress

10:53AM  21     clearly directing and authorizing the agencies to do so.

10:53AM  22     As my colleague mentioned, there's a requirement that

10:53AM  23     the President approve these regulations.  That's an

10:53AM  24     unusual requirement, and the legislative history shows

10:53AM  25     that it was put in place precisely because this is an

2:23-cv-692; Motion Hearing 1/09/24                    39

10:53AM  1    exceptionally broad grant of rule making to the agencies

10:53AM  2    to determine how best to effectuate that

10:53AM  3    antidiscrimination mandate.  Now, the legislative

10:53AM  4    history confirms that this is this broad grant meant to

10:53AM  5    give the agencies that discretion to decide which

10:53AM  6    actions to prohibit; but agencies -- since basically the

10:53AM  7    statute was passed, it's unusual to have agency action

10:53AM  8    almost contemporaneous with the statute; but here you

10:54AM  9    have consistent and widespread agency interpretation.

10:54AM 10         And lastly, you have that congressional

10:54AM 11    ratification piece.  In 1987 Congress returned Title VI

10:54AM 12    under the Civil Rights Restoration Act, and all of the

10:54AM 13    legislative history makes clear that the courts have

10:54AM 14    upheld the use of an effects standard.  Congress didn't

10:54AM 15    rein in any of that power in Section 602.  In addition,

10:54AM 16    you've got that series of statutes, I think we cited

10:54AM 17    eight in our brief, in the '70s and '80s where Congress

10:54AM 18    directed agencies to promulgate regulations similar to

10:54AM 19    those under Title VI again knowing that that included a

10:54AM 20    disparate impact prohibition.  And then as recently as

10:54AM 21    2010 in the Affordable Care Act it ensured that nothing

10:54AM 22    limits the rights, remedies, procedures, or standards of

10:54AM 23    Title VI including those disparate impact regulations.

10:54AM 24    So you have this consistent preservation and

10:54AM 25    ratification of the disparate impact standards.

2:23-cv-692; Motion Hearing 1/09/24                    40

10:54AM    1          I want to be clear in response to some of what my
10:55AM    2    colleague said.  These disparate impact regulations were
10:55AM    3    not dusted off from a closet.  These have been around
10:55AM    4    since the very beginning of the statute.  The EPA
10:55AM    5    started doing these investigations, I believe, in 1993.
10:55AM    6    From 1993 to 1998 I believe there were 50 investigations
10:55AM    7    against state and local governments about permitting
10:55AM    8    decisions.  One of those I'm surprised to hear my
10:55AM    9    colleague suggest this is completely new.  One of those
10:55AM   10    was against LDEQ.  There was a big Shintech
10:55AM   11    investigation in the 1990s under Title VI.  This is not
10:55AM   12    a new program and is not unique to the EPA.  It's across
10:55AM   13    the Federal Government.
10:55AM   14          To clear up any misunderstanding about how
10:55AM   15    disparate impact works, this is not triggered based on a
10:55AM   16    bare statistical disparity alone.  There is a very clear
10:55AM   17    paradigm that courts follow and that agencies use to
10:55AM   18    guide their investigations.  It starts with establishing
10:55AM   19    a prima facia case of a significant and adverse
10:55AM   20    disparate impact.  You're looking for them to identify a
10:56AM   21    facially neutral policy or practice, a significant and
10:56AM   22    adverse disparate impact on the basis of race, color, or
10:56AM   23    national origin.  And that applies to all races.  It
10:56AM   24    isn't just particular communities.  And then, lastly,
10:56AM   25    that causation aspect that you have to prove.  If all of

10:56AM   1    that is shown, the recipient still has a chance to show

10:56AM   2    that that significant and adverse impact is justified,

10:56AM   3    so, for example, the economic benefits to the community.

10:56AM   4    And, lastly, the question is was that justification

10:56AM   5    pretext or are there less discriminatory alternatives

10:56AM   6    that would mitigate that adverse impact.

10:56AM   7         So, for example, as you said, pollution doesn't

10:56AM   8    discriminate.  If there's a facility in a particular

10:56AM   9    community and it is shown to have a significant and

10:56AM   10   adverse disparate impact, can we put air scrubbers in it

10:56AM   11   to reduce the disparate impact.  Putting air scrubbers

10:56AM   12   in that facility doesn't discriminate against another

10:56AM   13   community.  Or, for example, if there's a school next to

10:57AM   14   a power plant that has a significant disparate impact

10:57AM   15   that's caused by a particular facially neutral policy,

10:57AM   16   can we modify the permit conditions to reduce that

10:57AM   17   impact by, for example, limiting the hours of when

10:57AM   18   emissions are let go to not be the same as the school

10:57AM   19   hours.  So that's -- those are the ways that you can use

10:57AM   20   race neutral measures to mitigate or eliminate this

10:57AM   21   disparate impact.

10:57AM   22        And my understanding based on the letter of concern

10:57AM   23   is that EPA was asking these state agencies to just do

10:57AM   24   that analysis, to know the impact, the burdens of the

10:57AM   25   environmental decisions they were having, to hire, I

10:57AM  1   believe it was, a risk information kind of to better

10:57AM  2   inform the public and to redo a health assessment as

10:57AM  3   well to, again, understand the impact of these

10:57AM  4   decisions.  Once you understand the impact of those

10:57AM  5   decisions, then you have to justify it and ask if there

10:57AM  6   are less discriminatory ways to accomplish the same

10:58AM  7   goal.

10:58AM  8        THE COURT:  I understand.  Thank you.  Do you have

10:58AM  9   a comment on that?

10:58AM  10       MR. ST. JOHN:  Several.  If that's what EPA is

10:58AM  11  demanding and that's what the regulations require, I

10:58AM  12  thank you for the concession on standing because that's

10:58AM  13  spending a whole ton of money to do that.

10:58AM  14       THE COURT:  What's that?

10:58AM  15       MR. ST. JOHN:  That the analysis that my colleague

10:58AM  16  just described, if that is what the regulation requires,

10:58AM  17  that is requiring us to do things and spend money.  That

10:58AM  18  is standing.  That is standing.

10:58AM  19       Let's turn back to the -- we got here on what does

10:58AM  20  the statute say.  Justice Scalia --

10:58AM  21       THE COURT:  I understand what you said.  I

10:58AM  22  understand what your point is by talking about standing,

10:58AM  23  but it was a good explanation of --

10:58AM  24       MR. ST. JOHN:  The holistic what's going on.

10:58AM  25       THE COURT:  Yeah, of what's going on, which I'll be

| | | |
|---|---|---|
| 10:58AM | 1 | honest with you, wasn't really clear in the briefs. |
| 10:58AM | 2 | MR. ST. JOHN:  We'll get back to that because |
| 10:58AM | 3 | there's a little more to it. |
| 10:58AM | 4 | THE COURT:  Not that y'all's briefs weren't good, |
| 10:59AM | 5 | there was just -- you know, it's a lot. |
| 10:59AM | 6 | MR. ST. JOHN:  This is a fed courts exam, Judge. |
| 10:59AM | 7 | This is a law school fed courts exam. |
| 10:59AM | 8 | THE COURT:  I hope not.  Poor law students are |
| 10:59AM | 9 | going to fail.  We all got a lot of experience and we're |
| 10:59AM | 10 | still grappling with it, you know. |
| 10:59AM | 11 | MR. ST. JOHN:  Going back to what does the statute |
| 10:59AM | 12 | authorize -- |
| 10:59AM | 13 | THE COURT:  Yeah. |
| 10:59AM | 14 | MR. ST. JOHN:  -- Section 601 does not ban |
| 10:59AM | 15 | disparate impact, it bans intentional discrimination. |
| 10:59AM | 16 | It's perfectly okay with a disparate impact.  And that |
| 10:59AM | 17 | was Justice Scalia's point in saying this is a strange |
| 10:59AM | 18 | interpretation to say you can effectuate something that |
| 10:59AM | 19 | 601 is okay with, that you can effectuate 601 by banning |
| 10:59AM | 20 | something that 601 is okay with.  That's what Justice |
| 10:59AM | 21 | Scalia called strange. |
| 10:59AM | 22 | On the text, the very same statute, Civil Rights |
| 10:59AM | 23 | Act of 1964, Title VII bans disparate impact, includes |
| 11:00AM | 24 | effects language.  You can't do -- you can't undertake |
| 11:00AM | 25 | an action that causes a disparate impact.  So you have |

11:00AM     1    one statute with two different bans.  One very clearly,
11:00AM     2    Title VII, bans disparate impact.  Then you've got
11:00AM     3    Title VI.  There is a distinction there.  In the
11:00AM     4    ordinary canons of textual construction, when Congress
11:00AM     5    says different things in different places it has a
11:00AM     6    different meaning.  The Fifth Circuit reached that same
11:00AM     7    conclusion in *Kamps*, K-A-M-P-S.  We cite it in our
11:00AM     8    brief.
11:00AM     9         THE COURT:  You agree with that, Title VII and
11:00AM    10    Title VI really say two different things?
11:00AM    11         MS. PHILO:  They're meant to.  Title VII directly
11:00AM    12    prohibits disparate impact.  Whereas Title VI, Congress
11:00AM    13    left it explicitly to the agencies to decide how to do
11:00AM    14    so.  The fact that they're different just shows that
11:00AM    15    they're different schemes, and for that reason *Kamps* is
11:00AM    16    inapposite.
11:00AM    17         MR. ST. JOHN:  *Kamps* says the Fifth Circuit looks
11:00AM    18    for effects language, something in the statute allowing
11:01AM    19    the regulation of effects, and that's what's absent
11:01AM    20    here.  There's no language in 601 or 602 authorizing
11:01AM    21    regulation of effects, and that's that distinction with
11:01AM    22    Title VII.  And so we go back to EPA is saying, well,
11:01AM    23    effectuate means that we can ban something that 601 is
11:01AM    24    okay with and that's just not effectuate.  That was
11:01AM    25    Justice Scalia's opinion.

2:23-cv-692; Motion Hearing 1/09/24                    45

11:01AM   1      THE COURT:  What's your comment on that?
11:01AM   2      MS. PHILO:  It wasn't Justice Scalia's opinion.
11:01AM   3  It's Justice Scalia's concern.  He doesn't get into the
11:01AM   4  merits because he assumes that they're valid because of
11:01AM   5  *Guardians* and *Choate* and that it wasn't raised.
11:01AM   6      To the extent my colleague is addressing the
11:01AM   7  concurrence in *Ricci*, I'm happy to explain why that's a
11:01AM   8  little bit different than the circumstances here; but I
11:01AM   9  don't want to interrupt.
11:01AM  10      THE COURT:  No, no, that's fine.  We'll come back
11:01AM  11  to you.  I just was on that point.  I was trying to find
11:01AM  12  again --
11:01AM  13      MR. ST. JOHN:  Trying to find --
11:02AM  14      THE COURT:  -- where we're on the same page.
11:02AM  15      MR. ST. JOHN:  Yes, Judge.
11:02AM  16      THE COURT:  And that helps me narrow where we're
11:02AM  17  not on the same page.
11:02AM  18      MR. ST. JOHN:  Going back to the -- what the
11:02AM  19  disparate impact analysis requires.  My colleague said
11:02AM  20  you look for an adverse impact.  Well, the clean -- if
11:02AM  21  something is legal under the Clean Air Act, how can you
11:02AM  22  call that an adverse impact?  The Clean Air Act
11:02AM  23  regulates emissions.  Emissions that violate the Clean
11:02AM  24  Air Act you won't grant a permit for, LDEQ.  Those are
11:02AM  25  illegal emissions.  Emissions that don't violate the

11:02AM   1    Clean Air Act you can grant a permit for.  Those are
11:02AM   2    okay emissions.  So we have a statute on point.  And how
11:02AM   3    can we come over here with Title VI and say even though
11:02AM   4    the on point statute says this permit is okay, these
11:03AM   5    emissions are okay, that's an adverse impact and we're
11:03AM   6    still going to regulate through Title VI that Clean Air
11:03AM   7    Act permitting.  That's completely rewriting the Clean
11:03AM   8    Air Act, the on point statute.  And that is what even
11:03AM   9    Justice Marshall in *Choate*, that's a bridge he wasn't
11:03AM  10    willing to cross.
11:03AM  11         THE COURT:  Stop right there.  Comment on that.
11:03AM  12         MS. PHILO:  So the environmental laws and the civil
11:03AM  13    rights laws are simply different.  The Clean Air Act is
11:03AM  14    not the only on point statute.  So is Title VI and the
11:03AM  15    regulations promulgated to effectuate them.  And you can
11:03AM  16    have a statistically significant disparate effect.  I
11:03AM  17    don't pretend to be a statistician.  But looking at
11:03AM  18    these, the burdens of these environmental decisions, if
11:03AM  19    you can show that there is a significant impact on a
11:03AM  20    particular community on the basis of race, color, or
11:04AM  21    national origin, then the question is is it justified or
11:04AM  22    can we do this with less discriminatory effects, like
11:04AM  23    that air scrubber I was mentioning or reducing the hours
11:04AM  24    or putting in additional monitors.  Those are all race
11:04AM  25    neutral ways to reduce what is that impact but is

2:23-cv-692; Motion Hearing 1/09/24                    47

11:04AM    1    disproportionally felt.

11:04AM    2        THE COURT:  Yeah.  Thank you.  Go ahead.  I'm

11:04AM    3    stopping and starting with you.  Now I made you lose

11:04AM    4    your train of thought.

11:04AM    5        MR. ST. JOHN:  You did, Judge.  Let's go to the

11:04AM    6    next question.

11:04AM    7        THE COURT:  Go ahead and gather your thoughts.  I'm

11:04AM    8    sorry.  I made you lose your train of thought.  While

11:04AM    9    you're gaining your thoughts, let me ask you.  So you

11:04AM    10   had the four complaints.

11:04AM    11       MS. PHILO:  I believe there were three.  I'm not

11:04AM    12   the factual expert, my colleague is, but I think there

11:05AM    13   were --

11:05AM    14       MR. ST. JOHN:  There were three complaints that

11:05AM    15   were the subject of --

11:05AM    16       MS. PHILO:  Of two --

11:05AM    17       MR. ST. JOHN:  -- of two investigations, one of

11:05AM    18   which -- one of those complaints was by Sierra Club

11:05AM    19   which was subject to the *CARE* injunction.  And then

11:05AM    20   after those there was an additional complaint filed

11:05AM    21   which EPA rejected.  I think you are correct, Judge.  I

11:05AM    22   believe there were four.

11:05AM    23       THE COURT:  That's what I read somewhere, there

11:05AM    24   were four at one point.  So those four were

11:05AM    25   investigated, right?

|  |  |
|---|---|
| 11:05AM | 1 |
| 11:05AM | 2 |
| 11:05AM | 3 |
| 11:05AM | 4 |
| 11:05AM | 5 |
| 11:05AM | 6 |
| 11:05AM | 7 |
| 11:06AM | 8 |
| 11:06AM | 9 |
| 11:06AM | 10 |
| 11:06AM | 11 |
| 11:06AM | 12 |
| 11:06AM | 13 |
| 11:06AM | 14 |
| 11:06AM | 15 |
| 11:06AM | 16 |
| 11:06AM | 17 |
| 11:06AM | 18 |
| 11:06AM | 19 |
| 11:06AM | 20 |
| 11:06AM | 21 |
| 11:06AM | 22 |
| 11:06AM | 23 |
| 11:06AM | 24 |
| 11:06AM | 25 |

MR. RESAR:  No, Your Honor.  There were two investigations and those two investigations pertained to three different complaints.  There was one filed after the complaint in this action was filed, and that complaint was rejected without an investigation ensuing.

MR. ST. JOHN:  Correct.

THE COURT:  So the EPA said we're not investigating that one.

MR. RESAR:  Correct.

THE COURT:  Is that the one, I've got it written on my folder here because -- I have one written here, June 17th, 2023, EPA objected to Clean Air Act on disparate impact.  Well, that was when they dropped, I guess, after suit was filed; is that right?

MR. ST. JOHN:  So that was a separate issue, Judge.

THE COURT:  Separate issue.

MR. ST. JOHN:  So EPA -- under the Clean Air Act the State has primacy and the State does the permitting. The State has to give EPA notice of the permit and EPA can file or submit an objection to the State, which is a legally effective document.

THE COURT:  They objected to this one.  Again, I couldn't find what facility it was or where it was at. It just says EPA objected to Clean Air Act permit on disparate impact grounds after this suit was filed,

11:06AM  1          June 17th.

11:06AM  2              MR. ST. JOHN:  Correct.  And they sent a letter.

11:06AM  3      It was a Louisiana facility.

11:06AM  4              THE COURT:  Is that one still pending?

11:06AM  5              MR. RESAR:  A complaint was not opened or an

11:06AM  6      investigation was not opened pursuant to that objection,

11:07AM  7      Your Honor, and it is no longer still pending.  In fact,

11:07AM  8      the permit was issued.  We submitted -- I believe it's

11:07AM  9      Exhibit A and B to our final papers that the permit was

11:07AM  10     issued, the plant is operating.

11:07AM  11             And I just want to reject, respectfully, a

11:07AM  12     characterization made by my colleague there about this

11:07AM  13     being an objection based on disparate impact grounds.

11:07AM  14     That is not at all accurate.  If you look at the

11:07AM  15     June 16th objection, it is based on five technical

11:07AM  16     grounds under the Clean Air Act.  The cover letter, yes,

11:07AM  17     the cover letter mentions disparate impact and it notes

11:07AM  18     we encourage, the verb is encourage, you to conduct a

11:07AM  19     disparate impact analysis; but that is not the substance

11:07AM  20     of the objection.  The substance of the objection is

11:07AM  21     purely technical grounds under the Clean Air Act.

11:07AM  22             MR. ST. JOHN:  Judge, when we have a legally

11:07AM  23     operative document, and that's what this objection is,

11:08AM  24     it halts a permit.

11:08AM  25             THE COURT:  Sounds like that permit eventually got

11:08AM 1      issued.

11:08AM 2          MR. ST. JOHN:  The permit did eventually issue.

11:08AM 3          THE COURT:  So this really -- let's go back to our

11:08AM 4      moot issue.  You know, is that really -- that one's been

11:08AM 5      done.  It's moot.

11:08AM 6          MR. ST. JOHN:  You still have a continuing -- you

11:08AM 7      know, this is an ordinary course of events that these

11:08AM 8      permits are considered by EPA and LDEQ is subject to the

11:08AM 9      regulations.

11:08AM 10          THE COURT:  Is there a pending EPA investigation

11:08AM 11      based on disparate impact in Louisiana.

11:08AM 12          MR. ST. JOHN:  Not an investigation.  There are --

11:08AM 13          THE COURT:  Is there an objection?

11:08AM 14          MR. ST. JOHN:  There are pending permits that in

11:08AM 15      the ordinary course of events that will be run by EPA

11:08AM 16      for EPA to object to.

11:08AM 17          THE COURT:  But we don't know yet if they will

11:08AM 18      object or not.

11:08AM 19          MR. ST. JOHN:  Correct.

11:08AM 20          THE COURT:  I'm not going to put you on the spot

11:08AM 21      and ask you that because I doubt you know right now,

11:08AM 22      unless you do know.  Do you know that?

11:08AM 23          MR. RESAR:  I don't know of any pending objections.

11:09AM 24          MR. ST. JOHN:  Rewinding, you'd asked about -- when

11:09AM 25      I lost my train of thought, Judge.  What my colleague is

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:09AM  | 1  | arguing is that Title VI can alter the standards of a    |
| 11:09AM  | 2  | substantive statute.  That is what Thurgood Marshall     |
| 11:09AM  | 3  | rejected.  They're shrinking violets on civil rights in  |
| 11:09AM  | 4  | *Choate*.  That was a Rehabilitation Act case where the   |
| 11:09AM  | 5  | issue was a change to the number of days that the        |
| 11:09AM  | 6  | State's -- Tennessee Medicaid would cover.  The          |
| 11:09AM  | 7  | plaintiffs were making the argument that my colleague's  |
| 11:09AM  | 8  | making here that Title VI -- or the Rehabilitation Act,  |
| 11:09AM  | 9  | apologies, provide this overarching law that you have to |
| 11:09AM  | 10 | follow.  Thurgood Marshall said no, we take the program  |
| 11:09AM  | 11 | as it is.  So we don't alter the substance of the        |
| 11:09AM  | 12 | program via the disparate impact analysis.  You take the |
| 11:09AM  | 13 | program as is.  That is a point of dispute here, I       |
| 11:10AM  | 14 | think, that EPA believes Title VI would impose           |
| 11:10AM  | 15 | additional substantive requirements on, for example, a   |
| 11:10AM  | 16 | Clean Air Act permitting whereas --                      |
| 11:10AM  | 17 | THE COURT:  Do you agree with that, that Title VI        |
| 11:10AM  | 18 | requires a disparate impact analysis on every air        |
| 11:10AM  | 19 | permit?                                                  |
| 11:10AM  | 20 | MS. PHILO:  The regulations require the recipients       |
| 11:10AM  | 21 | not to engage in disparate impact, that paradigm that I  |
| 11:10AM  | 22 | laid out for you.                                        |
| 11:10AM  | 23 | THE COURT:  So, basically, an analysis on every air      |
| 11:10AM  | 24 | permit would have to be conducted to see if that's       |
| 11:10AM  | 25 | happening.                                               |

11:10AM  1        MS. PHILO:  I don't believe they would have to

11:10AM  2   engage in that sort of analysis let alone a cumulative

11:10AM  3   impact analysis.  Doing so would help them ensure that

11:10AM  4   they were complying with the Title VI regulations to

11:10AM  5   ensure that there wasn't a significant and adverse

11:10AM  6   impact.

11:10AM  7        THE COURT:  So it's not a requirement EPA is

11:10AM  8   putting on the LDEQ in every air permit to be sure that

11:10AM  9   there's a disparate impact analysis done.

11:10AM  10        MS. PHILO:  The requirement under the regulation is

11:10AM  11   that there is no unlawful disparate impact, going back

11:11AM  12   to -- and I define that to mean a significant and

11:11AM  13   adverse disparate impact that is either --

11:11AM  14        THE COURT:  Only way they would know that is they'd

11:11AM  15   have to do an analysis or a study.

11:11AM  16        MS. PHILO:  They would do an analysis or study to

11:11AM  17   ensure --

11:11AM  18        THE COURT:  So that is required by EPA on every air

11:11AM  19   permit issued in the state, that they do that analysis.

11:11AM  20        MS. PHILO:  Theoretically, the EPA could do that

11:11AM  21   analysis to see if there was a problem.  The State is

11:11AM  22   required not to engage in unlawful disparate impact.  To

11:11AM  23   ensure that they are not, it is certainly best practices

11:11AM  24   to engage in a type of statistical analysis to see the

11:11AM  25   significant disparate impact and to ensure that any are

11:11AM  1    either justified or if there are alternative less

11:11AM  2    discriminatory measures to mitigate that impact.

11:11AM  3        THE COURT:  So the answer is yes, they would

11:11AM  4    have -- to ensure that they're not, they would have to

11:11AM  5    do the analysis.

11:11AM  6        MS. PHILO:  It's certainly --

11:11AM  7        THE COURT:  As you say, I like your verbiage, best

11:11AM  8    practices.

11:11AM  9        MS. PHILO:  Best practices.

11:11AM  10        THE COURT:  That basically means do it or else.

11:11AM  11        MS. PHILO:  What the regulation requires is that

11:11AM  12    they don't engage in unlawful disparate impact.

11:12AM  13        THE COURT:  Right, but the only way they can

11:12AM  14    evidence that to the EPA is by doing the analysis and

11:12AM  15    showing it to the EPA.

11:12AM  16        MS. PHILO:  The EPA --

11:12AM  17        THE COURT:  Or y'all are just going to take their

11:12AM  18    word for it?

11:12AM  19        MS. PHILO:  The EPA would do its own investigation

11:12AM  20    and would look for that significant disparate impact.

11:12AM  21        THE COURT:  Y'all are only going to do that if

11:12AM  22    there's a complaint, it sounds to me like.

11:12AM  23        MS. PHILO:  I believe --

11:12AM  24        THE COURT:  It sounds to me like that's the only

11:12AM  25    time y'all have come into Louisiana and done this, is

2:23-cv-692; Motion Hearing 1/09/24                    54

11:12AM  1    when you've had complaints.

11:12AM  2         MS. PHILO:  In response --

11:12AM  3         THE COURT:  It doesn't seem like it's been an

11:12AM  4    across-the-board audit of every air permit in the state

11:12AM  5    of Louisiana.  That's not the way I read it.  Fill me in

11:12AM  6    here.

11:12AM  7         MR. ST. JOHN:  EPA's demand, what we see in the

11:12AM  8    assignment declaration, is they were expecting this not

11:12AM  9    only ex ante for every permit going forward but for the

11:12AM  10   best practices, as my colleague euphemistically puts the

11:12AM  11   gun to our head, is to do it free ranging.  You know,

11:12AM  12   have the permits that have been issued in the past

11:13AM  13   imposed a disparate impact.  We should look at this

11:13AM  14   affirmatively and go out and try to find if that's the

11:13AM  15   case.  And again, best practices.  And if you mess it up

11:13AM  16   we're going to seek recoupment of $500 million or

11:13AM  17   $200 million from the State.  So saying it's best

11:13AM  18   practices as a euphemism when if you mess it up or we

11:13AM  19   disagree with you we're going to seek --

11:13AM  20        THE COURT:  I don't know about messing up.  What I

11:13AM  21   was really trying to get at is are they requiring you --

11:13AM  22        MR. ST. JOHN:  Effectively.

11:13AM  23        THE COURT:  -- are they requiring the state LDEQ to

11:13AM  24   do it.

11:13AM  25        MR. ST. JOHN:  Effectively, effectively, because

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

**2:23-cv-692; Motion Hearing 1/09/24**                    55

11:13AM  1     that's the only way to avoid liability.

11:13AM  2          THE COURT:  You rise.  Let me hear what your

11:13AM  3     comment is on this.

11:13AM  4          MR. RESAR:  Yes, Your Honor.  The EPA is

11:13AM  5     historically only here if there is an ongoing

11:13AM  6     investigation.  There are two ways in which an

11:13AM  7     investigation could be opened.  One would be a complaint

11:13AM  8     filed by some third party.  That's historically been the

11:13AM  9     reason why EPA has come here, as evidenced by this case

11:14AM  10    and the Shintech investigation that my colleague

11:14AM  11    referenced.  To be clear, it is possible the EPA could

11:14AM  12    open an investigation on its own.  I'm not aware of any

11:14AM  13    being opened into Louisiana on EPA's own initiative.

11:14AM  14    That's not what's happened here.

11:14AM  15         MR. ST. JOHN:  Respectfully disagree.  We had the

11:14AM  16    administrator of the EPA come on a Journey to Justice

11:14AM  17    tour through Cancer Alley and --

11:14AM  18         THE COURT:  Well, I mean, he wasn't down here doing

11:14AM  19    an investigation.  He was down here doing the political

11:14AM  20    thing.

11:14AM  21         MR. ST. JOHN:  And making promises that his

11:14AM  22    subordinates then --

11:14AM  23         THE COURT:  That's what politicians do.  I

11:14AM  24    shouldn't say that on the record probably, but that's

11:14AM  25    what politicians do.

11:14AM  1          MR. ST. JOHN:  In this capacity, Judge, he's not a

11:14AM  2      politician.

11:14AM  3          THE COURT:  Every political appointee almost is a

11:14AM  4      politician to some extent.  Let's be realistic here.

11:14AM  5          MR. ST. JOHN:  In this capacity --

11:14AM  6          THE COURT:  Go ahead.  You rise.

11:14AM  7          MR. RESAR:  Yes.  I just want to be clear.  When

11:14AM  8      the EPA administrator is, as Your Honor is suggesting,

11:14AM  9      taking a tour throughout the country he is not acting as

11:15AM  10     an investigator.  He's giving speeches --

11:15AM  11         THE COURT:  I know what he's talking about.  It

11:15AM  12     made the news down here, I mean, you know, that he was

11:15AM  13     down here and he said -- you know, he talked about this

11:15AM  14     very issue to a great extent and he did comment that

11:15AM  15     we're going to look into it.  But I think a director of

11:15AM  16     an agency saying things doesn't always lead to the

11:15AM  17     followup action either, you know.  They were talking

11:15AM  18     about tearing down overpasses, the transportation

11:15AM  19     secretary.  Doesn't mean they're going around tearing

11:15AM  20     them down.  He said they would, they might consider

11:15AM  21     tearing them down, but they haven't torn any down that I

11:15AM  22     know of.  So do we go ask the Court to file an

11:15AM  23     injunction not to let them tear down the Pontchartrain

11:15AM  24     Expressway.

11:15AM  25         MR. ST. JOHN:  If it's a regulation we can, Judge.

2:23-cv-692; Motion Hearing 1/09/24                    57

11:15AM  1      THE COURT:  I understand.  But just for -- because
11:15AM  2  the EPA administrator or the Department of
11:16AM  3  Transportation says these things, that alone, to me, is
11:16AM  4  not enough for the Court to do something.  We have to
11:16AM  5  see the actual action.  Now, I understand you've had
11:16AM  6  some investigations.
11:16AM  7      MR. ST. JOHN:  And they were pending when the
11:16AM  8  complaint was filed so that's the standing, and then the
11:16AM  9  question becomes whether those were mooted by the
11:16AM 10  dismissal of the investigations.
11:16AM 11      THE COURT:  I understand and that's what I was
11:16AM 12  asking, are there any pending ones at this moment.  I
11:16AM 13  don't think there are.  And my next question was is this
11:16AM 14  a requirement on all air permits at this time; and what
11:16AM 15  I heard was, well, it would be best practices if you did
11:16AM 16  it.
11:16AM 17      MR. ST. JOHN:  Just like that's a nice restaurant,
11:16AM 18  be a shame if something were to happen.
11:16AM 19      THE COURT:  Look, I mean, I'm not knocking -- I
11:16AM 20  mean, you got to be truthful to the Court.  At the same
11:16AM 21  time, you know, I understand you got to kind of
11:16AM 22  characterize it in the best light for your client.  But
11:17AM 23  the standing issue and the mootness issue, you know, is
11:17AM 24  a threshold issue that we have to get -- that I have to
11:17AM 25  get past and then we get to the next level.  I mean,

**2:23-cv-692; Motion Hearing 1/09/24**                    58

| | | |
|---|---|---|
| 11:17AM | 1 | this is a multilayered issue here.  I haven't decided. |
| 11:17AM | 2 | I mean, that's why I had the argument and the briefs. |
| 11:17AM | 3 | Continue.  I'm not trying to cut anyone off.  Good Lord, |
| 11:17AM | 4 | they hadn't even gotten to the podium yet.  But we've |
| 11:17AM | 5 | been talking.  We've been talking. |
| 11:17AM | 6 | MS. PHILO:  Yeah.  I don't need the podium. |
| 11:17AM | 7 | THE COURT:  The podium's overrated. |
| 11:17AM | 8 | MR. ST. JOHN:  I regret coming up here now, Judge. |
| 11:17AM | 9 | Might have been easier to sit at the table. |
| 11:17AM | 10 | THE COURT:  Taxpayers paid good money for that |
| 11:17AM | 11 | podium.  I'm glad somebody's using it. |
| 11:17AM | 12 | MR. ST. JOHN:  Taxpayers paying good money for |
| 11:18AM | 13 | everybody's time in here, Judge.  So the standing |
| 11:18AM | 14 | investigations were pending when the complaint -- |
| 11:18AM | 15 | THE COURT:  I understand they are pending. |
| 11:18AM | 16 | MR. ST. JOHN:  So we really are in the mootness -- |
| 11:18AM | 17 | the question of mootness.  There's a strong inference |
| 11:18AM | 18 | that the investigations were dropped as a result of |
| 11:18AM | 19 | litigation, and that does not moot.  You had a bird in |
| 11:18AM | 20 | the hand, EPA or -- |
| 11:18AM | 21 | THE COURT:  I'm sure the EPA's position, and they |
| 11:18AM | 22 | can comment on it, is -- your position is they had the |
| 11:18AM | 23 | investigations, they were dropped once y'all filed this |
| 11:18AM | 24 | suit.  They're going to tell me what they say in the |
| 11:18AM | 25 | brief, well, we just didn't find any disparate impact so |

**2:23-cv-692; Motion Hearing 1/09/24**                    59

11:18AM    1    we didn't need to go forward with them any further.

11:18AM    2    That's fair enough?

11:18AM    3         MR. RESAR:  That's fair, Your Honor.  I would add

11:18AM    4    two things to that.

11:18AM    5         THE COURT:  Please do.

11:18AM    6         MR. RESAR:  First, the EPA determined, and this is

11:18AM    7    in the closure letters, ECF 18, 1 and 2, believed that

11:18AM    8    it could accomplish the goal's pursuit through the

11:18AM    9    investigation through other means.  For example, EPA

11:18AM    10   opened a Clean Air Act.  I believe plaintiff has

11:18AM    11   suggested throughout this action that some of the aims

11:19AM    12   of the disparate impact investigation could be best

11:19AM    13   accomplished through the environmental statutes.  EPA

11:19AM    14   took that onboard and said yes, we will open a Clean Air

11:19AM    15   Act complaint, and that's pending.  They believe they

11:19AM    16   can resolve some of the pollutions through that

11:19AM    17   mechanism.

11:19AM    18        The second thing is that there was an impending

11:19AM    19   deadline of July 11th to resolve the complaints and EPA

11:19AM    20   determined in part that it couldn't make the findings

11:19AM    21   within that timeline as required.  Plaintiffs seem to be

11:19AM    22   challenging the existence of that deadline.  But given

11:19AM    23   how it worked out for them, I'm slightly confused by

11:19AM    24   that because it meant a closure of the investigations

11:19AM    25   without any adverse findings for plaintiffs.

2:23-cv-692; Motion Hearing 1/09/24                    60

11:19AM  1          MR. ST. JOHN:  The litigation was referenced in the

11:19AM  2     negotiating documents.  The final redlines that were

11:19AM  3     exchanged are in the record, makes express reference to

11:19AM  4     the litigation that my colleague is talking about.  So

11:19AM  5     this was not some sudden thing that nobody had

11:19AM  6     considered.  It was in the discussion.  EPA could have

11:19AM  7     taken the bird in the hand, had had counteroffers that

11:20AM  8     the activist community thought would have been

11:20AM  9     transformational.  Our briefing goes through the

11:20AM 10     language that was used by the complainants.  Huge bird

11:20AM 11     in the hand, huge win was the perception of the

11:20AM 12     community of what EPA would have had just by saying yes,

11:20AM 13     just by saying yes.  Offers were on the table.  EPA

11:20AM 14     could have said yes.  Instead, they dropped it and ran

11:20AM 15     like a hot potato or dropped it like a hot potato and

11:20AM 16     ran.

11:20AM 17          There is no grappling.  The defendants don't

11:20AM 18     grapple with the *Fenves* factors.  That's kind of the

11:20AM 19     controlling thing here.  And Judge Oldham has said when

11:20AM 20     the *Fenves* factors are satisfied the case is not moot,

11:20AM 21     full stop.  That's the controlling authority.  *Fenves*

11:20AM 22     was relegated to a footnote in defendants' reply saying,

11:20AM 23     well, the case is moot so the *Fenves* factors don't

11:21AM 24     apply.  No, the *Fenves* factors are whether the case is

11:21AM 25     moot or not and the *Fenves* factors all point to

11:21AM 1        mootness.

11:21AM 2            We haven't talked about the Department of Justice

11:21AM 3        regulation which is a facial challenge.  USDOJ applying

11:21AM 4        *Sandoval* in late 2020, going to a direct final rule

11:21AM 5        repealing its disparate impact regulations and the

11:21AM 6        standard for reopening is a serious substantive

11:21AM 7        reconsideration.  That's Page 15 of the defendants'

11:21AM 8        reply.  There's no dispute that the regulation and the

11:21AM 9        proposed repeal was finalized by the U.S. Department of

11:21AM 10       Justice, sent to OMB for review, and then pulled.  It is

11:21AM 11       incredible, I'd go so far as to say farcical, to say

11:22AM 12       that a regulation signed off on and sent to OMB is not

11:22AM 13       at the stage of a serious substantive reconsideration.

11:22AM 14           So defendants fall back and say, well, it was never

11:22AM 15       published and cite to a DC Circuit case.  Thankfully

11:22AM 16       we're in the Fifth Circuit and in the Fifth Circuit

11:22AM 17       publication's not required.  That very argument was

11:22AM 18       rejected in a case called *Arlington Oil Mills v. Knebel,*

11:22AM 19       K-N-E-B-E-L, 543 F.2d 1092 at 1099 to 1100.  "The

11:22AM 20       failure of APA required Federal Register publication is

11:22AM 21       without consequence to a person having actual knowledge

11:22AM 22       of the agency's actions" and "accordingly, neither the

11:22AM 23       department's failure to publish its March 19th

11:22AM 24       announcement in the Federal Register nor its failure to

11:22AM 25       publish a basis and purpose statement render the

11:22AM  1    announcement ineffective as to the parties in this

11:22AM  2    litigation."  Here the State had knowledge.  The

11:23AM  3    regulation sent to OMB was published in the Washington

11:23AM  4    Post.  So the fact it didn't make the Federal Register

11:23AM  5    doesn't mean we didn't have notice.  USDOJ reopened.

11:23AM  6    They did serious reconsideration.  This is timely.

11:23AM  7    That's just a plain, easy APA facial challenge.

11:23AM  8        MR. RESAR:  Want to step back, Your Honor, and make

11:23AM  9    it sort of clear what we're talking about here.  DOJ

11:23AM  10   issued its disparate impact regulation in 1966.

11:23AM  11   Plaintiffs just characterized the claim they're bringing

11:23AM  12   as a facial challenge to that regulation.  There's no

11:23AM  13   dispute here that there is a six year statute of

11:23AM  14   limitations for a facial challenge to a regulation.  So

11:23AM  15   the question that plaintiffs pose is whether or not DOJ

11:23AM  16   sending to the office of management for -- the office

11:23AM  17   for budgetary management a potential new regulation to

11:23AM  18   replace the disparate impact regulation at some point in

11:23AM  19   2021 and then two weeks later withdrawing that e-mail

11:24AM  20   without ever alerting the public that they were

11:24AM  21   considering retracting the disparate impact regulation

11:24AM  22   amounts to a reopening.  And if you look at the caselaw

11:24AM  23   that governs the reopening doctrine, the answer is clear

11:24AM  24   no and that's because the reopening doctrine, to the

11:24AM  25   extent it even exists -- and I would direct Your Honor,

11:24AM  1    I think it's to *Biden v. Texas,* Footnote 8, the Supreme

11:24AM  2    Court has called into question whether or not the

11:24AM  3    reopening doctrine even exists at all.  But assuming

11:24AM  4    that it does exist, the purpose of the doctrine is to

11:24AM  5    allow the public -- if the public has been informed by

11:24AM  6    the agency that the agency is reconsidering a potential

11:24AM  7    decision, a long-standing regulation, then the public

11:24AM  8    would have knowledge of that and know that the

11:24AM  9    regulation may not be applied anymore and essentially

11:24AM  10    would have forewarning that the regulation is no longer

11:24AM  11    in effect.  Here the DOJ never held out to the public

11:24AM  12    that they were reconsidering the investigation so the

11:24AM  13    logic that underpins the reopening doctrine simply

11:25AM  14    doesn't apply here at all.

11:25AM  15         MR. ST. JOHN:  There's no dispute that reopening

11:25AM  16    resets the statute of limitations.  I hear that the

11:25AM  17    United States is disputing whether the reopening

11:25AM  18    doctrine is a valid doctrine.  It is.

11:25AM  19         THE COURT:  Let's assume for the sake of argument

11:25AM  20    it is.  They withdrew it.  Does that trigger it?

11:25AM  21         MR. ST. JOHN:  The standard, as my colleagues have

11:25AM  22    reticulated, is a serious --

11:25AM  23         THE COURT:  Did they get far enough down the road

11:25AM  24    to trigger it?

11:25AM  25         MR. ST. JOHN:  So ordinarily I'd say most

| | | |
|---|---|---|
| 11:25AM | 1 | regulations you'd have a proposed regulation that would |
| 11:25AM | 2 | then be published for comment and then a final |
| 11:25AM | 3 | regulation that may make some tweaks around the edges. |
| 11:25AM | 4 | Once it's published -- as my colleagues have |
| 11:25AM | 5 | reticulated, once it's published as proposed regulation |
| 11:25AM | 6 | following the reopening caselaw, that would be enough. |
| 11:25AM | 7 | Okay.  Here, because USDOJ said *Sandoval* effectively |
| 11:26AM | 8 | undermines this regulation, they weren't opening up for |
| 11:26AM | 9 | comment, they were going for a direct final rule where |
| 11:26AM | 10 | you say the law has changed, we don't need comment on |
| 11:26AM | 11 | this thing, direct the publication.  The |
| 11:26AM | 12 | decision-maker -- and that's the way the Fifth Circuit |
| 11:26AM | 13 | looks at it.  The decision-maker has made up his mind. |
| 11:26AM | 14 | They sent the final rule to OMB.  That's just the |
| 11:26AM | 15 | process.  And then I believe OMB review is completed and |
| 11:26AM | 16 | they just never publish it.  Well, the Fifth Circuit |
| 11:26AM | 17 | does not require publication.  The decision-maker, here |
| 11:26AM | 18 | the U.S. Department of Justice, the Attorney General, |
| 11:26AM | 19 | decided.  That's reopening.  That has to be in the case |
| 11:26AM | 20 | of a direct final rule or -- |
| 11:26AM | 21 | THE COURT:  Even if they withdrew it. |
| 11:26AM | 22 | MR. ST. JOHN:  Even if they withdrew it because the |
| 11:26AM | 23 | decision was made and the regulated party, here |
| 11:26AM | 24 | Louisiana, was aware of that.  It was in the Washington |
| 11:26AM | 25 | Post.  They withdrew it, but it was in the Washington |

11:27AM  1    Post.

11:27AM  2        MR. RESAR:  Respectfully, Your Honor, the decision

11:27AM  3    was not made because the rule had never been published.

11:27AM  4    It had never been formally announced that there was a

11:27AM  5    new rule coming into effect.  It was an internal --

11:27AM  6    entirely internal to the DOJ process that somehow it got

11:27AM  7    leaked.  And I acknowledge that there weren't

11:27AM  8    publications, but DOJ did not publically announce to the

11:27AM  9    world that it was considering withdrawing this rule or

11:27AM 10    that it had reached a decision as to whether or not to

11:27AM 11    withdraw this rule.  Instead, within a two-week spell

11:27AM 12    DOJ sent a proposed new rule to OMB for review and then

11:27AM 13    two weeks later said we've changed our mind, we're

11:27AM 14    withdrawing it, the old regulation will remain in

11:27AM 15    effect.  And that is simply not enough to satisfy the

11:27AM 16    reopening doctrine because DOJ never held out to the

11:27AM 17    public that it was reconsidering the existing rule.

11:27AM 18        MR. ST. JOHN:  I think we've now fully teed up the

11:27AM 19    issue on that.  You've got to decide is the reopening

11:27AM 20    rule viable and, two, was this a reopening.  I think

11:28AM 21    those are the issues.

11:28AM 22        MR. RESAR:  Yes.  I just want to add one thing that

11:28AM 23    I neglected which is that OMB never actually completed

11:28AM 24    its review of the rule.  So that characterization is not

11:28AM 25    correct.

11:28AM    1          THE COURT:  I gotcha.  I understand.

11:28AM    2          MR. ST. JOHN:  Judge, I've been up here for a

11:28AM    3     while.

11:28AM    4          THE COURT:  No, that's fine.

11:28AM    5          MR. ST. JOHN:  And we've covered, not in the order

11:28AM    6     I'd planned to cover it, but we've covered --

11:28AM    7          THE COURT:  Never goes that way.

11:28AM    8          MR. ST. JOHN:  Never goes that way.

11:28AM    9          THE COURT:  If you've argued to the Fifth Circuit,

11:28AM   10     you know it never goes that way.

11:28AM   11          MR. ST. JOHN:  I have, Judge, and I have been

11:28AM   12     surprised.

11:28AM   13          I keep coming back to this, that -- the fact that

11:28AM   14     we're having this discussion this way.  Justice Scalia I

11:28AM   15     think was pretty accurate when he said our opinions have

11:28AM   16     not eliminated the uncertainty or resolved the

11:28AM   17     uncertainty in what Section 601 says or what Title VI

11:29AM   18     says.  That was in *Sandoval.*  And the fact that we just

11:29AM   19     had this back and forth, the State wins on spending

11:29AM   20     clause and major questions because it's just not clear.

11:29AM   21     That's the easy out for you, Judge.  You don't -- we

11:29AM   22     think that 602 clearly does not authorize disparate

11:29AM   23     impact, but what is abundantly clear is that it does not

11:29AM   24     clearly authorize it.  And so the State then wins under

11:29AM   25     spending clause and major questions.

| | |
|---|---|
| 11:29AM | 1 |
| 11:29AM | 2 |
| 11:29AM | 3 |
| 11:29AM | 4 |
| 11:29AM | 5 |
| 11:29AM | 6 |
| 11:29AM | 7 |
| 11:30AM | 8 |
| 11:30AM | 9 |
| 11:30AM | 10 |
| 11:30AM | 11 |
| 11:30AM | 12 |
| 11:30AM | 13 |
| 11:30AM | 14 |
| 11:30AM | 15 |
| 11:30AM | 16 |
| 11:30AM | 17 |
| 11:30AM | 18 |
| 11:30AM | 19 |
| 11:30AM | 20 |
| 11:30AM | 21 |
| 11:30AM | 22 |
| 11:30AM | 23 |
| 11:30AM | 24 |
| 11:30AM | 25 |

        If the Court has no other questions, I'll hand the
podium to my colleague and she can be the target for a
few minutes.
        MS. PHILO:  I've gotten quite comfortable here.
        THE COURT:  You can stay there if you prefer.
        MS. PHILO:  So I wanted to -- I rose to address the
major questions doctrine and the spending clause.  I
don't want to glide over their other jurisdictional
issues that my colleague is well prepared to address but
just to touch on these for right now.  I'll start with
the major questions doctrine because I think that's
particularly easy.  I think the major questions doctrine
doesn't apply here.  The major questions doctrine is
concerned with new assertions of agency power that are
of great political or economic significance.  This is
not a new assertion of power.  As we talked about when I
first rose, this has been on the books since
basically -- the model regulation was promulgated almost
contemporaneously with the statute.  EPA promulgated its
regulation almost at its inception in 1973.  So this is
simply not a case where you're concerned like in --
        THE COURT:  *West Virginia*.
        MS. PHILO:  -- *West Virginia* or *Alabama Association
of Realtors* or *OSHA v. NFIB*.  Those are all new
assertions looking to these ancillary provisions of the

2:23-cv-692; Motion Hearing 1/09/24                    68

11:30AM  1    statute where the agency is taking on this new power,
11:30AM  2    and that's not the case here so it doesn't apply.  Even
11:30AM  3    if it does apply, there's a sufficiently clear
11:31AM  4    statement.  You can look at the factors in Justice
11:31AM  5    Gorsuch's concurrence for that.  So this case is much
11:31AM  6    closer to the *Alliance For Fair Board Recruitment* that
11:31AM  7    the Fifth Circuit decided where it doesn't apply but if
11:31AM  8    it does there's a sufficiently clear statement.
11:31AM  9        MR. ST. JOHN:  Judge, we would disagree.  This is
11:31AM  10   not a -- the fact that EPA may have tiptoed around this
11:31AM  11   over four decades and then suddenly finds in the word
11:31AM  12   effectuate the power for EPA to regulate the State's
11:31AM  13   Medicaid program, talk about a fundamental
11:31AM  14   transformation of society.  That is exactly the kind of
11:31AM  15   newfound power or new analysis of a provision that the
11:31AM  16   major questions doctrine targets.  Doesn't have to be,
11:31AM  17   oh, we've never done this before, we're going to do it
11:31AM  18   now.  It's, okay, they tiptoed around but this is a
11:31AM  19   radical, radical new writing and understanding of both
11:32AM  20   602 and EPA's own disparate impact regulations.
11:32AM  21       MS. PHILO:  I don't think we've tiptoed around this
11:32AM  22   in the past.  As I talked about, we have those
11:32AM  23   investigations in the 1990s.  There are certainly
11:32AM  24   guidance documents, I believe, from 1998 and 2000.  This
11:32AM  25   isn't new in any sense.  It's not like those cases like

2:23-cv-692; Motion Hearing 1/09/24          69

11:32AM  1    *West Virginia v. EPA,* and that's just a fundamental
11:32AM  2    disagreement.
11:32AM  3        Turning to the spending clause, unless my
11:32AM  4    colleague -- turning to the spending clause, Congress
11:32AM  5    can put conditions on the receipt of federal funds
11:32AM  6    subject to certain limitations.  *Dole* sets out five of
11:32AM  7    those limitations.  The one at issue here is that the
11:32AM  8    conditions attached to federal funds must be
11:32AM  9    unambiguous.  And what that's really concerned with in
11:32AM  10   this quasi-contract analysis when you're talking about
11:32AM  11   did the recipient accept this contract knowingly and
11:32AM  12   voluntarily, it's concerned about knowing aspect.  So
11:33AM  13   the issue is notice, and the Supreme Court has made
11:33AM  14   clear when you do this analysis you put yourself in the
11:33AM  15   shoes of the state official deciding whether or not to
11:33AM  16   accept funds and would he or she know that there were
11:33AM  17   strings attached to those funds.
11:33AM  18       You don't need to do that analysis here because the
11:33AM  19   Supreme Court has already suggested approval of
11:33AM  20   substantively identical disparate impact regulations.
11:33AM  21   In *Lau* the Supreme Court said whatever the limits of the
11:33AM  22   spending clause are, they have not been reached here.
11:33AM  23   That was cited approvingly in *Dole*, that fundamental
11:33AM  24   spending clause case for the proposition that Congress
11:33AM  25   can require funding recipients to comply with statutory

11:33AM 1    or administrative directives.

11:33AM 2        But if you do do the analysis, then I would say

11:33AM 3    there are three critical ways that plaintiff had notice

11:33AM 4    here.  First, Section 601 is unambiguous in that it

11:33AM 5    prohibits discrimination.  Second, Section 602 is

11:33AM 6    unambiguous it directly authorizes the agencies to

11:33AM 7    promulgate regulations with which the recipients must

11:34AM 8    comply.  And those regulations which are themselves

11:34AM 9    unambiguous preexisted the receipt of federal funds.

11:34AM 10   And we know that the plaintiff had notice because they

11:34AM 11   signed assurances about complying with the statute and

11:34AM 12   regulations for decades.  And if you look at *Gruver*,

11:34AM 13   although that's a coercion case, the plaintiff's kind of

11:34AM 14   continual acceptance of funds has to come in somewhere

11:34AM 15   in the contract life analysis and we would argue that it

11:34AM 16   shows they indeed had notice.

11:34AM 17       Now, my colleague is about to stand up and say that

11:34AM 18   the disparate impact regulations are contained in the

11:34AM 19   regulations and that that doesn't satisfy the spending

11:34AM 20   clause.  I would respectfully point Your Honor to

11:34AM 21   *Bennett*, the Supreme Court case which makes clear that

11:34AM 22   recipients must comply with the legal requirements in

11:34AM 23   place when the grants were made.  It doesn't decide

11:34AM 24   about regulations that might come later, but

11:34AM 25   regulations -- pre-existing regulations are part of that

2:23-cv-692; Motion Hearing 1/09/24                71

11:34AM    1    notice analysis.

11:34AM    2         And *Texas Education Agency* does not hold

11:35AM    3    differently.  I would make two points to distinguish

11:35AM    4    *TEA, Texas Education Agency*.  One is that it's a

11:35AM    5    sovereign immunity case.  Although the analysis for the

11:35AM    6    waiver of sovereign immunity and the unambiguous

11:35AM    7    requirements for spending clause conditions overlap,

11:35AM    8    they're not identical.  There's a particular specificity

11:35AM    9    required for the waiver of sovereign immunity.  But

11:35AM   10    regardless, the Fifth Circuit makes clear that

11:35AM   11    regulations can be one of two flavors.  One is pursuant

11:35AM   12    to a direct statutory command and the other is

11:35AM   13    clarifying an ambiguous statute, and *Texas Education*

11:35AM   14    *Agency* dealt with a regulation in that second bucket

11:35AM   15    clarifying an ambiguous statute.  We're dealing with

11:35AM   16    something in the first bucket pursuant to Congress's

11:35AM   17    command because these regulations were promulgated

11:35AM   18    pursuant to that direct command to effectuate the

11:35AM   19    antidiscrimination mandate in Section 602.  So just with

11:35AM   20    all of that, with those three provisions in the

11:35AM   21    pre-existing regulations, plaintiff had notice and that

11:36AM   22    state official when deciding whether to accept funds had

11:36AM   23    notice of those disparate impact obligations.

11:36AM   24         MR. ST. JOHN:  Turning to my colleague's reliance

11:36AM   25    on *Lau.*  I saw this in a brief.  I'm a little bit

| | | |
|---|---|---|
| 11:36AM | 1 | shocked by it.  The abrogation of *Lau* was recognized by |
| 11:36AM | 2 | the Fifth Circuit, *Castaneda v. Pickard*, 648 F.2d 989, |
| 11:36AM | 3 | 1007, in 1981, recognized -- the abrogation was further |
| 11:36AM | 4 | recognized by *Sandoval* by the Supreme Court, 532 U.S. |
| 11:36AM | 5 | 275, and *Rollerson*, again the Fifth Circuit in 2021, |
| 11:36AM | 6 | 6 F.4th 633.  *Lau* was a 601 case where 6 -- before 601 |
| 11:36AM | 7 | was limited to intentional discrimination, *Lau* was fully |
| 11:36AM | 8 | abrogated.  And this has been a continuous concern. |
| 11:36AM | 9 | When we look through EPA's guidance there's *Lau*, *Lau*, |
| 11:37AM | 10 | *Lau*, *Lau*, *Lau*.  We've got four decades of cases, |
| 11:37AM | 11 | subsequent Supreme Court and Fifth Circuit caselaw, |
| 11:37AM | 12 | including that *Lau* was abrogated five years after it was |
| 11:37AM | 13 | entered. |
| 11:37AM | 14 | Two, my colleague is correct.  *Texas Education* |
| 11:37AM | 15 | *Agency.*  The statute cannot narrowly specify a |
| 11:37AM | 16 | condition.  It must specify the condition, the |
| 11:37AM | 17 | condition.  That is Fifth Circuit law that's simply |
| 11:37AM | 18 | controlling, and the Fifth Circuit -- my colleague tries |
| 11:37AM | 19 | to spin Texas Education -- tries to spin *Texas Education* |
| 11:37AM | 20 | *Agency* a little bit, but part of its holding was |
| 11:37AM | 21 | constitutional.  The spending power belongs to Congress. |
| 11:37AM | 22 | Congress cannot delegate that power to the Executive. |
| 11:37AM | 23 | Executive power cannot extend to adding conditions on |
| 11:38AM | 24 | spending.  That would make the delegation itself |
| 11:38AM | 25 | unconstitutional.  There's a plain separation of powers |

11:38AM   1    problem there, and *TEA* relied on that.  You see the

11:38AM   2    Supreme Court in *Cummings* and *Arlington Central*, they

11:38AM   3    too focussed on the delegation has to be -- or the

11:38AM   4    condition has to be in the statute itself.  It can't

11:38AM   5    merely be a condition.

11:38AM   6         My colleague is essentially arguing, well, you, the

11:38AM   7    State, Louisiana, had notice there was a condition.  No,

11:38AM   8    that's not correct.  The condition.  And I see nothing

11:38AM   9    in 602 about cumulative impact.  I see nothing about

11:38AM   10   disparate impact.  I see effectuate 601.  And to the

11:38AM   11   degree my colleague is reading 602 to authorize spending

11:39AM   12   clause restrictions beyond the scope of 601, that calls

11:39AM   13   the statute itself into question, the constitutionality

11:39AM   14   of the statute under *Texas Education Agency*.  That's

11:39AM   15   pretty plain.  So how do you avoid that doctrine of

11:39AM   16   constitutional avoidance?  602 is limited to regulations

11:39AM   17   effectuating 601 which means intentional discrimination.

11:39AM   18        MS. PHILO:  So I have a couple comments, as you

11:39AM   19   might expect.  So the first is that my colleague

11:39AM   20   characterized *Lau* as fully abrogated.  I want to

11:39AM   21   respectfully push back on that idea.  I agree that

11:39AM   22   you'll see a red flag when you look up that case.  It

11:39AM   23   has been abrogated to the extent that it relied on

11:39AM   24   Section 601 for disparate impact and two later cases

11:39AM   25   overruled that part of the holding because Section 601

11:39AM   1    was later interpreted to only directly reach intentional

11:39AM   2    discrimination.  But the discussion of the spending

11:40AM   3    clause has been subsequently cited by *Dole*, that pivotal

11:40AM   4    case which made clear that you can put conditions on

11:40AM   5    federal statutes on the receipt of federal funds to

11:40AM   6    comply with statutory or administrative directives

11:40AM   7    citing *Lau* in a string cite.  And that also comports

11:40AM   8    with *Bennett* which my colleague fails to address, the

11:40AM   9    Supreme Court case that made clear that recipients of

11:40AM   10   federal funds have to comply with the legal requirements

11:40AM   11   in place when the grants were made and that includes,

11:40AM   12   according to the Supreme Court, pre-existing

11:40AM   13   regulations.

11:40AM   14        Just checking my notes to make sure I don't miss

11:40AM   15   anything.  And I would just -- on the *Cummings* point,

11:40AM   16   both *Arlington Central* and *Cummings* again stress this

11:40AM   17   idea of notice which has been kind of the core of did

11:40AM   18   they have notice, and I explained how they did.  And

11:40AM   19   *Cummings* looks beyond the statute itself to basic

11:40AM   20   background principles of contract law to ask whether or

11:41AM   21   not the recipients would have had notice.

11:41AM   22        MR. ST. JOHN:  What I hear from my colleague is

11:41AM   23   frankly shocking, that the Executive can issue a nakedly

11:41AM   24   unlawful spending clause regulation.  Oh, you had notice

11:41AM   25   of it, you can't attack illegality.  We're attacking the

2:23-cv-692; Motion Hearing 1/09/24                    75

11:41AM  1    illegality here, Judge.  That's a flavor of *MedImmune*

11:41AM  2    where we can say, look, we're not going to breach the

11:41AM  3    contract just yet because the stakes are too high,

11:41AM  4    although my colleague has conceded in their briefs that

11:41AM  5    Louisiana is -- or they've argued that we are breaching

11:41AM  6    the contract, but we don't have to breach the contract

11:41AM  7    to have standing.  We can attack the underlying

11:41AM  8    illegality.  The contract is a license for a patent.  I

11:41AM  9    can attack the validity of the patent.  That's exactly

11:42AM  10   what the State is doing here.

11:42AM  11        MS. PHILO:  I'm not making a standing argument.  My

11:42AM  12   colleague was happy to rise, I'm sure, and make that.

11:42AM  13        MR. ST. JOHN:  It's the condition point, though.  I

11:42AM  14   can still attack the underlying condition.  It's a naked

11:42AM  15   illegality.  That's the State's position.

11:42AM  16        MS. PHILO:  And the question is was the State on

11:42AM  17   notice of that condition, was it unambiguous.  And here

11:42AM  18   again, I don't want to gloss over the fact that

11:42AM  19   Section 602 unambiguously tells recipients that the

11:42AM  20   agencies not only could promulgate regulations but that

11:42AM  21   they would be promulgating regulations with which they

11:42AM  22   must comply.  And those regulations, which no one has

11:42AM  23   contested that they are unambiguous, pre-existed the

11:42AM  24   receipt of funds as the State signed assurances to for

11:42AM  25   decades.

11:42AM    1        *Texas Education Agency* is not a spending clause

11:42AM    2        case.  It is about that waiver of sovereign immunity and

11:42AM    3        again just distinguishable.

11:42AM    4             THE COURT:  Well, what about the intentional part

11:43AM    5        found in 601?  I mean, you're not -- from earlier

11:43AM    6        argument, you weren't -- it sounds to me like the EPA's

11:43AM    7        not demanding investigations based on intentional

11:43AM    8        discrimination, but that's what that statute says so

11:43AM    9        that is a little ambiguous to me on what you're asking

11:43AM    10       the State to do.  Did they have notice.  They had notice

11:43AM    11       of maybe the intentional part but what about the

11:43AM    12       non-intentional part.

11:43AM    13            MS. PHILO:  So Section 601 doesn't explicitly use

11:43AM    14       the words intentional discrimination.  That's the gloss

11:43AM    15       that the courts have put on it.

11:43AM    16            THE COURT:  That's right.

11:43AM    17            MS. PHILO:  And then --

11:43AM    18            THE COURT:  So how did the State have notice of

11:43AM    19       that, of the non-intentional disparate analysis they'd

11:43AM    20       have to do?  How would they have notice of that?

11:43AM    21            MS. PHILO:  Based on the unambiguous delegation in

11:43AM    22       Section 602 that made clear that the recipients would

11:44AM    23       have to comply with those regulations, and those

11:44AM    24       regulations were in place when they accepted the funds

11:44AM    25       and signed assurances that they would comply with them.

11:44AM    1    Those regulations made clear that the disparate -- the
11:44AM    2    prohibition on disparate impact would apply to the
11:44AM    3    receipt of federal funds.
11:44AM    4        MR. ST. JOHN:  Clarity cannot come from the
11:44AM    5    regulations.  The condition must be in the statute.
11:44AM    6    That's *Texas Education Agency*.  And my colleague is
11:44AM    7    about to say we get that the agency is entitled to
11:44AM    8    deference.  *Texas Education Agency* also makes clear that
11:44AM    9    by asserting deference, which they did in the brief,
11:44AM   10    that's a concession that the statute is insufficiently
11:44AM   11    clear because you only get deference if the statute is
11:44AM   12    ambiguous.  We're back in the State wins on spending
11:44AM   13    clause.
11:44AM   14        THE COURT:  It's an interesting issue.
11:44AM   15        MS. PHILO:  I think we disagree on whether or not
11:44AM   16    the regulation can provide that clarity and whether or
11:44AM   17    not *TEA* is controlling.  It's just distinguishable both
11:45AM   18    on the sovereign immunity grounds and the fact that this
11:45AM   19    is not clarifying an ambiguous statute.  That delegation
11:45AM   20    is clear in Section 602, and those regulations
11:45AM   21    pre-existed the acceptance of federal funds.
11:45AM   22        THE COURT:  Anything else on that?  I think we've
11:45AM   23    covered the spending clause.
11:45AM   24        MS. PHILO:  Not on the spending clause.  I believe
11:45AM   25    my colleague has plenty to say on jurisdiction.  And the

11:45AM    1    only other thing that I had planned to address was

11:45AM    2    proposed relief, but I imagine that can wait for a

11:45AM    3    minute.

11:45AM    4            THE COURT:  Sure.

11:45AM    5            MR. RESAR:  Thank you, Your Honor.  I would just

11:45AM    6    briefly like to address, I think, the main

11:45AM    7    jurisdictional/threshold issues with each bucket of

11:45AM    8    claim and hopefully this will -- what I endeavor to do

11:45AM    9    at least is give you a way to resolve this action

11:45AM    10   without having to get into these very interesting but

11:45AM    11   thorny constitutional issues.

11:45AM    12           Now, there are three buckets of claims at issue in

11:46AM    13   this action.  First are the claims challenging EPA and

11:46AM    14   DOJ's disparate impact regulations which we've been

11:46AM    15   discussing today for most of the hearing.  These can

11:46AM    16   most simply be dismissed as untimely facial challenges

11:46AM    17   to regulations which were promulgated over 50 years ago.

11:46AM    18   We discussed earlier the reopening doctrine.  I want to

11:46AM    19   be crystal clear that plaintiffs have not claimed the

11:46AM    20   reopening doctrine applies to the challenges to EPA's

11:46AM    21   regulations so at most that could resuscitate the claim

11:46AM    22   to DOJ's regulations, although I think I explained

11:46AM    23   earlier why I don't believe the reopening doctrine

11:46AM    24   actually applies.  And to the extent there is some

11:46AM    25   residual as-applied challenges, Louisiana has selected

2:23-cv-692; Motion Hearing 1/09/24                         79

11:46AM    1    the wrong forum at the wrong time to bring those

11:46AM    2    challenges.

11:46AM    3         The second bucket of claims are the non-delegation

11:46AM    4    claims which challenge what really amounts to an

11:47AM    5    insignificant procedural mechanism by which EPA can

11:47AM    6    extend the 180-day deadline it has to conduct a Title VI

11:47AM    7    investigation.  These claims can most simply be

11:47AM    8    dismissed for lack of standing because Louisiana has not

11:47AM    9    and will not incur any injury as a result of this

11:47AM    10   180-day deadline.  In fact, Louisiana has benefitted

11:47AM    11   immensely from the existence of this 180-day deadline

11:47AM    12   because it was one of the reasons why the complaints

11:47AM    13   were closed when they were.

11:47AM    14        And then third bucket of claims is actually just

11:47AM    15   one claim and it's the extra regulatory requirement

11:47AM    16   claim which primarily challenges negotiating positions

11:47AM    17   that EPA took during the informal resolution process.

11:47AM    18   Again, this can most simply be dismissed for lack of

11:47AM    19   standing.  Merely hearing a negotiating position in an

11:47AM    20   informal resolution process is not itself an injury, and

11:47AM    21   that's clear from the fact that EPA never actually

11:48AM    22   imposed any of its negotiating positions on the State of

11:48AM    23   Louisiana.  Louisiana walked away, said no, we're not

11:48AM    24   going to accept that, and then no agreement was reached.

11:48AM    25   So there's simply no injury to support this Court

|  |  |
|---|---|
| 11:48AM | 1 |

reaching the question of whether the extra regulatory

requirements which, in fact, are not requirements are

legal.

        I want to go a little bit into more detail on the

timeliness challenge because, as I've tried to emphasize

throughout, these are regulations that are over 50 years

old.  There is a six year statute of limitations under

the EPA for challenges to -- for facial challenges to

regulations.  I don't think there's any dispute that

what plaintiff is primarily bringing here is a facial

challenge to the EPA and DOJ's regulations.  They say as

much at Footnote 7 on Page 16 of their opposition brief.

They've said repeatedly today that it's a facial

challenge.  And the prayer for relief at Page 55 in

their complaint makes clear that what they're asking for

is the disparate impact regulations to be held unlawful

as a whole, and under clear Fifth Circuit precedent in

*Turtle Island Foods* that means this is a facial

challenge.  And the problem for Louisiana with bringing

a facial challenge is that the statute of limitations

ran in 1979 for -- or expired in 1979 for EPA's

regulations because that's when the -- six years after

the disparate impact regulations were promulgated by the

EPA in 1973.  And DOJ's were promulgated in 1966.  Six

years after that is still about half a century ago.  So

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 11:49AM | 1  | they're simply too late.                                           |
| 11:49AM | 2  | Louisiana makes three arguments as to EPA's                        |
| 11:49AM | 3  | regulations for why they're not too late.  None of those           |
| 11:49AM | 4  | are supported by caselaw or should be availing here.               |
| 11:49AM | 5  | First they say there's a credible threat of future                 |
| 11:49AM | 6  | enforcement which somehow makes their APA claims timely.           |
| 11:49AM | 7  | There's no caselaw to support this proposition.  If                |
| 11:50AM | 8  | there was a future enforcement action, then Louisiana             |
| 11:50AM | 9  | sure could bring an as-applied challenge; but they have           |
| 11:50AM | 10 | to wait for that to actually happen.  They don't get to           |
| 11:50AM | 11 | reset the statute of limitations merely by claiming               |
| 11:50AM | 12 | there's the possibility of a future enforcement action.           |
| 11:50AM | 13 | Second, Louisiana argues every time a new grant is                |
| 11:50AM | 14 | issued the statute of limitations restarts.  That's not           |
| 11:50AM | 15 | correct if the grants do not change or extend the period          |
| 11:50AM | 16 | of time in which those obligations are legally binding.           |
| 11:50AM | 17 | And Louisiana, who bears the burden of establishing               |
| 11:50AM | 18 | jurisdiction, does not identify a single existing grant           |
| 11:50AM | 19 | in this case that extended the already existing Title VI          |
| 11:50AM | 20 | obligations further into the future than already existed          |
| 11:50AM | 21 | and nor could they.                                               |
| 11:50AM | 22 | We in our reply brief identify funding for real                   |
| 11:50AM | 23 | property construction grants.  Those are detailed in              |
| 11:51AM | 24 | Exhibits G and F of that.  And funds accepted for real            |
| 11:51AM | 25 | property construction grants require compliance with              |

11:51AM  1      Title VI for as long as the real property is used for

11:51AM  2      the funded purpose.  That's laid out in 40 CFR

11:51AM  3      Section 70.80(a)(2).  And Louisiana has not disputed

11:51AM  4      that and, therefore, they are bound by Title VI

11:51AM  5      obligations for accepting those real property grants

11:51AM  6      indefinitely and, therefore, there's no new extension of

11:51AM  7      the time period in which they're bound by Title VI

11:51AM  8      obligations and they do not have a timely claim.

11:51AM  9          Lastly, they argue that the current presidential

11:51AM  10     administration has somehow prioritized disparate impact

11:51AM  11     regulations in a way that previous administrations did

11:51AM  12     not.  This in and of itself is insufficient to restart

11:51AM  13     the statute of limitations.  Effectively, the result of

11:52AM  14     this argument would be every time a new political party

11:52AM  15     comes into power you have a complete restart on all

11:52AM  16     statute of limitations for all regulations in the Code

11:52AM  17     of Federal Register.  That's simply not how the law

11:52AM  18     works.  And the sole case they cite in support of that

11:52AM  19     proposition is *Mendosa v. Perez*.  In that case there was

11:52AM  20     a guidance letter that changed substantive obligations,

11:52AM  21     and here there has been no change in substantive

11:52AM  22     obligations because the disparate impact regulations

11:52AM  23     have existed for 50 years.

11:52AM  24          Unless Your Honor has further questions on the

11:52AM  25     threshold challenges to the disparate impact claims, I

11:52AM    1    think those can just be disposed on statute of

11:52AM    2    limitations grounds so I'll skip over standing and

11:52AM    3    mootness and rest on our briefs which I think lay out

11:52AM    4    the reason why the argument -- why plaintiff lacks

11:52AM    5    standing or its claims are moot.

11:52AM    6         If I could briefly address separately the DOJ

11:53AM    7    disparate impact regulations just because I think there

11:53AM    8    actually is a separate standing issue here that's worth

11:53AM    9    highlighting.  We agree that the State has adduced

11:53AM   10    sufficient evidence or has adduced some evidence of

11:53AM   11    Louisiana incurring costs to comply with EPA's

11:53AM   12    regulations.  They haven't done that for DOJ.  The sole

11:53AM   13    evidence they provide is the Sinquefield declaration

11:53AM   14    that's ECF 34-32.  And what that declaration says, I

11:53AM   15    quote at Paragraph 6, is Louisiana does not conduct a

11:53AM   16    disparate impact analysis before engaging in law

11:53AM   17    enforcement activities and intends to engage in the same

11:53AM   18    law enforcement activities it traditionally has without

11:53AM   19    conducting a disparate impact analysis.  So Louisiana

11:53AM   20    isn't incurring costs to conduct an injury -- or to

11:53AM   21    conduct a disparate impact analysis, they're not going

11:53AM   22    to in the future, and they haven't suffered any injury

11:53AM   23    as a result of that.  They don't identify any

11:53AM   24    investigations brought against Louisiana DOJ.  So they

11:53AM   25    simply haven't carried their burden to show that DOJ's

2:23-cv-692; Motion Hearing 1/09/24                    84

11:54AM    1    regulations are causing the State of Louisiana any harm

11:54AM    2    or that those regulations will cause the State of

11:54AM    3    Louisiana any harm so there is simply no standing to

11:54AM    4    assert those claims.

11:54AM    5         Turning to the non-delegation claims which I think

11:54AM    6    can also be disposed of for lack of standing, most

11:54AM    7    simply, plaintiffs haven't established any sort of

11:54AM    8    injury.  As I said earlier, they benefitted from the

11:54AM    9    existence of the 180-day deadline.  That deadline

11:54AM    10   contributed to the closure of the complaints, and that

11:54AM    11   was to Louisiana's benefit.  There were no adverse

11:54AM    12   findings.  There were no obligations imposed through

11:54AM    13   those investigation processes.  So they basically

11:54AM    14   haven't suffered the injury necessary to bring the

11:54AM    15   non-delegation claims.  Unless Your Honor has questions

11:54AM    16   on that point, I think we can just rest on our briefs

11:54AM    17   which have laid it out clearly.

11:55AM    18        THE COURT:  I don't have any questions.  Thank you.

11:55AM    19   Quick response.

11:55AM    20        MR. ST. JOHN:  Starting at the back and working up,

11:55AM    21   *Axon* Enterprises -- or *Axon* and *Free Enterprise Board*

11:55AM    22   make clear that being subject to an unlawful decision-

11:55AM    23   maker is a here and now injury.  There is no dispute

11:55AM    24   that Louisiana's ability to continue its negotiations

11:55AM    25   with EPA was subject to a veto by the private activists.

11:55AM    1      They were in an injunction to give the activists that

11:55AM    2      veto.  Louisiana was injured when, worse than a private

11:55AM    3      individual like an *Axon* or *Free Enterprise*, a state, a

11:55AM    4      sovereign state in its relations with the Federal

11:55AM    5      Government was subject to a veto by private individuals.

11:55AM    6           Two, regarding Louisiana Department of Justice, we

11:55AM    7      take money.  I agree the State does not want to engage

11:56AM    8      in a disparate impact analysis on law enforcement.  It

11:56AM    9      kind of highlights the practical import.  I'm sure Your

11:56AM   10      Honor's aware the new Governor and the new Attorney

11:56AM   11      General -- the Governor is deploying the state police to

11:56AM   12      New Orleans.  The Attorney General will prosecute cases

11:56AM   13      involving state police arrests.  What's the disparate

11:56AM   14      impact analysis?  New Orleans is a disproportionately

11:56AM   15      minority community.  Is there an adverse disparate

11:56AM   16      impact because we are deploying more law enforcement

11:56AM   17      resources that are going to result in more arrests?  Is

11:56AM   18      that the adverse disparate impact?  Are we dammed if we

11:56AM   19      don't deploy those law enforcement resources and leave

11:56AM   20      higher crime rates in a more minority community?  We're

11:56AM   21      damned if we do, dammed if we don't.  And the State is

11:56AM   22      entitled to clarity on that.  Louisiana Department of

11:56AM   23      Justice does not look at race.  That is

11:57AM   24      Mr. Sinquefield's declaration.  We do not want to look

11:57AM   25      at race.  We do not make law enforcement decisions on

2:23-cv-692; Motion Hearing 1/09/24                      86

11:57AM    1    the basis of race.  We do not want to make law

11:57AM    2    enforcement decisions on the basis of race.  It should

11:57AM    3    have no role whatsoever.  But best practices, best

11:57AM    4    practices, that gun to the head, is that the Louisiana

11:57AM    5    Department of Justice and Louisiana State Police need to

11:57AM    6    do a disparate impact analysis.  I don't know even know

11:57AM    7    which way it comes out because this disparate impact

11:57AM    8    thing depends on what you consider adverse impact.

11:57AM    9         THE COURT:  You rise to comment on that.

11:57AM   10         MR. RESAR:  I did, Your Honor.  I guess just

11:57AM   11    responding briefly to the most recent point, the EPA's

11:57AM   12    best practices for conducting disparate impact analysis

11:57AM   13    are not binding on -- they're not the same as DOJ's best

11:57AM   14    practices.  Plaintiffs haven't identified anything in

11:57AM   15    any document from DOJ sort of compelling this type of

11:57AM   16    analysis.

11:57AM   17         MR. ST. JOHN:  Not binding on Medicaid either,

11:58AM   18    Judge, but it turns out somebody somewhere accepted some

11:58AM   19    money from EPA so now EPA is claiming the right to

11:58AM   20    regulate Medicaid.  Now then, he may have a point that

11:58AM   21    Louisiana DOJ hasn't accepted that money.  I don't know.

11:58AM   22         MR. RESAR:  My response to him not knowing, Your

11:58AM   23    Honor, is that at the summary judgment stage it is

11:58AM   24    plaintiffs' burden to adduce sufficient evidence of

11:58AM   25    standing.  It is not enough for him to stand up here and

11:58AM  1    say I don't know, we could be subject to DOJ's disparate

11:58AM  2    impact regulations.  They have to identify specific

11:58AM  3    evidence.  Pleadings are no longer enough with a summary

11:58AM  4    judgment case to show --

11:58AM  5         MR. ST. JOHN:  This is a game, Judge.  This is a

11:58AM  6    game.  This is a game.  I can't say I'm thrilled with

11:58AM  7    it.  We're playing musical agencies here.  The

11:58AM  8    Department of Justice identify -- Louisiana Department

11:58AM  9    of Justice is taking money from the United States

11:58AM 10    Department of Justice.  Louisiana Department of Justice

11:58AM 11    challenged that regulation.  We have standing to do

11:58AM 12    that.  Then we have this problem of EPA's making where

11:59AM 13    state agencies can't have a clear who is my regulator if

11:59AM 14    I take this money.  Because I can tell you the then

11:59AM 15    Secretary of LDH, Mr. Russo, was shocked that his

11:59AM 16    Medicaid program was being regulated by EPA.  And if

11:59AM 17    that's a negotiating position, I hear the Federal

11:59AM 18    Government, oh, it was just a negotiating position.

11:59AM 19    Well, this is an unusual --

11:59AM 20         THE COURT:  I do have a concern with EPA meddling

11:59AM 21    around with Louisiana Department of Health and

11:59AM 22    Hospitals.  What's your comment on that?  I mean, that

11:59AM 23    is some crossover strong-arm tactics.

11:59AM 24         MR. RESAR:  The response, Your Honor, is that LDH

11:59AM 25    accepted EPA funds and when they accept EPA funds they

| | | |
|---|---|---|
| 11:59AM | 1 | sign a terms and conditions agreement in which they |
| 11:59AM | 2 | agreed to be bound by the conditions on those funds. |
| 11:59AM | 3 | Those conditions include Title VI regulations.  If they |
| 11:59AM | 4 | didn't want to be bound by those terms and conditions, |
| 12:00PM | 5 | they could either object to those terms and conditions, |
| 12:00PM | 6 | in our brief we outline a process the State of Louisiana |
| 12:00PM | 7 | should have taken but did not to object to those terms |
| 12:00PM | 8 | and conditions, they didn't, or they could have not |
| 12:00PM | 9 | accepted the funding.  But once they do, it is true |
| 12:00PM | 10 | you're bound by what you sign.  And they signed the |
| 12:00PM | 11 | terms and conditions and those terms and conditions |
| 12:00PM | 12 | include express statements that they will abide by EPA's |
| 12:00PM | 13 | regulations. |
| 12:00PM | 14 | MR. ST. JOHN:  So we have a concession that EPA's |
| 12:00PM | 15 | saying, okay, you accepted a grant to perform a study to |
| 12:00PM | 16 | help LDEQ.  That was what the trigger was here.  It's an |
| 12:00PM | 17 | $80,000 grant for LDH to perform a study to help LDEQ -- |
| 12:00PM | 18 | THE COURT:  Maybe you should give the 80,000 back. |
| 12:00PM | 19 | MR. ST. JOHN:  We tried. |
| 12:00PM | 20 | THE COURT:  They wouldn't take it? |
| 12:00PM | 21 | MR. ST. JOHN:  They wouldn't take it.  Mr. Russo |
| 12:00PM | 22 | was very upset about that. |
| 12:00PM | 23 | THE COURT:  Why wouldn't you take the money back? |
| 12:00PM | 24 | They don't want your money.  Take it back. |
| 12:00PM | 25 | MR. RESAR:  I have not seen any evidence in the |

12:00PM   1    record about them offering to give the money back so

12:00PM   2    this is an entirely new factual allegation that I'd have

12:01PM   3    to look into.  If plaintiffs adduce evidence on that,

12:01PM   4    I'm sure we could respond; but I'm not prepared to

12:01PM   5    today.  I apologize for that.

12:01PM   6         MR. ST. JOHN:  Mr. Russo was, "Can I give my

12:01PM   7    $80,000 back and get out of this?"  The answer was no.

12:01PM   8    But that's the practical problem with this, Judge.

12:01PM   9    That's the practical problem.  Health and Human Services

12:01PM  10    that actually knows something about Medicaid is

12:01PM  11    perfectly content with what LDH is doing; but you get an

12:01PM  12    activist at EPA, she thinks she knows better than Health

12:01PM  13    and Human Services how Medicaid should operate.  There's

12:01PM  14    a very pragmatic problem with this general article.

12:01PM  15         Winding back further, going back up the list, my

12:01PM  16    colleague makes a lot of claims about the regulations

12:01PM  17    being out there for 40, 50 years.  Fine.  Not all the

12:01PM  18    claims are APA claims.  They are nonstatutory review

12:02PM  19    claims, and those accrued when the problem arose.  The

12:02PM  20    as-applied APA challenges accrued when the problem

12:02PM  21    arose, so within the last 18 months, give or take.

12:02PM  22    Louisiana did not walk away.  Louisiana put offers on

12:02PM  23    the table.  EPA walked away.  And that's an important --

12:02PM  24    let's focus on the record, not the attorney argument.

12:02PM  25         The uncontroverted facts are that Louisiana, LDEQ

12:02PM  1    and LDH, had redline offers on the table that they

12:02PM  2    responded to EPA with.  I think it was LDEQ after EPA

12:02PM  3    continued cancelling the calls said, hey, still wanting

12:02PM  4    to negotiate, got an offer on the table, and this case

12:02PM  5    was dropped like a hot potato.

12:02PM  6            THE COURT:  His position is 180 days ran on it so

12:02PM  7    they were done.

12:02PM  8            MR. ST. JOHN:  A very convenient 180 days, but it

12:03PM  9    doesn't halt or doesn't undermine the problem of

12:03PM  10   Louisiana being subject to this 180 days.  That's

12:03PM  11   standing.  That's Louisiana standing for the as-applied

12:03PM  12   challenge.  It's Louisiana standing for the

12:03PM  13   nondelegation.

12:03PM  14           The final thing that I kind of want to hit on is

12:03PM  15   this negotiating positions idea.  Title VI and EPA's

12:03PM  16   regulations are both somewhat unique here.  The

12:03PM  17   reticulated scheme that Title VI sets outs talks about

12:03PM  18   compliance, and there's a statutory obligation for the

12:03PM  19   agency to seek voluntary compliance before enforcement.

12:03PM  20   That's in 602.  The EPA's regulations say that EPA will

12:03PM  21   informally resolve complaints whenever possible.  That's

12:04PM  22   a mandatory obligation.  The negotiations themselves

12:04PM  23   were all about EPA's view of what it's regulations

12:04PM  24   require, what disparate impact requires.  But if my

12:04PM  25   colleagues are coming here now with attorney argument

12:04PM     1    saying, hey, that was just negotiating positions, that's

12:04PM     2    just another form of illegality by EPA.  That's not

12:04PM     3    seeking voluntary compliance.  That's seeking something

12:04PM     4    more than compliance.  That's not resolving informally,

12:04PM     5    quote, whenever possible when you're asking for the moon

12:04PM     6    and somebody says not going to give you the moon.  And

12:04PM     7    that's not seeking that voluntary compliance.  That's

12:04PM     8    not resolving informally.

12:04PM     9         THE COURT:  In other words, you take it they're

12:04PM    10    strong-arming --

12:04PM    11         MR. ST. JOHN:  They're strong-arming.

12:04PM    12         THE COURT:  -- the State.

12:04PM    13         MR. ST. JOHN:  They're strong-arming the State, and

12:04PM    14    that's what the statute forbids and that's what the

12:04PM    15    regulation forbids.  So if that's what they're relying

12:04PM    16    on, they're just confessing that EPA was operating

12:04PM    17    illegally in yet another form.

12:05PM    18         MR. RESAR:  Your Honor, I don't think that a

12:05PM    19    negotiating position is strong-arm because Louisiana

12:05PM    20    obviously doesn't have to accept the negotiation

12:05PM    21    position.  And in this case they, in fact, didn't accept

12:05PM    22    many of these negotiation positions and they suffered no

12:05PM    23    adverse consequences.  So it's sort of confusing to me

12:05PM    24    how that the State of Louisiana can claim a strong-arm

12:05PM    25    on this factual record given the factual record shows

12:05PM  1   they refused to comply and didn't suffer adverse

12:05PM  2   consequences.

12:05PM  3        MR. ST. JOHN:  Mr. Seidemann's declaration

12:05PM  4   includes, quote, Dorka, it's not just $80,000, it's

12:05PM  5   millions and millions and millions of dollars.  I think

12:05PM  6   she said $200 million.  That's a gun to the head, Judge.

12:05PM  7   That is a gun to the head.

12:05PM  8        THE COURT:  The declaration does say that.

12:05PM  9        MR. ST. JOHN:  And for a state --

12:05PM 10        THE COURT:  Do you disagree?  I mean, that's what

12:05PM 11   it says.

12:05PM 12        MR. RESAR:  I understand the declaration says that.

12:05PM 13        THE COURT:  That's what it says.  That's

12:05PM 14   strong-arming.  You know, I didn't go -- I went to

12:06PM 15   public school, but that's strong-arming.

12:06PM 16        MR. RESAR:  Respectfully, Your Honor, the factual

12:06PM 17   record just refutes this suggestion that it's

12:06PM 18   strong-arming because the investigations were closed.

12:06PM 19   Louisiana never was forced to --

12:06PM 20        THE COURT:  So it's a bluff, is what you're telling

12:06PM 21   me.  You were bluffing them at the negotiating table by

12:06PM 22   telling them that you were going to make them pay back

12:06PM 23   hundreds of million dollars, which you probably know the

12:06PM 24   State of Louisiana probably can't pay.  So it was a

12:06PM 25   bluff.

12:06PM   1          MR. RESAR:  Respectfully, I don't know for sure

12:06PM   2   what was going on in the EPA individual's mind when they

12:06PM   3   were making that statement; but it sounds plausible that

12:06PM   4   it was a bluff to extract a more favorable settlement,

12:06PM   5   possibly.  I don't know.  But the point is that no

12:06PM   6   settlement was extracted, no strong-arm was ever

12:06PM   7   imposed.  It was just a negotiating position that was

12:06PM   8   rejected without consequence to the State.

12:06PM   9          THE COURT:  It does put the State in a very

12:06PM  10   peculiar predicament when they're threatened with having

12:07PM  11   to pay back hundreds of million dollars if they don't

12:07PM  12   comply.  No comment on that one?  Okay.  I gotcha.

12:07PM  13          All right.  Well, thank you all very much.  I

12:07PM  14   appreciate the arguments and the briefs.  Court's going

12:07PM  15   to take it under advisement and rule in due course.

12:07PM  16   Thank you all.  Have safe travels back home.

        17                    (Proceedings adjourned.)

        18

        19

        20                * * * * * * *

        21

        22

        23

        24

        25

1                          CERTIFICATE

2

3        I hereby certify this 12th day of January, 2024 that the

4    foregoing is, to the best of my ability and understanding, a

5    true and correct transcript of the proceedings in the

6    above-entitled matter.

7

8                            _Deidre D. Juranka_
                             Deidre D. Juranka, CRR
9                            Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25