# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| **STATE OF LOUISIANA** | **CASE NO.  2:23-CV-00692** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **U S ENVIRONMENTAL PROTECTION AGENCY ET AL** | **MAGISTRATE JUDGE LEBLANC** |

## <u>MEMORANDUM RULING</u>

Before the Court is  the "State of Louisiana's Motion for Preliminary Injunction and to Expedite" (Doc. 10), filed by and through the State of Louisiana's Attorney General, Liz Murrill, who moves for an order under Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants, the United States Environment Protection Agency ("EPA"), Michael Regan, Lilian Dorka, U S Department of Justice ("DOJ"), and Merrick Garland, United States of America. The State of Louisiana alleges that Defendants' actions violate the Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI") and the Administrative Procedures Act ("APA").

Specifically, the State seeks to enjoin Defendants from (1) delegating to any private person or group (including Special Interest Groups) any power to veto governmental actions of EPA, including extensions of the time to resolve Title VI complaints informally beyond 180 days after filing of complaints, for all Title VI enforcement actions involving the State or any State agency, (2) imposing or enforcing any disparate-impact-based requirements against the State or any State agency under Title VI, and (3) imposing or enforcing any Title VI-based requirements upon the State or any State agency that are not

both (a) ratified by the President, as required by 42 U.S.C. § 2000d-1, and (b) based upon requirements found within the four corners of EPA's disparate-impact regulations, 40 C.F.R. § 7.35(b), (c).

Also, before the Court is "Defendants' Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment" (Doc. 29) wherein Defendants move to dismiss the instant lawsuit for lack of jurisdiction, or alternatively, because there is no genuine issue of material fact in dispute and Defendants are entitled to judgment as a matter of law.

Finally, before the Court is "Louisiana's Request for Judicial Notice" (Doc. 39) wherein the State of Louisiana requests that the Court take judicial notice of the EPA's October 3, 2023, acceptance for investigation of a Title VI complaint alleging only disparate impact by facially non-discriminatory policies.

The Court heard arguments as to these motions on January 9, 2024.

## **INTRODUCTION**

In this lawsuit, the State of Louisiana complains that the EPA seeks to impose disparate-impact-based requirements that effectively require racial discrimination. The State asserts that the EPA has weaponized Title VI as a blanket grant of authority to veto any and all permitting decisions that offend its vision of environmental justice and "equity." The State contends that the EPA has no authority to impose these disparate-impact-based mandates under Title VI because Title VI has no such disparate-impact language. In other words, Title VI only prohibits intentional discrimination. So, the simple question here is whether Title VI disparate-impact regulations are lawful. Moreover, does

the Executive's limited authority under § 602 of Title VI[1] extend to imposing disparate-impact-based liability.

> Section 601 of Title VI provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Of note, agencies' rulemaking power is limited to actions that "effectuate" Section 601, and "no such rule, regulation, or order shall become effective unless and until approved by the President. *Id*. Section 602 of Title VI authorizes agencies, such as the EPA, to implement § 601 on intentional racial discrimination in federally-funded programs. The statute details the precise circumstances by which agencies can seek compliance with their rules and regulations through fund termination or "other means authorized by law." 42 U.S.C. § 2000d-1. The statute provides for judicial review of any "agency action taken pursuant to [42 U.S.C.] section 2000d-1," including any agency effort to enforce its regulations by "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any [section 2000d-1] requirement. 42 U.S.C. 2000d-2.

The DOJ has adopted regulations to implement Title VI under Section 602. *See* 28 C.F.R. §§ 41.101-12. DOJ's published regulations purport to impose disparate-impact-

---

[1] Section 602 governs enforcement and rulemaking. Under § 602, agencies are "authorized and directed to effectuate the provisions of [601] . . . by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1.

based requirements. *See*, *e.g.*, 28 C.F.R. § 42.104(b)(2). In 2003, DOJ acknowledged that "the Supreme Court's statements in *Sandoval* … call the validity of the Title VI disparate impact regulations into question." 68 Fed. Reg. at 51,338; *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (holding that a private plaintiff could not bring a Title VI action to enforce the Department's implementing regulation prohibiting unintentional discriminatory effect or disparate impact because the statutory provisions of Title VI prohibited only intentional discrimination.).[2] The DOJ acted to rescind its disparate impact regulations in 2020,[3] but inexplicably never published its decision to do so.

The EPA also adopted regulations to implement Title VI. *See* 40 C.F.R. §§ 7.10-180. Like DOJ's regulations, EPA's regulations contain a restriction on taking actions with disparate impacts. *See* 40 C.F.R. § 7.35(b), (c). Although the text of EPA's regulations does not mention any particular disparate impact standard, EPA has interpreted its regulations as establishing a standard that is largely identical to the Title VII disparate-impact regime established by 42 U.S.C. § 2000e–2(k).[4] EPA adopted that interpretation despite having joined DOJ in acknowledging that *Sandoval* "call[s] the validity of … Title VI disparate impact regulations into question." 68 Fed. Reg. at 51,338.

## **FACTUAL STATEMENT**

---

[2] The Supreme Court wrote that it assumed that the disparate impact regulation was valid but noted that there was "considerable tension" with its Title VI precedents. *Sandoval*, 532 U.S. at 281-82, 284-85.
[3] Exhibit 36.
[4] Exhibit 40, p. 11.

Shortly after Title VI was enacted in 1964, a Presidential task force and the Department of Justice (DOJ) drafted model Title VI regulations. See 45 CFR § 80.3 (1964). These model regulations included a provision that recipients of federal funds may not use "criteria or methods of administration which have the *effect* of subjecting individuals to discrimination" on the basis of race, color, or national origin." See *id*. § 80.3(b)(2) (1964) (emphasis added).

In 1966, DOJ promulgated its own Title VI regulations with presidential approval. See Nondiscrimination in Federally Assisted Programs—Implementation of Title VI of the Civil Rights Act of 1964, 31 Fed. Reg. 10265 (July 29, 1966) (Administrative Record ("AR") 1-5).  In 1973, the Environmental Protection Agency (EPA) promulgated its own Title VI regulations with presidential approval. See Nondiscrimination Programs Receiving Federal Assistance from the Environmental Protection Agency, 38 Fed. Reg. 17,968 (July 5, 1973) (AR286-90).

Both agencies' regulations prohibited recipients of federal financial assistance from administering programs in a manner that has the effect of subjecting individuals to discrimination based on race, color, or national origin. See Nondiscrimination in Federally Assisted Programs—Implementation of Title VI of the Civil Rights Act of 1964, 31 Fed. Reg. 10265 (July 29, 1966) (DOJ) (AR-15); Nondiscrimination Programs Receiving Federal Assistance from the Environmental Protection Agency, 38 Fed. Reg. 17,968 (July 5, 1973) (EPA) (AR286-90). Both the EPA and DOJ have periodically amended their regulations.

In 2020, DOJ considered a draft rulemaking that would have sought to eliminate disparate impact requirements from its Title VI regulations. AR277. Although DOJ submitted a draft Title VI rulemaking for review to the Office of Management and Budget (OMB) on December 21, 2020, *Id.*, shortly thereafter, on January 14, 2021, DOJ notified OMB that the Department had decided not to proceed with publication of that rule and requested an end to OMB's review, AR279. The draft rule was never filed for public inspection with the Office of the Federal Register and was never published in the Federal Register. See AR279-80.

Since 1988, EPA has provided more than one billion dollars in federal financial assistance through annual funding grants to the Louisiana Department of Environmental Quality (LDEQ) and the Louisiana Department of Health (LDH). Declaration of Christopher Watkins ("Watkins Decl.") ¶ 4. Current grants total $120,238,571 and at least 16 grant applications are pending. *Id.* ¶ 5.

LDEQ and LDH are required to certify, and have certified, their compliance with Title VI and the EPA's regulations implementing Title VI when they apply for and receive federal financial assistance from EPA, *Id.* ¶¶ 5-11, which the State posits, necessarily means that the State is an "object" of those regulations for purposes of Article III standing.

In 1984, EPA began requiring that applicants for federal funding assistance submit a signed EPA Form 4700-4. *Id.* ¶ 11. All applications for federal financial assistance by LDEQ, LDH, or the State of Louisiana since 1984 were required to contain a completed

and signed Form 4700-4, which contains certifications that the funding recipient will fully comply with all applicable civil rights statutes and EPA regulations. *Id.*

As the discriminatory-effect provisions of EPA's Title VI regulations have remained unchanged in substance for decades since 1984, LDEQ, LDH, and the State of Louisiana have certified with every application for federal financial assistance, including those made by LDEQ in June 2023, and by LDH in July 2023, that they will comply with the discriminatory-effect provisions of EPA's Title VI regulations. *Id.* ¶¶ 8-11.

On January 20, 2022, EPA's Office of External Civil Rights Compliance (OECRC) received: (1) the complaint subsequently docketed as EPA Complaint No. 01R-22-R6, titled "Complaint Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Regarding Civil Rights Violations by Louisiana State Agency Grantees and Environmental Injustice in St. John the Baptist Parish"; and (2) the complaint subsequently docketed as EPA Complaint No. 02R-22-R6, titled "Complaint Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Regarding Civil Rights Violations by Louisiana State Agency Grantees and Environmental Injustice in St. John the Baptist Parish." Declaration of Anhthu Hoang ("Hoang Decl.") ¶¶ 6-7.

On February 1, 2022, EPA's OECRC received the complaint docketed as EPA Complaint No. 04R-22-R6, titled "Complaint Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 40 C.F.R. Part 7 against the "Louisiana Department of Environmental Quality for Lack of Environmental Justice Procedures in its Air Permitting

Program and Resulting Discriminatory Decision on Formosa Air Permits." Hoang Decl. ¶ 8.

On April 6, 2022, EPA's OECRC initiated: (1) an investigation of Complaint Nos. 01R-22-R6 and 04R-22-R6, which were filed against LDEQ; and (2) an investigation of Complaint No. 02R-22-R6, which was filed against LDH. Hoang Decl. ¶¶ 9-10. On June 27, 2023, EPA's OECRC issued a letter to LDEQ administratively closing EPA Complaint Nos. 01R-22-R6 and 04R-22-R6 stating that "[a]s a result of its administrative closure, EPA will not initiate under Title VI or other civil rights laws any further action, enforcement or otherwise, in response to these Complaints."

Also on June 27, 2023, OECRC issued a letter to LDH administratively closing EPA Complaint No. 02-22-R6, stating that "[a]s a result of its administrative closure, EPA will not initiate under Title VI or other civil rights law any further action, enforcement or otherwise, in response to this Complaint."

On July 17, 2023, EPA rejected a Title VI Complaint (EPA Complaint No. 02R-23-R6) against LDEQ (Town of Mansura) that EPA received on December 16, 2022. Hoang Decl. ¶ 20.    On July 28, 2023, EPA rejected a Title VI Complaint (EPA Complaint No. 07RNO-23- R6) against LDEQ that EPA received on May 31, 2023. Hoang Decl. ¶ 21.

As of August 15, 2022, there were no Title VI complaints related to LDEQ, LDH, the State of Louisiana, or any of the State's subcomponents pending at or otherwise under consideration by EPA. Hoang Decl. ¶ 22.

On June 16, 2023, the EPA objected to LDEQ's issuance of a permit under the Clean Air Act, on Title VI disparate-impact grounds. See exhibit 84. The EPA demanded that LDEQ undertake analysis under "civil rights regulations" to avoid "unjustified discriminatory effect., and that the State consider "whether the community is already disproportionately impacted either by public health or environmental burdens." *Id.*

The EPA has never taken or attempted to take any enforcement steps outlined in 40 C.F.R. § 7.130 ("Actions available to EPA to obtain compliance") to terminate assistance, refuse to award assistance, or refuse to continue assistance, against any state to obtain compliance with EPA's disparate-impact regulations. Hoang Decl. ¶ 23. The EPA has successfully extracted settlements from Alabama, Michigan, and Missouri in the last twelve months by threatening enforcement under Title VI. See exhibits 54-57.

The State incurs or would incur costs to comply with the challenged Title VI disparate-impact regulations; Defendants remark that such compliance costs would be funded by the grant itself. See 2 C.F.R. § 200.403(a).

On October 12, 2022, EPA issued a "Letter of Concern" to LDEQ and LDH, which explained that it "issued[d] th[e] Letter [of Concern] to present significant evidence suggesting that the Departments' actions or inactions have resulted and continue to result in disparate adverse impacts on Black residents of St. John the Baptist Parish, St. James Parish, and the Industrial Corridor." See exhibit 11, Doc. 12-11.

The Letter of Concern requested that LDEQ and LDH "[c]onduct cumulative impact analysis" and set forth detailed requirements that EPA demanded, at a "minimum," what "[t]hese cumulative impact analyses should" contain. Exhibit. 11 at 5-6. The Letter of Concern did not allege that LDEQ or LDH had taken any actions on the basis of intentional discrimination. See generally exhibit 11.

The EPA submitted document demands to LDEQ and LDH on April 26, 2023, as part of its Title VI investigations. See exhibit 18, Doc. 12-18. In March 2023, the EPA admitted that it could not continue informal negotiations with the State without securing Sierra Club's[5] consent to an extension. See Seidemann Decl. ¶¶ 65-70; see also exhibit 42. Information was traded to secure Sierra Club's consent; the EPA told attorneys for LDEQ and LDH that it "did not think it was a very high price ... in order to get a 120-day extension for the purpose of continuing what we think is a very productive discussions [and] negotiation." See Seidemann Decl. ¶¶ 65-70.

The EPA and LDEQ/LDH exchanged proposed settlement agreements with each other, including redlines of EPA's proposals. See exhibits 81-83, Docs. 34-2 and 34-4 respectively.  In the course of the informal negotiations, Seidemann declared that to his recollection, EPA never alleged that LDEQ and LDH had taken any actions that were the product of intentional discrimination. See Seidemann Decl. ¶109.

---

[5] Sierra Club is a  private special interest group.

## LAW AND ANALYSIS

The State asserts the following causes of action: (1) those arising out of the Constitution itself; (2) an equitable cause of action arising from the "power of federal courts of equity to enjoin unlawful executive action; and (3) a non-statutory cause of action to challenge when an executive action is ultra vires. The State remarks that these causes of action do not require final agency action.

The State also asserts challenges under the private non-delegation doctrine and to Defendants' disparate-impact regulations under the Administrative Procedure Act's ("APA") cause of action, 5 U.S.C. § 704. Under the private non-delegation doctrine, the State posits that the EPA has taken final agency action by conveying governmental veto power upon the Private Special Interest Groups, and then took further final agency action by seeking (and obtaining) their approval to continue informal negotiations past December 2022, and again past March 2023.[6]

As to disparate-impact regulations, the State maintains that Defendants have taken final agency action in the form of making grants to the State and its agencies and purporting to condition those grants on compliance with Defendants' unlawful disparate-impact mandates.[7]

The State informs the Court that it is not seeking preliminary injunctive relief as to its non-delegation doctrine (Counts I and II).[8] The State also will limit its request for

---

[6] Seidemann Decl. ¶ ¶ 65-69 & exhibits 17, 37,  and 42.
[7] Seidemann Decl. ¶ ¶ 87-90 & exhibits 28-34.
[8] Doc. 21.

injunctive relief as to Extra-Regulatory Requirement (Count VI) to Defendant's attempts to impose cumulative-impact requirements and pre-decisional NEPA-like analysis, for which the EPA has released publications detailing the mandates it intends to impose.[9]

In response, Defendants oppose the Motion for Preliminary Injunction and also file a Cross-Motion to Dismiss, or alternatively, Motion for Summary Judgment. Defendants inform the Court that the above-mentioned complaints against the LDEQ and LDH allege that these Louisiana agencies violated Title VI by discriminating against black communities through their actions and inactions regarding chemical emitting facilities.[10] As admitted by the State, these complaints were either closed without a finding of a violation under Title VI, or rejected.

The State remarks that its Motion for Preliminary Injunction challenges alleged action by the EPA in connection with the now-dismissed Title VI complaints.[11] The State has also filed a Request for Judicial Notice wherein it requests that the Court take judicial notice of the EPA's October 3, 2023, acceptance for investigation of a Title VI complaint alleging only disparate impact by facially non-discriminatory policies.[12]

The State challenges the EPA's interpretation of its regulations as indicated in Defendant's Letter of Concern and additional permitting requirements that expand the plain text of the Regulation.[13] The State asserts that the Letter of Concern sets standards by which

---

[9] *Id.*
[10] Doc. 29-1, p. 18.
[11] *Id.*; Doc. 10.
[12] Doc. 39, and exhibits A and B attached thereto.
[13] 40 C.F.R. § 7.35(b).

LDEQ issues permits and further states the EPA's position that it could cause the permits to be modified, terminated or revoked if they violate the Clean Air Act. See 42 U.S.C. § 7661d. In other words, the EPA's interpretation of 40 C.F.R. § 7.35(b), which is generic and non-specific, goes beyond the plain text of the Regulation, to impose disparate impact liability.

Defendants argue that its dismissal of the investigations concerning the complaints, renders moot, Louisiana's challenge of the EPA's application of its regulations. Defendants remark that the State's arguments come fifty (50) years too late and conflicts with Supreme Court precedent.

Defendants argue that the State's lawsuit lacks Article III injury, which deprives this Court of jurisdiction. Defendants also argue that the State's challenge lacks merit because the Supreme Court has approved substantively identical disparate-impact regulations under Title VI.

As to the State's challenge to the Department of Justice's ("DOJ") Title VI implementing regulations, Defendants maintain that these regulations were not applicable to EPA investigations, and the State does not allege that they apply to LDEQ or LDH. Thus, Defendant argues that the State has failed to identify any nexus between the challenged DOJ regulations and any harm Louisiana has suffered.

Defendants argue that the State's challenge to the EPA's negotiating positions, and the complaint process itself is without merit because the State cannot show that receiving

a settlement proposal inflicts any legally cognizable injury on the State, nor can the State identify any final agency action to confer jurisdiction.

Before the Court can entertain the substantive issues in the State's Motion for Preliminary Injunction, or Defendants' Cross-Motion for Summary Judgment, it must first determine if this Court has subject matter jurisdiction.

## I.     SUBJECT MATTER JURISDICTION

*A.  Sovereign immunity*

5 U.S.C. § 702 waives sovereign immunity for the claims at issue here. See *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014).

*B.  Article III standing*

*1.  EPA's disparate-impact (Counts III and V)*

Defendants maintain that the State lacks standing to challenge EPA's disparate impact regulations (Counts III[14] and V[15]) because the State has not suffered an injury caused by EPA's regulations that is redressable by this Court. Defendants argue that the State does not identify any regulatory or administrative programs with which the EPA's disparate impact regulations interfere, and as such, the State does not identify any instance where it is actually taking race-conscious action to comply with the EPA's disparate impact regulations. Defendants argue that the State has not shown any "genuine conflict" between state and federal law that might be "capable of producing injury-in-fact" from EPA's

---

[14] Count III is the EPA's Title VI disparate-impact regulations that allegedly exceeds the EPA's authority under Title VI.

[15] Count V is Defendants' disparate impact based Title VI mandates that allegedly violate the spending clause.

disparate-impact regulations. *Va. Ex rel. Cuccinelli v. Sebelius,* 656 F.3d 253, 270 (4th Cir. 2011).

The State alleges that it has Article III standing due to the EPA' acts of attempting to impose illegal disparate-impact-based and extra-regulatory requirements upon the State, and that such acts cause injury-in-fact by inflicting four (4) distinct types of sovereign, quasi-sovereign, or proprietary harms.[16]

Specifically, the State alleges harm by (1) subjecting it to an arbitrary deadline and governmental processes in which the federal Executive illegally delegated governmental powers to non-governmental entities, (2) imposing illegal disparate-impact-based and extra-regulatory requirements upon the State, (3) constraining the State's authority to regulate and otherwise exercise its sovereignty within its borders, and (4) violating the State's right to clarity in the conditions concerning funding and the right not to be bound by any restriction not  unambiguously clear in the statutory text.[17]

Additionally, the State argues that because it is "'an object of the action (or forgone action) at issue' ... [the State's] standing to seek review of administrative action is self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife,*504 U.S. 555, 561 (1992)).

The State asserts that if a regulation is unlawful, the imposition of any burden by it constitutes "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 561. The State

---

[16] Doc. 1, ¶ 198-203.
[17] The State alleges that Title VI makes it a violation to discriminate on the basis of race, color, or national origin, yet Defendants' disparate-impact regulations go beyond Title VI's statutory text.

argues that regulations invariably create compliance, familiarization, and planning costs—all of which are cognizable and redressable injuries that flow from illegal regulations.  For that reason, "[a]n increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015) (holding that plaintiff had object-of-regulation standing).

Defendants admit that the State is the object of the challenged regulation, but argue that the State has not established (1) an injury in fact (2) fairly traceable to the challenged conduct of the Defendants, and (3) redressable by a favorable judicial decision to possess Article III standing on any of its claims. Defendants argue that these "three elements" are the "'irreducible constitutional minimum' of standing" that "the party invoking federal jurisdiction" always "bears the burden of establishing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendants argue that the State has failed to allege any ambiguity concerning the conditions imposed by the EPA that accompany federal funding.

 As noted in *Contender Farms,* the court found that the plaintiffs were the object of the challenged conduct, and further concluded that plaintiffs established standing because the challenged regulations amounted to an increased regulatory burden. 779 F.3d at 266 (citing  *Ass'n of Am. R.R.s v. Dep't of Transp.*, 38 F.3d 582 (D.C. Cir. 1994) (an increased regulatory burden typically satisfies the injury in fact requirement).

The State argues that the increased cost to comply with the illegal regulations is a cognizable injury. The State argues that it has a constitutional right to not to be bound by

any condition beyond what Title VI's statutory text unambiguously establishes, and that Defendants' disparate-impact regulations violate that right by doing just that.

The State also contends that it has standing under the Supreme Court's Spending Clause jurisprudence, noting that it has a right to clarity in Spending Clause conditions. The State asserts that the Government violates the Constitution either when (1) Congress presents the States with unclear conditions or (2) the Executive or Judiciary tries to enforce a Spending Clause condition against the States that goes beyond what the statutory text of the condition unambiguously establishes. The State considers these as sovereign rights it possesses under our "system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

The State argues that the Executive is wholly without constitutional power to impose Spending Clause conditions that exceed what Congress has unambiguously provided in the statutory text and the States have a corresponding right not to be so bound. *Arlington Central Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 301 (2006).

Under the Spending Clause, "[i]f congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" to ensure that "the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst States Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). There can "be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* at 17.

Next, the State argues that it has a right to be free of the exercise of federal governmental power dictated by private parties and that the EPA violated that right by

being subjected to unconstitutional agency authority. *Axon Enter., Inc. v. FTC*, 143 S.Ct. 890, 903 (2023). The State alleges that it was subjected to an illegitimate proceeding due to investigations infected by a non-delegation doctrine violation and led by Private Special Interest Groups. Specifically, the State complains that the EPA issued a "civil investigative demand" and required the State to provide documents it would prefer to withhold. The State argues that it will lose all of its federal funding if it does not comply with the EPA's demands that were propagated by these Private Special Interest Groups.

Additionally, the State complains that it was forced to produce documents upon demand, review and redline proposed settlement agreements, respond to the Letter of Concern, join innumerable conference calls, and indulge the EPA's pronounced habit of canceling meetings at the last minute, after this suit was filed. The State argues that this has caused it to incur costs that are not recoverable, which establishes irreparable injury.

The State also asserts it has standing based on the threat of enforcement.  The State notes that the EPA (1) had accepted complaints against LDEQ and LDH, (2) issued a letter of Concern with detailed allegations of Title VI disparate-impact violations and demanded that the State "[c]onduct cumulative impacts analyses," (3) was drafting findings of violations, and (4) was set to move to formal enforcement proceedings a mere 48 days after the Complaint was filed, on July 11.[18]

The EPA argues that a credible threat of enforcement did not exist at the time that this lawsuit was filed.

---

[18] Plaintiff's exhibit 11, pp.3-5 and exhibits 22-23.

The State argues otherwise and contends that it still faces a credible threat even after the investigations were terminated.  The State notes that the EPA's June 16 Objection makes plain that its intentions to enforce its mandates against the State is an ongoing and absolute certainty;[19] moreover, the objection makes clear that the EPA is enforcing the challenged disparate-impact and cumulative impact regulations against the State with no intention to abandon them.

The Cover Letter to the EPA's objections gives a narrative of its analysis that assessed key demographic and environmental indicators. The EPA noted that an Environmental Justice ("EJ") analysis should be developed to assist states and stakeholders, and the EJ analysis should include input from the community, an evaluation of existing environmental data, use of known demographic information and other relevant information.  The EPA also encouraged the LDEQ to screen permitting actions for EJ concerns and to consider potential compliance issues related to civil rights of the communities potentially impacted early in the permitting process. Such screening would indicate whether a permitting decision had the potential to contribute to significant public health or environmental impacts, if the community may be particularly vulnerable to impacts from the proposed permit, and whether the community is already disproportionately impacted either by public health or environmental burdens. Additionally, the screening practice would provide information as to whether there are residents of the affected community who could be disproportionately subject to adverse health, environmental and/or quality of life impacts

---

[19] Plaintiff's exhibit 84.

on the basis of income, national origin, or other demographic factors. The letter also stated that "[i]ntegrating environmental justice in decision making and ensuring compliance with civil rights laws can, together, address the strong correlation between the distribution of environmental burdens and benefits and the racial and ethnic composition, as well as income level of communities.[20]

The State contends that such disparate impact analysis required by the EPA cannot be without costs. It would require gathering data, coding, designing proper regression analysis and analyzing the results.

The State also complains that Defendants have not disavowed their position that States must comply with their challenged mandates when issuing permits or taking other relevant actions. The State considers this strong evidence that it faces a credible threat of enforcement, citing *California Trucking Ass'n v. Bonta,* 996 F.3d 644, 653 (9th Cir. 2021), *cert. denied* 142 S.Ct. 2903 (2022); see also *Seals v. McBee*, 898 F.3d 587, 592 & n. 9 (5th Cir. 2018). Consequently, the State argues that without a clear disavowal from the EPA that it will not enforce any disparate impact or cumulative impact mandates against the State, the risk of enforcement against the State is manifest.

Defendants remark that the June 16 Objection to the State's proposed permit renewal was based solely on technical grounds, to wit: (1) the LDEQ failed to justify the methodology it used to estimate the permittee's emissions, (2) failed to account for

---

[20] *Id.* p. 2.

uncontrolled emissions, and (3) failed to limit sulfur content according to permit limits.[21] Defendants assert that these objections were not based on disparate-impact grounds. Defendants also remark that the cover letter[22] referenced environmental justice but did not purport to apply its disparate impact regulations against the State. Additionally, the EPA informs the Court that the LDEQ issued the permit in September 2023.[23]

Defendants argue that *California Trucking Ass'n v. Bonta* is distinguishable from the instant matter. The *California Trucking* case involved a state that had already "commenced a number of prosecutions" under the challenged statute, whereas in this case the EPA has not brought any Title VI disparate-impact enforcement proceedings. Additionally, Defendants remark that considering that the EPA's disparate-impact regulations have existed for over fifty years, the lack of enforcement outweighs any speculative possibility of future enforcement. Thus, Defendants posit that not only has the State failed to establish a credible threat of enforcement, it cannot show that its purported costs are a cognizable injury.

The State argues it faces imminent threats based on the EPA's threat to issue findings of a violation within 48 days if the State did not agree to a settlement agreement,[24] underscored by the EPA objecting to a permit within one month thereafter on disparate-impact and cumulative-impact grounds. Thus, the State maintains that the objection carries the force of law, see 42 U.S.C. § 7661d, and ultimately this is proof of imminent future

---

[21] Doc. 34-5, pp. 5-11.
[22] Doc. 34-5, p. 3.
[23] Defendant's exhibit E.
[24] Plaintiff's exhibit 18.

injury. Additionally, the State argues that it currently faces new and ongoing injury every time it issues a permit and is required to comply with Defendants' fluid, and ever-increasing disparate impact mandates.

The State argues that the EPA's actions were either overwhelmingly or exclusively driven by disparate-impact theories through its Letter of Concern, document demands, and the mandates it sought to impose during the informal negotiations.[25] Also, the State notes that what was noticeably absent during the informal negotiations, was any credible or serious allegation that the State's actions were motivated by intentional discrimination.[26] Thus, the State asserts that Defendants cannot argue that intentional discrimination was a significant component of its investigation.

As to the costs incurred by the State to comply with Defendants' disparate-impact regulations whenever it renews a permit,[27] Defendants argue that any such costs may be funded by the grant itself, see 2 C.F.R. § 200.403(a), thus there are no costs.  Defendants note that the Burdette Declaration does not state that Louisiana conducts a disparate impact analysis prior to renewing permits, but instead it states that "costs to LDEQ would increase if LDEQ is required to perform additional disparate impact analyses on permit renewals."[28]

The State informs the Court of the increased funding the EPA has sought to employ full time employees for 2023 ($11.6 million) and again for 2024 ($42.3 million), the purpose of which is for the EPA to analyze and enforce Title VI disparate and cumulative

---

[25] Plaintiff's exhibit 11, pp. 3-5.
[26] Siedermann Declaration, ¶ 109.
[27] Burdette Declaration par ¶ 17-22.
[28] *Id.* ¶ 22.

impacts.[29] Finally, the State contends that there is a credible threat of enforcement, which is clearly supported factually by the settlements with the States of Alabama, Michigan and Missouri in the last twelve months.

The Court disagrees with the EPA and finds that when the suit was filed, there was a credible threat of enforcement as indicated by the EPA accepting complaints against the LDEQ and LDH, demanding that the State conduct disparate and cumulative impact analyses, and moving to formal enforcement proceedings within 48 days after the Complaint was filed.[30] Furthermore, the EPA has not disavowed its demands of disparate and cumulative impact analyses, but instead argues that Title VI should be interpreted broadly to allow such. Finally, the EPA's increased funding to enforce and analyze Title VI disparate impacts and cumulative impacts certainly supports the State's arguments concerning a credible threat of enforcement.

The Court agrees with the State that it has standing against the EPA to assert the claims presented here. As noted by the State, if it has to consider disparate impacts, there would be an increased burden. Further, the EPA's argument that any increased funds would be paid by the grant itself is of no moment, inasmuch as this would decrease the amount of the disposable fund proceeds, should the grant be awarded, and yet be an increased cost to the State, should the grant not be awarded.

---

[29] Plaintiff's exhibits 52 and 53.
[30] Exhibit 11, p. 3-5; exhibit 22-23; Seidemann Declaration, ¶¶ 18, 73.

In summation, the State has established that there is a credible continued threat of enforcement and an increased burden due to the EPA's decision to require disparate impact analysis when issuing permits and/or conditioning a grant with a disparate impact analysis. To be sure, by accepting federal funds, the State is bound by the terms of Title VI and its implementing regulations (if valid) for the duration of the grants and is coerced by the possibility of losing federal funds into complying with them. The State, therefore, is subject to imminent harm that is traceable to the EPA's regulations. As such the State has standing against the EPA to assert its claims because it has established a "case or controversy" that permits it to challenge the validity of the disparate impact and cumulative impact mandates. See *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

## 2. DOJ's disparate-impact (Counts IV and V)

The State argues that it has standing against the DOJ for the same essential reasons that apply to the EPA: (1) the State's Department of Justice is the object of those DOJ regulations, (2) the DOJ's attempt to impose disparate-impact liability exceeds the unambiguous text of Title VI thereby causing sovereign injury, and (3) the Louisiana Department of Justice is bound to Title VI by funding grants from DOJ and itself takes actions that are subject to DOJ's disparate-impact mandates, which result in compliance costs.[31]

Defendants argue that the State lacks standing to challenge the DOJ's disparate impact regulations because it cannot establish a "sovereign injury" to its "power to create and

---

[31] See Sinquefield Decl. ¶¶ 3-9, Doc. 34-32.

enforce a legal code"[32] flowing from DOJ's disparate impact regulations. Defendants argue that the State does not identify any of its own regulatory or administrative programs that conflict with the challenged regulations, and it cannot assert sovereign injury flowing from the alleged ambiguity regarding conditions imposed on the DOJ grants in light of Plaintiff's admission that no such ambiguity exists.[33]

Next, Defendants argue that the State neither alleges the existence of any enforcement proceedings brought under DOJ's disparate-impact regulations nor even asserts that pre-enforcement review is warranted because such future enforcement proceedings are likely.[34] Thus, Defendants maintain that the State cannot establish standing for a pre-enforcement challenge. Defendants also argue that the State's assertion of increased costs are speculative and unsubstantiated.

To support its claims, the State provides the Declaration of Ryan Seidemann, Assistant Attorney General, employed by the Louisiana Department of Justice. On November 2, 2022, EPA provided the LADOJ with a copy of the Letter of Concern sent to LDEQ and LDH and a Case Resolution Manual.[35] Afterward, informal resolution discussions began on November 16, 2022. The LADOJ inquired as to exactly what EPA believed the LDEQ and LDH were doing wrong and noted that the EPA's Letter of Concern failed to identify specific actions.[36] The LDOJ specifically requested that the EPA identify

---

[32] Doc. 15, p. 41.
[33]  See Compl. ¶ 23.
[34] See Compl. ¶¶ 228-40.
[35] Declaration of Ryan Seidemann, ¶ 19, and attached Exhibits 11 and 12.
[36] *Id.* ¶ 22.

any provisions in Louisiana law, any actions, or inactions that the EPA believed were in conflict with Title VI, and further asked that the EPA provide supporting legal analysis.[37]

Refusing to do so, instead, the EPA reiterated the elements of a disparate impact claim, then stated "this is not an environmental engagement per se."[38] EPA officials further stated that "compliance with environmental laws is not a shield to Title VI."[39] As the informal resolution discussions progressed, EPA officials refused to identify specific actions or inactions that purportedly triggered its Title VI concerns.[40] This is buttressed by one EPA official's statements that the EPA was "not looking at actual permit issuance and what happened each time a permit was issued."[41] However, Defendant Lilian Dorka elaborated that no specific action is at issue but that the EPA is targeting the cumulative impact of LDEQ's actions. Then, three weeks later, LADOJ complained that the EPA had not identified anything specific that the EPA considered a civil rights problem, other than outcome.  Dorka responded that "this is not about procedures," rather "it's your method of administering your air program in a couple of different instances ... we find strong evidence that the method of administering the air program ... resulted in some harms, some impacts, and that those impacts were born disproportionately based on race."[42]

---

[37] *Id.* ¶ 23.
[38] *Id.* ¶ 24.
[39] *Id.* ¶ 25.
[40] *Id.* ¶ 26.
[41] *Id.*
[42] *Id.* ¶ 27.

LADOJ again asked for specifics and Dorka pointed to LDEQ's "administration of the air program."[43] Ultimately, Dorka pointed to LDEQ's issuance of a single permit and said "that subjected people to discrimination," refusing to state whether its Letter of Concern represented a complete statement of EPA's concerns.[44]

The LADOJ explained to the EPA that it was required to comply with the statute but was entitled to be notified specifically as to how it was in noncompliance and again asked that the EPA identify specifics as to noncompliance with Title VI. EPA's only response included disparate impact, and whether alleged harms fall on communities that are predominately black.[45] Dorka admitted that "you're not going to see in any letter where we think [LDEQ or LDH] violated the law," but "what we're saying here, is in the future, put a process in place, as we've been engaging with many, many states ... other states ... so that you yourself can do an analysis ... both from an [environmental justice] perspective [and] from a civil rights perspective, that gives you an idea of whether the actions you may be about to take could have a disparate impact on the basis of race."[46]

LADOJ sought to confirm the EPA's positions via letters memorializing the informal resolution discussions; the EPA responded that it would "not be responding at this time to [one letter's] specific points ...."[47]

---

[43]*Id.* ¶ 28.
[44] *Id.*
[45] *Id.* ¶¶ 31-32.
[46] *Id.* ¶ 33.
[47] *Id.* ¶ 35 and attached exhibits 13 and 15; ¶ 36 and attached exhibit 14.

On January 18, 2023, Dorka stated that the initial draft informal resolution agreements that it presented contained standard boilerplate commitments but that she expected the agencies "to get back to [EPA] as to whether you already have certain things in place."[48] Dorka made clear that the EPA expected NEPA-like pre-decisional analysis of the potential for disparate impact, including express consideration of race.[49]

In a subsequent conversation, LADOJ requested the statutory or regulatory basis for requiring a NEPA-like pre-decisional process to which Dorka responded that "what we're putting in place is totally based on a Title VI approach," and "in formally resolving a number of these types of cases, we are helping folks put into place a framework, a Title VI disparate impact,  identify and address-type of framework," "to address this prospectively."[50] Unable to point to a specific provision, Dorka pointed to 40 C.F. R. § 7.35 and acknowledged that "[n]othing's gonna say that it requires [an analysis] to be conducted before" a permitting action.[51] Dorka made clear that the EPA expected LDEQ to add permitting conditions not authorized by environmental statutes[52] expressly stating that "odor, traffic, safety, things like that that are nevertheless from a civil rights perspective adversities that could be caused by certain actions,"[53] and "[s]ometimes ... in

---

[48] *Id.* ¶ 37.
[49] *Id.* ¶ 39.
[50] *Id.*  ¶ 40.
[51] *Id.*  ¶ 41.
[52] *Id.*  ¶ 42.
[53] *Id.*

order to address what appears to be a disparate impact, disparate harm, you may need to go beyond [environmental statutory] authorities."[54]

In summation, based on the conversations detailed above, the State asserts that the EPA is demanding ex-ante NEPA-like analysis to unlawfully facilitate decision-making on the express basis of race, and demand that the LDEQ conduct cumulative impact assessments as part of its permitting process, notwithstanding the absence of statutory authority for requiring such assessments. Seidemann declares that the EPA has confirmed that its demand was for LDEQ to "commit to doing a disparate impact screening assessment for every renewal permit application for any major source or synthetic minor source across the state.[55]

Again, this Court disagrees with Defendants.  There is a credible threat of enforcement; the State has received grants from the DOJ and will continue to apply for grants in the future,[56] which the State asserts will cause it to be subjected to unconstitutional proceedings for all future Title VI complaints.  To comply with the disparate impact analysis, the LADOJ would be required to expend additional LADOJ resources, including hiring additional staff, purchasing additional equipment, and additional work hours for personnel, in addition to collecting and reviewing information regarding the race, color, and national origin of communities impacted by LADOJ activities.[57]

---

[54] *Id.*
[55] *Id.* ¶ 51.
[56] Sinquefield Decl. ¶ 3, 5 Doc. 34-32.
[57] *Id.* ¶ 7.

The Court agrees with the State that the disparate impact and cumulative impact analysis the EPA is requiring as a condition for funding grants, creates a race-based decision. Where an action would have a disparate impact, a decision-maker is often compelled to act intentionally on the basis of racial considerations to avoid the disparate impact, see e.g., *Raytheon*, 540 U.S. 44, 52 (2003), thus disparate impact regulations require decision makers "to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci v. DeStefano*, 557 U.S. 595-96 (2009). (Scalia, J., concurring).

The Court finds that for the reasons stated concerning the EPA, because the State will be potentially subject to unconstitutional proceedings for all future Title VI complaints, permitting processes, or grant funding, and the increased burden to the State, it has standing against the DOJ to asserts its claims.

### 3. *EPA's standing challenge as to "extra-regulatory requirements" (Count VI)*

The State alleges that during the informal resolution process, the EPA's proposed settlement agreement contained "extra-regulatory" requirements that extended beyond Title VI's regulations. Defendants argue that even if the "EPA's proposals" were unlawful, the State does not allege that the EPA forced the LDEQ or LDH to accept them, nor can they because the Complaints were closed without any formal resolution. Defendants argue that the State's complaint as to these extra-regulatory requirements are no more than a "generalized interest in proper application" of EPA's regulations, and not itself an injury

in fact. *Delta Com. Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004).

Additionally, Defendants argue that to the extent receiving proposals during unsuccessful informal resolution discussions constitutes an injury in fact, that past injury does not confer standing on the State's claims for prospective relief. *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974); see also *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-08 (1983). Thus, Defendants argue that the State has not suffered an injury in fact.

The State maintains that there will be compliance costs because such mandates "require the [regulated entities] to begin collecting and reviewing information regarding applicants' race, color, [etc.] to monitor their compliance with the Rule," which "causes [the regulated parties] to incur costs." See, e.g. *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F.Supp.3d 1018, 1043-44 (N.D. Ill. 2014).

The State points to an LDEQ permit under the federal Clean Air Act, to which the EPA objected on June 16, 2023.[58] The stated objections encompass the EPA's concern with Environmental Justice and requires the LDEQ to perform analysis and consider overburdened communities. Specifically, the EPA is requiring the LDEQ to perform a screening practice to provide information as to whether there are residents of the affected community who could be disproportionately subjected to adverse health, environmental and/or quality of life impacts on the bases of income, national origin or other demographic

---

[58] Plaintiff's exhibit 84.

factors.[59] The objection also states that it has conducted its own analysis to assess key demographic and environmental indicators which shows a total population of approximately 1,921 residents of which 86% are people of color, 47% are low income, and 23% have less than a high school education.

The Objection also notes that civil rights regulations prohibit state, local, or other entities that receive federal financial assistance, from taking actions that are intentionally discriminatory as well as practices that have an unjustified discriminatory effect, including on the bases of race, color, or national origin. The Objection requires the State to consider "whether the community is already disproportionately impacted either by public health or environmental burdens."[60]The LDEQ has not removed said Objections.

The State asserts that the EPA is demanding that the State conduct analysis under civil rights regulations to avoid unjustified discriminatory effect (Title VI disparate impact mandates) and cumulative impacts analysis by insisting that the State consider "where the community is already disproportionately impacted either by public health or environmental burdens."[61] The State presents evidence that such analysis would cost millions of dollars to comply with the EPA's demand in the permitting process.[62]

Additionally, the State informs the Court that the EPA sought from Congress an additional *$11.6 million* and 50 new full-time employees for fiscal year 2023 to "address actions, policies, and practices by recipients of EPA funding that have a *discriminatory*

---

[59] *Id.* p. 2.
[60] *Id.*
[61] *Id.* p.2.
[62] Seidemann Declaration ¶ 71.

*impact* on overburdened and disadvantaged communities,"[63] to analyze and enforce Title VI disparate impacts, including cumulative disparate impacts. It similarly seeks "an additional $42.3 million and 9.5 FTE [full-time employees]" for fiscal year 2024 to "to modernize [EPA's] national enforcement and compliance data system and to expand compliance monitoring efforts to address environmental justice issues."[64]

The Court agrees with the State and finds that it has established an injury and thus has standing to challenge the extra-regulatory requirements the EPA is imposing upon the State.

*EPA's standing to challenge "parallel track" proceedings (Count VII)*

The State complains that during the EPA's and LDEQ's informal negotiations, the EPA was proceeding on "parallel tracks," which is contrary to its own regulations.  See 40 7.120(d). Specifically, the State complains that during the informal negotiations, the EPA was also on a fact-finding journey to ensure that it was in a position to resolve the complaint through the issuance of Preliminary Findings, should the EPA and LDEQ not be able to reach an agreement.

Defendants argue that the State's challenge to the EPA's conduct of "parallel tracking" is not an injury in fact because it is more of a procedural injury as opposed to a substantive injury. The EPA maintains that the State has failed to establish a concrete

---

[63] Exhibit 52, pp. 393-94 (emphasis added).
[64] Exhibit, 53, p. 241.

injury, and even if it could, the challenged enforcement proceedings are closed thus, foreclosing a finding of Article III standing.

While the Court finds that the State's challenge of parallel tracking is insufficient for standing, it does support the State's position that the EPA's actions were attributable to litigation posturing as explained below.

### C. Mootness due to closure of Title VI complaints

The EPA maintains that the closure of the Title VI complaints against the LDEQ and LDH renders moot any claims for which the State may have once had standing.

"Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). "As a general rule, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (quotation omitted). To remain a justiciable controversy, then, the plaintiff must "maintain a 'concrete interest in the outcome'" and "effective relief" must remain "available to remedy the effect of the violation." *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998). Accordingly, "[a] moot case exists when the court cannot grant relief that would affect the parties and redress the plaintiff's alleged wrongs." *First Indiana Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992). And, as with standing, "the court must evaluate mootness on a

claim-by-claim basis to determine whether each claim satisfies the constitutional requirements for Article III jurisdiction." *United States v. Vega*, 960 F.3d 669, 673 (5th Cir. 2020).

"The burden of demonstrating mootness 'is a heavy one.'" *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SEIU*, 567 U.S. 298, 307 (2012) (cleaned up) (emphasis added). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id*. at 307-08 (cleaned up).

The State maintains that its claims are not moot under ordinary mootness standards, and if it were, this case falls within the exception because the EPA's actions are transparent "'litigation posturing' to avoid judicial review." *Yarls v. Bunton,* 905 F.3d 905, 910 (5th Cir. 2018). Additionally, the State contends that its non-delegation claim satisfies the "capable of repetition, yet evading review" exception to mootness.

The State asserts that it continues to face injuries from Defendants' disparate impact and cumulative impact mandates as they occur every time that the State considers whether to grant a permit, make a funding request, or any other action governed by Title VI. In other words, they continue to bind the State in all relevant decisions, and the State will continue to incur compliance costs as long as the mandates are still in existence. The State argues that granting its requested relief will instantly and completely lessen the State's regulatory burdens in all relevant permitting decisions, and also remedy the State's

sovereign/Spending Clause injury. The State again refers to the EPA's June 16 Objection that has not been withdrawn. Thus, again the State insists that there is a credible threat of enforcement.

As to the State's non-delegation claim, the EPA argues that because the Complaints have been closed Plaintiff lacks standing to assert this claim. In other words, the complaints out of which those negotiations arose are now closed, thus the Court cannot issue relief to redress Plaintiff's already-suffered non-delegation injuries.

The State maintains that its non-delegation claims are not moot because there is a reasonable prospect of recurrence. The State provides instances of two other Title VI complaints that have been filed by the Sierra Club in other jurisdictions.[65] The State remarks that the EPA has provided no assurances or commitments that it will not avoid future non-delegation violations.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant ... free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up) (citations omitted). Even where the voluntary cessation is by governments, "voluntary cessation … moots a case … only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (quoting *United States v. Concentrated Phosphate*

---

[65] Doc. 34. P. 21, fn.11.

*Export Assn., Inc*., 393 U.S. 199, 203 (1968)) (rejecting government defendant's mootness argument).

For voluntary cessation to establish mootness, federal courts "'must be certain that a defendant's voluntary acts are not mere 'litigation posturing'—and that 'the controversy is actually extinguished.'" *Tucker v. Gaddis*, 40 F.4th 289, 295 (5th Cir. 2022) (Ho., J., concurring) (quoting *Yarls*, 905 F.3d at 910). Here, the State argues that the EPA's actions flunk both requirements: (1) its actions are obvious "litigation posturing" and (2) even after EPA's voluntary abdications, the dispute here is far from "actually extinguished." *Id*. In addition, the State remarks that all of the *Fenves* factors[66] identified by the Fifth Circuit for overcoming the presumption of good faith are present here.

The State complains that the EPA's closure and later rejection of the Complaints after this suit was filed on June 21, 2023, requesting a decision on the preliminary injunction by July 11, 2023, was nothing more than political posturing to avoid answering on an expedited bases and receiving a bad ruling from this Court. See e.g. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (holding that "the suspicious timing of the change" weighed against mootness.).

The State also questions the EPA's closing of the Complaints without one scintilla of relief, despite the parties trading multiple drafts of resolution agreements that provided

---

[66] The *Fenves* factors that can overcome the presumption of [good faith] include: (1) the absence of a controlling statement of future intention not to repeat the challenged policy; (2) the suspicious timing of the change, and (3) the governmental entity's continued defense of the challenged policy after the supposedly mooting event. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5 th Cir. 2020) (holding that "the suspicious timing of the change" weighed against mootness.).

the EPA with substantial benefits and new procedures, and when the parties were so close to an ultimate agreement.[67] Thus, the State opines that the real reason behind closing the Complaints was to avoid an expedited answer in this Court, but more significantly the prospect of an unfavorable ruling by this Court.

The State has presented undisputed evidence that the agreement the EPA abruptly walked away from would have been a win for the private interest groups that had filed the Complaints.  This is supported by the following statements and/or comments by interested persons:

- Achieved "meaningful reform." (Deep South Center for Environmental Justice Director of Law and Policy Monique Harden). Exh. 62 at 4.

- Attained a "tremendous step forward." (Harden.) Id

- "[G]iven LDEQ all of the tools that it could need to do a better job than what it has done." (Lisa Jordan, Head of Tulane Environmental Law Clinic. Id.).

- The agreements would have "ingrained sweeping new procedures to ensure that future permitting decisions included an in-depth analysis into ... the adverse [disparate] impacts" and represented a major win for EPA.[68]

The EPA's stated reasons for closing the investigation was its inability to resolve it by July 11, 2023, despite the investigation going on for over a year. As noted by the State,

---

[67] The State has provided, through FOIA requests, some of the Complainants statements that the EPA and the State were close to an agreement (Plaintiff's exhibit 65), and draft agreements that explained that the agreement would have "ingrained sweeping new procedures to ensure that future permitting decisions included an in-depth analysis into . . . the adverse [disparate] impacts" and represented a "major win" for the EPA. Plaintiff's exhibit 68, p. 3. Additionally, the Environmental groups believed that the agreements provided substantial gains. Plaintiff's exhibit 62, p. 4.
[68] Exhibit 68, p. 3. WWNO – New Orleans public Radio, Halle Parker, August 29, 2023.

after it filed the instant suit, the EPA began cancelling all telephone conferences without any explanation.

The Court finds that the voluntary-cessation exception to mootness applies here because it is abundantly clear that the EPA was litigation posturing considering the timing and abrupt closing of the Complaints, its absence of a statement to not attempt to enforce its disparate-impact and cumulative-impact mandates against the State, and the EPA's defense of the challenged policy after the supposed mooting event.

The Court further finds that the *Fenves* factors are clearly met. The EPA refuses to make a controlling statement of future intention not to repeat the challenged policy. To the contrary, the evidence makes clear that the EPA intends to promote and enforce its disparate impact and cumulative impact conditions with regard to grants and permits. As delineated above, the EPA's timing of the Complaints is beyond suspicion, and finally, the EPA continues to vehemently defend its position regarding the challenged mandates.

Furthermore, it is absolutely clear to this Court that the alleged wrongful behavior could reasonably be expected to recur in the not-to-distant future and/or is already occurring in this State as well as across this nation. *Adarand Constructors,* 528 U.S. at 222. The Court agrees with the State that there is a very real and tangible possibility that the EPA will attempt to enforce its cumulative impact mandates against the State as evidenced by the June 16, Objection. As such, the Court finds that should it agree with the State's challenges, relief could be granted that would affect the parties and redress the alleged

wrongs as to the State's challenges to the EPA's disparate impact mandates and extra-regulatory requirements.

As to the State's non-delegation and parallel-track claims, the Court agrees with Defendants that because the claims are closed, no relief could potentially be granted. Thus, these claims are moot.

### D. Alternative path for judicial review

In determining whether a plaintiff's claim is "'of the type Congress intended to be reviewed within this statutory structure,'" courts consider three factors: (1) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?", (2) "is the claim 'wholly collateral to [the] statute's review provisions'?", and (3) "is the claim 'outside the agency's expertise'?" *Axon*, 143 S. Ct. at 900 (quoting *Thunder Basin*, 510 U.S. at 212-13).

Defendants maintain that each *Thunder Basin* factors weighs in favor of review within the statutory scheme. Defendants argue that the State has failed to show that any of these conditions are satisfied, and the State would have the opportunity for meaningful judicial review should it actually suffer any injury, both before the agency and on judicial review of the agency's determination in district court. 40 C.F.R. § 7.130(b)(2) (providing for proceedings before ALJ to obtain compliance with EPA Title VI regulations); 42 U.S.C. § 2000d-2 (providing for judicial review of any decision to terminate or refuse to grant funding upon a finding of a failure to comply with Title VI requirement).

Defendants argue that the Court lacks jurisdiction to review Counts II-VII because Congress has provided an adequate, alternative path for judicial review. The EPA argues that judicial review here is barred because Congress has allowed judicial review for "agency action taken pursuant to [42 U.S.C.] section 2000d-1" for "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any [section 2000d-1] requirement." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994).

Defendants argue that Congress intended legal challenges to the EPA and DOJ interpretations of Title VI (and regulations promulgated pursuant to Title VI) to be brought within the procedural scheme for administrative enforcement proceedings that culminates in the opportunity for judicial review.

Next, Defendants argue that the State's claims are not wholly collateral to the administrative review scheme. *Bank of La v. FDIC*, 919 F.3d 916, 928 (5th Cir. 2019), but are inextricably intertwined with the issue of potential future enforcement proceedings as to whether certain conduct constitutes unlawful discrimination. Defendants further argue that the State's claims of alleged irregularities in the agency enforcement proceedings could be raised as defenses, therefore they are not wholly collateral to the administrative enforcement scheme. Additionally, Defendants argue that State's claims are within the heartland of the EPA and DOJ's expertise because they require interpretation of a statute authorizing agency action. Thus, Defendants maintain that the Court lacks jurisdiction as to the States claims in Count II-VII.

Finally, Defendants argue that judicial review is unavailable as to the State's Administrative Procedure Act ("APA") claims because the APA limits judicial review to "those agency actions which otherwise lack an 'adequate remedy in a court.'" *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (*per curiam*) (quoting *Bowen v. Mass.*, 487 U.S. 879, 903 (1988)); 5 U.S.C. § 704 (review available for "final agency action for which there is no other adequate remedy in a court").

Defendants explain that *if* the EPA or DOJ wanted to terminate funding on the basis of any of the challenged regulations, notice would have to be given followed by an attempt to resolve and provide a formal administrative hearing with that determination subject to judicial review. See 40 C.F.R. § 7.130(b)(2); 42 U.S.C. § 2000d-2.

Here, Defendants' post-suit abandonment considered by this Court as litigation posturing (discussed above) prevented any resolution that would equate to a final agency action and therefore judicial review under the APA is not possible.

The State argues that (1) that the *Thunder Basin* doctrine does not apply here, and (2) even if it did, it does not preclude judicial review under the *Thunder* Basin factors. The State maintains that 42 U.S.C. § 2000d-2 affirmatively confirms that judicial review is available.

The State argues that *Thunder Basin* does not apply here because § 2000d-2 is not a "special statutory scheme" that precludes district courts from exercising jurisdiction. Rather, the State argues that § 2000d-2 clearly states that ***any*** agency action is reviewable, whether final, post-enforcement, or neither. Section 2000d-2 provides as follows:

Any department or agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1 of this title, any person aggrieved (including any State or political subdivisions thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that chapter.

*United States v. Gonzales,* 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is 'one or some indiscriminately of whatever kind.'") (citation omitted)). The State remarks that the statute noticeably does not include the word "final," and the EPA's interpretation nullifies Congress's use of "any" and instead renders vast swaths of "agency action taken pursuant to [Section 602]" unreviewable. The State also remarks that the EPA's interpretation obliterates the Statute's use of the word "shall"[69] which normally creates an obligation impervious to judicial discretion." *Murphy v. Smith*, 138 S.Ct. 784, 787 (2018). Lastly, the State argues that the EPA is relying solely on the second sentence of the statute of § 2000d-2, that does not apply here because there is no agency action that has taken place, due to the closure of the Complaints.

The Court agrees with the State and finds that 42 U.S.C. § 2000d-2 is not a special statutory scheme and does not vest review in courts of appeal, nor does it provide any comprehensive review process. It provides that "[a]ny agency actions taken pursuant to section 2000d-1 of this title shall be subject to such judicial review." 2000d-2. Thus, this

---

[69] The Statute states that the EPA's actions "shall be subject to judicial review."

Court has jurisdiction over the matter concerning the Defendants' actions requiring disparate and cumulative impact analysis in it permitting process or as a condition of grant funding.

E. *Final agency action as to APA challenges to the EPA and DOJ disparate impact regulations (Counts III and IV)*

Defendants do not dispute that the promulgation of a federal regulation constitutes "final agency action."[70]

1. *EPA and DOJ disparate-impact regulations (Counts III and IV)*

Defendants argue that the State's challenge to the EPA's disparate impact rule under the APA are untimely.   Defendants assert that the rules were published over fifty years ago and later amended over twenty years ago. Defendants point to 28 U.S.C. § 2401(a), which bars civil actions not commenced within six years. See *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997) ("On a facial challenge to a regulation, the limitations period begins to run when the agency publishes the regulation in the Federal Register.").   Additionally, Defendants argue that because the obligations are not new but are conditioned on adherence to decades-old preexisting regulations, a challenge to those regulations are time-barred.

To prevail on an as-applied challenge to the regulations, Louisiana must "show some direct, final agency action involving the particular plaintiff within six years of filing suit." *Id.* Defendants contend that because the complaints were closed, and no action taken,

---

[70] Defendant Memorandum in Support of Motion to Dismiss, Motion for Summary Judgment and Opposition, p. 29, Doc. 29-1.

the EPA imposed no rights or obligations upon the States for purposes of an as-applied APA challenge.

The State alleges final agency action by way of the EPA's application of its Title VI disparate-impact regulations when responding to the LDEQ and LDH complaints. The State contends that the EPA has changed the substantive character of the Title VI obligations (conditioning permits, permit renewals and grants on disparate and cumulative impact analysis) within the last six years, thereby creating new obligations.

Defendants argue that there is controlling precedent that an agency's initiation of an investigation does not constitute final agency action, citing *Veldboen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994). The State argues otherwise.  The State contends that permit renewals are challengeable as final agency action even though there are no "new" obligations beyond the extension of obligations. See e.g., *Animal Legal Def. Fund v. USDA*, 789 F.3d 1206, 1215 (11th Cir. 2015) (holding that "renewal of [company's] license [wa]s a final agency action subject to judicial review").

The State explains that the APA defines "grant of money" as a form of "relief," and thus an "agency action." 5 U.S.C. § 551 (11), (13).  When the grant is executed (money changes hands), there are legal consequences that flow that have a binding effect and neither side can breach freely. Consequently, courts consider the grant of funds as a final agency action. Courts have also found a final agency action prior to the release of funds where the grant is conditioned upon eligibility criteria. See *Planned Parenthood of New York City, Inc v. HHS*, 3374 F.Supp. 3d 308, 329 (S.D.N.Y. 2018).

The State further asserts that by their nature Title VI obligations last as long as the "program or activity [is] receiving Federal financial assistance," 42 U.S.C.A. § 2000d, causing the grant recipient to be bound to the Title VI obligations during the relevant time period. Thus, because Title VI obligates recipients only for the term of the grant, the State argues that new grants create new obligations by extending the time in which the recipient is bound to Title VI mandates.

The State maintains that the conditions of a final agency action have been satisfied. "[T]wo conditions must be satisfied for agency action to be 'final'; First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

Here, both conditions are satisfied. The State has established that there is clearly a substantive change as to the conditions the EPA now requires (disparate impact and cumulative impact analysis) that are not tentative, but definite and certain.  The State submits the 2022 FAQ, which declares that "[i]n the context of Title VI investigations, EPA considers cumulative  impacts when evaluating whether there is an adverse impact from the recipient's policy or practice."[71] Similarly, the  EPA's Cumulative Impacts Addendum declares that Title VI "grants EPA the authority to consider cumulative impact'

---

[71] Exhibit 46, p. 13.

and further that "Addressing cumulative impacts is "integral to protecting civil rights."[72] Also, the State submits evidence that the EPA has submitted proposed settlement agreements that would have imposed cumulative-impact requirements to match its regulations,[73] and Brian Israel, deputized to defend the EPA's actions explained that "to get a permit from this EPA or a state that is being guided or monitored by EPA, you have to consider cumulative impacts."[74] But even more telling, is that during the hearing on these motions, the EPA consistently maintained its position, that it now requires disparate impact and cumulative impact analysis as mandatory.

The *Bennett* factors are met. An action is binding "'if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding." *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019). Consequently, to the extent funding grants have been awarded by the EPA within the last six years, triggering Title VI obligations, under the APA, the State can challenge the lawfulness of the Title VI obligations that require disparate and cumulative impact analysis.

Defendants maintain that the challenge to the DOJ's disparate-impact regulations are untimely. The State argues the reopening doctrine. A plaintiff can challenge an agency action past the ordinary timeline when an agency has reopened an issue. *Alliance for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023).

---

[72] Exhibit 47, pp. 3-4.
[73] Seidemann Declaration, ¶¶ 44-48; exhibit 82, Burdette declaration ¶ 11.
[74] Exhibit 64, p. 3.

The central inquiry under the reopening doctrine is whether the agency has "undert[aken] a 'serious, substantive reconsideration'" of its policy. *Id.* at 243 (citation omitted). Merely taking public comments on the possible repeal and responding to them is generally sufficient reconsideration to trigger a reopening. *See*, *e.g.*, *Ohio v. EPA*, 838 F.2d 1325, 1328-29 (D.C. Cir. 1988).

The State asserts that in years 2020-2021, the DOJ attempted to repeal its disparate-impact regulations. DOJ's published regulations purport to impose disparate-impact-based requirements. *See*, *e.g.*, 28 C.F.R. § 42.104(b)(2).[75] The DOJ acted to rescind its disparate impact regulations in 2020.[76] In its Amendment of Title VI Regulations (the "Amendment"), the DOJ explained that the basis of its rescission, was Supreme Court precedent that "established Title VI's statutory prohibition extends only to ***intentional discrimination,***"[77] citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (Powell, J., announcing judgment; *id.* at 325, 328, 352 (Brennan, J., joined by White, Marshall, and Blackmun, JJ., concurring in part); *Washington v. Davis*, 426 U.S. 229, 242

---

[75] That Regulation provides states as follows:

A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

[76] Exhibit 36, Doc. 12-36. The Summary of the DOJ's Amendment of Title VI Regulations provides as follows:
**AGENCY:** Civil Rights Division, Department of Justice.
**ACTION:** Final Rule.
**BILLING CODE: 4410-13**
**SUMMARY:** The Department of Justice amends its regulations implementing Title VI of the Civil Rights Act of 1964 ("Title VI") to align with the conduct Congress intended to prohibit when enacting Title VI and to address concerns the Supreme Court raised in ***Alexander v. Sandoval,*** 532 U.S. 275 (2001).

[77] *Id.* p. 3,

(1976) (finding the Equal Protection Clause required discriminatory intent, compared to Title VII's statutorily enacted disparate impact standard in employment); see also *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose."). And as noted, in 2001, the Supreme Court reaffirmed that Title VI's statutory prohibition extends only to intentional discrimination, *Sandoval, supra.*

However, after the Amendment was sent to OMB for review, it was inexplicably never published in the Federal Register. Consequently, the State asserts that the DOJ's drafting of the Amendment, and then sudden decision to not publish and promulgate the Amendment calls into question the constitutional validity of the 1966 Regulation.

Defendants argue that withdrawal of a draft rule does not constitute a final agency action for purposes of the APA, therefore, the State's claims against the DOJ are untimely. The State argues that the DOJ's withdrawal in 2021 of a draft rule which would have eliminated disparate-impact requirements constitutes final agency action and is timely.

Defendants rely on *GPA Midstream Ass'n v. DOT*, 67 F.4th 1188, 1195 (D.C. Cir. 2023). Defendants argue that because the rule was not published, its lacks enforceability, and thus it imposes no rights or obligations to be determined, nor can any legal

consequences flow. Instead, Defendants argue that it is merely a tentative or interlocutory step. *Bennett*, 520 U.S. at 177-78.

The State argues that the final agency action is the DOJ's initial promulgation of tis disparate impact mandates, and under the reopening doctrine, the States' challenge to that action is timely. Defendants remark that when the DOJ terminated the 2021 draft rule, it did so before any proposal was promulgated, without soliciting written comments, and undertaking the "serious, substantive reconsideration" required for reopening, citing *All. For Hippocratic Med. v. FDA*, 78 F.4th 210, 243-44 (5th Cir. 2023); *see also Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.33 1191, 1213 (D.C. Cir. 1996) (no reopening "when the agency merely responds to an unsolicited comment by reaffirming its prior position).

Here, the draft rule was never published in the Federal Register. However, the State contends that in the Fifth Circuit, publication is not required. *Arlington Oil Mills v. Knebel*, 543 F.2d 1092, 1099-1100 (5th Cir. 1976) citing *United States v. Aarons*, 310 F.2d 341, 348 (2d Cir. 1962) (the lack of formal publication does not preclude the effectiveness of an otherwise valid agency action.). Counsel for the State stated at the hearing that the draft rule was published in the *Washington Post*[78] and thus, the State had actual knowledge, and the ramifications of it being withdrawn were that the DOJ would be implementing and/or enforcing disparate impact regulations.

---

[78] Rough transcript, p. 58, 11:23 a.m.

To be clear, the State is challenging the DOJ's 1966 disparate impact regulations under Title VI, after the DOJ seriously considered repeal of the Regulation post-*Sandoval*. The State informs the Court that the Amendment was finalized by the DOJ and sent to the Office of Management and Budget ("OMB") for review, after which it was pulled and never published.

After reviewing the Amendment carefully, the Court finds that the DOJ's drafting of the final Amendment as well as the substance of the Amendment itself, sending it to the OMB for consideration, of which the State had notice of by publishing same in the *Washington Post*, clearly indicates that the DOJ seriously considered the validity of the 1966 Regulation.   As such, the reopening doctrine is applicable here under these circumstances and the State's challenge of the Regulation is timely.


*Non-delegation on APA claims (Count II)*

Although the Court has determined that the non-delegation claims are now moot, we will address the claim on its merits. The State complains that during the complaint process, Defendants granted private organizations the power to veto the continuation of an informal resolution process that lasted more than 180 days—the prescribed time period. Defendants note that when the complaint was filed the State and the private organizations had already approved the extensions of negotiations.  As noted by Defendants, the State has not provided the Court with any evidence of any future proceedings that Defendants have unconstitutionally granted governmental authority to private parties. While there may

have been a non-delegation doctrine violation as to the abovementioned complaint investigation, those complaints are now closed, and it would be speculative at this juncture for the Court to decide if there is an Article III injury in fact.

### 2. "Extra-regulatory requirements' as to APA violations (Count VI) and final agency action

The State complains that the EPA has demanded that the State submit to new requirements (that include the evaluation of cumulative impacts). Defendants argue that the State has failed to identify any final agency actions as to its "extra-regulatory requirements" and that the EPA's proposals are tentative and interlocutory, which does not obligate the State to comply, particularly because the complaints were closed.

Defendants remark that the States' passing reference to two recent EPA guidance documents (2022 FAQ and 2023 Cumulative Impacts Addendum) both disclaim any power to "create, expand, or limit any legal rights, obligations, responsibilities, expectations or benefits."[79] Defendants contend that the closed complaints disavow these documents as binding because the State faced no obligation to obey the complained-of "extra-regulatory requirements."

Defendants also argue that proposals attempting to achieve voluntary resolution of a Title VI complaint are not enforceable "rules, regulations, or orders" within the meaning of 42 U.S.C. § 2000d-1, nor are they regulations subject to APA rulemaking requirements. Additionally, Defendants argue that EPA guidance documents are not binding rules,

---

[79] Docs. 12-46 and 12-47.

regulations, or orders, and nothing in those guidance documents equate to a binding requirement on the State. See *Equity In-Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 106 (4th Cir. 2011)

The State points to the June 16 Objection to support its position that these extra-regulatory requirements are not tentative or interlocutory.  However, Defendants informed the Court that this particular permit which prompted the EPA's objection, was issued.[80] Defendants contend that the cover letter concerning the Objection was not a mandatory requirement, but a reminder by the EPA of the LDEQ's civil rights obligations.

The Court finds that the State's claim concerning extra-regulatory requirements are not a final agency action under the APA, and thus not reviewable as such.

3. *Non-statutory causes of action*

As an alternative cause of action, the State seeks non-statutory "*ultra vires*" review.[81] The State has asserted three types of non-APA claims: (1) claims arising from the Constitution, (2) claims at equity, and (3) non-statutory claims challenging *ultra vires* actions. An act is *ultra vires* only if it is "without any authority whatsoever" or is "made without any colorable basis for authority." *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011).

Defendants contend that claims of agency action in excess of statutory or constitutional authority are properly pled under the APA, not as *ultra vires* claims, citing

---

[80] Exhibit E, Doc. 34-5.
[81] Complaint, ¶¶ 209, 220, 230, 246, 249, 253 (Counts I, III, IC V and VI).

e.g., *Gen.Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) ("You may not bypass the specific method that Congress has provided for reviewing adverse agency action. . .") (citing 5 U.S.C. § 703, 704).

*Ultra vires* review is a "rarely invocable," "narrow exception" to the APA's final agency action requirement that permits judicial intervention for only the most "egregious error[s]" where a party is "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its rights." *Am. Airlines, Inc. v. Hermann*, 176 F.3d 283, 293-94 (5th Cir. 1999); see also *Leedom v. Kyne*, 358 U.S. 184 (1958); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

To support such a claim, allegations that an agency has acted in excess of statutory authority may not "simply involve a dispute over statutory interpretation." *See Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997); *Exxon Chem. Am. v. Chao*, 298 F.3d 464, 469 (5th Cir. 2002) (rejecting jurisdiction based on the *Kyne* exception where the plaintiff "can obtain meaningful judicial review" upon exhausting administrative proceedings). And courts may not engage in *ultra vires* review to "police" the "purity" of hypothetical agency actions "long before the administrative process is over." *Sanderson Farms, Inc. v. NLRB*, 651 F. App'x 294, 298 (5th Cir. 2016).

The State contends that its equitable and constitutional claims are not subject to the rigorous limitations in *Kyne.* As to its equitable cause of action, the State relies on *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd*, 561 U.S. 477, 491 n.2 (2010) to recognize the availability of that type of action, and not consider that type of claim as being *Kyne-*

based or "*ultra vires*"), citing generally, *id.; Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001); *Bell v. Hood,* 327 U.S.678 (1946); *Ex Parte Young*, 209 U.S. 123 (1908). The State argues that these cases permitted direct review of the legality of the challenged acts without any need to satisfy the *Kyne* or *Kyne*-like obstacles Defendants are asserting here. To be more succinct, the State asserts that federal courts do not impose *Kyne* limitations when the question for review is whether state officials are complying with federal law. The State contends that the same result should be reached when federal officials violate federal law.

As to the constitutional challenges, the State argues that its non-statutory *ultra vires* claim easily passes muster under Fifth Circuit precedent, citing *Cochran v. SEC*, 20 F.4th 194, 199-200 (5th Cir. 2021) (en banc), which the Supreme Court affirmed in *Axon, supra.* The State intends to "use[] the APA to assert a 'non-statutory cause of action'—such as an *ultra vires* claim." *Apter v. HHS*, 80 F.4th 579, 585 (5th Cir. Sept. 1, 2023) (discussing three potential paths).

The State asserts that it must satisfy two requirements: (1) "identify some agency action affecting [it] in some specific way; and (2) "show that [it] has been adversely affected or aggrieved by that action." *Id.* "The action need not be final" and the State notes that there is no mention of *Kyne's* hurdles in *Apter. Id.* To satisfy the aggrievement requirement, "the plaintiff must establish that the injury he complains of falls within the 'zone of interest' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Louisiana v. United States,* 948 F.3d 317, 321 (5th Cir.

2020) (internal quotation marks omitted) (quoting *Lujan*, 497 U.S. at 883, 110 S.Ct. 3177). The State argues that the two *Apter* requirements are easily met.

First, the State argues that there is an agency action. The agency-action requirement is governed by the APA's definition of "rule," which is defined "broadly enough to include virtually every statement an agency may make," including "'non-binding agency policy statements and guidance documents interpreting existing rules.'" *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983); see *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 494 (1980); see also *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980) ("The breadth of this definition [of 'rule'] cannot be gainsaid.").

Here, the State maintains there is "agency action" in the form of EPA's demands that the State comply with disparate-impact and cumulative-impact mandates, as reflected in *inter alia*: (1) Defendants' disparate-impact regulations, (2) EPA's letter of concern, (3) EPA's June 16 Objection, and (4) EPA's cumulative-impacts guidance documents. Similarly, the State relies upon EPA's March 2023 decision to allow Sierra Club to make the decision about whether to extend informal proceedings was agency action. To establish the aggrievement requirement the State's relies on its reasons explained regarding standing and irreparable injury.

The State argues, again relying on *Apter,* that it satisfies the substantive requirements for the non-statutory *ultra vires* claims that it asserts. The State remarks that in *Apter*, it was sufficient that plaintiffs asserted that FDA lacked authority to "recommend

treatments or give other medical advice." 2023 WL 5664191, at *5. And even though FDA possessed authority to "'make public statements'"—which might involve some line-drawing exercises between "statements" and "advice"—the plaintiffs had stated a valid, non-statutory, *ultra vires* claim because it was sufficient to argue that "FDA d[id] not have express authority to recommend against off-label uses of drugs approved for human use." *Id.* at *5-6.

The State contends that, *a fortiori,* its claims are more categorical in that (1) the EPA was wholly without power to delegate governmental authority to private Special Interest Groups, (2) Defendants are entirely without authority to impose disparate impact mandates, both generally and specifically under the Spending Clause, and (3) Defendants are entirely without power to enforce substantive mandates under Title VI without obtaining Presidential ratification and complying with the APA rulemaking requirements.

Defendants argue that they have pointed to statutory text that expressly authorizes them to effectuate Title VI's broad prohibition on discrimination, under *Kyne*, which carries a stricter burden.[82] The Court disagrees based on discussions expressed herein below. The Court finds that the State has viable non-APA causes of action as to its claims arising from the Constitution, and non-statutory claims challenging Defendants' *ultra vires* actions.[83]

---

[82] The complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority. *Apter*, 80 F.4th at 587-588.
[83] The Court will pretermit any decision as to the States' claims at equity.

II.     FAILURE TO STATE A CLAIM/MOTION FOR SUMMARY JUDGMENT

Defendants maintain that even if the Court finds that it has subject matter jurisdiction, Plaintiffs claims must be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, summary judgment should be granted to Defendants pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**RULE 12(b)(6) STANDARD**

Rule 12(b)(6) allows for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." When reviewing such a motion, the court should focus on the complaint and its attachments. *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The court can also consider documents referenced in and central to a party's claims, as well as matters of which it may take judicial notice. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000); *Hall v. Hodgkins*, 305 Fed. App'x 224, 227 (5th Cir. 2008) (unpublished).

Such motions are reviewed with the court "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). However, "the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, the court's task is not to evaluate the plaintiff's likelihood of success

but instead to determine whether the claim is both legally cognizable and plausible. *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

<u>**SUMMARY JUDGMENT STANDARD**</u>

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable

to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### A.  *Non-delegation claim (Count 1)*

Despite finding that the non-delegation claim was moot, the Court will consider the States claims on the merits. Defendants maintain that the State has failed to assert a claim under the non-delegation doctrine because it does not contend that Congress has sought to vest legislative power in a private entity. The State contends that during the informal resolution process, the EPA sought consent from the complainant (Private Special Interest Groups) to extend the 180-day deadline to issue preliminary findings of discrimination. The State argues that the EPA violated the APA's non-delegation doctrine, citing *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("Our Constitution permits only the federal government to exercise federal power."). The State maintains that this foundational principle is violated whenever governmental power is delegated to private groups, whether the perpetrator is Congress or the Executive.

The nondelegation doctrine prohibits Congress from vesting other entities with "powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S.Ct. 2116, 2123 (2019) (internal quotes and citations omitted).

Here, the State complains that in exchange for the Sierra Club's (a Private Special Interest Group and Complainant) blessing to extend the 180-day deadline, the EPA agreed

to provide the Sierra Club with non-public information. The State considers this to be a transfer of governmental power to that group that violates the nondelegation doctrine.

The State explains that in March 2023, Sierra Club could have compelled the EPA to either issue a formal finding of violations or terminate its investigation entirely. However, the State posits that Sierra Club was able to compel the EPA to exercise government power by extending that deadline. Thus, the State suggests that Sierra Club had a commanding role and EPA was compelled to follow its direction, which was a delegation of its powers contravening the APA, specifically, 5 U.S.C. § 706(2)(B).  The State further suggests that the EPA's actions were arbitrary and capricious. § 706(2)(A).

The State bases its arguments on the failure of the EPA to rationalize its sought-after extension, which it argues violates the APA. See, e.g., *Dillmon v. NTSB*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009) ("'[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation.'" (citation omitted). The State also complains that the EPA never explained why it conferred rights purely on the Private Special Interest Groups suggesting that it favored certain groups. The State seeks a judgment in its favor as to Count II—violation of the non-delegation doctrine.

Defendants argue that because the action was not by Congress, it fails to meet the basic requisites of a nondelegation claim and granting the extension was a procedural condition and not an exercise of governmental power. Defendants also argue that despite the 180-day deadline, an exception to this promptness requirement exists where it believes informal resolution of the complaint is possible and both the complainant and the funding

recipient "agree to a delay pending settlement negotiations." 40 C.F.R. § 7.120. See *Rettig,* 987 F.3d 518, 531 (5th Cir. 2021) ("an agency does not improperly subdelegate its authority when it 'reasonabl[y] condition[s]' federal approval on an outside party's determination of some issue; such conditions only amount to legitimate requests for input.") (quoting *U.S. Telecom Ass'n v. FCC,* 359 F.3d 554, 566-67 (D.C. Cir. 2004) (alterations in original).

Here, while the Court finds the EPA's conduct regarding the extension suspect, the Court finds that seeking permission of Sierra Club for the extension was not a delegation of legislative authority. As such, the States claims against Defendants are entitled to the dismissal of the State's non-delegation claim.

### B. Disparate-impact regulations (Counts III, IV, and V)

The State maintains that Title VI does not impose any disparate-impact-based requirements, citing *Sandoval, supra.* The State argues that Defendants are attempting to create extra-textual disparate-impact mandates under Title VI by regulation, but § 602 gives them no power to do so. The State relies on Title VI's plain text, reinforced by the statutory context, the applicable canons of construction, the doctrine of constitutional avoidance, and the major questions doctrine.

Section 601 of Title VI ensures that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Section 602, in turn, "authorize[s] and

direct[s]" each Federal agency responsible for distributing federal funds to "effectuate" Section 601 "by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1.

Defendants, relying on *Guardian Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 607 n. 27 (1983) (opinion White, J.)  maintain that § 601 does not undercut the validity of its disparate-impact regulations, issued under § 602. Defendants argue that its regulations are fully consistent with § 602's directive to federal agencies to "effectuate" § 601's prohibition on intentional discrimination.

Defendants argue that its discriminatory-effect regulations are prophylactic measures that "effectuate" Section 601's prohibition on intentional discrimination in two ways: (1) to root out intentional discrimination that is otherwise hard to detect or prove; and (2) to ensure that programs accepting federal funds are not perpetuating the effects of past intentional discrimination.

In *Guardians*, five Justices "form[ed] a majority for upholding the validity of the regulations incorporating a disparate impact standard." 463 U.S. at 607 n.27 (opinion of White, J.); *see also id.* at 623 n.15 (Marshall, J., dissenting); *id.* at 642-45 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). The Court later reaffirmed that it had "held [in *Guardians*] that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI." *Alexander v. Choate*, 469 U.S. 287, 293 (1985).

However, the State argues that *Guardians* has no precedential effect based on *Marks v. United States*, which holds that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." 430 U.S. 188, 193 (1977). The State points out that in *Guardians,* the Supreme Court held that "in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs." 463 U.S. at 584. The State argues that *Marks* makes plain that the only positions that count come from "[m]embers who concurred in the judgment[]."430 U.S. at 193; accord *Whole Woman's Health v. Paxton*, 10 F.4th 430, 440 (5th Cir. 2021) (en banc) (the *Marks* "principle 'is only workable where there is some common denominator upon which all of the justices of the majority can agree.") (citation omitted).

In *Sandoval*, the Court considered whether a private right of action existed to enforce the disparate impact regulations promulgated by DOJ and DOT. *Id.* at 278. The Court acknowledged that, although fractured across multiple opinions, "five Justices in *Guardians* voiced [their] view," as alternative grounds for their decisions, that the regulations promulgated under Section 602 "may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601." *Id.* at 281-82 (citations omitted). In discussing *Guardians,* the *Sandoval* Court explained that "no opinion of this Court has held" that "regulations promulgated under § 602 of Title

VI may validly proscribe activities that have a disparate impact on racial groups" even though "five Justices in *Guardian* voiced that view." 533 U.S. at 281.

Defendants argue that the Fifth Circuit has recognized that *Sandoval* "left untouched *Choate*'s apparent approval of the promulgation and enforcement of disparate-impact regulations by federal agencies." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, 6 F.4th 633, 643 (5th Cir. 2021). Of note, two judges expressed doubts about the underlying conclusions in *Guardians* and *Choate*, *id.* at 647 (Jones, J., concurring); *id.* at 648-50 (Ho, J., concurring in part). However, the State notes that the opinion in *Rollerson*, expressly stated that "there is a reasonable argument that *Choate's* approval of such regulations was mere dictum," rather than a holding and the panel only "assume[d] arguendo that the DOD's disparate-impact regulation [we]re valid." 6 F.4th at 643 no. 6.

The State agrees that § 601 unambiguously prohibits *intentional* discrimination, but argues that the contours of that prohibition and Defendants' authority to "effectuate" it must be unambiguously clear to bind States to the specific requirement at issue. *Arlington Central*; *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022). The State argues that needed clarity cannot be so provided by regulation but must come directly from the statute, *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021), and imposing disparate-impact liability to effectuate § 601 transforms the statute into something radically different.

The State notes the apparent conflict between disparate impact mandates and § 601's prohibition against intentional discrimination. See *Ricci v. DeStefano*, 557 U.S. 557 (2009) (noting that disparate impact and intentional discrimination have two different standards—one requires proof of intent and the other does not).

The State argues that its disparate-impact claims are most easily resolved under the Spending Clause, which forbids imposition of any conditions that are not unambiguously established in statutory text. *Arlington Central*, 548 U.S. at 293-94. The State maintains that Title VI's text does not unambiguously impose any potential disparate-impact liability. As noted by the State, the Supreme Court has recently applied this principle to Title VI, holding that emotional distress damages were unavailable because 'if Congress intends to impose a condition on the grant of federal monies, it must do so unambiguously.'" *Cummings*, 142 S.Ct. at 1569-70 (citations omitted) (emphasis added).

In *Brnovich v. DNC*, in its original iteration, § 2 of the Voting Rights Act ("VRA") lacked disparate impact/effects language. 141 S.Ct. 2321 (2021). The Supreme Court held that it prohibited only intentional discrimination. *Id*. Congress responded by adding explicit "results" language in the VRA, prohibiting some practices that "*result[]* in a denial or abridgement of the right" to vote. 52 U.S.C. § 10301(a) (emphasis added). But even with that express "results" language that explicitly goes beyond intentional discrimination, that was *still insufficient* to justify full-blown Title-VII-like disparate impact regulations. *See Brnovich*, 141 S. Ct. at 2340 ("We also do not find the disparate-impact model employed in Title VII and Fair Housing Act cases useful here…. Demanding such a tight fit" was

unsupportable.). The Court thus expressly rejected such a "freewheeling disparate-impact regime." *Id.* at 2341.

The State urges the Court to also consider two other cases that invite doubt as to the constitutionality of Defendants' disparate impact regulations. See *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S.Ct. 2141 (2023). The State also notes that in *Kamps v. Baylor University*, 592 F.App'x 282 (5t h Cir. 2014) ("[w]hen Congress wants to allow disparate impact claims, it uses particular language"). There, the Fifth Circuit held that there was no private right of action for disparate impact under the ADA because § 601 of Title VI only prohibited intentional discrimination. *Id.*

The State maintains that Defendants' regulations also fail under the major questions doctrine. The major questions doctrine demands "'clear congressional authorization' for the power [the government] claims" when the question posed is a "major" one. *West Virginia v.* EPA, 142 S.Ct. 2587, 2609 (2022) (citation omitted).

The State argues that the issue of Defendants' authority to impose disparate-impact mandates (1) is a "matter of great political significance," (2) seeks to regulate a significant portion of the American economy," and (3) "intrud[es] into an area that is the particular domain of state law." *West Virginia,* at 2620-21 (Gorsuch, J., concurring).

Defendants argue that the doctrine is not applicable because its regulations have been part of its regulatory approach since the agency's inception more than fifty years

ago.[84] Thus, Defendants posit that its disparate impact regulations are not a "transformative expansion in [its] regulatory authority." (quoting *West Virginia*, 142 S.Ct. at 2609).

The State refers the Court to *Alabama Realtors* and *NFIB* where the Supreme Court did not consider or mention putative "transformational expansion" of "long-extant statutes." *Alabama Ass'n of Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021); *NFIB v. OSHA*, 142 S.Ct. 661, 664-65 (2022). Be that as it may, the State argues that Defendants' mandates are a transformational expansion because they transform Title VI from pure intentional discrimination only, into a "freewheeling disparate-impact regime" akin to Title VII. See *Brnovich*, 141 S.Ct. at 2340-41. Thus, the State posits that the EPA's construction of § 602 results in a transformation of the agency's Clean Air Act authority, converting the statute from one regulating specific pollutants and environmental impacts into a tool for far-reaching social engineering in the name of "equity."

The State urges the Court to not give deference to the EPA's interpretation of Title VI as authorizing disparate-impact liability because the question is of "deep 'economic and political significance.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (citation omitted). The State asserts that deference is not warranted since Congress typically resolves the question of whether civil rights statutes permitted disparate impact liability, as well as the constitutional doubts raised by Defendants' interpretation. See *Solid Waste Agency of N.*

---

[84] Defendants rely on the Model Title VI regulation that was promulgated in 1964 and the DOJ's regulation that was promulgated in 1966.

*Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001) ("floor statements by individual legislators rank among the least illuminating forms of legislative history.").

The State argues that Defendants' resort to legislative history is unpersuasive because they rely on a single floor statement and second statement by a non-legislator, *NLRB v. SW Gen., Inc.*, 137 S.Ct. 929, 943 (2017) that did not address disparate impact specifically. Additionally, the State argues that the Court should not consider Congressional inaction as ratification. See *Brown v. Gardner*, 513 U.S. 115, 121 ("[C]ongressional silence lacks persuasive significance ... particularly where administrative regulations are inconsistent with the controlling statute.")

Instead, the State urges the Court to consider that in 1991, Congress codified disparate impact liability to Title VII, but did not codify disparate impact liability to Title VI. The Court considers the inaction of Congress as to Title VI to be particularly compelling that militates against ratification and finds that the State has established that the question as to whether Title VI imposes liability for disparate impact is a question of major importance.

The State posits and this Court agrees, that *Guardians* has no precedential effect as to the validity of disparate impact regulations under Title VI. The Court notes that *Guardians* did not evaluate § 602 under the unambiguous-clarity standard that the Spending Clause doctrine demands. Section 601 plainly prohibits intentional discrimination. Reliance upon 602 to effectuate § 601 does not morph § 601 to include discrimination by disparate impact mandates that remove the element of intent.

Additionally, the Court finds that under the Spending Clause, the grant recipients have a right to be on notice as to the conditions that are attached to grants. Defendant's use of § 602 to impose disparate impact regulations are not unambiguously established in the statutory text. *Arlington Central*, at 296 (the Spending Clause prohibits enforcement of any condition that is not "set out 'unambiguously'" in the statutory text; *Cummings*, 142 S.Ct. at 1569-70 (damages were unavailable because 'if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.'").

The Court agrees with the State that the major questions doctrine is applicable here as to the imposition of disparate impact mandates under Title VI and as such, demands clear congressional authorization. Here, the issue is whether Congress in fact meant to confer the power these agencies have asserted—to impose disparate impact liability under Title VI. The Court finds that this is an extraordinary case, of economic and political significance. Defendants have constructed Title VI to allow it to regulate beyond the Statute's plain text and by doing go, invade the purview of the State's domain. Common sense dictates otherwise. Accordingly, Defendants motion to dismiss under Federal Rule of Civil Procedures 12(b)(6) and Rule 56 will be denied.

### C.  *"Extra-regulatory requirements" claim*

Having concluded that the challenged extra-regulatory requirements that required cumulative impact mandates are not reviewable under the APA, the Court does consider them as a challenge under the Constitution and as a non-statutory claim challenging an *ultra vires* act. The State asserts that the EPA violated Title VI by its extra-regulatory

requirements and argues that they are unlawful. Defendants argue that the proposals or suggestions offered during negotiations were not enforceable rules, regulations or an order that would require presidential approval. Defendants further argue that the two agency documents concerning cumulative impact mandates were merely guidance, and not enforceable rules, regulations or an order.

The State points to the June 16th Objection wherein the EPA demanded evaluation of cumulative impacts and insisted that the State consider "whether the community is already disproportionately impacted by public health or environmental burdens.[85] Additionally, the EPA's letter of concern demands that the State "[c]onduct cumulative impact analyses" and sets a "minimum" for what those analyses should contain.[86] The State notes that Defendants have not disavowed, and has vigorously defended, their position that Title VI and the EPA's regulations demand consideration of cumulative disparate impacts and conducting public meetings.

The State argues that the EPA cannot interpret § 601 to mandate through guidance, cumulative impact requirements, but it must create them by legislative rulemaking. See e.g., *United Technologies Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987) (holding that if a "rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one"). During oral arguments, the Court inquired of counsel for Defendants if the EPA required cumulative

---

[85] Exhibit 84, p. 2.
[86] Exhibit 11, p. 5-7.

impact analysis on every air permit issued in the state to which counsel explained that "it is certainly best practices to engage in a type of statistical analysis to see the significant disparate impact, ... or if there are alternative less discriminatory measures to mitigate that impact . . . what the regulation requires is that they don't engage in unlawful disparate impact.[87] As noted by the State, such legislative rulemaking requires notice-and-comment compliance and Presidential ratification.

The Court agrees with the State that the EPA's demands of cumulative impact analyses was more than suggestions.  Based on the Court's understanding as explained in the briefs, the attached exhibits, and arguments made during the hearing, it appears that the EPA has and will continue to impose cumulative impact analysis as conditions for grants, and with regard to issuing permits. Most telling, was counsel for Defendants who refused to disavow the imposition of the mandates, and further stated that the EPA would continue to consider such analyses as best practices concerning issuing permits.[88]  As such, there is a real threat of enforcement as to those mandates and the EPA's "guidance" is actually binding.  The Court finds that these mandates are more than mere negotiating proposals or suggestions, and thus the Court will deny Defendants' motion to dismiss the States' claims challenging the extra-regulatory requirements.

---

[87] Rough transcript, p. 49-50 at 11:11a.m.
[88] *Id.* pp. 49-51.

III.   PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *accord Winter v. NRDC*, 555 U.S. 7, 20 (2008). Failure to satisfy any one requirement precludes injunctive relief, see *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and the State bears a heavy burden on each requirement. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). The "limited purpose" of a "preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. V. Camenisch*, 451 U.S. 390, 395 (1981); see also SEC *v. First Fin. Group of Tex.*, 645 F.2d 429, 435 n.8 (5th Cir. Unit A 1981).

As discussed hereinabove, the Court has determined that it has standing as to the State's to Challenge Defendants' disparate impact regulations and extra-regulatory requirements and for the reasons explained herein, the Court is convinced that the State has a substantial likelihood of success.

   A. *Irreparable harm*

Defendants argue that the State cannot make a clear showing of irreparable harm given the State's alleged fifty-year delay in bring the motion for preliminary injunction and

the absence of imminent injury. Defendants argue that the balance of equities and public interest disfavor preliminary relief because of the disruption of longstanding agency operations such an injunction would cause.

To show irreparable harm, Plaintiff must demonstrate "a *significant threat* of injury from the impending action, that the injury is imminent." *Humana, Inc. v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (emphases added), and that irreparable injury must be likely to occur "during the pendency of the litigation." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990).

### 1. *Fifty-year delay*

Defendants contend that the State's half-century delay suggest that the EPA and DOJ's disparate impact regulations disproves any irreparable harm.  Defendants note that the regulations to which the State complains were issued in 1966 (DOJ) and 1973 (EPA), and the Louisiana State agencies have for decades certified their compliance with the disparate impact regulations, refuting any suggestion that harm from such compliance is irreparable. In simple terms, Defendants posit that the State's substantial delay in challenging the regulations negates any assertion that such harms are irreparable.

### B. *Injuries*

Defendants argue that the State's harms do not rise to the level of imminent, irreparable injury. Defendants remind the Court that the EPA closed the complaints that initially precipitated the State's concerns as to the disparate impact mandates. Thus, because there are no pending complaints, there can be no imminent, irreparable injury.

Defendants argue that any harm arising from potentially adverse outcomes in future enforcement proceedings is insufficiently imminent to justify a preliminary injunction. *Winter*, 555 U.S. at 22.

The State asserts that it will suffer sovereign injury because the challenged regulations prevent it from "exercise[ing] its sovereign authority by regulating in a race-neutral manner. As sovereigns within our federal system, the States have "the power to create and enforce a legal code" within their borders. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982).

The State argues that is has a sovereign right to unambiguous clarity in the conditions being imposed by federal grants, and Title VI's plain text fails to provide unambiguous clarity that accepting federal funds will compel the State to accept disparate impact based requirements. See e.g., *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022). Thus, the State maintains that Defendants' actions inflict sovereign injury.

Additionally, the State argues that Defendants' disparate impact regulations and extra-regulatory requirements create compliance costs for the State, and due to its sovereign immunity, the States cannot recover damages from the federal government. As such, the State posits that those irrecoverable injuries constitute irreparable harm. See e.g. *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by,* 136 S.Ct. 2271 (2016); *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020).

Based on the discussions herein, the Court finds that the State has presented sufficient arguments and evidence that Defendants' disparate impact regulations and extra-regulatory

requirements do create substantial increases costs, which the State would not be able to recover from the federal governments.[89]  Additionally, the State is entitled to unambiguous clarity concerning Defendants' power to regulate beyond the plain text of Title VI. This is its sovereign right. The State must be able to issue permits and accept and maintain grants with advance knowledge and understanding of the scope of its compliance with Title VI. It is abundantly clear, that Defendants' actions iterated herein have created great cause for concern, not only for the State of Louisiana, but also for our sister states who have also found themselves at the whim of the EPA and its overreaching mandates. The State has met its burden as to irreparable harm.

### C. *Balance of equities and public interest factors*

"[T]here is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C. v.* FDA, 16 F. 4th 1130, 1143 (5th Cir. 2021). "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of non recoverable compliance costs."  *Louisiana v.* Biden, 55 F.4th 1017, 1034 (5th Cir. 2022) (cleaned up). The public interest here is that governmental agencies abide by its laws, and treat all of its citizens equally, without considering race. To be sure, if a decision maker has to consider race, to decide, it has indeed participated in racism. Pollution does not discriminate. Surely, that is why Title VI so plainly does not mention disparate impact. The Court finds that the States has met its heavy burden that warrants a preliminary

---

[89] See the discussions herein as to the State's costs of compliance, and as to the increased funding for the EPA to enforce its disparate impact mandate regime.

injunction against the EPA and DOJ as to its disparate impact mandates and extra-regulatory requirements (cumulative impact).

**<u>CONCLUSION</u>**

For the reasons set forth herein, the Court finds that the State has standing to challenge the EPA's disparate impact mandates and extra-regulatory requirements (cumulative impact) and the DOJ's 1966 disparate impact regulation. The Court further finds and that a preliminary injunction should issue against the EPA and DOJ to enjoin these federal governmental agencies from imposing or enforcing any disparate impact based requirements against the State or any State agency under Title VI, and imposing or enforcing any Title VI based requirements upon the State or any State agency that are not both (a) ratified by the President, as required by 42 U.S.C. § 2000d-1, and (b) based upon requirements found within the four corners or EPA's disparate impact regulations, 40 C.F.R. § 7.35(b),(c). The Court will dismiss the State's challenge to the EPA's alleged non-delegation violations, as the State does not have standing to assert this challenge. The Court will grant Louisiana's Request for Judicial Notice.

**THUS DONE AND SIGNED** in Chambers on this 23rd day of January, 2024.

_____<br>
**JAMES D. CAIN, JR.**<br>
**UNITED STATES DISTRICT JUDGE**