**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

|  |  |
|---|---|
| THE STATE OF LOUISIANA,<br>By and through its Attorney General, Liz Murrill,<br><br>PLAINTIFF,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY; et al.,<br><br>DEFENDANTS. | CIVIL ACTION NO. 2:23-cv-00692 |

**DECLARATION OF EMERALD SKIPPER**

1.      My name is Emerald Skipper. I am an assistant employed by the Louisiana Department of Justice. Except where otherwise indicated, I make this declaration based on my personal knowledge. I could competently testify as to its contents if called to do so.

2.      Attached as Exhibit 95 is a true and accurate copy of a September 9, 2024 InsideEPA article titled "Michigan Signs Title VI Deal Requiring EJ, Cumulative Impact Analyses," as obtained from https://insideepa.com/daily-news/michigan-signs-title-vi-deal-requiring-ej-cumulative-impact-analyses.

3.      Attached as Exhibit 96 is a true and accurate copy of an August 29, 2024 agreement between Michigan Department Of Environment, Great Lakes, And Energy and Complainants Michigan Environmental Justice Coalition, Sierra Club, Pamela McWilliams, Irene Sinclar, Kheir Arabi, Mark Covington, and Sharon Buttry, as obtained from https://insideepa.com/sites/insideepa.com/files/documents/2024/sep/epa2024_1705.pdf.

4.      Further declarant sayeth naught.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF LOUISIANA THAT THE FOREGOING IS TRUE AND CORRECT. 28 U.S.C. § 1746**.

Sworn and subscribed this 19th day of September, 2024, in Baton Rouge, Louisiana


s/Emerald Skipper
EMERALD SKIPPER

# EXHIBIT 95



# Michigan Signs Title VI Deal Requiring EJ, **Cumula**tive Impact Analyses

September 9, 2024

*Post*

Michigan has signed an agreement with environmentalists under Title VI of the Civil Rights Act requiring that all hazardous waste facility permit applicants perform environmental justice (EJ) analyses, an effort that one advocate says targeted the state, rather than EPA, because of fears a Trump administration would be unsympathetic to such efforts.

The Michigan Department of Environment, Great Lakes & Energy (EGLE) signed **the Aug. 29 agreement** to resolve a complaint filed in 2020 by the Michigan Environmental Justice Coalition, the Sierra Club and five individuals. It applies to new facility sitings, renewals and expansions, and it requires state officials to review the plans and to conduct a separate cumulative impact analyses for each application.

Further it says the state "shall not issue the license" if it determines that mitigation measures "are not capable of addressing an unlawful impact on human health or the environment," while also stating that the provisions do not require EGLE to impose conditions inconsistent with its lawful authority.

Nicholas Leonard of the Great Lakes Environmental Law Center says the groups filed the complaint with EGLE and not EPA because President Donald Trump was running for a second term against Joe Biden at the time and "we weren't sure what would happen with the election."

Also, a previous EPA-EGLE Title VI agreement required the state to launch a new grievance process, and the hazardous waste complaint was the first to be brought under it, at a time when Gov. Gretchen Whitmer (D) was still new and there was "a lot of talk about making Michigan" an EJ leader.

"So, we saw this as an opportunity to have some direct conversations" with the state. Leonard adds it was "really beneficial to be in the driver's seat and decide if the agreement was worth signing," unlike when groups file a complaint with EPA and are not formally a part of any agreement, which is between the agency and the funding recipient. Title VI requires recipients of agency funding to comply with the Civil Rights Act's nondiscrimination requirements.

While environmentalists targeted Michigan, rather than EPA, in the hazardous waste petition, its resolution comes just a week after a federal judge in Louisiana permanently blocked implementation of the federal agency's disparate impact Title VI rules in the Pelican State, though he endorsed a national ban.

In an Aug. 22 injunction, Judge James Cain of the U.S. District Court for the Western District of Louisiana said the "unlawful disparate impact regulations **are illegal anywhere** in the United States," though the state's request "is limited to a permanent injunction exclusively within the borders of the State of Louisiana."

And though the Michigan agreement did not include EPA, it notes that EGLE "is subject to the provisions of Title VI" because it "is a recipient of federal financial assistance from the EPA."

Julius Redd, an attorney at Beveridge & Diamond who follows EJ and civil rights, calls the agreement "significant because of the commitments EGLE agreed to make," including requiring the EJ analyses for hazardous waste license applicants and committing to conducting cumulative impacts for licensing across the state, though the complaint focused on a facility in Detroit, U.S. Ecology Michigan, Inc. which has been in operation since the 1940s.

He notes that "typically EPA is the one that administers this process" but adds that the Louisiana injunction is unlikely to dissuade states already willing to engage in Title VI from doing so, though it will give opposing states additional ammunition.

EPA has significantly scaled back its Title VI enforcement since Louisiana filed suit in the spring of 2023, though Redd notes that EPA has been willing to accept new complaints for investigation, including opening a probe in March to assess the compliance of Alabama's **Clean Air Act Title V permit program** even after Cain issued a preliminary version of his injunction in January.

**2023 Agreement**

Leonard adds that it is not totally clear why EGLE agreed to the strong measures in this agreement compared to a 2023 agreement it entered with EPA in response to a 2021 Title VI complaint by three Flint, MI, groups alleging the air permit the state issued to the Ajax asphalt plant in Genesee township was discriminatory.

That **informal resolution agreement** stopped short of requiring cumulative impact considerations in overburdened communities as the advocates sought. Instead, the agreement required EGLE to bolster outreach and air monitoring, a "watered down" agreement that makes "only cosmetic changes to the state's problematic air polluting program, allowing the state to continue its historical practice of packing dirty industries into low-income communities of color," EJ advocates said at the time.

EGLE acknowledged some of the disappointment in an Aug. 10, 2023, statement that said, "We realize the agreement does not address all the issues raised by the local residents during our discussion. We remain committed to continuing to work with the community to address ongoing concerns. This includes our collaborative work with EPA to address challenges presented in overburdened communities."

Leonard says the negotiations with EGLE went better in the context of the hazardous waste complaint than the Ajax one, and that it might be because they are regulated under two different programs. The air program is difficult from an environmental justice perspective "because it touches on so many very powerful industries, and in turn states are going to push back harder on anything that's going to make that process more stringent for industry.

"There are greater political forces at play. I don't think those same political forces are at play, at least not in Michigan, with the hazardous waste industry," Leonard says.

He adds that Michigan groups want to try out different EJ and civil rights approaches to see where they can be most successful, though he is unaware of any other pending complaints under the state's grievance process.

**'Good-Faith Discussions'**

EGLE touted the agreement in an Aug. 29 press release, calling it "a mutually agreed upon informal resolution process" in lieu of a formal investigation.

EGLE Director Phil Roos called the agreement "the culmination of productive, good-faith discussions between EGLE staff and residents advocating for the health of their communities -- a goal we share with them. We look forward to continuing to work with residents across the state to ensure all Michiganders, regardless of where they live, have safe air to breathe, clean water to drink and healthy communities to thrive in. This agreement, combined with recent announcements like EGLE's new Environmental Justice Impact Grants, exemplifies the state's commitment to empowering communities an advancing environmental justice."

It also reflects EGLE's "efforts to find solutions to community concerns within the confines of existing law and improve transparency in decision making," the state says.

The agreement states that each hazardous waste license applicant will be asked to prepare an EJ analysis for consideration by ELGE staff, and EGLE will conduct the analysis if the applicant does not complete one. It renews the state's commitment to the current practice of granting a license "only if it is

determined that it will not cause unlawful impacts to the environment or human health."

And it requires the installation of air monitors near the U.S. Ecology North facility and making that data publicly available. The state must also conduct an assessment of opportunities for public health improvement near the facility -- a study being funded by EPA.

Michigan Attorney General Dana Nessel (D) added that the state's commitment to do the assessment, with community input, "will help continue efforts to create lasting relationships and better assess the needs of the community." -- *Dawn Reeves* (dreeves@iwpnews.com)

247143

---

## RELATED NEWS

- **EJ Coalition Presses EPA To Reject AGs' Petition To Weaken Title VI Rules**
- **Court Backs National Ban On EPA Rights Rule, Expands Louisiana Bar**
- **Hoping To Limit Complaints, EPA Issues New Title VI 'Procedural' Guide**
- **White House Issues MOU On Interagency Coordination Process For EJ Issues**
- **WHEJAC Approves Report To Better Implement Biden EJ Executive Order**

---

**SITE LICENSE AVAILABLE**

Economical site license packages are available to fit any size organization, from a few people at one location to company-wide access. For more information on how you can get greater access to InsideEPA.com for your office, contact Online Customer Service at 703-416-8505 or **iepa@iwpnews.com**.

**STAY CONNECTED**



© 2024. Inside Washington Publishers | **Contact Us**

EXHIBIT 96

**AGREEMENT**
between the

**MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND ENERGY**

and

**COMPLAINANTS, Michigan Environmental Justice Coalition, Sierra Club, Pamela McWilliams, Irene Sinclar, Kheir Arabi, Mark Covington, and Sharon Buttry**

**EGLE Complaint No. 20-001-D**

I.    PURPOSE AND JURISDICTION

A.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 (Title VI), and United States Environmental Protection Agency's (EPA) implementing regulation at 40 C.F.R. Part 7 prohibit discrimination on the basis of race, color, or national origin in any programs or activities receiving federal financial assistance.

B.    The Michigan Department of Environment, Great Lakes, and Energy (EGLE) is a recipient of federal financial assistance from the EPA and is subject to the provisions of Title VI and 40 C.F.R. Part 7, and, as applicable, other federal nondiscrimination laws.

C.    On August 20, 2020, EGLE accepted for investigation EGLE Complaint No. 20-001-D filed pursuant to EGLE Policy No. 09-024, Nondiscrimination in EGLE Programs, Section C, Grievance Procedures. The complaint alleges:  (i) that EGLE Material Management Division (MMD)[1] discriminated on the basis of national origin by failing to identify limited English proficient persons living nearby U.S. Ecology Michigan, Inc.'s facility at 6520 Georgia Street, Detroit, Michigan 48211 (U.S. Ecology North) and by failing to provide adequate translation and interpretation services at its community meeting held on March 28, 2019, in violation of 40 C.F.R. Part 7; (ii) that EGLE MMD's issuance of a Hazardous Waste Management Facility Operating License to U.S. Ecology Michigan, Inc. (U.S. Ecology Michigan) on January 29, 2020 (License), for U.S. Ecology North was in violation of 40 C.F.R. Part 7; (iii) that EGLE MMD's failure to adopt policies or regulations requiring the consideration of racial and economic demographic information

---

[1] For ease of reference, references to EGLE MMD throughout include predecessors of EGLE MMD.

1

in hazardous waste licensing decisions has established a pattern or practice of discrimination on the basis of race, color, and national origin in violation of 40 C.F.R. Part 7 and 42 U.S.C. § 2000d.

D.    The Complainants are:  Michigan Environmental Justice Coalition, Sierra Club, Pamela McWilliams, Irene Sinclar, Kheir Arabi, Mark Covington, and Sharon Buttry.

E.    The parties agreed to engage in the informal resolution process provided for in EGLE Policy No. 09-024, Nondiscrimination in EGLE Programs.

F.    During the course of this informal resolution process, EGLE and the Complainants agreed to enter a voluntary informal resolution agreement to resolve Complaint No. 20-001-D.

G.    This Agreement is entered into pursuant to federal nondiscrimination laws, including Title VI and 40 C.F.R. Part 7, and under EGLE Policy No. 09-024, Nondiscrimination in EGLE Programs.

H.    EGLE MMD is committed to carrying out its responsibilities in a nondiscriminatory manner, in accordance with the requirements of Title VI, Section 504, 40 C.F.R. Part 7, and, as applicable, other state and federal nondiscrimination laws, and with EGLE Policy No. 09-024, Nondiscrimination in EGLE Programs, and EGLE Policy No. 09-007, Policy on Public Involvement in Department Programs and Activities, and EGLE's Limited English Proficiency (LEP) Plan. The activities detailed in Sections III to VII of this Agreement, which EGLE MMD has voluntarily agreed to undertake and implement, are in furtherance of this commitment.

## II.    BACKGROUND

A. ***Initial license.***  The U.S. Ecology North site has been an industrial facility since the 1940s. Since 1974, waste management activities have been conducted at the site prior to the enactment of the Resource Conservation and Recovery Act in 1976. EGLE MMD issued the site its first hazardous waste operating license in 1982. EGLE MMD renewed the license in 1990 before the current renewal cycle.

B. ***Detroit History.***  Throughout much of the early and mid-20th century, racial covenants restricting the sale of property to Black residents were a commonly used tool to maintain housing segregation in Detroit. Additionally, federal agencies commonly redlined predominantly Black neighborhoods, such as that around U.S. Ecology North, to restrict residents from obtaining mortgages. In addition to Black residents of Detroit being denied free access to housing and to

housing-related financing, many of Detroit's predominantly Black neighborhoods were also targeted by the local government for "industrial renewal," which commonly consisted of condemning and demolishing such neighborhoods for industrial development.

C. ***Application.*** EGLE MMD received another hazardous waste management facility operating license renewal application in 2007. During the renewal process, facility owner Dynecol was purchased by U.S. Ecology Michigan. A revised hazardous waste license application, with a proposal for the expansion of storage and treatment activities, was submitted March 4, 2013.

D. ***Current Status of Community Nearby U.S. Ecology North.*** According to EPA EJScreen, 9,344 people live in census tracts located within one mile of U.S. Ecology North. Of those people, 58% are people of color compared to 26% statewide, 74% are low-income compared to 31% statewide, and 12% are limited English speaking compared to 2% statewide. Additionally, the community within one mile of U.S. Ecology North is characterized by numerous high percentiles for environmental justice indexes, indicating that the environmental risks which nearby residents may be exposed to score higher compared to other residents in Michigan. Specifically, according to EPA EJScreen's environmental justice indexes, the community within one mile of U.S. Ecology North ranks in the 95th percentile in the State regarding hazardous waste proximity and in the 90th percentile or greater for a number of environmental indicators.

E. ***Public meetings.***

1. U.S. Ecology Michigan held a preapplication public meeting on November 26, 2012, for the proposed expansion.

2. EGLE conducted a public hearing regarding the draft license on August 18, 2015. EGLE did not receive any request for translation or interpretation services, and EGLE did not provide any translation or interpretation services for any limited English proficient persons at this meeting.

3. EGLE also participated in a meeting for the public with Detroit Councilman Scott Benson and representatives of U.S. Ecology Michigan on August 31, 2015.

4. During this time EGLE extended the public comment period twice, first from August 28, 2015, to September 12, 2015, and the second time to October 12, 2015. The people attending these events were able to provide formal comment for the public record.

5. On June 7, 2018, the Great Lakes Environmental Law Center sent a letter to EGLE expressing concerns that it had failed to identify a significant number of limited English proficient persons living nearby U.S. Ecology North and had failed to provide such persons with any translation or interpretation services regarding any previous public hearings, meetings, or information sessions. In consideration of these concerns, the Great Lakes Environmental Law Center requested that EGLE re-open the public comment period regarding the License, host an additional public hearing, and provide translation services for non-English speakers. Initially, EGLE denied this request. On July 23, 2018, the Great Lakes Environmental Law Center submitted another letter to EGLE expressing concern that it had failed to identify large numbers of limited English proficient persons living nearby U.S. Ecology North that primarily speak Bengali and Arabic. On September 10, 2018, EGLE agreed to reopen the public comment period and to host an additional public meeting with adequate translation and interpretation services.

6. Between September 2018 and February 2019, EGLE hosted numerous meetings with local Yemeni and Bengali community members to plan for the public meeting. These meetings included discussions regarding the best time, place, and manner for conducting the public meeting, documents to be prepared before the public meeting, and assistance with interpretation services, including appropriate dialects for interpreters. On February 22, 2019, in response to petitions received about excluding community members due to language barriers, EGLE formally notified residents of the reopening of the public comment period. The notice, provided in English, Arabic, and Bengali, included details on how to provide public comment for the record. The notice also identified how to attend a public meeting on March 28, 2019, to learn more about the License. The public comment period ended April 12, 2019. Materials at the meeting included translations into Arabic and Bengali, and Arabic and Bengali interpreters were present. In the discussions with EGLE and the community to plan the public meeting, local community members confirmed that dialects were not a concern; however, at the meeting issues arose related to the need for the interpreters to speak certain dialects.

F. ***License Issuance.*** Comments submitted during all of the public comment periods were considered by the project team, the hazardous waste section manager, and the MMD Director in the formulation of the final decision. Ultimately, the Hazardous Waste Management Facility Operating License ("the License") (including both renewal and expansion) was issued on January 29, 2020. EGLE provided to the public a Notice of Final Decision, Fact Sheet, and Responsiveness Summary, in English and translated into Arabic and Bengali.

G. ***Air Quality Monitoring.*** Air quality at and near the U.S. Ecology North facility is currently being evaluated, including, but not limited to the following:

1. ***Existing Air Monitoring Stationary Stations.*** EGLE's Air Quality Division (AQD) currently operates an air monitoring station three miles to the northeast of U.S. Ecology North. This site is located at Osborn High School and has been in operation for over 20 years. This AQD monitoring station, called E.7 Mile, measures nitrogen oxides, ozone, fine particulate matter, and a variety of air toxics during the summer months. The Stellantis/FCA Mack Avenue facility, less than three miles to the southeast of U.S. Ecology North, began operation of an ambient air monitoring site in November 2020. The Stellantis Mack Avenue monitoring location measures nitrogen oxides and fine particulate matter year-round and volatile organic compounds once a month from March to October. Because ambient air monitors measure pollutants from many local, regional, and national sources, these monitors provide useful information about the air quality in this area of Detroit.

2. ***Mobile Air Monitoring in 2021.*** The EPA conducted mobile air sampling in the neighborhoods surrounding the U.S. Ecology North facility in August and November 2021 for various parameters including hydrogen sulfide, methane, and volatile organic compounds. The EPA sampling event did not result in any notable findings and, therefore, the EPA did not generate a formal report.

3. ***Existing U.S. Ecology North on-site ambient air monitoring.*** U.S. Ecology North has an ambient air monitoring program as required in Part VI Section A of the License. The program consists of three perimeter monitoring stations with locations as follows: northeast corner (main office parking lot), east corner (east truck entrance gate), and southwest corner of the facility. The program measures total suspended particulates, arsenic, lead, and chromium twice a month year-round. The program has procedures in place to maintain the quality assurance and quality control of the air monitoring devices and samples collected by those devices.

H. ***Complaint.*** On July 27, 2020, Complainants filed with EGLE Complaint No. 20-001-D, alleging that EGLE MMD violated the EPA's Title VI regulations described in 40 C.F.R. Part 7 as well as the Civil Rights Act of 1964 as described in more detail in Subsection I.C. Pursuant to EGLE Policy No. 09-024, Nondiscrimination in EGLE Programs, the Complainants had the choice between entering into informal discussions with EGLE or having EGLE conduct an investigation into the complaint. The Complainants and EGLE agreed to enter into informal discussions which resulted in this Agreement. No formal investigation into the complaint was conducted.

I. ***Department-wide Limited English Proficiency Plan.***  As required by an informal resolution agreement entered into between the EPA and EGLE to resolve a complaint filed with the EPA under Title VI, in September 2020, after a public comment period and review by the EPA, EGLE adopted a Department-wide Limited English Proficiency Plan. The plan "establishes department-wide guidance to provide LEP individuals with meaningful access to EGLE actions programs, projects, services, or activities in a timely and effective manner."

J. EGLE agrees to undertake the following commitments described in sections III – VII.

## III.    LIMITED ENGLISH PROFICIENCY PROCEDURES

A. The purpose of these procedures is to provide persons with LEP the opportunity to meaningfully participate in EGLE MMD's hazardous waste program by providing translation and interpretation services so that individuals with LEP have the opportunity to participate in public meetings and/or hearings and have the opportunity to submit public comment during any public comment period related to licensing for the hazardous waste program.

B. EGLE MMD agrees to incorporate the following into its written procedures implementing the Department-wide LEP Plan for its hazardous waste licensing program:

    1.  EGLE MMD's hazardous waste licensing program will proactively identify individuals with LEP by undertaking the following analysis:

        a.  Complete an assessment for each proposed license to determine the appropriate assessment zone (Assessment Zone) by surveying census data at the tract level to identify the number of people that speak English less than "very well."

        b.  To determine the geographic scope of the Assessment Zone, the geographical scope of the review should include the area within a one-mile radius or those census tracts located, at least in part, within at a minimum a one-mile radius of the facility. The assessment may be expanded in concentric 0.5-mile increment circles, up to a three-mile radius around the facility, due to factors such as:

            i.  Community interest or concern is high

            ii.  Community input

       iii.    EGLE has prior knowledge of LEP populations

       iv.    High population density near the facility

       v.    The percentage of persons with LEP as related to the state
average

2.    EGLE MMD will establish thresholds for determining when translation or
interpretation services will be provided and for what languages.

    a.    Written Translation

       i.    If in the Assessment Zone, the population of persons with LEP
is over the state average for persons with LEP or 500
individuals are persons with LEP, whichever is less, there is a
presumption that EGLE MMD will provide translated versions
of vital documents. However, if there is not a predominate non-
English language(s) used in the community, EGLE will
determine using reasonable best efforts and in coordination with
community members in the Assessment Zone which non-English
language(s), if any, will be subject to written translation.

       ii.    Consistent with EGLE's Department-wide LEP Plan, EGLE
MMD will make reasonable best efforts to provide written
translation services upon request, allowing EGLE a reasonable
amount of time under the circumstances to identify and provide
the written translation services, to any person that lives within
the established Assessment Zone in the language(s) identified by
the person(s) with LEP. What constitutes "reasonable best
efforts" by EGLE MMD may include consideration of, but is not
limited to, the following:  availability of a contractor for
translation, timing of the request, nature of the action to which
the request relates, the level of effort and resources needed to
complete the request.

       iii.    The final decision on these issues in Subsection III.B.2.a will be
conveyed to community members who engaged with EGLE on
the issues and documented in a note to the file.

    b.    Oral Interpretation

        i.    If written translation for a language is required in Subsection III.B.2.a.i., EGLE will provide oral interpretation services for the same language identified in Subsection III.B.2.a.i. at a public meeting or hearing during the public engagement period. EGLE will use reasonable best efforts to determine whether specific dialects are needed for oral interpretation services. EGLE may hold separate public meetings or hearings if needed to effectively provide oral interpretation services for the applicable languages, for example, if two languages other than English require written translation and oral interpretation services under Subsection III.B.2.a.i and this section.

        ii.    Consistent with EGLE's Department-wide LEP Plan, EGLE MMD will make reasonable best efforts to provide oral interpretation services upon request, allowing EGLE a reasonable amount of time under the circumstances to identify and provide the oral interpretation services, to any person that lives within the established Assessment Zone in the language(s) identified by the person(s) with LEP. What constitutes "reasonable best efforts" by EGLE MMD may include consideration of, but is not limited to, the following:  availability of a contractor for interpretation, timing of the request, nature of the action to which the request relates, and the level of effort and resources needed to complete the request.

    c.    All translation and interpretation will be provided by contract interpreters, with competencies outlined in the Department of Technology, Management, and Budget's Contract Nos. 180000001162 or 180000001163, or any subsequent contract that supersedes such contracts.

3.    For its hazardous waste licensing program, EGLE MMD will establish what documents are "vital" in regards to hazardous waste licensing. "Vital" documents must be translated where required by Subsection III.B.2.a.i. EGLE MMD will consider the following documents "vital" and will post them on its website in the languages identified in Subsection III.B.2.a.i.:

    a.    License application review timeline

    b.    Meeting and public hearing notices

     c.   Fact sheets

     d.   Notices of final decision

     e.   Responsiveness summaries

C. In its Department-wide LEP Plan, EGLE has committed to monitoring and updating its LEP Plan to be responsive to public need and input. To further this commitment, Complainants agree that EGLE MMD may update its procedures implementing EGLE's LEP Plan, including the provisions agreed to in this Section III, if EGLE determines the updates will better provide for meaningful public engagement for persons with LEP.

## IV.    ENHANCED PUBLIC ENGAGEMENT PROCEDURES

A. For its hazardous waste licensing program, EGLE MMD will establish enhanced public engagement procedures where appropriate including if translation services are determined to be needed under the analysis in Subsection III.B.2.a.i. EGLE MMD will:

    1.   Engage with the local community to determine what will best provide for meaningful public involvement for each public meeting or public hearing, including, for example, which non-English language(s) will be subject to written translation and oral interpretation, as set forth in Section III, and logistics to provide effective communication at public meetings and public hearings if more than one language other than English is at issue.

    2.   Consistent with EGLE MMD's currently adopted procedure, hold a public information meeting when EGLE MMD has determined that an application for a license is administratively complete and still must undergo a technical review.

    3.   Consistent with EGLE MMD's currently adopted procedure, hold a public information meeting when EGLE MMD has determined that an application for a license is technically adequate.

    4.   Hold additional public meetings or "office hours," where persons can meet with EGLE staff in a smaller setting to ask questions and voice comments and concerns, if EGLE MMD determines there is a need for additional public engagement.

    5.   Disseminate translated notices within the Assessment Zone in English and in the language(s) identified in the analysis in Subsection III.B.2.a.i.

for any public information meeting, office hours, or post-application public hearing required by MCL 324.11125(1)(e).

6.  Consistent with EGLE's Policy 09-007, Policy on Public Involvement in Department Decisions,[2] all public notices will include the following statements:

    a.  Individuals needing language assistance or accommodations for effective participation at the meeting/hearing [choose which is appropriate] should contact [insert contact name and phone number] by [insert date two weeks in advance of the meeting/hearing date] to request language, mobility, visual, hearing, translation, and/or other assistance.

    b.  EGLE does not discriminate on the basis of race, sex, religion, age, national origin, color, marital status, disability, political beliefs, height, weight, genetic information, or sexual orientation in the administration of any of its programs or activities and prohibits intimidation and retaliation, as required by applicable laws and regulations.

7.  Post any prepared presentations on the facility's EGLE webpage with subtitles and audio in the languages identified in the analysis in Subsection III.B.2.a.i.

8.  Extend the timeframe in which persons may submit written comments to EGLE MMD, if EGLE MMD determines community members need additional time.

B.  EGLE will begin public engagement and the LEP analysis discussed above in Subsection III.B. at the latest upon receipt of a major modification request for an existing license or a license application for a hazardous waste storage, treatment, or disposal facility, including an application for a new license, license renewal, or license expansion, enlargement, or alteration of a treatment, storage, or disposal facility beyond its original authorized design capacity or beyond the area specified in an existing operating license, and may begin this process in advance of receipt of a license application if EGLE determines that it is needed.

C.  Within 90 days of the Effective Date of this Agreement, EGLE MMD agrees to update its procedures to include the commitments in Subsection IV.A. and to post online its procedures for EGLE MMD's hazardous waste program related to

---

[2] An update to this policy is currently out for public comment and is titled "Public Participation in Department Decisions."

10

persons and communities with LEP, on EGLE MMD's website, and will include versions translated into Spanish and Arabic. EGLE will notify the complainants in writing once it has completed updating its procedures as required by this subsection.

V.    **INCORPORATION OF TITLE VI INTO STATEWIDE HAZARDOUS WASTE MANAGEMENT**

A. The purpose of these procedures is to purposefully incorporate the consideration of Title VI of the federal Civil Rights Act and the EPA's Title VI regulations described in 40 C.F.R. Part 7 into EGLE MMD's statewide hazardous waste licensing program and procedures.

B. Part 111, Hazardous Waste Management, of Michigan's Natural Resources and Environmental Protection Act, 1994 PA 451, As Amended (Part 111), and its implementing regulations set forth specific requirements for persons seeking a new license or renewal of a license for a hazardous waste treatment, storage, or disposal facility. These provisions require the applicant to demonstrate to EGLE how the applicant intends to establish, construct, conduct, manage, maintain, and operate a treatment, storage, or disposal facility. Section 11123 of Part 111 MCL 324.11123, in coordination with the Part 111 rules, dictate the requirements an applicant must meet for a new license, a renewed license, and expansion, enlargement, or alteration of an existing license.  Included among these provisions are the following requirements, relevant to this Agreement: submittal of an environmental assessment; an environmental monitoring plan, as provided for in the rules; an analysis and plan for risk and impact of accidents and fires; and an analysis of the impact on the municipality where the proposed facility is to be located in terms of health, safety, and cost.  Additionally, the rules require that a facility be operated in a manner to prevent violations of state and federal environmental laws; exposure of humans or the environment to harmful quantities of hazardous waste or hazardous waste constituents; and pollution, impairment, or destruction of natural resources.  Mich. Admin. Code, R. 299.9602.

C. EGLE MMD agrees to incorporate the following into its written procedures for its hazardous waste treatment, storage, or disposal facility licensing program for renewal of operating licenses, the issuance of new operating licenses, or the expansion, enlargement, or alteration of a facility to ensure compliance with Part 111 and the Part 111 rules:

1.    ***License Renewals.***  Six months prior to the due date for an application for renewal of a hazardous waste operating license, EGLE MMD currently issues to the applicant a letter that details what the applicant must submit in its application for renewal. EGLE MMD will add language to

11

this letter within 90 days of the Effective Date of this Agreement that includes a provision requesting the applicant to perform an environmental justice analysis as part of the applicant's analysis required by MCL 324.11123(6)(c) and Mich. Admin. Code, R. 299.9504(1)(e). EGLE will provide the revised letter required by this subsection to the Complainants within 90 days of the Effective Date of this Agreement. This language will cite to the EPA's EJ Screen and, once finalized, the MiEJScreen, which is currently in draft form. The environmental justice analysis will include the score for each of the individual layers or indicators included within the screening tool and an assessment of the applicability of the layer to the operation of the facility as proposed within the application and its potential impacts. The geographical scope of the review should include the area within a one-mile radius or those census tracts located, at least in part, within at a minimum a one-mile radius of the facility. EGLE MMD will provide guidance to the applicant on how to conduct an environmental justice analysis. EGLE recommends the applicant develop the environmental justice analysis with input from the public. If the applicant fails to conduct the environmental justice analysis, EGLE shall perform one with input from the public.

2. ***New Licenses or Expansion, Enlargement, or Alteration.*** Upon receiving notification from an applicant of a proposal for a new hazardous waste facility or a major modification request for an existing license pursuant to R 299.9519 or upon receiving such an application, whichever is earlier, EGLE MMD will send a letter to the applicant that includes a provision requesting the applicant to perform an environmental justice analysis as described in Subsection V.C.1 as part of the applicant's analysis required by MCL 324.11123(2)(l) and Mich. Admin. Code, R. 299.9504(1)(e). The letter will cite to the EPA's EJ Screen and, once finalized, the MiEJScreen, which is currently in draft form. EGLE recommends the applicant develop the environmental justice analysis with input from the public. If the applicant fails to conduct the environmental justice analysis, EGLE shall perform one with input from the public.

3. ***Department Review of Environmental Justice Analysis.***

   a. Upon receipt of an application, EGLE MMD will perform a review of the environmental justice analysis performed by the applicant.

The purpose of this review is to verify that the analysis was properly completed and should evaluate whether:

   i.    EJ Screen[3] was used to analyze and report on the information identified in this section. Once MiEJScreen is finalized, MiEJScreen will be used to complete this analysis.

   ii.    An appropriate geographic scope was used when performing the analysis. If the department determines a broader scope of review is necessary, it may perform the review for a larger geographic area and consider the information collected. EGLE may consider a broader area based on:

       A)    If the community has expressed a high level of concern

       B)    If the community has indicated an interest in providing input

       C)    Environmental justice concerns in the vicinity of the facility

       D)    The population density and its proximity to the facility

   iii.    All relevant information was included and potential impact of the operation of the facility was fairly characterized.

b.    EGLE MMD will document its review of the environmental justice analysis and will include this documentation in the license file.

c.    EGLE MMD may provide the EGLE Environmental Justice and Tribal Liaison with a copy of its review of the environmental justice analysis to assist with the evaluation.

d.    EGLE MMD will work with the Complainants to develop the guidance regarding how an applicant is to perform the environmental justice analysis required by this section. At a minimum, this shall include providing the Complainants with a reasonable amount of time to conduct a comprehensive review and comment on the guidance before it is finalized and published. EGLE MMD agrees to have this guidance finalized, published, and incorporated into the letter to applicants requesting the environmental justice analysis within one year of the Effective Date of this Agreement.

---

[3] Currently available at https://ejscreen.epa.gov/mapper/.

4.  ***Facility Cumulative Impact Review.***  EGLE MMD will complete a review of available information regarding potential cumulative impacts and summarize the following information for each proposed license. EGLE MMD may gather this information through any available means. This review will include information regarding the facility and within the appropriate geographical scope identified in the Environmental Justice Analysis as described in Subsections V.C.1 to V.C.3. EGLE MMD's summary will be written in plain language and will be included in materials available to the public as part of the licensure process when the license application is put out for public notice. EGLE MMD will incorporate the requirement for this review into its written procedures for license application review.

Within 90 days of the Effective Date of this Agreement, EGLE will update its operating license procedures document to require EGLE MMD to complete a facility cumulative impacts review regarding any application for a new hazardous waste license, renewal of any hazardous waste license or a major modification request for an existing license pursuant to R 299.9519. Once the updates to the operating license procedures document are adopted, it will be provided to the Complainants. The cumulative impact review shall be based on all relevant available information and shall include the following information regarding the facility within the appropriate geographical scope:

a.  The environmental justice analysis completed for the facility.

b.  Evaluation of the Environmental Assessment form submitted during the licensure process.

c.  Activities that are taking place on site, including whether the facility is used for landfilling, treatment, or storage.

d.  A description of the relative size and capacity of the treatment, storage, or disposal facility as compared to other facilities offering the same services in Michigan.

e.  The types of wastes managed at the facility and how the wastes are being managed to protect the public health and welfare.

      f.     Population density of census tracts and proximity of the facility to vulnerable land uses, such as schools, hospitals, places of worship, and prisons.

      g.    A description of other licensed hazardous waste facilities, including a description regarding whether the hazardous waste facility is a commercial or non-commercial facility, whether it is a storage, treatment, and/or disposal facility, and the licensed storage, treatment, and/or disposal capacity of the facility.

      h.    A description of other major industrial facilities.

      i.     The level and type of hazardous waste transporter traffic, including estimated trucks per day and whether rail transport will be used.

      j.     Corrective action status of the facility at issue.

      k.    Other environmental permits, requirements, or obligations and the facility's compliance status, for example, a Risk Management Plan under the Clean Air Act, a Title V permit under the Clean Air Act, a National Pollutant Discharge Elimination System permit under the Clean Water Act, and a permit to discharge to a local sewer. For the avoidance of doubt, EGLE MMD staff will not determine the appropriateness of a permit that is not under its authority and purview, but will request permit and license information and compliance status information from the appropriate permitting or licensing authority.

5.    EGLE MMD shall provide a summary of its cumulative impact review to the public as a part of the licensure process.

6.    If EGLE MMD determines based on its review of the application, the environmental justice analysis, the facility cumulative impact review, and other relevant information that operation of a facility warrants additional monitoring or protections for the surrounding community, EGLE MMD will determine whether it will have an unlawful impact on human health and the environment in violation of Mich. Admin. Code R. 299.9521(3). EGLE MMD may require or request mitigation measures[4] consistent with

---

[4] Mitigation measures have included on a site-by-site basis and based on EGLE MMD's discretion and best professional judgment:  additional environmental

Part 111 and its implementing rules to avoid an unlawful impact on human health and the environment.

If EGLE MMD determines that mitigation measures are not capable of addressing an unlawful impact on human health or the environment, it shall not issue the license. Nothing in this Section shall be interpreted to require EGLE MMD to impose conditions that are not consistent with its authority under the law.

7. Consistent with the licensure and license renewal process under Part 111 and its implementing rules, including MCL 324.11123, in its analysis of an application, EGLE MMD will ensure that the license will be current with any new statutes or regulations and ensure that the license provisions are based on the conditions of the facility, including the surrounding area that may impact the need for additional or different provisions.

D. EGLE MMD agrees to encourage facilities to consider adding community aesthetic factors, for example, additional visual screening, trees, or landscaping.

E. EGLE MMD agrees to attempt to coordinate with local units of government during the application process.

F. EGLE MMD agrees to continue to encourage regulated hazardous waste facilities to periodically engage with entities in which they have arrangements to provide emergency services to review communication plans, practice response activities, and stay current on facility operations. This is in addition to continuing to require hazardous treatment, storage, and disposal facilities to comply with existing contingency plan and emergency procedures requirements in Part 111 and its implementing regulations.

G. In the next Part 111 rules package that EGLE MMD requests for approval of initiation of rulemaking, EGLE MMD will propose to amend Mich. Admin. Code, R. 299.9504(1)(e) to make the requirements of R 299.9504(1)(e)(i) to (iii) applicable to all treatment, storage, or disposal facilities that seek an operating license for a new facility or the expansion, enlargement, or alteration of an

---

monitoring; limitation on storage, treatment, and disposal capacity; additional pollution control requirements; additional operational requirements regarding hazardous waste storage, treatment, and disposal; limitations on truck traffic; limitations on types of waste accepted; and requirements for periodic reevaluation of effectiveness of emergency procedures, including engagement with appropriate local units of government.

existing facility. As written, the R 299.9504(1)(e)(i) to (iii) requirements only apply to "a facility that stores, treats, or disposes of hazardous waste in a surface impoundment or a landfill."

## VI.    COMMITMENTS RELATED TO U.S. ECOLOGY NORTH

A. The purpose of these provisions is to address concerns raised by the Complainants specific to U.S. Ecology North.

B. Within 60 days of the Effective Date of this Agreement, EGLE MMD will communicate with U.S. Ecology Michigan to seek minor modifications pursuant to Mich. Admin. Code, R. 519(2) and (5)(b) to U.S. Ecology Michigan's license regarding the following provisions:

1. The Waste Analysis Plan. EGLE MMD will request that U.S. Ecology Michigan agree to additional specifications for pre-treatment and/or in-process sampling be added to the Waste Analysis Plan. The proposed modifications will clarify the measured parameter, rationale, sampling and analytical methods, and frequency of such testing.

2. U.S. Ecology Michigan's contingency plan. EGLE MMD will request that U.S. Ecology Michigan update its contingency plan to require U.S. Ecology Michigan to coordinate with local emergency management to organize tabletop exercises and maintain an active working relationship with them.

C. Within 60 days of the Effective Date of this Agreement, EGLE MMD will request U.S. Ecology Michigan perform a single event soil sampling of non-paved areas at U.S. Ecology North to understand current site conditions. Data collected from this sampling event can be used as a baseline at the facility. This provision shall not be construed to revoke U.S. Ecology Michigan's existing groundwater monitoring or soil monitoring waivers provided under Part 111 and its implementing rules.

D. EGLE MMD will notify complainants that it has reached out to U.S. Ecology Michigan regarding the requests identified in this Subsection and will periodically update the Complainants regarding the status of these conversations.

E. EGLE maintains a webpage regarding U.S. Ecology North, which includes a link to environmental scorecards. EGLE agrees to maintain this webpage and continue to post the Environmental Scorecards for U.S. Ecology North, which includes the on-site ambient air monitoring data. This on-site ambient air monitoring data is submitted to EGLE by U.S. Ecology Michigan as a requirement in its Hazardous Waste Management Facility Operating License.

F. Air Quality

1.   Within 60 days of the Effective Date of this Agreement, EGLE MMD will reach out to EGLE's Air Quality Division with the goal of evaluating how changes in topography and new structures around the U.S. Ecology North may impact the effectiveness of the existing U.S. Ecology Michigan's ambient air monitoring program in its U.S. Ecology North license. If changes are found to be needed in U.S. Ecology Michigan's existing ambient air monitoring program, EGLE will communicate with U.S. Ecology Michigan seeking minor modifications under Mich. Admin. Code, R. 519(2), (3)(c), (5)(b) and Rule 611(5) to U.S. Ecology Michigan's license to modify the existing ambient air monitoring program. The purpose of this effort is to determine the U.S. Ecology North's contribution to atmospheric concentrations of the following air pollutants:  total suspended particulate, arsenic, lead, and chromium. EGLE MMD will notify the Complainants that it has reached out to EGLE AQD as required by this subsection and EGLE MMD. EGLE MMD will update the Complainants on the outcome of these conversations.

2.   EGLE AQD, in collaboration with the community, intends to deploy three Purple Air particulate sensors in the area around U.S. Ecology North for at least three years. These real-time sensors, through the use of a host WIFI, will post data to the Purple Air website for public availability. The Purple Air sensors measure fine particulate matter which is an important parameter for assessing air quality. The monitors described in this paragraph will be installed no later than six months from the Effective Date of this agreement, as long as required residential hosts for the monitors can be confirmed.

3.   The air quality data gathered from EGLE's Purple Air particulate sensors identified above in Subsection VI.F.2 will be posted in near real-time on the Purple Air website that is publicly available. Other data collected from the stationary regulatory monitors such as the EGLE E.7 Mile site and any new EGLE stations will be reported to the EPA's Air Quality System database each quarter and continuous data shall be posted on EGLE's website.

4.   EGLE is committed to seeking opportunities for funding to improve air monitoring in the area around U.S. Ecology North. If EGLE is able to secure adequate funding for equipment, infrastructure costs, and sustainable staff resources for additional air monitoring, the AQD will coordinate with the community to determine the most effective location for such additional air monitors. A new air monitoring site could potentially

measure black carbon, particulate matter, and/or meteorological
parameters.

5.  EGLE will provide a fact sheet, translated into the appropriate languages,
    with a plain language explanation describing the air quality monitoring
    data described herein. This fact sheet will include contact information for
    an appropriate EGLE staff person for anyone seeking further information.

## VII.  COMMUNITY ENGAGEMENT AND BENEFITS

A. The EPA has agreed that it is available to provide free garden soil testing to the
   community around U.S. Ecology North through a program that tests soil for lead
   levels. This program provides individuals with free sample kits with instructions
   for collection of soil samples, which they then take to EPA staff at a mobile lab
   that will be in the community. This Agreement does not and cannot bind the
   EPA since it is not a party to this Agreement; however, the EPA has indicated
   its willingness to provide and schedule this testing opportunity in coordination
   with community partners. EGLE commits to reaching out to the EPA within 30
   days of the Effective Date of this Agreement to facilitate the scheduling of this
   program for the community around U.S. Ecology North.

B. The EPA has committed to funding implementation of the Protocol for Assessing
   Community Excellence in Environmental Health (PACE EH)[5] for the community
   in northern Detroit, including the community around U.S. Ecology North.[6]  The
   EPA will be the lead for this work, and EGLE is committed to working with the
   EPA as part of the project team and to bring subject matter experts from EGLE
   to participate in the process. Funding has been allocated for this work and the
   EPA has begun this process. The PACE EH process is expected to take 18 to 24
   months. The Complainants agree that at least one of the individuals who is a
   complainant in this case will actively participate in the PACE EH process.

   The PACE EH process includes working with the project team to:
   ●  Develop a project approach
   ●  Develop a community profile, including defining the geographic scope of the
      project
   ●  Assemble a Community Environmental Health Assessment Team

---

[5] For more information on this approach, please see
https://www.cdc.gov/environmental-health-
services/php/about/index.html?CDC_AAref_Val=https://www.cdc.gov/nceh/ehs/docs/
pace-eh-guidebook.pdf

[6] Though the EPA has committed this funding, this Agreement does not and cannot
bind the EPA since it is not a party to this Agreement.

19

- Develop and conduct a community environmental health assessment
- Analyze the top issues from the community assessment
- Develop action plans to address priority issues

## VIII.  GENERAL PROVISIONS

A.  Based on EGLE's entry of this Agreement, EGLE will end its investigation and consider resolved EGLE Complaint No. 20-001-D and not issue a decision containing findings on the merits of the complaint.

B.  EGLE's Nondiscrimination Coordinator will monitor the implementation of the commitments in this Agreement.

C.  If after entry of this Agreement, EGLE can no longer carry out any commitments in this Agreement because of changed conditions making performance impractical or impossible, or due to material change to EGLE's program or authorities, or for other good cause, EGLE shall promptly notify EGLE's Nondiscrimination Coordinator in writing, setting forth the facts and circumstance justifying the proposed modification. EGLE's Nondiscrimination Coordinator will notify the Complainants and shall provide input to EGLE regarding the proposed modification. EGLE shall document and make public its modification.

D.  Notwithstanding anything in this Agreement, if EGLE cannot comply with any term of the Agreement due to a change in law or due to a ruling of a court of competent jurisdiction, EGLE will not be required under this Agreement to comply with such provision.

E.  This Agreement constitutes the entire Agreement between EGLE and the Complainants regarding the matters addressed herein, and no other statement, promise, or Agreement, made by any other person shall be construed to change any commitment or term of this Agreement, except as set forth above in Subsections VIII.C. and VIII.D.

F.  This Agreement does not create any additional rights or causes of action for Complainants that do not exist outside this Agreement.

G.  This Agreement does not alter EGLE's continuing responsibility to comply with Title VI and 40 C.F.R. Part 7 or the Complainants' ability to exercise their right to file a nondiscrimination complaint.

H. As used in this Agreement, "day" shall mean a calendar day. In computing any period of time under this Agreement, where the last day would fall on a Saturday, Sunday, or state or federal holiday, the period shall run until the close of business of the next working day.

I. The Effective Date of this Agreement is the date by which the Director of EGLE has signed the Agreement. This Agreement may be signed in counterparts. The Director of EGLE has the authority to enter into this Agreement for purposes of carrying out the activities listed in these paragraphs. The Signatories for Complainants have the authority to enter into this Agreement.

FOR COMPLAINANT REVEREND SHARON BUTTRY

E-SIGNED by Reverend Sharon Buttry
on 2024-08-29 14:35:00 EDT
_____
Reverend Sharon Buttry

FOR ALL OTHER COMPLAINANTS:

E-SIGNED by Nicholas Leonard
on 2024-08-29 14:39:58 EDT
_____
Nicholas Leonard
Executive Director
Great Lakes Environmental Law Center

E-SIGNED by Alice Jennings
on 2024-08-29 14:42:52 EDT
_____
Alice Jennings
Edwards & Jennings PC

FOR MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND ENERGY:

E-SIGNED by Phillip D. Roos
on 2024-08-29 14:57:27 EDT
_____
Phillip D. Roos, Director